## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ZF MERITOR LLC and MERITOR TRANSMISSION CORPORATION | ) ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. ____ |
| | ) | |
| v. | ) | |
| | ) | |
| EATON CORPORATION | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

## COMPLAINT

ZF Meritor LLC ("ZF Meritor") and Meritor Transmission Corporation

("Meritor"), by its undersigned counsel, bring this action against Eaton Corporation

("Eaton") for injunctive relief, costs of suit, and treble damages under the antitrust laws

of the United States for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1,

2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.  Based upon personal knowledge and

information and belief, Meritor and ZF Meritor allege as follows:

### NATURE OF THE ACTION

1.     The defendant in this antitrust action, Eaton, has long been the dominant

supplier of manual transmissions to original equipment manufacturers of heavy duty

trucks in the North American market.  In 1989, plaintiff Meritor began selling heavy

duty transmissions in competition with Eaton.  For a decade, Eaton engaged in

anticompetitive conduct to thwart Meritor's transmission sales.  Nevertheless, Meritor

built its share of units sold to over 16% by 1999.

2065395

2.    In 1999, Meritor stepped-up its efforts to compete by entering into a joint venture with ZF Friedrichshafen AG ("ZF"), Europe's most technologically advanced heavy duty transmission manufacturer. The new company, ZF Meritor, promptly took advantage of its expertise by developing and marketing North America's first fully automated, two-pedal manual transmission. The successful launch of this innovative product would increase ZF Meritor's sales and position it to expand its transmission offerings to serve a wider variety of heavy duty truck applications.

3.    In response, Eaton undertook a series of exclusionary actions designed to reduce consumer access to ZF Meritor transmissions. Chief among these, Eaton used its dominant position to induce all heavy duty truck manufacturers to enter into *de facto* exclusive dealing contracts with Eaton. These contracts foreclosed ZF Meritor from over 90% of heavy duty transmission sales. As a direct result of Eaton's unlawful contracts and other exclusionary conduct, Eaton has gained, maintained, and/or extended its monopoly power in North American markets for heavy duty transmissions in violation of Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act.

## PARTIES

4.    Plaintiff ZF Meritor LLC is an entity organized and existing under the laws of the State of Delaware, with its principal place of business in Laurinburg, North Carolina. During times pertinent to this Complaint, it sold heavy duty transmissions for use in Class 8 vehicles ("Class 8 Transmissions") throughout North America.

5.    Plaintiff Meritor Transmission Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Troy, Michigan.  During times pertinent to this Complaint, it sold and marketed Class 8 Transmissions throughout North America.

6.    Defendant Eaton Corporation is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Cleveland, Ohio.  During all times relevant to this Complaint, Eaton sold and marketed Class 8 Transmissions throughout North America.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this matter pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 and 28 U.S.C. §§ 1331, 1337.

8.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) and Section 12 of the Clayton Act, 15 U.S.C. § 22.   Eaton transacts business, can be found, and resides within this district.  Eaton has availed itself of the courts in this judicial district, having previously brought and litigated actions here, including a multi-year action against Meritor pertaining to transmission technology.

9.    Eaton sells, markets and distributes Class 8 Transmissions throughout North America, including this judicial district, and delivers them across state lines. Eaton is engaged in, and its activities substantially affect, interstate commerce.

**TRADE AND COMMERCE**

10.    Transmissions send power generated by a vehicle's engine to its wheels.

An engine performs best when it is operating within ranges of revolutions per minute

that best suit its design.  When operating at the desired revolutions, the engine

produces sufficient torque (*i.e.*, a force used to turn the engine crankshaft) to accelerate

and maintain the vehicle's speed.  Torque is measured in pound-feet ("lb-ft"), and a

transmission's capacity to accommodate torque is referred to as its torque rating.

11.    The amount of torque an engine must generate to move a vehicle

efficiently depends on a variety of factors.  In general, the more a vehicle weighs or

must tow, or the rougher the terrain in which the vehicle must operate, the more torque

the engine must be capable of producing.

12.    Transmissions use various gear ratios (called "gears" or "speeds") to

manage the torque and speed of the vehicle.  The number of gears and gearing

characteristics vary by vehicle application and engine operating characteristics.

13.    A vehicle operator selects gears "manually" or "automatically" depending

on the type of transmission.  Conventional manual and automatic transmissions use

different mechanisms to shift gears.  To change gears in a vehicle with a conventional

stick-shift manual transmission, the driver typically must depress a clutch pedal (which

disengages the transmission from the engine), and move a shift lever to select the

desired gear.  When the clutch is released, the transmission and engine re-engage in the

selected gear.  In a vehicle with a conventional automatic transmission, the operator

does not have to change gears; the transmission's hydraulics, aided in newer designs by

electronics, select gears based on engine revolutions and other factors.  Thus, a vehicle

with a conventional manual transmission has a three-pedal (accelerator, brake, and

clutch) configuration, while a vehicle with a conventional automatic transmission has a

two-pedal (accelerator and brake) configuration.

14.     Manual transmissions with clutches that have been automated with

actuators and electronic controls to perform operations normally performed by the

operator are called "automated manuals".  A fully automated manual transmission has

a two-pedal (accelerator and brake) configuration with an electronically controlled

clutch.  The driver can drive in either automated or manual mode.  In the manual mode,

the driver uses a joystick or similar device to initiate shifts between speeds, and the

computer operates the clutch or controls the engine to allow for clutchless shifting.

15.     Transmissions vary across vehicle classes.  There are eight recognized

vehicle classes.  Class 1 vehicles are the lightest, weighing 6,000 pounds or less and

include such vehicles as light trucks.  Class 8 vehicles are the heaviest, including any

vehicle weighing 33,001 pounds or more.  Transmissions used in Class 1-7 vehicles are

not suitable for use in Class 8 vehicles; unlike Class 8 Transmissions, they are not built

to withstand the high torque generated by the diesel engines that traditionally power

heavy duty trucks.

16.     In fiscal year 2005, manufacturers sold over 325,000 Class 8 Transmissions. Revenues from these sales eclipsed $1 billion.

17.     Eaton's current share of sales of all Class 8 Transmissions, based on units sold, is at least 90%. The other Class 8 Transmission manufacturers are Meritor with a 3% share of sales, Allison Transmission (a division of General Motors, "Allison") with a share of sales of approximately 4% to 5%, and Transmission Technologies Corporation ("TTC"), with a share of sales of around 2% or less. Mack Trucks, Inc. produces some transmissions solely for internal use.

