IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ZF MERITOR LLC and MERITOR TRANSMISSION CORPORATION | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 06-623-SLR |
| v. | ) ) | |
| EATON CORPORATION, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF EATON CORPORATION'S
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Plaintiffs' Complaint should be dismissed in its entirety for two independent reasons: 1) it fails to allege antitrust injury, and 2) its claims related to contracts signed in 2000 and 2001 (and allegations about even earlier conduct) are time-barred under the Clayton Act's four-year statute of limitations.

**PRELIMINARY STATEMENT**

The Complaint's failure to allege antitrust injury is fatal. Antitrust injury is a required element of every private antitrust claim. It is more than just an alleged injury to the plaintiff. All markets, including competitive markets, have winners and losers. Antitrust injury requires something more: an allegation that defendant has done something anticompetitive that injures not only the plaintiff, but also injures the competitive process itself.

But what do Plaintiffs allege was the anticompetitive conduct that caused injury to them and the competitive process? The Complaint describes *competitive* conduct by Eaton - - significant product innovation and lower prices. Plaintiffs allege that Eaton's pro-competitive pricing had the practical effect of inducing heavy duty truck transmission customers to buy more of Eaton's transmissions and fewer of Plaintiffs' transmissions. But that is the essence of competitive behavior and fails on its face to state an antitrust claim.

Eaton's rebates are contained in a second generation of contracts Eaton signed with each of the Big Four truck manufacturers in 2000, 2001, and 2002. Plaintiffs do not allege that the contracts legally required the truck manufacturers to use Eaton's transmissions exclusively, but they allege that rebates made them de facto "exclusive dealing" contracts. Plaintiffs' use of the "exclusive dealing" buzzword does not save their allegations because it does not provide the missing element of antitrust injury.

Exclusive dealing often has significant pro-competitive effects and it can only be illegal if it causes antitrust injury. For an exclusive deal to cause antitrust injury it must do two things: exclude a significant competitor from the market *and* impair the competitive process so that the defendant will subsequently raise its prices (or reduce its output) to supra-competitive levels. Neither is alleged here. The Complaint makes clear that Plaintiffs are still selling many of the same Class 8 transmissions today that they sold back in 1999, before the truck manufacturers' second round of contracts with Eaton. The only difference is that Meritor and ZF Friedricschafen, the "global leader[]" in Class 8 transmission technology, have re-formed their relationship from the separately incorporated ZF Meritor LLC joint venture into a contractual relationship with Meritor now acting as ZF's sales agent. Thus, the number of Class 8 transmission suppliers has not changed: Eaton, ZF Meritor LLC (now replaced by Meritor acting as ZF's agent), General Motors, Transmission Technologies Corporation, and Mack Trucks.

Even if the reformulated Meritor-ZF relationship somehow constitutes exclusion, it does not suffice to prove antitrust injury. The Complaint does not allege that the likely result of Plaintiffs' "exclusion" will be that Eaton will raise prices (or decrease supply). On the contrary, the Complaint alleges that Eaton *lowered* prices to obtain more business from the truck manufacturers and that it locked itself into those *lower* prices through long-term contracts. Without an allegation of antitrust injury, Plaintiffs' allegation of exclusive dealing fails.

Finally, Plaintiffs' allegations that Eaton engaged in anticompetitive conduct in 2000 and 2001, when it won three of the truck manufacturers' contracts, are time-barred. The Clayton Act's statute of limitations for all private antitrust cases is four years. 15 U.S.C. § 15(b).

2

The four years runs from the time when defendant commits an act that injures plaintiff. When the injurious act is a contract, the date of injury or accrual is the date the contract was entered. Plaintiffs obviously knew they lost these contracts back in 2000 and 2001 - - and they complained to Eaton at the time that its conduct was "anticompetitive." Yet, they waited more than five years to bring suit. By definition, their claims based on those contracts (and even earlier conduct alleged in the Complaint) are time-barred and must be dismissed.

## STATEMENT OF ALLEGATIONS

I.    **THE BIG FOUR TRUCK MANUFACTURERS AND CLASS 8 TRANSMISSIONS**

There are four manufacturers of heavy duty Class 8 trucks in North America. They are big, sophisticated companies: DaimlerChrysler's Freightliner subsidiary, Navistar's International Trucks division, Volvo/Mack Trucks, and Paccar Corporation, which makes and sells trucks under the well-known Kenworth and Peterbilt brand names. Complaint ¶ 27. Each of these companies makes linehaul trucks (or, 18-wheelers) for long distance highway travel, construction trucks, and start-and-stop garbage, fire and delivery trucks. *Id.* ¶¶ 20, 22, 24.

The Big Four truck manufacturers are the major purchasers of Class 8 transmissions. *Id.* ¶ 27. Transmissions send power from a vehicle's engines to its wheels, enabling it to move. *Id.* ¶ 10. The first transmissions were manual; that is, they required the driver to manually depress a clutch pedal to disengage the transmission from the engine and to use a stick shift to move the transmission out of one gear and into another. *Id.* ¶ 13. Automatic transmissions, which were developed more recently, shift gears using electronics and hydraulics. They do not have a clutch pedal (using a torque converter, instead) and do not require the driver to shift gears physically. *Id.* Automated manual transmissions, developed even more recently, are a sort of hybrid: the vehicle has a clutch, but the driver can operate it electronically (or manually) and does not need to physically depress the clutch with his or her foot in order to shift between gears. *Id.* ¶ 14. The first and second generation automated manuals had three pedals

3

(brake, accelerator, and clutch), but the clutch was used primarily to start and stop the vehicle. *Id.* ¶ 37. Third generation automated manuals have only two pedals (accelerator and brake). *Id.* ¶ 14. They provide substantial benefits to truck operators, including improved fuel efficiency, enhanced driver safety, reduced noise levels, and less drive train wear. *Id.* ¶ 45.[1]

   Each of these Big Four truck manufacturers purchases (or makes its own) manual, automated, and automatic transmissions for use in its heavy duty trucks. *Id.* ¶¶ 17-18. Typically, they purchase under multi-year contracts and, typically, they obtain significant discounts and rebates in exchange for their contractual commitment to buy. *Id.* ¶¶ 40, 51. The OEMs (Original Equipment Manufacturers) sell their trucks to dealers and large fleet operators. *Id.* ¶ 28. The trucks can be made to order. *Id.* If an OEM is carrying multiple suppliers' parts for a given component, it will list them in its databook, typically at different price points, depending on whether the OEM considers the part to be its standard (or preferred) offering or only an option. *Id.* ¶ 29. The databook is a means by which the truck manufacturers advertise and sell their products to their customers, the fleets and dealers. It is also an efficient mechanism for the suppliers of truck components to reach their indirect customers, although there are other means for doing so. *Id.* ¶ 29. For example, component suppliers have long paid rebates or provided price incentives to truck dealers and fleets - - even though they do not purchase components directly - - as a form of "pull-through" marketing. *Id.* ¶ 31. The OEM's customer can review the OEM's databook (and any pull-through marketing incentives from the component suppliers) and then select whether it wants a component made by supplier A or B (or C etc). If the OEM is carrying only a single supplier's component in its databook, its customer can still request another supplier's part. The OEM may charge its customer more for that part, however, because it has to incur engineering and administrative costs to build that component into the customer's trucks. *Id.* ¶¶ 30, 50.

---

[1] The terminology describing these transmissions is taken from plaintiffs' Complaint. Automatic transmissions are also called automotive-type transmissions and automated transmissions are also called automated mechanical transmissions.

## II.   CLASS 8 TRANSMISSION SUPPLIERS

### A.   Eaton

Eaton was the pioneer in making and selling heavy duty truck transmissions in North America: it was the first - - and, for roughly three decades (from the late 1950s until the late 1980s), the only -- manufacturer of Class 8 manual transmissions on this continent. *Id.* ¶ 33. As a result, it was the standard Class 8 transmission listing in each truck manufacturer's databook by the late 1980s. *Id.* ¶ 34.

Over the years, Eaton greatly expanded the capabilities and quality of Class 8 transmissions it offered the Big Four OEMs, so that it now offers manual transmissions in all of the speeds (9, 10, 13, 15 and 18) and torque ratings (1450 lb-ft to 1850 lb-ft or more) that OEMs require, and in a range of price points. *Id.* ¶¶ 20, 22, 24. In addition to developing a full line of manual transmissions, Eaton introduced several innovative "automated" Class 8 transmissions in the 1990s under the Top-2 and AutoSelect brand names. Eaton's Top-2 and AutoSelect automated transmissions were the first and second generations of Class 8 automation in North America. *Id.* ¶¶ 37, 44. Eaton introduced its third-generation automated transmission product series, the two-pedal UltraShift, in 2002. *Id.* ¶ 42.

### B.   Plaintiffs and Third-Party Producers

A number of additional companies supplied heavy duty transmissions to the Big Four manufacturers during the last 15 years or so. All of those companies are still in the market, and today there at least four suppliers in addition to Eaton: General Motors, ZF Friedrichshafen ("ZF") working together with Meritor, Transmission Technologies Corporation, and Mack Trucks. *Id.* ¶ 17. General Motors today produces "nearly all" of the automatic transmissions purchased by Class 8 truck manufacturers. *Id.* ¶ 25. Transmission Technologies and Mack focus on manual transmissions. *Id.* ¶¶ 17, 21, 23.

Meritor's predecessor, Rockwell International Corporation, began producing only 9 and 10-speed manual transmissions in the late 1980s to "complement its other drivetrain

offerings." *Id.* ¶¶ 35-36.[2]  Meritor, which Rockwell spun off in 1997, did not significantly expand Rockwell's limited manual offerings.  It did not manufacturer 13, 15 or 18 speed manual transmissions, for example.  *Id.* ¶¶ 23, 36, 71.  Meritor followed Eaton's lead by introducing a three-pedal automated transmission product in 1996, the ESS.  Two years later, a federal court jury reached a verdict finding that Meritor's ESS transmission products infringed Eaton patents.  The jury issued a multimillion damages award against Meritor.  The Court enjoined continued sales of the ESS line of products and Meritor subsequently pulled the ESS transmissions from the market.[3]

In 1999, Meritor decided to form a joint venture with the ZF, Europe's premier transmission producer.  ZF's product line of transmissions included not only manuals and automated manual transmissions, but automatic transmissions, as well.  Complaint ¶¶ 38-39. "No single manufacturer offered such a range of products in North America." *Id.* ¶ 39.  Meritor expected the joint venture to bring ZF's "global leadership and expertise in transmission technology" to the U.S.  *Id.*  The joint venture, called ZF Meritor, gave Meritor's North

---

[2]  A "drivetrain" is a complete line of products connected to the engine, in addition to the transmission, and includes steer axles, drive axles, clutches, trailer brakes, air brakes, drivelines, hydraulic brakes, braking control systems, and shock absorbers. *See, e.g.*, Exhibit 1 (DriveTrain Plus:  The Complete Story (ArvinMeritor March 2003)).  The Court can consider the parties' public statements and securities filings as part of the record on a motion to dismiss where their authenticity is uncontested. *E.g.*, *City of Pittsburgh v. W. Penn Power Co.*, 147 F. 3d 256, 259, 263 (3d Cir. 1998); *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 184 F.3d 280, 294 (3d Cir. 1999) (Nygaard, J., concurring in part and dissenting in part) (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).  Eaton does not anticipate any challenge to the authenticity of this document because it was published by Plaintiffs (or their parent) and is on their website.

[3]  See Exhibit 2 (ArvinMeritor 2001 Annual Report, at 14-15).  The Court's consideration of this securities filing by Plaintiffs (or their parent) is particularly appropriate here because Plaintiffs have alleged that Eaton's patent litigation was "unwarranted" without explaining its outcome.  Complaint ¶¶ 36, 70.  The jury's verdict was reversed in April 2003 because the district court had improperly construed Eaton's patent claims, but Meritor decided not to put the ESS back on the market after "assessing the practicality of re-introducing this shifting feature on our transmissions." Exhibit 3 (ArvinMeritor April 4, 2003 Press Release).

American sales force responsibility for selling its manual 9 and 10 speed transmissions and ZF's third-generation automated "FreedomLine" product. *Id.* The joint venture targeted its sales efforts at linehaul trucks, and it did not expand its manual product line to produce 13, 15, or 18-speed products that are commonly used in cement mixers, dump trucks, and other vocational trucks. *Id.* ¶ 42. Meritor and ZF were simply shareholders in the joint venture; each owned 50%. *Id.* ¶ 38.

Shortly after its formation in 1999, ZF Meritor won a multi-year contract with the largest OEM, DaimlerChrysler's Freightliner subsidiary, and became its standard databook offering for two of its many truck models. *Id.* ¶ 40. Eaton remained standard for many of Freightliner's other truck models. ZF Meritor's transmissions were also listed in the other OEMs' databooks as options. *Id.* ¶ 41. Eaton remained the standard listing for most truck models in those OEMs' databooks.

Plaintiffs vaguely allege that Eaton engaged in "unwarranted" patent litigation. *Id.* ¶ 36, 70. Eaton filed a patent infringement case against the ZF Meritor's FreedomLine transmission before the International Trade Commission, which resulted in a finding of infringement in early 2005. The Court of International Trade subsequently enjoined the sale of FreedomLine.[4]

## III.    THE OEMS' 2000-02 CONTRACTS

In late 1999 and early 2000, the trucking industry entered into a prolonged and particularly deep recession: demand for heavy duty trucks dropped in half and stayed low for several years.[5] The Big Four OEMs have "substantial bargaining power with respect to price and

---

4    Exhibit 4 (ArvinMeritor 2005 Annual Report, at 7). ZF purportedly designed around the Eaton patent the ITC found it infringed and the FreedomLine transmission remains on the market today.

5    *See, e.g.*, Exhibit 5 (ArvinMeritor March 2001 Press Release)("We've watched the North American Class 8 volumes drop more than 40 percent from all-time highs and anticipate that volumes could go even lower before they rebound"). Heavy duty truck builds plummeted from roughly 300,000 units in 1999 to 140,000 in 2001, and did not climb back above 250,000 units

other commercial terms." In response to the recession, they sought to lower their costs by concentrating their purchasing power in the hands of "the most capable global suppliers."[6] The Big Four OEMs, thus, sought new transmission contracts.

Eaton won this second generation of OEM contracts by offering the OEMs better price reductions than ZF Meritor offered. Complaint ¶¶ 49 ("millions in annual rebates and other incentives"), 57 ("incentives"), 58 ("compelling incentive"), 61 ("rebates"), 65 ("incentives" "price reductions"), 68 ("rebates"), 72 ("rebates").[7] Eaton also offered better rebates than ZF Meritor did to the OEMs' customers, the truck buyers, to entice them to continue ordering trucks with its transmissions. Complaint ¶ 31 ("monetary incentives" "discounts").

As a result, Eaton won a multi-year contract from Freightliner in late 2000. *Id.* ¶ 52 ("late 2000"). In early 2001, Eaton won International's contract. *Id.* ¶ 56 ("early 2001"). Paccar agreed in 2001 to modify and extend its prior agreement with Eaton. *Id.* ¶ 61. Volvo/Mack, which makes its own transmissions for its Mack trucks, also signed an agreement to purchase Eaton transmissions in the Fall of 2002. *Id.* ¶¶ 17, 65.

Plaintiffs do not claim that the contracts required the OEMs to buy only Eaton Class 8 transmissions, and (as noted above) they concede that the OEMs buy from multiple transmission suppliers (or, in Volvo/Mack's case, makes many of its own). Instead, they allege that the practical effect of Eaton's discounts, rebates and price incentives is that the OEMs preferred Eaton's transmissions, resulting in "de facto" exclusivity. *Id.* ¶¶ 3 ("de facto"), 48 ("de facto"),63 ("de facto"), 70 ("de facto"), 72 ("practical effect").[8]

---

until last year. Exhibit 2 (ArvinMeritor 2001 Annual Report, at 13); Exhibit 4 (ArvinMeritor 2005 Annual Report, at 13).

6    Exhibit 6 (ArvinMeritor 2002 Annual Report, at 7, 9-10).

7    The Complaint does not allege that Eaton priced its transmissions below-cost (*i.e.*, that it lost money on each additional transmission it sold).

8    The Complaint is ambiguous on exactly what happened to each OEM's previous databook listing of ZF Meritor's transmissions as "optional" following this new round of contracts. For example, it is silent on ZF Meritor's position within the Paccar databook, Complaint ¶¶ 61-62,

Plaintiffs allege that Eaton and the OEMs engaged in anticompetitive conduct when they entered into these contracts five and six years ago. Complaint ¶¶ 3, 53, 60. And, although the Complaint carefully avoids mentioning it, Meritor's current General Counsel complained to Eaton's General Counsel in early 2001 (shortly after the Freightliner contract) that Meritor believed the Freightliner-Eaton contract was "anticompetitive" because of the "economic incentives" Eaton provided and because of its purported effect on ZF Meritor's position in Freightliner's databook. *See* Exhibit 8.[9]   The Complaint does not contain any allegation why Plaintiffs waited until Fall 2006 - - *more than five years after they knew about the contract and their alleged injury*- - to bring their case. For that matter, the Complaint alleges that Plaintiffs also considered Eaton's conduct *in the 1990s*, when Meritor grew its share from 0% in 1989 to 20% by 1999, to be anticompetitive. Complaint ¶¶ 1 ("For a decade"), 36 (early 1990s), 38 (same). Again, the Complaint is silent on Plaintiffs' decade of delay in filing this suit.[10]

## IV.    THE MERITOR-ZF RELATIONSHIP TODAY

Meritor and ZF are both still in the market, although they have decided to change their relationship. Rather than continuing to collaborate in a formal, separately-established

---

and it tacitly alleges that it was still listed in Volvo/Mack's databook. *Id.* ¶ 64. A ZF Meritor press release fills in the blanks: the joint venture remained an option in every OEM's databook for some types of transmissions, notably, the FreedomLine automated family of transmissions - - just as it had been under the prior round of contracts. Exhibit 7 (ArvinMeritor October 2002 Press Release).

[9]   The Court can consider this Exhibit on a motion to dismiss for the reasons stated in footnote 2, *supra*. Again, Eaton does not anticipate that Plaintiffs will object to the authenticity of this letter.

[10]  The Complaint contains some additional allegations regarding conduct by *unidentified* OEMs - - none of whom is a defendant in the case - - that occurred at unspecified times in the past. Complaint ¶¶ 68 (an unidentified OEM refused to provide financing to customers specifying a ZF Meritor transmission, excluded ZF Meritor from its warranty program, notified customers that ZF Meritor transmissions were not available), 70-71. Thus, it is unclear whether this conduct, too, occurred prior to 2002. The Complaint vaguely alleges that Eaton "precipitated" the unidentified OEMs' conduct, although it does not contain factual allegations to support that boilerplate. *Id.* ¶ 69.

limited liability corporate joint venture, they have begun to dissolve ZF Meritor LLC. Instead, their collaboration is now contractual: Meritor has become the sales agent for ZF's transmissions in North America in order "to ensure continued customer access to the Freedomline." *Id.* ¶¶ 73-74. Meritor/ZF has chosen to focus its efforts on selling ZF's automated FreedomLine transmissions, and to stop selling Meritor's 10-speed manual transmissions. *Id.* Only Meritor, and not ZF, has chosen to sue following the companies' decisions to shift their relationship from formal joint venture to sales agency.

## ARGUMENT

Plaintiffs' Complaint fails for two fundamental reasons: 1) it fails to allege antitrust injury, which is a required element of each of Plaintiffs' claims; and 2) Plaintiffs' complaints about contracts signed in 2000 and 2001 (and even earlier alleged conduct in the 1990s) is barred by the Clayton Act's four-year statute of limitations.

## I.    EATON'S CONDUCT WAS PRO-COMPETITIVE

It has long been axiomatic that the antitrust laws were designed to safeguard the health of the competitive process, the process by which buyers are able to obtain more and better products at lower prices, and not to protect a company from its rivals. *E.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962) (antitrust laws were enacted for "the protection of *competition*, not *competitors*") (emphasis in original). That is why, in every private antitrust case, a plaintiff must allege (and, ultimately, prove) antitrust injury. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 (1986).

The doctrine of antitrust injury means that a plaintiff can only sue for anticompetitive wrongs that harm both it and the competitive process. In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), the Supreme Court rejected a claim brought by three local bowling alleys who claimed that a larger rival was creating a monopoly by acquiring other nearby bowling alleys. Plaintiffs claimed they were injured by the acquisition because it greatly increased the defendant's power in the market. They alleged that the acquired bowling

alleys would otherwise have gone out of business. The Supreme Court held that plaintiffs' allegations amounted to a claim that they wanted to be insulated from the defendant's increased competitive strength. The Court concluded that such a claim was "inimical" to the antitrust laws and failed to constitute antitrust injury, which was "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." 429 U.S. at 489.

Antitrust injury -- that is, anticompetitive harm to both the plaintiff and to competition -- is a required element in every antitrust case, whether under Sherman Act § 1 or § 2 or Clayton Act § 3. 15 U.S.C. § 15(a) (2000); *See also Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (exclusive dealing claim requires proof that the exclusive deal "will foreclose *competition* in a substantial share of the line of commerce affected"); *California Computer Prods, Inc. v. Int'l Business Machs.* Inc., 613 F.2d 727, 732 (9th Cir. 1979) ("the plaintiff must demonstrate that the defendant's conduct was intended to or did have some anticompetitive effect beyond his own loss of business or the market's loss of a competitor").

Plaintiffs here have entirely failed to allege harm to the competitive process. Instead, they have alleged competitive conduct by Eaton -- significant product innovation and lower prices – that has, at most, affected one competitor. As a result, their claims fail as a matter of law.

### A.    Rebates and Discounts Did Not Cause Plaintiffs Any Antitrust Injury

The Complaint alleges that Eaton possesses monopoly power and that it acquired that power lawfully: it acknowledges that Eaton pioneered Class 8 transmissions decades before any rivals emerged. Even assuming *arguendo* that the allegation was true, it would not, by itself, state a cause of action. The antitrust laws encourage monopolies based upon "a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). The Supreme Court reaffirmed that:

11

> The mere possession of monopoly power, and the concomitant charging of monopoly prices is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices - - at least for a short period - - is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.

*Verizon Comm'ns, Inc. v. Trinko*, 540 U.S. 398, 407 (2004) (emphasis in original); 15 U.S.C. § 2 (2000).

The Complaint does not point to any anticompetitive conduct by Eaton that willfully maintained its alleged monopoly. On the contrary, it alleges that Eaton maintained its monopoly by *pro-competitive* conduct. The Complaint clearly sets out Eaton's track record in continuing to develop and manufacture a full line of manual transmissions in a range of gear configurations (9, 10, 13, 15, and 18), torque ratings (1450 lb-ft to 1850 lb-ft or more) and a full line of first, second, and third generation automated manual transmissions.

The Complaint also acknowledges that Eaton cut prices to win business from the Big Four OEMs. Eaton won the Freightliner contract in 2000, for example, because it *lowered* its prices and provided Freightliner with rebates and other price breaks. Complaint ¶¶ 49 ("millions in annual rebates and other incentives"), 57 ("incentives"), 58 ("compelling incentive"), 61 ("rebates"), 65 ("incentives" "price reductions"), 68 ("rebates"), 72 ("rebates"). That is the essence of *pro-competitive* conduct - - as the Supreme Court has repeatedly held:

> Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993) ("As a general rule, the exclusionary effect of prices above a relevant measure of cost . . . reflects the lower cost structure of the alleged predator, and so represents competition on the merits").

