IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ZF MERITOR LLC and MERITOR TRANSMISSION CORPORATION | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 06-623-SLR |
| v. | ) ) | |
| EATON CORPORATION, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION TO TRANSFER TO THE MIDDLE DISTRICT OF NORTH CAROLINA

### PRELIMINARY STATEMENT

The core of this case is an allegation that Eaton Corporation monopolized Class 8 heavy duty truck transmissions by providing rebates and discounts to DaimlerChrysler's Freightliner subsidiary, Volvo/Mack Trucks, Navistar's International Truck & Engine business, and Paccar Inc., which makes the well-known Kenworth and Peterbilt truck lines. Eaton's rebates and discounts allegedly caused these Big Four truck manufacturers to enter into contracts to buy more of Eaton's heavy duty truck transmissions and fewer made by Plaintiffs and other suppliers, like General Motors and Transmission Technologies Corporation. *E.g.,* Complaint ("Compl.") ¶¶ 49 ("millions in annual rebates and other incentives"), 57 ("incentives"), 58 ("compelling incentive"), 61 ("rebates"), 65 ("incentives" "price reductions"), 68 ("rebates"), 72 ("rebates"). Plaintiffs allege that Eaton's price breaks were significant enough that they had the practical effect of inducing the Big Four truck companies to buy the vast majority of their heavy duty transmissions from Eaton and they label this effect "de facto" exclusive dealing. *Id.* ¶¶ 3 ("de facto" exclusivity), 48 ("de facto"), 63 ("de facto"), 70 ("de facto"), 72 ("practical effect"). Plaintiffs claim that each of the Big Four "conspired" with Eaton in accepting Eaton's offer and buying so many of its rebated transmissions. *See, e.g.,* Compl. ¶ 76 ("acted in

concert"). Plaintiffs did not name any of the Big Four truck companies as co-defendants, but they will obviously be critical third-parties to this suit. Plaintiffs also complain that each of the Big Four committed additional wrongs, such as refusing to provide financing to their truck customers if they specified ZF Meritor transmissions and falsely notifying their customers that ZF Meritor products were unavailable. *Id.* ¶¶ 68-76. In fact, nearly every substantive paragraph of the Complaint mentions one or more of the Big Four.[1]

Eaton does not believe that Plaintiffs' Complaint states an antitrust claim. Instead, it describes a highly competitive market characterized by product innovation, lower prices, and new suppliers entering the market. As a result, Eaton has moved to dismiss the case.[2] Putting that motion to the side for the moment, Eaton now moves to transfer this case to the Middle District of North Carolina because that venue - - not Delaware - - is connected to many of the facts at issue in this case.

Plaintiffs filed this lawsuit in Delaware even though none of the parties and none of the Big Four truck manufacturers has any pertinent office or employees in Delaware and none of the potential witnesses in this case is likely to be physically located within this district.

North Carolina, in contrast, has substantial contacts with *the actual businesses* that will be at issue in this case:

- The operational base of Plaintiffs' heavy duty truck transmission business has been *Laurinburg, North Carolina for nearly three decades*. Meritor, through its predecessor Rockwell International, entered the business of producing heavy duty manual truck transmissions at the Laurinburg plant in the late 1980s. ZF Meritor

---

[1]   The Complaint does not identify which of the Big Four truck manufacturers did what, and when. It vaguely alleges that Eaton "precipitated" each OEM's conduct, Compl. ¶ 69, but any proof of Plaintiffs' claim will obviously require evidence from the OEMs themselves.

[2]   The Complaint suffers from a number of additional defects that require dismissal, including, for example, that Plaintiffs' allegations about Eaton's 2000 and 2001 contracts with Freightliner, International, and Paccar (and alleged conduct in the 1990s) are time-barred. Compl. ¶¶ 1, 36 (early 1990s), 38 (same), 52 ("late 2000"), 56 ("early 2001"), 61.

continued to make its manual transmissions and assemble the automated transmissions it imported from its German parent.[3]

- Eaton has its single largest heavy duty transmission plant in Kings Mountain, North Carolina, and its heavy duty transmission sales manager for Volvo Trucks, one of the critical third-parties, is located in the Greensboro, North Carolina area near Volvo's North American truck headquarters.

- Freightliner, another critical truck manufacturer, has its largest heavy duty truck plant in Cleveland, North Carolina.

Given these facts, it is clear that the Middle District of North Carolina is a far superior venue for this litigation because that Court is home to many of the pertinent businesses and/or has subpoena power over them.

In contrast, the Complaint does not allege any factual connection between this litigation and this court or the state of Delaware. It does not allege that any party makes or sells heavy duty transmissions - - or has any pertinent office - - within this district. It does not allege that any of the Big Four truck manufacturers has offices or bought transmissions within this district or that the Court will have the means to subpoena them to appear for trial. The only alleged connection to this district is not related to the facts of this suit; it is simply that the two Plaintiffs - - although operationally based in North Carolina for their entire history in the heavy duty transmission business- - are incorporated here. Compl. ¶¶ 4, 5.

It simply makes no sense to try this case in this district when the Middle District of North Carolina is a significantly more appropriate district with actual - - and substantial - - connection to the facts that are likely to be at issue in this case.[4]

---

[3]  Plaintiff Meritor was only a shareholder in a transmission business during the 1999 period onward. It owned 50% of ZF Meritor LLC. ZF Friedrichshafen AG ("ZF"), the "global leader[]" in transmission technology, owned the other 50%. Compl. ¶ 39. ZF is not a plaintiff in this case. The Meritor/ZF collaboration is still in the market today, although they have changed their relationship from a formal, separately incorporated limited liability corporation (ZF Meritor LLC) to a contractual relationship in which Meritor acts as ZF's North American sales agent for its automated heavy duty transmissions. Id. ¶¶ 73-74. An important issue in this case will, of course, be whether Meritor and ZF changed their relationship in North Carolina because of something Eaton and the Big Four truck companies did, or for unrelated reasons. E.g., id. ¶ 77.

## STATEMENT OF FACTS

Laurinburg, North Carolina has been the operational base of Plaintiffs' heavy duty transmission business since Meritor's predecessor, Rockwell International, first entered the business in 1989.[5]  ZF Meritor's heavy duty transmission manufacturing and assembly headquarters was located at that same Laurinburg facility from 1999 onward.  Compl. ¶ 4.  The Laurinburg facility, which houses more than 300 employees within its 260,000 square feet of office and plant space, continues to manufacture heavy duty manual transmissions (at least through the end of this year) and, on information and belief, will continue to assemble and sell automated heavy duty transmissions into the future.  Exhibit 1; Compl. ¶ 74.

As a result, personnel relevant to this case are likely to be located in Laurinburg, North Carolina.  In particular, witnesses who can explain how the ZF-Meritor joint venture made its operational and pricing decisions and why ZF and Meritor chose to re-tool their relationship from a separately incorporated joint venture to a contractual sales agency.[6]  Additionally, Meritor has several other business facilities within North Carolina, including an axle manufacturing facility in Asheville that employs 650 workers, an axle and brake assembly facility in Arden that employs over 140 workers, a Light Vehicle Aftermarket warehouse in Fayetteville, and an axle assembly facility in Forest City.  Exhibit 1.

In contrast, Plaintiffs do not have a single heavy duty transmission manufacturing plant, sales office, or any significant transmission assets in Delaware.  Exhibit 3 (Declaration of Anthony Fanning) at ¶ 2.

---

[4]    Alternatively, the Western District of North Carolina is also more appropriate venue for this litigation than the district of Delaware for the reasons stated herein.

[5]    *See* Exhibit 1 (http://www.arvinmeritor.com/locations/northcarolina.asp).

[6]    The ZF Meritor joint venture was dissolved (or its dissolution began), and ownership of the Laurinburg, NC plant transferred back to Meritor's parent company, Arvin Meritor, on October 1, 2004.  *See* Exhibit 2  (ArvinMeritor 2001 Annual Report).

Eaton's largest heavy duty transmission manufacturing facility, with several hundred million dollars in annual revenue from Class 8 transmissions, is in Kings Mountain, North Carolina. *Id.* at ¶¶ 3-6. The Kings Mountain plant produces manual and automated Class 8 transmissions in a range of speeds and employs roughly 650 people. *Id.* at ¶ 4. In addition, Eaton's sales account manager for Volvo is located in the Greensboro, North Carolina area, near Volvo's North American trucks headquarters. *Id.* at ¶ 5. Eaton has a number of other facilities in North Carolina, including its truck clutch business near Charlotte and businesses in Raleigh and Laurinburg. *Id.* at ¶¶ 4, 6. In total, Eaton employs over 4,000 North Carolinians in manufacturing and sales offices throughout the state.[7]

Eaton, like Plaintiffs, has no heavy duty transmission manufacturing facility, sales offices, assets or employees in Delaware. It is incorporated and based in Ohio, not Delaware.

Volvo Trucks North American headquarters is based in Greensboro, North Carolina, as noted earlier. Volvo's headquarters is the home to all of its marketing, sales, distributor operations and customer service operations, as well as the company's Engineering and Technical Center.[8] Volvo, too, has a number of additional facilities throughout North Carolina, including its southeast regional sales office in Charlotte.[9]

Volvo does not maintain any trucking facilities in Delaware.

DaimlerChrysler's Freightliner LLC subsidiary maintains its largest truck manufacturing plant in Cleveland, NC. That facility is home to roughly 3,000 Freightliner

---

[7]    *See* Exhibit 4 (http://web.eat.com/NASApp/cs/ContentServer?pagename=EatonCom%2Fpage%2FEC) (listing locations including Arden, Concord, Charlotte, Raleigh, Fayetteville, Forest City, Kings Mountain, Laurinburg, Middlesex, Mooresville, Norwood, Durham, Roxboro, and Selma). A number of these facilities are in the Middle District of North Carolina.

[8]    *See* Exhibit 5 (http://www.volvo.com/trucks/na/en-us/about_us/facilities_locations/).

[9]    *See* Exhibit 6 (http://www.volvo.com/trucks/na/en-us/about_us/facilities_locations/sales_offices/).

employees.[10]  Freightliner also maintains several other facilities throughout North Carolina, including another significant truck manufacturing plant in Mount Holly, and cab and bus manufacturing facilities in Gastonia and High Point, respectively.[11]  Combined, Freightliner employs approximately 7,000 North Carolinians.[12]

Freightliner does not maintain any trucking facilities in Delaware.  Paccar and International Trucks, the remaining two of the Big Four transmission customers, likewise do not maintain any business facilities in Delaware.

In short, the only connection to the district of Delaware is unrelated to the facts of this case.  It is simply that Plaintiffs were incorporated here.[13]

## ARGUMENT

Transfer is a case-by-case inquiry that turns, in large part, on **the facts** that likely form the core of the case.  *See Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) ("Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness'").  Defendant Eaton seeks to transfer this matter pursuant to 28 U.S.C. §1404(a) to the Middle District of North Carolina because that venue has a close factual connection to this

---

[10]  *See* Exhibit 7 (http://www.freightliner.com/news/press-release-detail.aspx?id=301).

[11]  *See* Exhibit 8 (http://www.freightliner.com/inside/where-we-work-plants.aspx).

[12]  *See* Exhibit 9 (http://www.freightliner.com/news/press-release-detail.aspx?id=306).

[13]  Although Plaintiffs (at Complaint ¶¶ 8, 9) allege that Eaton "transacts business" within this district, they do not allege any facts indicating that Eaton's transmission business - - the pertinent business in this case - - has any direct manufacturing or sales connection to this district. Obviously, it is possible that heavy duty trucks manufactured by the Big Four OEMs and containing Eaton transmissions may be purchased by truck customers in this district or may be purchased elsewhere, but run across highways and roads in the district.  Plaintiffs' Complaint is silent on the point and does not indicate that those facts - - even if they do exist - - are at issue in this case.

case.[14]  Plaintiffs' heavy duty transmission business has been based in Laurinburg, North Carolina for more than 25 years. Compl. ¶ 4.  Eaton's largest heavy duty transmission plant is in North Carolina and Eaton's sales manager for Volvo Trucks North America, one of the critical OEMs in the case, is in the Greensboro, North Carolina area where Volvo is headquartered.  A second OEM, Freightliner, has a significant heavy duty truck plant in Cleveland, North Carolina.

In contrast, this district has no connection at all to the facts at issue in this case and none of the party or non-party witnesses is likely to be located within this district.

A district court may transfer a civil action to any other district where it might have been brought if transfer is more convenient for the parties and other witnesses, and is in the interests of justice.  28 U.S.C. § 1404(a).  Congress designed the transfer statute "to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'"  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal quotation marks omitted); *see also Virgin Wireless, Inc. v. Virgin Enters., Ltd.*, 201 F. Supp. 2d 294, 299 (D. Del. 2002).

## I.  THE PLAINTIFFS, THE DEFENDANT, AND TWO OF THE FOUR CRITICAL THIRD-PARTIES ALL HAVE SUBSTANTIAL BUSINESSES IN NORTH CAROLINA

Courts in this district routinely transfer actions similar to this one when the pertinent businesses and employees of the parties and the crucial third-parties are based elsewhere.  *See, e.g., Brunswick Corp. v. Precor Inc.*, 2000 U.S. Dist. LEXIS 22222 (D. Del. Dec. 12, 2000) (granting transfer to the Western District of Washington because parties were headquartered in Washington state, witnesses, documents and relevant records were all located in Washington, and the product at issue was designed and manufactured in Washington) (Exhibit 10); *Ikos Systems Inc. v. Cadence Design Systems Inc.*, 2002 U.S. Dist. LEXIS 20574 (D. Del. Oct. 21, 2002) (granting transfer because both parties were headquartered in the Northern District

---

[14]  Or, alternatively, to the Western District of North Carolina where its largest Class 8 transmission facility is located.

of California, the relevant industry was located in Northern California, and the majority of potential witnesses were located in that district) (Exhibit 11); *The Original Creatine Patent Company, Ltd. v. Kaizen, Inc.*, 2003 U.S. Dist. LEXIS 988 (D. Del. Jan. 22, 2003) (litigation was factually connected to California, not Delaware) (Exhibit 12).

The appropriate venue for a case is one that has a factual connection to the case because that factual connection makes a trial more efficient and provides "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and [lowers] the cost of obtaining attendance of willing witnesses . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." *See Bell Helicopter Textron, Inc. v. C&C Helicopter Sales*, 295 F. Supp. 2d 400, 411 (D. Del. 2002) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)); *see also SAS of Puerto Rico Inc. v. Puerto Rico Tel. Co.*, 833 F. Supp. 450 (D. Del. 1993); *SportsMedia Tech. Corp. v. Upchurch*, 839 F. Supp. 8 (D. Del. 1993).

The Middle District of North Carolina has significant ties to the facts that will be at issue in this case. In particular, Plaintiffs' transmission business has been based there during the entire period of the Complaint. Eaton's largest heavy duty transmission plant is in North Carolina and its sales account manager for Volvo is based in Greensboro.

Equally important in this case, is the connection between Volvo and other third-party witnesses from the Big Four truck manufacturers. Their documents and testimony will be critical in this case because they are alleged to have "conspired" with Eaton by accepting rebates and other price reductions that had the practical effect of increasing their purchases of Eaton transmissions and decreasing their purchases of ZF Meritor's transmissions.

None of the Big Four truck companies bought transmissions in Delaware or has any pertinent office there. In contrast, two of the four third-party OEMs named in the Complaint, Volvo and Freightliner, have significant heavy duty truck businesses within the Middle District of North Carolina, including Volvo's North American headquarters in Greensboro and Freightliner's largest heavy duty truck plant in Cleveland, North Carolina.

"Convenience of the expected trial witnesses *is the most important factor* to consider when determining whether or not transfer is appropriate." *Memminger v. Infocure Corp.*, 2000 U.S. Dist. LEXIS 22077, at *13-14 (D. Del. Nov. 14, 2000) (Exhibit 13); *See Mentor Graphics Corp. v. Quickturn Design Systems, Inc.*, 77 F. Supp. 2d 505, 510 (D. Del. 1999) ("The convenience of witnesses is often an important factor in a transfer inquiry"); *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 203 (D. Del. 1998) ("Traditionally, the location of potential witnesses and, thus, their ability to be subject to compulsory process has weighed heavily in the 'balance of convenience' analysis. . . . Fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit . . . have traditionally weighed quite heavily in the 'balance of convenience' analysis").

