## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

| | |
|---|---|
| ZF MERITOR LLC and MERITOR TRANSMISSION CORPORATION, ) ) ) ) | |
| Plaintiffs, ) ) | Civil Action No. 06-623-SLR |
| v. ) ) | |
| EATON CORPORATION, ) ) | |
| Defendant. ) ) | |

## PLAINTIFFS ZF MERITOR LLC AND MERITOR TRANSMISSION CORPORATION'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Charles M. Oberly, III (No. 743)
Karen V. Sullivan (No. 3872)
OBERLY, JENNINGS & RHODUNDA, P.A.
1220 Market Street, Suite 710
P.O. Box 2054
Wilmington, DE 19899
(302) 576-2000 (Tel)
(302) 576-2004 (Fax)

R. Bruce Holcomb
Christopher H. Wood
Charles E. Luftig
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006-5403
(202) 420-2200 (Tel)
(202) 420-2201 (Fax)

Attorneys for Plaintiffs
ZF Meritor LLC and
Meritor Transmission Corporation

Dated: December 11, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ii

PRELIMINARY STATEMENT ......................................................................1

NATURE AND STAGE OF PROCEEDINGS ...................................................4

SUMMARY OF ARGUMENT........................................................................5

STATEMENT OF FACTUAL ALLEGATIONS ................................................6

I.      Relevant Transmission Markets ....................................................6

II.     The Four Truck Manufacturers And Truck Sales .............................7

III.    ZF Meritor's Emergence As An Eaton Rival In The Linehaul Market..................7

IV.     Eaton's Exclusionary Conduct ......................................................8

        A.      Eaton's Exclusive Dealing Contracts With The Four OEMs .....................8

        B.      Eaton Supplemented Its Unlawful Contracts With Other Exclusionary Acts .................................................................9

V.      Eaton's Conduct Forced Meritor And ZF Meritor From The Linehaul Market And Barred Entry Into The Vocational Market, Injuring Competition................10

ARGUMENT...............................................................................................11

I.      The Complaint Alleges Antitrust Injury.................................................12

II.     Eaton Mischaracterizes The Complaint And Improperly Draws Inferences In Its Favor ...............................................................................................15

        A.      The Complaint Alleges Exclusionary Conduct That Violated The Antitrust Laws, Not That Eaton Benignly Lowered Prices .....................15

        B.      The Complaint Alleges Injury To Consumers In The Form Of Higher Prices And Otherwise ...............................................................20

        C.      The Complaint Alleges That Eaton Has Eliminated Competition In The Linehaul And Vocational Transmission Markets..............................22

III.    The Complaint Was Timely Filed ........................................................23

CONCLUSION.............................................................................................28

# TABLE OF AUTHORITIES

Page

**Cases**:

Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939 (3d Cir. 1985) .........................11

Arthrocare Corp. v. Smith & Nephew, Inc., No. Civ. 01-504-SLR, 2004 WL
    896002 (D. Del. Mar. 10, 2004) ...................................................................11, 12

Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997)...........................11, 12

Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp., 613 F.2d 727 (9th Cir.
    1979) .................................................................................................................20

City of El Paso v. Darbyshire Steel Co., 575 F.2d 521 (5th Cir. 1978) ...........................23

Davis v. Grusemeyer, 996 F.2d 617 (3d Cir. 1993) .........................................................21

Eichorn v. AT&T Corp., 248 F.3d 131 (3d Cir. 2001) .....................................................12

Friedman, Inc. v. Thorofare Mkts. Inc., 587 F.2d 127 (3d Cir. 1978).............................23

Fuentes v. S. Hills Cardiology, 946 F.2d 196 (3d Cir. 1991) .......................................5, 12

Gill v. Del. Park, LLC, 294 F. Supp. 2d 638 (D. Del. 2003)..................................5, 12, 19

Glaberson v. Comcast Corp., No. Civ. 03-6604, 2006 WL 2559479
    (E.D. Pa. Aug. 31, 2006) ...................................................................................21

Greater Providence MRI Ltd. P'ship v. Med. Imaging Network of S. New
    England, Inc., 32 F. Supp. 2d 491 (D.R.I. 1998) ........................................18

Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481 (1968).......................6, 23

Harrison Aire, Inc. v. Aerostar Int'l, Inc., 316 F. Supp. 2d 186 (E.D. Pa. 2004) ..............24

In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144 (3d Cir. 1993) ...............23

In re Warfarin Sodium Antitrust Litig., 214 F.3d 395 (3d Cir. 2000) ...............................14

J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc., No: 1:01CV704, 2005 WL 1396940
    (S.D. Ohio June 13, 2005) .................................................................................18

Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d
    1045 (5th Cir. 1982) ..........................................................................................23

Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406 (3d Cir. 1991) ...............................12

Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997) .............................................................24

LePage's, Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003) ..................................................2, 15, 16

Midwestern Mach. Co. v. Northwest Airlines, Inc., 392 F.3d 265 (8th Cir. 2004)...........24

Poster Exch., Inc. v. Nat'l Screen Service Corp., 517 F.2d 117 (5th Cir. 1975)...............24

R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362 (M.D.N.C.
    2002) .................................................................................................................18

DSMDB-2177451v01

<u>Roland Mach. Co. v. Dresser Indus., Inc.</u>, 749 F.2d 380 (7th Cir. 1984).........................19

<u>SmithKline Corp. v. Eli Lilly & Co.</u>, 575 F.2d 1056 (3d Cir. 1978)................................16

<u>Synopsys, Inc. v. Magma Design Automation, No. C.A. 05-701</u>, 2006 WL
    1452803 (D. Del. May 25, 2006)..................................................................12

<u>Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.</u>, 140 F.3d 478
    (3d Cir. 1998)........................................................................................11

<u>United States v. Dentsply Int'l, Inc.</u>, 399 F.3d 181 (3d Cir. 2005) .....................12, 16, 17

<u>United States v. Microsoft Corp.</u>, 253 F.3d 34 (D.C. Cir. 2001).....................................18

