IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ZF MERITOR LLC and ZF MERITOR TRANSMISSION CORPORATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 06-623-SLR |
| v. | ) ) | |
| EATON CORPORATION, | ) ) | **REDACTED – PUBLIC VERSION** |
| Defendant. | ) ) ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE OPINION TESTIMONY OF DR. DAVID W. DERAMUS

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Donald E. Reid (#1058)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 351-9219
   *Attorneys for Defendant*
   *Eaton Corporation*

OF COUNSEL:
Robert F. Ruyak
Joseph A. Ostoyich
Andrew D. Lazerow
Melissa R. Handrigan
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

Original Filing Date:  May 11, 2009
Redacted Filing Date:  May 18, 2009

## TABLE OF CONTENTS

FACTUAL BACKGROUND ..................................................................................5

I.  DR. DERAMUS FAILED TO SEPARATE LOSSES CAUSED BY EATON'S
    PURPORTED ANTICOMPETITIVE CONDUCT FROM LOSSES RESULTING
    FROM EATON'S COMPETITIVE CONDUCT AND ZF MERITOR'S
    PRODUCT DEFECTS, NON-COMPETITIVE PRICING, AND OTHER
    INTERNAL PROBLEMS .........................................................................5

    A.  Plaintiffs Lost Significant Share Before Any Of The Contracts At Issue
        For Reasons Unrelated To Eaton ....................................................7

    B.  ZF Meritor Lost Sales Because Eaton Offered Lower Pricing And Other
        Benefits That Meritor Was Unwilling To Match..................................8

        1.  Eaton Won Business From The OEMs Because It Offered Lower
            Pricing And A Better Overall Value.........................................8

        2.  ZF Meritor Lost Sales Because It Refused To Reduce Its Prices
            And, In Fact, Increased The Price Of Its Flagship Product by 25
            Percent In December 2003 .................................................11

    C.  The G Platform "Nightmare" Caused ZF Meritor To Lose Sales and Incur
        Millions In Unexpected Expenses ..................................................13

    D.  ZF Meritor's FreedomLine Product Was Plagued With Defects That
        Caused The Joint Venture To Lose Sales and Incur Significant Repair and
        Warranty Expenses .....................................................................16

    E.  Plaintiffs Lost Sales For Other Reasons Unrelated To Eaton................17

II. DR. DERAMUS DOES NOT APPLY ANY ACCEPTED, ECONOMIC TEST IN
    ASSESSING EATON'S CONTRACTS ......................................................18

III. DR. DERAMUS CONCOCTED AN EXTRAORDINARY DAMAGES FIGURE
     BASED UPON ASSUMPTIONS CONTRARY TO FUNDAMENTAL
     ECONOMIC THEORY AND CONTRADICTED BY THE FACTS .......................20

    A.  Dr. DeRamus Assumed Manual Prices          In His More
        Competitive, "But-for" World ......................................................22

    B.  Dr. DeRamus Assumed A Level Of Growth For The FreedomLine That Is
        Contradicted By The Factual Record................................................23

i

IV.    DR. DERAMUS RIGGED HIS DETERMINATION OF LOST ENTERPRISE
       VALUE BY USING A DIFFERENT TIME PERIOD THAN THAT REQUIRED
       BY IRS REVENUE RULING 59/60, VALUATION OF STOCKS AND BOND ..........24

ARGUMENT ................................................................................................................27

I.     THE SUPREME COURT AND THIS CIRCUIT MANDATE THAT THE
       DISTRICT COURT KEEP JUNK SCIENCE FROM THE JURY ..................................27

II.    DR. DERAMUS' CONCLUSION THAT
                                                            IS NOT
       THE RESULT OF SOUND ECONOMIC ANALYSIS................................................29

       A.    An Expert Must Base His Opinion On An Accepted Scientific Method..............29

       B.    Dr. DeRamus Applies No Economically Testable Theory ....................................30

III.   DR. DERAMUS' FAILURE TO DISAGGREGATE THE MANY CAUSES OF
       PLAINTIFFS' PURPORTED INJURIES AND DAMAGES IS FATAL .......................32

       A.    Experts Are Required To Disaggregate ........................................................32

       B.    Dr. DeRamus Does Not Disaggregate Injury Due To *Lawful* Conduct
             From Injury Due to Purportedly *Unlawful* Conduct And Meritor's Product
             Defects, Non-Competitive Pricing, And Other Problems....................................33

IV.    DR. DERAMUS' LOST PROFITS DAMAGES ANALYSES ARE JUNK
       SCIENCE BECAUSE THEY ARE BASED ON ASSUMPTIONS CONTRARY
       TO FUNDAMENTAL ECONOMIC THEORY AND CONTRADICTED BY
       THE FACTS ..............................................................................................35

V.     DR. DERAMUS' OPINION IS JUNK SCIENCE BECAUSE HIS
       ASSUMPTION ABOUT THE VOLUME OF DEMAND FOR ZF MERITOR'S
       FREEDOMLINE PRODUCT IS CONTRADICTED BY THE FACT RECORD ..........37

VI.    DR. DERAMUS' ENTERPRISE VALUE CALCULATION IS FLAWED ..................39

CONCLUSION...............................................................................................................41

# TABLE OF AUTHORITIES

## CASES

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)............................................................32

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
350 F.3d 316 (3d Cir. 2003)...............................................28, 29, 30

*Chemipal Ltd. v. Slim-Fast Nutritional Foods International, Inc.*,
350 F. Supp. 2d 582 (D. Del. 2004)...................................39, 40

*Coleman Motor Co. v. Chrysler Corp.*,
525 F.2d 1338 (3d Cir. 1975)..............................................3, 33, 36

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ............................................2, 32, 33, 36

*Daubert v. Merrill Dow Pharmaceuticals*,
509 U.S. 579 (1993)............................................................1, 27, 28, 30

*Elcock v. Kmart Corp.*,
233  F.3d 734 (3d Cir. 2000)...............................................4, 6, 7, 39

*Farley Transportation Co. v. Santa Fe Trail Transportation Co.*,
786 F.2d 1342 (9th Cir. 1985) ...........................................34, 36

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997)............................................................2, 31, 35

*JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*,
No. 97-CV-0652, 1998 U.S. Dist. LEXIS 5098 (E.D. Pa. Apr. 15, 1998),
*aff'd mem.*, 178 F.3d 1279 (3d Cir. 1999) ............................28, 30, 31, 39

*JRL Enterprises, Inc. v. Procorp Associates, Inc.*,
No. 01-2893, 2003 U.S. Dist. LEXIS 9397 (E.D. La. June 3, 2003).....................40

*MCI Communications Corp. v. AT&T*,
708 F.2d 1081 (7th Cir. 1983) ...........................................33

*Murphy Tugboat Co. v. Crowey*,
658 F.2d 1256 (9th Cir. 1981) ...........................................4, 37, 38

*National Ass'n of Review Appraisers & Mortgage Underwriter v. Appraisal Foundation,*
  64 F.3d 1130 (8th Cir. 1995) ................................................................................33

*In re Paoli R.R. Yard PCB Litigation,*
  35 F.3d 717 (3d Cir. 1994)....................................................................2, 29, 41

