IN THE UNITES STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ZF MERITOR LLC and MERITOR          )
TRANSMISSION CORPORATION,           )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )  Civ. No. 06-623-SLR
                                    )
EATON CORPORATION,                  )
                                    )
            Defendant.              )

Karen V. Sullivan, Esquire, Drinker Biddle & Reath LLP, Wilmington, Delaware. Of Counsel: R. Bruce Holcomb, Esquire, Adams Holcomb LLP, Washington, D.C.; Jay N. Fastow, Esquire, Dickstein Shapiro LLP, New York, New York. Counsel for Plaintiffs.

Donald E. Reid, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Of Counsel: Robert R. Ruyak, Esquire, Joseph A. Ostoyich, Esquire, Andrew D. Lazerow, Esquire, and Melissa R. Handrigan, Esquire, Howrey LLP, Washington, D.C. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: August 20, 2009
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

In this antitrust case, plaintiffs ZF Meritor LLC ("ZFM") and Meritor Transmission Corporation ("Meritor") (collectively, plaintiffs[1]) claim that defendant Eaton Corporation ("Eaton"), a manufacturer of heavy-duty ("HD") transmissions, had monopoly power in the HD transmission market and used that power, through *de facto* exclusive dealing contracts with distributors ("OEMs") in the market, to foreclose competition and cause ongoing injury to plaintiffs, all pursuant to Sections 1 and 2 of the Sherman Act, as well as Section 3 of the Clayton Act. The court has jurisdiction over the matter pursuant to 28 U.S.C. § 1331.

There are two pending motions: Eaton's motion for summary judgment on statute of limitations grounds, and Eaton's motion to exclude the expert opinion of Dr. David W. DeRamus. An evidentiary hearing on the latter motion was conducted on July 21, 2009, and the parties have submitted supplemental briefing based on the evidence adduced at said hearing. For the reasons that follow, the motion to exclude shall be granted.[2]

## II. BACKGROUND

ZFM was formed by Meritor (then Rockwell) and ZF Friedrichshafen AG. Meritor entered the HD transmission market in 1989. In the years 1990-1999, Meritor held

---

[1] ZFM is a joint venture; Meritor Transmission Corporation is one of ZFM's shareholders.

[2] It would be the court's understanding that plaintiffs cannot pursue their claims without the expert evidence of Dr. DeRamus. Therefore, the court shall not address the motion for summary judgment and it shall be denied without prejudice to renew.

between 10% and 18%[3] of the combined market for both HD linehaul transmissions and HD performance transmissions.[4] According to Figure 16 of the DeRamus expert report, the market for HD trucks fell dramatically in 1999 and bottomed out in 2001; demand plummeted from more than 300,000 new truck builds per year to roughly 150,000. (D.I. 123 at A-88) Of significance to the dispute at bar, it was during this time period that ZFM was formed and introduced "FreedomLine," a two-pedal, fully automated mechanical HD transmission.[5] According to Figure 19, captioned "FreedomLine unit sales and as a share of the linehaul market," sales of ZFM's FreedomLine transmission comprised 0% of the linehaul market in 2001, steadily increased to around 6% in 2003, and declined back down to 0% by 2007. (D.I. 123 at A-92) ZFM exited the market in December 2003 and the ZFM joint venture was dissolved at that time. (D.I. 123 at A-57)

Effective in mid-2000, Eaton entered into multi-year contracts (referred to as "Long Term Agreements" or "LTAs" in the papers)[6] with three OEMs. The contract terms were not exclusive; each customer remained free to buy HD transmissions from

---

[3] More specifically, Figure 34 of the DeRamus expert report indicates that ZFM's share of truck builds remained around 10% from 1991 to 1993, plummeted to 5% in 1994, and gradually increased to between 14% and 18% by 1997 through 1999.

[4] Linehaul transmissions are used in tractor-trailers traveling long distances on well maintained roads. Performance transmissions, with more gearing, are used in trucks operating on unfinished terrain (e.g., construction trucks), or trucks carrying extremely heavy loads.

