IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ZF MERITOR LLC and MERITOR TRANSMISSION CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 06-623-SLR |
| EATON CORPORATION, | ) ) ) | |
| Defendant. | ) | |

---

Karen V. Sullivan, Esquire of Drinker Biddle & Reath LLP, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Jay N. Fastow, Esquire of Dickstein Sapiro LLP, New York, New York. R. Bruce Holcomb, Esquire of Adams Holcomb LLP, Washington, D.C.

Donald E. Reid, Esquire of Morris Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Robert F. Ruyak and Joseph A. Ostoyich, Esquire of Howrey LLP, Washington, DC. Counsel for Defendant.

---

**MEMORANDUM OPINION**

Dated: March 10, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiffs ZF Meritor LLC ("ZFM") and Meritor Transmission Corporation ("Meritor") (collectively, "plaintiffs") filed this action against defendant Eaton Corporation ("defendant") on October 5, 2006, alleging violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. (D.I. 1) At all times relevant prior to trial, plaintiffs and defendant were rival manufacturers of Class 8 commercial truck transmissions. Following a trial, on October 20, 2009, a jury found that defendant violated Sections 1 and 2 of the Sherman Antitrust Act and Section 3 of the Clayton Act. (D.I. 226) The issue of damages was not tried. (Id.) Currently before the court is defendant's renewed motion for judgment as a matter of law or for a new trial. (D.I. 245) For the reasons stated below, defendant's motion is denied.

## II. BACKGROUND

### A. Parties and Market Conditions

Defendant began making heavy duty transmissions during the 1950's, and was the only manufacturer of heavy duty ("HD") manual transmissions before Meritor entered the market in 1989 with 9- and 10-speed manual transmissions for on-highway trucks. (D.I. 238 at 2488:22-2490:14; D.I. 233 at 1259:22-1260:7; D.I. 233 at 1259:15-1261:19) In mid-1999, Meritor transferred its transmission business into a new joint venture with ZF AG, a large German company that had never before sold HD transmissions in North America. (D.I 233 at 1263:7-14; D.I. 231 at 867:14-15) One purpose of this venture was to adapt ZF's "ASTronic" on-highway automated

mechanical transmission for the NAFTA market. (D.I. 233 at 1287:12-1289:10) The ASTronic (renamed the "FreedomLine") was introduced in April 2001. (D.I. 233 at 1289:11-14; D.I. 230 at 478:23-479:3)

A series of mergers in the mid-1990's reduced to four the number of truck Original Equipment Manufacturers ("OEMs") who purchased HD transmissions. (D.I. 238 at 2487:12-16; D.I. 242 at 3618:1-3619:11) In late 1999-early 2000, a severe economic downturn resulted in HD truck orders falling by 40-50%. (D.I. 233 at 1205:1-6; D.I. 230 at 654:6-14; D.I. 232 at 1033:9-1034:18) Shortly thereafter, defendant entered into new multi-year contracts (Long Term Agreements or "LTAs") with each OEM.

## B. The LTAs

Defendant's LTA with Freightliner, the largest of the OEMs, had a five-year duration and contained rebates that were contingent on a 92% share penetration target.[1] (D.I. 249, PTX-115 at 2-3) Defendant had the right to terminate the LTA if Freightliner did not meet its share penetration target. (Id.) Freightliner was also required under the LTA to preferentially price defendant's transmissions against all competing products, make defendant's products standard equipment, and exclusively

---

[1] Share penetration targets are different from volume targets. A share penetration target is based solely on the percentage of the OEM's trucks that incorporate defendant's transmissions. (D.I. 231 at 862:18-863:2) So, for example, 92% of Freightliner's trucks needed to incorporate defendants' transmissions in order to meet its penetration goal. If Freightliner built only one truck in a given year and it incorporated defendant's transmission, Freightliner would still meet its 92% share penetration target.

