## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

ZF MERITOR LLC and ZF MERITOR
TRANSMISSION CORPORATION,

        Plaintiffs,

        v.

EATON CORPORATION,

        Defendant.

Civil Action No. 06-623-SLR

**REDACTED PUBLIC VERSION**

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE OPINION TESTIMONY OF DR. DAVID W. DERAMUS

Donald E. Reid (Bar No. 1058)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DC 19899-1347
(302) 351-9219
DReid@MNAT.com

Joseph A. Ostoyich
Erik T. Koons
William C. Lavery
Evan A. Young
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., NW
Washington, DC 20004-2400
(202) 639-7905

Counsel for Defendant
Eaton Corporation

Original Filing Date:  March 25, 2013
Redacted Filing Date:  April 1, 2013

## TABLE OF CONTENTS

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS...............................1

SUMMARY OF ARGUMENT ...................................................................................................3

FACTUAL BACKGROUND........................................................................................................7

ARGUMENT...............................................................................................................................14

I.   DERAMUS'S OPINION IS UNRELIABLE BECAUSE IT FAILS TO EMPLOY
     VALID TIMEFRAMES TO MEASURE DAMAGES ......................................................16

     A.   DeRamus Improperly Projects Years Of Lost Profits After ZFM's
          Dissolution (And Then Adds Enterprise Value).....................................................16

     B.   DeRamus's Lost-Enterprise Value Is Rigged To Artificially Value ZFM
          At The Bubble's Height ........................................................................................18

II.  THE ECONOMETRIC MODEL IS UNRELIABLE BECAUSE ITS
     VARIABLES ARE NOT TETHERED TO THE RECORD.............................................19

     A.   DeRamus's Variables Have Nothing To Do With Truck Buyers' Selection
          Between Eaton And ZFM Transmissions...............................................................19

     B.   DeRamus Ignores Eaton's Lawful Lower Prices, As Well As ZFM's Self-
          Inflicted Wounds And Bad Luck ...........................................................................21

III. DERAMUS'S FAILURE TO DISAGGREGATE RENDERS HIS OPINION
     UNRELIABLE .................................................................................................................27

CONCLUSION...........................................................................................................................30

## TABLE OF AUTHORITIES

Page(s)

CASES

*Amerinet, Inc. v. Xerox Corp.*,
   972 F.2d 1483 (8th Cir. 1992) ...............................................................................................29

*Augustine Medical, Inc. v. Mallinckrodt, Inc.*,
   2003 WL 1873836 (D. Del. 2003) ..........................................................................................28

*Bonjorno v. Kaiser Aluminum & Chem. Co.*,
   559 F.2d 922 (E.D. Pa. 1983) ...............................................................................................17

*Brooke Group v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)...............................................................................................................21

*Calhoun v. Yamaha Motor Corp.*,
   350 F.3d 316 (3d Cir. 2003)..................................................................................................21

*Coleman Motor Co. v. Chrysler Corp.*,
   525 F.2d 1338 (3d Cir. 1975).................................................................................................29

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) .......................................................................21, 22, 23, 24, 29

*Daubert v. Merrill Dow Pharms.*,
   509 U.S. 579 (1993)..........................................................................1, 2, 3, 4, 15, 16, 17, 30

*Eiberg v. Sony Corp. of A.*,
   622 F.2d 1068 (2d Cir. 1980)................................................................................................17

*Farley Transp. Co. v. Santa Fe Transp. Co.*,
   786 F.2d 1342 (9th Cir. 1985) ...............................................................................................30

*Farmington Dowel Products Co. v. Forster Manufacturing Co.*,
   421 F.2d 61 (1st Cir. 1970).............................................................................................17, 18

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)......................................................................................2, 16, 19, 23, 24

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)..........................................................................................3, 16, 30

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999)..................................................................................................22

*In re Wireless Tel. Servs. Antitrust Litig.*,
385 F. Supp. 2d 403 (S.D.N.Y. 2005).......................................................................................21

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) (*en banc*) ...................................................................................30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 ............................................................................................................................21

*MCI Commc'ns Corp. v. AT&T Co.*,
708 F.2d 1081 (7th Cir. 1983) ...........................................................................................29, 30

*Murphy Tugboat Co. v. Crowey*,
658 F.2d 1256 (9th Cir. 1981) ...........................................................................................25, 26

*Seaboard Lumber Co. v. U.S.*,
308 F.3d 1283 (Fed. Cir. 2002)................................................................................................15

*Tse v. Ventana Med. Sys.*,
123 F. Supp. 2d 213 (D. Del. 2000), *aff'd* 297 F.3d 310 (3d Cir. 2002) .................................26

*U.S. Football League v. Nat'l Football League*,
842 F.2d 1335 (2d Cir. 1988)...................................................................................................30

*U.S. v. Bahena*,
223 F.3d 797 (8th Cir. 2000) ...................................................................................................15

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) ...............................................................................................15

*Virgin Atl. Airways, Ltd. v. British Airways PLC*,
69 F. Supp. 2d 571 (S.D.N.Y. 1999)........................................................................................28

*ZF Meritor LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012).........................................................................................2, 15, 22

**OTHER AUTHORITIES**

Rule 403 ...........................................................................................................................................30

Rule 702 .......................................................................................................................................2, 30

## APPENDIX

| EXHIBIT | DOCUMENT DESCRIPTION | APPENDIX PAGE RANGE |
|---------|----------------------|---------------------|
| 1 | August 27, 2009 Hearing Transcript | 000001 - 000015 |
| 2 | June 29, 2009 Hearing Transcript | 000016 - 000033 |
| 3 | March 6, 2013 David DeRamus Deposition Transcript | 000034 - 000138 |
| 4 | January 9, 2009 Richard Martello Deposition Transcript | 000139 - 000231 |
| 5 | January 16, 2013 DeRamus Expert Report | 000232 - 000287 |
| 6 | DX 0004 | 000288 - 000297 |
| 7 | February 17, 2009 DeRamus Expert Report | 000298 - 000492 |
| 8 | March 17, 2009 Sibley Expert Report | 000493 - 000605 |
| 9 | June 11, 2009 Declaration of David DeRamus | 000606 - 000628 |
| 10 | DX 0018 | 000629 - 000676 |
| 11 | DX 0200 | 000677 - 000694 |
| 12 | July 22, 2009 Hearing Transcript | 000695 - 000743 |
| 13 | DX 0722 | 000744 |
| 14 | October 25, 2011 Hearing Transcript | 000745 - 000758 |
| 15 | March 11, 2013 Sibley Expert Report | 000759 - 000832 |
| 16 | January 12, 2009 Antonio Lopes Deposition Transcript | 000833 - 000906 |
| 17 | DX 0310 | 000907 - 000908 |
| 18 | DX 0436 | 000909 - 000910 |
| 19 | DX 0287 | 000911 |
| 20 | DX 0400 | 000912 - 000914 |
| 21 | DX 0308 | 000915 - 000916 |

| 22 | DX 0303 | 000917 - 000922 |
| 23 | DX 0518 | 000923 - 000926 |
| 24 | DX 0120r | 000927 - 000928 |
| 25 | Meritor Market Cap Chart | 000929 |
| 26 | Eaton Market Cap Chart | 000930 |

Defendant Eaton Corporation ("Eaton") submits this memorandum of law in support of its motion to exclude the opinion testimony of Dr. David W. DeRamus ("DeRamus").  Not surprisingly, given the Third Circuit's narrow remand requiring him to use the same methods, assumptions, and data, DeRamus's amended damages opinion is even more flawed than his original opinion and, like that one, should be excluded as junk science.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

