UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ZF MERITOR LLC and MERITOR TRANSMISSION CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 06-623-SLR |
| v. | ) ) ) | **REDACTED PUBLIC VERSION** |
| EATON CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |

# DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE DERAMUS TESTIMONY

## VOLUME I – EXHIBITS 1 – 7

## VOLUME II – EXHIBITS 8 - 20

OF COUNSEL:
Joseph A. Ostoyich
Erik T. Koons
William C. Lavery
Evan A. Young
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 639-7700

Theodore B. Olson
Thomas G. Hungar
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  11101
(202) 955-8500

Donald E. Reid (#1058)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 351-9219

*Attorneys for Defendant Eaton Corporation*

Original Filing Date:  March 25, 2013
Redacted Filing Date: April 1, 2013

# EXHIBIT 1

1

```
1                 IN THE UNITED STATES DISTRICT COURT

2                 IN AND FOR THE DISTRICT OF DELAWARE

3                            - - -

4
       ZF MERITOR LLC and MERITOR     :    CIVIL ACTION
5      TRANSMISSION CORPORATION,      :
                                      :
6                    Plaintiffs,      :
                                      :
7          vs.                        :
                                      :
8      EATON CORPORATION,             :
                                      :
9                    Defendant.       :    NO. 06-623 (SLR)

10                           - - -

11
                             Wilmington, Delaware
12                           Thursday, August 27, 2009
                             4:27 o'clock, p.m.
13                           - - -

14
       BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.
15                           - - -

16
       APPEARANCES:
17

18            DRINKER, BIDDLE & REATH LLP
              BY:  KAREN V. SULLIVAN, ESQ.
19

20                    -and-

21

22

23

24                           Valerie J. Gunning
                             Official Court Reporter
25
```

2

1 APPEARANCES (Continued):

2

3     DICKSTEIN SHAPIRO LLP
      BY: JAY N. FASTOW, ESQ.,
4     PAUL R. TASKIER, ESQ.
      JENNIFER D. HACKETT, ESQ. and
      (Washington, D.C.)
5

6     -and-

7

8     ADAMS HOLCOMB LLP.
      BY: R. BRUCE HOLCOMB, ESQ.
9     (Washington, D.C.)

10    Counsel for Plaintiffs

11

12    MORRIS, NICHOLS, ARSHT & TUNNELL
      BY: DONALD E. REID, ESQ.
13

14    -and-

15

16    HOWREY LLP
      BY: JOSEPH A. OSTOYICH, ESQ.,
17    ROBERT F. RUYAK, ESQ. and
      MELISSA HANDRIGAN, ESQ.
18    (Washington, D.C.)

19    Counsel for Defendant

20

21    - - -

22
23
24
25

---

3

1     P R O C E E D I N G S

2

3     (Proceedings commenced in the courtroom,

4 beginning at 4:27 p.m.)

5

6     THE COURT: All right. I guess you can fill me

7 in on where we stand. Well, before you do that, let me say

8 this. Because we are going on three years without a fourth

9 judge, and although we have visiting judges taking over the

10 quarter of the civil cases that are coming in, we still have

11 all the criminal cases, and just because of our civil

12 docket, we're double-booked. So as it turns out, September,

13 I've got some criminal trials I have to get to, and one of

14 the double-booked cases, which does not happen often, is not

15 going away. So instead of four weeks, I probably have two

16 weeks to give you.

17     Now, I don't know what you plan to do today

18 given our situation, but I just want to let you know from

19 the get-go that if you plan to go forward, we're going to

20 have to do some juggling to get you any time at all.

21     And I also need to tell you that with the

22 caseload I have, I cannot get to any substantial motion

23 practice anytime soon. I just, with a fact-intensive case

24 like this, I continue to believe that summary judgment is

25 an incredibly burdensome exercise for me, and I will

---

4

1 probably come out saying, there are lots of facts here and

2 there's no way that I can say, because every time I say it,

3 the Third Circuit sends it back, saying, gee, you should

4 have let this go forward.

5     So this is my situation. You tell me what your

6 situation is and we will see how we can go forward.

7     MR. FASTOW: Thank you, your Honor. Jay Fastow,

8 for the plaintiffs.

9     And as plaintiffs, of course, we'd like to get

10 to trial, but in light of the Court's decision recently,

11 we think that the more efficient way to address this is to

12 do a couple of things first.

13     We would like to make a motion and we plan to do

14 it within the next week, in a week, addressing the opinion

15 and the order, a couple of grounds.

16     THE COURT: So you're talking about motion for

17 reconsideration and having me go back and go through the

18 exhaustive exercise again?

19     MR. FASTOW: Well, your Honor, if you like,

20 I could preliminarily preview it for you. But really

21 what we're looking at are a couple of things, just

22 briefly.

23     One is clarification in terms of the -- the

24 Court's rationale on the Daubert motion compared to the

25 final order the Court issued, excluding Dr. DeRamus'

---

5

1 testimony, because what the Court did, as we read it,

2 is went off on the Court's view of the sufficiency of

3 the strategic business plan. And there are a couple of

4 things.

5     One is, Dr. DeRamus, as the Court recognized

6 in the decision, also had in his report the discussion of

7 non-damage issues, injury to competition, injury to

8 plaintiffs. And the Court specifically says, I'm not

9 addressing that here. So we think that, number one, we

10 would like clarification that when the Court says the

11 motion to exclude his testimony is granted, that it does

12 not include those issues.

13     A second one, again, is clarification. We

14 submit the lack of connection between the Court's rationale

15 and even on damages, whether Dr. DeRamus would be allowed

16 to testify, because, again, the Court went off on its view

17 of the sufficiency of the strategic business plan, but

18 there are alternative damages approaches that Dr. DeRamus

19 can use. And, in fact, the case from the Third Circuit the

20 Court cited, in Re Paoli, specifically endorses that in

21 Footnote 19.

22     THE COURT: Well, I will tell you, that was

23 the worst expert report I ever read in all my years on

24 the bench. It was. So if, in fact, it's everyone's wish

25 to go forward and just get this to a close, then you would

---

**000002**

6

1  need to specifically point out to me where in the report
2  his alternate damages theories that do not -- I mean, I
3  don't know what he relies on and how you can have an
4  alternate damages theory, as far as I can see, without any
5  underlying -- any underpinning data.
6        But without getting into it here, because I,
7  frankly, don't have the patience for it, if it's our
8  considered view that it's better to get this case to trial
9  in some fashion, to put this matter to rest, then I will
10  certainly let you point out where his alternate damages
11  theories are and that they don't at all rely on the data that I found
12  so lacking, and that they do rely on something that is
13  appropriate.
14        So move on.
15        MR. FASTOW: Well, your Honor, just to be
16  crystal-clear from the plaintiffs' perspective, it's our
17  view that we should go through this motion first before we
18  proceed towards trial. We'd like to get to trial and do
19  want to get to trial. I believe we have a right to get to
20  trial. We think it makes sense to work through these issues
21  preliminarily.
22        A related, or another issue that we're going
23  to raise in this motion relates to the rationale of the
24  opinion compared to the motion that was, in fact, made.
25  And the motion that defendant Eaton made was not under --

7

1  well, let me put it this way. The Court's decision was
2  under Rule 703. Eaton did not make a motion under Rule
3  703.
4        THE COURT: That's fine, but as a gatekeeper,
5  I think I can review this under anything.
6        If you want -- well, all right. As I said, I
7  appreciate the fact that you want to file this motion, but
8  I really don't want to hear it today.
9        MR. FASTOW: That's fine, your Honor.
10        THE COURT: So on to how we get to trial.
11        You believe that all of these issues need to be
12  addressed before we get to trial?
13        MR. FASTOW: Yes, your Honor. We think that's
14  the appropriate and efficient and sensible way to do that.
15  And then once we get through this motion, then we would
16  like to come back to your Honor and set another conference
17  date.
18        THE COURT: All right. Thank you.
19        MR. FASTOW: And just, your Honor, one more
20  point I will mention is that Eaton has mentioned in its
21  submission yesterday that they want to renew the motion
22  for summary judgment on statute of limitations grounds. I
23  think they also mentioned reconsideration motion.
24        THE COURT: Yes.
25        MR. OSTOYICH: Your Honor, Joe Ostoyich from

8

1  Howrey, for Eaton Corporation.
2        We have gone through the process outlined by
3  the Federal Rules. We have engaged in fact discovery and
4  completed it. We've engaged in expert discovery and
5  completed it. We are ready to go to trial.
6        If we're going to have a delay, which we are not
7  advocating, we're all ready for this. This was the process
8  that's outlined, and if the expert didn't survive, just like
9  any other evidence, if they don't have backup evidence, I'm
10  not sure how they get to trial.
11        But we advocate starting the trial on the 8th.
12  If we're not going to, we do think we'd like that
13  opportunity to renew some of those motions because we
14  thought they were good motions, but we're here and ready to
15  start the trial on the day it's scheduled.
16        THE COURT: All right. So it's not clear to me
17  that plaintiffs can go to trial without some of this expert
18  opinion, so if we are going to go to trial, it seems to me
19  as though we need to go through the exercise and see if any
20  of the expert opinion survives.
21        So let me propose something with respect to
22  the schedule. Right now, I've got a criminal trial that
23  I've got to try because we've got the Speedy Trial Act,
24  and so I wouldn't be starting this trial until the 10th,
25  not the 8th. I've run up against another obstacle the

9

1  following week, where I can't attend to this case.
2        And you may sit down, sir.
3        MR. OSTOYICH: Thank you.
4        THE COURT: I guess what I'm proposing is, if I
5  only have two weeks to give this case under the best of
6  circumstances, number one, do you think we can accomplish
7  the trial in two weeks?
8        I do try virtually all of my patent cases in
9  two weeks or less. It seems to me we can do this in two
10  weeks. And, if so, whether, because this was a four-week
11  trial, whether, if I get my double-booked civil case that --
12  if I can get them to switch, would you be available to try
13  this case the weeks of the 22nd of September and the 28th
14  of September, rather than starting it as early as the 10th,
15  so that I have some time to address the plaintiffs' motion
16  for reconsideration to see what, if anything -- whether, in
17  fact, they've got expert opinion upon which to base any of
18  their case?
19        MR. FASTOW: Your Honor, well, just, first of
20  all, while we think that we would be entitled to proceed to
21  trial in any event, we certainly think it makes sense, as
22  your Honor is suggesting, to address these expert issues
23  first.
24        In terms of the schedule, I think in the
25  pretrial order, if I'm not mistaken, the total number of

000003

10

1  trial hours that the parties have proposed, if you divide
2  it by, I guess, 30 trial hours per week, would be in the
3  five to six-week range. So I mean we, frankly, submit that
4  two weeks would be way too short for this case. And, again,
5  as much as we would like to get to trial, we think it's
6  important to have enough time.
7         THE COURT: I have to say, you are never going
8  to get five or six weeks of trial time in this court. You
9  just can't. I don't have it to give. I am double-booked
10  through 2010. I am booking into 2011, and I think I even
11  have a few patent trials booked in 2012. You cannot do it.
12  So we either have to figure out how to separate issues and
13  get to the heart of this case in a two-week period and then
14  see where that takes us, or you are -- I don't know what to
15  tell you. I can't do it.
16         MR. FASTOW: Well, I hear your Honor. I think
17  for the moment, at least until we can see if there's
18  something to be done in terms of breaking up issues, that,
19  from our perspective, two weeks would plainly not be enough.
20  And we understand that works into your Honor's schedule. We
21  understand that. And as much as we'd like to get to trial,
22  we think that's not enough time.
23         THE COURT: All right. Is there -- I don't
24  know.
25         MR. OSTOYICH: Your Honor, just from a defense

11

1  perspective, I think two weeks is a lot for this case. I
2  think we can accomplish their case and our case in two
3  weeks.
4         Now, we did put in 80 hours for our case, but
5  that's pegging off, they gave us a 95 figure and listed 50
6  trial witnesses. Obviously, if I have to spend 45 minutes
7  to an hour crossing everyone, that by itself takes a fair
8  amount of time.
9         This is a two-week trial, in my view. We can
10  start on the 22nd, if we need to.
11         One thing I want to clarify. Are they saying
12  if they file a motion for reconsideration and you deny that
13  and in effect hold that the doctor's report is entirely out,
14  that we're still going to have the trial, because I have a
15  lot of people we have to gear up for this. So if we are not
16  going to do that, I would like to know that now just so we
17  can figure out our schedules.
18         THE COURT: Well, I have to say that I focused
19  on the damages issue, not the liability issue, because that
20  was clearer to me. I have limited time and resources, so I
21  addressed the issue that was clearer.
22         Now, I don't know how you go forward on a case
23  if you don't have damages even if there is some other report
24  that addresses the liability issue.
25         Now, so I guess in that regard, I guess they are

12

1  making the point that -- well, they've got their arguments
2  on the damages theory of the case. So I don't know.
3         I guess we should ask plaintiffs' counsel, if,
4  in fact, I conclude that there is no damages theory to which
5  this witness can testify, then how is it that we would be
6  going forward?
7         MR. OSTOYICH: I guess, your Honor -- first, the
8  answer is, yes, we believe we still would be entitled to go
9  forward.
10         THE COURT: I truly wish you wouldn't use the
11  word "entitled."
12         MR. FASTOW: Okay.
13         THE COURT: Because there are very few things in
14  life to which we are entitled, and I suspect in this case,
15  there's not a whole lot anyone is entitled to.
16         MR. FASTOW: All right. As to the bases, we
17  believe we could still proceed on damages with respect to
18  fact evidence and lay opinion testimony under Rule 701,
19  and there's a whole collection of cases dealing with lay
20  opinion testimony with respect to future profits, with
21  respect to business valuation, under Rule 701.
22         Separately, there's a claim for injunctive
23  relief. So, in any event, of course, damages don't go to
24  that at all.
25         THE COURT: And since the business -- since

13

1  there is no business anymore, what kind of injunctive relief
2  are you talking about?
3         MR. FASTOW: We're talking about injunctive
4  relief, for example, that they could not have these long-
5  term agreements, shouldn't be able to be long term anymore.
6  That they shouldn't be able to agree with OEMs.
7         Well, your Honor, can I just stop for a
8  second? I don't want to get into anything that would
9  implicate the confidentiality order. I see we have some
10  folks here.
11         THE COURT: Well, I guess I wasn't clear that
12  you were still a competitor, and if you weren't a
13  competitor, I'm not sure how you would have standing for
14  any injunctive relief, but that's neither here nor there.
15  That is your view on how we could proceed to trial
16  regardless of my decision.
17         MR. FASTOW: Yes, your Honor. We believe on
18  both damages and injunctive relief, we could proceed.
19         THE COURT: Can I ask you a question? You're
20  a very nice man, and I appreciate, and I have tried to make
21  sure that you and your clients have been able to proceed
22  and to gather your evidence, but when I look at it, as I
23  said someplace in my memorandum order, this is a business
24  that wasn't in business that long before it went out of
25  business, and the figures that you are coming up with just

14

1 strike me as the kind of extravagant greed that makes
2 everything look suspect.
3        So I mean, I have to say that if -- well,
4 there's no way anyone can settle when you're out here and
5 reality is probably far removed from that.  But I take it
6 your clients are absolutely wedded to these figures that
7 just, to me, are not at all connected to the real world.
8        Is that the case?
9        MR. FASTOW:  Are you asking on a litigation side
10 or a settlement side?
11        THE COURT:  On a settlement side.
12        MR. FASTOW:  Your Honor, we're always prepared
13 to have meaningful settlement discussions.
14        THE COURT:  But I'm just saying, you can't
15 with those figures, and you seem bound and determined to
16 stick with these figures come whatever or high water.  All
17 right.
18        MR. FASTOW:  Your Honor, I will mention it.  Of
19 course, settlement comes both ways.
20        THE COURT:  That's true.
21        MR. FASTOW:  And I think we shouldn't get
22 into much more, but there are two sides to a two-party
23 settlement.
24        THE COURT:  I understand that.  And, certainly,
25 this isn't a completely one-sided case.  That's why it has

15

1 gotten this far.
2        All right.  Well, what I would propose is the
3 following.  Well, it's unusual to me to have a plaintiff
4 who is not -- it does not seem as though you even want to
5 try to somehow get the case to trial soon because, as I
6 said, I can't promise you I will ever have five weeks to
7 give you.
8        So let's assume for the moment that you file
9 your motion for reconsideration and it's briefed promptly
10 and that I have to get to it promptly, obviously, and that
11 you can proceed to trial.  Is there no way that we can do
12 this in two weeks?
13        MR. FASTOW:  Your Honor, I don't see at all
14 doing the entire trial in two weeks.
15        One of the issues that I think your Honor has
16 raised, and we're perfectly happy to speak with Eaton's
17 counsel about it, is whether there are ways to bifurcate
18 the issues, whether that makes sense, and see if at least we
19 can do it in some pieces.
20        Yes.  So maybe we can follow up, if that's --
21 if there's some way to do that, because, again, you're
22 entirely right.  We're the plaintiff.  We would like to get
23 to trial.  Just in light of this decision, we think it makes
24 sense to work out some of these things first, and then we
25 are prepared to talk to them about ways to bifurcate.

16

1        THE COURT:  All right.  Thank you.
2        And from defendant's points of view, are there
3 issues that are more critical that -- is there any domino
4 effect here?  Are there issues that are critical so that if
5 they go forward and they go in either party's direction,
6 that that is a clear enough signal that the parties might
7 be able to not try every issue that they have asserted
8 against each other?
9        MR. OSTOYICH:  I mean, in concept, it's hard to
10 tell.  We're dealing with shifting sand, your Honor.  Let me
11 just give you an example.
12        We were here about three months ago, arguing
13 the possibility of summary judgment, and we heard bundled
14 rebates and Lepages and we heard exclusive dealing and
15 Dentsply.  Well, lo and behold, I got the jury instructions
16 two weeks ago.  There is no jury instruction on bundled
17 rebates and there is no jury instruction on exclusive
18 dealing, and they've objected to our instructions on
19 exclusive dealing.  They have a very brief mention of it in
20 their 80 papers of instructions.
21        So I don't even know what the basis for the
22 case is at this point.  It's this very amorphous kind of
23 something anticompetitive.  It's really not easy for me to
24 pin down.
25        So in concept, I would say maybe, but I can't

17

1 tell, because I don't know what the basis for the case is.
2        What I will do while I'm up here, your Honor,
3 if I can just ask the question, I'm not clear.  If they file
4 a motion for reconsideration and I can demonstrate that all
5 of Dr. DeRamus' damages methodologies are pinned down to
6 that plan and what other flaws there are, now it sounds
7 like if you deny their motion for reconsideration, they also
8 want to proffer lay witnesses on damages.
9        Well, we did not have the possibility during
10 discovery of cross-examining those, because we did not know
11 that was realistic.  I submit to you, they should not be in
12 a better position now than they would have been if they
13 proffered that under their rules.
14        So how many bites at the apple are they going to
15 ask for?  And I just submit, we should just have the trial
16 and be done with it, because we're confident at this point
17 and we've got our evidence lined up.
18        THE COURT:  All right.  Well, that is a problem
19 for the plaintiff.  If, in fact -- well, no evidence can
20 come in unless it was vetted through the discovery process,
21 and even if witnesses testified as to facts that might be
22 relevant to damages, if it wasn't in the context of damages
23 so that it was clear what the scope of the questioning
24 should be, that's a problem.
25        So I'm not sure we need to talk about that

000005

18

1  today, but, certainly, I share the defendant's concern about
2  the alternate resolution to your problem, that you can just
3  rely on fact witnesses.
4        MR. FASTOW:  Well, your Honor, if we have
5  witnesses whom they depose and didn't ask those questions,
6  it's not our fault.
7        THE COURT:  Well, clearly, in a sophisticated
8  antitrust case, you don't go forward on lay witnesses.
9  You go forward on an expert. The fact that the expert at
10  this point hasn't gotten through the Daubert gate does not
11  mean you can go back and say, well, we really meant to rely
12  on fact witnesses unless you specifically identified them
13  and it was clear to the defendant that you've got an expert,
14  but you're also relying on fact witnesses to prove a damages
15  case.
16        Don't tell me that that would have been clear to
17  anybody unless you specifically made it so.
18        MR. FASTOW:  Well, your Honor, as you say, we
19  can argue that issue another time.
20        THE COURT:  Yes. Yes, you can. Yes, you can.
21        All right. Well, let me say this. That,
22  clearly, until we're all on the same page as to what
23  theories and claims the plaintiff is pursuing, we cannot
24  hope to identify those that are more critical versus less
25  critical.

19

1        Is there someplace in the pretrial, the rather
2  hefty pretrial stipulation, that we could start kind of
3  looking at that?
4        MR. FASTOW:  Yes, your Honor. I think there's
5  a quite extensive discussion of our claims in the pretrial,
6  proposed pretrial order.
7        THE COURT:  All right. And is that as helpful
8  as the actual jury instructions that you submitted, which
9  it's kind of where the rubber meets the road when it comes
10  to --
11        MR. FASTOW:  I think the proposed pretrial
12  order lays out our notion of our theories, facts that need
13  to be adjudicated, facts that we think do not need to be
14  adjudicated, but should be deemed established.
15        THE COURT:  And where is that helpfully
16  located?
17        MR. FASTOW:  Well, just starting briefly on
18  Page 1, we have a brief statement of our case. Then we
19  have a list of joint statement of facts, which are admitted
20  and require no proof on Page 3. Then we have our proposed
21  statement of facts starting on Page 6.
22        THE COURT:  Well, it's not the facts. It's
23  what legal theories you are pursuing based on the facts.
24        MR. FASTOW:  I think, your Honor, when one
25  goes through the facts that we deemed should be admitted

20

1  and require no proof and then the facts at issue.
2        For example, we can look at issues of fact
3  which remain to be litigated on Page 18. We have a list of
4  our facts and -- I'm sorry -- our statement.
5        And I think, in fact, defendant is correct in
6  one sense, which is that you can't put one simple name on
7  our claim. What they've been trying to do through the whole
8  case is to call this a predatory pricing case, for example.
9  It's not just a predatory pricing case. And while they may
10  be frustrated by the fact that this is a set of claims,
11  Section 1 of the Sherman Act, Section 2 of the Sherman Act,
12  Section 3 of the Clayton Act, they are about lots of
13  anticompetitive conduct, and that you cannot just call it
14  a simple name.
15        We're entitled -- I will use a different word --
16  those are perfectly viable and valid claims and are
17  recognized by cases like Dentsply, like Lepages, many of
18  the case that we've cited.
19        THE COURT:  Well, Dentsply was a fairly easy --
20  I mean, it was an easier case in that it was clearly an
21  exclusive dealing, and this is more complicated because --
22  well, the contract you're talking about wasn't explicitly
23  exclusive, but that's neither here nor there.
24        MR. FASTOW:  We submit there are many more piece
25  of anticompetitive conduct, both individually and in

21

1  concert, in which the defendant here has engaged.
2        So while they keep trying through the whole
3  case -- you saw you saw it in the motion to dismiss, you
4  saw it in the motion for summary judgment. To pigeonhole
5  it into one particular name, that's not how our claims
6  work. And, of course, we're the master of our claims.
7        THE COURT:  All right. This is my concern
8  about plaintiffs' case, just as it was my concern about
9  plaintiffs' expert report, is that you rely on so many
10  facts. I mean, you push so much information at the
11  fact-finder, that I suspect there's no real way any lay
12  fact-finder, like a jury, even a judge, can possibly
13  understand what it all actually means. I mean, when you lay
14  out your seven, or your six statements, that looks really
15  easy. I mean, it looks like, well, this is all you have to
16  do, but your theory is based on conduct -- well, I don't
17  know.
18        I mean, that is why you think it is going to
19  take you six weeks to try the case, because you are just
20  throwing everything that happened during this three years
21  into the mix, and I get the impression that you're hoping
22  that the antitrust theory floats to the top. That's just
23  my impression.
24        MR. FASTOW:  Your Honor, just two points on
25  that.

22

1    One is, of course, your Honor did deny Eaton's
2  motion for summary judgment on the merits of the case.
3  And I would also refer your Honor to the discussion
4  beginning on Page 28 of the proposed pretrial order,
5  entitled, the heading, "Brief Statement of what Plaintiffs
6  Intend to Prove in Support of Their Claims." So that's
7  another discussion in the pretrial order of what we have.
8    And I think, if you match it page per page, it
9  may be that the defendant has a much longer discussion on
10  their side. I have not counted it, but in some of the
11  sections, I believe at least that's true.
12    In any event, I'm past summary judgment, and,
13  yes, they can hide behind the view that, well, this should
14  be a simple case when they've done, in our view, many things
15  that were anticompetitive. And of course, we intend to
16  raise the very anticompetitive conduct in this case.
17    THE COURT: Well, when I look at what you have
18  provided on Pages 28 and 29, these are not legal theories.
19  I mean, there's no way to separate out issues based on what
20  you've done on Pages 28 and 29. I mean, those are not kind
21  of different -- well, so I can't imagine that there's any
22  way to do this.
23    MR. FASTOW: I think, your Honor, that's where
24  you can look at the proposed jury instructions, where we
25  lay out the law we think is appropriate here. And as much

23

1  as they want to put a name, bundled rebates, the case is a
2  lot of things. And the cases that we cite in the proposed
3  jury instructions and elsewhere in this case on the motion
4  to dismiss, the motion for summary judgment, show that we
5  are very -- that they support the notion that plaintiff
6  can sue when a defendant engages in lots of anticompetitive
7  acts, and lots of kind of anticompetitive acts, as well as
8  if the defendant engaged in only one type of anticompetitive
9  act.
10    THE COURT: So it's really not that you are
11  pursuing different claims, it's just that you simply have a
12  whole lot of evidence you want to propound to support your
13  claims. So it does not sound like there's any way to
14  whittle down this trial.
15    I mean, certainly, I guess if I have no choice,
16  I can give you a choice. You either do it in two weeks now,
17  or we postpone and hope that at some point in the future,
18  all my other cases will go away one way or another so I can
19  give you more than two weeks. I don't know.
20    MR. FASTOW: Your Honor, as I said, we're
21  willing to put our minds to the task of seeing whether
22  there's a way to bifurcate something. But I think when
23  you think about Eaton's summary judgment motion, it was
24  also all kinds of stuff.
25    THE COURT: Well, but they were addressing what

24

1  you had proposed. And I guess the other problem is, if, in
2  fact, you're not necessarily saying that each kind of
3  conduct is necessarily anticompetitive -- well, are you
4  saying that it's not that each conduct can be classically
5  characterized as anticompetitive, but that all the conduct,
6  when you take it together, produces an anticompetitive
7  effect?
8    MR. FASTOW: Well, your Honor, what we're saying
9  is that each piece of conduct that we want to cite is
10  anticompetitive, but that the Supreme Court has also held
11  that we're entitled to put it altogether and they have a
12  cumulative effect. That's the Continental Ore case in 1962,
13  where the Supreme Court rejected exactly what Eaton is
14  trying to do here, which is to slice out each type of
15  conduct, look at that separately, and then try to move on.
16  The Supreme Court rejected just that argument and said that,
17  no, you look at it altogether.
18    THE COURT: Which is what makes this case so
19  difficult, both from a summary judgment point of view and
20  from a trial management point of view, which is why I
21  focused on damages, because you're piling a whole lot of
22  information, from what I saw, on a very slim read.
23    Now --
24    MR. FASTOW: Your Honor, perhaps -- could I
25  propose something?

25

1    THE COURT: Yes.
2    MR. FASTOW: Maybe it makes sense, let us make
3  our motion regarding the Court's recent order, have that
4  briefed and heard, and then perhaps get back together again
5  and see where we are after the Court has resolved that
6  motion.
7    THE COURT: All right. Well, if we do that,
8  let me say that I will rearrange my trial schedule either
9  by having the other trial go earlier or by rescheduling
10  that trial, which is a much simpler trial, so that at least
11  we'll have two contiguous weeks starting on September 22nd,
12  or are you saying that we -- that, truly, this will just
13  be another issue for appeal if I say, we have to go forward
14  and do this in two weeks?
15    I mean, I get in enough trouble with circuit
16  courts anyway, I'm not sure I want to take this on, because
17  I have to say that I could not survive, and I don't know how
18  any judge does, without timed trials, so that you actually
19  can schedule trials during the year.
20    And if I go forward and you, appeal and my very
21  favorite court, the Third Circuit, says, oh, Judge Robinson,
22  we've decided that timed trials really aren't a good idea,
23  you know what's going to happen? We won't try cases here.
24    So as an outside counsel, you might not care
25  about that. I suspect local counsel might care a little

000007

26

1  bit more, but I, frankly, am not sure I want to risk
2  that.
3       As I said, there's no way I can give you more
4  than three weeks, but the question is whether I go to the
5  trouble of rearranging everything to give you the two
6  contiguous weeks, or whether you're saying at this point,
7  if you can't give us at least three, if not four, if not
8  five, if not six, we can't possibly try this complicated
9  case.
10       MR. FASTOW: Well, your Honor, I feel very
11  confident on the lower parts of those numbers, but I'm
12  willing to think about the bifurcation issue, to see if we
13  can work at it, because we understand from our perspective,
14  if there is something that makes sense, it allows us to get
15  to trial sooner, so we have an incentive to do that once the
16  motion issues have been cleared up.  We understand plainly
17  the value to us in getting to at least a trial, if not the
18  full trial, if there's something that makes sense, but, for
19  example, two weeks, I just do not think that that would be
20  enough time to try this case entirely.
21       THE COURT:  All right.  Thank you.
22       Let's hear from defendant's counsel.  I mean, I
23  think part of the problem has been that -- well, anyway,
24  what say you?
25       MR. OSTOYICH: Again, your Honor, we can try

27

1  the case in two weeks.  I think that's reasonable.  I don't
2  know what we can slice out and bifurcate.  I'm not in favor
3  of it.
4       We're here.  We're ready to go.  This was the
5  schedule the parties agreed upon and submitted to you a
6  long time ago, and just like an evidentiary question, if a
7  ruling is issued pretrial, you live with it and you go to
8  trial, and that's what I would advocate here.
9       I don't think there's any reason to delay this
10  and drag it out.  The client just pays more money.  It's not
11  good for anything.  It's just hanging over our heads.
12  Frankly, we'd just like to be done with it and get it
13  cleared.
14       Thank you.
15       THE COURT:  All right.  Well, let me work on
16  my schedule, see what I can do.  In the meantime, we've got
17  to have a motion for reconsideration filed and we need to
18  have it filed promptly so that the defendant has an
19  opportunity to respond so that I have an opportunity to
20  resolve it before we might go to trial.  All right?
21       MR. FASTOW: We would propose, your Honor, a
22  week from today.  Next Thursday, we would propose to file
23  that motion.
24       THE COURT:  All right.
25       MR. FASTOW: And I will mention that although

28

1  defendant is now saying how they're ready to go to trial,
2  they also asked your Honor to address two motions, summary
3  judgment and statute of limitations motion.  They also want
4  to re-raise the reconsideration motion.
5       THE COURT:  I know, and I honestly wish I could
6  do it, but I really can't.
7       MR. OSTOYICH: We're saying in the alternative.
8  We would rather just try the case and be done with it.  If
9  we're going to have a delay, if it's not going to be until
10  September 22nd, or 2010, then we'll take you up on the
11  order, your Honor, which said you're denying without
12  prejudice to refile.
13       THE COURT:  All right.  Well, we're not delaying
14  at the moment, so let's focus on the motion for
15  reconsideration, and include in that your theory, sir, that
16  even if I continue to believe that your expert should not
17  testify on the grounds illuminated in his expert report on
18  damages, that there's some alternate way you can prove
19  damages, so that we can -- and let me just look.
20       I don't feel like turning on my computer, so let
21  me look at paper.
22       All right.  So Thursday, the 3rd.  Now, under
23  the local rules, a response wouldn't be due until the 17th,
24  which, obviously, does not give us enough time.
25       Can you do this by the 10th or the 11th?

29

1       MR. OSTOYICH: I don't have my calendar.  Either
2  one of those, your Honor.  You tell us.
3       THE COURT:  All right.  Well, you've got Labor
4  Day, so actually the 14th.  If you could get something back
5  by the 14th.  And if I need -- that's getting awfully close.
6       That's less than a week away.  I know you all
7  are gearing up for trial is the problem, and that's an
8  expensive proposition.  I don't know whether plaintiff is,
9  but defendant seems to be gearing up for trial.
10       MR. FASTOW: Your Honor, I think, again, it goes
11  back to trying to shoehorn, you know -- and I understand
12  your Honor's scheduling problems.  But let me just mention
13  the pretrial order, just to give the Court a sense of at
14  least what the parties were thinking about.
15       THE COURT:  Well, I mean, honestly,
16  shoehorning -- I don't really care what the parties were
17  thinking about.
18       MR. FASTOW: All right.
19       THE COURT:  It's how much this Court can bear,
20  and I mean that in b-e-a-r, under its strained, limited
21  resources.  So I think probably maybe 9/11 instead of 9/14
22  for the defendant's response.  In the meantime, I will let
23  you know whether I can rearrange my trial schedule.  I,
24  frankly, don't know.
25       I have no idea at this point in my mind -- I'm

30

1    sure I start a trial the first full week of October, but if
2    I can rearrange that and we've got those three weeks, then
3    please just see with your people whether, in fact, you might
4    be available, and I will see what I can do.
5         So I will let you know about scheduling next
6    week. In the meantime, 9/3, September 3rd for the motion,
7    September 11th for the response, and I might get you on the
8    phone to schedule a conference about the motion if it's
9    unclear to me what's going on, or if I have other issues to
10   address with you. All right?
11        MR. FASTOW: Thank you, your Honor.
12        MR. OSTOYICH: Thank you, your Honor.
13        THE COURT: All right. Counsel, I appreciate
14   your patience. I find antitrust very, very much more
15   complicated than patent litigation, by a hundredfold, so I
16   appreciate your patience. I will do my best to do a good
17   job.
18        All right. Thank you very much.
19        (Counsel respond, "Thank you, your Honor.")
20        (Court recessed at 5:12 p.m.)
21            - - -
22
23
24
25

000009

**0**

06-623 [1] - 1:9

**1**

1 [2] - 19:18, 20:11
10th [3] - 8:24, 9:14, 28:25
11th [2] - 28:25, 30:7
14th [2] - 29:4, 29:5
17th [1] - 28:23
18 [1] - 20:3
19 [1] - 5:21
1962 [1] - 24:12

**2**

2 [1] - 20:11
2009 [1] - 1:12
2010 [2] - 10:10, 28:10
2011 [1] - 10:10
2012 [1] - 10:11
22nd [4] - 9:13, 11:10, 25:11, 28:10
27 [1] - 1:12
28 [3] - 22:4, 22:18, 22:20
28th [1] - 9:13
29 [2] - 22:18, 22:20

**3**

3 [2] - 19:20, 20:12
30 [1] - 10:2
3rd [2] - 28:22, 30:6

**4**

45 [1] - 11:6
4:27 [2] - 1:12, 3:4

**5**

50 [1] - 11:5
5:12 [1] - 30:20

**6**

6 [1] - 19:21

**7**

701 [2] - 12:18, 12:21

703 [2] - 7:2, 7:3

**8**

80 [2] - 11:4, 16:20
8th [2] - 8:11, 8:25

**9**

9/11 [1] - 29:21
9/14 [1] - 29:21
9/3 [1] - 30:6
95 [1] - 11:5

**A**

able [4] - 13:5, 13:6, 13:21, 16:7
absolutely [1] - 14:6
accomplish [2] - 9:6, 11:2
act [1] - 23:9
Act [4] - 8:23, 20:11, 20:12
ACTION [1] - 1:4
acts [2] - 23:7
actual [1] - 19:8
ADAMS [1] - 2:7
address [5] - 4:11, 9:15, 9:22, 28:2, 30:10
addressed [2] - 7:12, 11:21
addresses [1] - 11:24
addressing [3] - 4:14, 5:9, 23:25
adjudicated [2] - 19:13, 19:14
admitted [2] - 19:19, 19:25
advocate [2] - 8:11, 27:8
advocating [1] - 8:7
ago [3] - 16:12, 16:16, 27:6
agree [1] - 13:6
agreed [1] - 27:5
agreements [1] - 13:5
allowed [1] - 5:15
allows [1] - 26:14
alternate [5] - 6:2, 6:4, 6:10, 18:2, 28:18
alternative [2] - 5:18, 28:7
altogether [2] - 24:11, 24:17
amorphous [1] - 16:22

amount [1] - 11:8
AND [1] - 1:2
answer [1] - 12:8
anticompetitive [12] - 16:23, 20:13, 20:25, 22:15, 22:16, 23:6, 23:7, 23:8, 24:3, 24:5, 24:6, 24:10
antitrust [3] - 18:8, 21:22, 30:14
anytime [1] - 3:23
anyway [2] - 25:16, 26:23
appeal [2] - 25:13, 25:20
APPEARANCES [2] - 1:16, 2:1
apple [1] - 17:14
appreciate [4] - 7:7, 13:20, 30:13, 30:16
approaches [1] - 5:18
appropriate [3] - 6:13, 7:14, 22:25
argue [1] - 18:19
arguing [1] - 16:12
argument [1] - 24:16
arguments [1] - 12:1
ARSHT [1] - 2:12
asserted [1] - 16:7
assume [1] - 15:8
attend [1] - 9:1
August [1] - 1:12
available [2] - 9:12, 30:4
awfully [1] - 29:5

**B**

backup [1] - 8:9
base [1] - 9:17
based [3] - 19:23, 21:16, 22:19
bases [1] - 12:16
basis [2] - 16:21, 17:1
bear [1] - 29:19
BEAR [1] - 29:20
BEFORE [1] - 1:14
beginning [2] - 3:4, 22:4
behind [1] - 22:13
behold [1] - 16:15
bench [1] - 5:24
best [2] - 9:5, 30:16
better [2] - 6:8, 17:12
between [1] - 5:14
BIDDLE [1] - 1:18
bifurcate [4] - 15:17, 15:25, 23:22, 27:2
bifurcation [1] - 26:12

bit [1] - 26:1
bites [1] - 17:14
booked [5] - 3:12, 3:14, 9:11, 10:9, 10:11
booking [1] - 10:10
bound [1] - 14:15
breaking [1] - 16:18
brief [2] - 16:19, 19:18
Brief [1] - 22:5
briefed [2] - 15:9, 25:4
briefly [2] - 4:22, 19:17
BRUCE [1] - 2:8
bundled [3] - 16:13, 16:16, 23:1
burdensome [1] - 3:25
business [8] - 5:3, 5:17, 12:21, 12:25, 13:1, 13:23, 13:24, 19:17
BY [5] - 1:18, 2:3, 2:8, 2:12, 2:16

**C**

calendar [1] - 29:1
cannot [4] - 3:22, 10:11, 18:23, 20:13
care [3] - 25:24, 25:25, 29:16
case [44] - 3:23, 5:19, 6:8, 9:1, 9:5, 9:11, 9:13, 9:18, 10:4, 10:13, 11:1, 11:2, 11:4, 11:22, 12:2, 12:14, 14:8, 14:25, 15:5, 16:22, 17:1, 18:8, 18:15, 19:18, 20:8, 20:9, 20:18, 20:20, 21:3, 21:8, 21:19, 22:2, 22:14, 22:16, 23:1, 23:3, 24:12, 24:18, 26:9, 26:20, 27:1, 28:8
caseload [1] - 3:22
cases [9] - 3:10, 3:11, 3:14, 9:8, 12:19, 20:17, 23:2, 23:18, 25:23
certainly [5] - 6:10, 9:21, 14:24, 18:1, 23:15
characterized [1] - 24:5
choice [2] - 23:15, 23:16
circuit [1] - 25:15

Circuit [3] - 4:3, 5:19, 25:21
circumstances [1] - 9:6
cite [1] - 23:2, 24:9
cited [2] - 5:20, 20:18
CIVIL [1] - 1:4
civil [3] - 3:10, 3:11, 9:11
claim [1] - 12:22, 20:7
claims [8] - 18:23, 19:5, 20:10, 20:16, 21:5, 21:6, 23:11, 23:13
Claims [1] - 22:6
clarification [3] - 4:23, 5:10, 5:13
clarify [1] - 11:11
classically [1] - 24:4
Clayton [1] - 20:12
clear [8] - 6:16, 8:16, 13:11, 16:6, 17:3, 17:23, 18:13, 18:16
cleared [2] - 26:16, 27:13
clearer [2] - 11:20, 11:21
clearly [3] - 18:7, 18:22, 20:20
client [1] - 27:10
clients [2] - 13:21, 14:6
close [2] - 5:25, 29:5
collection [1] - 12:19
coming [2] - 3:10, 13:25
commenced [1] - 3:3
compared [2] - 4:24, 6:24
competition [1] - 5:7
competitor [2] - 13:12, 13:13
completed [2] - 8:4, 8:5
completely [1] - 14:25
complicated [3] - 20:21, 26:8, 30:15
computer [1] - 28:20
concept [2] - 16:9, 16:25
concern [3] - 18:1, 21:7, 21:8
concert [1] - 21:1
conclude [1] - 12:4
conduct [9] - 20:13, 20:25, 21:16, 22:16, 24:3, 24:4, 24:5, 24:9, 24:15
conference [2] - 7:16, 30:8

confident [2] - 17:16, 26:11
confidentiality [1] - 13:9
connected [1] - 14:7
connection [1] - 5:14
considered [1] - 6:8
context [1] - 17:22
contiguous [2] - 25:11, 26:6
Continental [1] - 24:12
continue [2] - 3:24, 28:16
Continued [1] - 2:1
contract [1] - 20:22
Corporation [1] - 8:1
CORPORATION [2] - 1:5, 1:8
correct [1] - 20:5
Counsel [2] - 2:10, 2:19
counsel [7] - 12:3, 15:17, 25:24, 25:25, 26:22, 30:13, 30:19
counted [1] - 22:10
couple [4] - 4:12, 4:15, 4:21, 5:3
course [6] - 4:9, 12:23, 14:19, 21:6, 22:1, 22:15
court [2] - 10:8, 25:21
COURT [46] - 1:1, 3:6, 4:16, 5:22, 7:4, 7:10, 7:18, 7:24, 8:16, 9:4, 10:7, 10:23, 11:18, 12:10, 12:13, 12:25, 13:11, 13:19, 14:11, 14:14, 14:20, 14:24, 16:1, 17:18, 18:7, 18:20, 19:7, 19:15, 19:22, 20:19, 21:7, 22:17, 23:10, 23:25, 24:18, 25:1, 25:7, 26:21, 27:15, 27:24, 28:5, 28:13, 29:3, 29:15, 29:19, 30:13
Court [15] - 1:24, 4:25, 5:1, 5:5, 5:8, 5:10, 5:16, 5:20, 24:10, 24:13, 24:16, 25:5, 29:13, 29:19, 30:4
Court's [6] - 4:10, 4:24, 5:2, 5:14, 7:1, 25:3
courtroom [1] - 3:3
courts [1] - 25:16
criminal [3] - 3:11, 3:13, 8:22
critical [4] - 16:3,

16:4, 18:24, 18:25
cross [1] - 17:10
cross-examining [1] - 17:10
crossing [1] - 11:7
crystal [1] - 6:16
crystal-clear [1] - 6:16
cumulative [1] - 24:12

**D**

D.C [3] - 2:4, 2:8, 2:17
damage [1] - 5:7
damages [19] - 5:15, 5:18, 6:2, 6:4, 11:19, 11:23, 12:2, 12:4, 12:17, 12:23, 13:18, 17:5, 17:8, 17:22, 18:14, 24:21, 28:18, 28:19
data [2] - 6:5, 6:11
date [1] - 7:17
Daubert [2] - 4:24, 18:10
dealing [6] - 12:19, 16:10, 16:14, 16:18, 16:19, 20:21
decided [1] - 25:22
decision [5] - 4:10, 5:6, 7:1, 13:16, 15:23
deemed [2] - 19:14, 19:25
defendant [10] - 6:25, 18:13, 20:5, 21:1, 22:9, 23:6, 23:8, 27:18, 28:1, 29:9
Defendant [2] - 1:9, 2:19
defendant's [4] - 16:2, 18:1, 26:22, 29:22
defense [1] - 10:25
DELAWARE [1] - 1:2
Delaware [1] - 1:11
delay [3] - 8:6, 27:9, 28:9
delaying [1] - 28:13
demonstrate [1] - 17:4
Dentsply [3] - 16:15, 20:17, 20:19
deny [1] - 11:12, 17:7, 22:1
denying [1] - 28:11
depose [1] - 18:5
DeRamus [3] - 5:5, 5:15, 5:18
DeRamus' [2] - 4:25, 17:5
determined [1] - 14:15

DICKSTEIN [1] - 2:2
different [3] - 20:15, 22:21, 23:11
difficult [1] - 24:19
direction [1] - 16:5
discovery [4] - 8:3, 8:4, 17:10, 17:20
discussion [5] - 5:6, 19:5, 22:3, 22:7, 22:9
discussions [1] - 14:13
dismiss [2] - 21:3, 23:4
DISTRICT [2] - 1:1, 1:2
divide [1] - 10:1
docket [1] - 3:12
doctor's [1] - 11:13
domino [1] - 16:3
DONALD [1] - 2:12
done [6] - 10:18, 17:16, 22:14, 22:20, 27:12, 28:8
double [2] - 3:12, 3:14, 9:11, 10:9
double-booked [4] - 3:12, 3:14, 9:11, 10:9
down [4] - 9:2, 16:24, 17:5, 23:14
Dr [5] - 4:25, 5:5, 5:15, 5:18, 17:5
drag [1] - 27:10
DRINKER [1] - 1:18
due [2] - 28:23
during [3] - 17:9, 21:20, 25:19

**E**

early [1] - 9:14
easier [1] - 20:20
easy [3] - 16:23, 20:19, 21:15
Eaton [5] - 6:25, 7:2, 7:20, 8:1, 24:13
EATON [1] - 1:8
Eaton's [3] - 15:16, 22:1, 23:23
effect [4] - 11:13, 16:4, 24:7, 24:12
efficient [2] - 4:11, 7:14
either [5] - 10:12, 16:5, 23:16, 25:8, 29:1
elsewhere [1] - 23:3
endorses [1] - 5:20
engaged [4] - 8:3, 8:4,

21:1, 23:8
engages [1] - 23:6
entire [1] - 15:14
entirely [3] - 11:13, 15:22, 26:20
entitled [8] - 9:20, 12:8, 12:11, 12:14, 12:15, 20:15, 22:5, 24:11
ESQ [9] - 1:18, 2:3, 2:3, 2:4, 2:8, 2:12, 2:16, 2:16, 2:17
established [1] - 19:14
event [3] - 9:21, 12:23, 22:12
evidence [7] - 8:9, 12:18, 13:22, 17:17, 17:19, 23:12
evidentiary [1] - 17:10
exactly [1] - 24:13
examining [1] - 17:10
example [5] - 13:4, 16:11, 20:2, 20:8, 26:19
exclude [1] - 5:11
excluding [1] - 4:25
exclusive [5] - 16:14, 16:17, 16:19, 20:21, 20:23
exercise [3] - 3:25, 4:18, 8:19
exhaustive [1] - 4:18
expensive [1] - 29:8
expert [13] - 5:23, 8:4, 8:8, 8:17, 8:20, 9:17, 9:22, 18:9, 18:13, 21:9, 28:16, 28:17
explicitly [1] - 20:22
extensive [1] - 19:5
extravagant [1] - 14:1

**F**

fact [21] - 3:23, 5:19, 5:24, 6:24, 7:7, 8:3, 9:17, 12:4, 12:18, 17:19, 18:3, 18:9, 18:12, 18:14, 20:2, 20:5, 20:10, 21:11, 21:12, 24:2, 30:3
fact-finder [2] - 21:11, 21:12
fact-intensive [1] - 3:23
facts [12] - 4:1, 17:21, 19:12, 19:13, 19:19, 19:21, 19:22, 19:23, 19:25, 20:1, 20:4,

21:10
fair [1] - 11:7
fairly [1] - 20:19
far [3] - 6:4, 14:5, 15:1
fashion [1] - 6:9
FASTOW [37] - 2:3, 4:7, 4:19, 6:15, 7:9, 7:13, 7:19, 9:19, 10:16, 12:12, 12:16, 13:3, 13:17, 14:9, 14:12, 14:18, 14:21, 15:13, 18:4, 18:18, 19:4, 19:11, 19:17, 19:24, 20:24, 21:24, 22:23, 23:20, 24:8, 24:24, 25:2, 26:10, 27:21, 27:25, 29:10, 29:18, 30:11
Fastow [1] - 4:7
fault [1] - 18:6
favor [1] - 27:2
favorite [1] - 25:21
Federal [1] - 8:3
few [2] - 10:11, 12:13
figure [3] - 10:12, 11:5, 11:17
figures [4] - 13:25, 14:6, 14:15, 14:16
file [5] - 7:7, 11:12, 15:8, 17:3, 27:22
filed [2] - 27:17, 27:18
fill [1] - 3:6
final [1] - 4:25
finder [2] - 21:11, 21:12
fine [2] - 7:4, 7:9
first [7] - 4:12, 6:17, 9:19, 9:23, 12:7, 15:24, 30:1
five [4] - 10:3, 10:8, 15:6, 26:8
flaws [1] - 17:6
floats [1] - 21:22
focus [1] - 28:14
focused [2] - 11:18, 24:21
folks [1] - 13:10
follow [1] - 15:20
following [2] - 9:1, 15:3
Footnote [1] - 5:21
FOR [1] - 1:2
forward [12] - 3:19, 4:4, 4:6, 5:25, 11:22, 12:6, 12:9, 16:5, 16:8, 18:9, 25:13, 25:20
four [3] - 3:15, 9:10, 26:7
four-week [1] - 9:10

fourth [1] - 3:8
frankly [5] - 6:7, 10:3, 26:1, 27:12, 29:24
frustrated [1] - 20:10
full [2] - 26:18, 30:1
future [2] - 12:20, 23:17

**G**

gate [1] - 18:10
gatekeeper [1] - 7:4
gather [1] - 13:22
gear [1] - 11:15
gearing [2] - 29:7, 29:9
gee [1] - 4:3
get-go [1] - 3:19
given [1] - 3:18
granted [1] - 5:11
greed [1] - 14:1
grounds [3] - 4:15, 7:22, 28:17
guess [10] - 3:6, 9:4, 10:2, 11:25, 12:3, 12:7, 13:11, 23:15, 24:1
Gunning [1] - 1:24

**H**

HACKETT [1] - 2:4
HANDRIGAN [1] - 2:17
hanging [1] - 27:11
hard [1] - 16:9
heading [1] - 22:5
heads [1] - 27:11
hear [3] - 7:8, 10:16, 26:22
heard [3] - 16:13, 16:14, 25:4
heart [1] - 10:13
hefty [1] - 19:2
held [1] - 24:10
helpful [1] - 19:7
helpfully [1] - 19:15
hide [1] - 22:13
high [1] - 14:16
HOLCOMB [2] - 2:7, 2:8
hold [1] - 11:13
honestly [2] - 28:5, 29:15
Honor [42] - 4:7, 4:19, 6:15, 7:9, 7:13, 7:16, 7:19, 7:25, 9:19, 9:22, 10:16, 10:25,

12:7, 13:7, 13:17, 14:12, 14:18, 15:13, 15:15, 16:10, 17:2, 18:4, 18:18, 19:4, 19:24, 21:24, 22:1, 22:3, 22:23, 23:20, 24:8, 24:24, 26:10, 26:25, 27:21, 28:2, 28:11, 29:2, 29:10, 30:11, 30:12, 30:19
Honor's [2] - 10:20, 29:12
HONORABLE [1] - 1:14
hope [2] - 18:24, 23:17
hoping [1] - 21:21
hour [1] - 11:7
hours [3] - 10:1, 10:2, 11:4
Howrey [1] - 8:1
HOWREY [1] - 2:15
hundredfold [1] - 30:15

**I**

idea [2] - 25:22, 29:25
identified [1] - 18:12
identify [1] - 18:24
illuminated [1] - 28:17
imagine [1] - 22:21
implicate [1] - 13:9
important [1] - 10:6
impression [2] - 21:21, 21:23
IN [2] - 1:1, 1:2
incentive [1] - 26:15
include [2] - 5:12, 28:15
incredibly [1] - 3:25
individually [1] - 20:25
information [2] - 21:10, 24:22
injunctive [5] - 12:22, 13:1, 13:3, 13:14, 13:18
injury [2] - 5:7
instead [2] - 3:15, 29:21
instruction [2] - 16:16, 16:17
instructions [6] - 16:15, 16:18, 16:20, 19:8, 22:24, 23:3
Intend [1] - 22:6
intend [1] - 22:15
intensive [1] - 3:23

issue [10] - 6:22, 11:19, 11:21, 11:24, 16:7, 18:19, 20:1, 25:13, 26:12
issued [2] - 4:25, 27:7
issues [15] - 5:7, 5:12, 6:20, 7:11, 9:22, 10:12, 10:18, 15:15, 15:18, 16:3, 16:4, 20:2, 22:19, 26:16, 30:9
itself [1] - 11:7

**J**

JAY [1] - 2:3
Jay [1] - 4:7
JENNIFER [1] - 2:4
job [1] - 30:17
Joe [1] - 7:25
joint [1] - 19:19
JOSEPH [1] - 2:16
Judge [1] - 25:21
judge [3] - 3:9, 21:12, 25:18
judges [1] - 3:9
judgment [10] - 3:24, 7:22, 16:13, 21:4, 22:2, 22:12, 23:4, 23:23, 24:19, 28:3
juggling [1] - 3:20
jury [7] - 16:15, 16:16, 16:17, 19:8, 21:12, 22:24, 23:3

**K**

KAREN [1] - 1:18
keep [1] - 21:2
kind [8] - 13:1, 14:1, 16:22, 19:2, 19:9, 22:20, 23:7, 24:2
kinds [1] - 23:24

**L**

Labor [1] - 29:3
lack [1] - 5:14
lacking [1] - 6:12
law [1] - 22:25
lay [7] - 12:18, 12:19, 17:8, 18:8, 21:11, 21:13, 22:25
lays [1] - 19:12
least [7] - 10:17, 15:18, 22:11, 25:10, 26:7, 26:17, 29:14
legal [2] - 19:23, 22:18

Lepages [2] - 16:14, 20:17
less [3] - 9:9, 18:24, 29:6
liability [2] - 11:19, 11:24
life [1] - 12:14
light [2] - 4:10, 15:23
limitations [2] - 7:22, 28:3
limited [2] - 11:20, 29:20
lined [1] - 17:17
list [2] - 19:19, 20:3
listed [1] - 11:5
litigated [1] - 20:3
litigation [2] - 14:9, 30:15
live [1] - 27:7
LLC [1] - 1:4
LLP [4] - 1:18, 2:2, 2:7, 2:15
lo [1] - 16:15
local [2] - 25:25, 28:23
located [1] - 19:16
look [9] - 13:22, 14:2, 20:2, 22:17, 22:24, 24:15, 24:17, 28:19, 28:21
looking [2] - 4:21, 19:3
looks [2] - 21:14, 21:15
lower [1] - 26:11

**M**

man [1] - 13:20
management [1] - 24:20
master [1] - 21:6
match [1] - 22:8
matter [1] - 6:9
mean [7] - 6:2, 10:3, 14:3, 16:9, 18:11, 20:20, 21:10, 21:13, 21:15, 21:18, 22:19, 22:20, 23:15, 25:15, 26:22, 29:15, 29:20
meaningful [1] - 14:13
means [1] - 21:13
meant [1] - 18:11
meantime [3] - 27:16, 29:22, 30:6
meets [1] - 19:9
MELISSA [1] - 2:17
memorandum [1] - 13:23
mention [5] - 7:20,

14:18, 16:19, 27:25, 29:12
mentioned [2] - 7:20, 7:23
MERITOR [2] - 1:4
merits [1] - 22:2
methodologies [1] - 17:5
might [7] - 16:6, 17:21, 25:24, 25:25, 27:20, 30:3, 30:7
mind [1] - 29:25
minds [1] - 23:21
minutes [1] - 11:6
mistaken [1] - 9:25
mix [1] - 21:21
moment [3] - 10:17, 15:8, 28:14
money [1] - 27:10
months [1] - 16:12
MORRIS [1] - 2:12
motion [35] - 3:22, 4:13, 4:16, 4:24, 5:11, 6:17, 6:23, 6:24, 6:25, 7:2, 7:7, 7:15, 7:21, 7:23, 9:15, 11:12, 15:9, 17:4, 17:7, 21:3, 21:4, 22:2, 22:3, 23:4, 23:23, 25:3, 25:6, 26:16, 27:17, 27:23, 28:3, 28:4, 28:14, 30:6, 30:8
motions [3] - 8:13, 8:14, 28:2
move [2] - 6:14, 24:15
MR [45] - 4:7, 4:19, 6:15, 7:9, 7:13, 7:19, 7:25, 9:3, 9:19, 10:16, 10:25, 12:7, 12:12, 12:16, 13:3, 13:17, 14:9, 14:12, 14:18, 14:21, 15:13, 16:9, 18:4, 18:18, 19:4, 19:11, 19:17, 19:24, 20:24, 21:24, 22:23, 23:20, 24:8, 24:24, 25:2, 26:10, 26:25, 27:21, 27:25, 28:7, 29:1, 29:10, 29:18, 30:11, 30:12

**N**

name [4] - 20:6, 20:14, 21:5, 23:1
necessarily [2] - 24:2, 24:3
need [10] - 3:21, 6:1,

4

7:11, 8:19, 11:10,
17:25, 19:12, 19:13,
27:17, 29:5
**never** [1] - 10:7
**next** [3] - 4:14, 27:22,
30:5
**nice** [1] - 13:20
**NICHOLS** [1] - 2:12
**NO** [1] - 1:9
**non** [1] - 5:7
**non-damage** [1] - 5:7
**notion** [2] - 19:12,
23:5
**number** [3] - 5:9, 9:6,
9:25
**numbers** [1] - 26:11

## O

**o'clock** [1] - 1:12
**objected** [1] - 16:18
**obstacle** [1] - 8:25
**obviously** [3] - 11:6,
15:10, 28:24
**October** [1] - 30:1
**OEMs** [1] - 13:6
**OF** [1] - 1:2
**Official** [1] - 1:24
**often** [1] - 3:14
**once** [2] - 7:15, 26:15
**one** [18] - 3:13, 4:23,
5:5, 5:9, 5:13, 7:19,
9:6, 11:11, 14:25,
15:15, 19:24, 20:6,
21:5, 22:1, 23:8,
23:18, 29:2
**one-sided** [1] - 14:25
**opinion** [7] - 4:14,
6:24, 8:18, 8:20,
9:17, 12:18, 12:20
**opportunity** [3] - 8:13,
27:19
**order** [12] - 4:15, 4:25,
9:25, 13:9, 13:23,
19:6, 19:12, 22:4,
22:7, 25:3, 28:11,
29:13
**Ore** [1] - 24:12
**OSTOYICH** [10] - 2:16,
7:25, 9:3, 10:25,
12:7, 16:9, 26:25,
28:7, 29:1, 30:12
**Ostoyich** [1] - 7:25
**outlined** [1] - 8:2, 8:8
**outside** [1] - 25:24

## P

**p.m** [3] - 1:12, 3:4,
30:20
**page** [3] - 18:22, 22:8
**Page** [5] - 19:18,
19:20, 19:21, 20:3,
22:4
**Pages** [2] - 22:18,
22:20
**Paoli** [1] - 5:20
**paper** [1] - 28:21
**papers** [1] - 16:20
**part** [1] - 26:23
**particular** [1] - 21:5
**parties** [5] - 10:1,
16:6, 27:5, 29:14,
29:16
**parts** [1] - 26:11
**party** [1] - 14:22
**party's** [1] - 16:5
**past** [1] - 22:12
**patent** [3] - 9:8, 10:11,
30:15
**patience** [3] - 6:7,
30:14, 30:16
**pAUL** [1] - 2:3
**pays** [1] - 27:10
**pegging** [1] - 11:5
**people** [2] - 11:15,
30:3
**per** [2] - 10:2, 22:8
**perfectly** [2] - 15:16,
20:16
**perhaps** [2] - 24:24,
25:4
**period** [1] - 10:13
**perspective** [4] - 6:16,
10:19, 11:1, 26:13
**phone** [1] - 30:8
**piece** [2] - 20:24, 24:9
**pieces** [1] - 15:19
**pigeonhole** [1] - 21:4
**piling** [1] - 24:21
**pin** [1] - 16:24
**pinned** [1] - 17:5
**plainly** [2] - 10:19,
26:16
**plaintiff** [6] - 15:3,
15:22, 17:19, 18:23,
23:5, 29:8
**plaintiffs** [4] - 4:8, 4:9,
5:8, 8:17
**Plaintiffs** [3] - 1:6,
2:10, 22:5
**plaintiffs'** [5] - 6:16,
9:15, 12:3, 21:8,
21:9
**plan** [6] - 3:17, 3:19,

4:13, 5:3, 5:17, 17:6
**point** [12] - 6:1, 6:10,
7:20, 12:1, 16:22,
17:16, 18:10, 23:17,
24:19, 24:20, 26:6,
29:25
**points** [2] - 16:2,
21:24
**position** [1] - 17:12
**possibility** [2] - 16:13,
17:9
**possibly** [2] - 21:12,
26:8
**postpone** [1] - 23:17
**practice** [1] - 3:23
**predatory** [2] - 20:8,
20:9
**prejudice** [1] - 28:12
**preliminarily** [2] -
4:20, 6:21
**prepared** [3] - 14:12,
15:16, 15:25
**pretrial** [10] - 9:25,
19:1, 19:2, 19:5,
19:6, 19:11, 22:4,
22:7, 27:7, 29:13
**preview** [1] - 4:20
**pricing** [2] - 20:8, 20:9
**problem** [6] - 17:18,
17:24, 18:2, 24:1,
26:23, 29:7
**problems** [1] - 29:12
**proceed** [7] - 6:18,
9:20, 12:17, 13:15,
13:18, 13:21, 15:11
**Proceedings** [1] - 3:3
**process** [3] - 8:2, 8:7,
17:20
**produces** [1] - 24:6
**proffer** [1] - 17:8
**proffered** [1] - 17:13
**profits** [1] - 12:20
**promise** [1] - 15:6
**promptly** [3] - 15:9,
15:10, 27:18
**proof** [2] - 19:20, 20:1
**propose** [5] - 8:21,
15:2, 24:25, 27:21,
27:22
**proposed** [5] - 10:1,
19:6, 19:11, 19:20,
22:4, 22:24, 23:2,
24:1
**proposing** [1] - 9:4
**proposition** [1] - 29:8
**propound** [1] - 23:12
**prove** [2] - 18:14,
28:18
**Prove** [1] - 22:6
**provided** [1] - 22:18

**pursuing** [3] - 18:23,
19:23, 23:11
**push** [1] - 21:10
**put** [7] - 6:9, 7:1, 11:4,
20:6, 23:1, 23:21,
24:11

## Q

**quarter** [1] - 3:10
**questioning** [1] -
17:23
**questions** [1] - 18:5
**quite** [1] - 19:5

## R

**raise** [3] - 6:23, 22:16,
28:4
**raised** [1] - 15:16
**range** [1] - 10:3
**rather** [3] - 9:14, 19:1,
28:8
**rationale** [3] - 4:24,
5:14, 6:23
**Re** [1] - 5:20
**re** [1] - 28:4
**re-raise** [1] - 28:4
**read** [3] - 5:1, 5:23,
24:22
**ready** [5] - 8:5, 8:7,
8:14, 27:4, 28:1
**real** [2] - 14:7, 21:11
**realistic** [1] - 17:11
**reality** [1] - 14:5
**really** [9] - 4:20, 7:8,
16:23, 18:11, 21:14,
23:10, 25:22, 28:6,
29:16
**rearrange** [2] - 25:8,
29:23, 30:2
**rearranging** [1] - 26:5
**reason** [1] - 27:9
**reasonable** [1] - 27:1
**REATH** [1] - 1:18
**rebates** [3] - 16:14,
16:17, 23:1
**recent** [1] - 25:3
**recently** [1] - 4:10
**recessed** [1] - 30:20
**recognized** [2] - 5:5,
20:17
**reconsideration** [10] -
4:17, 7:23, 9:16,
11:12, 15:9, 17:4,
17:7, 27:17, 28:4,
28:15
**refer** [1] - 22:3

**refile** [1] - 28:12
**regard** [1] - 11:25
**regarding** [1] - 25:3
**regardless** [1] - 13:16
**REID** [1] - 2:12
**rejected** [2] - 24:13,
24:16
**related** [1] - 6:22
**relates** [1] - 6:23
**relevant** [1] - 17:22
**relief** [5] - 12:23, 13:1,
13:4, 13:14, 13:18
**relies** [1] - 6:3
**rely** [5] - 6:11, 6:12,
18:3, 18:11, 21:9
**relying** [1] - 18:14
**remain** [1] - 20:3
**removed** [1] - 14:5
**renew** [2] - 7:21, 8:13
**report** [7] - 5:6, 5:23,
6:1, 11:13, 11:23,
21:9, 28:17
**Reporter** [1] - 1:24
**require** [1] - 19:20,
20:1
**rescheduling** [1] -
25:9
**resolution** [1] - 18:2
**resolve** [1] - 27:20
**resolved** [1] - 25:5
**resources** [2] - 11:20,
29:21
**respect** [4] - 8:21,
12:17, 12:20, 12:21
**respond** [2] - 27:19,
30:19
**response** [3] - 28:23,
29:22, 30:7
**rest** [1] - 6:9
**review** [1] - 7:5
**risk** [1] - 26:1
**road** [1] - 19:9
**ROBERT** [1] - 2:16
**ROBINSON** [1] - 1:14
**Robinson** [1] - 25:21
**rubber** [1] - 19:9
**Rule** [4] - 7:2, 12:18,
12:21
**rules** [2] - 17:13,
28:23
**Rules** [1] - 8:3
**ruling** [1] - 27:7
**run** [1] - 8:25
**RUYAK** [1] - 2:16

## S

**sand** [1] - 16:10
**saw** [1] - 21:3, 21:4,

24:22
schedule [9] - 8:22,
   9:24, 10:20, 25:8,
   25:19, 27:5, 27:16,
   29:23, 30:8
scheduled [1] - 8:15
schedules [1] - 11:17
scheduling [2] -
   29:12, 30:5
scope [1] - 17:23
second [2] - 5:13,
   13:8
Section [3] - 20:11,
   20:12
sections [1] - 22:11
see [14] - 4:6, 6:4,
   8:19, 9:16, 10:14,
   10:17, 13:9, 15:13,
   15:18, 25:5, 26:12,
   27:16, 30:3, 30:4
seeing [1] - 23:21
seem [2] - 14:15, 15:4
sends [1] - 4:3
sense [9] - 6:20, 9:21,
   15:18, 15:24, 20:6,
   25:2, 26:14, 26:18,
   29:13
sensible [1] - 7:14
separate [2] - 10:12,
   22:19
separately [2] - 12:22,
   24:15
September [7] - 3:12,
   9:13, 9:14, 25:11,
   28:10, 30:6, 30:7
set [2] - 7:16, 20:10
settle [1] - 14:4
settlement [5] - 14:10,
   14:11, 14:13, 14:19,
   14:23
seven [1] - 21:14
SHAPIRO [1] - 2:2
share [1] - 18:1
Sherman [2] - 20:11
shifting [1] - 16:10
shoehorn [1] - 29:11
shoehorning [1] -
   29:16
short [1] - 10:4
show [1] - 23:4
side [4] - 14:9, 14:10,
   14:11, 22:10
sided [1] - 14:25
sides [1] - 14:22
signal [1] - 16:6
simple [3] - 20:6,
   20:14, 22:14
simpler [1] - 25:10
simply [1] - 23:11
sit [1] - 9:2

situation [3] - 3:18,
   4:5, 4:6
six [5] - 10:3, 10:8,
   21:14, 21:19, 26:8
six-week [1] - 10:3
slice [2] - 24:14, 27:2
slim [1] - 24:22
SLR [1] - 1:9
someplace [2] -
   13:23, 19:1
soon [2] - 3:23, 15:5
sooner [1] - 26:15
sophisticated [1] -
   18:7
sorry [1] - 20:4
sound [1] - 23:13
sounds [1] - 17:6
specifically [5] - 5:8,
   5:20, 6:1, 18:12,
   18:17
Speedy [1] - 8:23
spend [1] - 11:6
stand [1] - 3:7
standing [1] - 13:13
start [4] - 8:15, 11:10,
   19:2, 30:1
starting [6] - 8:11,
   8:24, 9:14, 19:17,
   19:21, 25:11
Statement [1] - 22:5
statement [4] - 19:18,
   19:19, 19:21, 20:4
statements [1] - 21:14
STATES [1] - 1:1
statute [2] - 7:22, 28:3
stick [1] - 14:16
still [5] - 3:10, 11:14,
   12:8, 12:17, 13:12
stipulation [1] - 19:2
stop [1] - 13:7
strained [1] - 29:20
strategic [2] - 5:3,
   5:17
strike [1] - 14:1
stuff [1] - 23:24
submission [1] - 7:21
submit [5] - 5:14,
   10:3, 17:11, 17:15,
   20:24
submitted [2] - 19:8,
   27:5
substantial [1] - 3:22
SUE [1] - 1:14
sue [1] - 23:6
sufficiency [2] - 5:2,
   5:17
suggesting [1] - 9:22
SULLIVAN [1] - 1:18
summary [10] - 3:24,

7:22, 16:13, 21:4,
   22:2, 22:12, 23:4,
   23:23, 24:19, 28:2
Support [1] - 22:6
support [2] - 23:5,
   23:12
Supreme [3] - 24:10,
   24:13, 24:16
survive [2] - 8:8, 25:17
survives [1] - 8:20
suspect [4] - 12:14,
   14:2, 21:11, 25:25
switch [1] - 9:12

T

task [1] - 23:21
TASKIER [1] - 2:3
term [1] - 13:5
terms [3] - 4:23, 9:24,
   10:18
testified [1] - 17:21
testify [5] - 5:16, 12:5,
   28:17
testimony [4] - 5:1,
   5:11, 12:18, 12:20
THE [47] - 1:1, 1:2,
   3:6, 4:16, 5:22, 7:4,
   7:10, 7:18, 7:24,
   8:16, 9:4, 10:7,
   10:23, 11:18, 12:10,
   12:13, 12:25, 13:11,
   13:19, 14:11, 14:14,
   14:20, 14:24, 16:1,
   17:18, 18:7, 18:20,
   19:7, 19:15, 19:22,
   20:19, 21:7, 22:17,
   23:10, 23:25, 24:18,
   25:1, 25:7, 26:21,
   27:15, 27:24, 28:5,
   28:13, 29:3, 29:15,
   29:19, 30:13
theories [6] - 6:2,
   6:10, 18:23, 19:12,
   19:23, 22:18
theory [6] - 6:4, 12:2,
   12:4, 21:16, 21:22,
   28:15
they've [5] - 9:17,
   12:1, 16:18, 20:7,
   22:14
thinking [2] - 29:14,
   29:17
Third [3] - 4:3, 5:19,
   25:21
three [6] - 3:8, 16:12,
   21:20, 26:4, 26:7,
   30:2
throwing [1] - 21:20

Thursday [3] - 1:12,
   27:22, 28:22
timed [2] - 25:18,
   25:22
today [4] - 3:17, 7:8,
   18:1, 27:22
together [2] - 24:6,
   25:4
top [1] - 21:22
total [1] - 9:25
towards [1] - 6:18
TRANSMISSION [1] -
   1:5
trial [49] - 4:10, 6:8,
   6:18, 6:19, 6:20,
   7:10, 7:12, 8:5, 8:10,
   8:11, 8:15, 8:17,
   8:18, 8:22, 8:24, 9:7,
   9:11, 9:21, 10:1,
   10:2, 10:5, 10:8,
   10:21, 11:6, 11:9,
   11:14, 13:15, 15:5,
   15:11, 15:14, 15:23,
   17:15, 23:14, 24:20,
   25:8, 25:9, 25:10,
   26:15, 26:17, 26:18,
   27:8, 27:20, 28:1,
   29:7, 29:9, 29:23,
   30:1
Trial [1] - 8:23
trials [5] - 3:13, 10:11,
   25:18, 25:19, 25:22
tried [1] - 13:20
trouble [2] - 25:15,
   26:5
true [1] - 14:20, 22:11
truly [2] - 12:10, 25:12
try [12] - 8:23, 9:8,
   9:12, 15:5, 16:7,
   21:19, 24:15, 25:23,
   26:8, 26:20, 26:25,
   28:8
trying [4] - 20:7, 21:2,
   24:14, 29:11
TUNNELL [1] - 2:12
turning [1] - 28:20
turns [1] - 3:12
two [25] - 3:15, 9:5,
   9:7, 9:9, 10:4, 10:13,
   10:19, 11:1, 11:2,
   11:9, 14:22, 15:12,
   15:14, 16:16, 21:24,
   23:16, 23:19, 25:11,
   25:14, 26:5, 26:19,
   27:1, 28:2
two-party [1] - 14:22
two-week [2] - 10:13,
   11:9
type [2] - 23:8, 24:14

U

U.S.D.C.J [1] - 1:14
unclear [1] - 30:9
under [10] - 6:25, 7:2,
   7:5, 9:5, 12:18,
   12:21, 17:13, 28:22,
   29:20
underlying [1] - 6:5
underpinning [1] - 6:5
UNITED [1] - 1:1
unless [3] - 17:20,
   18:12, 18:17
unusual [1] - 15:3
up [11] - 8:25, 10:18,
   11:15, 13:25, 15:20,
   17:2, 17:17, 26:16,
   28:10, 29:7, 29:9

V

Valerie [1] - 1:24
valid [1] - 20:16
valuation [1] - 12:21
value [1] - 26:17
versus [1] - 18:24
vetted [1] - 17:20
viable [1] - 20:16
view [11] - 5:2, 5:16,
   6:8, 6:17, 11:9,
   13:15, 16:2, 22:13,
   22:14, 24:19, 24:20
virtually [1] - 9:8
visiting [1] - 3:9
vs [1] - 1:7

W

washington [1] - 2:8
Washington [2] - 2:4,
   2:17
water [1] - 14:16
ways [3] - 14:19,
   15:17, 15:25
wedded [1] - 14:6
week [12] - 4:14, 9:1,
   9:10, 10:2, 10:3,
   10:13, 11:9, 27:22,
   29:6, 30:1, 30:6
weeks [26] - 3:15,
   3:16, 9:5, 9:7, 9:9,
   9:10, 9:13, 10:4,
   10:8, 10:19, 11:1,
   11:3, 15:6, 15:12,
   15:14, 16:16, 21:19,
   23:16, 23:19, 25:11,
   25:14, 26:4, 26:6,
   26:19, 27:1, 30:2

6

**whittle** [1] - 23:14
**whole** [6] - 12:15,
  12:19, 20:7, 21:2,
  23:12, 24:21
**willing** [2] - 23:21,
  26:12
**Wilmington** [1] - 1:11
**wish** [3] - 5:24, 12:10,
  28:5
**witness** [1] - 12:5
**witnesses** [8] - 11:6,
  17:8, 17:21, 18:3,
  18:5, 18:8, 18:12,
  18:14
**word** [2] - 12:11,
  20:15
**works** [1] - 10:20
**world** [1] - 14:7
**worst** [1] - 5:23

## Y

**year** [1] - 25:19
**years** [3] - 3:8, 5:23,
  21:20
**yesterday** [1] - 7:21

## Z

**ZF** [1] - 1:4

**000015**

EXHIBIT 2

1

```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        -  -  -

4
     ZF MERITOR LLC and MERITOR     :    CIVIL ACTION
5    TRANSMISSION CORPORATION,
                                    :
6                  Plaintiffs,      :
                                    :
7         vs.                       :
                                    :
8    EATON CORPORATION,             :
                                    :
9                  Defendant.    :    NO. 06-623 (SLR)

10                       -  -  -

11
                          Wilmington, Delaware
12                        Monday, June 29, 2009
                          11:58 o'clock, a.m.
13                       -  -  -

14
     BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.
15
                         -  -  -
16
     APPEARANCES:
17
                DRINKER BIDDLE & REATH LLP
18              BY:  KAREN V. SULLIVAN, ESQ.

19
                         -and-
20

21

22

23

24                          Valerie J. Gunning
                            Official Court Reporter
25
```

**2**

1  APPEARANCES (Continued):

2

3  DICKSTEIN SHAPIRO LLP
   BY:  JAY N. FASTOW, ESQ.,
4       JENNIFER DUNCAN HACKETT, ESQ. and
        BRUCE HOLCOMB, ESQ.
5       (Washington, D.C.)

6       Counsel for Plaintiffs

7

8

9  MORRIS, NICHOLS, ARSHT & TUNNELL
   BY:  DONALD E. REID, ESQ.
10

11       -and-

12

13  HOWREY LLP
    BY:  JOSEPH A. OSTOYICH, ESQ.,
14       ANDREW LAZEROW, ESQ. and
         MELISSA HANDRIGAN, ESQ.
15       (Washington, D.C.)

16       Counsel for Defendant

17

18       - - -

19

20
21
22
23
24
25

---

**3**

1       P R O C E E D I N G S

2

3       (Proceedings commenced in the courtroom

4  beginning at 11:58 a.m.)

5

6       THE COURT:  Good morning.  It is still morning

7  because we started a bit early.

8       Let me share some thoughts with you about the

9  sorts of issues I would like to address today.

10      There are three pending motions.  There's a

11 motion for summary judgment vis-à-vis the statute of

12 limitations issue.  There's a motion for reconsideration in

13 terms of my declining to -- I just brought out some of the

14 appendices that were filed in connection with Eaton's

15 broader motion for summary judgment.  There's a motion to

16 exclude plaintiffs' damages expert.

17      To some extent, they're all interrelated, so let

18 me share my questions, concerns with you, and, hopefully, in

19 addition to whatever prepared remarks you make, you can

20 include some of my concerns.

21      With respect to the statute of limitations

22 expert, in going through the expert's -- let me pull out his

23 name -- Dr. DeRamus.  Anyway, I might add for the record

24 that I think it's the longest expert opinion I have seen,

25 and he used the word "conservative" more times than I have

---

**4**

1  ever seen.

2       When you use a word too often, it makes me think

3  that maybe it's not.  But, in any event, I reviewed his

4  report as best I could understand it, because he does throw

5  a lot of data at -- include a lot of data in his report, and

6  it was difficult for me to cull and confirm the argument

7  that the defendant has made, that his but-for competitive

8  world is a more extensive one than reality and what is the

9  alleged anticompetitive world, which is a little upside

10 down, and, therefore, needs to be explained, assuming that

11 the figures that defendant gave me are correct.  And, again,

12 I didn't see those exact figures.  They were much broader

13 figures, so I will need that explained as well.

14      But this is the thing.  If, in fact, his report

15 really is inconsistent with the principles of Daubert, then

16 it seems to me as though this case is over.  Without

17 damages, the case can't go forward.  So I think it's an

18 important issue.

19      Having reviewed the report, it is confusing

20 enough and dense enough that it could be I will do something

21 that I have never done before, because usually Daubert

22 motions are frivolous, but this one, I think, might need

23 significantly more time addressed, perhaps even an

24 evidentiary hearing in connection with that, which I know

25 some Courts do, I've never done before.

---

**5**

1       But his report also, on numerous occasions, it's

2  almost like a mantra, says his damages figures ultimately

3  are conservative, highly conservative, most conservative,

4  because the defendant's anticompetitive conduct started

5  before January 2000 and it goes back to, I think, a 1997

6  contract with Mack, or 1998.

7       In any event, he continues to say that he's

8  starting at his -- his figures started, his calculations

9  started with conduct starting in 2000, but, really, this

10 conduct went on in the 1990's.  I think he used that phrase

11 on more than one occasion.

12      So in terms of the statute of limitations, I

13 understand the plaintiffs' argument and, certainly, I have

14 agreed with plaintiffs' argument, that according to them, is

15 a continuous course of conduct.  That at some point, if this

16 conduct has gone on for ten years before suit is filed,

17 there does have to be a limit to what you collect on

18 damages, even if there has been a continuing course of

19 conduct.

20      So that's certainly something that I want to

21 address with you all.

22      I think there are issues of fact which I'm not

23 confident is it appropriate for me to address in terms of

24 why plaintiff wasn't competitive.  I think everyone can

25 agree, it wasn't, but the question is why, and certainly

**000017**

6

1 there are facts on both sides of the issue, which is why I
2 declined to go through more than a foot-full of appendices
3 to cull that out. I don't think that generally is
4 appropriate. And the Third Circuit, I think, agrees with
5 me, to some extent.
6 　　　So, in any event, those are my introductory
7 comments. I'm not exactly sure what you all were prepared
8 to address, but I think the statute of limitations and
9 damages -- the Daubert motion are kind of interrelated as
10 well as the motion for reconsideration given the fact
11 that -- in light of my introductory comment.
12 　　　So all of the motions were the defendant, so I
13 assume the defendant was prepared to go first?
14 　　　MR. OSTOYICH: Yes, your Honor.
15 　　　THE COURT: All right.
16 　　　MR. OSTOYICH: Joel Ostoyich, from Howrey, for
17 the defendant.
18 　　　Your Honor, I don't have the precise cite, but I
19 know the report is long, but if you give me a second, I can
20 point you to the crystal-clear table in there that has his
21 but-for price assumption.
22 　　　THE COURT: All right. Well, that's fine.
23 　　　MR. OSTOYICH: It's table 5. It's in his
24 report, line 9. And it's entitled, But-For Price For Manual
25 Transmissions, and it has a price by year. I can tell you

7

1 the numbers. They're 3418 in fiscal year 2000 going up to
2 3776.
3 　　　THE COURT: Oh, I see. It was average but-for
4 price. Somehow I missed that line. All right.
5 　　　MR. OSTOYICH: All right. So that is the
6 average but-for price he has for the plaintiffs' sales of
7 manual transmissions each year in the future, and that price
8 affects all of his lost profits calculations. They all
9 depend upon that. He has different measures of market by
10 volume, but the prices, the multiplier he multiplied them
11 all out by.
12 　　　Then figure 17 of his report, which is in the
13 text of his report, plots out the average gross price, not
14 even the net price, deducting rebates and discounts, but the
15 gross price for each company to the OEMs, which is in the
16 $3,000 range. It's essentially a flat line during the
17 entire period.
18 　　　THE COURT: All right. I see that.
19 　　　MR. OSTOYICH: So that is the, called
20 anticompetitive world, where prices, because of Eaton's
21 conduct are 20, 25 percent lower than the world he wants,
22 which is the but-for world, with no alleged anticompetitive
23 conduct.
24 　　　Now, the expert himself conceded in his
25 deposition, a matter of basic economics, the but-for world,

8

1 without the alleged anticompetitive conduct, by definition,
2 is more competitive and prices should be lower. We have
3 case law we've cited to that effect. It's a simple rule of
4 economics.
5 　　　There really is no explanation that's sufficient
6 to explain why the price would be 25 percent higher, why
7 customers would be better off absent the conduct he has
8 complained about in the case, plaintiffs are complaining
9 about in the case.
10 　　　So fundamentally, on the face of it, there's an
11 enormous disconnect. That is a problem for Daubert. It's
12 contrary to the types of analysis, the theory, economic
13 theory, that an expert in this field normally applies in
14 academic studies and so forth.
15 　　　Now, that's actually comparing apples to apples,
16 just so we're clear. So that's a gross price, the $3,000 in
17 the actual world. Bear in mind, Eaton's price is always
18 lower than the plaintiffs'. That's just a gross price.
19 When you take out the rebates and the other thing, it's
20 actually another several hundred dollars lower. So he's
21 actually positing about a 45 to 50-percent higher price in
22 the but-for world and not surprisingly, that leads to an
23 enormous amount of damages.
24 　　　Now, we cited case law on this, your Honor. If
25 you look at the Murphy Tugboat case in the Ninth Circuit,

9

1 Murphy Tugboat affirmed the exclusion of an expert who
2 assumed that in effect prices would be higher. The issue
3 there was the expert assumed that the defendant would no
4 longer compete, and that's exactly what they have done here,
5 because in reality, in the actual world, if Eaton's prices
6 are substantially lower, why wouldn't they just lower its
7 prices to that level in the but-for world.
8 　　　So you've hit on what I think is a key flaw that
9 requires it to be knocked out and casts doubt, I think,
10 on -- reenforces some of the other assumptions he made that
11 are also problematic, in my view.
12 　　　One of those assumptions ties in with the
13 statute of limitations. He asserts, although I've read the
14 report pretty carefully and I deposed him, he could not find
15 it, that Eaton monopolized the heavy duty transmission
16 markets since the nineties.
17 　　　It's not exactly clear to me what conduct he's
18 complaining about, but bear in mind that the plaintiffs' own
19 complaint says that they basically entered these markets in
20 the late eighties and grew the 20 percent of the market or
21 so by the late nineties.
22 　　　So if Eaton was a monopolist then and it did
23 not seem to impede them at all, I'm not sure what he has
24 pointed to after the fact. If Eaton couldn't block them
25 during the nineties when it was a monopolist, how is it

**000018**

10

1  able to do so after this period?  And, in fact, your Honor,
2  we have a board presentation from the president of the
3  company that he ignored in his report that shows that six
4  months before any of the contracts the plaintiffs were
5  complaining about in this case, their share had already
6  declined substantially.  So from a time perspective,
7  chronologically, their growth had stopped and they were
8  already shrinking dramatically before the contracts they are
9  complaining about.
10        So all of these do seem to me intertwined, but I
11  think in my mind, looking at the mistake in the but for
12  versus actual pricing, it reinforces that some of the other
13  assumptions he has made here don't really seem to make a
14  whole lot of sense.
15        Now, the other big thing which we hit in the
16  motion to exclude was the lack of disaggregation, and I
17  know that there is case law that says if it's not disputed
18  that the -- that some of the plaintiffs' losses are due to
19  legitimate competition, you don't have to separate those
20  out.  In other words, if they are complaining about
21  everything Eaton did, which seems like a stretch.
22        Some of it we can show you in the contracts is
23  not tied to share, it's just lower price.  Some of it is
24  providing engineers onsite at the customers to help them
25  lower their overall cost of making a truck so they can work

11

1  with the engineers at Packer and so forth, some of his six
2  sigma efforts, which is a business school effort to lower
3  cost.  None of that has anything to do with share, targets,
4  or anything else.
5        So that type of stuff on its face sounds like
6  legitimate competition.  Now, he does not distinguish among
7  those things, he just says everything Eaton did is
8  anticompetitive.  But I think you can find as a matter of
9  law that some of it on its face is not.  That's why we
10  briefed summary judgment.
11        Certainly, there's no question that Eaton --
12  that they had significant product defects, they cut back,
13  they refused to lower prices.  They, in fact, raised the
14  price substantially of the Freedom line.  They stopped
15  providing fleet incentives, discounts to the ultimate truck
16  purchases.
17        None of that had anything to do with Eaton, but,
18  nonetheless, he ignores all of that.  It's a little like
19  saying the witnesses say five people were in the bank and
20  took the money, but I am going to assume, contrary to fact,
21  that one person took it all and they are to blame for
22  everything.
23        So, fundamentally, there are some major flaws in
24  his report.  They are beyond the pale, in my view, and the
25  but-for pricing is the most obvious of them, but there are

12

1  several others that are beyond the pale of what an expert
2  economist in an academic institution can submit to a
3  peer-reviewed journal and have them approve it.  That's why
4  I filed the motion.
5        Does that address your concerns?  Did you find
6  the right pages?
7        THE COURT:  I did.  Again, it is -- and I've
8  seen lots of expert reports and it is one of the denser
9  reports I've ever seen, and so I have tried to review it in
10  light of the papers filed in connection with it and I will
11  continue to try.  If need be, I will do something more in
12  terms of having the parties come in and actually put this
13  expert on the stand.
14        MR. OSTOYICH:  Yes.  I would welcome that.  I
15  mean, obviously, from our perspective, if you would like
16  to eyeball Dr. DeRamus and see how he answers some of
17  these questions and how he explains them, I'm all for
18  that.
19        THE COURT:  Thank you very much.
20        MR. OSTOYICH:  Thank you, your Honor.
21        MR. FASTOW:  Thank you, your Honor.
22        Jay Fastow, for the plaintiffs.
23        Let me get first right to your question on the
24  but-for, and I think the first point to make is that the
25  stakes, I think the Court mentioned on this issue, are not

13

1  those.  Is that under DeRamus did his damages calculations
2  five ways and plaintiff does not show that this issue even
3  applies to all five of those methodologies.
4        But I think even beyond that, because it means
5  the case would still continue, plaintiffs' argument shows
6  a whole misunderstanding of Dr. Ramus' methodologies when
7  he does use this issue or when we get to this, because
8  plaintiff talks about price.  But Dr. Ramus' focus in his
9  damages methodologies was not price.
10        As we made clear in our brief and as he explains
11  in his report, in his declaration, his focus was on market
12  share and profit margins, profit margins, of course, being
13  the difference between price and cost, the relationship
14  there, and market share not being limited just to particular
15  types of transmissions.
16        THE COURT:  But isn't, when we're talking about
17  damages -- well, I'm sorry.  It just strikes me that when
18  one assumes that, even if his focus was not on price, to
19  prove that there has been antitrust injury, it seems to me
20  you have to prove some damage to -- to not just to you, but
21  to the market.  In other words, that your consumers are some
22  way affected by this anticompetitive conduct.  But maybe I'm
23  misunderstanding.
24        You believe that if you as a competitor are
25  harmed, that is a sufficient antitrust injury, and it does

14

1  not matter what, ultimately, the effects of the conduct were
2  on the market on the consumers?
3         MR. FASTOW: I think that question is helpful
4  for me to address your concern, because the summary judgment
5  issue that your Honor has addressed and denied, that --
6  in that, Eaton argued that we had not shown either causal
7  injury to us or causal injury to the marketplace, injury to
8  competition, and your Honor denied that, talking about that,
9  for example, that the use of the LBAs may injure
10  competition.
11         So I think it's fair to say that we need to show
12  injury to competition and we need to show injury to us. But
13  the issue of but-for prices does not relate to the injury to
14  competition.
15         Dr. DeRamus -- well, I mean, it's relates,
16  but not for this purpose, for the Daubert purpose.
17  Dr. DeRamus talks at length about impact of Eaton's conduct
18  on truck buyers, right, because, of course, Eaton and the
19  OEMs were engaged in concerted activity, conspiracy, and
20  that Dr. DeRamus talks in a number of paragraphs in his
21  report about the impact of all of that on the truck buyers
22  and how it hurt the truck buyers.
23         And so that's the issue we would say --
24         THE COURT: And so that is what I should be
25  focusing on, not on any injury to the OEMs, but on injury to

15

1  the ultimate consumer, the truck buyers, and by the end of
2  the hearing, if you could just point out to me those
3  paragraphs, that would be helpful.
4         MR. FASTOW: Yes, your Honor. I can get you
5  that, hopefully, very quickly.
6         THE COURT: All right.
7         MR. FASTOW: But I think that that is what the
8  defendants are mixing in together, is the injury to the
9  truck buyers, because we know that -- here we are.
10         If you look at his report at Paragraph 215, 233
11  to 237, 215 to 233 to 237 and 247 to 250, maybe other spots
12  as well, he talks about the impact of all of this on the
13  ultimate consumer, the truck buyer.
14         Now, separately on the Daubert issue, proof of
15  damages -- Eaton is not trying to argue, as I understand it,
16  relationship to the truck buyers here, they're trying to
17  say, talk about the damage calculations by us, so that if we
18  establish injury to competition, we're then entitled to show
19  that if there was causal injury to us by the same conduct,
20  that we can get damages.
21         And we know that the Supreme Court, in Zenith
22  versus Hazeltine, the Third Circuit in Lepages and so forth,
23  have all held that in -- the Kresky case, that once we can
24  show injury to competition and causal injury to us by the
25  conduct, injury to competition, then there's a very liberal

16

1  standard of proving the amount of damages.
2         The fact of injury is one thing, but once we
3  get past injury to competition, here, principally, to the
4  truck buyers and injury to us, then the amount of damages,
5  which is what the issue today, is a standard of
6  liberality.
7         And one of the things that you see that
8  plaintiffs really don't focus on here is the applicable
9  law.
10         So we have the Kresky case talking about the
11  lenient standard under the leading Supreme Court case of
12  Zenith versus Hazeltine. And this gets back to the point
13  that the defendant can complain about a lack of precision in
14  proving the amount of damages when it's the one who
15  disrupted the market, who royaled the market and created
16  uncertainties in the first place.
17         Then we get to the issue of the Oddi case in the
18  Third Circuit, where the Third Circuit said, Daubert isn't
19  about the correct test, the best test, it's just about basic
20  liability.
21         THE COURT: Well, trust me when I say I'm
22  not a fan of Daubert, but this was one report that I found
23  more confounding than I found it helpful. I've never been
24  faced with a report like it, which is why it caught my
25  attention.

17

1         So generally, I mean, in my patent cases, they
2  file cross-motions in Daubert against each other's expert so
3  there's no expert left, and, to me, that is a waste of my
4  time. I think generally it should be a jury who resolves
5  credibility issues so long as I understand the mechanics.
6         I don't really understand the mechanics in a
7  150-page report, so it could be your expert just gave me too
8  much and it could be I need for him to come in. But I do
9  understand what you are saying, that the amount of damages
10  is something that a jury should decide so long as the
11  fundamental assumptions that there has been injury have been
12  established.
13         MR. FASTOW: Right. I would think that is the
14  summary judgment motion that your Honor has already decided,
15  where Eaton contested both injury to competition and injury
16  to, causal injury to us, and your Honor denied that motion.
17  So this just goes, we submit, to the amount of damages under
18  the Daubert standard.
19         All right. Now, let me just go on with some of
20  the points on this, because it's really even -- what
21  plaintiff does, even when we talk about this particular
22  damages calculation, which they said is not his only damages
23  calculation. And I think when your Honor picked up on the
24  word conservative, what that meant was that he did his
25  damages calculations a number of different ways, as is

18

1    cross-checking, and so that when we did it five different
2    ways and they all came out plus or minus, more or less, in
3    the same range, I think that's what he meant, for example,
4    by being conservative, is that he wasn't just going with one
5    theory and saying this is it.  He cross-checked it.
6            Another way of being conservative is, for
7    example, plaintiffs argued that the multiplier on the
8    Enterprise value should be as of February 2009.  And he
9    said, well, that is actually -- the way he did it was
10   conservative, because if we just took the time -- I'm sorry.
11   If he just took 2006, the number actually have been would
12   higher, his damages numbers would have been higher.
13           So I think that's what he meant by being
14   conservative, is that he was saying, I'm not pressing the
15   envelope here, I am taking positions that might cost me a
16   little bit of money in terms of my damages calculations,
17   but it puts me on solid, and even more solid ground, and
18   I've done it different ways, again, to show you that I'm on
19   solid ground.
20           Now, what plaintiff is doing on this but-for
21   pricing issue, again, it's not in the context of injury to
22   competition, it's in the context of his damages
23   calculations, and they are misunderstanding his calculation
24   because, as I said, his focus, as he says, is on profit
25   margins and market share.  It's not just on price and it's

19

1    not just on particular types of transmissions.
2            And as he said in his deposition, and we lay
3    this out in our brief at Pages 11 and 27 -- he was asked
4    these questions about this issue.  And he said, first of
5    all, the results we're comparing were taken from two
6    different data sources, so they're not comparable, one to
7    the other.
8            And that's his deposition at Page 35 and 36.
9            Then he said, and, by the way, they're only
10   talking about certain kind of manual transmissions.  He
11   said, if you look at the Freedom line transmission, which
12   is an automated mechanical transmission, he says that
13   the actual prices for the Freedom line transmission appear
14   higher than but-for comprises prices.  And on a weighted
15   average, when you weigh the various products, the higher
16   actual prices of the Freedom line transmissions more than
17   offset the lower actual prices of the manual transmissions,
18   making, to use a word I know your Honor does not like, his
19   damages calculation conservative, meaning lower than it
20   might have been, because when you include the rest of the
21   mix, it works out to be lower, not higher.
22           And then there's yet another point that he
23   mentioned, and this is where, under the law, as we've
24   discussed, defendant can't say, well, you have not proved
25   things with precision, because defendant is the one who

20

1    royaled the market.
2            Well, one of the things that the business plan
3    talked about was the possibility of plaintiffs increasing
4    their product line even with respect to other manual
5    transmissions.  And those transmissions might have been more
6    expensive multi-speed mechanical transmissions, but because
7    we were driven out of business, maybe that didn't happen, it
8    prevented us from expanding the product line, so the actual
9    prices only took into account the less expensive manual
10   transmissions rather than the more expensive ones we might
11   have been selling but for defendant's conduct.
12           So I think when you look at all of that, Dr.
13   DeRamus addressed this very directly, and what we see is
14   plaintiff similarly mischaracterizing his approach,
15   misunderstanding his approach, if you will, which is
16   not based just on price, but on profit margin and market
17   share.
18           And when you look at the entirety of the product
19   line, he says he's very comfortable that it works out, in
20   fact, makes it a lower damages estimate rather than might
21   have been.
22           So, your Honor, I think that what we hear is
23   an effort to mix different concepts, injury to competition
24   with calculation of damages when we know that the legal
25   standard is quite different for a calculation of damages,

21

1    and that Dr. DeRamus, whatever word we want to use, did not
2    push the envelope, did not make an assumption that makes no
3    sense, as Eaton would say, but when you look at all of the
4    products and you look at the data that's comparable, it
5    makes perfect sense.
6            And, of course, as I mentioned, he did his
7    calculation various ways.
8            Now, a couple of other points I will mention
9    that were raised.  On disaggregation, this is plaintiff,
10   again, just rearguing.  That's why he says it's interrelated
11   with the motion for reconsideration, because that's exactly
12   what's happening.  Again, just rearguing, we didn't do it.
13   We did not do anything anticompetitive.
14           Well, we know that the Third Circuit has said
15   in Lepages, in Callahan, in Rossi, that that disaggregation
16   is not necessary in a case like this.  That Lepages said
17   that in that case, it would be unnecessary, if not
18   impossible.
19           And we further know that Dr. DeRamus did look
20   at facts, not only facts that we like, but facts that Eaton
21   points to.  For example, he looked at warranty issues.  He
22   looked at the scope of product line issues.  He looked at
23   Freedom line pricing issues.
24           If you look at Dr. DeRamus' declaration on this
25   motion, Paragraphs 21 through 25 --

**000021**

22

1    THE COURT: Well, I didn't want to look at
2    anything but the report, and, quite frankly, his report was
3    in stark contrast to the undisputed facts submitted by the
4    defendant in connection with his motion for summary judgment
5    in saying that the -- you know, about the most successful
6    automated manual transmission in the world and that it was
7    Eaton's -- well, anyway, it did not sound to me, in going
8    through 150 pages, that Dr. Eaton took into account much of
9    anything negative in terms of plaintiffs' struggle to
10   maintain its competitive edge in this market. So I'm not
11   looking at declarations, I'm looking at his report, because
12   that's basically what we are talking about.
13       MR. FASTOW: Well, your Honor, if I can just
14   refer you, then, to his report.
15       THE COURT: All right.
16       MR. FASTOW: At Paragraph 196, in Sections 8
17   through 10, he talks about that he considered both facts,
18   that plaintiffs advocated facts that Easton would like to
19   advocate. But I think the further find is that the
20   law in the Third Circuit simply doesn't require that.
21       And so that even if he had looked at nothing
22   plaintiff likes, we have the Walker case. Bear with me one
23   second.
24       (Pause.)
25       MR. FASTOW: I'm sorry, your Honor. I will be

23

1    right there.
2        THE COURT: That's all right.
3        MR. FASTOW: The Walker case in the Third
4    Circuit --
5        THE COURT: I'm sure that there is a Third
6    Circuit case that stands for just about any proposition.
7        MR. FASTOW: Well, this one says that an expert
8    is permitted to base his opinion on a particular version of
9    disputed facts and the weight to be accorded that opinion is
10   for the jury.
11       THE COURT: I agree with that so long as it's
12   not -- so long as the facts he is basing it on are facts
13   that are admissible facts. In other words, if you've got
14   admissible fact versus non-admissible fact, it seems to me
15   as though there's a problem with that. But I agree with
16   that proposition, that you each have a story to tell and
17   expert is going to be telling your story, not your
18   opponent's story. So I agree with that.
19       MR. FASTOW: And, your Honor, just to follow
20   up on that one point, under Rule 702, an expert is not
21   limited to relying on admissible facts, but he can also rely
22   on other facts that are reliable, that can reliably be
23   relied on by an expert in his field.
24       THE COURT: Right. To a point. I mean, at some
25   point, it's not appropriate. There has to be some -- it

24

1    does have to be reliable information even if it's not
2    admissible. I'm hard pressed to make the distinction
3    sometimes, but I agree with that.
4        MR. OSTOYICH: And I think what Eaton is arguing
5    isn't that he relied on facts that are not admissible or
6    reliable, but Eaton is saying that he did not rely on the
7    facts that we, Eaton, liked.
8        And, number one, I'm saying that that is not
9    true, as his report points out. And, number two, the Third
10   Circuit says he does not have to, that you can ask him about
11   that in front of the jury. And certainly, when we get to
12   questions of disaggregation, in an antitrust case, I think
13   we need to step back and put all of this in two pieces of
14   context.
15       One is, the context of Oddi in the Third Circuit
16   saying we're not talking about the best or correct,
17   number one.
18       And number two is Zenith versus Hazeltine and
19   Lepages and Kresky, where the standard for calculation of
20   damages is liberal. This is not a strict standard. This
21   is a -- so we sort of have a double liberality here, one in
22   terms of the Daubert standard, and we're not looking at best
23   or correct; and, number two, in terms of the ultimate
24   substantive standard of proving amount of damages, which
25   is liberal because the defendant has royaled the market,

25

1    so it can get up and say, your Honor, this is not precise
2    enough, this isn't good enough. It's unclear.
3        THE COURT: Well, assuming that you are not
4    prepared to withdraw any of his alternate theories of
5    damages, and if I don't understand how they all interact,
6    then doesn't it make sense for me in my gatekeeper position
7    to really bring him in and have it explained to me so I can
8    be assured of the fact that maybe it may be conservative to
9    you, but pretty large damages figures that you are going to
10   present to a jury really do satisfy, the based on reliable
11   evidence and sound economic principle standard?
12       MR. FASTOW: If your Honor thinks that would
13   be useful to you, then we're prepared to bring him and have
14   him explain it in person. We think that's just fine and we
15   can probably do it in fewer pages than the report currently
16   is, because I think that when you distill it down, you will
17   see it's very simple, straightforward, and accurate.
18       THE COURT: I would love to see that.
19       One other question I have for you, and that is
20   in terms of this -- I mean, we have conduct that has been
21   talked about going back to the 1990's, and I understand that
22   a continuing violation, you can go back to bring all this
23   information in. But isn't there some ending? I mean, isn't
24   there some limit to the damages you can establish even with
25   a continuing violation?

000022

26

1    MR. FASTOW: Well, I think, your Honor, the rule
2  that we would look at here is, as your Honor talked about in
3  Dentsply and the Third Circuit talks about in Penn Dental,
4  is that each time a plaintiff is injured by a continuing
5  conspiracy, continuing violation, to violate the antitrust
6  laws, a new cause of action for damages accrues.
7    We had it in the Hanover Shoe case from the
8  Supreme Court, but although Hanover could have sued in 1912
9  for the injury that it inflicted, it equally was entitled to
10  sue in 1955. And in the Toledo Mack case in the Third
11  Circuit, the continuing violation doctrine allowed the suit
12  to continue even though plaintiff knew of the alleged
13  violation at least 13 years before it filed the case.
14    THE COURT: That's why antitrust cases are just
15  my very favorite cases. Anyway, all right. So that's your
16  explanation.
17    And Dr. -- your expert goes back to when?
18    MR. FASTOW: He goes back to 2000, your Honor, I
19  believe, is the calculation.
20    And the answer to Eaton's argument is that --
21  there are a couple of them. They say, well, if it started
22  before, then wasn't it over, then?
23    Well, we just read the cases that talk about the
24  continuing violation issue, and, of course, if they continue
25  to make the -- do the same conduct and do it even worse,

27

1  then you can have increased injury and damages, so that
2  if you do something one way and then you do it much stronger
3  and tighter, you can have, of course, more damages and more
4  implication both to the plaintiffs and to the marketplace
5  itself, truck buyers and injury to competition.
6    THE COURT: And at this point, truly, it is not
7  the OEMs at all, it is the truck buyers and the price -- I
8  mean, I guess I don't understand his report well enough to
9  understand what price are -- the prices that he uses are the
10  prices that are paid by the OEMs or by the truck buyers
11  themselves on the table 5, the but -- average but-for price?
12  Whose price is that?
13    MR. FASTOW: I think the prices he's looking for
14  are the prices paid by the OEMs, and then they resell the
15  truck as a truck to the truck buyers.
16    THE COURT: But he does not -- all right.
17    MR. FASTOW: But he's looking, your Honor, I
18  think, at the prices we get or would have gotten.
19    So the focus here -- see, that's why it's a
20  different issue, is the focus here is not so much on
21  the injury to competition, but it is on the injury and
22  damages to us, so he's looking at the lost profit margin
23  to us.
24    THE COURT: All right. So --
25    MR. FASTOW: And if I could, your Honor, it's

28

1  not just the truck buyers, because we contend also that the
2  OEMs were hurt. They were pushed, cajoled -- you know, we
3  have a whole lot of words there -- into doing what they were
4  doing, but at the end of the day, the OEMs now don't have us
5  as competition.
6    So we submit that they were hurt as well. And
7  the truck buyers were the next stop that -- first, let's
8  call it non-conspiratorial stop of the transmissions, Eaton
9  and the OEMs beings in a conspiracy and the truck buyers
10  being the first stop after that, and they were the ones who
11  were ultimately hurt. So we do contend that the OEMs
12  themselves were hurt even though they were part of the
13  conspiracy.
14    THE COURT: And may I just ask a question out of
15  curiosity? I understand that your settlement negotiations
16  have gone no place, but when you look at the papers, and I
17  think about if I were a client, the kind of information that
18  you all are going to share about each other and the fact,
19  whether the jury believes it or not, that plaintiff just
20  fell down on the job and didn't offer customer services,
21  didn't offer good product, go on and on, and apparently at
22  least the good doctor says the same thing about Eaton -- I
23  assume that this is of no concern to you and that trial,
24  in fact, is the way to go?
25    MR. FASTOW: Well, your Honor, we're always open

29

1  to an appropriate settlement discussion.
2    THE COURT: Well, I suspect you are not going
3  to get one with this kind of damages report, but, all right.
4  It just struck me that, I frankly, wouldn't want that
5  information on the front page.
6    All right. Well, so I think what I need to
7  do is have Dr. DeRamus come in because I, frankly, find
8  his report, as I said, the longest, densest, most confusing
9  report I've had to deal with in my 18 years on the bench.
10    So I need to find a time when -- when is the
11  pretrial in this case?
12    MR. FASTOW: I believe it is August 27th, your
13  Honor.
14    THE COURT: Let me get my computer on. I'm
15  sorry.
16    (Pause.)
17    THE COURT: And this will take some time, so if
18  anyone has something they want to talk to me about, this
19  would be the time, until I find a date to bring him in.
20    MR. OSTOYICH: May I address a couple of points?
21    MR. FASTOW: Just one other point, your Honor.
22    MR. OSTOYICH: Oh.
23    MR. FASTOW: On your question about isn't there
24  a time when the damages would end, I just want to be clear
25  that it's our position that during the limitations period,

000023

---

30

1  all injury incurred within the limitations period is subject
2  to our damages claim whether or not, you know, it came in
3  whole or in part from conduct during the limitations period
4  or prior to the limitations period.
5       THE COURT:  All right.  I just want you to
6  understand that having been on the bench for as long as I
7  have been, I approach economists with a certain degree of
8  healthy cynicism, and when an economist's damages figures
9  are high and yet he continues to use the word
10 "conservative," I particularly -- it kind of raises the
11 hackles on the back of my neck.
12      So to some extent, you all have brought it on
13 yourself, this close scrutiny, but I think it is well
14 deserved.  It is, I think, a bit on the greedy side, and
15 it's not even explained well enough to me to get the gist
16 of it.
17      So here we go.
18      MR. FASTOW:  All right, your Honor.  We will
19 eliminate that word from the vocabulary.  You said replace
20 it with the liberal treatment of antitrust damages.
21      THE COURT:  Yes.  I guess that's better, but not
22 much.
23      All right.
24      MR. OSTOYICH:  Can I just quickly, your Honor,
25 address two points?

---

31

1       THE COURT:  Yes.
2       MR. OSTOYICH:  First, it's interesting to me
3  that the focus of this -- I still didn't really hear an
4  explanation for why he makes an assumption of the but-for
5  prices to the OEMs being 25, 30 percent higher, why that's
6  legitimate.  I also didn't really hear an explanation why
7  that's in the truck customers' interest, that the input for
8  the product they are buying is now going to be 40 percent
9  higher than it was when Eaton was behaving the way they are
10 complaining about.
11      Particularly problematic in my mind, I just
12 went through 60-odd depositions in this case, and there
13 was not a single truck customer on plaintiffs' initial
14 disclosures and they did not depose a single truck customer.
15      So I am not sure where Dr. DeRamus is going to
16 have evidence of what the truck customers like or don't like
17 in an admissible way that I've had a chance to cross-examine
18 people on.  Just common sense, they're not going to like it
19 if prices for the product are going to go up commensurate
20 with a 40-percent increase in the input cost for
21 transmissions.
22      So that's point number one.  Truck customers
23 aren't here.  But if they were, they probably wouldn't like
24 higher price of transmissions in the trucks because it means
25 the trucks are going to cost more.

---

32

1       On a statute of limitations issue, a couple
2  things.  The main one is that if there is an act that occurs
3  prior to the statute that causes injury during the statute,
4  that can be recoverable in certain circumstances.  The
5  circumstances are the cases they cited.  Those are refusals
6  to deal with cases where the act is a refusal, and by
7  definition, it continued into the statutory period.
8       This case is very different.  It's like the
9  Kaiser and El Paso cases and like the Varner cases that we
10 cited.  The contracts were struck in 2000, 2001, for Freight
11 Liner Packer international.  The terms didn't change.  The
12 terms stayed the same.  After that, the customers placed an
13 order.  We filled the order.
14      At the time the contract was struck, the general
15 counsel of the parent company sent a letter to Eaton's
16 general counsel saying, the contract you just struck or are
17 about to strike is anticompetitive, in our view, but they
18 waited six years before filing the case.
19      I have not heard any explanation.  There's
20 nothing in the record that explains any legitimate reason
21 for just sitting back and waiting.  That's exactly what the
22 statute of limitations are designed to prevent.
23      I don't know what the theory is for just
24 waiting.  Maybe they did not really think they were going
25 to take it and they decided to see how they did over the

---

33

1  next six years.  That's one possible alternative.  But, in
2  any event, they complained about the contracts and just
3  waited.
4       So whatever harm occurred, by their own
5  admission, the general counsel believed accrued
6  six-and-a-half years before he filed suit.  So it is a very
7  different situation than the cases they are citing.
8       THE COURT:  All right.
9       MR. OSTOYICH:  Thank you.
10      MR. FASTOW:  Your Honor, may I?
11      THE COURT:  Yes, you may.
12      MR. FASTOW:  Just on the statute of limitations
13 points.
14      First of all, refusal to deal, defendant argued
15 that before, didn't explain why that should make any
16 difference.  The case we cite discussed the general
17 antitrust principles of limitations.  But Eaton seems
18 to forget that, of course, among other things a key part of
19 this case is Eaton getting the OEMs not to deal with us or
20 at least to deal with us much less than they would have.
21      So their refusal-to-deal argument does not take
22 them anywhere.
23      Now, number two is they talk about the Kaiser
24 case and so forth.  That case has been distinguished by the
25 Third Circuit.  Those cases by the Third Circuit in the

**000024**

34

1  Harold Friedman case, because what we had in those cases was
2  a situation where the plaintiff was a party to the contract
3  that plaintiff was contending caused the injury.
4        And I think it's Paragraph 41 -- I'm sorry --
5  footnote 41 in Harold Friedman. The Third Circuit says,
6  yes, that's different, because here, of course, we're not a
7  party to those contracts. It's much more like the Dentsply
8  case, where you had the defendant there saying, well, my
9  dealer criteria were final and binding in 1993 and you
10  didn't sue until 1999.
11        Your Honor said, no, I'm not going to dismiss
12  this case because the enforcement of the dealer criteria was
13  going on through the period and that was a new act and new
14  injury.
15        And similarly here, your Honor, in your summary
16  judgment decision, talked about the use of the LBAs, a very
17  analogous here. So the Third Circuit has rejected that
18  argument as well.
19        And then the just waiting argument, well, I
20  just think I talked about the Hanover Shoe case, where the
21  Supreme Court said it was okay to wait for 43 years. And
22  the Third Circuit in Toledo Mack, waiting 13 years.
23        Waiting and knowledge are not the touchstone of
24  the accrual of the claim. The accrual of the claim, as the
25  Third Circuit said in Penn Dental and your Honor said in

35

1  Dentsply, is the injury. When the injury occurs, that's
2  when you can sue and if there's continuing injury, then you
3  can continually sue.
4        And so when we talk about waiting
5  five-and-a-half years, it's simply irrelevant, it's a red
6  herring to this issue, because the question is when the
7  injury occurred, and for injury that occurred during the
8  limitations period, we're entitled to sue for those damages.
9  And as Eaton just conceded, that can be, depending on --
10  whether or not the acts that caused that injury were in the
11  limitations period or before the limitations period. It's
12  the injury that counts because, after all, you can't sue for
13  antitrust damages until you suffer the injury that you are
14  suing for.
15        And if you can't sue for the damages, the
16  limitations clock can't start running on you at least until
17  you could bring the suit. So it makes a lot of sense that
18  it's the injury that's the touchstone, not alleged
19  knowledge.
20        And even this letter, and what this letter
21  says -- to put it another way, what the letter does not show
22  is knowledge of everything that has happened. The letter
23  was, I think, in 2001. All right. Obviously, there has
24  been a lot of conduct before the limitations period and
25  through the limitations period since then.

36

1        What the letter shows is Eaton's willful
2  violation of the antitrust laws. They were on notice under
3  their position, their assertion. They say, he told us, he
4  told us, and Eaton said, we're going to go ahead anyway.
5  We're going to go ahead and strangle this marketplace.
6  We're going to monopolize and conspire restraint of trade,
7  harm you and harm competition regardless. So that's even
8  under Eaton's own position.
9        Thank you, your Honor.
10        THE COURT: It looks as though -- well, I'm
11  wondering if you all have available Tuesday, July 21st? I
12  have argument already scheduled in the morning, so this
13  would be in the afternoon, starting at 2:00 o'clock.
14        Do you all want to go back and see if the doctor
15  would be available and let my staff know? I will set it
16  aside in the meantime. Tuesday, July 21, starting at 2:00
17  o'clock.
18        MR. FASTOW: Okay, your Honor. We will note
19  that and be right back to you.
20        THE COURT: All right. And I will issue an
21  order once I get confirmation that you all can make it.
22        MR. FASTOW: Great. Thank you, your Honor.
23        THE COURT: I know you all had prepared remarks.
24  Are there any other remarks you care to make since I only
25  have taken an hour of your time?

37

1        MR. OSTOYICH: No. I think you've covered, from
2  the defense side, I think you've covered it. We had not
3  specifically talked about reconsideration.
4        The first -- let me just, briefly, the first
5  part of the recovery sentence that we cited in our brief --
6  maybe I didn't convey this clearly enough in the papers,
7  but we clearly intended to set out that we were challenging
8  all of the elements, including the monopoly power element,
9  but we're focusing, because we're trying to keep it
10  truncated per your Honor's practice, keep it truncated and
11  focus on the antitrust.
12        So as a result, there has been a
13  miscommunication. If that's so, I apologize, but that is, I
14  think, a factual mistake in our communication.
15        THE COURT: All right. Well, in preparing for
16  this evidentiary hearing, I will go back and review
17  everything, and if I find it helpful in terms of setting out
18  the landscape that I think we all should be on, I will issue
19  something. Otherwise, I will wait and hear more.
20        MR. OSTOYICH: Fair enough. Thank you, your
21  Honor.
22        THE COURT: How about from plaintiffs'
23  perspective?
24        MR. FASTOW: Your Honor, just briefly on
25  reconsideration, since Eaton raised that, in their requested

**000025**

38

1  reply, they say they raised two issues, but, of course, in
2  their motion, they ask for reconsideration of the whole
3  motion, whether plaintiffs have shown that there is genuine
4  issue of material fact that Eaton's contracts had an
5  anticompetitive effect, as required by Lepages.
6           So, again, to avoid conclusion, their initial
7  motion for reconsideration was asking for reconsideration of
8  the whole thing, not for two limited issues.
9           Then Eaton speaks about undisputed monopoly
10  power. Well, they didn't disputes it on summary judgment
11  with evidence or even with argument. And that's what's also
12  interesting is, well, Dr. DeRamus talked about it and
13  concluded, came to conclusions on market definition and
14  monopoly power. Defendant submitted two expert reports and
15  neither of them contests monopoly power.
16           So when they talk about undisputed monopoly
17  power, there is no genuine dispute of monopoly power here.
18  And I hope what we're not hearing is just a desire to take a
19  lot of time from the Court and us and the jury over an issue
20  that's not genuinely in dispute.
21           As to exclusionary conduct like the bundled
22  rebates in Lepages, well, we think your Honor is absolutely
23  correct. The conduct we've talked about is exclusionary
24  conduct as was the conduct like the conduct in Lepages.
25  And that's really -- I think, the answer is that there is no

40

1           And I just want to give you an alert. It could
2  be that I'd want to start the hearing at 1:00, not 2:00.
3  I've got to check to see how much time I gave the parties in
4  the prior case. So I don't want this to run, and I've got
5  to figure out how much time to give you. But I will issue
6  an order making sure you have some guidelines before you
7  walk into Court.
8           All right, counsel. Thank you very much for
9  your patience. I look forward to seeing you.
10           (Counsel respond, "Thank you, your Honor.")
11           (Court recessed at 12:53 p.m.)
12                         - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

39

1  basis for summary judgment for them on those grounds, and
2  your Honor was right.
3           THE COURT: All right. Anything else from you
4  all?
5           MR. OSTOYICH: Can I, at the risk --
6           THE COURT: Yes.
7           MR. OSTOYICH: -- he said, he said, but just to
8  correct one thing. Our experts, both of them, said that
9  Dr. DeRamus had not conducted an economically valid study
10  of monopoly power in market share. He did not employ the
11  tests under the Department of Justice guidelines. He did
12  not employ a significant non-transitory pricing test, or
13  any other test for determining it. So I just want to be
14  clear.
15           And we specifically said in both our letter and
16  in the brief that we were going to challenge it and
17  challenge it hard, because you'll see when we bring Dr.
18  DeRamus in, he has a hard time defending some of his
19  assertions.
20           So I don't think we need to belabor it, and I
21  don't mean to do that, but I do want to correct something
22  so there's no misstatement about this on the record. We
23  will be challenging that argument.
24           Thank you.
25           THE COURT: All right. Thank you.

**000026**

## $

**$3,000** [2] - 7:16, 8:16

## 0

**06-623** [1] - 1:9

## 1

**10** [1] - 22:17
**11** [1] - 19:3
**11:58** [2] - 1:12, 3:4
**12:53** [1] - 40:11
**13** [2] - 26:13, 34:22
**150** [1] - 22:8
**150-page** [1] - 17:7
**17** [1] - 7:12
**18** [1] - 29:9
**1912** [1] - 26:8
**1955** [1] - 26:10
**196** [1] - 22:16
**1990's** [2] - 5:10, 25:21
**1993** [1] - 34:9
**1997** [1] - 5:5
**1998** [1] - 5:6
**1999** [1] - 34:10
**1:00** [1] - 40:2

## 2

**20** [2] - 7:21, 9:20
**2000** [5] - 5:9, 5:9, 7:1, 26:18, 32:10
**2001** [2] - 32:10, 35:23
**2006** [1] - 18:11
**2009** [2] - 1:12, 18:8
**21** [2] - 21:25, 36:16
**215** [2] - 15:10, 15:11
**21st** [1] - 36:11
**233** [2] - 15:10, 15:11
**237** [2] - 15:11
**247** [1] - 15:11
**25** [4] - 7:21, 8:6, 21:25, 31:5
**250** [1] - 15:11
**27** [1] - 19:3
**27th** [1] - 29:12
**29** [1] - 1:12
**2:00** [3] - 36:13, 36:16, 40:2

## 3

**30** [1] - 31:5

**3418** [1] - 7:1
**35** [1] - 19:8
**36** [1] - 19:8
**3776** [1] - 7:2

## 4

**40** [1] - 31:8
**40-percent** [1] - 31:20
**41** [2] - 34:4, 34:5
**43** [1] - 34:21
**45** [1] - 8:21

## 5

**5** [2] - 6:23, 27:11
**50-percent** [1] - 8:21

## 6

**60-odd** [1] - 31:12

## 7

**702** [1] - 23:20

## 8

**8** [1] - 22:16

## 9

**9** [1] - 6:24

## A

**a.m** [1] - 1:12, 3:4
**able** [1] - 10:1
**absent** [1] - 8:7
**absolutely** [1] - 38:22
**academic** [2] - 8:14, 12:2
**accorded** [1] - 23:9
**according** [1] - 5:14
**account** [2] - 20:9, 22:8
**accrual** [1] - 34:24
**accrued** [1] - 33:5
**accrues** [1] - 26:6
**accurate** [1] - 25:17
**act** [3] - 32:2, 32:6, 34:13
**ACTION** [1] - 1:4
**action** [1] - 26:6
**activity** [1] - 14:19

**acts** [1] - 35:10
**actual** [7] - 8:17, 9:5, 10:12, 19:13, 19:16, 19:17, 20:8
**add** [1] - 3:23
**addition** [1] - 3:19
**address** [8] - 3:9, 5:21, 5:23, 6:8, 12:5, 14:4, 29:20, 30:25
**addressed** [4] - 4:23, 14:5, 20:13
**admissible** [7] - 23:13, 23:14, 23:21, 24:2, 24:5, 31:17
**admission** [1] - 33:5
**advocate** [1] - 22:19
**advocated** [1] - 22:18
**affected** [1] - 13:22
**affects** [1] - 7:8
**affirmed** [1] - 9:1
**afternoon** [1] - 36:13
**agree** [5] - 5:25, 23:11, 23:15, 23:18, 24:3
**agreed** [1] - 5:14
**agrees** [1] - 6:4
**ahead** [2] - 36:4, 36:5
**alert** [1] - 40:1
**alleged** [5] - 4:9, 7:22, 8:1, 26:12, 35:18
**allowed** [1] - 26:11
**almost** [1] - 5:2
**alternate** [1] - 25:4
**alternative** [1] - 33:1
**amount** [7] - 8:23, 16:1, 16:4, 16:14, 17:9, 17:17, 24:24
**analogous** [1] - 34:17
**analysis** [1] - 8:12
**AND** [1] - 1:2
**aNDREW** [1] - 2:13
**answer** [2] - 26:20, 38:25
**answers** [1] - 12:16
**anticompetitive** [10] - 4:9, 5:4, 7:20, 7:22, 8:1, 11:8, 13:22, 21:13, 32:17, 38:5
**antitrust** [10] - 13:19, 13:25, 24:12, 26:5, 26:14, 30:20, 33:17, 35:13, 36:2, 37:11
**anyway** [4] - 3:23, 22:7, 26:15, 36:4
**apologize** [1] - 37:13
**appear** [1] - 19:13
**APPEARANCES** [2] - 1:16, 2:1
**appendices** [2] - 3:14, 6:2

**apples** [2] - 8:15
**applicable** [1] - 16:8
**applies** [2] - 8:13, 13:3
**approach** [3] - 20:14, 20:15, 30:7
**appropriate** [4] - 5:23, 6:4, 23:25, 29:1
**approve** [1] - 12:3
**argue** [1] - 15:15
**argued** [3] - 14:6, 18:7, 33:14
**arguing** [1] - 24:4
**argument** [11] - 4:6, 5:13, 5:14, 13:5, 26:20, 33:21, 34:18, 34:19, 36:12, 38:11, 39:23
**ARSHT** [1] - 2:9
**aside** [1] - 36:16
**assertion** [1] - 36:3
**assertions** [1] - 39:19
**asserts** [1] - 9:13
**assume** [3] - 6:13, 11:20, 28:23
**assumed** [2] - 9:2, 9:3
**assumes** [1] - 13:18
**assuming** [2] - 4:10, 25:3
**assumption** [3] - 6:21, 21:2, 31:4
**assumptions** [4] - 9:10, 9:12, 10:13, 17:11
**assured** [1] - 25:8
**attention** [1] - 16:25
**August** [1] - 29:12
**automated** [2] - 19:12, 22:6
**available** [2] - 36:11, 36:15
**average** [5] - 7:3, 7:6, 7:13, 19:15, 27:11
**avoid** [1] - 38:6

## B

**bank** [1] - 11:19
**base** [1] - 23:8
**based** [2] - 20:16, 25:10
**basic** [2] - 7:25, 16:19
**basing** [1] - 23:12
**basis** [1] - 39:1
**bear** [3] - 8:17, 9:18, 22:22
**BEFORE** [1] - 1:14
**beginning** [1] - 3:4
**behaving** [1] - 31:9
**beings** [1] - 28:9

**belabor** [1] - 39:20
**believes** [1] - 28:19
**bench** [2] - 29:9, 30:6
**best** [4] - 4:4, 16:19, 24:16, 24:22
**better** [2] - 8:7, 30:21
**between** [1] - 13:13
**beyond** [3] - 11:24, 12:1, 13:4
**BIDDLE** [1] - 1:17
**big** [1] - 10:15
**binding** [1] - 34:9
**bit** [3] - 3:7, 18:16, 30:14
**blame** [1] - 11:21
**block** [1] - 9:24
**board** [1] - 10:2
**brief** [4] - 13:10, 19:3, 37:5, 39:16
**briefed** [1] - 11:10
**briefly** [2] - 37:4, 37:24
**bring** [6] - 25:7, 25:13, 25:22, 29:19, 35:17, 39:17
**broader** [2] - 3:15, 4:12
**brought** [2] - 3:13, 30:12
**bRUCE** [1] - 2:4
**bundled** [1] - 38:21
**business** [3] - 11:2, 20:2, 20:7
**But-For** [1] - 6:24
**but-for** [15] - 4:7, 6:21, 7:3, 7:6, 7:22, 7:25, 8:22, 9:7, 11:25, 12:24, 14:13, 18:20, 19:14, 27:11, 31:4
**buyer** [1] - 15:13
**buyers** [14] - 14:18, 14:21, 14:22, 15:1, 15:9, 15:16, 16:4, 27:5, 27:7, 27:10, 27:15, 28:1, 28:7, 28:9
**buying** [1] - 31:8
**BY** [4] - 1:18, 2:3, 2:9, 2:13

## C

**cajoled** [1] - 28:2
**calculation** [9] - 17:22, 17:23, 18:23, 19:19, 20:24, 20:25, 21:7, 24:19, 26:19
**calculations** [7] - 5:8, 7:8, 13:1, 15:17,

17:25, 18:16, 18:23
**Callahan** [1] - 21:15
**care** [1] - 36:24
**carefully** [1] - 9:14
**case** [36] - 4:16, 4:17, 8:3, 8:8, 8:9, 8:24, 8:25, 10:5, 10:17, 13:5, 15:23, 16:10, 16:11, 16:17, 21:16, 21:17, 22:22, 23:3, 23:6, 24:12, 26:7, 26:10, 26:13, 29:11, 31:12, 32:8, 32:18, 33:16, 33:19, 33:24, 34:1, 34:8, 34:12, 34:20, 40:4
**cases** [11] - 17:1, 26:14, 26:15, 26:23, 32:5, 32:6, 32:9, 33:7, 33:25, 34:1
**casts** [1] - 9:9
**caught** [1] - 16:24
**causal** [5] - 14:6, 14:7, 15:19, 15:24, 17:16
**caused** [2] - 34:3, 35:10
**causes** [1] - 32:3
**certain** [3] - 19:10, 30:7, 32:4
**certainly** [5] - 5:13, 5:20, 5:25, 11:11, 24:11
**challenge** [2] - 39:16, 39:17
**challenging** [2] - 37:7, 39:23
**chance** [1] - 31:17
**change** [1] - 32:11
**check** [1] - 40:3
**checked** [1] - 18:5
**checking** [1] - 18:1
**chronologically** [1] - 10:7
**Circuit** [19] - 6:4, 8:25, 15:22, 16:18, 21:14, 22:20, 23:4, 23:6, 24:10, 24:15, 26:3, 26:11, 33:25, 34:5, 34:17, 34:22, 34:25
**circumstances** [2] - 32:4, 32:5
**cite** [2] - 6:18, 33:16
**cited** [5] - 8:3, 8:24, 32:5, 32:10, 37:5
**citing** [1] - 33:7
**CIVIL** [1] - 1:4
**claim** [3] - 30:2, 34:24
**clear** [6] - 6:20, 8:16, 9:17, 13:10, 29:24, 39:14

**clearly** [2] - 37:6, 37:7
**client** [1] - 28:17
**clock** [1] - 35:16
**close** [1] - 30:13
**collect** [1] - 5:17
**comfortable** [1] - 20:19
**commenced** [1] - 3:3
**commensurate** [1] - 31:19
**comment** [1] - 6:11
**comments** [1] - 6:7
**common** [1] - 31:18
**communication** [1] - 37:14
**company** [3] - 7:15, 10:3, 32:15
**comparable** [2] - 19:6, 21:4
**comparing** [2] - 8:15, 19:5
**compete** [1] - 9:4
**competition** [17] - 10:19, 11:6, 14:8, 14:10, 14:12, 14:14, 15:18, 15:24, 15:25, 16:3, 17:15, 18:22, 20:23, 27:5, 27:21, 28:5, 36:7
**competitive** [4] - 4:7, 5:24, 8:2, 22:10
**competitor** [1] - 13:24
**complain** [1] - 16:13
**complained** [2] - 8:8, 33:2
**complaining** [6] - 8:8, 9:18, 10:5, 10:9, 10:20, 31:10
**complaint** [1] - 9:19
**comprises** [1] - 19:14
**computer** [1] - 29:14
**conceded** [1] - 7:24, 35:9
**concepts** [1] - 20:23
**concern** [2] - 14:4, 28:23
**concerns** [3] - 3:18, 3:20, 12:5
**concerted** [1] - 14:19
**concluded** [1] - 38:13
**conclusion** [1] - 38:6
**conclusions** [1] - 38:13
**conduct** [26] - 5:4, 5:9, 5:10, 5:15, 5:16, 5:19, 7:21, 7:23, 8:1, 8:7, 9:17, 13:22, 14:1, 14:17, 15:19, 15:25, 20:11, 25:20, 26:25, 30:3, 35:24,

38:21, 38:23, 38:24
**conducted** [1] - 39:9
**confident** [1] - 5:23
**confirm** [1] - 4:6
**confirmation** [1] - 36:21
**confounding** [1] - 16:23
**confusing** [2] - 4:19, 29:8
**connection** [4] - 3:14, 4:24, 12:10, 22:4
**conservative** [2] - 3:25, 5:3, 17:24, 18:4, 18:6, 18:10, 18:14, 19:19, 25:8, 30:10
**considered** [1] - 22:17
**conspiracy** [4] - 14:19, 26:5, 28:9, 28:13
**conspiratorial** [1] - 28:8
**conspire** [1] - 36:6
**consumer** [2] - 15:1, 15:13
**consumers** [2] - 13:21, 14:2
**contend** [2] - 28:1, 28:11
**contending** [1] - 34:3
**contested** [1] - 17:15
**contests** [1] - 38:15
**context** [4] - 18:21, 18:22, 24:14, 24:15
**continually** [1] - 35:3
**continue** [4] - 12:11, 13:5, 26:12, 26:24
**Continued** [1] - 2:1
**continued** [1] - 32:7
**continues** [2] - 5:7, 30:9
**continuing** [8] - 5:18, 25:22, 25:25, 26:4, 26:5, 26:11, 26:24, 35:2
**continuous** [1] - 5:15
**contract** [4] - 5:6, 32:14, 32:16, 34:2
**contracts** [7] - 10:4, 10:8, 10:22, 32:10, 33:2, 34:7, 38:4
**contrary** [2] - 8:12, 11:20
**contrast** [1] - 22:3
**convey** [1] - 37:6
**CORPORATION** [2] - 1:5, 1:8
**correct** [7] - 4:11, 16:19, 24:16, 24:23,

38:23, 39:8, 39:21
**cost** [6] - 10:25, 11:3, 13:13, 18:15, 31:20, 31:25
**counsel** [5] - 32:15, 32:16, 33:5, 40:8, 40:10
**Counsel** [2] - 2:6, 2:16
**counts** [1] - 35:12
**couple** [4] - 21:8, 26:21, 29:20, 32:1
**course** [10] - 5:15, 5:18, 13:12, 14:18, 21:6, 26:24, 27:3, 33:18, 34:6, 38:1
**COURT** [41] - 1:1, 3:6, 6:15, 6:22, 7:3, 7:18, 12:7, 12:19, 13:16, 14:24, 15:6, 16:21, 22:1, 22:15, 23:2, 23:5, 23:11, 23:24, 25:3, 25:18, 26:14, 27:6, 27:16, 27:24, 28:14, 29:2, 29:14, 29:17, 30:5, 30:21, 31:1, 33:8, 33:11, 36:10, 36:20, 36:23, 37:15, 37:22, 39:3, 39:6, 39:25
**Court** [9] - 1:24, 12:25, 15:21, 16:11, 26:8, 34:21, 38:19, 40:7, 40:11
**courtroom** [1] - 3:3
**Courts** [1] - 4:25
**covered** [2] - 37:1, 37:2
**created** [1] - 16:15
**credibility** [1] - 17:5
**criteria** [2] - 34:9, 34:12
**cross** [4] - 17:2, 18:1, 18:5, 31:17
**cross-checked** [1] - 18:5
**cross-checking** [1] - 18:1
**cross-examine** [1] - 31:17
**cross-motions** [1] - 17:2
**crystal** [1] - 6:20
**crystal-clear** [1] - 6:20
**cull** [2] - 4:6, 6:3
**curiosity** [1] - 38:15
**customer** [3] - 28:20, 31:13, 31:14
**customers** [5] - 8:7, 10:24, 31:16, 31:22, 32:12

**customers'** [1] - 31:7
**cut** [1] - 11:12
**cynicism** [1] - 30:8

**D**

**D.C** [2] - 2:4, 2:14
**damage** [2] - 13:20, 15:17
**damages** [43] - 3:16, 4:17, 5:2, 5:18, 6:9, 8:23, 13:1, 13:9, 13:17, 15:15, 15:20, 16:1, 16:4, 16:14, 17:9, 17:17, 17:22, 17:25, 18:12, 18:16, 18:22, 19:19, 20:20, 20:24, 20:25, 24:20, 24:24, 25:5, 25:9, 25:24, 26:6, 27:1, 27:3, 27:22, 29:3, 29:24, 30:2, 30:8, 30:20, 35:8, 35:13, 35:15
**data** [4] - 4:5, 19:6, 21:4
**date** [1] - 29:19
**Daubert** [11] - 4:15, 4:21, 6:9, 8:11, 14:16, 15:14, 16:18, 16:22, 17:2, 17:18, 24:22
**deal** [6] - 29:9, 32:6, 33:14, 33:19, 33:20, 33:21
**dealer** [2] - 34:9, 34:12
**decide** [1] - 17:10
**decided** [2] - 17:14, 32:25
**decision** [1] - 34:16
**declaration** [2] - 13:11, 21:24
**declarations** [1] - 22:11
**declined** [2] - 6:2, 10:6
**declining** [1] - 3:13
**deducting** [1] - 7:14
**defects** [1] - 11:12
**defendant** [14] - 4:7, 4:11, 6:12, 6:13, 6:17, 9:3, 16:13, 19:24, 19:25, 22:4, 24:25, 33:14, 34:8, 38:14
**Defendant** [2] - 1:9, 2:16
**defendant's** [2] - 5:4,

20:11
**defendants** [1] - 15:8
**defending** [1] - 39:18
**defense** [1] - 37:2
**definition** [3] - 8:1, 32:7, 38:13
**degree** [1] - 30:7
**DELAWARE** [1] - 1:2
**Delaware** [1] - 1:11
**denied** [3] - 14:5, 14:8, 17:16
**dense** [1] - 4:20
**denser** [1] - 12:8
**densest** [1] - 29:8
**Dental** [2] - 26:3, 34:25
**Dentsply** [3] - 26:3, 34:7, 35:1
**Department** [1] - 39:11
**depose** [1] - 31:14
**deposed** [1] - 9:14
**deposition** [3] - 7:25, 19:2, 19:8
**depositions** [1] - 31:12
**DeRamus** [14] - 3:23, 12:16, 13:1, 14:15, 14:17, 14:20, 20:13, 21:1, 21:19, 29:7, 31:15, 38:12, 39:9, 39:18
**DeRamus'** [1] - 21:24
**deserved** [1] - 30:14
**designed** [1] - 32:22
**desire** [1] - 38:18
**determining** [1] - 39:13
**DICKSTEIN** [1] - 2:2
**difference** [2] - 13:13, 33:16
**different** [11] - 7:9, 17:25, 18:1, 18:18, 19:6, 20:23, 20:25, 27:20, 32:8, 33:7, 34:6
**difficult** [1] - 4:6
**directly** [1] - 20:13
**disaggregation** [4] - 10:16, 21:9, 21:15, 24:12
**disclosures** [1] - 31:14
**disconnect** [1] - 8:11
**discounts** [2] - 7:14, 11:15
**discussed** [2] - 19:24, 33:16
**discussion** [1] - 29:1
**dismiss** [1] - 34:11

**dispute** [2] - 38:17, 38:20
**disputed** [2] - 10:17, 23:9
**disputes** [1] - 38:10
**disrupted** [1] - 16:15
**distill** [1] - 25:16
**distinction** [1] - 24:2
**distinguish** [1] - 11:6
**distinguished** [1] - 33:24
**DISTRICT** [2] - 1:1, 1:2
**doctor** [2] - 28:22, 36:14
**doctrine** [1] - 26:11
**dollars** [1] - 8:20
**DONALD** [1] - 2:9
**done** [4] - 4:21, 4:25, 9:4, 18:18
**double** [1] - 24:21
**doubt** [1] - 9:9
**down** [4] - 4:10, 25:16, 28:20
**Dr** [18] - 3:23, 12:16, 13:6, 13:8, 14:15, 14:17, 14:20, 20:12, 21:1, 21:19, 21:24, 22:8, 26:17, 29:7, 31:15, 38:12, 39:9, 39:17
**dramatically** [1] - 10:8
**DRINKER** [1] - 1:17
**driven** [1] - 20:7
**due** [1] - 9:19
**DUNCAN** [1] - 2:3
**during** [6] - 7:16, 9:25, 29:25, 30:3, 32:3, 35:7
**duty** [1] - 9:15

**E**

**early** [1] - 3:7
**Easton** [1] - 22:18
**Eaton** [26] - 9:15, 9:22, 9:24, 10:21, 11:7, 11:11, 11:17, 14:6, 14:18, 15:15, 17:15, 21:3, 21:20, 22:8, 24:4, 24:6, 24:7, 28:8, 28:22, 31:9, 33:17, 33:19, 35:9, 36:4, 37:25, 38:9
**EATON** [1] - 1:8
**Eaton's** [3] - 3:14, 7:20, 8:17, 9:5, 14:17, 22:7, 26:20, 32:15, 36:1, 36:8, 38:4

**economic** [2] - 8:12, 25:11
**economically** [1] - 39:9
**economics** [2] - 7:25, 8:4
**economist** [1] - 12:2
**economist's** [1] - 12:2
**economists** [1] - 30:7
**edge** [1] - 22:10
**effect** [3] - 8:3, 9:2, 38:5
**effects** [1] - 14:1
**effort** [2] - 11:2, 20:23
**efforts** [1] - 11:2
**eighties** [1] - 9:20
**either** [1] - 14:6
**El** [1] - 32:9
**element** [1] - 37:8
**elements** [1] - 37:8
**eliminate** [1] - 30:19
**employ** [2] - 39:10, 39:12
**end** [3] - 15:1, 28:4, 29:24
**ending** [1] - 25:23
**enforcement** [1] - 34:12
**engaged** [1] - 14:19
**engineers** [2] - 10:24, 11:1
**enormous** [2] - 8:11, 8:23
**entered** [1] - 9:19
**Enterprise** [1] - 18:8
**entire** [1] - 7:17
**entirety** [1] - 20:18
**entitled** [4] - 6:24, 15:18, 26:9, 35:8
**envelope** [2] - 18:15, 21:2
**equally** [1] - 26:9
**ESQ** [8] - 1:18, 2:3, 2:3, 2:4, 2:9, 2:13, 2:13, 2:14
**essentially** [1] - 7:16
**establish** [2] - 15:18, 25:24
**established** [1] - 17:12
**estimate** [1] - 20:20
**event** [4] - 4:3, 5:7, 6:6, 33:2
**evidence** [2] - 25:11, 31:16, 38:11
**evidentiary** [2] - 4:24, 37:16
**exact** [1] - 4:12
**exactly** [5] - 6:7, 9:4,

9:17, 21:11, 32:21
**examine** [1] - 31:17
**example** [4] - 14:9, 18:3, 18:7, 21:21
**exclude** [2] - 3:16, 10:16
**exclusion** [1] - 9:1
**exclusionary** [2] - 38:21, 38:23
**expanding** [1] - 20:8
**expensive** [2] - 20:6, 20:9, 20:10
**expert** [19] - 3:16, 3:22, 3:24, 7:24, 8:13, 9:1, 9:3, 12:1, 12:8, 12:13, 17:2, 17:3, 17:7, 23:7, 23:17, 23:20, 23:23, 26:17, 38:14
**expert's** [1] - 3:22
**experts** [1] - 39:8
**explain** [2] - 8:6, 25:14, 33:15
**explained** [4] - 4:10, 4:13, 25:7, 30:15
**explains** [3] - 12:17, 13:10, 32:20
**explanation** [5] - 8:5, 26:16, 31:4, 31:6, 32:19
**extensive** [1] - 4:8
**extent** [3] - 3:17, 6:5, 30:12
**eyeball** [1] - 12:16

**F**

**face** [3] - 8:10, 11:5, 11:9
**faced** [1] - 16:24
**fact** [15] - 4:14, 5:22, 6:10, 9:24, 10:1, 11:13, 11:20, 16:2, 20:20, 23:14, 25:8, 28:18, 28:24, 38:4
**facts** [15] - 6:1, 21:20, 22:3, 22:17, 22:18, 23:9, 23:12, 23:13, 23:21, 23:22, 24:5, 24:7
**factual** [1] - 37:14
**fair** [2] - 14:11, 37:20
**fan** [1] - 16:22
**FASTOW** [28] - 2:3, 12:21, 14:3, 15:4, 15:7, 17:13, 22:13, 22:16, 22:25, 23:3, 23:7, 23:19, 25:12, 26:1, 26:18, 27:13,

27:17, 27:25, 28:25, 29:12, 29:21, 29:23, 30:18, 33:10, 33:12, 36:18, 36:22, 37:24
**Fastow** [1] - 12:22
**favorite** [1] - 26:15
**February** [1] - 18:8
**fell** [1] - 28:20
**fewer** [1] - 25:15
**field** [2] - 8:13, 23:23
**figure** [2] - 7:12, 40:5
**figures** [7] - 4:11, 4:12, 4:13, 5:2, 5:8, 25:9, 30:8
**file** [1] - 17:2
**filed** [6] - 3:14, 5:16, 12:4, 12:10, 26:13, 33:6
**filing** [1] - 32:18
**filled** [1] - 32:13
**final** [1] - 34:9
**fine** [2] - 6:22, 25:14
**first** [11] - 6:13, 12:23, 12:24, 16:16, 19:4, 28:7, 28:10, 31:2, 33:14, 37:4
**fiscal** [1] - 7:1
**five** [5] - 11:19, 13:2, 13:3, 18:1, 35:5
**five-and-a-half** [1] - 35:5
**flat** [1] - 7:16
**flaw** [1] - 9:8
**flaws** [1] - 11:23
**fleet** [1] - 11:15
**focus** [9] - 13:8, 13:11, 13:18, 16:8, 18:24, 27:19, 27:20, 31:3, 37:11
**focusing** [2] - 14:25, 37:9
**follow** [1] - 23:19
**foot** [1] - 6:2
**foot-full** [1] - 6:2
**footnote** [1] - 34:5
**FOR** [1] - 1:2
**forget** [1] - 33:18
**forth** [4] - 8:14, 11:1, 15:22, 33:24
**forward** [2] - 4:17, 40:9
**frankly** [3] - 22:2, 29:4, 29:7
**Freedom** [5] - 11:14, 19:11, 19:13, 19:16, 21:23
**Freight** [1] - 32:10
**Friedman** [2] - 34:1, 34:5
**frivolous** [1] - 4:22

front [2] - 24:11, 29:5
full [1] - 6:2
fundamental [1] - 17:11
fundamentally [2] - 8:10, 11:23
future [1] - 7:7

**G**

gatekeeper [1] - 25:6
general [4] - 32:14, 32:16, 33:5, 33:16
generally [3] - 6:3, 17:1, 17:4
genuine [2] - 38:3, 38:17
genuinely [1] - 38:20
gist [1] - 30:15
given [1] - 6:10
great [1] - 36:22
greedy [1] - 30:14
grew [1] - 9:20
gross [4] - 7:13, 7:15, 8:16, 8:18
ground [2] - 18:17, 18:19
grounds [1] - 39:1
growth [1] - 10:7
guess [2] - 27:8, 30:21
guidelines [2] - 39:11, 40:6
Gunning [1] - 1:24

**H**

HACKETT [1] - 2:3
hackles [1] - 30:11
half [2] - 33:6, 35:5
HANDRIGAN [1] - 2:14
Hanover [3] - 26:7, 26:8, 34:20
hard [3] - 24:2, 39:17, 39:18
harm [3] - 33:4, 36:7
harmed [1] - 13:25
Harold [2] - 34:1, 34:5
Hazeltine [3] - 15:22, 16:12, 24:18
healthy [1] - 30:8
hear [4] - 20:22, 31:3, 31:6, 37:19
heard [1] - 32:19
hearing [5] - 4:24, 15:2, 37:16, 38:18, 40:2
heavy [1] - 9:15

held [1] - 15:23
help [1] - 10:24
helpful [4] - 14:3, 15:3, 16:23, 37:17
herring [1] - 35:6
high [1] - 30:9
higher [11] - 8:6, 8:21, 9:2, 18:12, 19:14, 19:15, 19:21, 31:5, 31:9, 31:24
highly [1] - 5:3
himself [1] - 7:24
hit [2] - 9:8, 10:15
HOLCOMB [1] - 2:4
Honor [41] - 6:14, 6:18, 8:24, 10:1, 12:20, 12:21, 14:5, 14:8, 15:4, 17:14, 17:16, 17:23, 19:18, 20:22, 22:13, 22:25, 23:19, 25:1, 25:12, 26:1, 26:2, 26:18, 27:17, 27:25, 28:25, 29:13, 29:21, 30:18, 30:24, 33:10, 34:11, 34:15, 34:25, 36:9, 36:18, 36:22, 37:21, 37:24, 38:22, 39:2, 40:10
Honor's [1] - 37:10
HONORABLE [1] - 1:14
hope [1] - 38:18
hopefully [2] - 3:18, 15:5
hour [1] - 36:25
Howrey [1] - 6:16
HOWREY [1] - 2:12
hundred [1] - 8:20
hurt [5] - 14:22, 28:2, 28:6, 28:11, 28:12

**I**

ignored [1] - 10:3
ignores [1] - 11:18
impact [3] - 14:17, 14:21, 15:12
impede [1] - 9:23
implication [1] - 27:4
important [1] - 4:18
impossible [1] - 21:18
IN [2] - 1:1, 1:2
incentives [1] - 11:15
include [3] - 3:20, 4:5, 19:20
including [1] - 37:8
inconsistent [1] - 4:15
increase [1] - 31:20

increased [1] - 27:1
increasing [1] - 20:3
incurred [1] - 30:1
inflicted [1] - 26:9
information [4] - 24:1, 25:23, 28:17, 29:5
initial [2] - 31:13, 38:6
injure [1] - 14:9
injured [1] - 26:4
injury [43] - 13:19, 13:25, 14:7, 14:12, 14:13, 14:25, 15:8, 15:18, 15:19, 15:24, 15:25, 16:2, 16:3, 16:4, 17:11, 17:15, 17:16, 18:21, 20:23, 26:9, 27:1, 27:5, 27:21, 30:1, 32:3, 34:3, 34:14, 35:1, 35:2, 35:7, 35:10, 35:12, 35:13, 35:18
input [2] - 31:7, 31:20
institution [1] - 12:2
intended [1] - 37:7
interact [1] - 25:5
interest [1] - 31:7
interesting [2] - 31:2, 38:12
international [1] - 32:11
interrelated [3] - 3:17, 6:9, 21:10
intertwined [1] - 10:10
introductory [2] - 6:6, 6:11
irrelevant [1] - 35:5
issue [24] - 3:12, 4:18, 6:1, 9:2, 12:25, 13:2, 13:7, 14:5, 14:13, 14:23, 15:14, 16:5, 16:17, 18:21, 19:4, 26:24, 27:20, 32:1, 35:6, 36:20, 37:18, 38:4, 38:19, 40:5
issues [8] - 3:9, 5:22, 17:5, 21:21, 21:22, 21:23, 38:1, 38:8
itself [1] - 27:5

**J**

January [1] - 5:5
Jay [1] - 12:22
JAY [1] - 2:13
JENNIFER [1] - 2:3
job [1] - 28:20
Joel [1] - 6:16
JOSEPH [1] - 2:13
journal [1] - 12:3

judgment [9] - 3:11, 3:15, 11:10, 14:4, 17:14, 22:4, 34:16, 38:10, 39:1
July [2] - 36:11, 36:16
June [1] - 1:12
jury [7] - 17:4, 17:10, 23:10, 24:11, 25:10, 28:19, 38:19
Justice [1] - 39:11

**K**

Kaiser [2] - 32:9, 33:23
KAREN [1] - 1:18
keep [2] - 37:9, 37:10
key [2] - 9:8, 33:18
kind [5] - 6:9, 19:10, 28:17, 29:3, 30:10
knocked [1] - 9:9
knowledge [3] - 34:23, 35:19, 35:22
Kresky [3] - 15:23, 16:10, 24:19

**L**

lack [2] - 10:16, 16:13
landscape [1] - 37:18
large [1] - 25:9
late [2] - 9:20, 9:21
law [7] - 8:3, 8:24, 10:17, 11:9, 16:9, 19:23, 22:20
laws [2] - 26:6, 36:2
lay [1] - 19:2
LAZEROW [1] - 2:13
LBAs [2] - 14:9, 34:16
leading [1] - 16:11
leads [1] - 8:22
least [4] - 26:13, 28:22, 33:20, 35:16
left [1] - 17:3
legal [1] - 20:24
legitimate [4] - 10:19, 11:6, 31:6, 32:20
length [1] - 14:17
lenient [1] - 16:11
Lepages [7] - 15:22, 21:15, 21:16, 24:19, 38:5, 38:22, 38:24
less [3] - 18:2, 20:9, 33:20
letter [7] - 32:15, 35:20, 35:21, 35:22, 36:1, 39:15
level [1] - 9:7

liability [1] - 16:20
liberal [4] - 15:25, 24:20, 24:25, 30:20
liberality [1] - 16:6, 24:21
light [2] - 6:11, 12:10
limit [2] - 5:17, 25:24
limitations [19] - 3:12, 3:21, 5:12, 6:8, 9:13, 29:25, 30:1, 30:3, 30:4, 32:1, 32:22, 33:12, 33:17, 35:8, 35:11, 35:16, 35:24, 35:25
limited [3] - 13:14, 23:21, 38:8
line [12] - 6:24, 7:4, 7:16, 11:14, 19:11, 19:13, 19:16, 20:4, 20:8, 20:19, 21:22, 21:23
Liner [1] - 32:11
LLC [1] - 1:4
LLP [3] - 1:17, 2:2, 2:12
longest [2] - 3:24, 29:8
look [13] - 8:25, 15:10, 19:11, 20:12, 20:18, 21:3, 21:4, 21:19, 21:24, 22:1, 26:2, 28:16, 40:9
looked [4] - 21:21, 21:22, 22:21
looking [7] - 10:11, 22:11, 24:22, 27:13, 27:17, 27:22
looks [1] - 36:10
losses [1] - 10:18
lost [2] - 7:8, 27:22
love [1] - 25:18
lower [14] - 7:21, 8:2, 8:18, 8:20, 9:6, 10:23, 10:25, 11:2, 11:13, 19:17, 19:19, 19:21, 20:20

**M**

Mack [3] - 5:6, 26:10, 34:22
main [1] - 32:2
maintain [1] - 22:10
major [1] - 11:23
mantra [1] - 5:2
Manual [1] - 6:24
manual [6] - 7:7, 19:10, 19:17, 20:4, 20:9, 22:6

**000030**

margin [2] - 20:16, 27:22
margins [3] - 13:12, 18:25
market [15] - 7:9, 9:20, 13:11, 13:14, 13:21, 14:2, 16:15, 18:25, 20:1, 20:16, 22:10, 24:25, 38:13, 39:10
marketplace [3] - 14:7, 27:4, 36:5
markets [2] - 9:16, 9:19
material [1] - 38:4
matter [3] - 7:25, 11:8, 14:1
mean [2] - 12:15, 14:15, 17:1, 23:24, 25:20, 25:23, 27:8, 39:21
meaning [1] - 19:19
means [2] - 13:4, 31:24
meant [3] - 17:24, 18:3, 18:13
meantime [1] - 36:16
measures [1] - 7:9
mechanical [2] - 19:12, 20:6
mechanics [2] - 17:5, 17:6
MELISSA [1] - 2:14
mention [1] - 21:8
mentioned [3] - 12:25, 19:23, 21:6
MERITOR [2] - 1:4
methodologies [3] - 13:3, 13:6, 13:9
might [7] - 3:23, 4:22, 18:15, 19:20, 20:5, 20:10, 20:20
mind [4] - 8:17, 9:18, 10:11, 31:11
minus [1] - 18:2
mischaracterizing [1] - 20:14
miscommunication [1] - 37:13
missed [1] - 7:4
misstatement [1] - 39:22
mistake [2] - 10:11, 37:14
misunderstanding [4] - 13:6, 13:23, 18:23, 20:15
mix [2] - 19:21, 20:23
mixing [1] - 15:8
Monday [1] - 1:12
money [2] - 11:20,

18:16
monopolist [2] - 9:22, 9:25
monopolize [1] - 36:6
monopolized [1] - 9:15
monopoly [7] - 37:8, 38:9, 38:14, 38:15, 38:16, 38:17, 39:10
months [1] - 10:4
morning [3] - 3:6, 36:12
MORRIS [1] - 2:9
most [4] - 5:3, 11:25, 22:5, 29:8
motion [16] - 3:11, 3:12, 3:15, 6:9, 6:10, 10:16, 12:4, 17:14, 17:16, 21:11, 21:25, 22:4, 38:2, 38:3, 38:7
motions [4] - 3:10, 4:22, 6:12, 17:2
MR [44] - 6:14, 6:16, 6:23, 7:5, 7:19, 12:14, 12:20, 12:21, 14:3, 15:4, 15:7, 17:13, 22:13, 22:16, 22:25, 23:3, 23:7, 23:19, 24:4, 25:12, 26:1, 26:18, 27:13, 27:17, 27:25, 28:25, 29:12, 29:20, 29:21, 29:22, 29:23, 30:18, 30:24, 31:2, 33:9, 33:10, 33:12, 36:18, 36:22, 37:1, 37:20, 37:24, 39:5, 39:7
multi [1] - 20:6
multi-speed [1] - 20:6
multiplied [1] - 7:10
multiplier [2] - 7:10, 18:7
Murphy [2] - 8:25, 9:1

**N**

name [1] - 3:23
necessary [1] - 21:16
neck [1] - 30:11
need [10] - 4:13, 4:22, 12:11, 14:11, 14:12, 17:8, 24:13, 29:6, 29:10, 39:20
needs [1] - 4:10
negative [1] - 22:9
negotiations [1] - 28:15
net [1] - 7:14

never [3] - 4:21, 4:25, 16:23
new [3] - 26:6, 34:13
next [2] - 28:7, 33:1
NICHOLS [1] - 2:9
nineties [3] - 9:16, 9:21, 9:25
Ninth [1] - 8:25
NO [1] - 1:9
non [3] - 23:14, 28:8, 39:12
non-admissible [1] - 23:14
non-conspiratorial [1] - 28:8
non-transitory [1] - 39:12
none [2] - 11:3, 11:17
nonetheless [1] - 11:18
normally [1] - 8:13
note [1] - 36:18
nothing [2] - 22:21, 32:20
notice [1] - 36:2
number [10] - 14:20, 17:25, 18:11, 24:8, 24:9, 24:17, 24:18, 24:23, 31:22, 33:23
numbers [2] - 7:1, 18:12
numerous [1] - 5:1

**O**

o'clock [3] - 1:12, 36:13, 36:17
obvious [1] - 11:25
obviously [2] - 12:15, 35:23
occasion [1] - 5:11
occasions [1] - 5:1
occurred [2] - 33:4, 35:7
occurs [2] - 32:2, 35:1
Oddi [2] - 16:17, 24:15
OEMs [12] - 7:15, 14:19, 14:25, 27:7, 27:10, 27:14, 28:2, 28:4, 28:9, 28:11, 31:5, 33:19
OF [1] - 1:2
offer [2] - 28:20, 28:21
Official [1] - 1:24
offset [1] - 19:17
often [1] - 4:2
once [5] - 15:23, 16:2, 36:21
one [30] - 4:8, 4:22,

5:11, 9:12, 11:21, 12:8, 13:18, 16:2, 16:7, 16:14, 16:22, 18:4, 19:6, 19:25, 20:2, 22:22, 23:7, 23:20, 24:8, 24:15, 24:17, 24:21, 25:19, 27:2, 29:3, 29:21, 31:22, 32:2, 33:1, 39:8
ones [2] - 20:10, 28:10
onsite [1] - 10:24
open [1] - 28:25
opinion [3] - 3:24, 23:8, 23:9
opponent's [1] - 23:18
order [4] - 32:13, 36:21, 40:6
OSTOYICH [18] - 2:13, 6:14, 6:16, 6:23, 7:5, 7:19, 12:14, 12:20, 24:4, 29:20, 29:22, 30:24, 31:2, 33:9, 37:1, 37:20, 39:5, 39:7
Ostoyich [1] - 6:16
otherwise [1] - 37:19
overall [1] - 10:25
own [3] - 9:18, 33:4, 36:8

**P**

p.m [1] - 40:11
Packer [2] - 11:1, 32:11
page [1] - 29:5
Page [1] - 19:8
pages [3] - 12:6, 22:8, 25:15
Pages [1] - 19:3
paid [2] - 27:10, 27:14
pale [1] - 11:24, 12:1
papers [2] - 12:10, 28:16, 37:6
Paragraph [3] - 15:10, 22:16, 34:4
paragraphs [2] - 14:20, 15:3
Paragraphs [1] - 21:25
parent [1] - 32:15
part [4] - 28:12, 30:3, 33:18, 37:5
particular [4] - 13:14, 17:21, 19:1, 23:8
particularly [2] - 30:10, 31:11
parties [2] - 12:12,

40:3
party [2] - 34:2, 34:7
Paso [1] - 32:9
past [1] - 16:3
patent [1] - 17:1
patience [1] - 40:9
Pause [2] - 22:24, 29:16
peer [1] - 12:3
peer-reviewed [1] - 12:3
pending [1] - 3:10
Penn [2] - 26:3, 34:25
people [2] - 11:19, 31:18
per [1] - 37:10
percent [5] - 7:21, 8:6, 9:20, 31:5, 31:8
perfect [1] - 21:5
perhaps [1] - 4:23
period [13] - 7:17, 10:1, 29:25, 30:1, 30:3, 30:4, 32:7, 34:13, 35:8, 35:11, 35:24, 35:25
permitted [1] - 23:8
person [2] - 11:21, 25:14
perspective [3] - 10:6, 12:15, 37:23
phrase [1] - 5:10
picked [1] - 17:23
pieces [1] - 24:13
place [2] - 16:16, 28:16
placed [1] - 32:12
plaintiff [13] - 5:24, 13:2, 13:8, 17:21, 18:20, 20:14, 21:9, 22:22, 26:4, 26:12, 28:19, 34:2, 34:3
Plaintiffs [2] - 1:6, 2:6
plaintiffs [9] - 8:8, 10:4, 12:22, 16:8, 18:7, 20:3, 22:18, 27:4, 38:3
plaintiffs' [11] - 3:16, 5:13, 5:14, 7:6, 8:18, 9:18, 10:18, 13:5, 22:9, 31:13, 37:22
plan [1] - 20:2
plots [1] - 7:13
plus [1] - 18:2
point [12] - 5:15, 6:20, 12:24, 15:2, 16:12, 19:22, 23:20, 23:24, 23:25, 27:6, 29:21, 31:22
pointed [1] - 9:24
points [7] - 17:20,

21:8, 21:21, 24:9, 29:20, 30:25, 33:13
positing [1] - 8:21
position [4] - 25:6, 29:25, 36:3, 36:8
positions [1] - 18:15
possibility [1] - 20:3
possible [1] - 33:1
power [7] - 37:8, 38:10, 38:14, 38:15, 38:17, 39:10
practice [1] - 37:10
precise [2] - 6:18, 25:1
precision [2] - 16:13, 19:25
prepared [6] - 3:19, 6:7, 6:13, 25:4, 25:13, 36:23
preparing [1] - 37:15
present [1] - 25:10
presentation [1] - 10:2
president [1] - 10:2
pressed [1] - 24:2
pressing [1] - 18:14
pretrial [1] - 29:11
pretty [2] - 9:14, 25:9
prevent [1] - 32:22
prevented [1] - 20:8
price [26] - 6:21, 6:25, 7:4, 7:6, 7:7, 7:13, 7:14, 7:15, 8:6, 8:16, 8:17, 8:18, 8:21, 10:23, 11:14, 13:8, 13:9, 13:13, 13:18, 18:25, 20:16, 27:7, 27:9, 27:11, 27:12, 31:24
Price [1] - 6:24
prices [20] - 7:10, 7:20, 8:2, 9:2, 9:5, 9:7, 11:13, 14:13, 19:13, 19:14, 19:16, 19:17, 20:9, 27:9, 27:10, 27:13, 27:14, 27:18, 31:5, 31:19
pricing [5] - 10:12, 11:25, 18:21, 21:23, 39:12
principally [1] - 16:3
principle [1] - 25:11
principles [2] - 4:15, 33:17
problem [2] - 8:11, 23:15
problematic [2] - 9:11, 31:11
Proceedings [1] - 3:3
product [8] - 11:12,

20:4, 20:8, 20:18, 21:22, 28:21, 31:8, 31:19
products [2] - 19:15, 21:4
profit [5] - 13:12, 18:24, 20:16, 27:22
profits [1] - 7:8
proof [1] - 15:14
proposition [2] - 23:6, 23:16
prove [2] - 13:19, 13:20
proved [1] - 19:24
providing [2] - 10:24, 11:15
proving [3] - 16:1, 16:14, 24:24
pull [1] - 3:22
purchases [1] - 11:16
purpose [2] - 14:16
push [1] - 21:2
pushed [1] - 28:2
put [3] - 12:12, 24:13, 35:21
puts [1] - 18:17

Q

questions [4] - 3:18, 12:17, 19:4, 24:12
quickly [2] - 15:5, 30:24
quite [2] - 20:25, 22:2

R

raised [4] - 11:13, 21:9, 37:25, 38:1
raises [1] - 30:10
Ramus' [2] - 13:6, 13:8
range [2] - 7:16, 18:3
rather [2] - 20:10, 20:20
read [2] - 9:13, 26:23
reality [2] - 4:8, 9:5
really [13] - 4:15, 5:9, 8:5, 10:13, 16:8, 17:6, 17:20, 25:7, 25:10, 31:3, 31:6, 32:24, 38:25
rearguing [2] - 21:10, 21:12
reason [1] - 32:20
REATH [1] - 1:17
rebates [3] - 7:14, 8:19, 38:22

recessed [1] - 40:11
reconsideration [8] - 3:12, 6:10, 21:11, 37:3, 37:25, 38:2, 38:7
record [3] - 3:23, 32:20, 39:22
recoverable [1] - 32:4
recovery [1] - 37:5
red [1] - 35:5
reenforces [1] - 9:10
refer [1] - 22:14
refusal [3] - 32:6, 33:14, 33:21
refusal-to-deal [1] - 33:21
refusals [1] - 32:5
refused [1] - 11:13
regardless [1] - 36:7
REID [1] - 2:9
reinforces [1] - 10:12
rejected [1] - 34:17
relate [1] - 14:13
relates [1] - 14:15
relationship [2] - 13:13, 15:16
reliable [4] - 23:22, 24:1, 24:6, 25:10
reliably [1] - 23:22
relied [2] - 23:23, 24:5
rely [2] - 23:21, 24:6
relying [1] - 23:21
remarks [3] - 3:19, 36:23, 36:24
replace [1] - 30:19
reply [1] - 38:1
report [28] - 4:4, 4:5, 4:14, 4:19, 5:1, 6:19, 6:24, 7:12, 7:13, 9:14, 10:3, 11:24, 13:11, 14:21, 15:10, 16:22, 16:24, 17:7, 22:2, 22:11, 22:14, 24:9, 25:15, 27:8, 29:3, 29:8, 29:9
Reporter [1] - 1:24
reports [2] - 12:8, 12:9, 38:14
requested [1] - 37:25
require [1] - 22:20
required [1] - 38:5
requires [1] - 9:9
resell [1] - 27:14
resolves [1] - 17:4
respect [2] - 3:21, 20:4
respond [1] - 40:10
rest [1] - 19:20
restraint [1] - 36:6

result [1] - 37:12
results [1] - 19:5
review [2] - 12:9, 37:16
reviewed [3] - 4:3, 4:19, 12:3
risk [1] - 39:5
ROBINSON [1] - 1:14
Rossi [1] - 21:15
royaled [3] - 16:15, 20:1, 24:25
rule [2] - 8:3, 26:1
Rule [1] - 23:20
run [1] - 40:4
running [1] - 35:16

S

sales [1] - 7:6
satisfy [1] - 25:10
scheduled [1] - 36:12
school [1] - 11:2
scope [1] - 21:22
scrutiny [1] - 30:13
second [2] - 6:19, 22:23
Sections [1] - 22:16
see [13] - 4:12, 7:3, 7:18, 12:16, 16:7, 20:13, 25:17, 25:18, 27:19, 32:25, 36:14, 39:17, 40:3
seeing [1] - 40:9
seem [3] - 9:23, 10:10, 10:13
selling [1] - 20:11
sense [6] - 10:14, 21:3, 21:5, 25:6, 31:18, 35:17
sent [1] - 37:7
sentence [1] - 37:5
separate [1] - 10:19
separately [1] - 15:14
services [1] - 28:20
set [2] - 36:15, 37:7
setting [1] - 37:17
settlement [2] - 28:15, 29:1
several [2] - 8:20, 12:1
SHAPIRO [1] - 2:2
share [11] - 3:8, 3:18, 10:5, 10:23, 11:3, 13:12, 13:14, 18:25, 20:17, 28:18, 39:10
Shoe [2] - 26:7, 34:20
show [8] - 10:22, 13:2, 14:11, 14:12, 15:18, 15:24, 18:18, 35:21
shown [2] - 14:6, 38:3

shows [3] - 10:3, 13:5, 36:1
shrinking [1] - 10:8
side [2] - 30:14, 37:2
sides [1] - 6:1
sigma [1] - 11:2
significant [2] - 11:12, 39:12
significantly [1] - 4:23
similarly [2] - 20:14, 34:15
simple [2] - 8:3, 25:17
simply [2] - 22:20, 35:5
single [2] - 31:13, 31:14
sitting [1] - 32:21
situation [2] - 33:7, 34:2
six [5] - 10:3, 11:1, 32:18, 33:1, 33:6
six-and-a-half [1] - 33:6
SLR [1] - 1:9
solid [3] - 18:17, 18:19
sometimes [1] - 24:3
sorry [5] - 13:17, 18:10, 22:25, 29:15, 34:4
sort [1] - 24:21
sorts [1] - 3:9
sound [2] - 22:7, 25:11
sounds [1] - 11:5
sources [1] - 19:6
speaks [1] - 38:9
specifically [2] - 37:3, 39:15
speed [1] - 20:6
spots [1] - 15:11
staff [1] - 36:15
stakes [1] - 12:25
stand [1] - 12:13
standard [10] - 16:1, 16:5, 16:11, 17:18, 20:25, 24:19, 24:20, 24:22, 24:24, 25:11
stands [1] - 23:6
stark [1] - 22:3
start [2] - 35:16, 40:2
started [5] - 3:7, 5:4, 5:8, 5:9, 26:21
starting [4] - 5:8, 5:9, 36:13, 36:16
STATES [1] - 1:1
statute [10] - 3:11, 3:21, 5:12, 6:8, 9:13, 32:1, 32:3, 32:22, 33:12
statutory [1] - 32:7

stayed [1] - 32:12
step [1] - 24:13
still [3] - 3:6, 13:5, 31:3
stop [3] - 28:7, 28:8, 28:10
stopped [2] - 10:7, 11:14
story [3] - 23:16, 23:17, 23:18
straightforward [1] - 25:17
strangle [1] - 36:5
stretch [1] - 10:21
strict [1] - 24:20
strike [1] - 32:17
strikes [1] - 13:17
stronger [1] - 27:2
struck [4] - 29:4, 32:10, 32:14, 32:16
struggle [1] - 22:9
studies [1] - 8:14
study [1] - 39:9
stuff [1] - 11:5
subject [1] - 30:1
submit [3] - 12:2, 17:17, 28:6
submitted [2] - 22:3, 38:14
substantially [3] - 9:6, 10:6, 11:14
substantive [1] - 24:24
successful [1] - 22:5
sue [7] - 26:10, 34:10, 35:2, 35:3, 35:8, 35:12, 35:15
SUE [1] - 1:14
sued [1] - 26:8
suffer [1] - 35:13
sufficient [2] - 8:5, 13:25
suing [1] - 35:14
suit [4] - 5:16, 26:11, 33:6, 35:17
SULLIVAN [1] - 1:18
summary [9] - 3:11, 3:15, 11:10, 14:4, 17:14, 22:4, 34:15, 38:10, 39:1
Supreme [4] - 15:21, 16:11, 26:8, 34:21
surprisingly [1] - 8:22
suspect [1] - 29:2

T

table [3] - 6:20, 6:23, 27:11

talks [6] - 13:8, 14:17, 14:20, 15:12, 22:17, 26:3
targets [1] - 11:3
ten [1] - 5:16
terms [12] - 3:13, 5:12, 5:23, 12:12, 18:16, 22:9, 24:22, 24:23, 25:20, 32:11, 32:12, 37:17
test [4] - 16:19, 39:12, 39:13
tests [1] - 39:11
text [1] - 7:13
THE [42] - 1:1, 1:2, 3:6, 6:15, 6:22, 7:3, 7:18, 12:7, 12:19, 13:16, 14:24, 15:6, 16:21, 22:1, 22:15, 23:2, 23:5, 23:11, 23:24, 25:3, 25:18, 26:14, 27:6, 27:16, 27:24, 28:14, 29:2, 29:14, 29:17, 30:5, 30:21, 31:1, 33:8, 33:11, 36:10, 36:20, 36:23, 37:15, 37:22, 39:3, 39:6, 39:25
themselves [2] - 27:11, 28:12
theories [1] - 25:4
theory [4] - 8:12, 8:13, 18:5, 32:23
therefore [1] - 4:10
thinks [1] - 25:12
Third [18] - 6:4, 15:22, 16:18, 21:14, 22:20, 23:3, 23:5, 24:9, 24:15, 26:3, 26:10, 33:25, 34:5, 34:17, 34:22, 34:25
thoughts [1] - 3:8
three [1] - 3:10
throw [1] - 4:4
tied [1] - 10:23
ties [1] - 9:12
tighter [1] - 27:3
today [2] - 3:9, 16:5
together [1] - 15:8
Toledo [2] - 26:10, 34:22
took [6] - 11:20, 11:21, 18:10, 18:11, 20:9, 22:8
touchstone [2] - 34:23, 35:18
trade [1] - 36:6
transitory [1] - 39:12
transmission [5] - 9:15, 19:11, 19:12,

19:13, 22:6
TRANSMISSION [1] - 1:5
Transmissions [1] - 6:25
transmissions [13] - 7:7, 13:15, 19:1, 19:10, 19:16, 19:17, 20:5, 20:6, 20:10, 28:8, 31:21, 31:24
treatment [1] - 30:20
trial [1] - 28:23
tried [1] - 12:9
truck [24] - 10:25, 11:15, 14:18, 14:21, 14:22, 15:1, 15:9, 15:13, 15:16, 16:4, 27:5, 27:7, 27:10, 27:15, 28:1, 28:7, 28:9, 31:7, 31:13, 31:14, 31:16, 31:22
trucks [2] - 31:24, 31:25
true [1] - 24:9
truly [1] - 27:6
truncated [2] - 37:10
trust [1] - 16:21
try [1] - 12:11
trying [3] - 15:15, 15:16, 37:9
Tuesday [2] - 36:11, 36:16
Tugboat [2] - 8:25, 9:1
TUNNELL [1] - 2:9
two [10] - 19:5, 24:9, 24:13, 24:18, 24:23, 30:25, 33:23, 38:1, 38:8, 38:14
type [1] - 11:5
types [3] - 8:12, 13:15, 19:1

U

U.S.D.C.J [1] - 1:14
ultimate [4] - 11:15, 15:1, 15:13, 24:23
ultimately [3] - 5:2, 14:1, 28:11
uncertainties [1] - 16:16
unclear [1] - 25:2
under [8] - 13:1, 16:11, 17:17, 19:23, 23:20, 36:2, 36:8, 39:11
undisputed [3] - 22:3, 38:9, 38:16
UNITED [1] - 1:1

unnecessary [1] - 21:17
up [5] - 7:1, 17:23, 23:20, 25:1, 31:19
upside [1] - 4:9
useful [1] - 25:13
uses [1] - 27:9

V

Valerie [1] - 1:24
valid [1] - 39:9
value [1] - 18:8
various [2] - 19:15, 21:7
Varner [1] - 32:9
version [1] - 23:8
versus [5] - 10:12, 15:22, 16:12, 23:14, 24:18
view [3] - 9:11, 11:24, 32:17
violate [1] - 26:5
violation [7] - 25:22, 25:25, 26:5, 26:11, 26:13, 26:24, 36:2
vis-à-vis [1] - 3:11
vocabulary [1] - 30:19
volume [1] - 7:10
vs [1] - 1:7

W

wait [2] - 34:21, 37:19
waited [2] - 32:18, 33:3
waiting [6] - 32:21, 32:24, 34:19, 34:22, 34:23, 35:4
walk [1] - 40:7
Walker [2] - 22:22, 23:3
wants [1] - 7:21
warranty [1] - 21:21
Washington [2] - 2:4, 2:14
waste [1] - 17:3
ways [5] - 13:2, 17:25, 18:2, 18:18, 21:7
weigh [1] - 19:15
weight [1] - 23:9
weighted [1] - 19:14
welcome [1] - 12:14
whole [6] - 10:14, 13:6, 28:3, 30:3, 38:2, 38:8
willful [1] - 36:1
Wilmington [1] - 1:11

withdraw [1] - 25:4
witnesses [1] - 11:19
wondering [1] - 36:11
word [7] - 3:25, 4:2, 17:24, 19:18, 21:1, 30:9, 30:19
words [4] - 10:20, 13:21, 23:13, 28:3
works [2] - 19:21, 20:19
world [11] - 4:8, 4:9, 7:20, 7:21, 7:22, 7:25, 8:17, 8:22, 9:5, 9:7, 22:6
worse [1] - 26:25

Y

year [3] - 6:25, 7:1, 7:7
years [9] - 5:16, 26:13, 29:9, 32:18, 33:1, 33:6, 34:21, 34:22, 35:5
yourself [1] - 30:13

Z

Zenith [3] - 15:21, 16:12, 24:18
ZF [1] - 1:4

EXHIBIT 3

REDACTED
IN ITS ENTIRETY

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

```
----------------------------x
ZF MERITOR LLC and MERITOR   :
TRANSMISSION CORPORATION,    :
                             :
          Plaintiff,         :  Civil Action No.
                             :    06-623-SLR
     vs.                     :
                             :
EATON CORPORATION,           :
                             :
          Defendant.         :
----------------------------x
```

CONFIDENTIAL

Washington, D.C.

Friday, January 9, 2009

Videotape Deposition of:

RICHARD MARTELLO,

the witness, was called for examination by counsel

for the Defendant, pursuant to notice, commencing

at 9:11 a.m., at the law offices of Dickstein

Shapiro LLP, 1825 Eye Street, Northwest,

Washington, D.C. 20006, before Dawn A. Jaques,
Certified Shorthand Reporter and Notary Public in
and for the District of Columbia, when were
present on behalf of the respective parties.
```
--------------------------------------------------
              DIGITAL EVIDENCE GROUP
           1111 16th Street, NW Suite 410
               Washington, DC  20036
                  (202) 232-0646
```

776d4e51-238a-48e2-8a9a-0079ed29673
000139

1/9/2009      ZF Meritor LLC et al v. Eaton Corporation Richard Martello
Confidential

---

Page 2

1    APPEARANCES:
2       On behalf of the Plaintiff:
3          JENNIFER DUNCAN HACKETT, ESQ.
4          BRUCE HOLCOMB, ESQ.
5          Dickstein Shapiro LLP
6          1825 Eye Street, N.W.
7          Washington, D.C.  20006-5403
8          PHONE:  (202) 420-4413
9          FAX:   (202) 420-2201
10         E-MAIL: Hackettj@dicksteinshapiro.com
11
12      On behalf of the Defendant:
13         JOSEPH A. OSTOYICH, ESQ.
14         Howrey LLP
15         1299 Pennsylvania Avenue, N.W.
16         Washington, D.C.  20004-2402
17         PHONE:  (202) 383-7241
18         FAX:   (202) 383-6610
19         E-MAIL: Ostoyichj@howrey.com
20
21      VIDEOGRAPHER:  Billy Fahnert
22

---

Page 3

1          I-N-D-E-X
2    WITNESS:              PAGE:
3    RICHARD MARTELLO
4       Examination by Mr. Ostoyich ...... 7
5          E-X-H-I-B-I-T-S
6    MARTELLO DEPOSITION EXHIBIT:      PAGE:
7    No. 1    April 24, 1997 Internal Letter .. 59
8    No. 2    June 3, 1998 letter to James
            Orchard from Rick Martello ...... 76
9
     No. 3    Supply Agreement .... 87
10
     No. 4    ZF Meritor Joint Venture
11         Presentation to Corporate Officers,
           January 22, 1999 ............... 93
12
     No. 5    ZF Meritor Joint Venture PowerPoint
13         Presentation ................... 99
14   No. 6    Meritor Board of Directors
           PowerPoint Presentation ........ 118
15
     No. 7    June 9, 1999 PowerPoint
16         Presentation ................... 130
17   No. 8    July 13, 2000 ZF Meritor Board of
           Directors Meeting .............. 154
18
     No. 9    July 13, 2000 Transmissions
19         PowerPoint Presentation ........ 172
20   No. 10   ZF Meritor 2001-2005 Strategic
           Business Plan ................. 179
21
     No. 11   February 13, 2001 e-mail string . 198
22

---

Page 4

1          INDEX (Continued)
2          E-X-H-I-B-I-T-S
3    MARTELLO DEPOSITION EXHIBIT:       PAGE:
4    No. 12   March 15, 2001 Internal Letter
           to T. Gosnell, et al., from
5          Rick Martello, RE:  2001 Activity
           Report ........................ 209
6
     No. 13   April 3, 2001 ZF Meritor Board of
7          Directors Meeting ............. 213
8    No. 14   October 3 - 9, 2001 e-mail string  220
9    No. 15   December 11 - 13, 2001 e-mail
           string ........................ 228
10
     No. 16   March 11, 2002 Memorandum to Rick
11         Martello, et al., from Mike
           Colaccino, RE:  Transmission
12         Failure Rate ................... 238
13   No. 17   July 3, 2002 ZF Meritor Board of
           Directors Meeting .............. 245
14
     No. 18   July 3, 2002 PowerPoint Presentation
15         for Board of Directors ......... 248
16   No. 19   Notice of Membership Interest
           Purchase Agreement .............. 258
17
     No. 20   November 12, 2002 ZF Meritor Board
18         of Directors Meeting ........... 262
19   No. 21   July 15, 2003 PowerPoint
           Presentation for Board Meeting .. 268
20
     No. 22   November 14 - 17, 2003 e-mail
21         string ........................ 290
22   No. 23   April 16, 2003 e-mail .......... 308

---

Page 5

1          INDEX (Continued)
2          E-X-H-I-B-I-T-S
3    MARTELLO DEPOSITION EXHIBIT:       PAGE:
4    No. 24   "Product Presentation" PowerPoint
           Presentation ................... 308
5
     No. 25   April 16 - 19, 2003 e-mail string  328
6
     No. 26   Revision:  ArvinMeritor Clarifies
7          Statement on Transmission's
           Availability ................... 335
8
     No. 27   ZFM Situation Overview ......... 336
9
     No. 28   December 12, 2003 letter to Paul
10         Barkus from Dennis Kline ....... 343
11   No. 29   December 12, 2003 letter to
           Friedrich Baumann from Dennis
12         Kline .......................... 345
13   No. 30   January 16, 2004 e-mail to Rolf
           Lutz, et al., from Charles Allen,
14         RE:  FreedomLine at Freightliner  346
15
16
17
18
19
20
21
22

2 (Pages 2 to 5)

776d4e51-238a-48e2-8a9a-0079ed29673
000140

Page 6

1      PROCEEDINGS
2          THE VIDEOGRAPHER:  We are on the record.
3   This is the videotape deposition of Rick Martello.
4   My name is Billy Fahner.  I am the videographer
5   here today.  The court reporter is Dawn Jaques.
6   We both represent Digital Evidence Group, located
7   in Washington, D.C.
8          This deposition is being recorded in the
9   matter of ZF Meritor LLC, et al., versus Eaton
10  Corporation, in the United States District Court
11  for the District of Delaware, Case No. 06-623 SLR.
12         Today's date is January 9th, 2009.  The
13  time on the camera is 8:56 a.m.
14         Will counsel please identify yourselves
15  for the record and the witness may be sworn in.
16         MR. OSTOYICH:  Joe Ostoyich from Howrey
17  LLP for Defendant Eaton Corporation.
18         MS. DUNCAN HACKETT:  Jennifer Hackett
19  from Dickstein Shapiro, LLP, for Plaintiffs.
20         MR. HOLCOMB:  Bruce Holcomb from Adams
21  Holcomb, LLP.
22

Page 7

1   Whereupon,
2          RICHARD MARTELLO
3      was called as a witness, after having been
4      first duly sworn by the Notary Public,
5      was examined and testified as follows:
6   EXAMINATION BY COUNSEL FOR THE DEFENDANT
7      BY MR. OSTOYICH:
8   Q   Mr. Martello, good morning.
9   A   Good morning.
10  Q   Can you for the record and for the court
11  reporter, can you state your full name and your
12  home and your work addresses for me?
13  A   My name is Richard Martello.  My home
14  address is 200 Plantation Drive, Southern Pines,
15  North Carolina.  I am retired, so it is also my
16  work address.
17  Q   Well, congratulations.  So you're not
18  currently employed?  You're not doing any
19  consulting or any type of work?
20  A   Been retired for four and a half years.
21  Q   Play golf down there?
22  A   I play just about every day.

Page 8

1   Q   I've seen your job history on some of
2   the documents that the plaintiffs produced in the
3   case, but I want to make sure I've got a general
4   understanding.
5          Now, I understand your education is an
6   engineering background.  You've got a degree in
7   engineering?
8   A   A bachelor's degree in engineering and a
9   master's degree in business administration with a
10  major in finance.
11  Q   What, what sort of engineer are you,
12  sir?
13  A   Industrial engineer.
14  Q   And where did you get your bachelor's
15  degree in industrial engineering?
16  A   General Motors Institute, Flint,
17  Michigan.
18  Q   And did you subsequently work for
19  General Motors after getting that degree?
20  A   Worked for them for five years as a
21  co-op and one year -- one, one and a half years
22  after that.

Page 9

1   Q   And what were your positions?  What sort
2   of job were you doing for General Motors?
3   A   I worked as a computer analyst.
4   Q   When did you get your bachelor's degrees
5   in industrial engineering?
6   A   I guess in 1968.
7   Q   And so you worked for GM after that
8   from '68 to about '74 or so?
9   A   Yeah -- no.  Somewhere in there, yeah,
10  about 1970, I would think.
11  Q   And where did you go after that
12  position?
13  A   Spent a few years at Burroughs
14  Corporation in Detroit.  Then I went to a company
15  called Gemini that made the General Motors motor
16  home.  Then the energy crisis hit and knocked us
17  out of business, and I went to work for Rockwell
18  International.
19  Q   Were you working in the axle business at
20  that time or somewhere else?
21  A   No.  I started at the headquarters in
22  Detroit, Michigan, as a manufacturing specialist,

3 (Pages 6 to 9)

776d4e51-238a-48e2-8a9a-0079ed29673
**000141**

Page 10

1  and then went to work for brake division in
2  Ashtabula, Ohio.  Then I moved into front axles
3  and rear axles.  Moved probably eight, ten times
4  for Rockwell.
5     Q   And what -- generally, what were your
6  positions?  Were you on the engineering side of
7  the --
8     A   No, I was always in operations.  I went
9  from manufacturing engineer to manufacturing
10 engineering manager to operation manager to plant
11 manager, and was a plant manager in two different
12 plants.
13        Then went to -- went to headquarters in
14 1988 as a General Manager in the Axle Division,
15 Manufacturing Manager in the Axle Division.  And
16 then through various reorganizations, was Vice
17 President of Worldwide Manufacturing for a while;
18 was General Manager of Axles; General Manager of
19 Transmissions, Clutches and Drivelines; Vice
20 President of Engineering and Purchasing; numerous
21 jobs while I was still working in Troy.
22        Then in, let's see, 1995, I became

Page 11

1  General Manager of Transmission, Clutches and
2  Drivelines.  And then when we formed a joint
3  venture in '99, became president of ZF Meritor.
4     Q   Let me ask you a little bit about your
5  position as the General Manager of Transmission,
6  Clutches and Drivelines.
7        What did that entail?  Were you involved
8  in the sales and marketing of those products, or
9  was it the operation, manufacturing and
10 operations?
11    A   The main -- your main -- your main
12 function was operations and marketing.  We
13 have -- Rockwell/ArvinMeritor always had a
14 centralized sales and marketing group, and always
15 had a centralized purchasing-type group,
16 purchasing logistics, so your main
17 responsibilities were the operations side and the
18 engineering side, but you were expected to -- you
19 had the profitability control, so you were
20 expected to interface with the sales and marketing
21 and purchasing group.
22    Q   In terms of decision making at that

Page 12

1  time, when you were the GM of the Transmissions,
2  Clutches and Drivelines for Rockwell, was it your
3  responsibility to determine what products to make
4  and how to price them, or would that have been the
5  sales and marketing folks?
6     A   It was always a combined effort, but the
7  final decision was -- the final decision was the
8  responsibility of the general manager.
9     Q   Just so we're clear, that was --
10    A   Plus, you know, with concurrence with
11 his boss too.  Sales could always take it to the
12 next level, and we would argue about it.
13    Q   Right.  Who did you report to at that
14 time when you were the GM of Transmissions,
15 Clutches and drivelines?
16    A   Prakash Mulchandani.
17    Q   And he was the President with the Heavy
18 Vehicle Systems at that time?
19    A   I think that's what it was called at the
20 time.
21    Q   Was that position as the GM of
22 Transmissions, Clutches and Drivelines, when you

Page 13

1  took that position I guess in '95 or so, was that
2  the first transmission/clutch responsibility you
3  had had with the company?
4     A   Yes.
5     Q   Tell me a little bit about -- I know
6  this is going way back in your memory, especially
7  since retirement probably forgotten some of this,
8  but tell me a little about it about the products,
9  the transmission products the company made at the
10 time.  I know that the company had manual
11 transmissions in the mid '90s.  Is that fair?
12    A   The basic product line, they started
13 with in 1989 was 9-speed manual, a 10-speed
14 manual, and a low-torque 13-speed manual.
15    Q   Okay.  And had that changed by the time
16 you got there in '95 to the position as General
17 Manager of Transmissions, Clutches and Drivelines?
18    A   No, product line.
19    Q   When you say low-torque 13-speed, what's
20 a low-torque 13-speed?
21    A   Well, every product has various torque
22 ranges.  We only had a 13-speed that worked --

4  (Pages 10 to 13)

776d4e51-238a-48e2-8a9a-0079ed29673

000142

Page 14

1  belonged in the lower torque ranges.
2     Q   What sort of truck applications was that
3  most suited for, the low-torque 13-speed?
4     A   It worked in a class 8 truck, but in
5  just certain applications.
6     Q   Give me an example.  What sort of
7  applications would a low-torque 13-speed be best
8  suited for?
9     A   Off the top of my head, I can't think of
10  one right now, but --
11     Q   Low torque, I take it that's, what, like
12  1150 foot pounds or 1400 or so?
13     A   I think it was 1250 -- 1350, I think.
14  But that's --
15     Q   Did the company have any high-torque 13
16  speeds above 1450?
17     A   No.
18     Q   What about LL trucks?  Did the company
19  have any LL transmissions -- did the company have
20  any LL transmissions when you got there?
21     A   No.
22     Q   15-speeds, 18-speeds, 20-speeds?

Page 15

1     A   No.
2     Q   You said you became the President of the
3  joint venture between Meritor and ZF/AG; is that
4  correct?
5     A   That's correct.
6     Q   And what were your responsibilities as
7  the President of the ZF Meritor joint venture?
8     A   I was responsible for the total
9  operation.  We had one plant, which was in
10  Laurinburg, North Carolina, so I had the
11  operations side.  Again, as plant manager there,
12  the human resources for the -- the financial
13  controller.
14        We had our own purchasing, project
15  management and we had a small engineering group
16  that interfaced with both Meritor and mainly ZF.
17        And we had a small marketing and service
18  group that interfaced with Meritor, sales and
19  marketing service group.
20     Q   Just so I'm clear, so you said you had a
21  small engineering group.  What do you mean by
22  "small"?  How small an engineering group was it at

Page 16

1  ZF Meritor?
2     A   I think we had -- I'd be guessing.  It
3  was more than 10, less than 50, okay?
4  Somewhere --
5     Q   Fair enough.  And that -- was Dean Molde
6  in charge of that engineering group?
7     A   Yes.
8     Q   And then you said you had a small
9  marketing and service organization that interfaced
10  with the Meritor sales and marketing team.  And
11  roughly how small was the marketing and service
12  group at ZF Meritor?
13     A   Between five and ten people.
14     Q   And was Charlie Allen the head of that
15  group?
16     A   Yes.
17     Q   And I take it the responsibility for --
18  for selling and marketing the transmissions of
19  ZF Meritor was really the ArvinMeritor sales and
20  marketing force who was responsible for that.  Is
21  that fair?
22     A   That's correct.

Page 17

1     Q   And that's Mr. Kline's organization,
2  Dennis Kline?
3     A   That's correct.
4     Q   Now, ZF Meritor, did ZF Meritor roll out
5  a high-torque 13-speed transmission during your
6  tenure there?
7     A   No.
8     Q   And what about an LL transmission?
9     A   We had -- at the end, we had an LML and
10  a 10D or 10C -- I can't remember the exact
11  terminology -- that we were bringing out towards
12  the end of the joint venture, yes.
13     Q   When you say "towards the end of the
14  joint venture," what do you mean?
15     A   Within the last year or so.  It had been
16  designed and tested, and I don't remember if we
17  had sold any or many.
18     Q   Do you remember whether it was
19  commercialized and sold at all?
20     A   No, I don't.
21     Q   What about a 15-speed or an 18-speed?
22  Did ZF joint venture commercialize a 15-speed or

5 (Pages 14 to 17)

Page 18

1   18-speed transmission?
2       A   Not of our own, no.
3       Q   Did you commercialize somebody else's
4   15-speed or 18-speed transmission?
5       A   We quoted 13- and 18-speeds in
6   conjunction with TTC a couple times.
7       Q   Okay, but you didn't -- you didn't
8   manufacture -- ZF Meritor didn't manufacture its
9   own 13s, 15s and 18s?
10      A   That's correct.
11      Q   I want to go back to your job history
12  for a second.
13          So you were the President of the
14  ZF Meritor joint venture when it was formed
15  in '99, and then how long did you continue as the
16  President of the joint venture?
17      A   Until approximately April of 2004, when
18  it was disbanded.
19      Q   And where did you go from that position?
20      A   I stayed with Meritor until the end of
21  the fiscal year and retired at the end of
22  September 2004.

Page 19

1       Q   Just so I'm clear, so the Meritor fiscal
2   year ended in September 2004, and you retired
3   after that?
4       A   I did.
5       Q   And have you stayed retired after that,
6   or have you worked since then?
7       A   I'm retired ever since then.
8       Q   I want to go back to this -- the period
9   we talked about earlier.  You were the General
10  Manager of the Transmission, Clutch and Driveline
11  business for Rockwell, and then Meritor.
12          I've seen a lot of documents in the
13  company's files where you're advocating to
14  management of the Meritor organization, and then
15  the joint venture Board as well, commercial --
16  designing and commercializing some of these other
17  transmission products that you didn't have at the
18  time alone: an LL, and a 13, 15 and 18.
19          Is that a fair characterization?
20      A   Yes.
21      Q   And what generally -- it looks like you
22  think those transmissions are necessary to meet

Page 20

1   what the customers what, what the OEM customers
2   want for certain truck applications; is that fair?
3       MS. DUNCAN HACKETT:  Objection.
4       THE WITNESS:  I think it was necessary
5   for us to have a full line of product in the long
6   term, yes.
7       BY MR. OSTOYICH:
8       Q   And I saw some -- viewed some requests
9   that you made for what was then the Rockwell or
10  Meritor management to authorize you to spend money
11  to build out or buy transmissions -- the assets
12  that would allow you to have 13, 15 and 18
13  multispeed transmissions; is that fair?
14      A   You'd have to rephrase that question a
15  little bit.
16          During the period it was Rockwell, you
17  would have seen documents for us to purchase the
18  Mack business, which would have given us other
19  products.
20          It would not have been until it was
21  either Meritor or ZF Meritor that you would have
22  seen appropriations for us to start spending money

Page 21

1   to develop something of our own.
2       Q   So just so we're clear on the record,
3   prior to the joint venture when you were the
4   General Manager of the Transmission, Clutch and
5   Driveline business with Rockwell/Meritor, you
6   looked at potentially purchasing the Mack
7   transmission line?
8       A   That's correct.
9       Q   And that -- at that time, what did that
10  include?  Was that 13-, 15- and 18-speed
11  transmissions?
12      A   I'm not -- it included everything that
13  Mack made.  Off the top of my head, I couldn't
14  name all of them, but certainly 13s and 18s were
15  part of it.
16      Q   Did you at that time, when you were the
17  General Manager of the Transmission, Clutch and
18  Driveline business with Rockwell and Meritor, did
19  you consider expending your own internal resources
20  to build -- design and build and manufacture and
21  commercialize 13s, 15s and 18s?
22      A   We felt if we could do it another way

6 (Pages 18 to 21)

1/9/2009        ZF Meritor LLC et al v. Eaton Corporation Richard Martello
Confidential

Page 22

1  than spend the resources to do it our self, we
2  would be better off.
3      Q   Why is that?
4      A   Because it took people resources,
5  capital resources, and time to do it.
6      Q   I take it the company at the time made a
7  decision it didn't want to spend the people
8  resources, capital resources, and other resources
9  required to do that?
10      MS. DUNCAN HACKETT:  Objection.
11      THE WITNESS:  It was a new -- it was a
12  new business with products that it was trying to
13  bring to market and gain share with, and that was
14  the focus.  We just felt we couldn't focus on too
15  many things at the same time.
16      BY MR. OSTOYICH:
17      Q   Okay.  And what about when you became
18  the President of the ZF Meritor joint venture, I
19  saw that you told the Board a number of times that
20  you thought the company should, somewhere or
21  another, figure out a way to offer 13s, 15s and
22  18s and LL transmissions.  Is that fair?

Page 23

1      A   To answer your exact question, no.
2      Q   Okay.  Go ahead.  Tell me what I didn't
3  get right in my question.
4      A   We had discussions on certainly 13s
5  and 18s in some form of a transmission that met
6  the L-type categories.
7      Q   When you say you had discussions, what
8  do you mean you had discussions?  Were they
9  discussions with the Board of Directors of
10  ZF Meritor?
11      A   Yes.
12      Q   And what discussions were you advocating
13  that the company -- that ZF Meritor joint venture
14  company that you were the president of, design --
15  allocate resources to design, build, manufacture,
16  and ultimately commercialize LL, 13s and 18
17  transmissions?
18      A   It was always considering various ways
19  of fulfilling the product line, whether it was
20  working with TTC or developing something our self,
21  or using what ZF had because ZF had tremendous
22  technology.

Page 24

1      We would consider any -- talked about
2  and considered all of the resources in any way,
3  shape or form.
4      Q   Did the Board of ZF Meritor, while you
5  were there -- looks like they did not agree with
6  your proposal to ultimately develop LLs, 13s
7  and 18s?
8      A   We -- they agreed with the necessity,
9  and one time approved funds to start developing
10  some of the products.
11      It wasn't a matter of they didn't agree
12  with it; it was a matter of timing.
13      Q   What do you mean --
14      A   Timing and resources.
15      Q   What do you mean it was a matter of
16  timing and resources?
17      A   Again, we had a lot on our plate.  We
18  had a lot to be doing.  As soon as the -- as soon
19  as the joint venture started, our number one focus
20  was to bring out the FreedomLine, and that meant
21  12-speeds and 16-speeds, neither of which anybody
22  in the United States ever saw before.  That meant

Page 25

1  17-inch clutches, which nobody in the United
2  States used for a long time.
3      So it was a -- we had a lot on our plate
4  for the size of the organization, so you can only
5  do so much, and that's what we were doing.
6      Q   So I take it a decision was made at the
7  Board level, and presumably you were involved in
8  it, to focus the company's resources on rolling
9  out the FreedomLine, the 12-speed and the 16-speed
10  and put on the back burner LLs, 13s, 15s, 18s, and
11  whatever else -- whatever other type of
12  transmission?
13      MS. DUNCAN HACKETT:  Objection.
14      THE WITNESS:  Decisions were made at the
15  Board that the company only had a certain amount
16  of resources and a certain amount of -- those
17  resources had to be used to the best of our
18  ability to use them, yes.
19      BY MR. OSTOYICH:
20      Q   And so the focus was on the FreedomLine
21  12- and 16-speed rather than on developing some of
22  these other transmission products?

7 (Pages 22 to 25)

Page 26

1    A   At the time, yes.
2    Q   Let me ask you a little bit more about
3  your responsibilities as the President of the
4  joint venture.
5        So in terms of the pricing of the
6  products you had -- and the joint venture, I guess
7  at that time, still had 9- and 10-speed manuals,
8  correct?
9    A   Correct.
10   Q   And then you had the FreedomLine, which
11 was -- when the joint venture was formed, was
12 going to be introduced to the U.S., North America,
13 about a year after the formation of the joint
14 venture; is that fair?
15   A   Correct.
16   Q   Who decided the pricing of the products?
17 Was that your responsibility, or would that have
18 been the ArvinMeritor sales and marketing?
19   A   The ultimate responsibility was within
20 ZF Meritor.
21   Q   And where within?  Was that your
22 responsibility or somebody else's?

Page 27

1    A   Yes, it ended up with me, yes.  It ended
2  up with the Board, but it would be my
3  recommendation to the Board as to what --
4    Q   And were you responsible for negotiating
5  that with OEMs over those prices, or would that
6  have been the Dennis Kline ArvinMeritor sales and
7  marketing team?
8    A   Dennis Kline's team would be the main
9  negotiator.
10   Q   When you say their main negotiator,
11 ultimately whose responsibility was it to
12 negotiate?
13   A   If -- if he needed Charlie Allen's
14 involvement or my involvement or any involvement
15 from ZF Meritor, we would be there to help him.
16   Q   But ultimately it was Mr. Kline's team's
17 responsibility to negotiate with the OEMs to sell
18 transmissions and clutches?
19   A   Yes.
20   Q   And what about with the fleets?  Did you
21 have any interaction with fleets or responsibility
22 for interacting with fleets when you were the

Page 28

1  President of the joint venture?
2    A   Again, it was the field sales and
3  service force that had the contact responsibility.
4        If they needed assistance from myself or
5  Charlie Allen or one of the service people, they
6  would ask for it.
7    Q   But it was the North American field
8  organization of ArvinMeritor that was directly
9  responsible for dealing with the fleets?
10   A   That's correct.
11   Q   When you got into the position as
12 General Manager of Transmissions, Clutches and
13 Drivelines with Rockwell/Meritor, were the -- were
14 the company's 9- and 10-speed manual
15 transmissions, was that the F platform at that
16 time?
17   A   I don't remember.  I don't remember the
18 terminology at that point in time.
19   Q   Fair enough.  Did the company's
20 transmissions, 9- and 10-speed manual
21 transmissions when you got there, were there
22 warranty problems with those products?

Page 29

1        MS. DUNCAN HACKETT:  Objection.
2        THE WITNESS:  When I took over, we were
3  finishing up a recall on a bearing.
4        BY MR. OSTOYICH:
5    Q   Okay.  What do you mean, when you were
6  finishing up recall on a bearing?  What do you
7  mean by that?
8    A   We had a bearing -- one of the -- we
9  had -- we had problems with a bearing, and we --
10 ArvinMeritor recalled them.  We had a field fix
11 for them, so we fixed all the ones that were in
12 the field.  That's when I took over the business.
13   Q   Okay.  Let me make sure I'm clear.
14   A   It started before I became President,
15 and then finished after I became President.
16   Q   Fair enough.  So was one of your
17 responsibilities when you became General Manager
18 of the Transmission, Clutch and Driveline business
19 to finish up that recall of the bearings issue?
20   A   Yes, it would have been one of them.
21   Q   Tell me a little bit about it.  You said
22 recall on bearings.  Bearings used in the

8 (Pages 26 to 29)

776d4e51-238a-48e2-8a9a-0079ed29673

000146

Page 30

1    company's 9- and 10-speed manual transmissions?
2        A    A particular bearing, yes.
3        Q    And what was the problem with the
4    bearing?
5        A    It's been too long.
6        Q    Fair enough.  But it was a problem, I
7    guess, that was causing transmission problems in
8    the field with fleets driving trucks with your
9    transmissions?
10       A    Yes.
11       Q    And I take it it was systemic?  It was
12   across the board with all of the transmissions
13   that had those bearings in them?
14       A    Yes.
15       Q    Was that 9- and 10-speed transmissions
16   that had the recall, or --
17       A    I believe so.
18       Q    And was it all the company's
19   transmissions, or was it a certain portion of the
20   9- and 10-speed family?
21       A    All of them.
22       Q    You said -- you used the term "recall."

Page 31

1    You said that the transmissions were recalled.
2    What do you mean by recall?
3        A    There was a specific -- specific
4    notification went out to all users, owners,
5    fleets, that said we have this problem, we have a
6    solution for it, you are to bring -- schedule with
7    our field people to bring them in at your
8    convenience, and we will fix them and pay for the
9    fix.
10       Q    You said you were -- when you became the
11   General Manager of that business, that you were
12   finishing up that recall.  What do you mean,
13   "finishing up"?  Obviously, it was in the works.
14       A    Well, it started before I -- it was
15   announced before I took over and finished up after
16   I took over.
17       Q    And so you took over in mid '95.  How --
18   how long after you took over did it take before
19   the recall was finished?
20       A    I don't remember.
21       Q    Well, I'm trying to get a sense.  Was it
22   a week or was it six months or a year?

Page 32

1        A    It was more than a week, less than a
2    year.
3        Q    I take it, Mr. Martello, that that
4    recall of the Rockwell/Meritor 9- and 10-speed
5    manual transmissions created difficulties with
6    OEMs and fleets, made it harder to sell the
7    product.  Is that fair?
8            MS. DUNCAN HACKETT:  Objection.
9            THE WITNESS:  To my knowledge, we had no
10   fleet or -- leave because of the problem.
11           BY MR. OSTOYICH:
12       Q    Slightly different than my question.  My
13   question is did it create difficulties on an
14   ongoing forward basis with trying to sell the
15   products you had after you did the recall of all
16   the 9- and 10-speed manual transmissions?
17       A    I would say no.  It was not uncommon in
18   the marketplace to have product fixes, product --
19   whether -- any part of a truck.
20           So I -- I mean, fleets -- it was not an
21   unusual situation for the fleets.
22       Q    Let me make sure I get your testimony

Page 33

1    right.
2            So it was not unusual to have recalls of
3    transmissions that were out in trucks that had
4    been operating on the highways?
5            MS. DUNCAN HACKETT:  Objection.
6            THE WITNESS:  I didn't say that.
7            I said it was not unusual for the fleets
8    to have field problems and fixes to field
9    problems.  Whether you call it a recall, or
10   however you do it -- "fixes fail" is another term
11   that was used in the market, but notification of
12   fleets by suppliers in the market was not totally
13   unusual.
14           BY MR. OSTOYICH:
15       Q    Fixes the -- you used the term "fixes
16   fail."  Is that synonymous with recall?
17       A    I would say no.
18       Q    Okay.  What did you mean by fixes fail,
19   then?
20       A    A recall to me would mean you told
21   somebody to fix it before it failed or that you
22   felt it was going to fail, and you told them to

9 (Pages 30 to 33)

776d4e51-238a-48e2-8a9a-0079ed29673
000147

Page 34

1  fix it.  Fixes fail would mean we have this
2  problem, here's the fix, but you'll have to do it
3  until it fails.
4      Q    Give me an example of a major fleet
5  customer that the company had for its transmission
6  products then.
7            Was Ryder one of the big customers,
8  fleet customers?
9      A    Yes.
10     Q    Ryder -- what sort of fleet are they?
11 Are they a leasing company or are they --
12     A    Mainly a leasing company.
13     Q    And was that one of the company's major
14 transmission customers at that time?
15     A    Yes.
16     Q    Can you give me an idea of the order of
17 magnitude.  Are we talking thousands of
18 transmissions that Ryder was -- Ryder trucks had
19 Meritor transmissions?
20     A    Eventually, yes.
21     Q    And am I right, Mr. Martello, that they
22 were -- Ryder was roughly 30, 40 percent of the

Page 35

1  company's transmission business at the time?
2      A    I don't remember.  It was a large
3  portion, but I don't remember the percentage.  I'd
4  have to look it up.
5      Q    Fair enough.  But a large portion, Ryder
6  by itself was 20, 30 percent of the company's
7  transmission business?
8            MS. DUNCAN HACKETT:  Objection.
9            THE WITNESS:  I don't want to give a
10 percentage.
11           BY MR. OSTOYICH:
12     Q    Were they the number one customer?
13     A    At a point in time, yes.
14     Q    Did Ryder have to return trucks to fix
15 the 9- and 10-speed manual transmissions with the
16 bearing problems as part of the recall?
17     A    Yes, they would have.
18     Q    And did it have to return thousands of
19 trucks to fix those bearing problems?
20     A    I don't believe they had thousands at
21 that time.
22     Q    And did the company lose Ryder business

Page 36

1  at some point after their recall?
2            MS. DUNCAN HACKETT:  Objection.
3            THE WITNESS:  To the best of my
4  recollection, we always had some amount of Ryder
5  business.
6            BY MR. OSTOYICH:
7      Q    Did your Ryder business decrease
8  substantially after the recall?
9      A    After the recall?  Right after the
10 recall?  No.
11     Q    At any time after the recall.
12     A    I don't believe the recall had anything
13 to do with the loss of business.
14     Q    But the company did lose a substantial
15 amount of Ryder business after recall of all of
16 its 9- and 10-speed manual transmissions; is that
17 fair?
18           MS. DUNCAN HACKETT:  Objection.
19           THE WITNESS:  It lost some of the
20 business after 1996, yes.
21           BY MR. OSTOYICH:
22     Q    You lost a substantial amount of the

Page 37

1  Ryder business, right?
2            MS. DUNCAN HACKETT:  Objection.
3            MR. HOLCOMB:  Objection.
4            THE WITNESS:  To the best of my
5  knowledge, yes.  Ryder was a contract that was
6  quoted every few years.
7            BY MR. OSTOYICH:
8      Q    When the next contract came up, you got
9  much less of their business?
10     A    I don't remember which -- at which point
11 in time that we lost some of the business.  I
12 don't remember.
13     Q    '98, 99 time frame?
14     A    I don't remember.
15     Q    But you do recall that sometime after
16 the recall, you lost a lot of the Ryder business?
17           MS. DUNCAN HACKETT:  Objection.
18           THE WITNESS:  Probably after 1996, yes.
19           BY MR. OSTOYICH:
20     Q    Have you done any -- we can go back to
21 your job history.
22           Have you done any consulting work at all

10 (Pages 34 to 37)

776d4e51-238a-48e2-8a9a-0079ed29673
000148

1/9/2009          ZF Meritor LLC et al v. Eaton Corporation Richard Martello
Confidential

Page 38

1  with ArvinMeritor or any Meritor organization
2  since you retired in September of '04?
3      A   The only -- the only work I have done
4  with ArvinMeritor since I retired is give
5  depositions in different cases.
6      Q   But you're not -- you're not doing any
7  consulting on an ongoing basis since your
8  retirement?
9      A   No.
10     Q   You made a clean break in September '04?
11     A   (No audible response.)
12     Q   You said you've given depositions in
13  cases.  What sort of cases?
14     A   Patent infringement cases.
15     Q   The complaint -- you left the joint
16  venture -- you retired from the company in
17  September of '04.
18         The complaint in this case was filed in
19  October of 2006, after you left the company.
20         Were you involved at all in authorizing
21  the complaint in this case?
22     A   No.

Page 39

1      Q   Were you involved in any decision on
2  whether to file a complaint in this case?
3      A   No.
4      Q   Were you involved in drafting the
5  complaint in this case?
6      A   No.
7      Q   Were you interviewed as part of the
8  drafting of the complaint in this case?
9         MS. DUNCAN HACKETT:  Objection.
10        THE WITNESS:  I honestly don't know.
11        BY MR. OSTOYICH:
12     Q   Were you consulted at all about whether
13  the company should file this lawsuit?
14     A   No.
15     Q   Did you see a draft of the complaint
16  before it was filed in the case?
17     A   No.
18     Q   Have you seen a draft of the complaint
19  since it was filed?
20     A   I've seen the complaint.
21     Q   And tell me about that.  When is the
22  first time you saw the complaint in the case?

Page 40

1      A   I don't remember.  A year and a half,
2  maybe two years ago.
3      Q   So sometime after it was filed, though,
4  you saw something that had already been submitted
5  to the court?
6      A   I saw something that hadn't been filed.
7      Q   Did you in the -- were you at all
8  consulted or did you provide any input that was in
9  the complaint that you saw?
10        MS. DUNCAN HACKETT:  Objection.
11        THE WITNESS:  Again, I don't know
12  whether I was consulted or talked to before or
13  after the complaint was drafted.
14        BY MR. OSTOYICH:
15     Q   You just don't remember one way or
16  another; is that right?
17     A   No.
18     Q   Now, when you were the President of the
19  joint venture, did you authorize the filing of any
20  kind of a complaint?
21     A   No.
22     Q   Were you consulted about that?

Page 41

1      A   No.
2      Q   Were you asked by lawyers, back when you
3  were the President of the joint venture, to
4  preserve documents that might be relevant to any
5  lawsuit?
6      A   Any lawsuit?
7      Q   Any --
8      A   While I was President, there was a --
9  actually two lawsuits and an FTC investigation
10  going on, yes.
11     Q   Patent lawsuits?
12     A   Patent lawsuits, all of them.
13     Q   What about asked to preserve documents
14  related to antitrust lawsuit?
15     A   No.
16        MS. DUNCAN HACKETT:  Objection.
17        BY MR. OSTOYICH:
18     Q   Were you involved, Mr. Martello, as
19  President of the -- of the joint venture, in any
20  letters that ArvinMeritor sent to Eaton claiming
21  that its conduct violated the antitrust laws?
22     A   No.

11 (Pages 38 to 41)

776d4e51-238a-48e2-8a9a-0079ed29673

000149

Page 42

1    Q   Were you consulted at all about any
2 letters about whether the company violated the
3 antitrust laws?
4    A   No.
5    Q   Have you had any ongoing involvement --
6 any involvement at all since your retirement with
7 the lawsuit, this lawsuit?
8       MS. DUNCAN HACKETT:  Objection.
9       THE WITNESS:  Discussions with my
10 lawyer -- with the lawyer.
11      BY MR. OSTOYICH:
12   Q   And I'm not going to ask you the
13 substance of what you talked about, but you said
14 discussions with your lawyer.
15      Have you had discussions prior to today
16 about the lawsuit?
17   A   Yes.
18   Q   And was that in preparation for the
19 deposition today, or for other purposes?
20   A   We had discussions yesterday, yes.
21   Q   Other than discussions yesterday with
22 your lawyer, have you had any other involvement in

Page 43

1 the lawsuit since your retirement?
2    A   Yes.
3    Q   And what kind of involvement?
4    A   We had discussions, and that's the time
5 frame that I told you I can't remember.  It was
6 maybe a year and a half, two years ago.  I don't
7 remember whether it was before or after the
8 complaint was filed.
9    Q   Fair enough.  How did you -- how did you
10 get a copy of the complaint?
11   A   From the lawyers.
12   Q   Did they mail it to you, or were you in
13 a face-to-face meeting?
14   A   E-mailed.
15   Q   E-mailed?  And did they e-mail you
16 drafts ahead of time?
17      MS. DUNCAN HACKETT:  Objection.
18      THE WITNESS:  No.
19      BY MR. OSTOYICH:
20   Q   Other than a meeting yesterday, did you
21 do anything else to prepare for today's
22 deposition?

Page 44

1    A   No.
2    Q   Have you had any discussions with any
3 ArvinMeritor or former ArvinMeritor employees
4 about the lawsuit?
5    A   No, not really about the lawsuit, no.
6       I have a very good friend that lives
7 close to me that worked for ArvinMeritor, and we
8 discussed that one was going on, but that's the
9 extent of it because he's not involved and never
10 was.
11   Q   Who -- who was that person?
12   A   A gentleman named Craig Pryor.
13   Q   Was he in the transmission business at
14 all?
15   A   A long time ago.
16   Q   When you received a copy of the
17 complaint via e-mail in this case, was it
18 surprising to you or had you been expecting a
19 lawsuit was going to be filed?
20      MS. DUNCAN HACKETT:  Objection.
21      THE WITNESS:  I can't say I was
22 surprised, can't say I wasn't.  I mean, I didn't

Page 45

1 know if one -- I didn't know anything about it.
2       The surprise was, if I had any surprise,
3 it was that I didn't know anything about it.
4       BY MR. OSTOYICH:
5    Q   What do you mean you didn't know
6 anything about it?
7    A   Well, I had no knowledge of it until it
8 was --
9    Q   Okay.  Yeah, that's what I'm trying to
10 get a sense -- you say you don't remember whether
11 you were consulted ahead of time or after the
12 fact.  I'm trying to get a sense if you had a
13 bunch of meetings, and then they said we're
14 thinking about drafting a complaint, can we
15 interview you and get information from you, and
16 then you got it in the e-mail, the actual
17 complaint that had been drafted; or whether it
18 came out of the blue, in a sense?
19      MS. DUNCAN HACKETT:  Objection.
20      THE WITNESS:  I know -- all I know is
21 that there was -- when I did have discussions,
22 there was no writing of a draft and looking at a

12  (Pages 42 to 45)

776d4e51-238a-48e2-8a9a-0079ed29673

000150

Page 46

1  draft or doing anything that would be considered a
2  draft.
3      BY MR. OSTOYICH:
4      Q   And I take it you weren't aware that
5  this was for purposes of a lawsuit, in other
6  words?
7      A   Oh, yes, I was aware of what the purpose
8  was, I remember that.  But I didn't -- it
9  wasn't -- like I say, I don't remember if it was
10  at a period of time when there was consideration,
11  or a period of time just after it was filed.  I
12  don't remember what that time frame was.
13     Q   Fair enough.
14     A   And it was strictly a one-day type of
15  meeting.  It wasn't a week-long meeting of any
16  kind.
17     Q   I'll ask you a little bit about the
18  joint venture.
19         I understand that the joint venture was
20  a separate company which was -- in a sense, it was
21  a subsidiary of ArvinMeritor and ZF/AG, the German
22  company; is that right?

Page 47

1      A   It was an LLC, yes.
2      Q   And it was owned by the two parent
3  companies, ArvinMeritor owned 50 percent of its
4  shares, and ZF/AG owned 50 percent of the shares,
5  is that fair?
6      A   50 percent of ArvinMeritor's was owned
7  by a company called Heavy-Duty Transmission
8  business, I think.
9      Q   Okay.  So the direct owner of the shares
10  of ZF Meritor was Heavy-Duty Transmission
11  business?
12     A   Something of that nature, yes.
13     Q   And then that company was owned by
14  ArvinMeritor?
15     A   Correct.
16     Q   And then I take it ZF/AG owned the other
17  50 percent?
18     A   To the best of my knowledge.  I don't
19  know if there was a subcompany to that.
20     Q   Did either of the parent companies --
21  did Meritor, ArvinMeritor or any Meritor
22  organization, directly own ZF Meritor, or was it

Page 48

1  just through the shareholdings?
2      A   I don't understand the question.
3      Q   I understand they were a shareholder,
4  right?
5      A   Uh-huh.
6      Q   Were Meritor employees -- were your
7  employees at ZF Meritor, were they employed by
8  your organization, ZF Meritor, or were they still
9  ArvinMeritor employees?
10     A   No.  They were ZF Meritor employees.
11     Q   So a complete, separate company, in
12  other words, the business had been divested into
13  the joint venture?
14     A   Yes.
15     Q   Mr. Martello, have you -- do you have
16  any agreements to appear at trial for the
17  plaintiffs in this case?
18         MS. DUNCAN HACKETT:  Objection.
19         THE WITNESS:  I have no signed documents
20  of any kind with plaintiffs, no.
21         BY MR. OSTOYICH:
22     Q   Okay.  And have you agreed orally or

Page 49

1  otherwise to appear at trial for the plaintiffs in
2  the case?
3          MS. DUNCAN HACKETT:  Objection.
4          THE WITNESS:  I have not been asked.
5          BY MR. OSTOYICH:
6      Q   And do you have any plans to appear at
7  trial?
8      A   Excuse me?
9      Q   Do you have any plans to appear at trial
10  of this case?
11     A   I have not been asked.
12     Q   But does that mean you don't have any
13  plans?
14         MS. DUNCAN HACKETT:  Objection.
15         THE WITNESS:  Yeah, at this time, I have
16  no plans.  I haven't been asked.
17         BY MR. OSTOYICH:
18     Q   Are you being compensated for your time
19  today?
20     A   Yes, hopefully.
21     Q   I'm sorry.  What did you say,
22  "hopefully"?

13 (Pages 46 to 49)

776d4e51-238a-48e2-8a9a-0079ed29673

000151

Page 50

1   A   Hopefully, yes.
2   Q   All right.  I take it it's not a done
3   deal?
4   A   Yeah, time and expenses, yes.
5   Q   And what are time and expenses?
6   A   Excuse me?
7   Q   How much is time and expenses?
8   A   My former contract with ArvinMeritor was
9   $125 an hour for time, plus extra expenses, but
10   that contract is actually over, so hopefully
11   they'll honor it.
12   Q   What -- I didn't realize you had a
13   contract.  So what was the contract you had for
14   $125 an hour with Meritor?
15   A   When I left the company, they -- I
16   signed a contract to help them if they needed
17   help.  The contract was a year -- a two-year
18   contract -- consulting agreement, contract,
19   whatever you want to call it.
20   Q   Okay.  So let me go back then because I
21   thought you said you didn't have any -- after you
22   retired, you made a clean break.

Page 51

1   A   I did not do anything -- I have not done
2   anything with them other than the depositions for
3   other lawsuits.
4   Q   So other than your time -- did you
5   charge $125 an hour for your time in the other
6   lawsuits?
7   A   Yes.
8   Q   Okay.  Other than that time, have you
9   done any consulting work with the company?
10   A   No.
11   Q   Why did you -- why did you leave the
12   joint venture in April of '04?
13   A   I had 31, almost 31 years with the
14   company, and the formula at which our retirement
15   is based made it advantageous for me to retire at
16   that time.
17   Q   Was your retirement voluntary, sir?
18   A   Yes.
19   Q   Mr. Martello, I asked you a little bit
20   about the bearings recall issue in the 9- and
21   10-speed manual transmissions.
22       Would you agree with me that the

Page 52

1   company's transmissions, when you were the General
2   Manager of the Transmission, Clutch and Driveline
3   business for Rockwell/Meritor, that the company's
4   transmissions had been plagued with warranty
5   problems?
6       MS. DUNCAN HACKETT:  Objection.
7       THE WITNESS:  They had no more warranty
8   problems than anybody else in the industry or any
9   other products in the industry.
10       BY MR. OSTOYICH:
11   Q   Would you agree with me that they've
12   been plagued with warranty problems?
13       MS. DUNCAN HACKETT:  Objection.
14       THE WITNESS:  You'd have to define what
15   you mean by "plagued."
16       BY MR. OSTOYICH:
17   Q   What did you mean by "plagued"?  What
18   does plagued typically mean to you?
19   A   What does it mean to me.  An ongoing
20   problem.
21   Q   Of severity, right?
22   A   Not necessarily severity.

Page 53

1   Q   Would you agree with me, then, that the
2   company's transmissions had been plagued with
3   ongoing warranty problems?
4       MR. HOLCOMB:  Objection.
5       MS. DUNCAN HACKETT:  Objection.
6       THE WITNESS:  I would agree that the
7   transmissions had no more warranty problems than
8   anybody else in the industry.
9       BY MR. OSTOYICH:
10   Q   Slightly different question, so I'd like
11   you to answer the one I'm asking.
12       Would you agree with me that the
13   company's transmissions, manual transmissions,
14   were plagued with warranty problems?
15       MR. HOLCOMB:  Objection.
16       THE WITNESS:  Not continually.
17       BY MR. OSTOYICH:
18   Q   But at points they were plagued with
19   warranty problems?
20   A   At points they had warranty problems,
21   yes.
22   Q   Plagued with them, correct?

14  (Pages 50 to 53)

776d4e51-238a-48e2-8a9a-0079ed29673

000152

1/9/2009          ZF Meritor LLC et al v. Eaton Corporation Richard Martello
Confidential

Page 54

1      MS. DUNCAN HACKETT:  Objection.
2      MR. HOLCOMB:  Objection.
3      You don't have to answer any more.
4      MR. OSTOYICH:  Yes, you do.  He has to
5  answer every question I ask him unless it calls
6  for privilege.
7      MR. HOLCOMB:  You don't have to answer
8  the same question over and over.
9      MR. OSTOYICH:  If you want to instruct
10 him not to answer, you can instruct him not to
11 answer.
12     MR. HOLCOMB:  I'm telling you he doesn't
13 have to answer the same question over and over
14 again.
15     MR. OSTOYICH:  He's not answering the
16 question I've asked:
17     The company's transmissions were at
18 times plagued with warranty problems.
19     MR. HOLCOMB:  You're arguing with him.
20 You've asked the question five times.  He's
21 already said he's not going to answer that
22 question.

Page 55

1      MR. OSTOYICH:  Who is defending the
2  deposition --
3      MR. HOLCOMB:  I am right now.  He's not
4  going to answer the --
5      I instruct you not to answer the
6  question.
7      Move on.  Make a motion if you don't
8  like it.
9      BY MR. OSTOYICH:
10     Q   Fine.  Mr. Martello, are you going to
11 follow his instruction or are you going to answer
12 my question?
13     A   Yes, he is my attorney, and I will
14 follow his instructions.
15     Q   Okay.  Now, when you were the President
16 of the joint venture, ZF Meritor joint venture,
17 you came out with a G platform family of manuals,
18 9- and 10-speed manuals, correct?
19     A   That's correct.
20     Q   And those manual transmissions had
21 warranty problems, right?
22     MS. DUNCAN HACKETT:  Objection.

Page 56

1      THE WITNESS:  We had product problems,
2  yes.
3      BY MR. OSTOYICH:
4      Q   And at times you had substantial
5  warranty problems that you brought to the
6  attention of the Board of Directors of the joint
7  venture, right?
8      MS. DUNCAN HACKETT:  Objection.
9      THE WITNESS:  The G platform was an
10 attempt to change the shift mechanism to a single
11 rail, and we had problems introducing the
12 single-rail shift system, just as Eaton did when
13 they introduced the Lightning, which was a single
14 rail that they finally took off the market.
15     BY MR. OSTOYICH:
16     Q   Mr. Martello, when you were the
17 President of the joint venture, the ZF Meritor
18 joint venture, you made quarterly reports to the
19 Board of Directors, right?
20     A   That's correct.
21     Q   And at many of those Board of Directors
22 meetings, the subject of the G platform warranty

Page 57

1  problems was discussed with the Board of Directors
2  of the joint venture, right?
3      A   We discussed warranty at every Board
4  meeting.
5      Q   And similarly, when the company, the
6  joint venture, introduced the FreedomLine
7  automated mechanical transmission into the market,
8  you reported quarterly to the Board of Directors
9  on the warranty problems the FreedomLine was
10 having in the field, right?
11     A   I would characterize the FreedomLine as
12 more the launch of a new product than I would an
13 ongoing warranty problem.
14     Q   You did in fact participate in multiple
15 Board of Directors meetings where FreedomLine with
16 warranty problems were raised with the Board of
17 Directors, right?
18     MS. DUNCAN HACKETT:  Objection.
19     THE WITNESS:  I participated in a lot of
20 the meetings where we talked about the FreedomLine
21 launch and what needed to be done to get the
22 product to where we wanted it in the marketplace.

15 (Pages 54 to 57)

776d4e51-238a-48e2-8a9a-0079ed29673

000153

Page 58

```
1        We used failure rates as a method of --
2  failure rate per hundred as a method of describing
3  the problems that existed during the launch
4  period, yes.
5        BY MR. OSTOYICH:
6     Q   What do you mean, "failure rate per
7  hundred"?
8     A   That's just -- the rate per hundred is
9  the way we calculated it.
10     Q   And what were the rate of failures per
11  hundred FreedomLine units in the field?
12     A   I don't know.  I mean, that's -- I've
13  seen so many warranty and failure rate charges
14  that I couldn't tell you what the numbers were.
15     Q   Fair enough.
16        Why don't we take a short break.
17        THE VIDEOGRAPHER:  Going off the record.
18  The time is 9:58 a.m.
19        (A break was taken.)
20        THE VIDEOGRAPHER:  Back on record.  The
21  time is 10:06 a.m.
22
```

Page 59

```
1        BY MR. OSTOYICH:
2     Q   All right, Mr. Martello, I'm going to
3  mark as the first exhibit to your deposition a
4  document that your lawyers produced from the
5  company's files.
6        It's an internal Rockwell letter from
7  R. Martello, Transmission, Clutch and Driveline
8  business, April 1997, related to a white paper you
9  wrote on the Mack Alliance.
10        There's a stamp down at the bottom
11  indicating it came from the company's files,
12  ZFMA0369760 to 68, and I'm going to ask you to
13  take a look at that.
14        (Martello Exhibit No. 1 was marked for
15        identification.)
16        BY MR. OSTOYICH:
17     Q   I only got one copy.  I didn't know I
18  was going to get double-teamed here.
19        Just let me know when you've had a
20  chance to look at that.
21     A   I've glanced through it, yes.  I do
22  remember this.
```

Page 60

```
1     Q   On the front page, Mr. Martello -- this
2  is an internal Rockwell letter, it says up in the
3  upper right-hand corner.
4     A   Correct.
5     Q   And this is an internal letter and
6  attachment on a white paper with Mack Alliance
7  that you wrote and sent to a list of people on the
8  distribution on the front page--
9     A   Correct.
10     Q   -- on April 24th, 1997, right?
11     A   Correct.
12     Q   Okay.  You prepared this and sent it in
13  the ordinary course of your responsibilities as
14  the -- at that time, as General Manager of the
15  Rockwell Transmission, Clutch and Driveline
16  business, right?
17     A   Correct.
18     Q   This is a white paper that you wrote, I
19  take it, after you lost this potential Mack
20  Alliance on transmissions that you mentioned
21  earlier this morning.  Is that fair?
22     A   Yes.
```

Page 61

```
1     Q   Okay.  So this -- you were looking at
2  potentially purchasing the Mack transmission
3  business, which included some of the multispeeds
4  that the Rockwell company didn't have at the time,
5  and this reflects that they -- they decided not to
6  sell their business, and then you wrote this white
7  paper in response to that, I take it?
8     A   Yes.
9     Q   You mention on the first page of your
10  white paper -- what -- what's a white paper, by
11  the way?
12     A   A white paper just was a explanation of
13  what happened.
14     Q   So it just signifies that this is
15  something that you're documenting for the people
16  on the cover page, I take it, of what happened
17  during the negotiations, what you think
18  recommendations should come out of that?
19     A   Yes, because this was -- it was
20  something that had been proved all the way up to
21  the Board of Directors of Rockwell.
22     Q   On the -- on the one, two, third --
```

16 (Pages 58 to 61)

776d4e51-238a-48e2-8a9a-0079ed29673

000154

Page 62

1  fourth page in, then, you have a section there
2  that says "Financial Impact."
3      A   Uh-huh.
4      Q   Do you see that?  And it says -- right
5  above that it says, "in the final analysis," you
6  wrote, "I believe our lack of a full product line
7  coverage, plus our lack of market leadership
8  versus Eaton, were the main factors which led to
9  Mack's final decision.  It certainly reduced the
10 risks involved and made financial sense once the
11 decision not to sell the business was made."
12         Do you see that?
13     A   One, two, three, four.  Okay.
14     Q   It's the paragraph right above
15 "Financial Impact."  Do you see where I am?
16     A   Right above Financial Impact.  I guess I
17 was considering that the third page, so I'm sorry.
18         I guess it's the fourth page of the
19 document, the third page--
20     Q   Third page of the white paper itself.
21     A   Okay.
22     Q   Do you see where I am?

Page 63

1      A   Yes.  That says -- the meaning of that
2  is that they were not willing to bear the brunt of
3  what Eaton had told them would happen if they sold
4  the business, that they wouldn't -- they had been
5  told that they would evoke the patent agreement
6  against them and that they would take action
7  against the pricing of the products that they sold
8  Mack if they were to sell this business, and they
9  did not want Mack to do that.  That's what that
10 statement says.
11     Q   Okay.  I'm reading the paragraph,
12 Mr. Martello.  It says, "Therefore, in the final
13 analysis, I believe our lack of a full product
14 line coverage, plus our lack of market leadership
15 versus Eaton, were the main factors which led to
16 Mack's final decision."
17     A   Yes.  We could not, one for one, replace
18 the products that they purchased from Eaton, and
19 Eaton had -- as you look up in number three, risk
20 of price retaliation from Eaton.  Eaton had told
21 them they would have price retaliation on the
22 product that they had to buy from Eaton.

Page 64

1         Therefore, because we could not, one for
2  one, replace the Eaton products in the
3  marketplace, they were afraid of the retaliation
4  from Eaton.
5      Q   Tell me a little bit about that.  So you
6  wrote this number three up here?
7      A   Yes, I read that also -- wrote that
8  also.
9      Q   I take it you weren't privy to
10 discussions between Eaton and Mack; is that fair?
11     A   I was never in a meeting between Eaton
12 and Mack.
13     Q   So you have no firsthand knowledge of
14 any Eaton discussion with Mack about the pricing
15 of its products?
16     A   I was told this specifically by the head
17 of purchasing of Mack.
18     Q   Who was that person?
19     A   Who was that person?  Hans Walter.
20     Q   So my prior question, just so I'm clear
21 on the record, you firsthand were not privy to any
22 discussion between anyone at Eaton and anyone at

Page 65

1  Mack about pricing of any products?
2      A   No, sir.
3      Q   You said the head of purchasing at Mack,
4  Hans --
5      A   Hans Walter.
6      Q   Hans Walter.  And he said something to
7  you that caused you to write this.  Now, what did
8  he say?
9      A   He said -- if you go back to the various
10 reasons why Mack had made that decision, that's
11 what the discussion was with Hans Walter at the
12 time.  Immediately before I wrote this white paper
13 is we were called in to -- he called us in, which
14 we thought was to give us the go-ahead with this
15 project because it had gone all the way up to
16 legal documents being drafted.
17         And we got called in and he told us that
18 they were not going through with the -- with the
19 agreement that we had been working on, and these
20 are the reasons why.
21     Q   What did he say about Eaton?
22     A   He said that they had a meeting with

17 (Pages 62 to 65)

776d4e51-238a-48e2-8a9a-0079ed29673

000155

Page 66

1  Eaton, because one of the things that we wanted in
2  the legal document was indemnification from Mack
3  as to the patents that we thought they were in
4  violation of for 13- and 18-speeds.  That's this
5  first statement.
6       He said -- I'll paraphrase; I can't
7  remember exact words.  But that they, being Mack,
8  had discussions with Eaton, and Eaton told them
9  that they knew they were in violation.  They
10  didn't mind it as long as it was just using the
11  Mack product for Mack.
12       But if they decided to sell that
13  product, and especially if whoever they sold it to
14  decided to market it, that they would file a
15  lawsuit against them for violation of the
16  particular patent that we felt was in violation of
17  and, therefore, Mack could not indemnify us
18  because they just didn't want to take that risk.
19  That's number one.
20       Number two, they said that -- in the
21  discussion -- that they were told that if they
22  went through with this, they would have some price

Page 67

1  retaliation from Eaton on the products that they
2  currently bought from Eaton.
3     Q   And who did the guy that you were
4  talking to at Mack, who did he say made those
5  comments to him?
6     A   Didn't give a name.  I don't know who he
7  talked to.  I don't know if he talked to him
8  specifically, or that the engineers talked to the
9  legal guys, talked to the legal guys.  He just
10  said "Eaton."
11     Q   Other than the conversation you had with
12  someone from Mack who said they talked to some
13  unidentified person, or maybe people, at Eaton, do
14  you have any basis for this statement here?
15     A   No, no.
16     Q   All right.  Now, down below you say in
17  the paragraph I read, "Therefore, in the final
18  analysis, I believe our lack of a full product
19  line coverage, plus our lack of market leadership
20  versus Eaton, were the main factors which led to
21  Mack's final decision."
22       Do you see where I am?

Page 68

1     A   Yes.
2     Q   Okay.  I take it your reference to your
3  belief that your lack of a full product line
4  coverage is the issue we talked about above, that
5  Rockwell at that time didn't have LLs, high-torque
6  13s, 18s, 15s and so forth; is that fair?
7     A   My -- my reference is that we could not
8  protect Mack on an immediate basis, one-to-one
9  product coverage, against Eaton, yes.
10     Q   Because you didn't have certain of those
11  transmissions, fair?
12     A   That's correct.
13     Q   Now, coming out of this negotiation with
14  Mack, you then had some recommendations.  You've
15  got on the next page, for example, you have the
16  impact on transmissions.
17       Do you see where I am in the second
18  paragraph there, the middle of the page?
19     A   Yes.
20     Q   Okay.  It says, "The major strategic
21  impacts on the transmission business," that it
22  weakens your standard position strategy with

Page 69

1  Freightliner.
2       Do you see that?
3     A   Yes.
4     Q   What was that a reference to?
5     A   If you looked at one of the things
6  previously that Mack said, it was right after
7  Freightliner purchased the Sterling business, or
8  the Ford Truck business, and we wanted the -- some
9  of the Mack products for the Sterling Truck
10  because the Sterling Truck had a lot of -- call it
11  vocational applications.  That's what that means.
12     Q   Okay.  And just so we're clear, so when
13  you say "vocational applications," I take it --
14     A   Other than -- other than 9- and
15  10-speeds.
16     Q   So -- so let me make sure we're clear on
17  the record.
18       So at this point, sometime in '97
19  period, Freightliner purchases a company called
20  Sterling, Sterling Trucks?
21     A   Yes.
22     Q   And Sterling Trucks is primarily

18 (Pages 66 to 69)

Page 70

1  manufacturing trucks that are for on/off highway
2  uses?
3      A   Yeah, it would be one of their
4  functions, yes.
5      Q   So they need multispeed transmissions, I
6  take it?
7      A   Yes.
8      Q   And at that point, Rockwell didn't have
9  the multispeed transmissions, right?
10     A   Yes.
11     Q   So you're saying that Freightliner's
12 purchase of Sterling makes it harder for you to
13 maintain a standard position because you don't
14 have the transmissions they need for this new
15 business they purchased?  Is that --
16     A   Yes, it weakens our standard position
17 strategy with Freightliner because we didn't have
18 that.
19     Q   Then you say, number two, that of the
20 major strategic impacts on the transmission
21 business, that this negotiation with Mack resulted
22 in is, it says, "It further emphasizes our

Page 71

1  vulnerability at the OEM's unless we have a full
2  product line."
3          What did you mean by your vulnerability
4  at the OEMs?
5      A   It led to -- it could lead to the same
6  thing as happened at Mack, and that is Eaton
7  coming in and making price threats that on the
8  products that they were selling to the OEM where
9  we didn't have a product that was 100 percent
10 applicable to that product.
11     Q   Let me make sure I'm clear on the
12 record.
13         So you didn't have the full product
14 line, the multispeeds and the LL, right?
15     A   Correct.
16     Q   So your concern is that Eaton might
17 threaten OEMs with price increases if -- what?
18     A   If an -- if an OEM put us in standard
19 position on the products we had, it left the
20 vulnerability of the OEMs to be subject to Eaton's
21 threats of price increases, just as they
22 threatened Mack.

Page 72

1      Q   Well, let's be clear on the record
2  because you say "just as they threatened Mack"?
3      A   Just as I believe they threatened
4  Mack --
5      Q   Fair enough.
6      A   -- from my discussions with Mack
7  personnel.
8      Q   Right.  Just so we're clear on the
9  record, you, Rick Martello, have no firsthand
10 knowledge of any communications from anyone at
11 Eaton at any time and any OEM discussing the
12 prices they're going to sell any transmission?
13     A   That's correct.
14     Q   Then below you say, "Freightliner:  The
15 loss of Mack makes the need for standard position
16 at Freightliner even more important."
17         What did you mean by that?
18     A   It was always my belief that you needed
19 to be standard position at one OEM to have a base
20 volume, and since we didn't get the Mack, it made
21 holding on to Freightliner more important.
22     Q   Okay.  But the way I understood your

Page 73

1  testimony, it would be difficult at Freightliner
2  because you don't have some of the transmissions
3  that the new Sterling business they bought needs
4  for their operation?
5      A   Well, that's what it meant up there.
6  Down here, it just means that since we didn't --
7  since we couldn't get standard position at Mack,
8  it meant keeping Freightliner is even more
9  important because you needed that volume base.
10     Q   Okay.  Now, carrying over on the next
11 page, then, you say one of the things you should
12 do to help you preserve standard position with
13 Freightliner is to fill the gap on some of these
14 multispeed transmissions that they're going to
15 need for their new Sterling business, right?
16     A   Uh-huh.
17     Q   Am I reading that right?
18     A   Yes, all these things, yes.
19     Q   So you say, number two, you should offer
20 to work with Freightliner on an exclusive program
21 for transmission shift systems with
22 Rockwell/WABCO; an exclusive automated manual

19 (Pages 70 to 73)

776d4e51-238a-48e2-8a9a-0079ed29673

000157

Page 74

1    6-speed transmission for their medium-duty,
2    business class truck; an exclusive, automated LL
3    ratio 8- or 10-speed for the vocational market.
4    And then you list some 5- and 6-speeds, 7-speeds,
5    9 and 10s, 15s and 18s and LLs and so forth?
6       A   Right.
7       Q   Am I right, Mr. Martello?
8       A   Yes, so it says.
9       Q   And I take it this is essentially your
10   recommendation to your management at Rockwell that
11   it's important for you to maintain standard
12   position at Freightliner, you should offer
13   Freightliner an exclusive ability to purchase some
14   of these products which we're going to have to
15   develop, right, one way or the other, either
16   develop or buy or otherwise add to your product
17   portfolio?
18       MS. DUNCAN HACKETT:  Objection.
19       THE WITNESS:  Exclusivity in working
20   with them to develop it would mean that, for a
21   limited time, they would have rights to it, yes.
22

Page 75

1       BY MR. OSTOYICH:
2       Q   Let me make sure we're clear on the
3    record.
4       So, in other words, you're telling your
5    management we didn't get the Mack opportunity,
6    it's really important for us to maintain standard
7    position at Freightliner.  We know Freightliner
8    has this new Sterling business, they need some
9    transmissions that we don't currently have on the
10   market, right?  Fair?
11       A   Correct.
12       Q   And so you're saying we should come up
13   with a proposal to work with Freightliner and give
14   them exclusive access to some of these products
15   which we'll have to design and manufacture and
16   develop?
17       A   In conjunction with them, yes, but
18   exclusivity in this case meant a period of time
19   because we could not survive in the marketplace,
20   nor anybody, just giving exclusivity to one
21   customer because you would totally damage your
22   relationship with all the other customers.

Page 76

1       But they would understand -- customers
2    understand that if it is a short period of time
3    because they helped you develop it and they helped
4    you market it and begin to market it.
5       Q   And subsequent to this, now, you did
6    have a contract with Freightliner where you did
7    offer them exclusive rights and said you'd
8    introduce some of these products and they could be
9    exclusive to Freightliner for some period of time.
10   Is that fair?
11       A   One product, yes.
12       Q   Let's mark as Exhibit 2 to your
13   deposition --
14       A   Excuse me?
15       Q   I'm going to mark as Exhibit 2 to your
16   deposition a June 3rd, 1998 letter on Meritor
17   letterhead from R. Martello, General Manager,
18   Transmission Clutch and Driveline, to James C.
19   Orchard, President and CEO, ZF Group, North
20   American Operations, produced to me by your
21   lawyers out of the company's files,
22   ZFMA0014533043.  I'll ask you to take a look at

Page 77

1    that.
2       (Martello Deposition Exhibit No. 2 was
3       marked for identification.)
4       THE WITNESS:  Excuse me, just a point
5    for me.  Since these are -- have been marked, do I
6    give them back to someone, or are these mine?
7       BY MR. OSTOYICH:
8       Q   She's going to take all the exhibits
9    back at the end.
10       MS. DUNCAN HACKETT:  Just hold on to
11   them for now.
12       MR. OSTOYICH:  She's the official
13   custodian of the --
14       THE WITNESS:  I don't remember this, but
15   it is my signature, so I must have written it.
16       BY MR. OSTOYICH:
17       Q   Okay.  Have you had a chance to look at
18   Exhibit 2 to your deposition?
19       A   I looked at the letter itself.  Yes.
20       Q   So this -- you said this is your
21   signature, and just so we're clear on the record,
22   on the second page of this, where it says

20 (Pages 74 to 77)

Page 78

1   R. Martello, General Manager, Transmission, Clutch
2   and Driveline, there's a signature, and that's
3   your signature; you wrote it, right?
4       A   Correct.
5       Q   Okay.  This is a letter that you sent to
6   Mr. James Orchard, President and CEO of ZF Group,
7   North American Operations, in the ordinary course
8   of your business on June 3rd, 1998, right?
9       A   Yes.
10      Q   You say -- I take it this is initiating
11  or furtherance of potential joint venture between
12  Meritor's transmission business and ZF's
13  transmission business?
14      A   Yes.
15      Q   So, "Dear Mr. Orchard, I apologize that
16  I could not be part of your teleconference on
17  May 20, 1998."
18          Sounds like you were out of the country,
19  in Japan, but you're now getting back in touch
20  with him to see if you can further a potential
21  joint venture.  Is that fair?
22      A   That's correct.

Page 79

1       Q   Okay.  The second part you say, "I
2   believe an agreement between our companies can be
3   a great opportunity for both of us.  Our strategic
4   business plan for transmissions is to become a
5   full-line supplier of transmissions for sales in
6   North American-style trucks worldwide.  We
7   currently have plans for medium duty, as well as
8   13- through 20-speed transmissions."
9           Do you see that?
10      A   Yes.
11      Q   And I take it, at that time, the company
12  had plans to develop a medium-duty, but you didn't
13  have a medium-duty transmission offering at the
14  time?
15      A   We had plans to obtain the
16  transmissions.  I say in here, "in some manner."
17      Q   What do you mean, obtain in some manner?
18      A   As I said before, whether it was from
19  Mack or from TTC or from some other company or
20  develop them our self from ZF.  I mean --
21      Q   I missed the last part of that --
22      A   Or from ZF.

Page 80

1       Q   Or from ZF.
2           Did you have plans to develop them
3   internally, these transmissions, the medium-duty
4   and the 13 through 20?
5       A   We never had anything on the board for
6   medium duty, no.  We had, as we'll say in the back
7   here, plans on deriving stuff from what we had,
8   yes.
9       Q   What do you mean, deriving stuff from
10  what you had?
11      A   Well, taking the base 9, 10 and
12  low-torque 13 and deriving products from it, yes.
13      Q   You said say back here you can see that.
14  What are you referring to?
15      A   I think it's -- well, one, two, three,
16  four, five -- page 5, I guess.
17      Q   Is that the one at the top that says
18  "Product Development Strategy"?
19      A   Yes.
20      Q   And is this a page that you -- was
21  prepared as part of your strategic planning
22  process in April of 1998?

Page 81

1       A   Yes.
2       Q   And you sent this to Mr. Orchard to show
3   him that the company had plans to internally
4   develop some heavy-duty transmissions that you
5   didn't currently have?
6       A   Correct.
7       Q   And so you say your plan was to
8   internally develop some 9-speed, 10-speed, LLs,
9   and a splitter, right?
10      A   Yes.
11      Q   What's a splitter?
12      A   I don't know what that reference is, to
13  be honest with you.  A splitter is the rear box,
14  but I don't know what that reference is.
15          At this point in time, I couldn't tell
16  you what that reference is.  The LLs, I know that
17  reference because we were looking at derivatives
18  of our 10-speed that could cover the majority of
19  the LL business.
20      Q   You use the phrase "derivative" again.
21  What do you mean, a derivative of your 10-speed
22  that could cover the LL?

21 (Pages 78 to 81)

776d4e51-238a-48e2-8a9a-0079ed29673
000159

Page 82

1     A   Take the base box of the 10-speed and
2   make changes that provides you with a -- so it's
3   not redesigning a complete transmission; it's
4   taking what you have, making changes to it, so we
5   would consider that a derivative of the product.
6     Q   I see.  Did the company at this time,
7   did you have plans to start from scratch and
8   design any of these transmissions?
9     A   No.  What I have here, no.
10    Q   Why not?  Was that a more
11  resource-intensive to start from scratch?
12    A   It would be more resource-intensive,
13  yes.
14    Q   More costly to the company?
15    A   Yes.
16    Q   So I take it the company decided rather
17  than engage in the costly, resource-intensive of
18  actually designing these products from scratch,
19  you would derive them from some other products
20  that you had?
21    A   If possible, yes.
22    Q   What do you mean, "if possible"?

Page 83

1     A   Well, it would be difficult to make an
2   automatic out of any of these products.  It would
3   be difficult to make a medium-duty out of any of
4   these products and make it cost effective.  So you
5   have to do the most cost effective part, no matter
6   what you're doing, so --
7     Q   And then right below that, you're
8   telling Mr. Orchard that your strategic plan at
9   that time in the spring of '98 was to develop
10  partnerships for some of the other transmissions,
11  the medium-duty and automated manual 12- through
12  20-speed transmissions?
13    A   Well, that's basically what we were
14  going to get from ZF.  That's what we thought we
15  could get from ZF at the time.
16    Q   Right.  So you're telling him -- in
17  other words, you're not going to internally
18  develop these, but we are looking for
19  partnerships, and you are a candidate for that
20  partnership?
21    A   Yes.
22    Q   Did the -- did the joint venture

Page 84

1   subsequently strike a partnership with ZF for
2   medium-duty transmissions?
3     A   We were working on a medium-duty
4   transmission from the -- before the joint venture
5   started until after -- till the end of the joint
6   venture.  We were working on trying to develop a
7   medium-duty transmission that would be applicable
8   to both Europe and the United States.
9     Q   You say you were working on developing.
10  You mean with ZF, or just independent?
11    A   ZF.  ZF was doing it.  We were providing
12  data on what had to be done to make it useful in
13  North America.
14    Q   So in other words, they had -- they had
15  an equivalent transmission in Europe, but it had
16  to be modified in some sense to make it acceptable
17  for the U.S.?
18    A   I think they were developing a new
19  transmission, but I wouldn't -- I don't know
20  exactly.
21    Q   Okay.  Did the joint venture ever
22  commercialize -- finalize that process and

Page 85

1   commercialize medium-duty?
2     A   No.
3     Q   Attached to this, then, after that is a
4   sort of a proposal of the joint venture structure
5   between Meritor Heavy Vehicle Systems and ZF that
6   you sent Mr. Orchard, right?
7     A   Are you --
8     Q   The last four or five pages here?
9     A   Where it says "Proposed Joint Venture
10  Structure between" -- yes.  I was looking for an
11  organizational chart, which I didn't see.
12    Q   What was the proposed term of the joint
13  venture?  Like if I look at No. 17 in your
14  proposal, which is on the fourth page of the
15  proposal, you say, "Initially and every five years
16  thereafter," but was there a term that you were
17  contemplating of the joint venture?
18    A   No.  I mean, to be honest with you, we
19  were looking at this joint venture being -- we
20  certainly went into it as a forever type of
21  situation.
22    Q   I take it it would be five years

22 (Pages 82 to 85)

Page 86

1    initially, but then you could reup it for
2    additional --
3        A    No, it just says that every five years
4    we would review the goals and objectives each
5    company has for the joint venture, because we
6    had -- one of the charts, I believe it's in here,
7    is the goals and objectives of the joint venture,
8    strategic goals.
9        Q    Where are you looking?  Is that the
10   page--
11       A    The second chart in that says "Strategic
12   Goals" right after the letter.
13       Q    Strategic goals, and one of the goals of
14   the joint venture would be to allow Meritor to
15   become a full product line supplier?
16       A    Yes.
17       Q    In other words, to use the ZF products
18   in Europe, modify them, bring them to the U.S.,
19   and fill some of the gaps in your transmission
20   offerings?
21           MS. DUNCAN HACKETT:  Objection.
22           THE WITNESS:  Well, the original portion

Page 87

1    of ZF was to bring in automated manuals.
2           BY MR. OSTOYICH:
3        Q    And that would allow you to fill some of
4    the gaps in the transmission products you had and
5    become a full product line supplier?
6        A    Well, in that respect, it allowed us to
7    bring in the technology that was not even
8    available in the United States.
9        Q    Would it allow you to extend your
10   product line?
11       A    Yes.
12       Q    What about LLs?  Were you looking at LLs
13   with ZF to supply those?
14       A    No.  If you look at the chart, that was
15   one of the things we were looking to do from our
16   10-speed, and we had -- looking at what we called
17   a 10C and an 11L, I think, were the two
18   terminologies we used.
19       Q    I want to show you, Mr. Martello,
20   Exhibit 3 to your deposition, which is the
21   Freightliner supply agreement with Meritor Heavy
22   Automotive Systems from October of 1998, and I'll

Page 88

1    ask you to take a look at that.
2           (Martello Deposition Exhibit No. 3 was
3           marked for identification.)
4           BY MR. OSTOYICH:
5        Q    And I'll point you to some specific
6    pieces of it, but obviously flip through it.
7           Okay.  Have you had a chance to look at
8    Exhibit 3, Mr. Martello?
9        A    I didn't read all the way through it.  I
10   know what it is.
11       Q    You recognize this?
12       A    Yes, yes.
13       Q    This is the contract that Meritor Heavy
14   Automotive Systems had with Freightliner in
15   October 1998 for purchase of various drivetrain
16   components?
17       A    Correct.
18       Q    Good.  On the second page there's a
19   section at the top that says "Exclusive
20   Purchases."
21           "Supplier," and that's obviously
22   Meritor, "agrees to provide Freightliner with the

Page 89

1    opportunity for limited exclusive original
2    equipment manufacturer rights to purchase certain
3    of the products through the dates set forth in
4    Exhibit B."
5           Do you see that?
6        A    Uh-huh.
7        Q    I take it that's the reference to the
8    concept we just discussed where you would, in an
9    effort to maintain standard position at
10   Freightliner, you were offering them the exclusive
11   ability to purchase some products that you were
12   going to develop.  Is that fair?
13           MS. DUNCAN HACKETT:  Objection.
14           THE WITNESS:  Through the date set forth
15   in Exhibit B, yes.
16           BY MR. OSTOYICH:
17       Q    And then if we look at Exhibit B, if you
18   look down at the lower right-hand corner, there's
19   page numbers from the Bates stamp that your
20   lawyers put on this, and that's a page that ends
21   with 6691, and that's Exhibit B.  And while you're
22   looking at that, I'll just identify it.  It came

23 (Pages 86 to 89)

776d4e51-238a-48e2-8a9a-0079ed29673

000161

Page 90

1 from the company's file, ZFMA006653 to 702.
2        Do you see where I am?  At the top it
3 says Exhibit B, "Supply Agreement Product
4 Exclusives"?
5    A   Yes.
6    Q   And this is the list of the products
7 that you were agreeing to provide Freightliner the
8 exclusive right -- exclusive opportunity to
9 purchase these from the time of their
10 introduction, right?
11    A   For a period to be determined from date
12 of introduction, yes.
13    Q   Okay.  So in your reading of the first
14 paragraph, it says Supplier agrees to provide
15 Freightliner the opportunity to exclusively
16 purchase the following components for a period to
17 be determined from the date of introduction,
18 correct?
19    A   Correct.
20    Q   And then it lists down in the left-hand
21 column the products, and then when they're going
22 to be introduced and available in the right-hand

Page 91

1 column, right?
2    A   Correct.
3    Q   So, for example, you're offering
4 Freightliner the opportunity to purchase --
5 exclusively purchase the 8 LL transmission for
6 some period of time to be determined after it's
7 introduced and available in June of 2000?
8    A   Yes.
9    Q   And you're offering them the opportunity
10 to exclusively purchase the 6-speed AMT -- which
11 is I guess is an automated mechanical
12 transmission?
13    A   Correct.
14    Q   -- for some period of time to be
15 determined after you introduce it and make it
16 available in June of 2000 also.
17    A   Yes.
18    Q   And then the same thing with the
19 multispeed automated mechanical transmission, this
20 says they'd have some opportunity for some period
21 of time to purchase it exclusively after it's
22 introduced in 1999, assuming you strike a joint

Page 92

1 venture with a third party.
2    A   Correct.
3    Q   And at this point, there's an asterisk
4 that says, "Assuming the joint venture with a
5 third party."  And at this point, you were
6 negotiating with ZF to form that joint venture,
7 fair?
8    A   Correct.
9    Q   Now, did the company introduce and make
10 available an 8 LL transmission by June of 2000?
11    A   We had -- no.
12    Q   What about the 6-speed automated
13 mechanical transmission?
14    A   That was to be purchased from TTC.
15    Q   And was it made available by --
16    A   It was available at the point in time
17 that we wrote this document.
18    Q   Was it available exclusively to --
19    A   Freightliner.
20    Q   -- Freightliner?
21    A   Freightliner never made the --
22 Freightliner never accepted to do it.

Page 93

1    Q   And what about the multispeed automated
2 mechanical transmission?
3    A   Yes, that was the ZF transmissions, the
4 12- and 16-speed.
5    Q   And was that made available --
6 introduced and made available to Freightliner on
7 an exclusive basis in 1999?
8    A   Back in '99, no.  We never finished the
9 joint venture at that point in time.
10    Q   Okay.  So the joint venture
11 negotiations, I take it, dragged on into '99; is
12 that fair?
13    A   Yes.
14    Q   Let's -- let's mark as Exhibit 4 to your
15 deposition a Meritor presentation that says
16 "ZF Meritor Joint Venture Presentation to
17 Corporate Officers" from January 22, 1999.
18        It came from your files the company --
19 your lawyers produced to me, ZFMA0368703 to 721,
20 and I'll ask you to take a look at that.
21        (Martello Deposition Exhibit No. 4 was
22        marked for identification.)

24 (Pages 90 to 93)

Page 94

1    THE WITNESS:  Okay.
2    BY MR. OSTOYICH:
3    Q    Mr. Martello, have you had a chance to
4  look at Exhibit 4 to your deposition?
5    A    I've read it, but I don't -- I don't
6  remember this one at all.
7    Q    Okay.  Is this a document that, as the
8  General Manager of Transmission, Clutch and
9  Driveline, you were involved in preparing for the
10  corporate officers of Meritor to explain what sort
11  of a joint venture should be formed with ZF and
12  how it should be structured and so forth?
13    MS. DUNCAN HACKETT:  Objection.
14    THE WITNESS:  As I say, I don't remember
15  this document.  I don't know where it was
16  presented.  I don't know who presented it.  I
17  don't remember this document at all.
18    BY MR. OSTOYICH:
19    Q    Okay.  Is it likely, sir, that you were
20  involved in preparing this for the corporate
21  officers of Meritor?
22    MS. DUNCAN HACKETT:  Objection.

Page 95

1    THE WITNESS:  Preparing the actual
2  document, no, I don't believe so.
3    BY MR. OSTOYICH:
4    Q    How about overseeing the preparation by
5  people in your organization of a document
6  explaining the joint venture you're in the process
7  of negotiating?
8    A    I would say providing information for
9  it, yes.  But, again, I don't remember this
10  document.  I don't know who it was presented to,
11  even.
12    Q    The cover page says "Presentation to
13  Corporate Officers" in January of 1999.  I take it
14  this reflects the company was negotiating with
15  ZF/AG this joint venture in early 1999, fair?
16    A    Yeah, I would imagine it was presented
17  to the Meritor corporate officers.
18    Q    There's an agenda on the second page
19  that says, "Define the JV structure, define the
20  due diligence work to be performed," and so on.
21  Do you see where I am?
22    A    Yes.

Page 96

1    Q    I take it, as part of the joint venture
2  negotiations with ZF, obviously you're talking
3  about the structure, and then there's some
4  discussion of that structure on the subsequent
5  pages, the potential structure of that agreement,
6  right?
7    A    Yes.
8    Q    Was part of the structure of the joint
9  venture agreement so Meritor put all of its
10  transmission and clutch assets into a separate
11  company, right?
12    A    Yes.
13    Q    And ZF paid Meritor roughly $51 million
14  as part of its participation in the joint venture?
15    MS. DUNCAN HACKETT:  Objection.
16    THE WITNESS:  ZF paid Meritor a sum.  I
17  see what the -- I see what this page 5 says.  I
18  don't know if that's the right number, but I would
19  say it is because of the page.  But, again, I
20  don't remember this.
21    BY MR. OSTOYICH:
22    Q    You're aware that as part of the joint

Page 97

1  venture, ZF paid Meritor a multimillion-dollar sum
2  to participate in the joint venture?
3    A    Correct.
4    Q    And then -- I take it it was a formal
5  process?  In other words, this reference on the
6  agenda page, due diligence, there was a formal due
7  diligence process that was engaged in between the
8  two parties?
9    A    Absolutely, yes.
10    Q    The time schedule proposed, tell me a
11  little bit about that.  On the next page, which is
12  page 6 of this presentation, it says the due
13  diligence proposed schedule was February 1st to
14  February 5th, 1999.  Do you see that?
15    A    Uh-huh.
16    Q    So I take it that reflects sometime in
17  the winter of '99, there was going to be a due
18  diligence between each of the companies so they
19  could look at each other's businesses and figure
20  out whether it made sense to engage in the joint
21  venture?
22    MS. DUNCAN HACKETT:  Objection.

25 (Pages 94 to 97)

776d4e51-238a-48e2-8a9a-0079ed29673
000163

Page 98

BY MR. OSTOYICH:
1   Q   Is that right, Mr. Martello?
3   A   That is what the statement says, yes.
4   Q   Did you in fact engage in a due
5   diligence process as part of the formation of the
6   joint venture with ZF?
7   A   Was there due diligence done?  Yes.
8   Q   And was the due diligence sometime in
9   the winter of 1999?
10  A   I believe it was.
11  Q   And was it a four-day period in early
12  February?
13  A   Four months, maybe, but not four days.
14  Q   You're laughing when you say that.
15  A   It was a long, drawn-out process, yes.
16  Q   Due diligence was a long, drawn-out
17  process?
18  A   Yes.
19  Q   As part of that due diligence, did ZF
20  get -- did you provide access to ZF on the
21  G platform series of manual transmissions?
22      MS. DUNCAN HACKETT:  Objection.

Page 99

1       THE WITNESS:  There was no G platform at
2   the time.
3       BY MR. OSTOYICH:
4   Q   I'm going to show you another document,
5   Mr. Martello.  We're going to mark it as Exhibit 5
6   to your deposition.
7       This is a ZF Meritor joint venture
8   presentation, Board of Directors, from May of
9   1999.  I'm going to ask you to take a look at that
10  one.
11      (Martello Deposition Exhibit No. 5 was
12      marked for identification.)
13      BY MR. OSTOYICH:
14  Q   While you're flipping through this, I'll
15  identify it for the record.  It came from your
16  files, ZFMA0371511 to 17, and just let me know
17  when you've had a chance to look at it.
18  A   Yes, this is something I did.
19  Q   I'm sorry, I didn't catch that?
20  A   This is something that I wrote,
21  presented.
22  Q   Okay.  So this is a -- just so we're

Page 100

1   clear on the record, this is a presentation that
2   you prepared for the Board of Directors of Meritor
3   explaining the potential negotiations with ZF over
4   the joint venture in May of 1999; is that right?
5   A   I don't honestly remember who it was
6   presented to.
7   Q   But you did prepare it for some --
8   A   Yes, for a presentation.
9   Q   Down at the bottom of the left-hand side
10  of the first page, it says "Board of Directors,
11  Revised May 25th, 1999."  Do you see that?
12  A   Yes.
13  Q   Does that refresh your memory that you
14  prepared this for a Board of Directors meeting in
15  May of 1999?
16  A   I don't know if it meant the Board of
17  Directors of the joint venture, which didn't exist
18  at the time, or that somebody else presented it.
19      I made absolutely no presentations
20  personally to the Board of Directors of Meritor,
21  so --
22  Q   Did you prepare this document for

Page 101

1   someone else --
2   A   It's something that I prepared.
3   Q   Fair enough.  And you prepared this in
4   the ordinary course of your business when you were
5   the General Manager of the Transmission, Clutch
6   and Driveline business of Meritor?
7   A   Correct.
8   Q   On the first page you have a history,
9   and I take it this is a little snapshot of the
10  history of the Rockwell/Meritor transmission
11  business --
12  A   Uh-huh.
13  Q   -- fair?
14      You say the company entered the
15  transmission business in 1987, the product line
16  was limited to 9-, 10- and 13-speed transmissions,
17  and that's what we've been talking about where you
18  didn't have the high-torque 13s and the
19  multispeeds and the LLs at that point, right?
20      MS. DUNCAN HACKETT:  Objection.
21      THE WITNESS:  Yes.  This was the
22  original product line initiated by Meritor, yes,

26 (Pages 98 to 101)

776d4e51-238a-48e2-8a9a-0079ed29673

000164

Page 102

1   or Rockwell.
2       BY MR. OSTOYICH:
3       Q   You say here that the product design was
4   purchased from Nissan.  What did you mean by that?
5       A   Correct.
6       Q   What does it mean the product line
7   was -- product design was purchased from Nissan?
8       A   Rockwell at the time did not do the
9   design work.  Nissan did the design work.
10      Q   And at that time --
11      A   They contracted Nissan to design the
12  transmissions.
13      Q   And Nissan was a car or truck
14  manufacturer at the time?
15      A   It's a Japanese car and truck
16  manufacturer.
17      Q   And so the company didn't design the 9-
18  and 10-speed and 13-speeds that it began in the
19  market; it purchased design from a Japanese
20  company, Nissan?
21      A   Correct.
22      Q   And was Nissan selling its own 9- and

Page 103

1   10-speed and 13-speed transmissions for class 8
2   trucks in North America?
3       A   Not to my knowledge.
4       Q   Were they -- were they selling trucks
5   outside North America, class 8-equivalent trucks?
6       A   Outside North America, they wouldn't be
7   the same as a North America truck, but I would
8   imagine Nissan had class 8 trucks for the rest of
9   the world.
10      Q   Do you know one way or the other at the
11  time whether they offered class 8 trucks?
12      A   No.  I had no dealings with Nissan.
13  This is before my time in transmissions.
14      Q   On the last bullet there you say that
15  the limited product line was aimed at the major
16  fleet's linehaul business.
17      A   Correct.
18      Q   What did you mean, "linehaul business"
19  there?
20      A   We segregated the market into linehaul,
21  vocational, and specialty.  And linehaul meant the
22  major fleets that had tractors that carried

Page 104

1   freight and usually used 9- and 10-speed
2   transmissions.
3       Q   You said "they usually used 9- and
4   10-speed transmissions."  What do you mean, they
5   usually used them?
6       A   Some fleets used 7-speed, some fleets
7   used 13-speeds, but the majority of the linehaul
8   business, great majority, was 9- and 10-speed
9   transmissions.
10      Q   I take it from a functional perspective,
11  you can use any kind of transmission to drive on
12  highway, and you can use any kind of transmission
13  to drive off highway; is that fair?
14      MS. DUNCAN HACKETT:  Objection.
15      THE WITNESS:  Not economically.
16      BY MR. OSTOYICH:
17      Q   There are fleets that use 13-speeds on
18  the highway?
19      A   Yes.
20      Q   Are there fleets that use 18-speeds and
21  20-speeds if they're on-highway driving?
22      A   Not to my knowledge.  I mean --

Page 105

1       Q   What about 9s and 10s, are there fleets
2   that use 9s and 10s for on/off-highway driving?
3       A   Not really to my knowledge.  It would be
4   very special if they did.
5       Q   I want to look at a couple pages
6   forward.  It's got on the one, two, three -- on
7   the fourth page of the document, you have a page
8   here that you wrote this says the initial results,
9   and this is a summary of the initial results of
10  the Rockwell/Meritor transmission business since
11  its inception in 1987, right?
12      Mr. Martello, is that right?  You've got
13  to be audible.
14      A   Correct.
15      Q   So you've got some results that the
16  company realized up at the top, right?  Right?
17      A   Correct.
18      Q   So for the court reporter, you're going
19  to have to say it out loud so she can get you.
20      A   Correct.  Shaking my head doesn't work.
21      Q   Then you've got a list, you say,
22  "Meritor results not realized," right?

27 (Pages 102 to 105)

776d4e51-238a-48e2-8a9a-0079ed29673

000165

Page 106

1    A   Yes.
2    Q   And that's the results that, as the
3  General Manager of the Transmission, Clutch and
4  Driveline business you said the company had not
5  been able to realize since it began manufacturing
6  transmissions in 1987, right?
7    A   Correct.
8    Q   First one, you say you "Have not
9  achieved financial expectations," right?
10   A   Correct.
11   Q   "Have not achieved market penetration,"
12 right?
13   A   Correct.
14   Q   And you say, "Products plagued by
15 warranty issues," right?
16   A   That's what the statement says.
17   Q   So we're clear, that's a statement you
18 wrote, right?
19   A   I believe that's a statement I wrote,
20 yes.
21   Q   You say, cover -- "Meritor results not
22 realized," you cover only 70 percent of the

Page 107

1  class 8 market, right?
2    A   That's correct.
3    Q   And that's in reference to the fact that
4  the company at that time didn't offer products
5  that filled some of these multispeed and LL
6  applications, right?
7       MS. DUNCAN HACKETT:  Objection.
8       THE WITNESS:  It's reference that the
9  products that we have covered about 70 percent of
10 the class 8 market.
11      BY MR. OSTOYICH:
12   Q   In other words, you didn't have products
13 that customers wanted for the multispeeds and the
14 LLs, right?
15      MS. DUNCAN HACKETT:  Objection.
16      THE WITNESS:  We did not have them at
17 that time.
18      BY MR. OSTOYICH:
19   Q   You say, "Eaton determined not to lose
20 market share," right?
21   A   Correct.
22   Q   And you wrote, "Eaton continues

Page 108

1  technology superiority," right?
2    A   Correct.
3    Q   Now, on the next page, you've got a list
4  of current obstacles, right?
5    A   Correct.
6    Q   And the first bullet point you say, "The
7  OEM's reluctance to provide standard position
8  without a full product line."  Do you see that?
9    A   That is in the same reference I told you
10 with Mack about the fact that every time we talked
11 to an OEM, they were afraid of the retaliation in
12 pricing that Eaton would do on the products that
13 we didn't have, yes.
14   Q   And, again, so we're clear on the
15 record, your knowledge of that is that people at
16 OEMs told you some unidentified people at Eaton at
17 some point --
18   A   That's correct.
19   Q   You have no firsthand knowledge or
20 communication?
21   A   I have no firsthand knowledge of that.
22 I have no reason to believe they would lie to me,

Page 109

1  either.
2    Q   Were you -- you negotiate with OEMs to
3  sell products to them, you have at times?
4    A   Excuse me?
5    Q   You've participated in negotiations with
6  OEMs to sell products to them, right?
7    A   I have participated, yes.
8    Q   And you yourself have purchased products
9  or you had purchasing responsibility in some your
10 jobs, right?
11   A   That's correct.
12   Q   As part of the purchasing process, both
13 sets try to get an advantage in the negotiations,
14 right, the seller is trying to get a good price,
15 and the buyer is trying to get a lower price
16 typically, right?
17   A   Yes.
18   Q   And as part of that process, both sides
19 occasionally bluff, right?
20      MS. DUNCAN HACKETT:  Objection.
21      THE WITNESS:  I don't believe I would
22 ever threaten a customer.

28 (Pages 106 to 109)

Page 110

BY MR. OSTOYICH:
1
2    Q   Well, first, let's answer my question,
3   which is as part of the negotiation of buying and
4   selling products, one of the tools that both the
5   buyer and the seller uses, and you yourself have
6   probably participated in meetings like this, is
7   people try and bluff occasionally, right?
8        MS. DUNCAN HACKETT:  Objection.
9        THE WITNESS:  The term "bluff" can be --
10  can mean a multitude of things.
11       I mean, there's a difference between
12  bluffing that's -- that if you don't give me that
13  price, I'm going to go see if I can get a better
14  price from somebody else.  That's a price in
15  negotiations and things of that nature, but I
16  don't believe that that bluffing -- I think
17  there's a big difference between bluffing and
18  threatening.
19       BY MR. OSTOYICH:
20   Q   When a customer in a negotiation to buy
21  products from you tells you something, you don't
22  literally believe everything you they tell you is

Page 111

1   true, right?
2        MS. DUNCAN HACKETT:  Objection.
3        THE WITNESS:  I have to believe, when
4   I'm dealing with anyone, that they're just not out
5   and out lying to me.  My integrity is too high to
6   believe that.
7        BY MR. OSTOYICH:
8    Q   But at the same time, you understand,
9   their not necessarily tipping their hand and
10  showing you all their cards on the table?
11   A   Absolutely.
12   Q   Now, you chose, it sounds like, to
13  believe OEMs, the guy from Mack, for example, when
14  he said Eaton was threatening him with price
15  increases?
16   A   Correct.
17   Q   But you don't in fact have any idea of
18  what Eaton was discussing with the guy from Mack,
19  firsthand?
20       MS. DUNCAN HACKETT:  Objection.
21       THE WITNESS:  I have no firsthand
22  knowledge.

Page 112

BY MR. OSTOYICH:
1
2    Q   Why did you choose to believe that was
3   truthful?
4    A   Because it came from more than just
5   Mack.
6    Q   Who else?
7    A   It came from just about every OEM we
8   talked to in one way or the other.
9    Q   Which -- which person at Freightliner?
10  Anybody that directly told you that someone from
11  Eaton had threatened them?
12   A   I don't remember.
13   Q   What about Volvo -- not Mack, but Volvo?
14   A   Larry Moore.
15   Q   What did he say?
16   A   He said that -- I remember him saying
17  that if we were to do this, we would be under --
18  we -- we could expect a response from Eaton that
19  would raise the prices on all the products that
20  you can't supply to us.
21   Q   Did he say anything else?
22   A   No.

Page 113

1    Q   Did he say --
2    A   Not that I remember, but I remember
3   that.
4    Q   So Mr. Moore at Volvo said they could
5   expect that Eaton would raise prices?
6    A   Correct.
7    Q   I take it that he not say that Eaton had
8   threatened him with a price increase?
9    A   No, he did not.
10   Q   What about International, International
11  Truck?
12   A   I personally had had very little
13  dealings with International.
14   Q   So I take it no one from International
15  directly told you about any --
16   A   That's true.
17   Q   -- alleged Eaton threats, okay.  Pair?
18   A   Those would be third and fourth hand.
19   Q   What about PACCAR, any discussions you
20  had with PACCAR people along those lines?
21   A   Not personally, no.  Most of my
22  negotiations personally with OEMs was either Mack,

29 (Pages 110 to 113)

776d4e51-238a-48e2-8a9a-0079ed29673

000167

Page 114

1  Volvo, or Freightliner.
2      Q   Going back to the document you wrote,
3  Mr. Martello, this presentation.  Under the
4  "Current Obstacles," in the second bullet there
5  you wrote, "Lack of resources to compete in
6  automation technology."
7          What did you mean by that?
8      A   We had limited engineering ability, and
9  to do automation technology like at this point in
10 time, I was talking about ZF because that's what
11 it was about, and ZF had a tremendous ability in
12 automation technology that we just didn't have.
13     Q   And so I'm clear on the record, so
14 rather than internally -- you didn't have the
15 resources to internally develop automation
16 technologies; you're looking at outsourcing and
17 getting it from ZF in this case?
18     A   Correct.
19     Q   And that's for automated mechanical
20 technology?
21     A   Correct.
22     Q   The next page, so it's probably the same

Page 115

1  concept, it says, "Alternatives Considered," and
2  you said that this references you considered
3  purchasing the Mack product line, but they decided
4  to retain the transmissions, right?
5          Again, for the record, Mr. Martello,
6  you've got to say it out loud.
7      A   That's correct.
8      Q   And you looked at a marketing agreement
9  with Spicer, which I take it they're another
10 transmission manufacturer?
11     A   That's really TTC.
12     Q   TTC was the same company as Spicer; they
13 just changed the name?
14     A   Yeah.  Spicer SADCV -- I don't know what
15 their legal name is but it's one of the two.
16     Q   Okay.  And then you say -- I guess that
17 marketing agreement didn't work because it looks
18 like TTC or Spicer lost Freightliner medium-duty
19 business due to cost and lack of fully
20 complementary product line; is that fair?
21     A   As you saw in the proposal to
22 Freightliner, we offered them a 6 AMT.  They did

Page 116

1  not accept that.  That's what that is referencing.
2      Q   Okay.  So -- lost me.  Is the
3  6-speed AMT was a medium-duty transmission?
4      A   6-speed, that's correct.
5      Q   Okay.  So you -- you in fact had a
6  marketing agreement with TTC or Spicer, you
7  offered.  You offered a 6-speed medium-duty
8  transmission to Freightliner, but you didn't get
9  that business due to cost and lack of fully
10 complementary product line?
11     A   Yes.
12     Q   And what did you mean, "due to cost and
13 lack of fully complementary product line"?
14     A   The cost that we -- the cost that we
15 passed on from Spicer SADCV, Freightliner said was
16 not competitive, I guess.
17     Q   What did you mean by Freightliner said
18 there was a lack of fully complementary product
19 line?
20     A   I honestly don't know -- it certainly
21 had something to do with medium duty, but I don't
22 know what the particulars were behind that

Page 117

1  particular statement.
2      Q   But I take it there was something --
3  some other type of medium-duty transmissions that
4  Freightliner wanted but wasn't available?
5      A   For medium duty.  I wouldn't -- I don't
6  remember, but it sounds like that.
7      Q   You say another road of alternatives
8  that you considered in the third bullet there was,
9  "Internal growth and development," but I take it
10 there was a lack of resources and timing to create
11 the transmissions that you needed internally and
12 put them on the market; is that fair?
13     A   Yeah.  We would have to hire major
14 staff, which costs money and take time.
15     Q   Okay.  And then on the last page of this
16 presentation you prepared, there's a "Strategic
17 Recommendations."  You say, as a result of not
18 having the internal resources and the timing and
19 these other items that we had here, you're
20 recommending that you form a joint venture with ZF
21 in North America, fair?
22     A   Correct.

30  (Pages 114 to 117)

776d4e51-238a-48e2-8a9a-0079ed29673

000168

Page 118

1    Q   I'm going to quickly mark,
2  Mr. Martello -- I've got three or four similar
3  presentations, which I guess over a period of
4  probably a month or two -- in the summer of '99, I
5  take it the joint venture negotiations are coming
6  to a head in the summer of '99.  Is that fair?
7    A   Correct.
8    Q   All right.  Let's mark as Exhibit 6 --
9  now, this is a presentation on Meritor letterhead,
10 Heavy Vehicle Systems presentation by
11 Mr. Mulchandani in April of 1999.  And again, for
12 the record, it came from the company's file,
13 ZFMA0368676 to 702, and I'll ask you to take a
14 look at that one.
15     (Martello Deposition Exhibit No. 6 was
16     marked for identification.)
17     BY MR. OSTOYICH:
18   Q   Have you had a chance to take a look at
19 it, Mr. Martello?
20   A   I've had a chance to look at it, yes.
21 Not my presentation.
22   Q   So on the top of the second page, it

Page 119

1  says that this is a presentation of
2  Mr. Mulchandani presented to the Meritor Board of
3  Directors in April of '99.
4      I take it he was the head of the entire
5  Heavy Vehicle Systems business at Meritor at the
6  time?
7    A   Correct.
8    Q   And he was your boss in a sense, you
9  reported to him?
10   A   That's correct.
11   Q   This presentation, the first few pages
12 here, you'll see is very similar to the one we
13 looked at just now that you drafted.
14     I take it you had prepared that, and
15 that he had taken it and was putting into this
16 presentation to present to the Board of Directors
17 of Meritor to explain why the joint venture with
18 ZF should go forward.  Is that fair?
19   A   I would say that's fair.
20     MS. DUNCAN HACKETT:  Objection.
21     BY MR. OSTOYICH:
22   Q   And as part of your ordinary

Page 120

1  responsibilities as the General Manager, you had
2  provided him with the information that went into
3  this presentation, and he then, as the President
4  of the Heavy Vehicle Systems, takes it to the next
5  step and presents it to the Meritor Board, right?
6    A   I would say I provided him with the
7  majority of this, yes.
8    Q   Okay.  So if we look, for example, the
9  fourth page in, it's got the Initial Transmission
10 Strategy, which is the same language we just saw
11 in your presentation, right?
12   A   Uh-huh.
13   Q   It explains that Meritor entered the
14 business in 1987, the limited product line was
15 aimed at the major fleet's linehaul business,
16 right?  That comes from your presentation?  I take
17 it you prepared that for Mr. Mulchandani, right?
18   A   I would say he took it off the same --
19 the same thing.
20   Q   Then on the next page of the Initial
21 Transmission Strategy, again, it's got the
22 information that you prepared, Meritor results

Page 121

1  realized, Meritor results not realized, right?
2    A   Mine doesn't seem to have that.
3    Q   Mine is on the page that ends with 80.
4    A   Oh, okay.  I was looking for a separate
5  page, yes.
6    Q   This is the same information you had in
7  the prior presentation, now Mr. Mulchandani is
8  telling the Board of Meritor these are the results
9  that the company has realized with its
10 transmission business, and these are the results
11 the company has not realized, right?
12   A   Correct.
13   Q   So he's got the same information.  So
14 for the Meritor results not realized, again, the
15 company has not achieved financial expectations,
16 has not achieved market penetration, products
17 plagued by warranty issues, cover only 75 percent
18 of class 8 market, Eaton determined not to lose
19 market share, and Eaton continues technology
20 superiority, right?
21   A   That's what it says, yes.
22   Q   Then on the next page, again, it's got

31 (Pages 118 to 121)

776d4e51-238a-48e2-8a9a-0079ed29673
000169

Page 122

1  Current Obstacles to Success, and it's got the
2  same kind of -- the same facts that you had in
3  your presentation he's now presenting to the Board
4  of Meritor, "Lack of resources and timing to
5  obtain a full product line," right?
6        MS. DUNCAN HACKETT:  Objection.
7        THE WITNESS:  That's what it says, yes.
8        BY MR. OSTOYICH:
9     Q    And then the next page, again, the same
10  alternatives that you had listed that you
11  considered, he's now presenting those to the
12  Board, right?
13    A    Yes.
14    Q    Then it's got after that a summary of
15  the joint venture, and I just want to ask you
16  about the structure.
17        So I take it this is the summary of the
18  structure that you were contemplating the joint
19  venture in the summer of '99 and were recommending
20  that you go forward with the joint venture, fair?
21    A    Yes.
22    Q    So, again, it's got a reference here,

Page 123

1  it's a 50/50 ownership, 50 percent of the
2  shareholders -- of the shares would be owned by
3  ZF, the German company, and 50 percent by Meritor,
4  some Meritor company, right?
5     A    Yes.
6     Q    The name, you decided to combine the two
7  names so it's just ZF Meritor, right?
8     A    Correct.
9     Q    Meritor put -- assigned 60 percent of
10  its ownership in the clutch business into the
11  joint venture?
12    A    Correct.
13    Q    Then it's got ZF to pay Meritor
14  $51 million up front, right?
15    A    Correct.
16    Q    And then it says, "The JV to pay Meritor
17  an additional $24 million in earn-out payments."
18  Do you see that?
19    A    Correct, that's what it says.
20    Q    What's an earn-out payment?
21    A    It tells you on the next page.
22    Q    Tell -- tell me how it works here.

Page 124

1     A    I don't remember the total detail, but
2  if there was pre-tax profit, it would be
3  distributed such that Meritor would end up with an
4  extra $24 million over the period.
5     Q    So let me make sure I understand.  It
6  says, for example, it says, "The earn-out
7  distribution period will be for 10 years."
8        So in other words, over the next
9  10 years from mid 1999 on, the joint venture, if
10  it earns a profit above a certain level, will pay
11  some portion of its earnings to -- to Meritor?
12    A    Correct.
13    Q    Okay.  And that would be not paid in a
14  lump sum in year one, but rather paid out over the
15  next 10 years or so, right?
16    A    Correct.
17    Q    And it says that the projections are
18  that Meritor would earn -- would receive that
19  earn-out within 8 years?
20    A    Correct.
21    Q    And the earn-out is, I guess it's
22  limited to $24 million?

Page 125

1     A    I think that's the number.
2     Q    I'm sorry?
3     A    I think that's the number.
4     Q    How -- when -- when you were doing
5  planning for this joint venture that was formed,
6  were you doing formal strategic planning
7  type-documents, annual strategic plan?
8     A    When we were doing this?
9     Q    Yes.  In other words --
10    A    You have to -- well, repeat the
11  question, please.
12    Q    Sure.  As President of ZF Meritor, did
13  you prepare or authorize to have prepared under
14  your direction a formal strategic plan for the
15  business?
16    A    Yes.
17    Q    Did you do it every year?
18    A    Yes.
19    Q    Okay.  Was it an annual plan, or did you
20  do a plan looking three years in the future?
21    A    We always did an annual plan, plus a
22  five-year projection.

                          32 (Pages 122 to 125)

776d4e51-238a-48e2-8a9a-0079ed29673

000170

Page 126

1    Q   Did you do 10-, 15-, 20-year
2  projections?
3    A   No.
4    Q   Why not?
5    A   I don't know.  We just never did.
6    Q   Did you, when you were the General
7  Manager of the Rockwell/Meritor Transmission,
8  Clutch and Driveline business, did you do 10-,
9  15-, 20-year plans?
10    A   No.  Not in detail.
11    Q   It's hard to predict that far into the
12  future?
13    A   We never did anything in detail in that
14  length of period.
15    Q   I take it it's hard to predict that far
16  in the future what's going to happen with any
17  business, right?
18       MS. DUNCAN HACKETT:  Objection.
19       THE WITNESS:  Correct.  Not in the
20  detailed sense, that's correct.
21       BY MR. OSTOYICH:
22    Q   So you didn't do a formal, sort of here

Page 127

1  is our expected profit in year 10 through 15 of
2  the joint venture?
3    A   No.
4    Q   I take it you expected there to be some
5  ramp time, though, that the joint venture wouldn't
6  turn around and be immediately profitable, or did
7  you expect --
8    A   Excuse me?
9    Q   Did you expect the joint venture to be
10  immediately profitable, or did you expect there to
11  be a certain period of time, a couple of years to
12  get the joint venture up and running?
13    A   I would imagine there's some models
14  here.
15    Q   Are you referring to something specific
16  in the document, or you mean that somewhere at one
17  point there were models?
18    A   At the end of this document is
19  financials that were presented.
20    Q   Okay.  Where are you looking?
21    A   698.
22    Q   Okay.

Page 128

1    A   699.
2    Q   Okay.  So these are the planning that
3  went into explaining why the joint venture would
4  make sense for Meritor, I take it?
5    A   Yes.
6    Q   On 699, tell me a little bit about what
7  I'm looking at here.  Impact on Meritor, I take it
8  that's what Meritor would earn from the joint
9  venture over the next 5 years?  That was the
10  expectation?
11       MS. DUNCAN HACKETT:  Objection.
12       THE WITNESS:  I don't know.  I didn't
13  prepare this document.  I would have to just read
14  the same things that you can read here.
15       BY MR. OSTOYICH:
16    Q   Fair enough.  Who prepared this, do you
17  know?
18    A   Well, if you go back to page 697,
19  Thomas A. Madden presented it, so I would imagine
20  him and his staff prepared it.
21    Q   Is Mr. Madden somebody in the Heavy
22  Vehicle Systems business?

Page 129

1    A   He was the Vice President of -- I don't
2  know his exact title, but he was the head
3  financial person for Meritor.
4    Q   The chief financial officer?
5    A   Chief financial officer of some kind.
6    Q   Okay.  You didn't have any direct
7  involvement in preparing these tables on 698?
8    A   I personally had no direct involvement
9  in this.  Whether -- he probably dealt with the
10  financial people that were involved in the due
11  diligence, but I don't -- I had no direct
12  involvement in this.
13    Q   Fair enough.  I'm going to mark as the
14  next exhibit -- we've got the change the tape, so
15  why don't we take a break now.
16       THE VIDEOGRAPHER:  Going off the record.
17  This is the end of tape 2.  The time is 11:23.
18       (A break was taken.)
19       THE VIDEOGRAPHER:  Back on record.  This
20  is the Tape No. 3.  The time is 11:35.
21       BY MR. OSTOYICH:
22    Q   All right.  Mr. Martello, welcome back.

33 (Pages 126 to 129)

776d4e51-238a-48e2-8a9a-0079ed2967?

000171

Page 130

1   Anything you want to change from your testimony so
2   far?
3       A   No, sir.
4       Q   Okay. We're going to mark as Exhibit 7
5   to your deposition a ZF Meritor presentation that
6   came from your files. It's got a stamp on it from
7   the lawyers, ARM 012524 to 38. And I'll ask you
8   to take a look at that.
9           (Martello Deposition Exhibit No. 7 was
10          marked for identification.)
11          BY MR. OSTOYICH:
12      Q   It should look familiar.
13          Mr. Martello, you've had a chance to
14  look at this?
15      A   Yes.
16      Q   Okay. You said you know what this is.
17  What is it?
18      A   It's a presentation I gave to people in
19  the Laurinburg plant, and people that would be
20  part of the joint venture.
21      Q   And I take it it's dated on the second
22  page in the upper right-hand corner, it says

Page 131

1   June 9th, 1999 on all the subsequent page.
2           I that it this is a document that you
3   prepared in the ordinary course, and presented it
4   to people at the Laurinburg plant in June of 1999,
5   right?
6       A   I believe so, yes.
7       Q   Who did you present it to?
8       A   I believe it was one that I prepared to
9   inform the people at the Laurinburg plant, plus
10  people that worked for me in Troy that would be
11  part of the joint venture as to what we were
12  doing.
13      Q   So this --
14      A   The reason I say that is page 13 states,
15  "What Happens to Me."
16      Q   So this a presentation you made to
17  people who were employed at that time in the
18  Transmission, Clutch and Driveline business of
19  Meritor, but you're saying to these people, we're
20  forming a joint venture, we'll be put into a
21  separate company, here's an explanation of what
22  the joint venture is. And then you have a slide

Page 132

1   on "What happens to me as an employee of this
2   business? Where do I go? Who employees me?" And
3   all of that stuff, right?
4       A   I believe that's what this presentation
5   was.
6       Q   Gotcha, okay.
7           So if we look through it, some of it
8   should look very similar to what we just saw,
9   right, so you've got on the first page-- second
10  page of the document you've got this history page
11  which you put together, right?
12      A   Uh-huh.
13      Q   And again it says -- it chronicles the
14  company entered the transmission business in 1987,
15  the product line was limited to 9-, 10-,
16  13-speeds, right --
17      A   Uh-huh.
18      Q   Again, for the record, Mr. Martello,
19  you've got to say it out loud.
20      A   Yes, sir.
21      Q   Okay. The product design you're telling
22  me was purchased from Nissan, right?

Page 133

1       A   Yes.
2       Q   The limited product line the company had
3   was aimed at the major fleet's linehaul business,
4   right?
5       A   Correct.
6       Q   We've got the initial plan, the initial
7   results, right?
8       A   Correct.
9       Q   Again, same information you already
10  provided to Mr. Mulchandani, and he provided it to
11  the Board, right?
12      A   Correct.
13      Q   You've got the Meritor results realized,
14  and you're telling the employees these are the
15  results we haven't realized, right?
16      A   Yes.
17      Q   Same results: "The company hasn't
18  achieved market penetration expectations, products
19  plagued by warranty issues," right?
20      A   That's what it says.
21      Q   "Full product line coverage not
22  available to the OEMs," right?

34 (Pages 130 to 133)

776d4e51-238a-48e2-8a9a-0079ed29673
000172

Page 134

1     A   Correct.
2     Q   In other words, you don't have the
3  multispeeds and the LLs, right?
4     A   Partly, yes.
5     Q   "Eaton determined not to lose market
6  share, and Eaton continues technology
7  superiority," right?
8     A   Correct.
9     Q   Then on the next page we've got the
10  current obstacles the company is facing, the
11  transmission and clutch business is facing at the
12  time, right?
13     A   Correct.
14     Q   Same obstacles we saw in your
15  presentation to Mr. Mulchandani: "The OEMs'
16  reluctance to provide standard position without a
17  full product line," right?
18     A   Correct.
19     Q   "Lack of resources to compete in
20  automation technology and develop new products,"
21  right?
22     A   Correct.

Page 135

1     Q   You've got -- on the next page, you've
2  got the same alternatives.  You're explaining to
3  the employees we thought about other options, we
4  looked at purchasing the Mack transmission line,
5  right?
6     A   Correct.
7     Q   But Mack decided to retain their
8  transmission business, right?
9     A   Correct.
10     Q   You looked at the marketing agreement
11  with Spicer/TTC for the 6-speed medium-duty
12  transmission, but Freightliner didn't want to buy
13  it, it was too expensive, right?
14     MS. DUNCAN HACKETT:  Objection.
15     THE WITNESS:  It's not exactly what it
16  says, but --
17     BY MR. OSTOYICH:
18     Q   Okay.  It says you lost the Freightliner
19  medium-duty business due to cost, right?
20     A   And lack of fully complementary product
21  line, yes.
22     Q   And part of that is Freightliner

Page 136

1  informed you that the 6-speed transmission from
2  TTC/Spicer was too expensive, right?
3     A   Correct.
4     Q   You looked at internally growing and
5  developing transmissions, but you lacked the
6  resources and the timing to do it in a -- in a
7  quick manner, right?
8     A   Correct.
9     Q   You looked at an agreement with Daimler
10  Benz, and you looked at a joint venture in North
11  America with ZF, right?
12     A   Correct.
13     Q   You've got on the next line, "What were
14  Meritor's business objectives?"  I take it you're
15  telling the employees you want to have a full
16  transmission product line, right?
17     A   Correct.
18     Q   You want to obtain electronic shift
19  technology, which is the automated mechanical
20  technology, correct?
21     A   Correct.
22     Q   You want to have a partner who can

Page 137

1  provide future product technology support?
2     A   Correct.
3     Q   You want to get a worldwide reputation
4  in transmissions?
5     A   Correct.
6     Q   And partner with someone who can help
7  battle Eaton, Dana and Daimler Powertrain
8  worldwide?
9     A   Yes.
10     Q   By the way, when you're making this
11  presentation, how many employees are in
12  Laurinburg?
13     A   Again, I'll give you --
14     Q   Ballpark?
15     A   This is more than 50, less than 500.
16     Q   Fair.  What I'm trying to get a sense of
17  is are you in front of a room full of dozens of
18  people, or was this in a small group setting.
19     A   This, more than likely, is in a large
20  group setting.
21     Q   So effectively, this is your
22  announcement to all the employees in the

35 (Pages 134 to 137)

776d4e51-238a-48e2-8a9a-0079ed29673

**000173**

Page 138

1  transmission and clutch business that you're
2  ultimately responsible for, and you're telling
3  them in a group setting what's going on with the
4  creation of the joint venture?
5      A   This is -- I believe this was because we
6  were going to start having people from ZF in the
7  plant to do more due diligence and more work, and
8  we wanted them to know why the people were there.
9      Q   And so you had a big meeting with
10  effectively as many of the employees who were in
11  the Laurinburg plant as were available to do it
12  that day?
13      A   Correct.
14      Q   And it was dozens of people?
15      A   Correct.
16      Q   It's got toward the back, then, you've
17  got some product plans and timing issues, and I
18  want to take a look at that.  So on page 11 of
19  your presentation in June of '99, you've got
20  "Transmission Product Plans, class 6 through 8."
21  Do you see that?  Right?
22      A   Yes.  I didn't know where you saw the

Page 139

1  words "6 through 8," but now I see it.
2      Q   It's up at the top in the title.
3      A   You're correct.
4      Q   And the 6-speed, which is in the
5  left-hand column, I take it that's -- that's the
6  ZF manual or automated mechanical product that
7  would be for a class 6 or 7 application,
8  typically?
9      A   That's correct.
10      Q   Okay.  And then you've got listed down
11  some the 9 and the 10s, which were already
12  existing Meritor manual products, right?
13      A   That's correct.
14      Q   What is the MO9 series?  Is that the F
15  series, or is that the G series, do you remember,
16  MO9 and MO10?
17      A   No.  The terms F and G just followed
18  when we made changes to them.  So in June of '99,
19  I would imagine that's an F, with maybe some of
20  the G changes in it, but certainly not all of
21  them.
22      Q   Okay.  But you don't remember exactly

Page 140

1  when that transition occurred?
2      A   No, not off the top of my head.
3      Q   Fair enough.
4      A   It's -- it started a little before the
5  joint venture and ended a little -- ended within a
6  year after the joint venture started.
7      Q   The next page, then, you've got your
8  "Transmission Class 8 Product Plan Timing."
9          If you'll turn to the next page.  So
10  you've got a table here which has your plans for
11  when you're going to roll out some -- some new
12  products, right?
13      A   Yes.
14      Q   And it looks to me like, although the
15  joint venture is going to be formed in mid '99,
16  that these new products for the most part aren't
17  going to be available to commercialize for about a
18  year, that they're going to be -- initially
19  launched some of them in the fall of 2000,
20  spring/fall of 2000, and so forth, and then fully
21  launched in 2001, effectively?
22      A   True.

Page 141

1      Q   Okay.  Why -- why is that?  Is that just
2  the lead time it takes to get some of these
3  transmissions from the 12-speed ASTronic and the
4  16-speed ASTronic from Germany and do the testing
5  necessary in the North American market, and bring
6  them here and test them here and all of that?
7      MS. DUNCAN HACKETT:  Objection.
8      THE WITNESS:  The rationale would be
9  different depending upon which one you looked at.
10      BY MR. OSTOYICH:
11      Q   Give me an example.
12      A   If you want specifically for the
13  ASTronic, the ASTronic was a automated 12-speed
14  for the European truck.  There was changes and
15  additions to it that had to be done to make it
16  comparable for a North American truck.
17          So that was lead times to do that
18  engineering, get that tested, get, you know, the
19  tooling and everything for those particular parts
20  and to test it and get it to market.
21      Q   And just so we're clear on the record,
22  so that's the 12-speed and the 16-speed ASTronic,

36 (Pages 138 to 141)

776d4e51-238a-48e2-8a9a-0079ed29673
000174

Page 142

1  which becomes the FreedomLine.  We read that.
2     A   Correct.  You see ASTronic in Europe.
3     Q   Is it A-S Tronic, or ASTronic?
4     A   ASTronic I guess is what it is.
5     Q   And I take it so that it's not -- you
6  can't buy it off the shelf when you form the joint
7  venture and just start selling it in North
8  America.  It's got to be retooled to work with
9  North American driving conditions, in effect?
10    A   It has to have some additions.  For
11 example, Europe uses a 24-volt battery, we use a
12 12-volt battery, so there's -- it had to have a
13 voltage converter put on it that worked with it,
14 so that was one of the four or five additions that
15 had to have to be added to it.
16    Q   And I take it so those would have to be
17 made after the formation of the joint venture;
18 that takes a certain amount of time to design
19 those changes?
20    A   Correct.
21    Q   And then they have to be tested in some
22 sense?

Page 143

1     A   Correct.
2     Q   How long is the testing period,
3  typically?
4     A   Depends on what you're testing.  If
5  you're testing something simple, it could be a
6  matter of weeks.  If you're testing something big,
7  it could be years, so --
8     Q   And I take it between the changes that
9  had to be made to the ASTronic and then the
10 testing period was in effect, it was going to take
11 about a year before you would be ready to
12 initially launch the product in the fall of 2000?
13    A   Yeah, that's what we felt, yes.
14    Q   What's -- what's an initial launch
15 versus a full production launch?
16    A   It was a period in which we wanted to
17 put a number of products in the field and have
18 them sort of tested.
19        So this launch, initial launch to
20 production, was a period of time where you would
21 what we call seed the market and let the
22 product -- determine if the product had any

Page 144

1  problem that you weren't -- had knowledge of when
2  you launched it, and make some changes to those if
3  you had to.
4     Q   And I take it that's a normal process
5  that you go through whenever you roll out a new
6  product?
7     A   That's a normal process.
8     Q   Is that about the right time frame, it
9  typically takes about six months or so where
10 you're testing it in the field to see?
11    A   Well, in this particular case, we
12 were -- we knew the reliability of the ASTronic.
13 So the main box, we had a lot of data from Europe
14 that it was sound, so you're only testing the
15 changes plus its fit into a North American truck.
16 So it might be less than some of the other ones
17 that you might do.
18    Q   I take it, Mr. Martello, that
19 effectively in the middle of 1999, you're forming
20 the joint venture, but the way I'm reading it,
21 then, the ASTronic is not going to be available,
22 even for initial testing in the U.S., until about

Page 145

1  a year --
2     A   About a year afterwards, yes.
3     Q   -- afterwards, right?
4     A   Correct.
5     Q   And then it won't be available for full
6  testing almost for two full years after the
7  formation of the joint venture?
8     A   Full production, yes.
9     Q   Spring of 2001?
10    A   Year and a half.
11    Q   And then you've got some of the other
12 products.  What's the 10-speed high-torque Model 3
13 that you were at this point planning to launch in
14 May of 2000?
15    A   It was our belief that engines would
16 continue to raise in torque value, and one of the
17 things we wanted to do was have a 10-speed that
18 could handle the higher torques and really beat
19 our competition to the market, so we had already
20 had it designed and tested internally, waiting --
21 waiting for the change in engines to happen that
22 never happened, so --

37 (Pages 142 to 145)

776d4e51-238a-48e2-8a9a-0079ed29673
**000175**

Page 146

1    Q   Okay.  Spell that out for me.  So the
2  change in engines never happened.  What do you
3  mean?
4    A   The engines' changes to the higher
5  torques never happened in my time with the
6  business.
7    Q   Okay.  So in other words, you didn't
8  need the 10-speed high-torque Model 3 because the
9  engines weren't increased in power?
10   A   Correct.  It never came into existence
11 when we thought it would.
12   Q   Fair enough.
13   A   The engine companies had other things
14 that they had to do because of regulations.
15   Q   Environmental regulations and so forth?
16   A   Yes.
17   Q   So this 10-speed high-torque Model 3
18 product was not launched in May of 2000 and in
19 full production in October of 2000, I take it?
20   A   No.
21   Q   Okay.  What about below that, the fourth
22 bullet point.  It says the 10-speed high-torque

Page 147

1  with torque management.
2       Is that the same product with torque
3  management, or is that something different?
4    A   Same product.
5    Q   And I take it, because the engine change
6  never occurred, you didn't need this product,
7  commercially launch this product also?
8    A   Correct.
9    Q   Okay.  And then you've got dates for the
10 LL for initial launch in October of 2001, full
11 production in 2002, so this would be in the third
12 year of the joint venture, right?
13   A   Correct.
14   Q   And so forth.  And you've got some
15 subsequent products being planned for launch on
16 subsequent dates in January 2002, April 2002, and
17 January 2003?
18   A   Correct.
19   Q   I take it from when the joint venture
20 was formed in mid '99, then, there were no
21 products immediately available to U.S. customers
22 that were different from what you had been

Page 148

1  offering previously?
2       MS. DUNCAN HACKETT:  Objection.
3       BY MR. OSTOYICH:
4    Q   Okay.  The next page, you've got the
5  slide on "What Happens to Me," and I take it this
6  is sort of your assurance to the employees who had
7  assembled in the Laurinburg plant that, yes, you
8  will remain employees, we're keeping the business
9  as is, but we're adding in the ZF/AG technology.
10 Is that fair?
11   A   Yes, but it says they would remain a
12 Meritor employee for one year, and then they would
13 fold into the joint venture.  It was a matter of
14 getting everything done structurewise to do that,
15 so --
16   Q   And I take it that some of that is just
17 we want certain employees who have overhead
18 functions to be part of the joint venture or
19 remain employees of Meritor, things of that
20 nature?
21   A   Everybody, including me, became an
22 employee of ZF Meritor.  So from a person on the

Page 149

1  floor to myself, we all became ZF Meritor
2  employees.  But there was a lot of work to do to
3  structure it so that we did not lose our years of
4  service with -- you know, there was a lot of work
5  to do on the employee side, and that's why we
6  figured it would take a one-year period to do
7  that.
8    Q   Fair enough.  So you're basically saying
9  you'll have your job, everything is the same
10 for a year, and in the meantime we're going to
11 evaluate how to structure the business going
12 forward; is that fair?
13   A   That's correct.
14   Q   You've got your class 8 goal, which
15 you're communicating to the employees on the next
16 page of growing the company's share of the class 8
17 transmission business, right?
18   A   Correct.
19   Q   And then on the next page you've got the
20 projected sales volume year by year by product?
21   A   Correct.
22   Q   And make sure I'm reading this right.

38  (Pages 146 to 149)

776d4e51-238a-48e2-8a9a-0079ed29673

000176

Page 150

1 So the projection for -- your fiscal year 2000,
2 was it the same then as Meritor's, would have been
3 starting in the fall of '99 through the fall of
4 2000?
5     A   Excuse me?
6     Q   Looking at the --
7     A   Year 2000 --
8     Q   So that's a fiscal year that starts in
9 the fall of '99?
10    A   Yes, it would be fiscal year, correct.
11    Q   So in other words, in the calendar year
12 from the fall of '99 to the fall of 2000, you're
13 predicting sales volume of 9- and 10-speed
14 manuals, for example, of 45,717?
15    A   Correct.
16    Q   Okay.  And you're predicting that over
17 the next four or five years of the joint venture,
18 the 9- and 10-speed manuals that Meritor offered
19 would decline in sales volume from 45,700 to about
20 28,600, right?
21    A   Yes, the manuals would go down as the
22 automated manuals took their place.

Page 151

1     Q   Okay.  And by "automated manuals," you
2 mean the 12-speed ASTronic and the 16-speed
3 ASTronic?
4     A   Plus SureShift and SmartShift.
5     Q   And collectively, then, it looks like
6 down at the bottom you've got the totals, so
7 you're predicting an overall growth in
8 transmission sales during that five-year period of
9 about 35,000 or so, 58,900 to 94,000, right?
10    A   Yes.
11    Q   And the way I'm reading it, virtually
12 all of that growth is from the automated
13 mechanical products, right?
14    A   The large majority, yes.
15    Q   In other words, the FreedomLine, which
16 is the 12-speed and 16-speed ASTronic, goes from
17 zero to about 31,000 during that period in your
18 plan?
19    A   Oh, yes, okay.  Yes.
20    Q   And then the SureShift, which is an
21 automated mechanical product --
22    A   Correct.

Page 152

1     Q   -- that goes from 5,000 to 10,000,
2 right?
3     A   Correct.
4     Q   And the SmartShift goes from 4500 to
5 77 -- so about 8,000 over that five-year period?
6     A   Correct.
7     Q   So it looks like about, of the 35,000
8 unit increase in sales, you're projecting
9 somewhere around 35,000 or so increase in
10 automated mechanical products?
11    A   Correct.
12    Q   And a decline in the manual products?
13    A   Correct.
14    Q   And just so I'm clear, there was no plan
15 or strategic planning process for the period after
16 2004?  This was as far out as you did it at this
17 time?
18    A   At this time, we did -- we always did
19 five-year detailed projections.  One year was
20 extreme detail, other four years was detailed but
21 not as much detail.
22    Q   Fair enough.  And you didn't do the

Page 153

1 planning, detailed planning of any kind for years
2 5 through 10 or 10 through 15 and so on?
3     A   No.
4     Q   I asked you this morning about some of
5 the Board presentations, and I think you said that
6 you were responsible, as the President of the
7 ZF Meritor joint venture, for presenting quarterly
8 reports to the Board of Directors on the business;
9 is that fair?
10    A   Yes.
11    Q   Okay.  I've got a series of those, and I
12 want to make sure I've got you're -- what you were
13 presenting, so I'm going to try to run through
14 some of those.
15        The first one, which we're going to mark
16 as Exhibit 8 to your deposition, Mr. Martello, is
17 the minutes of a ZF Meritor LLC Board of Directors
18 meeting, July 13th, 2000.  Again, produced by your
19 lawyers to me out of the company's file, it's
20 ZFMA0033226 through 35.
21        And it says there was a Board of
22 Directors meeting held at the offices of

39 (Pages 150 to 153)

776d4e51-238a-48e2-8a9a-0079ed29673
000177

Page 154

1    ZF Industries in Gainesville, Georgia, commencing
2    at 8:00 a.m. on Thursday, July 13th, 2000.  It
3    says the following members of the Board were
4    present in person, and also present in person at
5    the meeting at the request of the directors was,
6    among others, Richard Martello, President of the
7    company.
8         So I'll ask you to take a look at that.
9         (Martello Deposition Exhibit No. 8 was
10        marked for identification.)
11        THE WITNESS:  Okay.
12        BY MR. OSTOYICH:
13    Q   I take it, Mr. Martello, that you in
14   fact did attend a Board meeting of ZF Meritor LLC
15   in July of 2000 at --
16    A   Excuse me?
17    Q   You did in fact attend a Board of
18   Directors meeting --
19    A   Yes.
20    Q   -- of ZF Meritor LLC in July of 2000?
21    A   Yes.
22    Q   Okay.  So it says you attended as

Page 155

1    president of the company.  Mr. Mulchandani made
2    some opening remarks, and then it's got various
3    presentations that were presented at that Board
4    meeting by you and others, right?
5     A   Correct.
6     Q   Okay.  And one of the things, if I look
7    through it, it's got presentations on the 2001 to
8    2005 business plan, which I take it is that
9    five-year strategic plan that you mentioned
10   earlier?
11    A   I would believe that's it.
12    Q   Okay.  That's starting on -- the last
13   two digits there are 29.
14    A   Yes.
15    Q   It says you made a presentation on parts
16   of that, and then on the next page, there was a
17   presentation by Mr. Martello on environmental
18   analysis and competitive analysis, right?
19    A   Uh-huh.
20    Q   If you look at the carryover from 5
21   to 6, I guess as part of your presentation on
22   competitive analysis, you recommended to the Board

Page 156

1    of ZF Meritor that a full line of automated
2    products be released at every OEM, right?
3     A   That's what it says.  I think the words
4    are a little -- I don't think the sentence was
5    written correctly in that -- it would be nice to
6    say I recommended it be released at every OEM, but
7    that's not going to make it happen.
8     Q   Sure.  But in other words, you made a
9    presentation at this July 200 ZF Meritor Board
10   meeting where you said, in effect, we should try
11   and get a full line of automated products released
12   at every OEM, right?
13    A   Correct.
14    Q   And we should try and develop a full
15   class 8 product line --
16    A   Correct.
17    Q   -- as a business, as a company going
18   forward, right?
19    A   Correct.
20    Q   Now, just so I'm clear on the record,
21   what did you mean by you should try to get a full
22   line of automated products released at every OEM?

Page 157

1    In other words, is that just the 12- and 16-speed
2    FreedomLine, or is it something else?
3     A   It included the 12- and 16-speed.
4     Q   Okay.  And where you're recommending
5    that you try and get other automated products
6    released at every OEM?
7     A   At the time, we only had -- it was same
8    thing I've said before.  You can refer to the
9    other documents that we've talked about.
10        I always believed that because of the
11   threat that Eaton had on pricing of products that
12   we didn't have, it was -- always put us in a
13   position that we didn't want to be in when we
14   dealt with the OEMs.
15    Q   Again, so I'm clear on the record, so
16   you're recommending to the Board the same issue we
17   saw back when we were looking at the Mack purchase
18   five or six years before this, which is we needed
19   to develop a full line of products, full line of
20   transmission products, the LLs, the 13-speeds, the
21   15-speeds, the 18s and so forth, right?
22    A   We needed a line of products.  I never

40 (Pages 154 to 157)

776d4e51-238a-48e2-8a9a-0079ed29673

000178

Page 158

1  believed we needed exactly everything you said,
2  but --
3      Q   Okay.
4      A   -- but, yes, we needed a fuller line of
5  products.
6      Q   Fair enough.  You have customers out
7  there, big truck customers, that need
8  transmissions that you're not offering, and you're
9  just saying to the Board, again, as I've been
10 saying when I was back at Meritor, we need to
11 develop those or form a partnership or somehow
12 create some of the transmissions we don't
13 currently have for their customers, fair?
14     A   Again, as I said in the Mack
15 presentation, there was a constant view by
16 everyone that Eaton would threaten market pricing
17 to OEMs that took as a standard on products that
18 we didn't have.
19     Q   What do you mean there was a constant
20 view by everyone?
21     A   Well, within -- within the people of
22 ArvinMeritor, it was discussed more than once

Page 159

1  among Charlie Allen, Dennis Kline, myself, and
2  Dennis's salespeople, that the OEMs were afraid of
3  retaliatory pricing from Eaton on the products
4  that we didn't have.
5      Q   Sure, I understand.  So internally you
6  had a lot of discussions about the OEMs' concern,
7  right?
8      A   Correct.
9      Q   And, again, the only conversation you
10 ever had was one guy from Mack who referenced an
11 unidentified person at Eaton, right?
12         MS. DUNCAN HACKETT:  Objection.
13         BY MR. OSTOYICH:
14     Q   Right?
15     A   I don't understand -- you mean the
16 only --
17     Q   You have no firsthand knowledge of any
18 Eaton threats about pricing of any products,
19 right?  We've already talked about that.
20     A   "Firsthand" being --
21     Q   You heard it.
22     A   -- that I was in the meeting where Eaton

Page 160

1  particularly said that?  No, I was never in a
2  meeting with Eaton personnel that said that.
3      Q   And the only Mack person, one person at
4  Mack, Hans -- what's his name?
5      A   Hans Walter.
6      Q   Hans Walter.
7      A   I remember that, and I remember Larry
8  Moore at Volvo telling me that.  That's the two I
9  can remember other than third and fourth hand
10 discussion with sales guys and people within
11 ArvinMeritor.
12     Q   All right.  Now, at this point, you're
13 telling the Board you have customers out there who
14 are buying things that you're not making, right?
15     A   Correct.
16     Q   LLs, high-torque 13-speeds, 18-speeds,
17 right?
18     A   Correct.
19     Q   You're saying we need to make those or
20 get them somehow so we can offer those products
21 because they want to buy those, right?
22     A   Correct.

Page 161

1      Q   And we're not going to be able to keep
2  and maintain standard position at the OEMs unless
3  we actually offer the products, all the products
4  they need to purchase for their business, right?
5          MS. DUNCAN HACKETT:  Objection.
6          THE WITNESS:  It would be difficult to
7  do without all the products, yes.
8          BY MR. OSTOYICH:
9      Q   Let's go back in the presentation.
10         There's a -- on that page we looked at
11 before with the 2001 to 2005 business plan that
12 you presented to the Board at this July 13th, 2000
13 Board meeting, there's a section there that says,
14 "A.  Market Share Analysis."
15     A   Correct.
16     Q   It says, "Mr. Martello discussed,
17 initially, the variance between projected market
18 share penetration (expected to increase from 16.1%
19 to 21.7%) and the actual results (decrease from
20 16.1% to 13%)."  Do you see that?
21     A   Uh-huh.
22     Q   And I take it that reflects,

41 (Pages 158 to 161)

776d4e51-238a-48e2-8a9a-0079ed29673
000179

Page 162

1  Mr. Martello, you presented to the Board in July
2  of 2000 that the company had expected in the first
3  year of the joint venture to increase its market
4  share from 16 percent of the class 8 transmissions
5  to about 22 percent of the class 8 transmissions,
6  right?
7      A   I believe it's total market.  It could
8  just be the linehaul, but I believe it's total
9  market, yes.
10     Q   But the actual results in that first 12
11 months or so of the joint venture was that your
12 share of the total class 8 transmissions declined
13 from about 16 percent to 13 percent, right?
14     A   Yes.
15     Q   And then you listed for the Board the
16 factors that contributed to that situation, that
17 decline in share, right?
18     A   Yes.
19     Q   Poor product quality image, right?
20     A   Yes.
21     Q   And what did you tell the Board about
22 poor product quality image?  What did you mean by

Page 163

1  that?
2      A   I don't remember exactly what, but it
3  probably went back to the bearing issue on recall
4  that we had.
5      Q   And then you said to the Board in
6  July of 2000 that another factor that contributed
7  to the decline in the joint venture's share of
8  class 8 transmission sales was a decrease in Ryder
9  business.
10         Do you see that?
11     A   Correct.
12     Q   And that's the decrease we talked about
13 before, that after the bearing issue, at some
14 point, your business with Ryder decreased?  They
15 started purchasing less from the company?
16     A   Yeah.  I think in this particular
17 instance, but I'm not positive, it was just a down
18 year for Ryder purchases of trucks in general, and
19 since Ryder was a major -- major part for us.  But
20 I wouldn't swear to that, but it does say decrease
21 in Ryder business.
22     Q   Then the third factor you told the Board

Page 164

1  contributing to the decline in the company's
2  market share in its first year of operation was
3  turnover in the company's sales organization.
4          Do you see that?
5      A   Yes.
6      Q   What did you mean by "turnover in the
7  company's sales organization"?
8      A   I believe it was a period of time where
9  we lost a lot of people in the sales organization
10 that left and were replaced.  They were going
11 through a changeover in the sales organization.
12     Q   Okay.  Was that a reference to the joint
13 venture sales organization, or was that the
14 ArvinMeritor North American field organization?
15     A   ArvinMeritor.
16     Q   Was that coincident with the merger
17 between Meritor and ArvinMeritor, or was that
18 the --
19     A   It had nothing to do with the joint
20 venture.
21     Q   Okay.  Just something to do with the
22 parent -- the shareholder, ArvinMeritor?

Page 165

1      A   Yes, just something that happened,
2  that's all.
3      Q   Then the fourth factor that you told the
4  Board contributed to the decline in the company's
5  share of class 8 transmissions was an increase in
6  sales of Eaton auto shift, right?
7      A   Correct.
8      Q   So in other words, it's a competitive
9  product, and they've taken some business from us,
10 right?
11         MS. DUNCAN HACKETT:  Objection.
12         THE WITNESS:  It was just a period of
13 where they were increasing sales of auto shift.
14         BY MR. OSTOYICH:
15     Q   And then the fifth factor that you told
16 the board contributed to the company's decline in
17 transmission share was the push towards 13-speed
18 transmissions, especially by Freightliner.
19         What did you mean by that?
20     A   I believe because -- I believe it had a
21 lot to do with the integration of Sterling Trucks
22 into the Freightliner, and Sterling had a lot of

42 (Pages 162 to 165)

776d4e51-238a-48e2-8a9a-0079ed29673
000180

Page 166

1  13-speed business.
2  Q  Spell that out for me.  So in other
3  words, we've talked about Freightliner at this
4  point has purchased a new truck business, the
5  Sterling business, and they had a higher mix of
6  13-speed transmission trucks, I take it?
7  A  Correct.  Yes, that we didn't -- that we
8  couldn't --
9  Q  Mr. Martello, you've got to speak up a
10  little bit.
11  A  I said, yes, that's -- the Sterling
12  business had a lot of higher-torque 13-speeds than
13  the Freightliner normal mix of product.
14  Q  And I take it at that point, you didn't
15  have the 13-speed offerings that
16  Sterling/Freightliner needed?
17  A  Correct.
18  Q  All right.  Then the sixth factor you
19  told the Board contributed to the decline in the
20  company's share from 16 percent to 13 percent of
21  class 8 transmissions was the multiyear fleet
22  business lost due to competitive equalization

Page 167

1  cutbacks in early 1999.
2       What did you mean by that?
3  A  Well, I'm going to tie it in with the
4  next sentence, which was control distribution.
5  Q  Okay.
6  A  And that was a period of time where we
7  were selling everything we could make.  Eaton was
8  selling everything they could make, and our boss
9  said if we're selling everything we can make, why
10  are we giving competitive equalization to people
11  in the marketplace.
12  Q  What's competitive equalization?
13  A  Pricing -- price reductions for people
14  to buy product in the marketplace.
15  Q  And is that a price reduction that was
16  provided to the OEMs or to the fleet customers?
17  A  To the fleet customers.
18  Q  I see, okay.  So you were having, I
19  guess, in that prior year of the joint venture
20  operation, you were having a good year, you were
21  selling out?
22  A  (Witness nodding head up and down.)

Page 168

1  Q  Again, you've got to be audible,
2  Mr. Martello.
3  A  That's correct.
4  Q  And you said your boss said why are we
5  giving price concessions, competitive
6  equalization, to fleets?
7  A  That's correct.
8  Q  And who was that person?
9  A  Mr. Mulchandani.
10  Q  Okay.  So I take it the company in that
11  year, the first year of the joint venture's
12  operation, under Mr. Mulchandani's direction,
13  decided not to pay those discounts to the fleets?
14       MS. DUNCAN HACKETT:  Objection.
15       THE WITNESS:  See, I'm not -- I don't
16  know -- this doesn't tell me what year that this
17  penetration drop is talking about, whether that is
18  our fiscal '99 or our fiscal 2000.  I'd have to
19  know that in particular.
20       But to answer -- to answer your exact
21  question, when you say first year of the joint
22  venture, I'm not sure whether that was the first

Page 169

1  year of the joint venture or the last year of just
2  ArvinMeritor.
3       BY MR. OSTOYICH:
4  Q  Fair enough.  So just so we're clear on
5  the record, so you're telling the Board of
6  Directors of the joint venture, our share has gone
7  down of class 8 transmissions from 16 percent to
8  13 percent, and factors 6 and 7 are, at some point
9  over the last two years, we cut back on our
10  discounts to the fleets, right?
11  A  Cut back on our discounts to the fleet
12  because we were selling as many product as we can.
13  Q  And as a result, I guess you lost
14  business because some fleets decided to take their
15  business elsewhere?
16       MS. DUNCAN HACKETT:  Objection.
17       THE WITNESS:  It was lost business
18  because we didn't have -- we didn't offer
19  multiyear fleet business, so -- I mean, that's
20  what it says.  It says we lost business due to
21  competitive equalization cutbacks to fleets.
22

43  (Pages 166 to 169)

776d4e51-238a-48e2-8a9a-0079ed29673
000181

Page 170

1       BY MR. OSTOYICH:
2       Q   Right.  In other words, you're telling
3   the Board that's what --
4       A   That's one of the reasons, yes.
5       Q   -- the 6 factors we lost some share last
6   year.
7       A   That's what it says, yes.
8       Q   What is -- are you saying the seventh --
9   one of the reasons, the seventh reason you lost
10  some share was control distribution.
11      What did that mean?
12      A   Well, it was -- that was a period of
13  time where we were producing everything we could
14  produce, so regardless of what the market was, we
15  could only produce a certain amount.  So when you
16  look at share of the total market, it didn't mean
17  as much because we produced everything we could
18  produce, anyway.
19      Q   You were selling out, in other words?
20      A   Yes, we sold out.
21      Q   But what does it mean that you lost
22  business due to control distribution?  What is

Page 171

1   control distribution, in other words?
2       A   We -- we only had a certain amount of
3   trucks -- I mean, a certain amount of
4   transmissions that we could sell to the OEMs to
5   put in trucks.  So we gave so many to
6   Freightliner, so many to Mack, so we had to
7   control the distribution because we couldn't give
8   them everything they wanted.
9       Q   I gotcha.  In other words, you
10  allocated, Mack, you get so many units, and
11  Freightliner, you get so many because we can't
12  provide everything you want, basically?
13      A   We never used the word "allocation."
14      Q   Fair enough.  But it's the same idea,
15  right?
16      A   Sort of, yes.
17      Q   Okay.  Let's mark as the next exhibit --
18  and actually, if you could keep that one there,
19  Mr. Martello, because it's --
20      A   Excuse me?
21      Q   Keep the July 13th, 2000 Board
22  presentation there.

Page 172

1       This will be Martello 9.
2       (Martello Deposition Exhibit No. 9 was
3       marked for identification.)
4       BY MR. OSTOYICH:
5       Q   While you're looking at that, I'll just
6   identify it for the record.
7       It's on ZF Meritor -- it's got a logo at
8   the top.  It says, "Board of Directors meeting,
9   July 13, 2000.  Transmissions."  Came from the
10  company's files with the stamp on it from the
11  lawyers ZFMA0343536 to 45.
12      And let me know when you've had a chance
13  to look at that.
14      A   Yes.
15      Q   Now, if you'll look at Exhibit 8, which
16  is the minutes of the Board meeting, it says that
17  you made some presentations on competitive
18  analysis and so forth on page 5 down at the
19  bottom.  See where I am under the section that
20  says "D" right there?
21      A   Yes, but this -- this is -- this is a
22  presentation of the technology road map that

Page 173

1   Mr. Molde made, I do believe, because the last --
2   if you look at it, it says, "Market trends, the
3   competitive position of Eaton, TTC, Mack, Daimler
4   Chrysler, development of acquisitions of --
5       Q   I gotcha.
6       A   So the technology road map is something
7   that the engineering community in ArvinMeritor
8   did, and that's what this back part is.
9       So I would say this is a presentation
10  made by Dean Molde.
11      Q   Gotcha.  So you were at the Board
12  meeting, and you're saying Mr. Molde, who was the
13  chief engineer for the joint venture --
14      A   That's correct.
15      Q   -- he presented this set of slides to
16  the Board of Directors while you were there?
17      A   I believe that to be true.
18      Q   So I got it.  So in other words, on that
19  first page-- or the second page, Mr. Molde
20  provided the competitive analysis of Eaton, right?
21      A   Correct.
22      Q   He said the transmission, the

44 (Pages 170 to 173)

776d4e51-238a-48e2-8a9a-0079ed2967
000182

Page 174

1    transmission class 6 through 8, they're the market
2    leader, full product line offering, right?
3        A    Yes.
4        Q    And he told the Board they're
5    introducing shift and clutch system automation on
6    the entire product line, right?
7        A    That's correct.
8        Q    Told the Board that Eaton has very
9    strong brand loyalty, right?
10       A    Correct.
11       Q    Very strong engineering and technical
12   resources, correct?
13       A    Correct.
14       Q    That Eaton has their own electronics
15   division?
16       A    Correct.
17       Q    That Eaton has a very aggressive patent
18   portfolio?
19       A    Correct.
20       Q    And on the next page Mr. Molde told the
21   Board the competitive analysis of TTC, which is
22   the old Spicer transmission business?

Page 175

1        A    Correct.
2        Q    And then on the next page, the
3    competitive analysis of Mack?
4        A    Correct.
5        Q    Mack is not selling its transmissions;
6    they use them internally for their own truck
7    production, right?
8        A    Correct.
9        Q    But I take it the company, the joint
10   venture, considered Mack a competitor in the sense
11   that you had to win their business and they had an
12   alternate product line that they could use
13   internally on their own, themselves?
14       A    In this particular case, being that it
15   was done by an engineer for an engineering
16   analysis, "competitive" would mean a product -- in
17   the competitive design of the product more than it
18   would mean competition in the marketplace.
19       Q    Fair enough.  And I take it on the next
20   page, Mr. Molde is telling the Board that Daimler
21   Chrysler has competitive alternatives in-house
22   that they could use on their own, right?

Page 176

1        A    We believe this to be true, yes.
2        Q    Okay.  And I take it, as part of your
3    sales and marketing effort for the joint venture,
4    you're considering that Daimler or Mack could use
5    more of their own transmissions and buy fewer from
6    any outside vendor, right?
7            MS. DUNCAN HACKETT:  Objection.
8            THE WITNESS:  We did not believe that to
9    be true at Mack.  We did believe that Daimler
10   Chrysler wanted to get into the transmission
11   business because we had discussions with them
12   about it.
13           BY MR. OSTOYICH:
14       Q    In other words, the Daimler Chrysler,
15   just so we're clear, Daimler Chrysler, they own
16   Freightliner, right?
17       A    That's correct.
18       Q    And Daimler Chrysler made its own
19   transmissions and other components in Europe,
20   right?
21       A    For European-style trucks.
22       Q    And there was -- you had a concern that

Page 177

1    they could start making their own transmissions
2    for North American-style trucks?
3        A    We knew that it was their desire, yes.
4        Q    So I take it, as part of your assessment
5    of how you're going to proceed, you're factoring
6    in, as the President of the joint venture, we've
7    got to keep one eye on Daimler Chrysler because if
8    we're not offering the right products at the right
9    prices, they can start making their own products.
10   Is that fair?
11           MS. DUNCAN HACKETT:  Objection.
12           THE WITNESS:  I don't think it had
13   anything to do with the right products at the
14   right prices.  We just said, in this analysis,
15   Daimler Chrysler is someone that can make
16   transmissions and has the desire to make
17   transmissions for North America.
18           BY MR. OSTOYICH:
19       Q    So you considered them a potential
20   competitor for their business because if you
21   didn't give them an offer that they found
22   acceptable, they could just use their own?

45 (Pages 174 to 177)

776d4e51-238a-48e2-8a9a-0079ed29673

**000183**

Page 178

1    A   That's correct.
2    Q   Fair enough.
3        It's 12:30, Mr. Martello.  Do you have
4    enough stamina for another document, or do you
5    want to stop for lunch?
6    A   I'm not a great lunch eater, so that's
7    up to you lunching people.
8    Q   Well, I'll tell you what, let's see if
9    we can do --
10   A   This lady has to exercise her fingers
11   more than --
12   Q   Let's just mark one more document, then
13   we'll take a break after that.
14   A   Okay.
15   Q   I know you don't want to eat, but she
16   does, and I do, and probably Jen does as well.
17       We're going to mark as --
18   A   Can I put this away?
19   Q   Yes, you can, thanks.
20       We'll mark as Exhibit 10 to your
21   deposition a ZF Meritor 2001 to 2005 strategic
22   business plan.  And I'll ask you to take a look at

Page 179

1    that.
2        (Martello  Deposition Exhibit No. 10 was
3        marked for identification.)
4        THE WITNESS:  Yes, sir.
5        BY MR. OSTOYICH:
6    Q   All right.  Mr. Martello, let me know
7    when you've flipped through it, familiarized
8    yourself with it.  And while you're doing that, it
9    came from the company's files, the lawyer stamp on
10   it is ZFMA0021579 through 628.
11   A   Okay.
12   Q   We're still on Exhibit 8 to your
13   deposition, the Board minutes that you presented
14   on the 2001 to 2005 ZF Meritor business plan to
15   the Board, and that Mr. Molde did the technology
16   road map, and that was Exhibit 9, right?
17   A   Yes.
18   Q   If you look at the second page of this,
19   this says then you presented on the environmental
20   analysis, the competition analysis, and so forth,
21   right?
22   A   Uh-huh.

Page 180

1    Q   And I take it this is the slides that
2    you presented to the Board in July of 2000, right?
3    A   I would say so.
4    Q   Okay.  And this was prepared and
5    presented in the ordinary course of your
6    responsibilities as the President of the joint
7    venture, fair?
8    A   Correct.
9    Q   The pages aren't numbered, Mr. Martello,
10   but would the lawyer stamp at the bottom, it's got
11   the last two digits 83, and it's probably about 5
12   or 6 pages in, if you could take a look at that.
13   A   83?
14   Q   83 are the last two digits.
15   A   Yes.
16   Q   So up at the top it should say
17   "Unfavorable Market Trends."  Do you see that?
18   A   Correct.
19   Q   I take it this is a page that you
20   prepared and presented to the Board in July of
21   2000 on unfavorable market trends that you saw on
22   the horizon, is that fair?  Or favorable market

Page 181

1    trends that were already in progress, I guess.
2    A   Some of them in progress, some of them
3    were just discussion.
4    Q   The first bullet says, "The OEMs are
5    resisting engineering new products into their
6    vehicles due to lack of resources and
7    fast-changing products.  That was an unfavorable
8    market trend."
9        What did you mean by that?
10   A   I do believe that this was a period of
11   time where most of them -- most of them had their
12   plates full with engine changes.  And every
13   company has a certain amount of resources, and so
14   a lot of the companies were -- a lot of the OEMs
15   had a tremendous amount of their engineering
16   resources tied up in engine changes and its
17   associated changes with the truck, and so they
18   weren't -- you know, they were less receptive to
19   doing other work.
20   Q   I take it that was unfavorable market
21   trend to the joint venture's perspective.  Why?
22   A   Because we were trying to introduce the

46 (Pages 178 to 181)

776d4e51-238a-48e2-8a9a-0079ed29673

000184

Page 182

1 FreedomLines.
2    Q   So it made it harder to get the OEMs to
3 pay attention to the new transmission product
4 because their resources, their engineering
5 resources were just tied up on engines?
6    A   Correct.
7    Q   Okay.  And in the second unfavorable
8 market trend you identified in this strategic plan
9 for the Board was, "Pull-through of products is
10 becoming more difficult because of the European
11 influence on the industry."
12        What did that mean?
13    A   And this is one that was more talked in
14 actuality, but all of the -- except for
15 International, all of the OEMs were now owned by a
16 European company.  The European way of doing
17 business does not really have a pull-through
18 system of products, where the supplier goes out
19 and introduces its products to a fleet.
20        They do all of that strictly through the
21 OEMs.  And because the European -- Europeans that
22 were running the OEMs were not used to that

Page 183

1 concept, they didn't like it, and that's what that
2 means.
3    Q   Okay.  So we're clear on the record, so
4 at that point -- and this is in mid 2000 you're
5 presenting this -- Freightliner is owned by a
6 German company, Daimler Chrysler?
7    A   Correct.
8    Q   And Volvo Mack is owned by a European
9 company, Volvo?
10    A   Correct.
11    Q   Or Volvo Renault?
12    A   Right.
13    Q   And then PACCAR has DAF as the owner?
14    A   I'm sorry, PACCAR is totally American
15 owned.
16    Q   PACCAR is U.S., but they have a DAF
17 business, but that's a separate company?
18    A   Yes.
19    Q   And then International?
20    A   International was a U.S. company.
21    Q   So when you're talking about the
22 European influence, you're talking about Daimler's

Page 184

1 ownership of Freightliner, which is the biggest
2 OEM, right?
3    A   And our biggest customer, yes.
4    Q   And your biggest customer.
5    A   And Volvo, which is our second biggest.
6    Q   Volvo, which is your second biggest, is
7 owned by now a European company because they
8 merged with Mack?
9    A   Yes.
10    Q   And so the European were not used to the
11 pull-through of products, and that is becoming
12 more difficult.
13        What was unfavorable about that?  How
14 did that impact your business?
15    A   We did not want -- the industry did not
16 want a strict push system where the, you know,
17 where the fleets -- everybody that we talked to
18 wanted to continue to have a system where the
19 fleets had contact with the suppliers as well as
20 the OEMs.  People, the European people that I
21 dealt with, within especially Freightliner, did
22 not like that concept.

Page 185

1    Q   Did not like the concept of you --
2    A   Suppliers --
3    Q   -- as a transmission manufacturer going
4 direct to their customers?
5    A   -- going to their customers, yes.
6    Q   We have to speak one at a time or she's
7 going to get mad at us.
8        And I take it, so as you're rolling out
9 the FreedomLine in the next few months, in the
10 fall of 2000 and the spring of 2001, it's making
11 it harder to sell it to Freightliner because to
12 get -- to go to the fleets to get them to spec the
13 product from Freightliner because the Daimler
14 Chrysler influence at Freightliner is counter to
15 that?
16        MS. DUNCAN HACKETT:  Objection.
17        THE WITNESS:  I don't -- at
18 Freightliner, we believe it was mainly the
19 engineering side because their resources was tied
20 up, yes.
21    BY MR. OSTOYICH:
22    Q   What about at Volvo Mack, did you get --

47 (Pages 182 to 185)

776d4e51-238a-48e2-8a9a-0079ed29673

000185

Page 186

1    A   We didn't -- again, their resources in
2  June were tied up.
3    Q   What I'm trying to get a sense, you say
4  this is an unfavorable market trend, and I take it
5  what you mean is it's going to make it harder for
6  you to generate interest in the fleet --
7    A   Over the long run, yes.  Over the long
8  run, we felt that was going to be a negative
9  influence to our business, correct.
10   Q   Okay.  Then the third unfavorable market
11 trend you have here is that sales incentives are
12 increasing rapidly as the market declines.  And I
13 take it this was the period in '99-2000 where
14 there was a slump in the truck market?
15   A   Correct.
16   Q   And so you say there's an unfavorable
17 market trend and sales incentives are increasing
18 rapidly as the market declines.  What did you mean
19 by that?
20   A   Eaton was out buying business.  And as
21 your volume declines and you're having to spend
22 more and more money to generate sales, it's a

Page 187

1  negative to your profit line.
2    Q   Just so we're clear on the record, so
3  when you say Eaton was out buying business,
4  they're providing incentives, discounts of some
5  sort, rebates, to get customers to spec their
6  products?
7    A   Correct.
8    Q   And I take it you guys were doing the
9  same thing because the market is declining and
10 there are fewer trucks being purchased at the
11 time?
12   A   Yes, we were doing the same thing.
13   Q   And that's unfavorable to ZF Meritor,
14 your joint venture, profit line?
15   A   Profitability.
16   Q   So prices are going down, so you're just
17 going to be less profitable as everybody is
18 scrambling for business in a down truck market; is
19 that fair?
20   A   Excuse me?  I'm --
21   Q   Your prices are going down and everybody
22 is going to be less profitable and everybody is

Page 188

1  scrambling for business with the decline in the
2  truck market?
3    A   Yes, your net price goes down.
4    Q   Then the last -- the fourth bullet here
5  that you told the Board in July of 2000 was an
6  unfavorable market trend was consolidation of the
7  OEMs into large global truck and bus conglomerates
8  is rapidly taking place.
9        What did you mean by that?
10   A   Again, the European influence of buying
11 up -- they bought up Freightliner, Freightliner
12 then bought up Sterling, so it took Ford out of
13 the market.
14       Volvo was a combination of the old GM
15 auto car, five or six other at one time truck
16 companies.  Western Star got bought out by
17 Freightliner, Daimler Chrysler.
18       So these companies were being bought up,
19 and mainly by large global companies, so there was
20 not a lot of -- there wasn't -- besides PACCAR and
21 Navistar, which we knew were having discussions,
22 at least at that time, with people.  There was no

Page 189

1  strictly U.S.-owned truck companies because, like
2  I say, PACCAR was even becoming global.
3    Q   So I take it your customers, your --
4  your big truck customers, are getting and bigger
5  during this period; you're pointing that out?
6    A   Yes.
7    Q   And what's unfavorable to the joint
8  venture about that trend?
9    A   OEM -- the larger the OEM, the more
10 leverage they have on you.
11   Q   So as they get bigger and bigger and buy
12 each other up, they have more leverage to
13 negotiate lower pricing and better terms.  Is that
14 fair?
15   A   They have more leverage in total, yes.
16   Q   And they're using that leverage to
17 purchase at lower prices and get better terms for
18 products?
19   A   Plus worldwide, yes.
20   Q   And I take it that's unfavorable
21 because, again, your prices are going to go down
22 as the seller --

48  (Pages 186 to 189)

Page 190

1    A   The profitability goes down.
2    Q   We've really got to try not to --
3        And then at the bottom, you summarize
4  and say, "All of these factors are driving toward
5  the elimination of the pull system," which is
6  where you're reaching out to the fleets to try and
7  generate demand and get them to spec your
8  transmissions in their trucks, right?
9    A   Correct.
10   Q   "These factors are driving towards the
11 creation of closer relationships with the OEMs,
12 and the desire to have single-source full product
13 line suppliers or possible integration by the
14 OEMs."
15       What did you mean by, "These factors are
16 driving towards the desire to have single-source
17 full product line suppliers or possible
18 integration by the OEMs"?
19   A   The European -- the European market
20 tells their customers, here's a truck.  If you
21 want to buy a Daimler Chrysler truck, this is what
22 you get.  If you want to buy a Volvo truck, this

Page 191

1  is what you get.
2        The U.S. market had always been more
3  open to multifunctional -- or multispecification
4  of parts within a truck, and that's what that
5  statement means.
6    Q   And what about the second part of that
7  statement where you say, "These factors are
8  driving towards the desire to have single-source
9  full product line suppliers"?
10   A   That's what I'm saying.  The -- the OEMs
11 in Europe says, here's a truck.  If you want to
12 buy my truck, this is what you get.
13       So you've got a single source, a single
14 product.  You couldn't specify -- in Europe, you
15 don't specify -- in the United States or in North
16 America, people specify fan belts and light bulbs.
17 In Europe, they can't even specify what engine and
18 transmission they want.  I mean, that's what it
19 means.
20   Q   So am I right, Mr. Martello, essentially
21 you're saying the European influence, as the OEMs,
22 the customers are getting bigger and they're

Page 192

1  getting purchased by the European companies, it's
2  causing them to look at decreasing the number of
3  options that they're making available for various
4  components?
5    A   It's a desire by them to drive the
6  market more like a European market.
7    Q   And part of that is to not provide
8  multiple options for every component in the truck?
9  In other words, just to provide one -- one option,
10 a single-source axle for their trucks to their
11 customers?
12   A   That is correct.
13   Q   And so they're looking at, with the
14 European influence, they're looking at providing
15 their customers with just a single source of
16 transmissions?
17   A   A single truck, yes.
18   Q   And they're looking at full product line
19 suppliers, one customer that can provide all the
20 different products that they need to offer a
21 single --
22   A   They may be looking at --

Page 193

1    Q   -- manufacturer of transmissions?
2    A   -- certain products for each product
3  that they introduce.  They just -- they want to
4  reduce the number of -- they want to reduce the
5  specification of products or components on their
6  truck.
7    Q   So in other words, buy more of their
8  components from one manufacturer for axles and
9  brakes, and more from one manufacturer of
10 transmissions?
11   A   I don't think they care about that.  I
12 think they care about not having individual
13 components spec'd by the fleets in their truck.
14   Q   So just provide a -- sort of a set
15 option, no ability to vary the set option?
16   A   That's correct.  The next page really
17 explains what I was talking about, a consolidation
18 of the industry into major --
19   Q   It references some specific companies,
20 Daimler Chrysler purchased Mercedes; Freightliner,
21 Sterling, Western Star and so forth?
22   A   Correct.

49  (Pages 190 to 193)

Page 194

1    Q   Volvo had purchased Renault, Mack,
2  Mitsubishi, Nissan diesel, et cetera?
3    A   Correct.
4    Q   The page after that is -- it says
5  "Environmental Threats," and the last bullet seems
6  to reflect what you were talking about. It says
7  the purchasing power of the remaining OEMs with
8  increased competition erodes the margins of the
9  suppliers. Do you see that?
10   A   Correct.
11   Q   I take it that's a reference as to as
12  these OEMs get bigger and bigger and buy each
13  other up, they have better negotiating power,
14  which is driving our prices down lower and our
15  margins down lower. Is that fair?
16   A   Correct.
17   Q   If you'll look further into your
18  strategic plan, with the last two numbers 93, you
19  should see a page that says, "Our recommendation."
20   A   Yes.
21   Q   And I take it this is the recommendation
22  that you had in the strategic plan which you

Page 195

1  presented to the Board of ZF Meritor in July of
2  2000, right?
3    A   Yes.
4    Q   Okay. And you say, "We need to leapfrog
5  Eaton and establish the FreedomLine as the
6  industry standard for automated manual
7  transmission, for example."
8    A   Yes.
9    Q   And then down below it, the fourth
10  bullet down, you say -- again, you're
11  reiterating -- "We need a full class 8 product
12  line. LL, 14-speeds and 15-speeds are key."
13  Right?
14   A   Yes, that's what it says. I believe the
15  "14" is a misprint, but --
16   Q   It should be 13?
17   A   I believe so, but I wouldn't swear to
18  it.
19   Q   And then the page after that, a couple
20  of pages after that, it's got, "Daimler Chrysler
21  Powertrain, here they come." And I take it this
22  is a series of pages you put together to

Page 196

1  demonstrate again that Daimler Chrysler is a
2  concern because they can start bringing their own
3  transmissions into North America?
4    A   Correct. Not -- not at the time. If
5  you looked at that page and you read the -- Claude
6  Elson's comment, it says, "We aim to be a full
7  line supplier in markets of our products.
8  Acquisitions, collaborations are valid ways of
9  extending PTU's offering."
10        So Powertrain -- Daimler Powertrain was
11  a division of Daimler Chrysler.
12   Q   Right. As part of your five-year plan
13  for ZF Meritor, you say, "This is something we
14  need to be conscious of."
15   A   Correct.
16   Q   "They can start to move into
17  manufacturing transmissions for NAFTA, for North
18  America."
19   A   Correct.
20   Q   So the next page you've got a page,
21  looks like it's from a Daimler Chrysler Web site
22  that says, "Shifting into a Higher Gear,

Page 197

1  Transmissions for a Whole New World," right?
2    A   It's a -- I do believe it's a page out
3  of their -- it's a copy of something from a
4  Daimler -- or a Powertrain -- Daimler Powertrain
5  brochure of some kind.
6    Q   Right, showing that they're in fact
7  making some transmissions for their own use in
8  Europe?
9    A   European-style transmissions.
10   Q   Okay. Let's -- let's go off the record
11  and stop for lunch.
12        THE VIDEOGRAPHER: Going off the record.
13  This is the end of Tape 3. The time is 12:48 p.m.
14        (Lunch break taken.)
15        THE VIDEOGRAPHER: Back on record. This
16  is Tape No. 4. The time is 1:32 p.m.
17        BY MR. OSTOYICH:
18   Q   Mr. Martello, welcome back.
19        Do you have anything from this morning's
20  testimony you want to change or amend?
21   A   No, sir.
22   Q   We're going to mark as Exhibit 11 to

50 (Pages 194 to 197)

776d4e51-238a-48e2-8a9a-0079ed29673
000188

Page 198

1  your deposition a series of e-mails which you
2  received copies of, R. Martello, Rick Martello, in
3  February of 2001, again produced by your lawyers
4  to me out of the company's files, ZFMA0187126 and
5  27. I'm going to ask you to take a look at these.
6      (Martello Deposition Exhibit No. 11 was
7  marked for identification.)
8      THE WITNESS: Yes, sir.
9      BY MR. OSTOYICH:
10     Q   Mr. Martello, you've had a chance to
11 look at Exhibit 11 to your deposition?
12     A   Yes.
13     Q   These are a series of e-mails from
14 Robert Rosenthal to Charlie Allen with a copy to
15 Rick Martello on February 13th, 2001.
16         Do you see that in the middle of the
17 first page?
18     A   Yes, sir.
19     Q   And that's an e-mail you received from
20 Mr. Rosenthal in the ordinary course of your
21 duties as President of ZF Meritor, right?
22     A   Yes, sir.

Page 199

1      Q   And there's a response from Mr. Allen to
2  Mr. Rosenthal later that same day with a copy to
3  you, and you received that in the ordinary course,
4  right?
5      A   I don't see that, but --
6      Q   Right at the top of the first page.
7      A   Okay, yes.
8      Q   Now, Mr. Rosenthal, the subject matter
9  of his e-mail that you received a copy says DSM
10 Survey of G platform issues, February 9th, 2001.
11         Do you see that, middle of the first
12 page?
13     A   Are you talking about, "In this survey
14 we just completed, there were approximately," is
15 that the sentence you're talking about?
16     Q   I was talking about the subject line for
17 Mr. Rosenthal, which says DSM Survey of
18 G platform issues.
19     A   Yes, I see that.
20     Q   I take it the company conducted a survey
21 of its district service managers in February of
22 2001 regarding the G platform manual transmission

Page 200

1  series, right?
2      MS. DUNCAN HACKETT: Objection.
3      THE WITNESS: I only know what I'm
4  reading here, and that is that they did a survey.
5  I don't know who did it or --
6      BY MR. OSTOYICH:
7      Q   Okay.
8      A   I don't know who did it, how many people
9  were involved. All I know is what's on this
10 paper.
11     Q   Fair enough. Let's try to get to the
12 bottom. So Mr. Rosenthal at that time worked for
13 ArvinMeritor, right?
14     A   Correct.
15     Q   And he is in what position?
16     A   I don't know exact title, but he was
17 responsible for the service organization --
18 something to do with the service organization of
19 ArvinMeritor.
20     Q   Including the service of the
21 transmissions that ZF Meritor was selling, right?
22     A   That's correct.

Page 201

1      Q   So Mr. Rosenthal sends an e-mail to
2  Mr. Allen, who is your Director of Sales and
3  Marketing at the joint venture, right?
4      A   Correct.
5      Q   He copied you, and he says, "Charlie,
6  Our District Service Managers" -- and that's the
7  ArvinMeritor district service managers, right?
8      A   That's correct.
9      Q   -- "responded to this survey over the
10 past week with issues that they are aware of, from
11 their daily contacts, with 'G' platform
12 transmissions," and those are manual transmissions
13 that ZF Meritor offered to customers in
14 February 2001, right?
15     A   G platform, yes.
16     Q   Those are 9 and 10-speed manuals?
17     A   Yes.
18     Q   Mr. Rosenthal tells Mr. Allen and you in
19 this e-mail, "As you are aware, product issues
20 this early in the Warranty period, go through the
21 OEM dealers, and many times we are not notified of
22 an issue, unless there is a problem getting parts.

51 (Pages 198 to 201)

776d4e51-238a-48e2-8a9a-0079ed29673
000189

Page 202

1    "In this survey we just completed, there
2  were approximately 435 unit downs with 'G'
3  platform transmissions."  Then he's got a
4  breakdown of data showing the various problems
5  with the G platform that were found in the survey,
6  right?
7    A   Correct.
8    Q   So he's got, for example, range piston
9  sale leakage, there were 187 occurrences, right?
10    A   Correct.
11    Q   Air filter regulator, 95 occurrences?
12    A   Correct.
13    Q   Top cover miscellaneous, I take it there
14  were miscellaneous top cover problems, 51
15  occurrences?
16    A   Correct.
17    Q   Shift bar breakage, 34 occurrences?
18    A   Correct.
19    Q   Pin fallout/overdrive shift bar, 11
20  occurrences, right?
21    A   Correct.
22    Q   And he says to Mr. Allen and to you and

Page 203

1  the others, "A very high frustration level, as you
2  know, is being reached by our Customers, and our
3  Field Organization.
4    "Reasons for this frustration are:
5    "1.  Multiple repairs, different
6  problem, on the same transmission/truck;
7    "2.  Repeat failures, of the same issue,
8  on the same transmission;
9    "3.  Many loyal customers, are just
10  recovering from Meritor transmission thrust washer
11  issue downtime and now are faced with multiple
12  'G' platform issues."
13    Do you see that?
14    A   Thrust washer issue is the same issue I
15  called a bearing issue.
16    Q   So he's saying many of our customers --
17  many loyal customers are just recovering from the
18  bearings or the thrust washer issue, which led the
19  company to recall its transmissions, right?
20    A   The bearing issue, yes.
21    Q   And so the loyal customers, many loyal
22  customers are just recovering from that, and now

Page 204

1  they're faced with multiple G platform issues.
2  That's what he says, right?
3    A   That's what it says, yes.
4    Q   And then he identifies in item 4, "At
5  one of our Conquest Fleets, Eagle Express," and a
6  conquest fleet is what a customer that you want to
7  win or you have won, is that fair?
8    MS. DUNCAN HACKETT:  Objection.
9    THE WITNESS:  I'm having a hard time
10  with why it's capitalized, but I would say a
11  conquest fleet is one that we -- it's a fleet that we
12  were selling transmissions to, but --
13    BY MR. OSTOYICH:
14    Q   A fleet you converted from somebody
15  else's transmissions, that's conquest?
16    A   I don't know if that's true.
17    Q   Well, he says that one of our conquest
18  fleets, Eagle Express, "bought 9 units, and all 9
19  have gone down, with one unit a second time.
20  Range piston seal leakage is the primary issue.
21  This first time buyer, has lost confidence in us
22  as a transmission manufacturer."

Page 205

1    Do you see that?
2    A   Yes.
3    Q   And then in the next one, number 5, it
4  says, "Established, customers such as Les Hazen of
5  Prime, feels we do not know how to make a 'good'
6  transmission."  Do you see that?
7    A   I see the words, and I know Lee Hazen.
8    Q   You know Les Hazen?
9    A   I know of him, yes.
10    Q   Do you know Prime is a fleet customer of
11  yours?
12    A   Yes.
13    Q   Now, Mr. Allen responds up at the top of
14  that first page -- you're on the second page, but
15  at the top -- go ahead, take a look at the second
16  page.
17    A   Okay, go ahead.  I read the top.
18    Q   Up at the top, Mr. Allen, your Director
19  of Sales and Marketing, responds to Mr. Rosenthal,
20  "Bob, Engineering is making many changes to
21  improve the performance of the 'G' platform
22  transmissions.  I suggest that you and the

52 (Pages 202 to 205)

776d4e51-238a-48e2-8a9a-0079ed29673
000190

Page 206

1  Regional service managers meet with engineering
2  and service to review these changes at Laurinburg.
3  We recognize that the field has lost confidence in
4  the product."
5        Do you see that?
6     A   Yes, sir.
7     Q   And that's a reference to the North
8  American field organization of ArvinMeritor,
9  right?
10    A   That's true.
11    Q   Now, I take it, Mr. Martello, you got
12  other reports like this from the North American
13  field organization or Mr. Rosenthal setting out
14  problems with the Jeep platform transmissions?
15       MS. DUNCAN HACKETT:  Objection.
16       BY MR. OSTOYICH:
17    Q   Is that fair?
18    A   I knew of the problems with the
19  G platform transmission, if that's what you --
20    Q   Fair enough.  I take it there were
21  multiple problems, right?  He set out five here,
22  right?

Page 207

1        MS. DUNCAN HACKETT:  Objection.
2        THE WITNESS:  Yeah.  Understand the
3  G platform transmission was a change from a
4  three -- three-bar to a single-bar transmission,
5  just as Eaton did trying to do with the Lightning.
6        We had problems with the single-shift
7  rail, and went back to the three-shift rail to fix
8  the problem.  That happened over a period of time,
9  yes.
10       BY MR. OSTOYICH:
11    Q   Now, we saw earlier that when Rockwell
12  entered the transmission business in '87, you said
13  that they had used a design that they purchased
14  from Nissan, right?
15    A   A design that they purchased from
16  Nissan, that's correct.
17    Q   Is this G platform, is this the first
18  transmission design that the company had rolled
19  out for manual transmissions?
20    A   The G platform is just a continuation of
21  that same product.
22    Q   Who designed it?

Page 208

1     A   The base design was from Nissan, and
2  then changes -- we used letters to designate major
3  changes to the platform.
4     Q   So this is a G platform that was based
5  on a Nissan design.  Did the company have any
6  manual transmissions that it designed on its own?
7     A   Totally on its own?  No.
8     Q   So you took the Nissan design, and you
9  made changes to it to create the G platform, is
10  that fair?
11    A   Over a period of time.  It was
12  F platform before that, and then it went to
13  G platform.
14    Q   All right.  I'm going to hand you
15  Exhibit 12 to your deposition, which is a
16  ZF Meritor Internal Letter from R. Martello,
17  President, to Tom Gosnell, Dennis Kline, and a
18  list of people.  It's a February 2001 Activity
19  Report, and I'm going to ask you to take a look at
20  that.
21       (Martello Deposition Exhibit No. 12 was
22       marked for identification.)

Page 209

1        THE WITNESS:  Yes, sir.
2        BY MR. OSTOYICH:
3     Q   Okay.  While you're -- you had a chance
4  to look at it.  You recognize it, right?
5     A   Yes, I know what it is.
6     Q   This is a --
7     A   It's a monthly activity report that we
8  put together.
9     Q   I take it this is a February 2001
10  Activity Report that you sent to the list of
11  people here, Mr. Gosnell, Mr. Kline and others, on
12  March 15th, 2001, in the ordinary course of your
13  duties as President of the ZF Meritor joint
14  venture, right?
15    A   That is correct.
16    Q   Now, for the record, it came from the
17  company's files, it's ZFMA0196697 to 705.
18       Now, this February 2001 Activity Report,
19  on the second page, you tell Mr. Gosnell and
20  Mr. Kline and the others -- these are the Board
21  members of ZF Meritor, right?
22    A   The majority of them.

53 (Pages 206 to 209)

776d4e51-238a-48e2-8a9a-0079ed29673

000191

Page 210

1    Q   Mr. Gosnell was on the Board, Mr. Kline
2  was on the Board?
3    A   Correct.
4    Q   Mr. Vogel was on the Board?
5    A   Correct.
6    Q   Mr. Lutz?
7    A   Correct.
8    Q   Was Mr. Orchard on the Board?
9    A   Correct.
10   Q   And then Mr. Madden is the CFO of
11 ArvinMeritor, right?
12   A   He was on the Board.
13   Q   And what about Walzer?
14   A   No.
15   Q   Who is Mr. Walzer?
16   A   He's just a person at ZF that requested
17 that I send him activity reports.
18   Q   What was his position?
19   A   I don't know of his title.  He worked in
20 the financial area of -- he worked in the
21 financial area of ZF in Germany.
22   Q   So on the first page, in the sales and

Page 211

1  marketing information, you say the marketing
2  conditions in the U.S. economy has slowed
3  dramatically.  GDP growth is nearly flat, National
4  Association of Business Economists puts the risk
5  of recession at one-in-three currently.  The
6  manufacturing sector, a major generator of truck
7  freight, has actually been in recession for a
8  few months.
9      I take it that's a reflection of the
10 fact that in the spring of 2001, you're still in
11 this sort of prolonged slump in the Class 8 truck
12 demand, is that fair?
13   A   I would say it's a fair assumption from
14 these words.
15     I would like to make one point.  These
16 activity reports were a -- I got activity reports
17 from my direct reports.  I combined them and sent
18 this out.  So mostly everything in here,
19 especially what you're reading right now, came out
20 of Charlie Allen's activity report to me, so --
21   Q   Fair enough.  And you took what
22 Mr. Allen gave you, and you're passing it on to

Page 212

1  the Board members of ZF Meritor?
2    A   Correct.
3    Q   Now, on the second page there's a
4  section that says Market Share & Volume Analysis,
5  and then below that, below the first three
6  bullets, it says, "Customer Complaints,
7  Transmission:  Continue to handle issues related
8  to 'G' Platform, including air filter regulators,
9  top covers, and range pistons."
10     I take it that reflects that you're
11 informing the Board of ZF Meritor in March of 2001
12 that you were continuing to handle problems with
13 the G platform related to the air filter
14 regulator, top covers and range pistons, right?
15   A   That's what it says, yes.
16   Q   You say, "It is imperative that all of
17 the fixes are implemented as soon as possible to
18 help control warranty cost."
19   A   Correct.
20   Q   And what did you mean it's imperative
21 that the fixes -- all of the fixes are implemented
22 as soon as possible?

Page 213

1    A   We had -- our engineering department had
2  come up with a how we were going to remedy all the
3  problems with the G platform at the time, and this
4  simply means we felt that we needed to get the
5  fixes into the product so that we could -- if you
6  let the thing fail, you would have a
7  larger cost to replace a whole transmission than
8  you would to replace a range piston, for instance.
9    Q   I'm going to hand you as the next
10 exhibit, Mr. Martello, the April 3rd, 2001,
11 ZF Meritor LLC Board of Directors meeting minutes,
12 again from the company's files, ZFMA0034144 to 51,
13 and I'm going to ask you to take a look at that.
14     (Martello Deposition Exhibit No. 13 was
15     marked for identification.)
16   BY MR. OSTOYICH:
17   Q   While you are looking at Exhibit 13 to
18 your deposition, I'll just identify it.
19     April 3rd, 2001 meeting, held at
20 ZF Meritor facility, Laurinburg, North Carolina,
21 commencing at 8:00 a.m. on Tuesday, April 3rd,
22 2001.

54 (Pages 210 to 213)

776d4e51-238a-48e2-8a9a-0079ed29673

000192

Page 214

1      The following members of the Board were
2  present, then there's a list of names, and it says
3  also present in person at the meeting at the
4  request of the directors were the following
5  individuals, among others, including Richard
6  Martello, President of the company.
7      Have you had a chance to look at
8  Exhibit 13?
9      A   Yes, I saw it.
10     Q   I take it you in fact attended this
11 Board of Directors meeting at ZF Meritor?
12     A   That is correct.
13     Q   Be careful, Mr. Martello.  She's shaking
14 her head because you're talking over me.
15     A   That is correct.
16     Q   Now, at this Board of Directors meeting,
17 I take it -- the second page it says there was a
18 presentation of warranty and a discussion of
19 G platform issues, right?
20     A   Two separate presentations, yes.
21     Q   Okay.  First it was a presentation of
22 warranty by PriceWaterhouseCoopers, right?

Page 215

1      A   That is correct.
2      Q   And it says to two representatives from
3  PriceWaterhouseCoopers -- that's the accounting
4  firm that ZF Meritor used at the time, right?
5      A   It's an accounting firm used by
6  ArvinMeritor to do this study.
7      Q   Okay.  So ArvinMeritor had
8  PriceWaterhouseCoopers do a study, and it says two
9  representatives from PriceWaterhouseCoopers
10 presented PriceWaterhouseCoopers' analysis of the
11 warranty procedures and warranty liability
12 exposure of the company, right?
13     A   Correct.
14     Q   And then below that at the bottom of the
15 page it says the PriceWaterhouseCoopers audit
16 conclusions were then summarized in three general
17 areas, and the first one says that the company's
18 transmission and clutch warranty reserves are
19 understated due to specific warranty exposures
20 excluded from the accrual, right?
21     A   That's what it says.
22     Q   And I take it that was part of the

Page 216

1  presentation that PriceWaterhouseCoopers made to
2  the Board of Directors at this meeting you
3  attended in April of 2001, that the company's
4  transmission and clutch warranty reserves were
5  understated?
6      A   I know, and I remember, the presentation
7  was made.  I do not believe -- it says that they
8  were at this Board meeting, but it doesn't list
9  them as being present, so I don't know if they
10 made the actual presentation or they presented it
11 to someone who made the presentation.  I know I
12 did not have anything to do with the presentation.
13     Q   Fair enough.  But you were at the Board
14 meeting, and someone made a presentation on
15 conclusions --
16     A   Yes.
17     Q   -- reached by PriceWaterhouseCoopers'
18 audit --
19     A   Correct.
20     Q   -- that the company's transmission and
21 clutch warranty reserves were understated?
22     A   That is correct.

Page 217

1      Q   Then on the next page it says, page 3,
2  up at the top, a report was distributed to the
3  Board, and there was discussion that touched on
4  the following items.
5      Do you see where I am up at the top?
6      A   Yes.
7      Q   And one of the items that was discussed
8  at that Board meeting you attended in April 2001
9  was the high failure rates on the G platform
10 manual transmissions the company offered, right?
11     A   That's what it says, yes.
12     Q   And if I look a few pages further in,
13 Mr. Martello, on page 5 of this document, there's
14 a section that says G platform issues.
15     Do you see where I am?
16     A   Yes.
17     Q   And it says, "Mr. Molde, Chief Engineer
18 of the Company, then discussed current conditions
19 affecting warranty issues for G platform.
20 Mr. Molde discussed the spike in G platform
21 failures, which are due to a number of factors,
22 including supplier quality."

55 (Pages 214 to 217)

776d4e51-238a-48e2-8a9a-0079ed29673
000193

Page 218

1        Do you see that?
2    A   That's what it says, yes.
3    Q   And I take it that reflects that
4  Mr. Molde, the chief engineer of the joint
5  venture, made a presentation to the Board of
6  Directors in April 2001 at the meeting you
7  attended where he discussed the spike in
8  G platform failures, which are due to a number of
9  factors, including supplier quality?
10   A   That's correct.
11   Q   Now, down at the bottom of that same
12  page, Mr. Martello says that you made a
13  presentation on market presentation.
14       Do you see that?
15   A   Yes.
16   Q   And again it sounds like, at this April
17  2001 Board of Directors meeting, you again raised
18  with the Board of Directors why the company needs
19  a full product line; is that right?
20   A   That's what it says, yes.
21   Q   And it says you noted, up in the top of
22  the next page, a full product line is important in

Page 219

1  gaining a partnership with any OEM, protecting the
2  linehaul business and protecting the residual
3  value in the used truck market, right?
4    A   Yes.
5    Q   What was having a full product line
6  important for protecting residual value in the
7  used truck market?  What did you mean by that?
8    A   I honestly don't remember.
9    Q   But I take it you were telling the
10  Board, in effect, to protect the residual value,
11  to keep the residual value of trucks with
12  transmissions high enough, you have to have a full
13  product line, or it would help to have a full
14  product line?
15       MS. DUNCAN HACKETT:  Objection.
16       THE WITNESS:  Again, I really don't know
17  why -- I don't remember anything about protecting
18  residual value of the used truck market.  I really
19  do not.
20
21       BY MR. OSTOYICH:
22   Q   In general, would you agree with me that

Page 220

1  having a full product line would be important to
2  keep the residual value of trucks -- having a full
3  transmission product line would help the residual
4  value of the trucks?
5    A   At this time in my -- at this time, I
6  wouldn't say that was a true statement, but I must
7  have thought for some reason it was back then.
8    Q   Fair enough.  You don't remember the
9  details now, but that is what you told the Board.
10   A   I don't remember the details.
11  Absolutely.
12   Q   We're going to mark as Exhibit 14 to
13  your deposition a series of e-mails that you were
14  copied on in October of 2001, and I'm going to ask
15  you to take a look at those.
16       (Martello Deposition Exhibit No. 14 was
17       marked for identification.)
18       THE WITNESS:  Yes, sir.
19       BY MR. OSTOYICH:
20   Q   You've had a chance to look at
21  Exhibit 14 to your deposition?
22   A   Yes.

Page 221

1    Q   Okay.  This is a document, again
2  produced by your lawyer to me, ZFMA0293315 at the
3  bottom.  This is a series of e-mails that you
4  received copies of in the ordinary course of your
5  duties as the President of ZF Meritor in
6  October 2001, right?
7    A   Yes.
8    Q   Okay.  Now, the first one down at the
9  bottom, chronologically it's the first one.  It's
10  an e-mail from Charlie Allen, your Director of
11  Sales and Marketing, to Dennis Kline, who is the
12  head of the ArvinMeritor sales organization,
13  right?
14   A   Yes.
15   Q   And Mr. Burmeister, who is the head of
16  the North American field organization for
17  ArvinMeritor at the time, right?
18   A   I believe so.
19   Q   And on October 3rd, 2001, Mr. Allen says
20  to them -- just so we're clear, they're
21  responsible ultimately for selling the
22  transmissions that ZF Meritor offered, right?

56 (Pages 218 to 221)

776d4e51-238a-48e2-8a9a-0079ed29673

000194

Page 222

1      A    That's correct.
2      Q    Mr. Allen says, "As a reminder ZFM does
3   not have any sales policy funds budgeted in
4   FY '02."
5           Now, fiscal year '02 is the year
6   starting in October 2001 going for the next
7   12-month period, right?
8      A    Fiscal year '02 would be October 1 of
9   2001 to September 31st, 2002.
10     Q    And Mr. Allen is telling the sales
11  organization of ArvinMeritor, responsible for
12  selling the transmissions, that the joint venture
13  at ZF Meritor does not have any sales policy funds
14  budgeted for the upcoming 12-month period, right?
15     A    There was no funds available directly
16  for the sales organization.  They had to get it
17  approved -- every one of them approved by me.
18     Q    What is a sales policy fund?  What is
19  that?
20     A    That was one of the problems.  We had
21  difference of opinion in what the sales policy
22  fund was.

Page 223

1      Q    What do you mean a difference of
2   opinion?
3      A    I believe that it should be used only in
4   cases that are not in any way, shape or form
5   warranty type of -- or competitive equalization
6   type of situations, and I wanted to better -- we
7   just had a difference of opinion of how it should
8   be used, and I just said, to resolve that, you're
9   going to have to go through me on what you want to
10  do, and I have to approve it.
11     Q    Spell it out a little bit for me.
12          So your view of a sales policy fund was
13  that it should be related to what?
14     A    Excuse me?
15     Q    Your view of a sales policy fund was
16  that it should be related to what?
17     A    Well, it should be related strictly to
18  goodwill.  Strictly to goodwill.
19     Q    Goodwill of the fleets, or the OEMs?
20     A    Mainly the fleets.
21     Q    And was it a fund of money that was used
22  to generate goodwill at the fleets?

Page 224

1      A    Correct.
2      Q    And in what ways?  Give me examples of
3   how that fund of money would be used.
4      A    I'm trying to give you a good example
5   that I can say is an actual example.
6           A good example would be a product that's
7   50,000 miles or six months out of the warranty
8   period, but it is a good customer, and they're
9   complaining about it, and you go ahead and make
10  some type of settlement with them and say, okay,
11  you know, you're a good customer, we don't think
12  it's in the warranty period, but since you're a
13  good customer, here's the money that we agreed on
14  that would be compensation for the problem.
15     Q    You said before that there was a
16  difference of opinion.  Who had a different
17  opinion of what the sales policy fund was?
18     A    Who had a different opinion?  Me and
19  every sales guy at ArvinMeritor.
20     Q    So Mr. Burmeister, Mr. Kline, and their
21  organizations?
22     A    Yes.

Page 225

1      Q    And how did they view -- what were they
2   telling you they viewed the sales policy fund as
3   being for?
4      A    Any situation that they wanted to make
5   the customer happy because of a problem.
6      Q    Give me an example of something they
7   brought to you, and you said, well, I don't want
8   to spend the joint venture's money on that.
9      A    A claim that we turned down because we
10  said it wasn't our fault, the driver did this, we
11  can prove that they didn't -- the service people
12  didn't do this, that's what caused the problem,
13  not anything that had to do with what we did, but
14  that irritated the customer.
15          It was easy for them to say, rather than
16  have an irritated customer, just say, okay, we'll
17  pay you for that.
18     Q    But I take it the sales policy funds
19  were coming from your budget at the joint venture,
20  not from the ArvinMeritor sales and marketing
21  budget?
22     A    Anything to do with transmissions and an

57 (Pages 222 to 225)

776d4e51-238a-48e2-8a9a-0079ed29673

000195

Page 226

1  clutches at the time came from our budget.
2     Q   So was it your decision then in the fall
3  of 2001 to tell the ArvinMeritor sales and
4  marketing force we're not putting sales policy
5  funds in the budget.  You're going to have to come
6  to me and get my approval?
7     A   That's correct.
8     Q   At that time, how large -- give me an
9  idea, ballpark, how large the sales policy fund
10  was for the company for a given year.  Was it
11  $5,000 for the year, or was it hundreds of
12  thousands or a million dollars a year?
13     A   Between 500 and $2 million would be my
14  estimate.
15     Q   And I take it now there's an e-mail then
16  in response to Mr. Allen from Kurt Burmeister, the
17  head of the North American field organization at
18  ArvinMeritor, and I take it he's disagreeing with
19  your decision not putting sales policy funds in
20  the budget for the upcoming fiscal year, right?
21     A   He's disagreeing.  No sales individual
22  likes to have to come and get things approved, and

Page 227

1  it's easier for them to do things that I didn't
2  want them to do.  So I figured if I just had the
3  policy that they had to come to me, what they came
4  to me with would be more legitimate than what I
5  felt was going on in the past, so --
6     Q   So Mr. Burmeister says in his e-mail,
7  "Comments on policy elimination... This action is
8  a severe limitation on our effort to sell
9  transmissions in light of our track record
10  concerning quality performance."
11        Do you see that?
12     A   Every sales guy wants every type of
13  excuse that they can gather, and this is -- you
14  know, for a while, they gathered on, well, we
15  don't have any sales policy as an excuse.
16     Q   The excuse that the head of the North
17  American field organization at ArvinMeritor is
18  providing to us --
19     A   Yes, because he was getting pressure
20  from his sales guys who always had funds available
21  to them at their whim.
22     Q   So what he is telling you at the joint

Page 228

1  venture is that your action in eliminating the
2  sales policy fund from the upcoming budget for the
3  upcoming year is a severe limitation on our effort
4  to sell transmissions in light of our track record
5  concerning quality performance, right?
6     A   That's what's in this statement, but he
7  was a guy that would -- let's get a list of
8  excuses and use them on why we don't do something,
9  so --
10     Q   We're going to mark as Exhibit 15 to
11  your deposition a set of e-mails in December of
12  2001 from -- well, you get copied on some of these
13  e-mails, so I'll show you some of these.
14        (Martello Deposition Exhibit No. 15 was
15        marked for identification.)
16        THE WITNESS:  Yes, I read it.
17        BY MR. OSTOYICH:
18     Q   Just for the record, it's again a
19  document produced by the company's files,
20  ZFMA0009332 to 33.
21        Now, the top e-mail is an e-mail from
22  Dennis Kline, December 13th, 2001, 5:00 p.m., to

Page 229

1  Rick Martello.  Subject:  Forwarding Heartland
2  Express.
3        I take it that's an e-mail that you
4  received from Mr. Kline at ArvinMeritor on
5  December 13, 2001, in the ordinary course of your
6  duties as President of ZF Meritor, right?
7     A   Yes.
8     Q   And what he did was forward all the
9  e-mails below that, which are attached to it,
10  right?
11     A   Uh-huh.
12     Q   Just so we're clear on the record,
13  Mr. Martello, if you could say --
14     A   Yes, sir.
15     Q   Okay.  So let's work through
16  chronologically.
17        So the bottom e-mail, which got
18  forwarded to you by Mr. Kline, is an e-mail from
19  Michael Hayes to Mike Colaccino and Mac
20  Whittemore, and those are ArvinMeritor North
21  American field organization people, right?
22     A   Mike Hayes was a field service guy, and

58 (Pages 226 to 229)

776d4e51-238a-48e2-8a9a-0079ed29673

000196

Page 230

1    Colaccino was his boss, was Director of one of the
2    regions of ArvinMeritor, yes.
3        Q    And they are -- do you know what region
4    he was?
5        A    I can't remember.  I think it was
6    Northeast, but I can't remember.
7        Q    So Mike Hayes is sending an e-mail to
8    his boss, Mike Colaccino, and copying Mac
9    Whittemore and Norm Austin on Heartland Express.
10        He says, "Mike, Mack and Norm, Not sure
11    of the correct procedure to follow so I will copy
12    all.
13        "I have attached four policy request
14    forms for Heartland Express located in
15    Coralville IA."
16        I take it Heartland Express is a fleet
17    customer of the company's?
18        A    Yes.
19        Q    Give me an idea how big a fleet is
20    Heartland Express?  Were they a couple hundred
21    trucks?
22        A    Medium size fleet.  Not one of the

Page 231

1    largest, and certainly not one of the smallest.
2        Q    So medium size would be what, 500
3    trucks?
4        A    Probably more than that.
5        Q    All right.  So Mr. Hayes attaches four
6    policy request forms for Heartland Express located
7    in Coralville, Iowa.  "All are for tow bills at
8    low mileage related to G-Platform range shift
9    issues, all four total $1,352.70.  I processed the
10    first request ($120.00) on Oct 29 and had it
11    returned denied."
12        And I take it that reflects that he
13    asked for policy to cover some of these expenses
14    incurred by Heartland Express related to towing
15    bills related to G platform range shift issues in
16    the fall of 2001, right?
17        MS. DUNCAN HACKETT:  Objection.
18        THE WITNESS:  Correct.
19        BY MR. OSTOYICH:
20        Q    And you or someone under your
21    supervision denied those requests for sales policy
22    funds?

Page 232

1        A    I don't know from this letter whether he
2    submitted it through the warranty system or as a
3    policy -- as a policy request.
4        He said he's attached four policy
5    request forms, which may mean that he's submitting
6    them as policies because they were denied in
7    warranty.  That would be -- that would be what I
8    think this is, yes.
9        Q    As a request for policy, they were
10    denied, right?
11        MS. DUNCAN HACKETT:  Objection.
12        THE WITNESS:  I don't know that.
13        BY MR. OSTOYICH:
14        Q    Now, he says in the middle paragraph on
15    that second page, "I understand the financial
16    position of ZF Meritor but feel it is my
17    responsibility to surface this request once again
18    and ensure this is the decision I am to relay to
19    Mr. Gerdin," and that's Russ Gerdin, who is the
20    head of Heartland Express, right?
21        A    Yes.  "Gerdin."
22        Q    "Gerdin" is the way you pronounce it?

Page 233

1        A    Correct.
2        Q    And then in the last paragraph at the
3    bottom, Mr. Hayes says, "On-going G-platform
4    problems have left Russ," and that's Russ Gerdin,
5    the head of Heartland Express, your customer,
6    right?
7        A    Correct.
8        Q    "On-going G-platform problems have left
9    Russ very frustrated to start with.  I feel to
10    jeopardize this account over this amount of money
11    requires review by management a second time to
12    make sure of my direction.
13        "Please advise ASAP," as soon as
14    possible, "and I will forward to fleet."
15        And then Mr. Austin responds on the
16    first page, in the middle of that page, the next
17    day, on December 12th, 2001, and you got a copy of
18    that, you're listed as a CC, in the ordinary
19    course of your duties, right?
20        A    Yes.
21        Q    Mr. Austin at that point is the regional
22    service manager.  He says, "Rosey," and this

59 (Pages 230 to 233)

776d4e51-238a-48e2-8a9a-0079ed29673
000197

Page 234

1  Robert Rosenthal, the head of service for the
2  ArvinMeritor North American field organization,
3  right?
4      A   Yes.  He has something to do -- I don't
5  know his exact title, but he has responsibilities
6  within the service organization of ArvinMeritor,
7  yes.
8      Q   So Mr. Austin, the Regional Service
9  manager, says, "Rosey, The message below form Mike
10 is a very serious one.  When we talk about units
11 failing at the rate of three per day related to a
12 known problem, well shame on us for not being
13 proactive and changing out the subject parts."
14      Do you see that?
15     A   I see that.
16     Q   Now, this e-mail, that you get a copy
17 of, and Mr. Kline, who is the head of all sales
18 and marketing for all products for ArvinMeritor,
19 responds up at the top, right?
20     A   That's correct.
21     Q   And he's responding directly to you, and
22 he's coping Mr. Gosnell, who is the president of

Page 235

1  the entire heavy vehicle systems business at
2  ArvinMeritor, right?
3      A   That's correct.
4      Q   And Mr. Gosnell and Mr. Kline are both
5  members of the Board of ZF Meritor, right?
6      A   That's correct.
7      Q   He says, "Rick - This is exactly the
8  kind of thing I was afraid of with your zero $
9  policy plan," and that's a reference to the
10 decision you made not to have sales policy funds
11 in the budget for the fiscal year 2002, right?
12     A   They had to go through me for policy,
13 yes.  It was not in their budget.
14     Q   And he says, "Russ Gerdin is your
15 largest fleet customer.  He is extremely volatile
16 and emotional.  He demands answers and will not
17 stand for 'I gotta check with Rick.'  We can and
18 will lose business in a heartbeat if we continue
19 this practice.  You/we simply cannot afford this
20 risk," right?
21     A   That's what it says.
22     Q   So I take it he is reflecting again this

Page 236

1  disagreement that you, as the President of
2  ZF Meritor, had with the ArvinMeritor North
3  American sales organization about who should sign
4  off and how you should authorize sales policy
5  funds for the fiscal year 2002?
6      A   That's correct.
7      Q   And --
8      A   Difference of what was -- how things
9  should be handled, that's correct.
10     Q   And --
11     A   Understand, specifically under warrant
12 policies, it says we do not pay towing.  That was
13 my position, and that was the position in the
14 warranty department on this request.
15     Q   And that ArvinMeritor salespeople who
16 were out there talking to Heartland Express were
17 saying we should cover it anyway, in effect, even
18 though it's not supposed to be covered under the
19 policy?
20     A   That's correct.
21     Q   Now, did you subsequently, in response
22 to these e-mails from Mr. Kline, did you

Page 237

1  subsequently change your policy on the sales
2  policy fund at ZF Meritor?
3      A   I do not believe so.  In this particular
4  request, I don't remember what the final outcome
5  was, if Tom got involved and Dennis got involved
6  and they came to me.  I don't remember what the
7  final outcome.  I know my initial stance would
8  have been we don't pay for towing.
9      Q   Fair enough.  What about the overall
10 policy of not having sales policy funds in the
11 budget and requiring the ArvinMeritor sales force
12 to get sign-off from you.  Did you change that?
13     A   Again, it wasn't a budget matter as much
14 as the fact that they did not have it freely
15 available in their budget.  They had to come to
16 me, and I think you'll see e-mails where they
17 have, and I approved them.
18     Q   Fair enough, but did you change the
19 policy so that they went back --
20     A   Not to my knowledge.  Not to my
21 knowledge.  Not for that year.
22     Q   All right, we're going to mark as

60 (Pages 234 to 237)

776d4e51-238a-48e2-8a9a-0079ed29673

000198

Page 238

1  Exhibit 16 to your deposition a memorandum from
2  Mike Colaccino to Rick Martello and others,
3  Re: Transmission failure rate, and I'm going to
4  ask you to take a look at that.  For the record,
5  it's produced from the company's files,
6  ZFMA0000794 to 812.
7       (Martello Deposition Exhibit No. 16 was
8       marked for identification.)
9       THE WITNESS:  Okay.
10      BY MR. OSTOYICH:
11      Q   All right.  You've had a chance to look
12  at Exhibit 16 to your deposition, Mr. Martello?
13      A   Yes.
14      Q   All right.  The first cover page here is
15  a memorandum that Mike Colaccino sent to you, Rick
16  Martello, and the others listed here on March 11,
17  2002, regarding transmission failure rate, and you
18  received that in the ordinary course of your
19  duties as President of the ZF Meritor joint
20  venture, right?
21      A   Yes.
22      Q   Okay.  And then Mike says, "Attached" --

Page 239

1  just for the record, Mike Colaccino is the
2  ArvinMeritor regional sales head, right?
3      A   Yes.
4      Q   And he's attaching a one-week road
5  breakdown report from Heartland, which is a mid
6  size fleet customer of yours, right?
7      A   That's what it says, yes.
8      Q   And he's attaching some heartfelt
9  comments from Mike Hayes, the ArvinMeritor
10  national account manager for Heartland, Crete and
11  Ruan, right?
12      A   Yes.
13      Q   And you received those attachments along
14  with his memorandum in March of 2002, right?
15      A   It says that I did, yes.  I do not
16  remember this whatsoever.
17      Q   Now, the attachments -- it's an internal
18  letter on ArvinMeritor letterhead from Mike Hayes
19  to Mike Colaccino, Subject:  National account
20  transmission issues.  It says, "Mike, as a follow
21  up to our conversation regarding transmission
22  issues at Heartland, Crete Carriers and Ruan," and

Page 240

1  these are three of your fleet customers, right?
2      A   Yes.
3      Q   "Attached is a copy of the road
4  breakdown report provided to Mr. Gerdin on a
5  weekly basis at Heartland.  The maintenance staff
6  at all three accounts reports on-going issues with
7  range shifts and top covers."
8       And those are range shifts and top
9  covers for the company's manual 9 and 10-speed
10  transmissions, right?
11      A   Yes.
12      Q   "All Heartland units have had Air Filter
13  Regulators and Range pistons changed but continue
14  to have several units each week go out of service
15  due to G-Platform problems."
16      Do you see that?
17      A   Yes, I see it.
18      Q   And those are air filter regulator,
19  range piston, G platform problems on the company's
20  9 and 10-speed manual transmissions, right?
21      A   Yes.
22      Q   And in my case, it says Crete also is

Page 241

1  becoming frustrated with this issue.
2       Crete is what, a mid size fleet?
3      A   It's about the same as Heartland.
4      Q   So a couple thousand trucks potentially,
5  somewhere in that range?
6      A   Between 500 and 2,000.
7      Q   Where are they located, Crete?
8      A   Crete's headquarters is in Lincoln,
9  Nebraska, I believe.
10      Q   I take it they have national locations?
11  They're listed here as a national account
12  transmission issue.
13      A   Yeah.  Most of the larger fleets have a
14  national headquarters, and then have different --
15  what do you want to call them -- maintenance
16  locations in different areas of the country.
17      Q   And what about Ruan?  How big is Ruan?
18      A   About the same.  A little bit bigger
19  probably.
20      Q   Where are they based?
21      A   I don't remember.
22      Q   So in the middle of that second

61 (Pages 238 to 241)

776d4e51-238a-48e2-8a9a-0079ed29673
000199

Page 242

1  paragraph, Mike Hayes says, "Ruan is now becoming
2  alarmed with an increasing number of the same type
3  of failures and has had lease customers attempt to
4  return units due to repeated G-Platform
5  transmission issues.  Ruan has asked to make
6  G-Platform problems part of the up-coming
7  Technology Conference."
8        Now, this -- Mike Colaccino, who is Mike
9  Hayes' boss, then forwards to you with this first
10  page that he wrote to you, right?
11    A   Correct.
12    Q   And in the middle paragraph on that
13  first page, Mike Colaccino says to you in March of
14  2002, "As you can see from the volume of the
15  document attached if we continue to fix as fail I
16  believe these customers will find another
17  transmission supplier.  This could place other
18  components in danger as we have seen what our
19  competition is doing with competitive offers to
20  these end users."
21        Now, what is fix as fail?
22    A   Fix as fail, as I said before, is you

Page 243

1  tell the person here's the solution, fix it when
2  it fails, rather than bring them all in and fix
3  them.
4    Q   Mike Colaccino is advocating, I take it,
5  that you bring them in and fix them all at once
6  without waiting until they fix -- until they fail?
7        MS. DUNCAN HACKETT:  Objection.
8        THE WITNESS:  I don't know.
9        BY MR. OSTOYICH:
10    Q   You do know that he informed you in
11  March of 2002 that he believed, as the sales
12  manager responsible for these accounts, that if
13  you continue to fix as fail, the customers will
14  find another transmission supplier, right?
15        MS. DUNCAN HACKETT:  Objection.
16        THE WITNESS:  I know what he said there,
17  but I don't know what his alternative is that he
18  wanted --
19        BY MR. OSTOYICH:
20    Q   Fair enough.  But you know that he
21  informed you that his belief as the guy
22  responsible for selling these customers,

Page 244

1  Heartland, Crete, Ruan, was that if you waited to
2  fix them when they failed, they'd turn to other
3  suppliers?
4        MS. DUNCAN HACKETT:  Objection.
5        THE WITNESS:  I don't believe any of
6  these ever left our transmissions.
7        BY MR. OSTOYICH:
8    Q   Let me just make sure we're clear on the
9  record.
10        But that's what he told you was his
11  belief in March of 2002, was that they could or
12  would, right?
13    A   That is what it says right here, yes.
14    Q   Now, I take it then that the G platform
15  warranty problems, the air filter regulator and so
16  forth, are continuing in March of 2002.  Is that
17  fair?
18        MS. DUNCAN HACKETT:  Objection.
19        THE WITNESS:  I can't say for sure
20  because the actual document, other than the
21  letter, is not dated.  I don't know -- I don't
22  know when these happened, so I can't --

Page 245

1        BY MR. OSTOYICH:
2    Q   Fair enough.  You know that in March of
3  2002, you're continuing to get reports from the
4  ArvinMeritor sales force that they're having
5  problems with the G platform.
6    A   That's true.
7    Q   Let's mark the July 3rd, 2002 ZF Meritor
8  Board of Directors minutes.
9        (Martello Deposition Exhibit No. 17 was
10        marked for identification.)
11        BY MR. OSTOYICH:
12    Q   While you're looking at it, I'll just
13  say it came from the company's files.  It's
14  ZFMA0000869 to 77.
15    A   Okay.
16    Q   This is the ZF Meritor Board of
17  Directors meeting minutes, July 3rd, 2002, of a
18  meeting held at 2135 -- the ArvinMeritor
19  facility -- 2135 West Maple Road, Troy, Michigan,
20  and it says that you were a participant in the
21  request of the Board of Directors, Richard
22  Martello, President of the Company, on the first

62 (Pages 242 to 245)

776d4e51-238a-48e2-8a9a-0079ed29673
000200

Page 246

1  page, correct?
2      A   Correct.
3      Q   I take it that reflects that in fact
4  that you went to the Board of Directors meeting
5  and participated in it, right?
6      A   Yes.
7      Q   Mr. Martello?
8      A   Yes.
9      Q   At that Board of Directors meeting, on
10  page 2 it says that there was a G platform
11  warranty update presented by Mr. Allen, and that's
12  Charlie Allen, your Director of Sales and
13  Marketing, right?
14      A   That's what it says.
15      Q   I'm sorry, he's the Director of Sales
16  and Engineering.  He's listed on the first page.
17  At some point, did he assume the engineering role
18  from Mr. Molde?
19      A   Yes.
20      Q   So at this point in mid 1992, Mr. Allen
21  is the ZF Meritor Director of Sales and
22  Engineering, and he made a presentation on the

Page 247

1  G platform warranty --
2      A   Correct.
3      Q   -- update to the Board at this meeting?
4      A   Correct.
5      Q   It says he presented information in
6  graphic form of repairs per 100 transmission,
7  scaled against the in-service month.
8          Do you see that?
9      A   Yes, sir.
10      Q   And I take it that's -- you mentioned
11  this morning that there were graphs of repairs
12  per 100 units.  Is that what you're referring to?
13      A   That's correct.
14      Q   Okay.  It says Mr. Allen told the Board
15  in July of 2002 that early indications are that
16  the corrective actions taken with respect to the
17  G platform are beginning to show positive results,
18  right?
19      A   That's what it says, yes.
20      Q   Now, let's look at -- or mark as
21  Exhibit 18, this is the presentation at a
22  ZF Meritor Board of Directors, July 3rd, 2002.

Page 248

1  Again, it came from the company's files,
2  ZFMA0000703 to 765, and I'll ask you to take a
3  look at that.
4          (Martello Deposition Exhibit No. 18 was
5          marked for identification.)
6          THE WITNESS:  Okay.
7          BY MR. OSTOYICH:
8      Q   This is a set of presentation materials
9  for this Board meeting you attended in July 2002,
10  right?
11      A   Yes.
12      Q   And the second page of the document has
13  got the agenda, reflects that you were there.  It
14  says Rick Martello made presentations on old
15  business and new business, and it says that
16  Mr. Allen, your Director of Sales and Engineering,
17  presented a G platform warranty update, and that's
18  the one we just saw in the Board minutes, right?
19      A   I see that he made the presentation.  I
20  haven't seen the presentation.
21      Q   Okay, let's look a couple of pages in.
22          On page 4 of the document, it says this

Page 249

1  is the Sales and Engineering Report, and Mr. Allen
2  was the Director of Sales and Engineering for
3  ZF Meritor at the time, right?
4      A   That's correct.
5      Q   And it's got an attached set of slides
6  here, and these are the slides he presented at the
7  Board meeting you attended in July 2002?
8      A   That's correct.
9      Q   On page 6, these are the slides you
10  presented on the G platform warranty update,
11  right?
12      A   Yes.
13      Q   On page 7 is the graph that you just
14  referred to in the minutes of the Board meeting,
15  the transmission warranty performance claims
16  through May 2002, repairs per 100 transmission,
17  right?
18      A   That's correct.
19      Q   Now, am I reading it right, the
20  G platform launch occurred in February of 2000?
21  There's a flag right in the middle of the page.
22      A   Correct.

63 (Pages 246 to 249)

776d4e51-238a-48e2-8a9a-0079ed29673
**000201**

Confidential

Page 250

1    Q   And in February through April of 2001,
2  so about a year after that platform was launched,
3  you were experiencing somewhere in the range of 50
4  to 80 repairs for every 100 G platform
5  transmissions in the field, right?
6    A   This -- I'm sorry, but I'm trying to
7  remember how this graph actually works, because
8  each line has a number of months in service, I
9  believe.
10       So to answer your question, there is in
11 the launch period of the G platform.  And if you
12 look at it compared to the F, which is to the left
13 of this, rates that are higher than in the
14 previous platform, being the F platform, there is
15 a point close to 80, yes.
16   Q   And that's around the end of 2001, the
17 beginning of 2002, right?
18   A   That is correct.
19   Q   80 repairs for every 100 units in the
20 field for a G platform?
21   A   Not unusual for the launch of a product.
22       I think if you looked at Eaton's

Page 251

1  warranty data, you would see that on certainly
2  things like the AutoShift and the Lightning.
3    Q   That's something we'll deal with
4  separately, but I want to make sure I'm reading
5  the graph data.
6        For your G platform, at the end of 2001,
7  the beginning of 2002, you were having 80 repairs
8  per 100 units in the field, right?
9        MS. DUNCAN HACKETT:  Objection.
10       THE WITNESS:  As I say, I don't know --
11 don't remember exactly how these cumulative
12 numbers are.  Charlie Allen would be the best
13 person to ask.
14       There is a number around 80, and I
15 believe that's what it means, yes.
16       BY MR. OSTOYICH:
17   Q   Let's look at the next page, the
18 warranty costs by component and subassembly.  I
19 take it this is a listing of the various major
20 problems that the G platform was having causing
21 warranty claims, yes.
22       MS. DUNCAN HACKETT:  Objection.

Page 252

1        THE WITNESS:  This is -- yes, this is
2  the type of components that we were having
3  problems with on the G platform, yes.
4        BY MR. OSTOYICH:
5    Q   So in other words, 33 percent of the
6  warranty claims were coming from top cover/tower
7  problems with the G platform?
8    A   Top cover, yes, single-rail top cover,
9  correct.
10   Q   11 percent were coming from air filter
11 regulator claims?
12   A   Correct.
13   Q   Synchronizer was the source of
14 10 percent of the warranty claims related to the
15 G platform?
16   A   That's what it says, yes.
17   Q   Range piston, 14 percent?
18   A   Yes.
19   Q   Shift knob, another 6 percent?
20   A   That's what it says, yes.
21   Q   And then there's a catchall, I take it,
22 "Other," so there were other problems that were

Page 253

1  causing 26 percent of the claims?
2    A   Yes.
3    Q   And then the next page breaks that down
4  and says the top five G platform performance
5  issues, top five subassemblies, it says top cover,
6  air filter regulator, range piston, shift knob,
7  synchronizer.  So this is just a listing of these
8  top five problems?
9    A   Same as the previous page.
10   Q   It says these issues address 74 percent
11 of the G platform warranty cost, which leaves the
12 other 26 percent, which is this catchall "Other"
13 category, right?
14   A   Correct.
15   Q   It's got on the next page after that,
16 "G Platform Corrective Actions" that the company
17 is taking or plans to take, right?
18   A   Correct.
19   Q   The synchronizer, it says corrective
20 action assessment is pending, and the status is
21 testing, so I take it that's still in the works --
22   A   Correct.

64 (Pages 250 to 253)

776d4e51-238a-48e2-8a9a-0079ed29673

000202

Page 254

1    Q    -- in July 2002?
2    A   That's correct.
3    Q    Range piston, corrective action
4    assessment is strong, the status is testing.  Same
5    thing, still in the works in July 2002?
6    A   Correct.
7    Q    Shift knob, it says pending, and the
8    status is hold.  I take it that was on hold in
9    July 2002?
10        MS. DUNCAN HACKETT:  Objection.
11        THE WITNESS:  That is what the chart
12    says.  I don't remember the specific situation for
13    the shift knob.
14        Again, it's a launch of a product.
15    Compared to the F platform, it was having
16    problems.
17        BY MR. OSTOYICH:
18    Q    Is the F platform the one that had that
19    bearing recall, the bearing issue?
20    A    No.  It was a generation or two after
21    the bearing problem.
22    Q    Let me make sure, because you joined the

Page 255

1    transmission division at Rockwell in mid '95,
2    right --
3    A    Yes.
4    Q    -- as the General Manager?
5        And you were finishing up the recall on
6    the manual transmissions at the time, right?
7    A    Yes.
8    Q    And this chart here begins in 1997.
9    A    Yes.
10    Q    So you finished up the recall of the
11    prior generation of transmissions sometime in
12    what, late '95, early '96?
13    A    '96, yes.
14    Q    And was there a generation between '96
15    and '97, or is this data here reflective of
16    whatever came after the recall?
17    A    That's the F platform, which is after
18    the recall.  I don't remember.  Because I had just
19    joined, I don't remember what the letter
20    designations were previous.
21    Q    Fair enough.  Let me just make sure I
22    understand.

Page 256

1        So prior to the left-hand part of this
2    graph here was the transmission series that was
3    recalled as the bearing problem?
4    A    I would -- at the time we had the
5    recall -- at the time of the recall, it was
6    certainly left to the graph.
7    Q    And then you had the F series, which is
8    the beginning of this graph here in the '97 time
9    period to ninety --
10    A    I know it is the period closest to the
11    G.  I don't remember how far F went back.
12    Q    Fair enough.  This is the transmission
13    family before the G platform launch was '97 to
14    '99, somewhere in that time range?
15    A    That's correct.
16    Q    And that was experiencing somewhere in
17    the 30 to 40 percent repairs per hundred units,
18    and then it sort of averaged out, it looks like
19    around 30, and then went down in '98 and '99 to
20    about 20, 15 to 20, right?
21    A    Yes, over 750,000 mile, 36-month
22    history, yes.

Page 257

1    Q    And then G platform is introduced at the
2    beginning of 2000, right?
3    A    That's what that graph will tell you,
4    yes.
5    Q    I just want to ask you a question.
6        On page 23 of this, it's got some
7    figures on 2003 to 2007, Market Volume Summary.
8    A    Uh-huh.
9    Q    To the left, where it says "Total" in
10    the middle, and it's got the first, second and
11    third quarter, I take it that's the 2002 figures
12    there, the fiscal year 2002?
13    A    2003, I believe, yeah.
14    Q    2003, I'm sorry.
15        So in other words, if I'm reading it
16    right, the company, during fiscal year 2003, which
17    goes from the fall of 2002 to the fall of 2003 --
18    A    Yes.
19    Q    -- the company sold 16,000 G platform
20    manual transmissions?
21    A    See, if this was in July of '02, we
22    would have been in the -- we would have been in

65 (Pages 254 to 257)

776d4e51-238a-48e2-8a9a-0079ed29673
000203

Page 258

1    the fourth quarter, so it would have been the
2    first three-quarters actual, and the last quarter
3    estimate.
4        Q    So the estimate for the first
5    three-quarters, and then you've got the estimate,
6    it adds up to 16,000 manual G transmissions?
7        A    Correct.
8        Q    Mr. Martello, we're going to mark as
9    Exhibit 19 to your deposition a notice dated
10   August 29th, 2002, by ZF Friedrichshafen AG and
11   others, produced by the company from its files,
12   ZFMA0001953, and on the second page is a fax cover
13   sheet reflecting that it was -- a copy was faxed
14   to ZF Meritor LLC, President.  I'll ask you to
15   take a look at that.
16           (Martello Deposition Exhibit No. 19 was
17           marked for identification.)
18           THE WITNESS:  Yes, sir.
19           BY MR. OSTOYICH:
20       Q    This is a fax on the letterhead of
21   Hunter & Schank, a law firm, that was faxed to
22   ZF Meritor LLC, attention to the President of

Page 259

1    ZF Meritor LLC -- and that's you, right, at this
2    time in mid 2002?
3        A    Yes.
4        Q    And this is a fax you received in the
5    ordinary course of your duties as the President of
6    the company in August of 2002, right?
7        A    I don't remember ever seeing this
8    document.
9        Q    You don't have any reason to doubt that
10   you received this fax that says it was sent to
11   ZF Meritor, to the attention of the President of
12   ZF Meritor LLC, do you?
13       A    Where do you see that it was sent?
14       Q    On the second page is a fax cover sheet
15   from Hunter & Schank, and it's got a To line, to
16   Meritor Heavy Vehicle Systems, LLC, Attention
17   General Counsel, and then below that it says Copy.
18   The third copy, ZF Meritor LLC, Attention
19   President.
20       A    Yeah, I see that, but I don't remember
21   ever seeing it.
22       Q    Fair enough.  You don't have any reason

Page 260

1    to believe you didn't get this, do you?
2        A    To the best of my knowledge, those are
3    not my fax numbers.  I'd have to go back and look,
4    but --
5        Q    This is a notice signed by
6    ZF Friedrichshafen AG's attorney, and
7    ZF AG Holding's attorney, dated August 29th, 2002.
8    This is ZF --
9        A    All I'm saying is this the general
10   counsel -- it went to the general counsel with a
11   copy to Miller, Canfield.  Kent Shafer, I don't
12   even know why he would be around.
13           All I can tell you is I don't remember
14   getting this fax, and I don't remember this at
15   all.  I see what it says, but I don't remember it.
16       Q    Do you remember ZF/AG forming the
17   company that it had a claim for breach of the
18   Asset Transfer Agreement for --
19       A    Honestly, I do not remember that, no.
20       Q    Let me finish my question, Mr. Martello.
21           Do you remember that they filed a claim
22   for breach for failure of Meritor HVS or Meritor

Page 261

1    Sub to adequately design and test transmission
2    products prior to the sales of transmissions?
3           MS. DUNCAN HACKETT:  Objection.
4           THE WITNESS:  No, I do not remember
5    that.
6           BY MR. OSTOYICH:
7        Q    Do you remember that ZF/AG submitted a
8    claim against the company for damages in the form
9    of diminution of value of their membership
10   interest for several million?
11       A    No, I do not remember that.
12       Q    But you do remember that ZF, AG and
13   Meritor ended up in a dispute over warranty
14   expenses related to the joint venture, right?
15           MS. DUNCAN HACKETT:  Objection.
16           THE WITNESS:  I don't remember that
17   either.  I was not part of any dispute claims
18   between the two companies other than normal
19   disagreements on things in Board of Directors
20   meetings.
21           It looks like it happened, but I
22   don't -- I was not part of it, and I don't

66 (Pages 258 to 261)

776d4e51-238a-48e2-8a9a-0079ed29673

000204

Page 262

1  remember this at all.
2       MR. OSTOYICH:  We're going to change the
3  tape, so let's take a break.
4       THE VIDEOGRAPHER:  Going off the record.
5  This is the end of tape 4.  The time is 2:50 p.m.
6       (A break was taken.)
7       THE VIDEOGRAPHER:  Back on record.  This
8  is Tape No. 5.  The time is 2:56 p.m.
9       BY MR. OSTOYICH:
10      Q   We're going to mark as the next exhibit
11  to your deposition, 20, ZF Meritor LLC Board of
12  Directors Meeting Minutes, November 12th of 2002.
13  This is about six months later.  Again produced by
14  the company from its files, ZFMA0186297 to 310.
15  I'll ask you to take a look at that.
16      (Martello Deposition Exhibit No. 20 was
17      marked for identification.)
18      THE WITNESS:  Okay.
19      BY MR. OSTOYICH:
20      Q   I take it this reflects the ZF Meritor
21  LLC Board of Directors Meeting Minutes,
22  November 12th, 2002.  It says that Rick Martello,

Page 263

1  President of the company, participated in that
2  meeting in Laurinburg, North Carolina, at the
3  ZF Meritor facility?
4       A   That's true.
5       Q   On the second page, it's got a section
6  CFO Report, Auditor's Report, and it says that
7  Mr. Coleman -- now, Mr. Coleman was the chief
8  financial officer of ZF Meritor at that time?
9       A   That's correct.
10      Q   And Mr. Coleman initiated the Auditor's
11  Report by introducing to the Board two
12  representatives from Deloitte & Touche, Mike
13  Desmond and Michael Zagora; is that right?
14      A   Correct.
15      Q   Deloitte & Touche, I take it they were
16  the company's auditors at the time?
17      A   That's correct.
18      Q   It says the Deloitte & Touche
19  representatives discussed at that Board meeting in
20  November 2002 five matters that will affect the
21  content -- the form and content of the fiscal year
22  2002 financial statements of the company.

Page 264

1       Do you see that?
2       A   Correct.
3       Q   And I take it, Mr. Martello, that the
4  Deloitte & Touche auditors discussed at that Board
5  meeting in November 2002 the potential need to
6  write down various G platform transmission assets
7  and other asset valuation matters, right?
8       A   It says -- item three says that, yes.
9       Q   In fact, that was a presentation
10  provided at the Board meeting you attended in
11  November 2002, right?
12      A   That's correct.
13      Q   And Deloitte & Touche presented to the
14  Board that there are certain preconditions,
15  number five down there, for issuance of a clean
16  opinion with respect to the 2002 financial
17  statements, is that right?
18      A   Yes.
19      Q   And what's a clean opinion?
20      MS. DUNCAN HACKETT:  Objection.
21      THE WITNESS:  I don't know exactly what
22  the words mean.

Page 265

1       BY MR. OSTOYICH:
2       Q   It's an opinion from your auditors that
3  the company's financial reporting is clean, right?
4       MS. DUNCAN HACKETT:  Objection.
5       THE WITNESS:  I don't know what exactly
6  what the words mean.
7       BY MR. OSTOYICH:
8       Q   Am I right, Mr. Martello, that Deloitte
9  & Touche, your auditors, told the Board in
10  November 2002 they would only provide a clean
11  opinion with respect to the 2002 financial
12  statements if you met a precondition that the
13  members ArvinMeritor and ZF/AG will commit to
14  financially support the company for at least one
15  year plus one day?
16      A   That's correct.
17      Q   Now, a few pages further in it says
18  that -- on page 5 of these minutes it says that
19  Mr. Allen, up at the top, was the Director of
20  Sales and Marketing of the company,
21  reviewed monthly warranty statistics, and they're
22  reflected in Exhibit K, am I right?

67 (Pages 262 to 265)

776d4e51-238a-48e2-8a9a-0079ed29673

000205

1/9/2009        ZF Meritor LLC et al v. Eaton Corporation Richard Martello
Confidential

Page 266

1     A   Yes.
2     Q   It says Mr. Allen reported on the
3  transmission warranty performance rainbow chart,
4  which is attached to these minutes as Exhibit K,
5  right?
6     A   That's what it says.
7     Q   And if we look on the very last page of
8  this, there's an Exhibit K, and it says
9  transmission warranty performance claims through
10  October 2002, right?
11     A   Correct.
12     Q   Left-hand column says repairs per
13  100 transmissions, right?
14     A   Yes.
15     Q   Now, on the bottom it says per
16  in-service month.  This is the rainbow chart
17  that's referenced in the minutes?
18     A   I can't read all this.  It's so small, I
19  can't read what those numbers are, so --
20     Q   Fair enough.  I'm not asking you
21  specific numbers, but this is the graph that was
22  presented --

Page 267

1     A   This is a graph presented, yes.
2     Q   -- at that Board meeting in November
3  2002, right?
4     A   That's correct.
5     Q   Now, you can see at least with me that
6  there were times in the middle of that graph where
7  the repairs per 100 transmissions in the field
8  exceed 100, right?
9     A   Correct.
10     Q   On page 5 of this, of the minutes,
11  there's a section about halfway down, it says
12  FreedomLine Review.
13     A   Yes.
14     Q   And it says that Mr. Allen was directed
15  to design a rainbow chart, and that's the kind of
16  chart we just looked at, right?
17     A   Yes.
18     Q   Graphing out repairs, warranty claims
19  per 100 units of transmissions, right?
20     A   Yes.
21     Q   It says Mr. Allen was directed to design
22  a rainbow chart specifically for FreedomLine so

Page 268

1  that results could be tracked as FreedomLine is
2  rolled out.  Do you see that?
3     A   Yes.
4     Q   I take it the Board directed him, the
5  Director of Sales and Marketing of Engineering of
6  ZF Meritor, to do that after this Board meeting in
7  November 2002?
8          MS. DUNCAN HACKETT:  Objection.
9          THE WITNESS:  That's correct.
10          BY MR. OSTOYICH:
11     Q   You'll be happy to hear, Mr. Martello,
12  that I'm going to jump ahead to the July 15th,
13  2003, ZF Meritor Board meeting, again produced by
14  your lawyers, ZFMA0019956 to 20003.  I'm going to
15  ask you to take a look at this.
16          (Martello Deposition Exhibit No. 21 was
17          marked for identification.)
18          THE WITNESS:  Yes, sir.
19          BY MR. OSTOYICH:
20     Q   Mr. Martello, just let me know when
21  you've had a chance to flip through it.  I'll
22  point you to some specific pages, obviously.

Page 269

1     A   Yes, I accept the fact that this is the
2  presentation made at that Board meeting.
3     Q   Okay.  So this is a presentation at the
4  July Board meeting that you attended as President
5  of ZF Meritor, right?
6     A   That is correct.
7     Q   On the second page it's got a list of
8  the agenda for the meeting.  There's some opening
9  remarks by Mr. Vogel.  He's a Board member from
10  ZF/AG, right?
11     A   He was the Chairman of the Board at the
12  time, yes.
13     Q   And then it says there were acceptance
14  of minutes from the March 2003 Board meeting by
15  Mr. Hawley, right?
16     A   Correct.
17     Q   And if we look a few pages in, the
18  page that's the fourth page of the document, it
19  then has a section on the ZF Meritor, March 20th,
20  2003 meeting minutes, right?
21     A   Give me the page number at the bottom.
22     Q   It's the fourth page of the document, or

68 (Pages 266 to 269)

776d4e51-238a-48e2-8a9a-0079ed29673

000206

Page 270

1   959.
2       A   959?
3       Q   Uh-huh.
4       A   My 959 is just a --
5       Q   Yeah, it's a section.  It says
6   ZF Meritor, March 20, 2003 Meeting Minutes, and
7   then subsequent to that it's got the minutes from
8   that meeting, right?
9       A   Correct.
10      Q   And you attended the Board meeting in
11  March of 2003 as President of ZF Meritor, right?
12      A   Yes.
13      Q   And at that Board meeting, if you look a
14  couple pages into it, Mr. Allen, there's a page on
15  page 4 of those minutes, it says Old Business?
16      A   Yes.
17      Q   It says, "Mr. Allen was then called upon
18  to discuss certain matters of old business.  He
19  provided a warranty report update, which included
20  a G Platform Warranty Performance rainbow chart
21  (attached to these Minutes as Exhibit G.)"
22      Do you see that?

Page 271

1       A   Uh-huh.
2       Q   "and various warranty corrective actions
3   that have been taken (or are in process) with
4   respect to 9 & 10 speed transmissions," correct?
5       A   Correct.
6       Q   And that reflects that he made a
7   presentation at the Board meeting you attended in
8   March of 2003 where he presented a rainbow chart
9   of G platform warranty performance, right?
10      A   Yes.
11      Q   And a list of the corrective actions
12  that either had been taken or were still in
13  progress in March of 2003, right?
14      A   Yes.
15      Q   Now let's look a few pages in, and the
16  last two digits are 72.  Do you see where I am?
17  It should say ZF Meritor Board meeting,
18  March 20th, 2003, in the upper right-hand corner,
19  right?
20      A   927, Exhibit G.
21      Q   This is the Exhibit G that Mr. Allen
22  presented at the meeting you attended, right?

Page 272

1       A   Yes.
2       Q   Okay.  This is the rainbow graph of the
3   G platform warranty performance claims through
4   January of that year, 2003, right?
5       A   That's what it says, yes.
6       Q   So we see again the same graph that's
7   got the G platform launch, and then it's got 80
8   repairs per 100 transmissions in the field a
9   little bit to the right of that, right?
10      A   Yes.
11      Q   And then it goes down to about 50,
12  right?
13      MS. DUNCAN HACKETT:  Objection.
14      THE WITNESS:  Yeah, it goes down, but I
15  can't read the bottom.  I don't know what the
16  dates are, so --
17      BY MR. OSTOYICH:
18      Q   You can read across on the side, and the
19  black line goes down to about 50 repairs per every
20  100 units in the field for the G platform, right?
21      A   About the seventh page -- seventh one
22  down, yes.

Page 273

1       Q   Then it spikes back up to about 60
2   repairs for every hundred units in the field for
3   the G platform manual transmissions, right?
4       A   No.  That's the last point on here.  I
5   don't know where you get that.
6       Q   See where I am, Mr. Martello?  Read the
7   left-hand column.  It says repairs per 100
8   transmissions.
9       A   Yeah, I know the chart.  I just said if
10  you go over from one, two, three, four, five,
11  six -- between six and seven black dots, that's
12  the best I can do from the right, that top line
13  comes down below 50, and it never -- below 60, and
14  it never goes up again, so I don't know where --
15  where you're coming from.
16      Q   I want to make sure we're reading it
17  right.  So it goes up to 80, and then it comes
18  down to 50, right?
19      A   You're talking the black line?
20      Q   Black line.
21      A   Yes.
22      Q   And then it goes back up to 60?

69 (Pages 270 to 273)

776d4e51-238a-48e2-8a9a-0079ed29673
000207

Page 274

1    A   Yes.
2    Q    And then it comes back down to about
3 between 30 and 40 repairs for every hundred units
4 in the field, right?
5    A   Yes.
6    Q    And then it goes down to a little bit
7 under 30 repairs for every hundred units in the
8 field?
9    A   Yes.
10    Q    And then it goes back up to about 30 at
11 the end of that?
12    A   Yes.  It shows continued improvement
13 down the chart once the problems -- once the
14 implementation of things.
15    Q    Now, let's look back at the front.
16       After this presentation from the March
17 2003 Board minutes, then there was the
18 presentation for the July 2003 meeting itself,
19 right?
20    A   Yes.
21    Q    If you look at the end on the first
22 page.

Page 275

1    A   Yes.
2    Q    Okay.  And as part of the July 2003
3 presentation, there was an update on the
4 G platform warranty performance graph, right?
5    A   Yeah.  I believe that's what we were
6 looking at.
7    Q    Well, we were looking at the March 2003.
8 Now I'm going to ask you to look at the July 2003,
9 which is on page 32.  Actually, let's start on
10 page 27.
11       MS. DUNCAN HACKETT:  What's the Bates
12 number?
13       THE WITNESS:  Give me the bottom number
14 that you're using.
15       BY MR. OSTOYICH:
16    Q    96 are the last two digits.
17    A   96?
18    Q    Yep.
19    A   July?  Old Business?
20    Q    Yeah.
21    A   Okay.
22    Q    And old business on the agenda says that

Page 276

1 this was a section of the Board minutes that
2 R. Martello presented in July 2003, right?
3    A   Old business/new business I presented.
4    Q    And one of the items of old business
5 that you presented was the FreedomLine sales and
6 warranty update on that page 96, right?
7    A   It was on my -- I presented this chart,
8 but I would imagine that Charlie Allen actually
9 presented the data.  I would never have tried to
10 explain Charlie's charts.
11    Q    Fair enough.  And one of the items of
12 old business that you presented, and maybe
13 Mr. Allen as well, was the G platform warranty
14 update, right?
15    A   I see the FreedomLine chart.
16       MR. HOLCOMB:  Which page is that?
17       MR. OSTOYICH:  96, on the Old Business
18 line first.
19       THE WITNESS:  001, is that the one
20 you're talking about?
21       BY MR. OSTOYICH:
22    Q    Well, that's the actual graph.  I was on

Page 277

1 a different page, but, yes, you presented as part
2 of the old business update to the Board in July of
3 2003 this graph on G platform transmission total
4 warranty performance, adjusted claims through May
5 2003, right?
6    A   Yeah, I presented the -- a lot of these
7 old business and new business, I would always
8 present -- I would always present the agenda for
9 them.  If it was things that I didn't particularly
10 feel comfortable presenting, like warranty graphs,
11 Charlie actually did the presentation.
12    Q    Fair enough.  So you introduced
13 Mr. Allen, and then he presented the graph that's
14 on page 00 --
15    A   Yeah, he would -- he would -- he would
16 explain the graph, yes.
17    Q    All right.  So now let's turn to
18 page 001.  This is the graph Mr. Allen presented
19 at the Board meeting you attended in July 2003.
20    A   Yes.
21    Q    And, again, we see the spike of 80
22 repairs for 100 units for the G platform in the

70 (Pages 274 to 277)

776d4e51-238a-48e2-8a9a-0079ed29673

000208

Page 278

1    middle of that graph, right?
2    A    Uh-huh.
3    Q    And it goes down to 50, right?
4    A    Uh-huh.
5    Q    Then back up to 60 repairs for every
6    hundred units, right?
7    A    Uh-huh.
8    Q    And it comes down to 30, right?
9    A    Uh-huh.
10    THE REPORTER:  Say yes, please.
11    THE WITNESS:  Yes.
12    BY MR. OSTOYICH:
13    Q    Back up to 40 repairs for every hundred
14    units?
15    A    Approximately.
16    Q    And it comes down a little bit below 30,
17    right?
18    A    Yes.
19    Q    And it goes back up to just under 50
20    repairs for every hundred units, right?
21    A    Yes.
22    Q    And then it comes down and levels out

Page 279

1    between 30 and 40 repairs for every hundred units
2    in May of 2003, right?
3    A    That particular chart, yes, that graph,
4    yes.
5    Q    Now, you also introduced Mr. Allen, I
6    take it, and he presented the graph on the
7    FreedomLine total warranty performance claims?
8    A    I would say that's probably true.
9    Q    Let's look back at page 99.
10    A    Yes.
11    Q    And these are the -- this is the graph
12    he presented at that Board meeting in July of
13    2003?
14    A    Looks to be, yes.
15    Q    And it looks like from the graph that
16    was presented to the Board of Directors,
17    ZF Meritor, in July 2003, the FreedomLine
18    transmission total warranty performance claims
19    through May 2003, that there were at times between
20    250 and 300 warranty claims for every hundred
21    FreedomLine units in the field?
22    MS. DUNCAN HACKETT:  Objection.

Page 280

1    THE WITNESS:  First of all, when you're
2    talking about per hundred units, I don't know how
3    many units were actually out in the field.  So
4    when you're doing a per hundred units, this is the
5    extreme launch -- shorting launch period of the
6    FreedomLine.
7    And if you remember, we said we were
8    going to have an initial launch, and then full
9    production, and this is during the launch period,
10    and until I -- unless I knew how many units were
11    in the market -- if I knew how many units were in
12    the market, I could better understand this chart.
13    BY MR. OSTOYICH:
14    Q    This graph --
15    A    And that's the reason that Charlie
16    probably had it zero to 400 is there wasn't very
17    many units in the market, and it was the initial
18    launch of the product.
19    Q    Now, the title of this one at the top of
20    the graph says this is the FreedomLine
21    Transmission Total Warranty Performance, Claims
22    Through May 2003, Removed Influence of the GS3 and

Page 281

1    & Clutch Actuator Retrofits, right?
2    A    Yes.
3    Q    So this is -- I take it there were
4    retrofits for the GS3?
5    A    Yes.
6    Q    Some trucks were brought in and taken
7    out of service to retrofit the GS3?
8    A    I'm not sure what that means, because we
9    had a period of time where we retrofitted some of
10    the ones in-house because of the supply chain.  We
11    retrofitted some before we went out.
12    I'm not sure if that means that or not,
13    but we did not have a so-called recall ever of the
14    FreedomLine to bring things in and retrofit, so --
15    Q    Fair enough.  There was a retrofit of
16    certain --
17    A    Yes.
18    Q    -- FreedomLine units for GS --
19    A    Yes.
20    Q    What's GS3?
21    A    Off the top of my head, I can't
22    remember.

71  (Pages 278 to 281)

776d4e51-238a-48e2-8a9a-0079ed29673
000209

Page 282

1    Q   Okay.  But it's a component that was
2  causing problems --
3    A   Yes.
4    Q   -- you just had to retrofit it in the
5  FreedomLine transmission, fair?
6    A   Yes.
7    Q   And also because of clutch actuator
8  problems with the FreedomLine, there's a retrofit?
9    A   That's what it says, yes.
10    Q   So taking those out, those were removed
11  from this graph, right?
12    A   Yes.  And like I say, I believe the
13  retrofit means the ones we did internally.
14    Q   So those aren't reflected in the graph.
15  So the graph just reflects the other units without
16  the retrofitted parts?
17    A   Correct.
18    Q   And it looks like the product is
19  introduced to the market in the -- mid 2001,
20  right?  It looks like June 2001, right?
21    A   The first -- yeah, the first in-service
22  month that's on here is 2001.

Page 283

1    Q   Then am I reading it right that by the
2  end of 2001, the beginning of 2002, there were --
3  the graph reflects 250 to 300 repairs for every
4  hundred FreedomLine transmissions in the field?
5    A   It reflects two and a half repairs for
6  every one out there, yes.
7    Q   250 to 300 for every hundred units out
8  there were repaired?
9    A   Yes, but I don't even think there was
10  300 out there.  That's why I'm saying what I'm
11  saying is --
12    Q   And that comes down by May of 2003,
13  which is when the graph ends, right?
14    A   Yes.
15    Q   That comes down to 100 repairs for every
16  hundred FreedomLine in the field, right?
17    A   That's where this graph ends, yes.
18    Q   Now, there's a little handwritten note
19  to the right of that.  It says, "So
20  100 repairs/100 units 12 months in service as of
21  March 2003."  Do you see that?
22    A   That's correct.

Page 284

1    Q   Is that your handwriting, Mr. Martello?
2    A   No, it's not.
3    Q   Do you recognize that handwriting?
4    A   No, I don't.
5    Q   Now, let's look at the next page,
6  FreedomLine -- Current FreedomLine Performance
7  Issues, and this reflects that there are current
8  FreedomLine performance issues in July of 2003,
9  right?
10    MS. DUNCAN HACKETT:  Objection.
11    THE WITNESS:  Would you repeat the
12  question, please?
13    BY MR. OSTOYICH:
14    Q   Sure.  The title of this page at the
15  Board meeting in July 2003 says "Current
16  FreedomLine Performance Issues."  I take it this
17  reflects that there were, in July 2003, current
18  FreedomLine performance issues, right?
19    MS. DUNCAN HACKETT:  Same objection.
20    THE WITNESS:  No.  You've got to read
21  the total thing.  It says performance issues, top
22  six from engineering field test and/or production.

Page 285

1    BY MR. OSTOYICH:
2    Q   Gotcha.  This reflects that the top
3  six --
4    A   From engineering field test and/or
5  production are listed below, yes.
6    Q   So there are other performance issues
7  with the FreedomLine.  This is just the top six,
8  right, from the engineering field test and/or
9  production?
10    A   Yes.
11    Q   Multiple symptoms is number one, right?
12    MS. DUNCAN HACKETT:  Objection.
13    THE WITNESS:  GS3, yes.
14    BY MR. OSTOYICH:
15    Q   And then number two, it says harsh
16  engagement/shift was a performance issue with the
17  FreedomLine transmission in July 2003, right?
18    A   Yes.
19    Q   Then the number three performance issue
20  with the FreedomLine transmission was zero voltage
21  doubler capacitor?
22    A   It was three points -- yeah.  The

72 (Pages 282 to 285)

776d4e51-238a-48e2-8a9a-0079ed29673
000210

Page 286

1  voltage capacitor, as I said before, we had to
2  change the voltage because in Europe it's 24 volts
3  and this is 12.  That was the capacitor that was
4  used to change the voltage.
5      Q   It was causing performance issues with
6  the FreedomLine in the field, correct?
7      A   That's what it says.
8      Q   The number four performance issue with
9  the FreedomLine in the field was multiple
10 symptoms, ZMTEC.  What's that?
11     A   ZMTEC is an electronic unit that's on
12 it.
13     Q   The number five item causing performance
14 issues with the FreedomLine transmission in the
15 field is -- says no symptom, C/S bearing cups.
16 What's that?
17     A   Countershaft bearing cups.
18     Q   I take it that was causing performance
19 issues in the field with the FreedomLine?
20     MS. DUNCAN HACKETT:  Objection.
21     THE WITNESS:  If you look at the first
22 column, it says the field situation for that one

Page 287

1  is stabilized.
2      BY MR. OSTOYICH:
3      Q   The last one --
4      A   So it was a technical issue that the
5  engineers were still looking at.
6      See the little stoplights?
7      Q   Yeah.  So you're pointing out that that
8  one says it had stabilized in July of 2003?
9      A   It is stabilized at this presentation.
10     Q   So if I'm reading it right, so if I look
11 back up at the --
12     A   It says three --
13     Q   It's frequent in July 2003, the
14 stoplights?
15     A   The first three are, yes.
16     Q   And the sixth of the top six
17 FreedomLine performance issues in July 2003, it
18 says no air pressure, floating valves.  What was
19 that?
20     A   The shift mechanism required air.
21     Q   Let's look a few pages forward.  We saw
22 the G platform graph, and then it's got on

Page 288

1  page 33 --
2      A   Which one?
3      Q   It's the second to last page of the
4  document.
5      A   G platform issues is the --
6      Q   Yeah.  I take it at this Board meeting
7  of ZF Meritor that you attended as the President
8  of the company in July 2003, these G platform
9  issues were presented, right?
10     A   That's correct.
11     Q   And it's got a list of subassembly
12 components that were causing problems with the
13 G platform at that time, right?
14     A   That's correct.
15     MS. DUNCAN HACKETT:  Objection.
16     BY MR. OSTOYICH:
17     Q   Then it's got the corrective action
18 status in the middle of the page for each of
19 those?
20     A   That's correct.
21     Q   Now, it looks like, for example, shift
22 knob guardian, the corrective action status was

Page 289

1  still in process in the middle of 2003, right?
2      A   Guarding is the name of a company that
3  we were buying the shift knobs from.  Parkers, the
4  person we switched to because of the problem.
5      Q   I take it the shift knob fixes are still
6  in process in mid 2003, right?
7      A   Yes.  We were changing vendors, yes.
8      Q   And it looks like you're aiming for
9  fixing those or switching vendors from Guardian in
10 September 2003 to Parker at the end of the year?
11     A   I believe that's what it means, yes.
12     Q   And then it says below that the neutral
13 switch.  What was that problem with the G platform
14 transmissions?
15     A   It's listed there.  It's an
16 investigation.  I don't know from this whether it
17 was causing severe or any warranty problems in the
18 field.  All I know is it says they were
19 investigating neutral switches and output shaft
20 seals.
21     Q   So those are still in the mid 2003 time
22 period, you're still investigating those and

73 (Pages 286 to 289)

776d4e51-238a-48e2-8a9a-0079ed29673
000211

Page 290

1  they're ongoing?
2      A   July 15th, 2003, that is correct, but I
3  believe if you looked at any date of any
4  presentation, we're always looking to improve the
5  product and looking at issues.
6      Q   We're going to mark as the next exhibit
7  to your deposition, Mr. Martello -- set
8  of e-mails that you're copied on from Joe Mejaly
9  and others.  It came from the company's files,
10  ZFMA0000623 to 625, and I'm going to ask you to
11  take a look at that.
12          (Martello Deposition Exhibit No. 22 was
13          marked for identification.)
14      THE WITNESS:  Okay.
15      BY MR. OSTOYICH:
16      Q   All right, Mr. Martello, you've had a
17  chance to look at Exhibit 22 to your deposition,
18  right?
19      A   Yes.
20      Q   Okay.  The top e-mail on the first
21  page is an e-mail from Joe Mejaly to Michael
22  Veillette, with a copy to Rick Martello, among

Page 291

1  others, related to transmission issues.
2      A   Right.
3      Q   I take it you received a copy of that on
4  November 17th, 2003, right?
5      A   That's what it says, yes.
6      Q   And you received a copy of the e-mail
7  below it, which he's responding to from Michael
8  Veillette to Joe Mejaly, CC to Rick Martello,
9  transmission issues, right?
10      A   That's what it says, yes.
11      Q   And that was forwarding the e-mails at
12  the end of page 1, going to page 2 and 3, were a
13  series of e-mails back and forth between Joe
14  Mejaly and others, and Larry Gitt at Marathon
15  Ashland Petroleum, right?
16      A   Yes.
17      Q   You received all of those in the
18  ordinary course of your responsibilities as the
19  President of ZF Meritor LLC, right?
20      A   It says I did, yes.
21      Q   Okay.  Now, tell me a little bit about
22  Marathon Ashland Petroleum.  I take it that was a

Page 292

1  transmission customer of the ZF Meritor joint
2  venture?
3      A   I am not extremely knowledgeable about
4  Marathon Ashland Petroleum LLC.  I am not.  It's
5  not a -- it's not a fleet that I recognize the
6  name of.
7      Q   Fair enough.  You recognize it's a
8  customer of the company, you just don't know much
9  about it, is that fair?
10      A   Yeah, I would believe it's a customer
11  from the letters, but I don't know much about it,
12  though.
13      Q   The last e-mail in this trail, which
14  chronologically it's the first one, is an e-mail
15  from Larry Gitt to David Eaton at ArvinMeritor.
16  David Eaton was the ArvinMeritor sales rep out in
17  the field, right?
18      A   That's correct.
19      Q   And it's an e-mail dated November 14,
20  2003.  Subject:  Transmission issues.  And
21  Mr. Gitt, the manager of equipment and maintenance
22  at Marathon Ashland Petroleum, says, "Dave, Due to

Page 293

1  Meritor's continued rejection of warranty due to
2  their design problems on the 'G' platform
3  transmissions, I feel that I have to reconsider my
4  supplier for axles, transmissions, differentials
5  and brakes."  Do you see that?
6      A   Yeah, I see it, yes.
7      Q   And then a little bit below that, he
8  says, "You, Quentin and the other service reps
9  that we deal with on a day to day basis do a great
10  job, but it appears that corporate is not willing
11  to acknowledge that this new transmission has
12  serious problems.  The claims are being denied due
13  to Meritor's claim of driver abuse and as you know
14  we have little to no driver turnover (less than
15  5%) with most of our drivers having over 20 years
16  service.  This being said we never had
17  transmission problems with the older RMT style
18  transmission and have nothing but problems with
19  the G platform transmission," right?
20      A   Correct, that's what it says.
21      MR. HOLCOMB:  You say "right" at the end
22  of reading something.  I don't know what that

74 (Pages 290 to 293)

776d4e51-238a-48e2-8a9a-0079ed29673
000212

Page 294

1  means.
2      MR. OSTOYICH: Don't --
3      MR. HOLCOMB: But I'm asking you what --
4      MR. OSTOYICH: No. She's defending the
5  deposition. You get one person to defend. You're
6  not. One person gets to speak.
7      THE REPORTER: I can only take one at a
8  time.
9      MR. HOLCOMB: You read a long paragraph,
10  and you say "right" at the end of it. I mean, is
11  he supposed to be saying whether you read it
12  correctly?
13      MR. OSTOYICH: One person gets to defend
14  the deposition.
15      MR. HOLCOMB: You should make -- I'll
16  tell the witness. Make sure if you say -- don't
17  just say right if he says right. If you mean he
18  read it correctly, say he read it correctly.
19  Don't just say "right" because we don't know what
20  is correct.
21      THE WITNESS: I agree. You have read it
22  correctly, yes.

Page 295

1      MR. OSTOYICH: Who's defending the
2  deposition? Which one of you?
3      MR. HOLCOMB: Both of us are.
4      MR. OSTOYICH: No, you're not both
5  defending the deposition.
6      MR. HOLCOMB: She's defending, and I'm
7  making comments.
8      THE REPORTER: One at a time, please.
9      MR. OSTOYICH: She's defending it,
10  you're flitting in and out and being a pest. Stop
11  it. It's a violation of the local rules.
12      MR. HOLCOMB: Okay. I've said what I
13  said.
14      MR. OSTOYICH: Good. Don't say it again
15  because you're not on the record in the
16  deposition.
17      MR. HOLCOMB: Don't count on it. We'll
18  see what happens.
19      MR. OSTOYICH: Well, then, she should be
20  quiet and you should speak. One of you gets to
21  defend, not two.
22      MR. HOLCOMB: We went through this once

Page 296

1  before.
2      MR. OSTOYICH: Right. I'm going to
3  bring in a second person and have two people ask
4  questions. Do you want to do that?
5      MR. HOLCOMB: I don't care. As long as
6  you don't ask them at the same time, I don't care.
7      MR. OSTOYICH: The rule is one person,
8  not two.
9      MR. HOLCOMB: I'd like you to show me
10  that rule.
11      MR. OSTOYICH: I guarantee Judge
12  Robinson is not going to let two people stand up
13  at trial and question one witness.
14      MR. HOLCOMB: Okay. Do you want to use
15  your time like this, or do you want to use it for
16  the purpose of questioning?
17      BY MR. OSTOYICH:
18      Q   Now, your customer at Marathon, Larry
19  Gitt at Marathon, asks you, says in the next
20  paragraph, "I feel that with this transmission
21  issue your company has turned their back on us and
22  the industry in supplying less than superior

Page 297

1  components. I will be finishing up my final
2  specifications for my 2004 tractor order in the
3  next six weeks and will decide who the vendor will
4  be for my driveline components during this time
5  frame. I would suggest that Meritor consider how
6  they plan to handle our transmission issues going
7  forward and let me know if they want to continue
8  the 30+ year partnership we've enjoyed in the
9  past."
10      Now, Mr. Eaton then forwards this to
11  Mr. Destefano and Mr. Austin at ArvinMeritor, and
12  they're regional managers for ArvinMeritor sales
13  force, right?
14      A   Carmen Destefano is, yes.
15      Q   He says, "This the most upset I have
16  ever seen Larry Gitt. In my opinion he makes some
17  good points. I have called on Larry for over
18  15 years, he has known many of our engineers and
19  has spoken very highly of this company for
20  many years, from the father of the disc brake
21  Wayne French on down. This is just the tip of the
22  iceberg in my opinion. Larry is not the only one

75 (Pages 294 to 297)

776d4e51-238a-48e2-8a9a-0079ed29673

000213

Page 298

1  to feel this way," and he identifies Rick
2  Lorenzoni at Celadon, and says he had very similar
3  reservations on the continued use of Meritor
4  components.  Do you see that?
5      A   You read it correctly.
6      Q   And who is Rick Lorenzoni at Celadon?  I
7  take it Celadon is a fleet customer of yours?
8      A   Celadon is a fleet customer.  I do not
9  know Rick Lorenzoni.
10     Q   Give me an idea about Celadon.  Are they
11 a big fleet?  Small fleet?
12     A   Medium size.
13         MS. DUNCAN HACKETT:  Objection.
14         BY MR. OSTOYICH:
15     Q   Medium size meaning hundreds of trucks?
16     A   Hundreds, yes.
17     Q   Now, it says Celadon asked why they have
18 had three transmission failures denied this past
19 week.  They claim they were told they had improper
20 driveline angels.  Rick does not buy that
21 explanation.  It has -- it says his question is
22 simple, if driveline angles have caused the

Page 299

1  problem, why am I not having pinion bearing,
2  pinion seal, u-joint problems as well?
3         Now, Mr. Eaton then takes this and tells
4  Mr. Destefano, "In my opinion we have to look at
5  the root causes of problems, if we are correct and
6  they take the business elsewhere, so be it.  But
7  the bottom line is we have some issues that need
8  to be investigated.  Many customers are not happy
9  with the answers they get from ONTRAC.  Something
10 has changed, we need to address the cause and
11 react."
12         Now, what was OnTrac?
13     A   OnTrac was a new warranty system that
14 was adopted.
15     Q   And what sort of a warranty system was
16 it that was adopted?
17     A   It was a new warranty system.
18     Q   Was it an electronic warranty system
19 where customers of yours filled out warranty
20 claims --
21     A   That is correct.
22     Q   -- on the Internet?

Page 300

1      A   They fill out warranty claims and send
2  them in, yes.
3      Q   Was that a ZF Meritor warranty program,
4  or was that an ArvinMeritor?
5      A   ArvinMeritor.
6      Q   Now, in response to Mr. Eaton's e-mail
7  to Mr. Destefano and Mr. Austin, there's an e-mail
8  up at the top, ultimately which -- well, it starts
9  at the bottom of the first page.  It's from Joe
10 Mejaly.  Who is Joe Mejaly at that time in
11 November of 2003?
12     A   He was -- he was the guy that was the
13 head of -- he certainly was head of the OnTrac
14 system.  I don't know if at the time he was head
15 of all of service or not.
16     Q   For ArvinMeritor?
17     A   For ArvinMeritor, correct.
18     Q   So Mr. Mejaly then sends an e-mail to
19 Charles Allen and Michael Veillette.  It says,
20 "Guys, We have to dimension the G platform shift
21 fork exposure and move quickly."
22         Now, what's the shift fork exposure on

Page 301

1  the G platform transmission?
2      A   I don't know what the exact exposure of
3  the shift fork was, but what it would mean is
4  something to do with -- as it says, with the
5  financial exposure for the warranty system.
6      Q   Let me try it a different way.
7         What is the shift fork of the G platform
8  manual transmissions?
9      A   A shift fork is a part that goes into a
10 transmission.
11     Q   And it was causing problems at Marathon
12 and other customers, and Mr. Mejaly, who is the
13 head of service, is saying let's figure out if
14 this is a system-wide problem and figure out what
15 the exposure to the company is, right?
16         MS. DUNCAN HACKETT:  Objection.
17         THE WITNESS:  That's what he says, yes.
18         BY MR. OSTOYICH:
19     Q   And then Mr. Veillette responds to that
20 and copied you on the first page, right?
21     A   Yes.
22     Q   He says there were 21,364 generation 2

76 (Pages 298 to 301)

776d4e51-238a-48e2-8a9a-0079ed29673

000214

Page 302

1    single rail top cover, and I take it that's 21,000
2    generation 2 G platform transmissions out there
3    with a single rail top cover, right?
4        A    That's correct.
5        Q    It says the estimated failure rate due
6    to collar wear is 11 percent, right?
7        A    He doesn't say that there is an
8    estimated failure rate.  He's saying he used
9    11 percent in his calculation as the estimated
10   failure rate.
11       Q    And at an average repair cost of $1,500
12   each, that would be financial exposure of
13   $3.5 million to the company?
14       A    Yes.  Mike Veillette was strictly a
15   person that did calculations.  He's a statistical
16   type of person.
17       Q    I take it, Mr. Martello, in November
18   2003, you're still saying customer complaints
19   about what is now generation 2 of the G platform
20   transmission, right?
21           MS. DUNCAN HACKETT:  Objection.
22           THE WITNESS:  As stated in here, most of

Page 303

1    these problems, or at least the reason for the
2    letters, was that they were turned down under the
3    warranty system as operator error.
4           So if you included operator error as a
5    problem with everything in the country, we would
6    have a thousand percent warranty because I don't
7    consider that as a warranty problem unless it's
8    verified that it was a product problem and not an
9    operator error problem, and at this point in time,
10   only -- this document only directs me to believe
11   it was an operator error problem.
12           BY MR. OSTOYICH:
13       Q    Let's look at Mr. Colaccino's response
14   at the top of the first page to Mr. Veillette --
15       A    Yes.
16       Q    -- which you received a copy of it,
17   right?
18       A    From Mejaly to -- from Joe to Mike, yes,
19   okay.
20       Q    CC, Rick Martello.  That's you, correct?
21       A    Correct.
22       Q    "Thanks Mike.  Attached is an e-mail

Page 304

1    from Larry Gitt at Marathon relative to
2    frustrations over the Gen 2 failures..."  That's
3    the failures of the Generation 2 G platform manual
4    transmissions, right?
5        A    Which?  Excuse me, but which?  Again, in
6    the Gitt letter, said were turned down because of
7    driver abuse.
8        Q    Now, Mr. Mejaly says, "We are seeing
9    this problem growing at an accelerated rate of
10   fleets.  No distinct pattern can be seen.
11   Customers that have supported us (Celadon, Knight,
12   Crete, Heartland, to name just a few) are seeing
13   the repetitiveness of this failure and are
14   frustrated by our current response that is
15   associated with 'driver error,'" right?
16       A    Yes, that's what it says.
17       Q    Now, this is right around the time when
18   the joint venture dissolved?
19       A    Excuse me?
20       Q    The joint venture decided to dissolve in
21   the fall of 2003, right?
22       A    I honestly don't remember when the

Page 305

1    discussions started or stopped, but it could be,
2    yes.
3        Q    And at this time, the fall of 2003, late
4    fall of 2003, you're still seeing failures of the
5    Generation 2 G platform, right?
6            MS. DUNCAN HACKETT:  Objection.
7            THE WITNESS:  You have to repeat your
8    question because I truthfully didn't hear you.  So
9    if she heard you, that was fine, but I didn't.
10           BY MR. OSTOYICH:
11       Q    Fair enough.  Can you read that one back
12   for me?
13           (The reporter read back the record.)
14           MS. DUNCAN HACKETT:  Same objection.
15           THE WITNESS:  I believe that this letter
16   indicates a difference of opinion on whether it
17   was a problem associated with the G2 failure or it
18   was an operator error failure, and I can't tell
19   that without more documentation than what I have
20   right here.
21           BY MR. OSTOYICH:
22       Q    Fair enough.  First, you were still

77 (Pages 302 to 305)

776d4e51-238a-48e2-8a9a-0079ed29673
000215

Page 306

1  seeing failures of the Generation 2 G platform,
2  and the question is what they were caused by,
3  right, but you were seeing failures in November of
4  2003 of the Generation 2 G platform manual
5  transmissions, right?
6      A   That is what this says, yes.
7      Q   And the question is what was it caused
8  by, and your belief was it was caused by driver
9  error, right?
10     A   My belief is stated that the warranty
11 people said that it was caused by driver error.
12     Q   And Mr. Mejaly -- who is the head of
13 service for ArvinMeritor, right?
14     A   Head of the OnTrac system as well as
15 service, yes.
16     Q   -- says that the problem is growing at
17 an accelerated rate at fleets, right?
18     A   That's what he says, yes.
19     Q   And he says no distinct pattern can be
20 seen, right?
21     A   That's what it says, yes.
22     Q   And he says the customers that have

Page 307

1  supported you, Celadon, Knight, and he lists a few
2  others, are seeing the repetitiveness of this
3  failure, right?
4      A   That's what it says, yes.
5      Q   And they're frustrated by our current
6  response that it's associated with driver error,
7  right?
8      A   That's what it says, yes.  It doesn't
9  quote how many problems.  It doesn't quote
10 anything other than exactly what you read.
11     Q   Do you remember offhand how many
12 Generation 2 failures you were experiencing in
13 this period in late 2003?
14     A   No.  No, sir.
15     Q   I'm going to mark as Exhibit 23,
16 Mr. Martello, an e-mail from Kathleen McAvoy on
17 behalf of Rick Martello, President of ZF Meritor
18 LLC, to Tom Gosnell and Wolfgang Vogel in April
19 2003.  I'm going to ask you to take a look at
20 that.
21     A   Sure.
22

Page 308

1      (Martello Deposition Exhibit Nos. 23 and
2      24 were marked for identification.)
3      MR. OSTOYICH:  Is this all one exhibit?
4      MS. DUNCAN HACKETT:  No.  The e-mail is
5  23, and the attachment is 24.
6      THE WITNESS:  Yes, sir.
7      BY MR. OSTOYICH:
8      Q   Okay.  Exhibit 23 is the e-mail from
9  Kathleen McAvoy.  I take it she was your
10 assistant?
11     A   That's correct.
12     Q   And she sent this e-mail at your request
13 under your signature, under your name, Rick
14 Martello, President, ZF Meritor LLC, to Tom
15 Gosnell and Wolfgang Vogel in April 2003, right?
16     A   I would say yes to that, yes.
17     Q   And at that time, Tom Gosnell and
18 Wolfgang Vogel were the Board members of
19 ZF Meritor LLC?
20     A   They were both Board members at the
21 time, yes.
22     Q   And this is an e-mail you wrote in the

Page 309

1  ordinary course of your responsibilities as the
2  President of the company, right?
3      A   Correct.
4      Q   The subject is ZF Meritor Product Line.
5  You say, "I am sending you a copy of a product
6  line presentation that I hoped to present to the
7  Board of Directors.  Unfortunately, I believe that
8  the decision on an appropriate product line for
9  the J.V. has been decided by default."
10     And if I look at the next exhibit,
11 Mr. Martello, 24, this is a product presentation
12 on -- product presentation.  In the upper
13 right-hand corner, it's ZFM Product Presentation,
14 April 14th, 2003, PowerPoint, it says RM.
15     That's Rick Martello, right?
16     A   Yes.
17     Q   This is the product presentation that
18 you attached to the e-mail and you intended to
19 present at the Board meeting of ZF Meritor in
20 April 2003, right?
21     A   It is, yes.  It is a presentation that
22 had put together, and as it says, had hoped to

78 (Pages 306 to 309)

776d4e51-238a-48e2-8a9a-0079ed29673
000216

Page 310

1  present to them, but it was never presented.
2    Q   It's a presentation you hoped to present
3  on the appropriate product line for the joint
4  venture, right?
5    A   Much more to do with it than just the
6  appropriate product line.
7    Q   But that's one of the items you hoped to
8  present?
9    A   That's one of the items, yes.
10   Q   And this presentation related in part to
11 your ongoing belief that the company needed to
12 offer a full line of transmission products to be a
13 viable supplier, right?
14     MS. DUNCAN HACKETT:  Objection.
15     THE WITNESS:  As I've stated every time
16 you've asked me that question, it is my belief
17 that it was necessary to offset the OEMs' belief
18 that they would get punitive pricing from Eaton if
19 they tried to switch.
20     BY MR. OSTOYICH:
21   Q   You've said -- you're right, you have
22 said that every time I've asked you, and every

Page 311

1  time I've had to come back and pick at it and see
2  if you have any basis for it.
3    A   And every time I've given you the same
4  answer, yes.
5    Q   Which is you heard from people who
6  heard --
7    A   That is correct.  I believe it was
8  certainly common knowledge within our business,
9  and I've heard it from --
10   Q   Just so we're clear --
11   A   I've heard it from one -- two people
12 individually at the OEMs, and numerous people
13 within our -- within the ArvinMeritor
14 organization.
15   Q   Sure.  You guys at ArvinMeritor were
16 going around in circles saying this is what we
17 believe about what Eaton is saying to the OEMs?
18   A   I don't believe anybody went around in
19 circles.  I believe people heard it from other
20 people and repeated it.
21   Q   Let's make sure.  Your firsthand
22 knowledge of any Eaton discussion with any OEM is

Page 312

1  zero.  You didn't overhear any communications
2  related to pricing of any transmission?
3    A   I never heard -- I never overheard any
4  communication between Eaton and anybody about
5  pricing.
6    Q   And your basis for all of your comments
7  today about threats by Eaton is one communication
8  with one guy at Mack?
9    A   One communication with one guy at Volvo,
10 and numerous discussions with ArvinMeritor people.
11   Q   Okay.  So you were talking to other
12 ArvinMeritor people, and you were all telling each
13 other that you believed Eaton had said something
14 to OEMs, right?
15     MS. DUNCAN HACKETT:  Objection.
16     BY MR. OSTOYICH:
17   Q   Right?
18   A   When you say "right," what is it --
19   Q   Right.  You were talking to other
20 ArvinMeritor --
21   A   I was talking to other ArvinMeritor
22 people.

Page 313

1    Q   And all of you were telling each other
2  that you each believed that Eaton had said
3  something to OEMs?
4      MS. DUNCAN HACKETT:  Objection.
5      THE WITNESS:  We each said that we had
6  heard something from somebody about Eaton
7  threatening pricing actions at OEMs, yes.
8      BY MR. OSTOYICH:
9    Q   And the only thing you heard was from
10 the fellow at Mack, right?
11   A   And the fellow at Volvo.
12   Q   And the fellow at Mack said some
13 unidentified person at Eaton said something to
14 him, right?
15     MS. DUNCAN HACKETT:  Objection.
16     THE WITNESS:  I've answered this
17 question.  I said the gentleman at Mack in
18 conversations told me one of the reasons that he
19 could not follow through on our agreement was that
20 Eaton had threatened a lawsuit against him on the
21 patent infringement of their 13 and 18-speed if
22 they sold it, and had threatened them with

79 (Pages 310 to 313)

776d4e51-238a-48e2-8a9a-0079ed29673
000217

Page 314

1  price -- additional pricing on products that we
2  couldn't -- we didn't have a match for in their
3  product line.
4       BY MR. OSTOYICH:
5       Q    And that relates to your effort to buy
6  the Mack product line back in 1996 and '97, right?
7       A    Yes, it did, that particular
8  conversation, yes.
9       Q    And were there other conversations with
10 the Mack fellow?
11      A    No.  I'm just saying that particular
12 conversation took time -- took that time frame.
13      Q    Fair enough.  And then your only other
14 conversation, you had a conversation with
15 Mr. Moore at Volvo?
16      A    Correct.
17      Q    And when did that occur?
18      A    I would have to say I don't remember,
19 but it would have been sometime between '98 and
20 2001, somewhere in that neighborhood.
21      Q    Mr. Moore retired from Volvo somewhere
22 in the early 2000 period, right?

Page 315

1       MS. DUNCAN HACKETT:  Objection.
2       THE WITNESS:  I don't know.
3       BY MR. OSTOYICH:
4       Q    Fair enough, but the best you can tell
5  me today is the conversation with Mr. Moore
6  occurred sometime in the '98 to 2001 period?
7       A    That's correct.
8       Q    And Mr. Moore told you he was concerned
9  about Eaton raising prices on products that you
10 didn't offer, right?
11      A    He said he was concerned -- after
12 discussions with Eaton, that he was concerned
13 about it.  Yes, that's what he said.
14      Q    But he didn't tell you that anyone from
15 Eaton had threatened to do that, right?
16      A    He did not say anybody had threatened
17 him, no.
18      Q    And he did not tell you that anybody
19 from Eaton had actually raised prices on their
20 products to Volvo, right?
21      A    He did not say that anybody had raised
22 prices.

Page 316

1       Q    Now, let me go back to the document you
2  wrote here, because you wrote to Mr. Gosnell and
3  Mr. Vogel, on the Board of Directors of your
4  company --
5       A    Yes.
6       Q    -- in April 2003 was that you
7  continually discuss the elimination of the manual
8  transmissions from the ZF Meritor product line,
9  right?
10      A    That's what this statement says, yes.
11      Q    And why were you continually discussing
12 eliminating the manual transmissions from the
13 ZF Meritor product line?
14      A    Well, we discussed during this period of
15 time every conceivable option that we had in the
16 marketplace.  One of the discussions was about
17 only offering the FreedomLine AMTs, strictly being
18 an AMT niche market player.  That was one of the
19 options, as well as options on full product lines,
20 as well as partnerships with TTC.
21      We had -- you know, as most good
22 companies and boards do, they discuss every

Page 317

1  option, business option they have, so that was the
2  discussion.
3       Q    So you -- was it repeatedly over time
4  that you had discussed with the Board of
5  ZF Meritor eliminating the manual transmissions?
6       A    No.  That was just towards this period
7  of time.
8       Q    After the problems with the G platform?
9       A    It had nothing to do with G platform.
10      MS. DUNCAN HACKETT:  Objection.
11      BY MR. OSTOYICH:
12      Q    I didn't ask you if it had anything to
13 do with it, but it was after the problems with the
14 G platform transmissions?
15      MS. DUNCAN HACKETT:  Objection.
16      THE WITNESS:  I -- I don't -- I would
17 say it was in the time frame of early '03 to
18 middle '03, yes.
19      BY MR. OSTOYICH:
20      Q    That's after we saw some of the spikes
21 up to 80 repairs per hundred G platform manual
22 transmissions in the field, right?

80 (Pages 314 to 317)

776d4e51-238a-48e2-8a9a-0079ed29673
000218

Page 318

1     A   It was probably after Bush was elected
2   President, but, I mean, there's no real -- I mean,
3   you can connect any two lines if you work hard
4   enough, but --
5     Q   Fair enough.  And one of the lines I'm
6   connecting is that you discussed eliminating the
7   manual transmissions after you had a lot of
8   warranty defects with them, correct?
9     A   That is the line you're connecting.
10    Q   And it is an accurate historical line.
11  After you had those problems, you discussed
12  eliminating the manual transmissions from your
13  offerings?
14        MS. DUNCAN HACKETT:  Objection.
15        THE WITNESS:  It is a legitimate line
16  that you're connecting.
17        BY MR. OSTOYICH:
18    Q   And, in fact, the company subsequently
19  stopped --
20    A   In fact, I don't believe there's a lot
21  of connection with the two.  I believe the
22  connection was more towards the financial health

Page 319

1   of the total company.
2     Q   And part of the financial health of the
3   company was unexpected warranty claims in the
4   G platform, right?
5        MS. DUNCAN HACKETT:  Objection.
6        THE WITNESS:  It was -- the main health
7   reason for the company was we could never generate
8   enough volume.  That was the main thing in the --
9   the main problem we had.
10        I don't think the warranty was -- I
11  certainly don't think warranty was the biggest
12  problem.  I think generation of volume was the
13  problem.
14        BY MR. OSTOYICH:
15    Q   You agree with me that the warranty --
16  unexpected several million dollars worth of
17  warranty claims in the G platform was a
18  contributor to the financial health of the
19  company?
20    A   Everything that took money out of the
21  business was a contributor, yes.
22    Q   And you say lack of volume.  The company

Page 320

1   was unable to sell as many G platform
2   transmissions as you expected?
3     A   We did not sell as many transmissions in
4   total as we'd like to, whether it be -- as we
5   needed to to be a viable business, that's true.
6     Q   Now, from day one, when you formed the
7   joint venture, you expected your manual
8   transmission sales to decline, right?  We saw
9   that?
10    A   Correct.
11    Q   And, in fact, they did decline, right?
12    A   That's correct.
13    Q   And they declined more steeply than you
14  expected, right?
15    A   They declined more steeply than we
16  expected from the initial -- from the initial
17  projection.
18    Q   And you had --
19    A   And that had many, many reasons for it,
20  not one.
21    Q   And we looked at some of those reasons
22  earlier, right, the Board presentation when you

Page 321

1   saw, among other things, cutoff of competitive
2   equalization in 1998-99?
3     A   The number one reason was loss of the
4   Freightliner standard position in my opinion.
5     Q   And unexpectedly high warranty claims,
6   repairs on those G platform contributed to your
7   inability to sell as many as you expected, right?
8        MS. DUNCAN HACKETT:  Objection.
9        THE WITNESS:  Price increases from
10  vendors.  There's many reasons why your costs go
11  up more than you expected and your revenues go
12  down more than you expected.
13        BY MR. OSTOYICH:
14    Q   Absolutely, and I just want to make
15  sure, though, that unexpectedly high warranty
16  claims, repairs on the G platform, contributed to
17  your selling fewer of those than you anticipated?
18    A   I never said that.
19        MS. DUNCAN HACKETT:  Objection.
20        THE WITNESS:  I never said that -- never
21  said that it contributed to selling less than we
22  expected.

81 (Pages 318 to 321)

776d4e51-238a-48e2-8a9a-0079ed29673

000219

Page 322

1        I don't know the warranty -- I don't
2    know that any customer ever left us for that.  I
3    don't know of any customer that, in the long run,
4    didn't believe that we were -- we properly handled
5    our warranty claims.
6        BY MR. OSTOYICH:
7        Q    Unexpectedly high repair rates -- you
8    agree with me that the G platform, you didn't
9    expect to see 80 repairs for every hundred in the
10   field?
11       A    I agree with you on that, yes.
12       Q    You would agree with me that having
13   unexpectedly high repair rates of, at times, 80
14   repairs for every hundred units made it harder for
15   you to sell the volumes you expected of the
16   G platform?
17       MS. DUNCAN HACKETT:  Objection.
18       THE WITNESS:  No.  I believe it
19   contributed to higher warranty costs than we
20   expected.
21       BY MR. OSTOYICH:
22       Q    And that contributed to the difficulties

Page 323

1    of financial health of the joint venture?
2        A    It aided in that, yes.
3        Q    Now, your e-mail in April 2003 to
4    Mr. Gosnell, Mr. Vogel, the next sentence you say
5    you have continually said that this joint venture
6    cannot survive without a complete product line to
7    compete with Eaton.  Every OEM has told us
8    repeatedly that you need a product line that is
9    competitive with Eaton in order to be considered
10   as a viable transmission supplier, right?
11       A    Yes, that's what it says.
12       Q    In the next paragraph you tell
13   Mr. Gosnell and Mr. Vogel you try to provide a
14   synopsis of the Class 5 through 8 transmission
15   market.  I've put together the attached
16   information, and that's the presentation which is
17   Exhibit 24, right?
18       A    I'm sorry, where did you --
19       Q    I'm reading right in the middle of
20   your -- about a third of the way down your e-mail
21   to Mr. Gosnell.
22       A    "To try to provide a synopsis," yes, I

Page 324

1    see that.
2        Q    And then you say, "I have put together
3    the attached information," and that's Exhibit 24
4    to your deposition?
5        A    That's correct.
6        Q    And then you tell Mr. Gosnell and
7    Mr. Vogel that the conclusions that you have
8    always reached from this analysis are, number one,
9    to be viable, you must, at a minimum, provide the
10   OEM with a 10/12-speed manual and automated manual
11   transmission, a 6-speed manual and automated
12   manual transmission, and an LL transmission,
13   right?
14       A    Yes, that's what it says.
15       Q    And number two thing -- conclusion that
16   you inform them that you have always reached from
17   your analysis is that you need to provide either
18   some multispeed or automatic transmissions, right?
19       A    Yes, that's what it says.
20       Q    You tell them if we can't meet these
21   criteria, we will not be considered a viable
22   transmission supplier.

Page 325

1        A    That's what it says, and this was a
2    period of time where I was trying my best to keep
3    the joint venture viable.
4        Q    A little bit below that, there's a
5    reference you make to the original plan for the
6    JV.  Do you see that paragraph down there?
7        A    That's correct.
8        Q    You say, "The original plan for this
9    J.V. was to have the high volume products I
10   described in Item 1 above, plus viable automatics.
11   In fact, the first quote this J.V. made was a line
12   of medium-duty transmissions to International that
13   never materialized."
14       A    That's correct.
15       Q    Tell me about that.  The company -- so
16   we saw some plans early on that the company
17   thought about getting it to medium-duty
18   transmissions, right?
19       A    Before the joint venture actually became
20   a joint venture, ZF, with our knowledge, made a
21   presentation to International, which I think at
22   the time had a new name for their medium duties of

82 (Pages 322 to 325)

776d4e51-238a-48e2-8a9a-0079ed29673

000220

Page 326

1  Blue Diamond, but I wouldn't swear to that name,
2  of potential 6-speed manuals and automated manuals
3  that was to be folded into the joint venture.
4      Q   And was that --
5      A   That's what I'm talking about.
6      Q   Was that a 6-speed that would be
7  purchased from TTC Spicer, or would you at that
8  point --
9      A   That was a ZF conceptual design product.
10     Q   And it sounds like you made a quote to
11 International in that time period?
12     A   As I said, it was made by ZF people
13 from -- ZF people from their plant in Georgia,
14 their business in Georgia, with our knowledge.
15     Q   Just so I'm clear, you say the quote for
16 the 6-speed medium-duty transmission to
17 International was made by ZF people at Georgia,
18 you mean ZF-AG people --
19     A   Correct.
20     Q   -- the separate company?
21     A   Correct.
22     Q   Okay.  And that -- I guess they made the

Page 327

1  quote, but the product was never -- never
2  materialized?
3      A   That's correct.
4      Q   And why did the product not materialize?
5      A   I don't know what happened.  At this
6  point in time, I'd have to go back.  It was
7  probably '98, so 10 years ago.
8      Q   I'm going to mark as Exhibit 24 to your
9  deposition --
10         THE REPORTER:  25.
11         MR. OSTOYICH:  25.
12         MS. DUNCAN HACKETT:  Joe, before you do
13 that, can we take a quick break?
14         MR. OSTOYICH:  Yeah, we'll take a short
15 break.
16         THE VIDEOGRAPHER:  Going off the record.
17 This is the end of Tape 5.  The time is 4:09 p.m.
18         (A break was taken.)
19         THE VIDEOGRAPHER:  Back on record.  This
20 is Tape No. 6.  The time is 4:19 p.m.
21         BY MR. OSTOYICH:
22     Q   All right, Mr. Martello, welcome back.

Page 328

1          Anything you want to change from your
2  testimony so far?
3      A   No, sir.
4      Q   I'm going to mark as Exhibit 25 to your
5  deposition an e-mail from Wolfgang Vogel to
6  Kathleen McAvoy, Rick Martello at Meritor,
7  April 19th, 2003.  I ask you to take a look at
8  that.
9          (Martello Deposition Exhibit No. 25 was
10         marked for identification.)
11         THE WITNESS:  Okay.
12         BY MR. OSTOYICH:
13     Q   For the record, it's ZFMA0170083 to 84.
14         I take it, Mr. Martello, that this is a
15 response to your e-mail to Mr. Gosnell and
16 Mr. Vogel that you received in the ordinary course
17 of your duties as President of the joint venture
18 on April 19th, 2003, from Mr. Vogel, right?
19     A   Yes, sir.
20     Q   And he says, "Rick, thank you for this
21 presentation," and that's the presentation we just
22 looked at, the prior two exhibits to your

Page 329

1  deposition, right?
2      A   I believe so.
3      Q   "I think we all agree that a longterm
4  strategy to be, say, a 30 or 40% market share
5  player against Eaton requires a product lineup
6  close to theirs," right?
7      A   That's what it says.
8      Q   It says, "Actually this was our plan in
9  1999, based on the predictions that were presented
10 then for the G platform to reach 25 to 30%
11 (without the FreedomLine)," right?
12     A   That's what it says.
13     Q   It says, "We all know what happened."
14     A   That's what it says.
15     Q   And then he advocates that, in his view,
16 the immediate course of action should be to stop
17 the cash bleeding and reposition the joint venture
18 and start from a smaller scale, right?
19     A   That's what it says.
20     Q   And this is in April of 2003.
21         Subsequent to this, for the next four to
22 six months, you negotiated back and forth, and

83 (Pages 326 to 329)

776d4e51-238a-48e2-8a9a-0079ed29673
000221

Page 330

1  ultimately at the end of that year, you agreed to
2  dissolve the joint venture at that time, right?
3      A   I believe the joint venture dissolves at
4  the end of the year, yes.
5      Q   And subsequent to that, Meritor then
6  made a decision to stop manufacturing and selling
7  the manual transmissions?
8      A   That would have been after I retired.
9      Q   Fair enough.  You weren't involved in
10 any decision in that regard?
11     A   That would have been after I retired,
12 yes.
13     Q   And after the joint venture dissolved,
14 though, Meritor, ArvinMeritor, continues to sell
15 the FreedomLine transmission in North America,
16 right?
17     A   Best of my knowledge, between the time
18 you're talking about and when I retired, they
19 still sold manuals as well as the FreedomLine.
20     Q   Fair enough.  The FreedomLine -- so I'm
21 clear on this.  The FreedomLine, your plan in 1999
22 that we saw was to release the FreedomLine at all

Page 331

1  the major OEMs, right?
2      A   That's correct.
3      Q   And it was released at Peter Bilt in the
4  spring of 2001?
5      A   Peter Bilt was the first place it was
6  released.  I believe you may be right in the time
7  frame, but I couldn't be certain.
8      Q   Fair enough.  But the FreedomLine
9  transmission was in fact released at Peter Bilt?
10     A   That is correct.
11     Q   And Peter Bilt is a subsidiary of
12 PACCAR --
13     A   That is correct.
14     Q   -- one of the big customers?
15     A   That's correct.
16     Q   And Kenworth is another subsidiary of
17 PACCAR?
18     A   That is correct.
19     Q   And Kenworth in fact released the
20 FreedomLine transmission?
21     A   That is correct.
22     Q   And did Freightliner release the

Page 332

1  FreedomLine?
2      A   I believe they did.
3      Q   And did Volvo or Volvo Mack release the
4  FreedomLine?
5      A   I believe they did.
6      Q   And did International Truck release the
7  FreedomLine?
8      A   I believe they did.
9      Q   And it was listed in all those
10 companies' databooks as an optional transmission,
11 right?
12         MS. DUNCAN HACKETT:  Objection.
13         THE WITNESS:  The actual standard truck
14 in the industry is a truck that's never been
15 purchased.  It's made up of components that are
16 the cheapest in the databook usually, so mostly
17 every transmission is an option of some kind.
18         BY MR. OSTOYICH:
19     Q   In other words, customers typically will
20 spec various components?
21     A   That's right.
22     Q   They don't typically buy whatever is

Page 333

1  listed as the standard?
2      A   That is correct.
3      Q   And the FreedomLine transmission was
4  listed as an optional transmission offering by
5  Freightliner, Volvo, International Truck and
6  PACCAR during the tenure of the joint venture?
7      A   I do not know if they were all listed in
8  the databook.
9      Q   I'm going to show you a press release --
10     A   I do know that they were offered, but
11 not -- I'm not sure if they were all in the
12 databook.
13     Q   Okay.  What do you mean you know they
14 were offered, but you're not sure they --
15     A   I know we sold transmissions through all
16 those OEMs.
17     Q   Okay.  You're not sure whether
18 specifically whether it was in the databook, but
19 you know that all four of those OEMs offered to
20 their fleet customers the FreedomLine
21 transmission?
22     A   I know that we sold -- I'm 99 percent

84 (Pages 330 to 333)

776d4e51-238a-48e2-8a9a-0079ed29673

000222

Page 334

1  sure we sold transmissions, FreedomLine
2  transmissions, through each of those OEMs, yes.
3     Q   Fair enough. Let me show you a press
4  release the company issued in October of 2002,
5  okay?
6     A   2002?
7     Q   2002. And the press release says,
8  "ArvinMeritor, Inc., issued the following product
9  text correction to its press release distributed
10 earlier today.
11        "We released the following statement
12 that requires a correction:
13        "The FreedomLine transmission captures
14 standard position with four truck OEMs; fifth OEM
15 position begins in 2003."
16        And then that was corrected and says,
17 "The correct statement is:
18        "The FreedomLine automated manual
19 transmission is now available as a standard
20 databook option with four truck OEMs; a fifth OEM
21 offering begins in 2003."
22    A   Okay.

Page 335

1     Q   I'll ask you to take a look at that.
2        (Martello Deposition Exhibit No. 26 was
3        marked for identification.)
4        THE WITNESS:  Okay, I read it.
5        BY MR. OSTOYICH:
6     Q   I take it this reflects that the
7  FreedomLine transmission was in fact offered as a
8  databook option at all of the four major OEMs?
9     A   This is four truck OEMs. Fifth OEM
10 position begins in 2003, meaning separating Peter
11 Bilt and Kenworth as two truck OEMs is what I
12 would take this to mean.
13    Q   So just so we're clear on the record,
14 this is a press release announcing that, in fact,
15 Freightliner, Volvo, Peter Bilt and Kenworth and
16 International offered the FreedomLine transmission
17 as a databook option, right?
18    A   I don't remember which one the fifth --
19 the fifth OEM would be. I don't remember.
20    Q   But all of them at this time period
21 either were or were about to issue the -- offer
22 the FreedomLine as a databook option?

Page 336

1     A   Yeah.  You have to understand that they
2  were offered in the position because -- they were
3  all offered, and they were all outside of the
4  Eaton contracts with these people because Eaton
5  did not have a comparable product.  Therefore,
6  they didn't fall under the long term agreements
7  that Eaton had with every OEM.
8     Q   Therefore, the OEMs offered them as a
9  databook option?
10    A   That's correct.
11    Q   Mr. Martello, I'm going to show you
12 Exhibit 27 to your deposition, which is -- this is
13 a document the company produced from its files,
14 ZFMA0000436 through 39.  It's called ZFM Situation
15 Overview.
16        (Martello Deposition Exhibit No. 27
17        was marked for identification.)
18        THE WITNESS:  I have no reason to
19 believe I ever saw this before.
20        BY MR. OSTOYICH:
21    Q   Okay.  Just so we're clear --
22    A   Can you give me some indication of where

Page 337

1  it came from and what it was --
2     Q   Came from the company's files.
3     A   -- and what time frame it is?
4     Q   All I can tell you is what I know, which
5  is down at the bottom, the company put on a stamp
6  on it that says ZFMA.
7     A   Okay.
8     Q   So I take it you didn't draft this
9  ZFM Situation Overview?
10    A   I did not draft it for sure.
11    Q   Do you know who did draft it?
12    A   I have no idea who drafted it.  I could
13 read it thoroughly.  I have no idea.
14    Q   Nothing in here jogs your memory seeing
15 this before or participating in drafting this?
16    A   I can say that I don't remember ever
17 seeing it, and didn't participate in drafting it
18 whatsoever.
19    Q   Anything in here give you any insight
20 into who prepared it potentially?  I'm sorry, just
21 for the record, Mr. Martello, you're not saying --
22    A   No, I --

85 (Pages 334 to 337)

776d4e51-238a-48e2-8a9a-0079ed29673

000223

Page 338

1    Q    -- the answer is no?
2    A    No.  It would be a total absolute guess,
3  so I don't know.
4    Q    Okay.  What number are we up to, Dawn?
5        THE REPORTER:  28.
6        BY MR. OSTOYICH:
7    Q    Mr. Martello, I have a series of letters
8  from International Truck in the 2001-2002 time
9  frame asking ZF Meritor/ArvinMeritor to lower the
10  prices of your transmissions.
11        Do you recall that situation?
12    A    I recall letters asking for lower prices
13  from every OEM almost every year.
14    Q    Sure.  That's their job, right?  They're
15  buyers, and they want to pay less than they're
16  paying, right?
17    A    That's correct.
18    Q    And you recall that the company rejected
19  those requests by International Truck for lower
20  prices?
21        MS. DUNCAN HACKETT:  Objection.
22        THE WITNESS:  I'd have to see the

Page 339

1  documents you're talking about and time frame and
2  everything in order to answer that question.
3        BY MR. OSTOYICH:
4    Q    Okay.  So you don't recall one way or
5  another sitting here today?
6    A    No.  I mean, I don't recall -- like I
7  say, we had negotiations with OEMs constantly
8  about pricing, so I don't know which you're
9  talking about, which price decrease we rejected
10  and which one we accepted, without some knowledge
11  of time frame and what it was all about.
12    Q    What about this, Mr. Martello?  Do you
13  remember granting International any price
14  concessions on your transmissions?
15        MS. DUNCAN HACKETT:  Objection.
16        THE WITNESS:  At some point during the
17  period I was General Manager, I would believe that
18  at some point we did, yes.
19        BY MR. OSTOYICH:
20    Q    So that was the period -- you were
21  General Manager in the '95 to '99 time period?
22    A    From '99 through 2004, at some point in

Page 340

1  time, I would imagine we gave them some reduction
2  on some product, yes.
3    Q    I don't want you to imagine.  Do you
4  remember specifically doing that?
5    A    No, I don't remember specifically.
6    Q    The reason I'm asking is I can't find
7  any documents documenting an agreement to lower
8  your prices to International.
9    A    I don't remember specifically, no.
10    Q    Fair enough.
11        Do you remember when the joint venture
12  was dissolved that the company informed its
13  customers that the FreedomLine was going to
14  increase in price by --
15    A    Yes, I do remember that, yes.
16    Q    And were you directly -- did you
17  communicate that message to any of the OEMs?
18    A    I personally did not.
19    Q    And did you have any discussions with
20  the OEMs about the increase in price on the
21  FreedomLine?
22    A    I personally did not.

Page 341

1    Q    And the letters come from Mr. Kline.
2    A    That's correct.
3    Q    I take it, was that his responsibility
4  to communicate the price increase on the
5  FreedomLine to the OEMs?
6    A    That's correct.
7    Q    Were you involved in that decision to
8  increase the price of the FreedomLine
9  transmissions?
10    A    No, sir.
11    Q    Who made that decision to increase the
12  price of the FreedomLine transmissions?
13        MS. DUNCAN HACKETT:  Objection.
14        THE WITNESS:  I was not involved, so I
15  can't say exactly who made the decision.
16        BY MR. OSTOYICH:
17    Q    Someone other than you as the President
18  of the joint venture, the ZF Meritor joint
19  venture?
20    A    Well, that was happening when we were
21  disbanding the joint venture and the product was
22  going to come from Germany, so I would imagine

86 (Pages 338 to 341)

776d4e51-238a-48e2-8a9a-0079ed29673
000224

Page 342

1    somebody in the ZF organization made that
2    decision.
3        Q   Fair enough.  I'm just trying to figure
4    out whether you had any involvement in the
5    decision, but it sounds like the joint venture --
6    you, as the President of the joint venture, had no
7    input into that decision?
8        A   That is correct.
9        Q   Okay.  So it came either from ZF or from
10   ArvinMeritor?
11       A   That is correct.
12       Q   Were you consulted at all about whether
13   the FreedomLine should increase in price at that
14   point?
15       A   At that point, no.
16       Q   I'm going to show you just a sample
17   letter.  We'll mark it as Exhibit 30 to your
18   deposition --
19           THE REPORTER:  28.
20           MR. OSTOYICH:  28 to your deposition,
21   but it's a letter from Mr. Kline at ArvinMeritor
22   to Mr. Barkus at International.

Page 343

1        (Martello Deposition Exhibit No. 28 was
2        marked for identification.)
3           MS. DUNCAN HACKETT:  Joe, I'm just going
4    to put an objection on this record that this has
5    an ITE Bates stamp and his name isn't on it
6    anywhere, so I'm sure we probably have a Bates
7    number, but it's outside the -- this technically
8    is outside the protective order I'm just saying.
9           MR. OSTOYICH:  Okay.  I can substitute
10   in an ArvinMeritor Bates stamp copy if you want.
11          MS. DUNCAN HACKETT:  It doesn't -- I
12   mean, it's obviously not my protective order, it's
13   ITE's, but I'm just saying that --
14          MR. OSTOYICH:  I can't imagine they can
15   complain since someone at ArvinMeritor sent the
16   letter to them.
17          MS. DUNCAN HACKETT:  That's fine.  I'm
18   just noting it for the record.
19          MR. OSTOYICH:  Fair enough.
20          BY MR. OSTOYICH:
21       Q   Mr. Martello, you're not copied on this.
22       My only question is were you involved in

Page 344

1    sending this letter, Mr. Kline's letter, to Paul
2    Barkus at International?
3        A   No.
4        Q   So he didn't -- Mr. Kline didn't consult
5    you when he sent this letter to Mr. Barkus?
6        A   No.
7        Q   And did you have any input into
8    Mr. Kline's letter at all, substantive input?
9        A   No.
10       Q   Did you have any discussions with
11   Mr. Kline about the letter?
12       A   Mr. Kline and I discussed the fact that
13   ZF or ArvinMeritor, I believe ZF, wanted to
14   increase the price by $1,250.  I mean, we
15   discussed that.  We saw each other every day still
16   at this point in time.
17       Q   But other than that discussion, you
18   didn't have any discussion about the specific
19   wording of his language or anything?
20       A   No.
21       Q   And I take it -- I've got comparable
22   letters from Mr. Kline to all the OEMs.  I take it

Page 345

1    the same situation --
2        A   I would imagine just the name at the top
3    changed.
4        Q   Fair enough.  And you didn't discuss
5    with Mr. Kline the specific wording of any of
6    these letters he sent to the OEMs?
7        A   No.
8        Q   And I'm going to just show you so we're
9    clear on the record, this is a letter Mr. Kline
10   sent to Friedrich Baumann, the General Manager of
11   Purchasing at Freightliner, on December 12th,
12   2003.  I'll ask you to take a look at that.
13       (Martello Deposition Exhibit No. 29 was
14       marked for identification.)
15          BY MR. OSTOYICH:
16       Q   Okay, Mr. Martello, you've had a quick
17   look at that document, I take it?
18       A   Yes.
19       Q   It's the same letter, right?
20       A   Same letter.
21       Q   Verbatim the same, Mr. Kline just put in
22   Mr. Baumann's name at Freightliner as the

87 (Pages 342 to 345)

776d4e51-238a-48e2-8a9a-0079ed29673
000225

Page 346

1  purchasing manager there instead of Mr. Barkus at
2  International, right?
3      A   Other minor changes, but, yes.
4      Q   Fair enough.  And, again, you were not
5  involved in discussing the specifics of how
6  Mr. Kline should word that letter, I take it?
7      A   No.
8      Q   Okay.  Now, we'll mark as Exhibit 30 an
9  e-mail from Charles Allen to Rolf Lutz, Wilhelm
10  Haerdtle, Rick Martello and others, Subject:
11  FreedomLine at Freightliner, January 16th, 2004,
12  and I'll ask you to take a look at that.
13          (Martello Deposition Exhibit No. 30 was
14          marked for identification.)
15      THE WITNESS:  Yeah, I read it, and it's
16  an indication of basically the long-term agreement
17  that Eaton had with Freightliner, I believe, at
18  this point in time, FreedomLine was listed in the
19  penetration targets, and it was a simple and easy
20  way for Freightliner to give us a reason to delist
21  it.
22      BY MR. OSTOYICH:

Page 347

1      Q   Okay.  Let's start with the document
2  came from the company's files, ZFMA0303094.
3      A   That's what this is.
4      Q   It's an e-mail that you received in the
5  ordinary course of your employment --
6      A   Yes.
7      Q   -- with the company from Charlie
8  Allen --
9      A   Yes.
10      Q   -- on January 16th, 2004, right?
11      A   Yes.
12      Q   Okay.  Now, Mr. Allen -- the subject is
13  the FreedomLine at Freightliner, right?
14      A   Yes.
15      Q   Okay.  Mr. Allen is -- this is about a
16  month after Mr. Kline sends his letter to
17  Freightliner announcing the $1,250 increase in the
18  FreedomLine transmission, right?
19      A   Yes.
20      Q   Mr. Allen says, Paul, and that's to you
21  and Mr. Lutz, Loren Dreier -- who is Loren Dreier?
22      A   He's the -- he was the head engineer at

Page 348

1  Laurinburg.
2      Q   Head engineering at ZF Meritor?
3      A   Yes.
4      Q   Liz Woodhull, who is she?
5      A   She was a product manager that -- which
6  Freightliner and FreedomLine fell under.
7      Q   And who is Wilhelm Haerdtle?
8      A   I don't remember.
9      Q   ZF/AG person, I take it?
10      A   Yes.
11      Q   And then there's Mr. Lutz, and he's on
12  the Board of Directors of ZF Meritor, right?
13      A   Yes.
14      Q   So Mr. Allen tells Mr. Lutz and you and
15  the others, "All, Freightliner indicated that the
16  FreedomLine will be 'de-listed' in the data book,"
17  right?
18      A   That's what it says, yes.
19      Q   It says, "This action is the result of
20  the price increase," right?
21      A   That's what it says, yes.
22      Q   Now, when I asked you about this a

Page 349

1  minute ago, you said something about an LTA and
2  some other information.
3      A   Correct.
4      Q   What are you referring to?
5      A   Well, Eaton had a long-term agreement
6  with Freightliner that provided an --
7      Q   Let me --
8      A   -- incentive for penetration, and at
9  this point in time, I think it is, to the best of
10  my memory, a point in time when FreedomLine --
11  Eaton got Freightliner to agree that FreedomLine
12  belonged into that agreement as far as going
13  against the calculation, and so this was an easy
14  way for Freightliner to say we're taking it out of
15  the agreement, and it goes into the -- you know,
16  we're taking it out of the databook because it
17  will help us meet the penetration goals that Eaton
18  has in the agreement.
19      Q   Mr. Martello, let me break this down
20  into pieces.
21      A   Yeah, go ahead.
22      Q   The e-mail doesn't say anything about

88 (Pages 346 to 349)

776d4e51-238a-48e2-8a9a-0079ed29673

000226

Page 350

1  any long-term agreement between Eaton and
2  Freightliner, right?
3      A   No, but you asked me -- you asked me
4  what I thought -- you asked me a question about
5  this, and I gave you an answer about it.
6      Q   Right.  I want to make sure we
7  distinguish between what you know from firsthand
8  knowledge and what you think from what you're
9  guessing about or what you have heard from other
10  people.  There's a distinction, okay?
11          This e-mail from your Director of Sales
12  and Engineering on January 16th, 2004, says,
13  "Freightliner indicated that the FreedomLine will
14  be 'de-listed' in the data book.  This action is
15  the result of the price increase," right?
16      A   That's exactly what it says.
17      Q   And the price increase is the $1,250 --
18      A   But you would --
19      Q   -- that Mr. Kline just announced a month
20  earlier to Freightliner on the FreedomLine, right?
21      A   But you would have to ask Mr. Allen
22  whether that statement was because he heard it

Page 351

1  directly from Freightliner, or that that was his
2  opinion of what Freightliner -- the reason that
3  Freightliner delisted it.  I don't know that, and
4  I gave you my opinion of why they delisted.
5      Q   I understand.  I'll get to that in a
6  second.  First I want to make clear what Mr. --
7      A   You asked me did I know this as a fact.
8  All I know is that that's what Charlie put in this
9  e-mail.
10      Q   All I want to establish, Mr. Martello,
11  is your Director of Sales and Engineering said
12  that Freightliner indicated that the FreedomLine
13  will be delisted in the databook.  This action is
14  the result of a price increase, correct?
15      A   That's what he said, yeah, in this
16  e-mail.
17      Q   Now, did you directly talk to anyone at
18  Freightliner about the price increase of $1,250
19  that the company had announced a month earlier on
20  the FreedomLine transmission?
21      A   No, I have not.
22      Q   Did you directly talk to anyone at

Page 352

1  Freightliner about the decision to delist the
2  FreedomLine in their databook?
3      A   No, I did not.
4      Q   Okay.  Now --
5      A   And I do not know if Charlie Allen did.
6      Q   Fair enough.  Now, you mentioned the LTA
7  with Eaton and some other stuff.  What makes you
8  bring that into this e-mail?  Because it's not
9  written into the e-mail.
10      A   Well, as I said, there's always reasons
11  for people to do things.  Freightliner had no real
12  incentive to delist it in the databook because of
13  the price increase.  If the customer wanted to pay
14  the price increase, he could pay it.  If he
15  didn't, they wouldn't order it.
16          The reason to delist it is to get it out
17  of the databook, and so it is easier for them to
18  meet the agreement they had with Eaton.  That's my
19  opinion.
20      Q   Sure, I understand that.  I'm just
21  trying to --
22      A   And that's the reason -- that's the

Page 353

1  reason I brought it up because it says it right
2  here.
3      Q   Fair enough.  You're entitled to
4  whatever opinion you want.
5      A   Okay.
6      Q   I'm just trying to figure out what the
7  basis of your opinion is.
8      A   That's the basis.
9      Q   It's not talking to Freightliner.
10  Obviously, you didn't talk to anybody at Eaton
11  about the FreedomLine being delisted, correct?
12      A   No.  It's my knowledge of the market,
13  which says you can put anything you want in a
14  databook and put a price on it, and if somebody
15  wants to buy it at the price you put on it, so be
16  it.  So why would anybody delist something for
17  that type of reason?
18          We've had people put two and three times
19  the price increase we gave them on the penalty as,
20  you know, I'll show you what happens when you give
21  me a price increase.  And so to say you're
22  going -- the reason is because of the price

89 (Pages 350 to 353)

776d4e51-238a-48e2-8a9a-0079ed29673
000227

Page 354

1    increase, I find that as -- you know, at the time,
2    I might have told Charlie that, I don't know.
3        Q    Sure.  I'm just trying to get to the
4    basis for the opinion.
5        A    Okay.
6        Q    So you have an opinion, although the
7    e-mail doesn't say it, it relates to the Eaton
8    long-term agreement, right?
9        A    Absolutely.  Absolutely that's my
10   opinion.
11       Q    And your opinion is not based on anyone
12   at Freightliner telling you that, right?
13       A    My opinion is the reason that we had
14   trouble selling product at every OEM was the Eaton
15   long-term agreements.
16       Q    I understand.  That's why you filed a
17   lawsuit.  I understand that point.
18            What I just want to know is why you hold
19   the opinion you do, because it's not based on
20   anything Freightliner told you about their
21   contract with Eaton, correct?
22       A    It's not.

Page 355

1        Q    It's not based on anything Eaton told
2    you about their contract?
3        A    It's based on my opinion of and
4    knowledge of the market.
5        Q    Okay.  Other than the fact it's in your
6    head, anything else you're relying on for your
7    opinion?
8        A    No.
9        Q    So because you say it, you think it,
10   therefore, you're assuming it's true, right?
11           MS. DUNCAN HACKETT:  Objection.
12           THE WITNESS:  Because I have 30 years of
13   experience in the business, and I was in this
14   business at this level for a good many years, I
15   know the reasons why someone would delist and not
16   list things in the databook.
17           BY MR. OSTOYICH:
18       Q    Let's be clear about this.  When you say
19   the know the reasons why -- you don't know the
20   reason why anyone at Freightliner made a decision
21   in this particular instance to delist the
22   Freightliner from firsthand knowledge from that

Page 356

1    person?
2        A    I have no firsthand knowledge of that
3    action.
4        Q    So you believe it, but you have no
5    firsthand basis for believing it, right?
6        A    That is correct.
7        Q    And you're not discounting what
8    Mr. Allen, your Director of Sales and Engineering,
9    tells you in this e-mail?  You have no reason to
10   believe he's not telling you the truth?
11       A    I'm not -- I have no reason to believe
12   that that was not his opinion also.
13       Q    Fair enough.
14           MR. OSTOYICH:  How much time do I have
15   left, Billy?
16           THE VIDEOGRAPHER:  20 minutes.
17           MR. HOLCOMB:  I have 5:08 by my
18   calculation.
19           BY MR. OSTOYICH:
20       Q    Mr. Martello, you told me earlier in the
21   day you left -- you retired from the company, I
22   think you said in April of 2004?

Page 357

1        A    No.  I retired September 31st, 2004.
2        Q    I thought you said you retired in March
3    or April, but then you formally retired later that
4    year in September.
5        A    Well, when the joint venture was
6    dissolved, I worked for ArvinMeritor for a period
7    of time until I retired on September 31st.
8        Q    In what capacity did you work for
9    ArvinMeritor?
10       A    I just did special things for Tom
11   Gosnell, whatever he asked me to do.
12       Q    Give me an example of what you worked
13   on.
14       A    I worked on a contract resolution that
15   we had with a company to solve the list of
16   problems that there were.
17           I worked at the beginning to help
18   transition the joint venture to buying stuff from
19   ZF and marketing it out of -- that's the first
20   thing I did.
21           And just from that point on, just little
22   things that Tom asked me to do.

90 (Pages 354 to 357)

776d4e51-238a-48e2-8a9a-0079ed29673

000228

Page 358

1    Q   Were you involved at all in any
2  negotiations between ArvinMeritor and ZF/AG over
3  the dissolution of the joint venture?
4    A   My involvement to answer questions
5  as part of -- as President of the joint venture.
6  I was not on the ArvinMeritor negotiation team,
7  nor on the ZF negotiation team.
8        I was a person that they asked questions
9  about as far as the joint venture was concerned.
10   Q   Were there formal negotiation teams set
11 up at ArvinMeritor and at ZF/AG to negotiate the
12 dissolution of the joint venture?
13   A   I don't know about formal.
14   Q   Okay.  But there was some sort of
15 negotiating team?
16   A   Yes, there was people that negotiated
17 it, yes.
18   Q   Who at ArvinMeritor was involved in
19 those negotiations?
20   A   Well, I know Dennis Kline was, I know
21 Tom Gosnell was.  That's the two I can remember
22 off the top of my head, and were probably the two

Page 359

1  major people.
2    Q   What about at ZF/AG, who was involved in
3  the dissolution?
4    A   I know the two major people were Rolf
5  Lutz out of Schottenhauser (ph) -- I can't --
6  Auto.  Lutz was -- Lutz wasn't -- I mean, Vogel
7  was not involved in any discussions I had.  He
8  was -- he stayed more in Germany, and the
9  discussions usually happened in the United States.
10 Those two I remember were the main two from ZF.
11   Q   So I take it as part of the dissolution
12 process, you participated to the extent you had
13 discussions directly with some ZF/AG people,
14 Mr. Lutz and the other guy, Mr. Shoulden (ph)?
15   A   We never -- I can't say I had any
16 without somebody from ArvinMeritor.  It was
17 usually a discussion where they called me in to
18 say, you know, explain this to me, or what's this
19 or what's that?  How do you do this?  It was more
20 asking questions of me about how the business ran
21 and what they should do from that standpoint.
22   Q   Were you aware of any dispute between

Page 360

1  ZF/AG and ArvinMeritor over who should pay or
2  cover certain warranty expenses of the joint
3  venture?
4        MS. DUNCAN HACKETT:  Objection.
5        THE WITNESS:  I can remember
6  discussions, but when you say "dispute," what do
7  you mean by a dispute?
8        BY MR. OSTOYICH:
9    Q   What about --
10   A   You showed me that one piece of paper
11 that I really don't remember, so --
12   Q   What about claims by ZF/AG that Meritor
13 people had misrepresented the quality of the
14 manual transmission product in the original
15 purchase joint venture negotiations?
16   A   I never saw a document of that nature,
17 no.
18   Q   I didn't ask you if you saw a document.
19       Are you aware whether ZF/AG people took
20 the position in your negotiations over the
21 dissolution of the joint venture that Meritor
22 people had misrepresented --

Page 361

1    A   At the delusion (sic) of the joint
2  venture?  No.
3    Q   At some point in your discussions with
4  ZF/AG people, are you aware of whether they took
5  the position that Meritor had misrepresented the
6  quality of the manual transmission products during
7  the formation of the joint venture?
8    A   That we misrepresented?  I never heard
9  that, no.
10       There was numerous discussions in the
11 Board meeting about the G platform quality
12 problems.  Did you know this?  We didn't know
13 this, we didn't know that when we formed the joint
14 venture.  Was it something you kept from us or
15 didn't keep from us or you didn't know?  There was
16 always discussions at Board meetings just like
17 discussions in any group.
18   Q   And did you hear ZF/AG people say that
19 they believed Meritor had misrepresented the
20 quality of the manual transmissions?
21   A   No.  No, never heard it.
22   Q   And do you know whether they said it to

776d4e51-238a-48e2-8a9a-0079ed29673
000229

Page 362

1  other people, or did you discuss with other people
2  at Meritor that ZF/AG indicated that they believed
3  Meritor had misrepresented the quality of the
4  G platform manual transmissions?
5      A   I don't know of any such situation, no.
6      Q   I want to make sure your testimony is
7  clear, Mr. Martello.
8          As President of the joint venture, you
9  were never informed that ZF/AG took the position
10 and informed the company that Meritor had
11 misrepresented the quality of the manual
12 transmissions during the formation of the joint
13 venture?
14         MS. DUNCAN HACKETT:  Objection.
15         THE WITNESS:  You said -- could you read
16 that back, the question back?
17         (The reporter read back the record.)
18         THE WITNESS:  I'd have to go back and
19 read the paper you gave me from Tom Shank that I
20 don't remember ever seeing, but if that doesn't
21 say it, then I don't ever remember that being
22 said, no.

Page 363

1      BY MR. OSTOYICH:
2      Q   Just to make sure we're crystal clear on
3  this, Mr. Martello, are you denying that it
4  occurred, or you just don't remember whether they
5  told you that the company had misrepresented --
6      A   I can only tell you that I don't
7  remember.
8      Q   You're not denying it occurred, you're
9  just saying you don't remember one way or the
10 other?
11         MS. DUNCAN HACKETT:  Objection.
12         THE WITNESS:  I can only tell you what I
13 remember.
14         BY MR. OSTOYICH:
15     Q   Fair enough.  I just want to make sure
16 we're clear on the record.
17     A   I can't deny that it's raining outside
18 because I can't tell.
19     Q   And you, as part of your negotiations
20 with the wind down, the dissolution of the joint
21 venture, you weren't informed that ZF/AG took the
22 position that Meritor had misrepresented the

Page 364

1  quality of the manual transmissions?
2      A   As I said, I was never in the actual
3  negotiations between ArvinMeritor and ZF as to
4  what happened or what the final agreement was
5  going to be in any of the negotiations.
6          I was only asked questions of, so I
7  don't -- I can say I don't ever remember seeing a
8  final document about the end of the joint venture.
9      Q   Were you involved in structuring the
10 sales and marketing agreement between ArvinMeritor
11 and ZF/AG to allow ArvinMeritor to continue
12 selling the FreedomLine in U.S.?
13     A   Only a discussion of how -- what would
14 have to happen for it to work.  I wasn't in
15 negotiating because, you know, what had to change
16 at Laurinburg for all that happen, it was in that
17 kind of discussion.
18         That's what I said.  After it dissolved,
19 I helped, you know, figure out how we were going
20 to do that, so I was involved in that part of it,
21 yes.
22     Q   Were you involved in setting the terms

Page 365

1  on which ArvinMeritor would continue selling the
2  FreedomLine transmission?
3      A   No.
4      Q   Okay, no further questions.  Thank you
5  for your time.
6      A   Thank you.
7          MS. DUNCAN HACKETT:  I have no
8  questions.
9          THE VIDEOGRAPHER:  Going off the record.
10 This concludes the deposition of Rick Martello.
11 The time is 5:02 p.m.
12         (Whereupon, at 5:02 p.m., the taking of
13         the deposition was concluded.)
14
15
16
17
18
19
20
21
22

92 (Pages 362 to 365)

1/9/2009        ZF Meritor LLC et al v. Eaton Corporation Richard Martello
                        Confidential

Page 366

1  Mr. Richard Martello c/o
2  Dickstein Shapiro
3  1825 Eye Street NW
   Washington, DC 20006
4  Case: Meritor v. Eaton
5  Date of deposition: 01/09/09
6  Deponent: Mr. Richard Martello
7  Please be advised that the transcript in the above
8  referenced matter is now complete and ready for signature.
9  The deponent may come to this office to sign the transcript,
10 a copy may be purchased for the witness to review and sign,
11 or the deponent and/or counsel may waive the option of signing.
12 Please advise us of the option selected.
13 Please forward the errata sheet and the original signed
14 signature page to counsel noticing the deposition, noting the applicable
15 time period allowed for such by the governing Rules of Procedure.
16 If you have any questions, please do not hesitate to call our office at
17 (202)-232-0646.
18
19 Sincerely,
20
21 Digital Evidence Group
   Copyright 2009 Digital Evidence Group
22 Copying is forbidden, including electronically, absent express written consent.

Page 368

1  Digital Evidence Group, L.L.C.
2  1111 16th Street, Northwest, Suite 410
3  Washington, D.C. 20036
4  (202) 232-0646
5
   SIGNATURE PAGE
6
7
8  Case Name: Meritor v. Eaton
9  Witness Name: Mr. Richard Martello
10 Deposition Date: 01/09/09
11 I do hereby acknowledge that I have read
   and examined the foregoing pages
12 of the transcript of my deposition and that:
13
14 (Check appropriate box):
15 ( ) The same is a true, correct and
   complete transcription of the answers given by
16 me to the questions therein recorded.
17 ( ) Except for the changes noted in the
   attached Errata Sheet, the same is a true,
18 correct and complete transcription of the
   answers given by me to the questions therein
19 recorded.
20
21 _____     _____
22  DATE          WITNESS SIGNATURE

Page 367

1          CERTIFICATE OF NOTARY PUBLIC
2      I, DAWN A. JAQUES, a Notary Public in and for
3   the District of Columbia, before whom the foregoing
4   deposition was taken, do hereby certify that witness
5   whose testimony appears in the foregoing pages was
6   duly sworn by me; that the testimony of said witness
7   was taken by me in shorthand at the time and place
8   mentioned in the caption hereof and thereafter
9   reduced to typewriting under my supervision; that
10  said deposition is a true record of the testimony
11  given by said witness; that I am neither counsel
12  for, related to, nor employed by any of the parties
13  to the action in which this deposition is taken;
14  and, further, that I am not a relative or employee
15  of any attorney or counsel employed by the parties
16  thereto, nor financially or otherwise interested in
17  the outcome of the actions.
18
19      _____
        Dawn A. Jaques, C.S.R.
20      Notary Public in and for
        District of Columbia
21
    My commission expires:
22  December 14, 2010.

Page 369

1  Digital Evidence Group, L.L.C.
2  1111 16th Street, Northwest, Suite 410
3  Washington, D.C. 20036
4  (202) 232-0646
5
       E R R A T A   S H E E T
6
7
8  Case Name: Meritor v. Eaton
9  Witness Name: Mr. Richard Martello
10 Deposition Date: 01/09/09
11 Page No.   Line No.      Change
12
13
14
15
16
17
18
19
20
21 _____    _____
22  Signature           Date

93 (Pages 366 to 369)

776d4e51-238a-48e2-8a9a-0079ed29673
000231