18.     Class 8 vehicles are used for a wide array of applications, thereby requiring substantial variation among Class 8 Transmissions. Truck components, from tires to transmissions, are tailored to ensure vehicles perform the applications for which they are intended as efficiently as possible. For Class 8 transmissions, this means multiple variations in operating and performance characteristics. Transmission characteristics of significance to truck purchasers and operators often include operating configuration (*e.g.,* manual versus automatic), gearing traits, number of gears, and torque rating. If a Class 8 Transmission is not properly matched to the Class 8 vehicle in which it is installed and the application for which the vehicle is intended and operated, the vehicle's overall value to its owner and operator, measured by performance, efficiency, maintenance costs, and other factors, will diminish.

19.     Class 8 Transmissions for vehicles used in materially different applications are not good substitutes for one another.  Class 8 Transmissions can be divided into three distinct product markets:  linehaul, vocational, and specialty.  Purchasers of a Class 8 Transmission well-suited for a particular vehicle application (*i.e.*, linehaul, vocational, or specialty) are unlikely to substitute for that transmission a transmission intended for a different vehicle application.

20.     Roughly 70% of Class 8 Transmissions are used in the linehaul market.  Class 8 Transmissions used for linehaul applications ("linehaul transmissions") are used in linehaul trucks, which are predominately tractor trailers (sometimes called "18 wheelers") that carry freight long distances (at least 30 miles between stops).  Linehaul trucks travel 60,000 miles or more a year and operate almost exclusively on highways or other paved surfaces.  Historically, linehaul trucks have used manual 9 and 10 speed transmissions with a three-pedal configuration consisting of an accelerator, brake, and clutch pedal, and torque ratings typically ranging from 1450 lb-ft to 1650 lb-ft.  More recently, automated manual transmissions (*i.e.*, transmissions that do not use a manual clutch pedal to shift gears), with torque ratings similar to 9 and 10 speed manual transmissions, have been gaining in popularity among linehaul operators.  In response to a small but significant, non-transitory increase in price from a competitive level, substitution by purchasers of linehaul transmissions to other products would not be significant.

21.     Eaton has monopoly power in the market for linehaul transmissions; its current share of that market is around 95%.  Although Meritor once held a share of roughly 22% in this market, that share has dwindled to around 4%.  Meritor now markets only a small number of automated manuals and 10 speed manuals and will exit the manual market in 2007.  TTC sells a relatively small number of 10 speeds in Mexico.

22.     Approximately 26% of Class 8 Transmissions are used in the vocational market.  Class 8 Transmissions used for vocational applications ("vocational transmissions") are found in heavy duty trucks operating in rugged performance environments.  Vocational transmissions can be segmented into various product markets, but for purposes of this Complaint will be aggregated to include extreme duty 13 and 18 speeds, with high torque ratings usually ranging from 1650 lb-ft to 1850 lb-ft and occasionally exceeding 2000 lb-ft, and on- and off-road "Low-Low" ("LL") and 15 speed transmissions, with gearing designed to provide efficient cruising and creeping (*i.e.*, extremely slow) speed versatility.  Vocational transmissions with high torque ratings often are used in heavy duty trucks transporting equipment or materials that can  weigh in excess of 140,000 pounds.  Vocational LL and similar transmissions predominately are found in heavy duty construction vehicles, which need great versatility to operate in on- and off-road environments.  Vocational transmissions are priced at a substantial premium above manual linehaul transmissions, generally at prices 10% to 45% higher, with price differentials becoming more pronounced in higher

torque rated transmissions.  In response to a small but significant, non-transitory increase in price from a competitive level, substitution by purchasers of vocational transmissions to other products would not be significant.

23.    Eaton has monopoly power in the market for vocational transmissions; its share of that market is close to 90% or more.  As a practical matter, Eaton is the only external manufacturer and supplier of vocational transmissions throughout North America.  Mack Trucks, Inc. produces transmissions solely for internal use on vehicles it manufactures for vocational purposes and TTC offers a small number of vocational transmissions in Mexico.

24.    The remainder of Class 8 Transmissions, about 4%, are sold in the specialty transmission market.  Class 8 Transmissions used for specialty applications ("specialty transmissions") primarily are operated in "stop and start" vehicles, such as refuse, fire, and delivery trucks.  Because consumers historically have assumed automatic transmissions are best suited for frequent stop and start driving, nearly all specialty transmissions are automatic transmissions.  The torque ratings for specialty transmissions tend to be less than 1500 lb-ft.  Unlike tractor trailers, most heavy vehicles containing specialty transmissions are straight trucks, where the cab, chassis and body are a single unit.  Generally, customers pay three to five times more for a specialty, automatic transmission than they would for a comparable manual or automated manual transmission.  In response to a small but significant, non-transitory increase in

price from a competitive level, substitution by purchasers of specialty transmissions to other products would not be significant.

25.    Allison currently sells nearly all automatic transmissions for use in the specialty transmission market. It is the primary manufacturer of heavy duty automatic transmissions.

26.    The geographic market for linehaul and vocational transmissions is North America (*i.e.,* United States, Canada, and Mexico). Because of the assorted applications for which North American Class 8 trucks are used, the wide assortment of North American truck configurations, extensive network of highways and expressways in North America, the historical North American preference for non-synchronous transmissions (*i.e.,* transmissions that require the operator to synchronize gear speed), and other factors, transmissions used in Class 8 vehicles in North America are different from transmissions used in Class 8 vehicles in other regions of the world. Suppliers of North American Class 8 Transmissions tend to locate their primary manufacturing and assembly facilities, and marketing, distribution, and service personnel in North America. As such, consumers cannot practicably turn to other regions of the world for transmissions to use in North American Class 8 vehicles.

27.    Original equipment manufacturers ("OEMs") of heavy duty trucks are the only direct purchasers of Class 8 Transmissions. There are four OEMs (with their controlled subsidiaries or divisions): Freightliner LLC ("Freightliner"), Volvo Trucks

North America, Inc. and Mack Trucks, Inc. ("Volvo/Mack"), Paccar Inc. ("Paccar"), and

International Truck and Engine Corporation ("International"). Freightliner is owned by

DaimlerChrysler Corporation, and sells its trucks under the Freightliner, Sterling, and

Western Star brand names. Mack is owned by the Volvo Group, and International is an

operating company of Navistar International Corporation. Paccar sells its trucks in

North America under the Kenworth and Peterbilt nameplates.