Courts have thus noted that the Supreme Court has "urged great caution and a skeptical eye" when dealing with a claim that lower prices caused antitrust injury. *Bathke v.*

*Casey's Gen. Stores, Inc.*, 64 F.3d 340, 343 (8th Cir. 1995).  When an alleged monopolist simply lowers its prices - - but, as here, does not lower them to predatory or below-cost levels - - any losses it causes its competitors "cannot be said to stem from an *anticompetitive* aspect of the defendant's conduct.  It is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition." *Atlantic Richfield*, 495 U.S. at 340-41 (emphasis in original) (quotations omitted).    Above-cost discounts and price rebates are the essence of competition and must be held lawful because it "is beyond the practical ability of a judicial tribunal to control [above cost discounting] without courting intolerable risks of chilling legitimate price-cutting." *Brooke Group*, 509 U.S. at 223.  To hold otherwise "would, in effect, render illegal any decision by a firm to cut prices in order to increase market share.  The antitrust laws require no such perverse result." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986).[11]

The Third Circuit, like every Circuit, follows this rule.  *E.g., Barr Labs, Inc. v. Abbott Labs, Inc.*, 978 F.2d 98, 111 (3d Cir. 1992) (no violation: "warehouse chains entered the contracts because of the inherent advantages they saw in them in price, convenience, and service").  "If a firm has discounted prices to a level that remains above the firm's average variable cost, 'the plaintiff must overcome a **strong presumption of legality** by showing other

---

[11]  Plaintiffs do not allege that Eaton priced its products below-cost, *i.e.*, that Eaton lost money on each additional unit transmission it sold.  The law on predatory pricing is a useful analogy, however, because it shows what is necessary to prove antitrust injury.  Below-cost prices, by themselves, are permissible because they are entirely pro-competitive.  The law prohibits below-cost prices only if a monopolist uses them as a tool to injure the competitive process.  That occurs if the monopolist's below-cost prices drive its rivals out of the market *and* it subsequently increases its prices for a long enough period of time that it has "a dangerous probability of recouping its investment in below-cost prices." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993).  "Predatory pricing schemes that fail at the recoupment stage may injure specific competitors, like [plaintiff], but do not injure competition (*i.e.*, they do not injure consumers) and so produce no antitrust injury." *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1200 (3d Cir. 1995).

factors indicating that the price charged is anticompetitive.'" *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1061 (8th Cir. 2000) (emphasis added and citation omitted).

**B.    The Big Four Truck Companies' Contracts With Eaton Did Not Cause Plaintiffs Antitrust Injury**

So, what do Plaintiffs allege was the anticompetitive conduct that caused antitrust injury to them and to the competitive process? That Eaton signed a second generation of multi-year contracts with each of the Big Four OEMs. Plaintiffs do not allege that the contracts legally required each OEM to buy only Eaton's transmissions. On the contrary, the Complaint acknowledges that each OEM continued to buy competing Class 8 transmissions. Complaint ¶¶ 17, 21, 23, 25, 73, 74. Instead, the Complaint asserts that the contracts were *de facto* exclusive because the practical effect of Eaton's rebates and price reductions (*i.e.*, lower prices) was that each OEM had a strong incentive to buy more of Eaton's transmissions and fewer transmissions from ZF Meritor. That is pro-competitive, not anticompetitive. *E.g.*, *Barr Labs*, 978 F.2d at 111 ("exclusive" contract was pro-competitive: "warehouse chains entered the contracts because of the inherent advantages they saw in them in price, convenience, and service"); *Stitt Spark Plug Co. v. Champion Spark Plug Co.*, 840 F.2d 1253, 1257-58 (5th Cir. 1988).

Even if *arguendo* each OEM's 2000-02 contract with Eaton was considered exclusive dealing, that would not save Plaintiffs' claims. There is nothing inherently illegal about exclusive contracts. Exclusive contracts have well-recognized pro-competitive benefits for both buyers and sellers. *See, e.g., Jefferson Parish Hospital Dist. v. Hyde,* 466 U.S. 2, 45 (1984) (O'Connor, J. concurring) (exclusive dealing "may be substantially procompetitive by ensuring stable markets and encouraging long-term, mutually advantageous business relationships"); *Standard Oil Co. v. United States*, 337 U.S. 293, 306-07 (1949) ("In the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand"). Because of these pro-competitive benefits, even long-term exclusive contracts of five years or more are permissible. *See Jefferson Parish,* 466

U.S. at 45 (1984) (affirming five-year exclusive contract); *Tampa Electric Co. v. Nashville Co.*, 365 U.S. 320, 334 (1960) ("The 20-year period of the contract is singled out as the principal vice, but at least in the case of public utilities the assurance of a steady and ample supply of fuel is necessary in the public interest").

### 1.    The ZF-Meritor Collaboration Is Still A Class 8 Transmission Competitor

Exclusive dealing is, thus, judged under the rule of reason, which looks at its effects on the marketplace. *E.g., Beltone Elect. Corp. v. Federal Trade Comm'n*, 100 F.T.C. 68, 208 (1982) (plaintiff must show that "the restraint . . . has a probable adverse effect on interbrand competition"). The question is whether the exclusive dealing injured the competitive process, not a competitor. *Tampa Elect.*, 365 U.S. at 327 ("will foreclose *competition* in a substantial share of the line of commerce affected") (emphasis added). Exclusive dealing that is procompetitive does not injure competition - - even if that procompetitive conduct injures a competitor. It is only problematic when it harms competition itself, not simply a competitor.

The competitive process is alive and well in the battle for heavy duty truck transmission sales. Eaton and other suppliers continue to sell innovative products at discounted prices. Moreover, the same number of suppliers are in the market today, as there were before the alleged "exclusive dealing" contracts. In 1999, there were five suppliers: Eaton, ZF Meritor, General Motors, Transmission Technologies Corporation, and Mack Trucks. Today, there are five: Eaton, Meritor (acting as ZF's sales agent), General Motors, Transmission Technologies Corporation, and Mack Trucks. Meritor and ZF are in the market in the same way they have always been in it: working together, albeit under a contractual relationship rather than as a separately-incorporated LLC joint venture, to sell Class 8 transmissions against Eaton and the other suppliers. Complaint ¶¶ 73-74.[12]

---

[12] The Complaint is ambiguous on precisely what harm Meritor alleges it suffered. To the extent Meritor is complaining that it was injured as a shareholder of ZF Meritor, its claim must be dismissed for lack of standing. The antitrust laws are clear that shareholders do not have

### 2.    The Competitive Process Is Unimpaired

Even if the contracts between the OEMs and Eaton were exclusive dealing *and* - - counter to the allegations - - the ZF/Meritor collaboration had been driven from the market, that would not, by itself, indicate any violation of the antitrust laws. "The exclusion of one or even several competitors, for a short or even a long time, is not *ipso facto* unreasonable." Instead, "[t]he exclusion of competitors is cause for antitrust concern only if it impairs the health of the competitive process itself." *Roland Mach. Co. v. Dresser Indus., Inc*., 749 F.2d 380, 394 (7th Cir. 1984). *See also Jefferson Parish*, 466 U.S. at 34 (exclusive dealing violates the antitrust law "only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal"). As a result, a plaintiff:

> must prove two things to show that an exclusive-dealing agreement is unreasonable. First, he must prove that it is likely to keep at least one significant competitor of the defendant from doing business in a relevant market. If there is no exclusion of a significant competitor, the agreement cannot possibly harm competition. Second, he must prove that the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition.

*Roland Mach.*, 749 F.2d at 394. *See also Harbor Drug Co., Inc. v. Medco Containment Servs., Inc.*, No. C95-01949, 1996 WL 441018, *4 (C.D. Cal. July 15, 1996) ("The vice typically inherent in a foreclosure case is the likelihood that substantial distributors will be eliminated from the market and that the defendant will therefore be able to increase prices to consumers. . . . The complaint here does not allege that Defendants' plans have increased prices to consumers; in fact, it pleads that prices have been lowered. Nor does the complaint allege that Defendants'

---

standing to sue for antitrust wrongs that allegedly harm the companies they own because any harm they suffer is only derivative of the directly injured company. *See, e.g., Vinci v. Waste Management, Inc*., 80 F.3d 1372, 1375 (9th Cir. 1996) ("A shareholder of a corporation injured by antitrust violations has no standing to sue in his or her own name. . . . This rule applies even if the injured shareholder is the sole shareholder . . . or if the shareholder alleges that the antitrust violations were intended to drive the individual out of the industry") (citations omitted); *Zschaler v. Claneil Enterps*., Inc., 958 F. Supp. 929, 940 (D. Vt. 1997) ("Zschaler and Malboeuf's shareholder status is not sufficient to establish standing for, regardless of the percentage of shares they hold, their interest is derivative of SVA's").

networks will result in  higher prices to consumers even if Harbor Drug and other small pharmacies are driven out of business. . . . Absent such allegations, Harbor Drug has failed to state a claim upon which relief can be granted")(citations omitted) (Exhibit 9).

But that is not what happened here.  Plaintiffs allege that Eaton *lowered* prices to each OEM and locked itself into those *lower* prices with long-term contracts.  Plaintiffs do not allege that Eaton did (or could) raise prices to supracompetitive levels or that it reduced (or could reduce) output below the competitive level.  As a result, Plaintiffs fail both prongs of the exclusive dealing test and the claims should be dismissed.[13]

Plaintiffs' complaint about their positioning within each of the truck manufacturer's databook fails for the same reasons:  first, Plaintiffs do not allege they were excluded from marketing to the truck manufacturer's customers.  Complaint ¶ 29.[14]  On the contrary, it concedes that there are other mechanisms for doing so.  For example, Eaton and Plaintiffs have long paid rebates or provided price incentives to truck dealers and fleets - - even though they do not purchase components directly - - as a form of "pull-through" marketing.  *Id.* ¶ 31.

Even if it did allege that Plaintiffs were literally precluded from marketing to truck fleets and dealers, it does not allege the requisite harm to competition, i.e., higher prices for Class 8 truck transmissions (or reduced output). Without that allegation, the claim is deficient. *See, e.g., J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, No: 1:01CV704, 2005 WL 1396940 (S.D. Oh. June 13, 2005) ("[w]hile favorable PBM formulary placement is no doubt an effective

---

[13]    In contrast, for example, the Third Circuit found that exclusive dealing that did, in fact, exclude competitors *and* result in supracompetitive pricing violated the Sherman Act. *United States v. Dentsply International, Inc.*, 399 F.3d 181, 185 (3d Cir. 2005) (defendant had "a reputation for aggressive price increases in the market and has created a high price umbrella").

[14]  The Complaint does not even allege they were excluded from each OEM's databook.  For example, it does not allege anything about Plaintiffs' position on Paccar's databook.  Plaintiffs' October 2002 press release indicates that it was still listed as an option in every truck manufacturer's databook, just as it had been prior to the manufacturers' contracts with Eaton. Exhibit 7.

method for sales of a drug, it is clearly not the only route Duramed had to sell its new product, Cenestin. The Court cannot conclude that Wyeth's favorable or exclusive formulary placement for Premarin in many PBMs equates to actionable market foreclosure") (Exhibit 10); *R.J. Reynolds Tobacco Corp. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 393(M.D.N.C. 2002) ("Plaintiffs have other non-retail marketing opportunities to communicate with adult smokers"), *aff'd*, 67 Fed. Appx. 810 (4th Cir. 2003).[15]

## II.    PLAINTIFFS' COMPLAINTS ABOUT 2000-01 CONTRACTS (AND CONDUCT IN THE 1990s) ARE TIME BARRED

Plaintiffs claim that Eaton's anticompetitive conduct began in the early 1990s and that Eaton engaged in anticompetitive conduct when it won the Freightliner, International and Paccar contracts in 2000 and 2001. Plaintiffs did not sue until October 2006, however, long after

---

[15]    The Complaint also throws another antitrust buzzword into the allegations, "bundled rebates," but that also fails to supply the missing element of antitrust injury. Complaint ¶ 72. A bundled rebate is a rebate that requires a customer to purchase a diverse set of products, and it can be illegal if it drives a small competitor that lacks the same set of diverse products out of the market *and* it injures the competitive process. In *LePage's Inc. v. 3M*, 324 F.3d 141, 154 (3d Cir. 2003), the defendant required customers to buy substantial amounts of entirely unrelated products "spanning six of 3M's diverse product lines," including health care, home care, home improvement, leisure time and retail auto products, in order to get a rebate on its monopoly Scotch-brand tape. "If a customer failed to meet the target volumes for one product, it would lose all of the rebates across the diverse product lines." Plaintiff was a small start-up private label tape producer who "d[id] not manufacture an equally diverse group of products and therefore could not make a comparable offer." *Id.* at 154. As a result, defendant's rebates drove the plaintiff from the market. In addition, they also injured competition: defendant's "interest in raising prices is well-documented" and it used its bundled, cross-product rebates to drive plaintiffs from the market expecting to "then cease or severely curtail its own private-label and second-tier tape lines." *Id.* at 163. In contrast, Plaintiffs here do not allege that Eaton increased prices (or reduced supply). The allegations here also differ from *LePage's* because they concern discounts and rebates on a single set of products (Class 8 transmissions) sold to the same customers for different end-uses (linehaul, construction trucks, garbage trucks), not a diverse and unrelated set of products. *See Concord Board Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1061 (8th Cir. 2000) (reversing jury verdict because alleged monopolist acted pro-competitively when it provided above-cost rebates on a full line of "one product, stern drive engines," that increased as defendant obtained a higher share of each customer's business).

these events.  Any suit to enforce a cause of action under the federal antitrust laws is "forever barred unless commenced within four years after the cause of action accrued."  15 U.S.C. § 15(b); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) ("The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action accrued'").[16]

An antitrust cause of action accrues at the time defendant commits an act that injures a plaintiff's business. *See Curtis v. Campbell-Taggart, Inc.*, 687 F.2d 336, 337 (10th Cir. 1982) ("The general rule is that a plaintiff's cause of action accrues on the date the defendant commits an act that injures the plaintiff's business"); *see also Com. of Pa. v. Milk Indus. Mgmt. Corp.*, 812 F. Supp. 500, 503-504 (E.D. Pa. 1992) ("Accrual of a private anti-trust cause of action for purposes of the statute of limitations occurs when the defendants commit an act which injures the plaintiff's business").

Plaintiffs here allege that they were injured by contracts Eaton entered with Freightliner in 2000 and with International and Paccar in 2001 (and even earlier conduct in the 1990s).  In cases where the injurious act is an allegedly anticompetitive contract, the date of injury, or accrual, is the date that the contract was made. *See Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1054, 1056 (5th Cir. 1982) (affirming dismissal on statute of limitations grounds because the "claimed injury to competition in the present case occurred when the alleged tie-in was formed, thus precluding Avondale from purchasing the aluminum tanks from one of Kaiser's competitors"); *City of El Paso v. Darbyshire Steel Co.*, 575 F.2d 521, 523 (5th Cir. 1978) ("In the instant case, the rights and liabilities of the parties were

---

[16]    This statute of limitations applies to all of Plaintiffs' antitrust causes of action. *See, e.g., In Re Linerboard Antitrust Litig.*, 305 F.3d 145, 160 (3d Cir. 2002) (Sherman Act § 1); *Re/Max Intern., Inc. v. Realty One, Inc.*, 173 F.3d 995, (6th Cir. 1999) (Sherman Act § 2); *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1048, 1052 (Sherman Act §§ 1 and 2 and Clayton Act § 3).  The parties agreed to toll the running of the statute of limitations between March 23, 2006 and September 30, 2006, but that does not help Plaintiffs because claims based on the Freightliner, International, and Paccar contracts ran before the tolling agreement began.

finalized by the contract signed on September 4, 1970. On that date, the price, the quantity, and the delivery schedule were fixed by the terms of the contract"; "City of El Paso felt an 'adverse impact' on September 4, damages were provable on that date; therefore, the City had four years from that date . . . in which to file its antitrust action").

Plaintiffs obviously knew they lost the Freightliner, International, and Paccar contracts in 2000 and 2001 and they allege they knew Eaton's conduct in winning the contracts was anticompetitive. Complaint ¶¶ 2, 60. In fact, their General Counsel sent a letter to Eaton in January 2001 specifically delineating his concern that Eaton's win at Freightliner was "anticompetitive" because of the "economic incentives" Eaton provided and because it allowed Eaton to "achieve an exclusive databook position." Exhibit 9. Yet, Plaintiffs waited until October 2006 - - more than five and a half years after the Freightliner, International, and Paccar contracts - - to file a suit making the *same allegations*. *E.g.,* Complaint ¶ 49 ("incentives"), 50 ("excluded from the data book"), 57 ("incentives" "exclude . . . from International's data book"), 65 ("incentives" "excluded . . . from its data book") .

Prevention of such delay is the precise reason that statutes of limitation exist. *See American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("Statutory limitation periods are 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded and witnesses have disappeared'"); *see also Artman v. Int'l Harvester Co.*, 355 F. Supp. 476, 482 (E.D. Pa. 1972) (four-year statute of limitations is "an expression of Congress' intent that no party be required to collect and prepare such defense material unless they are given timely notice before records are lost and witnesses' memories are dimmed").[17]

─────────────────────

[17] The allegation that Eaton subsequently delivered product under the contracts it signed does not solve the time bar. *See Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004) ("Performance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period"); *see also In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 229 (E.D.N.Y. 2003) ("the performance of an allegedly anticompetitive, pre-existing contract is not a new predicate act"); *Homeco Devs. v. Markborough Props., Ltd.*, 1986-2 Trade Cas. (CCH) ¶ 67,315, at 61,627-28 (S.D. Fla. 1986) (plaintiff's injury occurred at the

Plaintiffs' claims related to 2000-01 contracts (and earlier conduct) are therefore not timely on their face.

## CONCLUSION

Antitrust claims are enormously burdensome to defend (and, of course, impose significant burdens on third-parties, like the truck manufacturers here, and the Court). Before forcing a defendant to grapple with such a significant disruption to its business and to incur such expenses, the Court must ensure that the Complaint actually alleges all of the required elements of a claim. The Complaint here does not. Instead, it lacks any allegations that Eaton caused Plaintiffs antitrust injury. Moreover, Plaintiffs' complaints related to contracts signed in 2000 and 2001 (and even earlier conduct) are barred by the Clayton Act's four-year statute of limitations. For the foregoing reasons, this Court should grant Eaton's motion and dismiss it from this litigation.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 351-9219
*Attorneys for Defendant*
*Eaton Corporation*

OF COUNSEL:

Robert F. Ruyak
Joseph A. Ostoyich
Curtis J. LeGeyt
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

November 22, 2006

---

time the contracts were signed; "The continuation of benefits under the contract; namely, the sale of units and receipt of real estate brokerage commissions by the defendants, within the four year statute time period of limitations is not a basis for waiting almost five years to file suit").

## CERTIFICATE OF SERVICE

I, Jason A. Cincilla, hereby certify that on the 22nd day of November, 2006 a Memorandum In Support Of Eaton Corporation's Motion To Dismiss Plaintiff's Complaint was served by electronic filing or e-mail on the following counsel of record:

Charles M. Oberly, III, Esquire
Oberly, Jennings & Rhodunda, P.A.
1220 N. Market Street, Suite 710
Wilmington, DE 19801

Christopher Wood, Esquire
Dickstein Shapiro LLP
1825 Eye Street, NW
West Tower, Suite 500
Washington, DC 20006-5403
Email:  woodc@dicksteinshapiro.com

Jason A. Cincilla (#4232)

# EXHIBIT 1

## PART 1 OF 2

# DriveTrain Plus™
## The Complete Story



ArvinMeritor™



# The ArvinMeritor story

ArvinMeritor has been a leading supplier of parts and systems to the transportation industry for more than 90 years. Our innovative products have been at the heart of successful commercial vehicle operations for three generations — as Rockwell Automotive, Meritor and now ArvinMeritor.

Through the changes, our commitment to providing the best and most complete undercarriage systems has never wavered. We continue to set industry standards for everything from axles and brakes, to transmissions and clutches.

Whether your need is for a single brake or a complete drivetrain, ArvinMeritor is your complete source. You can spec our products with the confidence and assurance that comes from working with a leader who will be there for generations to come.



**DRIVETRAIN PLUS™**
**THE COMPLETE SYSTEM**

**ArvinMeritor™**

**ZF Meritor FreedomLine™ Transmissions**
- Totally automated two-pedal operation
- Integrated clutch and electronics for worry-free shifting
- Skip-shifts for maximum fuel economy
- No clutch pedal" design reduces fatigue and driver training time
- Available in 12- and 16-speed models



**ZF Meritor SureShift™ Transmissions**
- The intuitive automated manual transmission
- Offers the ease of an automated transmission, but keeps control at the driver's fingertips
- Improved fuel economy
- Clutch used only to start and stop, reducing driver fatigue
- Available in 9- and 10-speed models with torque range of 1,150-2,050 lb-ft





**Gabriel® Shock Absorbers**

- The industry leader in commercial vehicle ride control
- Integral to reducing highway vibration, protection of valuable cargo and minimizing driver fatigue
- A complete range of products and systems designed and manufactured to meet the exacting needs of primary cab, trailer and seat suspensions

**Meritor® Disc Brakes**



- The new generation of air disc brakes are available for wheel diameters 19.5 and 22.5 inches
- Improves extreme-duty braking performance by providing maximum braking efficiency, stability and resisting brake fade
- Clearance-sensing auto adjustment monitors and maintains optimum pad-to-rotor clearance
- Easy to maintain; no special tools required for pad replacement



# COMPLETE BRAKING SYSTEM

## New E-Version Meritor WABCO Anti-Lock Braking Systems (ABS) For trucks, tractors and buses

- Power Line Carrier (PLC) technology enables tractor-to-trailer communication
- Configurations to meet multiple applications
  - 4S/4M, 6S/4M and 6S/6M
- Automatic Traction Control (ATC) option available for all ABS ECU configurations

## Enhanced Easy-Stop™ Trailer ABS

- Power Line Carrier (PLC) technology enables tractor-to-trailer communication
- Additional generic inputs/outputs for added communication options
- System configurations to meet virtually any trailer application

## Meritor WABCO Electronic Leveling Module (ELM)

- Available for trucks, tractors and trailers
- Enhances ride, handling and control
- Minimum air consumption due to constant ride-height averaging by the ECU
- Maintains optimum driveline angles for reduced drivetrain vibration and wear
- Large internal air passageways for rapid raising and lowering of suspension



## Meritor WABCO Electronic Braking Systems (EBS)

- Integrates ABS, ATC and other key vehicle control systems to facilitate the next generation of braking
- Reduces number of brake system components and air lines for easier installation and maintenance





**Meritor® Trailer Products**

- Complete trailer axle line TN, TQ, TP and TB
- Industry-leading TN Series economical standard-use axle for a wide range of vocations
- TP axles with interchangeable inner and outer bearings
- TB trailer axles with unitized wheel ends
  - No need to install wheel seals or adjust bearings
- Extra heavy-duty construction axle

**Meritor® TRIAD™ Wheel-End System**

- Reduces trailer wheel-end maintenance for 3-Years/300,000-Miles in on-highway applications
- Features high-performance seals and anti-back-off washers, along with a patented installation technique to maximize performance
- Teflon™ sealing element achieves superior contamination exclusion extending wheel-end life
- The TRIAD system is available on TN, TQ and TP trailer axle models with both ferrous and aluminum hubs



**ZF Meritor Manual Transmissions**
- Complete linehaul line of 9-, 10-, and 13-speed transmissions
- Available with shift-and-cruise option
- Perfect match for today's high torque engines ranging from 1,150-1,850 lb-ft
- Torq-2™
  - Up to 2,050 lb-ft torque rating in top gears
  - Available at a fraction of the cost of spec'ing a multi-speed transmission

**Meritor® Clutches**
- AutoJust™ clutch eliminates the need for clutch adjustments
  - Reduces maintenance costs
  - Maximizes component life
- LitePedal™ clutch with Long Travel Damper™ (LTD) reduces torsional vibration
  - Low pedal effort reduces fatigue
- Available in popular torque ranges from 1,150-2,050 lb-ft
- Available with an optional six-paddle disc for increased component life
- Extended-lube option for release bearing – up to 100,000-mile grease intervals



**MeritorLite™ Hubs**
- Lightest standard ductile iron hub available, more durable than aluminum hubs
- 50 percent improvement in tensile and yield strength over aluminum hubs
- Less prone to corrosion than aluminum hubs
- For trailer applications