It is not even clear this Court will have sufficient jurisdiction over these third-parties to subpoena pertinent employees to appear at trial. Although one or more of the OEMs may be incorporated in Delaware, that may be insufficient to guarantee the appearance of their employees at trial. *See Steelcase, Inc. v. Smart Techs., Inc.*, 336 F.Supp. 2d 714, 722 (W.D. Mich. 2004) ("a federal court's subpoena power is governed by Fed.R.Civ.P. 45 without regard to a party's state of incorporation. Therefore, the fact that STC and Greensteel were incorporated in Delaware is irrelevant to the issue of whether a court has the power to compel the attendance of an unwilling witness"). Plaintiffs may argue that these third-party witnesses will voluntarily appear at trial, but the litmus test is the scope of the court's subpoena power, not a party's promises. *See Mentor Graphics,* 77 F. Supp. 2d at 511 ("In this case, this factor weighs heavily in favor of transfer. Quickturn has identified a number of non-party witnesses who are likely to be important to this litigation. These witnesses may be unavailable to testify in Delaware"); *see also Continental Cas. Co. v. Am. Home Assure Co.*, 61 F. Supp. 2d 128, 132 (D. Del. 1999) (transferring because five third-party witnesses were located in the forum to which the defendant sought transfer, while the current forum only contained one third-party witness).

Transfer is therefore all the more necessary, as this Court simply may not have the ability to guarantee the testimony of any of the crucial third-parties in this matter.

II.    **PLAINTIFFS' DECISION TO FILE IN DELAWARE DESERVES LITTLE WEIGHT BECAUSE THIS DISTRICT HAS NO CONNECTION TO THE FACTS AT ISSUE IN THIS CASE**

Plaintiffs' decision to file in Delaware deserves little deference because Delaware has no connection to the facts at issue in this lawsuit.  In *SAS of Puerto Rico Inc.*, 833 F. Supp. 450, the defendant telephone company moved to transfer the action to Puerto Rico.  This Court granted the transfer because an overwhelming factual connection between the lawsuit and Puerto Rico was demonstrated.  The Court found that: (i) both parties' pertinent businesses were in Puerto Rico; (ii) defendant's conduct allegedly injured the plaintiffs in Puerto Rico; and (iii) far more witnesses and documents relevant to the action were in or around Puerto Rico. As here, the only connection to Delaware was **unrelated to the facts** of the case.  Instead, it was simply that the plaintiffs were incorporated in Delaware. This Court concluded that the nexus between Puerto Rico and the facts at issue in the case dictated that Puerto Rico - - not Delaware - - was the right venue:

> Where . . . the Defendant has demonstrated that an alternative forum would be more convenient and would better serve the interests of justice because that forum, and only that forum, has substantial connections with the litigation, incorporation in Delaware alone will not necessarily prevent transfer.

833 F. Supp. 450, 453.  *See also Jahncke Service Inc. v. OKc Corp.*, 301 F. Supp. 866, 868 (D. Del. 1969) (transfer appropriate where facts were connected to Louisiana and the only connection with Delaware was incorporation); *Glickenhaus v. Lytton Financial Corp.*, 205 F. Supp. 102 (D. Del. 1962) (transferring case because all operational headquarters and operative facts were in California).

Plaintiffs filed this case outside their home territory, and can hardly cry inconvenience by being sent back to federal court in North Carolina, where ZF Meritor's principal place of business has long been located.  In fact, transfer is routine where the plaintiff has not chosen its "home turf" or a forum where the alleged wrongful activity occurred. *E.g., Davis Constructors v. Dartco Mfg., Inc.*, 668 F. Supp. 380, 384 (D. Del. 1987) ("Since there has

been no showing, nor even a suggestion, that Davis has any contacts with this district, Delaware is certainly not the 'home turf' of Davis. Thus, although defendant still has the burden of demonstrating that the balance of convenience is strongly in defendant's favor, that burden is less onerous than it would otherwise be"); *Pall Corp. v. Bentley Laboratories, Inc.*, 523 F. Supp. 450, 452-53 (D. Del. 1981) ("As previously noted, [Defendant] is based in California, all of its officers, key trial witnesses and records are located there and most of the alleged infringing activities occurred there. . . . Accordingly, the Court concludes that the slight inconvenience to plaintiff is substantially outweighed by the convenience to defendant").[15]

"[T]he weaker the connection between the forum and *either* the plaintiff *or* the lawsuit, the greater the ability of a defendant to show sufficient inconvenience to warrant transfer." *Affymetrix*, 28 F. Supp. 2d at 199. In *Affymetrix*, the patent holder of a high density micro-array used by genetic researchers sued defendants for infringement of its patents. The plaintiff filed its infringement actions in Delaware. The *Affymetrix* defendants subsequently moved for transfer to the Northern District of California under § 1404(a). Just as in the present matter, none of the parties had any pertinent facilities, employed any personnel, manufactured the relevant products or maintained any storage facilities within Delaware. Instead, significant business facilities of both parties were located relatively close to one another in California and many of the pertinent employees and records were in California. The only connection to Delaware was not a factual connection to the case, but simply that the plaintiff was incorporated there. The *Affymetrix* court transferred the case because: (i) all of the witnesses relevant to the case would be located outside of the court's subpoena power, which meant that the court could not guarantee that they would appear for trial; and (ii) despite the parties' financial ability to

---

[15]    "Home turf" refers to a corporation's principal place of business. *Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc.*, 2005 U.S. Dist. LEXIS 2825, *5 (D. Del. 2005) (Exhibit 14); *Waste Distillation Tech., Inc. v. Pan Am. Res., Inc.*, 775 F. Supp. 759, 764 (D. Del. 1991).·

litigate in the District of Delaware, transferring the case would reduce the costs to *all* parties and third-parties involved.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

For all of the foregoing reasons, this case should be transferred to the Middle District of North Carolina or, alternatively, to the Western District of North Carolina because both of those venues have a substantial connection to the facts allegedly at issue in this case. Maintaining this action in this district simply makes no sense given the district's complete lack of connection to any of the facts alleged in the Complaint.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 351-9219
  *Attorneys for Defendant*
  *Eaton Corporation*

OF COUNSEL:

Robert F. Ruyak
Joseph A. Ostoyich
Curtis J. LeGeyt
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

November 22, 2006

## CERTIFICATE OF SERVICE

I, Jason A. Cincilla, hereby certify that on the 22nd day of November, 2006 a

Memorandum In Support Of Defendant's Motion To Transfer To The Middle District Of North

Carolina was served by electronic filing or e-mail on the following counsel of record:

> Charles M. Oberly, III, Esquire
> Oberly, Jennings & Rhodunda, P.A.
> 1220 N. Market Street, Suite 710
> Wilmington, DE 19801

> Christopher Wood, Esquire
> Dickstein Shapiro LLP
> 1825 Eye Street, NW
> West Tower, Suite 500
> Washington, DC 20006-5403
> Email: woodc@dicksteinshapiro.com

_____
Jason A. Cincilla (#4232)

# EXHIBIT 1





**ArvinMeritor**

home | contact us | Search

about us | suppliers | investors | media room | events | careers | products & services | NYSE: **ARM** $ 17.64 | change

ArvinMeritor
worldwide
**USA**




+ Afric
+ Asia
+ Aust
+ Euro
+ Nortl
+ Sout

**Laurinburg, NC, USA**

**Business Unit:** Commercial Vehicle Systems

**Address:**
22021 Skyway Church Rd.
Maxton, NC 28364
United States

**Phone:** 910-844-9401

**Fax:** 910-844-9428

**Site Manager:** David Coleman

**Human Resources Manager:** Ann Krotz

**Products:**

- Services
  - Continuous Improvement and Quality
  - Engineering
  - Finance
  - Human Resources
  - Information Technology
- Specialty Vehicles & Other Products
  - Off-Highway Products
- Truck & Trailer Products
  - Axles
  - Drivelines
  - Transmissions





Want to join us in Maxton? Visit our careers section, where we post job opportunities for experienced professionals as well as internship, co-op and entry-level positions.

**History:**
HISTORY: Year Built (established) 1981; Non-Union; # of Employees 304; Annual Sales $$340M Arvin & $30M ZF ISO Status - Certified Dec. 5, 2000 QS-9000 - Certified March 18, 1998 MANUFACTURING CAPABILITIES: Major Markets Class 8 Transmission Products/Components Produced Arvin Meritor manual transmissions ZF automated manual transmissions Major Customers: Class 8 OEM's Customer Awards: Freightliner Masters of Quality World Class Safety ------------------------------------- ------------------------------------------------------------------------------------- ----------------- SITE PROFILE OVERVIEW: Plant Name: CVS - Laurinburg Location: Maxton, NC USA Sq. Ft.: 259,360 Overview (History of facility) 1981 - Built as Rockwell Western Wheel division headquarters. 1981-1987 - Western Wheel business sold prior to production launch. Two axle start-ups stopped due to market down turns from 1981-1987. 1987 - Launched Transmission division. New business start-up. 1995 - Moved Rockwell/Meritor Clutch to Laurinburg from Florence, KY. start-up site. Clutch was 60/40 joint venture with Meritor and Exedy of Japan. 1999 - Laurinburg had $220M in Revenue with 18% Transmission and 42% Clutch North American Class 8 market. 1999 new engineering building completed. End of 1999 – A 50/50 joint venture formed between Meritor and ZF. Laurinburg

joint venture formed between Meritor and ZF Edinburg
becomes ZF Meritor JV manufacturing site. 2001 - Exedy exits JV
with ZF Meritor. 2002 – ZF Meritor sells Clutch business to Sachs
after Sachs is purchased by ZF. April 6, 2004 - ZF Meritor JV
Dissolution Agreement signed and ownership of plant moved
back to ArvinMeritor August 1, 2004 Machining operation
outsourced to Asheville and Accurate Gauge.

**Awards/Achievements:**

- "Bronze All Star Award" - 2006
  - Plaque for contributions to The American Cancer
    Society











| about us | suppliers | investors | | Media | events | careers | products & services | NYSE: **ARM** $17.63 | change |

Search

home    contact us

+ Afric
+ Asia
+ Aust
+ Euro
+ Nortl
+ Sout

**Fayetteville, NC, USA - Whse**

**Business Unit:** Light Vehicle Aftermarket

**Address:**
4800 Corporation Drive
Fayetteville, NC 28306
United States

**Phone:** 910-323-2205

**Fax:** 910-485-0253

**Site Manager:** Chuck Gwilliam



**Fayetteville, NC, USA - Plant**

**Business Unit:** Light Vehicle Aftermarket

**Address:**
3200 Natal Road
Fayetteville, NC 28306
United States

**Phone:** 910-425-4181

**Fax:** 910-425-9953

**Site Manager:** Mark Godwin

**Human Resources Manager:** Dave Hogan





| about us | suppliers | investors | media room | events | careers | products & services | NYSE: **ARM** $ 17.63 | change |

home    contact us    Search






+ Afric
+ Asia
+ Aust
+ Euro
+ Nortl
+ Sout

**Arden, NC, USA**

**Business Unit:** Commercial Vehicle Systems

**Address:**
90 Christ School Rd.
Arden, NC 28704
United States

**Phone:** 828-650-3046

**Fax:** 828-650-3067

**Site Manager:** Kevin Parkhill

**Human Resources Manager:** Stanley Walker

**Products:**

- Specialty Vehicles & Other Products
    - Bus & Coach Products
    - Off-Highway Products
- Truck & Trailer Products
    - Axles



Job Opportunities

Want to join us in Arden? Visit our careers section, where we post job opportunities for experienced professionals as well as internship, co-op and entry-level positions.

**History:**
Example: Leased in 1999 for the assembly of Non-Drive Steer Axles. Hydraulic and pneumatic brake assembly, and ABS components for non-drive steer and rear drive axles. Employees include 4 exempt and 140 non-exempt.

**Awards/Achievements:**

- "ISO-14001" - 2001
- "QS-9000" - 2000

# EXHIBIT 2

**ARVINMERITOR INC filed this 10-K405 on 12/19/2001.**

Outline                                      Printer Friendly
                                              Next Page »

----------------------------------------------------------------------------
----------------------------------------------------------------------------

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
------------------------

FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED SEPTEMBER 30, 2001
COMMISSION FILE NUMBER 1-15983
------------------------

ARVINMERITOR, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)


INDIANA                                          38-3354643
(STATE OR OTHER JURISDICTION OF               (I.R.S. EMPLOYER
INCORPORATION OR ORGANIZATION)                IDENTIFICATION NO.)

2135 WEST MAPLE ROAD                             48084-7186
TROY, MICHIGAN                                   (ZIP CODE)
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES)


REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (248) 435-1000
------------------------

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:


TITLE OF EACH CLASS                    NAME OF EACH EXCHANGE ON WHICH REG
-------------------                    ----------------------------------

Common Stock, $1 Par Value                    New York Stock Exchange
(including the associated Preferred
Share Purchase Rights)


SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: NONE
------------------------

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes [X]  No [ ]

Operations below. The impact that the euro and other currencies will have on our sales and operating income is difficult to predict in the upcoming year.

We enter into foreign currency forward exchange contracts to minimize the risk of unanticipated gains and losses from currency rate fluctuations on foreign currency commitments entered into in the ordinary course of business. It is our policy not to enter into derivative financial instruments for speculative purposes and, therefore, we hold no derivative instruments for trading purposes. We have not experienced any material adverse effect on our consolidated financial position, results of operations or cash flow related to these foreign currency forward exchange contracts. (See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations -- Quantitative and Qualitative Disclosures about Market Risk and Note 13 of the Notes to Consolidated Financial Statements under Item 8. Financial Statements and Supplementary Data below.)

On January 1, 1999, the euro became the common currency of 11 countries of the European Union and the present national currencies of these 11 countries became sub-units of the euro at fixed exchange rates. Subsequent to January 1, 1999, an additional country was added to the European Monetary Union. The European Union's current plans call for the transition to the euro to be substantially completed by January 1, 2002, at which time the euro will become the sole legal tender in those participating countries.

We are engaged in business in many of the countries that participate in the European Monetary Union, and sales for fiscal year 2001 in these countries were approximately 18 % of our total sales. In addition, we enter into foreign currency forward exchange contracts with respect to several of the existing currencies that have been subsumed into the euro and we have borrowings in participating currencies primarily under our

12

bank revolving credit facility. We have analyzed the potential effects of the euro conversion on competitive conditions, information technology and other systems, currency risks, financial instruments and contracts, and have examined the tax and accounting consequences of euro conversion, and we believe that the conversion has not had and will not have a material adverse effect on our business, operations and financial condition.

We are making the necessary adjustments to accommodate the conversion, including modifications to our information technology systems and programs, pricing schedules and financial instruments. We expect that all necessary actions will be completed in a timely manner, and that the costs associated with the conversion to the euro will not be material.

SEASONALITY; CYCLICALITY

LVS and CVS may experience seasonal variations in the demand for products to the extent automotive vehicle production fluctuates. Historically, for both segments, such demand has been somewhat lower in the quarters ended September 30 and December 31, when OEM plants may close during model changeovers and vacation and holiday periods.

In addition, the industry in which LVS and CVS operate has been characterized historically by periodic fluctuations in overall demand for trucks, passenger cars and other vehicles for which we supply products, resulting in corresponding fluctuations in demand for our products. Cycles in

the major automotive industry markets of North America and Europe are not
necessarily concurrent or related. The cyclical nature of the automotive
industry is outside our control and cannot be predicted with certainty. We have
sought and will continue to seek to expand our operations globally to mitigate
the effect of periodic fluctuations in demand of the automotive industry in one
or more particular countries.