<u>Xechem, Inc. v. Bristol-Myers Squibb Co.</u>, 372 F.3d 899 (7th Cir. 2004) ......................24

<u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321 (1971) .................5, 21, 23

**<u>Statutes and Rules</u>**:

15 U.S.C. § 15b (2006) ...............................................................................................5, 21

DSMDB-2177451v01

## PRELIMINARY STATEMENT

Defendant Eaton Corporation seeks dismissal of Plaintiffs' Complaint because, according to Eaton: "Plaintiffs here have entirely failed to allege harm to the competitive process." (Eaton Br. 11.)[1]  The absurdity of this statement is evident to anyone who reads the Complaint, which, on its second page, alleges "Eaton undertook a series of exclusionary actions designed to reduce consumer access to ZF Meritor transmissions" and that among these, "Eaton used its dominant position to induce all heavy duty truck manufacturers to enter into de facto exclusive dealing contracts with Eaton" that "foreclosed ZF Meritor from over 90% of heavy duty transmission sales."  (Compl. ¶ 3.)  The paragraph continues, "As a direct result of Eaton's unlawful contracts and other exclusionary conduct, Eaton has gained, maintained, and/or extended its monopoly power in North American markets for heavy duty transmissions . . . ."  (Id.)

After explicitly detailing Eaton's exclusionary conduct, paragraph 75 of the Complaint catalogues various antitrust injuries caused by that conduct.  While we normally refrain from quoting at great length, paragraph 75's unambiguous allegations of harm to competition merit such treatment here:

> The foregoing anticompetitive conduct by Eaton, individually and in coordination with the OEMs, has directly and proximately harmed competition by limiting consumer choice, eliminating competitive checks on pricing, suppressing innovation, and foreclosing an efficient and significant competitor from the markets for Class 8 Transmissions.  Meritor and ZF Meritor have been excluded from the market for linehaul transmissions, and they

---

[1] Plaintiffs are ZF Meritor LLC and Meritor Transmission Corporation (collectively, "ZF Meritor").

have been deterred from undertaking investments in technology and products that would have threatened Eaton's monopoly in the market for vocational transmissions. If Meritor and ZF Meritor had not been foreclosed, competition would have intensified, and consumers would have benefited from lower prices for transmissions sold by Eaton, as well as those sold by Meritor and ZF Meritor. Instead, Eaton's conduct led to downstream customers being monetarily penalized and excluded from warranty programs if they purchased Meritor or ZF Meritor transmissions, and deprived of fair and timely access to ZF Meritor's advanced transmission technology, including but not limited to, Meritor's Engine Synchro Shift transmission system and North America's first two-pedal, fully automated manual transmissions.

Paragraphs 76 and 77 subsequently describe, in similar detail, how Eaton's anticompetitive conduct "caused antitrust injury" to Plaintiffs.

There is no question that a series of exclusionary acts by a monopolist to foreclose over 90% of a market and drive out a meaningful competitor unlawfully tampers with and impairs the competitive process and injures competitors. See LePage's, Inc. v. 3M, 324 F.3d 141, 159 (3d Cir. 2003) ("When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e., predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general."). Rather than accept these allegations as true and the consequent sufficiency of Plaintiffs' antitrust injury claims, Eaton resorts to mischaracterizing the Complaint (and, at times, the law) in at least three ways.

First, the Complaint alleges Eaton gained or maintained its monopoly power in the relevant transmission markets by, among other acts, "enter[ing] into de facto exclusive contracts with each of the four OEMs," as well as "eliminat[ing] ZF Meritor

DSMDB-2177451v01

from data book listings," and "link[ing] rebates on vocational transmissions for which it faced no meaningful competition" to the "purchase of linehaul transmissions for which Eaton faced competition from Meritor."  (Compl. ¶¶ 48, 49, 68.)  Yet, Eaton says the Complaint only alleges that Eaton simply "<u>lowered</u> prices to obtain more business." (Eaton Br. 2, 12 (emphasis in original).)  These statements cannot be reconciled with the allegations of the Complaint.

Second, the Complaint alleges that Eaton's conduct caused consumers to pay more for transmissions.  For instance, paragraph 75, quoted above, states that absent Eaton's conduct "consumers would have benefited from lower prices" and that "Eaton's conduct led to downstream customers being monetarily penalized," while paragraphs 91 and 96 state that Eaton's conduct "depriv[ed] consumers of . . . lower prices" for linehaul and vocational transmissions.  Despite these allegations, Eaton says the Complaint "does not allege . . . higher prices . . . ."  (Eaton Br. 17.)  Regardless, Eaton's contention fails to recognize that an allegation of increased prices is not the only way to plead antitrust injury.  The requirement may be satisfied by alleging a broader array of competitive harm, which Plaintiffs do at length.

Third, the Complaint alleges that "Meritor, other than marketing the FreedomLine, will exit the business in January 2007" and that Eaton is a monopolist in the linehaul and vocational markets, facing essentially no competition.  (Compl. ¶¶ 21, 23, 74.)  The Complaint does not allege that General Motors is in those markets. According to Eaton, however, there is a transmission "market" with five competitors, including General Motors and, despite a change in corporate relationships, "Meritor and

DSMDB-2177451v01

ZF are in the market in the same way they have always been in it." (Eaton Br. 15.)
These, and Eaton's other quoted assertions above, are not only factually inaccurate, but
impermissible for purposes of a Rule 12 motion; taking this type of liberty with the
allegations of a complaint cannot form the grounds for dismissal.

Eaton also seeks dismissal under the four-year statute of limitations. The
argument has no basis because the Complaint alleges injurious acts within the limitations
period, including the execution of one of the four de facto exclusive dealing contracts
Eaton entered into with the key truck manufacturers. Moreover, the Complaint describes
a continuing violation of the antitrust laws – it maps out Eaton conduct, beginning in the
1990s and continuing into the limitations period, involving a host of exclusionary,
injurious acts designed to drive ZF Meritor from the markets for linehaul and vocational
transmissions. The statute of limitations period restarted with each of Eaton's injurious
acts.