*R.S.E., Inc. v. Pennsy Supply, Inc.,*
  523 F. Supp. 954 (M.D. Pa. 1981) .......................................................................33

*TK-7 Corp. v. Estate of Barbouti,*
  993 F.2d 722 (10th Cir. 1993) ............................................................................40

*Target Market Publishing, Inc. v. ADVO, Inc.,*
  136 F.3d 1139 (7th Cir. 1998) ............................................................................39

*Total Containment, Inc. v. Dayco Products, Inc.,*
  No. 1997-cv-6013, 2001 U.S. Dist. LEXIS 15838 (E.D. Pa. Sept. 6, 2001),
  *aff'd* , 43 Fed. Appx. 511 (3d Cir. 2002) ...................................................28, 38, 39

*Tyger Construction Co. v. Pensacola Construction Co.,*
  29 F.3d 137 (4th Cir. 1994) ................................................................................39

*United States Football League v. National Football League,*
  842 F.2d 1335 (2d Cir. 1988)........................................................................34, 36

*Weisgram v. Marley Co.,*
  528 U.S. 440 (2000)...........................................................................................29

## STATUTES

Fed. R. Evid. 702 ...............................................................................................28, 29

Defendant Eaton Corporation ("Eaton") respectfully submits this memorandum of law in support of its motion to exclude opinion testimony of Dr. David W. DeRamus.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

In this antitrust case, a competitor of Eaton in the heavy duty truck transmission business asserts claims for exclusive dealing and monopolization under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Fact discovery and expert discovery closed on January 16, 2009 and April 3, 2009, respectively. Trial is set to begin on September 8, 2009.

Plaintiffs[1] have proffered testimony from Dr. David W. Deramus – a Partner at Bates, White, LLC – who has never testified at an antitrust trial and has no teaching experience or peer-reviewed publications listed on his CV. His analyses suffer from several fatal flaws that renders them unreliable and inadmissible: (1) he does not apply any accepted scientific test to analyze Eaton's contracts, but simply asserts *ipse dixit* that they were exclusionary; (2) he fails to disaggregate the myriad causes of Plaintiffs' injuries; (3) he assumes                  absent Eaton's alleged anticompetitive conduct, which stands fundamental economic theory on its head; (4) he assumes                  but that is contradicted by the facts; and (5) his "lost enterprise value" analysis is calculated in a "rigged" manner contrary to fundamental standards set out in Revenue Ruling 59/60. These flaws require that Dr. DeRamus' opinions be excluded *in their entirety*. *See, e.g.*, *Paoli*, 35 F.3d 717, 745 (1994) ("*Daubert*'s requirement that the expert testify to scientific knowledge -- conclusions supported by good grounds for each step

_____

[1] Plaintiffs are ZF Meritor LLC ("ZF Meritor"), the joint venture, and ZF Meritor Transmission Corporation ("ZF Meritor Transmission"), one of its shareholders. The other shareholder of the joint venture, ZF Friedrichshafen AG ("ZF AG"), is not a party to this lawsuit.

in the analysis -- means that *any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible").

## SUMMARY OF ARGUMENT

1.    The Supreme Court has mandated that "the trial judge *must* ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable" in order to prevent junk science from misleading a jury. *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993) (emphasis added).

2.    Dr. DeRamus' opinion that

                 is flawed because

                                             He failed to apply any of the standard tests employed by academics in the field – such as the attribution test applied by Defendants' experts -- to analyze the question. Instead, he simply

                                             An expert's *ipse dixit* conclusion – divorced from the tests applied by actual economists in the field – is inadmissible as a matter of law. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing ... requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert"). Dr. DeRamus' "say-so" is particularly problematic here because he reviewed a very skewed portion of the evidentiary record – and ignored volumes of facts that contradicted his say-so. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (economist's analysis was flawed where he "ignored inconvenient evidence"). Finally, Federal Rule of Evidence 702 required Dr. DeRamus to employ *expert* analysis, not simply to review and interpret facts that the jury can interpret for itself.

3.      Dr. DeRamus' lost profits damages calculation is flawed because

- ***Eaton's competitive conduct.***

(*See, e.g.,* Lopes Dep. 33:4-18; 119:9-10

That legitimate competition cannot give rise to antitrust injury or damages as a matter of law and must be separated out by the expert's calculations. *See, e.g., Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1353 (3d Cir. 1975) ("The damage figures advanced by plaintiff's experts may be substantially attributable to lawful competition. In the absence of any guidance in the record, we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition.")

- ***Factors entirely within Plaintiffs' control.***

Dr. DeRamus was also required to disaggregate and quantify the amount of damages resulting from these internal Meritor problems.

- ***Factors that neither Plaintiffs nor Eaton controlled.*** The launch of the joint venture coincided with a severe downturn in the truck industry, where demand plummeted roughly 50% within two years.

Again, proper scientific analysis requires that losses resulting from these factors beyond Eaton's control be disaggregated.

---

[2] The exhibits and deposition testimony cited in this motion are contained in the Appendix of Supporting Documents and Deposition Testimony In Support Of Eaton Corporation's Motion For Summary Judgment ("Appendix"), which is being filed concurrently with this motion. "[Deponent] Dep. __:__" refers to deposition testimony, listed in the Appendix in alphabetical order by deponent's name. "__:__" refers to the page and line numbers in the original transcripts. "Ex. __ at App. __" refers to the exhibits in the Appendix, with a pinpoint cite to the page of the Appendix, separately numbered in accordance with DE Local Rule 7.1.3(a)(3).

4.    Dr. DeRamus' damages analyses are economically irrational because he

The  assumption  that

' makes no economic sense and -- as he conceded -- is

contrary to basic economic theory.    (DeRamus Dep. 72:2-7

*See Murphy Tugboat*

*Co. v. Crowey,* 658 F.2d 1256, 1262 (9th Cir. 1981) (plaintiffs' lost profits damages theory was

unreliable where it assumed that the defendant would not lower its prices when its competitor

began to acquire market share because "economic rationality must be assumed for all

competitors").    It is fundamental economic theory that prices have to be lower in the more

competitive world where everything is exactly the same, except there is no allegedly

anticompetitive conduct.    According to Dr. DeRamus,

— the

antithesis of the antitrust laws.

5.    Dr. DeRamus assumes that

Dr. DeRamus did not conduct any empirical study to determine whether

customers want three or four times the number of automated mechanical transmissions they are

buying today, and cites nothing in the fact record that suggests there was untapped demand, let

alone untapped demand of that magnitude for the FreedomLine, specifically.    Instead, he just

-4-

assumes it.  The sole document he relies on for the proposition is – as he concedes –

That is not the proper

basis for expert testimony.  It is rank speculation – and it is contradicted by the record evidence

which unequivocally shows

*See Elcock v. Kmart Corp.,* 233 F.3d 734, 756 (3d Cir. 2000) (abuse

of discretion for district court to admit expert testimony on purported damages because the

expert's "economic model relied on several empirical assumptions that were not supported by

the record").

6.     Dr. DeRamus' calculation of ZF Meritor's "enterprise value" is fundamentally

flawed because he uses a "rigged" time period in his calculations that is contrary to IRS authority

on the issue.