[5] Although ZFM announced the launch of the FreedomLine in November 1999, it would appear that the product did not actually reach the market until February 2001 at the earliest. (See D.I. 123 at A-54)

[6] The LTAs ranged in duration from five to seven years.

other suppliers, including ZFM. Each LTA provided a different set of incentives to buy more Eaton transmissions (such as base price reductions kept firm for several years, up front payments in lieu of gradual price reductions, on-site engineering resources and other efforts to lower the OEMs' costs, and rebates[7]), depending on what each customer wanted. In 2002, Eaton entered into similar five-year LTAs with two additional OEMs.

Plaintiffs claim that the LTAs foreclosed competition and caused antitrust injury. The market context for this claim is illustrated most clearly by Figures 16, 17 and 34 of the DeRamus expert report. (D.I. 123 at A-88, A-89 and A-134) Figure 16 indicates that, after the dramatic drop in truck builds from 1999 to 2001, truck builds gradually increased from 150,000 in 2001 to more than 350,000 trucks per year in 2006 before falling again to approximately 200,000 per year in 2007. Figure 17 indicates that, at all times relevant to the dispute, Eaton's average prices were lower than Meritor's average prices. Figure 34 indicates that, from July 2000 to October 2003, ZFM's share of truck builds ranged between 8% and 14%, before it started its decline to zero by 2007. Plaintiffs filed the instant lawsuit on October 5, 2006. Dr. DeRamus has calculated plaintiffs' damages to be between $606 million and $824 million.

## III. STANDARD OF REVIEW

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), made clear that courts have to play a gatekeeping role with respect to

---

[7]For example, the LTAs provided for rebates conditioned on Eaton's attaining specified market share at each OEM across linehaul and performance transmissions.

experts. According to the Supreme Court, Rule 702 of the Federal Rules of Evidence[8] is the primary locus of the gatekeeping role. Pursuant to Rule 702, a party can offer testimony of an expert witness at trial so long as the expert is qualified, the methodology the expert uses is reliable, and the opinion fits the facts of the case. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). A trial judge, then, is tasked with being a "'gatekeeper' to ensure that 'any and all expert testimony is not only relevant, but also reliable.'" *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

As recognized by the United States Court of Appeals for the Third Circuit, while an expert's methodology is required to pass muster under Rule 702, the data

---

[8]Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

underlying the expert's opinion must pass muster under Rules 104[9] and 703[10]. More specifically, the Third Circuit, in *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994), made clear "that it is the judge who makes the determination of reasonable reliance, and that for the judge to make the factual determination under Rule 104(a) that an expert is basing his or her opinion on a type of data **reasonably** relied upon by experts, the judge must conduct an independent evaluation into reasonableness." *Id.* at 748. The Third Circuit concluded in *In re Paoli* that, because the policy considerations underlying the rules of evidence are the same,[11] the "reliability requirement" for admission under Rules 104, 702 and 703 should be the same - "there must be good

---

[9]Rule 104 provides:

(a) **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). . . .

(b) **Relevance conditioned on fact.** When the relevance of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

[10]Rule 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. . . .

[11]Although the Third Circuit did not take the opportunity to expound on what these policy considerations are, it cannot be disputed that the touchstone of a trial judge's responsibilities is to provide to each jury the tools it needs to return a reasoned verdict, based upon appropriate legal instructions and evidence that is reliable and trustworthy.

5

grounds on which to find the data reliable." *Id.*

## IV. DISCUSSION

In the context of the case at bar, plaintiffs argue that Dr. DeRamus has applied reliable methodologies to data of a type relied upon by experts in his field. Although Eaton argues that Dr. DeRamus failed to apply any actual economic tests to conclude that the LTAs were exclusionary in the first instance, the court will focus on the damages aspect of his expert opinion, where he applied accepted methodologies to arguably unreliable data to reach his damages figures.