2

publish defendant's transmissions in its data books.[2]  (D.I. 249, PTX-115, ex. E)[3]

Defendant's LTA with Paccar had similar characteristics.  In exchange for a 90-95% share penetration target, Paccar would receive optional rebates from 2-3%. (D.I. 249, PTX-599 at 26)  These rebates were conditioned on share penetration across all product lines, and failure of any one line would lead to a loss of rebate across all lines. (Id.)  Defendant's products were to receive preferential pricing and become standard equipment in Paccar's data books.  (Id. at 7)  The LTA contained an up-front payment of $1 million dollars in lieu of certain price reductions and had a seven-year term.  (Id. at 2-3)

The LTA with International had a five-year term and included year-over-year price decreases on medium duty products.  (D.I. 249, DX-467 at 4-6)   It also included a $2.5 million dollar up-front payment in lieu of certain price reductions that was to be returned on a pro-rata basis in the event of termination of the agreement.  (Id.) Additional rebates of 0.35%-2% were conditioned on International buying 87-97.5% of its HD transmission needs from defendant.  (Id., Schedule 8.3)

Finally, Volvo's LTA had a five-year term and required that defendant's HD transmissions were listed as the standard offering for all Volvo North America trucks.

---

[2]  A data book is a term of art in the trucking industry.  It represents the truck broken down into its core components, and provides the customer with a list of options when building the truck.  (D.I. 229 at 320:1-16)  For example, in the "seats" section of the data book, the customer may have a choice between Sears brand seats or Bostrom brand seats.  (Id.)  The same applies for other components such as engines and transmissions.  (Id.)

[3]  Many of the LTAs included additional benefits such as dedicated engineering support.

(D.I. 249, DX-515 at 1) As with the Freightliner LTA, defendant had the ability to terminate if Volvo did not meet its share penetration target. (*Id.* at 8) If Volvo did reach its penetration targets of 70-78%, it would receive a discount of 0.5%-1.5%. (*Id.*, Attachment B)

Each of the LTAs contained a "competitive" clause that allowed the OEM to purchase transmissions from another supplier if said supplier offered the OEM a lower price, the OEM notified defendant of the price, and the price could not be met after good faith negotiations. (D.I. 249, DX-515 at 7; PTX-599 at 32; DX-467 at 15; PTX-115 at 3) Upon invoking the clause, the remaining provisions of the LTA remained in full force and effect, however, the OEM could remove defendant's product as standard equipment. (*Id.*)

For Freightliner, if not for all of the OEMs, these LTAs represented a substantial departure from their previous supply contracts. Prior to the LTAs, it was uncommon for a contract to include penetration targets. (D.I. 231 at 950:3-13) It was also uncommon to require preferential pricing of one supplier's products over another's and to require that an OEM exclusively publish one manufacturer's products in its data book. (*Id.* at 950:14-951:10)

### 3. ZFM's Exit From the Market

Despite the existence of the LTAs, ZFM's market share of on-highway HD transmissions increased at three of the four OEMs between 2000 and 2003. (D.I. 236 at 1987:19-1991:7) Irrespective of this growth, ZFM believed that it was limited by the LTAs to approximately 8% of the transmission market, and not the 30% that it had

originally expected at the beginning of the joint venture. (D.I. 230 at 504:3-505:15) Because of this, ZFM concluded that it did not have enough potential market share to "industrialize" its transmissions and maintain viability as an ongoing business. (Id. at 505:22-506:9) The decision was made to dissolve the joint venture in 2003. (Id. at 506:12-20)

## III. LEGAL STANDARDS

### A. Motion for Judgment as a Matter of Law

In ruling on a renewed motion for judgment as a matter of law following a jury trial under Federal Rule of Civil Procedure 50(b), the court must "inquire whether there is any legally sufficient evidentiary basis for a reasonable jury to find for [plaintiff]." *Weisgram v. Marley Co.*, 528 U.S. 440, 453-54 (2000) (internal quotations omitted). In making this determination, the court "must draw all reasonable inferences in favor of [plaintiff], and [the court] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, "[t]he question is not whether there is literally no evidence supporting the party against whom the [Rule 50(b)] motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citing *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978)).

### B. Motion for a New Trial

Federal Rule of Civil Procedure 59(a) provides, in pertinent part:

A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of

5

the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

New trials are commonly granted in the following situations: (1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence surfaces that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent. *See Zarow-Smith v. N.J. Transit Rail Operations*, 953 F. Supp. 581, 584 (D.N.J. 1997) (citations omitted).