DeRamus's amended damages range from $400 to $800 million.  That is the same wide range as in his original opinion which this Court excluded as "unreliable" junk science because DeRamus did not create "his own [but-for] world," "did not apply his own assumptions, based on his expertise, to any financial data," and instead reached "extraordinary conclusions . . . from the slenderest of analytical threads." D.I. 144 at 7-8 (Aug. 20, 2009 op.).   His original opinion thus completely "fail[ed] the reliability analysis required under Rules 104, 702, and 703[.]" *Id.* During several rounds of briefing, argument, and a full-blown *Daubert* hearing, this Court observed that DeRamus's opinion suffered from additional flaws that the Court had no need to formally address given the sheer absurdity of his business plan assumptions and the Court's "limited time and resources." Ex. 1 at App. 4 (Aug. 27, 2009 hearing).  The Court noted, for example, that DeRamus's analytical approach was "upside down" because it assumed significantly higher prices in the supposedly more competitive but-for world without Eaton's contracts, Ex. 2 at App. 17 (June 29, 2008 hearing), and that his extraordinary damages figures were "not at all connected to the real world" because they utterly ignored the significant product problems and other struggles that Plaintiffs (collectively, "ZFM") faced during ZFM's brief three-year life,[1]—

---

[1] ZFM's FreedomLine suffered 350 repairs for every 100 transmissions in the field its first year and its manuals had 80 repairs per 100 transmissions at times stemming from a series of prob-

and thus represented "the kind of extravagant greed that makes everything look suspect." Ex. 1 at App. 5 (Aug. 27, 2009 hearing). Indeed, the Court characterized the report as "the worst expert report I ever read in all my years on the bench." *Id.*

The Third Circuit affirmed the exclusion of DeRamus's opinion because it "bore insufficient indicia of reliability" and "[t]he record amply supported the District Court's concern that . . . [DeRamus] lacked critical information that would be necessary for Eaton to effectively cross-examine him." *ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012). The Third Circuit thus held that "DeRamus's opinion was properly excluded because it failed the reliability requirements of Rule 702." *Id.* It remanded on a single, narrow issue: for this Court to consider whether DeRamus's "amended" opinion, submitted long after the expert discovery deadlines and this Court's earlier denial of ZFM's request to supplement,[2] sufficed under the Federal Rules of Evidence and *Daubert*, *Joiner*, and their progeny. *Id.* at 293-94, 300 & n.28. That "amended" opinion excised only his business plan assumptions—but kept all of the other methods, assumptions, and data that contributed to this Court's wide-ranging critique of his opinion. The Third Circuit explicitly limited DeRamus to the same assumptions and data "already in the expert report," *id.* at 300 n.28, and expressed "no opinion as to the reliability or admissibility of DeRamus's alternate damages calculations. That is a matter left to the District Court on remand." *Id.* This Court must now determine whether DeRamus's amended opinion with all of the defects in his original opinion except the excised business plan assumptions, passes muster. DeRamus submitted his amended report on January 16, 2013 and was deposed on March 6, 2013. Not surprisingly, given the Third Circuit's tight requirements, the amended opinion is even more flawed

---

lems that lasted throughout ZFM's brief life. D.I. 230 at 588:20-23, 638:2-8 (Kline); Ex. 10 at App. 674.

[2] "Dr. DeRamus' trial testimony is limited the scope of his expert report and deposition testimony." July 9, 2009 Response to Request for Emergency Relief.

than the original.  It churns out the very same $400 to $800 million range for single damages (with 43 alternatives in between) using the same flawed methods and data, but it does so with assumptions that are even less tied to the record than the business plan.  It again disregards common academic standards for lost-profit and enterprise-value calculations, and ignores inconvenient facts developed in the trial and discovery record, including the fundamental fact—which the Third Circuit endorsed—that Eaton's transmission prices were always both lower than ZFM's prices *and* above-cost.  Eaton's prices were thus lawful and not the cause of any antitrust injury—yet DeRamus again fails to disaggregate their effect and instead taxes all of his inflated damages to Eaton despite its ***lower and entirely lawful prices***.  DeRamus's amended damages opinion, like his original opinion, is driven by assumptions that do not fit the facts of this case and are not at all connected to the real world.  He predicts that truck buyers in the but-for world would choose ZFM's transmissions over Eaton's based not on price or quality (variables he omits), but on household consumer confidence indices and crude oil prices.  He acknowledges, though, that nothing in this record supports that assumption.  He simply made it up.

As this Court noted, cross-examination, while effective, is not sufficient to protect against sheer nonsense cloaked as expertise.  That is entrusted to the Court's gate-keeping function under *Daubert* and that role demands that "'there must be good grounds on which to find the data reliable'" before it is presented to the jury.  D.I. 144 at 6-7 (Aug. 20, 2009 opinion) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994)).  No such "good grounds" exist.

## SUMMARY OF ARGUMENT

After excluding DeRamus's original opinion as unreliable, this Court observed that "I'm not sure how we go about the damages trial . . . when my *Daubert* opinion has so thoroughly eviscerated the plaintiffs' damages expert."  Ex. 14 at App. 753 (July 29, 2011 hearing).  The

answer is now clear:  the Court cannot.  Because DeRamus's amended opinion repeats all of the same flawed methodologies and assumptions, except the business plan, it leaves unbridged his first opinion's pervasive analytical gaps.  Accordingly, the Court should again exclude DeRamus's opinion as unreliable junk science.

1. DeRamus's fundamental method has been rejected by court after court as too speculative to get to a jury.  Rather than estimating lost profits for the narrow period up to the December 2003 dissolution of the ZFM joint venture, and then enterprise value on that date, he constructs a deeply flawed econometric model that: (a) estimates supposed lost profits for years and years after ZFM's dissolution—all the way up to 2009; (b) uses those improperly-inflated hypothetical lost profits as foundation on top of which he builds his purported enterprise value of the business (which assumes those inflated profits in perpetuity); and (c) exacerbates those structural flaws by supposedly calculating the fair market value a hypothetical buyer would have paid for ZFM "as of February 2009," *after* the housing bubble burst, but in reality jacking his damages up by basing his valuation on hypothetical profit figures from several years earlier, *before* the bubble burst.  He admits that he cannot point to a single buyer in the real world who, after the bubble burst, was willing to pay top-dollar, pre-burst prices for a business.  Nor can he identify any peer reviewed academic journal endorsing such nonsense.

2. DeRamus's econometric model for estimating the market share he believes ZFM would have obtained but-for Eaton's conduct utterly disregards the actual, real-world factors that drive customers to specify an Eaton versus a ZFM transmission (such as relative price, innovation, quality, and service) and, instead, uses "macroeconomic factors" that he acknowledges are entirely disconnected from truck buyers' choices of whose transmissions to specify (such as crude oil indices and household consumer confidence surveys).  Not surprisingly, his model

yields extraordinary and immediate market share gains by ZFM that are entirely inexplicable. For example, in the real world, ZFM's share precipitously declined from 17% to 12% in June 2000 before even the first of the contracts at issue because of ████████████████ and unattractive prices resulting from its decision to cut back on its rebates to fleets. Ex. 3 at App. 67; Ex. 7 at App. 382. Yet, DeRamus's model predicts that ZFM's share would instantaneously *change directions* and *leap up* to 16% on July 1, 2000 (the very next day), and then jump again to 19% only three months later. *Id*. at App. 382-83. His model predicts this quick reversal of fortune and extraordinary growth even though the supposed engine of ZFM's but-for growth, the FreedomLine, was literally not even commercially available at the time and ZFM's recently-introduced manual transmissions were experiencing ███████ warranty claims by DeRamus's own admission. Ex, 3 at App. 67, 70. DeRamus cannot explain this extraordinary growth he predicts, except by saying that his flawed model predicts it. His tautological *ipse dixit* is insufficient on its face. These extraordinary market share predictions are even less reliable than the unreliable business plan assumptions: indeed, they are substantially higher in the majority of years by amounts ranging from 5% up to 45%. *Id*. at App. 80-81.