28.     The OEMs manufacture and sell Class 8 trucks for linehaul and vocational

uses to dealers, and, on occasion, directly to large truck fleet operators. Dealers sell to

fleets and owner operators. In most instances, truck buyers specify the brand of

transmission and other components to be used in the Class 8 trucks they purchase.

29.     When selecting components, truck buyers reference OEM product data

books or on-line ordering software. These sources list an OEM's component offerings,

including transmissions, by component type. For each component, one brand will be

listed as "standard", while others may be listed as optional. Optional transmissions

usually are priced at a mark-up above the price of the standard transmission. The

standard transmission is considered to be the OEM's preferred choice. Truck buyers are

more likely to purchase the standard component.

30.     When a transmission is not listed as an option – excluded from the data

book – the manufacturer's ability to sell the transmission is diminished severely if not

eliminated.  The unlisted transmission, if available at all, is always priced with an up-charge.  Customers rarely ask to purchase transmissions excluded from the data book.

31.     In addition to using data book positioning to increase demand for its transmissions, a manufacturer may try to "pull through" downstream sales by enticing the truck buyer to order a particular transmission from an OEM.  Pull through devices include monetary incentives such as discounts or competitive equalization payments (*i.e.*, payments to customers to meet a competitor's price or "equalize" the price), as well as non-monetary incentives such as demonstrations of product superiority and value. When a manufacturer's transmission is excluded from the data book, is priced with an up-charge, or otherwise placed at a disadvantage, pull through marketing becomes considerably more costly and far less effective.

32.     Entry barriers are high in the markets for Class 8 Transmissions.  In the markets for linehaul and vocational transmissions, Eaton has excluded competitors from making sales to the four OEMs.  Without these sales, competitors cannot achieve the economies of scale necessary to effectively compete.  Entrants and existing competitors face high sunk and fixed costs to bring competitive products to market. They have little to no ability to license critical intellectual property needed for transmission design and development, and have to spend substantial sums to validate the reliability and other attributes of their products, which can take a year or more. Entrants and existing competitors also would have to overcome Eaton's entrenched

brand name recognition.  They would have to make intensive and sustained

investments in transmission marketing, warranty programs, demonstrations, sales, and

service if they hope to persuade customers to purchase or switch to their transmissions.


## STATEMENT OF FACTS

**I.      Meritor's Entry And Establishment Of A Class 8 Transmission Foothold**

33.      For more than 40 years, Eaton (beginning with its purchase of the Fuller

Manufacturing Company in 1958) has been the dominant and most widely known

heavy duty manual transmission manufacturer in North America.

34.      By the late 1980s, Eaton held at least an 80% market share and standard

position in the data books for nearly every truck model at each of the OEMs in the

markets for linehaul and vocational transmissions.  It described itself as "solidly

entrenched" in the marketplace.

35.      In 1989, in response to customer demand for greater transmission choice,

and the opportunity to complement its other drivetrain component offerings, Meritor

(through its predecessor, Rockwell International Corporation), began to manufacture

and sell linehaul transmissions.

36.      Meritor focused on supplying 9 and 10 speed manuals for linehaul trucks.

By 1992, Meritor obtained roughly 14% of sales in the linehaul market.  Meritor

achieved additional growth after it obtained standard position on certain Freightliner

truck models and data book publication at all the OEMs. Eaton frustrated Meritor's

further attempts to expand its transmission supply relationships with the OEMs,

including sales of vocational transmissions, by explicitly or implicitly threatening OEMs

with punitive pricing on transmissions for which Eaton was the sole supplier, and with

unwarranted patent litigation if OEMs sold or licensed transmission technology to

Meritor.

37.     In 1996, to meet consumer demand for manual transmission automation,

Meritor developed an engine synchronized shift system ("ESS"), which automatically

synchronized engine revolutions to road speed. The innovation made manual shifting

easier, essentially eliminating the need to use the clutch except for stopping and

starting. In the same period, Eaton offered some transmission automation through its

"Top-2" and AutoSelect products. The Eaton and Meritor technology represented the

first generation of Class 8 Transmission automation in North America. Meritor's

introduction of ESS benefited consumers by, among other things, causing Eaton to

reduce the price of its automated products.

## II.    ZF Meritor Formed To Overcome Eaton's Exclusionary Conduct And Enhance Competition

38.     Despite Eaton's efforts to stifle competition, by 1999, Meritor's share of the

linehaul market had surpassed 20%. To further challenge Eaton's dominance, Meritor

formed a joint venture with Europe's premier transmission manufacturer, ZF, creating

ZF Meritor in June 1999. Meritor and ZF each had a 50% interest in the venture, including the venture's profits and losses.

39.    ZF brought to the venture its global leadership and expertise in transmission technology. ZF's product line of transmissions in Europe included automatics and fully automated manual heavy duty transmissions. No single manufacturer offered such a range of products in North America. The combination of ZF with Meritor's marketing and service teams, distribution and manufacturing capabilities, and North American presence, created a formidable competitor.

40.    In August 1999, building upon Meritor's relationship with Freightliner, ZF Meritor entered into a supply agreement with the largest Class 8 truck OEM, Freightliner, which would lay the foundation for the business and provide market share stability going forward. At Freightliner, ZF Meritor secured standard position on, among other models, Freightliner's Class 8 Century and Sterling's (a Freightliner subsidiary) Aeromax truck models. The agreement did not require Freightliner to remove Eaton transmissions from the Freightliner data book or charge customers a price penalty for selecting optional Eaton transmissions. The agreement was to run through 2001 and could be extended by the parties. ZF Meritor expected to achieve a high volume of transmission sales on Freightliner trucks.

41.    At the other OEMs, ZF Meritor transmissions were listed in the data books as a competitively priced option.

-15-

42.    In November 1999, ZF Meritor further advanced its competitive position by announcing the launch of North America's first two-pedal, fully automated manual Class 8 Transmission, the "FreedomLine."  Based on ZF's Astronic automated manual transmission, the FreedomLine would beat Eaton's two-pedal offering (the UltraShift) to market release by nearly three years.  ZF Meritor targeted the linehaul market with the new product.