**Meritor® SteeLite X30™ Drums**
- Up to 200 pounds weight savings over standard full-cast iron drums for a tandem axle tractor/trailer configuration
- One-piece design provides exceptional strength
- Machine balanced without weld weights
- Available for tractor and trailer applications

**Meritor WABCO System Saver Air Dryers**
- Single-cartridge, extended-cartridge and dual-cartridge designs available to meet a variety of heavy-truck and vocational applications
- Premium desiccant for increased adsorption capacity and extended cartridge life
- Spin-on cartridge design for convenient, easy maintenance and reduced downtime
- Compact, lightweight design for increased payload



**Meritor WABCO Air Compressors**
- Air output rating of 18.7 CFM for greater air delivery
- Up to 90 percent lower oil consumption, extends air system component life
- Reduced discharge temperatures lower carbonization and air system contamination



**Aftermarket Parts**

- The Commercial Vehicle Aftermarket provides parts and services to a network of 5,000 independent distributors, OEMs and OEM dealers in North America
- Portfolio extends across 21 product lines, featuring OEM-quality aftermarket repair parts
- Growing line of remanufactured products, including differentials, carriers, clutches and brake shoes
- OEM-quality "all-makes" product line
- An extensive list of e-business solutions, making parts ordering and inventory more convenient
- Two established umbrella brands – Meritor® and Euclid®

**Meritor® Tire Inflation System by P.S.I.**

- Monitors and maintains air pressure at a constant and proper level
- Reduces the second-highest fleet opportunity expense – tire wear due to under- or overinflation
- Helps prevent costly damage to tires and trailer undercarriage from blowouts
- Winner of R&D 100 Award



## Meritor® Front Steer Axles

- Easy Steer™ bushings provide maximum lubrication for longer kingpin life and reduced steering effort
- Easy Steer™ Plus premium option
  - Includes a permanently lubricated unitized hub, bearing and seal package
  - Eliminates bearing adjustment
  - Backed by the industry's first 5-Year/750,000-Mile linehaul warranty

## Meritor® Drivelines and Universal Joints

- Innovative needle retention design, thicker bearing cups and nylon thrust washers all contribute to increased durability of the RN design
- RPL Series Permalube™ permanently lubricated drivelines provide longer U-joint life for higher torque applications
  - The industry's only sealed and greased-for-life, reduced maintenance driveline
  - Up to 3-Year/350,000-Mile warranty



**Meritor® Single and Tandem Drive Axles**

- Industry-exclusive aluminum carrier option can save up to 90 pounds per tandem
- Hypoid-Generoid™ gears handle higher torques, run quieter and improve life
- Optional pump and filter resists spin-out damage
- Driver-Controlled Differential Lock (DCDL) provides maximum traction on slippery or poor roads
- Unitized Wheel End premium option
  - Includes permanently lubricated unitized hub, bearing and seal package
  - Eliminates wheel-bearing adjustment
  - Cast aluminum hubs provide up to 110 pounds weight savings over conventional hubs on a tandem axle application



# EXHIBIT 1

## PART 2 OF 2

# COMPLETE BRAKING SYSTEM

## Meritor® Cam Brakes



- Q Plus™ cam brakes have common hardware for front steer, rear drive and trailer axles
- MX500 Long-Life Package helps meet changing needs of vehicle brake dynamics
  - No lubrication or lining maintenance needed during first 3-Years/500,000-Miles
- LX500 Extended Lube Feature
  - Specially-mated brake and Meritor® ASA combination is lubrication-free for 3-Years/500,000-Miles

## Meritor® Automatic Slack Adjusters (ASA)

- Lightest weight ASA on the market
- Keeps brakes in constant adjustment, reducing downtime and maintenance costs
- Enhanced boot and gear seal designs keep out contaminants reducing maintenance costs
- Integrated with Q Plus™ LX500 package – extends lubrication interval to 3-Years/500,000-Miles



## RideStar™ — RHP Suspension

- Highway Parallelogram with integrated slider, trailer, axles and brakes
- Efficiently sliding tandem centered around a single, unified frame bracket
- Weighs 255 pounds less than conventional trailing arm suspensions
- Eliminates dock walk without heavy add-on devices
- Eliminates suspension-induced backslap, providing a smoother ride for cargo and driver
- Winner of PACE™ Award for Innovation

## RideStar™ — FS Suspension Series

- Provides the legendary performance of Meritor RHP Series to the non-van market
- Better ride and handling in a low-maintenance system
- Revolutionary new bushing uses interleaf shims for superior for/aft stiffness
- Narrow profile saves total suspension system weight and bulk
- Specially-designed Gabriel™ shocks deliver exceptional damping and long-term, low maintenance dependability
- The FS Series reduces tire wear, improves braking and control, and minimizes axle vibration



**Leading technology creates market leaders**

ArvinMeritor components and systems are the most spec'd products in North America, year after year. Our reliability, innovation and reputation make us the most popular supplier for:

Steer Axles

Drive Axles

Clutches

Trailer Axles

Air Brakes

Permalube™ Drivelines

Hydraulic Brakes

Braking Control Systems

Shock Absorbers

And, our research and development has led to a new generation of products destined to take a leadership position in:

Transmissions

Suspension Systems

Exhaust Systems

**Reliable solutions**

Producing the best components and systems available is only the beginning. ArvinMeritor also provides the industry's leading network of sales, service and support.

- 24-hour Customer Service Center provides around-the-clock support
- Committed field operations personnel in sales and service throughout North America
- Aftermarket parts sales and support
- Product development dedicated to reliability, low maintenance and cost effectiveness

Our combination of product excellence and after-sale support means that you can rely on ArvinMeritor to be your complete source. Today and tomorrow.

**Specialized Training and Field Support**

- Unmatched support for dealers, fleets and OEM customers
- Programs tailored to parts professionals
- Training services brought to our customers by utilizing localized partnerships in schools
- Drivetrain Plus™ field representatives work as partners with you
- Assistance specifying drivetrains to help assure you've selected compatible systems
- Service troubleshooting support
- Warranty claim assistance

**Customer Service Center 800.535.5560**

- Well-trained customer service representatives
- Technical information
- Troubleshooting support
- Product literature
- Unit down assistance and warranty coverage information
- Online services for product information, technical library and company news



**www.drivetrainplus.com**



ArvinMeritor, Inc.
2135 West Maple Road
Troy, Michigan  48084  USA
800-535-5560
www.drivetrainplus.com

© Copyright 2003
ArvinMeritor, Inc.

Litho in U.S.A.

Revised 3-03
SP-2091 (465089/11900)



# EXHIBIT 2

Case 1:06-cv-00623-SLR    Document 8-4    Filed 11/22/2006    Page 2 of 15

**ARVINMERITOR INC filed this 10-K405 on 12/19/2001.**

Outline                                    Printer Friendly
                                           Next Page »

---------------------------------------------------------------------------
---------------------------------------------------------------------------

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
------------------------

FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED SEPTEMBER 30, 2001
COMMISSION FILE NUMBER 1-15983
------------------------

ARVINMERITOR, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

INDIANA                                38-3354643
(STATE OR OTHER JURISDICTION OF        (I.R.S. EMPLOYER
INCORPORATION OR ORGANIZATION)         IDENTIFICATION NO.)

2135 WEST MAPLE ROAD                   48084-7186
TROY, MICHIGAN                         (ZIP CODE)
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES)

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (248) 435-1000
------------------------

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

TITLE OF EACH CLASS                NAME OF EACH EXCHANGE ON WHICH REG
--------------------               ----------------------------------

Common Stock, $1 Par Value              New York Stock Exchange
(including the associated Preferred
Share Purchase Rights)

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:  NONE
------------------------

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.  Yes [X]  No [ ]

Operations below. The impact that the euro and other currencies will have on our sales and operating income is difficult to predict in the upcoming year.

We enter into foreign currency forward exchange contracts to minimize the risk of unanticipated gains and losses from currency rate fluctuations on foreign currency commitments entered into in the ordinary course of business. It is our policy not to enter into derivative financial instruments for speculative purposes and, therefore, we hold no derivative instruments for trading purposes. We have not experienced any material adverse effect on our consolidated financial position, results of operations or cash flow related to these foreign currency forward exchange contracts. (See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations -- Quantitative and Qualitative Disclosures about Market Risk and Note 13 of the Notes to Consolidated Financial Statements under Item 8. Financial Statements and Supplementary Data below.)

On January 1, 1999, the euro became the common currency of 11 countries of the European Union and the present national currencies of these 11 countries became sub-units of the euro at fixed exchange rates. Subsequent to January 1, 1999, an additional country was added to the European Monetary Union. The European Union's current plans call for the transition to the euro to be substantially completed by January 1, 2002, at which time the euro will become the sole legal tender in those participating countries.

We are engaged in business in many of the countries that participate in the European Monetary Union, and sales for fiscal year 2001 in these countries were approximately 18 % of our total sales. In addition, we enter into foreign currency forward exchange contracts with respect to several of the existing currencies that have been subsumed into the euro and we have borrowings in participating currencies primarily under our

12

bank revolving credit facility. We have analyzed the potential effects of the euro conversion on competitive conditions, information technology and other systems, currency risks, financial instruments and contracts, and have examined the tax and accounting consequences of euro conversion, and we believe that the conversion has not had and will not have a material adverse effect on our business, operations and financial condition.

We are making the necessary adjustments to accommodate the conversion, including modifications to our information technology systems and programs, pricing schedules and financial instruments. We expect that all necessary actions will be completed in a timely manner, and that the costs associated with the conversion to the euro will not be material.

SEASONALITY; CYCLICALITY

LVS and CVS may experience seasonal variations in the demand for products to the extent automotive vehicle production fluctuates. Historically, for both segments, such demand has been somewhat lower in the quarters ended September 30 and December 31, when OEM plants may close during model changeovers and vacation and holiday periods.

In addition, the industry in which LVS and CVS operate has been characterized historically by periodic fluctuations in overall demand for trucks, passenger cars and other vehicles for which we supply products, resulting in corresponding fluctuations in demand for our products. Cycles in

the major automotive industry markets of North America and Europe are not
necessarily concurrent or related. The cyclical nature of the automotive
industry is outside our control and cannot be predicted with certainty. We have
sought and will continue to seek to expand our operations globally to mitigate
the effect of periodic fluctuations in demand of the automotive industry in one
or more particular countries.

The following table sets forth vehicle production in principal markets
served by LVS and CVS for the last five fiscal years:

|  | FISCAL YEAR ENDED SEP | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
| Light Vehicles (in millions): |  |  |  |
| North America............................................ | 15.6 | 17.5 | 16.9 |
| South America............................................ | 2.2 | 2.0 | 1.5 |
| Europe................................................... | 19.1 | 18.9 | 18.2 |
| Asia/Pacific............................................. | 16.0 | 17.5 | 15.6 |
| Commercial Vehicles (in thousands): |  |  |  |
| North America, Heavy-Duty Trucks......................... | 140 | 269 | 292 |
| North America, Medium-Duty Trucks........................ | 117 | 165 | 175 |
| North America, Trailers.................................. | 208 | 367 | 366 |
| Europe, Trailers......................................... | 110 | 119 | 124 |

---------------
Source: Automotive industry publications and management estimates.

The company's most recent outlook for fiscal year 2002 shows continued
softening in North American production in the heavy-duty commercial truck and
trailer markets, and we anticipate North American heavy-duty truck production to
decline approximately 7%. European heavy and medium trucks are estimated to be
down approximately 15% from fiscal year 2001. There is greater uncertainty in
light vehicle production, but the company currently expects a 4 % decline in
North America and a 7 % decline in Europe during fiscal year 2002. See "Industry
Developments and Outlook" above and Item 7. Management's Discussion and Analysis
of Financial Condition and Results of Operations -- Overview and Outlook and
-- Results of Operations below for information on downturns in certain markets
and their effects on our sales and earnings.

13

ITEM 2.  PROPERTIES.

At September 30, 2001, our operating segments had the following facilities
in the United States, Europe, South America, Canada, Mexico, Australia, South
Africa and the Asia/Pacific region:

|  | MANUFACTURING FACILITIES | ENGINEERING FACILITIES, SALES AND SERVICE CEN |
|---|---|---|

```
LVS..................................    95              62
CVS..................................    42              59
LVA..................................    24              29
Other................................     4               3
```

These facilities had an aggregate floor space of approximately 35 million square feet, substantially all of which is in use. We owned approximately 74% and leased approximately 26% of this floor space. There are no major encumbrances (other than financing arrangements that in the aggregate are not material) on any of our plants or equipment. In the opinion of management, our properties have been well maintained, are in sound operating condition and contain all equipment and facilities necessary to operate at present levels. A summary of floor space of these facilities at September 30, 2001, is as follows:

| | OWNED FACILITIES | | | | LEASED FACILITIES | | |
|---|---|---|---|---|---|---|---|
| LOCATION | LVS | CVS | LVA | OTHER | LVS | CVS | LV |
| | | | (IN THOUSANDS OF SQUARE FEET) | | | | |
| United States............... | 4,032 | 4,856 | 2,144 | 642 | 687 | 1,106 | 7 |
| Canada..................... | 566 | 413 | -- | -- | 103 | 160 | 1 |
| Europe..................... | 3,903 | 2,934 | 1,076 | -- | 2,747 | 150 | 8 |
| Asia/Pacific................ | 493 | 1,047 | -- | -- | 147 | 658 | 5 |
| Latin America.............. | 1,225 | 2,120 | 157 | -- | 89 | 163 | 1 |
| Africa..................... | 304 | -- | -- | -- | -- | 11 | |
| Total............. | 10,523 | 11,370 | 3,377 | 642 | 3,773 | 2,248 | 2,5 |

ITEM 3.  LEGAL PROCEEDINGS.

On July 17, 1997, Eaton Corporation filed suit against Rockwell in the U.S. District Court in Wilmington, Delaware, asserting infringement of Eaton's U.S. Patent No. 4850236, which covers certain aspects of heavy-duty truck transmissions, by our Engine SynchroShift(TM) transmission for heavy-duty trucks, and seeking damages and injunctive relief. Meritor was joined as a defendant on June 11, 1998. The following judgments and orders have been issued in this case:

- After trial, on July 1, 1998, a jury rendered a verdict in favor of Eaton, finding that Meritor had infringed Eaton's patent and awarding compensatory damages in an amount equal to 13% of total product sales. On October 11, 2001, the judge entered an order granting damages to Eaton in the amount of $2.9 million, plus post-judgment interest.

- A separate phase of the trial was held in April 1999, without a jury, with respect to Meritor's allegations that Eaton had engaged in inequitable conduct in obtaining its patent and that the patent was therefore unenforceable. On February 9, 2001, the judge ruled against the company on the second phase of the proceedings, finding that we had not provided clear and convincing evidence of inequitable conduct by Eaton in obtaining its patent.

- On September 19, 2001, the judge granted Eaton's request for a permanent

injunction against our manufacturing or selling the Engine
SynchroShift(TM) transmission and any "colorable variations."

- On October 11, 2001, the judge denied our motions for a new trial and for
  judgment as a matter of law.

We have appealed these judgments and orders to the United States Court of
Appeals for the Federal Circuit. Based on advice of M. Lee Murrah, Esq., Chief
Intellectual Property Counsel of the company, management

14

believes our truck transmissions do not infringe Eaton's patent. We intend to
continue to defend this suit vigorously.

Various other lawsuits, claims and proceedings have been or may be
instituted or asserted against ArvinMeritor or our subsidiaries relating to the
conduct of our business, including those pertaining to product liability,
intellectual property, environmental, safety and health, and employment matters.

Included in these matters are claims for alleged asbestos-related personal
injuries, which arose from products manufactured prior to 1977 by a subsidiary
acquired by Arvin in 1986. During fiscal years 1996 through 2001, ArvinMeritor
and our predecessors paid asbestos-related claims of approximately $40 million,
substantially all of which were reimbursed by insurance. As of September 30,
2001, we had accrued approximately $71 million for contingent asbestos-related
liabilities, and recorded assets of $60 million for probable recoveries from
third parties and insurance. Management believes that existing insurance
coverage will reimburse substantially all of the potential liabilities and
expenses related to pending cases.

Prior to February 1, 2001, the Center for Claims Resolution (the "CCR")
handled the processing and settlement of asbestos claims on our behalf, and we
shared in the payment of defense costs and settlements of the asbestos claims
with other CCR members. Several members of the CCR have filed for bankruptcy
protection, and these members have failed, or may fail, to pay certain financial
obligations with respect to settlements that were reached while they were CCR
members. We expect to be subject to claims for payment of a portion of the
defaulted shares and an estimate of this payment has been included in the
recorded reserves. We and our insurers are engaged in proceedings to determine
whether existing insurance coverage should reimburse any potential liability
related to this issue.

The outcome of litigation cannot be predicted with certainty and some
lawsuits, claims or proceedings may be disposed of unfavorably to ArvinMeritor
and for amounts in excess of the foregoing estimates. However, based on
management's evaluation of matters which are pending or asserted, after
consulting with Vernon G. Baker, II Esq., ArvinMeritor's General Counsel, we
believe the disposition of such matters will not have a material adverse effect
on our financial statements.

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

There were no matters submitted to a vote of security holders during the
fourth quarter of fiscal year 2001.

ITEM 4A.  EXECUTIVE OFFICERS OF THE COMPANY.

The name, age, positions and offices held with ArvinMeritor and principal occupations and employment during the past five years of each of our executive officers as of November 30, 2001, are as follows:

LARRY D. YOST, 63 -- Chairman of the Board and Chief Executive Officer since July 2000. Chairman of the Board and Chief Executive Officer of Meritor from May 1997 to July 2000; Acting President, Light Vehicle Systems of Meritor from January 1998 to March 1999; Senior Vice President, President, Automotive and Acting President, Heavy Vehicle Systems of Rockwell (electronic controls and communications) from March 1997 to September 1997; President, Heavy Vehicle Systems of Rockwell from November 1994 to March 1997.

VERNON G. BAKER, II, 48 -- Senior Vice President and General Counsel since July 2000. Secretary of ArvinMeritor from July 2000 to November 2001; Senior Vice President, General Counsel and Secretary of Meritor from August 1999 to July 2000; Vice President and General Counsel, Corporate Research and Technology of Hoechst Celanese Corporation, a subsidiary of Hoechst AG (pharmaceuticals and industrial chemicals), from 1989 to July 1999.

DIANE S. BULLOCK, 44 -- Vice President and Controller since August 2001. Vice President, Corporate Development of ArvinMeritor from July 2000 to December 2000; Vice President and Controller of Meritor from September 1998 to July 2000; Assistant Controller of Meritor from January 1998 to September 1998;

15

Controller -- Body Systems N.A. of ITT Automotive, Inc. (automotive component supplier) from 1995 to 1997.

LINDA M. CUMMINS, 53 -- Senior Vice President, Communications since July 2000. Senior Vice President, Communications of Meritor from April 2000 to July 2000; Vice President, Communications of Meritor from August 1999 to April 2000; Vice President of Advanced Marketing and Worldwide Communications of United Technologies Automotive (automotive component supplier) from August 1997 to August 1999; Vice President of Communications and External Affairs of United Technologies Automotive from June 1996 to August 1997; Director of Broadcast News/Global News Department of Ford Motor Company (automotive) from 1993 to 1996.

WILLIAM K. DANIEL, 36 -- Senior Vice President and President, Light Vehicle Aftermarket since July 2000. President of Arvin Replacement Products business group from December 1999 to July 2000; Managing Director of Arvin Replacement Products in Europe from January 1998 to November 1999; Managing Director of Gabriel Europe from May 1996 to December 1997.

JUAN L. DE LA RIVA, 57 -- Senior Vice President, Corporate Development & Strategy, Engineering and Procurement since October 2001. Senior Vice President, Corporate Development and Strategy of ArvinMeritor from July 2000 to October 2001; Senior Vice President, Business Development of Meritor from February 2000 to July 2000; Senior Vice President, Business Development and Communications of Meritor from February 1999 to February 2000; Vice President, Business Development and Communications of Meritor from September 1998 to February 1999; Managing Director -- Wheels, Light Vehicle Systems of Meritor from September 1997 to September 1998; Managing Director -- Wheels, Light Vehicle Systems of Rockwell, from 1994 to September 1997.

THOMAS A. GOSNELL, 51 -- Senior Vice President and President, Commercial Vehicle Systems since November 2000. Senior Vice President and President, Heavy

# EXHIBIT 3



About Us | Newsletter | Advertisers | Sub

Sear





SUBSCRIBE HERE

Back Issues



Home

Buyers' Guide

Subscribe

Trailer Output

Snow & Ice Directory

Product Info

Newsletter

Truck/Trailer Locator

Media Kit

E-mail Updates

Rent Our Lists

American Trucker

Fire Chief

Fleet Owner

Bulk Transporter

Refrigerated Transporter

## ArvinMeritor wins appeal in transmission patent infringement suit

*Apr 4, 2003 12:00 PM*

ArvinMeritor, Inc. announced it has won its appeal in the patent infringement suit brought by Eaton Corp. against ZF Meritor's Engine Synchro Shift(TM) (ESS) transmission system. The Court of Appeals for the Federal Circuit reversed the decision of the Delaware trial court and found that ArvinMeritor did not infringe on the Eaton patent.

"We are pleased that the Appellate Court ruled in ArvinMeritor's favor and dissolved the injunction," said M. Lee Murrah, chief patent counsel of ArvinMeritor. "ArvinMeritor, and its predecessor Rockwell International Corp., have believed from the beginning that Eaton's position was unwarranted, and the Court of Appeals agreed."

"This is a significant victory for our transmission business and, more importantly, for our customers," said Tom Gosnell, president of ArvinMeritor's Commercial Vehicle Systems business and board member of the ZF Meritor joint venture. "Our advanced technologies are completely vindicated, and we will continue to rigorously defend ourselves against any company that tries to stifle our technological advancements for the commercial vehicle industry."

The Court of Appeals narrowed Eaton's overly broad interpretation of its patent. As a result, Eaton cannot apply its patent against ArvinMeritor's ESS transmission or any other transmission that does not contain the structures listed in the patent claim, according to ArvinMeritor's outside legal counsel, Welsh & Katz Ltd.

Following the initial lawsuit filing by Eaton in July 1997, ZF Meritor -- a joint venture created in 1999 between ArvinMeritor and ZF -- was forced in September 2001 to remove ESS from the market, following the initial verdict in the competitor's favor.

"This type of legal action by Eaton prevented the industry and our North American customers from enjoying the unique benefits of ESS during the past 18 months and attempted to create a doubt on our advanced shift systems," said Rick Martello, president of ZF Meritor. "Now, we must assess the practicality of re-introducing this shifting feature on our transmissions."

Want to use this article? Click here for options! 
© 2006 Prism Business Media Inc.









ArvinMeritor wins appeal in transmission patent infringement suit                    Page 2 of 2

**About Us**

**Contact Us**



Back to Top

Key:     Paid Content        Enhanced for the Web

Contact Us  For Advertisers  For Search Partners  Privacy Policy  Subscribe
© 2006 Prism Business Media Inc. All rights reserved.

# EXHIBIT 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF
### THE SECURITIES EXCHANGE ACT OF 1934
#### For the Fiscal Year Ended October 2, 2005
#### Commission file number 1-15983

# ARVINMERITOR, INC.

###### (Exact name of registrant as specified in its charter)

| Indiana | 38-3354643 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 2135 West Maple Road Troy, Michigan | 48084-7186 |
| (Address of principal executive offices) | (Zip Code) |

#### Registrant's telephone number, including area code: (248) 435-1000

## SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $1 Par Value (including the associated Preferred Share Purchase Rights) | New York Stock Exchange |

### SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: None

Indicate by check mark whether the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K ____

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒ No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the registrant's voting and non-voting common equity held by non-affiliates of the registrant on April 1, 2005 (the last business day of the most recently completed second fiscal quarter) was approximately $1,067.2 million.

70,315,961 shares of the registrant's Common Stock, par value $1 per share, were outstanding on October 31, 2005.