The following table sets forth vehicle production in principal markets
served by LVS and CVS for the last five fiscal years:

|  | FISCAL YEAR ENDED SEP | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
| Light Vehicles (in millions): |  |  |  |
| North America............................................ | 15.6 | 17.5 | 16.9 |
| South America............................................ | 2.2 | 2.0 | 1.5 |
| Europe................................................... | 19.1 | 18.9 | 18.2 |
| Asia/Pacific............................................. | 16.0 | 17.5 | 15.6 |
| Commercial Vehicles (in thousands): |  |  |  |
| North America, Heavy-Duty Trucks......................... | 140 | 269 | 292 |
| North America, Medium-Duty Trucks........................ | 117 | 165 | 175 |
| North America, Trailers................................. | 208 | 367 | 366 |
| Europe, Trailers........................................ | 110 | 119 | 124 |

---------------

Source: Automotive industry publications and management estimates.

The company's most recent outlook for fiscal year 2002 shows continued
softening in North American production in the heavy-duty commercial truck and
trailer markets, and we anticipate North American heavy-duty truck production to
decline approximately 7%. European heavy and medium trucks are estimated to be
down approximately 15% from fiscal year 2001. There is greater uncertainty in
light vehicle production, but the company currently expects a 4 % decline in
North America and a 7 % decline in Europe during fiscal year 2002. See "Industry
Developments and Outlook" above and Item 7. Management's Discussion and Analysis
of Financial Condition and Results of Operations -- Overview and Outlook and
-- Results of Operations below for information on downturns in certain markets
and their effects on our sales and earnings.

13

ITEM 2.  PROPERTIES.

. At September 30, 2001, our operating segments had the following facilities
in the United States, Europe, South America, Canada, Mexico, Australia, South
Africa and the Asia/Pacific region:

|  | MANUFACTURING FACILITIES | ENGINEERING FACILITIES, SALES AND SERVICE CEN |
|---|---|---|

```
LVS................................    95                      62
CVS................................    42                      59
LVA................................    24                      29
Other..............................     4                       3
```

These facilities had an aggregate floor space of approximately 35 million square feet, substantially all of which is in use. We owned approximately 74% and leased approximately 26% of this floor space. There are no major encumbrances (other than financing arrangements that in the aggregate are not material) on any of our plants or equipment. In the opinion of management, our properties have been well maintained, are in sound operating condition and contain all equipment and facilities necessary to operate at present levels. A summary of floor space of these facilities at September 30, 2001, is as follows:

|  | OWNED FACILITIES | | | | LEASED FACILITIES | | |
| LOCATION | LVS | CVS | LVA | OTHER | LVS | CVS | LV |
| -------- | --- | --- | --- | ----- | --- | --- | --- |
|  | (IN THOUSANDS OF SQUARE FEET) | | | | | | |
| United States.............. | 4,032 | 4,856 | 2,144 | 642 | 687 | 1,106 | 7 |
| Canada..................... | 566 | 413 | -- | -- | 103 | 160 | 1 |
| Europe..................... | 3,903 | 2,934 | 1,076 | -- | 2,747 | 150 | 8 |
| Asia/Pacific............... | 493 | 1,047 | -- | -- | 147 | 658 | 5 |
| Latin America.............. | 1,225 | 2,120 | 157 | -- | 89 | 163 | 1 |
| Africa..................... | 304 | -- | -- | -- | -- | 11 |  |
| Total............ | 10,523 | 11,370 | 3,377 | 642 | 3,773 | 2,248 | 2,5 |

ITEM 3.  LEGAL PROCEEDINGS.

On July 17, 1997, Eaton Corporation filed suit against Rockwell in the U.S. District Court in Wilmington, Delaware, asserting infringement of Eaton's U.S. Patent No. 4850236, which covers certain aspects of heavy-duty truck transmissions, by our Engine SynchroShift(TM) transmission for heavy-duty trucks, and seeking damages and injunctive relief. Meritor was joined as a defendant on June 11, 1998. The following judgments and orders have been issued in this case:

- After trial, on July 1, 1998, a jury rendered a verdict in favor of Eaton, finding that Meritor had infringed Eaton's patent and awarding compensatory damages in an amount equal to 13% of total product sales. On October 11, 2001, the judge entered an order granting damages to Eaton in the amount of $2.9 million, plus post-judgment interest.

- A separate phase of the trial was held in April 1999, without a jury, with respect to Meritor's allegations that Eaton had engaged in inequitable conduct in obtaining its patent and that the patent was therefore unenforceable. On February 9, 2001, the judge ruled against the company on the second phase of the proceedings, finding that we had not provided clear and convincing evidence of inequitable conduct by Eaton in obtaining its patent.

- On September 19, 2001, the judge granted Eaton's request for a permanent

injunction against our manufacturing or selling the Engine
SynchroShift(TM) transmission and any "colorable variations."

- On October 11, 2001, the judge denied our motions for a new trial and for
  judgment as a matter of law.

We have appealed these judgments and orders to the United States Court of
Appeals for the Federal Circuit. Based on advice of M. Lee Murrah, Esq., Chief
Intellectual Property Counsel of the company, management

14

believes our truck transmissions do not infringe Eaton's patent. We intend to
continue to defend this suit vigorously.

Various other lawsuits, claims and proceedings have been or may be
instituted or asserted against ArvinMeritor or our subsidiaries relating to the
conduct of our business, including those pertaining to product liability,
intellectual property, environmental, safety and health, and employment matters.

Included in these matters are claims for alleged asbestos-related personal
injuries, which arose from products manufactured prior to 1977 by a subsidiary
acquired by Arvin in 1986. During fiscal years 1996 through 2001, ArvinMeritor
and our predecessors paid asbestos-related claims of approximately $40 million,
substantially all of which were reimbursed by insurance. As of September 30,
2001, we had accrued approximately $71 million for contingent asbestos-related
liabilities, and recorded assets of $60 million for probable recoveries from
third parties and insurance. Management believes that existing insurance
coverage will reimburse substantially all of the potential liabilities and
expenses related to pending cases.

Prior to February 1, 2001, the Center for Claims Resolution (the "CCR")
handled the processing and settlement of asbestos claims on our behalf, and we
shared in the payment of defense costs and settlements of the asbestos claims
with other CCR members. Several members of the CCR have filed for bankruptcy
protection, and these members have failed, or may fail, to pay certain financial
obligations with respect to settlements that were reached while they were CCR
members. We expect to be subject to claims for payment of a portion of the
defaulted shares and an estimate of this payment has been included in the
recorded reserves. We and our insurers are engaged in proceedings to determine
whether existing insurance coverage should reimburse any potential liability
related to this issue.

The outcome of litigation cannot be predicted with certainty and some
lawsuits, claims or proceedings may be disposed of unfavorably to ArvinMeritor
and for amounts in excess of the foregoing estimates. However, based on
management's evaluation of matters which are pending or asserted, after
consulting with Vernon G. Baker, II Esq., ArvinMeritor's General Counsel, we
believe the disposition of such matters will not have a material adverse effect
on our financial statements.

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

There were no matters submitted to a vote of security holders during the
fourth quarter of fiscal year 2001.

ITEM 4A.  EXECUTIVE OFFICERS OF THE COMPANY.

The name, age, positions and offices held with ArvinMeritor and principal occupations and employment during the past five years of each of our executive officers as of November 30, 2001, are as follows:

LARRY D. YOST, 63 -- Chairman of the Board and Chief Executive Officer since July 2000. Chairman of the Board and Chief Executive Officer of Meritor from May 1997 to July 2000; Acting President, Light Vehicle Systems of Meritor from January 1998 to March 1999; Senior Vice President, President, Automotive and Acting President, Heavy Vehicle Systems of Rockwell (electronic controls and communications) from March 1997 to September 1997; President, Heavy Vehicle Systems of Rockwell from November 1994 to March 1997.

VERNON G. BAKER, II, 48 -- Senior Vice President and General Counsel since July 2000. Secretary of ArvinMeritor from July 2000 to November 2001; Senior Vice President, General Counsel and Secretary of Meritor from August 1999 to July 2000; Vice President and General Counsel, Corporate Research and Technology of Hoechst Celanese Corporation, a subsidiary of Hoechst AG (pharmaceuticals and industrial chemicals), from 1989 to July 1999.

DIANE S. BULLOCK, 44 -- Vice President and Controller since August 2001. Vice President, Corporate Development of ArvinMeritor from July 2000 to December 2000; Vice President and Controller of Meritor from September 1998 to July 2000; Assistant Controller of Meritor from January 1998 to September 1998;

15

Controller -- Body Systems N.A. of ITT Automotive, Inc. (automotive component supplier) from 1995 to 1997.

LINDA M. CUMMINS, 53 -- Senior Vice President, Communications since July 2000. Senior Vice President, Communications of Meritor from April 2000 to July 2000; Vice President, Communications of Meritor from August 1999 to April 2000; Vice President of Advanced Marketing and Worldwide Communications of United Technologies Automotive (automotive component supplier) from August 1997 to August 1999; Vice President of Communications and External Affairs of United Technologies Automotive from June 1996 to August 1997; Director of Broadcast News/Global News Department of Ford Motor Company (automotive) from 1993 to 1996.

WILLIAM K. DANIEL, 36 -- Senior Vice President and President, Light Vehicle Aftermarket since July 2000. President of Arvin Replacement Products business group from December 1999 to July 2000; Managing Director of Arvin Replacement Products in Europe from January 1998 to November 1999; Managing Director of Gabriel Europe from May 1996 to December 1997.

JUAN L. DE LA RIVA, 57 -- Senior Vice President, Corporate Development & Strategy, Engineering and Procurement since October 2001. Senior Vice President, Corporate Development and Strategy of ArvinMeritor from July 2000 to October 2001; Senior Vice President, Business Development of Meritor from February 2000 to July 2000; Senior Vice President, Business Development and Communications of Meritor from February 1999 to February 2000; Vice President, Business Development and Communications of Meritor from September 1998 to February 1999; Managing Director -- Wheels, Light Vehicle Systems of Meritor from September 1997 to September 1998; Managing Director -- Wheels, Light Vehicle Systems of Rockwell, from 1994 to September 1997.

THOMAS A. GOSNELL, 51 -- Senior Vice President and President, Commercial Vehicle Systems since November 2000. Senior Vice President and President, Heavy

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ZF MERITOR LLC and MERITOR TRANSMISSION CORPORATION | ) ) ) | Judge Robinson |
| Plaintiffs, | ) ) | C.A. No. 1:06-cv-623-SLR |
| v. | ) ) | November 21, 2006 |
| EATON CORPORATION, | ) ) | |
| Defendant. | ) | |

## <u>DECLARATION OF ANTHONY FANNING</u>

I, Anthony Fanning, having first been duly sworn under oath, state as follows:

1.      I was employed as Controller for the Heavy Duty Transmissions division at Eaton Corporation ("Eaton") from 2001 until recently, when I became the Group Controller for Eaton's Fluid Power business.  The information contained herein is based on my own personal knowledge, my review of reasonably available documents prepared and/or maintained by Eaton in the ordinary course of business and upon information provided to me by Eaton employees responsible for and with knowledge of Eaton business records.  If called upon to testify as a witness, I can competently testify that to the best of my knowledge and belief the matters set forth herein are true.

2.      This declaration is made in support of Eaton's Motion to Transfer to the Middle District of North Carolina.

3.    Eaton does not have a heavy duty transmission facility in the State of Delaware. Eaton does not have a plant in Delaware that produces heavy duty transmissions. Eaton does not have a sales person within the State of Delaware that sells heavy duty transmissions to any of the four Original Equipment Manufacturers ("OEMs"). To the best of my knowledge, Eaton does not sell any heavy duty transmissions directly to any customer in Delaware and does not report any revenue from heavy duty truck transmission sales in Delaware.

4.    Eaton's largest production facility for heavy duty transmissions in terms of revenue is located in Kings Mountain, North Carolina. The Kings Mountain facility manufacturers a range of manual transmissions (7-, 8-, 9-, 10-, and 15-speed), and is also the main manufacturing facility for Eaton's automated transmissions, including the UltraShift and AutoShift lines. Eaton derives hundreds of millions of dollars in revenue from the transmissions produced at the Kings Mountain facility. The Kings Mountain facility employs approximately 650 workers. It is my understanding that representatives of each of the four major OEMs attended periodic meetings at Eaton's Kings Mountain facility.

5.    Eaton's account manager for Volvo/Mack (one of four major OEM customers) during the pertinent period was located in Greensboro, North Carolina, in close proximity to Volvo/Mack's North American Truck headquarters.

6.    Eaton has a related clutch manufacturing plant near Charlotte, North Carolina. This clutch manufacturing facility has annual revenues of between $50 and $100 million and employs roughly 95 people. The company has a number of additional facilities throughout the state of North Carolina.

I, Anthony Fanning, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on November 21, 2006.

2

Anthony Fanning

# EXHIBIT 4

Eaton Corporation - Search Results



Who We Are | Our Products | Services & Support | Doing Business | News Room | Investor Relations | Careers

Home | Help | Contact Us | Advanced S

Search

Home > Who We Are > Our Company > Locations > Search Results

From the CEO
Innovation in Your World
■ Our Company
   Fast Facts
■ Locations
   ■ Search Results
   Leadership
   Operational Excellence
   Company History
   Global Ethics
   Corporate Governance
   Office of the Ombuds
   Escritório do Ombuds
   (Portuguese)
   Oficina del Ombuds
   (Spanish)
Eaton Businesses
Social Commitment

# Locations - Results

**North Carolina, United States**

**Arden Plant**
22 Heywood Rd
Arden, North Carolina   28704

**Arden Plant**
175 Vista Boulevard
Arden, North Carolina   28704

**Concord Plant**
6811 Belt Rd
Concord, North Carolina   28027

**Electrical Sales Office**
8720 Red Oak Blvd
Ste 410
Charlotte, North Carolina   28217

**Electrical Sales Office**
5540 Centerview Dr
Ste 318
Raleigh, North Carolina   27606

**Fayetteville Plant**
2900 Doc Bennett Road
Fayetteville, North Carolina   28306

**Forest City Plant**
240 Daniel Rd
Forest City, North Carolina   28043

**Kings Mtn Plant**
744 S. Battleground Ave.
Kings Mountain, North Carolina   28086

**Laurinburg Plant**
16900 Aberdeen Rd
Laurinburg, North Carolina   28353

**Middlesex Plant**
8171 Planer Mill Rd
Middlesex, North Carolina   27557

**Mooresville Plant**
1035 Mecklenburg Highway
Mooresville, North Carolina   28115

**Norwood Plant**
680 Lanier Rd.
Norwood, North Carolina   28128

**Raleigh Satellite Office**
2933 South Miami Blvd.
Durham, North Carolina   27703

**Roxboro Plant**
830 Third Avenue
Suite 920
Roxboro, North Carolina   27573-0241

**Selma Plant**

1100 East Preston Street
Selma, North Carolina   27576

Privacy Policy  |  Terms  |  Copyright

# EXHIBIT 5

North America - Volvo Trucks : facilities & locations　　　　　　　　　　Page 1 of 1

**VOLVO** Volvo Trucks - North America　　　　　　　search | cont us

home　　products　　parts & service　　business tools　　dealers　　news & events

# home » about us » facilities & locations

leasing　d

facilities &
locations

　manufacturing
　plant

　parts
　distribution
　centers

　regional sales
　offices

　remanufacturing
　center

career
opportunities

contacts

core values

environmental
policy

corporate

commercial
results

directions

fact sheet

history

investor relations

mission / origin /
trademark

supplier diversity

Volvo Group

Volvo Group
supplier portal

safety

testimonials

**products**



☐ **highway trucks**VT (
VN 780, 730, 670, 6
Daycab

☐ **vocational trucks**V

☐ **engines**Volvo Powe



## FACILITIES AND LOCATIONS

### Corporate Headquarters
All administrative and support functions, including
marketing, sales, distributor operations, and
customer service operations, among others, are based
in Greensboro, NC.