Eaton's motion must be denied in its entirety.

## NATURE AND STAGE OF PROCEEDINGS

On October 5, 2006, ZF Meritor LLC and Meritor Transmission Corporation filed
a lawsuit in this Court against Defendant Eaton Corporation. On October 26, 2006, the
Court approved the parties' stipulation to extend the time for Eaton to respond to the
Complaint. On November 22, 2006, Eaton filed a Motion to Dismiss and a Motion to
Transfer.

DSMDB-2177451v01

This Brief is submitted in opposition to Eaton's Motion to Dismiss. Concurrently with this submission, Plaintiffs also have submitted a brief in opposition to Eaton's Motion to Transfer.

## <u>SUMMARY OF ARGUMENT</u>

1. Antitrust Injury. Plaintiffs have alleged facts sufficient to demonstrate antitrust injury. Antitrust injury is pled properly when a plaintiff alleges that it was excluded from a market, with the result being decreased competition. <u>See, e.g.</u>, <u>Gill v. Del. Park, LLC</u>, 294 F. Supp. 2d 638, 644 (D. Del. 2003) (citing <u>Fuentes v. S. Hills Cardiology</u>, 946 F.2d 196, 202 (3d Cir. 1991)). Plaintiffs allege two relevant product markets, that they entered or sought entry into those markets, and that Defendant engaged in exclusionary conduct detailed in the Complaint that excluded Plaintiffs from those markets and forced their exit from the business. This reduced competition and caused a variety of other harms to consumers.

2. Statute of Limitations. Plaintiffs timely filed the Complaint. A cause of action accrues when a defendant commits an injurious act that injures the plaintiff. <u>See</u> <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 338 (1971). From the date of injury, the plaintiff has four years to file its action. 15 U.S.C. § 15b (2006). Plaintiffs allege a number of injurious acts by the Defendant within the applicable four-year period. In addition, Plaintiffs allege that Defendant engaged in a scheme to exclude it from the relevant markets, spanning several years and including injurious acts within and outside of the limitations period that caused Plaintiffs accumulating harm. This conduct constitutes a continuing violation that starts the limitations clock anew with each injury.

DSMDB-2177451v01

See, e.g., Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15 (1968) (finding antitrust statute of limitations does not expire when a defendant engages in a "continuing violation … which inflict[s] continuing and accumulating harm on [the plaintiff].").

## STATEMENT OF FACTUAL ALLEGATIONS

### I.    RELEVANT TRANSMISSION MARKETS

This case concerns transmissions used in heavy-duty trucks, and other "Class 8" vehicles, which serve a wide array of applications. (Compl. ¶ 18.) There are three Class 8 transmission markets: linehaul, vocational, and specialty. (Id. ¶ 19.) Linehaul transmissions are used in tractor trailers (sometimes called "18 wheelers") that carry freight long distances between stops. (Id. ¶ 20.) Transmissions used for linehaul applications are 9 and 10 speed manuals, and automated manuals. (Id.) Vocational transmissions are found in heavy-duty trucks that operate in rugged performance environments (e.g., construction vehicles and heavy equipment haulers). (Id. ¶ 22.) Transmissions used for vocational applications include 13, 15, 18 and LL multi-speed manual transmissions. (Id.) In the markets for Class 8 transmissions, roughly 70% of the transmissions are linehaul transmissions, while 26% are vocational. ( Id. ¶¶ 20, 22.)[2] The relevant geographic market for linehaul and vocational transmissions is North America, where entry barriers are high. (Id. ¶¶ 26, 32.)

---

[2] The remaining 4% are specialty transmissions, used in "stop and start" vehicles (e.g., delivery and fire trucks). (Compl. ¶ 24.) Specialty transmissions are almost always automatic transmissions. (Id.)

## II.    THE FOUR TRUCK MANUFACTURERS AND TRUCK SALES

The four heavy-duty truck original equipment manufactures ("OEMs") –
Freightliner LLC ("Freightliner"), Volvo Trucks North America, Inc. and Mack Trucks,
Inc. ("Volvo/Mack"), Paccar Inc. ("Paccar"), and International Truck and Engine
Corporation ("International") – are the <u>only</u> direct purchasers of Class 8 transmissions.
(<u>Id.</u> ¶ 27.)  They sell trucks for linehaul and vocational uses to dealers and some large
truck fleets.  (<u>Id.</u> ¶ 28.)  In some instances, truck buyers specify the transmissions to be
installed in the trucks they purchase.  (<u>Id.</u> ¶ 28.)  Buyers select transmissions by
referencing OEM product data books.  (<u>Id.</u> ¶ 29.) Components listed as "standard" are
considered to be an OEM's preferred choice and more likely to be selected by a truck
buyer.  (<u>Id.</u>)  Manufacturers try to "pull through" transmission sales downstream by
enticing truck buyers, through monetary and non-monetary devices, to order a particular
transmission.  (<u>Id.</u> ¶ 31.)  When an OEM excludes a manufacturer's transmission from its
data book, prices the transmission with a material up charge, or otherwise places the
transmission at a competitive disadvantage, pull through marketing becomes
"considerably more costly and far less effective."  (<u>Id.</u>)

## III.    ZF MERITOR'S EMERGENCE AS AN EATON RIVAL IN THE LINEHAUL MARKET

Since the 1960s, Eaton has been the dominant supplier of heavy-duty manual
transmissions in North America.  (<u>Id.</u> ¶ 33.)  Meritor began selling linehaul transmissions
in 1989 in response to, among other things, customer demand for choice.  (<u>Id.</u> ¶¶ 35-36.)
In 1996, Meritor introduced transmission innovation that automatically synchronized

engine revolutions to road speed.  (Id. ¶ 37.)  This technology caused Eaton to "reduce the price of its automated products."  (Id.)  By 1999, Meritor's linehaul transmission market share had exceeded 20%.  (Id. ¶ 38.)  In June 1999, Meritor entered into a joint venture with ZF Friedrichshafen AG ("ZF"), combining ZF's global leadership in transmission technology with Meritor's strong North American marketing, service, distribution, and manufacturing presence.  (Id. ¶¶ 38-39.)  In the fall of 1999, ZF Meritor introduced the FreedomLine, North America's first two-pedal fully automated manual Class 8 transmission.  (Id. ¶ 42.)  The FreedomLine won a coveted industry award and high praise from customers.  (Id. ¶ 43.)  ZF Meritor's emergence, with standard or competitively priced optional position at the OEMs, an existing customer base, and introduction of the FreedomLine transmission (particularly in the absence of a two-pedal Eaton transmission) created a substantial competitive threat to Eaton.  (Id. ¶ 47.)