IRS Revenue Ruling 59/60, Valuation of Stocks and Bonds,

required Dr. DeRamus to use data on the value of his comparable companies as of the valuation

date, February 2009.

## FACTUAL BACKGROUND

I.     **DR. DERAMUS FAILED TO SEPARATE LOSSES CAUSED BY EATON'S PURPORTED ANTICOMPETITIVE CONDUCT FROM LOSSES RESULTING FROM EATON'S COMPETITIVE CONDUCT AND ZF MERITOR'S PRODUCT DEFECTS, NON-COMPETITIVE PRICING, AND OTHER INTERNAL PROBLEMS**

Dr. DeRamus' methodology fails to account for injuries that resulted from conduct

entirely unrelated to Eaton's purported anticompetitive acts, such as

-5-

For example, although Plaintiffs contend that it was the share-based rebate provisions in Eaton's contracts that were anticompetitive, Dr. DeRamus did not attempt to quantify the amount of alleged damage from those provisions as opposed to the amount of damage from the guaranteed price reductions and other benefits that were *not* linked to share:

\*     \*     \*

(DeRamus Dep. 358:2-360:15 (emphasis added).)  Nor did Dr. DeRamus isolate the amount of damages from any particular Eaton conduct:

(*Id.* 361:20-362:5 (emphasis added); *see id.* 357:4-22

; 361:8-19

Rather, he

-6-

### A.    Plaintiffs Lost Significant Share Before Any Of The Contracts
At Issue For Reasons Unrelated To Eaton

ZF Meritor was formed in mid-1999, just as the cyclical heavy duty truck market entered

an extraordinary and prolonged downturn that literally halved its size between 1999 and the end

of 2001.  (Ex. 27 at App. 317.)  Indeed, during that time, demand plummeted from more than

300,000 new truck builds per year to roughly 150,000.  (*Id.*)

By July 2000 – before any of the purported anticompetitive contracts were signed – ZF

Meritor's share                                                    (Ex. 5 at App. 11.)  The President

of the Joint Venture, Rick Martello, explained at a board meeting that

(Ex. 5 at App. 11; *see* Martello Dep. 35:14-36:20; 165:15-171:16.)  In his deposition, Mr.

Martello explained

•

(Martello Dep. 163:12-21.)

(Martello Dep. 35:14-36:20

-7-

●

(Martello Dep. 165:15-166:17.)

●

170:21.)                                                                (Martello Dep. 165:15-

●

(Martello Dep. 170:8-171:16.)

Nevertheless, Dr. DeRamus' methodology fails to account for the fact that ZF Meritor's business was already in significant decline prior to Eaton entering into the purported anticompetitive contracts.

**B.    ZF Meritor Lost Sales Because Eaton Offered Lower Pricing And Other Benefits That Meritor Was Unwilling To Match**

**1.    Eaton Won Business From The OEMs Because It Offered Lower Pricing And A Better Overall Value**

ZF Meritor's failure to price competitively resulted in lost sales.  ZF Meritor's prices were                                                                                          (Ex. 73 at App. 1292.)    According to Dr. DeRamus:

(Ex. 73 at App. 1292; *see also* DeRamus Dep. 48:2-50:1; 296:16-297:3

Eaton won business from the OEMs because it was willing to provide low pricing and other valuable benefits.  At Paccar,

-8-

(Ex. 3 at App. 5 (emphasis added); Floyd Dep. 107:3-118:23.)

While Freightliner was ZF Meritor's biggest customer in the 1990s, it

(Ex. 1 at App. 1 (emphasis added); Kline Dep. 332:3-12.)  As a result, Freightliner decided

(Sharp Dep. 99:12-103:9

(Barkus Dep. 180:18-21.)

(Barkus Dep. 55:12-57:19.)

(Lopes

Dep. 196:19-197:2; Louya Dep. 25:15-26:7; 28:20-29:17.)

Indeed, Eaton's contracts with the OEMs contained

For example, Freightliner

-9-

(Ex. 53 at App. 623.)

(Ex. 53 at App. 623, 639.)

(Ex. 53 at App. 641

(Ex. 57 at App. 711-12)

Freightliner received (Ex. 53 at App. 625-26.)  Similarly, at Volvo and Mack, (Lopes. Dep. 194:15-195:4.)  Eaton provided International (Meegan Dep. 71:11-72:5.)    Indeed, Eaton promised to provide International (*Id.*)  For Paccar, Eaton provided (Ex. 55 at App. 672-73.)

Tom Lundahl, Paccar's Vice President of Purchasing, testified that '

-10-

(Lundahl Dep. 77:10-78:5 (emphasis added).)  Tony Lopes, VolvoMack's Purchasing Director, similarly testified that

(Lopes Dep. 118:22-120:8 (emphasis added); *see also* Lopes Dep. 33:4-18; 119:9-10

, Despite these admissions, Dr. DeRamus' analysis fails to account for losses ZF Meritor suffered due to Eaton's lower pricing and other *competitive* conduct.  Under Dr. DeRamus' view of the world,

        2.       **ZF Meritor Lost Sales Because It Refused To Reduce Its Prices And, In Fact, Increased The Price Of Its Flagship Product by 25 Percent In December 2003**

In contrast to Eaton, ZF Meritor

(Ex. 10 at App. 75

); Ex. 11 at App. 79

); Ex. 13 at App. 84

. ZF Meritor

also

. (Ex. 21 at App. 302

-11-

Not only did Plaintiffs fail to                          , but they actually

.   (Kline

Dep. 303:8-305:2.)[3]                                                                        At

Paccar, the

(Lundahl Dep. 160:24-161:15.)  Paccar's Tom Floyd testified that

(Floyd Dep. 145:18-146:9.)

Freightliner also believed that

(Ex. 37 at App.

367; Lampert Dep. 164:5-24, 167:17-168:12.)  Other OEMs faced similar issues.  International

(Barkus Dep. 242:3-13

(Barkus Dep. 315:5-317:4.)  VolvoMack was

.  (Louya Dep. 83:6-14.)

As a result,

(Lampert Dep. 161:21-162:2.)

Dr. DeRamus fails to account for the effects of Meritor's failure to cost competitively

when determining damages.  He fails to apply any economic analysis to disaggregate the effects

---

[3] The parties dissolved the joint venture in December 2003.  ZF Meritor Transmission, however,
serves as a sales agent for ZF AG's sales of the FreedomLine in North America.  (Kline Dep.
248:9-249:6; 249:20-250:19.)

-12-

of Meritor's significant price increase on Plaintiffs' sales.  To the contrary, his analysis

Its not surprising that Dr. DeRamus considered

a conclusion that, as discussed *infra,* makes no economic sense.

      **C.**      **The G Platform "Nightmare" Caused ZF Meritor To Lose**
                   **Sales and Incur Millions In Unexpected Expenses**

     ZF Meritor's manual transmissions (referred to as the G Platform) had numerous, severe

product defects.

            (Kline Dep. 128:9-129:5.)

                                      (*See, e.g.,* Ex. 6 at

App. 20 (April 3, 2001 board of directors meeting minutes note

       Ex. 17 at App. 101; Ex. 18 at App. 117-18.)

   (Meritor Rule 30(b)(6) Dep. at 253:2-255:2; 271:18-21.)