The keystone of Dr. DeRamus' damages analysis is one page (captioned "Five Year Product Line Profit and Loss") of the "Revised Strategic Business Plan" for fiscal years 2001-2005, presented to ZFM's board of directors on November 30, 2000 (hereafter, the "2000 estimates"). (D.I. 123 at A-294, Table 5 at A-148) According to Dr. DeRamus, "[t]his document provides a reliable, albeit conservative, set of estimates prepared by [ZFM] that can be used as the basis for a damages calculation." (*Id.* at A-128) There can be no doubt that, in his 153-page expert report, Dr. DeRamus manipulated the 2000 estimates using methodologies employed by economists. However, the fundamental query remains as to whether the 2000 estimates pass the reliability requirements of Rules 104, 702 and 703.

The court starts with the helpful insight of the Third Circuit. In its analysis of a similar problem in *In re Paoli*, the Third Circuit first noted that an expert who relies on, for example, animal studies cannot characterize those studies as being his underlying data, "but rather the data that went into the animal studies in the first place are his

underlying data." 35 F.3d at 748 n.18. The Third Circuit went on to explain that "[t]here will be times when an expert's methodology is generally reliable but some of the underlying data is not of a type reasonably relied on by experts." *Id.* at 749. The Third Circuit then concluded that, "[w]hen a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert." *Id.*

Plaintiffs argue that "[a]n economist's use of the internal financial projections of a company that has been in the marketplace is a reliable basis upon which to estimate damages." (D.I. 122 at 23) Plaintiffs cite to *LePage's Inc. v. 3M*, 324 F.3d 141, 165 (3d Cir. 2003), in support of this argument. Although the court does not disagree with the general proposition that "'an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities,'" *id.*, unlike LePage's expert,[12] Dr. DeRamus did not construct his own world. He did not use actual financial data in order to project the 2000 estimates. He did not apply his own assumptions, based upon his expertise, to any financial data in order to project the 2000 estimates. In short, Dr. DeRamus relied on the 2000 estimates without knowing either the qualifications of those who actually prepared them or the validity of the underlying data and assumptions upon which the

---

[12]LePage's expert constructed a "lost market share" model based on actual financial data from 1992 to 1997 and his projections based on various assumptions he made. 324 F.3d at 165.

2000 estimates were based.[13]

At this juncture, the court emphasizes that it is not judging the credibility of Dr. DeRamus, a judgment within a jury's province. Rather, the only question before the court is whether the expert opinion of Dr. DeRamus is based on reliable data. The court concludes that it is not. The court does not reach this decision lightly, as it has been a critic of the almost routinely-filed motions to exclude filed under the auspices of *Daubert*. Nevertheless, Dr. DeRamus' expert opinion fails the reliability analysis required under Rules 104, 702 and 703, given that the extraordinary conclusions reached by Dr. DeRamus (damages in the range of $606 to $824 million[14]) flow from the slenderest of analytical threads (one page of estimates from a business plan prepared for a business formed within the year[15]) whose source is both unknown to, and untested by, Dr. DeRamus. Without sufficient indicia of the reliability of the 2000

---

[13] The projections of company officials have been held admissible, for example, where such witnesses "set out at length the bases from which they derived their figures, and consequently [defendant] was able to cross-examine them vigorously. These projections were no mere 'interested guess' prepared with an eye on litigation. Instead, they were the product of deliberation by experienced businessmen charting their future course." *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 566 (3d Cir. 1970).

[14] Despite the magnitude of these numbers, the expert report characterizes (on innumerable occasions) the analysis as "conservative," bringing to mind a favorite line from the movie "Princess Bride," changed to fit the context: "I don't think the word 'conservative' means what you think it means."

[15] The court understands that a new business claiming to have been foreclosed from entering a market may not have actual financial data upon which to rely to calculate damages. All the more reason, however, to identify and justify the assumptions underlying any financial projections for such a business, especially if the data or assumptions ultimately used relate to a different company altogether (e.g., Meritor data is liberally interspersed in the DeRamus expert report).

estimates, the expert analysis collapses of its own weight.

## V. CONCLUSION

For the reasons stated, Eaton's motion to exclude the expert opinion of Dr. DeRamus is granted. An order shall issue.