The decision to grant a new trial rests entirely within the sound discretion of the trial court. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Wagner v. Fair Acres Geriatric Ctr.*, 49 F. 3d 1002, 1017 (3d Cir. 1995). In considering whether a new trial is appropriate under Rule 59, the "court need not view the evidence in the light most favorable to the verdict winner, a distinction from similar motions under Rule 50." *McMillan v. Weeks Marine, Inc.,* 478 F. Supp.2d 651, 655 (D. Del. 2007). A new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand, the verdict cries out to be overturned, or where the verdict shocks the conscience." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1352 (3d Cir. 1991); *Montgomery County v. MicroVote Corp.*, 152 F. Supp. 2d 784, 795 (E.D. Pa. 2001); *Barbee v. Southeastern Pennsylvania Transp. Authority*, Civ. No. 04-4063, 2007 WL 675851, at *2 (E.D. Pa. 2007). A court should be cautious to not replace the jury's view of evidence with its own. *Power Integrations, Inc.* v. *Fairchild Semiconductor Int'l, Inc.*, 589 F. Supp. 2d 505, 508 (D. Del. 2008). Nevertheless,

6

> [w]here a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors, a verdict should be scrutinized more closely by the trial judge than is necessary where the litigation deals with material which is familiar and simple, the evidence relating to ordinary commercial practices.

*Mattern & Associates, L.L.C. v. Seidel*, 678 F. Supp. 2d 256, 264 (D. Del. 2010)

(quoting *Lind v. Schenley Indus. Inc.*, 278 F.2d 79, 90-91 (3d Cir. 1960) (en banc)).

The movant has the burden of proving that a new trial is warranted. *Weeks Marine, Inc.*, 478 F. Supp. 2d at 655.

## IV. DISCUSSION

### A. Sufficiency of Evidence of Injury to Competition or Customers

#### 1. Standard

Antitrust injury is "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* "The antitrust-injury requirement helps ensure 'that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for . . . damages.'" *West Penn Allegheny Heath Sys. Inc. v. UPMC*, 627 F.3d 85, 101 (3d Cir. 2010) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)). "Courts have consistently held that competitors frozen out by exclusive dealing arrangements have suffered an antitrust injury." *3M v. Appleton Papers, Inc.*, 35 F. Supp 2d 1138, 1147 (D. Minn. 1999). *See also Stop & Shop*

7

*Supermarket Co. v. Blue Cross and Blue Shield of Rhode Island*, 373 F. 3d 57, 66 (1st Cir. 2004); *Blackburn v. Sweeney*, 53 F.3d 825, 830 (7th Cir. 1995) ("harm inflicted on an excluded competitor . . . [is an] antitrust injury[]"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (rev'd on other grounds).

## 2. Discussion

Plaintiffs' theory of the case was that defendant's use of the LTAs injured competition by excluding plaintiffs from the marketplace, and injured consumers by depriving them of their ability to choose HD transmissions on the trucks they ordered. (D.I. 248 at 3) In support of its motion, defendant argues that there is insufficient evidence of injury to competition or customers to support the jury's finding of liability because the LTAs that form the basis of the anticompetitive conduct in question led to lower prices. (D.I. 246 at 27)

Defendant's argument misinterprets the goals of the antitrust laws. It is true that antitrust laws protect competition, not competitors. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 887, 906 (2007). However, obtaining the absolute lowest price is not always antitrust's goal.[4] Foreclosure of a market is a form of antitrust injury,

---

[4] For example, the Supreme Court recently held that minimum resale price maintenance was not *per se* illegal because it can create competition in the form of retailer services. *Leegin Creative Leather Prods.*, 551 U.S. at 903-905. Minimum resale price maintenance involves a manufacturer dictating the price retail sellers can charge. While this may lead to higher prices, it (in theory) also can lead to increased customer service. As the Supreme Court reasoned:

Absent vertical price restraints, the retail services that enhance interbrand competition might be underprovided. This is because discounting retailers can free ride on retailers who furnish services and then capture some of the increased demand those services generate. Consumers might learn, for example, about the benefits of a manufacturer's product from a retailer that

especially where the foreclosure is by a monopolist. *LePage's Inc. v. 3M*, 324 F.3d 141, 157-58 (3d Cir. 2003); *see also Brown Shoe Co. v. U.S.*, 370 U.S. 294, 329 (1962). As discussed below, there was sufficient evidence for the jury to find that defendant had foreclosed the market to competition by tying discounts to market penetration goals in its LTAs with OEMs.