3. DeRamus's profit assumption—that ZFM would have earned exactly $1,019 profit on every single transmission he hypothesizes it would have sold for the nine years following the first contract at issue in the case—is pure speculation. It ignores vast differences in the prices, costs, and profitability of ZFM's manual and FreedomLine transmissions, huge increases in raw materials costs, material variations in the terms under which OEMs and fleets buy transmissions, wild swings in demand over time in this highly cyclical industry, and significant shifts in demand to 13-speeds and other multi-speeds that ZFM did not make. Most significantly, it simply assumes that Eaton would not have engaged in any competitive efforts for nearly ten years (*i.e.*, it

would not lower its prices or margins one penny; stop innovating; end Six Sigma and other effi-ciency-enhancing efforts to lower its manufacturing and supply chain costs; cease all quality im-provement programs; and cancel ongoing service improvement initiatives).  It would, instead, sit still and take no action to fend off the aggressive market share gains he hypothesizes ZFM would have made between 2000 and 2009—despite the fact that this Court found, and the Third Circuit agreed, that substantial real world evidence demonstrated that *Eaton always priced its manual and automated mechanical transmissions below ZFM* and record evidence showed it improved in all of these other facets, too.

4.  Finally, DeRamus admits that he again utterly fails to separate out losses attributable to the non-price conduct the Third Circuit identified from business losses attributable to Eaton's competitive efforts, including its lawful, lower prices, and to problems of ZFM's own creation. Those problems include its ███████████████████████████████████████████████████████

████████████████████████████████████████████████████ after it reduced its rebates, and a legal dispute between ZFM's parent companies that led ZF AG to assert a $39 mil-lion claim against Meritor for misrepresenting the quality of its manual transmissions.  As in his original report, DeRamus again ignores all such real-world facts and taxes all of his purported damages to the undifferentiated ██████████████████████████████████████████████████████

████████████████████████████.  The Third Circuit has already rejected that tactic in holding that "not every provision [of the LTAs] was exclusionary" and, in particular, that Eaton's lawful "above-cost prices" must be treated differently because "prices are unlikely to exclude equally efficient rivals unless they are below-cost."  *ZF Meritor*, 696 F.3d at 281, 288 n.20.  But again DeRamus fails to disaggregate and deduct those losses and losses attributable to ZFM's own fail-ings.  Indeed, case law in every Circuit holds that unless an expert disaggregates (1) business

losses caused by lawful conduct and plaintiffs' own failings from (2) damages caused by the un-

lawful conduct at issue, his opinion is too speculative to get to a jury.

## FACTUAL BACKGROUND

**1. DeRamus's amended opinion is less reliable than his unreliable "SBP" opinion.**

DeRamus's amended report, like his original report, yields the same very wide range of single

damages, from a low of about $400 million to a high that is roughly 100% higher (about $800

million), with dozens of alternate figures in between. Ex. 3 at App. 53 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. He again predicts that

ZFM would have sold approximately 300,000 additional transmissions but for the alleged anti-

competitive conduct. Ex. 3 at App. 51 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Likewise, he again assumes a ZFM would have earned a profit

margin ($1,019) on each transmission sold from up until February 2009 that is within a percent-

age point or two of his original, unreliable assumption. *Id.* at App. 51-52 ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮. As a result, his amended opinion contains "remarkably similar" total

damages, *id.* at App. 86, 90, to the original figures this Court observed represented "the kind of

extravagant greed that makes everything look suspect." Ex. 1 at App. 5.

**2. DeRamus's Two-Part Damages Methodology.** DeRamus's damages opinion has

two basic parts. First, he hypothesizes nine years of lost profits he believes ZFM would have

earned between June 2000 and February 2009 but-for Eaton's conduct. Second, he hypothesizes

that ZFM would have continued to earn those profits ▮▮▮▮▮▮▮▮▮ Ex. 3 at App. 36, and he

calculates their present value as a hefty multiple of the nine-year lost-profits he hypothesized.

This latter amount is the ███████████████ that he thinks a hypothetical buyer would have paid a ZFM for the joint venture in February 2009. *Id.* at App. 56.

As DeRamus acknowledges, ZFM dissolved not in February 2009, but in December 2003. *Id.* at App. 41. DeRamus made no effort to determine hypothetical lost profits for the period up to December 31, 2003, and then to measure enterprise value as of that date—but agreed he *could* have. *Id*. at App. 59-60, 62. He chose instead to project lost profits out for years—all the way to 2009—and then determine enterprise value as of that date simply because ████████ ██████████████ (without testing it) that it was somehow more reliable to project out lost profits for nearly a decade. *Id*. at App. 60.

DeRamus acknowledges that ██████████████████████████████████████ ██████████████████ and that he can identify no outside peer-reviewed study that endorses a decade-long projection of lost profits, years after a fledgling joint venture dissolved, and then an enterprise value calculation on top of that. *Id*. at App. 63 ███████████████████████ ████████████████████████████████████████████.[3] He also acknowledged that ZFM *itself* ever projected out its future earnings for a decade. *Id*. at App. 117. To the contrary, ZFM *did not consider such long-term projections reliable.* Ex. 4 at App. 170-71 ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.

### 3. DeRamus's econometric estimate of ZFM's but-for market shares. Like any

econometric model, DeRamus's depends upon the variables and data that generate its results.

---

[3] DeRamus believes his method is "consistent" with an ABA textbook on antitrust damages, but only in the vague sense that he used available data (for household consumer confidence and crude oil indices) and (he claimed) the textbook said that available data should invariably be used. Ex. 3 at App. 63. That is irrelevant. The textbook's principle is, of course, predicated upon the use of *reliable data that fits the case*. But DeRamus's "available" data is disconnected from any evidence about why truck buyers choose Eaton or ZFM transmission, as he admits.

Because DeRamus chose variables that do not remotely fit the facts of this case, the market-share and profits results are inevitably unreliable.

*A. The model does not fit the facts or economic reality.*  DeRamus ignored real-world, record evidence (and common sense) that truck buyers specify Eaton or ZFM transmissions based on price, quality, and service; yet his predictive model contains *no* variable to address *any* of those factors.  Ex. 3 at App. 71-72.[4]  Instead, he acknowledged that the variables he *did* include do not fit the facts of the case because there is no evidence that any truck buyer chose between Eaton and ZFM transmissions based on those variables: household consumer confidence, the average price of West Texas crude oil, the ███████████████████████████████ ████ and the bare number of heavy-duty trucks per year.  Ex. 5 at App. 244; Ex. 3 at App. 95-96 ████████████████████████████.[5]

DeRamus's "macroeconomic" variables  might explain demand for trucks, but he points to no record evidence they explain demand for which supplier's transmission a buyer will choose to install in those trucks.  DeRamus was also unable to proffer any peer-reviewed journal endorsing the use of his variables or, indeed, any reason to believe that those variables are any more

---

[4] *See also* Ex. 3 at App. 68 ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████████████████.