43.    The FreedomLine met with overwhelming positive feedback and accolades from the trade press and customers.  In 2000, the Truck Writers of North America awarded FreedomLine the Technical Achievement Award.  The award is bestowed annually on the truck component that "best exemplifies engineering excellence and broad practicality for use in the trucking industry."

44.    The FreedomLine represented the third generation in automated transmission technology for Class 8 trucks in North America.  The first and second generation technology, though providing engine synchronization with ever increasing automation, was limited by the need for varying degrees of manual operation.  First and second generation technology required the use of a manual clutch, thereby necessitating a three-pedal configuration.  The FreedomLine did not require a clutch pedal; it operated with only accelerator and brake pedals.

45.    The superior efficiencies and value of the third generation technology were numerous, ranging from improved fuel economy (engine is operated in most

-16-

efficient speed range), to enhanced driver safety, instruction and retention (training and operation is easier without the clutch, and recruitment and retention increases, particularly of non-traditional drivers), to less drive train wear (the automated system causes less wear and tear than human guidance), to quieter ride (reduces noise levels), to higher resale value.

46.     ZF Meritor's release of the FreedomLine put Eaton's dominant position at risk. Eaton did not have a two-pedal offering and predictions in the heavy duty truck industry were that automated manual transmissions, including third generation technology, would gain significant share among Class 8 Transmission users (which they did; by 2005, share had reached 12% to 15%, with Eaton predicting additional growth of one to two percent per year).

III.    **Eaton Used *De Facto* Exclusive Dealing And Other Anticompetitive Conduct To Drive ZF Meritor From The Class 8 Transmission Markets**

47.     The emergence of ZF Meritor, with its standard position at Freightliner, optional, competitively priced position at other OEMs, existing customer base upon which to build, and introduction of the industry leading FreedomLine transmission (particularly in the absence of a two-pedal Eaton transmission) created a substantial competitive threat to Eaton's market dominance. Eaton responded with further exclusionary conduct designed to thwart competition, and once and for all drive Meritor and any affiliated entities out of the linehaul market, and foil any further attempts to enter the vocational market.

48.     To preserve and increase its market dominance, Eaton entered into *de facto* exclusive contracts with each of the four OEMs, including, in some instances, expanding or extending prior supply agreements with provisions designed to foreclose competition.  Eaton knew that if it could tie up each OEM's purchases by agreement, there would be no room in the linehaul and vocational markets for ZF Meritor.  These agreements ultimately limited ZF Meritor's access to less than 10% of those markets.

A.     Foreclosure at Freightliner

49.     Eaton dislodged ZF Meritor's supply agreement with Freightliner by, among other acts, guaranteeing Freightliner millions in annual rebates and other incentives if Freightliner purchased 92% of its total linehaul and vocational transmission needs from Eaton.  Freightliner's rebate package included sizeable rebates on Eaton's vocational, premium-priced transmissions (*e.g.*, 13 and 18 speeds), for which Eaton was the sole manufacturer.  Unless it qualified for the rebates, Freightliner would pay substantially more for these transmissions.  Given its mix of vocational and linehaul transmission needs, Freightliner would have to purchase Eaton 9 and 10 speeds, to the exclusion of ZF Meritor's competing transmissions, to achieve 92% penetration.  Thus, Eaton linked rebates on vocational transmissions for which it faced no meaningful competition (including vocational transmissions critical to Freightliner's subsidiary Sterling) to Freightliner's purchase of linehaul transmissions for which Eaton faced competition from Meritor.

50.     Eaton also demanded that Freightliner displace ZF Meritor from standard

position in its data book and bestow that valuable status on Eaton.  Further, Eaton

demanded that ZF Meritor's transmissions be listed at a penalty in the Freightliner data

book (*i.e.*, at prices above comparable Eaton transmissions), and excluded from the data

book beginning in late 2001 or early 2002.  Freightliner expressed reservations about this

latter demand because the exclusive listing would increase the cost of processing and

administering orders for unpublished transmissions.  There was no procompetitive

justification for Eaton's demands; Eaton's only aspiration was to drive ZF Meritor out of

the market.

51.     ZF Meritor attempted to save the Freightliner business by offering

discounts and other incentives on its linehaul transmissions.  Although it was an

efficient producer of linehaul transmissions, it could not fully compensate Freightliner

for rebates on vocational transmissions Freightliner would have to forego if it

contracted with ZF Meritor.

52.     Eaton and Freightliner consummated their new relationship in or around

late 2000.  The purpose and effect of the Eaton/Freightliner contract, whether through

the use of penetration incentives, bundled rebates, or Eaton's non-negotiable demand

for standard position and displacement of ZF Meritor transmissions, was to ensure that

Eaton secured all of Freightliner's transmission business, to ZF Meritor's exclusion.

Further, to assure ZF Meritor would starve in the market before having an opportunity

to partner with Freightliner again, Eaton obtained a long-term contract with

Freightliner, which would carry the agreement into at least 2006.

53.    Freightliner's acceptance of Eaton's demands harmed competition and

injured consumers.  Among other things, removal of ZF Meritor transmissions from the

Freightliner data book and the imposition of price penalties on ZF Meritor

transmissions impaired consumer access to those products.

54.    In 2000, Freightliner awarded ZF Meritor its Master of Quality Award.  In

2002, Freightliner again awarded ZF Meritor that award; no Eaton facility received a

similar award from Freightliner.  Despite ZF Meritor's dedication to quality and

Freightliner's ready recognition of that quality, ZF Meritor could not surmount the

restrictive and exclusionary nature of the Eaton/Freightliner agreement.

55.    As a direct and foreseeable result of the Eaton/Freightliner anticompetitive

agreement and Eaton's other exclusionary acts, including enforcement of the terms of

the contract, ZF Meritor's sales to Freightliner and its affiliates declined substantially.

Shortly before consummation of the Eaton/Freightliner contract, for the fiscal fourth

quarter of 2000, ZF Meritor's penetration at Freightliner and Sterling, respectively,

stood at around 23% and 17%.  By the end of fiscal year 2005, Meritor's share of

transmission sales to Freightliner and Sterling, respectively, had fallen to roughly 4%

and 3%.