### DOCUMENTS INCORPORATED BY REFERENCE

Certain information contained in the Proxy Statement for the Annual Meeting of Shareowners of the registrant to be held on January 31, 2006 is incorporated by reference into Part III.

Standard Inc., is the leading supplier of ABS and a supplier of other electronic and pneumatic control systems for North American heavy-duty commercial vehicles. The joint venture also supplies hydraulic ABS to the North American medium-duty truck market and produces stability control systems for tractors and trailers, which are designed to help maintain vehicle stability and aid in reducing tractor-trailer rollovers.

*Transmissions.* In the second quarter of fiscal year 2004, we dissolved our 50%-owned joint venture with ZF Friedrichshafen AG ("ZF"), which produced transmission components and systems for heavy vehicle OEMs and the aftermarket in the United States, Canada and Mexico. The joint venture was replaced by a marketing arrangement that allows us to provide the redesigned FreedomLine™, a fully automated mechanical truck transmission without a clutch pedal, to our customers. This transmission product line enables us to supply a complete drivetrain system to heavy-duty commercial vehicle manufacturers in North America.

*Emissions Systems.* CVS has adapted products and applications from the LVS emissions technologies business unit and introduced new technologies to develop a portfolio of technologically advanced emissions control products and applications to address increasingly stringent regulatory standards for diesel particulate matter and nitrogen oxide (NOx) emissions in commercial vehicles. To date, we have nine contracts related to these products and applications, which include:

- Diesel Oxidation Catalysts — capable of removing up to 90% of hydrocarbon and carbon monoxide emissions and 30% of particulate matter. This technology is available currently.

- Thermal Regenerator — on demand, active regeneration technology that offers a safe and effective way to remove diesel particulate matter, using diesel fuel as a heat source, without the use of a catalytic coating or precious metals. This technology is expected to be released for OEM use in 2006, in preparation for the EPA's 2007 particulate matter emission standards.

- Catalyzed Diesel Particulate Filter — a filter that traps the diesel particulate matter from the exhaust and prevents it from reaching the atmosphere. It is expected to be available in 2007 to meet the new 2007 U.S. regulations.

- Selective Catalytic Reduction (SCR) System — a compact, low-weight option to effectively reduce NOx emissions to the levels required to meet 2006 and 2008 European standards. The system also achieves reduction of diesel particulate matter and allows the engine to operate in ways that could maximize fuel economy.

- Plasmatron (Plasma Fuel Reformer) — a system that creates a hydrogen-rich gas from any hydrocarbon fuel source, which enables more efficient control of NOx from diesel engine exhaust, through effective regeneration of "NOx adsorbers" or "lean NOx traps." This technology could be less sensitive to sulfur contamination and could use less fuel than conventional regeneration and consume minimal power. This technology, which is expected to be available for production in 2010, also has potential for future applications in gasoline combustion engines.

### Specialty Products

*Off-Highway Vehicle Products.* In fiscal year 2005, we supplied brakes in North America, South America, Europe and the Asia/Pacific region, and heavy-duty axles and drivelines in the Asia/Pacific region, for use in numerous off-highway vehicle applications, including construction, material handling, agriculture, mining and forestry. These products are designed to tolerate high tonnages and operate under extreme conditions. We sold the off-highway brakes business in the first quarter of fiscal year 2006 (see "Strategic Initiatives" below).

*Government Products.* We supply axles, brakes and brake system components including ABS, trailer products, transfer cases and drivelines for use in medium-duty and heavy-duty military tactical wheeled vehicles, principally in North America.

*Specialty Vehicle Products.* We supply axles, brakes and transfer cases for use in buses, coaches and recreational, fire and other specialty vehicles in North America and Europe, and we are the leading supplier of bus and coach axles and brakes in North America.

### Light Vehicle Aftermarket

The principal LVA products include mufflers; exhaust and tail pipes; catalytic converters; shock absorbers; struts; gas lift supports and vacuum actuators; and automotive oil, air, and fuel filters. These products are sold under the brand names Arvin® (mufflers); Gabriel® (shock absorbers); and Purolator® (filters). LVA also markets products under private label to customers such as CARQUEST, NAPA and AC Delco (ride control) and Motorcraft, Quaker State, Shell and Mobil (filters).

### Customers; Sales and Marketing

ArvinMeritor's operating segments have numerous customers worldwide and have developed long-standing business relationships with many of these customers. Our ten largest customers accounted for approximately 74% of our total sales from continuing operations in fiscal year 2005.

The following table sets forth vehicle production in principal markets served by LVS and CVS for the last five fiscal years:

| | Year Ended September 30, | | | | |
|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2002** | **2001** |
| Light Vehicles (in millions): | | | | | |
| North America | 15.6 | 15.9 | 16.0 | 16.3 | 15.6 |
| South America | 2.7 | 2.3 | 2.0 | 1.9 | 2.2 |
| Western Europe (including Czech Republic) | 16.4 | 16.9 | 16.7 | 16.5 | 16.9 |
| Asia/Pacific | 22.5 | 20.9 | 18.9 | 17.3 | 16.9 |
| Commercial Vehicles (in thousands): | | | | | |
| North America, Heavy-Duty Trucks | 324 | 235 | 164 | 169 | 150 |
| North America, Medium-Duty Trucks | 208 | 172 | 141 | 133 | 144 |
| United States and Canada, Trailers | 327 | 284 | 213 | 145 | 208 |
| Western Europe, Heavy- and Medium-Duty Trucks | 421 | 376 | 364 | 363 | 386 |
| Western Europe, Trailers | 115 | 109 | 98 | 101 | 110 |

Source: Automotive industry publications and management estimates.

We anticipate the North American heavy-duty truck market to decrease approximately 6% in fiscal year 2006, with production at an estimated 305,000 units. In Western Europe, we expect production of heavy- and medium-duty trucks to remain at approximately 421,000 units. Our most recent outlook shows North American and Western European light vehicle production to be 15.6 million and 16.4 million vehicles, respectively, during fiscal year 2006. See Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations — Overview* and *— Results of Operations* below for information on the effects of recent market cycles on our sales and earnings.

**Available Information**

We make available free of charge through our web site (www.arvinmeritor.com) our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, all amendments to those reports, and other filings with the Securities and Exchange Commission ("SEC"), as soon as reasonably practicable after they are filed.

**Cautionary Statement**

This Annual Report on Form 10-K contains statements relating to future results of the company (including certain projections and business trends) that are "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements are typically identified by words or phrases such as "believe," "expect," "anticipate," "estimate," "should," "are likely to be," "will" and similar expressions. Actual results may differ materially from those projected as a result of certain risks and uncertainties, including but not limited to: global economic and market conditions; the demand for commercial, specialty and light vehicles for which the company supplies products; risks inherent in operating abroad (including foreign currency exchange rates and potential disruption of production and supply due to terrorist attacks or acts of aggression); availability and cost of raw materials, including steel; OEM program delays; demand for and market acceptance of new and existing products; successful development of new products; reliance on major OEM customers; labor relations of the company, its suppliers and customers, including potential disruptions in supply of parts to our facilities or demand for our products due to work stoppages; the financial condition of the company's suppliers and customers, including potential bankruptcies; successful integration of acquired or merged businesses; the ability to achieve the expected annual savings and synergies from past and future business combinations; success and timing of potential divestitures; potential impairment of long-lived assets, including goodwill; competitive product and pricing pressures; the amount of the company's debt; the ability of the company to access capital markets; credit ratings of the company's debt; the outcome of existing and any future legal proceedings, including any litigation with respect to environmental or asbestos-related matters; as well as other risks and uncertainties, including but not limited to those detailed herein and from time to time in other filings of the company with the SEC. See also the following portions of this Annual Report on Form 10-K: Item 1. *Business,* "Certain Risk Factors"; "Customers; Sales and Marketing"; "Competition"; "Raw Materials and Supplies"; "Strategic Initiatives"; "Environmental Matters"; "International Operations"; and "Seasonality; Cyclicality"; Item 3. *Legal Proceedings;* and Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations.* These forward-looking statements are made only as of the date hereof, and the company undertakes no obligation to update or revise the forward-looking statements, whether as a result of new information, future events or otherwise, except as otherwise required by law.

Our international operations are subject to a number of risks inherent in operating abroad, including, but not limited to:

- risks with respect to currency exchange rate fluctuations;
- local economic and political conditions;
- disruptions of capital and trading markets;
- possible terrorist attacks or acts of aggression that could affect vehicle production or the availability of raw materials or supplies;
- restrictive governmental actions (such as restrictions on transfer of funds and trade protection measures, including export duties and quotas and customs duties and tariffs);
- changes in legal or regulatory requirements;
- import or export licensing requirements;
- limitations on the repatriation of funds;
- difficulty in obtaining distribution and support;
- nationalization;
- the laws and policies of the United States affecting trade, foreign investment and loans;
- tax laws; and
- labor disruptions.

There can be no assurance that these risks will not have a material adverse impact on our ability to increase or maintain our foreign sales or on our financial condition or results of operations.

Our operations are exposed to global market risks, including the effect of changes in foreign currency exchange rates. We have implemented a foreign currency cash flow hedging program to help reduce the company's exposure to changes in exchange rates. We use foreign currency forward contracts to manage the company's exposures arising from foreign currency exchange risk. Gains and losses on the underlying foreign currency exposures are partially offset with gains and losses on the foreign currency forward contracts. The contracts generally mature within 12 months. It is our policy not to enter into derivative financial instruments for speculative purposes and, therefore, we hold no derivative instruments for trading purposes. See Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations — Quantitative and Qualitative Disclosures About Market Risk* and Note 16 of the Notes to Consolidated Financial Statements under Item 8. *Financial Statements and Supplementary Data* below.

**Seasonality; Cyclicality**

LVS and CVS may experience seasonal variations in the demand for products to the extent automotive vehicle production fluctuates. Historically, for both segments, demand has been somewhat lower in the quarters ended September 30 and December 31, when OEM plants may close during model changeovers and vacation and holiday periods. LVA also experiences seasonal variations in the demand for products. Historically, demand has been somewhat lower in the quarters ended December 31 and March 31, when activity relating to the servicing of vehicles is less frequent.

In addition, the industry in which LVS and CVS operate has been characterized historically by periodic fluctuations in overall demand for trucks, passenger cars and other vehicles for which we supply products, resulting in corresponding fluctuations in demand for our products. The cyclical nature of the automotive industry is outside our control and cannot be predicted with certainty. Cycles in the major automotive industry markets of North America and Europe are not necessarily concurrent or related. We have sought and will continue to seek to expand our operations globally to mitigate the effect of periodic fluctuations in demand of the automotive industry in one or more particular countries.

Demand for CVS products can also be affected by pre-buy before the effective date of new regulatory requirements, such as changes in emissions standards. We believe that stronger heavy-duty truck demand in North America in fiscal year 2002 was partially due to the pre-buy before new U.S. emission standards went into effect on October 1, 2002. Implementation of new, more stringent, emissions standards is scheduled for 2007 and 2010 in the U.S. and 2008 in Europe, and we believe that heavy-duty truck demand in these markets could increase prior to the effective dates of the new regulations.

# EXHIBIT 5



about us | suppliers | investors | media room | events | careers | products & services | NYSE: ARM $17.68    change    home    contact us    Search

**ArvinMeritor's Tom Gosnell Reconfirms Commitment to Customers and Technology at North America's Largest Truck Show**

LOUISVILLE, Ky., (March 21, 2001) ArvinMeritor, Inc. (NYSE:ARM) President, Commercial Vehicle Systems (CVS) and Commercial Vehicle Aftermarket (CVA), Tom Gosnell today re-affirmed the company's dedication to its customers in remarks during an address to the North American media during the Mid-America Trucking Show.

He also restated the company's continuing focus to provide complete solutions in the form of advanced technologies and systems to meet customers' changing needs.

The show, held from March 22 through 24 at the Kentucky Fair and Exposition Center, showcases products from more than 1,000 trucking manufacturers and suppliers and drew more than 76,000 owners and operators last year.

Gosnell, who assumed the top CVS position last October and serves as a senior vice president of the corporation, discussed current industry conditions and re-confirmed ArvinMeritor's long-term commitment to maintaining its current leadership position in the truck and trailer drivetrain business. He also underscored the company's pledge to be the most comprehensive and responsive aftermarket supplier.

"We've watched the North American Class 8 volumes drop more than 40 percent from all-time highs and anticipate that volumes could go even lower before they begin to rebound," Gosnell said. "Conditions such as depressed freight rates, rising insurance costs, tighter credit and a glut of used trucks on the market have had a serious impact on sales volumes in the past year. We expect these conditions to dominate the market for at least the next 18 months, followed by a gradual turnaround. Tough times like these are no stranger to us, however. This is, by nature, a cyclical industry. We're confident that we have what it takes to come out of this downturn stronger than ever."

Gosnell went on to discuss the changing model of the automotive supplier industry, citing increased market globalization; more consolidations and alliances than ever before; and the trend toward smaller supplier bases as some of the reasons that businesses are changing the way they go to market. He explained that the company fully intends to address this changing model to be the supplier of choice for commercial vehicle drivetrain and undercarriage solutions, in both truck and trailer.

"Until we entered the transmission and clutch businesses, entered the joint venture with WABCO and pulled together our lineup in what we call DriveTrain Plus™ in the early '90s, we were thought of as simply 'the axle and brake guys,'" said Gosnell. "Now ArvinMeritor really can do it all - everything customers need before and after the sale - and is well-positioned to be the 'one-stop shop' to commercial vehicle truck and trailer OEMs. We're also proud to provide an outstanding lineup of products and services to our important end-users.

"Now we can provide complete solutions that focus on the four key goals for truck operators: lower maintenance costs, enhanced safety, reduced weight and driver comfort," continued Gosnell. "In addition, we can help them cut costs by developing new products and technologies that bundle parts into integrated systems. It's a simple answer, but it requires the complex proven engineering and integration expertise that ArvinMeritor has built its reputation on. We have the legacy and heritage of Rockwell and Arvin to thank for that."

Gosnell reiterated the company's understanding that, since technology is the price of entry in today's competitive marketplace, a continued focus on customer service is the prime differentiator in customer decision-making. The company's field support operations has consistently ranked No. 1 or No. 2 in American Truck Dealers' (ATD) annual surveys and is benchmarked by others in the industry for superior responsiveness to truck operators, dealers and others.

"We don't take our solid customer relationships for granted," Gosnell told the audience, in explaining the company's regular listening and info-exchange forums with fleets, dealers, distributors and owner-operators. "Our company maintains these relationships by consistently exceeding customer expectations, providing a state-of-the-art aftermarket distribution network and developing leading-edge technology into more Web-based service and training opportunities."

"ArvinMeritor's history is rich, with a truly impressive track record. We have been a major player in the industry for more than 100 years, and we'll be around for another 100, with the same can-do spirit and intense focus on delighting customers," Gosnell concluded. "We're just getting warmed up."

Gosnell's remarks were part of a presentation during which other ArvinMeritor leaders introduced the latest products, including a new drive axle and a new trailer suspension. The presentation also focused on two new aftermarket alliances, which further broaden the company's portfolio.

ArvinMeritor, Inc. is a premier $7-billion global supplier of a broad range of integrated systems, modules and components to the motor vehicle industry. The company serves light vehicle, commercial truck, trailer and specialty original equipment manufacturers and related aftermarkets. In addition, ArvinMeritor is a leader in coil coating applications, including those for the transportation, appliance, construction and furniture industries. The company is headquartered in Troy, Mich., and employs 36,000 people at more than 150 manufacturing facilities in 26 countries. ArvinMeritor common stock is traded on the New York Stock Exchange under the ticker symbol ARM. For more information, visit the company's Web site at: www.arvinmeritor.com.

### #

PR01-15
031801

# EXHIBIT 6

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
## THE SECURITIES EXCHANGE ACT OF 1934
#### For the fiscal year ended September 29, 2002
#### Commission file number 1-15983

# ArvinMeritor, Inc.
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Indiana** | **38-3354643** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2135 West Maple Road Troy, Michigan** | **48084-7186** |
| (Address of principal executive offices) | (Zip Code) |

#### Registrant's telephone number, including area code: (248) 435-1000

## SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $1 Par Value (including the associated Preferred Share Purchase Rights) | New York Stock Exchange |

## SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:   None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K   ☑

The aggregate market value of the registrant's voting stock held by non-affiliates of the registrant on March 28, 2002 (the last business day of the most recently completed second fiscal quarter) was approximately $1.918 billion.

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).   Yes ☑   No ☐

67,942,966 shares of the registrant's Common Stock, par value $1 per share, were outstanding on October 31, 2002.

## DOCUMENTS INCORPORATED BY REFERENCE

Certain information contained in the Proxy Statement for the Annual Meeting of Shareowners of the registrant to be held on February 19, 2003 is incorporated by reference into Part III.

Europe and the Asia/Pacific region. Our extensive truck axle product line includes a wide range of drive and non-drive front steer axles and single and tandem rear drive axles, which can include driver-controlled differential lock for extra traction, aluminum carriers to reduce weight and pressurized filtered lubrication systems for longer life. Our front steer and rear drive axles can be equipped with our cam, wedge or air disc brakes, automatic slack adjusters and anti-lock braking systems.

*Drivelines and Other Products.*  We also supply universal joints and driveline components, including our Permalube™ universal joint, a permanently lubricated universal joint used in the high mileage on-highway market.

### Braking Systems

We are a leading independent supplier of air and hydraulic brakes to medium- and heavy-duty commercial vehicle manufacturers in North America and Europe. In Brazil, the third largest truck and trailer market in the world, our 49%-owned joint venture with Randon S. A. Veiculos e Implementos is a leading supplier of brakes and brake-related products.

Through manufacturing facilities located in North America and Europe, we manufacture a broad range of foundation air brakes, as well as automatic slack adjusters for brake systems. Our foundation air brake products include cam drum brakes, which offer improved lining life and tractor/trailer interchangeability; air disc brakes, which provide fade resistant braking for demanding applications; wedge drum brakes, which are lightweight and provide automatic internal wear adjustment; hydraulic brakes; and wheel end components such as hubs, drums and rotors.

Federal regulations require that new heavy- and medium-duty vehicles sold in the United States be equipped with anti-lock braking systems ("ABS"). Our 50%-owned joint venture with WABCO Automotive Products ("WABCO"), a wholly-owned subsidiary of American Standard, Inc., is the leading supplier of ABS and a supplier of other electronic and pneumatic control systems for North American heavy-duty commercial vehicles. The joint venture also supplies hydraulic ABS to the North American medium-duty truck market.

### Specialty Systems

*Off-Highway Vehicle Products.*  We supply heavy-duty axles, brakes and drivelines for use in numerous off-highway vehicle applications, including construction, material handling, agriculture, mining and forestry, in North America, South America, Europe and the Asia/Pacific region. These products are designed to tolerate high tonnages and operate under extreme conditions. In October 2002, we announced an agreement to sell our off-highway planetary axle business. See "Strategic Initiatives" below.

*Government Products.*  We supply axles, brakes and brake system components including ABS, trailer products, transfer cases and drivelines for use in medium-duty and heavy-duty military tactical wheeled vehicles, principally in North America.

*Specialty Vehicle Products.*  We supply axles, brakes and transfer cases for use in buses, coaches and recreational, fire and other specialty vehicles in North America and Europe, and we are the leading supplier of bus and coach axles and brakes in North America.

### Suspension Systems and Trailer Products

We believe we are the world's leading manufacturer of heavy-duty trailer axles, with leadership positions in North America and in Europe. Our trailer axles are available in over 40 models in capacities from 20,000 to 30,000 pounds for virtually all heavy trailer applications and are available with our broad range of brake products, including ABS. In addition, we supply trailer air suspension systems and products for which we have strong market positions in Europe and an increasing market presence in North America.

In August 2002, we entered into a 50%-owned joint venture with Randon Participacoes to develop, manufacture and sell truck suspensions, trailer axles and suspensions and related wheel-end products in the South American market. See "Joint Ventures" below.

*Transmissions*

Our 50%-owned joint venture with ZF Friedrichshafen AG ("ZF") produces technologically advanced transmission components and systems for heavy vehicle OEMs and the aftermarket in the United States, Canada and Mexico. This transmission product line enables us to supply a complete drivetrain system to heavy-duty commercial vehicle manufacturers in North America. The most recent additions to the joint venture's range of transmission models include FreedomLine™, a fully automated mechanical truck transmission without a clutch pedal, and SureShift™, a shift-by-wire system that provides the operating ease of an automatic transmission with full manual control by the driver.

*Light Vehicle Aftermarket*

The principal LVA products include mufflers; exhaust and tail pipes; catalytic converters; shock absorbers; struts; and automotive oil, air, and fuel filters. These products are sold under the brand names Arvin®(mufflers); Gabriel® (shock absorbers); and Purolator® (filters). LVA also markets products under private label to customers such as Pep Boys and CARQUEST (ride control) and Quaker State (filters).

*Other*

"Other" consists of business units that are not focused predominantly on automotive products and includes our coil coating operation. Coated steel and aluminum substrates are used in a variety of applications, which include consumer appliances; roofing and siding; garage and entry doors; heating, ventilation and air conditioning (HVAC); and transportation.

**Customers; Sales and Marketing**

ArvinMeritor's operating segments have numerous customers worldwide and have developed long-standing business relationships with many of these customers. Our ten largest customers accounted for approximately 65% of our total sales in fiscal year 2002.

*Original Equipment.* Both LVS and CVS market and sell products principally to OEMs. In North America, CVS also markets truck and trailer products directly to dealers, fleets and other end-users, which may designate the components and systems of a particular supplier for installation in the vehicles they purchase from OEMs.

Consistent with industry practice, LVS and CVS make most of their sales to OEMs through open purchase orders, which do not require the purchase of a minimum number of products. The customer typically may cancel these purchase orders on reasonable notice. LVS and CVS also sell products to certain customers under long-term arrangements that require us to provide annual cost reductions (through price reductions or other cost benefits for the OEMs). If we were unable to generate sufficient cost savings in the future to offset such price reductions, our gross margins would be adversely affected.

Both LVS and CVS are dependent upon large OEM customers with substantial bargaining power with respect to price and other commercial terms. Although we believe that our businesses generally enjoy good relations with our OEM customers, loss of all or a substantial portion of sales to any of our large volume customers for whatever reason (including, but not limited to, loss of contracts, reduced or delayed customer requirements, plant shutdowns, strikes or other work stoppages affecting production by such customers) could have a significant adverse effect on our financial results. During fiscal year 2002, DaimlerChrysler AG (which owns Chrysler, Mercedes-Benz AG and Freightliner Corporation) accounted for approximately $670 million of sales for LVS, $410 million of sales for CVS and $20 million of sales for LVA, or 16% of our total sales. In addition, General Motors Corporation accounted for approximately $840 million of sales for LVS, $65 million of sales for CVS and $15 million of sales for LVA, or 13% of our total sales, and Ford Motor Company

accounted for approximately $605 million of sales for LVS, $30 million of sales for CVS and $90 million of sales for LVA, or 11% of our total sales. No other customer accounted for over 10% of our total sales in fiscal year 2002.

Except as noted above with respect to the North American market for heavy-duty trucks and trailers, LVS and CVS generally compete for new business from OEMs, both at the beginning of the development of new vehicle platforms and upon the redesign of existing platforms. New platform development generally begins two to four years prior to start-up of production. Once a supplier has been designated to supply products to a new platform, an OEM will generally continue to purchase those products from the supplier for the life of the platform, which typically lasts three to six years.

*Aftermarkets.* CVS also provides truck and trailer products and off-highway and specialty products to OEMs, dealers and distributors in the aftermarket. LVA sells products primarily to wholesale distributors, retailers and installers. The light vehicle aftermarket includes fewer and larger customers as the market consolidates and as OEMs increase their presence in the market.

*Coil Coating.* Our coil coating customers include steel companies, service centers and end manufacturers engaged in the transportation, appliance, construction and furniture industries.