### Volvo Trucks North America
P.O. Box 26115
7900 National Service Road
Greensboro, NC 27402-6115  U.S.A.
Phone: (336) 393-2000

Engineering and Technical Center, Greensboro, NC

　directions

**locators**



☐ **dealer locator**Find y
within North America

☐ **used truck locator**l
truck?  Check out ou
program or Arrow Us

☐ **VTLS member loca**
Truck Leasing Syste
your leasing, rental a
maintenance needs.

┌─────────────────────────┐
│ **loading ramp**
│ 🔹 Download screen savers,
│ 　video clips, wallpaper or
│ 　send an eCard to a friend.
└─────────────────────────┘

privacy | © copyright

Volvo Trucks -

# EXHIBIT 6

North America - Volvo Trucks : regional sales offices                        Page 1 of 2

 **Volvo Trucks - North America**

<sub>a</sub>search  <sub>a</sub>cont
us

home    products        parts & service        business tools        dealers        news & events

**home** » **about us** » **faciliti...** » **regional...**

leasing    d

# REGIONAL SALES OFFICES

Volvo maintains sales offices in Westerville, OH;
Charlotte, NC; Olathe, KS; Draper, UT;
Mississauga, ON; and Mexico.

**U.S. Regional Sales Offices**

facilities &
locations
  manufacturing
  plant
  parts
  distribution
  centers
  regional sales
  offices
  remanufacturing
  center

career
opportunities

contacts

core values

environmental
policy

corporate

commercial
results

directions

fact sheet

history

investor relations

mission / origin /
trademark

supplier diversity

Volvo Group

**Northeast Region
Region**
Peter Spence
Regional Vice President
President
730 Southbluff Drive
Avenue
Westerville, OH 43082
28209
Phone: (614) 890-1312
377-3952
Fax: (614) 890-8968
4246
Cell: (336) 210-1878
4954

**Central Region**
Jack Conaghan
Regional Vice President
President
14168 W. 141st Place
Parkway
Olathe, KS 66062
Phone: (913) 829-7741
84020
Fax: (913) 829-7742
572-5551
Cell: (336) 210-2495
6415

6690
**Canada**
Brent Weary
Regional Vice President
5600A Cancross Court
Mississauga, ON L5R 3E9
Phone: (905) 366-3505

**Southeast**

Bill Coffron
  Regional Vice

2529 Selwyn

Charlotte, NC

Phone: (704)

Fax: (704) 377-

Cell: (336) 457-

**Western Region**
Richard Bell
  Regional Vice

1192 E. Draper

#521
Draper, UT

Phone: (801)

 Fax: (801) 572-

Cell: (801) 201-

**products**

□ highway trucksVT 8
VN 780, 730, 670, 63
Daycab

□ vocational trucksVt

□ enginesVolvo Power

**locators**

□ dealer locatorFind y
within North America

□ used truck locatorL
truck?  Check out ou
program or Arrow Us

□ VTLS member local
Truck Leasing Syster
leasing, rental and cc
maintenance needs.

Volvo Group
supplier portal

safety
testimonials

Fax: (905) 366-0160
Cell: (416) 432-8381

**Volvo Trucks Canada, Inc.**
5600A Cancross Court
Mississauga, ON L5R 3E9 Canada
Phone: (905) 366-3500
Fax: (905) 366-0160

**Volvo Trucks de Mexico**
Prol. Paseo de la Reforma 600, 230
Col Santa Fe Peña Blanca Mexico, 01210
Phone: 52-55-5081-6850

other facilities and locations

**loading ramp**
- Download screen savers,
  video clips, wallpaper or
  send an eCard to a friend.

privacy | © copyright                                    Volvo Trucks -

# EXHIBIT 7

Freightliner LLC – North America's leading manufacturer of commercial trucks          Page 1 of 1



**FREIGHTLINER.**
LLC
A DaimlerChrysler Company

Site Map | Contac

HOME • BRANDS & BUSINESSES • NEWS • CAREERS • INSIDE FREIGHTLINER LLC • OUR COMMITMEI

NEWS
▶ Media Room
  • Freightliner LLC Overview
  • Product Overview
  • Press Releases
  • Images
  • Other Resources
Press Releases
Trade Shows & Events
Contact Information

**NEWS**
**PRESS RELEASES**

**Freightliner LLC to Add Third Shift, Nearly 600 Jobs at Cleveland, N.C., Truck Manufac Plant**

6/2/2004

*Heavy-Duty Truck Manufacturer Has Also Increased Employment at Gastonia, N.C., Manufacturing Plant*

CLEVELAND, N.C....Freightliner LLC today announced that it is adding a third shift a new full-time jobs at the company's Cleveland, N.C., Truck Manufacturing Plant. The additional shift and new employees are required to meet increased production demar the plant, which builds Freightliner-brand heavy-duty trucks. The Cleveland plant has increasing its output throughout the year in response to the improving North Americar duty truck market.

"The North American heavy-duty truck market continues its vigorous recovery and we positive outlook for further improvement," said Rainer Schmueckle, President and CE Freightliner LLC. "We are experiencing strong demand across our Class 8 product lin especially in the over-the-road segment."

The Cleveland, N.C., Truck Manufacturing Plant is Freightliner's largest manufacturin facility. The plant currently employs 3,000 people in the production of Class 8 vehicle including the Freightliner Century Class S/T, Columbia, Argosy and Condor. With the of the new jobs, employment will rise to approximately 3,600 people. The new positio mean Cleveland employment levels are at their highest in five years.

The new, third shift is scheduled to begin in mid-July. The company has already beer for the new production positions and will soon reach full employment conditions.

Freightliner also today announced that its Gastonia, N.C., Parts Manufacturing Plant added 100 full-time employees. The Gastonia Parts Manufacturing Plant produces ca chassis parts for Freightliner's truck manufacturing operations and parts distribution c The plant now employs 875 people. The plant also is increasing output in response tc growing North American Class 8 truck market.

"We are very pleased to increase our employment at the Cleveland and Gastonia pla continue our investment in our North Carolina operations," Schmueckle said.

Freightliner LLC, headquartered in Portland, Oregon is the leading heavy-duty truck manufacturer in North America. Freightliner produces and markets Class 3-8 vehicles the Freightliner, Sterling, Western Star, American LaFrance, and Thomas Built Buses nameplates and is a company of DaimlerChrysler, the world's leading commercial vel manufacturer.

Home | About Freightliner LLC | Media Room | Work at Freightliner

© Freightliner LLC Privacy Statement, Legal Notices and Terms

Freightliner LLC is a DaimlerChrysler company.

# EXHIBIT 8



A DaimlerChrysler Company

Site Map  |  Contac

HOME  •  BRANDS & BUSINESSES  •  NEWS  •  CAREERS  •  INSIDE FREIGHTLINER LLC  •  OUR COMMITMEI

INSIDE FREIGHTLINER LLC
Who We Are
Executive Committee
Quick Facts
▸ Where We Work
  • Corporate Headquarters
  • Brands
  • Manufacturing Plants
  • Parts Distribution
Our Vision and Values
Our History
Our Future
A DaimlerChrysler Company

INSIDE FREIGHTLINER LLC
**WHERE WE WORK**

## Manufacturing Plants

**Cleveland Truck Manufacturing Plant:**

11550 Statesville Blvd.
Cleveland, NC 27013
(704) 645-5000

Established: 1989

Products: The largest Freightliner Trucks manufacturing plant, this plant produces the company's full line of Class 8 truck models, including the Century Class S/T, Columbi Classic, Classic XL, and the Argosy cab-over-engine models.

Plant Manager: Bob Pacillas

---

**Gastonia Parts Manufacturing Plant:**

1400 Tulip Drive
Gastonia, NC 28052
(704) 868-5700

Established: 1978

Products: Cab and chassis parts for Freightliner's manufacturing operations and part: distribution centers.

Plant Manager: Erik Johnson

---

**Thomas Built Buses Manufacturing Plant:**

1408 Courtesy Road
High Point, NC 27260
(336) 889-4871

Established: 1916

President: John O'Leary

Products: Thomas-brand conventional and transit model school buses; Thomas Mino models.

---

**Mount Holly Truck Manufacturing Plant:**

1800 North Main Street

Mount Holly, NC 28120
(704) 822-7000

Established: 1979

Products: Freightliner's full line of medium-duty Business Class and Business Class f
models.

Plant Manager: Mike McCurry

---

**Portland Truck Manufacturing Plant:**

6936 North Fathom Street
Portland, OR 97217
(503) 745-7124

Established: 1969

Products: Western Star trucks including the 4900 EX, 4900 SA, 4900 FA and 6900 X
Freightliner's Century Class S/T, Columbia, and Coronado models; heavy-duty trucks
U.S. military.

Plant Manager: Paul Erdy

---

**Freightliner Custom Chassis Corporation Manufacturing Plant:**

552 Hyatt Street
Gaffney, SC 29341
(864) 487-1700

Established: 1995

Products: Custom chassis for vocational applications including: motorhomes, delivery
shuttle buses, and school buses.

President: Robert Harbin

---

**St. Thomas Truck Manufacturing Plant:**

350 South Edgeware Road
St. Thomas, ON, Canada N5P 4C4
(519) 633-8917

Established: 1992

Products: Sterling's full line of heavy-duty A-Line and L-Line trucks and the medium-c
Acterra.

Plant Manager: Mark Moseley

---

**Santiago Tianguistenco, Mexico, Truck Manufacturing Plant:**

KM 23.7 Carretera
LaMarquesa-Tenago
CP 52600 Santiago Tianguistenco
Edo de Mexico, Mexico
011-52-72-79-2574

Established: 1991

Products: Freightliner's Business Class medium-duty truck models; Freightliner's hea

FLD models.

Plant Manager: Knut Anderson

---

**Affiliate Company Manufacturing Locations:**

- Detroit Diesel Corporation, Redford, Michigan
- Detroit Diesel Remanufacturing Centers in Salt Lake City, Utah; Kansas City, Missi
  Cambridge, Ohio; Grand Rapids, Michigan; and Toluca, Mexico
- Axle Alliance Company, Redford, Michigan, and Kings Mountain, North Carolina

Home  |  About Freightliner LLC  |  Media Room  |  Work at Freightliner

© Freightliner LLC  Privacy Statement, Legal Notices and Terms

Freightliner LLC is a DaimlerChrysler company.

# EXHIBIT 9

Freightliner LLC – North America's leading manufacturer of commercial trucks    Page 1 of 2



**HOME • BRANDS & BUSINESSES • NEWS • CAREERS • INSIDE FREIGHTLINER LLC • OUR COMMITMEN**

NEWS
▶ Media Room
  • Freightliner LLC Overview
  • Product Overview
  • Press Releases
  • Images
  • Other Resources

Press Releases
Trade Shows & Events
Contact Information

**NEWS**
**PRESS RELEASES**

**Freightliner LLC Celebrates 25 Years of Excellence at Mount Holly Truck, N.C., Truck Manufacturing Plant**

6/12/2004

Download images for this press release

*Opened in 1979, Mount Holly Today Produces the Freightliner Business Class M2 Line of Medium-Duty and Vocational Vehicles*

*25th Anniversary Celebration Attended by U.S. Rep. Sue Myrick (9th District, N.C.), Mount Holly Mayor Bryan Hough, Employees and Their Families*

MOUNT HOLLY, N.C... Freightliner LLC celebrated the 25th anniversary of its Mount Holly Truck Manufacturing Plant with festive ceremonies at the plant on June 12. The plant opened in May 1979 and was originally designed to build heavy-duty Freightliner trucks for over-the-road applications. It is now the home of Freightliner Trucks' Business Class M2 line of medium-duty and vocational trucks.

"Freightliner LLC today celebrates a quarter-century of manufacturing excellence at our Mount Holly plant," noted Rainer Schmueckle, President and CEO of Freightliner LLC, which is based in Portland, Oregon. "Through their manufacturing skill and dedication to customers, Mount Holly employees have helped the Freightliner nameplate achieve and maintain a leadership position in North America's trucking industry," Schmueckle said.

The plant has exclusively built the Freightliner Business Class M2 line of medium-duty and vocational trucks since 2002. Before that, it produced the original Business Class product, introduced in 1991. Earlier, Mount Holly built a mix of heavy-duty Freightliners.

The Business Class M2 line features Class 5-8 models in three BBC (bumper-to-back-of-cab) dimensions, including 100-, 106- and 112-inch BBC m Also offered are Extended Cabs and Crew Cabs. Each vehicle can be customized for broad range of vocational and commercial truck requirements.

"The new Freightliner Business Class M2 trucks are finding new customers every day Schmueckle said. "It's an indication of the M2's strong customer acceptance in the m

**Plant History**
After more than 25 years as a West Coast-based truck manufacturer, Freightliner Corporation expanded its operations to the Southeast in the late 1970s because of th


Freightliner LLC's M
Holly, N.C., Truck
Manufacturing Plant


Business Class M2
Van Body


Business Class M2
Refrigerated Van Bo



number of customers located east of the Mississippi River. Construction began in 197 both Mount Holly and nearby Gastonia, N.C., site of the Gastonia Parts Manufacturin which was built to supply Mount Holly with truck parts.

The Mount Holly plant opened for business in May 1979 with 134 full-time employees produced its first truck, a 1980 Freightliner COE, that month for Goldston Inc., of Ede With 460,000 square feet of floor space, the Mount Holly plant was Freightliner's larg the time. Today the plant employs more than 1,100 people. Mount Holly production employees are members of the UAW.

Expanded and modernized several times, the Mount Holly Truck Plant now has 616,0 square feet of space after a major renovation in 2001-2. The 14-month remodel upda more than 80 percent of the floor space and prepared the plant for manufacturing the Business Class M2 product line. The facility incorporates high-tech manufacturing equipment, including robots for welding and painting, automated conveyor systems a sophisticated automated wash and paint centers.

Freightliner LLC operates a total of four manufacturing facilities in North Carolina: the Holly plant; the Cleveland Truck Manufacturing Plant, which builds Freightliner brand duty trucks; the Gastonia Parts Manufacturing Plant, which produces parts and comp for Freightliner LLC manufacturing facilities and parts distribution centers; and the Th Built Buses School Bus Manufacturing Plant in High Point. Combined, the four plants approximately 7,000 people in North Carolina.

**The Anniversary Event**
"The Mount Holly Truck Plant has played a critical role in Freightliner LLC's success f than 25 years," said Mark Moseley, Mount Holly plant manager and master of ceremo the anniversary event. U.S. Rep. Sue Myrick (9th District, NC), joined Freightliner exe and Mount Holly Mayor Bryan Hough for the celebration.

The half-day celebration included plant tours and activities for employees and their fa plus lunch and a range of games and activities designed to commemorate Mount Hol manufacturing history. The event included recognition of the plant's longest serving employees, including a number of original employees with 25 years of service.

Members of the West Gastonia Boys and Girls Club performed the National Anthem t the formal ceremony and sang "America the Beautiful" at the close.

Freightliner LLC, headquartered in Portland, Oregon is the leading heavy-duty truck manufacturer in North America. Freightliner produces and markets Class 3-8 vehicles the Freightliner, Sterling, Western Star, American LaFrance, and Thomas Built Buses nameplates and is a company of DaimlerChrysler, the world's leading commercial vel manufacturer.

Download images for this press release

Home  |  About Freightliner LLC  |  Media Room  |  Work at Freightliner
© Freightliner LLC Privacy Statement, Legal Notices and Terms
Freightliner LLC is a DaimlerChrysler company.

# EXHIBIT 10

LEXSEE

**BRUNSWICK CORPORATION, Plaintiff, v. PRECOR INCORPORATED., Defendant.**

**C.A. No. 00-691-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2000 U.S. Dist. LEXIS 22222**

**December 12, 2000, Decided**
**December 12, 2000, Filed**

**DISPOSITION:** [*1] Precor's motion to transfer granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder, a company incorporated in Delaware with a principal place of business in Illinois, brought an infringement action relating to exercise treadmills against defendant competitor, a company incorporated in Delaware with a principal place of business in Washington. The competitor moved to transfer the case pursuant to 28 U.S.C.S. § 1404(a).