## IV.    EATON'S EXCLUSIONARY CONDUCT

### A.    Eaton's Exclusive Dealing Contracts With The Four OEMs

Between 2000 and the end of 2002, Eaton entered into long-term, de facto exclusive dealing contracts with each of the four truck manufacturers.  (Id. ¶¶ 48-67.)  Each contract, beyond entrenching Eaton transmissions as standard, contained bundled rebate provisions linking rebates on vocational transmissions for which Eaton faced no competition to rebates on purchases of linehaul transmissions for which Eaton faced competition.  (Id. ¶¶ 49, 57, 61, 65.)  To obtain maximum rebates, the four OEMs had to buy the vast majority (in three of four cases, more than 90%) of their linehaul and vocational transmissions from Eaton, to ZF Meritor's exclusion.  (Id.)  In addition to

Eaton's contract with Paccar, which withheld maximum rebates until Eaton's transmission penetration hit 95% (id. ¶ 61), each contract contained further exclusionary provisions:

- at Freightliner, the contract required ZF Meritor transmissions to be listed at a price penalty and then excluded from Freightliner's data book (id. ¶ 50);

- at Volvo/Mack, the contract required ZF Meritor transmissions to be priced at a penalty (id. ¶ 65);

- at International, the contract required ZF Meritor transmissions to be excluded from International's data book and prohibited from inclusion in International's warranty program on new truck models (id. ¶ 58).

In 2006, Eaton and International executed a contract whereby International would remove the FreedomLine from its data book and exclusively market Eaton's automated manuals. (Id.)

### B.    Eaton Supplemented Its Unlawful Contracts With Other Exclusionary Acts

From the inception of the exclusionary contracts "through the present," Eaton relied on the structure of its contracts, its market strength, and further coordination with the OEMs to induce OEM action designed to thwart ZF Meritor transmission sales and pull through marketing.  (Id. ¶¶ 68-69.)  These acts denied truck buyers access to ZF Meritor transmissions or penalized truck buyers if they purchased trucks containing ZF Meritor, rather than Eaton, transmissions.  (See id.)  Eaton also threatened OEMs with

price retaliation or unwarranted patent litigation if they purchased ZF Meritor's

transmissions, or licensed or sold transmission technology to Meritor.[3]  (Id. ¶¶ 36, 70.)

Further, Eaton acted to delay and disrupt the release of ZF Meritor's FreedomLine.  (Id.

¶ 70.)

## V.    EATON'S CONDUCT FORCED MERITOR AND ZF MERITOR FROM THE LINEHAUL MARKET AND BARRED ENTRY INTO THE VOCATIONAL MARKET, INJURING COMPETITION

Eaton's conduct vastly diminished ZF Meritor's transmission sales penetration at

each of the four OEMs (id. ¶¶ 55, 60, 62, 67), and had the practical effect of precluding

ZF Meritor from the markets for vocational and linehaul transmissions (id. ¶ 73).  Eaton's

dealings with the truck manufacturers and other acts severely crippled ZF Meritor's

linehaul pull through marketing and limited ZF Meritor's potential share of sales to the

OEMs to less than 10% of the markets for linehaul and vocational transmissions.  (Id.)

Further, Eaton blocked ZF Meritor's attempts to enter the vocational market in the

1990s and spring and summer of 2002 by locking the OEMs into long-term exclusive

contracts covering linehaul and vocational transmission supply, and threatening price

increases or unwarranted patent litigation if an OEM sold or licensed vocational

transmission technology to, or partnered with ZF Meritor to develop such technology.

(Id. ¶¶ 36, 64, 71.)

---

[3] Defendant states that ZF Meritor alleges Eaton filed unwarranted patent litigation against Plaintiffs.  (Eaton Br. 6 n.3.)  Eaton then proceeds to discuss two of these legal proceedings.  (Id. 6, 7.)  The Complaint, however, does not make reference to that litigation (or the other 100 or so patent claims Eaton has filed against ZF Meritor since 1997), but rather to threats of retaliation Eaton made against OEMs if they chose to do vocational transmission business with ZF Meritor.  (Compl. ¶¶ 36, 70.)

DSMDB-2177451v01

Today, Eaton has monopoly power in the markets for linehaul and vocational transmissions, holding shares from 90% to 95% or more in these markets.  (Id. ¶¶ 21, 23.) Forced out by Eaton's conduct, ZF Meritor no longer sells transmissions and Meritor will stop doing so in January 2007.  (Id. ¶¶ 72-74.)  Eaton's conduct has harmed competition, by, inter alia, "limiting consumer choice, eliminating competitive checks on pricing, suppressing innovation, and foreclosing an efficient and significant competitor from the markets for Class 8 Transmissions."  (Id. ¶ 75.)  Eaton's conduct caused antitrust injury to Meritor and ZF Meritor by, inter alia, excluding Meritor and ZF Meritor from the markets for linehaul and vocational transmissions.  (Id. ¶ 76.)

## ARGUMENT

In analyzing a motion to dismiss under Rule 12(b)(6), the court "must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff."  Arthrocare Corp. v. Smith & Nephew, Inc., No. Civ. 01-504-SLR, 2004 WL 896002, at *2 (D. Del. Mar. 10, 2004) (citing Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)).  The motion should be granted "only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint."  Trump Hotels, 140 F.3d at 483 (citation omitted).[4]  The "defendant has the burden of persuasion to show that no claim

---

[4] A "district court ruling on a motion to dismiss may not consider [except in rare circumstances not applicable here] matters extraneous to the pleadings."  Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (citing Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985)).  Defendant has attached numerous

has been stated." Arthrocare, 2004 WL 896002, at *2 (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)).  Eaton cannot meet its burden.