                   ZF Meritor encountered problems with, among other things,

     (Ex. 17 at App. 101; Kline Dep. 118:14-121:19.)

            (Kline Dep. 120:17-121:19.)

     ZF Meritor's OEM Sales Manager admitted that

(Ex. 25 at App. 311 and Kline Dep. 132:9-135:7)


(Ex. 28 at App. 318; Hyatt Dep. 40:2-41:7, 49:1-20, 53:4-7.)


(Ex. 4 at App. 6; Kline Dep. 261:12-262:16; *see also* Kline Dep. 192:8-16.)

By the end of 2002, the problems                                ArvinMeritor's Vice-President for

Sales reported to the joint venture's Chairman in December 2002 that


(Ex. 30 at App. 325 and Gosnell Dep.

257:8-259:16)   The joint venture's Chairman reported in February 2003 that


(Ex. 32 at App. 355 and Gosnell Dep. 281:8-282:4)   A Meritor

National  Account  Manager  remarked  that

(Kollasch Dep. 160:12-161:2.)  Other large truck purchasers –

such as           who accounted for          of Plaintiffs' manual transmission business –

indicated that '                                                    (Ex. 31 at

App. 329; Gosnell Dep. 264:9-268:15.)  In 2002 alone, ZF Meritor paid '

          (ZF Meritor Rule 30(b)(6) Dep. 240:6-10.)

                              , (Kline Dep. 171:16-172:1.)

                              The methodology employed by

Dr. DeRamus to determine antitrust injury and damages, however, fails to account for the effect

that these product defects had on the company's sales and profits.  Dr. DeRamus fails to employ

any economic test to determine the effect of these defects even though

                    Instead, Dr. DeRamus




          (Ex. 73 at App. 1298.)  To the contrary, in October 2003, ArvinMeritor's

head of North American Field Operations remarked to ArvinMeritor's Vice President of Sales


                    (Ex. 34 at App. 360; Kline Dep. 164:18-171:12.)  By June

2003, warranty charges for fiscal year 2003 were

                                                  (Meritor

Rule 30(b)(6) Dep. 251:8-20.)  In November 2003, one month before the dissolution of the joint

venture, ZF Meritor was

                              (Ex. 35 at App. 362)

**D.**     **ZF Meritor's FreedomLine Product Was Plagued With Defects That Caused The Joint Venture To Lose Sales and Incur Significant Repair and Warranty Expenses**

(Allen 37:6-11.)   ZF Meritor's customers repeatedly

Paccar,

(Ex. 20 at App. 301; Floyd Dep. 82:12-86:15; Jablonski Dep. 130:4-131:2.)

(Ex. 23 at

App. 305; Kline Dep. 231:16-239:9.)   By the fall of 2001, Meritor was experiencing

(Kline Dep. 161:13-16.)

(Allen 310:10-

311:18.)   A July 2002 presentation to the board of directors identified

(Allen Dep. 308:9-14, 314:16-316:5; Allen Ex. 15.)

ZF Meritor's customers

John Hinesley, Regional Sales Manager, reported to his superiors that

-16-

(Ex. 43 at App. 435; Hinesley Dep. 153:21-155:2.)  Mark Kollasch, OEM Sales Manager, felt that '

(Ex. 42 at App. 429; Kollasch Dep. 165:5-17; 167:11-15.)
Dennis Kline, Vice-President of Sales, testified that '

(Kline Dep. 245:21-246:10.)  ZF
(Kline Dep. 246:11-17.)

(Kline Dep. 247:3-10; *see* Martello Dep. 284:14-287:20.)  Indeed, as of May 2003,

(Martello Depo.283:12-17.)

Again, despite the fact that Meritor lost sales and profits due to defects with the FreedomLine, Dr. DeRamus does not take them into account in his analysis.

### E.    Plaintiffs Lost Sales For Other Reasons Unrelated To Eaton

ZF Meritor encountered other significant issues that resulted in lost sales, including:

- '

(Ex. 65 at App. 904

'); Hayes Dep. 295:1-17; Ex. 66 at App. 905

•

          (Ex. 79 at App. 1455

         , Martello Dep. 309:4-310:11

•

    (Ex. 35 at App. 362

         (Kollasch Dep. 160:12-161:2 ("Q.

Again, Dr. DeRamus fails to account for these problems when analyzing whether ZF Meritor suffered antitrust injury and when calculating damages, despite the fact that

## II. DR. DERAMUS DOES NOT APPLY ANY ACCEPTED, ECONOMIC TEST IN ASSESSING EATON'S CONTRACTS

Dr. DeRamus concludes that

    (Ex. 73 at App. 1210.) But he does not apply any actual economic test – such as the well-accepted attribution test applied by Defendants' experts – to arrive at that conclusion.   Instead, he merely

         His "say-so" does not result from the application of any testable, verifiable economic theory.

Moreover, Dr. DeRamus' "say so" is based on numerous hearsay documents – many of which were never used with any witness during deposition – or, even worse, hearsay statements within those hearsay documents.   For example:

- When concluding that          Dr. DeRamus relies on only

-18-

one document: an internal Meritor email – not used with any witness during deposition –
in which                                    – classic hearsay within hearsay.
(Ex. 73 at App. 1265 (citing ZFMA0001979).)

- Dr. DeRamus relies on more hearsay within hearsay – an internal Meritor email that
                             – in concluding that
  (Ex. 73 at App. 1265 (citing ZFMA0199602).)

- Dr. DeRamus concludes that           He arrives at that conclusion by relying on internal
  Meritor documents that                                   
                               (Ex. 73 at App. 1261 (citing ZFMA0371650 and
  ZFMA0028117).) These documents again are classic hearsay within hearsay.

The examples above are just three of the many examples where Dr. DeRamus forms
conclusions based on hearsay documents, most of which were never used with any witness
during deposition or, when used, were contradicted by the speaker.

Eaton has proffered expert testimony from a highly regarded economist, Professor Kevin
Murphy, who concluded that Dr. DeRamus' liability opinion was "inconsistent with available
evidence and … not supported by sound economic analysis." (Ex. 71 at App. 1037.) According
to Professor Murphy, the fundamental error with Dr. DeRamus' analysis is that he failed to apply
any actual economic test to conclude that Eaton's contracts were exclusionary. (Ex. 71 at App.
1038 ("But, at its most fundamental level, Dr. DeRamus's analysis is without merit because he
never articulates or applies an economic and testable theory demonstrating exclusion or
foreclosure.") While Dr. DeRamus concludes that Eaton's contracts were "*de facto* exclusives,"
he never defines what constitutes a "*de facto* exclusive," and then never applies any actual
economic analysis to conclude that Eaton's contracts fit that definition. (Murphy Dep. 89:17-
90:5.) Instead, he merely "itemizes information that he claims demonstrates that Eaton and the

-19-

OEMs agreed to financial incentives in exchange for favoring Eaton products over those of competitors, as if that evidence by itself proves anticompetitive intent and harm rather than suggesting the opposite." (Ex. 71 at App. 1038-39.)  Professor Murphy concluded that Dr. DeRamus' "simplistic and non-economic approach to analyzing the validity of ZFM's allegations" is "not a proper economic analysis." (Ex. 71 at App. 1039.)[4]

**III.     DR. DERAMUS CONCOCTED AN EXTRAORDINARY DAMAGES FIGURE BASED UPON ASSUMPTIONS CONTRARY TO FUNDAMENTAL ECONOMIC THEORY AND CONTRADICTED BY THE FACTS**

Not only does Dr. DeRamus

but he then manages to

(Ex. 3 at App.