Defendant relies on *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000), to argue that market share discount programs are not anticompetitive when they do not require customers to purchase 100% from one source or to refrain from purchasing from competitors. (D.I. 254 at 9) While, in theory, OEMs were free to "walk away from [defendant's] discounts at any time," *id.* at 1062-63, this does not end the analysis. As the court in *Concord Boat* stated, "the principal criteria used to evaluate the reasonableness of a contractual arrangement include the extent to which competition has been foreclosed in a substantial share of the relevant market, the duration of any exclusive arrangement, and the height of entry barriers." *Id.* at 1059.

---

invests in fine showrooms, offers product demonstrations, or hires and trains knowledgeable employees. Or consumers might decide to buy the product because they see it in a retail establishment that has a reputation for selling high-quality merchandise. If the consumer can then buy the product from a retailer that discounts because it has not spent capital providing services or developing a quality reputation, the high-service retailer will lose sales to the discounter, forcing it to cut back its services to a level lower than consumers would otherwise prefer. Minimum resale price maintenance alleviates the problem because it prevents the discounter from undercutting the service provider. With price competition decreased, the manufacturer's retailers compete among themselves over services.

*Id.* at 890-91 (internal citations omitted).

There is sufficient evidence for the jury to have found that the LTAs were unreasonable restraints of trade. First, there was evidence that the contracts foreclosed a substantial share of the relevant market. As discussed *supra,* in order to obtain the pricing incentives, each OEM was required to order 80% or more of its transmissions from defendant. (D.I. 249, PTX-115 at 3; D.I. 249, PTX-599 at 26) There is no evidence of record that shows that these market penetration goals were necessary for defendant to support its discount program. For Freightliner, the largest of the OEMs, failure to meet defendant's penetration goal of 92% gave defendant the right to unilaterally terminate the sales agreement. (D.I. 249, PTX-115 at 3) It had been demonstrated to Freightliner that defendant would refuse to pay rebates if Freightliner did not meet its penetration goals. (D.I. 249, PTX-159R at 5) Given the use of rebates as a "big hammer," the jury could conclude that it was reasonable for Freightliner to assume that defendant was willing to terminate its sales agreement had its penetration goals not been met. (*Id.*) In that regard, a reasonable jury also could have concluded that compliance with the market penetration targets was mandatory because no risk averse business would jeopardize its relationship with the largest manufacturer of transmissions in the market.

Additionally, the OEMs believed that the LTAs killed plaintiffs' business. A Freightliner executive wrote: "This is a dangerous situation. We have already killed [plaintiffs'] transmission business. It is just a matter of time now before they close the doors." (D.I. 24, PTX-531) He testified to the same at trial. (D.I. 233 at 1110:14-1111:6) The statements of the OEMs, combined with the LTAs' penetration targets and termination provisions, constitute sufficient evidence for a jury to find that defendant

10

foreclosed a substantial share of the relevant market, and support the jury's verdict that the LTAs were an unreasonable restraint of trade.

The duration of the LTAs also supports the jury's verdict. Each of the LTAs lasted five to seven years. (D.I. 249, PTX-115 at 2; PTX-599 at 2; DX-467 at 4; DX-515 at 1) This is in stark contrast to the majority of the agreements in *Brunswick* that lasted two to three years. *Brunswick*, 207 F.3d at 1044. Indeed, the duration of these LTAs was substantially longer than defendant's previous contracts with the OEMs. (D.I. 231 at 950:3-13) This supports the jury's verdict that the contracts at issue were an unreasonable restraint of trade.

Finally, the record reflects barriers to entry that support the jury's verdict. There was not a single new entrant in the HD transmission market from 1989 to 2007, save ZF, who only entered after starting a joint venture with Meritor. (D.I. 239 at 2824:2-21) Even Volvo, who manufactures its own transmissions, entered into an LTA with defendant for a large majority of its needs. (D.I. 234 at 1576:25-1578:3) Defendant's power over the market was so strong that it was able to persuade Freightliner to remove plaintiffs from its data books. (D.I. 249, PTX-155, ex. E; PTX-633) This is credible evidence of high barriers to entry and supports the jury's verdict. As the Third Circuit said in *LePage's*, "the jury could have reasonably found that [defendant's] exclusionary conduct cut [plaintiffs] off from key retail pipelines necessary to permit it to compete profitably." *LePage's*, 324 F.3d at 159.