[5] DeRamus's model also contains a variable that assumes that Eaton's anticompetitive conduct began on July 1, 2000 (when the first LTA at issue became effective).  Ex. 3 at App. 47.  That variable then infects every subsequent month.  He acknowledges that the verdict form says nothing at all about the *start* date for Eaton's conduct.  *Id*. at App. 65.  He also acknowledges that the verdict form says nothing about when antitrust injury or damages began and says only that it began at some unidentified time *after* March 28, 2002.  See D.I. 217 at 2-5 ("injuries . . . at any time since March 28, 2002"); Ex. 3 at App. 48-49.  Yet, DeRamus starts his damages meter running on March 28, 2002—a date he chose based on his discussion with counsel about *their interpretation* of the jury verdict form.  *Id*. ████████████████████████████████
████.  DeRamus made no effort to calculate damages on any alternate dates after March 28, 2002; his opinion therefore cannot offer a damages estimate that is consistent with the verdict.

predictive of the choice of transmission than would be the price of gold. Ex. 3 at App. 99 ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓ [6]

By contrast, the variables that DeRamus acknowledges excluding are essential to any model attempting to fit the facts of the case. The record contains substantial testimony from OEMs on the importance of Eaton's lower prices in their purchasing decisions, and amply demonstrates that buyers are also motivated by quality, reputation, innovation, and service.[7] In fact, ZFM believed that these factors were *dispositive* in explaining its market share decline in early 2000 (before even the first of the Eaton contracts at issue). He notified the Board of Directors that ZFM's market-share decline was the result of its "poor product quality image" and skyrocketing warranty claims; prices that were not sufficiently competitive, as ZFM reduced its rebates to truck fleets and lost "multi-year fleet business" as a result; "turnover in the Company's sales organization"; OEMs' "push towards 13-speed transmissions," which ZFM did not make; and increasing demand for Eaton's AutoShift transmission. *See* Ex. 6 at App. 291; *see also* Ex. 4 at App. 148, 180-82. DeRamus grudgingly acknowledged that ZFM's share was affected by ▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

but did not include any of the factors in his model. Ex. 3 at App. 66. Instead, he departed from

---

[6] Eaton's expert, Dr. David S. Sibley, the John Michael Stuart Centennial Professor of Economics at the University of Texas at Austin and former Deputy Assistant Attorney General for Economic Analysis at the U.S. Department of Justice, pointed out that the price of gold was *more* reliable than interest rates in predicting ZFM's share, using the flawed measure DeRamus used, and yet yielded a but-for ZFM market share of only 1% in January 2008 – a tiny fraction of the 29% DeRamus predicted. "The important point is . . . that his forecasting approach is unreliable." *See* Ex. 15 at App. 790-91. Likewise, Dr. Sibley shows that if DeRamus chose a start date for his "conduct" variable of March 28, 2002 (consistent with DeRamus's damages date) ZFM's but-for share is again a small fraction of DeRamus's prediction. *Id.* at App. 794.

[7] *See* Ex. 18 at App. 909 (Eaton's 10-speed transmissions were "at a price significantly below ZFM's current prices to Freightliner," and Eaton thus had "a significant competitive advantage over your products in price and technology"); Ex. 19 at App. 911 (ZFM FreedomLine pricing proposal to Paccar was "six months late . . . and far off the mark"); Ex. 20 at App. 912 (ZF Meritor "has decided to not offer any transmission reductions").

any scientific methodology by substituting his own speculative variables for actual, established fact.

   ***B. The unreliable model generates unreliable results****.* Modeling with inputs that do not fit the case generates outputs that make no sense. Unsurprisingly, therefore, DeRamus cannot explain why his econometric model predicts such a dramatic reversal of ZFM's fortunes. In the real world, ZFM's share plummeted by one-third before even the first of the contracts at issue, falling from 16% in 1999 to 12% by June 2000. Ex. 3 at App. 64, 66-67; Ex. 7 at App. 431. ZFM was aware the decline was due to a range of price, quality, and service deficits, such as: "poor product quality image, rebate reductions that caused it to lose "multi-year fleet business," *increasing demand* for Eaton's AutoShift and 13-speeds, ZFM's inability to supply customers due to "controlled distribution," its loss of a major customer, Ryder, and its "turnover" in its sales force. Ex. 6. at App. 291, 431-32. The ramifications from ZFM's competitive deficits were persisted for years, particularly the loss of "multi-year fleet business" and the "poor product quality image" which worsened as ZFM's manual transmission problems dragged on and on. Even Dr. DeRamus concedes the manuals had ██████████ warranty problems until mid-2002, Ex. 3 at App. 41, 64, 66-67, 77, and the record shows that they continued well into 2003 with internal reports that "transmission failures continue to mount . . . many of our long-term customers have experienced enough and will change specs" and "large, formerly l[o]yal" transmission customers told ZFM they "would not be buying our JV products due to G Platform [manual] performance issues." Ex. 24 at App. 927. The problems were still significant at the very end of ZFM's brief life: "Customer satisfaction continues to erode as a result of single rail top cover issues." Ex. 23 at App. 924.

   Yet, somehow, DeRamus's model predicts a stunning and immediate reversal of fortune.

ZFM's real-world decline from 16% in 1999 down to 12% on June 30, 2000 stops, changes direction, and on July 1, 2000 (the very next day) immediately leaps up to 16%. Ex. 3 at App. 72. Then, it makes another leap up to 19% only three months later on October 1, 2000. *See id.* at App. 66, 69, 72, 75. How does DeRamus' model predict such a reversal of fortunes, such stunning and immediate growth? It should be explainable. After all, his model turns a 33% share decline in the real-world (from 16% down to 12% on June 30th) into an instantaneous rebound right back up to 16% the very next day on July 1 and what amounts to greater than 50% share growth only three months later (from the real-world 12% on June 30 to the model's prediction of 19% by October 1). But, DeRamus has no answers. He concedes that the surge his model churns out could not be due to the FreedomLine—it was not commercially available until Spring 2001. *Id.* at App. 76. Nor could it be attributable to robust demand for ZFM's manual transmissions, which, he concedes, were plagued with "significant" warranty problems that lasted for several years. *Id.* at App. 41, 77. The best that he can muster is the circular response that his model predicts it because . . . his model predicts it: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at App. 75-76.

Perhaps even more extraordinary, his econometric model yields far higher annual market shares (by amounts ranging from 5-45%) in the majority of the 2000-09 period than the unreliable SBP-model this Court excluded. *Id.* at App. 80-83. For example, his econometric model predicts ZFM would have a 16% share in fiscal year 2000, while his SBP prediction was only 11%. *Id.* at App. 72, Ex. 7 at App. 435. His econometric prediction for 2001 is 18.75% versus 13% in the SBP and the gap in 2002 is similar. *Id.* Indeed, DeRamus acknowledged that his econometric predictions are *less* reliable than his unreliable SBP predictions because the econometric model "has *inherent difficulty . . . in accurately capturing the but-for market share* effect of ZFM's in-

troduction of the FreedomLine." *See* Ex. 7 at App. 434; Ex. 3 at App. 84-85.

**4. DeRamus's lost enterprise value "as of February 2009."**  DeRamus projected lost profits through February 2009, and then evaluated lost enterprise value "as of February 2009"— despite the enterprise actually dissolving six years earlier in December 2003.  But in fact, De-Ramus only *purports* to have valued the enterprise "as of February 2009."  Ex. 5 at App. 239-40, 257.  Instead, he used data from two very different date ranges to estimate that value.  He took his *2006-08 average* of ZFM's hypothetical but-for profits as a proxy for its 2009 profits, and multiplied it against *even earlier valuation multiples data, from 2005-07* drawn from ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 3 at App. 56; Ex. 5 at App. 259-60.[8]

On its face, that method of establishing a February 2009 value collapses.  But it is worse than mere sloppiness.  Enterprise value is supposed to be the fair market value of "the amount at which property would change hands between a willing seller and a willing buyer when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts."  Ex. 7 at App. 439.  February 2009, and all times surrounding it, were engulfed in economic crisis.  Per-formance in the trucking industry was terrible in 2009.  Ex. 3 at App. 57.  Market capitalizations of virtually every company fell dramatically, including Eaton and ZFM's parent, ArvinMeritor, and the stock market crashed to less than half of what it had been.  The Dow Jones Industrial Average fell from a high of 13,058 in May 2008 to 7,522 on February 17, 2009, the date DeRa-