### B.    Foreclosure at International

56.    Eaton entered into a long-term *de facto* exclusive contract with International, effective in or around early 2001. The contract is still in operation in 2006.

57.    Under the contract, International would receive maximum incentives only after Eaton's combined linehaul and vocational sales penetration at International reached 87%, and possibly as high as 95% by the last year of the agreement. To obtain rebates on vocational transmissions for which Eaton faced no meaningful competition, International would have to purchase Eaton transmissions (mainly 9 and 10 speed manual transmissions), which competed directly with ZF Meritor's transmissions. The agreement also required International to exclude ZF Meritor on new truck models from International's data book, and prohibit International's Diamond Spec warranty from covering new truck models equipped with ZF Meritor, rather than Eaton, transmissions. Further, Eaton received standard position on International's Class 8 linehaul and vocational transmissions. There was no procompetitive justification for excluding ZF Meritor; Eaton acted solely to bar and foreclose ZF Meritor from markets for Class 8 Transmissions.

58.    Eaton's exclusionary practices at International expanded in 2002. According to International, Eaton offered International "a compelling incentive to increase their sales at your [ZF Meritor's] expense." If International accepted the Eaton proposal, it would undertake "every effort to cease ordering your [ZF Meritor] product

-21-

… switching current and future orders" to Eaton.  Further, in 2006, Eaton executed another contract with International, contractually obligating International to remove the FreedomLine from its data book and exclusively market Eaton's automated manual transmissions.

59.     Eaton's exclusionary conduct at International impaired consumer access to ZF Meritor transmissions and penalized downstream truck fleets and other customers who preferred ZF Meritor's transmissions.

60.     As a direct and foreseeable result of the Eaton/International anticompetitive agreement and Eaton's other exclusionary acts, ZF Meritor's penetration at International declined.  Around the consummation of the Eaton/International contract, for the fiscal fourth quarter of 2000, ZF Meritor's penetration at International stood around 13%.  By the end of fiscal year 2005, Meritor's share of transmission sales to International had faded to 2%.  As a result, for new International truck models, Meritor transmissions will not be engineered into the vehicle platform – the transmissions will not be available on those vehicles, even as an unpublished option.

### C.     Foreclosure at Paccar

61.     While ZF Meritor, and Meritor before it, had enjoyed limited success in selling to Paccar because of a pre-existing, and seemingly exclusive, supply relationship between Paccar and Eaton, ZF Meritor expected its share at Paccar to grow with the

formation of the venture and introduction of the FreedomLine.  Eaton, however,
modified and extended its supply agreement with Paccar to prevent ZF Meritor growth
at Paccar.  The long-term agreement, a five-year deal, withheld from Paccar maximum
transmission rebates unless Eaton's share of sales to Paccar of linehaul and vocational
transmissions (and other components) reached 95%.  The FreedomLine was not
excluded from Paccar's penetration calculation:  purchases of the FreedomLine would
count against Paccar reaching its penetration goals, thereby decreasing its incentive to
sell the new technology.  Dampening Paccar's purchases of the FreedomLine held
particular value to Eaton since Paccar would be the first OEM (through Peterbilt) to
release the FreedomLine to downstream customers.

62.     As a direct and foreseeable result of the Eaton/Paccar anticompetitive
agreements and Eaton's other exclusionary acts, ZF Meritor's share of transmission
sales at Paccar consistently languished around 5% and fell to less than 1% in fiscal year
2005.  In early 2005, Paccar's Peterbilt announced ZF Meritor/Meritor transmissions
would no longer be available on new truck orders.

### D.     Foreclosure at Volvo/Mack

63.     Having locked Freightliner, International, and Paccar into long-term *de
facto* exclusive contracts, Eaton locked ZF Meritor out of the remaining portion of the
market by entering into a similar exclusive arrangement with the only other OEM,
Volvo/Mack.

64.    In the spring and summer of 2002, ZF Meritor attempted to form a commercial partnership with Volvo/Mack for the manufacture, marketing, and sale of linehaul and vocational transmissions.  This was a ZF Meritor priority given Eaton's agreements with each of the other OEMs.  ZF Meritor offered substantial price reductions, year-over-year cost downs (*i.e.*, price decreases), and the opportunity for Volvo/Mack to obtain a full line of private brand transmissions, including vocational transmissions.

65.    In the fall of 2002, Eaton and Volvo/Mack entered into a long-term five-year contract, expiring at the earliest in 2007.  The agreement contained linehaul and vocational transmission penetration incentives that essentially withheld from Volvo/Mack maximum rebates or price reductions if ZF Meritor's sales reached 15% of Volvo/Mack's linehaul and vocational transmission purchases.  Eaton further diminished ZF Meritor's opportunity for sales at Volvo/Mack by requiring Volvo/Mack to price ZF Meritor transmissions at a penalty to Eaton transmissions.  Eaton also was made standard on all of Volvo/Mack's Class 8 linehaul trucks and Volvo's Class 8 vocational vehicles.  Eaton offered Volvo/Mack additional price reductions on transmissions if Volvo/Mack excluded ZF Meritor transmissions from its data book.

66.    Eaton's acts of exclusion through Volvo/Mack lacked any procompetitive justification and injured consumers.  Customers seeking ZF Meritor transmissions to be

installed in Volvo/Mack trucks were dissuaded from doing so by, among other things, the threat of monetary penalties.

67.    As a direct and foreseeable result of the Eaton/Volvo/Mack anticompetitive agreement and Eaton's other exclusionary acts, ZF Meritor's penetration at Volvo/Mack declined.  ZF Meritor's/Meritor's share of transmission sales to Volvo and Mack fell from an estimated 24% and 6%, respectively, in the fiscal fourth quarter of 2002, around the time of the Eaton/Volvo/Mack transaction, to approximately 11% and 2%, respectively, by the end of fiscal year 2005.