## Competition

Each of ArvinMeritor's businesses operates in a highly competitive environment. LVS and CVS compete worldwide with a number of North American and international providers of components and systems, some of which belong to, or are associated with, some of our customers. Some of these competitors are larger and some are smaller than the company in terms of resources and market shares. The principal competitive factors are price, quality, service, product performance, design and engineering capabilities, new product innovation and timely delivery. LVS has numerous competitors across its various product lines worldwide, including Tenneco, Faurecia and Eberspaecher (air and emissions systems); Webasto and Inalfa (roof systems); Brose, Magna, Hi-Lex and Grupo Antolin (door systems); Kiekert and Valeo (latch systems); Stabilus (motion control products); Thyssen-Krupp and NHK Spring (suspension systems); Kayaba, Tenneco and Sachs (ride control systems); and Hayes-Lemmerz and Michelin (wheel products). The major competitors of CVS are Dana Corporation and Eaton Corporation (truck axles and drivelines); Knorr/Bendix and Haldex Braking Systems (braking systems); Hendrickson and Holland-Neway (suspension systems); Hendrickson and Dana (trailer products); and Eaton Corporation (transmissions). In addition, certain OEMs manufacture for their own use products of the types we supply, and any future increase in this activity could displace our sales.

LVA competes with both OEMs and independent suppliers in North America and Europe and serves the market through our own sales force, as well as through a network of manufacturers' representatives. Major competitors include Tenneco, Goerlicks, Bosal, Flowmaster, Sebring and Remus (exhaust products); Tenneco, Kayaba and Sachs (ride control products); and Champion Laboratories, Honeywell, Dana, Mann & Hummel, Sogefi Filtration and Mahle (filtration products). Competitive factors include customer loyalty, competitive pricing, customized service, quality, timely delivery, product development and manufacturing process efficiency.

Our coil coating operation competes with other coil coaters and with customers' internal painting systems.

## Raw Materials and Supplies

We believe we have adequate sources for the supply of raw materials and components for our business segments' manufacturing needs with suppliers located around the world. We do, however, concentrate our purchases of certain raw materials and parts over a limited number of suppliers, some of which are located in developing countries, and we are dependent upon the ability of our suppliers to meet performance and quality specifications and delivery schedules. Although we historically have not experienced any significant difficulties in obtaining an adequate supply of raw materials and components necessary for our manufacturing operations,

the loss of a significant supplier or the inability of a supplier to meet performance and quality specifications or delivery schedules could have an adverse effect on us.

On March 5, 2002, President Bush, acting under Section 201 of the Trade Act of 1974, imposed tariffs of up to 30% on imports of most flat rolled carbon steel products for a three-year period. Imports of finished steel have decreased since imposition of the tariffs, and we began to experience rising steel prices and spot shortages of certain steel products as a result of these tariffs in the second half of fiscal year 2002. We cannot predict the effect of the tariffs on availability of steel in fiscal year 2003. If supplies are inadequate for our needs, or if prices increase significantly and we are unable to either pass these price increases to our customer base or mitigate the cost increases by alternative sourcing of material or components, our sales and operating income could be adversely affected.

## Strategic Initiatives

We regularly consider various strategic and business opportunities, including licensing agreements, marketing arrangements and acquisitions, and review the prospects of our existing businesses to determine whether any of them should be modified, restructured, sold or otherwise discontinued.

The industry in which we operate continues to experience significant consolidation among suppliers. This trend is due in part to globalization and increased outsourcing of product engineering and manufacturing by OEMs, and in part to OEMs reducing the total number of their suppliers by more frequently awarding long-term, sole-source or preferred supplier contracts to the most capable global suppliers. Scale is an important competitive factor, with the largest industry participants able to maximize key resources and contain costs.

Consistent with this trend, we completed the Merger of Arvin and Meritor in fiscal year 2000 in order to enhance the financial strength, diversity of operations and product lines of both companies and to better position ourselves to take advantage of global opportunities. In addition, we believe that efficiencies and cost savings resulting from the Merger enable us to improve upon and increase our strategic options and lower our average cost of capital.

On October 31, 2002, we announced that we had entered into an agreement to sell our off-highway planetary axle business to Axle Tech International, an affiliate of Wynnchurch Capital, Ltd. The sale includes manufacturing sites at Oshkosh, Wisconsin and St. Etienne, France and the planetary axle operations in Osasco, Brazil, and Seoul, Korea and is contingent on the satisfaction of certain conditions. We expect to complete the transaction in the first half of fiscal year 2003.

In the first quarter of fiscal 2002, we recorded a restructuring charge of $15 million to realign certain operations to reflect the weak demand in our major markets. The charge related to employee severance benefits for approximately 450 salaried employees. See Note 5 of the Notes to Consolidated Financial Statements under Item 8. *Financial Statements and Supplementary Data* below.

No assurance can be given as to whether or when any additional strategic initiatives will be consummated in the future. We will continue to consider acquisitions as a means of growing the company or adding needed technologies, but cannot predict whether our participation or lack of participation in industry consolidation will ultimately be beneficial to us. If an agreement with respect to any additional acquisitions were to be reached, we could finance such acquisitions by issuance of additional debt or equity securities or by using our accounts receivable securitization facility. The additional debt from any such acquisitions, if consummated, could increase our debt to capitalization ratio. In addition, the ultimate benefit of any acquisition would depend on our ability to successfully integrate the acquired entity or assets into our existing business and to achieve any projected synergies.

## Joint Ventures

As the automotive industry has become more globalized, joint ventures and other cooperative arrangements have become an important element of our business strategies. At September 30, 2002, we participated in 26 joint ventures with interests in the United States, Brazil, Canada, China, Colombia, the Czech Republic,

Germany, Hungary, India, Italy, Japan, Mexico, South Africa, Spain, Turkey, Venezuela and the United Kingdom.

In accordance with accounting principles generally accepted in the United States, our consolidated financial statements include the operating results of those majority-owned joint ventures in which we have control. Significant consolidated joint ventures include our 57%-owned North American joint venture with Mitsubishi Steel Manufacturing Co. (suspension products for passenger cars, light trucks and sport utility vehicles); and our 75% interest in a joint venture in Spain with Kayaba (ride control products). Significant unconsolidated joint ventures include our 50%-owned North American joint venture with WABCO (ABS systems for heavy-duty commercial vehicles); our 50%-owned joint venture in the United States with ZF (transmissions); our 50% interest in Arvin Sango Inc. in the United States and our 49% interest in Zeuna Stärker GmbH & Co. in Germany (air and emissions systems).

In August 2002, we formed a 50%-owned joint venture with Randon Participacoes to develop, manufacture and sell truck suspensions, trailer axles and suspensions and related wheel-end products in the South American market. The joint venture will combine our product technology and customer contacts with Randon's manufacturing and operations expertise and could enhance both our market penetration in South America and our product portfolio outside of the region.

In October 2002, Kayaba purchased our 40% interest in a Spanish joint venture that manufactures steering pumps, and our participation in this joint venture was terminated.

On December 17, 2002, we entered into agreements to purchase the remaining 51% interest in Zeuna Stärker GmbH & Co. See Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity.*

**Research and Development**

We have significant research, development, engineering and product design capabilities. We spent $132 million in fiscal year 2002, $136 million in fiscal year 2001, and $115 million in fiscal year 2000 on research, development and engineering. At September 30, 2002, we employed approximately 1,700 professional engineers and scientists.

**Patents and Trademarks**

We own or license many United States and foreign patents and patent applications in our manufacturing operations and other activities. While in the aggregate these patents and licenses are considered important to the operation of our businesses, management does not consider them of such importance that the loss or termination of any one of them would materially affect a business segment or ArvinMeritor as a whole. (See Item 3. *Legal Proceedings* for information regarding a patent infringement lawsuit filed against the company by Eaton Corporation and adverse judgments in the case.)

Our registered trademarks ArvinMeritor®, Arvin® and Meritor® are important to our business. Other significant trademarks owned by us include Gabriel® (shock absorbers and struts) and Purolator® (filters) with respect to LVA, and ROR™ (trailer axles) with respect to CVS. In connection with the 1997 spin-off of Meritor's common stock to the shareowners of Rockwell International Corporation (now Rockwell Automation, Inc., and referred to in this Annual Report on Form 10-K as "Rockwell") and the transfer of Rockwell's automotive businesses to Meritor, Meritor entered into an agreement that allows us to continue to apply the "Rockwell" brand name to our products until September 30, 2007.

**Employees**

At September 30, 2002, we had approximately 32,000 full-time employees. At that date, approximately 4,500 employees in the United States and Canada were covered by collective bargaining agreements and most

of our facilities outside of the United States and Canada were unionized. We believe our relationship with unionized employees is satisfactory. No significant work stoppages have occurred in the past five years.

## Environmental Matters

Federal, state and local requirements relating to the discharge of substances into the environment, the disposal of hazardous wastes and other activities affecting the environment have, and will continue to have, an impact on our manufacturing operations. We record liabilities for environmental issues in the accounting period in which our responsibility is established and the cost can be reasonably estimated. At environmental sites in which more than one potentially responsible party has been identified, we record a liability for our allocable share of costs related to our involvement with the site, as well as an allocable share of costs related to insolvent parties or unidentified shares. At environmental sites in which we are the only potentially responsible party, we record a liability for the total estimated costs of remediation before consideration of recovery from insurers or other third parties.

We have been designated as a potentially responsible party at eight Superfund sites, excluding sites as to which our records disclose no involvement or as to which our potential liability has been finally determined. Management estimates the total reasonably possible costs we could incur for the remediation of Superfund sites at September 30, 2002, to be approximately $34 million, of which $13 million is recorded as a liability.

In addition to Superfund sites, various other lawsuits, claims and proceedings have been asserted against us, alleging violations of federal, state and local environmental protection requirements or seeking remediation of alleged environmental impairments, principally at previously disposed-of properties. For these matters, management has estimated the total reasonably possible costs we could incur at September 30, 2002, to be approximately $50 million, of which $21 million is recorded as a liability.

The process of estimating environmental liabilities is complex and dependent on physical and scientific data at the site, uncertainties as to remedies and technologies to be used, and the outcome of discussions with regulatory agencies. The actual amount of costs or damages for which we may be held responsible could materially exceed the foregoing estimates because of these uncertainties and others (including the financial condition of other potentially responsible parties and the success of the remediation) that make it difficult to accurately predict actual costs. However, based on management's assessment, after consulting with Vernon G. Baker, II, Esq., General Counsel of ArvinMeritor, and subject to the difficulties inherent in estimating these future costs, we believe that our expenditures for environmental capital investment and remediation necessary to comply with present regulations governing environmental protection and other expenditures for the resolution of environmental claims will not have a material adverse effect on our business, financial condition or results of operations. In addition, in future periods, new laws and regulations, advances in technology and additional information about the ultimate clean-up remedy could significantly change our estimates. Management cannot assess the possible effect of compliance with future requirements.

## International Operations

Approximately 40% of our total assets as of September 30, 2002 and 38% of fiscal year 2002 sales were outside North America. See Note 23 of the Notes to Consolidated Financial Statements under Item 8. *Financial Statements and Supplementary Data* below for financial information by geographic area for the three fiscal years ended September 30, 2002.

Management believes that international operations have significantly benefited our financial performance. However, our international operations are subject to a number of risks inherent in operating abroad, including, but not limited to:

- risks with respect to currency exchange rate fluctuations;

- local economic and political conditions;

- disruptions of capital and trading markets;

- restrictive governmental actions (such as restrictions on transfer of funds and trade protection measures, including export duties and quotas and customs duties and tariffs);

- changes in legal or regulatory requirements;

- import or export licensing requirements;

- limitations on the repatriation of funds;

- difficulty in obtaining distribution and support;

- nationalization;

- the laws and policies of the United States affecting trade, foreign investment and loans;

- tax laws; and

- labor disruptions.

There can be no assurance that these risks will not have a material adverse impact on our ability to increase or maintain our foreign sales or on our financial condition or results of operations.

The impact that the euro and other currencies will have on our sales and operating income is difficult to predict in fiscal year 2003. We enter into foreign currency contracts to help minimize the risk of loss from currency rate fluctuations on foreign currency commitments entered into in the ordinary course of business. It is our policy not to enter into derivative financial instruments for speculative purposes and, therefore, we hold no derivative instruments for trading purposes. We have not experienced any material adverse effect on our business, financial condition or results of operations related to these foreign currency contracts. See Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations — Quantitative and Qualitative Disclosures About Market Risk* below.

### Seasonality; Cyclicality

LVS and CVS may experience seasonal variations in the demand for products to the extent automotive vehicle production fluctuates. Historically, for both segments, such demand has been somewhat lower in the quarters ended September 30 and December 31, when OEM plants may close during model changeovers and vacation and holiday periods.

In addition, the industry in which LVS and CVS operate has been characterized historically by periodic fluctuations in overall demand for trucks, passenger cars and other vehicles for which we supply products, resulting in corresponding fluctuations in demand for our products. The cyclical nature of the automotive industry is outside our control and cannot be predicted with certainty. Cycles in the major automotive industry markets of North America and Europe are not necessarily concurrent or related.

The following table sets forth vehicle production in principal markets served by LVS and CVS for the last five fiscal years:

| | Fiscal Year Ended September 30, | | | | |
|---|---|---|---|---|---|
| | 2002 | 2001 | 2000 | 1999 | 1998 |
| Light Vehicles (in millions): | | | | | |
| North America .................................................. | 16.4 | 15.6 | 17.5 | 16.9 | 15.4 |
| South America ................................................ | 1.9 | 2.2 | 2.0 | 1.5 | 2.0 |
| Western Europe (including Czech Republic) ..................... | 16.4 | 16.9 | 16.7 | 16.5 | 16.1 |
| Asia/Pacific .................................................. | 17.1 | 16.9 | 17.5 | 15.6 | 15.4 |
| Commercial Vehicles (in thousands): | | | | | |
| North America, Heavy-Duty Trucks ............................ | 170 | 150 | 294 | 323 | 263 |
| North America, Medium-Duty Trucks ........................... | 133 | 144 | 172 | 185 | 158 |
| United States and Canada, Trailers ............................ | 145 | 208 | 367 | 366 | 327 |
| Western Europe, Heavy- and Medium-Duty Trucks ............... | 354 | 386 | 400 | 376 | 362 |
| Europe, Trailers .............................................. | 101 | 110 | 119 | 124 | 130 |

Source: Automotive industry publications and management estimates.

We believe that the stronger heavy-duty truck demand in North America in fiscal year 2002 was partially due to the pre-buy before new U.S. emission standards went into effect on October 1, 2002. As a result, we anticipate the North American heavy-duty truck market to be slightly weaker in fiscal year 2003, with production at an estimated 161,000 units. In Western Europe, we expect production of heavy- and medium-duty trucks to decrease approximately 5% to 337,000 units. Our most recent outlook shows North American and Western European light vehicle production to be 16.0 million and 16.5 million vehicles, respectively, during fiscal year 2003. See "Industry Developments and Outlook" above and Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations — Overview and Outlook* and — *Results of Operations* below for information on downturns in certain markets and their effects on our sales and earnings.

**Available Information**

We make available free of charge through our web site *(www.arvinmeritor.com)* our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, all amendments to those reports, and other filings with the Securities and Exchange Commission, as soon as reasonably practicable after they are filed.

**Cautionary Statement**

This Annual Report on Form 10-K contains statements relating to future results of the company (including certain projections and business trends) that are "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements are typically identified by words or phrases such as "believe," "expect," "anticipate," "estimate," "should," "are likely to be" and similar expressions. Actual results may differ materially from those projected as a result of certain risks and uncertainties, including but not limited to global economic and market conditions; the demand for commercial, specialty and light vehicles for which the company supplies products; risks inherent in operating abroad, including foreign currency exchange rates; the availability and cost of raw materials; OEM program delays; demand for and market acceptance of new and existing products; successful development of new products; reliance on major OEM customers; labor relations of the company, its customers and suppliers; successful integration of acquired or merged businesses; achievement of the expected annual savings and synergies from past and future business combinations; competitive product and pricing pressures; the amount of the company's debt; the ability of the company to access capital markets; the credit ratings of the company's debt; the outcome of existing and any future legal proceedings, including any litigation with respect to environmental or asbestos-related matters; as well as other risks and uncertainties, including but not limited to those

14

detailed herein and from time to time in other filings of the company with the Securities and Exchange Commission. See also the following portions of this Annual Report on Form 10-K: Item 1. *Business* — "Industry Developments and Outlook"; "Customers; Sales and Marketing"; "Competition"; "Raw Materials and Supplies"; "Strategic Initiatives"; "Environmental Matters"; "International Operations"; and "Seasonality; Cyclicality"; Item 3. *Legal Proceedings;* and Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations.* These forward-looking statements are made only as of the date hereof, and the company undertakes no obligation to update or revise the forward-looking statements, whether as a result of new information, future events or otherwise, except as otherwise required by law.

### Item 2.  *Properties.*

At September 30, 2002, our operating segments and joint ventures had the following facilities in the United States, Europe, South America, Canada, Mexico, Australia, South Africa and the Asia/Pacific region:

| | Manufacturing Facilities | Engineering Facilities, Sales Offices, Warehouses and Service Centers |
|---|---|---|
| LVS | 88 | 45 |
| CVS | 41 | 51 |
| LVA | 20 | 17 |
| Other | 4 | 3 |

These facilities had an aggregate floor space of approximately 33.2 million square feet, substantially all of which is in use. We owned approximately 74% and leased approximately 26% of this floor space. There are no major encumbrances (other than financing arrangements that in the aggregate are not material) on any of our plants or equipment. In the opinion of management, our properties have been well maintained, are in sound operating condition and contain all equipment and facilities necessary to operate at present levels. A summary of floor space of these facilities at September 30, 2002, is as follows:

| | Owned Facilities | | | | Leased Facilities | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Location | LVS | CVS | LVA | Other | LVS | CVS | LVA | Other | Total |
| | | | | (in thousands of square feet) | | | | | |
| United States | 4,538 | 4,360 | 1,717 | 642 | 464 | 1,572 | 521 | 507 | 14,321 |
| Canada | 449 | 413 | — | — | 89 | 160 | 84 | — | 1,195 |
| Europe | 3,861 | 2,790 | 1,026 | — | 2,639 | 150 | 644 | — | 11,110 |
| Asia/Pacific | 448 | 471 | — | — | 147 | 658 | 597 | — | 2,321 |
| Latin America | 1,133 | 2,120 | 324 | — | 89 | 42 | 186 | — | 3,894 |
| Africa | 304 | — | — | — | — | 11 | 2 | — | 317 |
| Total | 10,733 | 10,154 | 3,067 | 642 | 3,428 | 2,593 | 2,034 | 507 | 33,158 |

In October 2002, we announced an agreement to sell our off-highway planetary axle business. The sale includes two owned manufacturing facilities, in Oshkosh, Wisconsin, USA and St. Etienne, France, with a total of 834,000 square feet of floor space.

### Item 3.  *Legal Proceedings.*

On July 17, 1997, Eaton Corporation filed suit against Rockwell in the U.S. District Court in Wilmington, Delaware, asserting infringement of Eaton's U.S. Patent No. 4850236, which covers certain aspects of heavy-duty truck transmissions, by our Engine SynchroShift™ transmission for heavy-duty trucks, and seeking damages and injunctive relief. Meritor was joined as a defendant on June 11, 1998. The following judgments and orders have been issued in this case:

- After trial, on July 1, 1998, a jury rendered a verdict in favor of Eaton, finding that Meritor had infringed Eaton's patent and awarding compensatory damages in an amount equal to 13% of total

# EXHIBIT 7

ArvinMeritor



**Revision: ArvinMeritor Clarifies Statement on Transmission's Availability**

**TROY,** Mich., (Oct. 1, 2002) — ArvinMeritor, Inc. (NYSE: **ARM**) issued the following product text correction to its press release distributed earlier today.
We released the following statement that requires a correction:

- The FreedomLine™ transmission captures standard position with four truck OEMs; fifth OEM position begins in 2003

The correct statement is:

- The FreedomLine™ automated manual transmission is now available as a standard databook option with four truck OEMs; a fifth OEM offering begins in 2003.

# # #

**CONTACTS: Media Inquiries**
D. Mike Pennington
1-248-435-1933
mailto:david.pennington@arvinmeritor.com

**Investor Inquiries**
Beth Gurnack
1-248-655-2159
mailto:beth.gurnack@arvinmeritor.com

# EXHIBIT 8

**ArvinMeritor**

ArvinMeritor, Inc.
2135 West Maple Road
Troy, MI 48084

**Vernon G. Baker II**
*Senior Vice President*
*General Counsel and Secretary*

**tel**    **248.435.0786**
fax    248.435.2184

January 24, 2001

J. Robert Horst, Esquire
Vice President & General Counsel
Eaton Corporation
1111 Superior Avenue
Eaton Center
Cleveland, OH  44114-2584

Dear Mr. Horst:

I am writing to inform you of the existence of what on its face appears to be an anticompetitive proposal made to Freightliner by Eaton Corporation.

We have been advised by Freightliner that they have received and are currently considering a proposal from Eaton Corporation that includes significant economic incentives which appear to be conditioned on the achievement of the following:

1.  Removal of ArvinMeritor as the standard transmission in certain truck models currently covered under a long-term supply agreement between Freightliner LLC and ArvinMeritor; and

2.  Future de-listing (removal from electronic and published data books) of ArvinMeritor manual transmissions.

ArvinMeritor is fully cognizant of the competitive nature of acquiring and retaining standard data book positions.  However, given your dominant market share position, we believe your efforts to bring about the de-listing of ArvinMeritor transmissions to achieve an exclusive data book position in this regard are anticompetitive and violate the antitrust laws.  We request that you immediately retract any suggestions, stipulations or requirements to Freightliner that ArvinMeritor be de-listed or restricted from their data book publications.

We await your immediate response.

Very truly yours,

Vernon G. Baker, II

# EXHIBIT 9

Westlaw.

Not Reported in F.Supp.                                                                    Page 1

Not Reported in F.Supp., 1996 WL 441018 (N.D.Cal.)

(Cite as: 1996 WL 441018 (N.D.Cal.))

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. California.
HARBOR DRUG COMPANY, INC., a California
corporation, Plaintiff,
v.
MEDCO CONTAINMENT SERVICES, INC., a
Delaware corporation, Paid Prescriptions,
Inc., a Nevada corporation, National RX Services, a
Delaware corporation, and
Merck & Co., a New Jersey corporation,
Defendants.
**No. C 95-01949 CW.**

July 15, 1996.
Dean S. Krystowski, Shearman & Sterling, San
Francisco, CA.

Lynn S. Carman, Mill Valley, CA.

Joseph L. Alioto, Joseph L. Alioto Law Offices,
San Francisco, CA.

*ORDER OF DISMISSAL*

WILKEN, District Judge.

**\*1** Defendants Medco Containment Services, Inc.,
PAID Prescriptions, Inc., National Pharmacies, Inc.,
and Merck & Co., Inc. move to dismiss the
complaint for failure to state a claim. Plaintiff
Harbor Drug Company, Inc. opposes the motion.
The motion came on regularly for hearing on
January 26, 1996. Having considered all of the
papers filed by the parties and oral argument on the
motion, the Court GRANTS Defendants' motion,
and dismisses the complaint without leave to amend.

SUMMARY OF THE COMPLAINT [FN1]

> FN1. The following facts are taken from
> the complaint. The proper names of
> Defendants and some terms of art of the
> managed care industry have been
> borrowed from Defendants' papers. The
> Court incorporates these terms for the sake
> of simplicity only. Their use does not
> affect the operative facts in this case as
> plead by Harbor Drug.

This case involves a set of the many contracts that
make up the "managed care" system of health care
insurance coverage that is currently developing in
this country. The contracts in dispute here relate to
the provision of pharmaceutical benefits.