**OVERVIEW:** The balance of the private factors tipped slightly in favor of transfer. The convenience of the parties, the convenience of the witnesses, and the location of records and books were the most pertinent of the private factors. Both parties were located outside of Delaware, the witnesses as well as the relevant documents and records were located in Washington, and the product at issue was designed and manufactured in Washington; therefore, the Western District of Washington was a more convenient forum for the litigation. Although the private factors tipped slightly in favor of the Western District of Washington, the relevant public factors weighed heavily in favor of transfer. There had already been litigation between the parties on another patent, a parent patent of the one at issue in the case, in the Western District of Washington. That matter was on appeal. Moreover, the parties were currently litigating another patent infringement matter involving exercise equipment in the Western District of Washington. Thus, transferring the case would have promoted the interests of justice.

**OUTCOME:** The court granted the motion to transfer venue.

**CORE TERMS:** patent, western district, convenience, patent infringement, weigh, balance of convenience, fora, tip, motion to transfer, choice of forum, infringement, expeditious, inexpensive, paramount, lawsuit, serving, principal place of business, manufacture, slightly

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN1] Pursuant to 28 U.S.C.S. § 1404(a), the court may transfer this action to any other district where it might have been brought when it appears that a change of venue would convenience the parties and the witnesses while serving the interest of justice.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Copyright Law > Civil Infringement Actions > Jurisdiction & Venue > General Overview*
[HN2] In deciding a motion to transfer venue, the district court applies the most relevant public and private factors to the facts of the case as directed by the United States Court of Appeals for the Third Circuit's decision in Jumara.These factors fall into two groups: those relating to the private convenience of the litigants and those affecting the public interest in the fair and efficient administration of justice. The court should apply these factors to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer. The burden is on moving party to show that balance of convenience and the interests of justice weighs in favor of transfer.

2000 U.S. Dist. LEXIS 22222, *

*Civil Procedure > Venue > Individual Defendants*
*Civil Procedure > Federal & State Interrelationships >*
*Erie Doctrine*
*Civil Procedure > Judgments > Entry of Judgments >*
*Enforcement & Execution > General Overview*
[HN3] On a motion to transfer venue, the private interest factors may include: 1) the plaintiff's original forum preference; 2) the defendant's preference; 3) whether the claim arose elsewhere; 4) the convenience of the parties; 5) the convenience of the witnesses -- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and 6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). The public interest factors may include: 1) the enforceability of the judgment; 2) practical considerations that make the trial easy, expeditious, or inexpensive; 3) the relative administrative difficulty in the two fora resulting from court congestion; 4) the local interest in deciding local controversies at home; 5) the public policies of the fora; and 6) the familiarity of the trial judge with the applicable state law in diversity cases.

*Civil Procedure > Venue > Federal Venue Transfers >*
*General Overview*
*Civil Procedure > Venue > Motions to Transfer >*
*Choice of Forum*
[HN4] A plaintiff's choice of forum is a "paramount" consideration on a motion to transfer venue that is not to be lightly disturbed.

*Civil Procedure > Venue > Federal Venue Transfers >*
*General Overview*
[HN5] Most relevant to the court's inquiry on a motion to transfer venue is whether there are practical considerations that would make trial easy, expeditious, or inexpensive.

*Civil Procedure > Venue > Federal Venue Transfers >*
*General Overview*
[HN6] Where related lawsuits exist, it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court.

**COUNSEL:** For BRUNSWICK CORPORATION, plaintiff: Robert W. Whetzel, Richards, Layton & Finger, Wilmington, DE.

For PRECOR INCORPORATED, defendant: Samuel David Brickley, II, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

On August 1, 2000, the plaintiff, Brunswick Corporation, and its division Life Fitness ("Life Fitness") brought this patent infringement action against Precor Incorporated ("Precor"). Life Fitness alleges that Precor is infringing its U.S. Patent No. 6,095,951 (" '951 patent") relating to exercise treadmills. Presently before this court is Precor's motion to transfer this case to the United States District Court for the Western District of Washington, pursuant to 28 U.S.C. § 1404(a). Because the court finds that a transfer would convenience the parties and the witnesses while serving the interests of justice, Precor's motion to transfer is granted.

### I. BACKGROUND

#### A. The parties

Life Fitness and Precor both design, manufacture, [*2] and sell exercise equipment and both directly compete with one another in the exercise fitness market. Although both parties are incorporated in Delaware, neither party maintains a physical presence (e.g., offices or facilities) in this state. Life Fitness has its principal place of business in Franklin Park, Illinois and Precor has its principal place of business in Bothell, Washington.

#### B. Prior Litigation Between the Parties

"Life Fitness and Precor are no strangers to each other, nor to patent litigation." D.I. 7, at 2. In 1994, Precor filed a patent infringement suit against Life Fitness in the United States District Court for the Western District of Washington ("1994 litigation"). At issue in the 1994 litigation were . U.S. Patent Nos 5,599,259, 5,752,897 and certain Claims of U.S. Patent No. 5,382,207 (respectively the " '259, '897, and '207 patents"). The '207 patent is the parent of the '951 patent currently at issue in the case before the court.

In the 1994 litigation, Claims 1-36 of '207 patent were dismissed on summary judgment in February 1996 leaving only claims 37, 38, and 39 at issue. In early September 1999, Life Fitness voluntarily stipulated to the dismissal [*3] of the claims for infringement of the '259 and '897 patents as well as Claims 38-39 of the '207 patent. As a result of this stipulation, these claims were dismissed with prejudice in an order dated September 23, 1999. *See Precor Inc. v. Life Fitness*, No. C94-1586C (W.D. Wash. Sept. 23, 1999) (stipulation and order of

dismissal). Thus, the only infringement claim remaining for trial related to Claim 37 of the '207 patent. In October 1999, Life Fitness lost at trial as to this one patent claim. The judgment from the 1994 litigation is currently on appeal to the Federal Circuit.

## II. DISCUSSION

[HN1] Pursuant to 28 U.S.C. § 1404(a), the court may transfer this action to "any other district where it might have been brought" when it appears that a change of venue would "convenience" the parties and the witnesses while serving the "interest of justice." 28 U.S.C. § 1404(a) (1993). The parties here agree that Life Fitness could have brought this action in the Western District of Washington. See 28 U.S.C. S 1391(b)(1) (1993). Moreover, this lawsuit could have initially been filed in Washington because it is a patent [*4] infringement matter. See 28 U.S.C. § 1400(b). Therefore, [HN2] the court will next apply the most relevant public and private factors to the facts of the case as directed by the Third Circuit's decision in Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995).

In Jumara, the Third Circuit Court of Appeals identified a nonexclusive list of factors that have been used to guide courts in the exercise of their discretion in ruling on requests for transfer. 55 F.3d at 879-80; see also Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp.2d 192, 196-97 (D. Del. 1998). These factors fall into two groups: those relating to the private convenience of the litigants and those affecting the public interest in the fair and efficient administration of justice. Jumara, 55 F.3d at 879-80. n1 The court should apply these factors to determine, "on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." Id. at 883 (citing Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 30-31, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988)). [*5] The burden is on moving party to show that balance of convenience and the interests of justice weighs in favor of transfer. See Jumara, at 879.

n1 [HN3] The private interests may include: 1) the plaintiff's original forum preference; 2) the defendant's preference; 3) whether the claim arose elsewhere; 4) the convenience of the parties; 5) the convenience of the witnesses-- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and 6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). Jumara, 55 F.3d at 879-880. The public interests may include: 1) the enforceability of the judgment; 2) practical considerations that make the trial easy, expedi-

tious, or inexpensive; 3) the relative administrative difficulty in the two fora resulting from court congestion; 4) the local interest in deciding local controversies at home; 5) the public policies of the fora; and 6) the familiarity of the trial judge with the applicable state law in diversity cases. Id.

[*6]

### A. Private Factors

The court concludes that the balance of the private factors tips slightly in favor of transfer. In this case, the court finds the convenience of the parties, the convenience of the witnesses, and the location of records and books to be the most pertinent of the private factors. Although both parties are incorporated in Delaware, Precor maintains its headquarters in the Western District of Washington and Life Fitness in Franklin Park, Illinois. Additionally, neither of the parties, their witnesses, or any of the potentially relevant documents and records are located in Delaware.

Recognizing that the balance of convenience tips toward the Western District of Washington, Precor further argues that Life Fitness will suffer no greater inconvenience in traveling to Washington than Delaware. In contrast, Life Fitness argues that its choice of forum is paramount. The court acknowledges that [HN4] a plaintiff's choice of forum is a "paramount" consideration that is not to be "lightly disturbed." Schutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970); see also Jumara v. State Farm Ins. Co., 55 F.3d 873, 879-80 (3d Cir. 1995). In this case, [*7] however, the plaintiff's preference for Delaware is not given as much deference because most of the events at issue, that is, the design and manufacture of the exercise equipment, occurred outside of Delaware. See Britamco Underwriters, Inc. v. Wallace, 56 F. Supp. 2d 542, 545 (E.D. Pa. 1999). "The transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen . . . a forum where the alleged wrongful activity occurred." Continental Casualty Co. v. American Home Assurance Co., 61 F. Supp. 2d 128, 131 (D. Del. 1999). Thus, because the parties are located outside of Delaware, the witnesses as well as the relevant documents and records are located in Washington, and the product at issue was designed and manufactured in Washington, the Western District of Washington is a more convenient forum for the litigation.

### B. Public Factors and the Interest of Justice

Although the private factors tip slightly in favor of the Western District of Washington, the relevant public factors weigh heavily in favor of transfer. [HN5] Most relevant to the courts inquiry is whether there are practi-

2000 U.S. Dist. LEXIS 22222, *

cal considerations that would make [*8] trial "easy, expeditious, or inexpensive." *Jumara, 55 F.3d at 879.* In this case, there has already been litigation on the '207 patent, a parent patent of the one at issue here, in the Western District of Washington. This matter is on appeal. Moreover, the parties are currently litigating another patent infringement matter involving exercise equipment in the Western District of Washington. n2 [HN6] Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court." *See Liggett Group, Inc. v. R.J. Reynolds Tobacco Co., 102 F. Supp. 2d 518,* (D.N.J. 2000) (citations omitted). Thus, the court finds that transferring this case would promote the interests of justice.

n2 The parties disagree as to whether this is a directly related matter.

### III. CONCLUSION.

Finding that the balance of convenience and the interests of justice weigh in favor of transfer,

IT IS HEREBY ORDERED that:

1. Precor Incorporated's [*9] Motion to Transfer is GRANTED; and

2. This matter shall be TRANSFERRED to the Western District of Washington.

Date: December 12, 2000

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT 11

LEXSEE

**IKOS SYSTEMS, INC., Plaintiff, v. CADENCE DESIGN SYSTEMS, INC., and QUICK TURN DESIGN SYSTEMS, INC., Defendant.**

**C.A. No. 02-1335-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2002 U.S. Dist. LEXIS 20574**

**October 21, 2002, Decided**

**DISPOSITION:** [*1] Defendants' motion to transfer the case granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sued defendants for patent infringement. Defendants moved to transfer the case to the United States District Court for the Northern District of California pursuant to 28 U.S.C.S. § 1404(a).

**OVERVIEW:** Defendants moved to have the case transferred to the Northern District of California, where each of the parties was headquartered. Defendants demonstrated to the court that transfer was appropriate. While the parties were Delaware corporations and could reasonably expect to litigate in Delaware, there appeared to be little connection between Delaware and the lawsuit or the parties. Each party was headquartered in northern California. The parties were large national and international organizations with apparently substantial assets. Because the parties maintained geographically diverse operating locations, travel time and convenience in the aggregate would be neither increased nor decreased substantially with a transfer of forum. Any disparity in court congestion was not so great as to justify a transfer of venue. The relevant industry in the instant patent suit was the Electronic Design Automotive Industry, which apparently was located in northern California. Finally, while some potential witnesses who were not employed by defendants resided the East Coast, it appeared that the majority of the potential witnesses were located in the Northern District of California.

**OUTCOME:** The court granted defendants' motion for transfer.

**CORE TERMS:** declaration, convenience, motion to transfer, northern, patent, venue, fora

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN1] 28 U.S.C.S. § 1404(a) provides that for convenience of the parties and witnesses, in the interest of justice, the court may transfer a civil action to any other district where it might have been brought. It is the movants burden to establish the need for transfer, and the plaintiff's choice of venue will not be lightly disturbed.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > General Overview*
[HN2] When considering a motion to transfer, the court must determine whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum. This inquiry requires "a multi-factor balancing test" embracing not only the statutory criteria of convenience of the parties and the witnesses and the interests of justice, but all relevant factors, including certain private and public interests. These private interests include the plaintiff's choice of forum; the defendant's preference; whether the claim arose elsewhere; and the location of books and record, to the extent that they could not be produced in the alternative forum. Among the relevant public interests are: the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; and the public policies of the fora.

**COUNSEL:** For Ikos Systems Inc, PLAINTIFF: Robert K Payson, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Cadence Design Systems, Inc, Quickturn Design Systems, Inc, DEFENDANTS: Josy W Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For Cadence Design Systems, Inc, Quickturn Design Systems, Inc, COUNTER-CLAIMANTS: Josy W Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For Ikos Systems Inc, COUNTER-DEFENDANT: Robert K Payson, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

### I. INTRODUCTION

On July 29, 2002, the plaintiff, IKOS Systems, Inc. ("IKOS"), filed the instant action for patent infringement against Cadence Design Systems, Inc. ("Cadence") and Quick Turn Design Systems, Inc. ("Quick Turn") (collectively "the defendants"). IKOS alleges that Quick Turn's Palladium TM design verification product infringes United States Patent No. 5,847,578 ("the '578 patent"). The defendants, move [*2] to transfer this case to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a) (D.I. 11). For the following reasons, the court will grant the defendants' motion.

### II. DISCUSSION

Each of the parties in this case is a Delaware corporation n1 with headquarters located within several miles of one another in what is commonly known as the Silicon Valley of northern California.

> n1 IKOS is a subsidiary of Mentor Graphics Corporation ("Mentor") which is incorporated under the laws of the State of Oregon. The defendants assert that Mentor is the real party in interest in this action. IKOS does not seem to seriously contest this assertion. Nevertheless, given the court's analysis and conclusions as to the most

appropriate forum for the litigation of this matter, the court need not reach this issue.

The defendants move to transfer this action to the District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a) [*3] . Section 1404(a) [HN1] provides that "for convenience of [the] parties and witnesses, in the interest of justice," the court may transfer a civil action "to any other district ... where it might have been brought." 28 U.S.C. § 1404(a). It is the movants' burden to establish the need for transfer, and 'the plaintiff's choice of venue [will] not be lightly disturbed.' Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995) (citations omitted).

[HN2] When considering a motion to transfer, the court must determine 'whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum.' Id.. This inquiry requires "a multi-factor balancing test" embracing not only the statutory criteria of convenience of the parties and the witnesses and the interests of justice, but all relevant factors, including certain private and public interests. Id. at 875, 879. These private interests include the plaintiff's choice of forum; the defendants' preference; whether the claim arose elsewhere; and the location of books and record, to the extent that they could not be [*4] produced in the alternative forum. n2 Id. at 879. Among the relevant public interests are: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies of the fora." Id. at 879-80 (citations omitted).

> n2 The first three of these private interest collapse into other portions of the Jumara analysis. The court, therefore, will consider them in the context of the entire inquiry only. See Affymetrix, Inc. v. Synteni, Inc. and Incite Pharmaceuticals, Inc., 28 F. Supp. 2d 192 (D. Del. 1998).