## I.    THE COMPLAINT ALLEGES ANTITRUST INJURY

A plaintiff claiming an antitrust violation must allege "antitrust injury that is causally related to the defendants' alleged illegal anti-competitive behavior." Gill v. Del. Park, LLC, 294 F. Supp. 2d 638, 643 (D. Del. 2003) (citing Eichorn v. AT&T Corp., 248 F.3d 131, 138 (3d Cir. 2001)).  Antitrust injury "is sufficiently pled where plaintiff alleges that he was excluded from participation in a particular market, and the result was a decrease in competition in that market." Gill, 294 F. Supp. 2d at 644 (citing Fuentes v. S. Hills Cardiology, 946 F.2d 196, 202 (3d Cir. 1991)); see also Synopsys, Inc. v. Magma Design Automation, No. C.A. 05-701, 2006 WL 1452803, at *2 (D. Del. May 25, 2006).  To establish exclusion, "it is not necessary that all competition be removed from the market.  The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." United States v. Dentsply Int'l, Inc., 399 F.3d 181, 191 (3d Cir. 2005).  The Complaint meets this standard.

The Complaint describes two relevant North American product markets: vocational transmissions and linehaul transmissions.  (Compl. ¶¶ 18-23, 26, 32.)  At one point, ZF Meritor sold over 20% of the transmissions in the linehaul market.  (Id. ¶¶ 1, 2,

___

exhibits to its motion.  These exhibits are not "integral to or explicitly relied upon in the complaint" and therefore should not be considered by this Court in ruling on Defendant's motion.  Burlington Coat Factory, 114 F.3d at 1426 (emphasis in original).  Regardless, even if considered by the Court, the materials do not advance Eaton's contentions, and in some instances, lend additional credence to ZF Meritor's allegations.

DSMDB-2177451v01

21, 35-46.)  The Complaint further alleges that ZF Meritor attempted to enter the vocational market.  (Id. ¶¶ 36, 64.)  Eaton's anticompetitive conduct, however, excluded ZF Meritor from 90% (or more) of both the linehaul and vocational transmission markets. (Id. ¶¶ 48-71.)

The Complaint alleges Eaton drove ZF Meritor from the marketplace, and injured competition; it includes over three pages of allegations under the heading "ZF Meritor Forced From The Markets, Injuring Competition, and ZF Meritor."  (Id. ¶¶ 72-78.)  For example:

- Eaton's anticompetitive conduct "had the practical effect of precluding ZF Meritor from selling linehaul and vocational transmissions to the OEMs" (id. ¶ 72);

- "Meritor and ZF began to dissolve ZF Meritor" and "[a]lthough ZF Meritor remains a legal entity, it no longer sells transmissions" (id. ¶ 73);

- Despite Meritor's efforts to remain in the marketplace, Eaton's conduct "has led to further decline in Meritor's sales," and "Meritor, other than marketing the FreedomLine, will exit the business in January 2007" (id. ¶ 74);

- Eaton "has directly and proximately harmed competition by limiting consumer choice, eliminating competitive checks on pricing, suppressing innovation and foreclosing an efficient and significant competitor" (id. ¶ 75);

-13-

- "[C]onsumers would have benefited from lower prices for transmissions," but instead, "Eaton's conduct led to downstream customers being monetarily penalized and excluded from warranty programs . . . and deprived of fair and timely access to ZF Meritor's advanced transmission technology" (id.); and

- Eaton "forc[ed] OEMs and downstream customers to purchase Eaton, instead of ZF Meritor, transmissions on grounds other than the merits" (id. ¶ 76).

Taken as true, these allegations plead antitrust injury.

## II.    EATON MISCHARACTERIZES THE COMPLAINT AND IMPROPERLY DRAWS INFERENCES IN ITS FAVOR

Eaton makes factual assertions not set forth in the Complaint and draws inferences in its own favor, which must be disregarded.  See In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 398 (3d Cir. 2000).

### A.    The Complaint Alleges Exclusionary Conduct That Violated The Antitrust Laws, Not That Eaton Benignly Lowered Prices

The Complaint alleges that Eaton engaged in a variety of exclusionary practices that eliminated competition from ZF Meritor.  It alleges that Eaton (1) threatened OEMs with price and/or patent litigation retaliation if those OEMs transacted transmission business with ZF Meritor (Compl. ¶¶ 36, 70); (2) disrupted and impeded ZF Meritor's launch and sales of its innovative two-pedal automated manual transmission (a transmission for which Eaton had no comparable offering) (id. ¶¶ 42, 70);

-14-

(3) coordinated, or otherwise induced OEM sales practices that effectively derailed ZF Meritor pull through marketing by obstructing truck buyer access to ZF Meritor transmissions and penalizing truck buyers if they selected ZF Meritor transmissions (id. ¶¶ 68-69); (4) bundled rebates on linehaul and vocational transmission purchases such that the four OEMs were forced to buy transmissions on grounds other than the merits (id. ¶¶ 49, 76); (5) required the exclusion of ZF Meritor transmissions from OEM data books and warranty programs (id. ¶¶ 50, 57); (6) mandated that OEMs charge more for ZF Meritor transmissions than Eaton transmissions (id. ¶¶ 31, 50, 58, 65); and (7) contractually conditioned discounts with each of the OEMs on de facto exclusivity in the relevant markets (id. ¶¶ 21, 23, 48, 73). Despite these allegations in the Complaint, Eaton repeatedly contends that it merely lowered prices. (Eaton Br. 1, 2, 8, 11, 12, 13, 14, 17.) It is not accepting the Plaintiffs' allegations as true.