1210.)  Dr. DeRamus is able to

---

[4] Professor Murphy is the George J. Stigler Distinguished Service Professor of Economics in the Booth School of Business and the Department of Economics at the University of Chicago, where he has taught graduate level courses in economics since 1983. (Ex. 71 at App. 934.) He has authored or co-authored more than 65 articles, which have been published in leading scholarly and professional journals. (*Id.* ¶ 3.)  In 1997, he was awarded the John Bates Clark Medal, which the American Economic Association awards once every two years to an outstanding American economist under the age of forty. (*Id.* at App. 935.)  In 2005, he was named a MacArthur Fellow, an award that provides a five-year fellowship to individuals who show exceptional merit and promise for continued and enhanced creative work. (*Id.*)  He has submitted testimony in federal court, the U.S. Senate, and to state regulatory bodies, and has submitted expert reports in numerous cases. (*Id.* at App. 935, 1063.)  Professor Murphy applied a well-known and accepted economic test of foreclosure – the attribution test – and concluded that Eaton's contracts did not injure consumers or competition. (*Id.* at App. 1054-55.)

[5] (2/4/09 ZF Meritor Rule 30(b)(6) Depo. 27:11-28:1, 32:4-33:6; ZFMA0368676 at 683-84; Martello Dep. at 122:14-25:1.)

(Ex. 72 at

App. 1123; Ex. 73 at App. 1351-53; DeRamus Dep. at 239:18-22, 255:2-22.)


Indeed, Dr.

DeRamus admitted that

(pg. 169:6-70:3),

_____

[6] Dr. DeRamus' damages estimate

(Ex. 73 at App. 1329.)

(*Id.* at App. 1329-44.)

(*Id.* at App. 1329-36.)

(*Id.* at App. 1338-42.)


(*Id.*)

(*Id.* At App. 1342-43.)

(*Id.* at App. 1343-44.)

(*Id.*)

[7]

_____

(Ex. 73 at 1351.)

(Ex. 73 at 1351;

DeRamus Dep. 226:13-27:7.)

-21-

(pg. 187:5-7, 212:8-213:13),

(pg. 170:4-10),

(pg. 171:2-5).  He further admitted he                                                    (pg.

189:11-22),

' (pg. 208:5-22)),

(pg. 229:9-230:8)),

(246:8-17)).

A.     **Dr. DeRamus Assumed Manual Prices**                    In
       **His More Competitive, "But-for" World**

Plaintiffs' expert's "but-for" world is – as in all antitrust damages determinations –

(DeRamus Dep. 11:8-12 (emphasis added).)

That is because it is supposed to be the actual world, exactly the same, except without the alleged

anticompetitive conduct.  Plaintiffs' expert, thus, admits that

(*Id.* 72:3-7.)  Nevertheless, Dr. DeRamus then proceeds to

(*Id.* 28:4-29:9; *see* Ex. 73 at App.

1292, 1351.)  Dr. DeRamus simply

For example, Dr. DeRamus' first four damages analyses

*(Id.)*

Similarly, Dr. DeRamus' models assume

[8]   Thus, according to Dr. DeRamus' theory, if Eaton had not behaved "anticompetitively," Plaintiffs would have — a result that         is contrary to basic economic principles.

### B.   Dr. DeRamus Assumed A Level Of Growth For The FreedomLine That Is Contradicted By The Factual Record

In calculating lost profits, Dr. DeRamus

(Ex. 73 at App. 1332, 1351.)   ZF Meritor's business plans projected that

(*See* Ex. 71 at App. 1061; ZF Meritor Rule 30(b)(6) Dep. 104:8-17, 139:11-20, 165:2-166:18.)   The sales projections for the FreedomLine

---

[8] Similarly, Dr. DeRamus' fifth calculation of lost profits

He also assumes in that model

(Ex. 73 at App. 1343-44; Ex. 72 at App. 1118-19; *see* Sibley Report ¶¶ 61-62.)   Thus, all five of Dr. DeRamus' lost profits calculations suffer from this fatal flaw.

were, in turn, based on this expectation

              (ZF Meritor Rule 30(b)(6) Dep. 105:8-107:4, 217:14-17.)

        Demand for automated mechanicals in total (including Eaton's)

            (*See, e.g.,* Lundahl Dep. 86:24-87:2

                                           Far from reaching ZF Meritor's

forecast of                    , automated mechanicals have

                                         (Ex. 71 at App. 1042,

1061.)  As a result, Dr. DeRamus' market share for the FreedomLine in the "but-for" world is

      (Ex. 3 at App. 1332, 1352; Ex. 71 at App. 1041, 1061.)  Dr. DeRamus does not cite any

admissible fact for the proposition that

        Nor did he conduct any empirical study of customer demand.  Instead, he just

assumes that

IV.      **DR. DERAMUS RIGGED HIS DETERMINATION OF LOST ENTERPRISE VALUE BY USING A DIFFERENT TIME PERIOD THAN THAT REQUIRED BY IRS REVENUE RULING 59/60, VALUATION OF STOCKS AND BONDS**

      Dr. DeRamus' last component of damages is

         (Ex. 73 at App. 1344.)

(*Id.*)

(*Id.* at App. 1345)

(*Id.* at App. 1345-46.)

(*Id.*
at App. 1346.)

Dr. DeRamus' analysis is fundamentally flawed.  While he purported to

(*Id.* at App. 1346-46; Sibley Report ¶ 95.)

.  (*Id.*)

(Ex. 72 at App. 1135-36.)  In fact, during 2005-07, the stock of almost every company on the New York Stock Exchange was trading higher than it was in February 2009. The stock of ArvinMeritor was selling for approximately $10 to $20 per share, or more than 15 to 30 times higher than its February 27, 2009 price of $0.63.  (*Id.* at App. 1135.)  Similarly, Eaton's stock during this time period was selling for approximately $53 to $95 per share, as compared to $36.15 on February 27, 2009.  (*Id.* at App. 1136.)  Dr. DeRamus' choice to is counter to IRS Revenue Ruling 59/60, Valuation of Stocks and Bond and, as a result, the figure that results is invalid.