## B. Lay Opinion Testimony as to Causation

In support of its argument that plaintiffs have failed to demonstrate that their

injury flows from that which makes defendant's acts unlawful, defendant claims that all

of plaintiffs' lay witnesses proffered "feelings" and "opinions" that they believed the

contracts restricted the OEMs,[5] yet no OEM directly testified that it was restricted by its

LTA with defendant. (D.I. 260 at 30-31) Defendant argues that this opinion testimony

should not have been admitted and, without it, plaintiffs have made no showing of

causation. (*Id.*)

### 1. Standard

> If the witness is not testifying as an expert, the witness' testimony in the form
> of opinions or inferences is limited to those opinions or inferences which are
> (a) rationally based on the perception of the witness, (b) helpful to a clear
> understanding of the witness' testimony or the determination of a fact in
> issue, and (c) not based on scientific, technical, or other specialized
> knowledge within the scope of Rule 702.

Fed. R. Evid. 701. "Rule 701 represents a movement away from . . . courts' historically

skeptical view of lay opinion evidence, and is rooted in the modern trend away from fine

distinctions between fact and opinion and toward greater admissibility." *U.S. v.*

*Stadtmauer*, 620 F.3d 238, 262 (3d Cir. 2010) (quotations and citations omitted).

Even if lay opinion testimony is erroneously admitted, "a finding of reversible

error 'may not be predicated upon a ruling which admits or excludes evidence unless a

substantial right of the party is affected.'" *Becker v. ARCO Chemical Co.*, 207 F.3d 176,

---

[5] For example, Mr. Lutz, a ZF employee, told the jury his "understanding" that Volvo/Mack was "scared to give business to us because they fear they will be penalized by [defendant] on the products which we cannot give them and they would still have to purchase from [defendant]." (D.I. 232 at 999:7-1000:14) Mr. Martello, president of ZFM, opined that the OEMs were "afraid" defendant would "give them a much higher price on the products that we could not protect[.]" (D.I. 233 at 1180:9-1181:14, 1189:14-19) Mr. Kline, Vice President of Meritor's truck division, told the jury that OEM customers purportedly "explained" to him that "there were very, very restrictive agreements in place." (D.I. 230 at 490:12-22)

205 (3d. Cir. 2000) (citations omitted) "In reviewing evidentiary rulings, if the Court finds nonconstitutional error in a civil suit, such error is harmless only if it is highly probable that the error did not affect the outcome of the case." *Id.*

## 2. Discussion

Defendant mistakenly claims that the court erroneously admitted lay opinion testimony over objection. (D.I. 246 at 29-32) With respect to Mr. Lutz, the court not only told plaintiffs to rephrase the question that led to the testimony, but also instructed the jury to disregard Mr. Lutz's answer. (D.I. 232 at 1000:9-13) Other testimony, such as Mr. Martello's opinion that OEMs were "afraid" defendant "would give them a much higher price on the product that we could not protect," was admitted over a hearsay objection, not an improper lay opinion objection.[6] (D.I. 233 at 1180:9-1181:14) Consequently, "[defendant] may not seek a new trial on the basis of objections to evidence not brought to the court's attention at the original trial." *Laymon v. Lobby House,* Inc. 613 F. Supp. 2d 504, 517 n.64 (D. Del. 2009); *Belmont Indus., Inc. v. Bethlehem Steel Corp.*, 512 F.2d 434, 438 (3d Cir. 1975).

Defendant relies on *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 225 (3d. Cir 2008), to argue that the court was placed on notice of its lay opinion objection because its "hearsay" objection at trial is sufficient to cover an improper lay opinion. (D.I. 254 at 11 n.6) The court finds this argument unpersuasive. Expanding *Hirst* to such a degree would vitiate any utility that a specific objection affords both the parties and the court. The objections made in *Hirst* were improper foundation, speculation and, most

---

[6] The testimony of Mr. Kline was also admitted over a hearsay objection, and not an improper opinion objection. (D.I. 230 at 490:12-22)

importantly, "[n]ot an expert witness." *Hirst*, 544 F.3d at 225. These objections would have put the court and parties on notice of an "improper lay opinion"[7] objection, whereas a "hearsay" objection does not.