---

[8] The word "comparable" is in quotations because DeRamus acknowledged he did no statistical analyses of the performance of any of the so-called ▮▮▮▮▮▮▮ companies compared to his hypothetical performance of ZFM in the but-for world.  Ex. 3 at App. 56 ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮.  Instead, he just asserted that they were comparable without *showing* that by refer-ence to any accepted test.

mus's report was due.  Three weeks later, the Dow had fallen another 15% to 6,547.[9]

Unsurprisingly, DeRamus could identify *no* transaction in any industry in February 2009 (at the market's bottom) where a buyer paid prices based on valuations from 2005 to 2007 (at the market's height):



Ex. 3 at App. 58. DeRamus acknowledged, but made literally no discount for, the market crash. *Id.* at App. 56.  Indeed, one of his two comparables, ArvinMeritor (ZFM's parent company) had a stock price hovering in the $.50 range in February 2009 and the entire market value of all of the company's outstanding stock was less than $100 million, compared to the $10-$20 range and $1.4 billion in the period that DeRamus decided to use.  Ex. 8 at App. 537.[10]

### ARGUMENT

The Third Circuit remanded for one reason:  for this Court to invoke the same "gatekeeping" function with respect to DeRamus's amended report that it has already properly exercised with respect to his original report.  The same standards apply under Federal Rules of Evidence 104, 702 and 703 and the *Daubert* case law that this Court properly exercised the first time around and which the Third Circuit held was "amply supported."  *ZF Meritor*, 696 F.3d at 291.

---

[9] The court can take judicial notice of this public data.  *See* http://www.marketcapchart.org/chart.php?symbol=MTOR&mc_option=true&prices_option=true ; Ex. 25 at App. 929; http://www.marketcapchart.org/chart.php?symbol=ETN&mc_option=true&prices_option=true; Ex. 26 at App. 930.

[10] Eaton's market capitalization declined, too.  *See* Ex. 25 at App. 929; Ex. 26 at App. 930.

"The trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrill Dow Pharm.*, 509 U.S. 579, 589 (1993). Cross examination, while effective, is no substitute for the court's gate-keeping role, which it "must" perform to "ensure" that confusing and speculative opinion is not presented to the jury cloaked under the guise of expertise. *Id.*; *see also Seaboard Lumber Co. v. U.S.*, 308 F.3d 1283, 1301 (Fed. Cir. 2002) ("A concern underlying the rule in *Daubert* is that without this screening function, the jury might be exposed to confusing and unreliable expert testimony"); *U.S. v. Bahena*, 223 F.3d 797, 809 (8th Cir. 2000) (*Daubert* requires "the judge to serve as a gatekeeper and screen out evidence that is unreliable and would have a tendency to confuse or mislead the jury.").

The Third Circuit was clear that DeRamus was limited to his original methods, assumptions, and data, minus only the SBP, which it left to this Court to judge: "We express no opinion as to the reliability or admissibility of DeRamus's alternate damages calculations." *ZF Meritor*, 696 F.3d at 300 n.28. ZFM cannot meet its burden to establish the amended report's reliability. *See, e.g.*, *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The amended report is essentially the same as the original report—but even less reliable under well-accepted *Daubert* standards. DeRamus chose flawed time periods for hypothesizing lost profits and enterprise value and, as the Supreme Court has put it, made crucial assumptions in his predictive model by mere "*ipse dixit*"—his own say-so—which in turn creates an analytical chasm between his opinion and the real world facts:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). An "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported specula-

tion.'"  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509

U.S. at 590).

I.      **DERAMUS'S OPINION IS UNRELIABLE BECAUSE IT FAILS TO
        EMPLOY VALID TIMEFRAMES TO MEASURE DAMAGES**

      A.      **DeRamus Improperly Projects Years Of Lost Profits After
        ZFM's Dissolution (And Then Adds Enterprise Value)**

DeRamus's opinion fails in the first instance because it uses timeframes for calculating

damages—both lost profits and lost-enterprise value—that are invalid as a matter of law.  De-

Ramus runs his lost profits all the way up through February 2009, years after ZFM's dissolution,

and then tacks on lost-enterprise value as of that date.[11]  Ex. 3 at App. 55.  Logically enough,

however, long-established case law directs that the *actual* date that an enterprise was lost is the

demarcation between lost profits and lost-enterprise value.  *See, e.g.*, *Eiberg v. Sony Corp.*, 622

F.2d 1068, 1082 (2d Cir. 1980) ("'going concern' value" calculated from "after th[e] point" at

which the business ceased); *Bonjorno v. Kaiser Aluminum & Chem. Co.*, 559 F. Supp. 922, 936-

37 (E.D. Pa. 1983) (calculation of going-concern value made as of the date the plaintiff's busi-

ness was terminated).

In *Farmington Dowel Products Co. v. Forster Manufacturing Co.*, 421 F.2d 61 (1st Cir.

1970), the First Circuit confronted an antitrust plaintiff's expert offering a theory materially in-

distinguishable from DeRamus's.  The expert there sought:

> to prove lost profits from 1956 to November 1968, the date of trial, plus its 'going
> concern' value in November 1968.  The district court—correctly, we believe—
> confined Farmington to lost profits from 1956 to February 28, 1958, *the date*
> *when Farmington went out of business*, plus the 'going concern' value of Farm-
> ington *on that date*.

---

[11] Extending the lost profits for all of those extra years before assessing lost-enterprise value cer-
tainly has the effect, desired by ZFM, of padding both damages figures.

*Id.* at 81 (emphasis added).  "[T]he time of cessation of business" is the dividing line, with lost profits preceding it, and lost-enterprise value following it.  Even before *Daubert*, district and appellate courts did not hesitate to exclude the expert who, like DeRamus, sought to move that line to a far later date.  The First Circuit went further, addressing precisely *why* DeRamus's hyper-extension of his lost profits generates invalid, unreliable results:

> [T]he method urged by Farmington would have required an estimate of profits for a period of some ten years *during which the company neither existed nor made profits*, plus an estimate of the 'going concern' value in 1968 of a company which had ceased being a going concern over ten years before, which estimate would have involved a further estimate of profits for a more remote future period.

*Id.* (emphasis added).  *Farmington* crisply explains that the further out one goes, the *less* reliable the resulting hypothetical damages become.  Inevitably, such an approach "relies too heavily on speculation and conjecture," not anything solid.  *Id.*

Accordingly, a jury must determine lost profits and enterprise value only up to the point the business was lost, and expert testimony can be useful to the jury *only* if it provides reliable estimates of damages based on that date.  *Id.* at 82.  The *Farmington* expert was excluded precisely because "none of [his] damage theories would provide the jury with a reasonable basis upon which it could determine Farmington's 'going concern' value on February 28, 1958, without resort to surmise, conjecture, and guesswork."  *Id.*  The same is true here.  DeRamus agreed that ZFM terminated in December 2003, not February 2009.  Ex. 3 at App. 41.  He made clear that he could have calculated damages based on the December 2003 termination, *id.* at App. 59, but like the *Farmington* expert, failed to do so.  His opinion must be excluded for the same reason.[12]

---

[12] After the dissolution of ZFM, Meritor continued selling transmissions until 2006.  Even if this conceivably would justify extending the relevant date until that point, DeRamus did not calculate either lost profits or lost-enterprise value using that date.

**B.**   **DeRamus's Lost-Enterprise Value Is Rigged To Artificially**
**Value ZFM At The Bubble's Height**

This Court noted that DeRamus's original report was "not at all connected to the real world," (Ex. 1 at App. 5), and not surprisingly the amended report has also passed through the looking glass, just as much for lost-enterprise value as for the econometric model itself.