### E.    Eaton used its exclusive dealing contracts to induce OEMs to push Eaton transmission sales to ZF Meritor's exclusion

68.    Eaton designed its penetration rebates so that the OEMs would qualify for the rebates only if they diverted purchasers of ZF Meritor transmissions to Eaton transmissions.  To the same end, Eaton relied on the overall structure of the contracts, its market strength, and further coordination with individual OEMs to induce the OEMs to, including through the present:

(a)    eliminate ZF Meritor from data book listings;

(b)    reduce the residual values to be paid for trucks sold with ZF Meritor transmissions;

(c)    offer larger concessions off of total truck prices for trucks equipped with Eaton transmissions;

(d)    refuse to provide financing to customers that specified ZF Meritor transmissions;

(e)    inform customers that if they wanted delivery by specified dates, the customers would have to change orders from ZF Meritor to Eaton transmissions;

(f)    decline to hold build slots for truck buyers if they selected other than Eaton transmissions;

(g)    market Eaton's three-pedal automated manual as essentially comparable to ZF Meritor's technologically superior two-pedal FreedomLine;

(h)    offer preferential discounts on Eaton transmissions;

(i)    employ other than cost-based pricing penalties on ZF Meritor transmissions;

(j)    exclude ZF Meritor from warranty programs; and

(k)    notify customers that ZF Meritor transmissions were not available, even though they were available.

69.    The Eaton-precipitated OEM conduct obstructed ZF Meritor's pull through marketing efforts and materially increased sales of Eaton transmissions.

**F.    Other Eaton anticompetitive conduct further foreclosed ZF Meritor linehaul transmission sales and vocational market entry**

70.    In combination with, or in addition to employing *de facto* exclusive contracts with the OEMs and the conduct those contracts precipitated, Eaton executed a

variety of exclusionary acts to foreclose Meritor and ZF Meritor sales of linehaul

transmissions.  Among these acts, Eaton:

      (a)     Threatened one or more OEMs with price retaliation on

transmissions for which Eaton did not face meaningful competition if those OEMs

purchased Meritor's or ZF Meritor's transmissions;

      (b)     Threatened one or more OEMs with unwarranted patent litigation

if those OEMs purchased Meritor's or ZF Meritor's transmissions; and

      (c)     Delayed and disrupted OEM release and sales of the FreedomLine.

71.     Eaton also used these and other exclusionary acts to obstruct Meritor's

entry into the market for vocational transmissions.  Given the significance of economies

of scale in production of Class 8 Transmissions, and the substantial fixed and sunk costs

associated with the research, development, and introduction of new transmission

technology and products, Meritor required sales opportunities and ample investment or

partnerships to enter into the vocational market.  Eaton's anticompetitive practices,

however, deprived Meritor and ZF Meritor of all three.  Eaton locked the OEMs into

long-term exclusive contracts covering linehaul and vocational transmissions and

threatened retaliation with price increases or patent litigation if an OEM sold or

licensed vocational transmission technology to Meritor or ZF Meritor.

**IV.    ZF Meritor Forced From The Markets, Injuring Competition, Meritor, and ZF Meritor**

72.    Eaton's anticompetitive conduct, including its contracts with the OEMs – employing bundled rebates, lucrative share penetration incentives, data book and other exclusions, and punitive pricing on Meritor and ZF Meritor transmissions – had the practical effect of precluding ZF Meritor from selling linehaul and vocational transmissions to the OEMs. One OEM simply told ZF Meritor that it could not do business with ZF Meritor because of the OEM's contract with Eaton.

73.    With its potential share of sales of linehaul and vocational transmissions to the OEMs limited to less than 10% and no practical ability to pull through meaningful sales downstream because of Eaton's exclusionary conduct, including dealings with the OEMs, Meritor and ZF began to dissolve ZF Meritor. Although ZF Meritor remains a legal entity, it no longer sells transmissions.

74.    To fill the void created by ZF Meritor's market departure, Meritor has tried to remain a supplier of Class 8 Transmissions to the OEMs and has become a sales agent for ZF to ensure continued customer access to the FreedomLine. Eaton's anticompetitive conduct, however, has led to further decline in Meritor's sales – by the end of fiscal year 2005, Meritor's share of transmissions sales at the four OEMs, including sales of the FreedomLine, had tumbled to around 4%. Meritor, other than marketing the FreedomLine, will exit the business in January 2007.

75.    The foregoing anticompetitive conduct by Eaton, individually and in coordination with the OEMs, has directly and proximately harmed competition by limiting consumer choice, eliminating competitive checks on pricing, suppressing innovation, and foreclosing an efficient and significant competitor from the markets for Class 8 Transmissions.  Meritor and ZF Meritor have been excluded from the market for linehaul transmissions, and they have been deterred from undertaking investments in technology and products that would have threatened Eaton's monopoly in the market for vocational transmissions.  If Meritor and ZF Meritor had not been foreclosed, competition would have intensified, and consumers would have benefited from lower prices for transmissions sold by Eaton, as well as those sold by Meritor and ZF Meritor. Instead, Eaton's conduct led to downstream customers being monetarily penalized and excluded from warranty programs if they purchased Meritor or ZF Meritor transmissions, and deprived of fair and timely access to ZF Meritor's advanced transmission technology, including but not limited to, Meritor's Engine Synchro Shift transmission system and North America's first two-pedal, fully automated manual transmissions.

76.    The foregoing anticompetitive conduct by Eaton, individually and in concert with the OEMs, has caused antitrust injury to Meritor and ZF Meritor by, *inter alia*, foreclosing Meritor/ZF Meritor from selling their Class 8 Transmissions to OEMs; undermining Meritor's/ZF Meritor's attempts to pull through truck buyer orders from

-29-

OEMs of Meritor/ZF Meritor transmissions; impairing and disrupting the development, release and sales of Meritor's/ZF Meritor's technologically advanced transmission systems; interfering with Meritor's/ZF Meritor's actual and prospective contractual and partnering relationships with OEMs and downstream fleets and other customers; dislodging Meritor/ZF Meritor strategies to enter into the market for vocational transmissions so that it could more directly and broadly compete with Eaton transmissions; forcing OEMs and downstream customers to purchase Eaton, instead of Meritor/ZF Meritor, transmissions on grounds other than the merits; casting doubt upon the integrity and value of Meritor's/ZF Meritor's transmission technology; and driving Meritor's/ZF Meritor's production and other costs to economically unacceptable levels.

77.     The foregoing anticompetitive conduct by Eaton has caused Meritor/ZF Meritor substantial financial harm and damage.  The loss of market share, entry, and gains Meritor/ZF Meritor would have achieved but for Eaton's anticompetitive, exclusionary conduct, cost Meritor/ZF Meritor hundreds of millions of dollars in current and future profits.  Harm to Meritor/ZF Meritor and damages they incurred also extend to their costs in dissolving ZF Meritor and the diminished valuation of their Class 8 Transmission business.  The full amount, scope, extent, form, and components of Meritor's/ZF Meritor's harm and damages will be calculated during this litigation.