Under most managed care plans, the covered
person pays only a small "co-payment" to the
pharmacy that dispenses the prescribed drug,
typically five dollars. The remainder of the fee
charged by the pharmacy is paid by the plan
sponsor or a managed care entity acting on its
behalf. Complaint ¶ 24. To obtain coverage and
pay only the small co-payment rather than the full
fee charged by the pharmacy, the covered person
must obtain the drugs in accordance with the
requirements of the plan sponsor, such as
purchasing the drugs from a designated pharmacy
participating in the plan sponsor's program. *Id.* ¶
25. In the event that the covered person elects to
purchase the drugs from another source, he or she
must pay all or most of the price charged by the
pharmacy. *Id.*

Medco, one of the Defendants here, is a managed
care provider generally referred to as a
pharmaceutical benefits manager. Pursuant to
contractual arrangements with medical plan
sponsors, Medco and PAID (one of Medco's
subsidiaries) manage pharmaceutical benefits by,
among other things, entering into contracts with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 2

Not Reported in F.Supp., 1996 WL 441018 (N.D.Cal.)

**(Cite as: 1996 WL 441018 (N.D.Cal.))**

chain and independently owned pharmacies that dispense drugs to plan members, and processing claims made based on those contracts. *Id.* ¶¶ 5(b)-(c), 9(b)-(d), 13. The prices or reimbursement rates for the drugs are specified in the pharmacy contracts. *Id.* ¶ 5(b)-(c). The terms of the agreement are not negotiable. *Id.* ¶ 9(a). Defendants refer to certain sets of contractual relationships as "networks." Entry into some networks is available to all pharmacies that wish to participate; other networks are open only to certain selected pharmacies. *Id.* ¶ 9(a)-(b), 13. Harbor Drug alleges that on at least one occasion Medco has paid a "kickback" to a plan sponsor to encourage it to participate in a network that was open only to selected pharmacies. *Id.* ¶ 11.

Medco also provides pharmacy services by mail for long-term maintenance drugs through National, a corporation Medco controls. *Id.* ¶¶ 6, 9(e), 12, 13. In some instances, the network contracts provide that covered persons must purchase maintenance drugs through National to receive plan benefits. *Id.* ¶ 9(e). Medco induces plan sponsors to participate in these networks by offering substantial discounts or rebates on drugs purchased through National. *Id.* The complaint alleges that these discounts and rebates are "so substantial that the practice effectively amounts to a tie-in requirement, without which Medco will not agree to formulate or administer the 3d party payer's prescription benefit plan." *Id.*

*2 Merck, also a Defendant here, is a drug manufacturer and is Medco's parent. *Id.* ¶ 7.

Plaintiff Harbor Drug, an independent "community" pharmacy located in Costa Mesa, California, has participated in various contracts with Medco which set the prices charged by Harbor Drug at "non-competitive low levels." *Id.* ¶ 17. Harbor Drug also alleges that it has lost customers because of the existence of exclusive networks organized by Medco which it has been unable to join. *Id.* ¶ 19. Harbor Drug alleges that it has been injured in its business by reason of Defendants' violations of the antitrust laws. *Id.* ¶ 3. Harbor Drug brings this action under §§ 1 and 2

of the Sherman Antitrust Act (15 U.S.C. §§ 1, 2), § 5 of the Clayton Act (15 U.S.C. § 14), and §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

DISCUSSION

Among other arguments, Defendants challenge Harbor Drug's standing to bring this suit under the antitrust laws. Antitrust standing derives from § 4 of the Clayton Act, a remedial provision which makes treble damages available to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. While this language is quite broad, the Supreme Court has held that to recover damages under § 4, "a plaintiff must prove the existence of ' *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990) ("*ARCO* ") (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977) ; emphasis in original). A plaintiff seeking an injunction against threatened injury pursuant to § 16 must make the same showing that the threatened injury is an antitrust injury. *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 111-113 (1986). The determination of antitrust standing is a question of law. *Bubar v. Ampco Foods, Inc.,* 752 F.2d 445, 449 (9th Cir.), *cert. denied,* 472 U.S. 1018 (1985).

The antitrust injury requirement is predicated on the principle that "the antitrust laws ... were enacted for the protection of *competition,* not *competitors.*" *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962). Accordingly, "the antitrust injury doctrine ... requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers." *Chicago Prof. Sports Ltd. Partnership v. National Basketball Ass'n,* 961 F.2d 667, 670 (9th Cir.), *cert. denied,* 113 S.Ct. 409 (1992) (citations omitted).

A private party does not incur antitrust injury as a result of low prices so long as those prices are above a predatory level. *ARCO,* 495 U.S. at 337-38, 340 ("A firm complaining about the harm it suffers from nonpredatory price competition is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 3

Not Reported in F.Supp., 1996 WL 441018 (N.D.Cal.)

(Cite as: 1996 WL 441018 (N.D.Cal.))

really claiming that it is unable to raise prices. This is not *antitrust* injury ... Low prices benefit customers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition") (internal quotations and citations omitted; emphasis in original); *Brunswick,* 429 U.S. at 488 (lost profits from increased competition is not antitrust injury). [FN2]

> FN2. Predatory pricing occurs when a competitor sells below its own costs. *E.g., ARCO,* 495 U.S. at 340; *Cargill,* 479 U.S. at 117-18 & n. 2. Harbor Drug has not alleged that Defendants are selling any product or service below its cost.

*3 Here, each of Harbor Drug's alleged harms is the product of lower prices to the consumer. Harbor Drug's boycott claim alleges that the Medco networks from which it is excluded reimburse pharmacies at "non-competitive low levels," requiring them to charge "unreasonably low prices" (Complaint ¶¶ 17, 44), and states that these prices are "considerable [sic] less than the prices the same pharmacies charge the general public for the same prescription drug dispensed." Complaint ¶ 24. Harbor Drug's tying claim alleges that plan sponsors are induced to use Medco's mail service through "substantial" discounts. Complaint ¶ 9(e). The attempted monopolization and conspiracy to monopolize claims allege that Medco will obtain monopoly power by charging substantially discounted prices to increase its mail order sales. *See* Complaint ¶¶ 9(e), 13.

Harbor Drug states, without citation to any authority, that "[e]xclusive contracts, price discrimination and price fixing allegations speak for themselves." Opp.Br. at 16:5-6. Mere allegations of violation, harm, and intent, however, are insufficient as a matter of law to establish antitrust injury. *See, e.g., Exhibitors' Serv., Inc. v. American Multi-Cinema, Inc.,* 788 F.2d 574, 578 (9th Cir.1986). In particular, the "[e]xclusion of a competitor may be a necessary condition to finding that a group boycott or refusal to deal violates the antitrust laws, but it is not a sufficient condition for

finding antitrust injury." *Legal Economic Evaluations, Inc. v. Metropolitan Life Ins. Co.,* 39 F.3d 951, 954 (9th Cir.1994), *cert. denied,* 115 S.Ct. 1420 (1995). All private parties bringing suits under the antitrust laws, including those claiming price fixing that is *per se* illegal, must separately allege that the plaintiff has or will suffer antitrust injury. *See, e.g., ARCO,* 496 U.S. at 344.

Harbor Drug argues that a plaintiff who is a participant in the market adversely affected by an antitrust violation, such as a customer or competitor, may sue for relief, citing *Bhan v. NME Hospitals, Inc.,* 772 F.2d 1467 (9th Cir.1985) and *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519 (1983). Consideration of these cases, however, does not alter the conclusion dictated by the cases discussed above. In *Bhan,* the defendant hospital adopted a policy against the use of nurse anesthetists. In light of the requirement that the injured party be a participant in the same market as the alleged malefactors, the district court dismissed the case finding that the plaintiff, a nurse anesthetist, did not participate in the same market as the M.D. anesthesiologists who were allowed to practice under the hospital's policy. *Bhan,* 772 F.2d at 1470-71. The Ninth Circuit reversed, finding that the plaintiff had sufficiently alleged the reasonable interchangeability of use for his services and those of anesthesiologists to meet the same market requirement. *Id.* The case did not turn on the whether the plaintiff had sufficiently alleged injury from being excluded from the market and is thus inapposite here. *Associated General Contractors* involved the same market requirement that was at issue in *Bhan, see* 459 U.S. at 538-39, and is therefore also inapplicable to the case at bar.

*4 Harbor Drug also argues that a plaintiff may sue under the antitrust laws if its injury is "inextricably intertwined with the injury sought to be inflicted in that market," relying on *Ostrofe v. H.S. Crocker Co.,* 740 F.2d 739 (9th Cir.1984), *cert. dismissed,* 469 U.S. 1200 (1985) and *Blue Shield of Virginia v. McCready,* 457 U.S. 465 (1982). These cases are also inapposite. *Ostrofe* involved a plaintiff who was an essential participant in a price-fixing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                           Page 4

Not Reported in F.Supp., 1996 WL 441018 (N.D.Cal.)

**(Cite as: 1996 WL 441018 (N.D.Cal.))**

conspiracy who chose to sue to challenge both a boycott and high prices that resulted from the price-fixing conspiracy. 740 F.2d at 745-46. Plaintiff here has not encountered this dilemma and the Ninth Circuit has limited *Ostrofe* to its unique facts. *See Exhibitors' Serv.,* 788 F.2d at 579-80. In *Blue Shield,* the plaintiff was a consumer who was directly impacted by a scheme to exclude a class of providers, psychologists, from the marketplace, which resulted in the plaintiff having to pay for a psychologist's services rather than having them covered by insurance. 457 U.S. at 475 . Nothing in *Blue Shield* suggests that private parties have standing to challenge low prices to consumers.

Even ignoring the antitrust injury requirement and focusing, as counsel for Harbor Drug did during oral argument, on the fact that some of Defendants' contracts are exclusive arrangements, Harbor Drug's complaint fails to state a claim. Harbor Drug does not dispute that exclusive dealing arrangements have been widely accepted as valid business arrangements that may offer procompetitive effects. What Harbor Drug appears to argue is that an exclusive dealing arrangement may pose a threat to competition where it forecloses a significant share of the market from competitors and the effect is to raise prices above the competitive level. *See, e.g., Roland Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 394 (7th Cir.1984) (Posner, J.). Harbor Drug has failed to allege, however, that such a danger is posed in this case. The vice typically inherent in a foreclosure case is the likelihood that substantial distributors will be eliminated from the market and that the defendant will therefore be able to increase prices to consumers. *See, e.g., U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 595 (1st Cir.1993). The complaint here does not allege that Defendants' plans have increased prices to consumers; in fact, it pleads that prices have been lowered. Nor does the complaint allege that Defendants' networks will result in higher prices to consumers even if Harbor Drug and other small pharmacies are driven out of business. *See Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1235 (8th Cir.1987) ("where the exclusive dealing restraint operates at the distributor level, rather than

at the consumer level, we require a higher standard of proof of 'substantial foreclosure,' because it is less clear that a restraint involving a distributor will have a corresponding impact on the level of competition on the consumer market"), *cert. denied,* 484 U.S. 1026 (1988). Absent such allegations, Harbor Drug has failed to state a claim upon which relief may be granted.

CONCLUSION

*5 For the foregoing reasons, the Court concludes that Harbor Drug has failed to allege antitrust injury and GRANTS Defendants' motion for that reason. During the hearing on the motion, counsel for Harbor Drug stated that it would stand on its complaint as plead and would not seek leave to amend. Leave to amend therefore is not granted. The Clerk shall close the file.

IT IS SO ORDERED.

Not Reported in F.Supp., 1996 WL 441018 (N.D.Cal.)

**Motions, Pleadings and Filings (Back to top)**

• 4:95CV01949 (Docket) (Jun. 12, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.


United States District Court,
S.D. Ohio, Western Division.
J.B.D.L. CORP., d/b/a Beckett Apothecary, et al.
Plaintiffs,
v.
WYETH-AYERST LABORATORIES, INC., et al.,
Defendants.
CVS MERIDIAN, INC. and Rite Aid Corp.,
Plaintiffs,
v.
WYETH, Defendant.
**No. 1:01-CV-704, 1:03-CV-781.**

June 13, 2005.

Eric L. Cramer, H. Laddie Montague, Ruthanne Gordon, David F. Sorensen, Berger & Montague PC, Eugene A. Spector, Jay S. Cohen, Spector Roseman & Kodroff PC, Philadelphia, PA, John Charles Murdock, Theresa L. Groh, Murdock Goldenberg Schneider & Groh LPA, Wilbert Benjamin Markovits, Markovits & Greiwe, Cincinnati, OH, Krishna Narine, Schiffrin & Barroway LLP, Bala Cynwyd, PA, Gordon A. Einhorn, Steve D. Shadowen, Hangley Aronchick Segal & Pudlin, Harrisburg, PA, for Plaintiffs.

Grant Spencer Cowan, James Ralph Adams, Frost Brown Todd LLC, Cincinnati, OH, Mark R. Merley , Asim Varma, David S. Eggert, Douglas L. Wald, Matthew D. Meisner, Son B. Nguyen, William J. Baer, Mark R. Merley, Arnold & Porter, Washington, DC, Brian D. Werner, Brooke B. Ward , Peggy M. Balesteri, Winston & Strawn, Chicago, IL, for Defendants.

*ORDER*

BECKWITH, Chief J.

I. *Introduction*

**\*1** Plaintiff J.B.D.L. Corp., for itself and a class of direct purchasers, alleges that Defendants Wyeth and Wyeth Pharmaceuticals (collectively "Wyeth"), violated the Sherman Act. Plaintiffs CVS Meridian and Rite Aid Corporation opted out of the J.B.D.L. class, and filed a separate Sherman Act complaint. All Plaintiffs contend that they were forced to pay a supracompetitive price for Wyeth's drug Premarin because Wyeth engaged in anti-competitive and exclusionary conduct towards one of its rivals, Duramed.

The Court has studied the extensive briefs filed by all parties in connection with Wyeth's motion for summary judgment. The Court finds that oral argument would not aid the Court in resolving the motion. The Court will grant Wyeth's motion and enter judgment in favor of Wyeth.

II. *Factual Background*

Wyeth manufactures Premarin. Premarin is Wyeth's trade name for its conjugated estrogen product approved for several therapeutic purposes: for treatment of vasomotor symptoms associated with menopause; treatment of vulval and vaginal atrophy; and to prevent osteoporosis, along with more specialized uses for more rare medical conditions. See Carlton Deposition, Table 1 (Doc. 135, Appendix C-1). Wyeth has manufactured and sold Premarin since 1942. No one disputes the fact that Premarin is the largest selling estrogen replacement drug (and one of the largest selling prescription medications) in the United States.

Premarin is an estrogen replacement drug. Estrogen replacement therapy (ERT) is typically prescribed for women without a uterus (as after a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 2

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

hysterectomy). Wyeth also manufactures products for use in hormone replacement therapy, which involves a combination of estrogen and progestin. Hormone replacement therapy (HRT) is typically prescribed for women with intact uteruses. The two categories of therapy are related but are distinct. Premarin can be used in combination with progestin in HRT. Wyeth's products PremPro and Premphase combine estrogen and progestin into one dose.

For all of the relevant time periods, several other ERT products were available in the market. None, however, were "conjugated" estrogen products, as is Premarin. There are no generic equivalents of Premarin approved by the FDA.

Duramed [FN1] manufactures Cenestin, its trade name for a newer conjugated estrogen product. Duramed obtained FDA approval to market Cenestin as a branded pharmaceutical in March 1999. Duramed had originally attempted to gain FDA approval of Cenestin as a generic equivalent to Premarin, but was not successful. It is important to note that Premarin and Cenestin are not therapeutic equivalents. See, e.g., Wyeth's Exhibit B-3, an FDA "Question and Answer" sheet about Cenestin. Cenestin, unlike Premarin, is not approved for long-term use, and thus cannot be prescribed for the prevention of osteoporosis.

> FN1. Duramed Pharmaceuticals was purchased by Barr Laboratories in 2001. The company will be referred to as "Duramed" in this Order.

Wyeth kept itself well informed of Duramed's efforts to secure FDA approval for Cenestin. Indeed, much of Plaintiffs' recitation of facts in opposition to Wyeth's motion for summary judgment is devoted to a review of Wyeth's documentation of the progress of its rival through the FDA process, and Wyeth's plans to address the impact of Cenestin's entry into the marketplace. Plaintiffs repeatedly refer to Wyeth's "Premarin Preemptive Plan", dated February 11, 1999 (Class Plaintiffs Exhibit P96, Doc. 143), as the key component of Wyeth's anti-competitive conduct.

*2 The "Plan" was a multi-faceted market strategy to maintain Premarin's dominant market share. One of its stated objectives was to hold "Cenestin to less than two percent of prescription market share in 1999, approximately $20 million in assumed sales." (Id. at WYE 132253). One part of the Plan was a demonstration for retail pharmacies on the advantageous pricing of Premarin vs. Cenestin, which Wyeth estimated would be priced below the average wholesale price (AWP) of Premarin. The demonstration showed that a pharmacy filling an ERT prescription would increase its net revenue by filling the prescription with the more expensive Premarin. Another part of the Plan was to advertise and promote Premarin's clinical differences--primarily its long-term use approval--and its longer track record. And yet another part of the "Plan" presented a strategy of limiting Duramed's "contracting opportunities" with third party payors, with whom Wyeth had in place various contracts. The "value" of these contracts to the third party payors is in the rebates Wyeth was paying for sales of various Wyeth products.

Wyeth kept a close eye on its market competitors. While Plaintiffs suggest this is part of Wyeth's anti-competitive scheming, such conduct appears to be a rational part of any market seller's business planning. See, for example, Class Plaintiffs Exhibit 97 (Doc. 143), a Wyeth "Premarin Family Business Brief" from June 21, 1999, that summarizes "Competitive Activity" from Duramed's Cenestin, but also from EVISTA, Lilly's Raloxifene, and a potential new entrant called "Activelle." In fact Wyeth appears to be closely tracking the effects of the March 1998 launch of EVISTA on its product sales; see WYE 089614 and 089621 (Class Plaintiffs Exhibit 97), showing that Premarin prescriptions actually declined (as a share of Wyeth family product sales) after EVISTA's market entry.

A. *Wyeth's PBM Contracts:* The record in this case fairly establishes that rebate and "access" contracts between pharmaceutical manufacturers and third party payors are a widespread industry practice. See, e.g., deposition testimony of Dr. White, chief clinical officer of HealthNet, at pp. 180-82 (Wyeth's Exhibit E-21, Doc. 135); Dept. of Health & Human

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 3

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

Services, "Report to the President--Prescription Drug Coverage, Spending, Utilization, and Prices" (April 2000) (excerpts at Exh. B-9, Doc. 135). The "third party payors" include not only traditional HMOs or insurers, but "pharmacy benefit managers" (PBMs). In overly simplistic terms, the rise of managed care, coupled with an increasing concern among employers and insurers with rising health care costs, created the pharmacy benefit manager and the drug formulary. (Some insurers manage plan pharmacy benefits internally, while others use an independent entity. For ease of reference, the Court will refer to both of these types of arrangements simply as "PBMs".)

The Plaintiffs generally contend that Wyeth's rebate/formulary contracts with many large PBMs permitted Wyeth to illegally maintain its monopoly in the ERT market, and to raise its prices after Cenestin's entry into the marketplace. Plaintiffs and their experts argue that the synergistic effects of Wyeth's "sole conjugated estrogen" clauses together with Wyeth's formulas for rebates to PBMs, effectively foreclosed competition from Duramed's Cenestin.

**\*3** The PBM is not involved in the actual sales transaction for the pharmaceuticals it "manages." Rather, the PBM negotiates both with the pharmaceutical manufacturers and the pharmacies that actually fill the prescriptions (many of the direct purchasers here). Manufacturers contract with a PBM for favorable formulary placement, or exclusive formulary listing in a given therapeutic drug classification. Manufacturers pay for these placements with rebates and other incentive payments.

The PBM also negotiates contracts with the pharmacies that actually buy the drugs and fill the plan members' prescriptions. These contracts are price contracts. Dr. White, of HealthNet, discussed this aspect of PBM contracts. She testified that, generally, the PBM-pharmacy contracts specify a reimbursement rate composed of the drug cost and a dispensing fee. For branded drugs, the cost is generally based on the average wholesale price of the drug less a negotiated discount. Dispensing fees

also vary depending on the pharmacy and geographic location. Under the type of contract terms Dr. White describes, if the average wholesale price of a drug should go up, the pharmacy's reimbursement from the PBM would also go up.

Wyeth submitted copies of its PBM contracts (Doc. 135, Exhibits H-1 through H-95). One of these contracts that the Plaintiffs analyze is with PCS Health Services, and is dated June 1996. (Plaintiffs Exhibit 92, Doc. 143) The term of this contract is thirty months, but Section 6.2.3 permits either party, with or without cause, to terminate with sixty days written notice. The contract obligates PCS to disclose to its plan sponsors all amounts Wyeth pays PCS (in rebates and other similar types of payments), while the actual distribution of those amounts is left to PCS and its plan sponsors.

Exhibit A lists the Wyeth products that are included in the PCS "Core Formulary." These include the various available dosages of Premarin. Section II states that all rebates paid under the agreement are contingent on Premarin being listed as the Core Formulary's "exclusive conjugated estrogen." The parties agreed that, in the event of a generic competitor's market entry, PCS would "consult" with Wyeth prior to placement of the generic on the formulary. (The contract also provides an "out" for both parties in the event that PCS and Wyeth could not agree on how to properly address a generic entry.)

The contract provides for "access" rebates and "market share" rebates, based on the number of prescriptions filled by PCS plan members for various Wyeth products, including Premarin. The market share rebate is defined for the "Estrogen and Estrogen/Progestin" therapeutic class as the "Premarin family" (Premarin, Prempro and Premphase tablets.) Other products for which Wyeth paid rebates include several oral contraceptives; an antidepressant (Effexor); the NSAIDs Lodine and Oruvail; an antibiotic (Suprax); a calcium channel blocker (Verelan); and a beta-blocker (Ziac).

B. *Wyeth's "Sole CE" Contract Clauses.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 4

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

**\*4** Wyeth attempted to include "sole conjugated estrogen" clauses, like the one in the PCS contract discussed above, in most of its PBM contracts. (Prior to Cenestin's approval by the FDA, Premarin was the only "conjugated estrogen" product on the market.) Wyeth's index of its PBM contracts indicates that, as of 1/1/2000, 31 out of 74 contracts contained a "sole conjugated estrogen" clause. (See Doc. 135, Exhibit H-13) By 1/1/2002, the clause was in 23 out of 60 contracts. (Of course, these numbers do not reflect the size of the PBMs and the "number of lives" each PBM represented.)

Plaintiffs recite a number of examples of Wyeth relying on its "sole CE" clause to "force" various PBMs to refuse a place for Cenestin on their formularies. Plaintiffs Exhibit 116 is an internal Wyeth memo titled "October 1999 Highlights," summarizing news and developments in many areas of Wyeth's business, including Premarin sales and marketing. Plaintiffs quote from page 3, which states in pertinent part: "A signed agreement with Duramed, which had added Cenestin to the Express Scripts formulary, was reversed by quick, concerted action between national account sales and CD & A. [FN2] To date, no known managed care accounts have Cenestin on formulary." The document goes on to note the creation of a "Premarin 2000 task force assigned to develop a strategy to counter the threat of an AB-rated generic conjugated estrogen anticipated in 2001."

> FN2. "National account sales" and "CD & A" are both internal Wyeth departments.

Class Plaintiffs review Wyeth's negotiations concerning the contracts with several large PBMs (Prescription Solutions, Medco, Wellpoint, Advance PCS, Integrated Pharmaceutical Services, Aetna) and with Kaiser, a managed care organization that purchased directly from Wyeth for its members. (See Doc. 143, pp. 37 to 51). In each case, Plaintiffs claim that the presence of a "sole CE" clause in the Wyeth contract gave Wyeth the leverage to "threaten" these PBMs with contract cancellation, and the attendant loss of Wyeth rebates, if the PBM added Cenestin to its formulary.