Upon consideration of these factors, the court finds that the defendants have met their burden of demonstrating that transfer is appropriate. In reaching this conclusion the court relied on the following considerations, among others: (1) while [*5] the defendants and the plaintiff are Delaware corporations and should reasonably expect to litigate in the forum, there seems to be little connection between Delaware and this action or the parties; (2) each party is headquartered in northern California; (3) the parties are large national and international organizations with apparently substantial assets; (4) be-

cause the parties maintain geographically diverse operating locations, travel time and convenience in the aggregate would be neither increased nor decreased substantially with a transfer of forum; (5) any disparity in court congestion is not so great as to justify a transfer of venue; (6) while patent disputes are often not properly characterized as "local" in nature or otherwise unique to a particular locale, *see Affymetrix*, 28 F. Supp. 2d at 207, the relevant industry, the Electronic Design Automotive Industry, is apparently located in the Silicon Valley. Finally, IKOS has identified six potential witnesses who are not employed by the defendants and reside on the east coast. n3 However, it appears that the majority of the defendants' engineers, as well as other potential witnesses, are located in the Northern [*6] District. Thus, the court is convinced that this fact and the other public and private interests are sufficient to tip "the balance of convenience ... *strongly* in favor of [the] defendant[s]." *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir. 1970) (emphasis in original).

n3 In its brief and an accompanying declaration by Giovanni Mancini, a former employee of the plaintiff, IKOS has identified William R. Beausoleil as a seventh potential non-party employee witness. In his declaration, Mr. Mancini states that the witness elected not to join the defendant, Cadence. In contrast, the defendants offer the declaration of the witness himself. In that declaration, Mr. Beausoleil attests that he entered the employ of Cadence on March 28, 2002. The court will credit Mr. Beausoleil's declaration.

### III. CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED that:

1. The defendants' motion to transfer the case to the United States District Court for the Northern District [*7] of California (D.I. 11) is GRANTED.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Dated: October 21, 2002

# EXHIBIT 12

LEXSEE

**THE ORIGINAL CREATINE PATENT COMPANY, LTD, Plaintiff, v. KAIZEN, INC., Defendant.**

Civil Action No. 02-471-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 988

January 22, 2003, Decided

**DISPOSITION:** [*1] Defendant's motion to dismiss or, in the alternative, to transfer was granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee filed an amended complaint for patent infringement against defendant corporation. The corporation filed an answer and asserted affirmative defenses, including inequitable conduct and bad faith and then moved to dismiss or to transfer. The patentee responded with a motion to strike and/or dismiss 15 of the corporation's affirmative defenses.

**OVERVIEW:** The court found the balance of private factors weighed in favor of transfer. The record reflected that neither litigant had ties to Delaware. Geographically, Delaware was inconvenient to everyone. All witnesses, documents and employees were located outside of the instant forum. Although the corporation described itself as a world-wide operation, there was nothing presented to corroborate this apparent embellishment. Turning to the public interests, the court found the practical considerations related to trial weighed in favor a transfer. The expense of trial in Delaware weighed more heavily on the corporation. Regardless of the forum, the patentee would incur travel expenses. A transfer to California would have eliminated rather than merely shifting the travel expense of one party. The court was likewise confident that the district court in California was well-equipped to decide the issues implicated, regardless of the pendency of the patentee's other infringement actions before the instant court. Further, considering the corporation was a California corporation conducting business therein, that forum had a more particular interest in the litigation than Delaware.

**OUTCOME:** The corporation's motion to dismiss or, in the alternative, to transfer was granted and the action was transferred.

**CORE TERMS:** patent, convenience, weigh, choice of forum, patents-in-suit, website, fora, motion to dismiss, creatine-containing, world-wide, reside, balance of convenience, deference, patent infringement, motion to strike, third party, store owner, declaration, implicated, embodying, nutrition, invention, internet, inventors, travel

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN1] Under 28 U.S.C.S. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interest of justice. Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN2] The burden of establishing the need to transfer rests with the movant to establish that the balance of convenience of the parties and witnesses strongly favors the defendants. Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail. The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*

[HN3] Although transfer of an action is usually considered as less convenient to a plaintiff if the plaintiff has not chosen its home turf or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > General Overview*
[HN4] The United States Court of Appeals for the Third Circuit indicates the analysis for transfer is very broad. Although emphasizing that there is no definitive formula or list of factors to consider, it has identified potential factors it characterized as either private or public interests. The private interests include: (1) a plaintiff's forum preference as manifested in the original choice; (2) a defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). The public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases.

**COUNSEL:** For ORIGINAL CREATINE PATENT COMPANY, LTD, plaintiff: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For KAIZEN INC., defendant: David L. Finger, David L. Finger, Esq., Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM ORDER**

At Wilmington this 22nd day of January, 2003, having reviewed defendant's motion to dismiss or, in the alternative, to transfer and the papers submitted in connection therewith;

IT IS ORDERED that said motion to transfer (D.I. 14) is granted, for the reasons that follow: n1

> n1 Because the court is transferring the action to California, Kaizen's motion to dismiss for lack of personal jurisdiction is denied as moot. Kaizen's motions for protective orders (D.I. 25, 31) and OCPC's motion to strike (D.I. 10) are denied without prejudice to renew.

1. **Introduction.** On July 11, 2002, plaintiff, The Original Creatine Patent [*2] Co., Ltd. ("OCPC"), filed an amended complaint for patent infringement against defendant Kaizen, Inc. ("Kaizen"). n2 (D.I. 7) The patents-in-suit are United States Patent Number 5,757,159 ("the '159 patent") and United States Patent Number 5,968,544 ("the '544 patent"). OCPC alleges that Kaizen has made, used, offered for sale, and continues to do the same, creatine-containing products embodying the invention patented in the '544 patent. OCPC further contends that Kaizen has marketed and sold creatine-containing products embodying the invention in the '159 patent. Kaizen filed an answer and asserted affirmative defenses, including inequitable conduct and bad faith. (D.I. 9) Kaizen then filed this motion to dismiss or transfer to the Central District of California. (D.I. 10) OCPC responded with a motion to strike and/ or dismiss fifteen of Kaizen's affirmative defenses. (D.I. 10)

> n2 CPC filed the original complaint incorrectly against Kaizen, Inc., a Delaware corporation unrelated to this action. (D.I. 1, 15)

[*3]

2. **Background.** OCPC is an English corporation with its principal place of business in Leeds, United Kingdom. (D.I. 7, P2) OCPC is the assignee of the two patents-in-suit, the '159 patent, issued to inventors Eric Hultman and Roger C. Harris, and the '544 patent, issued to inventors Alan N. Howard and Roger C. Harris. (Id. at PP5-6) While Hultman resides in Sweden, Howard and Harris reside in the United Kingdom. (D.I. 19, Ex. 1) The attorneys who prosecuted the patents are located in Washington, D.C. and Chicago, Illinois. OCPC has filed four other actions to enforce the patents-in-suit against different defendants, all of which are pending before this court.

3. Kaizen is a California corporation with only one office located in Los Angeles, California. (D.I. 15, Ex. A) Kaizen is a corporation involved in the advertising, distribution and sales of health food products. (Id. at P2) In 1998, Kaizen entered a licensing agreement to market, distribute and sell creatine-containing products from a German company under the trade-name Creapure <TM>. (Id. at P4) Kaizen claims that all its documents, and employees are located in California. With the exception of two potential [*4] witnesses, n3 Kaizen indicates the remaining reside in California.

n3 There are two witnesses located in Georgia and Canada. ( D.I. 15 P 9)

4. **Standard of Review.** [HN1] Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interest of justice. Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988); Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp.2d 192, 208 (D. Del. 1998).

[HN2] The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981) [*5] (citing Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970). "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". ADE Corp. v. KLA-Tencor Corp., 138 F. Supp.2d 565, 567 (D. Del. 2001); Shutte, 431 F.2d at 25.

The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. C.R. Bard, Inc. v. Guidant Corp., 997 F. Supp. 556, 562 (D. Del 1998); Siemens Medical Systems, Inc. v. Fonar Corporation, C.A. No. 95-261-SLR, 1995 U.S. Dist. LEXIS 22334, slip. op. at 8 (D. Del. Nov. 1, 1995); Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc., 2001 U.S. Dist. LEXIS 20803, 2001 WL 1617186 (D. Del. Nov. 28, 2001). [HN3] Although transfer of an action is usually considered as less convenient to a plaintiff if the plaintiff has not chosen its "'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh

strongly in favor of transfer. [*6] " In re M.L.-Lee Acquisition Fund II, L.P., 816 F. Supp. 973, 976 (D. Del. 1993).

[HN4] The Third Circuit Court of Appeals has indicated the analysis for transfer is very broad. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). Although emphasizing that "there is no definitive formula or list of factors to consider," id., the Court has identified potential factors it characterized as either private or public interests. The private interests include: "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." Id. (citations omitted).

The public interests include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; [*7] (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." Id. (citations omitted).

5. **Discussion.** Kaizen argues the public and private interests weigh in favor of a transfer to the Central District of California. Specifically, Kaizen argues that OCPC has no parties, witnesses or evidence related to this action in Delaware. Kaizen avers that OCPC instituted this action in Delaware for the sole reason of accommodating the convenience of its lawyers, who practice in this state. Kaizen contends that the action actually emanates from Los Angeles, California, the location of its sales center. California is also the location of all events and evidence related to the litigation. (D.I. 15, Ex. A)

6. OCPC contends its choice of forum should be afforded deference. (D.I. 19) The Delaware forum was selected because Kaizen has committed patent infringement in this state, argues OCPC. Moreover, the evidence and witnesses necessary to defend against Kaizen's affirmative [*8] defenses are located in Sweden, the United Kingdom, Washington, D.C. and Illinois. Although all of these witnesses will have to travel for trial purposes, OCPC asserts that Delaware is a closer forum than California. Further, because there are three other cases involving the same patents pending before this court, judicial economy will be promoted by maintaining

this action. (D.I. 19, Ex. 1) The risk of inconsistent results will be reduced by allowing one judge to become proficient in the patent technology and the relevant facts.

OCPC also raises another issue related to Kaizen's business, or lack thereof, in Delaware. On Kaizen's internet website, the company describes itself as maintaining offices "world-wide," in addition to the California office. (D.I. 19, Ex. 2) The Kaizen website does not accept orders for its products. However, the website does provide a link to an internet nutrition store which sells Kaizen products. According to the declaration of an OCPC attorney, she was able to place post-complaint orders for Kaizen products, including those alleged to infringe the patents-in-suit, from the linked nutrition store. (D.I. 19, Ex. 3) The orders were made from a Delaware computer [*9] and she received the products in Delaware. The attorney states that she was able to buy a nationally distributed magazine at a Delaware bookstore that contained advertisements for Kaizen products. She was also able to purchase, in person, noninfringing Kaizen products from a Delaware store. She states that the owner of the store told her that he has received solicitations to sell the entire line of Kaizen products. OCPC plans to call the Delaware store owner as a third party witness.

In response, Kaizen urges the court to strike the declaration as it contains impermissible double hearsay. (D.I. 20) However, even if it were considered, Kaizen contends it does not establish that Kaizen conducts business in Delaware or sells the accused products here. Moreover, the fact that Kaizen's website describes its operations as "world-wide" still does not establish any business relationship with anyone in Delaware. Kaizen also argues that any problems with having third party witness testifying in California, can be solved by taking the depositions elsewhere.

Since the parties do not dispute that this action could have been initiated in the Central District of California, an examination of the [*10] private issues implicated by

a transfer is warranted. The court finds the balance of private factors weighs in favor of transfer. The record reflects that neither litigant has ties to Delaware. Geographically, Delaware is inconvenient to everyone. All witnesses, documents and employees are located outside of this forum. Although Kaizen may describe itself as a world-wide operation, there has been nothing presented to corroborate this apparent embellishment.

With regard to compulsory process problems, OCPC indicates that a Delaware store owner will be called as a trial witness. However, it has not established that this individual will be unwilling to testify outside of Delaware. Absent a demonstrable obstacle to obtaining personal jurisdiction over a third-party witness, the court declines to consider this as a problem.

Turning to the public interests, the court finds the practical considerations related to trial weigh in favor a transfer. As noted, the expense of trial in Delaware will weigh more heavily on Kaizen. Regardless of the forum, OCPC will incur travel expenses. A transfer to California would eliminate rather than merely shifting the travel expense of one party. See [*11] Van Dusen v. Barrack, 376 U.S. 612, 646, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964).

The court is likewise confident that the Central District of California is well-equipped to decide the issues implicated by this case, regardless of the pendency of OCPC's other infringement actions. Further, considering Kaizen is a California corporation conducting business therein, that forum has a more particular interest in the litigation than Delaware. Accordingly, for the reasons stated, this action is transferred to the Central District of California.

Sue L. Robinson

United States District Judge

# EXHIBIT 13

LEXSEE

**JOSEPH MEMMINGER, Plaintiff, v. INFOCURE CORPORATION, et al., Defendants.**

**Civil Action No. 00-707-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2000 U.S. Dist. LEXIS 22077**

**November 14, 2000, Decided**

**DISPOSITION:** [*1] Defendants' Motion to Transfer Action to United States District Court, Northern District of Georgia granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff selling corporation's president filed an action alleging: (1) negligence, (2) conversion and trover, (3) breach of contract, (4) equitable fraud, (5) breach of fiduciary duty, and (6) negligent misrepresentation. Defendants, a purchasing corporation and a law firm, moved, pursuant to 28 U.S.C.S. § 1404(a), to transfer the action.

**OVERVIEW:** The court found that the factors weighing strongly in favor of transfer included: (1) the convenience of the witnesses, (2) the practical considerations regarding the law firm's motion to dismiss for lack of personal jurisdiction, and (3) Georgia's interest in resolving the controversy. Factors that weighed slightly in favor of transfer included: (1) the collective convenience of the parties, and (2) the Georgia court's familiarity with the applicable Georgia law. Meanwhile, no factors weighed against transfer. Therefore, the court concluded that transfer was warranted under the circumstances presented here.

**OUTCOME:** Defendants' motion to transfer was granted.

**CORE TERMS:** weigh, convenience, northern district, venue, resolving, turf, choice of forum, motion to dismiss, litigating, slightly, litigate, balancing, concede, fora, lack of personal jurisdiction, local interest, familiarity, non-party, travel, reside, registered, applicable state law, financial resources, public policies, length of time, legal issues, travel time, enforceability, unavailable, convenient

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN1] See 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Individual Defendants*
*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > General Overview*
[HN2] The United States Court of Appeals for the Third Circuit has set forth a list of factors for district courts to consider when deciding whether or not to transfer venue. These factors include six private interests: (1) the plaintiff's forum preference as evidenced by his or her original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties due to their relative physical and financial condition, (5) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (6) the location of books and records, to the extent that these books and records could not be produced in a certain forum. The factors also include six public interests for courts to consider: (1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases. District courts must balance all of the relevant factors and determine whether a transfer of venue would best serve all of the aforementioned interests.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN3] The burden is upon the movant to establish that the balance of the interests strongly weighs in favor of the requested transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN4] The "home turf" rule requires a plaintiff's choice of forum to be given even greater weight than usual if the chosen forum is the forum closest to a plaintiff's principal place of business in which personal service over the defendant can be obtained. The "home turf" rule does not affect the amount of deference given to a plaintiff's choice of forum. Rather, whether or not a plaintiff has brought an action on its "home turf" is one of the many factors courts should consider when balancing the convenience of the chosen forum.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN5] For purposes of transferring venue, large, multi-million dollar companies with national markets are not significantly burdened by having to litigate in a distant forum.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN6] Convenience of the expected trial witnesses is the most important factor to consider when determining whether or not transfer is appropriate. Furthermore, the availability of fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit are the most important type of witnesses for purposes of venue transfer analysis. But, because the convenience to witnesses is only relevant in how it may affect their availability for trial, only non-party witnesses need be considered because the parties are required to procure their own employees' attendance at trial. The defendant, however, does not have to allege that the witnesses actually will be unavailable for trial to establish the necessary lack of convenience.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*
*Civil Procedure > Venue > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*

[HN7] If a transfer of venue would eliminate a jurisdictional question and thus save judicial resources, such fact weighs in favor of transfer.

**COUNSEL:** Marc H. Snyder, Esquire, FRANK & ROSEN, New Castle, Delaware, for Plaintiff.

Alan L. Frank, Esquire, and Samantha A. Millrood, Esquire, FRANK & ROSEN, Philadelphia, Pennsylvania, for Plaintiff.