The allegations recite anticompetitive conduct similar to, if not worse than, that condemned under the Sherman Act by the Third Circuit. In LePage's, 324 F.3d 141, defendant 3M had monopoly power in the market for transparent tape and engaged in two types of conduct that "could reasonably have been viewed as effectuating exclusive dealing arrangements because of the way in which they were structured." Id. at 154. First, 3M offered customers substantial rebates conditioned on purchases spanning 3M's product lines. These bundled rebates, when offered by a monopolist, "may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products." Id. at 155. Second, 3M conditioned discounts to large retailers on effectively obtaining sole-supplier status. Id. at 157-159. The Court of

DSMDB-2177451v01

Appeals found this practice unlawful because 3M was in a position to "force manufacturers to make an all-or-nothing choice." Id. at 158.[5]

The Complaint likewise alleges that a monopolist used bundled rebates and conditional discounts to foreclose competition. Eaton manufactured linehaul and vocational transmissions, while ZF Meritor manufactured only linehaul transmissions. (Compl. ¶¶ 21, 23.) To increase its sales of linehaul transmissions and exclude ZF Meritor from that market, Eaton entered into contracts with each of the OEMs that conditioned rebates and price reductions (including rebates not otherwise available on Eaton's premium-priced vocational transmissions) on the OEMs' purchase of a high percentage of their total vocational and linehaul transmission requirements from Eaton. (See, e.g., id. ¶¶ 49, 57 (92% penetration requirement at Freightliner; 87% to 95% penetration requirement at International).) By employing a rebate scheme that judged penetration based on aggregated purchases across two different markets (where linehaul purchases constituted over 70% of those purchases), Eaton ensured that the OEMs would not qualify for rebates on vocational transmissions, unless they purchased Eaton's, instead of ZF Meritor's, linehaul transmissions. (Id. ¶¶ 20, 49, 57, 61, 65.)

In Dentsply, 399 F.3d 181, the Court concluded that a manufacturer with market power in the false teeth market violated Section 2 by employing a distribution policy that amounted to exclusive dealing arrangements with key false teeth dealers. Id. at 196. The

---

[5] See SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1065 (3d Cir. 1978) (holding that linking sales and rebates for two products facing no competition with sales of a third product facing competition violated Section 2 because the "result was to sell all three products on a non-competitive basis in what would have otherwise been a competitive market" for the product facing competition).

DSMDB-2177451v01

dealers were the "gateways" to end-users: "the firm that ties up the key dealers rules the market." Id. at 190, 193. Accordingly, "Dentsply's grip on its . . . dealers effectively choked off the market for artificial teeth, leaving only a small sliver for competitors." Id. at 196. With nothing more than a sliver, competitors could not raise their sales to "the critical level necessary . . . to pose a real threat to Dentsply's market share." Id. at 191.

Similarly here, Eaton leveraged the four OEMs, the only distributors of Class 8 transmissions, to choke off ZF Meritor from the linehaul and vocational transmission markets. Eaton threatened OEMs with litigation and/or price retaliation if they did business with ZF Meritor beyond that deemed appropriate by Eaton. (Compl. ¶ 36.) Further, Eaton extracted contractual concessions from the OEMs that forced the OEMs to list Eaton's linehaul transmissions as "standard," charge more for ZF Meritor transmissions than Eaton transmissions, and prevented the OEMs from listing ZF Meritor transmissions in their data books or providing warranties on trucks containing ZF Meritor transmissions. (Id. ¶¶ 50, 57, 65.) Eaton also induced the OEMs to take additional actions (e.g., provide lower residuals on trucks containing ZF Meritor, as opposed to Eaton, transmissions) to limit the availability of ZF Meritor transmissions. (See, e.g., id. ¶¶ 50, 57, 65, 68-69.) All of this conduct defeated ZF Meritor's ability to sell its linehaul transmissions to the OEMs or get truck purchasers to specify its linehaul transmissions (i.e., "pull through" the product). (Id. ¶ 73.) These acts also prevented ZF Meritor's entry into the vocational transmission market – it would not be able to achieve scale in the vocational market necessary to compete. (Id. ¶ 71.) This is antitrust injury.

DSMDB-2177451v01

Moreover, the Complaint alleges Eaton maintained a market share of 90% or more in the linehaul and vocational transmission markets and took exclusionary actions to foreclose Plaintiffs from 90% (or more) of those markets.  (Id. ¶¶ 3, 21, 23.)  The antitrust laws routinely condemn much lower levels of market foreclosure, see, e.g., United States v. Microsoft Corp., 253 F.3d 34, 70 (D.C. Cir. 2001) (holding that Microsoft's exclusionary conduct violated Section 2 "even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a Section 1 violation"), and the significant foreclosure alleged here is more than sufficient to survive a motion to dismiss.  See, e.g., Greater Providence MRI Ltd. P'ship v. Med. Imaging Network of S. New England, Inc., 32 F. Supp. 2d 491, 495 (D.R.I. 1998) (denying motion to dismiss where plaintiff alleged 85% foreclosure from the relevant market because, "Whether defendants' contract forecloses competition and injures plaintiff is an issue that this Court can only decide with the more-sensitive tools of summary judgment or trial.").[6]

---

[6] Eaton's reference to two district court summary judgment rulings provides it no support. In each case, the court found the plaintiff had unfettered access to substantial portions of the relevant market and the alleged foreclosure caused by the defendant was significantly less than the 90% here.  See J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc., No: 1:01CV704, 2005 WL 1396940, at *5, *9,*10 (S.D. Ohio June 13, 2005) (ruling no "actual market foreclosure" where defendant's market share in relevant period fell to around 68%, and plaintiff, though alleging 42% foreclosure, had access to critical paths to market in which defendant did not enjoy "preferred status" or a price advantage); R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 390, 393, 394 (M.D.N.C. 2002) (ruling no market foreclosure where defendant's market share in relevant period was around 51%, and plaintiff, though alleging 34% foreclosure, retained "significant opportunities to sell" its product because defendant's conduct did not "place restrictions on the availability of competitive products nor place restrictions on the price at which competitive products are sold").