*    *    *

Defendants' expert, Professor David Sibley, reviewed Dr. DeRamus' damages methodology and concluded that it was fundamentally flawed. Dr. DeRamus did not "provide an economically sensible methodology with which to estimate damages" and his analyses did not make "economic sense" because he assumed higher prices in his but-for, more competitive world than in the actual, allegedly monopolized world. (Ex. 72 at App. 1094, 1122.) Dr. DeRamus provided "no economically meaningful analysis" because he failed to disaggregate damages. (*Id.* at App. 1094.) Dr. DeRamus' five lost profits analyses were "not based on sound economic logic and analysis" and his econometric model had "no economic logic to it" and was "not economically meaningful because it fails to include any of the important determinants of ZFM's share." (*Id.* at App. 1094, 1128-29.) Dr. DeRamus' lost enterprise value methodology is "flawed" because he applied a date to valuate his comparable companies that is counter to IRS Revenue Ruling 59/60, Valuation of Stocks and Bonds, and failed to account to capital costs. (*Id.* at App. 1094, 1134-37.) [9]

---

[9] Professor Sibley is the John Michael Stuart Centennial Professor of Economics at the University of Texas at Austin, where he has taught classes in economics since 1991. (Ex. 72 at App. 1165.) He previously served as the Deputy Assistant Attorney General for Economic Analysis at the Department of Justice, the highest-ranking economics position within the Antitrust Division, where he supervised all economic analysis within the Antitrust Division and directed its Economic Analysis Group. (*Id.* at App. 1092.) He has authored or co-authored over 40 articles that have been published in a number of leading economic journals. (*Id.* at App. 1165.) He has conducted extensive research in the areas of industrial organization, microeconomic theory, and regulation and has submitted expert reports and/or testified in over 20 matters within the last four years. (*Id.* at App. 1092, 1165.) He also offered an affirmative opinion on damages that [ ]

ZFM would not ~~ ~~ ~~

(*Id.* at App 1094.)

-26-

**ARGUMENT**

**I.** **THE SUPREME COURT AND THIS CIRCUIT MANDATE THAT THE DISTRICT COURT KEEP JUNK SCIENCE FROM THE JURY**

In order to prevent junk science from getting to a jury, "the trial judge *must* ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589 (emphasis added); *id.* at 597 ("but the Rules of Evidence – especially Rule 702 – do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). The party proffering expert testimony has the burden of establishing its admissibility. *Daubert*, 509 U.S. at 592. The *Daubert* standards apply to all expert testimony, including that of economists. As the Third Circuit has held, the "'gatekeeper' function applies not only to testimony based on 'scientific' knowledge but to testimony based on 'technical' and 'other specialized' knowledge as well." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (citing *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999)); *see Total Containment, Inc. v. Dayco Prod., Inc.*, 2001 U.S. Dist. LEXIS 15838, at *8 (E.D. Pa. Sept. 6, 2001) ("The gate-keeping function assigned to district court judges is now also applied to ... economists.")

"Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is *scientifically valid* and of whether that reasoning or methodology *properly can be applied to the facts in issue*." *Daubert*, 509 U.S. at 502 (emphasis added); *see* FED. R. EVID. 702. An expert must be able to point to methods that he applied, *JMJ Enters. v. Via Veneto*

-27-

*Italian Ice*, 1998 U.S. Dist. LEXIS 5098 (E.D. Pa. 1998), and expert testimony fails if it is contradicted by the evidence or is based on unreliable methods, rather than well-accepted tests that have passed peer review scrutiny in the expert's academic community. *Daubert*, 509 U.S. at 590-91. Expert testimony "demands a grounding in the methods and procedures of science, rather than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *see also Weisgran v. Manley Co.*, 528 U.S. 440, 453 (2000) (expert testimony that is conclusory or speculative is not competent proof and contributes "nothing to a 'legally sufficient evidentiary basis'"); *Calhoun* 350 F.3d at 321 ("expert's opinion 'must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation.'").

Dr. DeRamus' report does not employ a proper scientific methodology, is based on assumptions that are economically irrational and contrary to the fact record, and contains fundamental flaws that render his analyses unreliable. This is not a case where one party simply disagrees with the conclusions of the opposing party's expert or with how that expert has chosen to interpret evidence. The fundamental flaw here is that Dr. DeRamus fails to conduct an economic analysis that disaggregates factors that are casual but not actionable – such as Plaintiffs' product defects and Eaton's competitive actions. Rather, he

Dr. DeRamus' opinions are junk science and, therefore, this court should exercise its gate-keeping function to exclude Dr. DeRamus' testimony from the jury. The flaws in Dr. DeRamus' damages methodology require that Plaintiffs' opinions be excluded *in their entirety*. *Paoli*, 35 F.3d at 745 ("*Daubert's* requirement that the expert testify to scientific knowledge -- conclusions supported by good grounds for each step in the analysis -- means that *any* step that

renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible").

## II.    DR. DERAMUS' CONCLUSION THAT ⟩

⟨_____⟩ IS NOT THE RESULT OF SOUND ECONOMIC ANALYSIS

### A.    An Expert Must Base His Opinion On An Accepted Scientific Method

Federal Rule of Evidence 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" an expert "may testify thereto." FED. R. EVID. 702. The Third Circuit has also held that an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Calhoun*, 350 F.3d at 321. Dr. DeRamus purports to offer his "expert" economic opinion in his report, therefore, the subject of his testimony must be "scientific . . . knowledge." *Id.* Thus, Dr. DeRamus' assertions must be derived by an accepted scientific method. *Daubert*, 509 U.S. at 590.

Further, for an economic analysis to be admissible it must be both testable and generally accepted in the scientific community. "In determining whether testimony is reliable, we are guided by several factors: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." *Id.* at 321. Dr.

DeRamus' analysis fails to satisfy any of the requirements above, relying primarily on unsupported ZF Meritor documents for his conclusions. (*See* DeRamus Dep. 368:18-369:6.)

### B.     Dr. DeRamus Applies No Economically Testable Theory

Black letter law states that an expert must be able to point to methods that he applied. *JMJ Enters. v. Via Veneto Italian Ice*, 1998 U.S. Dist. LEXIS 5098 (E.D. Pa. 1998). Dr. DeRamus has not and cannot do so because he never conducted any professionally recognizable economic analysis in his report. Dr. DeRamus' report proffers his opinion about the intent and effect of Eaton's contracts and other practices based entirely upon his interpretation of some skewed selection of documents (and very little testimony). He did not employ any recognized test at all for determining the key economic question at issue: whether Eaton's conduct economically excluded or foreclosed competition and injured Plaintiffs.

Defendants' experts, Professors Murphy and Sibley, did apply a proper test, the attribution test, to assess whether Eaton's agreements with the OEMs had any anticompetitive effect. (Ex. 71 at App. 1009-16; Sibley Report ¶¶ 43-45.) The attribution test is a specific form of the "price-cost test," which is a standard test used to determine whether a firm is pricing predatorily. (Ex. 71 at App. 1003-04.) Specifically, the attribution test allocates all discounts to the contestable units, and determines whether an equally efficient supplier of those products can compete and still set price above costs. (*Id.* at App. 104.) If the answer is yes, then an equally efficient competitor can profitably compete for that business. (*Id.*) Both Professors Sibley and Murphy applied this test and concluded that ZF Meritor could not have been foreclosed by the challenged contracts even if it were an equally efficient competitor. (Ex. 71 at App. 1054-55; Ex. 72 at App. 1111-12; Sibley Report ¶¶ 43-45.)

Dr. DeRamus does not attempt to employ any such analysis. To come to his conclusions, Dr. DeRamus '

to

However, Dr. DeRamus' belief – based upon how he perceives the small portion of the evidentiary record he chose to look at – that·

        ·is not the product of economic analysis.  An expert's *ipse dixit* conclusion – divorced from the tests applied by actual economists in the field – is inadmissible as a matter of law.  *See Joiner*, 522 U.S. at 146 ("Nothing … requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert").