Assuming, *arguendo*, that the opinion testimony of plaintiffs' lay witnesses was improperly admitted, it was harmless, as it is "highly probable that it did not affect the outcome of the case."[8] The jury heard testimony from plaintiffs' expert witness that defendant's conduct caused the alleged injuries. (D.I. 235 at 1885-89) The jury knew of the LTAs, read them, and heard testimony about them. The jury was also privy to defendant's internal communications which contained similar statements, that the "[OEMs] have expressed their concern that we hold them 'hostage' by virtually forcing them to not offer [competitor's] products their customers demand. . . . [We] have to work harder to keep the competition out." (D.I. 249, PTX-662 at 2) Members of the jury were free to judge the credibility of the witnesses and evidence, and eventually decided that plaintiffs' injuries flowed from anticompetitive conduct embodied within the LTAs.

## C. Dr. DeRamus' Opinions on Antitrust Injury

Defendant argues that Deramus' conclusions on antitrust injury are unsupported by the facts in the case, and cannot support the jury's verdict. (D.I. 246 at 32-33) Defendant's arguments essentially mirror those made in its *Daubert* motion of May 5,

---

[7] The court notes that "not an expert" is all but synonymous with "improper lay opinion."

[8] *Compare Hirst*, 544 F.3d at 228 (granting a new trial because improperly admitted lay opinion testimony was admitted on the issue of causation which was a "close case"); *Donlin v. Philips Lighting North Am. Corp.*, 581 F.3d 73, 83 (3d Cir. 2009) (vacating judgment where improper lay opinion testimony formed a significant share of the damages evidence presented at trial).

14

2009. (D.I. 106) Because defendant's motion was timely filed, and the court limited its analysis to DeRamus' damages opinion, it will now address causation. *ZF Meritor v. Eaton Corp.*, 676 F. Supp 2d 663, 668 (D. Del. 2009).

### 1. Standard

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 (1993), made clear that courts have to play a gatekeeping role with respect to experts. According to the Supreme Court, Rule 702 of the Federal Rules of Evidence[9] is the primary locus of the gatekeeping role. Pursuant to Rule 702, a party can offer testimony of an expert witness at trial so long as the expert is qualified, the methodology the expert uses is reliable, and the opinion fits the facts of the case. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). A trial judge, then, is tasked with being a "'gatekeeper' to ensure that 'any and all expert testimony is not only relevant, but also reliable.'" *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

As recognized by the United States Court of Appeals for the Third Circuit, while an expert's methodology is required to pass muster under Rule 702, the data underlying

---

[9] Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. § 702.

the expert's opinion must pass muster under Rules 104[10] and 703.[11] More specifically,

the Third Circuit, in *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994), made

clear "that it is the judge who makes the determination of reasonable reliance, and that

for the judge to make the factual determination under Rule 104(a) that an expert is

basing his or her opinion on a type of data reasonably relied upon by experts, the judge

must conduct an independent evaluation into reasonableness." Id. at 748. The Third

Circuit concluded in *In re Paoli* that, because the policy considerations underlying the

rules of evidence are the same,[12] the "reliability requirement" for admission under Rules

---

[10] Rule 104 provides:

(a) **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b)....

(b) **Relevance conditioned on fact.** When the relevance of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

Fed. R. Evid. § 104.

[11] Rule 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted[.]

Fed. R. Evid. § 703.

[12] Although the Third Circuit did not take the opportunity to expound on what these policy considerations are, it cannot be disputed that the touchstone of a trial judge's responsibilities is to provide to each jury the tools it needs to return a reasoned

16

104, 702 and 703 should be the same - "there must be good grounds on which to find the data reliable." *Id.*

## 2. Discussion

Defendant argues that Deramus' conclusions on antitrust injury are unsupported by the facts in the case, and cannot support the jury's verdict. (D.I. 246 at 32-33) Once again relying on *Brook Group*, defendant bases its arguments on the fact that its prices were at all times lower than that of plaintiffs', and that the OEMs sought out the LTAs. (*Id.* at 33-34). Defendant essentially argues that, so long as its prices were above its costs, it is insulated from antitrust review. However, this is not the law. Exclusion of competition is sufficient injury to give rise to liability. *LePage's*, 324 F.3d at 159.