Purporting to measure the value of an enterprise that terminated in December 2003 "as of February 2009" is not connected to reality. But even if DeRamus were correct that February 2009 was the proper measurement date, he has failed to provide a reliable opinion about what the value of ZFM would have been in a but-for world in February 2009. That is because the time period of the data he uses for that measurement has nothing to do with February 2009. DeRamus calculates lost-enterprise value in a two-step process. First, he selects the last three full years of lost profits generated by his econometric model—*2006 to 2008*. Second, he selects two "comparable" companies—Eaton itself and ZFM's parent company, ArvinMeritor—and measures their value *between 2005 and 2007* to create a "valuation multiple." The two numbers multiplied together are, DeRamus claims, the lost-enterprise value "as of February 2009."

It is thus readily why his valuation "as of February 2009" is not reliable: *neither* step is based on data from February 2009 and, instead, are based on data from the height of the market bubble. That is unreliable because it again assumes away real world facts from 2009 and replaces them with out-of-date facts. In 2009, the financial markets in this country were in flames; stocks and entire companies, therefore, could be purchased at fire sale prices. Measuring expected profits of *any* company based on hypothetical profits from several years earlier, and values obtained by "comparable" companies even earlier than that, particularly in such dire economic circumstances, is unjustified guesswork. The Supreme Court's admonition that an opinion should be excluded when "there is simply too great an analytical gap between the data and

the opinion proffered," *Joiner*, 522 U.S. at 146, perfectly addresses what DeRamus has tried to do here. He has sought to use data from a period of market highs to opine about the valuation of an entity at a time of dismal market lows.

DeRamus offered no authority to suggest that his selective rigging of the dates to maximize the estimated damages is economically sound, or something that anyone would ever do outside of litigation. DeRamus selected the group of dates for his calculations that would maximize damages, but they are utterly disconnected from economic reality. They are, as this Court put it, merely evidence that DeRamus has "chose[n] to rely on data that generated wildly inflated numbers." D.I. 279 at 5 (Aug. 4, 2011 opinion).

## II.     THE ECONOMETRIC MODEL IS UNRELIABLE BECAUSE ITS VARIABLES ARE NOT TETHERED TO THE RECORD

DeRamus's "but-for" world depends upon his econometric prediction of the market shares he believes ZFM would have obtained absent Eaton's conduct. His assumptions about what factors cause buyers to specify one transmission rather than another lie at the heart of the "econometric model," but he has offered no reasonable justification for including the variables he selected or for omitting those he disregarded. He admits that the model's variables have no connection to any record evidence explaining why truck buyers choose between Eaton and ZFM transmissions, and he offers no peer-reviewed or other academic endorsements of his odd choices. Despite being fully aware of the factors described in the record, DeRamus systematically ignored them, creating a wide analytical gap.

### A.     DeRamus's Variables Have Nothing To Do With Truck Buyers' Selection Between Eaton And ZFM Transmissions

The econometric model contains variables that have no connection to buyers' selection of heavy-duty transmissions. Instead, they are pure "macroeconomic" variables: ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████████

██████████████████████ *See* Ex. 3 at App. 95-97; Ex. 5 at App. 244.  His model has only two

other variables: ████████████████████████ and an ████████████████████████

█████ distinguishing months with alleged anticompetitive conduct (every month after July 1,

2000) and months without it (every month before July 2000).  Ex. 3 at App. 97-98.[13]

Neither the amended report nor the deposition provides any rational explanation of how

these variables could conceivably predict any buyer's choice among competing transmissions.

How could *household* consumer confidence or *crude oil* prices predict whether more or fewer

purchased heavy-duty transmissions would be ZFM's?  DeRamus offers nothing.  To the contra-

ry, he admits that the record contains no evidence that any truck buyer chose an Eaton or ZFM

transmission because of any of his variables.  Ex. 3 at App. 95-97.  For a model that generates

damages (when trebled) in the *billions*, the Court should expect and demand better.

In constructing his "but-for" world, DeRamus consciously chose to exclude from his

model all of those real-world variables that directly explain truck buyers' transmission choices

and, instead, to substitute his own "macroeconomic" variables.  That is fundamentally at odds

with an expert's role, as the Supreme Court has repeatedly held.  "Expert testimony is useful as a

guide to interpreting market facts, but it is not a substitute for them.  As we observed in

*Matshushita*, 'expert opinion evidence . . . has little probative value in comparison with the eco-

nomic factors' that may dictate a particular conclusion."  *Brooke Group v. Brown & Williamson*

---

[13] Remarkably, DeRamus tries to bolster the econometric model's predictive reliability by point-
ing to its similarity to his SBP predictions—the one that this Court excluded. ████████████
████████████████████████████████████████████████████████████████████ he ex-
plained. Ex. 3 at App. 91 (emphasis added). But that logic is self-defeating. It makes no sense
to defend a new method by saying that it matches up with an old method found unreliable by this
Court and the Third Circuit. If anything, that similarity justifies skepticism of, not confidence in,
his opinion.

*Tobacco Corp.*, 509 U.S. 209, 242 (1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n.19)).

Like the Supreme Court, the Third Circuit has made clear that an "expert's opinion must be based on the methods and procedures of science, rather than on subjective belief or unsupported speculation." *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003) (internal quotation omitted). But DeRamus did nothing *but* speculate that what ZFM's management found relevant to its market share—relative prices, quality, and service—was not, in fact, relevant, thereby dismissing out of hand ZFM's own views about its core business. He also ignored substantial additional testimony at trial, including from all of the OEMs, that the same factors (particularly Eaton's lower prices) made Eaton's transmissions more attractive than ZFM's. DeRamus's choice to ignore key variables means that his model "did not incorporate all aspects of the economic reality" of the industry. *Concord Boat*, 207 F.3d at 1057. An antitrust expert who fails to "incorporate major independent variables," cannot support a jury verdict. *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427 (S.D.N.Y. 2005). That is true in any legal context, not simply antitrust; the requirement that an expert's opinion must incorporate real-world facts is a bedrock requirement for every expert. "When [the expert's] ultimate conclusions are examined, it is clear that they must be rejected, not simply because they could not reliably flow from the facts known to the expert and the methodology used, but rather because they fly in the face of reality." *In re TMI Litig.*, 193 F.3d 613, 683 (3d Cir. 1999) (quotation omitted).

### B.   DeRamus Ignores Eaton's Lawful Lower Prices, As Well As ZFM's Self-Inflicted Wounds And Bad Luck

This Court has already noted that "it did not sound to me, in going through 150 pages, that Dr. [DeRamus] took into account much of anything negative in terms of plaintiffs' struggle

to maintain its competitive edge in this market." Ex. 2 at App. 22.  That failure, of course, persists in the amended report.  A sure-fire way for an expert to render his opinion unreliable is to "[i]gnore[] inconvenient evidence."  *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000).DeRamus's exclusion of variables relevant to the market-share and profit-estimating functions of his model is even more egregious and is another reason why it is junk science.  The key variables were widely discussed in the record.  A brief focus on some of that evidence illustrates how DeRamus's decision to ignore them destroys his opinion's reliability.

### 1.    Price

Record evidence—and human experience—reveal that price was the primary factor that motivated customers to purchase a transmission from Eaton or ZFM.  ZFM's leaders and employees fully recognized that ZFM was losing sales *because of* its pricing decisions.  *See* Ex. 4. This Court found that Eaton's average prices for manual and automated mechanical transmission were always lower than ZFM's—and the Third Circuit agreed and held that Eaton's lower prices were above-cost and lawful.  *ZF Meritor*, 696 F.3d at 266-67 ("At all times . . . Eaton's average prices were lower"), 277 ("Eaton never priced at a level below its costs" and "prices are unlikely to exclude equally efficient rivals unless they are below cost.").  The record contains substantial evidence that the OEMs said over and over that Eaton's prices were more attractive than ZFM's—*even without its rebates*. *See, e.g.,* D.I. 238 at 2445:8-2446:1 (Lopes) ("[p]ricing was significantly better with Eaton [even] excluding rebates . . . It was purely dollars, dollars and cents").  The OEMs repeatedly asked ZFM to lower its prices, but just as often, ZFM declined. *See* D.I. 230 at 659:14-660:12 (Kline) ("my interpretation of that [request] is simply take profit from our pocket, put it in theirs . . . And we declined to contribute to their profits"); D.I. 231 at 716:1-8 (Kline) ("the Board did not agree with providing any price decreases to Volvo").