78.    In contrast to the harm Eaton's conduct has caused consumers and

Meritor/ZF Meritor, Eaton's truck business, which relies heavily on North American

transmission sales, has amassed record profits.  Since 2002, Eaton's operating profits

from its truck business have increased roughly 400% (from $90 million to $453 million),

and its operating margins have increased 157% (from 7.7% to 19.8%).

## CLAIMS FOR RELIEF

### Count I:  Monopolization of the Linehaul Market in Violation of Sherman Act, Section 2 (15 U.S.C. § 2)

79.    ZF Meritor and Meritor incorporate by reference paragraphs 1 through 78.

80.    Linehaul transmissions constitute a relevant product market and North

America is the relevant geographic market.

81.    Eaton possessed (and currently possesses) monopoly power in the market

for linehaul transmissions in North America.  Barriers to entry and barriers to

expansion by existing firms are high in this market.  Eaton, with 95% share of the

linehaul market, has the power to control price and exclude competition for

transmissions in this market.

82.    Eaton willfully and wrongfully obtained and/or maintained its monopoly

in the linehaul market by engaging in the exclusionary, anticompetitive conduct set

forth in the preceding paragraphs of this Complaint.

83.    The anticompetitive effects of Eaton's conduct far outweigh any

purported procompetitive justifications.

84.     Eaton, through its exclusionary, anticompetitive conduct, has harmed consumers and impaired competition by, without limitation, depriving consumers of fair and timely access to innovative linehaul transmission technology and lower prices for linehaul transmissions, including Meritor and ZF Meritor manual and automated manual transmissions, which healthy and fair competition would have provided.

85.     As a direct, foreseeable, and proximate result of Eaton's exclusionary, anticompetitive conduct, Meritor and ZF Meritor were damaged by, without limitation, lost sales of linehaul transmissions, costs of dissolving ZF Meritor, and diminution in value of Meritor's and ZF Meritor's transmission business, all in amounts to be proven at trial.

**Count II:  Monopolization of the Vocational Market in Violation of Sherman Act, Section 2 (15 U.S.C. § 2)**

86.     ZF Meritor and Meritor incorporate by reference paragraphs 1 through 85.

87.      Vocational transmissions constitute a relevant product market and North America is the relevant geographic market.

88.     Eaton possessed (and currently possesses) monopoly power in the market for vocational transmissions in North America.  Barriers to entry and barriers to expansion by existing firms are high in this market.  Eaton, with 90% or more share of the vocational market, has the power to control price and exclude competition for transmissions in this market.

89.    Eaton willfully and wrongfully obtained and/or maintained its monopoly in the vocational market by engaging in the exclusionary, anticompetitive conduct set forth in the preceding paragraphs of this Complaint.

90.    The anticompetitive effects of Eaton's conduct far outweigh any purported procompetitive justifications.

91.    Eaton, through its exclusionary, anticompetitive conduct, has harmed consumers and impaired competition by, without limitation, depriving consumers of fair and timely access to innovative vocational transmission technology and lower prices for vocational transmissions, including Meritor and ZF Meritor transmissions, which healthy and fair competition would have provided.

92.    As a direct, foreseeable, and proximate result of Eaton's exclusionary, anticompetitive conduct, Meritor and ZF Meritor were damaged by, without limitation, lost sales of vocational transmissions, costs of dissolving ZF Meritor, and diminution in value of Meritor's and ZF Meritor's transmission business, all in amounts to be proven at trial.

### Count III:  Attempted Monopolization of the Linehaul Market in Violation of Sherman Act, Section 2 (15 U.S.C. § 2)

93.    ZF Meritor and Meritor incorporate by reference paragraphs 1 through 92.

94.    Eaton willfully and wrongfully attempted to obtain and maintain monopoly power in the linehaul market in North America by engaging in the

exclusionary, anticompetitive conduct set forth in the preceding paragraphs of this Complaint.

95.    Eaton acted with specific intent to monopolize the linehaul market. Eaton's anticompetitive, exclusionary conduct has had a dangerous probability of success and Eaton has in fact achieved dominant position, and market share of 95% in the linehaul market.  The anticompetitive effects of Eaton's conduct far outweigh any purported procompetitive justifications.

96.    Eaton, through its exclusionary, anticompetitive conduct, has harmed consumers and competition by, without limitation, depriving consumers of fair and timely access to innovative linehaul transmission technology and lower prices for those transmissions, including Meritor and ZF Meritor manual and automated manual transmissions, which healthy and fair competition would have provided.

97.    As a direct, foreseeable, and proximate result of Eaton's exclusionary, anticompetitive conduct, Meritor and ZF Meritor were damaged by, without limitation, lost sales of linehaul transmissions, costs of dissolving ZF Meritor, and diminution in value of Meritor's and ZF Meritor's transmission business, all in amounts to be proven at trial.

**Count IV:  Attempted Monopolization of the Vocational Market in Violation of Sherman Act, Section 2 (15 U.S.C. § 2)**

98.    ZF Meritor and Meritor incorporate by reference paragraph 1 through

-34-

paragraph 97.

99.    Eaton willfully and wrongfully attempted to obtain and maintain monopoly power in the vocational market in North America by engaging in the exclusionary, anticompetitive conduct set forth in the preceding paragraphs of this Complaint.

100.    Eaton acted with specific intent to monopolize the vocational market. Eaton's anticompetitive, exclusionary conduct has had a dangerous probability of success and Eaton has in fact achieved dominant position, and market share of 90% or more, in the vocational market.  The anticompetitive effects of Eaton's conduct far outweigh any purported procompetitive justifications.

101.    Eaton, through its exclusionary, anticompetitive conduct, has harmed consumers and competition by, without limitation, depriving consumers of fair and timely access to innovative vocational transmission technology and lower prices for those transmissions, including Meritor and ZF Meritor transmissions, which healthy and fair competition would have provided.