C. *Wyeth's Price Increases for Premarin.*

Wyeth does not dispute the fact that, after Cenestin was approved by the FDA in March 1999, Wyeth raised its prices for Premarin in a series of price increases. According to Class Plaintiffs' expert Dr. Leitzinger, "For the years 1999, 2000 and 2001, Wyeth increased Premarin's price twice annually for total annual increases of 11.8%, 12.4% and 16.8%, respectively. These price increases were not the result of any increase in Premarin costs. Nor did they reflect a response by Wyeth to price increases initiated by other ERT sellers." Leitzinger Report at p. 13 (Doc. 135, Exhibit C-7). Leitzinger also claims that for 1996-1998, Wyeth's "average rate of price increase" for Premarin was 7.58%. (Leitzinger Report at p. 47) Leitzinger, Keith Leffler (expert for CVS/Rite Aid) and Stephen Schondelmeyer (an economic pharmaceutical expert for both the Class and CVS/RiteAid) all opine that Wyeth's price increases were possible only because Wyeth successfully foreclosed Cenestin from the ERT market through the use of its illegal PBM contracts.

**\*5** Wyeth uses a longer view for purposes of evaluating its Premarin pricing. Wyeth's expert Christopher James submits a table (James Exhibit 2) calculating the annual growth rate in Premarin Average Price (for the most widely prescribed 0.625 mg dose) from 1989 to 2003. James calculates the increase from 1989 to 1990 at almost 20%, while the lowest increase for that period (1992 to 1993) was only 4%. Viewed in this longer-term fashion, Wyeth contends that its post-1998 price increases are not out of the ordinary.

D. *Wyeth's Market Share*

As initially noted above, Premarin has been on the market since 1942 and has had a majority market share for decades. In 1998, Premarin's overall ERT market share was 75.3%. Based on IMS data (a national source cited by all parties that provides statistical information on drug costs and utilization), Premarin's share of the oral ERT market declined in the period 1998 to 2003. In 1999, Premarin's share was 73.9%; by June 2003, its share was 68.6%. The fastest growing drug in the oral ERT market during

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

that same time was estradiol, which grew its share from 9.4% in 1998 to 18.5% by June 2003. (See Exhibit B-11, Doc. 135).

E. *The Women's Health Initiative Study*

In June 2002, the Womens' Health Initiative study released preliminary results of its long-term HRT study. (See generally, the WHI website at *http:// www.nhlbi.nih.gov/whi.*) The WHI announced its intention to prematurely stop its study of the long-term use of HRT. The WHI found that the overall risks of HRT outweighed the benefits. WHI found that HRT increased the risk of breast cancer, heart disease, stroke, and blood clots. This announcement negatively impacted sales of both HRT and ERT products (although the estrogen-only WHI study continued after June 2002). The Court agrees with Dr. Leitzinger and Dr. James, who both believe that the WHI announcement impacted the ERT market in such a major way that market behavior after that date cannot be relied on for purposes of analyzing liability or damages in this case.

III. *Procedural Background of This Litiation.*

In September 2000, approximately fifteen months after Cenestin was first commercially available on the market, Duramed sued Wyeth in this district, alleging that Wyeth's contracts with PBMs violated the antitrust statutes. [FN3] This Court denied Wyeth's initial motion to dismiss Duramed's complaint, but that case settled prior to any dispositive rulings or a trial on the merits.

FN3. See Case No. 1:00-cv-735.

J.B.D.L.'s complaint in this case, filed in October 2001, alleged that Wyeth's contracts and its post-1998 price increases violated Sections 1 and 2 of the Sherman Act. [FN4] This Court certified a direct purchaser class under F.R.C.P. 23 (Doc. 54, Order of May 12, 2003). The class, represented by J.B.D.L., includes both wholesalers and retail pharmacies who purchase directly from Wyeth. The class does not include the insurers, managed care organizations and pharmacy benefit managers who

entered into the challenged rebate contracts with Wyeth.

FN4. Case No. 1:01-cv-745, *McHugh Pharmacy Wynnewood, Inc. V. Wyeth-Ayerst Laboratories, Inc.,* was consolidated with this case, and the J.B.D.L. complaint is the operative complaint for both actions.

*6 Plaintiffs CVS and RiteAid, two retail pharmacies, opted out of the *J.B.D.L.* class and filed a separate Sherman Act complaint; their action has been consolidated with the Class Plaintiffs' action. After extensive discovery, Wyeth moved for summary judgment against Class Plaintiffs and CVS/RiteAid (Doc. 135). Class Plaintiffs (Doc. 143) and CVS/RiteAid (Doc. 144) filed lengthy opposition briefs, to which Wyeth replied (Doc. 155). Class Plaintiffs and CVS/RiteAid have sought leave to file sur-replies (Doc. 159 and 160), which Wyeth opposes (Doc. 164). Wyeth's motion has been exhaustively briefed and is ripe for decision.

ANALYSIS

I. *Summary Judgment Standards*

The standards for summary judgment are well established. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing a properly supported summary judgment motion " 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. *Guarino v. Brookfield Township Trs.,* 980 F.2d 399, 404 (6th Cir.1992); *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. den., Superior Roll*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 6

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

*Forming Co. v. InterRoyal Corp.,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment ...," *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479-80 (6th Cir.1989), and to designate specific facts in dispute. *Anderson,* 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. *United States v. Diebold Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. The court must assess "whether there is the need for trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. "If the evidence is merely colorable, ..., or is not significantly probative, ..., the court may grant judgment." *Anderson,* 477 U.S. at 249-50 (citations omitted). The Supreme Court has held:

  *7 The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict ...
*Id.* at 252. Hence the " 'mere possibility' " of a factual dispute will not suffice. *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir.1992), quoting *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986).

Summary judgment is not appropriate simply because the weight of the evidence favors the moving party. *Poller v. Columbia Broadcasting Systems, Inc.,* 368 U.S. 464, 472, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The issue of material fact required "to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Cities Serv. Co., supra,* 391 U.S. at 288-89.

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir.1979), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action." ' *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted).

II. *Antitrust Analysis*

A. *Class Plaintiffs' Claim Under Section 1 of the Sherman Act.*

Class Plaintiffs (but not CVS/RiteAid) assert that Wyeth's PBM contracts are illegal "exclusive dealing" contracts that substantially foreclosed competition in the relevant market, and thus violate Section 1. Wyeth seeks summary judgment on this claim, arguing that its conduct does not violate Section 1 as a matter of law.

Wyeth argues that its PBM contracts are not "exclusive dealing" contracts because those contracts do not forbid placement of alternate ERT products on the formularies of the contracting PBMs. Nor do the contracts forbid PBMs from purchasing or reimbursing their members' purchases of competing ERT products, including Cenestin. Wyeth describes its contracts as "mere preferential

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

treatment of one product over another" rather than exclusive dealing.

Wyeth also argues that its PBM contracts did not substantially foreclose competition in the relevant ERT market. Wyeth argues that the contracts' short termination notice provisions (30 to 60 days) prevent the contracts from being characterized as illegal exclusive dealings as a matter of law. Wyeth also attacks the market foreclosure rates calculated by Plaintiffs' experts as fatally flawed, as they fail to properly account for Cenestin's availability on many of the "open" PBM formularies and in the non-PBM cash market. Wyeth claims that once properly reduced, the rates are simply too low to create a triable issue concerning an "unreasonable" foreclosure rate.

**\*8** Section 1 prohibits contracts or agreements that unreasonably restrain trade or commerce. The contracts at issue in this case are evaluated under the "rule of reason" test. See generally, *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). This analysis must take into account a variety of factors, "including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Id.* at 10. The first, and critical, step in any rule of reason analysis is that the plaintiff must prove that "the challenged action has had an actual adverse effect on competition as a whole in the relevant market." *K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 127 (2d Cir.1995) (citation omitted). See also, *PSI Repair Services, Inc. v. Honeywell, Inc.,* 104 F.3d 811, 815 n. 12 (6th Cir.1997) ["Under the rule-of-reason analysis, the antitrust plaintiff must show, inter alia, an adverse effect on competition."]

The key questions at this juncture are (1) the appropriate definition of the relevant market, and (2) whether Wyeth's PBM contracts had an "actual adverse effect on competition as a whole" in that relevant market (or, in exclusive dealing parlance, whether the contracts substantially foreclosed competition in that market).

*Relevant Market:* Class Plaintiffs' expert Jeffrey Leitzinger defines the relevant product market as oral ERT products. According to Leitzinger, competing products to Premarin include Cenestin, Estratab/Menest (esterefied estrogens), Estrace/Gynodiol (micronized estradiol), Ogen/ Ortho-Est (estropipate), and Estinyl (ethinyl estradiol), as well as generic versions of several of these drugs, including estradiol. (See Leitzinger Report at p. 6, n. 4 and pp. 9-12.) The relevant geographical market is the United States. Wyeth's motion does not take a definitive position on the relevant market, but concedes that it is "at least" the market for oral ERT products.

The definition of the relevant market can be a complex and difficult issue. In this case, it may well be that the relevant market is broader than just the oral ERT therapeutic category. However, Plaintiffs have put forward an acceptable definition and the reasons for it, and Wyeth does not seriously challenge this definition. For purposes of ruling on Wyeth's motion, the Court will accept Plaintiffs' definition for purposes of analyzing Class Plaintiffs' claim.

*Premarin's Market Power:* The record establishes (and Wyeth does not dispute) that Premarin has always had a dominant share of the oral ERT market. But majority or dominant market share does not equal "market power." It must be shown that Wyeth's large market share translated to market power that enabled Wyeth to foreclose competition in that market.

*Actual Market Foreclosure:* The record in this case establishes that pharmaceutical manufacturers value advantageous formulary placement. It is beyond dispute that Wyeth and its competitors (both in the oral ERT market and in the pharmaceutical market generally) seek favorable formulary placement from PBMs, and are willing to pay large sums to obtain those placements. This favorable treatment can include favorable access (preferred brand status or formulary "tier" placement), favorable pricing (rebates to PBMs and lower co-pays to PBM members), or both. Wyeth's contract with PCS (discussed above) provided for rebates not only on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

Premarin, but a number of other drugs.

**\*9** These formulary arrangements can be pro-competitive, as the CVS/RiteAid expert Keith Leffler admits. Rebates effectively lower the cost paid for the product by the plan sponsor. PBM rebates, when passed on to the plan sponsor, lower the sponsor's cost of providing the benefit.

It is undisputed that many of Wyeth's PBM rebate contracts also contained "sole conjugated estrogen" clauses, which in operation did not permit those PBMs to include Cenestin, approved as a "conjugated estrogen," on the formulary. If the PBM did so, it risked contract cancellation and loss of Wyeth rebates. But it is also quite clear that these clauses did not prevent PBMs from listing other oral ERT products (products that are not "conjugated estrogens") on their formularies. And, Wyeth submits evidence from Duramed's own documents that "open" formularies (during the period 1999 to June 2002, at least) were more prevalent than Class Plaintiffs wish to recognize. Under "open" formularies without the exclusivity clause, Premarin would not have a preferred status over Cenestin, and the co-pay for Cenestin and Premarin would be equal. Duramed itself analyzed its status with PCS, where (according to Duramed) Cenestin was available at the same copay level for at least 90% of PCS business, or over 45 million lives. Duramed notes that Cenestin's low market share at PCS (approximately 1%) was reflective of its national market conditions. Duramed concluded that "considering the fact that the overwhelming majority of PCS business is open, with no restrictions on Cenestin," low market share simply demonstrated the need to help drive formulary decisions by increased efforts with its field sales force. See, DUR 010716 (Exhibit G-4, Doc. 135). To similar effect is Duramed's 8/5/99 "Update" on Cenestin, where Duramed concludes it can take a "conservative approach with regards to managed care contracting, because over 70% of managed care lives are enrolled in open formularies, meaning the majority of scripts go through with no issues and because we provide a 30 day sample." (DUR 010916, Wyeth's Exh G-5) Duramed's calculations as of 12/15/00 for the number of "lives" covered by

HMOs and PBMs with access to open formularies shows that HMO open lives were 73,359,394, 85% of the identified HMOs with a total of 113,078,707 covered lives. For thirteen PBMs, covering 222,000,000 lives, the open formulary lives were 137,800,000 or 62%. (DUR010961-966, Exhibit G-6, Doc. 135)

It has often been noted that exclusivity provisions in contracts can serve useful, pro-competitive purposes. See, e.g., *Jefferson Parish Hosp. Dist. No. 2. v. Hyde,* 466 U.S. 2, 95, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1989) (O'Connor, J., concurring). It is only when such provisions cross the line into the arena of exclusive dealing that substantially and negatively affects market competition, that the antitrust statutes come into play.

In *U.S. v. Microsoft,* 253 F.3d 34 (D.C.Cir.2001), the Court of Appeals discussed the trial court's conclusion that Microsoft's "exclusive dealing" contracts with internet access and service providers ("IAPs") did not violate Section 1. Under the terms of Microsoft's contracts, Microsoft licensed its Internet Explorer browser and an IE "access kit" to hundreds of IAPs at no cost. Microsoft then entered into rebate contracts with, or made outright payments to, the ten "most important" IAPs (such as AOL) to promote IE and "exile" Microsoft's largest browser competitor, Netscape Navigator. "Under that agreement Microsoft puts the AOL icon in the OLS folder on the Windows desktop and AOL does not promote any non-Microsoft browser, nor provide software using any non-Microsoft browser except at the customer's request, and even then AOL will not supply more than 15% of its subscribers with a browser other than IE." *Id.* at 68.

**\*10** The *Microsoft* district court, in analyzing the § 1 claim, concluded that "unless the evidence demonstrates that Microsoft's agreements excluded Netscape altogether from access to roughly forty percent of the browser market, the Court should decline to find such agreements in violation of § 1." This was true even though Microsoft had substantially excluded Netscape from "the most efficient channels for Navigator to achieve browser usage share," e .g., the internet access providers like

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 9

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

AOL.

Similarly, in the recent Third Circuit case of *United States v. Dentsply,* 2005 U.S.App. LEXIS 3219 (Feb. 24, 2005), the district court found that Dentsply's exclusive dealer contracts did not violate Section 1, because Dentsply's actions had not foreclosed competitors from "gaining a foothold in the market." *Id.* at \*7 (quoting from *U.S. v. Dentsply,* 277 F.Supp.2d 387, 453 (D.Del.2003)). This was so even though the challenged dealer contracts prohibited Dentsply's authorized dealers from selling any competitor's products. [FN5]

> FN5. The district court rulings on Section 1 claims were not appealed in either *Microsoft* or *Dentsply.*

This Court agrees with the analysis of the district courts in both *Microsoft* and *Dentsply.* The Plaintiffs must establish that Wyeth's conduct substantially foreclosed actual competition in the relevant market, oral ERT products. While favorable PBM formulary placement is no doubt an effective method for sales of a drug, it is clearly not the only route Duramed had to sell its new product Cenestin. The Court cannot conclude that Wyeth's favorable or exclusive formulary placement for Premarin in many PBMs equates to actionable market foreclosure.

The parties disagree about the appropriate basis for calculation of a foreclosure rate. For instance, Leitzinger opines that 42% of Premarin sales in fourth quarter 1999 were through PBMs with "sole CE" clauses, which he concludes is substantial market foreclosure. (Leitzinger Report pp. 39-40) But, as Wyeth points out, Leitzinger fails to account for the fact that many PBMs would reimburse for a Cenestin prescription even though it was not a "favored" drug and listed on the PBM's formulary. The Duramed documents discussed above show that Cenestin did have access, even if it may not have had the best or most preferred formulary position vis-a-vis Premarin. Leitzinger also assumes that his calculated 42% foreclosure rate, based on 4th quarter 1999 data only a few months after Cenestin was actually available on the market, should hold

for the entire time period at issue. This assumption is faulty, given the volume of information in the record about changing market conditions, including Duramed's activities to try to increase Cenestin's market share. His assumption also ignores the fact that most formularies have a "waiting period" during which new drugs are evaluated for addition to a PBM's formulary. Dr. White, of HealthNet, testified that a six-month period for review prior to placement is typical. Most importantly, however, Class Plaintiffs assume that because Cenestin could not gain full or complete access to all PBM formularies in the year it entered the market, that "competition in general" was harmed as a result. The fact that other oral ERT products were not only available but were simply not impacted by Wyeth's "sole CE" contract clauses, belies such an assumption.

**\*11** The Court need not resolve the dispute about the specific, appropriate foreclosure rate, because the Court finds that Class Plaintiffs have simply not established actual market foreclosure. The Court will therefore grant summary judgment to Wyeth on Class Plaintiffs' Section 1 claim.

B. *Section 2 Monopolization Claim.*

Class Plaintiffs and CVS/RiteAid allege that Wyeth violated Section 2 of the Sherman Act. A claim under Section 2 requires proof of two elements: (1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to 'growth or development resulting from a superior product, business acumen, or historic accident." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 595-96, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Conwood Co. v. U.S. Tobacco Company,* 290 F.3d 768, 782 (6th Cir.2002). "Monopoly power" for purposes of section 2 can be "something greater than market power under section 1." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

Wyeth concedes its "monopoly power" solely for

Not Reported in F.Supp.2d                                                                      Page 10

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

purposes of its summary judgment motion. [FN6] And, as noted above, Wyeth apparently concedes (at least for summary judgment purposes) that the relevant market is oral ERT products.

> FN6. The Court recognizes that absent Wyeth's concession on this point, a careful analysis of the existence of monopoly power is required. See generally, *ReMax International v. Realty One,* 175 F.3d 995, 1018- 1019 (6th Cir.1999). The Court also acknowledges that its concession will not prohibit Wyeth from challenging plaintiffs' allegation of its monopoly power in the event of a trial in this case.

Wyeth argues that despite its conceded monopoly power, its PBM contracts are in fact pro-competitive and are a hallmark of competition in the pharmaceutical industry. Wyeth claims that its rebates formulas are just pricing systems, which are not actionable by the direct purchaser plaintiffs under Section 2, absent predatory pricing. Since Wyeth's prices are clearly not "predatory" (in the classic sense of below-cost pricing to squeeze out a competitor), Wyeth argues that Plaintiffs have no viable Section 2 claim.

Initially, the Court rejects Wyeth's somewhat simplistic argument that its lack of predatory pricing mandates dismissal of the Section 2 claims. Plaintiffs' essential allegation is that Wyeth's contracts (rebate structure plus sole CE clauses) prevented Cenestin from becoming a competitive threat, and thus allowed Wyeth to unlawfully raise its Premarin prices after Cenestin's introduction. Moreover, the Supreme Court has acknowledged the viability of Section 2 claims brought by a competitor that go beyond allegations of predatory pricing. See, *Aspen Highlands, supra,* and *Kodak, supra* . [FN7] Thus it is not solely the Wyeth rebates that Plaintiffs attack. [FN8]

> FN7. The Supreme Court subsequently described *Aspen Skiing* as "at or near the outer boundary of § 2 liability." *Verizon Communications v. Law Offices of Curtis V. Trinko,* 540 U.S. 398, 409, 124 S.Ct.

872, 157 L.Ed.2d 823 (2004).

> FN8. The CVS/RiteAid expert Keith Leffler admitted in his deposition that the "more significant thing" in his analysis was the market share rebate, rather than the "sole CE" clause. See Leffler Deposition at p. 163-164. The Court does not view this testimony as limiting the CVS/RiteAid claim to Wyeth's rebate clauses, as Wyeth suggests.

Wyeth relies heavily on *NWS Michigan v. General Wine & Liquor,* 58 Fed. Appx. 127 (6th Cir.2003), an unpublished decision which held that a liquor distributor lacked antitrust standing to sue its larger competitor when it failed to allege predatory pricing. The Court of Appeals held that "Whether or not General Wine's pricing mechanism violated state law, the prices themselves simply reflect the storage and transportation efficiencies available to General Wine by virtue of its privileged status." That privileged status was conferred by an explicit legislative "grandfather" clause, permitting General Wine to deal in a wider market than NWS was able to do, thus achieving economies of scale denied to NWS.

**\*12** The facts of that case do not "fit" the facts here. Nor does the Court view the case as supporting the sweeping proposition which Wyeth ascribes to it (e.g., no "rebate" program can be challenged absent predatory pricing). Moreover, the Sixth Circuit has often instructed that Section 2 requires "a thorough analysis of each fact situation" in order to determine whether or not the monopolist's conduct is unreasonably anti-competitive and thus unlawful. See *Conwood, supra,* 290 F.3d at 782 (quoting *Byars v. Bluff City News Co.,* 609 F.2d 843, 860 (6th Cir.1979)). The critical questions presented here are whether Plaintiffs have established a material factual dispute as to whether Wyeth willfully maintained its historic (and apparently legally obtained) monopoly power by unreasonable anti-competitive or exclusionary means, and if so whether the Plaintiffs suffered an antitrust injury as a result.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 11

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

(Cite as: 2005 WL 1396940 (S.D.Ohio))

*Unreasonable Anti-Competitive Conduct*

Areeda & Hovenkamp describe unlawful exclusionary conduct as acts that "are reasonably capable of creating, enlarging or prolonging monopoly power by impairing the opportunities of rivals" and that either "do not benefit consumers at all," are "unnecessary for the particular consumer benefits that the acts produce," or "produce harms disproportionate to the resulting benefits." Antitrust Law P 749, at 141 (Supp.2003), as quoted in "Comment: LePage's v. 3M: An Antitrust Analysis of Loyalty Rebates", 79 N.Y.U .L.Rev. 1605 (October 2004).

And it must be kept in mind, when considering an allegation of exclusionary or anti-competitive conduct, that the antitrust laws are intended to protect competition, not a competitor. See, *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 823 (6th Cir.1982) ["Anticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor."] Plaintiffs and their experts repeatedly assert that Wyeth's "sole CE" clause-- which impacted only one competitor, Duramed--together with Wyeth's rebates formulas harmed "competition" in general. But there is little, if any, analysis of the effects of the challenged conduct on overall competition in the oral ERT market.

Despite this lack, Plaintiffs repeatedly point to Wyeth's expressed desire (as reflected in its "Premarin Plan" and various marketing documents in the record) to limit Cenestin's market share. But undisputed evidence that a manufacturer desires or intends to maintain or increase its product's market share at the expense of a new competitor, does not by itself create a triable issue of whether Wyeth's chosen means to achieve that desire violated the Sherman Act. See, e.g., *Cargill, Inc. v. Monfort of Colorado,* 479 U.S. 109, 116 (1986) ["The kind of competition Monfort alleges here, competition for increased market share, is not actively forbidden by the antitrust laws."]

Plaintiffs urge this Court to follow the recent Third Circuit decision in *LePage's v. 3M,* 324 F.3d 141

(3d Cir.2003), and permit their Section 2 claims to proceed to trial. But *LePage's* is not controlling on this Court. And absent persuasive authority that the Sixth Circuit would follow *LePage's* and agree with its conclusions, this Court is not persuaded.

*13 *LePage's* involved antitrust claims against 3M, the manufacturer of branded "Scotch" transparent tape, brought by LePage, 3M's competitor in the second-brand, or private label, transparent tape market. By 1992, LePage's had an 88% market share in the second-brand market, and 3M decided it would enter that market and compete with LePage's. 3M started offering rebate programs to various retailers, who could earn rebates on a variety of 3M products. Several specific types of rebates were offered. These included "bundled" rebates, and "tiered" rebates earned based on sales across six different 3M product lines, including lines in which LePage's did not compete. 3M also offered minimum purchase level agreements to two of the largest retail outlets for tape (Office Depot and Staples) for its branded Scotch tape relative to the second-brand or private label tape; if the retailer achieved a set "growth" factor for the second-brand sales, it could obtain higher rebates.

LePage's claimed that 3M's multi-tiered and bundled rebates "plus" the agreements with the largest retailers violated section 2, in that 3M was using its brand-name transparent (Scotch) tape monopoly to gain an unfair advantage in the second-brand, private label market, by restricting the availability of LePage's lower-priced second-brand tapes.

The case was submitted to a jury, which found for LePage's on both its monopolization and attempted monopolization claims under § 2 of the Sherman Act. It found in 3M's favor on LePage's claims under § 1 of the Sherman Act and § 3 of the Clayton Act. The district court denied 3M's motions for judgment as a matter of law and for a new trial on the Section 2 claim.