John H. Newcomer, Jr., Esquire, and Francis P. Newell, Esquire, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP, Newark, Delaware, for InfoCure Corporation, Defendant.

Michael R. Smith, Esquire, David L. Green, Esquire, Of Counsel, KING & SPALDING, Atlanta, Georgia, for InfoCure Corporation, Defendant.

Keith E. Donovan, Esquire, SWARTZ, CAMPBELL & DETWEILER, Wilmington, Delaware, for Morris, Manning & Martin, LLP, Defendant.

Jeffrey B. McCarron, Esquire, and Richard J. Wall, Esquire, SWARTZ, CAMPBELL & DETWEILER, Philadelphia, Pennsylvania, for Morris, Manning & Martin, LLP, Defendant.

**JUDGES:** Joseph J. Farnan, Jr., District Judge.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION:**

### MEMORANDUM OPINION

November 14, 2000
Wilmington, Delaware

Joseph J. Farnan, Jr., District Judge.

Presently before [*2] the Court is Defendants' Motion to Transfer Action to United States District Court, Northern District of Georgia Pursuant to 28 U.S.C. § 1404(a) (D.I. 15). For the reasons stated below, the Court will grant Defendants' motion.

### BACKGROUND

Plaintiff Joseph Memminger ("Plaintiff") was the President and principal shareholder of Scientific Data Management, Inc. ("SDM"), a Michigan corporation involved in developing, marketing, and supporting computer software customized specifically to assist in the management of physicians' offices. (D.I. 24 at 2). Plaintiff is a resident of Michigan. (D.I. 16 at 2). The Defen-

dants include InfoCure Corporation ("InfoCure") and Morris, Manning & Martin ("MM&M") (hereinafter known collectively as "Defendants"). InfoCure is a Delaware corporation involved with healthcare software, with its principal place of business in Atlanta, Georgia. (D.I. 16 at 2). MM&M is a law firm also located in Atlanta, Georgia. (D.I. 16 at 2). In the Spring of 1999, InfoCure approached Plaintiff regarding InfoCure's interest in acquiring SDM. (D.I. 24 at 2). During this initial encounter, and at all times relevant to this litigation, MM&M served [*3] as legal counsel for InfoCure. n1 (D.I. 24 at 2).

> n1 The MM&M lawyers involved in these negotiations included Richard Haury, Bradley T. Pruitt, and Duncan Spears. (D.I. 24 at 3).

Defendants negotiated with Plaintiff regarding this potential transaction for several months. (D.I. 16 at 1). These negotiations eventually culminated with the parties signing a Letter of Intent on July 27, 1999. (D.I. 24 at 3). The Letter of Intent was an agreement between Plaintiff, SDM, and InfoCure, in which InfoCure would acquire SDM in a stock-for-stock, reverse triangular merger. (D.I. 24 at 3). The relevant terms of this agreement provided that InfoCure would acquire and merge SDM into a wholly-owned subsidiary of InfoCure, and in exchange, Plaintiff would receive a number of shares of InfoCure's stock, the exact number of which was to be determined by a formula set forth in the Letter of Intent. (D.I. 24 at 3).

After the parties entered into the Letter of Intent, a period of due diligence commenced during which a "Registration [*4] Rights Agreement" was entered into between Plaintiff and InfoCure. (D.I. 24 at 4). This Registration Rights Agreement detailed the process by which Plaintiff was to obtain registration of his InfoCure shares, which was important to Plaintiff because he planned on selling most or all of these shares in early 2000. (D.I. 24 at 4). Plaintiff alleges that, upon representations from Defendants promising that Plaintiff's InfoCure shares would be available for public sale by mid-November of 1999, the transaction was closed on August 31, 1999, in MM&M's offices in Atlanta. (D.I. 24 at 4; D.I. 16 at 2).

The relationship between Plaintiff and Defendants deteriorated during the ensuing months. Plaintiff alleges that only one-half of his shares were registered on time, in October of 1999. (D.I. 24 at 6). By December of 1999, Plaintiff had purchased options on these shares of stock. (D.I. 24 at 8). These options required Plaintiff to sell the shares at a set price; but, if the stock price subsequently increased or decreased, Plaintiff would still be required to sell the shares at that set price. (D.I. 24 at 8). The price

of the shares soon started to increase, and Plaintiff sought to "unwind" [*5] his position in the options market by repurchasing the options. (D.I. 24 at 8). Plaintiff's effort to "unwind" his position was thwarted, however, because his shares had been placed on "legal hold" and could not be negotiated. (D.I. 24 at 8). Plaintiff alleges that his inability to sell the shares caused him significant monetary loss. n2 (D.I. 24 at 8). Plaintiff further contends that Defendants informed Plaintiff that his unregistered shares - which constituted one-half of all of his InfoCure shares - could not be registered due to a "blackout window" caused by a "significant event." (D.I. 24 at 9). As a result, Plaintiff was forced to retain ownership of these shares for longer than he desired. (D.I. 24 at 9). Meanwhile, InfoCure's stock closed at an all-time high of $ 36.625 per share on January 24, 2000. (D.I. 24 at 9).

> n2 Plaintiff's trading account had a negative balance of over $ 1,300,000 at this time. (D.I. 24 at 8).

During the ensuing months, Plaintiff was repeatedly told by Defendants that his unregistered [*6] shares still could not be registered. (D.I. 24 at 9). Not until May 10, 2000, did InfoCure's registration statement covering Plaintiff's shares become effective, thus enabling Plaintiff to sell them. (D.I. 24 at 9). At this point, however, InfoCure's stock price had dropped below $ 10 per share, again causing Plaintiff to suffer a significant monetary loss. (D.I. 24 at 9). Plaintiff subsequently filed this action in the United States District Court for the District of Delaware, alleging: (1) negligence, (2) conversion and trover, (3) breach of contract, (4) equitable fraud, (5) breach of fiduciary duty, and (6) negligent misrepresentation. (D.I. 1; D.I. 3). Defendants subsequently filed this motion, pursuant to 28 U.S.C. § 1404(a), seeking transfer to the United States District Court for the Northern District of Georgia. (D.I. 15).

## DISCUSSION

### A. Legal Standard for Transfer of Venue Under 28 U.S.C. § 1404(a)

[HN1] Under 28 U.S.C. § 1404(a), "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it [*7] might have been brought." 28 U.S.C. § 1404(a). Since both parties agree that Plaintiff could have brought this action in the Northern District of Georgia, the Court's only task is to determine whether the factors enumerated in § 1404(a) warrant a transfer.

[HN2] **The Court of Appeals for the Third Circuit has set forth a list of factors for district courts to consider when deciding whether or not to transfer venue.** Jumara v. State Farm Ins. Co., 55 F.3d 873, 879-80 (3d Cir. 1995). **These factors include six private interests: (1) the plaintiff's forum preference as evidenced by his or her original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties due to their relative physical and financial condition, (5) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (6) the location of books and records, to the extent that these books and records could not be produced in a certain forum.** Id. at 879. **The factors also include six public interests for courts to consider: (1) the [*8] enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases.** Id. at 879-80. **District courts must balance all of the relevant factors and determine whether a transfer of venue would best serve all of the aforementioned interests.** Id. at 883. [HN3] **The burden is upon the movant to establish that the balance of the interests strongly weighs in favor of the requested transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. See** Continental Cas. Co. v. American Home Assurance Co., 61 F. Supp. 2d 128, 131 (D. Del. 1999).

**B. Analysis of the Factors**

1. Plaintiff's Choice of Forum; Defendants' Preference; and Whether the Claim Arose Elsewhere

Although Jumara provides that the plaintiff's choice of forum, the defendant's preference, and whether or not the claim [*9] arose elsewhere, are separate factors for district courts to consider in deciding whether or not to transfer venue, these factors are afforded substantial weight during consideration of several other Jumara factors. Thus, in order to avoid considering these factors twice, the Court will defer consideration of them until later in the analysis. See Continental, 61 F. Supp. at 131 n.7 (holding that these three factors are subsumed in Jumara's other factors); Motorola Inc. v. PC-Tel, Inc., 58 F. Supp. 2d 349, 357 n.10 (D. Del. 1999) (same); Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192, 197 (D. Del. 1998) (same).

However, the Court will initially address the "home turf" rule even though it is traditionally discussed when considering the weight that a plaintiff's choice of forum deserves. [HN4] The "home turf" rule requires a plaintiff's choice of forum to be given even greater weight than usual if the chosen forum is "the forum closest to a plaintiff's principal place of business in which personal service over the defendant can be obtained." Sunds Defibrator, Inc. v. Durametal Corp., 1997 U.S. Dist. LEXIS 1859, 1997 WL 74660, at *2 n.2 [*10] (D. Del. Jan. 31, 1997). The Court affirms other recent opinions of this Court declaring that the "home turf" rule does not affect the amount of deference given to a plaintiff's choice of forum. See e.g., Affymetrix, 28 F. Supp. 2d at 199. Rather, whether or not a plaintiff has brought an action on its "home turf" is one of the many factors courts should consider when balancing the convenience of the chosen forum. See Sunds, 1997 U.S. Dist. LEXIS 1859, 1997 WL 74660, at *2 n.2 (holding that Delaware's "home turf" rule has been subsumed by Jumara's factors). The Court therefore concludes that the "home turf" rule has retained little, if any, vitality as a separate doctrine since the Third Circuit's decision in Jumara.

2. Convenience of the Parties as Indicated by their Relative Physical and Financial Positions

Defendants concede they have the financial resources to litigate in Delaware, which is a fact that weighs against transfer. See Motorola, 58 F. Supp. 2d at 358 (holding that [HN5] large, multi-billion dollar companies with national markets are not significantly burdened by having to litigate in a distant forum); Bering Diagnostics GMBH v. Biosite Diagnostics, Inc., 1998 U.S. Dist. LEXIS 531, 1998 WL 24354, [*11] at *5 (D. Del. Jan. 6, 1998)(same). Thus, unless Defendants can articulate "some unique or unexpected burden associated with defending this action," the convenience factor should not weigh significantly in favor of transfer. Motorola, 58 F. Supp. 2d at 358. Articulating such a burden is especially difficult when considering how technological advancements have minimized the difficulty of litigating matters in distant fora. See The Joint Stock Soc'y v. Heublein, Inc., 936 F. Supp. 177, 188-89 (D. Del. 1996). See also Motorola, 58 F. Supp. 2d at 358 n.12 (noting that the defendants need not attend courtroom proceedings other than the trial).

Defendants reside in Atlanta, Georgia, and Plaintiff resides in Michigan. Therefore, the amount of travel necessitated by litigating in Delaware compared to litigating in Georgia is significantly increased for Defendants. While Defendants would be required to travel from Georgia to Delaware if transfer is not granted, Plaintiff concedes he will only have one extra hour of travel time if required to travel to Georgia, as opposed to Delaware, which is an amount of time the Court deems "minimal" for [*12] purposes of venue transfer analysis. See Falco v. Alpha Affiliates, Inc., 1997 U.S. Dist. LEXIS 20122,

1997 WL 782011, at *3 (D. Del. Dec. 10, 1997). As a result, the Court concludes that it is more convenient for the parties to litigate this matter in Georgia. n3 But, because the extra burden imposed by increased travel time is not the kind of "unique or unexpected burden" that is required for parties with substantial financial resources, the Court concludes that this added convenience weighs only slightly in favor of transfer.

n3 The Court reaches this conclusion even though it is somewhat troubled by Defendants' assertion of inconvenience in having to litigate in Delaware, when Defendant InfoCure is incorporated in Delaware - a move presumably deemed "convenient" for purposes of being governed by the provisions of Delaware's management-friendly corporate law. (D.I. 24 at 14).

3. Convenience of the Witnesses as to their Availability at Trial

[HN6] Convenience of the expected trial witnesses is the most important factor to consider [*13] when determining whether or not transfer is appropriate. See Mentor Graphics Corp. v. Quickturn Design Sys., Inc., 77 F. Supp. 2d 505, 510 (D. Del. 1999). Furthermore, the availability of "fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit" are the most important type of witnesses for purposes of venue transfer analysis. Affymetrix, 28 F. Supp. 2d at 203. But, because the convenience to witnesses is only relevant in how it may affect their availability for trial, only non-party witnesses need be considered because the parties are required to procure their own employees' attendance at trial. See id. The defendant, however, does not have to allege that the witnesses actually will be unavailable for trial to establish the necessary lack of "convenience." Mentor Graphics, 77 F. Supp. 2d at 511 (noting that, if availability of a witness "cannot be guaranteed" in the present forum, this fact weighs in favor of transfer). See also Continental, 61 F. Supp. 2d at 132, 132 n. 8 (ruling that, because five witnesses were located in the forum to which the defendant sought transfer, while [*14] the current forum only contained one witness, the convenience of witnesses factor weighed in favor of transfer).

Defendants assert that three material non-party fact witnesses are located in Georgia. No representations have been made regarding witnesses located in Delaware. Although Plaintiff points out that two of these three witnesses would be subject to Rule 30(b)(6) deposition notices, this is not the equivalent to witnesses being subject to compulsory process in this forum. See United States v. Ismaili, 828 F.2d 153, 171 (3d Cir.

1987) (recognizing the difference between a witness being subject to the court's subpoena power and her availability for purposes of a deposition). In view of the location in Georgia of three non-party fact witnesses, the Court concludes that this factor weighs strongly in favor of transfer.

4. Location of Books and Records

Defendants concede that, while all the books and records relevant to the case are located in Atlanta, Georgia, they would be capable of being produced if this case is tried in Delaware. (D.I. 16 at 11). Therefore, the Court concludes that this factor weighs neither for nor against transfer.

5. Enforceability of [*15] a Judgment

Both parties concede that a judgment in this District or in the Northern District of Georgia would be equally enforceable. Thus, the Court concludes this factor weighs neither for nor against transfer.

6. Practical Considerations that Could Make the Trial Easy, Expeditious, or Inexpensive

Defendants argue that, because MM&M has filed a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) (D.I. 22), this fact weighs in favor of transfer. (D.I. 16 at 17). Plaintiff responds by arguing that MM&M is clearly subject to this Court's jurisdiction and Defendants' assertions to the contrary are frivolous.

The Court has previously ruled that, without expressing any opinion on the merits of a motion to dismiss for lack of personal jurisdiction, [HN7] if a transfer of venue would eliminate a jurisdictional question and thus save judicial resources, such fact weighs in favor of transfer. See Mentor Graphics, 77 F. Supp. 2d at 512, 513 n.10. Even if Plaintiff ultimately prevails on the jurisdictional issue, it is not clear to the Court at this time that MM&M's motion to dismiss lacks merit. n4 If MM&M's motion to dismiss [*16] has merit, a transfer of venue would avoid duplicitous litigation and save both parties substantial time and money. In these circumstances, the Court finds that the practical considerations involved in resolving this issue weigh in favor of transfer.

n4 It is possible that an evidentiary hearing would be needed to determine the extent of MM&M's contacts with Delaware before the Court could rule on this issue.

7. The Relative Administrative Difficulty in the Two Fora Resulting from Court Congestion

Defendants have submitted statistics indicating that the average length of time to trial in this District is 19 months, while the average length of time to trial in the Northern District of Georgia is 23 months. (D.I. 16). Plaintiff further observes that under Local District Court Rule 16.2, Delaware's Civil Justice Expense and Delay Reduction Plan, and the Civil Justice Reform Act of 1990, trials in this District are supposed to commence within 12 to 18 months after a complaint is filed. (D.I. 24 at 19). The Court [*17] has previously ruled that a two month average difference in respective times to trial among the two fora weighs against transfer "only slightly." Affymetrix, 28 F. Supp. 2d at 206. The Court has previously found that a nine month differential was only minimally significant due to the fact that the duration of time to trial varies greatly among different types of cases and can be affected by many different factors. Mentor Graphics, 77 F. Supp. 2d at 513-14. The Court finds the data in support of each side's argument demonstrates that this factor is insignificant in the Court's balancing, and therefore, the Court concludes this factor has no impact on the transfer analysis.