**B.    The Complaint Alleges Injury To Consumers In The Form Of Higher Prices And Otherwise**

The Complaint alleges that consumers have, or will, pay higher prices, above the competitive levels, as a consequence of Eaton's unlawful conduct.  (See, e.g., Compl. ¶ 75 (Eaton injured consumers by "eliminating competitive price checks on pricing"), id. (absent Eaton's conduct "consumers would have benefited from lower prices"), id. ¶ 81 (Eaton, "with 95% share of the linehaul market, has the power to control price"), id. ¶ 84 ("Eaton, through its exclusionary, anticompetitive conduct, has … deprive[ed] consumers of lower prices for linehaul transmissions), id. ¶ 88 (Eaton, "with 90% or more share of the vocational market, has the power to control price").)

Nonetheless, Eaton contends that the Complaint is deficient absent allegations that its conduct resulted in "higher prices for Class 8 truck transmissions . . . ."  (Eaton Br. 17.)  Setting aside Plaintiffs' allegations of higher prices, Eaton incorrectly narrows the boundaries of the antitrust injury requirement.  Price increases are but one way to measure injury to competition (and anticompetitive effects), not – as Eaton contends – the only way.  (Id. 17.)  As this Court has stated, antitrust injury is properly pled when a plaintiff alleges it was excluded by a defendant's conduct from participating in a relevant market, "and the result was a decrease in competition in that market."  Gill, 294 F. Supp. 2d at 644.

The cases relied upon by Eaton are consistent with this standard.  In Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 394 (7th Cir. 1984), the court acknowledged that exclusive dealing is unreasonable if it excludes a significant competitor and the "probable (not certain) effect of the exclusion" will be to increase

-19-

prices above the competitive level "or otherwise injure competition." See also Cal.

Computer Prods., Inc. v. Int'l Bus. Machs. Corp., 613 F.2d 727, 732 (9th Cir. 1979)

(stating that antitrust injury can be established by "showing that the injury was caused by

a reduction, rather than an increase, in competition flowing from the defendant's acts").

As detailed above, the Complaint sufficiently alleges such injurious acts, which "had the

practical effect of precluding ZF Meritor from selling linehaul and vocational

transmissions to the OEMs" (Compl. ¶ 72), and drove ZF Meritor from the marketplace

to the detriment of consumers (id. ¶¶ 74-75).

### C.    The Complaint Alleges That Eaton Has Eliminated Competition In The Linehaul And Vocational Transmission Markets

The Complaint defines three separate Class 8 transmission markets:  a linehaul

transmission market, a vocational transmission market, and a specialty transmission

market.  (Id. ¶¶ 18-26.)  Instead of recognizing these markets, Eaton treats all Class 8

transmissions as a single market.  According to Eaton, there are five suppliers selling

heavy-duty transmissions in the "market," and the competitive process "is alive and

well."  (Eaton Br. 15.)  Yet in the market for linehaul transmissions, General Motors and

Mack Trucks do not compete, and Eaton is forcing Meritor's exit in January 2007.

(Compl. ¶ 21.)  Eaton has a market share of 95% or more, and is virtually unchallenged in

that market except for ZF's efforts to sell the FreedomLine, which have been undermined

by Eaton's unlawful conduct.  (Id. ¶¶ 21, 74.)

In the market for vocational transmissions, General Motors is not a material

participant, Eaton blocked ZF Meritor from entry, and Mack produces transmissions

solely for use in trucks it manufactures.[7]  Eaton controls that market with a market share,

even when including Mack, of 90% or more.  (Id. ¶¶ 23, 36, 71.)  Far from competition

being alive and well, the Complaint alleges that Eaton has crippled or killed it.

## III.    THE COMPLAINT WAS TIMELY FILED

Eaton "bears a heavy burden in seeking to establish that the challenged claims are

barred as a matter of law [by the statute of limitations]."  Glaberson v. Comcast Corp.,

No. Civ. 03-6604, 2006 WL 2559479, at *13 (E.D. Pa. Aug. 31, 2006) (citing Davis v.

Grusemeyer, 996 F.2d 617, 623 n.10 (3d Cir. 1993)).[8]  The four-year limitations period in

this case runs from March 28, 2002 to March 28, 2006.[9]  See Zenith Radio Corp. v.

Hazeltine Research, Inc., 401 U.S. 321, 338 (1971) (stating that a cause of action accrues

---

[7] Transmission Technologies Corporation has de minimis share in the linehaul and
vocational transmission markets.  (See Compl. ¶¶ 17, 21, 23.)  Eaton's reference to
General Motors as a participant in the transmission markets presumably is to its Allison
Transmission division, which sells nearly all of its transmissions into the specialty
transmission market.  (Id. ¶¶ 24-25.)

[8] Eaton contends the statute of limitations has run on "Plaintiffs' claims related to 2000-
01 contracts (and earlier conduct)."  (Eaton Br. 21.)  There are, however, no "claims"
which concern solely conduct occurring prior to 2002.  There are factual "allegations"
that relate to pre-2002 conduct, but any dispute concerning those facts are not the proper
subject of a motion to dismiss and consideration here would be premature.  See
Glaberson, 2006 WL 2559479, at *14 (denying in part defendant's motion to dismiss
Sherman Act claims based on the statute of limitations because "the conceptualization of
[specified conduct] for statute of limitations purposes implicates questions of fact . . .
which are not properly considered on this Motion to Dismiss").

[9] Eaton does not identify the specific date by which it contends Plaintiffs should have
filed the Complaint.  Instead, it asks why Plaintiffs "waited" until October 2006 to file.
(Eaton Br. 9.)  As Eaton is aware, on March 23, 2006 the parties entered into an
agreement which tolled the limitations period through the end of September 2006.  (Id. 19
n.16.)  The tolling agreement covered 191 days and the Complaint was filed on October
5, 2006.  Consequently, the limitations period covers the four-year period, beginning
March 28, 2002.  See 15 U.S.C. § 15b (2006).

DSMDB-2177451v01

when a defendant "commits an act that injures a plaintiff's business."). The Complaint

alleges that Eaton, both independently and at times in conjunction with the OEMs,

engaged in acts that caused injury between March 2002 and March 2006.

Chief among Eaton's conduct in the limitations period were actions it took at

Volvo/Mack to foreclose competition in the linehaul and vocational markets. The

Complaint alleges that in the spring and summer of 2002, ZF Meritor attempted to form a

commercial partnership with Volvo/Mack for the manufacture, marketing, and sale of

linehaul and vocational transmissions. (Compl. ¶ 64.) Obtaining a contract with

Volvo/Mack was particularly important to ZF Meritor since it was the only OEM that did

not have an exclusive dealing arrangement with Eaton. (Id. ¶¶ 63-64.) Eaton, however,

undermined this effort by entering into a five-year supply agreement with Volvo/Mack in

the fall of 2002. (Id. ¶ 65.) The agreement stated that Volvo/Mack could only take

advantage of Eaton's significant transmission "rebates or price reductions" if

Volvo/Mack agreed to severely limit its purchases of ZF Meritor transmissions. (Id.)

The fall 2002 contract further foreclosed ZF Meritor from the marketplace by requiring

Volvo/Mack to price ZF Meritor transmissions at a penalty relative to Eaton

transmissions. (Id.)

Eaton also executed an exclusive agreement with International in 2006 that

obligated International to remove the FreedomLine, launched by ZF Meritor, from its

data book and sell only Eaton's automated manual transmissions. (Id. ¶ 58.) In addition,

the Complaint identifies numerous acts within the limitations period, induced by, or

performed in coordination with Eaton, that the OEMs engaged in to divert truck

purchasers from ZF Meritor to Eaton transmissions (e.g., by refusing to provide financing

on trucks containing ZF Meritor transmissions; by declining to hold build slots for trucks

to be built with ZF Meritor transmissions; by telling truck buyers that ZF Meritor

transmissions were not available, even though they were).  (Id. ¶ 68.)

Beyond alleging specific injurious acts within the limitations period sufficient to

meet the requirements of Zenith, the Complaint alleges a scheme by Eaton to drive

Plaintiffs from the marketplace, which started in the 1990s, accelerated in 1999 with the

formation of ZF Meritor, and shifted into high gear from 2000 through the present.  (See,

e.g., id. ¶¶ 36, 47-48, 58.)  The scheme ultimately foreclosed ZF Meritor from 90% or

more of the sales opportunities for linehaul and vocational transmissions and forced its

exit from the business.  (Id. ¶¶ 73, 74.)  This behavior constitutes a continuing antitrust

violation, thereby starting anew the limitations clock with each injury.  As the Supreme

Court has explained, the statute of limitations does not expire on an antitrust claim when

there is a "continuing violation . . . which inflict[s] continuing and accumulating harm on

[the plaintiff]."  Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15

(1968).[10]  See Friedman, Inc. v. Thorofare Mkts. Inc., 587 F.2d 127, 139 (3d Cir. 1978)

---

[10] The cases upon which Eaton relies in asserting its statute of limitations argument, none
of which are from this Circuit and including Kaiser Aluminum & Chemical Sales, Inc. v.
Avondale Shipyards, Inc., 677 F.2d 1045 (5th Cir. 1982) and City of El Paso v.
Darbyshire Steel Co., 575 F.2d 521 (5th Cir. 1978)), stand for the basic proposition that
when the antitrust injury complained of begins and ends with the execution of a contract,
the limitations period runs from the formation of the contract.  Here, as described in the
Complaint, Eaton engaged in a series of exclusionary acts including, but not limited to,
the execution of de facto exclusive dealing agreements with each of the four OEMs,
which inflicted accumulating harm upon ZF Meritor and forced its exit from the
marketplace.  See In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1171
(3d Cir. 1993) (affirming liability verdict under Sherman Act Sections 1 and 2, and

(finding injurious acts undertaken pursuant to exclusive agreement executed before the limitations period "may serve as a basis for [an] antitrust suit, independent of any claim that may have accrued" upon the formation of the agreement); Harrison Aire, Inc. v. Aerostar Int'l, Inc., 316 F. Supp. 2d 186, 204 (E.D. Pa. 2004) (holding that "each overt act that is part of the violation and that injures the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'") (quoting Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997)).[11] Accordingly, there is no basis to dismiss any portion of the Complaint on limitations grounds.

---

finding the limitations period on a "continuing violation of the Sherman Act" does not run from the "violation's earliest impact on a plaintiff.") (citation omitted).

[11] See also Poster Exch., Inc. v. Nat'l Screen Serv. Corp., 517 F.2d 117, 125 (5th Cir. 1975) (ruling that an alleged continuing conspiracy and monopoly that excluded plaintiff was to be "treated for statute of limitations purposes . . . as a continuing series of acts upon which successive causes of actions may accrue."); Midwestern Mach. Co. v. Northwest Airlines, Inc., 392 F.3d 265, 271 (8th Cir. 2004) (stating that a "continuing violation theory [can be] based on overt acts that . . . are designed to promote a monopoly"); Xechem, Inc. v. Bristol-Myers Squibb Co., 372 F.3d 899, 901 (7th Cir. 2004) (holding no statute of limitations bar when a monopolist committed new exclusionary acts that injured plaintiff within the limitations period).

-24-

## CONCLUSION

For the reasons set forth in this brief, Defendant's Motion To Dismiss should be denied in its entirety.

Dated:    December 11, 2006        Respectfully submitted,

By:    /s/ Karen V. Sullivan
        Charles M. Oberly, III (No. 743)
        Karen V. Sullivan (No. 3872)
        OBERLY, JENNINGS & RHODUNDA, P.A.
        1220 Market Street, Suite 710
        P.O. Box 2054
        Wilmington, DE  19899
        (302) 576-2000 (Tel)
        (302) 576-2004 (Fax)

        R. Bruce Holcomb
        Christopher H. Wood
        Charles E. Luftig
        DICKSTEIN SHAPIRO LLP
        1825 Eye Street NW
        Washington, DC  20006-5403

        Attorneys for Plaintiffs
        ZF Meritor LLC and
        Meritor Transmission Corporation