      Dr. DeRamus' "say-so" is particularly problematic here because he reviewed a very skewed portion of the evidentiary record – and ignored volumes of facts that contradicted his say-so.  *See Concord Boat*, 207 F.3d at 1056-57 (economist's analysis was flawed where it "did not incorporate all aspects of the economic reality" and he "ignored inconvenient evidence").  He reviews very little, if any, deposition testimony.  In fact, most of the information he relies on is hearsay within hearsay.  Had Dr. DeRamus conducted even a cursory review of the available deposition testimony in this case, he would have found that

      (*See, e.g.,* Lampert Dep. at 80:25-81:23, 83:3-12.)  This is not a proper scientific analysis.  It is simply a product of the say-so of Plaintiffs' expert.  His conclusion cannot be duplicated or tested.  It is unverifiable, and unsupported by any professionally recognized economic analysis.  For these reasons, Dr. DeRamus opinions on liability must be excluded.

III.    **DR. DERAMUS' FAILURE TO DISAGGREGATE THE MANY CAUSES OF PLAINTIFFS' PURPORTED INJURIES AND DAMAGES IS FATAL**

    C.    **Experts Are Required To Disaggregate**

It is well settled that an expert opinion cannot get to a jury if the expert has not separated the injuries and damages caused by the purported unlawful conduct from the injuries and damages caused by lawful, competitive conduct. In *Coleman*, 525 F.2d at 1353, the Third Circuit granted a new trial in a Sherman Act case because the expert failed to consider the effect of sales which would be lost as a result of lawful competition: "The damage figures advanced by plaintiff's experts may be substantially attributable to lawful competition. In the absence of any guidance in the record, *we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition*") (emphasis added). *Concord Boat*, 207 F.3d 1039, is also instructive. The economist in that case failed to "account for market events that both sides agreed were not related to any anticompetitive activity." *Id.* at 1057. The court concluded that the "expert opinion should not have been admitted because it did not incorporate all aspects of the economic reality of the stern drive engine market and because it *did not separate lawful from unlawful conduct.*" *Id.* (emphasis added). "Because of those deficiencies in the foundation of the opinion, the expert's resulting conclusions were 'mere speculation.'" *Id.; see also, e.g., MCI Communications Corp. v. AT&T*, 708 F.2d 1081, 1163-64 (7th Cir. 1983) (A jury verdict based on the aggregated study cannot stand.); *R.S.E., Inc. v. Pennsy Supply, Inc.*, 523 F. Supp. 954, 966 (M.D. Pa. 1981) ("Perhaps the most blatant defect in plaintiff's damage model for lost profits is its failure to account for any lawful competition.").

It is equally well settled that failure to account for losses caused by Plaintiffs' own internal problems is fatal to a damages estimate. *See National Ass'n of Review Appraisers &*

*Mortgage Underwriter v. Appraisal Found.*, 64 F.3d 1130, 1135 (8th Cir. 1995) (affirming summary judgment where "[a] number of highly publicized missteps and other considerations have contributed greatly to the Associations' current deflated membership base . . . their problems can be traced directly back to the corporate office."); *United States Football League v. National Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) (affirming nominal damages award because plaintiff failed to disaggregate its damages: "[a] plaintiff's proof of amount of damages thus must provide the jury with a reasonable basis upon which to estimate the amount of its losses caused by other factors, such as management problems, a general recession, or lawful factors").

> **D.**   **Dr. DeRamus Does Not Disaggregate Injury Due To *Lawful* Conduct From Injury Due to Purportedly *Unlawful* Conduct And Meritor's Product Defects, Non-Competitive Pricing, And Other Problems**

Dr. DeRamus asserts that

(Ex. 73 at App. 1259

1262                                                                      1262

Eaton, however, provided the OEMs

The methodology employed by Dr. DeRamus, however, fails to account for any of this clearly *competitive* conduct.  Nor does his analysis take into account that

-33-

(Lundahl Dep. 77:10-78:5

Rather, the methodology

employed by Dr. DeRamus assumes that

This is not proper scientific analysis.

In addition, Dr. DeRamus presents an

Because there is

reason to believe the economic effects of each contract differed at each OEM,[10] proper economic

analysis requires that each contract by analyzed separately.   (Ex. 72 at App. 1126.)   Dr.

DeRamus, however, did no such analysis.   He did not do any accepted economic test for

demonstrating that any contract (or any term of any contract) had any anticompetitive effect.

Instead, he just

This is a classic example of *ipse dixit* that courts repeatedly hold is improper.

*Joiner*, 522 U.S. at 146.

Nor does Dr. DeRamus make any effort to separate out the losses resulting from ZF

Meritor's own product defects and other problems.   ZF Meritor's employees

_____

10

. (Ex. 71 at App. 17.)

-34-

Dr. DeRamus' analysis, however, fails to take account of the fact that these internal problems caused lost sales.   Instead, his analysis

His analysis is not scientifically valid because he does not employ any economic test or analysis to determine the effect Meritor's own internal problems had on its sales.   Dr. DeRamus' failure to account for factors any reasonable economist would find relevant to ZF Meritor's purported claims of injury and damages requires that his opinions be excluded.   *See, e.g., Coleman*, 525 F.2d at 135; *Concord Boat Corp*, 207 F.3d at 1057; *United States Football League*, 842 F.2d at 1378.

**IV.   DR. DERAMUS' LOST PROFITS DAMAGES ANALYSES ARE JUNK SCIENCE BECAUSE THEY ARE BASED ON ASSUMPTIONS CONTRARY TO FUNDAMENTAL ECONOMIC THEORY AND CONTRADICTED BY THE FACTS**

Dr. DeRamus describes his "but-for" world as and admits that

(DeRamus Dep. at 11:8-12, 72:3-7.)   His damages analyses, however,

(*Id.* at 28:4-29:9; *see* Ex. 73 at App. 1292, 1351.)

Basic economic theory provides – and Dr. DeRamus admits – that

.   (Ex. 71 at App. 1121-22.)   To assume, as Dr. DaRamus does, that

makes no economic sense.   (*Id.*)   The fault in Dr. DeRamus' methodologies is that they are devoid of any actual economic analysis.   Instead, he

-35-

(DeRamus Dep. 17:1-8; 21:22-22:5.)


         . (*Id.* 21:5-22:5, 185:7-9 '                               228:3-

7 '

                   ,, 229:15-17, 237:1-12).   The application of Dr. DeRamus'

leads to the conclusion that

                   (Ex. 71 at App. 1121-22.) ZF Meritor, therefore, is

essentially claiming that


                   -- the antithesis of the antirust laws.

       In *Murphy,* 658 F.2d 1256, the Ninth Circuit held that the plaintiffs' lost profits damages theory was unreliable because it assumed the defendant would not lower its prices when its competitor began to acquire market share.  The court held that economic rationality is required in a damages analysis.  *Id.* at 1262 ("In a hypothetical economic construction, such as the one underlying Murphy's theory on lost profits, economic rationality must be assumed for all competitors, absent the strongest evidence of chronic irrationality"); *id.* at 1262 ("A reasonable jury could not, however, indulge in the assumption that a competitor would follow a course of behavior other than that which it believed would maximize its profits").  The Ninth Circuit affirmed the district court's judgment n.o.v. because the plaintiff's expert's pricing and market share assumptions made no economic sense.  *Id.* at 1262-63 (citations omitted, emphasis added).

As in *Murphy,* the assumption that

makes no economic sense.

## V.  DR. DERAMUS' OPINION IS JUNK SCIENCE BECAUSE HIS ASSUMPTION ABOUT THE VOLUME OF DEMAND FOR ZF MERITOR'S FREEDOMLINE PRODUCT IS CONTRADICTED BY THE FACT RECORD

Dr. DeRamus relies upon

He did not conduct any independent study of demand for FreedomLine and there is no evidence in the factual record supporting his assumption.   On the contrary, the record evidence contradicts his assumption: demand for automated mechanicals (*all* automated mechanicals) has never been more than approximately

Plaintiffs' expert

His assumption is based entirely on

That is not the proper basis for a scientific opinion.

"[T]he Third Circuit has found that an expert may not testify where an economic expert's testimony rests on faulty assumptions." *Total Containment,* 2001 U.S. Dist. LEXIS 15838, at *12 (citing *Elcock v. Kmart Corp.,* 233 F.3d 734, 754-55 (3d Cir. 2000).)   Courts have not hesitated to exclude expert opinions in such circumstances. *See, e.g., Elcock,* 233 F.3d at 756 (abuse of discretion for district court to admit expert testimony on purported damages because the expert's "economic model relied on several empirical assumptions that were not supported by the record"); *Tyger,* 29 F.3d at 143 ("expert's opinion was based on faulty assumption that is unsupported by the evidence"); *JMJ Enterprises,* 1998 U.S. Dist. LEXIS 5098 at *22 (expert's

-37-

damages opinion was "not reliable" because it was "based on an unrealistic sales projection"); *Total Containment*, 2001 U.S. Dist. LEXIS 15838, at *14 (economic expert's lost profits "conclusions and the underlying data on which they are based lack reliability" because analysis contained faulty assumptions related to market share in the but-for world); *Target Market Publishing, Inc. v. Advo, Inc.*, 136 F.3d 1139 (7th Cir. 1998) (excluding testimony of damages expert because the expert's report "projected $1.4 million in profits ... based on assumptions that do not legitimately support the conclusion," including implausible assumptions related to market penetration). Because Dr. DeRamus' lost profits analyses are not the product of sound economic analysis and, instead, based on assumptions contradicted by the fact record, his damages opinions should be excluded.

In fact, Dr. DeRamus' failure to independently verify the assumptions in the forecast, in and of itself, renders his analyses defective. In *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 588 (D. Del. 2004), for instance, a court in this District granted a defendant's motion to exclude plaintiffs' expert is lost profits damages opinion where, as here, the expert relied upon projections in a company business plan with no independent verification of their reasonableness. The defendant argued that the plaintiffs' "blind faith" reliance on the goals in the business plan rendered the expert's opinions unreliable because the expert "did not undertake any independent analysis, did not use any expertise to evaluate two secondary sources relied upon by [the business plan], and [did] not know what the data represents, how it was compiled, or how it was evaluated or chosen by Grey Isreal." *Id.* at 589. The Court held that the expert's opinion "does not withstand the basic test of reliability" because "he did not know what he was basing his testimony on" and simply "adopted the Grey marketing plan without reviewing its underpinnings." *Id.* at 589-90; *see also TK-7 Corp. v. Barbouti*, 993 F.2d 722, 732 (10th

-38-

Circuit 1993) (expert's adoption of the projections of another expert in formulating lost profits opinion was improper where there was "no indication that [the damages expert] had any familiarity with the methods or reasoning used by [the other expert] in arriving at his projections"); *JRL Enterprises, Inc. v. Procorp Assocs.*, 2003 U.S. Dist. LEXIS 9397, at *23 (E.D. La. June 3, 2003) (precluding damages testimony where expert blindly relied upon projections in business plan because the expert "performed no independent analysis of the numbers given to him by [the defendant]" and "has failed to show that reasonable accountants would simply and blindly accept such numbers in formulating opinions").[11]

## VI.   DR. DERAMUS' ENTERPRISE VALUE CALCULATION IS FLAWED

Significant flaws in Dr. DeRamus' enterprise value calculation render his analysis unreliable under *Daubert.* First, his enterprise value is fatally flawed because,

(Ex. 73 at App. 1345-46; Ex. 71 at App. 1136-37.) Thus, his



---

[11] Dr. DeRamus' lost profits damages methodology suffers from other, fatal flaws. For example,

(Ex. 73 at App. 1264-65) First, Dr. DeRamus' assumption that

makes no economic sense. (*See* Ex. 71 at App. 1132.) Second, Dr. DeRamus' assumption that

(*Id.* at App. 1118-19.) Dr. DeRamus' econometric model for calculating ZF Meritor's market share in the "but-for" world is also flawed because

(*Id.* at App. 1128-29)

(*Id.*)

(*Id.*)

enterprise value calculation suffers from the same flaws as his lost profits calculations and should be precluded for the same reasons. *See, e.g., Paoli,* 35 F.3d at 745.

Second, Dr. DeRamus' analysis is flawed because

(Ex. 73 at App. 1344.)

(*Id.* at App. 1345-46; Ex. 71 at App. 1134-35.)

(Ex. 73 at App. 1345-46; Ex. 71 at App. 1134-35.)  When using a comparables approach, however, the only relevant price is the price *on the date of valuation*.  (Ex. 71 at App. 1134-35; (citing IRS Revenue Ruling 59/60 Valuation of Stocks and Bonds).)  Thus, proper application of the enterprise value methodology in the case at bar required Dr. DeRamus' to use data on the valuation of his comparable companies as of February 2009.  Using data

makes no sense and renders his analyses unreliable and unhelpful to the trier of fact.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the expert opinions of Dr. David W. DeRamus be excluded and that the Court grant all further relief that is warranted.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*Donald E. Reid*

Donald E. Reid (#1058)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 351-9219
*Attorneys for Defendant*
*Eaton Corporation*

OF COUNSEL:
Robert F. Ruyak
Joseph A. Ostoyich
Andrew D. Lazerow
Melissa R. Handrigan
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

May 11, 2009

## CERTIFICATE OF SERVICE

I, Donald E. Reid, hereby certify that on the 18th day of May, 2009, a copy of the

Redacted Public Version of Defendant's Memorandum Of Law In Support Of Its Motion To

Exclude Opinion Testimony Of Dr. David W. Deramus was served via electronic filing on the

following counsel of record in the manner indicated below:

> Karen V. Sullivan, Esquire
> Drinker Biddle & Reath LLP
> 1100 North Market Street
> Suite 1000
> Wilmington, DE 19801
>
> R. Bruce Holcomb, Esquire
> Christopher H. Wood, Esquire
> Adams Holcomb LLP
> 1875 Eye Street, NW
> Suite 810
> Washington, DC 20006
>
> Peter J. Kadzik, Esquire
> Dickstein Shapiro LLP
> 1825 Eye Street, NW
> Washington, DC 20006

Donald E. Reid (#1058)