Unlike DeRamus' damages opinion that relied on a single page of estimates from a business plan prepared for a business formed within the year,[13] his opinion on liability is more substantive, and meets the standard for an expert opinion under Rule 702. In forming his opinion, DeRamus relied upon the exclusionary nature of the LTAs to opine as to plaintiffs' antitrust injury, and he stated the grounds for his opinion regarding the LTAs clearly during trial. (D.I. 235 at 1885-89) He discussed high barriers to entry, increases in price, and harm to customer choice. (D.I. 236 at 1889-1896) While some of his statements may have been contradicted by opposing evidence, DeRamus' testimony need not be automatically excluded.

verdict, based upon appropriate legal instructions and evidence that is reliable and trustworthy.

[13] See this court's opinion on defendant's previous *Daubert* motion in *ZF Meritor*, 676 F. Supp 2d at 668.

17

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

*S.E.C. v. Johnson*, 525 F. Supp. 2d 70, 76 (D.D.C. 2007) (quoting the advisory committee on Fed. R. Evid. 702). "Defendant's criticism of . . . [DeRamus'] alleged misconstruction of facts would appear to serve better as fodder for cross-examination than as grounds for a ruling *in limine*." *Id.* "[T]he credibility of [plaintiffs'] expert[] was for the jury to determine. [DeRamus] was extensively cross-examined and, . . . [i]n the end, the jury found [DeRamus] to be credible." *LePage's*, 324 F.3d at 165.

Defendant further argues that "DeRamus did not proffer any economic test of whether [defendant's] conduct was 'exclusionary' or foreclosed competition." (D.I. 246 at 33) To the contrary, by engaging in an analysis of defendant's monopoly power, barriers to entry, and exclusive dealing, then comparing the detrimental effects of these factors with their procompetitive justifications, he engaged in a rule of reason analysis similar to that found in *Dentsply*[14] and *LePage's*.[15] (D.I. 236 at 1899:10-1901:8) Plaintiff's second expert, Dr. Michael H. Riordan ("Riordan"), described this as a "consumer welfare analysis" and opined that DeRamus conducted the test correctly. (D.I. 123 at A-325-28)

### D. Sufficiency of Evidence of Monopoly Conduct

Defendant's challenge to the sufficiency of evidence of monopoly conduct is

---

[14] *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187-197 (3d Cir. 2005).

[15] *LePage's*, 324 F.3d at 154-164.

largely repetitive of its arguments about the sufficiency of evidence of injury to competition or customers as discussed *supra.* First, defendant argues that the OEMs benefitted from lower prices and greater total value. (D.I. 246 at 36) Second, defendant argues that DeRamus' opinion that defendant exercised monopoly power is also insufficient to prop-up the jury's verdict because it depends on his incorrect definition of the relevant market. (*Id.* at 37)

### 1. Standard

Section 2 of the Sherman Act makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce. 15 U.S.C. § 2. It is "the provision of the antitrust laws designed to curb the excesses of monopolists and near-monopolists." *LePage's Inc. v. 3M*, 324 F.3d 141, 169 (3d Cir. 2003) (en banc). Liability under § 2 requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Schuylkill Energy Resources v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 412-13 (3d Cir. 1997).

The second element of a monopolization claim under § 2 requires the willful acquisition or maintenance of monopoly power. As this element makes clear, the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Anticompetitive conduct

19

may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits. *LePage's*, 324 F.3d at 147. Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 n. 32 (1985). Conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) ("It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'" (quoting *Brown Shoe*, 370 U.S. at 320)); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.").

## 2. Discussion

As the court has already discussed, obtaining the absolute lowest price for customers is not always the goal of antitrust law. *Leegin,* 551 U.S. at 903-905. The jury found that defendant had willfully acquired or maintained its monopoly power through LTAs that amounted to de facto exclusive dealing contracts having the power to foreclose competition from the marketplace. (D.I. 217 at 4) "[Defendant] is a monopolist; a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior." *LePage's*, 324 F.3d at 151-52. Furthermore,

20

plaintiff's burden for proving anticompetitive conduct is lower than defendant suggests because "'[n]either proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.'" *Id.* at 148 (quoting *Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 810 (1946)).

Defendant's argument that DeRamus inaccurately defined the market is similarly without merit. Defendant states that "[DeRamus'] untested say-so is not enough to support the jury finding of a Class 8 transmission relevant market or that Eaton possessed a monopoly share of that market." (D.I. 246 at 37) However, the parties had **agreed** that the relevant market is the Class 8 heavy duty transmission market, and this agreement is reflected in the court's final jury instructions. (D.I. 214 at 21) ("In this case the parties agree that the relevant product market is Class 8 heavy duty transmissions."). As for the geographic market, DeRamus looked at the freight costs, tariff fees, patent protection, and general development costs of foreign companies entering into the market, ultimately deciding that such an entry was unlikely.[16] (D.I. 236 at 1957:2-8) DeRamus considered factors that experts in his field would ordinarily rely on and came to a conclusion. It was then up to the jury to determine his credibility.

---

[16] In terms of market definition, the court is cognizant of the *Cellophane* fallacy which cautions that "[the] existence of significant substitution in the event of further price increases or even at the current price does not tell us whether the defendant **already** exercises significant market power." *Eastman Kodak Co. v. Image Tech. Serv. Inc.*, 504 U.S. 451, 471 (1992) (quoting Phillip Areeda & Louis Kaplow, *Antitrust Analysis,* ¶ 340(b) (4th ed.1988) (emphasis in original)). Although foreign companies may have entered the market had defendant introduced a small but significant and non-transitory increase in price, this increase may have come on top of already existing monopoly prices. Therefore, it was not inappropriate for DeRamus to exclude foreign manufacturers from the Class 8 transmission market.

*LePage*, 324 F.3d at 165.

### E. Sufficiency of Evidence of Agreement

Defendant's final argument is that plaintiffs have failed to offer proof of an agreement that unreasonably restrained trade in violation of Section 1 of the Sherman Antitrust Act. (D.I. 246 at 37)

#### 1. Standard

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The Third Circuit has explained that this statutory language imposes two essential requirements on an antitrust plaintiff. "First, the plaintiff must show that the defendant was a party to a 'contract, combination . . . or conspiracy.'" *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008). Second, "the plaintiff must show that the [contract] to which the defendant was a party imposed an unreasonable restraint on trade." *Mack Trucks*, 530 F.3d at 218.

#### 2. Discussion

Defendant argues that proof of an agreement which unreasonably restrains trade requires plaintiff to show that "each OEM shared with Eaton a 'conscious commitment to a common scheme designed to achieve [the] unlawful objective'" of excluding competitors from the marketplace or raising prices. (*Id.* at 38) (citing *Link v. Mercedes-Benz of N. Am. Inc.*, 788 F.2d 918, 823 (3d Cir. 1986)). Defendant contends that the evidence in this case shows, at most, that each OEM agreed to lawfully give

defendant the majority of its business. (D.I. 246 at 38)

Defendant is incorrect in its assertion that plaintiffs were required to prove that both defendant and the OEMs desired to achieve an illegal objective, i.e., exclusion of plaintiffs from the Class 8 transmission marketplace. "[A]cquescense in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *U.S. v. Paramount Pictures*, 334 U.S. 131, 161 (1948) As plaintiffs point out, "a § 1 conspiracy arises when an unwilling dealer, to avoid termination by [its] supplier promises . . . to deal exclusively." *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 214 (3d Cir. 1992). "Though . . . co-conspirators must share a commitment to a common scheme which has an anticompetitive objective, they need not share an identical motive for engaging in concerted action in violation of section 1 of the Sherman Act." *Id.* Here, at the very least, the OEMs entered into the LTAs with the intention of obtaining the lowest price for defendant's transmissions, thus demonstrating a sufficient "commitment to a common scheme" to satisfy the requirements of Section 1 of the Sherman Antitrust Act. (D.I. 246 at 34)

## IV. CONCLUSION

For the reasons stated above, the court denies defendant's renewed motion for judgment as a matter of law or for a new trial. An appropriate order shall issue.

23