It is inescapable, therefore, that ZFM's market share would also be affected by the rela-

tive prices of its transmissions in the but-for world—it is likely the predominant factor.  An econometric measurement of market share that fails to consider purchasers' behavior in response to sellers' prices is plainly insufficient.  Yet DeRamus utterly fails to include pricing as an independent variable within his "econometric model."  This omission constitutes an "analytical gap," *Joiner*, 522 U.S. at 146—indeed, an analytical chasm.

DeRamus's decision to ignore the fact that Eaton's prices were always lower in the real-world, and to assume away price and other lawful competition in what is supposed to the more competitive "but-for" world, reinforces the point that this Court understood all along:  his opinion is inadmissible junk science.  The Third Circuit has already agreed, as has every other Circuit.  *E.g., Concord Boat*, 207 F.3d at 1056 (reversing verdict because expert "failed to account for market events").

### 2.   DeRamus's peculiar profit assumption and his assumption that Eaton would not lower prices

DeRamus's model is predicated on the profit margin in the "but-for" world remaining really, really steady.  That profit assumption—with its faux precision of exactly $1,019 per transmission, year after year after year—supposedly applies to *every single transmission* sold by ZFM in excess of the 12% of the market that it had in June 2000 (before any of the contracts at issue in the case), and over the entire nine-year period that the model claims to study.  That assumption is a classic "*ipse dixit*" that generates an "analytical gap."  *Joiner*, 522 U.S. at 146.  Courts have recognized this profit-fattening gambit as speculative and unreliable when previously tried by experts.  The court of appeals in *Concord Boat*, for example, found an expert to be unreliable in part because—like DeRamus—that expert "assessed an overcharge on each engine sold at any point where Brunswick possessed over the 50% market share he deemed permissible."  207 F.3d at 1056.  DeRamus's assumption was even more unsound.  He assumed ZFM earned its $1,019

profit on every hypothetical unit it sold above the 12% it had in the real world prior to the first of the contracts at issue.

DeRamus's unheard-of assumption fits neither the record of this case nor reality. He acknowledged that he knew of no heavy-duty transmission and, indeed, no product in any industry that has ever generated the same contribution margin—the same profit—year after year:



Ex. 3 at App.108-09.

The flat $1,019 "contribution margin" assumption flies in the face of many real-world factors that affect profit margin, all of which it completely ignores, including: (1) whether the marginal unit was a FreedomLine or manual 9 or 10-speed transmission, because of their very different manufacturing costs, prices, and margins in the real world; (2) which OEM and which fleet bought it, because profits varied based on the arrangements made with each OEM and fleet and which transmissions they bought; (3) when the OEM or fleet bought it, because there were wild cyclical fluctuations in the economy (and, thus, demand for heavy-duty trucks) and significant increases in raw materials during the relevant period; and (4) whether demand for some products (*e.g.*, 13-speeds) was growing, while other products (*e.g.*, 9-speeds) was shrinking. Most significantly, DeRamus hypothesizes away any competitive reaction from Eaton. That is, he assumes Eaton would not lower its prices or margins one penny in response to the extraordinary share growth he opines ZFM would have made, would stop innovating, cease all Six Sigma and other efforts to lower its manufacturing costs and supply chain costs, cut back on quality improvements, and stop service enhancement initiatives. Instead, DeRamus assumes Eaton would

sit still and watch ZFM double and nearly triple its share. That assumption flies in the face of record evidence—reflected in this Court's rulings and the Third Circuit's opinion—that Eaton engaged in all of those efforts and, in particular, that its average prices to the OEMs on both manual and automated mechanical transmissions were always lower than ZFM's.

DeRamus's decision to assume-away this last factor—Eaton's price response—may be the most damning. It is an unsound assumption at odds with all economic theory and commercial practice, and it renders DeRamus's opinions too speculative to get to a jury. In *Murphy Tugboat Co. v. Crowey*, 658 F.2d 1256 (9th Cir. 1981), the expert sought to prove lost damages based on the assumption, shared by DeRamus here, that the defendant would not lower its prices as its competitor began to acquire market share. Regardless of any conclusory statement by an expert, the Ninth Circuit held that "[a] reasonable jury could not, however, indulge in the assumption that a competitor would follow a course of behavior other than that which it believed would maximize its profits." *Id.* at 1262. The court reversed the verdict because a verdict based on such speculation could not be reliable. *Id.* at 1262-63.

Finally, the assumption that Eaton would not respond by lowering its prices and margins (or continue competing through innovation, quality improvements, cost reductions, and enhanced service) is particularly unreliable because it is at war with DeRamus's own damages-enhancing view that Eaton's profit margin was substantial and that it was a rational, profit-maximizing company. Eaton, like any rational company, would fight harder to preserve its business because it is that volume of business which allows it to keep its manufacturing costs low (and its customers happy). If anything, Eaton's profit margin gives it greater room to invest and lower its costs, increase its innovation and quality, and lower its prices, and it would surely do so in an effort to maintain the volume of business necessary to keep its costs low and its customers happy. In-

deed, DeRamus's only response to why he assumed-away Eaton competition is that if Eaton had lowered prices in a procompetitive way, he believes ZFM would ████████ Eaton's efforts to protect its market share. *See, e.g.*, Ex. 3 at App. 113. This confidence contravenes the record; as the Third Circuit noted, and it did so despite repeated OEM warnings that, because of its refusals, they would otherwise buy more from Eaton. *See supra* pp. 9-10. But even if ZFM *did* match Eaton price cuts, that would defeat DeRamus's flat and unchanging $1,019 contribution margin—if Eaton and ZFM had engaged in a price war, the profit margin for both would have *declined*. DeRamus's conclusory statements to the contrary merely show that this expert report is unusually deficient. Because his opinion is "based upon demonstrably false assumptions," *Tse v. Ventana Med. Sys., Inc.*, 123 F. Supp. 2d 213, 227 (D. Del. 2000), *aff'd* 297 F.3d 210 (3d Cir. 2002), it cannot assist a jury as a matter of law.[14]

### 3. DeRamus assumes away quality, performance, and warranty problems

Another way buyers distinguish among products is on their quality, including how frequently a buyer must resort to warranty claims. DeRamus thought the warranty issue could not even be relevant because ZFM's excruciating warranty problems— at times, 80 repairs for every 100 manual transmissions and 350 repairs for every 100 FreedomLine models in the field its first year[15]—did not go beyond mid-2002. Ex. 3 at App. 71. Even if the record supported that chronology, and it does not, it would hardly justify ignoring buyers' perceptions altogether. Without

---

[14] DeRamus has three alternate profit figures that also fail. Ex. 5 at App. 251-57. His second and third figures are infected by his speculative $1,019 contribution margin; they simply add some costs to that artificially high starting point. The fourth fails because its starting point is even more artificially high, according to DeRamus: it starts with Eaton's profits during a period he believes it was a monopolist charging monopoly prices. Ex. 3 at App. 123 ████████
████████████████████████████████████████████████████
.

[15] D.I. 230 at 588:20-23, 638:2-8 (Kline); Ex. 10 at App. 674.

robust testing, DeRamus's assumption that truck drivers had no aversion to ZFM despite its products' problems is unfounded.

It is also contradicted by the record.  The record shows that ZFM itself believed that its transmissions were "plagued" with warranty problems and that its share declined significantly, before even the first of the contracts at issue, because of its "poor product quality image."  Ex. 6; Ex. 4 at App. 148, 180-82.  The record shows substantial warranty problems, specific customer complaints—and lost business—that persisted for years, right up until ZFM's dissolution.  In The problems were still significant in Fall 2003, as ZFM was about to dissolve: "Customer satis-faction continues to erode as a result of single rail top cover issues."[16]  A truck that breaks down is not a mere inconvenience; it is a business disruption that can affect an entire supply chain.  Not even *trying* to identify the portion of ZFM's lost sales that were attributable to customers' quality concerns renders DeRamus's opinion invalid.  *See Augustine Medical, Inc. v. Mallinck-rodt, Inc.*, 2003 WL 1873836, at *1 (D. Del. 2003) (excluding expert because "[i]nstead of facts, Dr. Hoffman stacks assumption upon assumption to come to his conclusion"); *Virgin Atl. Air-ways, Ltd. v. British Airways PLC*, 69 F. Supp. 2d 571, 578 (S.D.N.Y. 1999) ("assumptions that have not been supported by the market data.").

## III.     DERAMUS'S FAILURE TO DISAGGREGATE RENDERS HIS OPINION UNRELIABLE

DeRamus concedes here, as he did in his first report, that he does not measure the various causes of ZFM's hypothetical lost profits and disaggregate the losses attributable to Eaton's law-

---

[16] The quality problems were so severe they erupted into a threatened $39 million lawsuit by ZF AG against Meritor for "misrepresent[ing]" the "quality of the G Platform" and failing "to ade-quately design and test the transmission products" prior to their sale.  Ex. 21 at App. 915; D.I. 232 at 1053:13-1055:8 (Lutz); Ex. 22 at App. 921; D.I. 232 at 1058:2-4, 1058:22-25 (Lutz).  De-spite this evidence, DeRamus did not include a variable measuring relative quality of Eaton and ZFM transmissions in his model.  Again, he simply assumed it away.

ful, lower prices or other competitive efforts (nor to ZFM's self-inflicted wounds like its "poor product quality image" and "significant" warranty costs) from those attributable to Eaton's non-price conduct.  Instead, he simply attributes all damages to the ████████ ███ ███ ████████ ████ conduct.  Ex. 3 at 383:5-384:13 ████ ████ ███ ████ ████ ████ ██.  His failure to disaggregate means that he can provide the jury with no reliable basis for determining and separating out the damages caused only by Eaton's *anticompetitive* conduct.  Because the jury cannot award damages without doing so, DeRamus's failure in this regard is fatal both to his opinion's reliability and to any recovery of damages.

Antitrust plaintiffs naturally wish to attribute as much of their losses as possible to a defendant's unlawful conduct, rather than its lawful competitive efforts or to their own problems or bad luck.  But the courts are on guard to prevent such wrongful attributions.  The Third Circuit long ago made clear that "we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition."  *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir. 1975).  Thus, that court reversed, because "damages figures advanced by plaintiff's experts may be substantially attributable to lawful competition."  *Id.*  Courts across the country are equally clear that disaggregation is not an option, it is mandatory.  Nothing in the law grants a plaintiff the right to windfall recoveries of damages attributable to wholly lawful and indeed salutary conduct, merely because it can also point to unspecified losses from undefined anticompetitive conduct.

> When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage.  This is precisely the type of "speculation or guesswork" not permitted for antitrust jury verdicts.

*MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1162 (7th Cir. 1983).  In *Concord Boat*, the court of appeals noted that the expert failed to make any adjustment for market-share decline that

could have been caused by market events that were not anticompetitive.  That court, too, re-versed a damages verdict and held that the "expert opinion should not have been admitted be-cause . . . it did not separate lawful from unlawful conduct."  207 F.3d at 1057.  "[I]f a plaintiff has suffered financial loss from the *lawful* activities of a competitor, then no damages may be recovered under the antitrust laws.  It is a requirement that an antitrust plaintiff must prove that his damages were caused by the *unlawful* acts of the defendant."  *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1494 (8th Cir. 1992) (quoting *MCI Commc'ns*, 708 F.2d at 1161).  Moreover, the plaintiff "must provide the jury with a reasonable basis upon which to estimate the amount of its losses *caused by other factors*, such as management problems, a general recession, or lawful fac-tors."  *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) (em-phasis added).  No jury verdict can otherwise be sustained: a plaintiff's "utter failure to make any segregation between damages attributable to lawful competition and that attributable to [defend-ant's] unlawful scheme" means that no damages may be awarded.  *Farley Transp. Co. v. Santa Fe Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985).

Yet DeRamus, who was singularly incurious about any losses caused other than by the "totality" of Eaton conduct, offers literally no way for the jury to disaggregate "without specula-tion or guesswork."  *MCI Commc'ns*, 708 F.2d at 1162.  An expert's failure to provide opinions or evidence that conform to governing law cannot "assist the trier of fact," as Rule 702 requires.  *See Paoli*, 35 F.3d at 742.  DeRamus's jumbled opinion would almost certainly "confus[e]" or "mislead[] the jury," and not help it, contrary to Rule 403.  ZFM's response in the original *Daubert* briefing was simply ignore the plethora of cases cited above, and instead to rely on in-apposite case law which says that no disaggregation is required *within multiple forms of unlawful conduct*.  *See, e.g.*, *LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003) (*en banc*).  But that is

not the issue.  Eaton is not asking DeRamus to distinguish between (1) sales lost from PACCAR because of purported non-price conduct and (2) sales lost from Freightliner because of non-price conduct.  It is challenging DeRamus's failure to disaggregate (1) sales lost from its non-price conduct taken as a whole (which the Third Circuit held *might* have been the basis for the verdict),[17] from (2) sales lost because of Eaton's competitive, including its lawful, lower prices,  and for all other reasons—ZFM's self-inflicted quality and reputational problems, its refusal to provide the OEMs with sufficiently attractive prices, its reduction in fleet rebates, the market downturn, or the problems that led to ZF AG's $39 million fraud claim against Meritor.

## CONCLUSION

From start to finish, DeRamus's approach to damages has been infused by "the kind of extravagant greed that makes everything look suspect." Ex. 1 at App. 5.  And, as expected given the Third Circuit's mandate that his amended opinion be limited to methods, data, and assumptions in his original, unreliable opinion, ZFM continues "to rely on data that generated wildly inflated numbers." D.I. 279 at 5 (Aug. 4, 2011 opinion).  Nothing in DeRamus's amended report is a reliable guide to assessing lawful damages.  For the foregoing reasons, Defendant requests that the amended expert opinions of DeRamus be excluded.  Without proper damages, ZFM's case fails for lack of proof of the required element of damages.  Eaton is simultaneously filing a motion for judgment as a matter of law.

---

[17] Those losses presumably consist primarily of losses caused by databook preferences in the LTAs, for example, which are mentioned in the Third Circuit opinion, though not in the verdict form.  DeRamus admitted that he did not separate out damages caused by databook positioning or any other factor. Ex. 3 at App. 130-31.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Donald E. Reid*

_____

Donald E. Reid (Bar No. 1058)
1201 N. Market Street
P.O. Box 1347
Wilmington, DC 19899-1347
(302) 351-9219
DReid@MNAT.com

Joseph A. Ostoyich
Erik T. Koons
William C. Lavery
Evan A. Young
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., NW
Washington, DC 20004-2400
(202) 639-7905

*Attorneys for Defendant
Eaton Corporation*

April 1, 2013