102.    As a direct, foreseeable, and proximate result of Eaton's exclusionary, anticompetitive conduct, Meritor and ZF Meritor were damaged by, without limitation, lost sales of vocational transmissions, costs of dissolving ZF Meritor, and diminution in value of Meritor's and ZF Meritor's transmission business, all in amounts to be proven at trial.

**Count V:  Use of Exclusionary Contracts to Substantially Lessen Competition in Violation of Clayton Act, Section 3 (15 U.S.C. § 14)**

103.    ZF Meritor and Meritor incorporate by reference paragraph 1 through paragraph 102.

104.    Eaton and OEMs entered into contracts for the purchase of goods (vocational and linehaul transmissions) that by their agreed upon terms, extended duration, and cumulative practical effect prevented the OEMs from purchasing Meritor's and ZF Meritor's transmissions.

105.    OEMs purchased transmissions from Eaton, consistent with their respective exclusionary contracts with Eaton, which excluded Meritor and ZF Meritor from 90% or more of the sales opportunities for linehaul and vocational transmissions and substantially lessened competition or tended to create an Eaton monopoly in the linehaul and vocational markets in North America.

106.    The anticompetitive effects of Eaton's exclusionary contracts far outweigh any purported procompetitive justifications.

107.    Eaton, through its exclusionary contracts with OEMs, has harmed consumers and competition by, without limitation, depriving consumers of fair and timely access to innovative linehaul and vocational transmission technology and lower prices for those transmissions, including Meritor and ZF Meritor manual and automated manual transmissions, which healthy and fair competition would have provided.

-36-

108.    As a direct, foreseeable, and proximate result of Eaton's exclusionary, anticompetitive contracts, Meritor and ZF Meritor were damaged by, without limitation, lost sales of linehaul and vocational transmissions, costs of dissolving ZF Meritor, and diminution in value of Meritor's and ZF Meritor's transmission business, all in amounts to be proven at trial.

### Count VI:  Use of Exclusionary Contracts in Violation of Sherman Act, Section 1 (15 U.S.C. § 1)

109.    ZF Meritor and Meritor incorporate by reference paragraph 1 through paragraph 108.

110.    Eaton and the OEMs entered into agreements for the purpose of foreclosing Meritor and ZF Meritor from competing in the linehaul and vocational markets and assisting Eaton in willfully and wrongfully obtaining and maintaining monopoly power in those markets in North America.  The agreements achieved the purposes for which they were undertaken and unreasonably restrained trade.

111.    The anticompetitive effects of Eaton's exclusionary contracts far outweigh any purported procompetitive justifications.

112.    Eaton, through its exclusionary contracts with OEMs, has harmed consumers and competition by, without limitation, depriving consumers of fair and timely access to innovative linehaul and vocational transmission technology and lower prices for those transmissions, including Meritor and ZF Meritor manual and

automated manual transmissions, which healthy and fair competition would have provided.

113.    As a direct, foreseeable, and proximate result of Eaton's exclusionary, anticompetitive contracts, Meritor and ZF Meritor were damaged by, without limitation, lost sales of linehaul and vocational transmissions, costs of dissolving ZF Meritor, and diminution in value of Meritor's and ZF Meritor's transmission business, all in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, ZF Meritor and Meritor respectfully request that the Court adjudge and decree that:

(a)    Eaton unlawfully obtained and/or maintained monopolies in the markets for linehaul transmissions and vocational transmissions in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and/or unlawfully attempted to obtain and maintain monopolies in those markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(b)    Eaton entered into exclusionary contracts that substantially lessened competition or tended to create a monopoly in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14; and

(c)    Eaton entered into exclusionary agreements in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

(d)    Meritor and ZF Meritor be awarded their actual damages in an amount to be determined at trial, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, along with interest on such damages.

(e)    Meritor and ZF Meritor be awarded their costs of suit, including reasonable attorneys' fees, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15.

(f)    Meritor and ZF Meritor be awarded injunctive relief prohibiting Eaton and all persons or entities acting on its behalf or under its direction or control from engaging in any further conduct unlawful under Sections 1 or 2 of the Sherman Act, or Section 3 of the Clayton Act.

(g)    Meritor and ZF Meritor be granted such further relief as the Court may deem just and proper.

## JURY DEMAND

Meritor and ZF Meritor demand a trial by jury on all claims.

Dated:    October 5, 2006

Respectfully submitted,

By:    _Karen V Sullivan_____

Charles M. Oberly, III (No. 743)
Karen V. Sullivan (No. 3872)
OBERLY, JENNINGS & RHODUNDA, P.A.
1220 Market Street, Suite 710
P.O. Box 2054
Wilmington, DE  19899
(302) 576-2000 (Tel)
(302) 576-2004 (Fax)

Attorneys for Plaintiffs ZF Meritor LLC and
Meritor Transmission Corporation

Of Counsel:

R. Bruce Holcomb
Christopher H. Wood
Charles E. Luftig
DICKSTEIN SHAPIRO LLP
1825 Eye St. NW
Washington, DC  20006-5403
(202) 420-2200 (Tel)
(202) 420-2201 (Fax)

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
ZF MERITOR LLC and MERITOR TRANSMISSION CORPORATION

**DEFENDANTS**
EATON CORPORATION

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    New Castle
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Charles M. Oberly, III, Esq. and Karen V. Sullivan, Esq.
Oberly, Jennings & Rhodunda, P.A., 1220 Market St., # 710
PO Box 2054, Wilmington, DE 19899; P: 302-576-2000; F: 302-576-2004

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | | | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | | ☐ 650 Airline Regs. | ☐ 830 Patent | |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product Liability | | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | | ☐ 810 Selective Service |
| | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | **PERSONAL PROPERTY** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 370 Other Fraud | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | ☐ 380 Other Personal Property Damage | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 385 Property Damage Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 443 Housing/ Accommodations | ☐ 530 General | | |
| | ☐ 444 Welfare | ☐ 535 Death Penalty | | |
| | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Sections 1 & 2; 15 U.S.C. Section 14
Brief description of cause: Monopolization of markets; use of exclusionary contracts to foreclose and substantially lessen competition.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE
10/5/06

SIGNATURE OF ATTORNEY OF RECORD
Karen V. Sullivan

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. 0 6 - 6 2 3 _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ____2____ COPIES OF AO FORM 85.

___10/5/06___
(Date forms issued)

_____
(Signature of Party or their Representative)

_____CAREY  M  SHEA_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action