On appeal, a panel of the Third Circuit reversed the District Court's judgment on LePage's § 2 claim by a divided vote. *LePage's Inc. v. 3M,* 277 F.3d 365

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 12

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

(3d Cir.2002). However, LePage's motion for rehearing en banc was granted, and the en banc court then affirmed the trial court's decision and the jury verdict. The en banc majority essentially concluded that exclusionary conduct that used above-cost price discounting was actionable under Section 2, and upheld a verdict against 3M of approximately $68 million.

The *LePage's* dissent criticized the result because it erred in favor of protecting LePage's, an inefficient competitor, rather than protecting overall competition. The jury punished 3M rather severely for engaging in above-cost, discount pricing coupled with some exclusive retail contracts, an arrangement that clearly permitted 3M to increase its market share and its profits, yet did not clearly harm competition or consumers. Nor, in reality, did 3M's conduct significantly harm LePage's secondary-brand market share (which declined from 88% to 67% in the years in which 3M's rebate programs were in effect). This latter conclusion is especially relevant, given the significant evidence in the record that LePage's market difficulties were caused by its own conduct and market decisions, and were not the result of 3M's challenged conduct.

**\*14** The Third Circuit decision also leaves unclear (at least to this Court) the precise nature of 3M's violation of Section 2. The verdict imposed a heavy penalty on 3M without producing consistent guidance for what is permissible price competition in the retail market for a simple item like transparent tape. That marketplace appears far less complex than the current United States marketplace for pharmaceuticals.

In contrast to *LePage's* is the Eighth Circuit decision in *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039 (8th Cir.2000), which Wyeth advocates. There, a group of power boat manufacturers sued Brunswick, the leading supplier of inboard and stern drive engines that the plaintiffs bought and used in their boats. Plaintiffs alleged that Brunswick engaged in anticompetitive conduct because it (1) began a market share discount pricing program in 1984, under which list price discounts were given for purchases of specified percentages

of engine purchases made from Brunswick. Additional long term discounts could be earned for signing a market share agreement for up to three years. Volume discounts based strictly on sales quantity were also used. When one of Brunswick's largest competitors introduced a new stern drive in 1985, Brunswick responded by purchasing two of the largest domestic boat builders (Bayliner and Sea Ray), thus vertically integrating its business.

The plaintiffs later filed suit, contending that the synergistic effect of the market share/volume discount programs, and Brunswick's willful vertical integration efforts, resulted in plaintiffs being charged supracompetitive prices for Brunswick engines, and also drove other engine manufacturers out of the market. Brunswick's summary judgment motion was denied, and after a ten week trial the jury awarded judgment for plaintiffs of over $44 million. After unsuccessful post-trial motions seeking to set aside the verdict, the final award against Brunswick was $142,165,931.12.

The Eighth Circuit reversed and remanded for entry of judgment in favor of Brunswick. Concerning plaintiffs Section 2 claim, the Circuit noted the strong line of authority that above cost discounting is not anticompetitive conduct as a matter of law and sound policy. See generally, *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 223, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). While the Eighth Circuit rejected Brunswick's suggestion that above cost pricing is always per se lawful, it also rejected plaintiffs' argument that Brunswick's discounts "plus"--in that case Brunswick's vertical integration purchases along with several other instances of allegedly anticompetitive conduct--could together result in a violation of Section 2. The Court noted that the boat builders were not required to refrain from purchasing from competitors, and were free to walk away from Brunswick's discounts if they got a better offer. The Court rejected the plaintiffs' arguments that Brunswick's discounts created "golden handcuffs" that amounted to an impenetrable barrier to the entry of additional competitors.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

**\*15** The Supreme Court denied certiorari in both *Concord Boat* and in *LePage's.*

The Plaintiffs here urge that the scale is tipped in favor of their position, and the reasoning of *LePage's,* by two additional cases; *U.S. v. Dentsply, supra,* and *Masimo v. Tyco Health Care Group,* 2004 U.S. Dist. LEXIS 26916 (C.D.Cal.2004). Neither of these are of substantive assistance. *U.S. v. Dentsply* was an action by the Justice Department, seeking only injunctive relief against Dentsply's enforcement of its truly exclusive dealing clause in its purchase order contracts. Dentsply had historically sold its products through dealers, who in turn sell to dental laboratories that fabricate the final artificial teeth or dentures that dentists (and their patients) buy. Some of Dentsply's competitors also sold directly to the laboratories, but that outlet for sales was small. Dentsply had long "discouraged" its dealers from selling products of its competitors; but in 1993, it adopted an explicit contract provision that its authorized dealers "may not add further tooth lines to their product offering." (The relationship between Dentsply and its dealers was on a purchase-order basis, which the Third Circuit characterized as "essentially terminable at will.") The district court found that the challenged contract clause did not violate Section 2, but the Third Circuit reversed. Following *LePage's,* the Court found that the contract provision essentially foreclosed all competition from the market, finding that "the firm that ties up the key dealers rules the market." 2005 U.S.App. LEXIS 3219 at \*20. The Court believes a key difference between *Dentsply* and the case at bar lies in the fact that Dentsply's contract clause barred all competition from the dealer network, which was how the overwhelming majority of dental products were sold into the market.

*Masimo,* a California district court opinion denying summary judgment on section 1 and 2 claims, involves a disparate mix of strategies adopted by the defendant, Tyco Corp., in its sales of pulse oximetry sensors and patient cables, sold to hospitals, health networks and other equipment manufacturers. The conduct included "loyalty discounts" to hospitals in exchange for agreements not to purchase more than 5 to 15% of their oximetry products from competitors; a few "sole source exclusive dealing arrangements" with hospital group purchasing organizations; offering "bundled rebates" to two of its customers which provided rebates when oximetry and non-oximetry products were purchased together; offering financing programs to hospitals that imposed penalties if the hospital switched to a competitor's oximetry products; and co-marketing contracts with original equipment manufacturers (OEMs) that required the OEMs that used Tyco's modules to also recommend that Tyco sensors be used, rather than those of Tyco's competitors, even when competitors sensors could have been used. The district court, relying on *LePage's,* found that a jury could find that the combined effect of all of Tyco's conduct resulted in actionable anticompetitive conduct, and denied Tyco's summary judgment motion. This Court of course is not bound to adopt the reasoning of the California district court, and is not inclined to do so given its heavy reliance on *LePage's.*

**\*16** *Conwood v. U.S. Tobacco, supra,* a Sixth Circuit decision that is binding on this court and that Plaintiffs argue supports denial of Wyeth's motion, is distinguishable. There, U.S. Tobacco ("USTC") appealed a jury verdict in favor of Conwood on its antitrust claims; Conwood and U.S. Tobacco competed in the "moist snuff" market, with USTC the largest seller. The Sixth Circuit denied USTC's appeal from both the jury verdict and the trial court's denial of its summary judgment motion, noting that there was sufficient evidence of USTC' willful anticompetitive conduct to submit the case to the jury. USTC argued that Conwood's injury (undeniable loss of market share and profits in areas where the two companies were in direct competition) flowed only from USTC's exclusive selling agreements with retailers, which were entirely legal. But the evidence in that case of USTC's conduct included not only exclusive retail agreements, but also evidence that USTC intentionally removed Conwood's package racks from retail stores without permission of store managers, and destroyed or discarded the racks, then put Conwood product cans into USTC's own racks in an attempt to "bury" Conwood's products;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 14

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

trained its sales representatives to trick store representatives and clerks so that the Conwood racks and products could be moved or destroyed; and that USTC provided misleading and incorrect information about sales data for USTC and competitors' products, to encourage the retailers to stock more of USTC's products and less of the competitors products. No such tortious conduct is involved in the case before the Court.

Thus, this Court finds itself faced with somewhat imprecise and certainly conflicting standards by which to judge Plaintiffs allegations of Wyeth's monopolistic behavior. *LePage's* obviously favors letting a jury sort it out, using the same imprecise, conflicting Section 2 standards transformed into jury instructions. *Concord Boat,* on the other hand, illustrates the dangerous possibility of a tremendous waste of time and resources of all involved here in permitting a jury to "sort it out" when the appellate court may well find that there is no jury issue here.

Professor Elhauge has observed that there is a great deal of ambiguity and uncertainty in the current legal formulations of monopolization claims. He notes in particular the problem of submitting these sorts of claims to a jury: "And if the judges don't decide the issue, the same problem will infect jury verdicts, for the typical set of jury instructions ... leaves it up to the jury to divine the metaphysical difference between acquiring or maintaining monopoly power through (1) willful, anticompetitive, or exclusionary means or purposes, and (2) business acumen, superior products, competition on the merits, or valid and legitimate business reasons. Without more guidance, different jurors are likely to use completely different normative understandings about what all these terms mean." E. Elhauge, "Defining Better Monopolization Standards", 56 Stan. L.Rev. 253, 266-267 (Nov.2003).

**\*17** The Supreme Court noted just last year that, "Under the best of circumstances, applying the requirements of Section 2 can be difficult because the means of illicit exclusion, like the means of legitimate competition, are myriad.... Mistaken inferences and the resulting false condemnations are

especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Verizon Communications v. Law Offices of Curtis Trinko, LLP,* 540 U.S. 398, 414, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) (internal citations omitted).

Based on the record before the Court, there is little doubt that Wyeth desired and intended to thwart Cenestin's market share growth with a vigorous multi-faced marketing campaign. Plaintiffs focus on one piece of that campaign, Wyeth's PBM contracts, and cry foul. But absent explicit, controlling appellate authority that Wyeth's conduct in executing those contracts, a practice that is widespread throughout the larger and unique pharmaceutical market in the U.S., runs afoul of the guiding principles of Section 2 liability, this Court believes that the approach adopted by the Eighth Circuit in *Concord Boat* is correct. Wyeth's pricing behavior "plus"--in this case the "plus" factor being the "sole CE" contract clause--did not violate Section 2 of the Sherman Act. Wyeth's motion for summary judgment against the Class Plaintiffs and CVS/RiteAid on the Section 2 claims is therefore granted.

*Antitrust Injury*

Even if the Court were convinced that Plaintiffs' Section 2 claims survive Wyeth's motion, Plaintiffs must also establish that they have suffered an "antitrust injury" in order to proceed. The Sixth Circuit again recently noted that "antitrust standing to sue is at the center of all antitrust law and policy. It is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws.... A private plaintiff may not recover damages under the antitrust laws merely by showing an 'injury causally linked to an illegal presence in the market.' " *Worldwide Sports v. NCAA,* 388 F.3d 955, 964-65 (Gibbons, J. concurring) (internal citations omitted). Antitrust laws are intended to prevent injuries to competition, and thus provide a remedy only for those losses that stem from the competition-reducing aspects of a defendant's conduct. There must be a distinct causal link between that challenged conduct, and the harm

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which Plaintiffs allege they have suffered. The Sixth Circuit has been zealous in ensuring that this element of an antitrust claim is satisfied. See, e.g., *Hodges v. WSM, Inc.,* 26 F.3d 36 (6th Cir.1994); *Valley Products v. Landmark,* 128 F.3d 398 (6th Cir.1997); and *Indeck Energy Services v. Consumers Energy Co.,* 250 F.3d 972 (6th Cir.2000).

*In Re Cardizem CD Antitrust Litigation,* 332 F.3d 896 (6th Cir.2003) does not "lower the bar" of this requirement, as Plaintiffs suggest. *Cardizem* involved an interlocutory appeal from the district court's denial of the defendant's Rule 12 motion to dismiss for failure to allege antitrust injury. At issue there, as described by the Sixth Circuit, was a "plain vanilla horizontal agreement to restrain trade in the form of a multi-million dollar cash payment," paid by the defendant to a competitor in order to delay the competitor's introduction of a generic substitute for Cardizem. *Id.* at 914. After ruling that the agreement was per se illegal, the Sixth Circuit also held that the district court correctly denied the motion to dismiss. Here, the Rule 56 standards apply, not Rule 12. And Wyeth's PBM contracts are clearly *not* illegal per se.

**\*18** Here, understanding the antitrust injury Plaintiffs allege requires a two-step analysis. First, Cenestin's lower market share from 1999-2002 was caused by Wyeth's PBM contracting practices. Second, once Wyeth "realized" that it was successful in keeping Cenestin at that lower market share, Wyeth willfully and illegally raised its price for Premarin.

Class Plaintiffs and CVS/RiteAid rely on their economic experts to establish the link between Wyeth's alleged exclusionary/anticompetitive conduct, and Wyeth's alleged supracompetitive price increases in the period 1999 to 2002. Leitzinger, Class Plaintiffs' expert, states that the increases were not tied to increases in Wyeth's costs to produce and market Premarin, nor to price increases in competitors' products. He therefore concludes (Leitzinger Report at pp. 40-45) that "By limiting Cenestin's development as a competitor and by restricting share growth by other oral ERT products, Wyeth maintained its hold on customers and avoided the need for any defensive pricing reactions. This enhanced Wyeth's market power relative to that it would have enjoyed had Cenestin's entry been unconstrained."

Leitzinger packs a series of assumptions into his conclusion. His primary assumption, of course, is that it was Wyeth's PBM contracts alone that "limited Cenestin's success," not Duramed's decisions or strategies for marketing its new product, nor any of the admitted clinical differences between Cenestin and Premarin, nor any other aspects of Wyeth's strategic planning for its ERT/HRT product line.

Concerning Duramed's marketing of Cenestin, Leitzinger relies entirely upon the opinion of another of Plaintiffs' experts, Stephen Schondelmeyer, that Duramed undertook a "substantial, concerted marketing effort." (See Schondelmeyer Report, Wyeth's Exh C-11 at ¶ 92) Schondelmeyer, in turn, relies heavily upon testimony from Duramed and Solvay, its marketing partner, who (unsurprisingly) blame Wyeth almost exclusively for Cenestin's failure to achieve the market share Duramed desired. While an expert may rely on another expert's opinion under Rule 702, neither Leitzinger nor Schondelmeyer offer any objective study to confirm this point. Worse, they ignore substantial evidence in the record that contradicts their assumption. They ignore the data discussed above concerning Duramed's unfettered access to "open" formularies, a fact Duramed used as a part of its own marketing strategy. They ignore the fact that a 1.25 mg. dosage of Cenestin was not approved by the FDA until March 2000, and was unavailable on the market until May 3, 2000. This is the most popular dosage level for Premarin. (See Wyeth's Exhibit B-5) PCS Health Systems told Duramed that primary resistance to listing Cenestin on formulary was Duramed's lack of this popular dose. (See Wyeth's Exhibit G-4, DUR010716)

Leitzinger also fails to note or take account of the undisputed clinical and therapeutic differences between Cenestin and Premarin. Those differences include Premarin's long history and track record of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 16

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

(Cite as: 2005 WL 1396940 (S.D.Ohio))

use, clinical studies, and long-term use for osteoporosis prevention. Wyeth used these differences in its "Premarin Strategy" advertising. And, PCS Health also told Duramed in June 2000 that Cenestin's lack of an osteoporosis indication would "likely result in a non-formulary status for 2001." (Wyeth's Exhibit G-4, DUR010717).

*19 Plaintiffs' experts fail to address the fact that Premarin's nearest competitor in the oral ERT market, estradiol, actually doubled its market share from 1998 to 2003 (from 9.4% to 18.5%); Premarin's market share in the same period declined (from 75.3% to 68.6%). If "overall competition" was harmed by Wyeth's PBM contracts, this kind of growth in a competitor's market share should, at the least, be explained or distinguished.

Also of note is Duramed's report on United Health Care ("UHC"), a large insurer with 44 regional health plans that varied widely in the type of pharmacy benefit programs offered. In 2000, UHC agreed to allow Cenestin equal co-pay status with Premarin for a plan with 650,000 covered lives; the pilot program was designed to monitor market demand. Duramed notes that "unfortunately the results were less than favorable. The Cenestin market share fell far short of the targeted 5% UHC anticipated and needed to make the addition of Cenestin 'worthwhile.' " (Wyeth Exhibit G-4, DUR 010717). Indeed, Duramed's internal "review" of its managed care relations for July 2000 concludes that lack of physician demand for Cenestin was the first-listed cause of lower managed care access, "as monitored by competitive market share in unrestrictive open markets ...". This admission significantly weakens Leitzinger's and Schondelmeyer's assumptions about Duramed's efficient, competitive marketing for Cenestin.

To similar effect is the fact that Cenestin's sales in the cash market segment, the Medicaid segment, and in the PBM-HMO segment, were all relatively stable throughout the period. If the PBM-HMO segment of the market is so critical, one would expect to see some variation between the three different segments. Plaintiffs' experts blame this on "spill over" or "threshold effect." (See, e.g.,

Schondelmeyer Report, ¶ 131-132) This argument is that physicians will not write prescriptions for their patients if the drug is not listed on the patients' PBM formularies, because it may cost more (through a higher co-pay) or because the physician might get a phone call from a pharmacy. But given the feedback Duramed was receiving noted above, an equally plausible explanation is that Duramed's marketing efforts were not succeeding as well as had been expected. Leitzinger does not address this possibility.

Keith Leffler, expert for CVS and RiteAid, relies on the same facts about Wyeth's PBM contracts to conclude that "Imposition and enforcement of such contractual provisions by a dominant seller with market power are clearly anticompetitive regardless of whether they are disguised as competitive responses or discounts." (Leffler Report at ¶ 42) But beyond this characterization of conduct, Leffler does not discuss or account for any of the other potential factors that could affect the marketplace success of a competing drug, or the specific factors that may have affected Cenestin's market share. He assumes, as does Leitzinger, that Wyeth's PBM contracts caused the Cenestin market share.

*20 But, assuming for the moment that the cause-and-effect relationship between the PBM contracts and Cenestin's market presence is accepted, the Leitzinger and Leffler opinions on the second part of the antitrust injury analysis--that Wyeth's price increases were the result of its PBM contracts' unlawful exclusionary effects--are fatally flawed. Leffler quotes from an internal Wyeth document which states: "As market share leader in estrogen replacement therapy, Premarin ... price increases should be aggressive to cover increasing costs and to maximize profits." (Leffler report ¶ 48, n. 72) From 1991 to 1998, Wyeth's average list price increase for Premarin was 6.7% per year. After 1998, the average price increase was 15.8% per year. Since Wyeth's costs were not increasing (at least at that rate), Leffler concludes that the price increases were implemented only to "maximize profits." But once again, profit maximization, even at the expense of a competitor, does not run afoul of the antitrust statutes.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 17

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

But both experts opine that Wyeth "crossed the line" between legal profit maximization and illegal supracompetitive pricing. They both rely on economic theory to support this opinion. According to Leffler, basic economic theory teaches that "a seller's profit maximizing price decreases when it faces more competition." (Leffler Report, ¶ 47) Wyeth's price behavior doesn't fit the theory, so he concludes that it was Wyeth's monopolistic behavior that permitted it to raise its prices in the face of competition from Cenestin.

Leitzinger also relies on "basic economic theory" that a dominant seller will lower its product price in response to market entry of competitors. This economic theory, of course, in itself contains assumptions about the relevant market--in particular, cross-elastic products and equally efficient competitors. While the record is replete with references to the uniqueness of the pharmaceutical marketplace in the United States, both Leitzinger and Leffler assume without substantive discussion that these basic pricing theories apply largely across-the-board to this unique market. There is a significant body of evidence that brand name drug prices actually rise in response to generic competition. This pricing behavior is noted in *Geneva v. Barr,* 386 F.3d 485, 496-500 (2d Cir.2004), and in *In re Ciprofloxacin Hydrochloride Antitrust Lit.,* 363 F.Supp.2d 514, 521-22 (E.D.N.Y.2005). The *Cipro* court cites a July 1998 Congressional Budget Office Study concluding that prices for brand-name drugs continue to rise faster than inflation even after generic competition begins. [FN9] Despite this, Leitzinger and Leffler simply assume that Wyeth's pricing "should have" followed their basic theory. This Court need not accept an expert's assumption that is supported only by the "ipse dixit" of the expert. See, e.g., *General Electric v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997): "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."

FN9. CBO, "How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry" (July 1998). A portion of this report is contained in Wyeth's Exhibit B-10, Doc. 135.

**\*21** Apart from economic theory, the factual support for their opinions cited by both Leitzinger and Leffler consists of Wyeth's Premarin price projections. Their primary source document (Plaintiffs Exhibit 171, WYE180544-- 180553) is entitled "Strategic Options Summary" and is dated July 8, 1999. Its author (Wyeth marketing employee Steve Strickland) describes it as a "summary of each of the three year financial options for the Premarin Franchise. Each summary contains detailed assumptions and the net effect on sales." The summary contains a base case, an "upside--preferred" case, and a "downside" case. Each of the three options contains net sales return projections based on levels and qualities of marketing investment; several assumptions about the demographics of oral ERT use; Wyeth's ability to launch additional products in the ERT/HRT market and the timing of those product entries; and assumptions about various potential competitors, only one of which is Cenestin. (There can be no doubt that manufacturers keep close watch on competitors, and that product pricing decisions are based in part upon competitive market conditions. This is as true for pharmaceuticals as it is for Scotch tape!)

From this document, Leitzinger and Leffler conclude that the alternate assumptions about Premarin price increases are directly linked to the alternate assumptions about Cenestin's market performance. Thus, they both conclude that once Wyeth "knew" that it was successful in limiting Cenestin's market share through its PBM contracts, it raised Premarin list price in line with the "best case" scenario of the 1999 marketing budget projections. This is a highly questionable leap of logic. There is nothing in the document stating that the alternate scenario price increases are tied to or dependent upon Wyeth's PBM contracts. Indeed, Leitzinger admitted that nothing in the document

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**(Cite as: 2005 WL 1396940 (S.D.Ohio))**

actually says what he believes it says, that the market share projections for Cenestin were tied to the stated price increase projections. Rather Leitzinger says he is inferring that "the difference in Cenestin's penetration was an important consideration distinguishing the pricing recommendations under the two cases." He also rejected the idea that any of the other critical assumptions contained in the document, such as quality and quantity of marketing, demographic changes, or introduction of new Wyeth products, could also affect Premarin pricing. (Leitzinger Deposition, p. 192) His refusal to recognize that distinct possibility, and his failure to attempt to control for the possibility that those other factors may have played an important role in Wyeth's price increases, makes his inference untenable.

The Court finds that Plaintiffs have not established a "but-for" causative link between Wyeth's PBM contracts and Wyeth's price increases. Therefore, Plaintiffs have not shown the existence of a triable issue of fact on whether they suffered an "antitrust injury." (The same fatal flaw exists for Plaintiffs' "but-for" damages model, which the Court need not discuss at length. Absent proof of a causative link between the alleged monopolistic conduct and the alleged supracompetitive price, the "but-for" Premarin prices offered by Leitzinger and Leffler are untenable.)

CONCLUSION

**\*22** For all of the foregoing reasons, the Court will grant Wyeth's motion for summary judgment (Doc. 135) against Class Plaintiffs and intervenors CVS and Rite Aid. The motions for leave to file supplemental briefs are denied.

Not Reported in F.Supp.2d, 2005 WL 1396940 (S.D.Ohio)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 3987155 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Prohibit Plaintiffs from Introducing Certain Evidence Based on the Testimony or Analysis of Jeffrey Leitzinger and Keith Leffler (May 13, 2005)Original Image of this Document (PDF)

• 2004 WL 2156588 (Trial Motion, Memorandum and Affidavit) Motion to Compel the Production of Documents from CVS Meridian, Inc. and Rite Aid Corp. (Feb. 27, 2004)Original Image of this Document (PDF)

• 2003 WL 23790640 (Trial Motion, Memorandum and Affidavit) Wyeth's Concurrence With Plaintiffs' Motion for Reassignment, Consolidation and Coordination (Dec. 24, 2003)Original Image of this Document (PDF)

• 2003 WL 23790634 (Trial Pleading) Complaint (Nov. 10, 2003)Original Image of this Document (PDF)

• 2001 WL 34914262 (Trial Pleading) Class Action Complaint (Oct. 12, 2001)Original Image of this Document (PDF)

• 2001 WL 35672465 (Trial Pleading) Class Action Complaint (Oct. 12, 2001)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.