8. Local Interest in Deciding Local Controversies at Home

Defendants argue that the Northern District of Georgia has a significant interest in deciding this controversy because (1) Defendants' principal places of business are located in Georgia, (2) all of the relevant conduct occurred in Georgia, and (3) the contract involved is governed by Georgia law. (D.I. 16 at 14). Plaintiff responds by relying on Banco Nominees Ltd. v. Iroquois Brands, Ltd., 748 F. Supp. 1070 (D. Del. 1990) [*18] to demonstrate that Delaware has a strong interest in ensuring its corporations adhere to their contractual obligations. (D.I. 24 at 19). In the Banco case, the Court recognized Delaware's interest, but concluded that Delaware's interest was "greatly outweighed" by the other forum's (i.e., England's) interest in resolving a dispute between entities located within its borders and where all the relevant facts occurred. Banco, 748 F. Supp. at 1077. Further, the Banco Court concluded that the only connection the case had to Delaware was that the defendant was incorporated there, and that this connection alone did not override England's interest in resolving the matter. Id.

The facts in the present case are similar to those in Banco, and the Court concludes that Georgia's interest in resolving this action outweighs Delaware's interest in resolving it. See also Lopez v. Consolidated Rail Corp., 1997 U.S Dist. LEXIS 15267, 1997 WL 633752, at *2 (E.D. Pa. Sept. 30, 1997) (noting that the public interest is best served when a jury is composed of citizens "drawn from the community where the plaintiff resides and works, the incident occurred, and the defendant is an employer"). [*19] Thus, the Court concludes that the local interest weighs in favor of transfer.

9. Public Policies of the Fora

Defendants argue that denying transfer in this case would only "encourage forum shopping of the worst kind." (D.I. 16 at 14). The Court, however, is not persuaded that Plaintiff's choice of forum violates any public policy concerns. Defendants' only assertion implicating any public policy is that Plaintiff chose to litigate in Delaware solely to drive up Defendants' litigation costs. (D.I. 16 at 15). Plaintiff, however, has articulated other legitimate reasons for its choice of forum, such as litigating in a forum closer to Plaintiff's counsel and litigating in a forum in which cases proceed more quickly. (D.I. 24 at 20). On this record, the Court concludes that this factor does not weigh for or against transfer.

10. Trial Judge's Familiarity with the Applicable State Law

Plaintiff argues that the governing Georgia law is relatively straight forward and should not be problematic for the Court to apply. (D.I. 24 at 20). However, the District Court for the Northern District of Georgia is obviously more familiar with Georgia state law. Therefore, the Court concludes this factor [*20] weighs in favor of transfer, although only slightly, due to the lack of complexity of the relevant legal issues. See Continental, 61 F. Supp. 2d at 132-33 (concluding that, because the legal issues were straight-forward, this factor weighed neither for nor against transfer).

C. Balancing the Factors

Balancing all of Jumara's factors, as modified by subsequent rulings, the Court concludes that this case should be transferred to the Northern District of Georgia. The Court finds that the factors weighing strongly in favor of transfer include: (1) convenience of the witnesses, (2) practical considerations regarding MM&M's motion to dismiss for lack of personal jurisdiction, and (3) Georgia's interest in resolving the controversy. Factors that weigh slightly in favor of transfer include: (1) the collective convenience of the parties, and (2) the Georgia Court's familiarity with the applicable Georgia law. Meanwhile, no factors weigh against transfer. Therefore, the Court concludes that transfer is warranted under the circumstances presented here.

CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Transfer Action to United [*21] States District Court, Northern District of Georgia Pursuant to 28 U.S.C. § 1404(a) (D.I. 15).

An appropriate Order will be entered.

2000 U.S. Dist. LEXIS 22077, *

**ORDER**

At Wilmington this 14 day of November, 2000, for the reasons set forth in the Memorandum Opinion issued this date, IT IS HEREBY ORDERED that Defendants' Motion to Transfer Action to United States District Court, Northern District of Georgia Pursuant to 28 U.S.C. § 1404(a) (D.I. 15) is GRANTED.

Joseph J. Farnan

UNITED STATES DISTRICT JUDGE

# EXHIBIT 14

LEXSEE

**TRILEGIANT LOYALTY SOLUTIONS, INC. Plaintiff, v. MARITZ, INC., Defendant.**

**Civil Action No. 04-360 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2005 U.S. Dist. LEXIS 2825**

**February 15, 2005, Decided**

**SUBSEQUENT HISTORY:** Motion denied by, Motion granted by, in part, Motion denied by, in part *Affinion Loyalty Group, Inc. v. Maritz, Inc., 2006 U.S. Dist. LEXIS 32311 (D. Del., May 22, 2006)*

**DISPOSITION:** Defendant's Motion To Transfer was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant company moved to transfer a patent infringement case under 28 U.S.C.S. § 1404(a).

**OVERVIEW:** Plaintiff patentee alleged patent infringement arising from the company's development and operation of online incentive programs. The court concluded that a transfer was not warranted. The court gave paramount consideration to the patentee's decision to file the case in the instant forum, Delaware; the patentee was a Delaware corporation. Private and public interest factors did not strongly favor a transfer to Missouri. As for private interest factors, neither party would be unduly burdened by litigating in Delaware, the company did not contend the books and records could not be produced in Delaware, and each party was able to procure the attendance of its own employees. The additional expense the company might incur by litigating in Delaware was substantially outweighed by private interest considerations. As for the public interest, the company did not argue that congestion of Delaware courts strongly favored a transfer; further, that the alleged infringement occurred in Missouri did not strongly favor a transfer, as patent rights alone did not give rise to a local controversy or implicate local interests.

**OUTCOME:** The motion to transfer was denied.

**CORE TERMS:** litigating, fora, convenience, litigate, unavailable, principal place of business, lawsuit, non-party, weigh, patent, legitimate reason, court congestion, prevail, venue, turf, patent infringement, local interest, paramount, inventor

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN1] See 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > General Overview*
[HN2] Courts in the Third Circuit apply the Jumara public and private interest factors to decide if they should order a transfer. The private interests include: (1) the plaintiff's forum preference; (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties; (5) the convenience of the witnesses--but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of books and records--but only to the extent that the documents may be unavailable for trial in one of the fora. The public interests include the enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting from court congestion, the local interest, and the public policies of the fora.

*Business & Corporate Law > Corporations > Formation > Place of Incorporation > Principal Office*

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*

[HN3] Ordinarily, a court will give paramount consideration to a plaintiff's choice of forum. However, absent a legitimate, rational reason, if the plaintiff chooses to litigate away from his or her "home turf," the defendant's burden is lessened. Under 28 U.S.C.S. § 1404(a), "home turf" refers to a corporation's principal place of business. A corporation's decision to incorporate in a particular state is a rational and legitimate reason to choose to litigate in that state.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Patent Law > Ownership > Employee Inventions & Shop Rights*

[HN4] In the context of a motion to transfer, a court should consider the location of books and records only to the extent that the files could not be produced in the alternative forum.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Patent Law > Ownership > General Overview*

[HN5] Rights relating to patents are not local or state matters. Therefore, patent rights do not alone give rise to a local controversy or implicate local interests.

**COUNSEL:** [*1] Jack B. Blumenfeld, Esquire, and Rodger D. Smith II, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware.; Of Counsel: Steven Lieberman, Esquire, Sharon L. Davis, Esquire, and R. Elizabeth Brenner, Esquire, of ROTHWELL, FIGG, ERNST & MANBECK, P.C., Washington, D.C, for Plaintiff.

Rudolf E. Hutz, Esquire, and Patricia Smink Rogowski, Esquire, of CONNOLLY BOVE LODGE & HUTZ LLP, Wilmington, Delaware.; Of Counsel: J. Bennett Clark, Esquire, Jennifer E. Hoekel, Esquire, and Marc W. Vander Tuig, Esquire, of SENNIGER POWERS, St. Louis, Missouri, for Defendant.

**JUDGES:** Farnan, District Judge.

**OPINION BY:** JOSEPH J. FARNAN, JR.

**OPINION:**

### MEMORANDUM OPINION

February 15, 2005
Wilmington, Delaware

Farnan, District Judge.

Presently before the Court is the Motion To Transfer Under 28 U.S.C. § 1404(a) (D.I. 13) filed by Defendant Maritz, Inc. ("Maritz"). For the reasons discussed, Maritz's Motion To Transfer will be denied.

### BACKGROUND

Plaintiff Trilegiant Loyalty Solutions, Inc. ("Trilegiant") initiated this lawsuit in this Court alleging patent infringement arising from Defendant Maritz's development and operation of online incentive [*2] programs. Trilegiant is incorporated in Delaware, and has its principal place of business in Richmond, Virginia. Maritz is a Missouri corporation with its principal place of business in Fenton, Missouri.

### PARTIES' CONTENTIONS

By its motion, Maritz contends that a transfer to the Eastern District of Missouri is appropriate in this case pursuant to the factors identified in Jumara v. State Farm Insurance Co., 55 F.3d 873 (3d Cir. 1995). Maritz contends that both the private and public interests favor a transfer to Missouri. With regard to the private interests, Maritz contends that none of the parties has a presence in Delaware, and that transfer to the Eastern District of Missouri would not significantly change the burden Trilegiant already bears by virtue of choosing Delaware. Maritz further contends that party witnesses and potential non-party witnesses appear to be located far from Delaware. Maritz also contends that accused activities likely took place in Missouri and that relevant documents are not likely to be located in Delaware. With regard to the public interests, Maritz contends that none of the interests involved in this lawsuit are unique to Delaware [*3] and that Missouri is the more practical venue for this lawsuit. Maritz did not address the following factors: 1) likelihood of an enforcement problem; 2) administrative difficulty in the two fora resulting from court congestion, and 3) familiarity with applicable state law.

In response, Trilegiant claims that its choice to bring suit in Delaware is entitled to substantial deference because Trilegiant chose to litigate in Delaware for several rational and legitimate reasons. Trilegiant contends that it sought the benefits of Delaware law by incorporation in this state. Trilegiant further contends that Magistrate Thyne mediated a previous case that involved two of the three patents in this suit. With regard to the convenience of the parties and witnesses, Trilegiant contends that Delaware is more convenient than Missouri for it and the inventor, Mr. Storey. Trilegiant stresses the Delaware Court has subpoena power over potential third-party Delaware corporations that would make access to documents easier in Delaware than in Missouri.

### DISCUSSION

Page 2

## I. Legal Standard

Maritz moves for a transfer to the Eastern District of Missouri pursuant to 28 U.S.C. § 1404(a). [*4] Section 1404(a) is the general transfer statute that provides, [HN1] "For the convenience of the parties and the witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought." [HN2] Courts in the Third Circuit apply the public and private interest factors outlined in Jumara v. State Farm Insurance Co., 55 F.3d 873 (3d Cir. 1995), to decide if they should order a transfer. The private interests outlined in Jumara include: (1) Plaintiff's forum preference; (2) Defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties; (5) the convenience of the witnesses--but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of books and records--but only to the extent that the documents may be unavailable for trial in one of the fora. Id. at 879 (citations omitted).

The public interests include "the enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting [*5] from court congestion, the local interest ..., [and] the public policies of the fora." Id.

Maritz bears the burden of establishing the need for transfer. Id.

## II. Analysis

### A. Whether Plaintiffs' Choice Of Forum Is Entitled To "Paramount Consideration"

[HN3] Ordinarily, a court will give "paramount consideration" to a plaintiff's choice of forum. See Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970). However, absent a legitimate, rational reason, if the plaintiff chooses to litigate away from his or her "home turf," the defendant's burden is lessened. Waste Distillation Tech., Inc. v. Pan Am. Res., Inc., 775 F. Supp. 759, 764 (D. Del. 1991). Under Section 1404(a), "home turf" refers to a corporation's principal place of business. Id. A corporation's decision to incorporate in a particular state is a rational and legitimate reason to choose to litigate in that state. Stratos Lightwave, Inc. v. E2O Communs., Inc., 2002 U.S. Dist. LEXIS 5653, C.A. No. 01-309 JJF, 2002 WL 500920 at *2 (D. Del. March 26, 2002).

Applying these principles to the circumstances in this case, the Court will give "paramount consideration" to Trilegiant's decision [*6] to file the instant action in Delaware. Trilegiant is a Delaware corporation. As the Court observed in Stratos, a corporation's decision to incorporate in a state is a rational and legitimate reason to file an action in that forum. 2002 U.S. Dist. LEXIS 5653, 2002 WL 500920 at *2. Therefore, to prevail on its Motion, Maritz must demonstrate that the Jumara factors strongly favor a transfer to Missouri.

### B. Whether The Private Interests Strongly Favor Transfer

Although the claim arose and Maritz has its principal place of business in Missouri, I conclude that these factors, along with the remaining Jumara private interest considerations, do not strongly favor a transfer to Missouri.

First, I conclude that the convenience of the parties does not favor venue in Missouri over Delaware. Neither party would be unduly burdened by litigating this action in Delaware. See Pennwalt Corp. v. Purex Inds., Inc., 659 F. Supp. 287, 290 (D. Del. 1986) (taking into account the burden a small company would encounter in litigating an action in a jurisdiction where it did not reside). Maritz's annual sales approximate $ 1.4 billion (D.I. 16 App. D) and Trilgiant chose to litigate in [*7] Delaware. Therefore, I conclude that litigating this action in Delaware will not "place a significant and onerous burden" on either party. Pennwalt, 659 F. Supp. at 290.

Next, although Maritz contends that the books and records necessary to litigate this action are in Missouri, Maritz does not contend that they could not be produced or would be unavailable in Delaware. Therefore, I do not consider the location of the books and records as weighing in favor of a transfer to Missouri. See Jumara, 55 F.3d at 879 (indicating that [HN4] a court should consider the location of books and records only to the extent that the files "could not be produced in the alternative forum").

Further, party witnesses or witnesses who are employed by Maritz or Trilegiant carry no weight in the "balance of convenience" analysis since each party is able to procure the attendance of its own employees. See Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192, 203 (D. Del. 1998). With respect to Mr. Storey, the inventor of the patents-in-suit and a non-party witness, Maritz does not contend that he would be unavailable for trial in Delaware, and Maritz has provided [*8] the Court with no evidence that Mr. Storey, would be unwilling to testify on its behalf. Accordingly, I give little weight to Mr. Storey's status as a non-party witness and residence outside of Delaware.

Finally, although I appreciate the additional expense that Maritz may incur as a result of litigating in Delaware, I find that this hardship is substantially outweighed by the private interest considerations.

C. Whether The Public Interests Strongly Favor Transfer

I also conclude that the public interests do not weigh strongly in favor of a transfer to Missouri. Maritz did not argue that the congestion of the Delaware courts strongly favors a transfer. Further, there is no strong local interest in litigating this action in Missouri. The instant action is a patent infringement case, and, as the Court held in Stratos, [HN5] rights relating to patents are not local or state matters. Stratos, 2002 U.S. Dist. LEXIS 5653, 2002 WL 500920 at *2. Therefore, patent rights do not alone give rise to a local controversy or implicate local interests. Id. Accordingly, I conclude that the fact that the alleged infringement occurred in Missouri does not weigh strongly in favor of transferring the instant [*9] action.

In addition, I find that the Jumara factor that requires examining the difficulty in enforcing a judgment, were Trilegiant to prevail in the Delaware litigation, does not weigh in favor or against a transfer because there has been no dispute in either state over in personam jurisdiction.

**CONCLUSION**

Based upon Trilegiant's decision to file the instant lawsuit in Delaware and the absence of strong private or public interests favoring transfer to Missouri, I conclude that the Jumara factors do not strongly favor a transfer of the instant action under 28 U.S.C. § 1404(a). Accordingly, I will deny Maritz's Motion.

An appropriate Order will be entered.

**ORDER**

At Wilmington, this 15th day of February 2005, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that the Motion To Transfer (D.I. 13) filed by Defendant is **DENIED.**

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE