## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ZF MERITOR LLC and MERITOR TRANSMISSION CORPORATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 06-623-SLR |
| v. | ) ) ) | **REDACTED PUBLIC VERSION** |
| EATON CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |

# DEFENDANT'S MEMORANDUM OF LAW IN
# SUPPORT OF ITS MOTION TO EXCLUDE DERAMUS TESTIMONY

## VOLUME I – EXHIBITS 1 – 7

## VOLUME II – EXHIBITS 8 - 20

OF COUNSEL:
Joseph A. Ostoyich
Erik T. Koons
William C. Lavery
Evan A. Young
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 639-7700

Theodore B. Olson
Thomas G. Hungar
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  11101
(202) 955-8500

Donald E. Reid (#1058)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 351-9219

*Attorneys for Defendant Eaton Corporation*

Original Filing Date:  March 25, 2013
Redacted Filing Date:  April 1, 2013

# EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| _____ ) | |
| ZF Meritor LLC and ) | |
| Meritor Transmission Corporation ) | |
| ) | |
| Plaintiffs, ) | **Civil Action No. 06-623-SLR** |
| ) | |
| v. ) | |
| ) | |
| Eaton Corporation ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**Expert Report of David S. Sibley**

# I.     INTRODUCTION

### A.     Qualifications

1.      My name is David S. Sibley.  I am the John Michael Stuart Centennial Professor of Economics at the University of Texas at Austin.  In October 2004, I completed an eighteen-month term as Deputy Assistant Attorney General for Economic Analysis in the Antitrust Division of the U.S. Department of Justice, the highest-ranking economics position within the Division.  In this capacity, I supervised all economic analysis within the Antitrust Division and directed its Economic Analysis Group.  As Deputy Assistant Attorney General, I also contributed to the economic analysis of general policy issues and represented the United States in Organization for Economic Cooperation and Development discussions.

2.      For the last thirty years, I have carried out extensive research in the areas of industrial organization (a field of economics that examines the behavior of firms and the structure of markets), microeconomic theory, and regulation.  My publications have appeared in a number of leading economic journals, including the Journal of Economic Theory, Review of Economic Studies, Rand Journal of Economics, American Economic Review, Econometrica, and the International Economic Review, among others.

3.      I hold a Ph.D. in economics from Yale University and a B.A. in economics from Stanford University.  Additional details regarding my qualifications and experience are given in my curriculum vitae, a recent copy of which is attached to this report as Appendix One.

### B.     Assignment

4.      I have been asked by counsel representing Eaton Corporation ("Eaton"), to examine, from an economic perspective, claims made by plaintiffs ZF Meritor LLC ("ZF Meritor") and Meritor Transmission Corporation ("Meritor") regarding antitrust injury and

alleged damages.[1]  In doing so, I respond to the expert report of Dr. David W. DeRamus.[2]  That report references a paper I co-authored pertaining to the economic analysis of loyalty rebates.  I have also been asked to address the relevance of that paper to the issues in this case.

5.      As part of my investigation into plaintiffs' claims, I (or my staff working under my direction) have considered a number of documents and other sources of information.  The materials I reviewed include, but are not limited to, the following: (1) the complaint; (2) documents and databases produced in discovery; (3) publicly available data and information regarding heavy-duty transmissions; (4) academic publications regarding economic issues relevant to this proceeding; (5) depositions of Eaton and ZFM personnel; and (7) the expert report and supporting documentation of Dr. DeRamus. Appendix Two provides a detailed list of the material I considered in the preparation of this report.

6.      I am being compensated at an hourly rate of $600, and my compensation is not contingent on the outcome of this proceeding.  My research into the matters discussed above continues, and I reserve the right to modify or supplement my opinions as additional information becomes available.

C.    *Summary of Conclusions*

7.      Based on my analysis to date, I conclude that ZFM sustained no antitrust-related impact or injury from Eaton's allegedly anticompetitive actions. I conclude this for the following reasons.

- ZFM could have sold more transmissions than it did without causing Freightliner, International, or Paccar to lose any rebates from Eaton.

---

[1] I refer to ZF Meritor and Meritor collectively as "ZFM" or plaintiffs.

[2] Expert Report of David W. DeRamus, Ph.D., ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation (Feb. 17, 2009 (hereinafter "DeRamus Report").

000495

- Had ZFM's costs been as low as Eaton's, ZFM could have profitably undercut Eaton's prices, including rebates and competitive equalization payments (a.k.a. "SPIFF" payments).

- Dr. DeRamus attempts to link anticompetitive actions by Eaton to price increases by noting that gross prices for certain transmissions rose in 2005 and 2006. However, the only economically correct way to infer market power from price changes is to take into account contemporaneous cost changes. Adjusting prices for cost changes, I find no systematic increase.

8.      I have analyzed damages assuming that the plaintiffs can prove liability. Therefore, I have assumed a but-for world in which Eaton's allegedly anticompetitive conduct is not present. In the but-for world there are no long term agreements ("LTAs") between Eaton and its customers (i.e. original equipment manufacturers ("OEMs") of trucks) that involve share-based rebates from Eaton to the OEMs. I also have analyzed the but-for world(s) assumed by Dr. DeRamus. I have reached the following conclusions regarding damages.

- ZFM would not have been financially viable in the but-for world. Therefore, damages are zero.

- In the liability portion of his report, Dr. DeRamus asserts that Eaton's conduct reduced competition and caused transmission prices to rise. However, in his damages analyses, Dr. DeRamus assumes the opposite: in the but-for world without Eaton's allegedly anticompetitive conduct, transmission prices would have been the same or higher. His approach does not provide an economically sensible methodology with which to estimate damages.

- Dr. DeRamus provides no economically meaningful analysis that supports a conclusion that the conduct he identifies as anticompetitive was the source of any diminution in ZFM's sales, share, or profits. Moreover, if any individual element of conduct (or group of elements) is found to be unlawful, his damage methodology is not capable of isolating the effects of specific act(s).

- Dr. DeRamus presents five alternative estimates of the present value of ZFM's lost profits during the period July 2000 through February 2009. I find that these methods are not based on sound economic logic and analysis for (at least) three reasons. First, ZFM's but-for prices for manual transmissions are substantially higher than the prices actually charged by Eaton. Thus, according to Dr. DeRamus, a more competitive market for manual transmissions in the but-for world would result in higher prices, not lower prices. This makes no economic sense. Second, his analysis rests largely

3

on the notion that the but-for world is adequately characterized by a business plan developed by ZFM's management in November 2000.  However, he offers no details on the analysis or modeling assumptions ZFM relied upon in the plan.  Third, he attributes the entire difference between the plan's forecast and ZFM's actual sales (adjusting for Class 8 truck builds) to the alleged conduct, without controlling for other factors that may have caused the company's plan not to be realized.

- Dr. DeRamus develops an econometric model to forecast ZFM's share of Class 8 truck builds, but that model is not economically meaningful because it fails to include any of the important determinants of ZFM's share, such as the relative prices of ZFM and rival products, the perceived product quality of ZFM's product versus competitive alternatives, and ZFM's ability to offer a full product line, among others.

- Assuming, *arguendo*, that Dr. DeRamus' econometric method provided an appropriate basis to measure damages (which it does not), I implemented that framework but using a more relevant measure of ZFM's share, i.e., ZFM's share of the combined manual and automated transmissions sold by ZFM and Eaton.  Data available to determine this share was first available in October 1995, so I estimated my econometric model starting from that date.  Applying this revision to Dr. DeRamus' model reduces his estimate of the present value of lost profits from approximately $390 million to approximately $33 million (using his risk-free interest rate).  However, this method also implies that ZFM would not have been economically viable in the but-for world because of its small scale of operations.  Therefore, unless we assume that ZFM could operate viably at an uneconomic scale of operations, damages again are zero.

- Finally, assuming, *arguendo*, that Dr. DeRamus' method of estimating ZFM's lost enterprise value is economically valid (which it is not), he still errs in his estimate.  He claims that ZFM's lost enterprise value equals $304 million in the but-for world.  Using his flawed approach, the correct estimate is $117 million.  I do not endorse the $117 million as an appropriate measure of lost enterprise value because it is based on Dr. DeRamus' flawed methodology for calculating ZFM's but-for profits.  Under the more likely outcome that ZFM is not financially viable in the but-for world, there is no lost enterprise value as of February 2009.

### D.    Outline of Report

9.    Section II provides a summary of the heavy-duty transmission industry. Section III presents my economic analysis of Dr. DeRamus' claims regarding antitrust injury to ZFM as a result of Eaton's allegedly anticompetitive actions. Section IV contains my economic analysis of Dr. DeRamus' damages claims.

000497

## II.    RELEVANT BACKGROUND ON HEAVY-DUTY TRANSMISSIONS

### A.    Characteristics of Heavy-Duty Transmissions

10.     A transmission is a mechanism located between the engine's crankshaft and the drive shaft of a vehicle.  Its function is to transfer energy efficiently from the engine to the wheels.  A vehicle's engine turns a crankshaft, delivering the power that is used to operate the vehicle.  Engines operate most efficiently within a relatively narrow range of revolutions per minute ("RPM").  The transmission helps convert this relatively narrow range of crankshaft RPMs to a far wider range of drive shaft RPMs, permitting the vehicle to be operated efficiently at a relatively wide range of speeds.

11.     Transmissions accomplish this task in a variety of ways.[3]  Manual transmissions use gears with different gear ratios to link the engine's crankshaft to the driveshaft.  A clutch is used to disengage the crankshaft from the driveshaft, and the driver selects a gear at which an efficient RPM for the engine matches the RPM of the drive shaft, given the vehicle's speed.  The clutch is then released to engage the gears, transferring power from the engine to the wheels.  Vehicles with manual transmissions typically have three pedals: one each for the clutch, the brake, and gas.  Other transmission systems include automatic transmissions, automated manual transmissions, and continuously variable transmissions.  Automatic transmissions dispense with the clutch and simplify the process of changing gears.  Because there is no clutch, these transmissions require the vehicle to have only two pedals.  Automatic transmissions are somewhat easier to operate than are manual transmissions and require less skilled drivers.  There is a mechanical clutch in some 3-pedal automated manual transmissions, e.g., the AutoShift.  Automated manual transmissions contain a clutch that is activated by actuators and electronic

---

[3] Chao-Hsu Yao, "Automotive Transmissions: Efficiently Transferring Power from Engine to Wheels," ProQuest Discovery Guides, Released January 2008.

000498

controls, thus freeing the driver from depressing a clutch pedal. Automated manuals can be operated in automated mode, which does not require the driver to shift gears, or in manual mode, in which case the driver uses a lever to shift gears. Continuously variable transmissions based on pulleys and belts have been used less frequently than the other types of transmissions.

12.      Transmissions vary in two other dimensions: the torque rating and the number of gears and their ratios. Heavier vehicles or those that operate in rough terrain require greater torque (roughly, the engine's ability to turn the crankshaft) than lighter vehicles or those operated on well-maintained roads. Transmissions for the former category (i.e., the heavier vehicles or the ones operated in rough terrain) require a higher torque rating than transmissions for the latter category.

13.      Vehicles that operate over long routes at relatively constant speeds require fewer gears (such as 9 and 10-speed transmissions) than the 13- to 18-speed transmissions that may be required by trucks serving in some off-road operations. Some off-road uses may require a wide range of low gears, which transfer a great deal of power to the wheels, but do not permit high-speed travel. Low-speed transmissions are also useful for garbage trucks that creep forward to pick up dumpsters.

14.      Trucks are classified into eight categories based on their Gross Vehicle Weight Rating ("GVWR"), i.e., their fully loaded weight. Class 8 vehicles are the heaviest and most powerful trucks, with a GVWR greater than 33,000 pounds. According to Christopher Konkel, at Eaton "[t]here's what we call medium heavy classification which may go up to 56,000. We typically look at heavy duty as over 56,000 or greater, but there's a lot of crossovers within those

000499

vehicle ranges once you get to medium heavy, heavy classification."[4]   Class 8, a well-defined category, is not uniformly viewed as "heavy duty."

15.      According to a presentation prepared by Meritor,[5] transmissions for Class 8 trucks can be divided into three segments.   The *linehaul* segment uses 9-, 10-, and 13-speed transmissions, with torque ratings between 1150 lb-ft to 1850 lb-ft.   The *vocational* segment uses LL, 13-, and 18-speed transmissions, with a torque range of 1150-2050 lb-ft.   The *specialty* segment consists of military vehicles, motor homes, construction equipment, fire engines, garbage trucks, and other such vehicles.   According to the presentation, 10-speeds make up about 53 percent of the heavy-duty segment, 9-speeds constitute about 15 percent, vocational transmissions are about 10 percent, 13-speeds are about 9 percent, 18-speeds are about 5 percent, and 15-speeds have about 2 percent.[6]   Eaton employs a somewhat different classification, categorizing transmissions as performance, vocational, automated, or fleet products.[7]   Linehaul transmissions "fit into both fleet and performance" categories.[8]   John Buck of Eaton stated that he considers heavy-duty trucks to be the same as Class 8 trucks.[9]

B.      *Suppliers of Heavy-Duty Transmissions*

16.      During the relevant period, suppliers of HD transmissions in the U.S. included Eaton, Meritor, ZF, ZF Meritor (a joint venture of ZF and Meritor), Allison Transmissions ("Allison"), Transmission Technologies Corporation ("TTC"), and Mack Trucks ("Mack").

---

[4] Deposition of Christopher Konkel, November 21, 2008, 8:2-6.

[5] Meritor, Product Presentation, ZFMA0198240-60, at '241.  For a slightly different categorization, see Deposition of Richard Decaire, September 30, 2008, 30:16 - 31:11.

[6] Meritor, Product Presentation, ZFMA0198240-60, at 246.

[7] Deposition of Giap Nguyen, January 28, 2009, pp. 29-35, and Deposition of Dwight Dennis Simpson, October 7, 2009, pp. 28-31.

[8] Deposition of Dwight Dennis Simpson, October 7, 2009, 30:15-16.

[9] Deposition of John Buck, January 6, 2009, 5:7-11.

000500

17.     Eaton was established in 1911, and was initially known as the Torbensen Gear and Axle Company.  In 1923, it changed its name to the Eaton Axle and Spring Co.[10]  Eaton manufactures a wide range of products including heavy-duty truck transmissions. Meritor has its origins in the Timken Detroit Axle Co. which was formed in 1909.  In 1997, Meritor was spun off to develop automotive products, including the Engine Synchro Shift transmission system.[11] Allison originated in the Indianapolis Speedway Team Company in 1915.[12] TTC is part of the DESC group, one of Mexico's largest automotive component suppliers.  It is a joint venture of DESC's automotive operations and Dana Corporation.  TTC produces manual transmissions, including transmissions for Class 8 commercial vehicles.[13]

18.     Mack manufactures heavy-duty trucks, as well as engines, transmissions, and axles used in its trucks.  Its Maxitorque transmission is available in 19 models ranging from 6 speeds to 18 speeds.  Unlike the other firms discussed above, Mack is vertically integrated in heavy-duty transmissions and heavy-duty trucks.

19.     According to a ZF Meritor Business Plan presented to its Board of Directors in July 2002, Eaton's sales volume of heavy-duty transmissions in 1999 was 219,346 units, or 68 percent of the total reported.  ZFM's volume of 47,567 amounted to about 14 percent of the total, TTC's volume of 24,964 amounted to about 7.7 percent, proprietary volume was 24,294 or 7.5 percent of the total, and Allison's volume of 6,452 amounted to 2 percent of the total.

---

[10] See http://www.eaton.com/EatonCom/OurCompany/AboutUs/EatonHistory/index.htm.

[11] See http://www.arvinmeritor.com/about/history.asp.

[12] See http://www.allisontransmission.com/company/history/1910.jsp.

[13] See http://www.ttcautomotive.com/English/aboutus/aboutus.asp.

000501

20.      In 2002, Eaton's volume fell to 111,411, just a little more than half its 1999 volume, and its share equaled 74.1 percent.  The shares of the other firms were: ZFM at 11.4 percent, proprietary at 8.6 percent, TTC at 2.9 percent and Allison at 3 percent.

       C.      *Direct and Indirect Purchasers of HD Transmissions*

21.      Eaton and other producers of transmissions sell their products to OEMs including Daimler Trucks North America ("DTNA") which sells the Western Star, Freightliner, and Sterling brands; PACCAR Inc. ("PACCAR") which owns the Kenworth and Peterbilt brands; International Truck and Engine Co. ("International"), the Volvo Group (which includes Mack), and Ford.  Ford sold its Sterling heavy duty truck brand to Freightliner circa 1999.[14]

22.      Large fleet owners may negotiate directly with OEMs, and sometimes rely on competitive bidding to keep prices low.  Smaller fleets and individual owner-operators purchase trucks from dealers.  OEMs maintain a data book with product descriptions and prices; these books are used by dealer salespeople to help configure trucks to meet their customers' specifications and arrive at a price for the configuration the customer wishes to purchase.  Configurations that differ from the "standard position" could sell for a lower or higher price than the standard.  End user customers often work with salespersons at the dealership to specify the components for the trucks they order.[15]  Accordingly, transmission manufacturers market their products to OEMs and also directly to the fleet owners and other groups who purchase trucks from OEMs.

---

[14] Deposition of John Buck, January 6, 2009, 13:14 – 14:2.

[15] Deposition of Dwight Dennis Simpson, October 7, 2008, 35:16 – 37:6.

000502

D.     *Vertical Integration by OEMs*

23.     Eaton's 2007 Strategic Plan notes that "[t]he trend for OEMs to vertically integrate continues to expand globally."[16]   Reasons for this growth include the strategic importance of the drivetrain (including the transmission) in OEMs' ability to differentiate their products, control the aftermarket, reduce complexity for the end-user, greater control over product design, economies of scale, and leveraging OEMs' investments in intellectual property related to transmissions, engines, and other key components of trucks.[17]   OEMs that manufacture their own heavy duty Class 8 transmissions include Daimler in Europe and South America, Volvo, and Mack, which is now part of Volvo.[18]

24.     The ability of OEMs to vertically integrate creates a credible threat to transmission manufacturers.   Indeed Mack is vertically integrated.    The President of ZFM, Richard Martello, stated the he was concerned about vertical integration and Daimler.[19]   Greg Sharp testified that his company repeatedly considered whether or not to vertically integrate using its German heavy duty transmission technology.[20]   Even the threat of vertical integration may be effective in disciplining a transmission suppler, whether or not vertical integration actually occurs.   Currently, Freightliner uses its own transmission for its medium duty trucks sold in NAFTA.[21]

---

[16] Truck Group: 2007 Strategic Plan, EATON-00294402-31, at '03.

[17] Truck Group: 2007 Strategic Plan, EATON-00294402-31, at '09.

[18] Deposition of Kenneth F. Davis, October 23, 2008, 44:21 – 49-10.

[19] Deposition of Richard Martello, January 9, 2009, pp. 176-178 and pp. 190-196.

[20] Deposition of Greg Sharp, December 11, 2008, pp. 171-172  and 176-177.

[21] Davis Deposition, October 23, 2008, p. 48-49.

000503

### III.   ANTITRUST IMPACT

25.      In analyzing antitrust injury, my task is to examine (1) whether anticompetitive effects occurred as the result of Eaton's alleged conduct and (2) whether ZFM suffered injury as the result of that alleged conduct.  Dr. DeRamus describes a series of alleged actions by the OEMs, either alone or purportedly in conjunction with Eaton that, in his view, reduced ZFM's market share and ultimately caused Meritor to exit the heavy-duty linehaul transmission market. The alleged actions consist of the following:

- Refusing to provide fleet customers with quotes for trucks equipped with ZFM transmissions;

- Providing end-consumers with inferior leasing and warranty arrangements for ZFM-equipped trucks;

- Delaying OEM engineering activities related to making the FreedomLine available to truck buyers;

- Imposing retail surcharges on purchases of trucks equipped with ZFM transmissions;

- Providing ZFM poor databook positioning, or none at all; and

- Quoting low residual values of trucks with ZFM transmissions.[22]

Although these actions were generally taken by OEMs—not Eaton—Dr. DeRamus links them to Eaton because they were allegedly undertaken by the OEMs to increase Eaton's share of OEMs' transmission purchases and thereby earn higher rebates from Eaton.

26.      Even assuming, *arguendo*, that these actions occurred and can be linked to Eaton, they do not raise any antitrust issues, in themselves.  From an antitrust standpoint, whether or not these alleged actions tended to affect or even exclude ZFM is irrelevant.  Antitrust economics

---

[22] DeRamus Report at ¶ 123.

000504

examines whether a firm's actions harm competition generally and consumers in particular—not whether those actions reduce the profits of a rival firm.  In an effort to characterize these actions as anticompetitive, Dr. DeRamus alleges that Eaton's long-term agreements ("LTAs") and other actions led to increases in (1) truck prices to end users[23] and (2) transmission prices to OEMs, starting in late 2005.[24]   Below I demonstrate that Dr. DeRamus is incorrect in claiming that Eaton's conduct led to either type of price increase or that ZFM was affected.  The only economically correct way to infer market power from price changes is to take into account contemporaneous cost changes.  Adjusting prices for cost changes, I find no systematic increase. I also demonstrate that (1) for most of the relevant time period, ZFM's sales could have increased considerably without being affected by share-based rebates, and (2) that if ZFM were as efficient as Eaton, ZFM could have profitably undercut Eaton's entire price and rebate structure.

     A.     *Bundled Discounts*

27.     Dr. DeRamus cites a paper that I co-authored with Patrick Greenlee and David Reitman ("GRS Paper") in his antitrust analysis of Eaton's LTAs.[25]   This paper examines economic issues regarding the competitive effects of bundled loyalty discount pricing agreements.  The bundling issues considered in the GRS paper can be explained as follows. Suppose a firm ("Firm 1") produces two products, A and B.  Product A is produced only by Firm 1, but product B is produced both by Firm 1 and a competitor ("Firm 2").  If a consumer who purchases both A and B buys all her requirements of B from Firm 1, then she receives a discount on A.  If the consumer buys some or all of her requirements for product B from Firm 2, then she

---

[23] DeRamus Report at ¶¶ 257-260.

[24] DeRamus Report at ¶ 251 and Figures 23-27.

[25] DeRamus Report, footnote 329.

000505

must pay a higher price for A, known as the "stand-alone" price. Dr. DeRamus does not attempt to see if this setup applies to the case at hand, much less use it in any way In other words, despite the fact that the GRS paper is his only citation for his proposition that Eaton's rebates turned the LTAs into de facto exclusive dealing contracts, Dr. DeRamus does not do what an economist is supposed to do which is to apply the set up to the conditions in the market to test whether the LTAs are, in fact, exclusionary. Instead, Dr. DeRamus simply jumps from the assertion that the rebates may be exclusionary to the assertion that they are exclusionary.

28. As a preliminary matter, if I were to agree that the GRS model is appropriate for use in analyzing the competitive issues in the present case, there is an implication of that paper that Dr. DeRamus appears to have missed. In that paper, GRS show that if (1) consumers in the A market have differing demands for Product A and (2) Firm 1 and Firm 2 make differentiated versions of product B, then the bundled discounts chosen by Firm 1 are a best response to the price set by Firm 2 (and vice versa), and those discounts do not depend on whether or not Firm 2 ever exits the B market.[26] In other words, Firm 1 would choose exactly the same prices if Firm 2 was sure to remain in the B market as it would if Firm 2 were sure to leave in the near future. This implies that Firm 1 cannot be viewed as attempting to monopolize the B market. To the extent that Dr. DeRamus believes that GRS can be applied here, this result undermines his argument.

29. Dr. DeRamus claims that the GRS paper's analysis of the circumstances in which loyalty discounts can create *de facto* exclusive contracts applies to the LTAs between Eaton and the OEMs.[27] He then cites the economic literature on exclusive dealing to try to establish that

---

[26] See Patrick Greenlee, David Reitman, and David S. Sibley, "An antitrust analysis of bundled loyalty discounts," International Journal of Industrial Organization, Vol. 26, no. 5 (2008), 1132–1152, Theorem 3, p. 1146.

[27] DeRamus Report, ¶ 221.

000506

exclusive dealing can sometimes reduce competition, using the GRS paper as a link between Eaton's LTA and a possible anticompetitive effect.[28]  I do not agree that this link is correct.  An exclusive contract limits the buyer to buying from the seller party to the contract.  Eaton's LTAs did not do this.  They gave OEMs incentives to buy more from Eaton in the form of rebates.  However, if Meritor had been willing to reduce its prices by the amounts of the rebates, they would have neutralized these incentives and could have caused the OEMs to pass up Eaton's share-based rebates.

30.      To try to make Eaton's rebates resemble bundled discounts as in the GRS paper, Dr. DeRamus points out that there are some types of transmissions that Eaton made but that ZFM did not make, as well as some types that both companies produced.  In particular, Eaton made both performance and linehaul transmissions, whereas ZFM only made the latter. Dr. DeRamus seems to view performance transmissions as akin to the A product in the GRS paper, and linehaul transmissions as the B product. He takes the view that the OEMs had to use Eaton's linehaul transmissions so as to get discounts on the performance products, an advantage that ZFM could not match.

31.      Dr. DeRamus has overlooked another critical difference between the GRS model and the LTA contracts of Eaton that takes it out of the bundling model set out in the GRS paper: the retroactive rebates offered by Eaton generally apply to *all* transmissions, both performance and linehaul.  In contrast, the GRS model of bundled discounts assumes that the share-based discounts apply *only* to the B product that both firms produce – linehaul in this case.  This difference is substantive because to the extent that an appreciable amount of Eaton's

---

[28] Furthermore, as Dr. DeRamus notes, exclusive dealing can be efficient and precompetitive (see DeRamus Report, at ¶ 220).  However he does not analyze which results applies here.

000507

performance transmissions count towards the total, this weakens the share disincentive related to the purchases of linehaul transmissions sold by ZFM.

32.     To see this more clearly, suppose that an OEM buys 100 performance and linehaul transmissions. The OEM receives a retroactive rebate from Eaton if 90% of the transmissions are purchased from Eaton.  Suppose the OEM purchases 70 performance transmissions, which can be supplied only by Eaton.  In order to earn the retroactive rebate from Eaton, the OEM must purchase at least 20 linehaul transmissions from Eaton.  Therefore, of the total (30) linehaul transmission needs of the OEM, the OEM can purchase up to 33% (i.e., 10/30) from ZFM and still earn its rebate from Eaton.  In other words, because Eaton sold transmissions that ZFM did not, ZFM could still sell up to 33% of the OEM's linehaul transmissions and not just 10 percent without affecting its ability to obtain retroactive rebates.  This feature is absent from the literature on bundled discounts, including GRS.

B.     *Did the LTAs Prevent ZFM from Selling More Transmissions?*

33.     This last point has an important implication for the alleged antitrust impact of Eaton's LTAs.  Suppose that ZFM sold only 8 transmissions, or 27 percent, of the overlap segment (i.e. 8/30).  In this case, the Eaton contract would not create any disincentive for the OEM to purchase more transmissions from ZFM.  These additional purchases would not result in the OEM losing retroactive rebates from Eaton.  On the other hand, suppose that ZFM sold 15 transmissions, or 50 percent, of the overlap segment, thus exceeding the maximum allowable 33 percent. Suppose further that, over time, ZFM's share declines until it equals 33 percent of the overlap segment.  Does this mean that the share provision alone caused the OEM to reduce its purchases of ZFM transmissions from 15 to 10? Not necessarily, because as discussed below,

15

ZFM could potentially have priced its transmission low enough to induce the OEM to forgo Eaton's rebates and ignore the share provision.

34.     For Freightliner, Paccar, and International, the data on performance and linehaul sales for the period 2000-2006 allow me to calculate whether ZFM would have had to lower its price to overcome the share provisions in the LTAs.  (I do not have sufficient data to make these calculations for sales to Volvo/Mack because I do not know how many linehaul transmissions Mack produced internally.)  Freightliner is something of a special case.  It was not until 2003 that rebates became linked explicitly to Eaton's share of transmission sales at Freightliner. When the Freightliner agreement was first signed, at the end of 2000, rebates were paid by Eaton, but they were not linked to Eaton's share.  Apparently, Eaton expected its share at Freightliner to grow over time to 92 percent at a certain rate, but the LTA did not explicitly link either the base price or the rebates to Eaton's share of sales with Freightliner.  Freightliner did not satisfy this commitment, and Eaton took the position that it was no longer obligated to provide the rebates (but continued to provide the base price concession implied by the contract).  In 2003, Eaton agreed to pay the rebates retroactively, even though Freightliner had not met the 92 percent target, and, in July 2003, they agreed to create a tiered rebated structure as an amendment to the November 2000 agreement.

35.     Figure 1 shows whether or not Eaton's LTA with Freightliner constrained ZFM's sales.  Starting in 2001, the blue line shows the maximum percentage of linehaul transmissions that ZFM could sell to Freightliner such that Freightliner would still earn its rebate with Eaton.[29] The blue line is at 100% in the period 2000-2002 because, as described above, Eaton and Freightliner did not have a share-based agreement pertaining to rebates. The red line shows

---

[29] That is, if the graph had shown the example above, the blue line would represent the 33% that the OEM could purchase from a non-Eaton firm and still earn its discount from Eaton.

000509

ZFM's actual share of linehaul transmission sales with Freightliner.  As demonstrated in the figure, the rebate provision would not have forced ZFM to lower its price to sell more to Freightliner.  Moreover, suppose that ZFM's sales to Freightliner did decrease to some extent as a result of Eaton's LTA.  As I demonstrate below, if ZFM had been as cost efficient as Eaton, and if the Freightliner prices and rebates were typical of the average for OEMs, ZFM could have made more sales by profitably lowering its prices to offset the discounts that OEMs would lose from Eaton.  In this case, the red line in Figure 1 would have crossed and exceeded the blue line, indicating that Freightliner  had chosen to purchase a sufficiently large volume of transmissions from ZFM so as to cause them to lose their discounts from Eaton.  This would have been in the interests of Freightliner if ZFM offered a price reduction sufficiently large to offset the discounts OEMs lost from Eaton.

36.      Figure 2 shows whether or not Eaton's LTA with Paccar would have forced ZFM to lower its price to sell more. As the figure makes clear, for the entire period under study, ZFM's share at Paccar was well below the level at which rebates came into play. Hence, Paccar faced no disincentive in purchasing more from ZFM.  Purchases were not at the point where Paccar would have needed to reduce purchases from ZFM in order to maximize its rebates from Eaton. The clear inference in that ZFM was out-competed by Eaton for Paccar's business.

37.      Finally, Figure 3 shows whether or not Eaton's LTA with International would not have forced ZFM to lower its price to sell more to International do to Eaton's rebates.  From the fourth quarter of 2001 until the third quarter of 2003, International did not buy enough transmissions from Eaton to meet the minimum 80 percent share required to qualify for rebates; hence the blue line is at 100 percent. Both before and after this period, ZFM's share of linehaul transmissions at International (the red line) was below the blue line showing the maximum

17

percentage of linehaul transmissions that ZFM could sell to International such that International would still earn its rebate with Eaton.  Again, the economic evidence shows that the contract between International and Eaton did not prevent ZFM from increasing its sales to International. Again, to the extent that ZFM's sales to International did decrease to some extent as a result of Eaton's LTA, if (a) Eaton's pricing to International was typical of the OEM average and if (b) it was as efficient as Eaton, then ZFM could have profitably prevented this decrease in sales by lowering its prices to offset the discounts that OEMs would lose from Eaton.  This would have been a profitable pricing strategy for ZFM if it had been as efficient as Eaton.

38.     Documents produced in this case shed light on other reasons why ZFM did not sell as many transmissions at it could have, even given the penetration rate requirements for the OEMs to obtain rebates from Eaton. I discuss this point in detail below, but the primary findings are as follows. First, both OEM and ZFM source documents agree that ZFM suffered from not having the same full range of heavy-duty transmissions that Eaton had. Second, Eaton offered OEMs attractive price and rebate concessions that ZFM did not match. Third, ZFM's G-platform transmissions were not highly regarded, compared to the corresponding Eaton products.[30]

C.      *Eaton's Discounts on Non-Overlap Transmissions Would Not Have Prevented ZFM from Competing Successfully if it were as Efficient as Eaton*

39.     So far, I have established that the share disincentives related to rebates in Eaton's LTAs did not constitute a firm limit on ZFM's sales of linehaul transmissions to major OEMs. Still, one might ask whether ZFM was denied significant growth at some OEMs because of Eaton rebates that would be potentially lost by OEMs who expanded ZFM sales significantly.  In

---

[30] ZF Meritor LLC, Board of Directors, April 3, 2001 Meeting, ZFMA0034148-9; ZF Meritor Joint Venture, Board of Directors Revised 5-25-99, ZFMA0371514; Deposition of Michael Elwell, 56:18 – 57:6; Deposition of Christian Benner, 103:1-9; Deposition of Thomas Lundahl, 147:9 – 153:3, and 156:4 – 157:13; Deposition of John D. Buck, 181:7-25 – 182:9; Deposition of Paul Barkus, 208:22 – 209:9; ZFMA0213049; ZFMA0089985; ZFMA0186327; and ZFMA0164328.

000511

order to investigate this issue, I examine the size of these retroactive rebates, calculated over all types of transmissions, and determine if they were large enough to have prevented ZFM from competing with Eaton, assuming that the two firms were equally efficient in the manufacture and sale of linehaul transmissions. In making these calculations, I allow for the presence of SPIFF payments by Eaton to truck purchasers.

40.     My analysis examines whether an "equally efficient competitor" could profitably undercut the price charged by a firm selling a bundle of products.  This test envisions a situation in which a firm with a non-contestable product (A) also sells a contestable product (B) in a market characterized by rivalry. In this situation, a discount pricing plan would give discounts on the noncontestable product to customers who buy at least a stated percentage of their demands for the contestable product from the firm that also makes the non-contestable product.

41.     If a customer buys too large a quantity of product B from a competitor, he loses retroactive rebates on both products A and B.  In order to evaluate the competitive effects of such a rebate pricing plan, the equally efficient competitor test calculates the total amount of rebates available from both A and B and then allocates those rebates to the contestable product sold by the producer of the noncontestable product ("Firm 1"). Dividing that total discount applied to B by the number of units of B sold by Firm 1, we obtain the discount over <u>both</u> products per unit of B. This discount is then subtracted from the list price of B set by Firm 1.  If this "net" price of B exceeds Firm 1's average variable cost of B, then the bundled discount plan is not inhibiting competition.[31]

42.     The equally efficient competitor test can be applied here. The A product in this case consists of all performance transmissions and the competitive B market consists of linehaul

---

[31] The GRS paper does not distinguish between up-front discounts or retroactive rebates.  In the GRS setting either term could be used, although GRS uses the term 'discounts."

000512

transmissions. Table 1 shows an estimate of the dollar value of Eaton's rebates for linehaul and non-linehaul transmissions over the period 1998-2007. For example, as shown in the last Column, Eaton's total rebates in 1998 were $8.9 million. These rebates were calculated by using information on the penetration rates in the LTAs (obtained from Dr. DeRamus' report) and by using information on Eaton's rebates to OEMs (obtained from Eaton's LTAs).

43.    Given these rebates, Table 2 carries out the equally efficient competitor test for the period 1998-2006 for Eaton's sales to Freightliner, International, Paccar, and Volvo/Mack. Column 1 shows the average gross price of Eaton's linehaul transmissions, and Column 2 shows the corresponding quantity. Column 3 shows Eaton's total rebates (i.e., the same values that are shown in the last column of Table 1). Column 4 divides Column 3 by Column 2, to obtain the average rebate per Eaton linehaul transmission. This rebate is then subtracted from the gross linehaul transmission price in Column 1 to give the average price per Eaton linehaul transmission less the bundled rebate, as shown in Column 5. Column 6 gives the ratio of Eaton's "average variable cost" (including SPIFF payments) to gross price that would allow Eaton to break even.[32] Finally, Column 7 gives the ratio of Eaton's average variable cost (including SPIFF) to gross price. For a given year, if the number in Column 7 is less than the number in Column 6, then Eaton's rebates satisfy the equally efficient competitor test.

44.    As shown in Column 7 of Table 2, Eaton passes the equally efficient competitor test in all years. Applications of the test separately to Freightliner, International, Paccar, and Volvo/Mack are shown in Tables 3-6, respectively. Eaton passes the test for all four firms in every year with one exception, Freightliner in 2001  Therefore, had ZFM been as efficient as

---

[32] I calculate Eaton's "average variable costs" based on manufacturing costs plus distribution expenses shown in Eaton's NAFTA HD Consolidated P&L. Average variable cost = [(Standard Costs + Total Variances + Distribution Exp) / Total Sales] x Eaton's average price.

000513

Eaton, it could have undercut the entire combination of Eaton's prices and rebates, and ZFM still could have charged prices well above its average variable costs, including SPIFF payments.

45.     In sum, based on the equally efficient competitor test, ZFM was not precluded from competing because of the retroactive rebates in Eaton's OEM contracts. The fact that ZFM failed to compete successfully must be either (1) because it did not realize that this was possible; (2) because of ZFM's quality and warranty problems; or (3) its average variable cost was significantly higher than was Eaton's.

46.     My economic analysis demonstrates, therefore, that (1) ZFM could have sold considerably more than it did without causing OEMs to lose any retroactive rebates from Eaton, and (2) if ZFM had the same average variable costs (including SPIFF payments) as Eaton, ZFM could have profitability undercut Eaton's prices net of rebates.  This leads me to conclude that Eaton's LTAs were not anticompetitive.

### D.     Did Eaton's Conduct Injure Competition?

47.     In this section I will demonstrate that the aspects of Eaton's conduct that Dr. DeRamus regards as anticompetitive had no anticompetitive effect. At two points in his expert report, Dr. DeRamus argues that actions of Eaton led to price increases, which is the only purported evidence he claims of anticompetitive outcomes.  First, Dr. DeRamus argues that Eaton's actions caused truck prices to rise.[33]  Second, he claims that Eaton raised prices after the ZFM joint venture failed, supposedly knowing that its exclusionary actions had eliminated competition from the transmission market.[34]

---

[33] DeRamus Report, ¶¶ 257-260.

[34] DeRamus Report, ¶ 251 and Figures 23-27.

000514

1. *Truck Prices*

48.     Dr. DeRamus advances an elaborate theory that purports to link Eaton's LTA agreements with increases in truck prices sold to end users.  His theory has three components. First, he claims that the enhanced rebates achieved through the LTAs were designed to give Eaton monopoly status with the OEMs and to share "monopoly rents" with OEMs, inducing them to engage in exclusionary acts towards ZFM. Second, the OEMs allegedly did not pass these cost savings through to truck buyers. Finally, starting in 2005, Eaton reduced SPIFF payments to fleets.[35]  Given that the OEMs supposedly did not pass through decreased transmission prices to these fleets, as a matter of arithmetic, they paid more – an anticompetitive outcome according to Dr. DeRamus' theory.

49.     I will assume, *arguendo,* that Dr. DeRamus is correct that the OEMs did not pass through reduced transmission prices made possible by the Eaton LTA agreements.  (I do not agree that that this is necessarily correct.)  However, even with this assumption, there is no link between Eaton's LTA agreements and higher truck prices.  The critical intermediate step in Dr. DeRamus' argument is that the OEMs did not pass through any cost savings to truck buyers. This alleged failure, assuming it occurred, was due to actions of OEMs—not Eaton. There is, therefore, a fundamental disconnect in Dr. DeRamus' argument, even assuming that its factual premise is correct. In any case, ZFM cannot plausibly claim to have been injured by higher retail truck prices.

50.     This argument also contains an error in economic logic.  A basic principle of microecoconomics is that firms produce at the level of output where the extra revenue of an additional unit of output equals the extra cost of that unit.  If the extra cost of one more truck

---

[35] DeRamus Report, Figure 29.

000515

falls, OEMs maximize their profits by producing more trucks, even though that will cause the price to fall.  Units of truck output that were not profitable to undertake at a high cost per additional truck become profitable to produce at lower cost per additional truck.  This necessarily involves some reduction in price.  A lower transmission price to an OEM lowers the cost of an additional truck.  Therefore, according to basic economics, the OEMs, in their own interest, would lower truck prices.  To assume otherwise, as Dr. DeRamus does, is to make a basic error.

### 2.      *Higher Transmission Prices?*

51.      In his report Dr. DeRamus states: "In 2005, when ZFM started considering and discussing with OEMs the possibility that it would exit the market. . . ."[36]  At that time, according to Dr. DeRamus, Eaton allegedly increased its prices for automated transmissions (i.e., for AutoShift and UltraShift) sold to Freightliner and to International. These products competed with ZFM's FreedomLine transmission.[37]  Dr. DeRamus also claims that Eaton increased its prices for manual transmissions sold to International.  These price increases took place in late 2004 and early 2005, according to Figures 23-27 of Dr. DeRamus' report.  According to Dr. DeRamus' argument, Eaton was able to increase its prices at that time because competition from ZFM had disappeared, once the joint venture between Meritor and ZF dissolved.  He appears to believe that these alleged prices increases constitute strong evidence that ZFM's weakening competitive position and eventual exit led to a decline in competition, allegedly due to Eaton's LTAs. Given what he concludes is evidence of a decline in competition, should we agree with Dr. DeRamus that ZFM sustained antitrust injury?

52.      I disagree with Dr. DeRamus for two reasons.  First, Dr. DeRamus interprets the price increases shown in his Figures 23-27 as evidence of a decline in competition. Dr. DeRamus

---

[36] DeRamus Report, ¶ 251.

[37] DeRamus Report, ¶ 251.

000516

is wrong. These figures show only gross prices over time, i.e., prices not adjusted for changes in input costs. Figures 23-27 show that gross prices were flat until late 2004. However, costs may well have gone up over time even though prices did not. Viewed in that light, it is not surprising that prices went up eventually – prices may have gone up simply because costs did. Second, this argument leaves unexplained why Eaton was able to raise manual transmission prices at International and Freightliner, but not at other OEMs.[38]

53. To investigate the extent of cost increases, I examined the contracts between Freightliner and Mack, which describe the appropriate cost index to apply to transmissions. Eaton's supply agreement with Freightliner, for example, shows the components of the index and their weights.[39] The components are: forgings, grey iron, aluminum, bearings, fasteners, and low-alloy steel. Figure 4 shows the behavior of this index over the period 2000-2008. The cost index is relatively flat from 2000 until early 2004 and rises rapidly thereafter, particularly in late 2004 and early 2005. Recall that Dr. DeRamus' Figures 23-27 show increases in gross prices during this 2004-2005 period. This suggests strongly that much or all of the gross price increases observed by Dr. DeRamus are attributable to cost increases and that transmission prices adjusted for cost increases may not have gone up at all.

54. My economic analysis confirms this conclusion, both at the NAFTA level and for Freightliner and International (see Figures 5-9). Consider, for example, Figure 7, which shows the price of UltraShift over time at Freightliner. The blue line shows the same gross prices that appear in Dr. DeRamus' Figure 26. However, the red line shows the cost-adjusted price of UltraShift transmissions sold to Freightliner—that price fell from 2000 until 2006, then rose only

---

[38] See Eaton-01110890; Eaton-00385583; and Eaton-00382048.

[39] Eaton-00385583.

000517

to its initial level, before falling again. Adjusted for costs, there was no systematic price increase. The picture drawn by Dr. DeRamus is illusory.

55.     Moreover, Figures 5-9 do not account for Eaton's discounts. Figures 10-12 show Eaton's transmission prices taking into account both increases in input costs and discounts.  As shown in Figure 10, Eaton's net prices over the period 1998-2006 for all its North American sales of Linehaul manual transmissions did not increase, in contrast to the gross prices shown in Figure 27 of Dr. DeRamus' report.  Figure 11 shows that Eaton's prices over the period 1998-2006 for all its North American sales of Automated Linehaul transmissions did not increase, in contrast to the gross prices shown in Figures 23-26 of Dr. DeRamus' report.  Finally, Figure 12 shows that Eaton's net prices over the period 1998-2006 for all its North American sales of Vocational transmissions did not increase.

56.     The results shown in Figures 5-12 also allow us to investigate a "natural experiment" that occurred in the market.  Namely, if Eaton had substantial market power, then the exit of ZFM should have allowed Eaton to increase its prices.  However, as shown in the figures, Eaton's prices, accounting for cost increases and discounts, did not increase.  This provides strong economic evidence that Eaton lacks substantial market power.

57.     Dr. DeRamus argues that ZFM's lower sales, allegedly caused by Eaton's actions, caused ZFM to face higher costs.[40]  Dr. DeRamus fails to recognize that when firms have fixed costs, a reduction in their output for any reason will cause their average costs to increase.  This fact does not indicate that any anticompetitive conduct has taken place—the increase in average cost  can easily result from the normal operations of a competitive market.  In this case, ZFM lost business because Eaton charged lower net prices.  As a result of not being competitive on price,

---

[40] DeRamus Report, ¶ 193.

000518

ZFM's output fell and its average cost may have gone up as a result.  In addition, Dr. DeRamus' claim ignores the fact that competition in markets is determined by firms' marginal costs—not their average costs.  In this regard, the economic evidence shows that Meritor understood its own marginal costs of producing manual transmissions to be constant, thereby unaffected by scale.[41] In addition, the marginal costs of producing FreedomLine transmissions likely were constant because these transmissions were produced on a large scale in a German factory.  As a result, even assuming, *arguendo*, that Eaton's actions caused Meritor's average costs to increase, that increase did not affect the firm's marginal costs, which are the costs that constrain the exercise of market power.

### E.   Summary: Antitrust Impact

58.      In this section, I have reached a number of conclusions.  First, ZFM could have sold considerably more transmissions than it did without causing OEMs to lose any rebates from Eaton.  Second, given Eaton's discounts and rebates, ZFM could have profitably undercut Eaton's prices had ZFM been as efficient as Eaton.  In effect, it could have compensated the OEMs for lost rebates, even on transmissions that ZFM did not make.  Third, Dr. DeRamus has shown no link between Eaton's alleged actions and price increases after accounting for increases in input costs.  Based on my findings, I further conclude that ZFM experienced no antitrust-related impact or injury from Eaton's alleged conduct.  Any losses sustained by ZFM were primarily the natural result of the competitive process.

---

[41] ZFMA0356438-536, at 535.

000519

## IV.   DAMAGES ANALYSIS

### A.    The But-for World

59.      In this section, I assume that the plaintiff has proven liability on the part of Eaton. According to Dr. DeRamus, the alleged anticompetitive conduct is attributable to Eaton's LTA agreements, and he assumes that in the but-for world there are no LTA agreements. The main feature of the LTAs, as it affected ZFM, was the degree to which they allowed OEMs to obtain rebates by increasing the shares of their transmission purchases from Eaton. Therefore, in the but-for world, I assume that there would have been no such rebates.

60.      If ZFM were significantly less efficient than Eaton, then in the but-for world without rebates the two firms would have competed on price and features. Holding constant the distinctive features of the main types of transmissions, it is likely that price was the main factor in determining OEM transmission choice, along with breadth of product line and quality. Hence, the relative cost efficiencies of Eaton and ZFM are an important competitive aspect of the but-for world. I have estimated two types of costs with which to compare the companies' cost efficiencies: average variable cost[42] and "average operating cost."[43] Average operating costs include such items as fixed costs and overheads that are unrelated to specific product lines. Therefore, Eaton's average operating cost will be at least as high as Eaton's average variable cost.

61.      I have estimated both types of average cost for Eaton and ZFM (see Tables 7 and 8).  Table 7 shows the average operating costs for ZFM over the period 2005-2007 for the G

---

[42] I calculate ZFM's "average variable cost" using the data in Dr. DeRamus' Tables 5 and 6 that specify the firm's "forecasted units" and "forecasted per unit variable cost."

[43] Eaton's average operating cost (including SPIFF) was estimated using information in Dr. DeRamus' report on Eaton's operating profit margin (see DeRamus Report, ¶ 110) and information from Eaton's NAFTA HD Consolidated P&L. ZFM's average operating costs was estimated using information in Dr. DeRamus' report ¶ 110.

000520

platform and for the FreedomLine. For Eaton, I have calculated average operating cost for all manual 9 and 10 speed transmissions and separately for the AutoShift and the UltraShift transmission. The average operating cost per G platform unit was $2,929, whereas the average operating cost per Eaton manual transmission was $2,239, i.e., 24 percent lower. The average operating cost per FreedomLine was $6,602, i.e., 70 percent higher than Eaton's average operating cost for the AutoShift ($3,851) and 59 percent higher than Eaton's average operating cost for the UltraShift ($4,140).  The weighted average operating cost for Eaton is $2,479 and for ZFM is $4,127, i.e., 66 percent higher.

62.     The argument could be made that these differences in average operating costs are due to the reduced scale experienced by ZFM as a result of the alleged anticompetitive conduct of Eaton. As discussed above, I do not consider this a correct economic argument.  But even if that argument were economically correct, the comparisons of average variable cost are not subject to this criticism.  As noted above, the economic evidence shows that ZFM's average variable cost does not vary with the level of output.  Table 8 shows that ZFM's average variable cost from 2001-2005 was considerably higher than that of Eaton. The average variable cost for Eaton's manual transmissions over period 2001-2005 was $1,953, whereas the average variable cost for ZFM's G platform transmissions was $2,416, i.e., 24 percent higher.  The average variable costs of AutoShift and UltraShift, were $3,363 and $3,510, respectively, compared to the average variable cost of ZFM's FreedomLine, $4,004, i.e., 19 percent and 14 percent higher, respectively.

63.     Because Eaton was more cost efficient than ZFM, Eaton could have set its prices at levels below ZFM's costs and still made a profit. Recall that in the but-for world, there would have been no LTAs and, hence, no rebates. Therefore, to make comparisons between prices and

28

costs, we must use gross prices, without rebates. The average gross price of an Eaton manual transmission over the period 2005-2007 was $2,961, whereas ZFM's average operating cost for its G platform manual transmissions was approximately equal to that, $2,929 (see Table 7). As for the FreedomLine, it was often equated by ZFM to the Eaton AutoShift. On that basis, the average gross price of an AutoShift, $5,093 was substantially below ZFM's average operating cost of the FreedomLine, $6,602. The same relationship holds for the average gross price of Eaton's UltraShift ($5,475) compared to ZFM's average operating cost of the FreedomLine ($6,602). Overall, this economic evidence suggests strongly that ZFM's relatively high operating and average variable costs would have made it economically non-viable in the but-for world.

64.    This conclusion is strengthened by the equally efficient competitor analysis undertaken above in the discussion of antitrust impact. The conclusion of that analysis was that an equally efficient competitor of Eaton could have profitably undercut Eaton's prices and rebates, even accounting for SPIFF payments. Clearly, this did not happen. ZFM priced the FreedomLine well above Eaton's competing products, AutoShift and UltraShift, and ZFM did not discount its prices sufficiently to keep the OEMs from signing up with Eaton under LTA agreements or to induce them to buy from ZFM during the term of the LTAs. There appear to be two possible explanations for ZFM's failure to undercut Eaton's prices and rebates. One is that ZFM simply did not realize that it could do this. Assuming the ZFM managers responsible for such decisions were capable and experienced, this seems unlikely. The other explanation is that in the long-run ZFM could not have covered total costs, including fixed costs. In view of the above discussion of the relative costs of the two companies, this seems the most likely explanation.

65.      If ZFM would not have been an economically viable competitor versus Eaton in the but-for world, then there are no damages resulting from Eaton's (assumed) anticompetitive conduct.  This, then, is my affirmative opinion of the correct level of damages: zero.

### B.      Discussion of Dr. DeRamus' Damages Methodology

66.      Dr. DeRamus takes two distinct overall approaches to damages, although he also presents several variations of them.  His first approach is based on the November 30, 2000 Strategic Business Plan ("SBP") presented to the ZF Meritor Board of Directors on that date.[44] The SBP contains forecasts of revenues and units sold over the period 2001-2005, and Dr. DeRamus uses these forecasts in his damages analysis.  He adopts the SBP without any critical evaluation.  Any discrepancies between the plan's assumptions in 2000 and actual events at later dates are just assumed to reflect anticompetitive conduct by Eaton.  In his second broad approach, he assumes that in the but-for world ZFM would have had the same costs as Eaton and would have sold its transmissions for the same prices as Eaton.[45]  He conducts no test of either assumption.  In order to estimate ZFM's but-for profits, Dr. DeRamus multiplies Eaton's margin times ZFM's but-for market shares.

67.      Both of these approaches logically conflict with plaintiffs' theory of the case.  The plaintiffs allege that Eaton's conduct reduced competition in the relevant market for transmissions.  This must mean that actual prices were higher than they would have been in a but-for world without this conduct.  However, using the first approach, ZFM's but-for prices for manual transmissions are substantially <u>higher</u> than the prices actually charged by Eaton.  Thus, according to Dr. DeRamus, a more competitive market for manual transmission in the but-for world would apparently have had <u>higher</u> prices, not lower prices.

---

[44] As discussed below, Dr. DeRamus offers four different methods for estimating damages using his first approach.

[45] As discussed below, Dr. DeRamus offers one method for estimating damages using his second approach.

000523

68.    Dr. DeRamus' second approach has the same kind of problem. If Eaton's actual prices reflect reduced competition due to Eaton's alleged conduct, then in the but-for world with more competition, prices should be lower.  Dr DeRamus' approach amounts to saying that ZFM simply deserved more of the "monopoly" rents than it actually received.  His second approach is logically inconsistent with the claim that the actual world is less competitive than the but-for world.  Yet this claim is the one the plaintiffs make.

69.    Below I discuss Dr. DeRamus' damages analysis in more detail.   However, despite the problems that I note below, the primary problem is that neither of his two approaches make economic sense.  It is also important to observe that Dr. DeRamus presents no analysis that supports a conclusion that the conduct he identifies as anticompetitive in his report (e.g., the conduct described in paragraph 9 of his report), was the source of any diminution in ZFM's sales, share, or profits.  Moreover, if any individual element or group of elements is found to be unlawful, his damage methodology is not capable of isolating the effects of any specific act(s).

C.    *Analysis of Dr. DeRamus' Damages*

70.    Dr. DeRamus claims that Eaton's LTAs with OEMs resulted in financial harm to ZFM in the range of $643 million to $826 million in present value as of February 2009.[46]    His estimate of damages has two components: (1) lost profits for the period July 2000 through February 2009 and (2) the lost enterprise value of the ZFM Transmission business on a going forward basis starting in February 2009.  The inclusion of lost enterprise value in his damage estimate is based on his assumption that the alleged anticompetitive conduct forced ZFM to exit the market.  He acknowledges that his measure of damages is equivalent to measuring the lost profits to ZFM from the beginning of the alleged damage period to perpetuity, discounted to the

---

[46] Dr. DeRamus' damage estimates range from $643 million to $778 million when has risk free rate is used to calculate the present value of alleged damages and from $672 million to $825 million when AvrinMeritor's cost of debt is used to calculate the present value of alleged damages.  See DeRamus Report, Table 13 at p. 148.

000524

present using an appropriate rate of interest. I address both components of his damages analysis below.

        *1.*      *Lost Profits for the Period July 2000 Through February 2009*

71.      Dr. DeRamus uses five alternative methods to calculate lost profits for the period July 2000 through February 2009. Methods One and Two are similar, in that lost profits are defined as the incremental revenues less incremental costs the plaintiff would have earned but for the alleged anticompetitive conduct. The methods differ only in the technique he uses to estimate the number of ZFM transmissions sold but for the alleged conduct. In Methods Three and Four, he uses the same incremental revenue derived in Method One, but adds additional overhead costs to account for possibly higher levels of operating expenses and certain fixed costs required to achieve the but-for sales.[47] Method Five assumes ZFM's but-for profit margin would have been similar to the profit margin earned by Eaton on comparable transmissions.

72.      **Method One: Based on ZFM's November 2000 Strategic Business Plan**. In order to estimate the number of transmissions (and associated sales revenue) ZFM would have sold but for the alleged conduct, Dr. DeRamus relies entirely on a strategic business plan presented to ZFM's Board of Directors on November 30, 2000 ("November 2000 SBP"). That plan included a five-year product line profit and loss statement based on a forecast of unit sales, unit prices, manufacturing costs, and operating expenses, and other line items.[48] Dr. DeRamus made only one change to the 2000 SBP: he changed the number of transmissions sold to account for the difference between actual Class 8 truck builds in NAFTA and the number of Class 8 truck builds in NAFTA on which ZFM's forecast of transmission sales was based. He states that Class

---

[47] In Method Three, additional overhead costs are added after fiscal year 2003 (after the dissolution of the joint venture). In Method Four, the additional overhead costs are added beginning in fiscal year 2002.

[48] ZFMA0034361-375.

000525

8 trucks builds differed from ZFM's estimates because of "macroeconomic fluctuations that ZFM could not have predicted accurately at the time it prepared the November 2000 SBP."[49] However, Dr. DeRamus offers no explanation as to why ZFM's ability to forecast competitive transmission prices and ZFM's transmission share (i.e., the two other variables from which his estimate of ZFM's but-for incremental revenue is based) is better than its ability to predict Class 8 truck builds.  In fact, Dr. DeRamus offers no details on the analysis or modeling assumptions ZFM relied upon in developing its plan.  He simply asserts that the forecast in the November 2000 SBP is conservative because (according to him) the plan already incorporated ZFM's management's view of the effects of allegedly anticompetitive conduct by Eaton that occurred before the plan was developed.  Other than that, he does not try to justify the SBP forecasts as being accurate or scientifically based.

73.       Dr. DeRamus' reliance on the November 2000 SBP is problematic for a variety of reasons.  First, ZFM continually updated its five-year forecasts since the inception of the joint venture.  Over time, the sales forecasts in those plans were routinely adjusted downward.[50]  Dr. DeRamus is of the view that these downward adjustments were primarily driven by effects of the alleged conduct on ZFM sales.  However, factors other than the alleged conduct also played an important role based on my review of ZFM planning documents.  For example, in April 1999, in a review of its initial transmission strategy, ZFM noted that its initial results were not achieved (both in terms of financial expectations and market penetration) because its products were "plagued by warranty issues," its products "cover[ed] only 75 percent of Class 8 market," and

---

[49] DeRamus at ¶ 276, p. 124.

[50] See ZFMA0074508-14 at 509, and ZFMA0000340-355.

000526

"Eaton continues technology superiority."[51]   In a presentation to the Board of Directors on July 13, 2000, when discussing the variance between projected market share penetration (expected to increase from 16.1% to 21.7%) and actual (decrease from 16.1% to 13%), Mr. Richard Martello, President of the ZFM joint venture) discussed a number of factors that contributed to this situation including:

> (i) poor product quality image; (ii) a decrease in Ryder business; (iii) turnover in the Company's sales organization, (iv) an increase in sales of Eaton AutoShift; (v) the push toward 13-speed transmissions, especially by Freightliner, (vi) the multi-year fleet business lost due to competitive equalization cutbacks in early 1999 and (vii) controlled distribution.[52]

Clearly factors other than the alleged conduct that DeRamus asserts were present prior to July 2000 influenced ZFM's success in selling transmissions.  Future deviations between actual and expected success along any of these factors are possible explanations for why actual sales were less than those envisioned in the plan.

74.     Examples of non-conduct variables that potentially influenced ZFM's sales include continued product quality problems and ZFM's inability to offer a full product line. With respect to product quality, ZFM in July 2001 recognized that quality issues had limited its success and that future product reliability was key to the success of the joint venture.[53]   Indeed one of the recognized risks in assessing its plan in July 2001 was that the G platform problems may not be fixed.[54]

---

[51] ZFMA0368680.

[52] ZFMA0356445; See also Rule 30(b)(6) Deposition of Plaintiffs, dated February 4, 2009 at 144-149.

[53] See ZF Meritor Strategy (dated July 10, 2001) at ZFMA0000233 ("product issues have limited our success in the market") and ZFMA0000239 ("future product reliability of JV products is key").

[54] ZFMA0000242.

000527

75.     The need to offer a more complete product line was also a factor known to have influenced ZFM's sales.[55]  A full product line was believed to be important in (1) gaining a partnership with any OEM, (2) protecting the linehaul business, and (3) protecting residual value in the used truck market.[56]  In April 2001, ZFM recognized that it had not achieved its goals of having a full product line because at that time the company was still discussing the issue of how to obtain a full product line faster.[57]

76.     Use of the plan is also problematic not only because it attributes the entire difference between the plan's forecast and ZFM's actual sales to the alleged conduct, but also because no attempt is made by Dr. DeRamus to isolate or disaggregate damages.  Rather, it is an aggregate estimate of damages that is not linked to any specific OEM agreement.  There is reason to believe that the economic impacts of these LTAs were not uniform across OEMs.  For example, the fact that Volvo/Mack is vertically integrated may help explain why it did not have as high a share target as the other OEMs in order to begin to obtain rebates.  As I discussed above, the Freightliner agreement with Eaton had no explicit link between rebates and shares until 2003, whereas they were always a feature of the Paccar agreement.  Looking at the actual behavior of the OEMs and ZFM, the experience of Paccar shows that ZFM was nearly always a substantial distance from the rebated-related shares implied by Paccar's agreement with Eaton.  All of this suggests that the differences between OEM purchases from ZFM in the but-for world and actual ZFM sales vary across OEMs in important ways.  Dr. DeRamus' methodology offers no way to isolate these separate effects.

---

[55] See, for example, ZFMA0369763.

[56] See ZFMA0348171.

[57] ZFMA0348171.

35

77.     Finally, because the November 2000 SBP does not provide forecasts of ZFM's business after fiscal year 2005, Dr. DeRamus develops his own projections of plaintiffs' manual and automated transmission sales during the period 2006-2009.  In particular, he holds constant ZFM's share of manual transmissions (as a percentage of Class 8 truck builds) in 2006-2009, and projects further increases in ZFM's share of automated transmissions.  His methodology for predicting the future growth in FreedomLine's share of Class 8 truck builds is based on a simple trend analysis that does not consider explicitly any economic factor likely to explain FreedomLine's share such as relative prices, product quality, and ZFM's ability to offer a full-product line, etc.  In reality, the projected growth in the number of automated transmissions (relative to manual) projected by the plan and Dr. DeRamus' trend analysis did not occur, either at ZFM or at Eaton.  Eaton's actual sales of automated manual transmissions accounted for approximately 13 percent of its total linehaul sales in 2008, a value well below the plan's estimate of 50 percent for ZFM's automated linehaul sales.

78.     **Method Two: Econometric Model of Damages.**   Dr. DeRamus' Method Two differs from his Method One in only one respect.  Instead, of relying on the forecast of ZFM's share of Class 8 truck builds contained in the November 2000 SBP, he constructs an econometric model to estimate ZFM's share.  Therefore, the logical problems with Method 1 as a but-for scenario apply here, as well.  Using his model, for each fiscal year, he derives ZFM's but-for transmission sales (in units) by multiplying the predicted share by the actual number of Class 8 truck builds.   It is important to note that in doing so, he continues to rely on the plan's assumptions regarding the mix of manual and FreedomLine transmissions sold by ZFM in each fiscal year.   Thus, his claim that his econometric analysis confirms the accuracy of November 2000 SBP forecast is not correct; he assumes that it is accurate in this respect.  An important

36

element in estimating the growth rates of the individual products (i.e., the mix of manual and FreedomLine transmissions) is based entirely on an assumption contained in the November 2000 SBP, which is not tested or confirmed at all by his econometric analysis.

79.     Using monthly data for the period January 1990 through September 2007, his econometric model relates ZFM's share of Class 8 truck builds to the following "macroeconomic" variables: (1) the number of heavy duty truck builds in NAFTA; (2) an index of consumer confidence in the U.S.; (3) the average wholesale price of oil in the U.S.; and (4) the 5-year U.S. Treasury Constant Maturity interest rate.  He also includes ZFM's share in the previous month to capture "market dynamics."  In addition to the above variables, he includes a variable (referred to as the conduct indicator variable) that takes the value of zero before July 2000 and a value of one from July onward.  He allows the conduct variable to interact with all the other variables in his model to allow the relationship between the macroeconomic variables and market share to be different between two time periods: the period prior to the alleged conduct (i.e., January 1990 through June 2000) and the conduct period (July 2000 through September 2008).   In effect, he uses the estimated relationship between the macroeconomic variables in the pre-conduct period to forecast ZFM shares in the alleged conduct period.  During the pre-conduct period (holding other factors constant) he found increases in the consumer confidence index and oil prices increase ZFM's share of U.S. Class 8 truck builds, while increases in truck builds and interest rates decrease ZFM's share.

80.     There is a fundamental flaw in Dr. DeRamus' econometric model -- there is no economic logic to it.  For example, why should the level of consumer confidence, interest rates, and oil prices have any effect on ZFM's share of the Class 8 trucks builds?  He offers no

000530

explanation.  He seems to be only interested in statistical predictions of ZFM shares, without any economic understanding for what determines those shares.

81.        Absent from his model are important determinants of ZFM's share such as (1) the relative prices of ZFM and rival transmissions, (2) the perceived quality of ZFM's product versus other alternatives, (3) the extent to which ZFM offers a full product line, and (4) OEM's brand preferences, among others. It is well-known in econometrics that the omission of relevant explanatory variables from a regression model can bias the parameter estimates of the variable that are included in the model.[58]

82.        Figure 13 shows ZFM's actual share and but-for share based on Dr. DeRamus' econometric model.  As shown in the figure, ZFM's but-for share increases rapidly from August 2006 through May 2008, more than doubling.  According to Dr. DeRamus' model, the rapid increase in ZFM's share during this period is largely determined by a decline in the interest rate and a run up in the price of oil.  For example, during this time period interest fell from 4.98 percent to 3.05 percent and oil prices increased from $73/barrel to $125/barrel.   Using Dr. DeRamus' model, Figure 13 also illustrates what the but-for share would be if one simply assumed that the interest rate did not decline during this period but rather remained constant at its August 2006 level.  As can be seen in the figure, in this scenario, ZFM's but-for share is significantly reduced.  But why would a change in the interest rate cause OEMs to purchase more ZFM transmission versus those from other suppliers?  Dr. DeRamus offers no explanation.

83.         It is also worth exploring an alternative way of defining shares.  Dr. DeRamus' shares are defined as ZFM units sold divided by NAFTA Class 8 truck builds.  However, many Class 8 trucks did not use transmissions of the types that ZFM made, e.g., vocational

---

[58] See, for example, Green, William, (1993), ECONOMETRIC ANALYSIS, 2nd Edition, MacMillian Publishing, at p. 243-244.

000531

transmissions. Thus, movements in ZFM's share could have nothing to do with Eaton's conduct but rather could reflect changes in the mix of transmissions used in Class 8 builds from month to month. This suggests that it might be useful to focus on ZFM's share of the combined manual and automated linehaul transmissions sold by ZFM and Eaton.

84.    Thus, as an alternative to Dr. DeRamus' model, I estimated an econometric model using this alternative way of defining ZFM's share. In doing so, I included the same explanatory variables included in Dr. DeRamus' model. In constructing the share variable, I used the actual number of G-platform and FreedomLine transmissions sold by ZFM and the actual number of Manual 9 and 10 speed, AutoShift 10 speed, and UltraShift 10 speed transmissions sold by Eaton. The data available to determine the share estimate was first available in October 1995, so I estimated the econometric model starting from that date. The results of the econometric model are shown in Table 9.

85.    Using this econometric model, I forecast ZFM's but-for market share over time. I then calculated damages using the same procedure followed by Dr. DeRamus. That is, I used the same assumptions regarding the mix of manual and automated manual transmissions, incremental cost, and discount rates to calculate the present value of lost profits. My findings are presented in Table 10. As shown in the table, the present value of lost profits using Dr. DeRamus' risk free rate is approximately $32.8 million, and the present value of lost profits equals approximately $37.2 million using ArvinMeritor's cost of debt. In addition, the number of manual and automated manual transmissions sold by ZFM in the but-for world is well below the number of transmissions ZFM estimated would be required to meet its break-even requirements. As noted by Dr. DeRamus, internal analysis performed by ZFM indicated that the company needed to sell approximately 32,000 manual transmissions to satisfy its break-even

000532

constraint.[59]   The quantity of transmission sales reported in Table 10 falls well below the required levels in all years.  Thus, a further implication of this but-for scenario is that ZFM would have no enterprise value in February 2009.

86.      Whatever the results of varying Dr. DeRamus' econometric procedure, it is important to keep in mind that the but-for world assumed by Dr. DeRamus makes no logical sense, as I described above.  His supposedly more competitive world somehow leads to higher manual transmission prices.  All of the criticisms that I have made of Method 1 apply here as well, except for market share determination in the but-for world.   Hence, for calculating damages, improving the econometric shares does nothing to save the overall approach of Method 2, based, as it is, on Method 1.   Therefore, I conclude than under this method, too, damages equal zero.

87.      **Methods 3 and 4: ZFM Lost Profits Assuming Incremental Fixed Costs**  As noted above, Method 3 is a variant of Method One in which Dr. DeRamus uses the same incremental revenue, but adds additional overhead costs to account for possibly higher levels of operating expenses and certain fixed costs required to achieve the but-for sales.  However, in this scenario, Dr. DeRamus changes his assumptions about the but-for world. Specifically, he attempts to "account for the possibility that in order to achieve the estimated 'but-for' sales after 2003, i.e., after the dissolution of the joint venture, ZFM would have to incur additional overhead costs."[60]   He offers no explanation as to why the joint venture would collapse in the but-for world.  (Elsewhere he attributes the collapse to Eaton's conduct, which of course, is absent in the but-for world.)  Method 4 differs from Method 3 in that he includes incremental overhead costs

---

[59] See DeRamus Report at ¶ 195, ZFMA0356438-536, at 535.

[60] DeRamus Report at ¶299, p. 134.

000533

in fiscal years 2000-2003 (i.e., prior to the dissolution of the joint venture).  The inclusion of overhead costs in these earlier years would suggest such costs would be relevant to include even if the joint venture had remained in place.  The addition of these costs reduces his damages estimates by approximately $200 million.  The inclusion of such costs in the econometric analysis I discussed above (i.e., $32.8 million in present value using the risk free rate and $37.1 million in present value using ArvinMeritor's cost of debt) would cause my estimates to fall well below zero.  This simply reinforces my view that ZFM would not be viable in the but-for world.

88.      Since Methods Three and Four are similar to Method One with the exception of the inclusion of additional costs, they suffer from the same flaws identified in my analysis of Method One above.

89.      **Method Five: Estimates of ZFM Lost Profits Based on Eaton's Actual Profits**.  I discussed above the conceptual problems inherent in this approach.  Nonetheless, it bears repeating that when analyzing antitrust liability, Dr. DeRamus asserts vigorously that Eaton's conduct reduced competition and led to higher prices.  However, in this method for calculating damages, he assumes that absent the alleged conduct, prices would have been unchanged at levels that do not reflect the extra competition supposedly provided by ZFM in the but-for world.  Under his assumption, ZFM's claim for damages is simply that it should have received a higher share of rents due to market power than it actually received.

### 2.      *Lost Enterprise Value*

90.      As noted above, Dr. DeRamus included lost enterprise value as of February 2009, as the second` component of his damages estimate. According to Dr. DeRamus, his estimate of lost enterprise value is equivalent to the present value of ZFM's future lost profits from the date of his report through perpetuity.

41

91.      Dr. DeRamus used ArvinMeritor and Eaton as "comparables" to estimate the lost enterprise value of ZFM on a "but-for" basis. He defined enterprise value as the market value of equity plus total debt[61] and preferred equity, less the amount of cash and cash equivalents.[62] Dr. DeRamus used two multiples to estimate the enterprise value of ZFM, enterprise value ("EV") over earnings before interest and taxes ("EBIT") and EV over earnings before interest, taxes, depreciation, and amortization ("EBITDA"). Dr. DeRamus assumed that "but-for" operating profits were equivalent to EBIT and that "but-for" operating profits less depreciation were equivalent to EBITDA.[63] Dr. DeRamus estimated enterprise value to be $233 million using the EV/EBITDA multiple and $556 million using the EV/EBIT multiple. He then used the midpoint between them, $394 million, as his estimate of lost enterprise value.

92.      **Dr. DeRamus' Estimate of Enterprise Value Using the EV/EBITDA Multiple**

Dr. DeRamus took the average EV/EBITDA multiple of ArvinMeritor and Eaton for the period 2005-2007,[64] 7.68, and multiplied it by his estimate of the average EBITDA for ZFM for the years 2006, 2007, and 2008[65] and arrived at an estimate for enterprise value. To estimate EBITDA, Dr. DeRamus estimated the "but-for" incremental gross profit and subtracted the "but-

---

[61] Dr. DeRamus did not specify if he used the book value or the market value of debt in his calculations.

[62] Dr. DeRamus stated: "This definition of enterprise value is a standard definition that is often used in valuing companies for a broad range of business purposes." No explanation was given as to why this definition was appropriate for this damages claim. See DeRamus Report, at ¶307.

[63] Depreciation is typically considered to be an operating expense that would be subtracted from revenues as one of the operating expenses used to derive EBIT, depreciation would typically be added back to EBIT to estimate EBITDA not subtracted.

[64] Dr. DeRamus did not provide details of this calculation, it is not known if the average was based on daily weekly monthly or quarterly data. The enterprise value of the comparable companies would have been different on every day, typically such information is available quarterly when relying on publicly available financial accounting records.

[65] EBITDA from table 11 were, $51,443,243 for 2006, $25,834,958 for 2007, and $13,874,463 for 2008 . The average was $30,384,221.

000535

for" overhead costs (excluding depreciation). Dr. DeRamus summarized his estimates of EBITDA for ZFM in Table 11 of his report. Applying the 2005-2007 EBITDA multiple of 7.68 to Dr. DeRamus' estimate of EBITDA for each year yields the following estimates of enterprise value: $394 million for 2006, $198 million for 2007, and $107 million for 2008 for an average of $233 million.

93.     **Dr. DeRamus Estimate of Enterprise Value Using the EV/EBIT Multiple.** DeRamus took the average EV/EBIT multiple for the period 2005-2007[66], 12.32 and multiplied it by his estimate of the average EBIT for ZFM for the years 2006, 2007 and 2008[67] and arrived at an estimate for enterprise value. To estimate EBIT, Dr. DeRamus used the lost profits from the approach based on Eaton's profitability in Section 11.10 that was summarized in Table 8 of his report. Dr. DeRamus claims that operating profit is a reasonable proxy for the EBIT.[68]

94.     Applying the 2005-2007 EBIT multiple of 12.32 to Dr. DeRamus' estimate of EBIT for each year yields the following estimates of enterprise value: $704 million for 2006, $648 million for 2007 and $314 million for 2008 for an average of $556 million.

        *i.     Dr. DeRamus' Estimate of Lost Enterprise Value is Highly Flawed*

95.     **Dr. DeRamus Uses the Wrong Time Period in His Analysis.**  When using a "comparables" approach to valuation, the only relevant price is the price of the comparables as of the date of the valuation. (See IRS Revenue Ruling 59/60 Valuation of Stocks and Bonds.)  Dr. DeRamus used the wrong time period in his comparables approach. Dr. DeRamus purported to

---

[66] Dr. DeRamus did not provide details of this calculation, it is not known if the average was based on daily weekly monthly or quarterly data. The enterprise value of the comparable companies would have been different on every day, it is unlikely that Dr. DeRamus could have obtained information on the outstanding debt or the companies' EBITDA more often than quarterly if he used financial accounting records

[67] EBIT for 2006, 2007 and 2008 from Table 12 were, $57,169,679, $52,629,045 $25,480,539.

[68] EBIT also includes non-operating revenues and expenses.

000536

estimate the "but-for" value of ZFM as of February 2009, but used data from the comparable companies based on averages of those companies' stock prices and performance that covered the time period from 2005 through 2007. Further, Dr. DeRamus applied these multiples to his estimates of EBITDA and EBIT to still another incorrect time period, 2006 through 2008. It is very unclear for what time period, if any, this estimate on enterprise value is relevant, but it certainly does not provide a basis for estimating the enterprise value at the end of February 2009.

96.     Dr. DeRamus used an "average" of the enterprise values using stock prices of his comparable companies, ArvinMeritor and Eaton, from the period 2005 through 2007. During this time period used by Dr. DeRamus to develop his "comparables" ratios of EV/EBITDA and EV/EBIT, the stock of ArvinMeritor was selling for approximately $10 to $20 per share or more than 15 to 30 times higher than its February 27, 2009 price of $0.63. The market and the economy changed dramatically from the time period used by Dr. DeRamus to the time period of the valuation. By using the earlier and inappropriate time period, Dr. DeRamus overstated the potential value of ZFM. On February 27, 2009, the EV/EBITDA ratio for ArvinMeritor was approximately 4.5 using the EBITDA as of December 2008.[69] Dr. DeRamus projected a negative EBITDA of $12 million for the first two months of 2009. Using a negative value for EBITDA would produce nonsensical results. The enterprise value as of February 27, 2009, using Dr. DeRamus' estimate of EBITDA for 2008 ($13,874,463), along with the February 27, 2009 EV/EBITDA for ArvinMeritor, would provide an estimate of enterprise value of approximately $58 million. On February 27, 2009, the EV/EBIT ratio for ArvinMeritor was approximately 5.6 using the EBIT as of September 2008.[70] The enterprise value for February 27, 2009 using Dr.

---

[69] Yahoo Finance "Key Statistics" ArvinMeritor's (ARM)

[70] EBIT through December 31 2008 for ArvinMeritor was -$149 million, calculating a EV/EBIT ratio with a negative number would yield nonsensical results.

000537

DeRamus' estimate of EBIT for 2008 ($25,480,539) along with the February 27, 2009 EV/EBIT for ArvinMeritor, would provide an estimate of enterprise value of approximately $143 million.

97.      Dr. DeRamus also used Eaton as a comparable company. During the time period used by Dr. DeRamus, Eaton was selling for approximately $53 to $95 per share, however it was selling for only $36.15 on February 27, 2009. On February 27, 2009 the EV/EBITDA ratio for Eaton was approximately 5.7 using the EBITDA as of December 2008.[71] The enterprise value as of February 27, 2009 using Dr. DeRamus' estimate of EBITDA for 2008 ($13,874,463), along with the February 27, 2009 EV/EBITDA for Eaton Corporation, would provide an estimate of enterprise value of approximately $79 million. On February 27, 2009 the EV/EBIT ratio for Eaton Corporation was approximately 7.4[72] using the EBIT as of September 2008. The enterprise value as of February 27, 2009 using Dr. DeRamus' estimate of EBIT for 2008 ($25,480,539), along with the February 27, 2009 EV/EBIT for Eaton, would provide an estimate of enterprise value of approximately $189 million.

98.      In sum, the average EV/EBITDA using Dr. DeRamus' estimate of EBITDA was $68.5 million[73] and the average EV/EBIT using Dr. DeRamus' estimate of EBIT was $166 million.[74] After correcting for the time period error, the revised estimate of ZFM's enterprise value using Dr. DeRamus' assumptions and methodologies falls from $374 million to $117

---

[71] Yahoo Finance "Key Statistics" Eaton Corporation (ETN), Enterprise value of Eaton was $10.46 billion on February 27, 2009. EBITDA as of December 31, 2008 was $1.83 billion. EV/EBITDA = 10.46/1.83 = 5.7.

[72] Yahoo Finance "Key Statistics" Eaton Corporation (ETN), Enterprise value of Eaton was $10.46 billion on February 27, 2009. Yahoo Finance "Income Statement" EBIT as of September, 2008 was $1.41 billion EV/EBIT. = EV/EBIT = 10.46/1.41 = 7.4

[73] Enterprise value based on EV/EBITDA was $58 million for ArvinMeritor and $79 million for Eaton Corporation. (58 +79)/2 = $68.5 million.

[74] Enterprise value based on EV/EBIT was $143 million for ArvinMeritor and $179 million for Eaton Corporation (143+189)/2 = $166 million

45

million.[75]  I do not endorse the $117 million as an appropriate measure of lost enterprise value because it is based on Dr. DeRamus' flawed methodology for calculating ZFM's but-for profits at the time of the valuation.  Under the more likely outcome that ZFM is not financially viable in the but-for world, there is no lost enterprise value in February 2009.

99.        **Dr. DeRamus Fails to Consider Capital Requirements**. Dr. DeRamus does not consider capital requirements when forecasting the lost profits used as a basis for estimating the lost enterprise value. Companies need to make investments in such things as plant, equipment, and working capital when they expand their business. Also ongoing businesses need to replace equipment that is worn out or becomes obsolete as time passes. Dr. DeRamus incorrectly assumes that ZFM could have approximately doubled its sales from 2000 to 2009 without making any additional investments or even replacing depreciated capital.

100.       The additional investments that would be required, as well as the cost of obtaining the required capital, would need to be subtracted from the "but-for" enterprise value. By failing to consider the additional capital required to run the business and have it grow to the level assumed by Dr. DeRamus, plaintiffs are asking for a return on capital investments that were never made. Further, Dr. DeRamus has not demonstrated that there would in fact be any lost enterprise value if the capital requirements were properly considered.

---

[75] $117 million is the midpoint between $166 million and $68.5 million

***

David S. Sibley

Executed March 17, 2009

000540

TABLE 1
EATON'S ANNUAL REBATES BY PRODUCT
($ THOUSANDS) [1]

| Year | Linehaul | | | | | | Non-Linehaul | | | | | Total |
| | Manual | | | | Automated | | Manual | | Automated | | | |
| | 7s | 9s & 10s | Lightning | Top 10 | AutoShift 10s | UltraShift | 13s & 18s | Top 13 & 18 | AutoShift 15s | AutoShift 18s | Other | |
|------|------|----------|-----------|--------|---------------|------------|-----------|-------------|---------------|---------------|-------|------|
| 1998 | 83.8 | 3,811.2 | 0.0 | 328.6 | 110.4 | 0.0 | 2,405.6 | 0.0 | 2,148.8 | 0.0 | 0.0 | 8,888.5 |
| 1999 | 81.0 | 2,575.6 | 0.5 | 89.9 | 376.3 | 0.0 | 1,864.8 | 0.0 | 1,432.6 | 0.0 | 0.0 | 6,420.6 |
| 2000 | 57.0 | 2,843.8 | 27.1 | 700.6 | 3,120.0 | 0.0 | 6,186.6 | 0.0 | 2,441.4 | 140.0 | 41.4 | 15,558.0 |
| 2001 | 64.9 | 2,061.1 | 105.1 | 628.2 | 4,432.1 | 0.0 | 7,277.4 | 0.0 | 2,948.0 | 198.6 | 95.3 | 17,810.7 |
| 2002 | 30.6 | 2,477.3 | 221.0 | 720.2 | 4,048.0 | 0.0 | 11,440.2 | 0.0 | 3,294.6 | 270.1 | 62.4 | 22,564.4 |
| 2003 | 15.2 | 1,704.8 | 745.5 | 0.0 | 3,408.3 | 144.0 | 9,052.1 | 0.0 | 2,821.0 | 649.0 | 44.0 | 18,583.9 |
| 2004 | 29.4 | 3,523.2 | 913.9 | 0.0 | 2,159.5 | 2,594.6 | 13,555.1 | 0.0 | 3,726.4 | 1,160.0 | 45.7 | 27,707.7 |
| 2005 | 10.5 | 4,446.7 | 550.0 | 0.0 | 2,706.4 | 5,600.6 | 18,560.5 | 0.0 | 4,307.3 | 1,872.1 | 41.9 | 38,096.1 |
| 2006 | 12.1 | 5,866.4 | 150.3 | 0.0 | 3,230.7 | 7,600.4 | 20,635.3 | 0.0 | 2,153.7 | 2,864.4 | 0.0 | 42,513.3 |
| 2007 | 1.3 | 1,823.8 | 0.0 | 0.0 | 1,117.2 | 2,980.1 | 11,817.8 | 0.0 | 1,856.1 | 3,920.4 | 0.0 | 23,516.6 |

Notes:
[1]  Based on penetration estimates reported in Dr. DeRamus' Report and rebate provisions in Eaton's LTAs.

000541

TABLE 2
EQUALLY EFFICIENT COMPETITOR TEST
BREAK-EVEN AVERAGE VARIABLE COST TO GROSS PRICE RATIO
AT FREIGHTLINER, INTERNATIONAL, PACCAR, AND VOLVO/MACK

| Year | [1]<br>Avg Gross Price of Eaton Linehaul Transmissions [1] ($) | [2]<br>Quantity of Eaton Linehaul Transmissions Sold [2] | [3]<br>Total Rebates Offered by Eaton Across All Transmission Products [3] ($) | [4] = [3] / [2]<br>Avg Rebate per Eaton Linehaul Transmission ($) | [5] = [1] - [4]<br>Avg Price of Eaton Linehaul Transmission Less per Unit Rebate ($) | [6] = [5] / [1]<br>Break-Even AVC to Gross Price Ratio [4] | [7]<br>Eaton AVC to Gross Price Ratio [5] |
|---|---|---|---|---|---|---|---|
| 1998 | 2,893 | 76,990 | 8,888,493 | 115 | 2,777 | 0.96 | n.a. |
| 1999 | 3,001 | 100,535 | 6,420,633 | 64 | 2,937 | 0.98 | **0.78** |
| 2000 | 3,221 | 84,989 | 15,558,012 | 183 | 3,038 | 0.94 | **0.77** |
| 2001 | 3,154 | 48,493 | 17,810,691 | 367 | 2,786 | 0.88 | **0.79** |
| 2002 | 3,086 | 61,526 | 22,564,397 | 367 | 2,719 | 0.88 | **0.73** |
| 2003 | 3,032 | 72,302 | 18,583,949 | 257 | 2,774 | 0.92 | **0.74** |
| 2004 | 3,069 | 118,887 | 27,707,700 | 233 | 2,836 | 0.92 | **0.75** |
| 2005 | 3,201 | 151,923 | 38,096,124 | 251 | 2,950 | 0.92 | **0.74** |
| 2006 | 3,356 | 168,420 | 42,513,316 | 252 | 3,103 | 0.92 | **0.71** |
| 1999-2006 | 3,164 | 807,075 | 189,254,822 | 234 | 2,930 | 0.93 | **0.75** |

Notes:
[1] Based on comparable manual and automated transmissions (manual 9s & 10s; AutoShift 10s; and UltraShift 10s).
[2] Based on comparable manual and automated transmissions (manual 9s & 10s; AutoShift 10s; and UltraShift 10s).
[3] Based on all manual, automated, and vocational transmissions (manual 7s, 9s, 10s, 13s, & 18s; Lightning series; Top 10, 13, & 18; AutoShift 10s, 15s, & 18s; and UltraShift 10s), and other.
[4] Estimated based on penetration estimates reported by DeRamus and OEM contract provisions.
[5] A value below the break-even estimate passes the equally efficient competitor test. Bold values in Column 7 indicate that the test is passed.

49

000542

TABLE 3
EQUALLY EFFICIENT COMPETITOR TEST
BREAK-EVEN AVERAGE VARIABLE COST TO GROSS PRICE RATIO
AT FREIGHTLINER

| Year | [1]<br>Avg Gross Price of Eaton Linehaul Transmissions[1] ($) | [2]<br>Quantity of Eaton Linehaul Transmissions Sold[2] | [3]<br>Total Rebates Offered by Eaton Across All Transmission Products[3] ($) | [4] = [3] / [2]<br>Avg Rebate per Eaton Linehaul Transmission ($) | [5] = [1] - [4]<br>Avg Price of Eaton Linehaul Transmission Less per Unit Rebate ($) | [6] = [5] / [1]<br>Break-Even AVC to Gross Price Ratio[4] | [7]<br>Eaton AVC to Gross Price Ratio[5] |
|---|---|---|---|---|---|---|---|
| 1998 | 3,009 | 26,336 | 0 | 0 | 3,009 | 1.00 | n.a. |
| 1999 | 3,062 | 36,256 | 0 | 0 | 3,062 | 1.00 | **0.83** |
| 2000 | 3,436 | 32,695 | 7,153,891 | 219 | 3,218 | 0.94 | **0.78** |
| 2001 | 3,319 | 18,094 | 10,676,403 | 590 | 2,729 | 0.82 | 0.85 |
| 2002 | 3,123 | 25,644 | 14,377,295 | 561 | 2,562 | 0.82 | **0.75** |
| 2003 | 3,038 | 36,104 | 12,850,981 | 356 | 2,682 | 0.88 | **0.78** |
| 2004 | 3,037 | 53,341 | 16,786,319 | 315 | 2,722 | 0.90 | **0.78** |
| 2005 | 3,096 | 68,105 | 24,111,857 | 354 | 2,742 | 0.89 | **0.78** |
| 2006 | 3,255 | 70,414 | 24,352,165 | 346 | 2,909 | 0.89 | **0.74** |
| 1999-2006 | 3,156 | 340,653 | 110,308,912 | 324 | 2,833 | 0.90 | **0.78** |

Notes:
[1] Based on comparable manual and automated transmissions (manual 9s & 10s; AutoShift 10s; and UltraShift 10s).
[2] Based on comparable manual and automated transmissions (manual 9s & 10s; AutoShift 10s; and UltraShift 10s).
[3] Based on all manual, automated, and vocational transmissions (manual 7s, 9s, 10s, 13s, & 18s; Lightning series; Top 10, 13, & 18; AutoShift 10s, 15s, & 18s; and UltraShift 10s), and other.
[4] Estimated based on penetration estimates reported by DeRamus and OEM contract provisions.
[5] A value below the break-even estimate passes the equally efficient competitor test.  Bold values in Column 7 indicate that the test is passed.

50

000543

TABLE 4
EQUALLY EFFICIENT COMPETITOR TEST
BREAK-EVEN AVERAGE VARIABLE COST TO GROSS PRICE RATIO
AT INTERNATIONAL

| Year | [1] Avg Gross Price of Eaton Linehaul Transmissions [1] ($) | [2] Quantity of Eaton Linehaul Transmissions Sold [2] | [3] Total Rebates Offered by Eaton Across All Transmission Products [3] ($) | [4] = [3] / [2] Avg Rebate per Eaton Linehaul Transmission ($) | [5] = [1] - [4] Avg Price of Eaton Linehaul Transmission Less per Unit Rebate ($) | [6] = [5] / [1] Break-Even AVC to Gross Price Ratio [4] | [7] Eaton AVC to Gross Price Ratio [5] |
|---|---|---|---|---|---|---|---|
| 1998 | 2,638 | 17,761 | 0 | 0 | 2,638 | 1.00 | n.a. |
| 1999 | 2,736 | 19,702 | 0 | 0 | 2,736 | 1.00 | **0.78** |
| 2000 | 2,834 | 14,972 | 145,171 | 10 | 2,824 | 1.00 | **0.81** |
| 2001 | 2,804 | 9,890 | 208,922 | 21 | 2,782 | 0.99 | **0.78** |
| 2002 | 2,777 | 9,629 | 0 | 0 | 2,777 | 1.00 | **0.74** |
| 2003 | 2,743 | 10,444 | 343,625 | 33 | 2,710 | 0.99 | **0.71** |
| 2004 | 2,941 | 24,575 | 1,362,635 | 55 | 2,885 | 0.98 | **0.75** |
| 2005 | 3,287 | 33,876 | 2,581,013 | 76 | 3,211 | 0.98 | **0.73** |
| 2006 | 3,381 | 41,691 | 5,493,316 | 132 | 3,250 | 0.96 | **0.70** |
| 1999-2006 | 3,059 | 164,779 | 10,134,682 | 62 | 2,997 | 0.98 | **0.74** |

Notes:
[1] Based on comparable manual and automated transmissions (manual 9s & 10s; AutoShift 10s; and UltraShift 10s).
[2] Based on comparable manual and automated transmissions (manual 9s & 10s; AutoShift 10s; and UltraShift 10s).
[3] Based on all manual, automated, and vocational transmissions (manual 7s, 9s, 10s, 13s, & 18s; Lightning series; Top 10, 13, & 18; AutoShift 10s, 15s, & 18s; and UltraShift 10s), and other.
[4] Estimated based on penetration estimates reported by DeRamus and OEM contract provisions.
[5] A value below the break-even estimate passes the equally efficient competitor test.  Bold values in Column 7 indicate that the test is passed.

000544

TABLE 5
EQUALLY EFFICIENT COMPETITOR TEST
BREAK-EVEN AVERAGE VARIABLE COST TO GROSS PRICE RATIO
AT PACCAR

| Year | [1]<br>Avg Gross Price of Eaton Linehaul Transmissions [1] ($) | [2]<br>Quantity of Eaton Linehaul Transmissions Sold [2] | [3]<br>Total Rebates Offered by Eaton Across All Transmission Products [3] ($) | [4] = [3] / [2]<br>Avg Rebate per Eaton Linehaul Transmission ($) | [5] = [1] - [4]<br>Avg Price of Eaton Linehaul Transmission Less per Unit Rebate ($) | [6] = [5] / [1]<br>Break-Even AVC to Gross Price Ratio [4] | [7]<br>Eaton AVC to Gross Price Ratio [5] |
|---|---|---|---|---|---|---|---|
| 1998 | 3,023 | 17,062 | 0 | 0 | 3,023 | 1.00 | n.a. |
| 1999 | 3,122 | 22,815 | 0 | 0 | 3,122 | 1.00 | **0.73** |
| 2000 | 3,183 | 16,992 | 2,514,914 | 148 | 3,035 | 0.95 | **0.71** |
| 2001 | 3,083 | 10,304 | 3,735,698 | 363 | 2,720 | 0.88 | **0.73** |
| 2002 | 3,128 | 14,123 | 5,243,165 | 371 | 2,757 | 0.88 | **0.67** |
| 2003 | 3,174 | 14,758 | 4,232,741 | 287 | 2,887 | 0.91 | **0.67** |
| 2004 | 3,248 | 22,497 | 7,794,877 | 346 | 2,902 | 0.89 | **0.70** |
| 2005 | 3,375 | 26,344 | 9,719,981 | 369 | 3,006 | 0.89 | **0.68** |
| 2006 | 3,486 | 30,411 | 11,138,140 | 366 | 3,120 | 0.89 | **0.67** |
| 1999-2006 | 3,262 | 158,244 | 44,379,514 | 280 | 2,981 | 0.91 | **0.69** |

Notes:
[1] Based on comparable manual and automated transmissions (manual 9s & 10s; AutoShift 10s; and UltraShift 10s).
[2] Based on comparable manual and automated transmissions (manual 9s & 10s; AutoShift 10s; and UltraShift 10s).
[3] Based on all manual, automated, and vocational transmissions (manual 7s, 9s, 10s, 13s, & 18s; Lightning series; Top 10, 13, & 18; AutoShift 10s, 15s, & 18s; and UltraShift 10s), and other.
[4] Estimated based on penetration estimates reported by DeRamus and OEM contract provisions.
[5] A value below the break-even estimate passes the equally efficient competitor test.  Bold values in Column 7 indicate that the test is passed.

000545

TABLE 6
EQUALLY EFFICIENT COMPETITOR TEST
BREAK-EVEN AVERAGE VARIABLE COST TO GROSS PRICE RATIO
AT VOLVO/MACK

| Year | [1] Avg Gross Price of Eaton Linehaul Transmissions [1] ($) | [2] Quantity of Eaton Linehaul Transmissions Sold [2] | [3] Total Rebates Offered by Eaton Across All Transmission Products [3] ($) | [4] = [3] / [2] Avg Rebate per Eaton Linehaul Transmission ($) | [5] = [1] - [4] Avg Price of Eaton Linehaul Transmission Less per Unit Rebate ($) | [6] = [5] / [1] Break-Even AVC to Gross Price Ratio [4] | [7] Eaton AVC to Gross Price Ratio [5] |
|---|---|---|---|---|---|---|---|
| 1998 | 2,844 | 15,831 | 8,888,493 | 561 | 2,283 | 0.80 | n.a. |
| 1999 | 3,014 | 21,762 | 6,420,633 | 295 | 2,719 | 0.90 | **0.75** |
| 2000 | 3,191 | 20,330 | 5,744,036 | 283 | 2,908 | 0.91 | **0.76** |
| 2001 | 3,271 | 10,205 | 3,189,668 | 313 | 2,958 | 0.90 | **0.76** |
| 2002 | 3,203 | 12,130 | 2,943,938 | 243 | 2,961 | 0.92 | **0.73** |
| 2003 | 3,092 | 10,996 | 1,156,602 | 105 | 2,987 | 0.97 | **0.71** |
| 2004 | 3,114 | 18,474 | 1,763,869 | 95 | 3,019 | 0.97 | **0.73** |
| 2005 | 3,183 | 23,598 | 1,683,273 | 71 | 3,111 | 0.98 | **0.72** |
| 2006 | 3,438 | 25,904 | 1,529,695 | 59 | 3,379 | 0.98 | **0.71** |
| 1999-2006 | 3,197 | 143,399 | 24,431,715 | 170 | 3,026 | 0.95 | **0.73** |

Notes:
[1] Based on comparable manual and automated transmissions (manual 9s & 10s; AutoShift 10s; and UltraShift 10s).
[2] Based on comparable manual and automated transmissions (manual 9s & 10s; AutoShift 10s; and UltraShift 10s).
[3] Based on all manual, automated, and vocational transmissions (manual 7s, 9s, 10s, 13s, & 18s; Lightning series; Top 10, 13, & 18; AutoShift 10s, 15s, & 18s; and UltraShift 10s), and other.
[4] Estimated based on penetration estimates reported by DeRamus and OEM contract provisions.
[5] A value below the break-even estimate passes the equally efficient competitor test. Bold values in Column 7 indicate that the test is passed.

000546

TABLE 7
COMPARISON OF EATON AND ZFM AVERAGE OPERATING COST
(2005-2007)

| Product | [1]<br><br>Operating Profit [1] | [2]<br><br>Average Price [2]<br>($) | [3] = [2] x (1 - [1])<br><br>Average Operating Cost<br>($) |
|---|---|---|---|
| Eaton | | | |
| Manual 9 and 10 | 24.4% | 2,961 | 2,239 |
| AutoShift | 24.4% | 5,093 | 3,851 |
| UltraShift | 24.4% | 5,475 | 4,140 |
| Weighted average | 24.4% | 3,279 | 2,479 |
| ZFM | | | |
| G Platform | 4.0% | 3,051 | 2,929 |
| FreedomLine | 4.0% | 6,877 | 6,602 |
| Weighted average | 4.0% | 4,299 | 4,127 |

Notes:
[1]  Eaton operating profit based on NAFTA HD Consolidated P&L.  ZFM operating profit based on DeRamus Report p. 46 at ¶ 110.
[2]  Equals observed gross price based on Eaton and Meritor transaction data.

000547

TABLE 8
COMPARISON OF EATON'S AND ZFM'S AVERAGE VARIABLE COST
(FY 2001-2005)

| Product | Average Variable Cost ($ per unit) |
|---|---|
| Eaton [1] | |
| Manual 9 and 10 | 1,953 |
| AutoShift | 3,363 |
| UltraShift | 3,510 |
| ZFM [2] | |
| G Platform | 2,416 |
| FreedomLine | 4,004 |

Notes:
[1]  Based on manufacturing costs plus distribution expenses shown in Eaton's NAFTA HD Consolidated P&L.
Variable cost = [(Standard Costs + Total Variances + Distribution Exp) / Total Sales] x Eaton's average price.
[2]  Based on DeRamus Report Tables 5 and 6.

000548

TABLE 9
RESULTS OF ECONOMETRIC MODEL

No. of Observations:      143
$F_{(11, 131)}$:               210.39
R-Squared:               0.9619

| Variable | Coefficient | Coefficient When Interacted with Conduct Variable |
|---|---|---|
| Lagged Log-Odds Ratio | 0.667 <br> (0.000) | 0.224 <br> (0.083) |
| Total ZFM and Eaton Linehaul Transmissions | 0.133 <br> (0.072) | 0.167 <br> (0.326) |
| Consumer Confidence | -0.007 <br> (0.060) | 0.002 <br> (0.731) |
| Oil Price | -0.022 <br> (0.025) | 0.002 <br> (0.890) |
| Interest Rate | 0.108 <br> (0.125) | 0.006 <br> (0.955) |
| Constant | 0.135 <br> (0.714) | -0.160 <br> (0.700) |

Notes:
P-values in parentheses.
Conduct variable equals zero before July 2000 and 1 afterwards.

56

TABLE 10

ZF MERITOR'S INCREMENTAL REVENUE BASED ON ECONOMETRIC ESTIMATE OF ZF MERITOR'S BUT-FOR SHARES

| Line | Incremental revenue | FY 2000 (since July) | FY 2001 | FY 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | FY 2009 (through February) | Total 2000 - 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **But-for Shares from Econometric Model** | | | | | | | | | | | |
| 1 | ZFM share of all ZFM and Eaton linehaul transmissions | 19.8% | 15.6% | 22.3% | 16.6% | 12.5% | 6.5% | 3.6% | 3.6% | 3.6% | 3.6% | NA |
| 2 | Ratio of automated to manual transmissions in SBP | 0.0 | 0.2 | 0.4 | 0.8 | 0.8 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | NA |
| 3 | Share of ZF Meritor manual transmissions | 19.8% | 13.3% | 15.7% | 9.3% | 6.9% | 3.3% | 1.8% | 1.8% | 1.8% | 1.8% | NA |
| 4 | Share of ZF Meritor FreedomLine transmissions | 0.0% | 2.3% | 6.6% | 7.3% | 5.6% | 3.2% | 1.8% | 1.8% | 1.8% | 1.8% | NA |
| | **Manual Transmissions (G Platform)** | | | | | | | | | | | |
| 5 | ZF Meritor's forecasted share (L. 3) | 19.8% | 13.3% | 15.7% | 9.3% | 6.9% | 3.3% | 1.8% | 1.8% | 1.8% | 1.8% | NA |
| 6 | Actual total number of ZFM and Eaton linehaul transmissions | 23,188 | 68,762 | 77,993 | 80,037 | 119,681 | 161,589 | 173,922 | 101,014 | 68,573 | 28,572 | 903,330 |
| 7 | But-for units based on actual number of ZFM and Eaton linehaul transmissions (L. 5 * L. 6) | 4,581 | 9,126 | 12,238 | 7,409 | 8,246 | 5,311 | 3,148 | 1,835 | 1,246 | 519 | 53,659 |
| 8 | Actual units | 5,445 | 17,124 | 19,194 | 10,599 | 9,374 | 7,704 | 6,909 | 1,517 | - | - | 77,866 |
| 9 | Incremental units in but-for world (L. 7 - L. 8) | - | - | - | - | - | - | - | 318 | 1,246 | 519 | 2,083 |
| 10 | Average but-for price (in SBP) | $ 3,418 | $ 3,418 | $ 3,519 | $ 3,776 | $ 3,663 | $ 3,650 | $ 3,650 | $ 3,650 | $ 3,650 | $ 3,650 | NA |
| 11 | Incremental revenue in but-for world (L. 9 * L. 10) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,160,697 | $ 4,546,652 | $ 1,894,438 | $ 7,601,787 |
| | **Automated Transmissions (FreedomLine)** | | | | | | | | | | | |
| 12 | ZF Meritor's forecasted share (L. 4) | 0.0% | 2.3% | 6.6% | 7.3% | 5.6% | 3.2% | 1.8% | 1.8% | 1.8% | 1.8% | NA |
| 13 | Actual total number of ZFM and Eaton linehaul transmissions | 23,188 | 68,762 | 77,993 | 80,037 | 119,681 | 161,589 | 173,922 | 101,014 | 68,573 | 28,572 | 903,330 |
| 14 | But-for units based on actual number of ZFM and Eaton linehaul transmissions (L. 12 * L. 13) | - | 1,604 | 5,152 | 5,849 | 6,745 | 5,225 | 3,096 | 1,805 | 1,225 | 511 | 31,211 |
| 15 | Actual units | - | 62 | 513 | 3,511 | 1,443 | - | - | - | - | - | 5,529 |
| 16 | Incremental units in but-for world (L. 14 - L. 15) | - | 1,542 | 4,639 | 2,338 | 5,302 | 5,225 | 3,096 | 1,805 | 1,225 | 511 | 25,682 |
| 17 | Average but-for price (in SBP) | NA | $ 4,687 | $ 5,135 | $ 4,942 | $ 4,927 | $ 4,920 | $ 4,920 | $ 4,920 | $ 4,920 | $ 4,920 | NA |
| 18 | Incremental revenue in but-for world (L. 16 * L. 17) | $ - | $ 7,225,798 | $ 23,822,748 | $ 11,552,073 | $ 26,122,461 | $ 25,705,541 | $ 15,233,998 | $ 8,880,806 | $ 6,028,660 | $ 2,511,942 | $ 127,084,026 |
| 15 | **Total incremental revenue in but-for world (L. 11 + L. 18)** | $ - | $ 7,225,798 | $ 23,822,748 | $ 11,552,073 | $ 26,122,461 | $ 25,705,541 | $ 15,233,998 | $ 10,041,503 | $ 10,575,312 | $ 4,406,380 | $ 134,685,814 |

57

000550

TABLE 10
ZF MERITOR'S INCREMENTAL COSTS BASED ON ECONOMETRIC ESTIMATE OF ZF MERITOR'S BUT-FOR SHARES

| Line | Incremental cost | FY 2000 (since July) | FY 2001 | FY 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | FY 2009 (through February) | Total 2000 - 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Manual Transmissions (G Platform) | | | | | | | | | | | |
| 1 | Manufacturing cost (standard cost + variances) | NA | $ 54,295,000 | $ 56,193,000 | $ 48,269,000 | $ 66,881,000 | $ 73,256,000 | $ 73,256,000 | $ 73,256,000 | $ 73,256,000 | $ 30,523,333 | $ 549,185,333 |
| 2 | Burden (including depreciation) | NA | $ 14,993,000 | $ 14,150,000 | $ 11,460,000 | $ 15,242,000 | $ 16,220,000 | $ 16,220,000 | $ 16,220,000 | $ 16,220,000 | $ 6,758,333 | $ 127,483,333 |
| 3 | Percentage of burden that is fixed | NA | 70% | 88% | 87% | 76% | 78% | 78% | 78% | 78% | 78% | NA |
| 4 | Fixed burden (L. 2 * L. 3) | NA | $ 10,566,477 | $ 12,501,833 | $ 10,005,697 | $ 11,658,716 | $ 12,708,807 | $ 12,708,807 | $ 12,708,807 | $ 12,708,807 | $ 5,295,336 | $ 100,863,286 |
| 5 | of which Depreciation | NA | $ 3,214,177 | $ 4,715,592 | $ 4,436,199 | $ 3,912,790 | $ 2,571,526 | $ 2,571,526 | $ 2,571,526 | $ 2,571,526 | $ 1,071,469 | $ 27,636,332 |
| 6 | Variable cost (L. 1 - L. 4) | NA | $ 43,728,523 | $ 43,691,167 | $ 38,263,303 | $ 55,222,284 | $ 60,547,193 | $ 60,547,193 | $ 60,547,193 | $ 60,547,193 | $ 25,227,997 | $ 448,322,047 |
| 7 | Forecasted units in SBP | NA | 19,348 | 19,001 | 15,202 | 22,008 | 24,399 | 24,399 | 24,399 | 24,399 | 10,166 | 183,321 |
| 8 | Forecasted per unit variable cost (L. 6 / L. 7) | $ 2,260 | $ 2,260 | $ 2,299 | $ 2,517 | $ 2,509 | $ 2,482 | $ 2,482 | $ 2,482 | $ 2,482 | $ 2,482 | $ 2,446 |
| 9 | Incremental units (From L. 8 in Table 1) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 318 | $ 1,246 | $ 519 | 2,083 |
| 10 | Incremental variable cost (L. 8 * L. 9) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 789,141 | $ 3,091,202 | $ 1,288,001 | $ 5,168,344 |
| | Automated Transmissions (FreedomLine) | | | | | | | | | | | |
| 11 | Manufacturing cost (standard cost + variances) | NA | $ 18,829,000 | $ 36,936,000 | $ 51,557,000 | $ 75,611,000 | $ 100,849,000 | $ 100,849,000 | $ 100,849,000 | $ 100,849,000 | $ 42,020,417 | $ 628,349,417 |
| 12 | Burden (including depreciation) | NA | $ 855,000 | $ 4,327,000 | $ 5,558,000 | $ 6,959,000 | $ 9,344,000 | $ 9,344,000 | $ 9,344,000 | $ 9,344,000 | $ 3,893,333 | $ 58,968,333 |
| 13 | Percentage of burden that is fixed | NA | 70% | 88% | 87% | 76% | 78% | 78% | 78% | 78% | 78% | NA |
| 14 | Fixed burden (L. 12 * L.13) | NA | $ 602,570 | $ 3,822,999 | $ 4,852,676 | $ 5,322,989 | $ 7,321,276 | $ 7,321,276 | $ 7,321,276 | $ 7,321,276 | $ 3,050,532 | $ 46,936,868 |
| 15 | of which Depreciation | NA | $ 564,823 | $ 1,985,408 | $ 3,501,801 | $ 3,200,210 | $ 2,529,474 | $ 2,529,474 | $ 2,529,474 | $ 2,529,474 | $ 1,053,947 | $ 20,424,085 |
| 16 | Variable cost (L. 11 - L. 14) | NA | $ 18,226,430 | $ 33,113,001 | $ 46,704,324 | $ 70,288,011 | $ 93,527,724 | $ 93,527,724 | $ 93,527,724 | $ 93,527,724 | $ 38,969,885 | $ 581,412,549 |
| 17 | Forecasted units in SBP | NA | 3,400 | 8,000 | 12,000 | 18,000 | 24,000 | 24,000 | 24,000 | 24,000 | 10,000 | 147,400 |
| 18 | Forecasted per unit variable cost (L. 16 / L. 17) | $ 5,361 | $ 5,361 | $ 4,139 | $ 3,892 | $ 3,905 | $ 3,897 | $ 3,897 | $ 3,897 | $ 3,897 | $ 3,897 | $ 3,944 |
| 19 | Incremental units (From L. 18 in Table 1) | - | 1,542 | 4,639 | 2,338 | 5,302 | 5,225 | 3,096 | 1,805 | 1,225 | 511 | 25,682 |
| 20 | Incremental variable cost | $ - | $ 8,264,857 | $ 19,203,065 | $ 9,098,343 | $ 20,702,166 | $ 20,360,092 | $ 12,066,099 | $ 7,034,049 | $ 4,775,004 | $ 1,989,585 | $ 103,493,260 |
| 21 | **Total incremental variable cost** | $ - | $ 8,264,857 | $ 19,203,065 | $ 9,098,343 | $ 20,702,166 | $ 20,360,092 | $ 12,066,099 | $ 7,823,190 | $ 7,866,207 | $ 3,277,586 | $ 108,661,605 |

58

000551

TABLE 10

ZF MERITOR'S INCREMENTAL PROFIT BASED ON ECONOMETRIC ESTIMATE OF ZF MERITOR'S BUT-FOR SHARES

| Line | Incremental gross profit | FY 2000 (since July) | FY 2001 | FY 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | FY 2009 (through February) | Total 2000 - 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Incremental profits in current dollars | | | | | | | | | | | |
| 1 | Incremental revenue | $ - | $ 7,225,798 | $ 23,822,748 | $ 11,552,073 | $ 26,122,461 | $ 25,705,541 | $ 15,233,998 | $ 10,041,503 | $ 10,575,312 | $ 4,406,380 | $ 134,685,814 |
| 2 | Incremental variable cost | $ - | $ 8,264,857 | $ 19,203,065 | $ 9,098,343 | $ 20,702,166 | $ 20,360,092 | $ 12,066,099 | $ 7,823,190 | $ 7,866,207 | $ 3,277,586 | $ 108,661,605 |
| 3 | Incremental gross profit in current dollars (L. 1 - L. 2) | $ - | $ - | $ 4,619,684 | $ 2,453,730 | $ 5,420,295 | $ 5,345,449 | $ 3,167,899 | $ 2,218,313 | $ 2,709,105 | $ 1,128,794 | $ 27,063,268 |
| | Incremental profits in 2009 dollars | | | | | | | | | | | |
| 4 | Incremental profits in 2009 dollars (Risk free rate) | $ - | $ - | $ 6,477,880 | $ 3,119,960 | $ 6,750,064 | $ 6,358,688 | $ 3,677,230 | $ 2,456,237 | $ 2,837,890 | $ 1,135,858 | $ 32,813,808 |
| 5 | Incremental profits in 2009 dollars (ArvinMeritor cost of debt) | $ - | $ - | $ 7,545,675 | $ 3,667,675 | $ 7,617,496 | $ 7,298,911 | $ 4,247,036 | $ 2,699,468 | $ 2,943,183 | $ 1,145,038 | $ 37,164,483 |

000552

FIGURE 1
MERITOR'S POTENTIAL AND ACTUAL LINEHAUL TRANSMISSION BUSINESS AT FREIGHTLINER



Sources: Penetration estimates reported in Dr. DeRamus' Report; rebate provisions in Eaton's LTAs.

60

**000553**



FIGURE 2
MERITOR'S POTENTIAL AND ACTUAL LINEHAUL TRANSMISSION BUSINESS AT PACCAR

Sources: Penetration estimates reported in Dr. DeRamus' Report; rebate provisions in Eaton's LTAs.

61

**000554**

FIGURE 3
MERITOR'S POTENTIAL AND ACTUAL LINEHAUL TRANSMISSION BUSINESS AT INTERNATIONAL



Sources: Penetration estimates reported in Dr. DeRamus' Report; rebate provisions in Eaton's LTAs.

000555

FIGURE 4
QUARTERLY TRANSMISSION COST INDEX



Sources: BLS Data, <http://www.bls.gov>; Eaton LTAs (EATON-00382048; EATON-00385583; EATON-01110890); EATON-00254694.

000556

FIGURE 5
AVERAGE PRICE OF AUTOSHIFT AT FREIGHTLINER



Sources: BLS Data, <http://www.bls.gov>; workpapers of Dr. DeRamus (*Fig 24-28 Eaton average price charts.xls*).

64



FIGURE 6
AVERAGE PRICE OF AUTOSHIFT AT INTERNATIONAL

Sources: BLS Data, <http://www.bls.gov>; workpapers of Dr. DeRamus (*Fig 24-28 Eaton average price charts.xls*).

65



Figure 7
Average Price of UltraShift at Freightliner

Sources: BLS Data, <http://www.bls.gov>; workpapers of Dr. DeRamus (*Fig 24-28 Eaton average price charts.xls*).

66

000559



FIGURE 8
AVERAGE PRICE OF ULTRASHIFT AT INTERNATIONAL

Sources: BLS Data, <http://www.bls.gov>; workpapers of Dr. DeRamus (*Fig 24-28 Eaton average price charts.xls*)
.

67

FIGURE 9
AVERAGE PRICE OF EATON LINEHAUL MANUAL TRANSMISSIONS AT INTERNATIONAL



Sources: BLS Data, <http://www.bls.gov>; workpapers of Dr. DeRamus (*Fig 24-28 Eaton average price charts.xls*)
.

000561



FIGURE 10
AVERAGE PRICE OF EATON MANUAL LINEHAUL TRANSMISSIONS: NAFTA
(INCLUDING DISCOUNTS AND COST ADJUSTMENTS)

Sources: Penetration estimates reported in Dr. DeRamus' Report; cost increase and rebate provisions in Eaton's LTAs; BLS Data, <http://ww.bls.gov>; Eaton transaction data.

000562



FIGURE 11
AVERAGE PRICE OF EATON AUTOMATED LINEHAUL TRANSMISSIONS: NAFTA
(INCLUDING DISCOUNTS AND COST ADJUSTMENTS)

Sources: Penetration estimates reported in Dr. DeRamus' Report; cost increase and rebate provisions in Eaton's LTAs; BLS Data, <http://ww.bls.gov>; Eaton transaction data.

70

**000563**



FIGURE 12
AVERAGE PRICE OF EATON VOCATIONAL TRANSMISSIONS: NAFTA
(INCLUDING DISCOUNTS AND COST ADJUSTMENTS)

Sources: Penetration estimates reported in Dr. DeRamus' Report; cost increase and rebate provisions in Eaton's LTAs; BLS Data, <http://ww.bls.gov>; Eaton transaction data.

000564



FIGURE 13
ZF MERITOR BUT-FOR SHARE HOLDING INTEREST RATE CONSTANT
BEGINNING IN AUGUST OF 2006

Sources: workpapers of Dr. DeRamus (*Data.dta*; *smearing butfor.xls*).

**000565**

APPENDIX ONE

CURRICULUM VITAE OF DAVID S. SIBLEY

AND LIST OF PRIOR TESTIMONY WITHIN THE PAST FOUR YEARS

000566

**DAVID S. SIBLEY**

Professor, Department of Economics
University of Texas at Austin
Austin, TX 78712
Phone: (512) 475-8545

**Education:**

1969   B. A. in Economics, Stanford University
1973   Ph.D. in Economics, Yale University

**Teaching Fields:**

Graduate and undergraduate courses in industrial organization, including topics covering antitrust and regulation.

**Research Fields:**

Vertical restrictions, including bundling and tying; vertical and horizontal mergers; public utility pricing and regulatory policy.

**Professional Experience:**

May 2003 – October 2004: Deputy Assistant Attorney General for Economic Analysis, U.S. Department of Justice, Washington, D.C.

March, 1992 – Present:  John Michael Stuart Centennial Professor of Economics, University of Texas at Austin.

August, 1991 – March, 1992:  Edward Everett Hale Centennial Professor of Economics, University of Texas at Austin.

September, 1983 – August, 1991:  Research Manager, Bell Communications Research, Morristown, NJ.  Head of Economics Research Group.

September 1981 – September 1983:  Member of Technical Staff, Bell Laboratories, Murray Hill, NJ.

September 1980 – September 1981:  Adviser to the Chairman of the Civil Aeronautics Board.

January 1980 – September 1980:  Consultant, Civil Aeronautics Board, Washington, D.C.

000567

September 1978 – January 1980:  Senior Staff Economist, Council of Economic Advisers, Executive Office of the President, Washington, D.C.

October 1973 – September 1978:  Member of Technical Staff, Bell Laboratories, Holmdel, NJ.

**Teaching:**

September 1991 – Present:  Introductory Microeconomics, undergraduate and graduate Industrial Organization.

Fall 1989:  Visiting Lecturer, Woodrow Wilson School of Public and International Affairs, Princeton University.  Graduate course in regulation and public choice.

September 1983 – December 1983:  Adjunct Lecturer in Economics, University of Pennsylvania. Graduate course on regulation.

**Publications:**

**A.  Journal Articles:**

"A Note on the Concavity of the Mean-Variance Problem,"  *Review of Economic Studies*, July 1975.

"Permanent and Transitory Income Effects in a Model of Optimal Consumption with Wage Income Uncertainty," *Journal of Economic Theory*, August 1975.

"Optimal Foreign Borrowing with Export Revenue Uncertainty," (with J. L. McCabe), *International Economic Review*, October 1976.

"The Demand for Labor in a Dynamic Model of the Firm," *Journal of Economic Theory*, October 1977.

"Optimal Decisions with Estimation Risk," (with L. C. Rafsky, R. W. Klein and R. D. Willig),  *Econometrica*, November 1977.

"Regulatory Commission Behavior:  Myopic vs. Forward-Looking," (with E. E. Bailey), *Economic Inquiry*, June 1978.

"Public Utility Pricing Under Risk:  The Case of Self-Rationing," (with J. C. Panzar), *American Economic Review*, December 1978. To be reprinted in *The International Library of Critical Writings in Economics*, Mark Blaug (ed.), Edward Elgar Press.

"A Dynamic Model of the Firm with Stochastic Regulatory Review," (with V. S. Bawa), *International Economic Review*, October 1980.

000568

"Optimal Nonlinear Pricing for Multiproduct Monopolies," (with L. J. Mirman), *Bell Journal of Economics*, Autumn 1980. To be reprinted in *The International Library of Critical Writings in Economics*, Mark Blaug (ed.), Edward Elgar Press.

"Efficiency and Competition in the Airline Industry," (with D. R. Graham and D. P. Kaplan), *Bell Journal of Economics*, Spring 1983.

"Optimal Non-Uniform Pricing," (with M. B. Goldman and H. E. Leland), *Review of Economic Studies*, April 1984. To be reprinted in *The International Library of Critical Writings in Economics*, Mark Blaug (ed.), Edward Elgar Press.

"Reply to Lipman and Further Results," *International Economic Review*, June 1985.

"Public Utility Pricing Under Risk:  A Generalization," *Economics Letters*, June 1985.

"Optimal Consumption, the Interest Rate and Wage Uncertainty," (with D. Levhari), *Economics Letters*, 1986.

"Regulating Without Cost Information:  The Incremental Surplus Subsidy Scheme," (with D. M.  Sappington), *International Economic Review*, May 1989.

"Asymmetric Information, Incentives and Price Cap Regulation," *Rand Journal of Economics*, Fall 1989.

"Optimal Two Part Tariffs for Inputs," (with J. C. Panzar), *Journal of Public Economics*, November 1989.

"Regulating Without Cost Information:  Some Further Thoughts," (with D. M. Sappington), *International Economic Review*, November 1990.

"Compensation and Transfer Pricing in a Principal-Agent Model," (with D. E. Besanko), *International Economic Review*, February 1991.

"Thoughts on Nonlinear Pricing Under Price Cap Regulation," (with D. M. Sappington), *Rand Journal of Economics*, Spring 1992.

"Ex Ante vs. Post Pricing:  Optional Calling Plans vs. Tapered Tariffs," (with K. Clay and P. Srinagesh), Journal of Regulatory Economics, 1992.

"Optimal Non-linear Pricing With Regulatory Preference over Customer Types," (with W. W. Sharkey), *Journal of Public Economics*, February 1993.

"Regulatory Incentive Policies and Abuse," (with D. M. Sappington), *Journal of Regulatory Economics*, June 1993.

000569

"A Bertrand Model of Pricing and Entry," (with W. W. Sharkey), *Economics Letters*, 1993.

"Optional Two-Part Tariffs:  Toward More Effective Price Discounting," (with R. Rudkin) in *Public Utilities Fortnightly*, July 1, 1997.

"Multiproduct Nonlinear Prices with Multiple Taste Characteristics," (with P. Srinagesh), *Rand Journal of Economics*, Winter 1997.

"The Competitive Incentives of Vertically-Integrated Local Exchange Carriers: An Economic and Policy Analysis," (with D. L. Weisman), *Journal of Policy Analysis and Management*, Winter 1998.

"Having Your Cake – How to Preserve Universal-Service Cross Subsidies While Facilitating Competitive Entry," (with M. J. Doane and M. A. Williams), *Yale Journal on Regulation*, Summer 1999.

"Raising Rivals' Costs: The Entry of a Upstream Monopolist into Downstream Markets," (with D. L. Weisman), *Information, Economics and Policy* 10:451-470

"Selected Economic Analysis at the Antitrust Division: The Year in Review," (with K. Heyer),  *Review of Industrial Organizations* 23*: 95-119, 2003

"Pricing Access to a Monopoly Input," (with M. J. Doane, M. A. Williams, and S. Tsai), *Journal of Public Economic Theory,* Vol. 6., No. 4, 2004.

"An Antitrust Analysis of Bundled Loyalty Discounts," (with P. Greenlee and D. Reitman, *International Journal of Industrial Organization*, Vol. 26, No. 5, 2008.


**B.  Reports and Articles in Conference Volumes, and Other Publications**

"The Dynamics of Price Adjustment in Regulated Industries," (with E. E. Bailey), in *Proceedings of IEEE Conference on Systems Control*, 1974.

"Optimal Non-Uniform Pricing for Electricity:  Some Illustrative Examples," (with R. W. Koenker), in Sichel (ed.) *Public Utility Ratemaking in an Energy-Conscious Environment*, Praeger, 1979.

"Antitrust Policy in the Airline Industry," (with S. B. Jollie), Civil Aeronautics Board, October 1982. Transmitted by the CAB to Congress as part of proposed sunset legislation.

"Deregulation and the Economic Theory of Regulation," (with W. W. Sharkey), in *Proceedings of the Eleventh Annual Telecommunications Policy Research Conference*, 1983.

000570

"An Analysis of Tapered Access Charges for End Users," (with W. E. Taylor, D. P. Heyman and J. M. Lazorchak), published in *the Proceedings of the Eighteenth Annual Williamsburg Conference on Regulation*, H. Treeing (ed.), Michigan State, 1987.

*Report to the Governor*, The Task Force on Market-Based Pricing of Electricity.  Co-authored with D. M. Sappington, Appendix III.

"Optional Tariffs for Access in the FCC's Price Cap Proposal," (with D. P. Heyman and W. E. Taylor), in M. Einhorn (ed.), *Price Caps and Incentive Regulation in the Telecommunications Industry*, Kluwer, 1990.

"U.S. v. Microsoft: Were the Exclusionary Practices Anticompetitive " (with Michael J. Doane), Computer Industry Newsletter, American Bar Association, Spring 2000, Vol. 5., No. 1.

"Exclusionary Restrictions in U.S. vs. Microsoft," (with M.J. Doane and A. Nayyar), *UWLA Law Review*, 2001.

"U.S. v. Microsoft: Is the Proposed Settlement in the Public Interest?" (with Michael J. Doane), *Computer Industry Newsletter*, American Bar Association, Spring 2002, Vol. 7., No. 1.

"Raising Rivals' Costs: An Analysis of Barnes and Noble' s Proposed Acquisition of Ingram Book Company," 2002, Book Chapter in *Measuring Market Power*, Edited by Daniel Slottje, North Holland (with Michael J. Doane).

 "An Antitrust Analysis of Bundled Loyalty Discounts,"(with P. Greenlee and D. Reitman), Economic Analysis Group Discussion Paper No. 04-13, October 2004.

Currently editing a special issue of the *Antitrust Bulletin* on vertical restraints related to pricing.

**C.  Books:**

*The Theory of Public Utility Pricing*, (with S. J. Brown), Cambridge University Press, 1986.  Second printing 1986.  Third printing 1989.

Co-editor of *Telecommunications Demand Analysis*:  *An Integrated View*, North-Holland, 1989.

**Editorial Duties:**

Associate Editor of the *Journal of Regulatory Economics*.

Guest Editor of "Bundling Rebates: The Quest for an Antitrust Theory," *Antitrust Bulletin* 50(3), Fall 2005.

**Unpublished Manuscripts:**

"Equilibrium Exit from a Long-Term Contract," (with S.J. Wilkie), July, 2003. Submitted to *International Economic Review*.

"Cost Asymmetries, Mavericks and Coordinated Behavior," July 2004.  Submitted to *Economics Letters*.

**Other Professional Activities:**

Consultant to the Governor of New Jersey's Task Force on Market-Based Pricing of Electricity.

Referee for National Science Foundation and numerous professional journals.

Consulting for Bell operating companies on a variety of pricing and public policy issues.

Memberships:  American Economic Association; listed in *Who's Who in the East* 1990.

**Prior Reports and Expert Testimony Within Past Four Years:**

UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, TEXARKANA DIVISION
Cody Wheeler, et al. v. Pilgrims Pride, et al.
        Declaration (2008).

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF TENNESSEE
Suzanne C. Clarke and Conise P. Dillard, et al. v. Baptist Memorial Healthcare Corporation and Methodist Healthcare.
        Expert Report (2008) and deposition testimony (2008).

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK
Marcus Corporation, et al. v. American Express Company and American Express Travel Related Company.
        Expert Reports (2007 and 2008) and deposition testimony (2008).

UNITED STATES DISTRICT COURT, NORTHEN DISTRICT OF CALIFORNIA
Jensen Enterprises vs. Olcastle Precast, Inc. *et al.*
        Expert report and deposition testimony (2008).

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF TEXAS
Marissa Maderazo, et al. v. VHS San Antonio Partners, L.P., et al.
        Expert Report, expert sur-rebuttal report, and deposition testimony (2008).

000572

UNITED STATES DISTRICT COURT, NORTHEN DISTRICT OF CALIFORNIA
Jensen Enterprises vs. Olcastle Precast, Inc. *et al*.
> Expert report and deposition testimony (2007).

UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF PENNSYLVANIA
In re: OSB Litigation
> Declaration (2007).

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS
Funeral Consumers Alliance, Inc. et al. v. Service Corporation International, et. al
> Expert report and deposition testimony (2007).

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS
Pioneer Valley Casket Company, et al. v. Service Corporation International, et al
> Expert report and deposition testimony (2007).

UNITED STATES DISCTRICT COURT, EASTERN DISTRICT OF NORTH CAROLINA WESTERN DIVISION
Georgia Pacific v. Von Drehle Corporation
> Expert report and deposition testimony (2007).

UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, TEXARKANA DIVISION
Cody Wheeler, et al. v. Pilgrims Pride, et al.
> Surrebuttal declaration (2007).

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS
Funeral Consumers Alliance, Inc. et al. v. Service Corporation International, et. al
> Expert report, deposition, and hearing testimony (2006).

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS
Pioneer Valley Casket Company, et al. v. Service Corporation International, et al
> Expert report, deposition, and hearing testimony (2006).

UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS
Tessera, Inc. v. Micron Technology, Inc., Micron Semiconductor Products, Inc., Infineon Technologies AG, Infineon Technologies Richman, LP, Infineon Technologies North America Corp., and Qimonda AG
> Expert report and deposition testimony (2006).

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
Ortho Biotech Products L.P. v. Amgen, Inc. and Amgen USA Inc.
> Expert report, deposition, and trial testimony (2006).

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS

Dealer Computer Services, Inc., f/k/a Ford Dealer Computer Services, Inc. vs. Ford Motor Company, Case No. H-06-175
>Deposition and trial testimony (2006).

ILLINOIS COMMERCE COMMISSION
>Docket No. 05-0159.
>Prepared direct testimony and cross examination (2005).

U.S. FEDERAL ENERGY REGULATORY COMMISSION
Policy for Selective Discounting, Docket Nos. RM05-02-000 and RM 97-7-000
>Affidavit (with Michael J. Doane) (2005).

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
Financial & Security Products Association v. Diebold, Incorporated
>Expert report and deposition testimony (2005).

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF TEXAS
Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc., and Wake Forest University Health Sciences v. BlueSky Medical Corporation, Medela AG, Medela, Inc., and Patient Care Systems, Inc.
>Expert report and deposition testimony (2005).

NEVADA GAMING COMMISSION AND STATE GAMING CONTROL BOARD
Harrah's Entertainment, Inc.'s proposed merger with Caesars Entertainment, Inc.
>Expert report (with Michael J. Doane and Michael A. Williams) (2005).

NEVADA GAMING COMMISSION AND STATE GAMING CONTROL BOARD
MGM Mirage's proposed merger with Mandalay Resort Group
>Expert report (with Michael J. Doane and Michael A. Williams) (2004-2005).

000574

APPENDIX TWO

DOCUMENTS CONSIDERED

000575

## COURT DOCUMENTS

Complaint, *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation*, Civil Action No. 06-623-SLR (October 5, 2006).

Report of David W. DeRamus, *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation*, Civil Action No. 06-623-SLR (February 17, 2009), and supporting documentation.

Defendant Eaton Corporation's Motion to Dismiss Plaintiff's Complaint *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation*, Civil Action No. 06-623-SLR (November 22, 2006), and exhibits.

Plaintiffs ZF Meritor LLC and Meritor Transmission Corporation's Answering Brief in Opposition To Defendant's Motion to Dismiss, *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation*, Civil Action No. 06-623-SLR (December 11, 2006).

Eaton Corporation's Motion for Reargument, *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation*, Civil Action No. 06-623-SLR (June 29, 2007).

Plaintiffs ZF Meritor LLC and Meritor Transmission Corporation's Opposition to Defendant's Motion for Reargument, *ZF Meritor LLC and Meritor Transmission Company v. Eaton Corporation*, Civil Action No. 06-623-SLR (July 11, 2007).

Defendant Eaton Corporation's Answer to Plaintiff's Complaint, *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation*, Civil Action No. 06-623-SLR (February 28, 2008).

Deposition Transcript of Charles Allen (September 17, 2008).

Deposition Transcript of Charles Allen (February 4, 2009).

Deposition Transcript of Paul Barkus (October 28, 2008), and exhibits.

Deposition Transcript of Donald Blanche (February 3, 2009).

Deposition Transcript of Christian Benner (December 5, 2008), and exhibits.

Deposition Transcript of John Buck (January 6, 2009), and exhibits.

Deposition Transcript of Edward Carroll (November 14, 2008).

Deposition Transcript of Kurt Burmeister (October 30, 2008).

Deposition Transcript of Michael Colaccino (December 17, 2008), and exhibits.

Deposition Transcript of Kenneth Davis (October 23, 2008), and exhibits.

Deposition Transcript of Richard Decaire (September 30, 2008), and exhibits.

000576

Deposition Transcript of Dale Delmege (January 4, 2009).

Deposition Transcript of Michael Elwell (October 29, 2008), and exhibits.

Deposition Transcript of Thomas Floyd (October 20, 2008).

Deposition Transcript of William Fouchs (December 11, 2008), and exhibits.

Deposition Transcript of Thomas A. Gosnell (January 16, 2009).

Deposition Transcript of Thomas Grimm (January 9, 2009), and exhibits.

Deposition Transcript of Lee Daniel Hafer (November 6, 2008).

Deposition Transcript of Robert S. Harrison (September 24, 2008).

Deposition Transcript of Michael Hayes (October 30, 2008).

Deposition Transcript of John Hinesly (October 10, 2008), and exhibits.

Deposition Transcript of Ricardo R. Hoffman (November 19, 2008).

Deposition Transcript of John J. Hyatt (December 19, 2008), and exhibits.

Deposition Transcript of Christopher Jablonski (January 1, 2009).

Deposition Transcript of Dennis Allen Kline (December 16th, 2008), and exhibits.

Deposition Transcript of Mark Kollasch (November 24, 2008), and exhibits.

Deposition Transcript of Christopher Konkel (November 21, 2008), and exhibits.

Deposition Transcript of Mark Lampert (December 10, 2008).

Deposition Transcript of Antonio Lopes (January 12, 2009).

Deposition Transcript of David Louya (January 13, 2009).

Deposition Transcript of Thomas Lundahl (October 21, 2008), and exhibits.

Deposition Transcript of Richard Martello (January 9, 2009), and exhibits.

Deposition Transcript of Steven McKeeby (October 22, 2008), and exhibits.

Deposition Transcript of Bruce McLendon (September 26, 2008), and exhibits.

Deposition Transcript of David Naegele (September 17, 2008), and exhibits.

Deposition Transcript of Giap "George" Nguyen (January 28, 2009), and exhibits.

000577

Deposition Transcript of James Pohl (November 26, 2008), and exhibits.

Deposition Transcript of Denise Reeves (November 11, 2008).

Deposition Transcript of David Renz (January 13, 2009).

Deposition Transcript of Michael Ruple (December 9, 2008), and exhibits.

Deposition Transcript of James Sahli (December 3, 2008), and exhibits.

Deposition Transcript of Kenneth Samples (October 28, 2008), and exhibits.

Deposition Transcript of Gregory Sharp (December 11, 2008), and exhibits.

Deposition Transcript of William L. Showen (September 23, 2008).

Deposition Transcript of Dwight Dennis Simpson (October 7, 2008), and exhibits.

Deposition Transcript of John Spanke (October 14, 2008), and exhibits.

Deposition Transcript of Matthew Sturdy (December 9, 2008).

Deposition Transcript of James Sweetnam (January 16, 2009), and exhibits.

Deposition Transcript of Adriana Swartzendruber (November 5, 2008), and exhibits.

Deposition Transcript of Kurt Wells Swisher (November 4, 2008), and exhibits.

Deposition Transcript of Terry L. Tosie (December 23, 2008).

Deposition Transcript of Elizabeth Woodhull (October 3, 2008), and exhibits.

Exhibit 5 to the Deposition of Kenneth Santschi (December 12, 2008).


**ACADEMIC ARTICLES**

Green, William, (1993), ECONOMETRIC ANALYSIS, 2nd Edition, MacMillian Publishing.

Greenlee, Patrick, D. Reitman, and D. Sibley, "An Antitrust Analysis of Bundled Loyalty Discounts," *International Journal of Industrial Organization*, Vol. 26, No. 5, 2008.


**ELECTRONIC DOCUMENTS**

Build.mdb
Class 8 Penetration data 1992-2008.xls
Class 8 Penetration data 1992-2006.xls
Cognos Data.xls

EATON-00254694.xls
Eaton CE data_all.xls
Eaton Q P&L.xls
FY1996 Unit Sales.xls
FY1997 Unit Sales.xls
FY1998 Unit Sales.xls
FY1999 Unit Sales.xls
FY2000 Unit Sales.xls
FY2001 Unit Sales.xls
FY2002 Unit Sales.xls
FY2003 Unit Sales.xls
FY2004 Unit Sales.xls
FY2005 Unit Sales.xls
FY2006 Unit Sales (Jul thru Sept).xls
FY2006 Unit Sales (thru Jun).xls
FY2007 Unit Sales (full yr).xls
FY 2008 Mexico Pen Rept YEAR END 11-12-08.xls
FY 2008 US and Canada Pen Rept YEAR END (rev) 13th of Nov .xls
Mack transmission quantity.xls
Nov 2008  fy09 NAFTA Pen Rept.xls
Quantity Data.xls
Sales (Dollars) Data.xls
Sep FY06 NAFTA Prod Pen Rept.xls
Sep FY07 NAFTA Truck & Trailer Penetrations.xls

**COMPANY AND INDUSTRY WEB PAGES**

http://finance.yahoo.com
http://findarticles.com
http://fleetowner.com
http://refrigeratedtrans.com
http://trailer-bodybuilders.com
http://www.allisontransmission.com
http://www.arvinmeritor.com
http://www.automotive.com
http://www.automotive-fleet.com
http://www.constructionequipment.com
http://www.daf.com
http://www.daimler.com
 http://www.dina.com.mx
http://www.eaton.com
http://www.etrucker.com
http://www.fleet-central.com
http://www.freightlinertrucks.com
http://www.hino-global.com
http://www.kenworth.com

000579

http://www.macktrucks.com
http://www.man.eu
http://www.navistar.com
http://www.paccar.com
http://www.peterbilt.com
http://www.proquest.com
http://www.renault-trucks.com
http://www.roadstar.online.com
http://www.volkswagenag.com
http://www.volvo.com

## COMPANY DOCUMENTS

A.      *Arvin Meritor*


Charles Allen, "Issues and Trends" (2001)

B.      *Eaton*


"Eaton's Major Technological Innovations"

C.      *International Truck and Engine*


"Eaton "Original" Proposal Analysis"

"Eaton HD Transmission Comparison" (February 14, 2003).

"EATON Internal Proposal Study"

"Eaton Penetration Matrix" (December 13, 2005).

"Eaton Penetration Matrix" (December 7, 2005).

"Eaton Penetration Summary" (October 21, 2003).

"Eaton Proposed Growth Targets Vs ITE '06 Actual YTD Performance" (September 26, 2006).

"Eaton/International Agreement Expectations" (October 4, 2005).

"EATON/International CSA Open Issues" (November 9, 2005, updated November 22, 2005).

"Heavy Duty Automated Transmission Activity" (June 4, 2003).

"International / 2002 Penetration" (March 11, 2002).

000580

"International / Eaton 2004 Penetration Analysis – FINAL"

"International / Eaton 2004 Penetration Analysis – OCTOBER (FISCAL YEAR FINAL)"

"International / Eaton 2004 Penetration Analysis"

"International / Eaton 2006 Penetration Analysis – FISCAL YEAR FINAL"

"International Truck & Engine Counter Proposal" (November 1, 2005).

"Manual Transmissions: Summary Recommendations"

"Penetration Tracking Options"

"Price Book Date" (October 1, 2002).

"Supply Manager Questions: Supplier – Eaton Corporation, Supply Manager – TBD/Barkus, Completed By – Barkus"

"Transmission Stategy" (April 10, 2007).

"Transmission Strategy / Allison /Eaton LTA(s)" (February 1, 2006).

"Two In a Box Activity: Powertrain, Steering & Suspension"

Email from Etienne Van Niekerk to Debbie J. Shust, Nicholas P. Matich, "RE: Exclude Maintenance Customer portion" (October 1, 2004).

Email from Jordan H. Feiger to John F. Ringlein, and Jordan H. Feiger, "Re: Meritor Transmission List Price Increase" (September 27, 2002).

Email from Karen S. Kohrman to Karen S. Kohrman, Debbie J. Shust, Douglas B. Taylor, John Wadden, and Ken Bultemeir Jr., "RE: FreedomLine" (March 20, 2006).

Email from Ken Bultemeir Jr. to Debbie J. Shust, "RE: Eaton negotiations" (November 2, 2005).

Email from Mark L. Belisle to Debbie J. Shust, Robert F. Walsh, and Tom Abbott, "RE: ZF and ArvinMeritor Update on Eaton Claim" (March 21, 2005).

Email from Paul D. Barkus to Etienne Van Niekerk, Debbie J. Shust, Gaylynn Skelnik, and Robert F. Walsh, "FW: Update Letter Regarding Future FreedomLine Availability" (March 21, 2005).

Email from Paul D. Barkus to Etienne Van Niekerk, Mark Meegan, Mike Elwell, Gaylynn Skelnik, and Curtis Baylor, "FreedomLine Price Protection" (February 5, 2004).

Email from Paul D. Barkus to John F. Fay, "RE: UltraShift in 9900" (January 30, 2006).

Email from Paul D. Barkus to Ken Bultemeir Jr., RE: UltraShift in 9900" (January 26, 2006).

000581

Email from Paul D. Barkus to Steven McKeeby, "Supply Agreement Penetration Commitments" (December 12, 2005).

Email from Paul D. Barkus to Steven McKeeby and Christ Konkel, "FW: Eaton/International Agreement" (January 19, 2006).

Email from Scott A. Brady to Paul D. Barkus, "RE: Lightning $98.50 Price Reduction" (July 24, 2003).

Email from Thomas D. Baughmen to Stephan P. Gilligan, Ann B. Hennigan, Ravi Rawat, Debbie J. Shust, and Michael D. House, "FW: Eaton Supply Agreement" (October 24, 2006,).

Letter from Dennis A. Kline and Rolf Lutz to Mark Meegan, "Update – ZFM Joint Venture Dissolution" (February 6, 2004).

Letter from Dennis A. Kline and Rolf Lutz to Tom Akers (March 3, 2005).

Letter from Dennis A. Kline and Rolf Lutz to Tom Akers (March 18, 2005).

Letter from Paul Barkus to Mark Meegan: "Eaton Agreement – Growth Rebate & Phase-Out" (October 29, 2003).


C.     PACCAR


000043 - 000048

000092 - 000118

000122 - 000134

000137 - 000144

000145 - 000149

000168 - 000184

000188 - 000191

000201 - 000204

000214 - 000217

000219 - 000230

000245 - 000284

000295 - 000300

000610 - 000619

000654 - 000680

000777 - 000778

000786 - 000787

000788 - 000826

000840 - 000842

000844 - 000845

000850

001798 - 001799

**BATES NUMBERED DOCUMENTS**

ARM012524 - 012539

ARM012700 - 012701

ARM012797 - 012807

ARM013110 - 013149

ARM013155 - 013157

ARM013162 - 013167

ARM013187 - 013195

ARM013288

ARM013347

ARM017673 - 017807

ARM017888 - 018031

ARM018090 - 018162

ARMFTL000558 - 000560

ARMFTL002713

ARMFTL002738

ARMFTL006790

ARMFTL006792 - 006793

EAT00101056 - 00101061

EAT00101065 - 00101066

EAT00103263 - 00103264

EAT00103307 - 00103309

EAT00103475 - 00103476

EAT00103561 - 00103562

EAT00103605 - 00103607

000583

EAT00103620 - 00103621

EAT00103766 - 00103767

EAT00122520

EATON-00000422 - 00000423

EATON-00010557 - 00010562

EATON-00013967

EATON-00020408 - 00020409

EATON-00020700 - 00020701

EATON-00020752 - 00020753

EATON-00020762 - 00020860

EATON-00021007

EATON-00021947 - 00021948

EATON-00022283 - 00022287

EATON-00023286 - 00023294

EATON-00023375 - 00023376

EATON-00023414 - 00023416

EATON-00023445 - 00023447

EATON-00023520 - 00023523

EATON-00023633 - 00023635

EATON-00023658 - 00023666

EATON-00023691 - 00023694

EATON-00023771

EATON-00024773 - 00024775

EATON-00024812 - 00024815

EATON-00024849

EATON-00025643

EATON-00026430

EATON-00027110 - 00027113

EATON-00027127 - 00027133

EATON-00028403 - 00028407

EATON-00029198 - 00029203

EATON-00029223 - 00029228

EATON-00029240 - 00029242

000584

EATON-00029306

EATON-00029321

EATON-00029481 - 00029490

EATON-00032732 - 00032735

EATON-00054793 - 00054794

EATON-00058710

EATON-00061829 - 00061830

EATON-00061833 - 00061834

EATON-00061850 - 00061851

EATON-00061863

EATON-00061870 - 00061871

EATON-00061877 - 00061880

EATON-00063216 - 00063217

EATON-00063492

EATON-00067127 - 00067131

EATON-00067142 - 00067143

EATON-00067162

EATON-00076695 - 00076754

EATON-00076769

EATON-00077029 - 00077038

EATON-00077049 - 00077057

EATON-00077223 - 00077224

EATON-00077276 - 00077277

EATON-00077674

EATON-00079521 - 00079523

EATON-00082309 - 00082310

EATON-00082450 - 00082451

EATON-00082798 - 00082801

EATON-00085599 - 00085601

EATON-00086204 - 00086205

EATON-00086313 - 00086315

EATON-00086363

EATON-00086391 - 00086398

000585

EATON-00086409 - 00086420

EATON-00086481 - 00086489

EATON-00086684 - 00086689

EATON-00087240 - 00087242

EATON-00088456 - 00088509

EATON-00099012 - 00099013

EATON-00107904 - 00108676

EATON-00110549 - 00110556

EATON-00111933

EATON-00112405 - 00112408

EATON-00113385

EATON-00113517

EATON-00113680 - 00113690

EATON-00114301 - 00114302

EATON-00116945 - 00116949

EATON-00116959 - 00116994

EATON-00128630 - 00128672

EATON-00146665 - 00146691

EATON-00146693 - 00146734

EATON-00147598 - 00147599

EATON-00154057 - 00154064

EATON-00155345 - 00155364

EATON-00162595 - 00162608

EATON-00168706 - 00168716

EATON-00185549 - 00185553

EATON-00191904 - 00191907

EATON-00192590 - 00192596

EATON-00202072 - 00202073

EATON-00203606 - 00203613

EATON-00212775

EATON-00218104 - 00218147

EATON-00218910 - 00218912

EATON-00219488 - 00219489

000586

EATON-00219737 - 00219738
EATON-00280118 - 00280119
EATON-00281597
EATON-00294401 - 00294431
EATON-00326538 - 00326560
EATON-00326633 - 00326652
EATON-00347192 - 00347193
EATON-00348427 - 00348429
EATON-00377730 - 00377742
EATON-00380547 - 00380548
EATON-00380675 - 00380681
EATON-00380683
EATON-00380692
EATON-00380713 - 00380719
EATON-00380741
EATON-00380745 - 00380748
EATON-00380805 - 00380806
EATON-00380870 - 00380871
EATON-00380917 - 00380918
EATON-00380990 - 00380991
EATON-00381020 - 00381022
EATON-00381034 - 00381035
EATON-00381049 - 00381055
EATON-00381075
EATON-00381090 - 00381104
EATON-00381110 - 00381111
EATON-00381127 - 00381128
EATON-00381164 - 00381185
EATON-00381489
EATON-00381808 - 00381851
EATON-00381978 - 00381980
EATON-00382027 - 00382092
EATON-00382154

000587

EATON-00382182

EATON-00384597 - 00384601

EATON-00385193 - 00385195

EATON-00385227 - 00385233

EATON-00385281

EATON-00385569 - 00385604

EATON-00385721 - 00385735

EATON-00386931 - 00386932

EATON-00386960 - 00386961

EATON-00386964 - 00386975

EATON-00386995

EATON-00387107 - 00387109

EATON-00389411 - 00389599

EATON-00438079 - 00438090

EATON-00438105 - 00438122

EATON-00438185

EATON-00450993 - 00450999

EATON-00470585 - 00470587

EATON-00471674 - 00471676

EATON-00478469 - 00478471

EATON-00485886 - 00485889

EATON-00486177 - 00486179

EATON-00555296 - 00555297

EATON-00555430 - 00555431

EATON-00555514 - 00555515

EATON-00560659 - 00560660

EATON-00562190 - 00562193

EATON-00562245 - 00562249

EATON-00564453 - 00564456

EATON-00567020 - 00567045

EATON-00578245

EATON-00581249 - 00581251

EATON-00581483 - 00581484

EATON-00588233 - 00588255

EATON-00618267

EATON-00622275 - 00622276

EATON-00625742

EATON-00628702 - 00628703

EATON-00629276 - 00629280

EATON-00631387

EATON-00631615 - 00631621

EATON-00633685

EATON-00634903

EATON-00639313 - 00639315

EATON-00639493 - 00639496

EATON-00646434

EATON-00655592 - 00655593

EATON-00656162

EATON-00658877 - 00658878

EATON-00666060 - 00666061

EATON-00676703 - 00676731

EATON-00677437

EATON-00679315

EATON-00682033 - 00682039

EATON-00684071 - 00684073

EATON-00685867 - 00685868

EATON-00685916 - 00685917

EATON-00691654 - 00691679

EATON-00692346 - 00692353

EATON-00692986 - 00692914

EATON-00693170

EATON-00699560 - 00699562

EATON-00700928 - 00700930

EATON-00704553 - 00704564

EATON-00704645 - 00704646

EATON-00705545 - 00705557

000589

EATON-00706678

EATON-00707546 - 00707547

EATON-00708101 - 00708102

EATON-00709213 - 00709214

EATON-00710591 - 00710604

EATON-00710988 - 00710994

EATON-00711112 - 00711120

EATON-00713075

EATON-00713085 - 00713086

EATON-00713792 - 00713793

EATON-00714260 - 00714266

EATON-00766698 - 00766712

EATON-00775704 - 00775709

EATON-00912901 - 00912902

EATON-00920894

EATON-00922307

EATON-00930506 - 00930507

EATON-00969271 - 00969272

EATON-00969343 - 00969347

EATON-00969344

EATON-00970671 - 00970674

EATON-00970883 - 00970895

EATON-00971532 - 00971533

EATON-00971538

EATON-00971540

EATON-00971617 - 00971626

EATON-00976414 - 00976422

EATON-00977717 - 00977718

EATON-00986815

EATON-00999730 - 00999733

EATON-00999737 - 00999740

EATON-01000011 - 01000013

EATON-01000393 - 01000420

000590

EATON-01000427 - 01000430

EATON-01000519 - 01000523

EATON-01006219

EATON-01081904 - 01081908

EATON-01082630

EATON-01084489

EATON-01085178 - 01085186

EATON-01110777 - 01110800

EATON-01110863 - 01110946

EATON-01119541 - 01119586

EATON-01119712 - 01120856

EATON-01121655 - 01121678

EATON-01121758 - 01122301

EATON-01122933 - 01122935

EATON-01122945 - 01122956

EATON-01122995

EATON-01123004

EATON-01123785 - 01123808

EATON-01124619 - 01124632

EATON-01124844 - 01124850

EATON-01129837 - 01129841

EATON-01143987 - 01144014

EATON-01158987 - 01158995

EATON-01173231 - 01173233

EATON-01174848 - 01174851

EATON-01179764

EATON-01180865 - 01180867

EATON-01186996 - 01187000

EATON-01187319 - 01187323

EATON-01198518 - 01198560

EATON-01198805 - 01198806

EATON-01202295 - 01202315

EATON-01202350 - 01202351

000591

EATON-01202611 - 01202612

EATON-01202620 - 01202621

EATON-01202757 - 01202758

EATON-01208170

EATON-01208178

EATON-01208180 - 01208181

EATON-01217125

EATON-01217988 - 01217989

EATON-01218762 - 01218764

EATON-01222915 - 01222916

EATON-01222938 - 01222939

EATON-01232951

EATON-01235199 - 01235200

EATON-01235253

EATON-01293039

EATON-01335806

EATON-01352462 - 01352473

EATON-01352534 - 01352550

EATON-01367460 - 01367461

EATON-01367463

EATON-01367560 - 01367561

EATON-01374635 - 01374637

EATON-01375732

EATON-01377600

EATON-01378985

EATON-01381709 - 01381711

EATON-01381717 - 01381719

EATON-01381730 - 01381735

EATON-01385632 - 01385633

EATON-01397488 - 01397490

EATON-01397506 - 01397508

EATON-01400584 - 01400585

EATON-01405413 - 01405414

000592

EATON-01405417

EATON-01405703 - 01405704

EATON-01408524 - 01408526

EATON-01409343 - 01409345

EATON-01409500 - 01409503

EATON-01410862 - 01410863

EATON-01410873 - 01410874

EATON-01410988

EATON-01411065

EATON-01419441 - 01419445

EATON-01423035 - 01423036

EATON-01427423 - 01427424

EATON-01441419 - 01441434

ETNFTL006866 - 006868

ETNFTL011894 - 011896

ETNFTL011901 - 011902

ETNFTL011905 - 011906

ETNFTL012150 - 012152

ETNFTL012174 - 012175

ETNFTL012190 - 012191

ETNFTL013086 - 013087

ETNFTL047469 - 047470

FLINER00149911

FLINER00160898

FLINER00165548 - 00165549

FLINER00167907 - 00167908

FTL0077 - 0097

FTL0124

FTL0174 - 0176

FTL0222 - 0254

FTL0273 - 0278

FTL0340 - 0342

FTL0355 - 0360

000593

FTL0364

FTL0366

FTL0425

FTL0427

FTL0430

FTL0433 - 0434

FTL-FB0001

FTL-FB0027 - 0034

FTL-FB0041

FTL-FB0069 - 0071

FTL-FB0147 - 0173

ITE-000020 - 000023

ITE-000028 - 000033

ITE-000042 - 000044

ITE-000051

ITE-000053

ITE-000056

ITE-000058

ITE-000060 - 000063

ITE-000073

ITE-000076 - 000077

ITE-000083 - 000093

ITE-000096

ITE-000098 - 000104

ITE-000106 - 000136

ITE-000138 - 000140

ITE-000287 - 000288

ITE-000296 - 000299

ITE-000302 - 000306

ITE-000349 - 000350

ITE-000401 - 000404

ITE-000647

ITE-001129 - 001131

000594

ITE-001147

ITE-001266 - 001290

ITE-001337 - 001338

ITE-001350 - 001366

ITE-001421 - 001424

ITE-001465 - 001468

ITE-001584 - 001596

ITE-001672 - 001677

ITE-001698 - 001707

ITE-001743 - 001745

ITE-002157

ITE-002190

ITE-002207 - 002212

ITE-002219 - 002220

ITE-002300 - 002301

ITE-003837 - 003838

ITE-003875 - 003877

ITE-003911 - 003913

ITE-003967

ITE-004104 - 004108

VM 000084 - 000119

VM 000147 - 000161

VM 000201 - 000202

VM 000224 - 000250

VM 002238 - 009852

VM2_00002236 - 00002238

VM2_00002292

VM2_00021798

VM2_00022122 - 00022126

VM2_00022236 - 00022237

VM2_00022328 - 00022329

VM2_00022333 - 00022335

VM2_00024175 - 00024178

000595

VM2_00024316 - 00024317

VM2_00024354

VM2_00024392

VM2_00024404 - 00024405

VM2_00002523

VM2_00028519 - 00028523

VM2_00029342

VM2_00029388 - 00029391

VM2_00029523

VM2_00035700 - 00035702

VM2_00035816 - 00035822

VM2_00070758 - 00070763

ZFMA0000003 - 0000004

ZFMA0000095 - 0000103

ZFMA0000230 - 0000261

ZFMA0000340 - 0000355

ZFMA0000436 - 0000439

ZFMA0000444 - 0000452

ZFMA0000623 - 0000625

ZFMA0000703 - 0000765

ZFMA0000773 - 0000784

ZFMA0000794 - 0000812

ZFMA0000846 - 0000861

ZFMA0000869 - 0000877

ZFMA0001003 - 0001004

ZFMA0001444 - 0001463

ZFMA0001953 - 0001954

ZFMA0002359 - 0002363

ZFMA0002913 - 0002914

ZFMA0003023 - 0003024

ZFMA0003185 - 0003204

ZFMA0003238 - 0003239

ZFMA0003248

000596

ZFMA0003877 - 0003881
ZFMA0003928 - 0003929
ZFMA0004714 - 0004715
ZFMA0005072 - 0005083
ZFMA0006653 - 0006702
ZFMA0006993 - 0007001
ZFMA0009332 - 0009333
ZFMA0009530 - 0009569
ZFMA0014533 - 0014543
ZFMA0014891 - 0014914
ZFMA0015151 - 0015152
ZFMA0016037 - 0016043
ZFMA0016110 - 0016112
ZFMA0016409 - 0016410
ZFMA0016775 - 0016843
ZFMA0018903 - 0018904
ZFMA0019956 - 0020003
ZFMA0020533 - 0020535
ZFMA0020944 - 0020968
ZFMA0021579 - 0021628
ZFMA0022509 - 0022556
ZFMA0026875 - 0026877
ZFMA0027714 - 0027715
ZFMA0029669 - 0029686
ZFMA0033226 - 0033235
ZFMA0034144 - 0034151
ZFMA0034361 - 0034375
ZFMA0036332
ZFMA0038858 - 0038875
ZFMA0040451 - 0040454
ZFMA0040458 - 0040462
ZFMA0053726 - 0053727
ZFMA0053991 - 0053992

000597

ZFMA0054510 - 0054511

ZFMA0054514 - 0054515

ZFMA0067215 - 0067264

ZFMA0067317 - 0067323

ZFMA0067331 - 0067415

ZFMA0068420 - 0068442

ZFMA0069298 - 0069389

ZFMA0074508 - 0074514

ZFMA0082721 - 0082727

ZFMA0085487 - 0085489

ZFMA0087280

ZFMA0087538

ZFMA0087961 - 0087964

ZFMA0089492 - 0089494

ZFMA0089793 - 0089794

ZFMA0089983 - 0089987

ZFMA0090037

ZFMA0090075 - 0090077

ZFMA0090105 - 0090106

ZFMA0090955 - 0090957

ZFMA0091438 - 0091441

ZFMA0091505 - 0091508

ZFMA0091615 - 0091616

ZFMA0091779 - 0091780

ZFMA0093295

ZFMA0094217 - 0094218

ZFMA0094552 - 0094555

ZFMA0095312 - 0095315

ZFMA0095931 - 0095932

ZFMA0096022 - 0096034

ZFMA0096060

ZFMA0096203 - 0096205

ZFMA0097464 - 0097466

000598

ZFMA0097809 - 0097810

ZFMA0098486 - 0098488

ZFMA0098527 - 0098532

ZFMA0098533 - 0098536

ZFMA0098863 - 0098864

ZFMA0098867 - 0098868

ZFMA0098874 - 0098877

ZFMA0099098 - 0099101

ZFMA0099796 - 0099801

ZFMA0099890 - 0099905

ZFMA0110526 - 0110533

ZFMA0112480 - 0112484

ZFMA0112681 - 0112682

ZFMA0112687

ZFMA0112837 - 0112838

ZFMA0123680 - 0123681

ZFMA0129721 - 0129722

ZFMA0130582 - 0130594

ZFMA0131049 - 0131053

ZFMA0134260 - 0134261

ZFMA0134324 - 0134327

ZFMA0134329

ZFMA0134333 - 0134336

ZFMA0134341 - 0134344

ZFMA0134422 - 0134328

ZFMA0134489

ZFMA0135009 - 0135010

ZFMA0135087 - 0135088

ZFMA0135350 - 0135363

ZFMA0135541 - 0135554

ZFMA0135915 - 0135916

ZFMA0136114 - 0136128

ZFMA0138190 - 0138217

000599

ZFMA0138448 - 0138449

ZFMA0139754 - 0139777

ZFMA0140339 - 0140380

ZFMA0140670 - 0140688

ZFMA0141253 - 0141272

ZFMA0141290 - 0141309

ZFMA0141440 - 0141454

ZFMA0141504 - 0141517

ZFMA0141528 - 0141538

ZFMA0141601 - 0141614

ZFMA0141710 - 0141746

ZFMA0142432 - 0142434

ZFMA0142439 - 0142441

ZFMA0142618

ZFMA0142944

ZFMA0151836 - 0151837

ZFMA0152533 - 0152534

ZFMA0153115 - 0153122

ZFMA0153482 - 0153616

ZFMA0158650 - 0158651

ZFMA0158740 - 0158743

ZFMA0162769 - 0162774

ZFMA0164286 - 0164289

ZFMA0164328 - 0164329

ZFMA0165900 - 0165902

ZFMA0166855 - 0166856

ZFMA0170083 - 0170084

ZFMA0174022 - 0174024

ZFMA0174508

ZFMA0179030 - 0179031

ZFMA0181469 - 0181475

ZFMA0183093 - 0183094

ZFMA0183148 - 0183151

000600

ZFMA0184502 - 0184539

ZFMA0185257 - 0185258

ZFMA0185369

ZFMA0185923 - 0185928

ZFMA0186297 - 0186310

ZFMA0186327 - 0186328

ZFMA0187126 - 0187127

ZFMA0196261 - 0196285

ZFMA0196697 - 0196705

ZFMA0197466 - 0197493

ZFMA0198238 - 0198260

ZFMA0199602 - 0199604

ZFMA0200057 - 0200060

ZFMA0200112 - 0200116

ZFMA0200151 - 0200154

ZFMA0200172 - 0200180

ZFMA0200352 - 0200353

ZFMA0200447 - 0200448

ZFMA0200511 - 0200513

ZFMA0200524 - 0200526

ZFMA0200844 - 0200846

ZFMA0202522

ZFMA0208547 - 0208549

ZFMA0211786

ZFMA0212250

ZFMA0213049 - 0213053

ZFMA0214679 - 0214687

ZFMA0215211 - 0215215

ZFMA0215254 - 0215256

ZFMA0215267 - 0215271

ZFMA0215354 - 0215356

ZFMA0215606 - 0215612

ZFMA0216488 - 0216496

000601

ZFMA0217523 - 0217525
ZFMA0217574 - 0217581
ZFMA0218918 - 0218921
ZFMA0219001 - 0219003
ZFMA0219125 - 0219129
ZFMA0219687 - 0219690
ZFMA0220129
ZFMA0221355 - 0221356
ZFMA0222161 - 0222164
ZFMA0222175 - 0222179
ZFMA0224480 - 0224482
ZFMA0224492 - 0224498
ZFMA0228273 - 0228281
ZFMA0228851 - 0228857
ZFMA0229026 - 0229027
ZFMA0229075 - 0229080
ZFMA0229970
ZFMA0232015
ZFMA0232176 - 0232177
ZFMA0233588
ZFMA0234246 - 0234247
ZFMA0234273 - 0234276
ZFMA0236104 - 0236106
ZFMA0236721 - 0236726
ZFMA0236835 - 0236836
ZFMA0236842 - 0236843
ZFMA0236864
ZFMA0236986 - 0236989
ZFMA0237447 - 0237449
ZFMA0237505
ZFMA0237596 - 0237601
ZFMA0237667 - 0237673
ZFMA0237897

000602

ZFMA0238055 - 0238056

ZFMA0238095 - 0238096

ZFMA0238235 - 0238237

ZFMA0240806 - 0240807

ZFMA0240872 - 0240874

ZFMA0240891 - 0240902

ZFMA0241411 - 0241412

ZFMA0241419 - 0241420

ZFMA0249121 - 0249128

ZFMA0252295 - 0252298

ZFMA0255772 - 0255773

ZFMA0256037 - 0256038

ZFMA0257176

ZFMA0266938 - 0266940

ZFMA0271183 - 0271187

ZFMA0272694 - 0272695

ZFMA0273185

ZFMA0273256 - 0273257

ZFMA0273258 - 0273267

ZFMA0273271 - 0273272

ZFMA0273583 - 0273591

ZFMA0273663 - 0273664

ZFMA0285940 - 0285966

ZFMA0291024

ZFMA0292726 - 0292728

ZFMA0293315

ZFMA0295316 - 0295318

ZFMA0295361

ZFMA0295754

ZFMA0295766

ZFMA0296200 - 0296201

ZFMA0298710 - 0298721

ZFMA0299470

000603

ZFMA0303067

ZFMA0303094

ZFMA0303628 - 0303635

ZFMA0311024 - 0311025

ZFMA0311865 - 0311866

ZFMA0312081 - 0312085

ZFMA0315355

ZFMA0316685 - 0316686

ZFMA0317588 - 0317598

ZFMA0321401 - 0321402

ZFMA0321503

ZFMA0329577

ZFMA0333389 - 0333439

ZFMA0336448 - 0336462

ZFMA0340441

ZFMA0340864 - 0340865

ZFMA0343110 - 0343241

ZFMA0343454 - 0343458

ZFMA0343536 - 0343545

ZFMA0343734 - 0343740

ZFMA0345009 - 0345015

ZFMA0345131 - 0345137

ZFMA0345354 - 0345442

ZFMA0345856 - 0345868

ZFMA0348024 - 0348036

ZFMA0348166 - 0348173

ZFMA0348587 - 0348665

ZFMA0348897 - 0348910

ZFMA0348926 - 0348945

ZFMA0348947 - 0348955

ZFMA0349015 - 0349019

ZFMA0349062 - 0349068

ZFMA0349070 - 0349082

000604

ZFMA0355697 - 0355709

ZFMA0356426 - 0356536

ZFMA0358435 - 0358462

ZFMA0364135

ZFMA0364161

ZFMA0366287 - 0366346

ZFMA0368080 - 0368063

ZFMA0368676 - 0368702

ZFMA0368703 - 0368721

ZFMA0369299 - 0369319

ZFMA0369760 - 0369768

ZFMA0371183 - 0371187

ZFMA0371408 - 0371410

ZFMA0371511 - 0371517

ZFMA0373337

ZFMA0373511 - 0373513

ZFMA0373724

ZFMFD0001 - 0024

# EXHIBIT 9

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ZF Meritor LLC and Meritor Transmission Corporation | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| Eaton Corporation | ) |
| | ) |
| Defendant | ) |

Declaration of David W. DeRamus, Ph.D.

in Response to

Defendant's Memorandum of Law in Support of its Motion to Exclude Opinion Testimony
of Dr. David W. DeRamus

June 11, 2009

Confidential and lawyers only

A-302

Declaration of David W. DeRamus, Ph.D.

## 1. Scope of Declaration

(1)     My name is David W. DeRamus. My business address is 1300 Eye Street, NW, Suite 600E, Washington, DC, 20005. I have been asked by counsel for ZF Meritor LLC ("ZF Meritor") and Meritor Transmission Corporation ("Meritor," and with ZF Meritor, "ZFM" or "Plaintiffs") to respond to various allegations and arguments raised by Eaton Corporation ("Eaton" or "Defendant") in its May 11, 2009 motion to exclude my testimony in this matter.

## 2. Summary of Defendant's arguments

(2)     Counsel for Eaton raises the following primary arguments in support of its motion to exclude my testimony in its entirety:

- I have presented no accepted scientific test with which to establish the exclusionary effect of Eaton's conduct.

- Because I have not performed an "attribution test," I have no objective means of concluding that Eaton's conduct was anticompetitive.

- I have not disaggregated damages to account for the effect on ZFM of factors unrelated to Eaton's anticompetitive conduct.

- My damages analysis is based on an economically unsound assumption that ZFM would have raised prices in a "but for" world absent Eaton's anticompetitive conduct.

- My damages analysis is based on business projections that I have insufficiently analyzed in order to determine their reliability.

- My damages analysis is based on the unsupported assumption of a large untapped demand for automated mechanical transmissions that is assertedly contradicted by the facts.

- My analysis of lost enterprise value is inconsistently applied, "rigged," and contrary to an IRS Revenue Ruling.

---

A-303

000607

Declaration of David W. DeRamus, Ph.D.

## 3. My report relies on accepted scientific methods of analysis

(3)     While Eaton argues that my analysis should be excluded in its entirety, none of
        Eaton's criticism is applicable to my well-accepted approach to defining the relevant
        markets and to establishing that Eaton has monopoly power in the relevant markets.
        Establishing Eaton's monopoly power is a fundamental "building block" for an
        economic assessment of whether the conduct at issue is anticompetitive.

(4)     My analysis of harm to competition is consistent with the "rule of reason" approach
        adopted by economists[1] in assessing allegations of illegal monopolization.

(5)     As discussed in my testimony, there is a voluminous economic literature that
        discusses the conditions under which conduct such as Eaton's can be anticompetitive.
        Each of the conditions that economists (and the courts) have often identified as
        leading to anticompetitive harm is present here.  For example:

        ▪ Eaton is a monopolist;[2]

        ▪ Eaton's LTAs are long-term contracts;[3]

        ▪ they cover all of the available distribution channels;[4]

        ▪ their staggered terms restrict the share of the market for which another
          manufacturer of HD Transmissions can compete, even when the LTAs do expire;[5]

---

[1] See, e.g., William E. Kovacic and Carl Shapiro, "Antitrust policy: a century of economic and legal thinking," *Journal of Economic Perspectives* 14, (2000): pp. 43-60.

[2] See DeRamus Report, Section 6. Also see, for example, *Standard Fashion Co. v. Magrane-Houston Co.,* 258 U.S. 346 (1922), and *United Shoe Machinery Corp. v. United States,* 258 U.S. 346 (1922) for early Supreme Court decisions, and *United States v. Microsoft Corp.,*., 253 F.3d 34 (D.C. Cir.), *cert. denied,* 122 S. Ct. 350 (2001) and *Avery Dennison Corp. v. ACCO brands, Inc,* 2000-1 Trade Cas. (CCH) ¶ 72,882 (C.D. Cal. 2000), for more recent decisions.

[3] Note that, even in cases in which the contracts at issue are of short duration or can be terminated at will, what matters is whether such termination is practically feasible for the buyer. See, for example, the discussion of *3M v. Appleton Papers,* 35 F. Supp. 2d 1138 (D. Minn 1999), and *United States v. Dentsply,* 2001-1 Trade Cas.(CCH) ¶ 73,243 (D. Del. 2001)  in Jonathan Jacobson, "Exclusive Dealing, "Foreclosure," and Consumer Harm," 70 *Antitrust Law Journal,* 311, 327 (2002).

[4] See, e.g., *United States v. Dentsply.* Note that Eaton's LTAs cover a greater portion of the market than that covered by Dentsply's conduct (which was about 80%).

[5] See, e.g., Michael D. Whinston, *Lectures on Antitrust Economics,* MIT Press (2008): pp. 147-148, "To succeed in continuing exclusion, an incumbent needs to ensure that the number of free buyers is low at every point in time.

---

A-304

000608

Declaration of David W. DeRamus, Ph.D.

- 🔲 the LTAs require that the OEMs maintain or increase Eaton's HD Transmission penetration and exclude other producers of HD Transmissions as a condition of receiving certain prices, discounts, rebates, or other payments from Eaton;[6] and

- 🔲 Eaton structured the LTAs such that if the OEMs failed to achieve Eaton's HD Transmission penetration targets, the OEMs faced significant financial penalties across all of their HD Transmission purchases.[7]

(6)    Contrary to Eaton's assertion, I have provided in my report a number of different, widely accepted "testable hypotheses" – extensively discussed in the peer-reviewed economic literature – to assess whether Eaton's conduct is anticompetitive, including:

- 🔲 erecting insurmountable barriers to entry;[8]

- 🔲 raising rivals' cost;[9]

- 🔲 increasing prices to end customers;[10]

- 🔲 increasing prices to OEMs in the long-run;[11] and

- 🔲 preventing or limiting technological innovation.[12]

---

This will involve the incumbent staggering the expiration dates of his contracts if these are of limited duration."

[6] For an economic analysis of the anticompetitive effects of share-based rebates see, for example, A. Majumdar and Shaffer, G. (2009), "Market-Share Contracts with Asymmetric Information," *Journal of Economics & Management Strategy*, Vol. 18, Issue 2 (Summer), pp. 393-421. Examples of cases in which share-based rebates were found to be anticompetitive by the courts include *Avery Dennison Corp. v. ACCO brands, Inc*, 2000-1 Trade Cas. (CCH) ¶ 72,882 (C.D. Cal. 2000) and *LePage's Inc. v. 3M*, 277 F.3d 365 (3d Cir. 2002) (rejecting claim), *rehearing en banc granted, judgment vacated*, Nos. 00-1368, 00-1473 (3d Cir. Feb. 25, 2002).

[7]  The rebate programs in Eaton's LTAs provide that an OEM would lose its rebates on *all* the transmissions it purchases from Eaton if it fails to meet the share target. For an analysis of this type of share-based, all-units rebates see, for example Willard K. Tom, David A. Balto & Neil W. Averitt, *Anticompetitive Aspects of Market-Share Discounts and Other Incentives to Exclusive Dealing*, 67 Antitrust L.J. 615 (2000).

[8]  See DeRamus Report, Sections 6.3 and 6.5.

[9]  See DeRamus Report, Section 10.4.

[10]  See DeRamus Report, Section 10.9.

[11]  See DeRamus Report, Section 10.8.

[12]  See DeRamus Report, Section 10.3.

---

A-305

000609

Declaration of David W. DeRamus, Ph.D.

(7)     The analysis of barriers to entry has a long history in economics.[13]  It is also a basic
        component of the U.S. DOJ/FTC Horizontal Merger Guidelines and has featured
        prominently in many court decisions involving antitrust issues.  For example, in *U.S.
        v. Microsoft*, a central issue was the extent to which Microsoft was able to maintain its
        monopoly power in the relevant market by preventing threats to the "applications
        barrier to entry," *e.g.*, by foreclosing Netscape and other threats to its PC operating
        system monopoly.[14]  In my testimony, I not only analyze whether there are pre-
        existing barriers to entry in the relevant markets, but also whether Eaton's conduct at
        issue has had the effect of creating or reinforcing barriers to entry in the relevant
        markets.  Indeed, I conclude that not only has Eaton's conduct had this effect, but
        Eaton itself has explicitly recognized the barrier to entry – preventing entry by new
        competitors – that Eaton's conduct has created.[15]

(8)     Many of my conclusions are based on a well-established economic theory of
        competitive harm, known as "raising rival's costs," as discussed in my testimony.[16]
        As argued by Krattenmaker and Salop and summarized by Jacobson: "the raising
        rivals' costs approach, or RRC, posits that an exclusionary arrangement (such as
        exclusive dealing) can raise the market price of a product, and thereby harm
        consumers, if the exclusive arrangement (1) is imposed by a firm with actual or
        potential market power, (2) increases the costs of rivals (through foreclosure or
        otherwise) sufficiently to diminish their capability to constrain the firm's market
        power, and (3) thereby permits the firm to raise prices to customers in the relevant
        market."[17]  I have thoroughly analyzed the evidence and demonstrated that the three
        conditions above are satisfied in the case at hand.

---

[13] See, e.g., Joe S. Bain, *Barriers to New Competition*. Harvard University Press, 1956; William J. Baumol and Robert
     D. Willig, "Fixed Costs, Sunk Costs, Entry Barriers, and Sustainability of Monopoly", *Quarterly Journal of
     Economics* 96 (1981): pp. 405-431; R. Preston McAfee, Hugo M. Mialon, and Michael A. Williams, "What is a
     Barrier to Entry?" *American Economic Review* 94, (2004): pp. 461-465; Barry Nalebuff, "Bundling as an Entry
     Barrier", *Quarterly Journal of Economics* 119, (2004): pp. 159-187; Martin Peitz, "Bundling may blockade entry",
     *International Journal of Industrial Organization* 26, (2008): pp. 41-58.

[14] See, e.g., *U.S. v. Microsoft*, Findings of Fact, ¶¶68, 93, 142, 155, 227, 384, 409, and 411.

[15] See DeRamus Report, Section 6.3.  The fact that a monopolist's exclusionary conduct can erect barriers to entry has
     been recognized in several monopolization cases, see e.g. *United States v. Pullman Co.*, 50 F. Supp. 123 (E.D. Pa.
     1943) and *United Shoe Machinery Corp. v. United States*, 258 U.S. 451 (1922).

[16] DeRamus Report, ¶226.

[17] Thomas Krattenmaker and Steven Salop, "Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over
     Price," 96 *Yale Law Journal* 209 (1986); and Jonathan Jacobson, "Exclusive Dealing, "Foreclosure," and

---

A-306

**000610**

Declaration of David W. DeRamus, Ph.D.

(9)     The conduct at issue is not simply about Eaton's pricing towards OEMs, but perhaps
        most importantly it is about the effect of Eaton's conduct on end customers –
        preventing end customers from getting the products they want, limiting their access to
        new cost-saving technology, and increasing the net prices they pay.  The focus of an
        analysis of anticompetitive effects of the conduct at issue on end customers has long
        been of central importance to economists and the courts.  In my report, I provide
        extensive evidence that in addition to foreclosing ZFM, the intent and effect of
        Eaton's conduct was to reduce the amount of price concessions that Eaton had
        previously provided to end customers in competing with ZFM.  Indeed, one can
        consider Eaton's conduct as a form of "costless predation",[18] to the extent that Eaton's
        offer of increased rebates to the OEMs in return for foreclosing ZFM from the market
        was funded at least in part by Eaton reducing rebates paid to end customers.[19]  This
        economic theory of anticompetitive harm is consistent with a wide body of recent
        economic literature, particularly in the context of the use of rebates and bundling by
        "upstream" manufacturers selling to distributors or other "downstream" firms – with
        the upstream and downstream firms effectively colluding to increase prices to end
        customers and splitting the resulting economic rents.[20]

(10)    While I consider the primary anticompetitive harm from Eaton's conduct to be
        suffered by end customers and ZFM, I also note that, in the long-run, Eaton's conduct
        led to increased prices to OEMs as well, by eliminating Eaton's only competitor and
        erecting insurmountable barriers to entry.[21]  There is perhaps no clearer "standard
        economic model" in analyzing whether conduct at issue is anticompetitive than an
        assessment of whether the conduct has or will likely lead to increased prices.

(11)    A monopolist's efforts to deprive customers of the benefits of technological
        innovation have also been of concern to economists and the courts.  In economics, it

---

Consumer Harm," 70 *Antitrust Law Journal*, 311, 327 (2002).

[18] See, e.g., Barry Nalebuff, "Exclusionary bundling", *Antitrust Bulletin* 50, (2005): pp. 321-370; Patrick Greenlee, David Reitman, and David S. Sibley, "An antitrust analysis of bundled loyalty discounts", *International Journal of Industrial Organization* 26, (2008): pp. 1132-1152.

[19] See DeRamus Report, Section 10.9.

[20] See J.-M. Abito and J. Wright, "Exclusive Dealing with Imperfect Downstream Competition", *International Journal of Industrial Organization*, 2008, 26: 227-246; J. Wright, "Exclusive Dealing and Entry, when Buyers Compete: Comment," *American Economic Review*, forthcoming; J. Simpson and Wickelgren, "Naked Exclusion, Efficient Breach, and Downstream Competition," *American Economic Review*, 2007, 97(4): 1305-20.

[21] See DeRamus Report, Section 10.8.

---

A-307

000611

Declaration of David W. DeRamus, Ph.D.

is well understood that anticompetitive exclusionary conduct can reduce the ability of competitors to introduce innovations.[22] The primary purpose of the U.S. DOJ Intellectual Property Guidelines is to address the potential harm to innovation resulting from anticompetitive restrictions on intellectual property.[23] Similarly, in *U.S. v. Microsoft*, a central issue was the extent to which Microsoft's conduct foreclosed new, innovative technologies that had the potential to change computing.[24] In my testimony, I analyze extensively the role of Eaton's conduct in preventing technological innovation (the FreedomLine).

(12)     In my report, I also perform an econometric analysis to assess whether there was a "structural break" starting in July 2000, consistent with the hypothesis that Eaton's anticompetitive conduct caused a significant reduction in ZFM's market share.[25] In particular, in order to test for the effect of Eaton's exclusionary conduct on ZFM's market share, I interact a conduct "indicator variable" with all of the other explanatory variables. If Eaton's exclusionary conduct had no anticompetitive effect, I would expect the coefficients on the conduct indicator variable and the interacted terms to be statistically indistinguishable from zero. In fact, all of the estimated coefficients on the interacted terms are statistically different from zero (at the 90% confidence level), and a standard statistical test (the "Wald test") confirms a "structural break" with Eaton's "OEM partnership" period.

## 4. An attribution test is unnecessary in this case due to the scope of conduct at issue

(13)     While I consider Eaton to have engaged in significant predation, there are many ways in which a monopolist can engage in predation.[26] While some form of a price-cost or

---

[22] See, e.g., Kenneth J. Arrow, "Economic welfare and the allocation of resources for invention", in *The rate and direction of inventive activity*, National Bureau of Economic Research conference report. Princeton: Princeton University Press, 1962, pp. 609-625; Jerry Ellig, ed. *Dynamic competition and public policy: technology, innovation, and antitrust issues*, Cambridge University Press, 2001; Carl Shapiro, "Antitrust, Innovation, and Intellectual Property," Testimony before the Antitrust Modernization Commission, 2005.

[23] See U.S. DOJ/FTC Antitrust Guidelines for the Licensing of Intellectual Property, available at http://www.usdoj.gov/atr/public/guidelines/0558.htm

[24] See *U.S. v. Microsoft*, Findings of Fact, ¶412.

[25] See DeRamus Report, Sections 11.6 and 15.2.

[26] See, for example, the discussion of the economic literature in Michael D. Whinston, *Lectures on Antitrust Economics*, MIT Press (2006), Chapter 4, and the court decisions in *United States v. Microsoft Corp.*, 253 F.3d 34

---

A-308

000612

Declaration of David W. DeRamus, Ph.D.

attribution test may be appropriate when bundling and/or rebates are the *only* conduct at issue, the conduct in this case does not simply involve Eaton's offer of rebates or lower prices in return for a certain volume or share of purchases by the OEMs.[27] Rather, Eaton has engaged in a variety of other conduct, including, without limitation:

- agreements to exclude competing transmissions from the databook;[28]

- agreements to increase the price of competing transmissions;[29]

- horizontal price-fixing agreements;[30]

- the imposition of inefficiencies and additional costs on OEMs and end customers resulting from the agreements;[31]

- price increases to end customers (via reduced "SPIFFs" or competitive equalization payments);[32] and

- other direct evidence that the primary purpose of the LTAs was to foreclose ZFM from the market, not to offer OEMs better prices.[33]

(14)   As discussed in my testimony,[34] the conclusions of the economic literature have been refined in a number of recently published articles showing that exclusion of a rival by a monopolist is even more likely when its direct buyers are downstream firms (such as the OEMs in the HD Transmission markets) than when they are end customers. OEMs are more likely to help a monopolist supplier exclude a rival supplier because they can shift the burden of any future price increase resulting from a loss of competition in the upstream market onto end customers. This theory shows that the

---

(D.C. Cir.), *cert. denied*, 122 S. Ct. 350 (2001) and *LePage's Inc. v. 3M*, 277 F.3d 365 (3d Cir. 2002) (rejecting claim), *rehearing en banc granted, judgment vacated*, Nos. 00-1368, 00-1473 (3d Cir. Feb. 25, 2002).

[27] See DeRamus Report, Section 8.
[28] See DeRamus Report, Section 8.
[29] See DeRamus Report, Section 8.
[30] See DeRamus Report, Section 8.4.
[31] See DeRamus Report, Section 8.
[32] See DeRamus Report, Section 10.9.
[33] See DeRamus Report, Section 8.
[34] DeRamus Report, ¶225.

---

Declaration of David W. DeRamus, Ph.D.

payment for exclusivity can be a means for a monopolist to share with the downstream firms (the OEMs) the monopoly rents created or preserved by excluding the rival. Besides harming the rival, this exclusionary strategy harms end customers, who face higher prices and reduced product variety.[35]

(15)     As shown in an article co-authored by Dr. Sibley, one of Eaton's economic experts, a dominant firm can leverage its absolute monopoly power in a given market (e.g., HD performance transmissions) to marginalize a rival and raise prices in another market (e.g., HD linehaul transmissions) in which the dominant firm faces actual or potential competition.[36] As argued by Dr. Sibley and his co-authors: "A main point of this article is that **bundled rebates are not usefully analyzed using predatory pricing case law**. Not only do prices typically exceed marginal cost, but **anticompetitive effects may not require a short term profit sacrifice or a period of recoupment**. Bundled rebates can generate anticompetitive effects, but they do so by confronting consumers with the choice between a collection of tied discount prices and unattractive standalone prices, all above cost."[37]

(16)     Noted economist Michael Whinston in his book *Lectures on Antitrust* confirms that there is no basis to Eaton's assertion that an "attribution" test is a *sine qua non* of any scientific, testable theory of competitive harm through exclusionary contracts.[38] Chapter 4 of Whinston's book, devoted to "exclusionary vertical contracts", is one of the most recent, complete, and well-regarded texts on the subject. *The attribution test, or any other type of price-cost test, is not mentioned at all in the entire chapter*. This does not mean that a price-cost test is never informative, but it clearly refutes Eaton's assertions that any *bona fide* economic theory of exclusionary contracts requires an attribution test.

(17)     While an attribution test is unnecessary given the facts in this case, there is also no standard attribution test that can be mechanistically applied in all cases. Indeed, in

---

[35]  See J.-M. Abito, and J. Wright, "Exclusive Dealing with Imperfect Downstream Competition", *International Journal of Industrial Organization*, 2008, 26: 227-246; J. Wright, "Exclusive Dealing and Entry, when Buyers Compete: Comment," *American Economic Review*, forthcoming; J. Simpson and Wickelgren, "Naked Exclusion, Efficient Breach, and Downstream Competition," *American Economic Review*, 2007, 97(4): 1305-20.

[36]  P. Greenlee, D. Reitman, and D.S. Sibley, "An antitrust analysis of bundled loyalty discounts," *International Journal of Industrial Organization* 26, no. 5. (2008):1132—1152.

[37]  *Id.*, p. 1149.

[38]  Michael D. Whinston, *Lectures on Antitrust Economics*, MIT Press (2006), Chapter 4.

---

A-310

000614

Declaration of David W. DeRamus, Ph.D.

many situations, the results of an attribution test can be highly sensitive to a number of important assumptions for which there is no consensus in either economic theory or practice. An attribution test will depend crucially on the measure of cost used (*e.g.*, variable or total cost), the measure of rebates used (*e.g.*, rebates expected, accrued, or paid), and the share of the monopolist's sales for which the rival can reasonably be expected to compete within a reasonable span of time (given buyers' preferences, potential capacity constraints, and other limitations on buyers' switching behavior). Different assumptions regarding the relevant share of sales on which to apply an attribution test are particularly susceptible to changing the results of such a test, as a monopolist may be able to use a rebate or discount schedule to effectively set prices below cost on its marginal sales for which a competitor is attempting to compete, even though its aggregate sales are priced above cost.

(18)    It is important to note that such below-cost (or even negative) prices at the margin is not simply a hypothetical result, but in this case, they are *necessarily* implied by Eaton's rebate schedule *over some range of sales*. For example, Eaton's LTA with PACCAR stipulates that PACCAR receives no rebate at all if it purchases less than 90% of its heavy duty transmissions from Eaton, while it receives a 2% rebate on *all* of its purchases from Eaton if it meets the 90% share target but remains below a 95% share, and receives a 3% rebate if it meets or exceeds a 95% share.[39] This implies that the Eaton units that would allow PACCAR to move its share of purchases from Eaton from 89% to 90% are effectively sold at a *negative* price.[40]

(19)    The fact that Eaton's rebates to Freightliner resulted in Eaton pricing below cost for an important quantity of sales is confirmed by a 2001 Eaton planning and review document.[41] Eaton reported that its penetration at Freightliner was 76% by the end of the third quarter of 2001 and estimated that, given the expected total demand for Freightliner trucks, Freightliner needed to convert approximately 1,800 units during the next two quarters in order to reach Eaton's 92% share target by the end of the first

---

[39]   See DeRamus Report, ¶162.

[40]   To see this, assume that PACCAR only purchased a total of 100 transmissions at a price of $p$ dollars from all HD transmission manufacturers (the results are independent of the total number or price of the units of heavy duty transmission purchased by PACCAR). If PACCAR purchased 89 transmissions from Eaton, it would receive no rebate and pay (89 x $p$) dollars. If instead PACCAR purchased 90 transmissions, it would receive a 2% rebate and pay (90 x 0.98 x $p$) = (88.2 x $p$) dollars. PACCAR would therefore pay a negative price (i.e., in effect be paid by Eaton) equal to (–0.8 x $p$) dollars for switching the 90th unit from ZFM to Eaton.

[41]   FTL0147-0158 at 0156.

---

Confidential and lawyers only                                    Page 10 of 23

A-311

000615

Declaration of David W. DeRamus, Ph.D.

quarter of 2002.  The document states that converting these units from Meritor to Eaton would equate "to a conversion benefit to Freightliner of $1,388 per unit per quarter of *enhanced* rebate/pricing dollars" (emphasis in the original).  In his testimony, Dr. Sibley reports that the average price of Eaton's linehaul transmissions for 2001 and 2002 was $3,204, and the average variable cost of these transmissions was $2,504.[42]  Since the per unit "enhanced rebate" of $1,388 referenced in Eaton's document implies an effective per unit price of $1,816 (= $3,204 − $1,388) for the 1,800 transmissions that Freightliner needed to convert, these transmissions were sold at an effective price significantly below Dr. Sibley's estimate of average variable cost.

## 5. Disaggregation is unnecessary, and I account for other relevant factors unrelated to Eaton's anticompetitive conduct

(20)    I did not disaggregate damages into each component of Eaton's conduct, since such a disaggregation is unnecessary.[43]  This is not a case in which the conduct at issue can be analyzed from an economic perspective as individually separable acts.

(21)    In my report, I analyzed extensively the effect on ZFM's sales and market shares of Eaton's conduct and several other potential explanatory factors, as discussed extensively in Section 8 and 9 of my report (and particularly in Section 9.2).  For example, with regard to warranty issues, I examined the empirical evidence regarding the potential impact on ZFM shares of its warranty claims, and I concluded that its "G-platform" warranty claim issues did not coincide with the significant declines in the ZFM market shares.[44]  I also concluded that as a significant *cost* issue for ZFM, the warranty claims related to the G-platform were largely resolved by 2002, as indicated by the ZFM data.[45]  In addition, I examined prior episodes in which ZFM

---

[42]   Table 3 of Dr. Sibley's testimony reports only annual data. The figures above are based on a (weighted) average for 2001 and 2002.

[43]   See Section of Antitrust Law of the American Bar Association, *Proving Antitrust Damages* (1996), pp. 42-43 ("[P]laintiffs normally need not disaggregate the harms attributable to different illegal acts of the defendant. 'Not requiring strict disaggregation of damages among the various unlawful acts of the defendant serves to prevent a defendant from profiting from his own wrongdoing and makes sense when damages arise from a series of unlawful acts intertwined with one another.'" (citing *MCI Communications Corp. v. AT&T*, 708 F.2d 1081, 1161 (7th Cir.), cert. denied, 464 U.S. 891 (1983)).

[44]   See DeRamus Report, Section 9.2.5.

[45]   See DeRamus Report, Section 9.2.5.

---

Confidential and lawyers only

A-312

000616

Declaration of David W. DeRamus, Ph.D.

had significant warranty claims, *e.g.*, its experience in 1993 with its "F-platform" transmissions, and I concluded that this prior, more significant event had no lasting impact in terms of reducing ZFM's market share.[46] This conclusion, in turn, informed my opinion that the G-platform warranty issues similarly were not sufficient to result in the dramatic decline in market share observed for the G-platform and other ZFM HD transmissions during Eaton's "OEM partnership period."[47]

(22)   I also did not observe any significant pattern of unusual warranty claims or other quality problems associated with the FreedomLine transmission, other than the typical issues that arise with any new product introduction in a demanding HD transmission environment. Certainly in comparison with Eaton's automated mechanical transmissions, the documents and data indicate that the FreedomLine was (and is) considered by the OEMs and end customers to be a high-quality, widely respected transmission.[48] Thus, no significant quality problems can explain the demise of FreedomLine sales in the NAFTA market. This is particularly evident given the highly favorable market acceptance of the FreedomLine in markets outside NAFTA, in which ZF recently sold its 250,000th transmission.[49]

(23)   As I discussed in my report, Eaton had at least as serious warranty issues with its own automated mechanicals, if not more so, particularly as compared with the FreedomLine.[50] For example, 90% of Eaton's Autoshift transmissions built in 2000 had claims, and these claims accounted for 82% of the total number of claims.[51] Thus, if warranty claims were an important determinant of market shares, it is reasonable to expect that sales of HD Transmissions would have increasingly shifted towards ZFM and away from Eaton, with the increased penetration of automated mechanicals. Indeed, one of the harms to competition I observe is the effect of Eaton's conduct in forcing customers who want increased automation in their transmissions to use Eaton transmissions rather than the superior ZFM FreedomLine transmissions.

---

[46]  See DeRamus Report, Section 9.2.5.
[47]  See DeRamus Report, ¶211.
[48]  See DeRamus Report, Section 7.2.
[49]  See DeRamus Report, ¶206.
[50]  See DeRamus Report, Section 7.2.
[51]  EATON-00713075.

---

A-313

000617

Declaration of David W. DeRamus, Ph.D.

(24)    Eaton claims that I fail to take into account ZFM's lack of a full product line and
        ZFM's decision to increase the price of the FreedomLine.  These factors, however, do
        not provide explanations for ZFM's decline in market share that are unrelated to the
        anticompetitive conduct at issue.  With regard to the full product line, OEMs and end
        customers have strong preferences for mixing and matching different components, as
        evident by the actions that Eaton and the OEMs had to take to meet Eaton's
        penetration targets specified in its LTAs.[52]  ZFM's lack of a full line of performance
        transmissions disadvantaged ZFM only because in Eaton's LTAs, Eaton made the
        rebates on performance transmissions contingent on OEMs purchasing a very large
        share of both linehaul and performance transmissions from Eaton.  As discussed in
        my report, the fact that in the short run, ZFM did not offer an alternative to Eaton's
        monopoly in performance transmissions provided Eaton with leverage to exclude
        ZFM from the linehaul market.[53]

(25)    With regard to Eaton's allegations of higher ZFM prices, the fact that ZFM had to
        raise the price of the FreedomLine in early 2004 was a consequence of Eaton's
        successful "raising rivals' costs" exclusionary strategy – it is not an explanation of
        ZFM's declining market share that is unrelated to the conduct at issue. As discussed
        in my report, by foreclosing ZFM from access to OEMs and end customers, Eaton
        prevented ZFM from reaching a scale sufficient to industrialize production of the
        FreedomLine in the U.S. and thereby minimize its production costs.[54]  It was thus
        Eaton's exclusionary conduct that prevented ZFM from lowering its prices and made
        the 2004 FreedomLine price increase necessary.

## 6. My damages analysis is not predicated on unreasonably high "but for" prices

(26)    Contrary to Eaton's mischaracterization of my testimony, I have *not* assumed that
        "but for" transmission prices would have been higher than actual prices. As I testified
        in my deposition, while the "but for" manual transmission prices from the ZFM
        November 2000 SBP forecast are higher than other schedules of actual ZFM manual

---

[52]   DeRamus Report, Section 8.
[53]   See, *e.g.*, DeRamus Report, ¶108 and ¶¶175-176.
[54]   DeRamus Report, ¶226.

---

Confidential and lawyers only

A-314

000618

Declaration of David W. DeRamus, Ph.D.

transmission prices, the FreedomLine prices in the forecast were lower than actual FreedomLine prices.  On average, across both the FreedomLine and the ZFM manual transmission series, the "but for" prices implied by my damages analysis are *lower* than actual prices over the relevant period, and the use of actual prices would simply increase my estimate of damages by fully 60%.  Even if I hold ZFM actual prices for the FreedomLine constant as of 2004, ZFM's "but for" damages are still 13% higher than the damages I derived using the prices implicit in the ZFM November 2000 SBP.

(27)   Further, even focusing only on manual transmissions, it is not the case that I have assumed – based on the ZFM SBP – that the prices of the *same* ZFM manual transmissions would have been higher in the "but for" world.  As discussed in the President's Report prepared for the October 16, 2000 Board of Directors, ZFM intended to *reduce* the price of its base (9- and 10-speed) manual transmissions over the period covered by the SBP.[55]  In fact, ZFM planned to release a number of multispeed and performance manual transmissions, such as an 11D (in competition with Eaton's 8LL performance transmissions) in October 2001, a 12/14-speed manual in April 2002, a 16-speed manual in October 2002, and possibly a 10-speed high torque in April 2003.[56]  These transmissions are technologically more advanced, and thus have higher prices (and costs), than the base 9- and 10-speed manual transmissions that ZFM actually sold.  Therefore, the inclusion of the (yet to be released) multi-speed and performance manual transmissions in the SBP forecast for the G-platform explains why the average per-unit price of G-platform transmissions in the SBP is higher than the actual average price of the 9- and 10-speed manual transmissions sold by ZFM.

(28)   In any event, of primary importance for a damages estimate are the *incremental profits* that ZFM would have earned absent Eaton's anticompetitive conduct.  Thus, the primary inputs for a damages estimate in this case is not an estimate of "but for" prices, but rather an estimate of ZFM's per unit incremental profits (or contribution margin) and "but for" market shares.  I have conducted an extensive analysis to confirm that the prices and costs in the November 2000 SBP are consistent and provide a reliable basis for estimating ZFM's "but for" profits, as discussed below.

---

[55]   See, for example, ZFMA0365437-536 at 469 and 472.
[56]   See ZFMA0365437-536 at 477.

---

A-315

000619

Declaration of David W. DeRamus, Ph.D.

## 7. I have appropriately verified the reliability and reasonableness of the ZFM business projections used in my analysis

(29)     I conducted an extensive assessment of the reasonableness of using the ZFM November 2000 SBP in my analysis.  I reviewed all of the business plans prepared by ZFM, as well as various presentations by ZFM management to the ZFM Board, including: the September 14, 1999 ZFM business plan; the March 10, 2000 ZFM Board of Directors Meeting presentation; the July 13, 2000 ZFM Board of Directors Meeting presentation; the October 16, 2000 Board Meeting minutes; and the October 16, 2000 President's Report prepared for the Board of Directors meeting.

(30)     As discussed in my report, after an extensive analysis of the documents, I used the ZFM November 2000 Strategic Business Plan (SBP) as the basis for some of my damages analyses, because that business plan was least affected by Eaton's conduct at issue.[57]  In addition, the ZFM November 2000 SBP explicitly took into account recent market developments.  The sales projections in that SBP had been revised downward due to the general market decline and Eaton's actions at the OEMs.

(31)     I also reviewed additional information to confirm the reasonableness of using the ZFM November 2000 SBP in estimating ZFM's damages, including, without limitation:

> The November 2000 SBP shows that ZFM created a "Revised Plan" for FY 2001 in which unit and net sales were 40% lower than previously forecast in its "Conservative Plan."[58]

> The November 2000 SBP includes both forecast *and actual* figures, and I verified that the forecast profit margins were consistent with the actual profit margins. For example, the SBP reports an actual per unit margin in FY 2000 of $1,014, compared to a FY 2001 forecast per unit margin of $1,169 (G-platform).

> The profit margins in the November 2000 SBP are consistent with ZFM's actual financials.  For example, the per unit contribution margin for all ZFM HD

---

[57]   See DeRamus Report, Sections 11.2 and 11.3.
[58]   See ZFMA0357342-351 at 348.

---

A-316

**000620**

Declaration of David W. DeRamus, Ph.D.

transmissions calculated using ZFM's P&L statements for FY 2002 was $959, as compared to the November 2000 SBP forecast for the same year of $949.

- The SBP was prepared by ZFM management, scrutinized by its Board of Directors, and revised according to the Board's explicit direction.

- ZFM management and its Board had many years of experience in selling HD transmissions, and thus had significant expertise in developing a reasonable SBP.

- ZFM's projections of profit margins for the FreedomLine are likely to be reliable, given ZF's extensive experience with manufacturing and selling the same automated mechanical transmission in Europe (and elsewhere).

- The profit margins in the ZFM November 2000 SBP are consistent with (and likely lower than) Eaton's margins on comparable products. For example, while ZFM's average per unit contribution margin in the SBP for 2001-2005 is $1,054, Eaton's average per unit margin on linehaul transmissions for 2006 and 2007 is $1,022.[59] While ZFM's contribution margin only subtracts variable costs, the standard cost used to calculate Eaton's margin likely includes some allocated fixed costs,[60] and thus Eaton's contribution margin would be higher if calculated on a comparable basis.

- In Eaton's "Profit Plan Review" from 2000, Eaton reported its per unit profits for several manual HD transmissions. Eaton's reported profits are in the range of $877 to $1,520 per unit for the listed 9- and 10-speed transmissions. Eaton's per unit profits for performance transmissions are considerably higher, ranging from $1,570 to $2,312 per unit. While these profits likely understate Eaton's per unit contribution margin, as they appear to include more than just direct manufacturing costs, they confirm that ZFM's 2000 SBP per unit profit forecasts are reasonable.

---

[59] Eaton's cost data for linehaul transmissions are available only starting in August 2005. I thus chose to consider the average of the only two full years available, i.e. 2006 and 2007.

[60] The available data for Eaton reports only unit standard cost, without specifying or breaking down the individual cost items included in standard cost. I was therefore unable to exclude some of the allocated overhead costs that are likely to have been included in standard cost. The unit cost for ZFM have instead been calculated by using only variable cost items, such as direct labor, material, freight and the variable part of the burden (see Table 6 in my report).

A-317

000621

Declaration of David W. DeRamus, Ph.D.

(32)   In my report, while I consider contribution margin to be appropriate in estimating ZFM's damages, to be conservative I also estimate ZFM damages based on various other (lower) measures of operating profits, *i.e.*, assuming that ZFM would have incurred additional operating and fixed costs to achieve the sales volume predicted by my estimate of ZFM's "but for" market shares. For example, in two of my damage estimates, I include between $199 and $220 million in *additional* operating and fixed costs over 2000 – 2009 (on a present value basis) relative to my first measure of damages based on ZFM's contribution margin. Thus, even if the price and contribution margin estimates used in some of my computations were unrealistically high (which they are not), they would be more than balanced by the conservative assumptions regarding incremental operating and fixed costs in the other methods.

(33)   Independently of the ZFM November 2000 SBP, I also constructed an econometric model of ZFM's "but for" market shares, a standard economic technique used to estimate damages.[61] The results of that model provide an alternative damage estimate as well as confirm the reasonableness of the share projections in the ZFM SBP, as evident in Table 3 of my report.[62] My "base case" econometric model using July 2000 as the beginning of Eaton's anticompetitive conduct shows that ZFM's forecast shares in the SBP are *lower* than in the econometric model for every year except 2005. An alternative econometric model using 1999 as the beginning of Eaton's anticompetitive conduct shows even higher ZFM market shares than my "base case" econometric model, with shares that are significantly higher than the SBP in all years.

(34)   Independently of the ZFM November 2000 SBP, I also derive a damages estimate using Eaton's own operating profit margins.[63] Of the five different approaches I use to estimate damages, this approach provides the median result. To be conservative, I apply an estimate of Eaton's *operating profit* (rather than contribution margin) for linehaul transmissions to the incremental volume of ZFM's "but for" sales. This approach effectively assumes that on each incremental ZFM's transmission sale, ZFM would have incurred additional operating and fixed costs at the same average level as Eaton (allocated on a per unit basis), *in addition to* the operating and fixed costs that ZFM already incurred. As I discussed in my deposition testimony, the fact that I have

---

[61]   See DeRamus Report, Sections 11.6 and 11.7.
[62]   See DeRamus Report, p. 134.
[63]   See DeRamus Report, Section 11.10.

A–318

000622

Declaration of David W. DeRamus, Ph.D.

not added back approximately $79 million in operating losses incurred by ZFM during the damage period[64] has the highly conservative result that ZFM's "but for" profit margin using this approach is considerably lower than Eaton's.

## 8. I have reasonably estimated ZFM's FreedomLine sales

(35)   In my damages analysis, I appropriately conclude that ZFM would have sold significant volumes of its FreedomLine transmission absent Eaton's anticompetitive conduct. First, I use a conservative approach to estimating the growth of the share of FreedomLine sales in total market sales, using a polynomial curve rather than a linear trend-line, such that the forecast of FreedomLine sales reaches a maximum of 13.6% of HD linehaul sales during 2006-2009.[65]

(36)   Second, the estimates of automated mechanical transmissions in my analysis are for the FreedomLine alone; I make no assumption regarding the percentage of sales that Eaton would have made with its automated mechanical transmissions. Indeed, given Eaton's technologically inferior product (its 3-pedal Autoshift), the significant reliability problems with both its Autoshift and its Ultrashift, and its significant delays in releasing a 2-pedal product (relative to the FreedomLine), I would not expect Eaton to have captured a particularly large percentage of automated mechanical sales, absent its anticompetitive conduct.

(37)   Third, I considered a range of factors in assessing the reasonableness of ZFM's forecast of 2000-2005 FreedomLine sales. For example, as discussed in my report, this result is conservative, as it effectively assumes that the FreedomLine would achieve a market penetration level in NAFTA that is significantly below its market penetration in Europe.[66] I expect similar cost-benefit considerations that drove European customers to adopt the Astronic to be present in the U.S., *e.g.*, reduced training costs, increased fuel efficiency, improved driver safety, improved driver retention, etc. I also observe evidence in the documents of significant pent-up demand for the FreedomLine transmission, a trend that the OEMs also recognized by

---

[64]  Sum of ZFM operating profit (loss) from July 2000 through FY2007.
[65]  See DeRamus Report, Section 11.2.
[66]  See DeRamus Report, Section 11.2.

---

A-319

000623

Declaration of David W. DeRamus, Ph.D.

early 2000 – 2001. My estimate of a flattening of demand for the FreedomLine is conservative, given the nearly exponential growth rate observed in FreedomLine sales immediately after its introduction, until ZFM was forced to abandon its plans to localize production in the U.S. due to Eaton's conduct.

(38)     Fourth, as discussed in my report, by depriving ZFM of the ability to compete for a sufficient share of the market to localize production in the U.S., Eaton's conduct led to increased costs and hence prices for ZFM's FreedomLine transmissions.[67] Absent Eaton's "raising rivals' cost" strategy, I would expect ZFM's FreedomLine costs and prices to be significantly lower, which in turn would have stimulated increased demand for automated mechanical transmissions. The current share of Eaton's automated mechanical transmissions as a percentage of total HD transmissions is likely to significantly underestimate the FreedomLine's "but for" share of HD transmission sales, as Eaton's sales reflect market outcomes that are themselves fundamentally affected by Eaton's anticompetitive conduct. Absent Eaton's conduct, ZFM was well-positioned and incentivized to compete aggressively with its FreedomLine technology, as the technological innovation of the FreedomLine gave ZFM a means to significantly differentiate its products from Eaton's.

(39)     Fifth, as discussed above, ZFM's forecast of its *total* share was consistent with the results of my econometric forecast. My econometric model is conservative, since it is predominantly calibrated on ZFM's manual sales, and thus it is unlikely to adequately capture ZFM's incremental "but for" share due to its introduction of the FreedomLine.[68] Thus, if one were to reduce my estimate of ZFM's "but for" FreedomLine sales, I would need to increase my estimate of ZFM's manual sales. As is evident in my report, however, my estimate of damages to ZFM is not sensitive to the "mix" of lost sales as between manual and FreedomLine transmissions. Indeed, if one were to decrease the volume of FreedomLine transmissions and increase the volume of manual transmissions in my damages model, the damages to ZFM would *increase*, not decrease. In my damages model, the weighted average contribution margin for manual transmissions is approximately $1,170 per unit on average, compared with approximately $1,023 for the FreedomLine Transmission. Thus, any

---

[67] See DeRamus Report, Figure 22 and ¶¶238-241.
[68] See DeRamus Report, Section 11.6.

Declaration of David W. DeRamus, Ph.D.

shift in the incremental "but for" volume away from the FreedomLine and towards manual transmissions would simply increase ZFM's damages.

## 9. I have appropriately estimated ZFM's lost enterprise value

(40)    In estimating damages to ZFM from Eaton's anticompetitive conduct, I estimate both ZFM's past lost profits and its going-forward lost enterprise value using standard, well-accepted methods of analysis.[69]  In estimating ZFM's lost enterprise value, I use comparable publicly traded companies to estimate a "multiple" to apply to alternative measures of ZFM's profits.[70]  ArvinMeritor and Eaton constitute reasonable "comparables," as confirmed by two alternative sets of comparables.[71]  In estimating ZFM's lost enterprise value, I use data from a range of years to reduce the potential variance associated with relying on a specific point in the business cycle.  I use ZFM's "but for" financials for FY 2006-2008, as 2008 was the last full year for which I had estimated ZFM's but for profits, and this three-year period spans the business cycle.  I use 2005-2007 for the comparables data, as this is the most recent three-year period with complete financials as of the date of my report (due to lags in reporting by many publicly traded companies).  Using ZFM "but for" financials for 2005-2007 rather than 2006-2008 would simply increase my estimate of lost enterprise value.

(41)    I do not consider it necessary to apply "multiples" from a specific date to ZFM's "but for" profits for that same date.  The use of one date or another can lead to large volatility in the valuation estimate, due to either financial market conditions unrelated

---

[69]  See, e.g., Stephen H. Kalos, "Antitrust" In *Litigation Services Handbook, The Role of the Financial Expert*, 4th ed. edited by Roman L. Weil, Peter B. Frank, Christian W. Hughes and Michael J. Wagner  (Hoboken, NJ: John Wiley & Sons, Inc., 2007), 24.11; Robert E. Hall. and Victoria A. Lazear, "Estimating Economic Losses in Damages Awards (New)" In *Litigation Services Handbook, The Role of the Accountant as Expert*, 2nd ed. 1999 Cumulative Supplement, edited by Roman L. Weil, Michael J. Wagner and Peter B. Frank (New York, John Wiley & Sons, Inc., 1999), 29A.2.; Victoria A. Lazear, "Estimating Lost Profits and Economic Losses" In *Litigation Services Handbook, The Role of the Financial Expert*, 3rd ed. edited by Roman L. Weil, Michael J. Wagner and Peter B. Frank, (New York: John Wiley & Sons, Inc., 2001), 5.2.; Patrick A. Gaughan, *Measuring Business Interruption Losses and other Commercial Damages* (Hoboken, NJ: John Wiley & Sons, Inc., 2004), 70; Robert E. Hall and Victoria A. Lazear in "Reference Guide on Estimation of Economic Losses in Damages Awards" in *Moore's Federal Practice Reference Manual on Scientific Evidence* (New York: Matthew Bender & Co., Inc., 1997) 478; and Section of Antitrust Law, American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues* (1996) 36; 132-135.

[70]  See DeRamus Report, Sections 11.11 and 11.12.

[71]  See DeRamus Report, Section 11.12.

---

A-321

000625

Declaration of David W. DeRamus, Ph.D.

to the specific business at issue (as in the case of the October 2008 – February 2009 financial market meltdown) or business-specific volatility that is unlikely to be representative of the company's average future cash flows. Using FY 2006 for both the "multiple" and ZFM's "but for" profits, for example, would imply a "but for" lost enterprise value considerably *higher* than the estimate of lost enterprise value in my report (2006 is the peak year for ZFM's "but for" profits but provides slightly lower multiples for the comparables). Including both 2007 and 2008 in an averaging approach provides a valuation that is less sensitive to the selection of any single year, and it produces a more conservative estimate of ZFM's damages.

(42)    A related issue is whether the current period of significant financial market turmoil – since October 2008 – provides a more reasonable benchmark to assess the "but for" value of ZFM's business than a benchmark derived under normal financial market conditions. Basing a damages analysis on a period of unprecedented financial turmoil, however, is unlikely to provide a reliable estimate of enterprise value. The value of a business is the discounted present value of its future cash flows. In selecting a "multiple" for a given valuation context, it is thus important to consider whether the multiples and the profits to which they are applied reflect long-run expectations of average future cash flows, appropriately risk-adjusted. Relying on financial market data for the period from October 2008 – February 2009 does not meet these criteria.

(43)    I confirmed the reasonableness of my "comparables" results by cross-validating them against the results that would be obtained by modeling the future cash flows of ZFM. In this cross-validation analysis (often described as the "Gordon growth model"), I used a growth rate based on the applicable Producer Price Index (PPI) and an appropriate discount rate provided by a widely respected, independent source of information (the Ibbotson Cost of Capital Yearbook for 2008).[72] Thus, if my choice of comparables or the use of a three-year average time period to estimate the ZFM lost enterprise were for some reason inappropriate (or, as alleged by Eaton, "rigged"), I would expect there to be a significant discrepancy between my results obtained by these very different methods. As discussed in my report,[73] this approach produces a

---

[72] For a discussion of this approach to valuation, see, Section of Antitrust Law American Bar Association, *Proving Antitrust Damages*, 1996, pp. 128-132; for a discussion of discount rates, see, pp. 119-122.

[73] DeRamus Report, ¶316.

---

Declaration of David W. DeRamus, Ph.D.

valuation that is approximately $51 million *higher* than applying the "multiple" approach to those same cash flows. This confirms that I have used a reasonable multiple – from an appropriate period – in estimating the lost enterprise value of ZFM due to Eaton's anticompetitive conduct.

(44)    Eaton asserts that my damages analysis is inconsistent with the guidance of IRS Revenue Ruling 59-60. The purpose of my estimate of ZFM's enterprise value is to measure damages suffered by ZFM due to Eaton's anticompetitive conduct. The stated purpose of IRS Revenue Ruling 59-60 is "to outline and review… factors to be considered in valuing shares of the capital stock of closely held corporations *for estate tax and gift tax purposes*" by appraisers.[74] Thus, even taken at face value, the guidance of IRS Revenue Ruling 59-60 is not applicable to this case.

(45)    Moreover, not withstanding its lack of applicability, IRS Revenue Ruling 59-60 in fact supports the assumptions and analytical procedures I applied in my analysis. IRS Revenue Ruling 59-60 states, *inter alia*, that an appropriate valuation "will depend upon the circumstances in each case," as there is no generally applicable formula to different valuation issues;[75] "[w]hen a stock… is traded in an erratic market, some other measure of value must be used;"[76] "value has a close relation to future expectancy;"[77] and "detailed profit-and-loss statements should be obtained and considered for a representative period immediately prior to the required date of appraisal, preferably five or more years."[78] My analysis is consistent with each of these statements and is not contradicted by any other guidance in the Revenue Ruling.

---

[74] IRS revenue Ruling 59-60, Section 1 (emphasis added).
[75] Id., Section 3.01.
[76] Id., Section 3.03.
[77] Id., Section 4 (a).
[78] Id., Section 4 (d).

---

A-323

000627

Declaration of David W. DeRamus, Ph.D.

I declare under penalty of perjury that the foregoing is true and correct.

_____          June 11, 2009
                                          _____
David W. DeRamus, Ph.D.                    Date

A-324

000628

# EXHIBIT 10





# ZF Meritor Board Meeting

**July 15, 2003**



**DX 18**

Highly Confidential
ZFMA0019956



ZF Meritor Board Meeting
July 15, 2003

# ZF Meritor
## Board of Directors Meeting
### July 15, 2003

| I.   | Opening Remarks | 9:00 AM | W. Vogel |
|------|-----------------|---------|----------|
| II.  | Acceptance of Minutes Dated 3/20/03 | 9:15 AM to 9:30 AM | M. Hawley |
| III. | Full Year 2003 Forecast | 9:30 AM to 10:00 AM | D. Coleman |
| IV.  | 2004 – 2008 Business Plan Summary | 10:00 AM to 10:30 AM | D. Coleman |

2

Highly Confidential
ZFMA0019957

000630



ZF Meritor Board Meeting
July 15, 2003

# ZF Meritor
## Board of Directors Meeting
### July 15, 2003

| V. | Break | 10:30 AM to 10:45 AM | |
|----|-------|----------------------|---|
| VI. | Old Business | 10:45 AM to 11:15 AM | R. Martello |
| VII. | New Business | 11:15 AM to 11:45 AM | R. Martello |
| VIII. | LUNCH | 11:45 AM TO 12:30 PM | |
| IX. | Shareholders Meeting and Discussion | 12:30 PM to 6:00 PM | |

3

Highly Confidential
ZFMA0019958





ZF Meritor Board Meeting
July 15, 2003

# ZF Meritor
# March 20, 2003
# Meeting Minutes

4

Highly Confidential
ZFMA0019959

**000632**

# ZF MERITOR LLC

BOARD OF DIRECTORS MEETING MINUTES

March 20, 2003

In accordance with Section 5.3(a) of the Amended and Restated Limited Liability Company Agreement (the "Joint Venture Agreement") of ZF Meritor LLC (the "Company"), a regular meeting of the Board of Directors of the Company was held at the Brown Hotel, Louisville, Kentucky, commencing at 2:00 p.m. on Thursday, March 20, 2003.  The following members of the Board of Directors participated in the meeting (in person, unless otherwise noted):

| ZF Member Representatives | ArvinMeritor Member Representatives |
|---|---|
| **Wolfgang Vogel**<br>**Rolf Lutz**<br>**Otto Schafhauser** | **Thomas Gosnell**<br>**Dennis Kline** |

Also participating in the meeting at the request of the Directors were the following individuals:

**Richard Martello**, President of the Company
**Robert Guy**, Vice President of the ArvinMeritor Member
**Dave Coleman**, Chief Financial Officer of the Company
**Charles Allen**, Director of Sales and Engineering of the Company
**Carl Myers**, Chief Financial Officer of ZF North America
**Hans Collenberg**, Division President, ZF NAO
**Tony Wooten**, Company Director of Human Resources
**Michael S. Hawley**, legal counsel to, and Secretary of, the Company

Wolfgang Vogel, Chairman of the Board of the Company, presided at the Meeting.  Michael Hawley acted as recording secretary, taking minutes of the Meeting.  An Agenda for the Meeting was presented to the Board, and each of the items on the Agenda was taken up in the order listed, unless otherwise noted.  Significant items of discussion, and actions by the Board with respect to the Agenda items, were as follows:

I.      <u>Review and Approval of Minutes.</u>

The first order of business was review and approval of the minutes from the previous meeting.   Upon motion duly made and seconded, the Board approved the Minutes of the November 12, 2002 meeting of the Board of Directors.

0256723.02
LIB: C2

Highly Confidential
ZFMA0019960

**000633**

II.    **CFO Report.**

Mr. Coleman was then called upon to present a financial report.

a.    2002 Audited Financials.

Mr. Coleman initially reviewed the financial adjustments resulting from the 2002 audit by Deloitte & Touche, LLP.  A summary of those adjustments and a P&L breakdown are attached to these Minutes as Exhibit A (page 8) and Exhibit B (page 9), respectively.  Mr. Coleman addressed in particular the adjustments relating to the writedown of various G Platform transmission assets and warranty accrual adjustments.

b.    2003 Full Year Forecast.

Mr. Coleman then presented an Executive Summary of the 2003 Actual/Forecast vs. AOP.  That Summary is attached to these Minutes as Exhibit C (page 10).  There was extensive discussion of the particulars appearing in that Summary, with a focus on sales and PBT.

The Board discussed the timeliness of the financial data presented to the Board and directed as follows:

*At future Board meetings, Mr. Coleman was asked to present the most current Company financial information available.  To the extent that information becomes available following the time when pre-Board meeting material is distributed, the updated information is to be included in the Board meeting materials.*

Mr. Coleman then addressed the Profit and Cash Causals (both year-to-date actuals and forecasts, versus AOP) data with respect to which is attached to these Minutes as Exhibits D, E and F (pages 11, 12 and 13).  There was significant discussion about the contribution margin of additional sales and conflicting indications from the data relating to profitability and increased volume.

*The Board directed that Mr. Coleman evaluate and report back to the Board on the volume and profitability implications of the Causal Reports and the affect on profit (or loss) of increased sales volume.*

The discussion then turned to appropriate accounting for warranty matters.  The role of Mike Veillette in this process was described, and it was noted that Mr. Veillette sets accrual rates twice each year and that accrual amounts are calculated quarterly based on those rates.

*The Board directed that Mr. Coleman evaluate again the accounting system for warranty accruals and report to the Board on*

0256723.02
LIB: C2

Highly Confidential
ZFMA0019961

000634

*when warranty claim improvement (evidenced by field experience) might be reflected in warranty financial reporting.*

The Board then discussed the need for more frequent monitoring of the financial condition of the Company, resulting in the following directive:

*The Board directed that Mr. Coleman reinstitute frequent and regularly scheduled meetings of the Audit Committee so that the financial condition of the Company can be monitored, and corrective action taken, in a timely fashion.*

c.   <u>Revised Financials for 2004-2008</u>.

The assumptions underlying the 2004-2008 Business Plan were then discussed, with emphasis on the three primary areas of concern, those being labor costs, currency fluctuations and warranty uncertainty.  It was noted by Mr. Coleman that volume projections have remained unchanged since the break-even analysis previously performed.

In concluding this portion of the Meeting, the Board discussed various opportunities for cost reduction with Company suppliers and the possibility of bargaining with those suppliers on a system-wide basis.  With respect to these matters, the Board concluded as follows:

*Mr. Martello is to provide the Board with a listing of vendors and the value of purchases from each.*

*Mr. Gosnell and Mr. Vogel are to exchange background information with respect to each Member's respective primary commodity suppliers.*

III.   <u>**Strategic Options**</u>

Mr. Martello then led a discussion of the various strategic options available to the Company, which include (i) continuation of Company operations "as is", (ii) shutdown and redeployment of assets of the Company, (iii) possible increased utilization of the Laurinburg facility by one or both of the Members, (iv) movement of Laurinburg operations to facilities of one or both of the Members and (v) possible combination with other manufacturers.

Mr. Martello presented various aspects of each alternative, along with supporting financial projections.  During the course of the discussion, considerable attention was given to options relating to consolidation of operations throughout the systems of the Members.  Mr. Lutz presented preliminary possibilities involving the Gainesville, Georgia facility of the ZF Member, and Mr.

0256723.02
LIB: C2

Highly Confidential
ZFMA0019962

000635

Gosnell did the same with respect to possibilities involving operations of the ArvinMeritor Member.

Following a candid discussion of the fundamental importance of the Company to each of the Members, the Board tentatively concluded that the most promising strategies would involve (in this order) (i) continuing operations of the Company at the Laurinburg facility but with significant additional utilization of that facility by the ArvinMeritor Member and (ii) relocating elements of the Company's Laurinburg operations to the ZF Member's facility in Gainesville, Georgia (or to other companies and suppliers). In conjunction with that discussion, it was agreed that, in any event, cash flow management must be a priority so that the Company's cash flow position can be stabilized and the need for regular or significant cash infusions from the Members eliminated. Following that discussion, the following commitment was made:

> *Mr. Gosnell is to report back to the Board (within a 30 to 90 day period, but hopefully toward the earlier end of that range) on the possibilities for additional utilization of the Company's Laurinburg facility by the ArvinMeritor Member.*

## IV.    Old Business

Mr. Allen was then called upon to discuss certain matters of old business. He provided a warranty report update, which included a G Platform Warranty Performance rainbow chart [attached to these Minutes as <u>Exhibit G</u> (page 31)] and various warranty corrective actions that have been taken (or are in process) with respect to 9 & 10 speed transmissions.

Mr. Allen then discussed briefly the status of patent litigation involving (i) the ESS system and (ii) an interference claim lodged with respect to one of the Company's torque prediction patents.

<br/>

Redacted

<br/>

Mr. Wooten then briefly presented to the Board an updated environmental performance report.

4

0256723.02<br/>LIB: C2

Highly Confidential
ZFMA0019963

000636

## V.    New Business

Mr. Martello then led a discussion of various items of new business. The initial matter involved deliberations of, and recommendations from, the Compensation Committee of the Company. The Board made the following determinations with respect to compensation related matters:

> *Subject to continuation of the program by the ArvinMeritor Member, the Board approved reinstatement of the Savings Plan match and approved the ICP Percentage match for fiscal year 2003.*

The next items of new business related to requested capital expenditure authorizations, those being (i) the pressing need to make a decision on FreedomLine industrialization, (ii) manual transmission cost reduction systems, (iii) shift knob re-sourcing and (iv) implementation of the ERP/SAP system.

> *The Board directed that Mr. Coleman provide to the ZF Member (through Mr. Schafhauser and Mr. Vogel) and to the ArvinMeritor Member (through Mr. Gosnell and Mr. Guy) an appropriation request justifying expenditures with respect to FreedomLine industrialization. That matter will be taken up at the next Board meeting.*

> *The Board approved the proposals relating to manual transmission cost reduction and shift knob re-sourcing, provided that Mr. Shah and Mr. Hardig are involved in the testing and release of any changes in order to assure that there are no quality problems respecting the same.*

> *The Board directed that the ERP/SAP implementation remain on hold pending the decision on future utilization of the Laurinburg facility.*

The next order of new business was a discussion of the potential lease and transfer of various machine tooling and housing assets of the Company to vendors (in exchange for economic concessions from those vendors).

> *The Board directed that matters relating to the lease or transfer of such assets be referred to the Audit Committee for review and approval.*

The next order of new business was a brief discussion of pressure being applied by Company suppliers to raise prices because of low volume component orders from the Company. Following a discussion of this issue the Board concluded as follows:

0256723.02
LIB: C2

Highly Confidential
ZFMA0019964

**000637**

*The Board directed that the Company discontinue production of SureShift and directed that price increases from suppliers for other components be rejected.*

The next order of new business was a discussion of quality control processes, with the Board directing as follows:

*The Company is to utilize the best practices from each Member in continuing to refine its quality control processes, and Ashok Shah is to be consulted on a frequent and regular basis concerning development and operation of those processes.*

The final order of new business was a discussion of the schedule for future Board meetings. It was noted that the previously scheduled meeting on July 24, 2003 in Friedrichshafen, Germany conflicts with other events and will need to be rescheduled.

*Mr. Vogel and Mr. Gosnell are to check the schedules of the Board members representing each Member, respectively, and are to re-set the date of the next meeting of the Board by informing all members of the Board, Company management and the Secretary of that new date.*

The regularly scheduled Board meeting on December 2, 2003 in Troy, Michigan was confirmed, as previously scheduled.

## VI.   Adjournment.

The Board then commended Mr. Allen on the article in Heavy Duty Trucking (March 2003) which favorably cited the FreedomLine technology.

There being no further business to come before the Board, upon motion duly made and seconded, the meeting was adjourned.

Michael S. Hawley, Secretary

Approved:

Wolfgang Vogel, Chairman

6

0296723.02
LIB: C2

Highly Confidential
ZFMA0019965

**000638**



# 2002 Audit Summary

|  | Transmissions | | Clutch | | Total ZFM | |
|---|---|---|---|---|---|---|
|  | Sales | PBT | Sales | PBT | Sales | PBT |
| 2002 September Close | $65,149 | ($16,687) | $19,958 | ($2,060) | $85,107 | ($18,747) |
| 2002 D&T Audited Statements | 64,704 | (23,676) | 0 | 343 | 64,704 | (23,333) |
| Adjustments | ($445) | ($6,989) | ($19,958) | $2,403 | ($20,403) | ($4,586) |

Exhibit A

Highly Confidential
ZFMA0019966

 **MERITOR**

# 2002 Audit
# P&L Adjustments

|  | Transmissions | Clutch | Total |
|---|---|---|---|
| Impairment (1) | ($10,041) |  | ($10,041) |
| Post JV Accrual (2) | (3,118) | 2,016 | (1,102) |
| Adjust Shut Down Serverence Accrual |  | 521 | 521 |
| CEPA | (520) |  | (520) |
| Pre JV Warranty (3) | 3,784 |  | 3,784 |
| Book Earnout (4) | 2,951 |  | 2,951 |
| Other | (45) | (134) | (179) |
| Total 2002 Adjustments | ($6,989) | $2,403 | ($4,586) |

5 November 12 Board Meeting Minutes Follow-Up Items Including the Going Concern Letter (5)

Exhibit B

Highly Confidential
ZFMA0019967



# Executive Summary
# 2003 Actual/Forecast vs. AOP

|  | January Year-To-Date | | | Full Year | | |
|---|---|---|---|---|---|---|
|  | 2003 FCST | AOP | B/(W) | 2003 FCST | AOP | B/(W) |
| Units | 4,482 | 4,359 | 123 | 15,828 | 18,890 | (3,062) |
| Sales | $16,885 | $15,002 | $1,883 | $61,770 | $66,095 | ($4,325) |
| PBT | ($9,170) | ($7,705) | ($1,465) | ($20,933) | ($17,150) | ($3,783) |
| Capital | $562 | $2,003 | $1,441 | $4,000 | $4,097 | $97 |
| Accounts Receivable Days | 40.5 | 40.0 | (0.5) | 35.6 | 37.8 | 2.2 |
| Accounts Payable Days | 45.7 | 42.3 | 3.4 | 38.0 | 37.1 | 0.9 |
| Inventory Turns (Net) | 8.1 | 10.7 | (2.6) | 10.9 | 12.2 | (1.3) |
| Head Count | 160 | 152 | (8) | 174 | 160 | (14) |
| Operating Cash Flow (Excl. Earnout) | ($10,833) | ($9,850) | ($983) | ($28,783) | ($27,180) | ($1,603) |
| Debt | $59,478 | $61,717 | $2,239 | $69,983 | $71,594 | $1,611 |
| Change In Debt | $3,598 | $2,617 | ($981) | $14,103 | $12,500 | ($1,603) |

Exhibit C

Highly Confidential
ZFMA0019968



ZFM Board Meeting
March 20, 2003

# Profit Causal
# 2003 January YTD Actuals Vs. AOP

|  | Transmission | |
|---|---|---|
|  | Sales | PBT |
| Jan 03 YTD Actuals | $16,885 | ($9,170) |
| Jan YTD AOP | 15,002 | (7,705) |
| Better/(Worse) | $1,883 | ($1,465) |

| | Sales | PBT | |
|---|---|---|---|
| Volume and Mix | $1,110 | ($155) | Freedom 93 and G 30 Units Higher Than AOP. |
| Pricing-CE/PA | 773 | 773 | Removed Freightliner Pricing. |
| Material Variances | | (201) | $ Per Euro in AOP = .93.  Actual $ Per Euro At 1.07. |
| Freight Variance | | (257) | Customs and Duty Understated in AOP. |
| Labor and Burden | | (563) | Inefficient volume levels; benefits of laid-off workers; launch of the new assembly line |
| Warranty Volume | | (20) | |
| Warranty Rate | | (1,313) | Waiting for Reserve Analysis.  Still Maintaining AOP Reserve Levels. |
| Operating Expenses | | (185) | Higher Policy and ZFF Engineering Charges. |
| Depreciation | | 139 | Less Spending and Slower Capitalization of FreedomLine™.   Evaluating Impact of Impairment. |
| Interest Expense | | 342 | 2.7% Actual Vs. 4% in AOP. |
| Other Income/Expense | | (25) | Evaluating Impact of Impairment.  Clutch $154K. |
| Total PBT Change | $1,883 | ($1,465) | |

Exhibit D

Highly Confidential
ZFMA0019969



# Profit Causal
# 2003 Full Year FCST Vs. AOP

| | January YTD | | Full Year | | |
|---|---|---|---|---|---|
| | Sales | PBT | Sales | PBT | |
| FY 03 Actual/Fcst | $16,885 | ($9,170) | $61,770 | ($20,933) | |
| AOP | 15,002 | (7,705) | 66,095 | (17,150) | |
| Better/(Worse) | $1,883 | ($1,465) | ($4,325) | ($3,783) | |
| | | | | | |
| Volume and Mix | $1,110 | ($155) | (6,897) | (3,210) | Freedom 178 and G (3,240) Vs. AOP. |
| Pricing-CE/PA | 773 | 773 | 2,572 | 2,572 | Eliminated $1,723 Freightliner Pricing. |
| Material Variances | | (201) | | (2,884) | Steel (160), Exchange (1,400)-Act. .93$/Euro,Vs. 1.07$/Euro.  Industrialization (800). |
| Freight Variance | | (257) | | (267) | Customs and Duty Understated in AOP. |
| Labor and Burden | | (563) | | (898) | Inefficient volume levels; benefits of laid-off workers; launch of the new assembly line |
| | | | | | |
| Warranty Volume | | (20) | | 540 | Lower Units |
| Warranty Rate | | (1,313) | | (1,578) | Waiting for Reserve Analysis.  Still Maintaining AOP Reserve Levels. |
| | | | | | |
| Operating Expenses | | (185) | | 802 | Spending Timing |
| Depreciation | | 139 | | 139 | Less Spending and Slower Capitalization of FreedomLine™.  Evaluating Impact of Impairment. |
| Interest Expense | | 342 | | 954 | Lower Debt and Rates 2.7% Vs. 4%. |
| Other Income/Expense | | (25) | | 47 | Includes $154K Clutch |
| Total PBT Change | $1,883 | ($1,465) | ($4,325) | ($3,783) | |

Exhibit E

Highly Confidential
ZFMA0019970

ZFM Board Meeting
March 20, 2003

**ZF MERITOR**

# Cash Causal
# 2003 February YTD Vs. AOP

|  | January YTD Actual | | | Full Year FCST | | |
|---|---|---|---|---|---|---|
|  | Actual | AOP | B/(W) | Actual | AOP | B/(W) |
| Net Income | ($9,170) | ($7,706) | ($1,464) | ($20,933) | ($17,150) | ($3,783) |
| Warranty Accruals | (2,091) | (759) | (1,332) | (4,324) | (3,286) | (1,038) |
| Depreciation | (1,094) | (1,600) | 506 | (3,639) | (4,143) | 504 |
| Net Income Without Warranty & Depreciation | ($5,995) | ($5,347) | ($638) | ($12,970) | ($9,721) | ($3,249) |
|  |  |  |  |  |  |  |
| Inventory | ($2,288) | $1,427 | ($3,715) | ($1,645) | ($1,753) | $108 |
| Accounts Receivable | 7,111 | 2,401 | 4,710 | 2,966 | (1,912) | 4,878 |
| Accounts Payable | (3,819) | (2,604) | (1,215) | (2,602) | 746 | (3,348) |
| Other Assets | 107 |  | 107 | 172 | 55 | 117 |
| Other Liabilities | (1,200) | (22) | (1,178) | (623) | 618 | (1,241) |
| Warranty Payouts Transmissions | (3,100) | (1,934) | (1,166) | (6,567) | (5,812) | (755) |
| Warranty Payouts & Other Cash for Clutch | (1,095) | (1,768) | 673 | (3,514) | (5,304) | 1,790 |
| Capital | (562) | (2,003) | 1,441 | (4,000) | (4,097) | 97 |
| Net Cash Flow from Operations | ($10,831) | ($9,850) | ($981) | ($28,783) | ($27,180) | ($1,603) |
|  |  |  |  |  |  |  |
| Earnout | 7,233 | 7,233 | 0 | 14,680 | 14,680 | 0 |
| Net Increase/(Decrease) in Cash | ($3,598) | ($2,617) | ($981) | ($14,103) | ($12,500) | ($1,603) |
|  |  |  |  |  |  |  |
| Beginning Debt | $55,880 | $59,100 | $3,220 | $55,880 | $59,200 | $3,320 |
| Ending Debt | $59,478 | $61,717 | $2,239 | $69,983 | $71,591 | $1,608 |

Exhibit F

Highly Confidential
ZFMA0019971



## G Platform Warranty Performance
## Claims Thru January 2003



Exhibit G

Highly Confidential
ZFMA0019972

**000645**

Highly Confidential
ZFMA0019973

 **MERITOR.**



ZF Meritor Board Meeting
July 15, 2003

# Action Items from March 20, 2003 Meeting

1. **Mr. Coleman to Present Latest Financial Data Available – Complete.**
2. **Mr. Coleman to Send to The BOD A Better Explanation of Causal for the Year-To-Date Profit Deterioration – Complete  E-Mail Dated 4/4/03.**
3. **Mr. Coleman to Re-Evaluate Warranty Financial Information – This Was Done Again in Preparation for the July 15, 2003 Board of Directors Meeting.**
4. **Mr. Coleman to have More Frequent Audit Committee Meetings – Complete.**
5. **Mr. Martello to Provide a Listing of Vendors and Their Purchases – Complete. E-Mail dated 3/26/03.**
6. **Mr. Gosnell and Mr. Vogel to Exchange Purchasing Information with Their Purchasing Managers – Feedback from ZFF's Mr. Regenscheit Received.**
7. **Mr. Gosnell to Report Back to the Board of Directors the Possibility of ArvinMeritor Utilizing the Laurinburg Facility – Completed in the April Teleconference and Reconfirmed in E-Mail Dated 6/20/03.**
8. **Mr. Allen to Continue Vigorous Defense of Eaton Patent Interference – Update in July 15, 2003 Meeting.**
9. **Compensation Committee Recommendation:**
    - Approval of Reinstating Savings Plan Match – On Hold Until After July 2003 Board Meeting
    - Approval of Change in ICP Match - Communicated
10. **Mr. Coleman to Re-Submit FreedomLine® Industrialization Justification – On Hold Until Outcome of July Board Meeting.**

5

Highly Confidential
ZFMA0019974

000647





ZF Meritor Board Meeting
July 15, 2003

# ZF Meritor

# 2003

# Full Year Forecast

6

Highly Confidential
ZFMA0019975





**ZF** MERITOR.

ZF Meritor Board Meeting
July 15, 2003

# ZF Meritor
# 2003 Full Year Forecast

| | FY 2003 ($000) | | | |
|---|---|---|---|---|
| | June YTD Actuals | B/(W) Plan | Full Year Forecast | B/W Plan |
| **Sales** | $38,802 | ($3,880) | $53,568 | ($12,527) |
| **PBT** | ($14,759) | ($237) | ($26,160) | ($9,010) |
| **Cash** | ($12,692) | ($1,677) | ($17,552) | ($5,052) |
| **Debt** | $68,572 | $1,529 | $73,432 | ($1,846) |

*Handwritten annotations: "Clutch 2.4m driven by clutch" near PBT; "5.6m inprovmen" near top right; "began yr. 3.2m at BoP"; "71.6m. ceiling"*

7

Highly Confidential
ZFMA0019976

000649

 

# 2003 PBT Vs. AOP

| | FY 2003 JUNE YTD | | | | | FY 2003 FCST | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | ACTUALS | AOP | B/(W) | Change | | FCST | AOP | B/(W) | Change | |
| CIVILIAN SALES -- BASE | $37,912 | $43,289 | ($5,377) | -12% | | $52,251 | $67,174 | ($14,923) | -22% | YTD actual units F 1,562 vs. AOP 1,376 |
| FLORENCE SALES | 3,883 | 3,564 | 319 | 9% | | 4,912 | 4,753 | 160 | 3% | YTD actual units G 8,791 vs. AOP 10,583 |
| PLAINFIELD SALES | 1,484 | 1,278 | 206 | 16% | | 1,892 | 1,704 | 189 | 11% | |
| NET SALES | $43,279 | $48,131 | ($4,852) | -10% | | $59,055 | $73,630 | ($14,575) | -20% | FY FCST G 13,235 vs. AOP 18,890 |
| | | | | | | | | | | FY FCST F 3,052 vs. AOP 2,842 |
| STD. MATERIAL AND FREIGHT | ($30,910) | ($32,489) | $1,579 | -5% | | ($42,721) | ($49,969) | $7,248 | -15% | |
| STD. LABOR | (1,164) | (1,515) | 351 | -23% | | (1,507) | (2,292) | 785 | -34% | Higher Freedomline mix. |
| STD. BURDEN | (4,808) | (6,315) | 1,507 | -24% | | (6,189) | (9,563) | 3,374 | -35% | Lower G volume. |
| STD. COST OF SALES | ($36,882) | ($40,319) | $3,437 | -9% | | ($50,417) | ($61,824) | $11,407 | -18% | |
| STD. MARGIN B/F PRICING | $6,397 | $7,812 | ($1,415) | -18% | | $8,638 | $11,806 | ($3,168) | -27% | |
| STD. MARGINS B/F PRICING | 14.8% | 16.2% | (1.4) | | | 14.6% | 16.0% | (1.4) | | |
| CIVILIAN SALES -- PRICING | ($220) | ($1,381) | $1,161 | -84% | | ($250) | ($1,996) | $1,746 | -87% | Less Freightliner Pricing. |
| C5/PA | (4,258) | (4,069) | (189) | 5% | | (5,238) | (5,539) | 301 | -5% | |
| STANDARD GROSS MARGIN | $1,919 | $2,362 | ($443) | -19% | | $3,150 | $4,271 | ($1,121) | -26% | |
| MATERIAL VARIANCES | ($854) | $594 | ($1,448) | -244% | | ($1,053) | $1,466 | ($2,519) | -172% | Morristown, Guardian, Leoni, Parker. |
| EXCHANGE | (710) | 43 | (753) | -1751% | | (1,611) | 146 | (1,757) | -1203% | Exchange at .85 $/E vs. 1.07. |
| DIRECT LABOR VARIANCE-OTHER | ($563) | $83 | ($646) | -778% | | ($671) | $295 | ($966) | -327% | Slow adjustment to lower volumes. Freedom Launch. |
| BURDEN VARIANCE | (10) | 1,432 | (1,442) | -101% | | (262) | 2,969 | (3,231) | -109% | Inability to Reduced Fixed Burden. |
| DEPRECIATION/IMPAIRMENT | (424) | (2,383) | 1,959 | 82% | | (5,975) | (3,257) | (2,718) | 83% | Impaired depreciation. 5,400K 2003 impairment. |
| WARRANTY ACCURAL | (3,573) | (2,129) | (1,444) | 68% | | (4,255) | (3,286) | (969) | 29% | Deficit. Rates $206/U vs. $176. Lower volumes. |
| TOTAL VARIANCES | ($6,134) | ($2,360) | ($3,774) | 160% | | ($13,827) | ($1,667) | ($12,160) | 729% | |
| GROSS PROFIT | (4,215) | 2 | | | | (10,677) | 2,604 | | -510% | |
| GENERAL & ADMIN. | ($3,445) | ($3,800) | $355 | -9% | | ($4,610) | ($4,992) | $382 | -8% | Lower spending. |
| ENGINEERING | (3,561) | (3,978) | 417 | -10% | | (4,742) | (5,273) | 531 | -10% | Lower spending. |
| SALES & MKTG | (4,639) | (4,410) | (229) | 5% | | (6,193) | (6,372) | 179 | -3% | Spending timing. Lower spending. |
| TOTAL OPERATING EXPENSE | ($11,645) | ($12,188) | $543 | -4% | | ($15,545) | ($16,637) | $1,092 | -7% | |
| NET OPERATING PROFIT | ($15,860) | ($12,186) | ($3,674) | 30% | | ($26,222) | ($14,033) | ($12,189) | 87% | |
| OTHER INCOME/EXPENSE | $270 | $0 | $270 | n/a | | ($137) | $0 | ($137) | n/a | Interest on Earnout 536. Asset w/o. |
| INTEREST EXPENSE | (1,570) | (2,336) | 766 | -33% | | (2,202) | (3,117) | 915 | -29% | 2.57% vs. 4.0% |
| TRANSMISSION PBT | ($17,160) | ($14,522) | ($2,638) | 18% | | ($28,561) | ($17,150) | ($11,411) | 67% | |
| CLUTCH PBT | 2,401 | 0 | 2,401 | n/a | | 2,401 | 0 | 2,401 | n/a | Warranty Reserve Surplus |
| COMBINED PBT | ($14,759) | ($14,522) | ($237) | 2% | | ($26,160) | ($17,150) | ($9,010) | 53% | |

8

Highly Confidential
ZFMA0019977





ZF Meritor Board Meeting
July 15, 2003

# 2003 Cash Flow

| | FY2002 Balance | FY 2003 FORECAST | | | |
|---|---|---|---|---|---|
| | | JUNE YTD | B/(W) PLAN | FY 2003 FCST | B/(W) PLAN |
| Transmission PBT | | ($17.2) | ($2.6) | ($28.6) | ($11.4) |
| Transmission Warranty Accrual | | $3.6 | $1.4 | $4.2 | $0.9 |
| Depreciation/Impairment | | $0.3 | ($2.6) | $6.1 | $2.0 |
| Transmission Warranty Charges | | $8.4 | ($4.0) | $9.8 | ($4.0) |
| Capital Spending | | $0.7 | $3.3 | $1.3 | $2.8 |
| Working Capital Changes | | $1.7 | $1.9 | $0.5 | $2.7 |
| Earnout | | $10.9 | $0.0 | $14.7 | $0.0 |
| Transmissions Operating Cash Flow | | ($9.7) | ($2.7) | ($14.2) | ($7.1) |
| Clutch Operating Cash Flow | | ($1.5) | $2.5 | ($3.6) | $1.7 |
| Cash Balance Change | | ($1.5) | ($1.5) | $0.2 | $0.2 |
| Combined Cash Required | | ($12.7) | ($1.7) | ($17.6) | ($5.1) |
| Debt | $55.9 | $68.6 | $1.5 | $73.4 | ($1.8) |

*ended '02*
*3.2 AT FC⁹*
*cash*

Highly Confidential
ZFMA0019978



ZF Meritor Board Meeting
July 15, 2003

**ZF Meritor**
**Causal – Year to Date Actual vs Plan (Transmission Only)**

| | ZF MERITOR FY 03 June YTD | |
|---|---|---|
| | Sales | PBT |
| FY 03 June YTD Actuals | $ 38,802 | $ (17,160) |
| FY 03 June YTD AOP | 42,682 | (14,522) |
| Better / (Worse) | $ (3,880) | $ (2,638) |

| **Volume & Mix** | | |
|---|---|---|
| Sales Volume | (4,852) | (1,187) |
| Sales Mix | | (229) |
| Prod. Volume / Mix | | (1,346) |
| Overtime Premium | | (34) |
| **Total Volume & Mix** | (4,852) | (2,796) |

Act units 10,130 – G 8,158 Freedom 1,972.
AOP units 12,247 – G 10,544 Freedom 1,703.

| **Pricing** | | |
|---|---|---|
| CE/PA | (189) | (189) |
| OEM Pricing | 1,161 | 1,161 |
| **Total Pricing** | 972 | 972 |

(1,235) Freightliner adjustment in May, volume 616.
Freightliner 1,220, Volvo (100), Mack 42.

| **Performance** | | |
|---|---|---|
| Material | | (110) |
| Labor | | (782) |
| Burden | | 23 |
| **Total Performance** | - | (869) |

Direct (698), Indirect (121), Salary 92, Temp (26), Ind Frg (52), Salary Frg 13.
T&A 12, AOS 67, Utilities 10, Communications 31, Purchased Serv 184, Scrap (40).
Rent (13), All Other Exp 64, P&E Repair (109), Mat Handling (183).

| **Economics** | | |
|---|---|---|
| Material | | (2,089) |
| Labor | | - |
| Burden | | - |
| **Total Economics** | - | (2,089) |

Exchange 710K, Morristown, Guardian, Leoni, Parker.

| **Operating Expenses** | | |
|---|---|---|
| General & Admin. | | 355 |
| Engineering | | 417 |
| Sales & Marketing | | (229) |
| **Total Operating Expenses** | - | 542 |

Lower Spending.
Lower Spending.
Spending timing.

| **Other** | | |
|---|---|---|
| Depreciation (operations) | | 1,959 |
| Freight Variance | | (189) |
| Other Income | | 558 |
| Other Expense | | (287) |
| Interest Expense | | 766 |
| Warranty | | (1,444) |
| Other | | 238 |
| **Total Other** | - | 1,601 |

Mostly adjustment of 1,570 for 2002 impairment.
Higher Freedom Line™ Freight.
Interest on Earnout 536K, Asset w/o 10K, Other 12K.
Clutch AP (33), Waupaca Rebate 19, Asset Retirement (298), Other 25.
Interest rate 2.57% vs. 4% in Plan.
AOP Accural 2,129, Actual 3,573, May true-up 2,072, June true-up (1,993) Volume 377.
MPV Other (17), Scrap sales 5, Inventory Adjustments 233, Taxes 17.

| **Total PBT Change** | $ (3,880) | $ (2,638) |
|---|---|---|

10

Highly Confidential
ZFMA0019979



**ZF Meritor Board Meeting**
July 15, 2003

**ZF Meritor**
Causal – Full Year FY03 Forecast vs FY03
(Transmission Only)

| | ZF MERITOR | |
| --- | --- | --- |
| | FY 03 Full Year | |
| | Sales | PBT |
| FY 03 Full Year Forecast | $ 53,568 | $ (28,561) |
| FY 03 Full Year AOP | 66,095 | (17,150) |
| Better / (Worse) | $ (12,527) | $ (11,411) |

| Volume & Mix | | |
| --- | --- | --- |
| Sales Volume | (14,574) | (2,856) |
| Sales Mix | | (312) |
| Prod. Volume / Mix | | (3,266) |
| Overtime Premium | | (27) |
| Total Volume & Mix | (14,574) | (6,461) |

Pst units 13,436 - G 10,411 Freedom 3,044.
AOP units 18,890 - G 16,048 Freedom 2,842.

| Pricing | | |
| --- | --- | --- |
| CE/PA | 301 | 301 |
| OEM Pricing | 1,746 | 1,746 |
| Total Pricing | 2,047 | 2,047 |

Freightliner Adjustment (1,235), volume 1,585.
Freightliner 1,661, Volvo/Mack 85.

| Performance | | |
| --- | --- | --- |
| Material | | (376) |
| Labor | | (1,033) |
| Burden | | (146) |
| Total Performance | - | (1,555) |

Direct Labor (929), Ind (161), Temp Labor (2), ID Frg (73), Salary 125, Sal Frg 27.
T&A (9), Utilities (9), Freight (4), Comm. 34, Purch Serv 197, Scrap (55), Rent (14),
AOE 59, P&E Repair (129), Mat Handling (263), AOS 46.

| Economics | | |
| --- | --- | --- |
| Material | | (3,704) |
| Labor | | - |
| Burden | | |
| Total Economics | - | (3,704) |

Exchange (1,528), Morristown, Guardian, Leoni, Parker.

| Operating Expenses | | |
| --- | --- | --- |
| General & Admin. | | 382 |
| Engineering | | 531 |
| Sales & Marketing | | 179 |
| Total Operating Expenses | - | 1,092 |

Lower spending.
Lower spending.
Lower spending.

| Other | | |
| --- | --- | --- |
| Depreciation (operations) | | (2,718) |
| Freight Variance | | (181) |
| Other Income | | 558 |
| Other Expense | | (287) |
| Interest Expense | | 915 |
| Warranty | | (969) |
| Other | | (148) |
| Total Other | - | (2,831) |

Depreciation 2,682 - mostly 2002 impairment impact. Year-end impairment (5,400).
Higher Freedom freight.
Asset w/o 10, Other 10. Earnout interest $536K.
Clutch AP (33), Waupaca Rebate 19, Asset Retirement (298), Other 25.
Interest rate 2.57% vs. 4% in Plan.
May True up (2,072), June true-up $1,903, volume $960.
Forecast hold (409), MPV Other (23), Taxes 17, Scrap 5, Inv. Adj. 262.

| Total PBT Change | $ (12,527) | $ (11,411) |
| --- | --- | --- |

11

Highly Confidential
ZFMA0019980





ZF Meritor Board Meeting
July 15, 2003

# ZF Meritor

# 2004 to 2008

# Business Plan Assumptions

# June 28, 2003

12

Highly Confidential
ZFMA0019981

 **MERITOR**



ZF Meritor Board Meeting
July 15, 2003

# NAFTA Class 8 Truck Build

| | FY '03 | FY '04 | | | | FY '05 | | | | FY '06 | | | | FY '07 | | | | FY '08 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 165,500 | 222,110 | | | | 273,300 | | | | 304,500 | | | | 263,500 | | | | 194,300 | | | |
| ZFM - FY | 4th Qtr. | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | 4th Qtr. | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | 4th Qtr. | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | 4th Qtr. | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | 4th Qtr. | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | 4th Qtr. |
| Qtr. Split | | 21% | 24% | 27% | 28% | 23% | 24% | 26% | 27% | 26% | 25% | 25% | 24% | 28% | 27% | 24% | 22% | 28% | 25% | 24% | 23% |
| Qtr. Units | 44,020 | 47,000 | 53,500 | 60,000 | 61,610 | 62,859 | 65,592 | 71,058 | 73,791 | 77,952 | 77,343 | 74,907 | 74,298 | 72,463 | 69,828 | 63,240 | 57,970 | 54,404 | 48,575 | 46,632 | 44,689 |

## OEM MARKET SHARE - Class 8 - NAFTA

| | OEM Market Share Percentage | | | | | | OEM Market Share Volume | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 |
| **Freightliner LLC** | | | | | | | | | | | |
| Freightliner | 29.6% | 29.6% | 29.6% | 29.6% | 29.6% | | 65,700 | 80,842 | 90,071 | 77,943 | 57,474 |
| Sterling | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% | | 14,800 | 18,212 | 20,291 | 17,559 | 12,947 |
| Western Star | 1.7% | 1.7% | 1.7% | 1.7% | 1.7% | | 3,800 | 4,676 | 5,209 | 4,508 | 3,324 |
| Total | 38.0% | 38.0% | 38.0% | 38.0% | 38.0% | | 84,300 | 103,729 | 115,571 | 100,010 | 73,745 |
| **International** | 16.6% | 16.6% | 16.6% | 16.6% | 16.6% | | 36,820 | 45,306 | 50,478 | 43,681 | 32,210 |
| **Paccar** | | | | | | | | | | | |
| Kenworth | 12.3% | 12.3% | 12.3% | 12.3% | 12.3% | | 27,300 | 33,592 | 37,427 | 32,387 | 23,882 |
| Peterbilt | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | | 24,150 | 29,716 | 33,108 | 28,650 | 21,126 |
| Total | 23.2% | 23.2% | 23.2% | 23.2% | 23.2% | | 51,450 | 63,308 | 70,535 | 61,038 | 45,008 |
| **VTNA** | | | | | | | | | | | |
| Mack | 11.9% | 11.9% | 11.9% | 11.9% | 11.9% | | 26,500 | 32,607 | 36,330 | 31,438 | 23,182 |
| Volvo | 10.3% | 10.3% | 10.3% | 10.3% | 10.3% | | 22,850 | 28,116 | 31,326 | 27,108 | 19,989 |
| Total | 22.2% | 22.2% | 22.2% | 22.2% | 22.2% | | 49,350 | 60,723 | 67,656 | 58,546 | 43,171 |
| **Scania** | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | | 190 | 234 | 260 | 225 | 166 |
| **TOTAL** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | 222,110 | 273,300 | 304,500 | 263,500 | 194,300 |

13

Highly Confidential
ZFMA0019982





ZF Meritor Board Meeting
July 15, 2003

# ZFM Penetration & Product Mix by Major OEM's

| | Product Penetration By OEM | | | | | | Product Mix Volume By OEM | | | | |
| | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Freightliner LLC** | | | | | | | | | | | |
| Freightliner | | | | | | | | | | | |
| Model 2 | 8.0% | 7.7% | 5.8% | 4.1% | 3.5% | | 5,278 | 6,198 | 5,196 | 3,231 | 1,996 |
| Freedom | 1.5% | 1.9% | 3.8% | 5.4% | 6.1% | | 1,014 | 1,544 | 3,431 | 4,234 | 3,508 |
| Total | 9.6% | 9.6% | 9.6% | 9.6% | 9.6% | | 6,292 | 7,742 | 8,627 | 7,465 | 5,504 |
| Sterling | | | | | | | | | | | |
| Model 2 | 2.5% | 2.3% | 1.8% | 1.5% | 1.3% | | 377 | 420 | 365 | 263 | 175 |
| Freedom | 0.4% | 0.7% | 1.2% | 1.5% | 1.6% | | 67 | 126 | 243 | 263 | 214 |
| Total | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | | 444 | 546 | 609 | 527 | 388 |
| Western Star | | | | | | | | | | | |
| Model 2 | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | | 8 | 9 | 11 | 9 | 7 |
| Freedom | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | 0 | 0 | 0 | 0 | 0 |
| Total | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | | 8 | 9 | 11 | 9 | 7 |
| **Total** | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% | | 6,744 | 8,297 | 9,247 | 8,001 | 5,900 |
| **International** | | | | | | | | | | | |
| International | | | | | | | | | | | |
| Model 2 | 5.5% | 4.5% | 4.5% | 4.5% | 4.5% | | 2,025 | 2,038 | 2,272 | 1,966 | 1,450 |
| Freedom | 2.5% | 3.5% | 3.5% | 3.5% | 3.5% | | 921 | 1,585 | 1,767 | 1,529 | 1,127 |
| **Total** | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% | | 2,946 | 3,624 | 4,040 | 3,494 | 2,577 |
| **Paccar** | | | | | | | | | | | |
| Kenworth | | | | | | | | | | | |
| Model 2 | 1.1% | 0.8% | 0.5% | 0.2% | 0.2% | | 307 | 252 | 187 | 81 | 60 |
| Freedom | 1.4% | 1.8% | 2.0% | 2.2% | 2.2% | | 374 | 588 | 748 | 728 | 537 |
| Total | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | | 681 | 840 | 935 | 809 | 597 |
| Peterbilt | | | | | | | | | | | |
| Model 2 | 1.6% | 1.1% | 0.7% | 0.3% | 0.3% | | 380 | 333 | 232 | 100 | 74 |
| Freedom | 1.9% | 2.4% | 2.8% | 3.1% | 3.1% | | 465 | 707 | 927 | 902 | 665 |
| Total | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | | 845 | 1,040 | 1,159 | 1,002 | 739 |
| **Total** | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | | 1,526 | 1,879 | 2,094 | 1,812 | 1,336 |

14

Highly Confidential
ZFMA0019983





ZF Meritor Board Meeting
July 15, 2003

## ZFM Penetration & Product Mix by Major OEM's – cont.

| VTNA | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mack | | | | | | | | | | | |
| Model 2 | 2.1% | 2.1% | 2.1% | 2.1% | 2.1% | | 560 | 686 | 768 | 664 | 490 |
| Freedom | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | | 240 | 294 | 329 | 285 | 210 |
| Total | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | | 800 | 980 | 1,097 | 949 | 700 |
| Volvo | | | | | | | | | | | |
| Model 2 | 12.9% | 12.6% | 9.7% | 5.8% | 5.8% | | 2,939 | 3,549 | 3,031 | 1,577 | 1,154 |
| Freedom | 4.6% | 4.9% | 7.8% | 11.7% | 11.7% | | 1,060 | 1,371 | 2,452 | 3,167 | 2,344 |
| Total | 17.5% | 17.5% | 17.5% | 17.5% | 17.5% | | 3,999 | 4,920 | 5,483 | 4,744 | 3,498 |
| Total | 9.7% | 9.7% | 9.7% | 9.7% | 9.7% | | 4,799 | 5,900 | 6,580 | 5,693 | 4,198 |
| | | | | | | | | | | | |
| Scania | | | | | | | | | | | |
| Scania | | | | | | | | | | | |
| Model 2 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | 0 | 0 | 0 | 0 | 0 |
| Freedom | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | 0 | 0 | 0 | 0 | 0 |
| Total | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | |
| Total Model 2 | 5.3% | 4.9% | 4.0% | 3.0% | 2.8% | | 11,875 | 13,485 | 12,062 | 7,892 | 5,405 |
| Total FreedomLine | 1.9% | 2.3% | 3.3% | 4.2% | 4.4% | | 4,140 | 6,215 | 9,898 | 11,108 | 8,605 |
| TOTAL | 7.2% | 7.2% | 7.2% | 7.2% | 7.2% | | 16,015 | 19,700 | 21,960 | 19,000 | 14,010 |

15

Highly Confidential
ZFMA0019984

000657



ZF Meritor Board Meeting
July 15, 2003

# Assumptions - Pricing and CE/PA

1.  CE/PA  - $235 per unit for 10-speed manuals
           - $500 per unit for FreedomLine®
2.  Pricing - Volvo 2% reduction in 2004 and 2005 for G Platform.
    No other pricing.
3.  Data Book Positions:

| Product | Freightliner LLC | Volvo Truck Group | PACCAR | International |
|---|---|---|---|---|
| 10-Speed Manuals | • Not listed in the Data Book<br>• $200 Penalty list as special order | • Listed in the Data Book<br>• $200 List Penalty | • Listed in the Data Book<br>• $50 to $250 List Penalty | • Listed on 9000 Series only<br>• Not offered on new models<br>• $585 List Price Penalty |
| FreedomLine® | • Not listed in the Data Book<br>• Approx. $450-500 penalty to AutoShift as special order | • Listed in the Data Book<br>• $596 list penalty to AutoShift | • Listed in the Data Book<br>• $1,853 list penalty to AutoShift | • Listed in Data Book<br>• $2,157 list penalty to AutoShift |

16

Highly Confidential
ZFMA0019985



**ZF MERITOR** Assumptions – Product Line

ZF Meritor Board Meeting
July 15, 2003

| Product | Assumption | Rationale |
|---|---|---|
| 9-Speeds | Drop as of 1-1-04 | • Low Volume (2%);  Negative Margin at International; Eaton and OEMs dropping |
| 13-Speeds | Drop as of 1-1-04 | • Derivative of 9-Speed Poor design and warranty problem |
| 10-Speeds | • Drop SureShift 11-1-03<br>• Maintain all other 10-Speed derivatives<br>• 10L Release in 2005 | • Low Volume; Wabco Price Increase<br>• Majority of Volume<br>• Testing in 2003 and 2004 |
| 12-Speed<br>FreedomLine® | • Industrialize the Overdrive by 2005<br>• Purchase the Direct Drive complete from ZFF | • Direct Drive (1.5%)<br>• Overdrive (96.5%) |
| 16-Speed<br>FreedomLine® | • Purchase complete from ZFF (overdrive only) | • Low volume (2.0%) of the FreedomLine® |

17

Highly Confidential
ZFMA0019986

**ZF MERITOR.**



ZF Meritor Board Meeting
July 15, 2003

# Assumption – Warranty Accrual Rates

**FY04 AOP Total Cost per Unit Sold - Original**

|   | FY97 | FY98 | FY99 | FY00 | FY01 | FY02 | FY03 | FY04 | FY05 | FY06 | FY07 | FY08 |
|---|------|------|------|------|------|------|------|------|------|------|------|------|
| 1 | $63.59 | $66.24 | $43.26 | $123.52 | $153.93 | $62.77 | $41.55 | $42.80 | $44.08 | $45.41 | $46.77 | $48.17 |
| 2 | $75.84 | $90.98 | $39.64 | $153.58 | $135.59 | $69.18 | $38.72 | $39.88 | $41.08 | $42.31 | $43.58 | $44.89 |
| 3 | $90.03 | $98.84 | $51.06 | $125.64 | $143.65 | $72.11 | $42.99 | $44.28 | $45.61 | $46.98 | $48.39 | $49.84 |
| 4 | $85.25 | $106.96 | $51.75 | $80.27 | $103.16 | $73.73 | $57.20 | $58.91 | $60.68 | $62.50 | $64.38 | $66.31 |
| 5 | $87.41 | $106.32 | $57.24 | $87.27 | $114.01 | $86.05 | $67.26 | $69.28 | $71.36 | $73.50 | $75.70 | $77.97 |
| Total | $402.12 | $469.34 | $242.96 | $570.29 | $650.34 | $363.85 | $247.73 | $255.16 | $262.82 | $270.70 | $278.82 | $287.19 |

**OnTrac**

| | | FY00 | FY01 | FY02 | FY03 | FY04 | FY05 | FY06 | FY07 | FY08 |
|---|---|------|------|------|------|------|------|------|------|------|
| 30% reduction to CPC | 1 | 1 | 1 | 1 | 1 | 0.85 | 0.82 | 0.79 | 0.76 | 0.73 |
| 50% of claims in fy04 | 2 | 1 | 1 | 1 | 0.85 | 0.82 | 0.79 | 0.76 | 0.73 | 0.73 |
| 60% of claims in fy05 | 3 | 1 | 1 | 0.85 | 0.82 | 0.79 | 0.76 | 0.73 | 0.73 | 0.73 |
| 70% of claims in fy06 | 4 | 1 | 0.85 | 0.82 | 0.79 | 0.76 | 0.73 | 0.73 | 0.73 | 0.73 |
| 80% of claims in fy07 | 5 | 0.85 | 0.82 | 0.79 | 0.76 | 0.73 | 0.73 | 0.73 | 0.73 | 0.73 |

 *Uv Produced*

**FY04 AOP Total Cost per Unit Sold - With OnTrac Assumption**

|   | FY97 | FY98 | FY99 | FY00 | FY01 | FY02 | FY03 | FY04 | FY05 | FY06 | FY07 | FY08 |
|---|------|------|------|------|------|------|------|------|------|------|------|------|
| 1 | $63.59 | $66.24 | $43.26 | $123.52 | $153.93 | $62.77 | $41.55 | $36.38 | $36.15 | $35.87 | $35.54 | $35.17 |
| 2 | $75.84 | $90.98 | $39.64 | $153.58 | $135.59 | $69.18 | $32.91 | $32.70 | $32.45 | $32.16 | $31.81 | $32.77 |
| 3 | $90.03 | $98.84 | $51.06 | $125.64 | $143.65 | $61.30 | $35.26 | $34.98 | $34.67 | $34.30 | $35.33 | $36.39 |
| 4 | $85.25 | $106.96 | $51.75 | $80.27 | $87.68 | $60.46 | $45.19 | $44.77 | $44.30 | $45.63 | $46.99 | $48.40 |
| 5 | $87.41 | $106.32 | $57.24 | $74.18 | $93.49 | $67.98 | $55.12 | $50.57 | $52.09 | $53.65 | $55.26 | $56.92 |
| Total | $402.12 | $469.34 | $242.96 | $557.20 | $614.34 | $321.69 | $206.03 | $199.42 | $199.66 | $201.61 | $204.94 | $209.65 |

- Warranty Rates Adjusted for OnTrac Cost Improvements
- Further Engineering Improvements Not Estimated.  Rate based on Current Data
- FreedomLine® rate held the same as "G" Platform — *due to lack of data*
- Based on Latest Rates From M. Veillette, Dated 6-26-03

*per Otto, their experience is $600/act on A drenic*

18

Highly Confidential
ZFMA0019987

**000660**

**ZF MERITOR**

# Assumptions – Warranty Cash Flow

|  | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| **"G" Platform** ($000) | $6,594 | $5,357 | $3,758 | $2,740 | $2,042 |
| **FreedomLine®** ($000) | 130 | 281 | 524 | 874 | 1,138 |
| **Sub Total** ($000) | $6,724 | $5,638 | $4,282 | $3,614 | $3,180 |
| **Clutch** ($000) | $2,091 | $812 | $229 | $63 | $5 |
| **TOTAL** ($000) | $8,815 | $6,450 | $4,511 | $3,677 | $3,185 |



**Based on Cash Flow Estimates from M. Veillette Dated 6-26-03**

19

Highly Confidential
ZFMA0019988

 

# Assumptions - Operations

1. **Housing Machining will be outsourced effective January 1, 2004:**
   - The back half of the building will be shutdown.
   - Honing and housing sub-assembly will be moved to the front building.

2. **Labor and Burden Reductions Due to Outsourcing Machining are:**
   - Labor – Production and Production Support – 11 Technicians
      - **Maintenance – 4 Technicians**
      - **Savings $728 thousand annually**
   - Burden ($000):

|   | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|------|------|------|------|------|
| Utilities | 133 | 178 | 178 | 178 | 178 |
| Scrap | 52 | 77 | 77 | 77 | 77 |
| T&A | 134 | 175 | 175 | 175 | 175 |
| Repairs | 362 | 430 | 430 | 430 | 430 |
| Total | $681 | $860 | $860 | $860 | $860 |

3. **Communication Cost Reduction:**
   - Shared Office Equipment = 48.5% ($132,077) over 5 years
   - Voice/Data Equipment and services = 18% ($138,500) over 5 years

20

Highly Confidential
ZFMA0019989



ZF Meritor Board Meeting
July 15, 2003

# Assumptions - Operations

*– MT impact – currently assumed 6 mos of this business*

### 4. Tremec Contract

- All gearing resourced by October, 2003
- Testing of 1,850 ft-lb torque to continue until May 2004.

### 5. "G" Platform Material Performance – With The Decrease in Volumes, Cost Reduction Is Minimal.

|  | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| MPV ($000) | $(106) | $93 | $304 | $181 | $120 |
| MPV (%) | -0.4% | 0.3% | 1.0% | 1.0% | 1.0% |

### 6. Inventory Turns:

|  | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Gross Inventory ($000) | $6,454 | $8,484 | $10,654 | $8,441 | $7,094 |
| In-Transit Inv. ($000) | 657 | 1,055 | $1,754 | $1,353 | $1,043 |
| Gross Inv. Turns | 10.4 | 9.7 | 8.2 | 8.8 | 9.5 |
| Inv. Turns Less In-Transit | 11.6 | 10.9 | 9.7 | 10.3 | 11.2 |

21

Highly Confidential
ZFMA0019990


**ZF MERITOR.**

ZF Meritor Board Meeting
July 15, 2003

# Assumption – FreedomLine® Industrialization

| 12 Speed Freedom Cost Model | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 CBU | 2002 CBU | 2003 CBU | 2003 CKD | 2004 CKD | 2005 CKD | 2006 CKD | 2007 CKD | 2008 CKD |
| Volumes | | | | | 4,060 | 6,091 | 9,699 | 10,886 | 8,433 |
| Actuator & Shift Module * | $1,120 | $1,110 | $1,101 | $1,066 | $1,066 | $1,066 | $670 | $670 | $670 |
| Gears | 881 | 916 | 907 | 881 | 881 | 349 | 0 | 0 | 0 |
| Housing | 280 | 330 | 355 | 353 | 353 | 353 | 353 | 353 | 353 |
| Machining Labor and Burden | 278 | 275 | 165 | 158 | 158 | 0 | 0 | 0 | 0 |
| Planetary | 512 | 516 | 541 | 531 | 531 | 531 | 0 | 0 | 0 |
| Other Parts | 675 | 722 | 678 | 666 | 666 | 666 | 438 | 222 | 0 |
| Pinning Assembly and Burden | 54 | 55 | 58 | 55 | 55 | 55 | 0 | 0 | 0 |
| Other Assembly and Burden | 574 | 363 | 352 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal ZFF Purchases | $4,374 | $4,287 | $4,157 | $3,710 | $3,710 | $3,020 | $1,461 | $1,245 | $1,023 |
| Brazil Gears | | | | | | $504 | $717 | $717 | $717 |
| Machining Outsourced | | | | | | 117 | 117 | 117 | 117 |
| Planetary | | | | | | | 433 | 433 | 433 |
| Other Parts | | | | | | | 101 | 317 | 539 |
| Add-Ons * | | 786 | 786 | 776 | 776 | 806 | 800 | 699 | 699 | 699 |
| Subtotal Other Material | $786 | $786 | $776 | $776 | $806 | $1,421 | $2,067 | $2,283 | $2,505 |
| Subtotal Combined Material | $5,160 | $5,073 | $4,933 | $4,486 | $4,516 | $4,441 | $3,528 | $3,528 | $3,528 |
| Freight | $283 | $194 | $194 | $203 | $203 | $203 | $203 | $203 | $203 |
| Packing | 57 | 57 | 57 | 100 | 100 | 81 | 39 | 34 | 28 |
| In-House Assembly Labor and Burden | | | | 171 | 120 | 115 | 106 | 106 | 109 |
| Total | $5,500 | $5,324 | $5,184 | $4,960 | $4,939 | $4,840 | $3,876 | $3,871 | $3,868 |

- CKD for 12-Speed; CBU for 16-speed
- GS4 Cost Reduction of $380 per unit 05 thru 08 based on Engineering cost of $1.5 million in 2004. *(development w/ wabco)*
- Euro = $1.00 (Exchange In Material Variances)

*(handwritten: eliminates need for voltage doubler)*

22

Highly Confidential
ZFMA0019991

000664

 

ZF Meritor Board Meeting
July 15, 2003

# Assumptions - Economics

1. Exchange Rate: 1 Euro = $~~0.85~~ 1.18
2. Employee Costs:
   - 401K Plan Reinstated in FY 2003
   - Technician Wage Increase = 3% in February 2004, 2006, 2008
   - Professional Wage Increase = 5% in February 2004 and 4% in February 2005 through 2008
3. Interest Rate = 2.57%
4. Utilities Price Increase of 2.8% annually
5. Insurance Rate Increase from $436K in 2003 to $636K in 2004
6. Accounts Receivable = 42 days
7. Accounts Payable = 52 days
8. Workman's Compensation Costs Estimated at $250,000 Annually

23

Highly Confidential
ZFMA0019992

 

ZF Meritor Board Meeting
July 15, 2003

# Assumptions - Other

1. Impairment:
   - Land and Building at appraised value  $2.356 m
   - All Equipment and Machinery Written Down to 10% of Book Value or Salvage Value
   - All Asset Purchases (Capital Plan) will be expensed at 90% and capitalized at 10%

2. ArvinMeritor Services Contract – All Items Held Constant Throughout The Planning Period at 2003 Rate Except IT Services, Which Were Held Constant Until ERP Was Implemented.

3. Engineering Budget - $1.5 Million Added In 2004 To Pay ZF for Engineering The Voltage Doubler and ZMTEC Into The GPS4.  Cost Reduction of $380 Per Unit from 2005 to 2008.

4. ERP - $1.4 Million Capital and $0.4 Million Operating Expense Was Added to 2004 for Implementation of SAP.  This Was Originally Expected To Be Approved And Implemented In 2003.

24

Highly Confidential
ZFMA0019993

 MERITOR



ZF Meritor Board Meeting
July 15, 2003

# Executive Summary

| | FY 2003 FORECAST | | | | FY 2004 PLAN | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | JUNE YTD | B/(W) PLAN | FY 2003 FCST | B/(W) PLAN | 2004 | B/(W) PRIOR | 2005 | B/(W) PRIOR | 2006 | B/(W) PRIOR | 2007 | B/(W) PRIOR | 2008 |
| Units | 10,130 | (2,117) | 13,455 | (5,435) | 16,015 | (15,424) | 19,700 | (25,027) | 21,960 | (29,229) | 19,000 | (31,333) | 14,010 |
| Sales | $38.8 | ($3.9) | $53.6 | ($12.5) | $65.6 | ($41.7) | $81.1 | ($82.6) | $97.0 | ($119.5) | $91.8 | ($135.4) | $71.0 |
| Combined PBT | ($14.8) | ($0.2) | ($26.2) | ($9.0) | ($22.1) | ($8.9) | ($17.7) | ($15.0) | ($9.1) | ($19.0) | ($9.0) | ($20.5) | ($12.6) |
| Cash Requirement Trans. | $10.9 | ($3.9) | $14.1 | ($6.9) | $22.7 | ($12.3) | $21.0 | ($14.6) | $11.3 | ($22.1) | $6.9 | ($22.9) | $10.9 |
| Cash Requirement Clutch | 1.8 | 2.2 | 3.5 | 1.8 | 2.1 | 1.5 | 0.8 | 1.1 | 0.2 | 0.6 | 0.1 | 0.3 | 0.0 |
| Total Cash Required | $12.7 | ($1.7) | $17.6 | ($5.1) | $24.8 | ($10.8) | $21.8 | ($13.5) | $11.5 | ($21.5) | $7.0 | ($22.7) | $10.9 |
| Ending Debt | $68.6 | $1.5 | $73.4 | ($1.8) | $98.2 | ($12.7) | $120.0 | ($26.1) | $131.4 | ($47.5) | $138.3 | ($70.2) | $149.3 |
| A/R Days Average | 42.6 | (6.3) | 42.0 | (4.0) | 42.0 | (10.9) | 42.0 | (13.0) | 42.0 | (13.0) | 42.0 | (13.0) | 42.0 |
| A/P Days Average | 54.3 | 15.8 | 51.5 | 10.5 | 52.0 | 17.1 | 52.0 | 22.2 | 52.0 | 24.2 | 52.0 | 27.8 | 52.0 |
| Gross Inv. Turns Ending | 8.0 | (4.6) | 10.0 | (2.6) | 10.4 | (4.0) | 9.7 | (5.5) | 8.2 | (7.1) | 8.8 | (6.4) | 9.5 |
| Gross Inv. Turns Average | 7.5 | (3.6) | 7.8 | (3.7) | 11.4 | (3.5) | 10.3 | (6.9) | 8.7 | (6.9) | 9.4 | (6.9) | 10.3 |
| Net Inv. Turns Ending | 8.7 | (4.6) | 10.9 | (2.2) | 10.0 | (4.0) | 9.7 | (5.8) | 8.2 | (7.4) | 8.8 | (8.2) | 9.5 |
| Net Inv. Turns Average | 8.2 | (3.6) | 8.5 | (3.7) | 11.0 | (3.6) | 10.3 | (6.1) | 8.7 | (7.3) | 9.4 | (7.5) | 10.3 |
| Capital Plan (90% expense/10% capital) | $0.7 | $3.2 | $1.3 | $2.8 | $4.7 | ($0.6) | $2.9 | $2.8 | $3.1 | $1.7 | $1.2 | $1.7 | $1.0 |
| Headcount w/o temps | 154 | 3 | 151 | 14 | 137 | 36 | 148 | 38 | 148 | 48 | 140 | 53 | 128 |
| Sales/Employee ($000) | | | 355 | | 479 | | 548 | | 655 | | 655 | | 555 |

25

Highly Confidential
ZFMA0019994

000667





ZF Meritor Board Meeting
July 15, 2003

# 2003 – 2008 Cash Flow

| | FY2002 Balance | FY 2003 FORECAST | | | | FY 2004 PLAN | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | JUNE YTD | B/(W) PLAN | FY 2003 FCST | B/(W) PLAN | 2004 | B/(W) PRIOR | 2005 | B/(W) PRIOR | 2006 | B/(W) PRIOR | 2007 | B/(W) PRIOR | 2008 |
| Transmission PBT | | ($17.2) | ($2.6) | ($28.6) | ($11.4) | ($22.1) | ($8.9) | ($17.7) | ($15.0) | ($9.1) | ($19.0) | ($9.0) | ($20.5) | ($12.6) |
| Transmission Warranty Accrual | | $3.6 | $1.4 | $4.2 | $0.9 | $3.2 | ($1.5) | $4.0 | ($3.3) | $4.5 | ($4.4) | $4.0 | ($4.9) | $3.1 |
| Depreciation/Impairment | | $0.3 | ($2.6) | $6.1 | $2.0 | $4.7 | $0.8 | $3.1 | $0.4 | $3.5 | ($0.6) | $1.6 | ($2.1) | $1.3 |
| Transmission Warranty Charges | | $8.4 | ($4.0) | $9.8 | ($4.0) | $6.7 | ($2.1) | $5.6 | ($0.9) | $4.3 | $0.9 | $3.6 | $2.5 | $3.2 |
| Capital Spending | | $0.7 | $3.3 | $1.3 | $2.8 | $4.7 | ($0.6) | $2.9 | $2.8 | $3.1 | $1.7 | $1.2 | $1.7 | $1.0 |
| Working Capital Changes | | $1.7 | $1.9 | $0.5 | $2.7 | ($0.8) | $0.1 | ($1.9) | $1.4 | ($2.8) | ($0.7) | $1.3 | $0.3 | $1.5 |
| Earnout | | $10.9 | $0.0 | $14.7 | $0.0 | $3.8 | ($0.0) | | $0.0 | | $0.0 | | $0.0 | |
| Transmissions Operating Cash Flow | | ($9.7) | ($2.7) | ($14.2) | ($7.1) | ($22.7) | ($12.3) | ($21.0) | ($14.6) | ($11.3) | ($22.1) | ($6.9) | ($22.9) | ($10.9) |
| Clutch Operating Cash Flow | | ($1.5) | $2.5 | ($3.6) | $1.7 | ($2.1) | $1.5 | ($0.8) | $1.1 | ($0.2) | $0.6 | ($0.1) | $0.2 | |
| Cash Balance Change | | ($1.5) | ($1.5) | $0.2 | $0.2 | | | | | | | | | |
| Combined Cash Required | | ($12.7) | ($1.7) | ($17.6) | ($5.1) | ($24.8) | ($10.8) | ($21.8) | ($13.5) | ($11.5) | ($21.5) | ($7.0) | ($22.7) | ($10.9) |
| Debt | $55.9 | $68.6 | $1.5 | $73.4 | ($1.8) | $98.2 | ($12.7) | $120.0 | ($26.1) | $131.4 | ($47.5) | $138.3 | ($70.2) | $149.3 |

Highly Confidential
ZFMA0019995

000668



ZF Meritor Board Meeting
July 15, 2003

# Old Business

*conflict w/ ARM L'ship mtg — 12/1 A-M ?*

1. **Meeting Schedule:**
   - December 2, 2003 – ArvinMeritor Headquarters, Troy, MI

2. **Eaton Interference on the ZF Meritor Patent for Predicting Torque:**
   - Eaton Lost This Interference Claim *in round one "priority phase" is over*
   - Eaton Has Requested Discussion on Paying A Royalty For Use of This Patent.

3. **FreedomLine® Sales and Warranty Update**

4. **"G" Platform Warranty Update**

27

Highly Confidential
ZFMA0019996





ZF Meritor Board Meeting
July 15, 2003

# Interferences

Background:

Eaton has filed Interferences against ZFM Patents.

Two of the Interferences that were granted (104.835 and 104.834) against Patent 5,573,477 have had a favorable ruling by the Patent and Trademark Office.

Next step is discovery for a priority phase

Request for Interference (directed at Patents 5,571,059, 5,569,115, 5,573,588) have been filed. The Patent and Trademark Office maintains secrecy until the Interference is granted.

28

Highly Confidential
ZFMA0019997

**000670**



**ZF Meritor Board Meeting**
July 15, 2003

# Interference

- Status

Redacted                    Redacted

&gt; Eaton has indicated that they would be willing to concede priority in all of the Interferences in exchange for a license.

Redacted

&gt; Discussions are in process to negotiate an Agreement with Eaton that will be presented to the BOD for approval.

Redacted

Highly Confidential
ZFMA0019998





ZF Meritor Board Meeting
July 15, 2003

## Freedom Transmission Total Warranty Performance
## Claims Thru May 2003



30

Highly Confidential
ZFMA0019999



**ZF MERITOR**



ZF Meritor Board Meeting
July 15, 2003

# Current FreedomLine® Performance Issues
# Top 6 from Engineering Field Test &/or Production

| TOP ISSUES<br>Symptom<br>Root Cause | Field Situation<br>☒Frequent<br>☐Occasional<br>☒Stabilized | Technical Progress<br>☐No c.a. and/or devel. not started and/or not enough evidence to support c.a.<br>☒Final c.a. identified, devel. in process | ☐☐☐<br>Documentation complete AND 3 mos positive field experience | Failure Severity<br>LS Trans will not move when started<br>L Trans fails when moving<br>F Fault Code, no influence on performance<br>K Comfort problem | Issue # |
|---|---|---|---|---|---|
| **1. Multiple Symptoms**<br>GS3 | ☒ | ☒ | 3/03 (König) | LS | 128<br>300 |
| **2. Harsh Engagement / Shift**<br>Clutch Act. Crimp | ☒ | ☒ | 3/31/03 (Schuh) | L (worst case) | 332 |
| Clutch Cover | ☒ | ☒ | 9/31/03 (Kramer) | K | 352 |
| Clutch Linkage | ☒ | ☒ | Open (Kramer)<br>Int. Soln. in place<br>Lo. Term task force | K | 355 |
| **3. 0 Voltage**<br>Doubler Capacitor | ☒ | ☒ | 8/03 (Huber) | LS | 356 |
| **4. Multiple Symptoms**<br>ZMTEC | ☒ | ☒ | 8/03 (Huber) | LS (worst case) | 333<br>336<br>376<br>378<br>380 |
| **5. No Symptom**<br>C/S Bearing Cups | ☒ | | 11/03 (Dreier) | | 177 |
| **6. No Air Pressure**<br>Floating Valves | ☒ | ☒ | 12/03 (Dreier)<br>PAK 6 | | 403 |

*top issue*

31

Highly Confidential
ZFMA0020000



ZF Meritor Board Meeting
July 15, 2003



32

Highly Confidential
ZFMA0020001



ZF Meritor Board Meeting
July 15, 2003

# "G" Platform Issues

| Subassembly | Corrective Action | Status | |
|---|---|---|---|
| Top Cover | Launched | 5-23-02 | |
| Air Filter Regulator | Launched | 6-21-02 | |
| Range Piston | Launched | 9-30-02 | |
| Synchronizer | Pending | | Similar Friction Material shows debond in service |
| Shift Knob | | | |
| Guardian | In Process | 9-03 | Change in Process to address switch stability and overmold |
| Parker | In Process | 12-03 | Re-launch Parker shift knob Follow-up Program with a new design scheduled for future launch |
| Neutral Switch | Investigating | Ongoing | |
| Output Shaft Seal | Investigating | Ongoing | |

33

Highly Confidential
ZFMA0020002

 **MERITOR**


ZF Meritor Board Meeting
July 15, 2003

# New Business

1. **Decisions Required Immediately:**
   - Approval of ZF Supply Contract *but w/b amended for new agreement*
   - Write-Off of Remaining "Impaired" Assets in FY 2003 *– defer to RBury review*
   - Approval to Raise the Debt Ceiling in FY 2003 from $71.6M to $73.4M

2. **Decisions Required to Implement the 2004-2008 Business Plan:**
   - Immediate:
     - $1.5 Million Design Fee for ZF for GPS4 *– defer*
     - Approval to Raise Debt Ceiling in FY 2004 to $98.2M *– defer*
     - ERP Implementation *– defer*
     - Outsourcing of "G" Housing Machining *– defer*
   - At Next Board of Director's Meeting:
     - Resourcing of FreedomLine® Gears to ZF Brazil or Tremec

34

Highly Confidential
ZFMA0020003

000676

EXHIBIT 11



Good morning ladies and gentlemen!

I am Silvio Angori and I have the pleasure of leading the ArvinMeritor Commercial Vehicle Exhaust team in Europe.

Our responsibility is to penetrate the CV exhaust market offering aftertreatment & exhaust modules.



1

Confidential
ZFMA0038858

**000677**

**Main Contacts**

| Contact Name | Title | Phone |
|---|---|---|
| Bob Weaver | President | 479-361-5470 |
| Larry Goddard | CFO | |
| Cliff Lawson | VP Operations | |
| Clark Gray | Dir of Safety | |
| Carl Tapp | Dir of Maint | 479-361-5251 |

ArvinMeritor

P.A.M.

2

About two year ago we started within our division to gather market information on CV exhaust and aftretreatment systems. The drivers were the anticipated emission legislations changes. The merger with Meritor accelerated this process and 10 months ago we created two teams, one in US and another in UE with the main mission of gaining business on:

•OE market

•Retrofit markets, in use vehicles;

•Lifestyle vehicles

Offering to all of them competitive products and system solutions.


Today, Bob and I will take you through this challenging business adventure reviewing with you:

•What are the Market drivers and our opportunities;

•Our business Strategy

•Its implementation and the successes we have had.

2

Confidential
ZFMA0038859
000678



Confidential
ZFMA0038860
**000679**



Confidential
ZFMA0038861

**000680**

*ArvinMeritor.*

# Product Listing

| Product Name | Product Manufacturer |
| --- | --- |
| Front Axle | ARM |
| Rear  Axle | ARM |
| Trans | ARM |
| Brakes | ARM |
| ASA | ARM |
| ABS | ARM |
| Suspension | Hendrickson |
| Brakes | ARM |
| Tire Inflation | MTIS |

**P.A.M.**

5

Confidential
ZFMA0038862
**000681**



Confidential
ZFMA0038863
**000682**



7

Confidential
ZFMA0038864

000683



Confidential
ZFMA0038865
**000684**



9
Confidential
ZFMA0038866
000685

**ArvinMeritor.**

# Meritor Weakness

➢ **ESS product problems**
➢ **RHP product problems**
➢ **Eaton CE-product support**
➢ **Tapp-Eaton long time relationship**
➢ **Tapp-Sergeant relationship**
➢ **Freightliner-Eaton trans status**

**P.A.M.**
TRANSPORT

10

10
Confidential
ZFMA0038867
000686

**ArvinMeritor.**

## Obstacles to doing business with PAM Transport

➢ **Freightliner pricing of Freedom**
➢ **Freightliner push for Fuller trans**
➢ **Tapp relationship with Sergeant**
➢ **Tapp relationship with Eaton**
➢ **Weaver price buyer-not features**



11

Confidential
ZFMA0038868
**000687**



Confidential
ZFMA0038869
000688

**Opportunities**

ArvinMeritor.

- AutoShift user-likes technology in the transmission product line
- PAM successful fleet and buys new vehicles every year
- Very visible in NW Ark due to success and fleets copy specs

13

Confidential
ZFMA0038870
000689



Confidential
ZFMA0038871
**000690**



Confidential
ZFMA0038872
**000691**



Confidential
ZFMA0038873

**000692**

**ArvinMeritor.**

# Action Plan

➢ **Key Element**
**Freedom trans specs @Volvo**

➢ **Timing**
**2003 Volvo purchase**

➢ **Responsibility**

➢ **Swisher**

➢ **Completion Date**

➢ **November 02**

➢ **Strategic Long Term Agreement**
**Secure Freedom order-replace AutoShift**



17

Confidential
ZFMA0038874

**000693**



Confidential
ZFMA0038875
**000694**

# EXHIBIT 12

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                        - - -

 4
    ZF MERITOR LLC and MERITOR    :    CIVIL ACTION
 5  TRANSMISSION CORPORATION,     :
                                  :
 6              Plaintiffs,       :
                                  :
 7      vs.                       :
                                  :
 8  EATON CORPORATION,            :
                                  :
 9              Defendant.    :    NO. 06-623 (SLR)

10
                          - - -
11
                          Wilmington, Delaware
12                        Tuesday, July 22, 2009
                          1:56 o'clock, p.m.
13
                          - - -
14
    BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.
15
                          - - -
16
    APPEARANCES:
17

18          DRINKER, BIDDLE & REATH LLP
            BY:  KAREN V. SULLIVAN, ESQ.
19

20                  -and-

21

22

23

24                          Valerie J. Gunning
                            Official Court Reporter
25
```

2

1  APPEARANCES (Continued):

2

3  DICKSTEIN SHAPIRO LLP
   BY:  JAY FASTOW, ESQ.,

4       PAUL R. TASKIER, ESQ.,
        JENNIFER HACKETT, ESQ.,

5       BRUCE HOLCOLMB, ESQ. and
        CHRISTOPHER WOOD, ESQ.

6       (Washington, D.C.)

7       Counsel for Plaintiffs

8

9  MORRIS, NICHOLS, ARSHT & TUNNELL
   BY:  DONALD E. REID, ESQ.

10

11       -and-

12

13  HOWREY LLP
    BY:  JOSEPH A. OSTOYICH, ESQ.,

14       ANDREW LAZEROW, ESQ. and
         MELISSA HANDRIGAN, ESQ.

15       (Washington, D.C.)

16       Counsel for Defendant

17

18       - - -

19

20

21

22

23

24

25

---

3

1            P R O C E E D I N G S

2

3       (Proceedings commenced in the courtroom,

4  beginning at 1:56 P p.m.)

5

6       THE COURT:  All right.  Have you all discussed

7  how this should probably proceed at this point?

8       MR. TASKIER:  No, your Honor.  Paul Taskier, for

9  Plaintiff ZF Meritor and Meritor Transmission.

10       I think at the last hearing, your Honor

11  indicated that you wanted us to bring Dr. DeRamus for

12  questioning.

13       THE COURT:  Right.

14       MR. TASKIER:  Understanding that and hoping that

15  we can put his testimony in a quick and understandable

16  framework, we prepared a brief direct examination for him.

17  Of course, your Honor should feel free to interrupt and ask

18  any questions you have at any time.  But that is how we

19  thought we would proceed in the first instance.

20       THE COURT:  All right.  So, in other words, you

21  lay kind of the foundation testimony and then defendant's

22  counsel would be free to examine?

23       MR. OSTOYICH:  That's correct, your Honor.  Joe

24  Ostoyich from Howrey, for Eaton Corporation.  That's all

25  right.

---

4

DeRamus - direct

1       THE COURT:  Good.  Why don't we put the good

2  doctor on the stand, then.

3       MR. TASKIER:  Your Honor, I also prepared a few

4  boards and slides, which might be useful for following his

5  testimony.

6       THE COURT:  All right.  Let me swear him in and

7  then you can hand that up.

8            PLAINTIFFS' EVIDENCE

9       ... DAVID W. DeRAMUS, having been duly

10       sworn as a witness, was examined and testified as

11       follows...

12       MR. TASKIER:  Your Honor, may I approach.

13       THE COURT:  Do you want to hand those up?

14       MR. TASKIER:  We'll also be having some larger

15  versions.

16       THE COURT:  All right.

17       (Mr. Taskier handed documents to the Court.)

18            DIRECT EXAMINATION

19  BY MR. TASKIER:

20  Q.   Dr. DeRamus, you prepared an expert report in this

21  case; is that correct?

22  A.   I did.

23  Q.   What were you asked to do in that report?

24  A.   I was asked to review the information provided in this

25  case and to conduct my own research in order to assess

---

5

DeRamus - direct

1  whether, from an economic perspective, the conduct by Eaton

2  was anticompetitive.  I was asked to define relevant markets

3  for antitrust purposes, and I was asked to estimate damages,

4  if any, suffered bay ZF Meritor as a consequence of Eaton's

5  conduct.

6  Q.   Did you do an economic analysis to determine any

7  market definition?

8  A.   Yes, I did.

9  Q.   And did you determine also whether there was

10  monopolization in this case?

11  A.   Yes, I did.

12  Q.   And were either of those conclusions challenged, as

13  far as you know?

14  A.   With regard to the market definition, while Eaton's

15  experts had criticisms of my analyses, I don't believe they

16  proposed an alternative market definition, nor did they

17  challenge, from what I recall the testimony, the -- my

18  conclusion that Eaton has monopoly power in a relevant

19  antitrust market.

20       MR. OSTOYICH:  Your Honor, I don't want to

21  interrupt, but just for the record, I'm going to object to

22  his characterization of that.

23       THE COURT:  Understood.

24  BY MR. TASKIER:

25  Q.   Dr. DeRamus, are you aware that Eaton contends that

000696

6

DeRamus - direct

1    you did not apply any actual economic test to arrive at your
2    conclusion that their conduct was exclusionary and caused
3    harm to competition?
4    A.    I understand they make that assertion, yes.
5    Q.    Are you aware also that Eaton contends that you merely
6    reviewed some documents and did not apply any testable,
7    verifiable economic theory and that your conclusion is just
8    your say-so?
9    A.    I do understand they make that assertion, yes.
10   Q.    Did you conduct economic testing to determine whether
11   Eaton's conduct was anticompetitive?
12   A.    Yes, I do.
13   Q.    How many economic tests did you conduct and include in
14   your report?
15   A.    With regard to the conclusion that Eaton's conduct was
16   anticompetitive, I performed at least six different tests,
17   and possibly seven, depending on how you want to count
18   them.
19   Q.    Can you briefly tell us what the first test that was
20   you conducted?
21   A.    I first analyzed whether Eaton's conduct gave rise
22   to barriers to entry or exacerbated previously existing
23   barriers to entry.
24   Q.    Did you provide a standard economic test performed by
25   economists in assessing whether conduct was anti-competitive

7

DeRamus - direct

1    in antitrust cases?
2    A.    Yes. An analysis of various entry is a fundamental
3    part of antitrust analysis and has long been used in
4    economists in assessing whether conduct was anticompetitive.
5    Q.    And was there a second test that you used?
6    A.    Yes. I analyzed whether the defendant's conduct
7    effectively resulted in raising rivals' costs.
8    Q.    And what did you do to conduct that test?
9    A.    I analyzed whether the costs, the production costs of
10   ZF Meritor for certain of their transmissions were increased
11   as a result of their inability to -- as a result of Eaton's
12   conduct preventing them from competing from an adequate
13   share of the market.
14   Q.    And is that a standard economic test that's used in
15   these cases?
16   A.    Yes, it is.
17   Q.    And what was the third test you conducted to determine
18   whether Eaton's conduct was anti-competitive?
19   Anti-competitive?
20   A.    I did an analysis of prices paid by end customers.
21   Q.    And is that also a standard economic test?
22   A.    Yes. An analysis of prices and price elevation as a
23   result of anticompetitive conduct is perhaps the sine qua
24   non of antitrust analysis.
25   Q.    And the fourth test that you conduct?

8

DeRamus - direct

1    A.    I also analyzed prices paid by OEM over the long
2    running.
3    Q.    And is that also a standard economic test that's
4    accepted by economists to test whether conduct was
5    anticompetitive?
6    A.    Yes, it's.
7    Q.    And what was the fifth test you conducted?
8    A.    The fifth test was analysis of the impacts of Eaton's
9    conduct on innovation and, in particular, the delay and cost
10   in introducing innovations that would have been valuable to
11   customers in this market.
12   Q.    And is that also a standard test?
13   A.    Yes.
14   Q.    And was there a sixth test that you conducted?
15   A.    Yes. I, in my, as part of my econometric analysis, I
16   also analyzed whether Eaton's conduct, in fact, had a
17   significant impact on ZF Meritor's sales and caused its
18   exclusion from the market, and I concluded that it did.
19   Q.    And is that a standard tested that's used by
20   economists as well?
21   A.    Yes. Econometrics, a standard methodology that is
22   used by economists.
23   Q.    In performing all of these tests, what was your
24   conclusion with regard to whether Eaton's conduct was
25   anticompetitive?

9

DeRamus - direct

1    A.    I concluded from an economist's perspective that it
2    was, indeed, anticompetitive.
3    Q.    Now, did you also calculate plaintiffs damages in this
4    case?
5    A.    Yes, I did.
6    Q.    Now, focusing on the damages, did you reach an opinion
7    about the type or types of damages that the plaintiff
8    suffered?
9    A.    Yes.
10   Q.    What were those damages?
11   A.    I concluded that there were two types of damages that
12   plaintiff -- that the plaintiff suffered in this case. One,
13   the lost profits that would have been earned by ZF Meritor
14   up through 2009, and the second component of damages was the
15   lost enterprise value, i.e., the reduction in the going
16   concern value of ZF Meritor from the date of my report,
17   2009, forward.
18   Q.    And when you say that they were but-for profits, they
19   were but for in what context?
20   A.    They were -- the estimate of damages are the profits
21   that ZF Meritor would have earned in the absence of Eaton's
22   anticompetitive conduct, accounting for other factors in the
23   market unrelated to this conduct.
24   Q.    All right. So this first page is a calculation, is
25   basically is the rough description of how you calculated

000697

10

DeRamus - direct

1  total damages?  Lost profits plus lost enterprise value
2  equals plaintiffs total damages; is that correct?
3  **A.   Yes.  I would say that's my overarching methodology**
4  **computing damages in this case.**
5  **Q.**   Was that a standard economic method of estimating
6  damages in an antitrust case?
7  **A.   Yes, it is.**
8  **Q.**   All right.  Let's now talk briefly about your lost
9  profits analysis.  In the most basic terms in an antitrust
10  case involving harm to a competitor, how do you calculate
11  lost profits?
12  **A.   Lost profits is calculated as the incremental units**
13  **that ZF Meritor would have earned in the but-for world,**
14  **i.e., absent anticompetitive conduct multiplied by the**
15  **profit that they would have earned on those units.**
16  **Q.**   And is that a standard economic formula for
17  calculating lost profits?
18  **A.   Yes, it is.**
19  **Q.**   How many calculations did you do using that formula?
20  **A.   I did five separate damages calculations.**
21  **Q.**   And in each of those methods, those five calculations,
22  did you calculate lost profits by multiplying some measure
23  of lost unit sales by lost profit per unit?
24  **A.   Effectively, yes.  There are some differences in the**
25  **details, the computations, but effectively it comes down to**

11

DeRamus - direct

1  **multiplying incremental units, i.e., lost of number of**
2  **transmissions sold that have been would have been sold in**
3  **the but-for world by a measure of profits.**
4  **Q.**   Now, what was your reason for measuring the lost
5  profits five different ways?
6  **A.   In my -- in the liability section of my report, I came**
7  **to the conclusion that there was significant dislocations**
8  **market caused by Eaton's anticompetitive conduct, that it**
9  **ultimately caused ZF Meritor to exit the market, ZF Meritor**
10  **being the only significant competitor in this market.**
11  **      And as are result, there is going to be some**
12  **inherent uncertainty with regard to the but-for world, the**
13  **profits that ZF Meritor would have earned in the but-for**
14  **world.  In doing it five different ways allows me to provide**
15  **a range of results, balances the high and the low, what I**
16  **consider to be reasonable estimates.  It allows me to allow**
17  **me to use all of the available data that I felt was**
18  **reasonable, and it also allows me to derive an estimate of**
19  **the expected value.  Take an average of the five, since I do**
20  **not consider any single methodology to provide the most**
21  **accurate estimate of damages.**
22  **Q.**   Is that a standard way of approaching damages
23  calculation?
24  **A.   Yes.  Economists will typically look at all available**
25  **information and will often construct a range of damages and**

12

DeRamus - direct

1  **take an average of the estimate they believe to be**
2  **reasonable.**
3  **Q.**   Let's turn to your first method.  What was your first
4  method?
5  **A.   First method -- the first method was I relied on the**
6  **strategic business plan forecast prepared by ZF Meritor.  I**
7  **used that method both, and in that method I used the**
8  **strategic business plan both for the estimate of the but-for**
9  **units as well as the per-unit profit computations.**
10  **Q.**   And why did you use that particular plan, sir?
11  **A.   I'm sorry.  Why did I use that particular method or**
12  **the source?**
13  **Q.**   The source.
14  **A.   The source?  I reviewed a wide range of business plans**
15  **that were available.  The wide range of information**
16  **available to me at the time, and this particular business**
17  **plan was prepared at or about the beginning of the conduct**
18  **at issue.  I.e., November 2,000 was when it was presented to**
19  **the Board of Directors.  It was prepared by -- presented by**
20  **experienced finance professionals, individuals with the**
21  **leadership of ZF Meritor, the President, Rick Martello, the**
22  **CFO of the company as well.  It was accepted by the Board of**
23  **Directors, and there were investment decisions made as a**
24  **result of the -- that particular business plan.**
25  **      It was also revised relative to previous**

13

DeRamus - direct

1  business plans, revised downward to account for other
2  factors occurring in the market.
3  **Q.**   What other factors?
4  **A.   One of the largest was -- this was in 2000, the**
5  **overall market was beginning to decline.  And the Board of**
6  **Directors asked the company to revise -- to revise its**
7  **business plan to produce this particular one in light of**
8  **that and various other factors.**
9  **Q.**   Now, in your experience as an economist, is it
10  standard to use a company's business forecasts or internal
11  business predictions to analyze future market shares or
12  profits?
13  **A.   Yes.  It provides contemporaneous information about**
14  **the perspectives of knowledgeable individuals.  That is,**
15  **they are likely to be particularly reliable if they are**
16  **prepared by a company that is in business, has a proven**
17  **track record in that business, and is prepared with adequate**
18  **due diligence with regard to the underlying assumptions.**
19  **Q.**   And what did you use the strategic business plan for
20  in this first method of calculating lost profits?
21  **A.   I used the business plan as the basis for estimating**
22  **the but-for market share that ZF Meritor would have earned**
23  **absent anticompetitive conduct as well as for a measure**
24  **of the of pre-profits, using this first method using the**
25  **variable cost as the cost measure, or contribution margin,**

**000698**

14

DeRamus - direct

1 as I described it in my report, the measure of profits.

2 Q. So you -- and how did you calculate the lost units?

3 A. I took the units that were specified in the November

4 2000 strategic business plan. I applied it to the total

5 size of the market forecasted by ZF Meritor for the same

6 time period and also prepared contemporaneously for the 2000

7 2005 time period. I took the ratio of the two, and that

8 gave me my estimate of their expected market shares that

9 were prepared at the time of the -- at the time of the

10 strategic business plan.

11 Q. Why did you use the actual -- why did you correct the

12 number that was in the report with application of the actual

13 number of trucks built?

14 A. Well, by taking the projected market share that the

15 company had devised and multiplying it by then the actual

16 number of total truck built that were actually built over

17 the 2000, 2005, 2009 time period, it allows me to account

18 for other factors, economic factors and the effect of the

19 demand for trucks that would have affected ZF Meritor's

20 but-for sales that would have been unrelated to Eaton's

21 anticompetitive conducts.

22 Q. I'm sorry. Unrelated?

23 A. Yes. Unrelated to Eaton's anticompetitive conduct.

24 Q. So that was a screening effort?

25 A. Yes, it was.

15

DeRamus - direct

1 Q. So did you do any verification of the projected prices

2 and costs in this strategic business plan?

3 A. Yes. I verified -- particularly, the parameter of

4 interest is the per-unit profit, and I verified that the

5 per-unit profits in the projections were consistent with

6 actual per-unit profits imported in that same document that,

7 in fact, tie to the company's audited financial statements.

8 I verified that they were consistent with the per-unit

9 profits that the company had earned previously and that

10 Eaton, in fact, had earned, and significantly lower than the

11 per-unit profit measured in the same manner by Eaton.

12 Q. Did you do anything else to satisfy yourself that the

13 projections in the strategic business plan were a reliable

14 basis for your lost profit calculations?

15 A. Yes. My next -- the second method that I applied, I

16 constructed an econometric analysis with which to assess

17 the reasonableness of those -- the market share projections.

18 Q. Now, did you do any calculations to arrive at a

19 price or cost figure that was independent of the business

20 plan?

21 A. No, I did not separately estimate but-for prices or

22 but-for costs. As I said, the primary parameter of interest

23 for the purposes of the damage calculation in this case is

24 the per-unit profit.

25 Q. And are the projected or but-for prices in the

16

DeRamus - direct

1 business plan higher than the actual OEM invoice prices as

2 found in your report in figure 17?

3 A. No, they are not.

4 Q. Are you aware that Eaton accuses you of using

5 but-for prices that are higher than actual prices charged?

6 A. Yes, I'm aware they make that allegation.

7 Q. Is that what you did?

8 A. No. Absolutely not.

9 Q. Do you have a response to that?

10 A. Certainly. This is a subject matter that was

11 the -- the subject of questioning by Eaton during my

12 deposition. We discussed this particular subject at

13 some length, and I described in detail what I did and why I

14 did it. And in their response, they -- it appears to me

15 that they've ignored and mischaracterized my testimony on

16 that subject.

17 I would say, first, the -- as I mentioned

18 earlier, the issue is irrelevant because the only parameter

19 of interest is the damage calculation, is the pre-profit,

20 not the per unit price per se. As long as prices and costs

21 are measured on a consistent basis, which I did verify

22 through multiple methods, then the estimate of damages is

23 reasonable.

24 Q. That's because you're only dealing with a percentage

25 of, a profit number?

17

DeRamus - direct

1 A. That is correct. Profit is the ultimate variable of

2 interest. It's not a price-fixing case, as I explained in

3 my deposition, in which elevation of prices is maybe the

4 primary parameter of interest. Here, damages to ZF Meritor

5 are the lost sales and lost profits, so therefore profit is

6 the variable of ultimate interest.

7 Q. Is there another reason why the characterization of

8 your testimony is incorrect?

9 A. Yes. It's a, very much of an apples and oranges

10 comparison, or maybe apples and bicycles comparison.

11 The question came up in comparing one

12 particular line in one of my tables with a separate figure

13 in a different part of my report, and the products that are

14 included in table 5 are very different than the products

15 that are included in the other table, in the figure of my

16 report. It is a P&L number. It is net revenue.

17 So it is computed on a different basis. It

18 includes additional revenues that aren't included in the

19 other figure. I'm happy to go through all the details of

20 those differences, if you would like.

21 And -- but, ultimately, it comes down to a

22 difference in the product mix between the figure in my

23 report that they pointed to and the line, one line on my

24 table.

25 And as I emphasized in my deposition, Eaton

000699

18

DeRamus - direct

1  has focused on one particular product line in my testimony;
2  namely, the G-Platform combined line of products, and
3  they've ignored the FreedomLine, which comprises a
4  substantial portion of damages.  And, in fact, averaged
5  across both products on a weighted average basis, the prices
6  implied by my table are, in fact, lower than the prices in
7  the -- in the figure, the corresponding figures of the
8  report.  That's if I were to substitute out the prices that
9  they refer to as the actual prices in place of my but-for
10 prices, damages would only go up, not down.
11 Q.    Thank you.
12         So once you calculated the but-for profit, what
13 did you do next?
14 A.    I computed them on a present value basis and to
15 account for the time value of money.  So dollars, nominal
16 dollars in 2002, 2003, for example, were brought up to a
17 2009 basis.  I.e., as of the date of my report.
18 Q.    So there are essentially three lost profits damages
19 numbers that you come to.  One is nominal, one is risk-free
20 discount, and one is on the cost of debt?
21 A.    That's correct.  For each of my damages, I do report
22 three separate numbers.  One, the nominal value; and then
23 right below that, I report the present value using the risk-
24 free interest rate; and below that, I report a present value
25 using the cost of debt, which I believe to be a reasonable

19

DeRamus - direct

1  estimate, and is a factor of -- a present value computation
2  and the one that I ultimately use and rely upon in my
3  overall conclusion of damages.
4  Q.    Now, you also said you had done an economic --
5  econometric method analysis and that's Method 2?
6  A.    That is correct.
7  Q.    What is the econometric model that you use?
8  A.    Econometric model is a statistical model to estimate
9  ZF Meritor's but-for market shares based on a variety of
10 independent variables I've identified and estimated.
11 Q.    And what purpose does that serve?
12 A.    It serves several purposes.  First, it provides a way
13 of confirming the reasonableness of the strategic business
14 plan as a source of information on but-for market shares.
15        It also provides a methodology that I can
16 use in my liability analysis to determine whether there was
17 a structural break in the market.  I.e., whether there was a
18 significant difference in ZF Meritor's experience prior to
19 the beginning of the core conduct period and drafting, and
20 also provides a separate way of estimating damages.
21 Q.    You constructed an econometric model to test those
22 issues?
23 A.    Yes, I did.
24 Q.    And did you test your econometric model to make sure
25 that it was reliable?

20

DeRamus - direct

1  A.    Yes, I did.
2  Q.    How did you satisfy yourself that it was a reliable
3  model?
4  A.    I performed a variety of standard statistical tests to
5  determine that the model was appropriately specified.  I.e.,
6  test for autocorrelation.  I also looked at the goodness of
7  fit, how well my model fit the data, and it was a very high
8  R-squared.  I also performed an alternative specification
9  of the model beginning the conduct period in February of
10 1999.
11        In the liability section of my report, I had
12 concluded that there was significant evidence as an
13 economist to conclude that some of the conduct that Eaton
14 was engaged in occurred prior to that time period, and it
15 showed me that the -- and it provided but-for market
16 shares.  In fact, significantly higher using the
17 February 1999 starting point for the econometric model
18 as opposed to July 2000, which is what I used for this
19 particular computation.
20 Q.    So if you can walk us through the chart, can you
21 tell us what you did under but-for unit sales with the
22 projected share from the econometric model?
23 A.    Certainly.  As with the first method, I applied the
24 projected shares from the econometric model to the actual
25 number of trucks built over the 2000 to 2009 time period.

21

DeRamus - direct

1  I.e., what I refer to as my explicit forecast period to get
2  the but-for unit sales, I subtracted out ZF Meritor's actual
3  unit sales during that time period, and I multiplied it by
4  the same but-for measure of per-unit profits that I
5  discussed in the first computations.
6  Q.    The same method?
7  A.    Effectively the same method using an econometric
8  model for the -- for one of the inputs.
9  Q.    Now, you testified that you calculated damages a third
10 way?
11 A.    Yes.
12 Q.    Tell us what way that was.
13 A.    In the third computation, I accounted for the
14 possibility that ZF Meritor would have incurred additional
15 fixed costs during the 2004 and 2009 time period.
16        ZF Meritor effectively stopped -- the joint
17 venture was effectively dissolved at the end of 2003.  It
18 was offered in a different framework going forward, and the
19 first method accounted for marginal costs.  So this provides
20 for an additional alternative way of estimating damages.
21 Q.    Why did you want to provide for more than marginal
22 costs?
23 A.    Because I wanted to account for the possibility that
24 they would have incurred additional costs and, therefore,
25 which, in fact, would have lowered, and did lower, the

22

DeRamus - direct

1   estimate of damages.
2   Q.   And that's how it affected the calculation?
3   A.   Yes.  It lowered the estimate of damages.
4   Q.   Now, you also did a fourth method; is that not right?
5   A.   That's correct.
6   Q.   And how does that differ from the third method?
7   A.   In the fourth method, I took the additional fixed
8   costs that had been projected for the 2000 and 2003 period,
9   and I also subtracted those additional fixed costs from the
10  estimate of ZF Meritor's but-for profits.
11  Q.   So you took ten years of fixed costs out as opposed to
12  five?
13  A.   That's correct.  As I stated in my report, while I
14  consider that unnecessary, because I do have 2000/2003 as
15  the actual experience of the company when they were in
16  operations, I, nevertheless, thought it was helpful in
17  establishing a lower bound of the estimate.
18  Q.   Now, these four method are all a variance of the first
19  method.  Is that not right?
20  A.   They are all a variant of the method that is the --
21  the primary method is but-for profits and lost enterprise
22  value, which we've not discussed.  That is the overarching
23  method, and these are simply ways of implementing inputs.
24  Q.   And the inputs that were used were all derived from
25  the strategic business plan that you selected?

23

DeRamus - direct

1   A.   The econometric model provides an internal input for
2   the market share computations.  The but-for profit for each
3   of these methods is ultimately derived from the strategic
4   business plan, both for the estimate of variable costs and
5   fixed costs, although as I mentioned before, I did verify
6   that the -- the per unit cost, the variable cost, per-unit
7   profit from the strategic business plan was equivalent to
8   other data sources, so the result would have been equivalent
9   if I had substituted alternative sources of information.
10  Q.   Now, you also did a fifth method that did not rely on
11  the per-unit profit derived from the strategic business
12  plan; is that correct?
13  A.   That is correct.
14  Q.   Can you tell us what you did in your fifth method?
15  A.   The fifth method, rather than relying on forecasts of
16  profit and profitability, I looked to Eaton's actual
17  profits, and here I used a more conservative -- I'm sorry --
18  a lower measure of profits, operating profits, which is --
19  includes all fixed costs, all depreciation.  And this is,
20  again, Eaton's actual experience over the 2000 and 2009 time
21  period.
22          I applied a measure of ZF Meritor's but-for
23  market share to that -- to the estimate of the
24  profitability -- operating profits available in the market
25  and to then derive the estimate of lost profits.

24

DeRamus - direct

1   Q.   So this particular method does not use anything that
2   was found in the strategic business plan, but you used,
3   rather, what Eaton's actual experience was?
4   A.   For the profitability, the per-unit profitability
5   metrics, that is correct.  I did use the forecast from the
6   strategic business plan, the applied forecast of the market
7   share statistics, although I could certainly have -- I could
8   have just as easily used the results of my econometric model
9   of but-for market shares, and that would have simply
10  resulted in a higher damage --
11  Q.   The discussion we had previously about but-for prices
12  and the criticisms that were levied at you, does your use of
13  this have any bearing on that particular criticism?
14  A.   Well, it certainly shows that if, for some reason, and
15  I -- that I can't fully comprehend, if the analysis that I
16  was -- that I did on the previous methods were deemed
17  unreliable, this provides a method that is independent of
18  those criticisms.
19  Q.   This is independent of what was in the strategic
20  business plan for those purposes, for the purposes of
21  calculating profit?
22  A.   It is independent of any price assumptions in that
23  business plan, yes.
24  Q.   Thank you.
25          Now, these are the five methods you utilized to

25

DeRamus - direct

1   calculate lost profits, the one portion of your damages
2   figure that's lost profits; is that correct?
3   A.   That is correct.
4   Q.   And you averaged them to come to the number that you
5   postulated in your report; is that correct?
6   A.   That's correct.
7   Q.   All right.  And then you took the lost enterprise
8   value?
9   A.   Correct.
10  Q.   And you calculated that how, sir?
11  A.   For the lost enterprise value, or loss of going
12  concern value, depends on how -- the particular name you
13  want to attach to it, I applied a standard multiples
14  approach.
15          I looked to --
16  Q.   What is a standard multiples approach?
17  A.   A multiples approach, or comparables approach, is when
18  an analyst goes to define or identify comparable publicly
19  fit companies, assess the value of those publicly traded
20  companies, those comparable companies to some
21  financial measure, whether it's relative to sales or some
22  measure of profits, and then applies -- can apply that
23  multiple to the business of interest.  In this case, ZF
24  Meritor's but-for profitability.
25  Q.   Is this a standard method of valuation of a going

26

DeRamus - direct

1  concern?

2  **A.    Yes, it is.**

3  **Q.    So how did you go about doing that?**

4  **A.    I identified two particular comparables that I thought**
5  **were quite reasonable. Namely, ArvinMeritor and Eaton**
6  **themselves, both of whom are public traded companies. The**
7  **parent company, Eaton is obviously involved in this issue,**
8  **and involved in the same industry, producing some more**
9  **products, and ArvinMeritor, the parent company, one of the**
10 **owners of ZF Meritor, the joint venture. They are publicly**
11 **traded companies, very comparable in terms of what they do,**
12 **the products they make. And that provided me strong comfort**
13 **that the valuations, the multiples, would be reasonable.**
14      And I also confirmed that using two alternative
15 sets of comparables, namely, a set of comparables that
16 investments analysts identified as being comparable to Eaton
17 itself. I believe there were five such companies identified
18 by the U.S. analysts in that approach. And then another
19 approach where I independently went to databases that we
20 have of publicly traded companies and identified companies
21 in this particular industry and reviewed the business
22 descriptions and determined that those were a reasonable set
23 of approximately 11 companies.
24      And I confirmed that the multiples obtained from
25 any of these alternatives are within a very narrow range.

27

DeRamus - direct

1  **Q.    And you used those multiples on projected earnings**
2  that ZF Meritor would have earned but for Eaton's conduct to
3  achieve what the value of the going concern would have been,
4  lost enterprise value?
5  **A.    That is correct.**
6  **Q.    Now, did you use any other models to check this**
7  calculation?
8  **A.    Yes. I applied what's often referred to as the Gordon**
9  growth model. As I mentioned in my report, a valuation of
10 going concern value is effectively equivalent to estimating
11 the present value of the future cash flows of the company.
12      That approach to doing valuation can be
13 somewhat fraught with differences of opinion as to what are
14 appropriate growth rates, what are appropriate discount
15 rates, and so on. So, therefore, I felt this was the -- the
16 lost enterprise value, the multiple approach, was the most
17 straightforward, most reasonable method.
18      But since I have estimates of ZF Meritor's
19 but-for operating profit, or EBIT, earnings before interest
20 and taxes, and earnings before interest taxes, depreciation,
21 amortization, for a benchmark time period, I can determine
22 what is effectively an implied present value of those future
23 cash flows, assuming that those cash flows would grow at a
24 very modest rate.
25      I used the producing price index for the

28

DeRamus - direct

1  industry at issue, durable goods manufacturing as the
2  estimate of the expected growth rate, which I believe is
3  approximately two percent. And I used an estimate of the
4  cost of capital in this company, in this business, or
5  approximately 13-and-a-half percent, which I derived from a
6  well-respected publisher, Gibbitson's, publishes cost of
7  capital estimates for various industries.
8      And dividing a benchmark period of cash flow
9  by the difference between the cost of capital and the
10 expected growth rate of cash flows gives you an implied
11 valuation of what the present value of those future cash
12 flows is.
13 **Q.    And did that confirm your alternative initial**
14 calculation?
15 **A.    Yes, it did.**
16 **Q.    It tied to it?**
17 **A.    The result -- you can apply it different ways. I**
18 **applied the -- one I discussed in my report, I applied to**
19 **the lower valuation of using the ZF Meritor fourth method**
20 **that we went through here to the ZF Meritor but-for EBITDA,**
21 **earnings before interest, taxes, depreciation and**
22 **amortization.**
23      And the estimate using the Gordon growth model
24 approach resulted in a valuation of approximately
25 $50 million higher than using the multiple approach.

29

DeRamus - direct

1      So it provided me with the assurance that the
2  multiple approach was indeed reasonable and I had not
3  somehow cherry-picked a bad set of comparables that would
4  have given me an inflated estimate of damages.
5  **Q.    So is it true for each year of damages, you calculated**
6  for each fiscal year of damages for ZF Meritor, you
7  calculated a damages figure?
8  **A.    That is correct. In each of the tables in my report,**
9  **I provide a -- annual summary year by year of the**
10 **damages, both on a, again, on a nominal basis and on a**
11 **present value basis for all of the methodologies.**
12 **Q.    So if the jury in this case at some point decided to**
13 choose five years or four years or three years, it could do
14 that easily in terms of calculating how much dams accrued in
15 whatever period it chose?
16 **A.    Yes. All the figures are there in my report.**
17      MR. TASKIER:  Your Honor, Dr. DeRamus could
18 go, and I could have him go for ten more hours if we wanted
19 to drill down on each of these things, but I didn't think
20 you would appreciate it.
21      THE COURT:  I think it's better if we have a
22 defendant focus on its concerns and then you can come back,
23 certainly redirect.
24      MR. TASKIER:  Thank you, your Honor.
25      THE COURT:  Thank you very much.

000702

30

DeRamus - cross

1    MR. OSTOYICH:  Thank you, your Honor.  I have a
2 few questions.
3    CROSS-EXAMINATION
4 BY MR. OSTOYICH:
5 Q.  Dr. DeRamus, thank you.
6    Dr. DeRamus, fundamentally, I think I heard you
7 say you applied a but-for methodology for determining the
8 profits you believe the plaintiffs would have earned absent
9 Eaton's allegedly anticompetitive conduct.
10    Is that fair?
11 A.  That's generally fair.  The but-for world, it's a term
12 of art that's often used in calculating -- damage
13 calculation methods.  It does not really tell you exactly
14 what I did.
15    It is -- as I described, the overall method is
16 one of but-for profits and but-for enterprise value.  So in
17 a sense, it does reflect the world that would have occurred
18 absent Eaton's anticompetitive conduct.
19 Q.  All right.  And a world without Eaton's allegedly
20 anticompetitive conduct is a more competitive world than the
21 actual world; is that right?
22 A.  That is correct.
23 Q.  And a more competitive world than the actual world
24 would have lower prices than the actual world; is that
25 right?

31

DeRamus - cross

1 A.  In general, that's -- that is what I would expect,
2 although as I mentioned, I did not do an estimate of -- an
3 explicit estimate of but-for prices.  And I think you also
4 need to be careful in terms of which prices you are talking
5 about, prices of customers versus prices of OEMs, because
6 there are important dynamics in this market that need to be
7 taken into consideration.
8 Q.  Let me go back to something you just said.  You did
9 not do an independent estimate of but-for prices; is that
10 right?
11 A.  That's correct.  Well, let me step back from that one
12 minute.
13    With regard to the damages calculation, the
14 parameter of interest I focused on was per-unit profits,
15 but-for per-unit profits.
16    With regard to prices, I did provide extensive
17 testimony in my deposition about the impact of Eaton's
18 conduct on prices both to end customers and prices to OEMs,
19 and in particular, not just -- there's a discussion about
20 the removal of the -- the reduction in discounts that Eaton
21 provided to the end customers, but also the direct effect
22 that Eaton's conduct had in elevating ZF Meritor's prices,
23 which is I think one of the most egregious examples of
24 anticompetitive consequences of the conduct at issue.
25 Q.  The answer to my question was pretty simple.  You did

32

DeRamus - cross

1 not do an independent determination of but-for prices in
2 this case; is that correct?
3 A.  As part of my damages analysis, I did not conduct an
4 independent estimate of but-for prices, that's correct.
5 Q.  And as a result, Dr. DeRamus, what price in your
6 but-for world is Eaton selling its ten-speed high torque
7 manual transmissions?
8 A.  I don't have a specific estimate of the specific -- a
9 specific estimate that I derived for that.
10 Q.  What price is Eaton's selling its 13-speed manual
11 transmissions in your but-for world?
12 A.  Again, I don't have a specific estimate of that.
13 Q.  What price, Dr. DeRamus, what price is ZF Meritor
14 selling its performance transmissions in your but-for world?
15 A.  Again, I give you the same answer I just gave.
16 Q.  How many performance transmissions is ZF Meritor sell
17 in fiscal year 2003 in your but-for world?
18 A.  I'm sorry.  ZF Meritor?
19 Q.  Yes.
20 A.  As I -- I think we discussed in my deposition, the way
21 I presented the numbers was primarily based on the overall
22 line haul transmission market.  I consider line haul and
23 performance transmissions to be separate relevant markets.
24 And the bulk of ZF Meritor's production in the but-for world
25 I estimated to be line haul transmissions, although I saw

33

DeRamus - cross

1 that it is primarily a -- a means of convenience more than
2 anything.  But I do consider that in the projections
3 themselves, ZF Meritor was expected to produce performance
4 transmissions.
5    They were expecting the FreedomLine ultimately
6 to be applied to the performance applications.  They were
7 also developing other performance transmissions, such as the
8 11D, which was a potential competitor for Eaton's
9 performance transmission, the LL, as well as various 13 and
10 14-speed transmissions.
11    So I just want to make sure it is clear, as we
12 discussed in my deposition, that there's one thing to look
13 at the way the numbers are presented.  There's another issue
14 in terms of what is -- what are the assumptions underlying
15 those computations.
16    I would say that I would expects ZF Meritor to
17 have produced significant number of performance
18 transmissions during the time period at issue.
19 Q.  I gather that.  I'm looking for what number, what
20 volume of transmissions, performance transmissions, do you
21 posit in your but-for world the company would have sold in
22 fiscal year 2003?
23 A.  I don't have the exact number.  Again, the report just
24 has one number of the total transmissions in each category,
25 the G-Platform and FreedomLine transmissions.

34

DeRamus - cross

1          If you are asking me to estimate as I sit
2  here today, I would probably estimate a couple percentage
3  points.
4      Q.    I'm not asking you for an estimate; I'm asking you
5  what you did in your report.
6          Shall I hand you a copy of your report, Dr.
7  DeRamus?  Would that make it easier?
8      A.    No.  I have it in front of me.
9              MR. OSTOYICH:  Does your Honor have the full
10  report?
11             THE COURT:  Yes.
12  BY MR. OSTOYICH:
13     Q.    I'm looking for the number you assumed in your but-for
14  world the company would have sold an 11D transmission.
15  That's a manual performance, low, low load transmission; is
16  that right?
17     A.    Yes.
18     Q.    What number do you assume they would have sold in
19  fiscal year '03, because I can't find it in my report.
20     A.    That's right.  It's not in my report.  My report is --
21  that's where I think you need to be careful in terms of
22  levels of aggregation.  I could have done the damages at a
23  level of aggregation, total transmission.
24             I thought it was important to separate them out
25  the manual versus FreedomLine transmissions.  I did not have

35

DeRamus - cross

1  the data to disaggregate the forecasts even further than
2  that.  As I testified in my deposition, it's my position ZF
3  Meritor would have sold a significant number of
4  transmissions in the but-for world.
5      Q.    You applied a standard but-for methodology; is that
6  right?
7      A.    That's correct.
8      Q.    But you have no but-for price for any Eaton
9  transmission in your report?
10     A.    Again, for the damages analysis, I do not.  It's
11  unnecessary, although I would say it's there implicitly in
12  the -- the strategic business plan provides a but-for price,
13  provides the forecasted revenues.  It provides a forecasted
14  revenue divided by number of units to get the implied
15  forecasted price, but that's not an independent estimate of
16  the but-for price that I performed.
17     Q.    Let me be clear.  Let me be clear about this.
18             You did not do an independent assessment of the
19  but-for price of any Eaton transmission or the but-for
20  volume of any particular ZF Meritor transmission in your
21  report, your analysis; is that right?
22     A.    No, that's not correct.
23     Q.    Oh?
24     A.    You said -- I certainly assessed the prices that Eaton
25  paid.  I looked at an extensive amount of data produced by

36

DeRamus - cross

1  Eaton, produced by ZFM in terms of the prices they sold.  I
2  presented a lot of information about the prices, and I
3  assessed the difference, particularly the difference between
4  the prices and costs, because the primary input in a lost
5  profits case is the per-unit profit.  There is a sensitive
6  assessment of price and cost that I did in determining the
7  reasonableness of that as an input.
8              In terms of ZFM's volumes, I certainly did
9  extensive analysis of ZFM's but-for volumes.  I used the
10  strategic business plan as one source of information.  I
11  performed a second method with my econometric method that
12  verified the reliability of the business plan as a basis for
13  but-for market shares, which I then applied to actual
14  volumes, to strip out the effect of other factors unrelated
15  to this conduct.
16     Q.    Let's turn to your report, Dr. DeRamus.
17             MR. OSTOYICH:  If I can, your Honor, I will put
18  it up on the screen rather than hand out physical copies.
19             THE COURT:  All right.
20  BY MR. OSTOYICH:
21     Q.    If we could can look at your report, table 5 of your
22  report, which is on Page 143, if we can bring that up.
23             MR. OSTOYICH:  Your Honor, is it all right if I
24  walk up to point out specific lines?  I promise I will talk
25  loud enough for everyone to hear me.

37

DeRamus - cross

1              THE COURT:  All right.
2  BY MR. OSTOYICH:
3      Q.    Now, table 5, Dr. Ramus, is part of your method one
4  for calculating lost profits; is that right?
5      A.    That's correct.
6      Q.    And this is a table that represents the incremental
7  revenue that you believe the company would have earned
8  absent Eaton's allegedly anticompetitive conduct; is that
9  right?
10     A.    Yes.  The first step in that computation.
11     Q.    Now, if I look at the line 9, which is over here --
12     A.    Yes.
13     Q.    -- this is the average but-for price that you believe
14  ZF Meritor would have obtained for its transmissions absent
15  Eaton's allegedly anticompetitive conduct?
16     A.    Well, to be clear, the label is probably a little bit
17  of -- is a shorthand.  It reflects the revenue, the revenue
18  that is listed on the business plan, total of revenue.  Net
19  revenue divided by the number of units.  That gives you the
20  effective revenue per unit.  It is used as a proxy for, a
21  proxy for computational purposes, but is not necessarily
22  comparable -- it is not comparable to other prices you've
23  pointed to in my -- in my testimony.
24     Q.    So in fiscal year 2001, you assume the company would
25  have sold 19,348, and over here you can't see it, but these

38

DeRamus - cross

1  are G-Platform, these are manual transmissions absent
2  Eaton's conduct.  Is that fair?
3  A.    No, it's not fair.  I would say first that the
4  forecasted number of units is what appears in the business
5  plan.  I applied the -- I divide the number of units by the
6  forecasted total number of trucks to get ZF Meritor's
7  forecasted share, which your screen just popped down, but
8  was the third, to get the -- on line 4 gets you the actual
9  share, multiply it by the actual number of trucks, line 5.
10  That then, in turn, gives you row 6, is the but-for number
11  of G-Platform transmissions sold.
12          17,000 -- 17,886 gives you the number of
13  but-for units applied by the market share projections of
14  the business plan applied to the actual number of units.
15          And one other characterization you made about
16  the results or that computation is important to clarify.
17  The G-Platform is what the, in the strategic business plan,
18  is what was -- how it's labeled by the company.  They
19  provided two different columns in their forecasts, one for
20  what they call the G-Platform, another one, another column
21  which was the FreedomLine, and the G-Platform was
22  effectively everything other than the FreedomLine, which
23  did include some levels of automation.
24          So you had, for example, ESS, Sure Shift.
25  Various levels of automation that appear to be -- where

39

DeRamus - cross

1  the transmission will cost more to produce and gets a higher
2  price in the market than, for example, the 9 and 10-speed
3  transmissions.  It's also a blend of different kinds of
4  transmissions with different torque ratings, and as I said,
5  it's a net revenue number, so it will include additional
6  revenue items in addition to simply the price of a given
7  transmission.
8  Q.    Dr. DeRamus, bear with me.  I only have an
9  hour-and-a-half, so I want to get some quicker answers, if
10  you would, for me now.
11          Now, average but-for price, this is your average
12  but-for price that the company would have obtained for every
13  transmission, G-Platform transmission sold in each fiscal
14  year; is that right?
15  A.    It is the average per-unit revenue implied by the
16  strategic business plan that I believe to be a reliable
17  basis for my damage calculation.
18  Q.    And that average but-for price below is $3,418; right?
19  Fiscal year '00 and fiscal year '01.  The high is 3776; is
20  that right?
21  A.    Again, the average per-unit revenue.  For example, it
22  does aftermarket revenues as well.  There are other revenues
23  other than price.
24          Just so the record is clear, every time a
25  company talks about but-for price on this schedule, it is

40

DeRamus - cross

1  total revenues for a given product line obtained from the
2  ZF Meritor plan business divided by the number of units.
3          THE COURT:  I'm confused.  I mean so it's not
4  really a but-for price?  It's something else?
5          THE WITNESS:  You can think of it as a but-for
6  price in the shorthand.
7          THE COURT:  Well, you are not letting us think
8  about it in a shorthand.  You continue to explicate what it
9  is instead of a but for comprise price.
10          So it is not the price that they -- well, it's
11  not the price they would sell it for?  It's the revenue they
12  would get?
13          THE WITNESS:  There are a couple of different
14  prices one has to keep in mind.  I apologize if it's a bit
15  confusing.
16          THE COURT:  I don't want to think about more
17  than what is here, so tell me again what this is, when you
18  say average but-for price.
19          THE WITNESS:  It is all of the revenues that
20  ZF Meritor is earning or projects to earn from the sale of
21  the transmissions that are included in this category.  So
22  it will include, for example, something called aftermarket
23  revenues.  So if there are additional sales or repairs or
24  rebuilds that are done for a given transmission, those
25  revenues are counted in the strategic business plan.

41

DeRamus - cross

1          So if you take your car into a car dealership,
2  for example --
3          THE COURT:  All right.  So all revenues earned,
4  not just from the initial sale, but forever?
5          THE WITNESS:  That's correct.  Well, it is
6  the revenues they expect to earn in that given year for
7  the -- for that particular product line.  It's not a
8  present value concept or a future earnings.  It's a current
9  year, these are the current dollars they expect to earn for
10  that particular -- from sales of those particular
11  transmissions.
12          THE COURT:  All right.  So that's explained
13  once, so you don't have to explain it again.
14          THE WITNESS:  All right.
15          THE COURT:  All right.  You can go ahead.
16  BY MR. OSTOYICH:
17  Q.    Your average but-for price in table 5, line 9, goes
18  from 3418 low in fiscal year '00 and fiscal year '01, up to
19  3776, and then it levels off at 3650; right?
20  A.    That's correct.
21  Q.    That's a net price?
22  A.    I'm sorry?
23  Q.    That's a net price?  You deducted out rebates to the
24  OEMs and you deducted out field incentives to the truck
25  buyers; is that correct?

000705

42

DeRamus - cross

1   A.   Correct.

2   Q.   Now, this table 5, you then in your Method 1, compare

3   to the table 6 values that you have for the average cost per

4   incremental transmissions sold, and then at table 7, the

5   revenue minus the cost gives you your method one incremental

6   profits; is that right?

7   A.   Correct, for that particular G-Platform line.  I do a

8   similar calculation for the FreedomLine in the second part

9   of that table right below that.

10  Q.   Now, this average but-for net price, let's go, if we

11  could, to figure 18 on Page 84.

12         This figure 17 on Page 84, Dr. DeRamus, this is

13  a figure that you created.  It's in your report; is that

14  right?

15  A.   That's correct.

16  Q.   The black line here is Meritor's average price for its

17  Linehaul transmissions, the 9 and 10-speeds; is that right?

18  A.   Yes, it is derived from an actual database of OEM

19  transactions, and we selected only 9 and 10 transmissions in

20  computing the but-for price -- I'm sorry -- in computing the

21  prices that are on -- in that table.

22  Q.   And these average Meritor prices for each year,

23  they're in the $3,000 range for 9 and 10-speeds; is that

24  correct?

25  A.   That is correct.

43

DeRamus - cross

1   Q.   All right.  And you would agree with me, just as a

2   matter of math, your table 5, line 9 average but-for price

3   is in every year about 15-percent higher than the actual

4   price the company obtained for its 9 and 10-speed manuals;

5   is that correct?

6   A.   I would agree with you as a matter of arithmetic,

7   but I agree with you as a matter of characterization of

8   those -- those two data points are in no way comparable,

9   as I said.  These are derived from different data sources.

10  These are OEM transaction prices.  The other one, the other

11  ones are total revenues, and those are -- in fact, there is

12  some period there where you can compare them in terms of

13  actuals to actuals.

14         There's -- part of my table 5 actually has 2000

15  actuals in there, and those actuals, what you refer to --

16  we've -- what's referred to in table 5 as a but-for price,

17  i.e., a but-for per unit revenue, you can see that is an

18  actual audit number that ties back to the audited

19  financials, and you can compare that to an actual OEM price

20  here.  That tells you something about a difference in the

21  numbers, but they're not comparable data points.

22  Q.   Dr. DeRamus, I have not characterized anything yet.

23  I'm just asking you if the numbers are higher.

24         The numbers are higher; right?  There's no

25  question about that.

44

DeRamus - cross

1   A.   The numbers are higher, but in doing the comparison,

2   you have the potential of seriously misleading the Court as

3   to the reliability of the numbers in table 5.

4   Q.   Dr. DeRamus, I will take care of that.

5         Now, this, your but-for price of 3418 up to 3776

6   and leveling off at 3650 is a net price, but this is a gross

7   price for the OEMs; correct?

8   A.   The net revenue, pre-revenue in table 5, is net of

9   all payments and additional -- including additional

10  aftermarket revenues applied across a different set of

11  products, and this is a price, the invoice price to the

12  OEMs.

13  Q.   Right.  You say up at the top -- this is your title:

14  Gross of Rebates and Incentives.

15         So you have not deducted for the rebates and

16  incentives; is that right?

17  A.   That is my understanding of the data.  Again, it

18  is derived from a particular database that was provided

19  to us by both ZF Meritor and Eaton, and that was our

20  general understanding of how to interpret the net price in

21  that.

22  Q.   The blue line in your figure 17 is Eaton's actual

23  price for 9 and 10-speed manual transmissions; is that

24  right?

25  A.   That is Eaton's actual price charged to the OEM for 9

45

DeRamus - cross

1   and 10-speed transmissions.

2   Q.   And as we see, it's for every year from 2000 on,

3   it's a little bit lower than Meritor's actual prices for

4   the 9 and 10-speed transmissions; is that right?

5   A.   That is correct.

6   Q.   As you characterize in your report, it's about

7   four-and-a-half percent on average; is that correct?

8   A.   That's correct.

9   Q.   Now, this is the gross price, and we know that there

10  are some rebates that Eaton provides to the truck companies

11  when they purchase transmissions; right?

12  A.   Yes.  There are rebates provided.  My assumption is

13  that those are gross of those rebates.

14  Q.   It's your report.  Do you know what it is?  It says

15  gross.

16         Is it gross?

17  A.   It is based on the -- the representations that Eaton

18  gave us of the data was not always completely clear, but

19  that it was may understanding, yes.

20  Q.   That's why you put the title up there?

21  A.   Yes.  Because that was my understanding.

22  Q.   The net price -- the rebates to the OEMs are in the

23  range of 1 to 5 percent that Eaton provide; is that right?

24  A.   That is correct.

25  Q.   And so if we net those out so we can compare this to

46

DeRamus - cross

1  your but-for price, if we net out this, take about five
2  percent, a little bit under $3,000, somewhere in the range
3  of 50, $75 to $150 less to the OEM; is that right?
4  **A.    As I said before, you can't do that comparison you are**
5  **trying to make, but you can certainly do the math of**
6  **applying the -- the rebates from -- to reduce that price**
7  **accordingly.**
8  **Q.**    So if we deduct out the rebates, Eaton's average
9  price for 9 and 10-speed manuals is somewhere in the 2700
10  range?
11  **A.    That's the math that applies.**
12  **Q.**    Eaton applies incentives, as does Meritor, to the
13  truck buyers themselves to incentivize them to specify
14  their transmissions; right?
15  **A.    That is correct.**
16  **Q.**    In fact, you've calculated in your report what the
17  average is that Eaton provided across this time period to
18  the truck buyers; is that right?
19  **A.    Correct.  Both Eaton and ZF Meritor provided**
20  **incentives.**
21  **Q.**    And, on average, Eaton's SPIFFs -- they're called
22  SPIFFs; right?
23  **A.    That is one term, yes.**
24  **Q.**    And that's, on average, about $450 of an additional
25  price incentive to the truck buyers?

47

DeRamus - cross

1  **A.    I would have to review my testimony to see what**
2  **specifically the average was.  It was a range depending on**
3  **the size of the truck buyer and varied over time.**
4  **Q.**    Let's look at figure 28 on Page 113.
5          You plotted out Eaton's average incentives to
6  the truck buyers; right?  Is that right, Dr. DeRamus?
7  **A.    Bear with me one minute.**
8          Yes, I'm there.  Figure 28.
9  **Q.**    The black line is the average per unit SPIFF to all
10  truck purchasers; is that right?
11  **A.    Can you bear with me one minute?**
12  **Q.**    Sure.
13          (Pause.)
14          THE WITNESS:  That is what the -- the title
15  says, but just to be clear, I don't recall whether this is
16  conditional on someone receiving a SPIFF versus the total
17  SPIFF divided by the total quantities.
18  BY MR. OSTOYICH:
19  **Q.**    In the year 2001, you plotted out an average of
20  $450 price concession to the truck buyers that Eaton
21  provided per unit; is that right?
22  **A.    That is correct.**
23  **Q.**    Now, if I take your figure 17, you said already we
24  deducted discounts or rebates to the truck buyer, the
25  truck manufacturers.  You have another $2,700 per unit price

48

DeRamus - cross

1  for the nines on tens on average in the table.  And if we
2  take this and deduct it, we're down to about 2300 or so; is
3  that right?
4  **A.    That is what the math implies, yes.**
5  **Q.**    That's a net price on average in 2001 for Eaton's
6  9 and 10-speed manual price, the transmissions; is that
7  right?
8  **A.    That's correct.  Net price before any additional**
9  **aftermarket sales of revenues that Eaton may earn from**
10  **those.**
11  **Q.**    If we go back to figure 17 on Page 84, Eaton's net
12  actual price is about 2300 for 9 and 10-speed manual
13  transmissions in 2001.  And you've got the actual prices
14  for ZF of 3,000; right?
15  **A.    Again, be careful, because we've not gone through the**
16  **same exercise of getting the competitive equalization**
17  **payments and deducted those from ZF Meritor's prices.  And,**
18  **again, I would put a big caveat on making sure that the math**
19  **that we just did actually was a reflection of the $450 per**
20  **unit applied to all units, which is something I would need**
21  **verified.**
22  **Q.**    But table 5, line 9, you've got the but-for net price
23  that you posit for ZF Meritor's transmissions on average of
24  3418, 2001.
25          Do you recall that?  It's on Page 133.

49

DeRamus - cross

1  **A.    I'm sorry.  We're back to table 7 of my report?**
2  **Q.**    Table 5.
3  **A.    Table 5?**
4  **Q.**    Table 5, line 9.
5  **A.    With all the caveats that I expressed previously about**
6  **what that average but-for price means and how to interpret**
7  **that, yes.**
8  **Q.**    So you've got an average but-for net price is 3418
9  when the actual net price that Eaton was selling 9 and
10  10-speed manual transmissions in 2001 was in the 2300
11  range?
12  **A.    That's where I think you fall off the wagon, apples**
13  **and oranges, or apples and bicycles comparison.  That**
14  **includes additional revenues from aftermarket sales that I**
15  **believe is appropriate to include in a damages calculation,**
16  **and it includes a different mix of products.**
17          **These are not just 9 and 10-speed transmissions.**
18  **These include transmissions with additional levels of**
19  **automation that cost more to make and that are sold for**
20  **higher prices as, well as in the forecast time period,**
21  **performance transmissions, such as 11-speed, 13, 14-speed**
22  **transmissions that also generally sell for higher prices and**
23  **cost more to make.**
24  **Q.**    How many -- how many of those other transmissions
25  besides 9 and 10-speeds are in this column, fiscal year '01,

000707

50

DeRamus - cross

1  Dr. DeRamus, in your but-for world?
2  A.    I don't have a precise estimate of those.  There are
3  different projections that ZF Meritor provided where they
4  provided greater levels of details of their assumptions
5  regarding the different products that were coming out and
6  when they were expected to come out.
7         Some of these are coming out during this 2001
8  and forward time period, so on the strategic business plan
9  itself, the one line item that's separated is the
10 aftermarket sales.
11        So you can see the additional revenues from the
12 aftermarket sales, but it does not provide a break-out in
13 what they call the G-Platform between 9-speed, 10-speeds,
14 and everything else.
15        And I also emphasize that this is forecast
16 based on -- it's not just specifically one price for all
17 9 and 10-speed transmissions.  There's a mix of -- they're
18 forecasting a particular mix on a going-forward basis.
19 They're forecasting increased torque ratings, to accommodate
20 higher horsepower requirements.
21        So you may have expectations going forward of
22 even 9 and 10-speed transmissions that are higher priced
23 and higher cost that are not comparable to a given --
24 another given table that just has 9 and 10-speed particular
25 transmissions.

51

DeRamus - cross

1  Q.    Dr. DeRamus, I promise, I will get to that point
2  in a minute.  But this figure you have here, is it your
3  testimony that your but-for world, that you don't know
4  how many of these other transmissions are in those figures?
5  A.    Yes.  I have the -- reviewed all the information that
6  was available to me about this business plan and previous
7  business plans.
8         It did not provide the details of the individual
9  units of each product in this -- accompanying this
10 November 2006 -- I'm sorry -- November 2000 business plan.
11 Prior business plans did have more explicit information
12 about the torque rating, projected torque ratings, the dates
13 of introductions of alternative business -- of alternative
14 products.
15        What it did have was -- I note that in those
16 projections, there are additional transmissions.  We see it
17 from the capital expenditure forecasts that are included as
18 part of the business plan.
19 Q.    Let me see if I can break this -- first, this is
20 your but-for world up here.  You created it, but you can't
21 tell me how many other transmissions are in there; is that
22 right?
23 A.    My estimate of the but-for world based on all the data
24 that's available to me.
25 Q.    So what you did was you assumed that there was a

52

DeRamus - cross

1  company business plan that was a proxy for the but-for
2  world; is that right?
3  A.    I used a company business plan, and I -- and with
4  certain adjustments, I concluded that it was reasonable to
5  use the basis for some of my computations.
6  Q.    Now, the plan you use, and I will get to it in detail
7  in a moment, I promise, but the plan you use, you don't know
8  what assumptions the creator of that plan used in preparing
9  the plan, do you?
10 A.    I know some of the assumptions.  I don't know every
11 single assumption that they used, but I did verify the
12 reasonableness of the forecasts.
13 Q.    We have an assumption on an assumption; right?
14 You have an assumption that the plan is a proxy for your
15 but-for world and you have an assumption that they made
16 assumptions that are reasonable.  You don't know all the
17 assumptions in the plan?
18 A.    I'm not sure how to answer that question because
19 it's kind of -- I did not assume something about the --
20 the but-for world based on -- let me try that again.
21        You have, many assumptions there.  Let me
22 tell you what I did.  Maybe that's the easiest way to answer
23 the question.
24        I looked at all the available information
25 to me.  I looked at this particular business plan and I used

53

DeRamus - cross

1  all of the information I had about the way in which this was
2  developed, who presented it.  Certain assumptions in that
3  business plan are very explicit and easily calculable.
4  Other ones are not.  Other others are buried in the details
5  of the spread sheets of the individuals who prepared these.
6  I did verify the procedures against other business plans
7  where they were more explicit.
8         So it's not simply taking without any
9  underlying analysis, taking the numbers at face value.  I
10 did a very extensive analysis to verify the reasonableness
11 and the reliability of the numbers in that business plan,
12 particularly as I applied and modified them for purposes of
13 my damages calculation.
14 Q.    Now, Dr. DeRamus, is it your testimony that the plan
15 that you relied upon and assumed was the basis of the
16 but-for world here, that the plan included transmissions
17 other than 9 and 10-speeds for fiscal year '01?
18 A.    Yes.  That is my understanding based on the
19 information that I've seen.
20 Q.    You relied upon as part of your report a president's
21 report that was prepared in October of 2000; right?  Do you
22 remember that?
23 A.    I relied on president's reports that were prepared
24 throughout this time period, including the October 2000
25 president's reports, or the -- the presentation to the Board

54

DeRamus - cross

1  of Directors as well as this.
2          MR. OSTOYICH: Your Honor, if I could, I would
3  like to hand the witness a copy and bring your Honor a copy
4  as well, and I have an extra copy (handing documents to the
5  Court and the witness).
6          THE COURT: Thank you.
7  BY MR. OSTOYICH:
8  Q.    Now, Dr. DeRamus, do you recognize this from your,
9  deposition, president's report, which you relied upon in
10 preparing your report?
11 A.    Yes, I do.
12 Q.    And this was a president's report. At the top of the
13 first page, it says it was prepared in October of 2000;
14 right?
15 A.    Correct.
16 Q.    And you relied upon this in looking at your report, in
17 preparing your report; is that right?
18 A.    Correct.
19 Q.    Now, this has a page that ends with 477, are the last
20 three digits. Let's me know when you've gotten there.
21         It should say up at the top, New Product
22 Timetable.
23         Do you see where I am, Dr. DeRamus?
24 A.    Yes, I do see where you are. It's --
25 Q.    All right. This has a table, a timetable for when

55

DeRamus - cross

1  some other products, the manual products that are going to
2  be developed by the company -- do you see that on the
3  left-hand side?
4  A.    I do.
5  Q.    All right. Now, the company is on a fiscal year; is
6  that right?
7  A.    Correct.
8  Q.    And a fiscal year runs from October 1, one calendar
9  year, to September 30th of the next year; is that right?
10 A.    That's correct.
11 Q.    Now, fiscal year '01, which is the column I was just
12 looking at in your table 5, that runs from October 2000 to
13 September 30th, 2001?
14 A.    Correct.
15 Q.    Now, these product introductions here, this is what
16 you were talking about? You said these were in the column
17 for fiscal year '01; right? These products?
18 A.    Those, among others. I also mentioned the additional
19 automation of the ESS, the Sure Shift product that was
20 released prior to this time period.
21 Q.    These all say they are being developed after fiscal
22 year 2001. This is the first one, and it's fiscal year
23 2002; right?
24 A.    The exact timing of the sale was not particularly
25 clear to me. There's preproduction time periods, so they --

56

DeRamus - cross

1  that is the -- the table says New Product Timetable. It
2  wasn't particularly clear to me when the volumes are
3  expected to go into the forecast.
4  Q.    This is for a new product introduction. They were
5  reintroduced in fiscal year 2001; right? We know that
6  much; right? It exists in fiscal year '02 or afterwards;
7  right?
8  A.    There, you are making an assumption about what
9  introduction means, because there are pre-releases that
10 occur, testing models. I don't know how they accounted for
11 those in terms of the revenues.
12         Yes, the table does say October 2001 was a -- as
13 part of the timetable.
14 Q.    I don't want to suggest that they are not available in
15 fiscal year '01, which was the prior year; right?
16 A.    Unless there were some pre-release production numbers
17 included in that.
18 Q.    So if we go back to table 5, line 9, for fiscal year
19 '01, your average price figure of 3418, which is the net
20 price, is 9 and 10-speed manual transmissions almost
21 entirely; is that right?
22 A.    There is a large faction of, they're G-Platform sales
23 that are going to be 9 and 10-speed transmissions. There
24 will also be additional levels of automation, so the
25 transmissions that are sold at that level automation will

57

DeRamus - cross

1  be higher.
2         It wasn't clear to me whether, when they were
3  redoing this particular forecast, what they actually -- like
4  I said, I don't have the individual spread sheets that
5  go in and say on a product line by product line basis, how
6  many additional, or performance application transmissions
7  they were projecting in 2001 in this particular business
8  plan.
9  Q.    I'm not asking you the fact question about what the
10 company was predicting. Now I'm asking you what's in your
11 but-for world?
12         Your but-for world, I thought you said you
13 assumed other transmissions besides nines and tens of fiscal
14 year '01 to gets to this average price of 3418.
15 A.    I expect that ZF Meritor included additional
16 transmissions other than simply 9 and 10-speed manual
17 transmissions.
18 Q.    How many? How many and what kind?
19 A.    And that's where I said, all of the information that
20 is available to me does not -- and it's available to
21 estimate damages in this case, does not provide me with the
22 precise number of units by product type that are included in
23 this.
24         All I know is in the -- comparing it to previous
25 plans, it appears that there are a -- there are levels of

58

DeRamus - cross

1  automation, additional types of products with additional
2  levels of automation that would cause that price to go up.
3  There are, as I said, aftermarket revenues that would also
4  cause it to go up.  But that would also correspondingly
5  cause the cost to go up as well.
6  Q.     So am I right, Dr. DeRamus, you don't know how many
7  other products are in there, or what the volume of those
8  products are?
9        Do you know what the price assumptions in your
10  but-for world, table 5, line 9, those other unknown quantity
11  of transmissions are going to sell for?
12  A.     Again, I don't have the underlying -- the spread
13  sheets.  I have what is the implied revenue per unit
14  sold, which is ultimately only a parameter of interest to me
15  in the damage calculation, the only parameter that you need
16  for purposes of the damages calculation.
17        I have looked at their business plans, as I
18  said, where they were more explicit and where it gives me a
19  sense of the prices that were being charged for the
20  transmissions, the higher level of automation, and for the
21  performance application transmissions, and those were
22  higher-priced products than the 9 and 10-speed
23  transmissions.
24        And it also showed me, again, the evolution of
25  the -- of their expectations of the torque requirements

59

DeRamus - cross

1  even for just their 9 and 10-speed transmissions, which may
2  be different than their -- than their actuals, but, again,
3  provides you an apples-to-apples comparison if you are
4  looking at revenues versus costs.
5  Q.     Now, the assumption you made in the but-for world that
6  some number of transmissions, some different types of
7  transmissions would sell on average for 3418 net, right,
8  that was your assumption?
9  A.     Again, with all the caveats that I just said before, I
10  don't want to try the courts patience, but it is not that --
11  that is the net revenue that they would receive divided by
12  the total number of transmissions.
13  Q.     That's the average but-for price.  That's what you
14  wrote on line 9, table 5?
15  A.     That is the figure that is listed as average but-for
16  price on line 9.
17  Q.     Now, for your Method 1, you take this and you multiply
18  it by the additional units you think they sell of whatever
19  those transmissions are that you can't identify; is that
20  right?  Right?
21  A.     I multiply it by the additional incremental -- the
22  total incremental units for that particular platform,
23  the G-Platform transmission, just as I do below the
24  FreedomLine.
25  Q.     And then you subtract out the incremental variable

60

DeRamus - cross

1  costs in table 6 to get your table 7, incremental profits,
2  and that is your Method 1?
3  A.     The variable costs that are commensurate with
4  the -- whatever product, specific product is underlying the
5  aggregate numbers that are reports in table 1.
6  Q.     Now, your Method 2 -- did you prepare this, by the
7  way?
8  A.     No, I did not.
9  Q.     All right.  The second page -- I think it's the third
10  Pages in.  The third page in says you calculated lost
11  profits five different ways.
12        Do you see where I am?
13  A.     Yes.
14  Q.     Now, there are not five independent ways, are they,
15  Dr. DeRamus?
16  A.     No.  As I said, there is one method, which is --
17  damages, which is lost -- lost profits plus lost enterprise
18  value.  That is the overarching method, and there are
19  various approaches I took using different data, and,
20  frankly, all of the data that was available to me to come up
21  with a reliable estimate.
22  Q.     Your second method you said was an econometric measure
23  of the market share.  Is that fair?
24  A.     That is correct.
25  Q.     And in that method, let's look at table 8 on Page

61

DeRamus - cross

1  145.
2  A.     Yes.
3  Q.     Now, this is your calculation of the incremental
4  profit under your Method 2, the econometric measure of
5  market share?
6  A.     That's correct.
7  Q.     You did a separate econometric measure of what you
8  think they would have sold the volume, the market share of
9  the volume they would have sold --
10  A.     That's correct.
11  Q.     -- in the but-for world?
12        And then you measured it by, you multiplied it
13  to get your profit, or you multiplied it by the profit
14  figures in table 7, your first method; is that correct?
15  A.     Correct.  As I mentioned before, I could have easily
16  used alternative measures of profit.  It would have given me
17  the same results.
18  Q.     The second method is premised upon the assumption that
19  the but-for pricing and the but-for variable cost and the
20  but-for profit of the first measure are reasonable; is that
21  right?
22  A.     It's premised on the figures that are included in
23  the first measure and on the overarching assumption that,
24  yes, the per-unit profit is a reasonable measure of per-unit
25  profit.

---

62

DeRamus - cross

1  Q.  Now, the third method was you added some additional
2  costs after your fiscal '03.  Is that fair?
3  A.  That's correct.
4  Q.  And if we can turn to table 10 on Page 145.  145.
5  A.  Yes.
6  Q.  That's the next page, table 10.
7       Table 10.  This is the calculation of the
8  incremental profit in your third method for lost profits;
9  right?
10  A.  That's correct.
11  Q.  And line one, you have the incremental gross profit in
12  current dollars.  And that comes out of -- straight out of
13  table 7 in Method 1?
14  A.  Correct.
15  Q.  And that's from table 7, line 3, in Method 1?
16  A.  That's correct.  I'm sorry.  I'm not
17  cross-referencing, but that's correct based on my memory.
18  Q.  Table 7, line 3 comes out of --
19  A.  Yes.
20  Q.  -- in part line 21 from table 5, your first method?
21  A.  I'm sorry?  Table 7 is ultimately derived from table
22  5 and 6.
23  Q.  Therefore, it depends upon your but-for price
24  assumptions in table 5, line 9; is that right?
25  A.  It depends on the consistency of the assumptions in

---

63

DeRamus - cross

1  table one, table 5 and table 6 of prices and costs.
2  Q.  Now, your Method 4 even added some additional
3  incremental costs in from fiscal year 2000 up to 2009; is
4  that right?
5  A.  Correct.
6  Q.  And the incremental revenue figures, again, come out
7  of table 7; right?
8  A.  That is correct, yes.
9  Q.  So on table 11, which is Page 147, it's a little hard
10  to read, but table 11, line 1, comes right out of table 7;
11  is that right?  Line 3 in table 7?
12  A.  I'm sorry.  Table 11, line?
13  Q.  Table 11, line 1, incremental gross profit in current
14  dollars.
15  A.  Yes.
16  Q.  It comes from table 7, line 3?
17  A.  Yes, that's correct.
18  Q.  And that depends upon the incremental revenue figure
19  on line one of table 7; is that right?
20  A.  The -- yes.  Yes.  Incremental revenue and incremental
21  costs, both.
22  Q.  And that line comes out of, in part, table 5, line 9
23  price assumptions automatically; right?
24  A.  Well, again, I think it's appropriate to emphasize,
25  because we never did talk about the FreedomLine, and these

---

64

DeRamus - cross

1  are also aggregating up across both the FreedomLine and
2  the EG Platform.  It's not simply the EG Platform numbers
3  here.
4  Q.  In part, it comes from table 5, line 9?
5  A.  Correct.
6  Q.  Then you had a fifth lost profits calculation, and
7  that's the one you laid in your -- this handout here, Eaton
8  operating profit benchmark; right?
9  A.  Correct.
10  Q.  And that is an assessment you made that the company in
11  the but-for world, the plaintiffs would have earned an
12  operating profit based upon Eaton's operating profit in the
13  actual world?
14  A.  I would say more or less.  It is -- and significant
15  differences in terms of how you think about the assumptions
16  that are there in terms of the results.
17       It is an alternative source of data.  It's
18  Eaton's actual profits as opposed to forecast profit.  But I
19  don't necessarily derive -- I don't add back in the losses
20  that ZF Meritor actually incurred during this time period,
21  so that effectively, in the but-for world, the damage line
22  there is not their but-for profit.  Their but-for profits is
23  the sum of the damages there, 200 -- I think it's
24  approximately $250 million.
25       Bear with me.  I will get the exact number.

---

65

DeRamus - cross

1  Less approximately 80 to $90 million of losses.  So that
2  would have been their -- their actual but-for profitability,
3  would be well less than $200 million.
4  Q.  Can we bring up table 12 on Page 147?
5       This is your fifth method that summarizes the
6  fifth method based upon Eaton's operating profit, which you
7  calculated the company's but-for profitability; is that
8  right?
9  A.  Yes.
10  Q.  And table 12, line one, says, Eaton's profits from
11  heavy duty transmissions, all product types.
12       Is that right?
13  A.  Correct.
14  Q.  And then in line 2, you multiplied that out by a ratio
15  of Linehauls just to get the Linehaul profits; is that
16  right?
17  A.  Right.  I measured that I -- a procedure that I
18  felt was going to provide a lower bound estimate, since I
19  do expect ZF Meritor to have sold some performance
20  transmissions as well in the but-for world.  But, yes,
21  that provides a lower --
22  Q.  This number in Dr. DeRamus' line 2, Eaton's profits
23  in Linehaul, you define as the Linehaul market, is, in
24  your view, a monopolistically high profit margin; is that
25  right?

---

66

DeRamus - cross

1    A.   Yes, I believe they are earning monopoly profits.

2    Q.   And, in fact, you have a section of your report,

3    Section 6.6, that says you can infer monopoly power in the

4    Linehaul segment of the market from the high profits Eaton

5    earned; right?

6    A.   Correct.

7    Q.   And in this method, you're assuming ZF Meritor, in the

8    but-for world, where profitability based, upon that Linehaul

9    profit figure?

10   A.   Not exactly.  That's where -- the not exactly can be

11   significant in terms of dollars because I did not take out

12   the losses that ZF Meritor incurred in that time period.

13        So the actual profits that Eaton's -- that ZF

14   Meritor would have incurred in the but-for world using this

15   methodology is that number, the number on line 8, and then

16   add in the losses they incurred during the end of the year,

17   and that would, in turn, be the actual but-for profitability

18   of ZF Meritor.

19   Q.   But for this purpose, you took Eaton's profits,

20   monopolistically high profits Eaton earned in the Linehaul

21   segment of the market, multiplied them out by the

22   incremental units they would have sold, to get the figure

23   down at the bottom on line 9?

24   A.   That's correct.  There's an input into the

25   calculations.

67

DeRamus - cross

1    Q.   And you assume in this model of the but-for world,

2    which is the more competitive world; right?  Right?

3    A.   Yes, it is.

4    Q.   You assume that ZF Meritor would have obtained 50,

5    60 percent of the Linehaul portion of the market?

6    A.   Well, I think that's where there's a distinction

7    between dividing a number by the total Linehaul number

8    versus what I actually expect would have happened in the

9    but-for world.

10       I do expect approximate -- ZF Meritor would have

11   had approximately 50 percent of the Linehaul market and some

12   percentage of the performance market as well.

13   Q.   Just reading your table, line 5, line 5, that's

14   what you posit that ZF Meritor's, a share of the Linehaul

15   market?

16   A.   Those are the words I used.  Just to be clear, there's

17   one thing that you do for exposition, for ease of

18   exposition, I think in terms of what you do for explaining

19   what is underlying the data and underlying the conclusions.

20       I do consider that Eaton's -- I'm sorry -- ZF

21   Meritor's but-for units would have been comprised of both

22   performance and Linehaul transmissions for expositional

23   use.

24       And in order, frankly, to provide a lower

25   estimate of damages, I'm using just the Linehaul percentages

68

DeRamus - cross

1    and the Linehaul profits as opposed to the higher Eaton

2    performance profits as the benchmark, and instead of putting

3    in Eaton's performance transmissions in the denominator for

4    estimating ZF Meritor's but-for shares.

5    Q.   All right.  Can you slide this this way so we can get

6    fiscal years '04, '05, '06 and '07 here?

7        So I'm clear again, these are your words, table

8    12, line 5:  ZF Meritor's but-for share of the Linehaul

9    market.  It's 43 percent, 57 percent.  Ultimately, it's

10   60 percent of your you but-for world; right?

11   A.   Those are the percentages that are on that spread

12   sheet, but, again, as we discussed in my deposition, I

13   wouldn't characterize those too narrowly as necessarily

14   reflecting my view that they would have only sold Linehaul

15   transmissions.

16   Q.   I'm taking your words and the table you prepared.  All

17   right?  That's what it says.

18   A.   Those are the numbers and the words in that table.

19   That's correct.

20   Q.   Table 13 on the next page.  This is your summary of

21   all five of your lost profits calculations; is that

22   right?

23   A.   That's correct.

24   Q.   This one down here is the one we just looked at.

25   This is ZF Meritor's lost profits based upon Eaton's

69

DeRamus - cross

1    monopoly level operating profits; right?

2    A.   It is the -- one is based on an allocation of Eaton's

3    profitability.

4    Q.   You have about $245,000,000 worth of profits for the

5    period '00 to 09 under that method, and based upon a

6    monopolistically high Linehaul profitability; right?

7    A.   Not those are damages on profits.  The damage on

8    profits would be 248 less orders of magnitude, probably 80

9    or $90 million.  So that would be 160, $170 million,

10   depending on how you do that.

11   Q.   Yes, but your Methods 1 and 2 are somewhere in the

12   range of 75-percent higher than the monopolistically high

13   level of profits in table 12; right?

14   A.   Those estimates are higher.  Again, they're damage

15   estimates because for damages calculation, the question is

16   ultimately, what is the incremental sales that --

17   incremental profits that ZF Meritor would have earned, not

18   necessarily a representation of P&L that ZF Meritor would

19   have had.

20   Q.   I'm looking at your table.  The first two lines, you

21   have lost profits of somewhere in the $400 million range for

22   that period?

23   A.   Correct.  And that is --

24   Q.   $384,991,000?

25   Q.   I'm sorry?

70

DeRamus - cross

1  Q.    $384,991,000?
2  A.    **That is correct.  In present value terms -- you are**
3  **pointing to the risk-free rate in present value terms.**
4  Q.    That's not quite double.  It's about 60-percent
5  higher than the monopoly level profits in your Method 5;
6  right?
7  A.    **It's significantly higher, the damages on the first**
8  **two are significantly higher than the damages in the Method**
9  **5.  Method 5 is the median method.  It's between the two**
10 **high estimates and the two low estimates.**
11 Q.    I want to go now to your enterprise value calculation,
12 if we could.  And if we could look -- first, tell me,
13 enterprise value, the way I understand your report,
14 enterprise value is the fair market value someone would pay
15 for a business at a given point in time.  Is that a fair way
16 of thinking of it?
17 A.    **It's a fair way of characterizing it, yes.**
18 Q.    And that depends in part upon how profitable the
19 business is; is that right?
20 A.    **That is correct.**
21 Q.    That depends in part on how profitable you think the
22 business will be; right?
23 A.    **Correct.**
24 Q.    And when you calculate an enterprise value, your
25 enterprise value assumed two different measures of

71

DeRamus - cross

1  profitability for the joint ventures of ZF Meritor; is that
2  right?
3  A.    **I did the -- the computation of the enterprise value**
4  **based on two measures of ZF Meritor -- yes.  ZF Meritor**
5  **but-for profitability.**
6  Q.    One was based upon table 11 and the other was based
7  upon table 12; right?
8  A.    **That's correct.**
9  Q.    And you were looking at your for enterprise value
10 purposes, what someone would pay for that business, assuming
11 it had earned those profits, as of February 2009, when you
12 submitted your report; right?
13 A.    **Effectively, I would say that's the -- for the purpose**
14 **of the exercise is to determine the fair market value, the**
15 **value of the enterprise as of the date of my report.**
16 **Whether it's -- the computation is done at some alternative**
17 **date, my but-for world is not one in which I'm assuming**
18 **ZF Meritor would have been on the block or up for sale in**
19 **February 2009.  Simply that happens to be the date of my**
20 **report.**
21 Q.    Well, let's look at Paragraph 306 of your report on
22 Page 36.  Paragraph 306.  Let's blow this up down here.
23        This is your description of your enterprise
24 value methodology; is that right?
25 A.    **That's correct.**

72

DeRamus - cross

1  Q.    And you say, looking at what someone paid for this
2  business, the lost enterprise value measured as of
3  February 2009; right?
4  A.    **That's correct.**
5  Q.    And you're looking at February 2009, when what a buyer
6  would pay for a business.  You looked at the profit figures
7  from ZF Meritor in your but-for world from a different time
8  period; is that right?
9  A.    **Well, to be clear, I'm trying to get an estimate of**
10 **the equitable value of the business as of 2009.  There is**
11 **an issue when anyone is doing any kind of valuation, what**
12 **time period you are using or what the base period you are**
13 **using for profits and how you apply discounts rate and so**
14 **forth and the time period of the multiples from as well.**
15        **I did use 2006 to 2008 as the average time**
16 **period for the lost profits as the benchmark for the**
17 **going-forward value of ZF Meritor's profitability on a**
18 **going-forward basis.**
19 Q.    Dr. DeRamus, you agree with me, right, that this is a
20 cyclical industry?
21 A.    **That's correct.**
22 Q.    And you would agree with me that the last nine months
23 of the auto industry has seen a downturn in this cycle;
24 fair?
25 A.    **That's correct.**

73

DeRamus - cross

1  Q.    Now, rather than measure what someone would pay for
2  the business in February 2009, in looking at the underlying
3  profitability during a downturn, you chose to look at
4  ZF Meritor profitability from '06 to '08; right?
5  A.    **That's, again, where I disagree with the way**
6  **you're characterizing the premise of the analysis.  Not**
7  **necessarily an assumption in the but-for world in which,**
8  **magically, ZF Meritor would have been sold to another buyer**
9  **and forced to sell on a particular date that happened to**
10 **correspond -- that happened to correspond to the low points**
11 **of market valuation, the extreme point of financial market**
12 **dislocations and having else.**
13        **It is a valuation done as of a particular time,**
14 **using all of the information that is available to the**
15 **individual who is doing the valuation, which I believe is**
16 **the appropriate way to form the analysis.**
17 Q.    Dr. DeRamus, bear with me.  I'm not characterizing;
18 I'm simply asking you dates.
19        You are measuring it as of February 2009, what
20 someone would pay for that business, but you lacked at the
21 profits for the underlying business as of 2006 to 2008, not
22 to 2009; right?
23 A.    **I measured the expected value as of 2009 and I**
24 **used the profits from the -- but-for profits from 2006**
25 **to 2008.**

000713

74

DeRamus - cross

1  Q.   And then you looked at what someone would pay
2  for comparable businesses, ArvinMeritor, and some others;
3  right?
4  A.   That's correct.
5  Q.   And you didn't look at what someone would pay for
6  those comparable businesses in February 2009; right?
7  A.   No, because I did not feel that was appropriate.
8  Q.   You looked at what someone would pay for those
9  businesses several years earlier; is that right?
10 A.   I looked at all of the -- the most recent three-year
11 time period for which I have complete information for the
12 publicly traded companies, which was 2005 to 2007.
13 Q.   And Appendix E lays this all out.  You chose the time
14 period for your comparable businesses, you chose 2005 to
15 2007, for all of them; right?
16 A.   That's correct, because that was the most recent
17 three-year time period of information available to me.
18 Q.   And the enterprise value, what someone would pay for
19 those businesses, is, in part, determined by the stock price
20 of those companies at that time; is that right?
21 A.   Well, the valuations that are derived from this
22 approach certainly are affected by the stock market prices
23 during this time period, yes.
24 Q.   All right.  Appendix E and tables 20 and 21, you set
25 out the time period you are looking at for those comparable

75

DeRamus - cross

1  businesses in '05 to '07; right?
2  A.   Correct.
3  Q.   And in table 19, you point out that you are looking in
4  part at the stock price of those companies back in '05 and
5  '07; right?
6  A.   Yes.  I'm not there in my report, but that sounds
7  correct.
8  Q.   Do you want to look it up?
9  A.   No, that's okay.
10 Q.   Now, this, in February of '09, the market obviously
11 is lower than it was three or four years ago; is that
12 correct?
13 A.   That's correct.
14 Q.   But you have not brought any scenarios using the
15 values for your comparable companies, the lost enterprise
16 value measured as of February of '09, did you?
17 A.   No.  That would be inappropriate.
18 Q.   But you say it's inappropriate, Dr. DeRamus.  You say
19 it was measured as of February '09.  That's what you wrote;
20 right?
21 A.   That is correct.
22 Q.   Did you write that?
23 A.   I did write that.
24 Q.   You said it was measured as of '09, February of '09;
25 right?

76

DeRamus - cross

1  A.   The valuation -- the estimate of the valuation as
2  of 2009 and with any estimate of valuation, the question
3  is whether the -- a question in terms of what is the
4  benchmark time period to use.  And as even the guidelines,
5  your own experts have cited, it's appropriate to take into
6  consideration the I.R.S. revenue guidelines on something
7  completely unrelated, I might add.  But they still cited the
8  need to take into account five years of financials to -- you
9  need to account for fluctuations in the market.
10      Certainly, if there's a major market dislocation
11 in February 2009, you would not use that as a basis for
12 an equitable value of what is the but-for enterprise
13 value.
14 Q.   Dr. DeRamus, if I put my house on the market tomorrow,
15 I look at comparables, what my neighbors were selling
16 their houses for as of this time period; right?  It makes
17 sense?
18 A.   If you are forced to sell your house and you decide
19 you want to sell your house at that particular time, you may
20 also decide you want to wait until the market recovers some
21 semblance of normalcy.
22 Q.   I'm assuming I put my house on the market tomorrow, so
23 I look at comparable houses in my neighborhood, what value
24 people were paying for those houses tomorrow or some time
25 contemporaneously; is that right?

77

DeRamus - cross

1  A.   That might be how you do it.  This is not a process
2  of valuing your house.  This is valuing a going concern
3  value of a business that has future cash flows, a revenue-
4  generating business, a profit-generating business in a
5  but-for world.  Very different than your, the way in which
6  you -- considerations you might have about selling your
7  house.
8  Q.   I could look back and pick a figure from my neighbors'
9  houses from three or four years ago at the height of the
10 market; is that right?  Right?
11 A.   You could always do that if you like, yes.
12 Q.   But that would not tell me what the buyer is willing
13 to pay as of today, would it?
14 A.   In the housing market, that would not give you the
15 view of what the housing market would be willing to pay.
16 Q.   It's no different than --
17 A.   It's very different in this.  You are absolutely
18 mixing, again, apples-to-bicycles comparison.  This is a
19 valuation of a business.  Businesses recognize when there
20 are severe market dislocations.  Sellers recognize it.
21      When there are capital constraints, the low
22 market valuations may reflect concerns of liquidity.  A
23 whole host of issues that are not captured in your --
24 Q.   I just want to make sure, your testimony is, it's
25 appropriate to determine a business in the automobile --

000714

78

DeRamus - cross

1  auto industry by looking at valuations from three years
2  earlier.
3        Is that your testimony?
4  **A.    It is my testimony that using the -- the 2006 to 2008**
5  **time period for ZF Meritor's but-for operating profits,**
6  **but-for profits, is reasonable, and it's reasonable to use**
7  **the valuations from a 2005/2007 time period.**
8  **Q.    Dr. DeRamus, I want to go back to the plan.  Your**
9  figures if your but-for world, your but-for pricing
10 assumptions and your but-for volumes and so forth, they
11 come from the November strategic business plan; right?
12 **A.    Again, some of them, some of the inputs from the**
13 **calculation come from that strategic business plan.**
14       MR. OSTOYICH:  Your Honor, I don't know if you
15 have a copy of that.
16       May I bring you a copy?
17       THE COURT:  Yes.
18       MR. OSTOYICH:  You do have it?
19       THE COURT:  No.  Please bring me one.
20       MR. OSTOYICH:  I can bring one up.
21       THE COURT:  I mean, I'm sure I have one, but it
22 would be helpful to have.
23       (Pause.)
24       MR. OSTOYICH:  Can I bring it up, your Honor?
25       THE COURT:  Yes.

79

DeRamus - cross

1        (Mr. Ostoyich handed an exhibit to the Court and
2  the witness.)
3        THE COURT:  Thank you.
4        MR. OSTOYICH:  You're welcome.
5  BY MR. OSTOYICH:
6  **Q.    These figures, this document, this is where you**
7  determined the but-for price for the manual transmissions on
8  table 5, line 9; is that right?
9  **A.    The number that I -- I got the -- the figure on table**
10 **5.  Correct.**
11 **Q.    In other words, you did not do an independent**
12 determination of the but-for price for the manual
13 transmissions.  You took it from here?
14 **A.    That's correct.**
15 **Q.    And you did not do an independent assessment of the**
16 but-for price for the FreedomLine transmissions.  You took
17 that from here as well; is that right?
18 **A.    That's correct.**
19 **Q.    And for the volume of the transmissions, you took that**
20 from here as well?
21 **A.    Well, the -- as an input into computing the but-for**
22 **market shares, I took the actual -- the -- I applied the**
23 **but-for, the implied estimate of the -- of ZF Meritor's**
24 **market share by the actual number of truck builds in the**
25 **market.**

80

DeRamus - cross

1  **Q.    Other than adjusting for the total Class A truck, all**
2  the other figures from your but-for world come from here,
3  don't they?
4  **A.    I believe we went through various iterations of my**
5  **calculation.  The econometric model is based on the**
6  **different set of data.  Eaton's profitability is based on a**
7  **different set of data.  So there are different data sources**
8  **that I'm using.  And, again, I look to see all of the**
9  **available -- the information that was available.  I chose**
10 **the information I felt was the most reliable.**
11 **Q.    To be clear about this, your econometric model is a**
12 **different measure of the market share, but the but-for**
13 **pricing, the but-for profitability, comes from this; is that**
14 **right?**
15 **A.    For four of the five methods, the pre-units profit is**
16 **effectively derived from this sheet, and again it's verified**
17 **against other source of information.**
18 **Q.    The methods 1, 2, 3 and 4, the but-for price**
19 assumptions all come from this document?
20 **A.    The tables -- I think there's a table 5, yes, that**
21 **came from this particular document.**
22 **Q.    And this particular document, you don't know who**
23 prepared this; right?
24 **A.    I know it was presented by the president of the**
25 **company.  It was sent by the president of the company, or**

81

DeRamus - cross

1  **Martello, to the Board of Directors.**
2  **It was reviewed and presented and developed at**
3  **the request of the Board of Directors, so it's not just**
4  **prepared by someone who is completely unknown to me.  I've**
5  **know who reviewed it.**
6  **Q.    You don't know the assumptions that the person**
7  who prepared this used for price and volume; is that
8  right?
9  **A.    I know some of the assumptions they use.  I know on an**
10 **aggregate in terms of what their net revenue per unit was**
11 **across both the G-Platform and, again, which encompassed**
12 **some automation and sales of transmissions with automation**
13 **included, such as the ESS and Sure Shift.**
14 **So I do know, I do have information about some**
15 **of their assumptions.  I don't have all of their**
16 **assumptions.**
17 **Q.    Let's go to Page 4 of this.**
18 **Page 4 is the table you took a number of your**
19 but-for assumptions from; right?
20 **A.    That is correct.  Table 4 is one source of**
21 **information.**
22       Bear with me one minute.
23       (Pause.)
24       THE WITNESS:  I would say table -- Page 4 and
25 Page 7 as well.

**000715**

82

DeRamus - cross

1  BY MR. OSTOYICH:
2  **Q.**  Now, Page 4, I'm not going to ask you specific
3  numbers, because they're hard to read.  But the price
4  assumptions that you use in table 5, line 9, for your
5  G-Platform, come from taking a figure up here, in units,
6  dividing by the revenue figure?
7  **A.**  **Yes.  Dividing it by the net sales figures.**
8  **Q.**  Net sales figures.  Deducted out the discounts.
9  **A.**  **And added in aftermarket sales.**
10  **Q.**  Why did the person who prepared the plan you relied
11  upon assume the revenue data in '01?  Why they derive
12  that?
13  **A.**  **I'm not quite understanding the question.**
14  **Q.**  Let's go numbers.  And I'm wondering how the person
15  who prepared the plan you relied upon chose to put this
16  number here and this number there?  What assumptions did
17  they make?
18  **A.**  **I would expect it was done -- it was done under the**
19  **direction of the CFO and the president of the company.**
20  **I don't know the specific assumptions that went into that.**
21  **I know that there are -- and we've tied it to the overall**
22  **markets, volumes, change in the overall markets.  So it**
23  **is based on their expectation, based on their past**
24  **experience, of how they perform on that -- on a going-**
25  **forward basis, but I don't have a specific estimate.  And I**

83

DeRamus - cross

1  **know how they revised it.  That's the table, Page 7 of that**
2  **same presentation, shows how they revised it downward**
3  **specifically, the specific request.**
4  **Q.**  What about the volume assumptions that you took?  The
5  volume assumptions for the FreedomLine came out of this
6  plan; right?
7  **A.**  **That's correct.  Again, the volume assumptions that we**
8  **use to derive a market share estimate, which is then applied**
9  **to actual volumes.**
10  **Q.**  Why did the person who prepared this plan assume 3400
11  FreedomLine units would be sold in fiscal year '01?
12  **A.**  **I don't know the specific reasons why they came up**
13  **with those assumptions.  I do know why they changed them.**
14  **I know why they reduced those volume assumptions**
15  **significantly, as evident in Page 7, and that was the**
16  **subject of the Board of Directors meeting in the October**
17  **time period and the prior Board of Directors meetings, where**
18  **there was a lot of discussion between ZF Meritor management**
19  **and the owners of the company, ArvinMeritor and ZF, as to**
20  **the reasonableness of the forecast, the need to update it in**
21  **light of current market events.  They went through some**
22  **current discussion about those events and how they affected**
23  **the numbers.**
24  So I know the process they went through and I
25  know the factors they were considering and I know the

84

DeRamus - cross

1  direction, the changes they made.  I don't know the
2  specific inputs into the spread sheets underlying the
3  competition.
4  **Q.**  I understand I know the process.  I know the numbers
5  they chose.
6  What assumptions did they make in picking any
7  particular set of numbers?
8  **A.**  **They made an assumption about the decline in the**
9  **total market based on what was going on in the market in**
10  **this time period.  They made assumptions about the decline**
11  **in their particular share based on other factors that were**
12  **going on with regard to some perceptions in the industry,**
13  **the quality of some of their products.  They revised it**
14  **downward to account for that.  They revised it to account**
15  **for Ryder having the significant reduction in their volume**
16  **of sales.**
17  There were other plans where they talked about
18  various factors and the number of transmissions that they
19  were going to be losing as a result of various factors
20  going on in the market, and those are the factors that I
21  understand had been taken into consideration in preparing
22  this specific business plan.
23  **Q.**  The specific numbers, like 19,348 assume units of
24  G-Platform manual transmissions, how did they get that
25  particular number?

85

DeRamus - cross

1  **A.**  **Again, I don't have the specific computations.**
2  **Q.**  How did they get the revenue figure, $66,133,000?  How
3  was that derived?
4  **A.**  **I know directionally they were forecasting a reduction**
5  **in the price.  They talked about in that same presentation,**
6  **in the same president's report, the October 2000 president's**
7  **report, they talked about the need to provide a reduction in**
8  **prices, several personal points, depending on the customer.**
9  **So I know directionally what some of their assumptions were**
10  **that were going into this relative to previous business**
11  **plans, but I don't know the specific source for why they**
12  **picked that particular --**
13  **Q.**  My question is specifically, why did this number --
14  who created it?  Why did they assume that number up
15  there?
16  **A.**  **The piece of information that I do understand is that**
17  **they are not -- directionally, are they expecting prices to**
18  **increase relative to the actual prices?  That's why I**
19  **pointed you to the fact of my table 5, I had figures for**
20  **2000, and there was -- 2000 are actual numbers, audited**
21  **financials.  They are audited and they're aggregated.  They**
22  **provide a number.  And I know that there's not an increase**
23  **in the per-unit price that they are sell to the OEMs in**
24  **figure 17, and I know in the discussions of the board**
25  **meeting minutes, they are not talking about increasing**

86

DeRamus - cross

1  price, they're talking about reducing prices.
2       I know directionally, the assumption that is
3  going on behind the scenes in developing these numbers is
4  not one of increasing prices on -- considered on a
5  comparable product-by-product basis, at least based on all
6  the information I've seen at the time.
7  Q.   Now, you mentioned Page 7 of this report.  Down at the
8  bottom of Page 7, there's a table; right?  It says Meritor
9  Transmission Company.  I'm sorry.  ZF Meritor, Detail of
10 Volume, Price, and Mix Variance.
11      Down at the bottom of the middle, it's got a
12 conservative plan, a revised plan.  Down here, it says
13 check, check.
14      Do you see where I am?
15 A.   Yes, I see that.
16 Q.   Do you know whether the person that prepared this
17 checked these figures?
18 A.   I do not know that.  I know that they were sent to
19 the ZF Meritor board of directors and that they were the
20 basis on which investment decisions were being made.  I
21 don't know if they specifically checked whatever the --
22 whatever that's in reference to.
23 Q.   Bear with me.  At the time I deposed you, I asked
24 you, do you know whether this is even a final document or
25 whether it's a draft?

87

DeRamus - cross

1       You don't know the answer to that, do you?
2  A.   There were numerous versions floating around.  I've
3  know that there was one that was accompanying a -- that
4  was sent to the -- it was sent -- the transmittal from
5  ZF Meritor to the Board of Directors, and there's no
6  discrepancy between that and the numbers that are in my
7  report.
8       So like I said, there are multiple copies of
9  this forecast prepared and available in the documents.
10 Q.   Dr. DeRamus, let me ask the request very clearly.
11 Do you know whether this is a draft or a final document?
12 A.   I do not know whether this specific one is a draft
13 or final one.  I do know that there was one that was sent to
14 the Board of Directors, again, as a basis for investment
15 decisions that was approved by the president of the company,
16 and that -- the numbers are consistent with the numbers in
17 my report.
18 Q.   Dr. DeRamus, I want to switch from your damages
19 model to some of your causation analysis, causation
20 analysis.
21 A.   Yes.
22 Q.   And if we look at Paragraph 196 on Page 81 of your
23 report --
24      MR. OSTOYICH:  Your Honor, do you mind if I come
25 up and get a cup of water?

88

DeRamus - cross

1       THE COURT:  No.
2       (Pause.)
3       THE COURT:  Actually, we've been going for
4  almost two hours.  Shall we take a ten-minute break?
5       MR. OSTOYICH:  That would be fine with me.
6       THE COURT:  Ten minutes.
7       MR. OSTOYICH thank you, your Honor.
8       (Short recess taken.)
9                      - - -
10      (Proceedings resumed after the short recess.)
11      THE COURT:  You may continue.
12      MR. OSTOYICH:  Okay.  Thank you, your Honor.
13      Your Honor, I'm told I have a few minutes left.
14 Is it all right if I -- am I on the clock or can I go a
15 little bit longer?
16      THE COURT:  I want to make sure we get this
17 completed, so at least another 15 minutes, and we'll go from
18 there.
19      MR. OSTOYICH:  I will do my best, your Honor.
20      I would like to switch topics to cover something
21 I have not fully explored at this point, and that's the
22 causes, the causes of ZF Meritor's lost sales and lost
23 market share.
24 BY MR. OSTOYICH:
25 Q.   Dr. DeRamus, in your report, in Paragraph 196 on Page

89

DeRamus - cross

1  81 --
2       MR. OSTOYICH:  Can we put that up on the
3  screen?
4  BY MR. OSTOYICH:
5  Q.   This is the section of your report where you look at
6  whether there might be determinative causes for some of the
7  company's lost sales and lost market share; right?
8  A.   That's right.  That's the introductory paragraph of
9  that section.
10 Q.   Right.  And in the introductory paragraph, you say you
11 looked at some other potential causes for their
12 less-than-expected sales and lower-than-expected market
13 share, including failure to price products competitively in
14 the market; correct?
15 A.   Correct.
16 Q.   Quality of differences between the Meritor
17 transmissions and the Eaton transmissions; correct?
18 A.   Correct.
19 Q.   Overly optimistic assumptions in the method,
20 FreedomLine penetration; right?
21 A.   Correct.
22 Q.   Now, you say you examined each of these in detail.
23 You say the data of the documentary evidence is clear that
24 Eaton's LTAs and the various means undertaken by the OEMs
25 to comply with the terms of these LTAs were a significant

90

DeRamus - cross

1 factor and, indeed, the primary factor in explaining the
2 company's performance; is that correct?
3 A.    That's correct.
4 Q.    Which LTAs did you mean were a significant factor and,
5 indeed, the primary factor?
6 A.    In my report, I discussed the LTAs with all of the
7 OEMs. They are going back to -- even going back into the
8 1996 time period. But it's clear from -- so I would compare
9 all the LTAs and the means by which they were -- to have
10 been the primary factor explained to ZFM in the market.
11 Q.    So just so we are clear, when you say the LTAs were
12 the primary factor, you are talking about all the LTAs from
13 the mid-nineties?
14 A.    To be clear, there were different provisions in
15 each of the LTAs by 1990, and different LTAs, the
16 provisions had different type of effect to different type
17 of binding effect on the market. Some of them had -- and
18 over time, had greater market share penetration
19 requirements.
20       One of them was -- I considered, or I concluded
21 to be a horizontal price-fixing agreement between Mac and
22 Eaton.
23       So they were different in different aspects,
24 but certainly by the -- by the 2000 time period, what's
25 called -- what Eaton refers to as the Eaton OEM partnership

91

DeRamus - cross

1 period, that all of those, the LTAs, in effect, had those
2 provisions that I concluded were significant factors in
3 explaining the defendant's decline in market share.
4 Q.    So we have at least 10, 12 different contracts that
5 were the primary factor; is that right?
6 A.    I would say all the contracts, the contracts with all
7 of them, with the major OEMs. I do make a distinction in my
8 report between the types of conduct that's occurring over
9 time. That's why I spend some amount of pages going through
10 each of the contracts and looking at the data, examining the
11 data, to correlation changes in the market share with the
12 implementation of the different LTAs.
13 Q.    Did you look at, did you measure any particular effect
14 on ZF Meritor's shares, market share, from any particular
15 contract, or did you treat them all together?
16 A.    I looked at them individually.
17 Q.    All right. Where in your report do you measure the
18 effect of any particular contract? Let's take the Paccar
19 contract in 2000.
20 A.    In Section A is where I go through each of the
21 contracts, so bear with me one moment.
22       (Pause.)
23       THE WITNESS: So the 2000 LTA is discussed
24 beginning on, I believe, one -- well, it's Page 67 is where
25 the discussion begin s, and it discusses -- it discusses

92

DeRamus - cross

1 various provisions of the LTAs. And throughout that
2 section, it discusses efforts by Paccar and Eaton to comply
3 with terms of the LTAs.
4       And in figure 13, several pages of text in, here
5 and then figure 13 describes the changes to -- in Eaton's
6 market share corresponding to what's occurring according to
7 the terms of the -- the attempts -- attempts by Eaton and
8 Paccar to comply with those terms.
9 Q.    Now, that Paccar contract, Dr. DeRamus, did you look
10 at the effect each specific term of that contract had on
11 Paccar's desire to purchase from Eaton or ZF Meritor?
12 A.    I'm sorry. Each term within the contract?
13 Q.    Correct.
14 A.    The effect of each of the individual terms?
15 Q.    Correct.
16 A.    No, I did not.
17 Q.    Now, you say here in Paragraph 196, this introductory
18 paragraph, you say the LTAs were the primary factor.
19       I assume that means there were some secondary
20 factors for the decline in sales and market share; is that
21 right?
22 A.    Well, in determining from an economist's standpoint --
23 I use the term liability loosely -- in determining
24 anticompetitive effects, the primary question is, did the
25 contracts cause, and Eaton's conduct cause harm to

93

DeRamus - cross

1 competition? The question is one of materiality.
2       Were they, A, the material cause of ZFM's
3 difficulties in the market? From those, I concluded that
4 they were. You can see that quite specifically, and
5 negotiations with the -- between the OEMs and the
6 individual and the -- and Eaton, and between the OEMs
7 and their customers. You can see the individual price
8 increases.
9       So there are very specific instances in which
10 Eaton induces the OEMs to remove from a -- from a -- an
11 OEM's data book a very specific action. We're removing
12 this product from the data book, this ZFM product from
13 the data book, and we're going to, in fact, increase
14 ZFM's prices, and Eaton complaining to the OEM if it
15 doesn't meet -- if the OEM does not implement that price
16 increase.
17       So there is a very specific link between the
18 contracts and contract terms and the harm to competition
19 that I observe.
20 Q.    All right. Dr. DeRamus, my question is simple. You
21 say the LTAs are the primary factor. That means there are
22 some secondary factors; is that right?
23 A.    Well, I conclude as a -- at a minimum, that is the
24 primary factor.
25       In order to conclude that there is

94

DeRamus - cross

1  anticompetitive effect, I conclude that -- I need to
2  conclude there is some substantial, some significant
3  impact, and the courts may have a different opinion as to
4  what that significance is, but as an economist, I look for
5  a certain level of significance, and I do see some impact.
6  In fact, I did conclude that it was the primary barrier to
7  ZFM succeeding in the market.
8  Q.   All right.  What secondary factors did you look at,
9  Dr. DeRamus?
10 A.   As I described throughout the section, I looked at
11 issues of quality, I looked at macroeconomic factors, the
12 reduction in sales caused by overall conditions.  I looked
13 at the potential for price differentials to explain the
14 pricing, the market share developments.
15      So I looked at all of the things that are listed
16 in that report.
17 Q.   These things up here, A, B and C, did you go through
18 those?  Paragraph 196?
19 A.   Yes.
20 Q.   You did an econometric study -- right -- referenced
21 below this?
22 A.   That's correct.
23 Q.   And you had explanatory variables in your econometric
24 study; is that right?
25 A.   That's correct.

95

DeRamus - cross

1  Q.   And you had no explanatory variable or differences,
2  relative differences in the price between Meritor
3  transmissions and Eaton transmissions, did you?
4  A.   That would be incorrect as a matter of econometrics,
5  so, yes, I did not include it.
6  Q.   Dr. DeRamus, do you have your deposition in front of
7  you?
8  A.   I do not, sir.
9  Q.   You say no?
10 A.   I do not.
11 Q.   I asked you in your deposition --
12      MR. OSTOYICH:  Your Honor, can I bring a copy
13 up?
14      THE COURT:  Certainly for him.  I certainly
15 don't need one.
16      MR. OSTOYICH:  I'm sorry.  I didn't hear you.
17      THE COURT:  I said you certainly may bring one
18 to him, yes.
19      (Mr. Ostoyich handed a deposition transcript to
20 the witness.)
21      THE COURT:  And I have to say, the defendant
22 is getting more than the allotted time, in part because we
23 have very long answers from the expert witness, and so I
24 don't believe that it's fair to hold defendant to the time I
25 allotted.

96

DeRamus - cross

1           So you may continue until I tell you you need to
2  stop.
3           MR. OSTOYICH:  Okay.  Thank you, your Honor.  I
4  appreciate that.
5  BY MR. OSTOYICH:
6  Q.   Dr. DeRamus, I asked you about your econometric
7  analysis in your deposition; correct?
8  A.   Yes.  But if you would point me to a specific page?
9  Q.   Yes.  Page 309, line 4 through line 14.
10          I asked you:  "Am I right that your
11 econometric" --
12          MR. OSTOYICH:  I have a deposition clip, your
13 Honor.  Do you mind if I just put it up?
14          THE COURT:  No, I don't mind.
15          MR. OSTOYICH:  Can we just put that one up?  His
16 deposition, Page 309.  I will read it while we're doing
17 that.
18 BY MR. OSTOYICH:
19 Q.   I asked you:  "Am I right that your econometric
20 model estimating the share of ZF Meritor would have obtained
21 the Class A transmission sales?  Have no variable taking
22 into account the relative price between the ZF Meritor
23 transmission and the equivalent Eaton transmission?
24          "Answer:  That's correct."
25          "That's not the structure of the model I chose."

97

DeRamus - cross

1           Right?  That's what you said?
2  A.   That's correct.
3  Q.   So your econometric model did not take into account
4  the explanatory paragraph in the differences in the price
5  between the company's' transmissions; right?
6  A.   No.  I did not feel it was appropriate --
7  Q.   Your econometric model didn't take into account the
8  qualitative differences between the transmissions; is that
9  right?
10 A.   No, but I did take that into consideration in other
11 ways.  I did feel the purposes of my econometric model was
12 not necessary.  Indeed, it would be infeasible.
13 Q.   Your econometric model had no explanatory variable for
14 the projections about the FreedomLine's projections of
15 success in the market either; right?
16 A.   Correct.  And I don't believe those would be relevant
17 factors either.
18 Q.   So your econometric model did not take into account A,
19 B and C of Paragraph 196; right?
20 A.   That is correct.  They were not explicit variables
21 included in my econometric model.
22 Q.   Your econometric model took into account what?  T bill
23 rates; am I right?
24 A.   I included a lag variable for ZF Meritor's market
25 share.  I included a variable to account for the beginning

000719

98

DeRamus - cross

1 of the conduct time period, and I accounted -- and I
2 included four additional variables, including total truck
3 builds and interest rates, measure of interest rates, a
4 measure of consumer confidence, and measure of the
5 pricing.
6 Q.    Dr. DeRamus, I want to go back to your conclusion
7 here, your summary in your introductory paragraph, that the
8 LTAs were significant; indeed, the primary factor.
9         I'm going to play you a clip from the deposition
10 of one of the Meritor witnesses in the case.  This is Rick
11 Martello.  He's the president of the joint venture, or he
12 was the president of the joint venture.  And we're going to
13 look at his deposition, Page 320.
14       MR. OSTOYICH:  And if your Honor will indulge
15 me --
16       MR. TASKIER:  Your Honor, I have no objection
17 to him showing Dr. DeRamus his deposition, because he can
18 answer questions and fill in the record, but the notion
19 that he's cherry-picking pieces of other witnesses that
20 we have not had any advance noticed of, counterdesignated,
21 it strikes me as a little unfair and not helpful.
22       THE COURT:  Well, certainly, if this were a
23 trial that an expert can be cross-examined with this sort
24 of material, I guess my question is, if the purpose of this
25 hearing is to determine whether the conclusions reached in

99

DeRamus - cross

1 this report are, in fact, reasonable and based on all
2 available information, it seems to me this is appropriate
3 cross-examination.
4       MR. TASKIER:  Thank you, your Honor.
5       MR. OSTOYICH:  Thank you, your Honor.
6         If we can, I'm going to play what the president
7 of the joint venture said.
8         Can we play that, please?
9         (Videotaped deposition excerpt played as
10 follows.)
11       "Question:  Now, from day one, when you formed
12 the joint venture, you expected your manual transmission
13 sales to decline; right?
14       "Answer:  That's correct.
15       "Question:  And, in fact, they did decline;
16 right?
17       "Answer:  That's correct.
18       "Question:  And they declined more steeply than
19 you expected; right?
20       "Answer:  They declined more steeply than we
21 expected from the initial -- from the initial projection.
22       "Question:  And you had --
23       "Answer:  And that had many, many reasons for
24 it, not one."
25       (End of videotape deposition excerpt.)

100

DeRamus - cross

1 BY MR. OSTOYICH:
2 Q.    Now, he says there are many, many reasons for the
3 decline.  You say the primary one is the LTAs, or the whole;
4 right?
5 A.    I believe I say the decline in their market share and
6 exit from the market is due to the LTAs.  There are, for
7 example, decline in the overall size of the market that I
8 account for, and even in my damages analysis and in the
9 econometric analysis, I'm taking the time period from July
10 2000 forward after there were -- to accounts for issues that
11 were occurring with their transmissions prior to the time
12 period.
13 Q.    Well, in fact, Dr. DeRamus, your report plots out the
14 market share of ZF Meritor; right?
15 A.    That's correct.
16 Q.    Okay.  If we look at figure 8 on Page 39 of your
17 report, this shows the blue line as Meritor's market
18 share -- correct -- excluding that?
19 A.    Yes.
20 Q.    Okay.  And there's a decline back here from '99 to
21 2000 in the market share; is that right?
22 A.    That's correct.
23 Q.    And that's before any of the contracts that you
24 pegged your damages to, which occurred here (indicating);
25 right?

101

DeRamus - cross

1 A.    Provide a fair amount of caveats in my report as to
2 what's going on in that 1999 and prior time period.  The
3 primary conduct at issue I focused on was 2004.
4 Q.    So let's look at our records.  So this decline in
5 share, '99 to 2000, which is before any of the contracts
6 that you are pegging your damages to?
7 A.    Using -- effectively, I would say that's correct, yes.
8 Q.    Now, what do you, Dr. DeRamus, what do you attribute
9 this decline in share from '99 to 2002 to?
10 A.    Well, there's some discussion in the ZF Meritor board
11 meeting minutes and the presentation that the president
12 makes to the company contemporaneously with this.  One of
13 them is a loss of Ryder, one of their more significant --
14 not the loss of Ryder, but significant decline in Ryder's
15 purchases.
16         They do note some quality problems that they
17 are going to be taking some corrective action on, and
18 various other facts.  There are about eight different
19 facts.
20 Q.    I happen to have that report here.  Maybe we can call
21 it up.  It's in DeRamus Exhibit 2.
22       MR. OSTOYICH:  If you can pull that up and
23 scroll through, it's about, I think, about the tenth page in
24 there.  It ends with, 445.
25 BY MR. OSTOYICH:

102

DeRamus - cross

1  **Q.**   There it is.  This is what you are referring to;
2  right?  This board report?  This is from July of 2000.  This
3  is an excerpt.
4  **A.**   That one.  There's a long discussion that begins in
5  March 2000 and goes into October, but there are
6  discussions about those other various factors.
7  **Q.**   Now, you said the primary cause of the company's
8  decline in share was the LTAs; is that right?
9  **A.**   Over this entire time period, in terms of its
10  exclusion from the market and its dropping down to
11  effectively a market share of zero, yes.
12  **Q.**   Now, this is the board presentation, and this is what
13  Mr. Martello, the president of the joint venture of the
14  board of the company, happened to their market share prior
15  to mid-2002; right?
16  **A.**   I'm sorry.  Prior to when?
17  **A.**   Mid-2002.
18  **A.**   This is prior to mid-2002, yes.
19  **Q.**   Does Mr. Martello discuss initially the variance
20  between projected market share penetration, which is
21  expected to increase from 16 percent to 22 percent, but
22  actually decreased.
23      We're talking about the decrease, and just
24  looked at the blue line; correct?
25  **A.**   Correct.

103

DeRamus - cross

1  **Q.**   And he attributes it to a number of factors, a number
2  of factors contributed to that situation, including, and he
3  lists seven factors; right?
4  **A.**   Correct.
5  **Q.**   Poor product quality image, decrease in Ryder
6  business, turnover in the company's sales organization, an
7  increase in Eaton auto shift sales, the push towards 13
8  speed transmissions, so on; correct?
9  **A.**   Correct.
10  **Q.**   Where does your but-for analysis take this into
11  account?
12  **A.**   It takes it entirely into account.  That's why I used
13  the November 2000 SVP basis in my analysis.  That's why it's
14  conservative.  It is taking the previous business plan.
15  They reduced -- they dropped their forecast in half to
16  account for these factors after extensive discussion by the
17  board, and after explicit direction to the board to
18  management that says you need to revise your projections
19  to account for all of these factors you recognize taking
20  place.
21      I would also say other documents at the same
22  time, also, Mr. Martello is recognizing that Eaton is taking
23  an aggressive action with his LTAs during this time period.
24  There are negotiations.
25      This is an October 2000 document.  June of 2000

104

DeRamus - cross

1  is when several of these, or the time frame in which several
2  of these are being negotiated.  I don't know how much
3  information he has about the specifics of the time, but he
4  is aware that these discussions are going on.  And as I
5  mentioned in my report, in 1999, I'm also concerned about
6  the provision in the Freightliner, LTA where Eaton
7  effectively induces Freightliner to increase effective price
8  of ZF Meritor's transmissions.  That's going to have an
9  impact on the market share.
10  **Q.**   Now, Dr. DeRamus, this many of these factors continued
11  into 2000, 2001; right?
12  **A.**   Some of them may have.
13  **Q.**   Yes.  Like this one, multi-year fleet business.  The
14  multi-year fleet business was lost in 2000.  Continued into
15  next year; correct?
16  **A.**   That's correct.
17  **Q.**   Yes.
18  **A.**   I would say that happens throughout.
19  **Q.**   This one, right here, poor product quality.  In fact,
20  you address that in your report?
21  **A.**   That's right.
22  **Q.**   And you say on Page 211 -- I'm sorry -- Paragraph 211
23  on Page 89 of your report, the company had significant
24  warranty claims beginning in approximately January 2000;
25  right?

105

DeRamus - cross

1  **A.**   Yes.  I'm sorry.  Could you point me to the paragraph
2  again?
3  **Q.**   Paragraph 211.  It starts down here at the bottom of
4  the page, ZFM did experience significant warranty claims for
5  its G-Platform transmissions that -- which were first
6  introduced into the market?
7  **A.**   Correct.
8  **Q.**   And those significant warranty problems continued
9  throughout 2000, correct, the G-Platform?
10  **A.**   Correct.
11  **Q.**   And 2001?
12  **A.**   Correct.
13  **Q.**   And they continued in 2002; right?
14  **A.**   Correct.  My understanding is they were resolved by
15  approximately mid-2002.
16  **Q.**   Right.  You say that in your report?  You say in this
17  Paragraph 211, by mid-2002, the problems with ZFM's
18  G-Platform transmissions had been fixed, as is clear from
19  data on ZFM's warranty approvals; correct?
20  **A.**   Right.
21  **Q.**   And I am going to show you some documents in the
22  case.
23      Am I right that because you believe that the
24  G-Platform transmission problems were fixed in mid-2002,
25  your but-for world, you did not deduct anything from your

000721

---

106

DeRamus - cross

1  but-for world for lost sales due to ongoing G-Platform
2  warranty problems; right?
3  **A.    To be clear in my but-for market shares, I don't**
4  **believe there are any forecast of G-Platform units in the**
5  **2000 and 2002 time period.  I need to look through.**
6      **I know the basis of my case.  I need to look at**
7  **my econometric results just to verify, so there's no --**
8  **there is nothing to adjust for.**
9  **Q.**    Wait.  We looked at table 5 before.  You had a but-for
10  line for the number of G-Platform units the company was
11  going to sell in the but-for world every year, now through
12  two 2009; correct?
13  **A.    I believe -- bear with me one moment.**
14      (Pause.)
15      THE WITNESS:  Yes.  And you'll see in that line
16  9, that there are zero units for 2001 or 2002 as the
17  incremental units.
18  BY MR. OSTOYICH:
19  **Q.**    And the figure you have for the but-for G-Platform
20  unit volume, you took the total from the November 2000
21  business plan; right?
22  **A.    Correct.**
23  **Q.**    And then you adjusted for the overall market decline;
24  is that right?
25  **A.    Correct.**

---

107

DeRamus - cross

1  **Q.**    But you did not deduct anything, any sales, from
2  ongoing G-Platform problems?
3  **A.    For 2000 and 2001, there's nothing to deduct.  As I**
4  **said, the incremental units are zero.**
5  **Q.**    You did not end up with anything for G-Platform in
6  2002, 2003, 2004?
7  **A.    That's correct.  Based on my review of the evidence, I**
8  **concluded nothing was appropriate.**
9  **Q.**    What do you mean, based on your review of the
10  evidence?
11  **A.    I looked to see the effect of the warranty issues in**
12  **this industry.  And there are -- particularly with any**
13  **introduction of new products, there would be some warranty**
14  **issues.**
15      **The more you have a technological --**
16  **technologically advanced product, there are going to be some**
17  **issues.  There were significant issues with Eaton's own**
18  **transmissions.**
19      **ZF Meritor had, or previously Meritor**
20  **Transmissions back then, had even more significant problems**
21  **with its F-Platform transmission when it was introduced, and**
22  **that had no long-term effects on its sales.**
23      **The primary -- as I looked at the data, I**
24  **concluded that the primary effect of warranty issues are**
25  **increased costs, and they were not a convincing explanation**

---

108

DeRamus - cross

1  **for ZFM's decline in market share throughout the time**
2  **period, particularly after 2002.**
3  **Q.**    Dr. DeRamus, your but-for world, your damages, your
4  standard methodology, is supposed to keep everything
5  constant except Eaton's conduct, the actual; right?
6  **A.    To the extent possible, it accounts for every other**
7  **factor, yes.**
8  **Q.**    You are supposed to isolate the effect of Eaton's
9  allegedly anticompetitive conduct; right?
10  **A.    That is the general purpose.  Again, within the**
11  **constraints of what the data allow.**
12  **Q.**    Now, you say here that the G-Platform problems have
13  been fixed by mid-2002, and therefore you didn't take them
14  into account as having caused any lost sales after mid-2002;
15  right?
16  **A.    As a significant factor, yes.**
17  **Q.**    I'm going to show you some documents.  I want to see
18  if you took these into account because I can't find it.
19      Now let's look at Hyatt 5, for example.  Let's
20  go to the next page.
21      This says, G-Platform -- this is December 2002.
22  G-Platform overdrive transmission failures continue to
23  mount.
24      All right?  Do you see that?
25  **A.    I see it.  If I can see the document, it would be**

---

109

DeRamus - cross

1  helpful.
2  **Q.**    I'm happy to hand it up to you.
3      MR. OSTOYICH:  Your Honor, I will bring you
4  a copy as well (handing exhibit to the witness and the
5  Court).
6      THE COURT:  Thank you.
7  BY MR. OSTOYICH:
8  **Q.**    I'm up at the top of the second page, where Mr. Hyatt
9  reports in December of 2002, the G-Platform overdrive
10  transmission failures continue to mount.  He says, it
11  appears that many of our long-term customers have
12  experienced enough fun and will change specs in fiscal year
13  '03.
14      Now, we know because the company reported what
15  actually happened; right?  We know that the company actually
16  lost sales after mid-2002 because of G-Platform transmission
17  problems; is that right?
18  **A.    Well, we don't know that for certain.  We know that**
19  **there are some problems that are continuing, I would say**
20  **consistent with other documents I've seen that make very**
21  **similar statements about Eaton's own transmissions, and**
22  **the question ultimately is how significant effect and**
23  **is it swamped by other factors that are going on in the**
24  **market.**
25      **Again, the point of my liability testimony**

---

110

DeRamus - cross

1  you're pointing to is one about significance, is are the
2  LTAs having a significant effect and, in fact, I conclude
3  that they were. Without going through the rest of the
4  documents, you would need to see what other factors that
5  ArvinMeritor is discussing.
6  Q.   Let's look at paper Exhibit 7.
7        By the way, you did not look at Mr. Hyatt's
8  deposition before you prepared your report, did you?
9  A.   I don't recall.
10 Q.   Now, this exhibit, when it comes up, this is an
11 exhibit from February of '03. There's a report up here
12 about Knight Transportation.
13       MR. OSTOYICH: Your Honor, I will give you a
14 copy (handing exhibit to the Court).
15       THE COURT: All right.
16 BY MR. OSTOYICH:
17 Q.   Knight Transportation in Phoenix, Arizona, which has
18 over 1700 tractors with the full Meritor drivetrain plus.
19 And then if you scroll up a little bit.
20       Now, this has been forwarded -- a little more.
21 Tom Gosnell was the chairman of the board, joint venture;
22 right?
23 A.   I don't recall his exact title. I know he was --
24 Q.   Yes.
25 A.   -- senior level.

111

DeRamus - cross

1  Q.   Mr. Gosnell reports to Wolfgang Vogel, who set up the
2  German company.
3        Wolfgang, here is some more bad news regarding a
4  large, formerly loyal transmission customer who will not be
5  buying our J.V. products due to G-Platform performance
6  issues.
7        That's February of '03. Your but-for world does
8  not have any lost sales from this large, formerly loyal
9  transmission customer, who, in the actual world, will the
10 not be buying anymore of the company's transmissions because
11 of G-Platform performance issues; is that right?
12 A.   It's hard for me to say definitively what is occurring
13 based on a quick scan of the document.
14       There were a number of fleet customers that
15 Freightliner and -- this is a Freightliner deal?
16       Yes. There were significant activities by
17 Freightliner to convert customers during this time period,
18 so I would have to go back and look and -- significant
19 pressure, significant removal of other incentives.
20       So it's hard to say, based on this communication
21 what, in fact, was the cause of losses, if any, that
22 happened.
23 Q.   But the one thing we do know is you did not take
24 into account any lost sales from Knight Transportation;
25 right?

112

DeRamus - cross

1  A.   My analysis is at an aggregate level, correct. I
2  did not go through and do a lost sales analysis on a
3  customer-by-customer basis.
4        MR. OSTOYICH: With your Honor's indulgence, if
5  I can do a couple more, I've got a lot of these, and I would
6  to make the point.
7        THE COURT: I'm going to give you 15 more
8  minutes. Then I need to let --
9        MR. OSTOYICH: I appreciate that.
10       THE COURT: -- the plaintiff proceed.
11       MR. OSTOYICH: Let's call up Hayes 20.
12       If I could, I will walk this up as well, your
13 Honor. Now, Page 20 is now January of 2004. There's an
14 e-mail in the middle of the page from Truck Country, Mike
15 McCoy, to Dennis Kline.
16 BY MR. OSTOYICH:
17 Q.   Dennis Kline was the Vice President of Sales and
18 Marketing for the joint venture; right?
19 A.   Again, I don't recall the exact titles.
20 Q.   You did not read Mr. Kline's deposition prior to
21 preparing your report, did you?
22 A.   I don't recall.
23 Q.   Now, Mr. McCoy says, Dennis, I'm sorry it has come to
24 this, but I have told Foodliner to change all of their
25 remaining truck orders to Eaton components.

113

DeRamus - cross

1        This is January of 2004; right?
2  A.   I'm sorry. Would you mind if I scanned the document
3  really quickly?
4  Q.   Not at all.
5  A.   I'm trying to orient myself.
6        (Pause.)
7        THE WITNESS: Okay. I'm sorry. Go ahead.
8  BY MR. OSTOYICH:
9  Q.   Now, here's a lost sale with Foodliner in January of
10 '04.
11       Were you going to take that into account in your
12 but-for world?
13 A.   Well, January of 2004, the joint venture is
14 effectively dissolved. There are -- the question is
15 really what ultimately led to the dissolution of the joint
16 venture.
17 Q.   That's why I'm asking the question. Where do you
18 take this into account if the customers were stopping
19 purchases because of G-Platform transmission problems?
20 A.   Well, again, I'm not sure this is because of
21 G-Platform transmission problems. This does talk about
22 the warranty processing procedures that they had put in
23 place, it is, again, a bit of -- economists will refer to
24 it as an endogeniety problem.
25       You are looking at something that may, in fact,

114

DeRamus - cross

1   be a reflection again -- but as I said before, I did not
2   do my analysis on a customer-by-customer basis, nor have
3   I ever seen a damages analysis done a -- on this detailed
4   individual customer basis, because I think it's
5   impractical.
6          My report stands in terms of what I did.
7   Q.   Did you -- I can't find it in the report. Did you
8   do a correlation study between the company's G-Platform or,
9   for that matter, the FreedomLine, because FreedomLine had a
10  lot of problems too; right?
11  A.   The FreedomLine had some -- had some -- some warranty
12  issues when it was released, such that the auto shift,
13  Eaton's auto shift had tremendous warranty problems, and
14  they -- any time there's a product introduction, there is
15  one. That is why I concluded, as an economist, that
16  warranty issues are not -- and different changes in quality
17  issues that are happening in the market are not explaining
18  this very severe pattern you see in the data, which is
19  increased market share for ZF Meritor prior to 2000 and a
20  sharp decline thereafter.
21  Q.   Did you do a correlation study between when the
22  G-Platform and FreedomLine warranty problems were hitting
23  and the customers' resulting share subsequent to those?
24  Problems?
25  A.   Actually, I did. I didn't estimate the correlation

115

DeRamus - cross

1   co-efficients, but I looked to see when the issues were --
2   were being -- were arising, and what was going on in the
3   market share here during this time period.
4   Q.   Let me make that clear. You said you didn't
5   estimate the estimate of co-efficients. What do you mean by
6   that?
7   A.   Well, you're presuming that there -- one would have
8   created some measure of quality, quality index, so relative
9   quality index. That's unclear to me how you would do that,
10  because quality ultimately is a subjective issue, and there
11  are issues of measuring ZF Meritor's quality and issues of
12  measuring Eaton's quality and then making an inference about
13  how that, in turn, relates to customer sales.
14  Q.   Sure.
15  A.   I did not do that step, and one could, in theory, do a
16  correlation of some index of sales, but the data were not
17  available to me to do that.
18  Q.   I just want to be clear. You did not do a study
19  as part of your analysis correlating all of these G-Platform
20  or FreedomLine warranty problems with the company's actual
21  performance in the market?
22  A.   I analyzed whether the warranty issues identified
23  in the documents correlated with decline of sales. I didn't
24  do a formal physical correlation measure, because all I
25  had was a qualitative indicator of approximately a time

116

DeRamus - cross

1   period when issues were occurring, not a quantitative
2   measure that I could then use as part of a correlation
3   statistic.
4   Q.   By the way, Dr. DeRamus, did the company's warranty
5   expenses actually increase between 2002 and 2003?
6   A.   The data I recall seeing on the G-platforms was that
7   the per-unit warranty accruals declined over the time
8   period. The peak was in 2001.
9   Q.   Well, the total amount the company incurred as a
10  result of the G-Platform, the warranty expenses, was several
11  million dollars in 2002; right?
12  A.   I don't recall. Again, from my perspective, the
13  issues are per-unit basis, not the aggregate value.
14  Q.   I just want to be clear because you made a fact
15  statement that the G-Platform values were fixed in 2002.
16         I want to show you a piece of testimony, which
17  is a 30(b)(6) deposition. That means it's a company
18  representative testifying on behalf of the company. And
19  this is the testimony at Page 240 of the company's
20  representative on the warranty expenses that the company
21  incurred at this time.
22         MR. OSTOYICH: Would you play that, please?
23         (Videotaped deposition excerpt played as
24  follows.)
25         "Question: And the next entry is warranty paid.

117

DeRamus - cross

1   And then there's a figure of eight million for actual for
2   2002.
3          "Does that represent that eight million was paid
4   in warrants tea for fiscal year 2002?
5          "Answer: That's what it appears to indicate.
6          "Question: And the next column, 4.2, does that
7   indicate that it was worse than planned by 4.2?
8          "Answer: Based on -- based on what's shown
9   here, that's how I would read that."
10         (End of videotape excerpt.)
11         MR. OSTOYICH: And the next clip after that.
12         (Videotaped deposition excerpt played as
13  follows.)
14         "Question: And then under -- if you go down a
15  little bit under transmission warranty charges, there's a
16  figure 8.4 million for June year to date?
17         "Answer: Yes.
18         "Question: Does that represent that the
19  transmission warranty charges for fiscal year 2003 as of
20  June year to date were 8.4 million?
21         "Answer: I believe that's what it indicates.
22         "Question: And does this document also indicate
23  that that was about four million worse than planned?
24         "Answer: I believe that's what it indicates.
25         "Question: And then if you go over a little bit

**118**

DeRamus - cross

1  farther, there's a full year 2003 forecast, and it indicates
2  that the that the transmission warranty charges are
3  forecasted to be 9.8 million for the full year, fiscal year
4  2003; is that correct.
5      "Answer:  That's what it shows."
6      (End of videotape excerpt.)
7  BY MR. OSTOYICH:
8  Q.    Now, so this suggestion that the warranty expenses
9  were increased in 2002, 2003, where do you take the
10  increasing expenses of warranties and the effect that that
11  had on customers in your but-for world?  Where do you
12  measure that?
13  A.    As I said, the documents that I was looking at were
14  looking at a per-unit basis, and the per-unit spend appear
15  to peak in 2001 and then decline in 2002 and significantly
16  thereafter.  And, again, I didn't see a significant effect
17  in terms of when those peak per unit warranties warranty
18  issues were occurring and the decline in their sales.
19  Q.    My question was simply, Dr. DeRamus, where do you
20  take that into account and the effect that those increases
21  in warranty expenses was having on customers, where do you
22  take that into account in your but-for world?
23  A.    It would depend on how they accounted for them.  It
24  may be in my -- my fourth method, where I'm adding back in
25  the operating expenses.

**119**

DeRamus - cross

1  Q.    But it's your but-for world?
2  A.    I'm sorry?
3  Q.    It's but-for world.  Where did you take it into
4  account?
5  A.    I looked at the warranty issues and to see whether
6  warranty and quality problems associated with ZF Meritor
7  transmissions were a cause of its significant decline
8  from -- again, this pyramid-shaped pattern from 2000 to --
9  down to a negligible quantity of sales in 2000 forward, and
10  I concluded they weren't.  I did not do any further
11  adjustment for warranty costs.
12  Q.    Dr. DeRamus, how would -- this is a hypothetical.  How
13  would someone taking your damages figure separate out lost
14  sales or lost market share attributable to G-Platform
15  warranty problems versus FreedomLine warranty problems?
16  A.    I'm sorry.  Could you read the question back,
17  please?
18  Q.    I will state it again.  How would someone, given your
19  damages figures, how would someone separate out lost sales,
20  lost profits caused by G-Platform warranty problems or
21  FreedomLine warranty problems?
22  A.    Well, one -- I don't think there is a method out
23  there to, again, do the damages analysis, lost profits
24  analysis, on a customer-by-customer basis, because there
25  are so many different factors and I think is, as I said

**120**

DeRamus - cross

1  before, there is some endogenizing problem associated
2  with trying to tie it up closely for any particular
3  customer.
4      But I would say that one approach someone could
5  take would be to adopt additional warranty expenses, if the
6  warranty expenses were higher.  Again, that's why, in my
7  fourth method, I deducted all of the incremental operating
8  costs that the company incurred during the -- during this
9  time period, from the damages.
10  Q.    How would someone take your damages figures and
11  separate out lost sales that were caused by Eaton's lower
12  manual transmission prices?
13  A.    There, I think you're assuming something about the
14  anticompetitive conduct of Eaton, because ultimately, there
15  is -- the part of the conduct at issue in the provision of
16  rebates, the way those rebates are structured, and the
17  impact those had on customer decisions.  So there's a whole
18  host of issues associated with doing that.
19  Q.    Well, this is my question.  A little bit more precise.
20      MR. OSTOYICH:  I promise, your Honor, I will be
21  done in a second.
22  BY MR. OSTOYICH:
23  Q.    You looked at the figure before, which was gross
24  prices, did not have the rebates in there.  Rebate prices
25  were at all times for manual transmissions about

**121**

DeRamus - cross

1  four-and-a-half percent lower.  Those are the figures you
2  plotted out.
3      How would someone take your damages and separate
4  out sales that were lost because Eaton's manual
5  transmissions were at all times 4.4 percent lower?
6  A.    I -- I don't think one necessarily should do that,
7  because there is a -- an issue -- I'm at a loss to say -- to
8  address the issue you're talking about.
9      Ultimately, the question is the but-for world,
10  what would they have sold.  They would have an aggregate
11  measure, the aggregate measure of what their sales would
12  have been.  Absent Eaton's conduct and the contracts and the
13  conduct of Eaton and the OEMs in furtherance of their LTAs,
14  those prices may well have been -- Eaton's prices may well
15  have been higher.  Those are also prices paid by OEMs, so
16  those are not necessarily prices that were offered by ZF
17  Meritor.
18  Q.    Just so we're clear, you did not as part of your
19  study separate out any lost sales caused by that gap?
20  Q.    The gap of Eaton's gross prices to OEMs were at
21  all times below Meritor's manual transmission prices; is
22  that right?
23  A.    Two lines on that graph, at all times after 2001,
24  the blue -- the Eaton line is below Meritor.  I don't know
25  if I would go so far as to say all their prices, their

000725

122

DeRamus - cross

1   prices were always lower, because, for example, you have
2   issues of what were their prices that ZF Meritor is being --
3   that customers who want to buy ZF Meritor transmission are
4   actually paying and those are affected by the agreements
5   that the OEMs had with Eaton to increase ZF Meritor's
6   prices.
7         So you're confounding issues of liability from
8   the issues of damages.
9   Q.   Dr. DeRamus, right above this, you say in your own
10  text, Eaton's manual transmission prices were an average
11  four-and-a-half percent lower during this time period;
12  right?  Right above that?
13  A.   On average, the -- that's what the data in the OEM
14  invoice database --
15  Q.   Gross prices, four-and-a-half percent lower for manual
16  transmissions?
17  A.   That's what that data shows.
18  Q.   You did not separate out as part of your damages
19  analysis any of your particular lost sales, where customers
20  decided to buy transmission from Eaton because its price
21  was, on average, 4.4 percent lower for 9 and 10-speed manual
22  transmissions; is that right?
23  A.   No, I don't think that would be the appropriate way to
24  do a damage calculation.
25        MR. OSTOYICH:  Okay.  Your Honor, I appreciate

123

DeRamus - cross

1   your indulgence.
2         THE COURT:  All right.
3         MR. OSTOYICH:  That's it.
4         THE COURT:  Let's have any redirect.
5         MR. TASKIER:  Your Honor, Dr. DeRamus appeared
6   today for purposes of being examined under Rule 702 for
7   Daubert analysis and determining whether his testimony and
8   his report is sufficient reliability and fit to go to the
9   jury and that it's not junk science.
10        Based on what he has said so far today, I have
11  no additional questions, but I invite the Court, if it has
12  any questions, to help it make that determination, to feel
13  free to examine him yourself.
14        THE COURT:  Well, my concern really is with the
15  fundamental source of all of his estimations, and that's on
16  a strategic business plan that does not -- so I'm going to
17  have to go back and look and see whether I think that was an
18  appropriate way to start the analysis, and after that, I
19  guess I will try to figure out whether all the different
20  ways that the analysis was done and the different kind of
21  figures were manipulated --
22        MR. TASKIER:  In that regard, your Honor, I
23  direct your attention to the Lepages case, which explicitly
24  endorses the use of the strategic business plan that was
25  presented for use by the Board of Directors on this for

124

DeRamus - cross

1   purposes just as this was.  So I think that there's case law
2   which supports the notion that this is a reliable basis from
3   which to work and that this is not junk science.
4         THE COURT:  You may step down, I think.  I don't
5   have specific questions.  I have to say that your
6   explanations, if I were sitting here in a trial, would make
7   me think you're going to confuse the jury, and not
8   illuminate the jury, which may be what you are trying to do.
9   You may step down.  I don't know.
10        (Witness excused.)
11        THE COURT:  And if, in fact, I am required to
12  accept as a fundamental basis of an expert report a
13  strategic business plan with economic analyses that don't
14  take into account anything that was really going on, then I
15  guess that's what you are telling me, but I'm not real
16  comfortable with it.
17        So you may rest on your laurels and I will do
18  what I need to do.
19        If you all want to submit ten pages, or no more
20  than ten pages based on the additional explanation, for what
21  it's worth, you may, and I will issue a decision within
22  ten days.  Ten pages or less.  All right?
23        All right.  Thank you, counsel.
24        (Counsel respond "Thank you, your Honor.").
25        THE COURT:  I have to get out of my computer, so

125

DeRamus - cross

00:00:34  1   you don't have to wait for me.
00:00:30  2         (Court recessed at 4:50 p.m.)
3                       -  -  -
4
5
6
7
8
9                  I N D E X
10
11  PLAINTIFF'S TESTIMONY
12  WITNESS              DIRECT   CROSS   REDIRECT  RECROSS
13  DAVID W. DERAMUS       4       30       --        --
14
15                      -  -  -
16
17
18
19
20
21
22
23
24
25

## $

**$150** [1] - 46:3
**$170** [1] - 69:9
**$2,700** [1] - 47:25
**$200** [1] - 65:3
**$245,000,000** [1] - 69:4
**$250** [1] - 64:24
**$3,000** [2] - 42:23, 46:2
**$3,418** [1] - 39:18
**$384,991,000** [2] - 69:24, 70:1
**$400** [1] - 69:21
**$450** [3] - 46:24, 47:20, 48:19
**$50** [1] - 28:25
**$66,133,000** [1] - 85:2
**$75** [1] - 46:3
**$90** [2] - 65:1, 69:9

## '

**'00** [3] - 39:19, 41:18, 69:5
**'01** [11] - 39:19, 41:18, 49:25, 53:17, 55:11, 55:17, 56:15, 56:19, 57:14, 82:11, 83:11
**'02** [1] - 56:6
**'03** [5] - 34:19, 62:2, 109:13, 110:11, 111:7
**'04** [2] - 68:6, 113:10
**'05** [3] - 68:6, 75:1, 75:4
**'06** [2] - 68:6, 73:4
**'07** [3] - 68:6, 75:1, 75:5
**'08** [1] - 73:4
**'09** [5] - 75:10, 75:16, 75:19, 75:24
**'99** [3] - 100:20, 101:5, 101:9

## 0

**06-623** [1] - 1:9
**09** [1] - 69:5

## 1

**1** [12] - 42:2, 45:23, 55:8, 59:17, 60:2, 60:5, 62:13, 62:15, 63:10, 63:13, 69:11,
80:18
**10** [5] - 42:19, 62:4, 62:6, 62:7, 91:4
**10-speed** [19] - 39:2, 43:4, 44:23, 45:1, 45:4, 46:9, 48:6, 48:12, 49:10, 49:17, 50:17, 50:22, 50:24, 56:20, 56:23, 57:16, 58:22, 59:1, 122:21
**10-speeds** [5] - 42:17, 42:23, 49:25, 50:13, 53:17
**11** [6] - 26:23, 63:9, 63:10, 63:12, 63:13, 71:6
**11-speed** [1] - 49:21
**113** [1] - 47:4
**11D** [2] - 33:8, 34:14
**12** [7] - 65:4, 65:10, 67:13, 68:8, 69:13, 71:7, 91:4
**13** [6] - 33:9, 49:21, 68:20, 92:4, 92:5, 103:7
**13-and-a-half** [1] - 28:5
**13-speed** [1] - 32:10
**133** [1] - 48:25
**14** [1] - 96:9
**14-speed** [2] - 33:10, 49:21
**143** [1] - 36:22
**145** [3] - 61:1, 62:4
**147** [2] - 63:9, 65:4
**15** [2] - 88:17, 112:7
**15-percent** [1] - 43:3
**16** [1] - 102:21
**160** [1] - 69:9
**17** [6] - 16:2, 42:12, 44:22, 47:23, 48:11, 85:24
**17,000** [1] - 38:12
**17,886** [1] - 38:12
**1700** [1] - 110:18
**18** [1] - 42:11
**19** [1] - 75:3
**19,348** [2] - 37:25, 84:23
**196** [5] - 87:22, 88:25, 92:17, 94:18, 97:19
**1990** [1] - 90:15
**1996** [1] - 90:8
**1999** [4] - 20:10, 20:17, 101:2, 104:5
**1:56** [2] - 1:12, 3:4

## 2

**2** [8] - 19:5, 60:6, 61:4, 65:14, 65:22, 69:11, 80:18, 101:21
**2,000** [1] - 12:18
**20** [3] - 74:24, 112:11, 112:13
**200** [1] - 64:23
**2000** [40] - 13:4, 14:4, 14:6, 14:17, 20:18, 20:25, 22:8, 23:20, 43:14, 45:2, 51:10, 53:21, 53:24, 54:13, 55:12, 63:3, 85:6, 85:20, 90:24, 91:19, 91:23, 100:10, 100:21, 101:5, 102:2, 102:5, 103:13, 103:25, 104:11, 104:14, 104:24, 105:9, 106:5, 106:20, 107:3, 114:19, 119:8, 119:9
**2000/2003** [1] - 22:14
**2001** [19] - 37:24, 47:19, 48:5, 48:13, 48:24, 49:10, 50:7, 55:13, 55:22, 56:5, 56:12, 57:7, 104:11, 105:11, 106:16, 107:3, 116:8, 118:15, 121:23
**2002** [17] - 18:16, 55:23, 101:9, 105:13, 106:5, 106:16, 107:6, 108:2, 108:21, 109:9, 116:5, 116:11, 116:15, 117:2, 117:4, 118:9, 118:15
**2003** [11] - 18:16, 21:17, 22:8, 32:17, 33:22, 107:6, 116:5, 117:19, 118:1, 118:4, 118:9
**2004** [6] - 21:15, 101:3, 107:6, 112:13, 113:1, 113:13
**2005** [4] - 14:7, 14:17, 74:12, 74:14
**2005/2007** [1] - 78:7
**2006** [5] - 51:10, 72:15, 73:21, 73:24, 78:4
**2007** [2] - 74:12, 74:15
**2008** [4] - 72:15, 73:21, 73:25, 78:4
**2009** [22] - 1:12, 9:14, 9:17, 14:17, 18:17, 20:25, 21:15, 23:20, 63:3, 71:11, 71:19, 72:3, 72:5, 72:10, 73:2, 73:19, 73:22, 73:23, 74:6, 76:2, 76:11, 106:12
**21** [2] - 62:20, 74:24
**211** [4] - 104:22, 105:3, 105:17
**22** [2] - 1:12, 102:21
**2300** [3] - 48:2, 48:12, 49:10
**240** [1] - 116:19
**248** [1] - 69:8
**2700** [1] - 46:9
**28** [2] - 47:4, 47:8

## 3

**3** [5] - 62:15, 62:18, 63:11, 63:16, 80:18
**3,000** [1] - 48:14
**30** [1] - 125:13
**30(b)(6** [1] - 116:17
**306** [2] - 71:21, 71:22
**309** [2] - 96:9, 96:16
**30th** [2] - 55:9, 55:13
**320** [1] - 98:13
**3400** [1] - 83:10
**3418** [7] - 41:18, 44:5, 48:24, 49:8, 56:19, 57:14, 59:7
**36** [1] - 71:22
**3650** [2] - 41:19, 44:6
**3776** [3] - 39:19, 41:19, 44:5
**39** [1] - 100:16

## 4

**4** [10] - 38:8, 63:2, 80:18, 81:17, 81:18, 81:20, 81:24, 82:2, 96:9, 125:13
**4.2** [2] - 117:6, 117:7
**4.4** [2] - 121:5, 122:21
**43** [1] - 68:9
**445** [1] - 101:24
**477** [1] - 54:19
**4:50** [1] - 125:2

## 5

**5** [38] - 17:14, 36:21,
37:3, 38:9, 41:17, 42:2, 43:2, 43:14, 43:16, 44:3, 44:8, 45:23, 48:22, 49:2, 49:3, 49:4, 55:12, 56:18, 58:10, 59:14, 62:20, 62:22, 62:24, 63:1, 63:22, 64:4, 67:13, 68:8, 70:5, 70:9, 79:8, 79:10, 80:20, 82:4, 85:19, 106:9, 108:19
**50** [3] - 46:3, 67:4, 67:11
**57** [1] - 68:9

## 6

**6** [5] - 38:10, 42:3, 60:1, 62:22, 63:1
**6.6** [1] - 66:3
**60** [2] - 67:5, 68:10
**60-percent** [1] - 70:4
**67** [1] - 91:24

## 7

**7** [19] - 42:4, 49:1, 60:1, 61:14, 62:13, 62:15, 62:18, 62:21, 63:7, 63:10, 63:11, 63:16, 63:19, 81:25, 83:1, 83:15, 86:7, 86:8, 110:6
**702** [1] - 123:6
**75-percent** [1] - 69:12

## 8

**8** [3] - 60:25, 66:15, 100:16
**8.4** [2] - 117:16, 117:20
**80** [2] - 65:1, 69:8
**81** [2] - 87:22, 89:1
**84** [3] - 42:11, 42:12, 48:11
**89** [1] - 104:23

## 9

**9** [40] - 37:11, 39:2, 41:17, 42:17, 42:19, 42:23, 43:2, 43:4, 44:23, 44:25, 45:4, 46:9, 48:6, 48:12, 48:22, 49:4, 49:9,

49:17, 49:25, 50:7,
50:22, 50:24, 53:17,
56:18, 56:20, 56:23,
57:16, 58:10, 58:22,
59:1, 59:14, 59:16,
62:24, 63:22, 64:4,
66:23, 79:8, 82:4,
106:16, 122:21
**9-speed** [1] - 50:13
**9.8** [1] - 118:3

**A**

**absence** [1] - 9:21
**absent** [8] - 10:14,
13:23, 30:8, 30:18,
37:8, 37:14, 38:1,
121:12
**absolutely** [2] - 16:8,
77:17
**abut** [1] - 40:9
**accept** [1] - 124:12
**accepted** [2] - 8:4,
12:22
**accommodate** [1] -
50:19
**accompanying** [2] -
51:9, 87:3
**according** [1] - 92:6
**accordingly** [1] - 46:7
**account** [28] - 13:1,
14:17, 18:15, 21:23,
76:8, 76:9, 84:14,
96:22, 97:3, 97:7,
97:18, 97:22, 97:25,
100:8, 103:11,
103:12, 103:16,
103:19, 108:14,
108:18, 111:24,
113:11, 113:18,
118:20, 118:22,
119:4, 124:14
**accounted** [5] - 21:13,
21:19, 56:10, 98:1,
118:23
**accounting** [1] - 9:22
**accounts** [2] - 100:10,
108:6
**accruals** [1] - 116:7
**accrued** [1] - 29:14
**accurate** [1] - 11:21
**accuses** [1] - 16:4
**achieve** [1] - 27:3
**action** [3] - 93:11,
101:17, 103:23
**ACTION** [1] - 1:4
**activities** [1] - 111:16
**actual** [45] - 6:1,
14:11, 14:12, 14:15,

15:6, 16:1, 16:5,
18:9, 20:24, 21:2,
22:15, 23:16, 23:20,
24:3, 30:21, 30:23,
30:24, 36:13, 38:8,
38:9, 38:14, 42:18,
43:3, 43:18, 43:19,
44:22, 44:25, 45:3,
48:12, 48:13, 49:9,
64:13, 64:18, 65:2,
66:13, 66:17, 79:22,
79:24, 83:9, 85:18,
85:20, 108:5, 111:9,
115:20, 117:1
**actuals** [5] - 43:13,
43:15, 59:2
**add** [3] - 64:19, 66:16,
76:7
**added** [3] - 62:1, 63:2,
82:9
**adding** [1] - 118:24
**addition** [1] - 39:6
**additional** [30] -
17:18, 21:14, 21:20,
21:24, 22:7, 22:9,
39:5, 40:23, 44:9,
46:24, 48:8, 49:14,
49:18, 50:11, 51:16,
55:18, 56:24, 57:6,
57:15, 58:1, 59:18,
59:21, 62:1, 63:2,
98:2, 120:5, 123:11,
124:20
**address** [2] - 104:20,
121:8
**adequate** [2] - 7:12,
13:17
**adjust** [1] - 106:8
**adjusted** [1] - 106:23
**adjusting** [1] - 80:1
**adjustment** [1] -
119:11
**adjustments** [1] - 52:4
**adopt** [1] - 120:5
**advance** [1] - 98:20
**advanced** [1] - 107:16
**affected** [5] - 14:19,
22:2, 74:22, 83:22,
122:4
**aftermarket** [9] -
39:22, 40:22, 44:10,
48:9, 49:14, 50:10,
50:12, 58:3, 82:9
**afterwards** [1] - 56:6
**aggregate** [6] - 60:5,
81:10, 112:1,
116:13, 121:10,
121:11
**aggregated** [1] - 85:21
**aggregating** [1] - 64:1

**aggregation** [2] -
34:22, 34:23
**aggressive** [1] -
103:23
**ago** [2] - 75:11, 77:9
**agree** [5] - 43:1, 43:6,
43:7, 72:19, 72:22
**agreement** [1] - 90:21
**agreements** [1] -
122:4
**ahead** [2] - 41:15,
113:7
**allegation** [1] - 16:6
**allegedly** [5] - 30:9,
30:19, 37:8, 37:15,
108:9
**allocation** [1] - 69:2
**allotted** [2] - 95:22,
95:25
**allow** [1] - 108:11
**allows** [4] - 11:14,
11:16, 11:18, 14:17
**almost** [2] - 56:20,
88:4
**alternative** [11] - 5:16,
20:8, 21:20, 23:9,
26:14, 28:13, 51:13,
61:16, 64:17, 71:16
**alternatives** [1] -
26:25
**amortization** [2] -
27:21, 28:22
**amount** [4] - 35:25,
91:9, 101:1, 116:9
**analyses** [2] - 5:15,
124:13
**analysis** [39] - 5:6,
7:2, 7:3, 7:20, 7:22,
7:24, 8:8, 8:15, 10:9,
15:16, 19:5, 19:16,
24:15, 32:3, 35:10,
35:21, 36:9, 53:9,
53:10, 73:6, 73:16,
87:19, 87:20, 96:7,
100:8, 100:9,
103:10, 103:13,
112:1, 112:2, 114:2,
114:3, 115:19,
119:23, 119:24,
122:19, 123:7,
123:18, 123:20
**analyst** [1] - 25:18
**analysts** [2] - 26:16,
26:18
**analyze** [1] - 13:11
**analyzed** [6] - 6:21,
7:6, 7:9, 8:1, 8:16,
115:22
**AND** [1] - 1:2
**ANDREW** [1] - 2:13

**annual** [1] - 29:9
**answer** [7] - 31:25,
32:15, 52:18, 52:22,
87:1, 98:18, 117:17
**Answer** [10] - 96:24,
99:14, 99:17, 99:20,
99:23, 117:5, 117:8,
117:21, 117:24,
118:5
**answers** [2] - 39:9,
95:23
**anti** [3] - 6:25, 7:18,
7:19
**anti-competitive** [3] -
6:25, 7:18, 7:19
**anticompetitive** [24] -
5:2, 6:11, 6:16, 7:4,
7:23, 8:5, 8:25, 9:2,
9:22, 10:14, 11:8,
13:23, 14:21, 14:23,
30:9, 30:18, 30:20,
31:24, 37:8, 37:15,
92:24, 94:1, 108:9,
120:14
**antitrust** [7] - 5:3,
5:19, 7:1, 7:3, 7:24,
10:6, 10:9
**apologize** [1] - 40:14
**appear** [2] - 38:25,
118:14
**APPEARANCES** [2] -
1:16, 2:1
**appeared** [1] - 123:5
**Appendix** [1] - 74:13
**appendix** [1] - 74:24
**apples** [7] - 17:9,
17:10, 49:12, 49:13,
59:3, 77:18
**apples-to-apples** [1] -
59:3
**apples-to-bicycles** [1]
- 77:18
**application** [3] -
14:12, 57:6, 58:21
**applications** [1] - 33:6
**applied** [21] - 14:4,
15:15, 20:23, 23:22,
24:6, 25:13, 27:8,
28:18, 30:7, 33:6,
35:5, 36:13, 38:5,
38:13, 38:14, 44:10,
48:20, 53:12, 79:22,
83:8
**applies** [3] - 25:22,
46:11, 46:12
**apply** [6] - 6:1, 6:6,
25:22, 28:17, 72:13
**applying** [1] - 46:6
**appreciate** [4] - 29:20,
96:4, 112:9, 122:25

**approach** [14] - 4:12,
25:14, 25:16, 25:17,
26:18, 26:19, 27:12,
27:16, 28:24, 28:25,
29:2, 74:22, 120:4
**approaches** [1] -
60:19
**approaching** [1] -
11:22
**appropriate** [13] -
27:14, 49:15, 63:24,
73:16, 74:7, 76:5,
77:25, 97:6, 99:2,
107:8, 122:23,
123:18
**appropriately** [1] -
20:5
**approvals** [1] - 105:19
**approved** [1] - 87:15
**approximate** [1] -
67:10
**arising** [1] - 115:2
**arithmetic** [1] - 43:6
**Arizona** [1] - 110:17
**arrive** [2] - 6:1, 15:18
**ARSHT** [1] - 2:9
**art** [1] - 30:12
**ArvinMeritor** [5] -
26:5, 26:9, 74:2,
83:19, 110:5
**aspects** [1] - 90:23
**assertion** [2] - 6:4, 6:9
**assess** [3] - 4:25,
15:16, 25:19
**assessed** [2] - 35:24,
36:3
**assessing** [2] - 6:25,
7:4
**assessment** [4] -
35:18, 36:6, 64:10,
79:15
**associated** [3] -
119:6, 120:1, 120:18
**assume** [10] - 34:18,
37:24, 52:19, 67:1,
67:4, 82:11, 83:10,
84:23, 85:14, 92:19
**assumed** [5] - 34:13,
51:25, 53:15, 57:13,
70:25
**assuming** [6] - 27:23,
66:7, 71:10, 71:17,
76:22, 120:13
**assumption** [14] -
45:12, 52:11, 52:13,
52:14, 52:15, 56:8,
59:5, 59:8, 61:18,
61:23, 73:7, 84:8,
86:2
**assumptions** [34] -

13:18, 24:22, 33:14, 50:4, 52:8, 52:10, 52:16, 52:17, 52:21, 53:2, 58:9, 62:24, 62:25, 63:23, 64:15, 78:10, 80:19, 81:6, 81:9, 81:15, 81:16, 81:19, 82:4, 82:16, 82:20, 83:4, 83:5, 83:7, 83:13, 83:14, 84:6, 84:10, 85:9, 89:19
**assurance** [1] - 29:1
**attach** [1] - 25:13
**attempts** [2] - 92:7
**attention** [1] - 123:23
**attributable** [1] - 119:14
**attribute** [1] - 101:8
**attributes** [1] - 103:1
**audit** [1] - 43:18
**audited** [4] - 15:7, 43:18, 85:20, 85:21
**auto** [5] - 72:23, 78:1, 103:7, 114:12, 114:13
**autocorrelation** [1] - 20:6
**automatically** [1] - 63:23
**automation** [11] - 38:23, 38:25, 49:19, 55:19, 56:24, 56:25, 58:1, 58:2, 58:20, 81:12
**automobile** [1] - 77:25
**available** [19] - 11:17, 11:24, 12:15, 12:16, 23:24, 51:6, 51:24, 52:24, 56:14, 57:20, 60:20, 73:14, 74:17, 80:9, 87:9, 99:2, 115:17
**average** [39] - 11:19, 12:1, 18:5, 37:13, 39:11, 39:15, 39:18, 39:21, 40:18, 41:17, 42:3, 42:10, 42:16, 42:22, 43:2, 45:7, 46:8, 46:17, 46:21, 46:24, 47:2, 47:5, 47:9, 47:19, 48:1, 48:5, 48:23, 49:6, 49:8, 56:19, 57:14, 59:7, 59:13, 59:15, 72:15, 122:10, 122:13, 122:21
**averaged** [2] - 18:4, 25:4
**aware** [5] - 5:25, 6:5,

16:4, 16:6, 104:4

## B

**bad** [2] - 29:3, 111:3
**balances** [1] - 11:15
**barrier** [1] - 94:6
**barriers** [2] - 6:22, 6:23
**base** [1] - 72:12
**based** [33] - 19:9, 32:21, 45:17, 50:16, 51:23, 52:20, 53:18, 62:17, 64:12, 65:6, 66:8, 68:25, 69:2, 69:5, 71:4, 71:6, 80:5, 80:6, 82:23, 84:9, 84:11, 86:5, 99:1, 107:7, 107:9, 111:13, 111:20, 117:8, 123:10, 124:20
**basic** [1] - 10:9
**basis** [31] - 13:21, 15:14, 16:21, 17:17, 18:5, 18:14, 18:17, 29:10, 29:11, 36:12, 39:17, 50:18, 52:5, 53:15, 57:5, 72:18, 76:11, 82:25, 86:5, 86:20, 87:14, 103:13, 106:6, 112:3, 114:2, 114:4, 116:13, 118:14, 119:24, 124:2, 124:12
**bay** [1] - 5:4
**bear** [9] - 39:8, 47:7, 47:11, 64:25, 73:17, 81:22, 86:23, 91:21, 106:13
**bearing** [1] - 24:13
**BEFORE** [1] - 1:14
**beginning** [6] - 3:4, 12:17, 13:5, 19:19, 20:9, 91:24, 97:25, 104:24
**begins** [2] - 91:25, 102:4
**behalf** [1] - 116:18
**behind** [1] - 86:3
**below** [8] - 18:23, 18:24, 39:18, 42:9, 59:23, 94:21, 121:21, 121:24
**benchmark** [6] - 27:21, 28:8, 64:8, 68:2, 72:16, 76:4
**best** [1] - 88:19

**better** [1] - 29:21
**between** [22] - 17:22, 28:9, 36:3, 50:13, 67:7, 70:9, 83:18, 87:6, 89:16, 90:21, 91:8, 93:5, 93:6, 93:17, 95:2, 96:22, 97:5, 97:8, 102:20, 114:8, 114:21, 116:5
**bicycles** [3] - 17:10, 49:13, 77:18
**BIDDLE** [1] - 1:18
**big** [1] - 48:18
**bill** [1] - 97:22
**binding** [1] - 90:17
**bit** [10] - 37:16, 40:14, 45:3, 46:2, 88:15, 110:19, 113:23, 117:15, 117:25, 120:19
**black** [2] - 42:16, 47:9
**blend** [1] - 39:3
**block** [1] - 71:18
**blow** [1] - 71:22
**blue** [4] - 44:22, 100:17, 102:24, 121:24
**Board** [11] - 12:19, 12:22, 13:5, 53:25, 81:1, 81:3, 83:16, 83:17, 87:5, 87:14, 123:25
**board** [9] - 85:24, 86:19, 101:10, 102:2, 102:12, 102:14, 103:17, 110:21
**boards** [1] - 4:4
**book** [3] - 93:11, 93:12, 93:13
**bottom** [4] - 66:23, 86:8, 86:11, 105:3
**bound** [2] - 22:17, 65:18
**break** [4] - 19:17, 50:12, 51:19, 88:4
**break-out** [1] - 50:12
**brief** [1] - 3:16
**briefly** [2] - 6:19, 10:8
**bring** [11] - 3:11, 36:22, 54:3, 65:4, 78:16, 78:19, 78:20, 78:24, 95:12, 95:17, 109:3
**brought** [2] - 18:16, 75:14
**BRUCE** [1] - 2:4
**builds** [2] - 79:24, 98:3
**built** [4] - 14:13,

14:16, 20:25
**bulk** [1] - 32:24
**buried** [1] - 53:4
**business** [83] - 12:6, 12:8, 12:14, 12:16, 12:24, 13:1, 13:7, 13:10, 13:11, 13:16, 13:17, 13:19, 13:21, 14:4, 14:10, 15:2, 15:13, 15:19, 16:1, 19:13, 22:25, 23:4, 23:7, 23:11, 24:2, 24:6, 24:20, 24:23, 25:23, 26:21, 28:4, 35:12, 36:10, 36:12, 37:18, 38:4, 38:14, 38:17, 39:16, 40:2, 40:25, 50:8, 51:6, 51:7, 51:10, 51:11, 51:13, 51:18, 52:1, 52:3, 52:25, 53:3, 53:6, 53:11, 57:7, 58:17, 70:15, 70:19, 70:22, 71:10, 72:2, 72:6, 72:10, 73:2, 73:20, 73:21, 77:3, 77:4, 77:19, 77:25, 78:11, 78:13, 84:22, 85:10, 103:6, 103:14, 104:13, 104:14, 106:21, 123:16, 123:24, 124:13
**businesses** [7] - 74:2, 74:6, 74:9, 74:14, 74:19, 75:1, 77:19
**but-for** [147] - 9:18, 10:13, 11:3, 11:12, 11:13, 12:8, 13:22, 14:20, 15:21, 15:22, 15:25, 16:5, 18:9, 18:12, 19:9, 19:14, 20:15, 20:21, 21:2, 21:4, 22:10, 22:21, 23:2, 23:22, 24:9, 24:11, 25:24, 27:19, 28:20, 30:7, 30:11, 30:16, 31:3, 31:9, 31:15, 32:1, 32:4, 32:6, 32:11, 32:14, 32:17, 32:24, 33:21, 34:13, 35:4, 35:5, 35:8, 35:12, 35:16, 35:19, 36:9, 36:13, 37:13, 38:10, 38:13, 39:11, 39:12, 39:18, 39:25, 40:4, 40:5, 40:18, 41:17, 42:10, 42:20, 43:2, 43:16, 43:17, 44:5, 46:1,

48:22, 49:6, 49:8, 50:1, 51:3, 51:20, 51:23, 52:1, 52:15, 52:20, 53:16, 57:11, 57:12, 58:10, 59:5, 59:13, 59:15, 61:11, 61:19, 61:20, 62:23, 64:11, 64:21, 64:22, 65:2, 65:7, 65:20, 66:8, 66:14, 66:17, 67:1, 67:9, 67:21, 68:4, 68:8, 68:10, 71:5, 71:17, 72:7, 73:7, 73:24, 76:12, 77:5, 78:5, 78:6, 78:9, 78:10, 79:7, 79:12, 79:16, 79:21, 79:23, 80:2, 80:12, 80:13, 80:18, 81:19, 103:10, 105:25, 106:1, 106:3, 106:9, 106:11, 106:19, 108:3, 111:7, 113:12, 118:11, 118:22, 119:1, 119:3, 121:9
**buy** [2] - 122:3, 122:20
**buyer** [5] - 47:3, 47:24, 72:5, 73:8, 77:12
**buyers** [6] - 41:25, 46:13, 46:18, 46:25, 47:6, 47:20
**buying** [2] - 111:5, 111:10
**BY** [28] - 1:18, 2:3, 2:9, 2:13, 4:19, 5:24, 30:4, 34:12, 36:20, 37:2, 41:16, 47:18, 54:7, 79:5, 82:1, 88:24, 89:4, 96:5, 96:18, 100:1, 101:25, 106:18, 109:7, 110:16, 112:16, 113:8, 118:7, 120:22

## C

**calculable** [1] - 53:3
**calculate** [6] - 9:3, 10:10, 10:22, 14:2, 25:1, 70:24
**calculated** [10] - 9:25, 10:12, 18:12, 21:9, 25:10, 29:5, 29:7, 46:16, 60:10, 65:7
**calculating** [6] - 10:17, 13:20, 24:21, 29:14, 30:12, 37:4

**calculation** [23] - 9:24, 11:23, 15:23, 16:19, 22:2, 27:7, 28:14, 30:13, 31:13, 39:17, 42:8, 49:15, 53:13, 58:15, 58:16, 61:3, 62:7, 64:6, 69:15, 70:11, 78:13, 80:5, 122:24
**calculations** [7] - 10:19, 10:20, 10:21, 15:14, 15:18, 66:25, 68:21
**calendar** [1] - 55:8
**capital** [5] - 28:4, 28:7, 28:9, 51:17, 77:21
**captured** [1] - 77:23
**car** [2] - 41:1
**care** [1] - 44:4
**careful** [3] - 31:4, 34:21, 48:15
**case** [20] - 4:21, 4:25, 5:10, 9:4, 9:12, 10:4, 10:6, 10:10, 15:23, 17:2, 25:23, 29:12, 32:2, 36:5, 57:21, 98:10, 105:22, 106:6, 123:23, 124:1
**cases** [2] - 7:1, 7:15
**cash** [7] - 27:11, 27:23, 28:8, 28:10, 28:11, 77:3
**category** [2] - 33:24, 40:21
**causation** [2] - 87:19
**caused** [9] - 6:2, 8:17, 11:8, 11:9, 94:12, 108:14, 119:20, 120:11, 121:19
**causes** [4] - 88:22, 89:6, 89:11
**caveat** [1] - 48:18
**caveats** [3] - 49:5, 59:9, 101:1
**certain** [5] - 7:10, 52:4, 53:2, 94:5, 109:18
**certainly** [15] - 16:10, 20:23, 24:7, 24:14, 29:23, 35:24, 36:8, 46:5, 74:22, 76:10, 90:24, 95:14, 95:17, 98:22
**CFO** [2] - 12:22, 82:19
**chairman** [1] - 110:21
**challenge** [1] - 5:17
**challenged** [1] - 5:12
**change** [3] - 82:22, 109:12, 112:24
**changed** [1] - 83:13

**changes** [4] - 84:1, 91:11, 92:5, 114:16
**characterization** [4] - 5:22, 17:7, 38:15, 43:7
**characterize** [2] - 45:6, 68:13
**characterized** [1] - 43:22
**characterizing** [3] - 70:17, 73:6, 73:17
**charged** [3] - 16:5, 44:25, 58:19
**charges** [3] - 117:15, 117:19, 118:2
**chart** [1] - 20:20
**check** [3] - 27:6, 86:13
**checked** [2] - 86:17, 86:21
**cherry** [2] - 29:3, 98:19
**cherry-picked** [1] - 29:3
**cherry-picking** [1] - 98:19
**choose** [1] - 29:13
**chose** [8] - 29:15, 73:3, 74:13, 74:14, 80:9, 82:15, 84:5, 96:25
**CHRISTOPHER** [1] - 2:5
**cited** [2] - 76:5, 76:7
**CIVIL** [1] - 1:4
**claims** [2] - 104:24, 105:4
**clarify** [1] - 38:16
**Class** [2] - 80:1, 96:21
**clear** [24] - 33:11, 35:17, 37:16, 39:24, 45:18, 47:15, 55:25, 56:2, 57:2, 67:16, 68:7, 72:9, 80:11, 89:23, 90:8, 90:11, 90:14, 105:18, 106:3, 115:4, 115:18, 116:14, 121:18
**clearly** [1] - 87:10
**clip** [4] - 96:12, 98:9, 117:11
**clock** [1] - 88:14
**closely** [1] - 120:2
**co** [2] - 115:1, 115:5
**co-efficients** [2] - 115:1, 115:5
**column** [5] - 38:20, 49:25, 55:11, 55:16, 117:6
**columns** [1] - 38:19

**combined** [1] - 18:2
**comfort** [1] - 26:12
**comfortable** [1] - 124:16
**coming** [2] - 50:5, 50:7
**commenced** [1] - 3:3
**commensurate** [1] - 60:3
**communication** [1] - 111:20
**companies** [14] - 25:19, 25:20, 26:6, 26:11, 26:17, 26:20, 26:23, 45:10, 74:12, 74:20, 75:4, 75:15
**Company** [1] - 86:9
**company** [41] - 12:22, 13:6, 13:16, 14:15, 15:9, 22:15, 26:7, 26:9, 27:11, 28:4, 33:21, 34:14, 37:7, 37:24, 38:18, 39:12, 39:25, 43:4, 52:1, 52:3, 55:2, 55:5, 57:10, 64:10, 80:25, 82:19, 83:19, 87:15, 101:12, 102:14, 104:23, 106:10, 109:14, 109:15, 111:2, 116:9, 116:17, 116:18, 116:20, 120:8
**company's** [12] - 13:10, 15:7, 65:7, 89:7, 90:2, 102:7, 103:6, 111:10, 114:8, 115:20, 116:4, 116:19
**company's'** [1] - 97:5
**comparable** [16] - 25:18, 25:20, 26:11, 26:16, 37:22, 43:8, 43:21, 50:23, 74:2, 74:6, 74:14, 74:25, 75:15, 76:23, 86:5
**comparables** [6] - 25:17, 26:4, 26:15, 29:3, 76:15
**compare** [5] - 42:2, 43:12, 43:19, 45:25, 90:8
**comparing** [2] - 17:11, 57:24
**comparison** [7] - 17:10, 44:1, 46:4, 49:13, 59:3, 77:18
**competing** [1] - 7:12
**competition** [4] - 6:3, 84:3, 93:1, 93:18

**competitive** [7] - 6:25, 7:18, 7:19, 30:20, 30:23, 48:16, 67:2
**competitively** [1] - 89:13
**competitor** [3] - 10:10, 11:10, 33:8
**complaining** [1] - 93:14
**complete** [1] - 74:11
**completed** [1] - 88:17
**completely** [3] - 45:18, 76:7, 81:4
**comply** [3] - 89:25, 92:2, 92:8
**component** [1] - 9:14
**components** [1] - 112:25
**comprehend** [1] - 24:15
**comprise** [1] - 40:9
**comprised** [1] - 67:21
**comprises** [1] - 18:3
**computation** [7] - 19:1, 20:19, 21:13, 37:10, 38:16, 71:3, 71:16
**computational** [1] - 37:21
**computations** [7] - 10:25, 12:9, 21:5, 23:2, 33:15, 52:5, 85:1
**computed** [2] - 17:17, 18:14
**computer** [1] - 124:25
**computing** [4] - 10:4, 42:20, 79:21
**concept** [1] - 41:8
**concern** [7] - 9:16, 25:12, 26:1, 27:3, 27:10, 77:2, 123:14
**concerned** [1] - 104:5
**concerns** [2] - 29:22, 77:22
**concession** [1] - 47:20
**conclude** [7] - 20:13, 93:23, 93:25, 94:1, 94:2, 94:6, 110:2
**concluded** [12] - 8:18, 9:1, 9:11, 20:12, 52:4, 90:20, 91:2, 93:3, 107:8, 107:24, 114:15, 119:10
**conclusion** [8] - 5:18, 6:2, 6:7, 6:15, 8:24, 11:7, 19:3, 98:6
**conclusions** [3] - 5:12, 67:19, 98:25

**conditional** [1] - 47:16
**conditions** [1] - 94:12
**conduct** [53] - 4:25, 5:1, 5:5, 6:2, 6:10, 6:11, 6:13, 6:15, 6:21, 6:25, 7:4, 7:6, 7:8, 7:12, 7:18, 7:23, 7:25, 8:4, 8:9, 8:16, 8:24, 9:22, 9:23, 10:14, 11:8, 12:17, 13:23, 14:23, 19:19, 20:9, 20:13, 27:2, 30:9, 30:18, 30:20, 31:18, 31:22, 31:24, 32:3, 36:15, 37:8, 37:15, 38:2, 91:8, 92:25, 98:1, 101:3, 108:5, 108:9, 120:14, 120:15, 121:12, 121:13
**conducted** [4] - 6:20, 7:17, 8:7, 8:14
**conducts** [1] - 14:21
**confidence** [1] - 98:4
**confirm** [1] - 28:13
**confirmed** [2] - 26:14, 26:24
**confirming** [1] - 19:13
**confounding** [1] - 122:7
**confuse** [1] - 124:8
**confused** [1] - 40:3
**confusing** [1] - 40:15
**consequence** [1] - 5:4
**consequences** [1] - 31:24
**conservative** [3] - 23:17, 86:12, 103:14
**consider** [6] - 11:16, 11:20, 22:14, 32:22, 33:2, 67:20
**consideration** [4] - 31:7, 76:6, 84:21, 97:10
**considerations** [1] - 77:6
**considered** [2] - 86:4, 90:20
**considering** [1] - 83:25
**consistency** [1] - 62:25
**consistent** [5] - 15:5, 15:8, 16:21, 87:16, 109:20
**constant** [1] - 108:5
**constraints** [2] - 77:21, 108:11
**construct** [1] - 11:25
**constructed** [2] -

Case 1:06-cv-00623-SLR   Document 312-3   Filed 04/01/13   Page 244 of 259 PageID #: 11801

000730

15:16, 19:21
**consumer** [1] - 98:4
**contemporaneous** [1] - 13:13
**contemporaneously** [3] - 14:6, 76:25, 101:12
**contends** [2] - 5:25, 6:5
**context** [1] - 9:19
**continue** [5] - 40:8, 88:11, 96:1, 108:22, 109:10
**continued** [4] - 104:10, 104:14, 105:8, 105:13
**Continued** [2] - 2:1
**continuing** [1] - 109:19
**contract** [7] - 91:15, 91:18, 91:19, 92:9, 92:10, 92:12, 93:18
**contracts** [10] - 91:4, 91:6, 91:10, 91:21, 92:25, 93:18, 100:23, 101:5, 121:12
**contributed** [1] - 103:2
**contribution** [1] - 13:25
**convenience** [1] - 33:1
**convert** [1] - 111:17
**convincing** [1] - 107:25
**copies** [2] - 36:18, 87:8
**copy** [9] - 34:6, 54:3, 54:4, 78:15, 78:16, 95:12, 109:4, 110:14
**core** [1] - 19:19
**CORPORATION** [2] - 1:5, 1:8
**Corporation** [1] - 3:24
**correct** [131] - 3:23, 4:21, 10:2, 14:11, 17:1, 18:21, 19:6, 22:5, 22:13, 23:12, 23:13, 24:5, 25:2, 25:3, 25:5, 25:6, 25:9, 27:5, 29:8, 30:22, 31:11, 32:2, 32:4, 35:7, 35:22, 37:5, 41:5, 41:20, 41:25, 42:1, 42:7, 42:15, 42:24, 42:25, 43:5, 44:7, 45:5, 45:7, 45:8, 45:24, 46:15, 46:19, 47:22,

48:8, 54:15, 54:18, 55:7, 55:10, 55:14, 60:24, 61:6, 61:10, 61:14, 61:15, 62:3, 62:10, 62:14, 62:16, 62:17, 63:5, 63:8, 63:17, 64:5, 64:9, 65:13, 66:6, 66:24, 68:19, 68:23, 69:23, 70:2, 70:20, 70:23, 71:8, 71:25, 72:4, 72:21, 72:25, 74:4, 74:16, 75:2, 75:7, 75:12, 75:13, 75:21, 79:10, 79:14, 79:18, 81:20, 83:7, 89:14, 89:15, 89:17, 89:18, 89:21, 90:2, 90:3, 92:13, 92:15, 94:22, 94:25, 96:7, 96:24, 97:2, 97:16, 97:20, 99:14, 99:17, 100:15, 100:18, 100:22, 101:7, 102:24, 102:25, 103:4, 103:8, 103:9, 104:15, 104:16, 105:7, 105:9, 105:10, 105:12, 105:14, 105:19, 106:12, 106:22, 106:25, 107:7, 112:1, 118:4
**corrective** [1] - 101:17
**correlated** [1] - 115:23
**correlating** [1] - 115:19
**correlation** [7] - 91:11, 114:8, 114:21, 114:25, 115:16, 115:24, 116:2
**correspond** [2] - 73:10
**corresponding** [2] - 18:7, 92:6
**correspondingly** [1] - 58:4
**cost** [20] - 8:9, 13:25, 15:19, 18:20, 18:25, 23:6, 28:4, 28:6, 28:9, 36:6, 39:1, 42:3, 42:5, 49:19, 49:23, 50:23, 58:5, 61:19
**costs** [27] - 7:7, 7:9, 15:2, 15:22, 16:20, 21:15, 21:19, 21:22, 21:24, 22:8, 22:9, 22:11, 23:4, 23:5,

23:19, 36:4, 59:4, 60:1, 60:3, 62:2, 63:1, 63:3, 63:21, 107:25, 119:11, 120:8
**Counsel** [2] - 2:7, 2:16
**counsel** [3] - 3:22, 124:23, 124:24
**count** [1] - 6:17
**counted** [1] - 40:25
**counterdesignated** [1] - 98:20
**Country** [1] - 112:14
**couple** [3] - 34:2, 40:13, 112:5
**course** [1] - 3:17
**COURT** [46] - 1:1, 3:6, 3:13, 3:20, 4:1, 4:6, 4:13, 4:16, 5:23, 29:21, 29:25, 34:11, 36:19, 37:1, 40:3, 40:7, 40:16, 41:3, 41:12, 41:15, 54:6, 78:17, 78:19, 78:21, 78:25, 79:3, 88:1, 88:3, 88:6, 88:11, 88:16, 95:14, 95:17, 95:21, 96:14, 98:22, 109:6, 110:15, 112:7, 112:10, 123:2, 123:4, 123:14, 124:4, 124:11, 124:25
**Court** [7] - 1:24, 4:17, 44:2, 54:5, 79:1, 123:11, 125:2
**Court)** [2] - 109:5, 110:14
**courtroom** [1] - 3:3
**courts** [2] - 59:10, 94:3
**cover** [1] - 88:20
**created** [4] - 42:13, 51:20, 85:14, 115:8
**creator** [1] - 52:8
**criticism** [1] - 24:13
**criticisms** [3] - 5:15, 24:12, 24:18
**CROSS** [2] - 30:3, 125:12
**cross** [3] - 62:17, 98:23, 99:3
**CROSS-EXAMINATION** [1] - 30:3
**cross-examination** [1] - 99:3
**cross-examined** [1] - 98:23
**cross-referencing** [1]

- 62:17
**cup** [1] - 87:25
**current** [6] - 41:8, 41:9, 62:12, 63:13, 83:21, 83:22
**customer** [13] - 85:8, 111:4, 111:9, 112:3, 114:2, 114:4, 115:13, 119:24, 120:3, 120:17
**customer-by-customer** [3] - 112:3, 114:2, 119:24
**customers** [14] - 7:20, 8:11, 31:5, 31:18, 31:21, 93:7, 109:11, 111:14, 111:17, 113:18, 118:11, 118:21, 122:3, 122:19
**customers'** [1] - 114:23
**cycle** [1] - 72:23
**cyclical** [1] - 72:20

**D**

**D.C** [2] - 2:5, 2:14
**damage** [10] - 15:23, 16:19, 24:10, 30:12, 39:17, 58:15, 64:21, 69:7, 69:14, 122:24
**damages** [64] - 5:3, 9:3, 9:6, 9:7, 9:10, 9:11, 9:14, 9:20, 10:1, 10:2, 10:4, 10:6, 10:20, 11:16, 11:21, 11:22, 11:25, 16:22, 17:4, 18:4, 18:10, 18:18, 18:21, 19:3, 19:20, 21:9, 21:20, 22:1, 22:3, 25:1, 29:4, 29:5, 29:6, 29:7, 29:10, 31:13, 32:3, 34:22, 35:10, 49:15, 53:13, 57:21, 58:16, 60:17, 64:23, 67:25, 69:7, 69:15, 70:7, 70:8, 87:18, 100:8, 100:24, 101:6, 108:3, 114:3, 119:13, 119:19, 119:23, 120:9, 120:10, 121:3, 122:8, 122:18
**dams** [1] - 29:14
**data** [53] - 11:17, 20:7, 23:8, 35:1, 35:25, 43:8, 43:9, 43:21,

44:17, 45:18, 51:23, 60:19, 60:20, 64:17, 67:19, 80:6, 80:7, 82:11, 89:23, 91:10, 91:11, 93:11, 93:12, 93:13, 105:19, 107:23, 108:11, 114:18, 115:16, 116:6, 122:13, 122:17
**database** [3] - 42:18, 44:18, 122:14
**databases** [1] - 26:19
**date** [8] - 9:16, 18:17, 71:15, 71:17, 71:19, 73:9, 117:16, 117:20
**dates** [2] - 51:12, 73:18
**Daubert** [1] - 123:7
**DAVID** [2] - 4:9, 125:13
**days** [1] - 124:22
**deal** [1] - 111:15
**dealership** [1] - 41:1
**dealing** [1] - 16:24
**debt** [2] - 18:20, 18:25
**December** [2] - 108:21, 109:9
**decide** [2] - 76:18, 76:20
**decided** [2] - 29:12, 122:20
**decision** [1] - 124:21
**decisions** [4] - 12:23, 86:20, 87:15, 120:17
**decline** [2] - 13:5, 84:8, 84:10, 91:3, 92:20, 99:13, 99:15, 100:3, 100:5, 100:7, 100:20, 101:4, 101:9, 101:14, 102:8, 106:23, 108:1, 114:20, 115:23, 118:15, 118:18, 119:7
**declined** [3] - 99:18, 99:20, 116:7
**decrease** [2] - 102:23, 103:5
**decreased** [1] - 102:22
**deduct** [5] - 46:8, 48:2, 105:25, 107:1, 107:3
**deducted** [7] - 41:23, 41:24, 44:15, 47:24, 48:17, 82:8, 120:7
**deemed** [1] - 24:16
**Defendant** [2] - 1:9, 2:16

**defendant** [3] - 29:22, 95:21, 95:24
**defendant's** [3] - 3:21, 7:6, 91:3
**define** [3] - 5:2, 25:18, 65:23
**definition** [3] - 5:7, 5:14, 5:16
**definitively** [1] - 111:12
**DELAWARE** [1] - 1:2
**Delaware** [1] - 1:11
**delay** [1] - 8:9
**demand** [1] - 14:19
**Dennis** [3] - 112:15, 112:17, 112:23
**denominator** [1] - 68:3
**deposed** [1] - 86:23
**deposition** [25] - 16:12, 17:3, 17:25, 31:17, 32:20, 33:12, 35:2, 54:9, 68:12, 95:6, 95:11, 95:19, 96:7, 96:12, 96:16, 98:9, 98:13, 98:17, 99:9, 99:25, 110:8, 112:20, 116:17, 116:23, 117:12
**depreciation** [3] - 23:19, 27:20, 28:21
**DeRamus** [49] - 3:11, 4:9, 4:20, 5:25, 29:17, 30:5, 30:6, 32:5, 32:13, 34:7, 36:16, 37:3, 39:8, 42:12, 43:22, 44:4, 47:6, 50:1, 51:1, 53:14, 54:8, 54:23, 58:6, 60:15, 72:19, 73:17, 75:18, 76:14, 78:8, 87:10, 87:18, 88:25, 92:9, 93:20, 94:9, 95:6, 96:6, 98:6, 98:17, 100:13, 101:8, 101:21, 104:10, 108:3, 116:4, 118:19, 119:12, 122:9, 123:5
**DERAMUS** [1] - 125:13
**DeRamus'** [1] - 65:22
**derive** [5] - 11:18, 23:25, 64:19, 82:11, 83:8
**derived** [12] - 22:24, 23:3, 23:11, 28:5, 32:9, 42:18, 43:9, 44:18, 62:21, 74:21, 80:16, 85:3

**described** [4] - 14:1, 16:13, 30:15, 94:10
**describes** [1] - 92:5
**description** [2] - 9:25, 71:23
**descriptions** [1] - 26:22
**desire** [1] - 92:11
**Detail** [1] - 86:9
**detail** [3] - 16:13, 52:6, 89:22
**detailed** [1] - 114:3
**details** [5] - 10:25, 17:19, 50:4, 51:8, 53:4
**determination** [3] - 32:1, 79:12, 123:12
**determinative** [1] - 89:6
**determine** [10] - 5:6, 5:9, 6:10, 7:17, 19:16, 20:5, 27:21, 71:14, 77:25, 98:25
**determined** [3] - 26:22, 74:19, 79:7
**determining** [5] - 30:7, 36:6, 92:22, 92:23, 123:7
**developed** [4] - 53:2, 55:2, 55:21, 81:2
**developing** [2] - 33:7, 86:3
**developments** [1] - 94:14
**devised** [1] - 14:15
**DICKSTEIN** [1] - 2:2
**differ** [1] - 22:6
**difference** [6] - 17:22, 19:18, 28:9, 36:3, 43:20
**differences** [9] - 10:24, 17:20, 27:13, 64:15, 89:16, 95:1, 95:2, 97:4, 97:8
**different** [44] - 6:16, 11:5, 11:14, 17:13, 17:14, 17:17, 21:18, 28:17, 38:19, 39:3, 39:4, 40:13, 43:9, 44:10, 49:16, 50:3, 50:5, 59:2, 59:6, 60:11, 60:19, 70:25, 72:7, 77:5, 77:16, 77:17, 80:6, 80:7, 80:12, 90:14, 90:15, 90:16, 90:23, 91:4, 91:12, 94:3, 101:18, 114:16, 119:25, 123:19, 123:20
**differentials** [1] -

94:13
**difficulties** [1] - 93:3
**digits** [1] - 54:20
**diligence** [1] - 13:18
**DIRECT** [2] - 4:18, 125:12
**direct** [3] - 3:16, 31:21, 123:23
**direction** [2] - 82:19, 84:1, 103:17
**directionally** [4] - 85:4, 85:9, 85:17, 86:2
**Directors** [11] - 12:19, 12:23, 13:6, 54:1, 81:1, 81:3, 83:16, 83:17, 87:5, 87:14, 123:25
**directors** [1] - 86:19
**disaggregate** [1] - 35:1
**disagree** [1] - 73:5
**discount** [2] - 18:20, 27:14
**discounts** [4] - 31:20, 47:24, 72:13, 82:8
**discrepancy** [1] - 87:6
**discuss** [1] - 102:19
**discussed** [10] - 3:6, 16:12, 21:5, 22:22, 28:18, 32:20, 33:12, 68:12, 90:6, 91:23
**discusses** [3] - 91:25, 92:2
**discussing** [1] - 110:5
**discussion** [8] - 24:11, 31:19, 83:18, 83:22, 91:25, 101:10, 102:4, 103:16
**discussions** [3] - 85:24, 102:6, 104:4
**dislocation** [1] - 76:10
**dislocations** [3] - 11:7, 73:12, 77:20
**dissolution** [1] - 113:15
**dissolved** [2] - 21:17, 113:14
**distinction** [2] - 67:6, 91:7
**DISTRICT** [2] - 1:1, 1:2
**divide** [1] - 38:5
**divided** [5] - 35:14, 37:19, 40:2, 47:17, 59:11
**dividing** [4] - 28:8, 67:7, 82:6, 82:7
**doctor** [1] - 4:2
**document** [12] - 15:6,

79:6, 80:19, 80:21, 80:22, 86:24, 87:11, 103:25, 108:25, 111:13, 113:2, 117:22
**documentary** [1] - 89:23
**documents** [11] - 4:17, 6:6, 54:4, 87:9, 103:21, 105:21, 108:17, 109:20, 110:4, 115:23, 118:13
**dollars** [7] - 18:15, 18:16, 41:9, 62:12, 63:14, 66:11, 116:11
**DONALD** [1] - 2:9
**done** [10] - 19:4, 34:22, 40:24, 71:16, 73:13, 82:18, 114:3, 120:21, 123:20
**double** [1] - 70:4
**down** [18] - 10:25, 17:21, 18:10, 29:19, 38:7, 48:2, 66:23, 68:24, 71:22, 86:7, 86:11, 86:12, 102:10, 105:3, 117:14, 119:9, 124:4, 124:9
**downturn** [2] - 72:23, 73:3
**downward** [3] - 13:1, 83:2, 84:14
**Dr** [48] - 3:11, 4:20, 5:25, 29:17, 30:5, 30:6, 32:5, 32:13, 34:6, 36:16, 37:3, 39:8, 42:12, 43:22, 44:4, 47:6, 50:1, 51:1, 53:14, 54:8, 54:23, 58:6, 60:15, 65:22, 72:19, 73:17, 75:18, 76:14, 78:8, 87:10, 87:18, 88:25, 92:9, 93:20, 94:9, 95:6, 96:6, 98:6, 98:17, 100:13, 101:8, 104:10, 108:3, 116:4, 118:19, 119:12, 122:9, 123:5
**draft** [3] - 86:25, 87:11, 87:12
**drafting** [1] - 19:19
**drill** [1] - 29:19
**DRINKER** [1] - 1:18
**drivetrain** [1] - 110:18
**dropped** [1] - 103:15
**dropping** [1] - 102:10

**due** [4] - 13:18, 100:6, 106:1, 111:5
**duly** [1] - 4:9
**durable** [1] - 28:1
**during** [15] - 16:11, 21:3, 21:15, 33:18, 50:7, 64:20, 66:16, 73:3, 74:23, 103:23, 111:17, 115:3, 120:8, 122:11
**duty** [1] - 65:11
**dynamics** [1] - 31:6

**E**

**e-mail** [1] - 112:14
**earn** [4] - 40:20, 41:6, 41:9, 48:9
**earned** [17] - 9:13, 9:21, 10:13, 10:15, 11:13, 13:22, 15:9, 15:10, 27:2, 30:8, 37:7, 41:3, 64:11, 66:5, 66:20, 69:17, 71:11
**earning** [2] - 40:20, 66:1
**earnings** [5] - 27:1, 27:19, 27:20, 28:21, 41:8
**ease** [1] - 67:17
**easier** [1] - 34:7
**easiest** [1] - 52:22
**easily** [4] - 24:8, 29:14, 53:3, 61:15
**Eaton** [55] - 3:24, 5:1, 5:18, 5:25, 6:5, 15:10, 15:11, 16:4, 16:11, 17:25, 20:13, 26:5, 26:7, 26:16, 31:20, 32:6, 35:8, 35:19, 35:24, 36:1, 44:19, 45:10, 45:17, 45:23, 46:12, 46:17, 46:19, 47:20, 48:9, 49:9, 64:7, 66:4, 66:20, 68:1, 89:17, 90:22, 90:25, 92:2, 92:7, 92:11, 93:6, 93:10, 93:14, 95:3, 96:23, 103:7, 103:22, 104:6, 112:25, 120:14, 121:13, 121:24, 122:5, 122:20
**EATON** [1] - 1:8
**Eaton's** [63] - 5:4, 5:14, 6:11, 6:15, 6:21, 7:11, 7:18, 8:8,

8:16, 8:24, 9:21, 11:8, 14:20, 14:23, 23:16, 23:20, 24:3, 27:2, 30:9, 30:18, 30:19, 31:17, 31:22, 32:10, 33:8, 37:8, 37:15, 38:2, 44:22, 44:25, 46:8, 46:21, 47:5, 48:5, 48:11, 64:12, 64:18, 65:6, 65:10, 65:22, 66:13, 66:19, 67:20, 68:3, 68:25, 69:2, 80:6, 89:24, 92:5, 92:25, 107:17, 108:5, 108:8, 109:21, 114:13, 115:12, 120:11, 121:4, 121:12, 121:14, 121:20, 122:10
EBIT [1] - 27:19
EBITDA [1] - 28:20
econometric [33] - 8:15, 15:16, 19:5, 19:7, 19:8, 19:21, 19:24, 20:17, 20:22, 20:24, 21:7, 23:1, 24:8, 36:11, 60:22, 61:4, 61:7, 80:5, 80:11, 94:20, 94:23, 96:6, 96:11, 96:19, 97:3, 97:7, 97:11, 97:13, 97:18, 97:21, 97:22, 100:9, 106:7
econometrics [2] - 8:21, 95:4
economic [15] - 5:1, 5:6, 6:1, 6:7, 6:10, 6:13, 6:24, 7:14, 7:21, 8:3, 10:5, 10:16, 14:18, 19:4, 124:13
economist [4] - 13:9, 20:13, 94:4, 114:15
economist's [2] - 9:1, 92:22
economists [7] - 6:25, 7:4, 8:4, 8:20, 8:22, 11:24, 113:23
effect [19] - 14:18, 31:21, 36:14, 90:16, 90:17, 91:1, 91:13, 91:18, 92:10, 92:14, 94:1, 107:11, 107:24, 108:8, 109:22, 110:2, 118:10, 118:16, 118:20
effective [2] - 37:20, 104:7

effectively [16] - 7:7, 10:24, 10:25, 21:7, 21:16, 21:17, 27:10, 27:22, 38:22, 64:21, 71:13, 80:16, 101:7, 102:11, 104:7, 113:14
effects [2] - 92:24, 107:22
efficients [2] - 115:1, 115:5
effort [1] - 14:24
efforts [1] - 92:2
EG [1] - 64:2
egregious [1] - 31:23
eight [3] - 101:18, 117:1, 117:3
either [3] - 5:12, 97:15, 97:17
elevating [1] - 31:22
elevation [2] - 7:22, 17:3
emphasize [2] - 50:15, 63:24
emphasized [1] - 17:25
encompassed [1] - 81:11
end [9] - 7:20, 21:17, 31:18, 31:21, 66:16, 99:25, 107:5, 117:10, 118:6
endogenating [1] - 120:1
endogeniety [1] - 113:24
endorses [1] - 123:24
ends [2] - 54:19, 101:24
engaged [1] - 20:14
enterprise [22] - 9:15, 10:1, 22:21, 25:7, 25:11, 27:4, 27:16, 30:16, 60:17, 70:11, 70:13, 70:14, 70:24, 70:25, 71:3, 71:9, 71:15, 71:23, 72:2, 74:18, 75:15, 76:12
entire [1] - 102:9
entirely [2] - 56:21, 103:12
entry [4] - 6:22, 6:23, 7:2, 116:25
equalization [1] - 48:16
equals [1] - 10:2
equitable [2] - 72:10, 76:12
equivalent [4] - 23:7, 23:8, 27:10, 96:23

ESQ [10] - 1:18, 2:3, 2:3, 2:4, 2:4, 2:5, 2:9, 2:13, 2:13, 2:14
ESS [3] - 38:24, 55:19, 81:13
essentially [1] - 18:18
establishing [1] - 22:17
estimate [49] - 5:3, 9:20, 11:18, 11:21, 12:1, 12:8, 14:8, 15:21, 16:22, 19:1, 19:8, 22:1, 22:3, 22:10, 22:17, 23:4, 23:23, 23:25, 28:2, 28:3, 28:23, 29:4, 31:2, 31:3, 31:9, 32:4, 32:8, 32:9, 32:12, 34:1, 34:2, 34:4, 35:15, 50:2, 51:23, 57:21, 60:21, 65:18, 67:25, 72:9, 72:17, 76:1, 76:2, 79:23, 82:25, 83:8, 114:25, 115:5
estimated [2] - 19:10, 32:25
estimates [7] - 11:16, 27:18, 28:7, 69:14, 69:15, 70:10
estimating [6] - 10:5, 13:21, 19:20, 27:10, 68:4, 96:20
estimations [1] - 123:15
events [2] - 83:21, 83:22
evidence [4] - 20:12, 89:23, 107:7, 107:10
EVIDENCE [1] - 4:8
evident [1] - 83:15
evolution [1] - 58:24
exacerbated [1] - 6:22
exact [5] - 33:23, 55:24, 64:25, 110:23, 112:19
exactly [3] - 30:13, 66:10
EXAMINATION [2] - 4:18, 30:3
examination [2] - 3:16, 99:3
examine [3] - 3:22, 123:13
examined [4] - 4:10, 89:22, 98:23, 123:6
examining [1] - 91:10
example [9] - 18:16, 38:24, 39:2, 39:21, 40:22, 41:2, 100:7,

108:19, 122:1
examples [1] - 31:23
except [1] - 108:5
excerpt [7] - 99:9, 99:25, 102:3, 116:23, 117:10, 117:12, 118:6
excluding [1] - 100:18
exclusion [2] - 8:18, 102:10
exclusionary [1] - 6:2
excused [1] - 124:10
exercise [2] - 48:16, 71:14
exhibit [5] - 79:1, 109:4, 110:10, 110:11, 110:14
Exhibit [2] - 101:21, 110:6
existing [1] - 6:22
exists [1] - 56:6
exit [2] - 11:9, 100:6
expect [6] - 31:1, 41:6, 41:9, 57:15, 65:19, 67:8, 67:10, 82:18
expectation [1] - 82:23
expectations [2] - 50:21, 58:25
expected [14] - 11:19, 14:8, 28:2, 28:10, 33:3, 50:6, 56:3, 73:23, 89:12, 99:12, 99:19, 99:21, 102:21
expecting [2] - 33:5, 85:17
expects [1] - 33:16
expenditure [1] - 51:17
expenses [9] - 116:5, 116:10, 116:20, 118:8, 118:10, 118:21, 118:25, 120:5, 120:6
experience [7] - 13:9, 19:18, 22:15, 23:20, 24:3, 82:24, 105:4
experienced [2] - 12:20, 109:12
expert [4] - 4:20, 95:23, 98:23, 124:12
experts [2] - 5:15, 76:5
explain [2] - 41:13, 94:13
explained [3] - 17:2, 41:12, 90:10
explaining [4] - 67:18, 90:1, 91:3, 114:17
explanation [2] -

107:25, 124:20
explanations [1] - 124:6
explanatory [4] - 94:23, 95:1, 97:4, 97:13
explicate [1] - 40:8
explicit [8] - 21:1, 31:3, 51:11, 53:3, 53:7, 58:18, 97:20, 103:17
explicitly [1] - 123:23
explored [1] - 88:21
exposition [2] - 67:17, 67:18
expositional [1] - 67:22
expressed [1] - 49:5
extensive [5] - 31:16, 35:25, 36:9, 53:10, 103:16
extent [1] - 108:6
extra [1] - 54:4
extreme [1] - 73:11

F

F-Platform [1] - 107:21
face [1] - 53:9
fact [23] - 8:16, 15:7, 15:10, 18:4, 18:6, 20:16, 21:25, 43:11, 46:16, 57:9, 66:2, 85:19, 93:13, 94:6, 99:1, 99:15, 100:13, 104:19, 110:2, 111:21, 113:25, 116:14, 124:11
faction [1] - 56:22
factor [14] - 19:1, 90:1, 90:4, 90:5, 90:10, 90:12, 91:5, 92:18, 93:21, 93:24, 98:8, 108:7, 108:16
factors [28] - 9:22, 13:2, 13:3, 13:8, 14:18, 36:14, 83:25, 84:11, 84:18, 84:19, 84:20, 91:2, 92:20, 93:22, 94:8, 94:11, 97:17, 102:6, 103:1, 103:2, 103:3, 103:16, 103:19, 104:10, 109:23, 110:4, 119:25
facts [2] - 101:18, 101:19
failure [1] - 89:13

**failures** [2] - 108:22, 109:10
**fair** [13] - 30:10, 30:11, 38:2, 38:3, 60:23, 62:2, 70:14, 70:15, 70:17, 71:14, 72:24, 95:24, 101:1
**fall** [1] - 49:12
**far** [3] - 5:13, 121:25, 123:10
**FASTOW** [1] - 2:3
**February** [16] - 20:9, 20:17, 71:11, 71:19, 72:3, 72:5, 73:2, 73:19, 74:6, 75:10, 75:16, 75:19, 75:24, 76:11, 110:11, 111:7
**felt** [4] - 11:17, 27:15, 65:18, 80:10
**few** [3] - 4:3, 30:2, 88:13
**field** [1] - 41:24
**fifth** [8] - 8:7, 8:8, 23:10, 23:14, 23:15, 64:6, 65:5, 65:6
**figure** [38] - 15:19, 16:2, 17:12, 17:15, 17:19, 17:22, 18:7, 25:2, 29:7, 42:11, 42:12, 42:13, 44:22, 47:4, 47:8, 47:23, 48:11, 51:2, 56:19, 59:15, 63:18, 66:9, 66:22, 77:8, 79:9, 82:5, 82:6, 85:2, 85:24, 92:4, 92:5, 100:16, 106:19, 117:1, 117:16, 119:13, 120:23, 123:19
**figures** [18] - 18:7, 29:16, 51:4, 61:14, 61:22, 63:6, 72:6, 78:9, 79:6, 80:2, 82:7, 82:8, 85:19, 86:17, 119:19, 120:10, 121:1, 123:21
**fill** [1] - 98:18
**final** [3] - 86:24, 87:11, 87:13
**finance** [1] - 12:20
**financial** [3] - 15:7, 25:21, 73:11
**financials** [3] - 43:19, 76:8, 85:21
**fine** [1] - 88:5
**first** [29] - 3:19, 6:19, 6:21, 9:24, 12:3, 12:5, 13:20, 13:24,

16:17, 19:12, 20:23, 21:5, 21:19, 22:18, 37:10, 38:3, 51:19, 54:13, 55:22, 61:14, 61:20, 61:23, 62:20, 69:20, 70:7, 70:12, 105:5
**fiscal** [31] - 29:6, 32:17, 33:22, 34:19, 37:24, 39:13, 39:19, 41:18, 49:25, 53:17, 55:5, 55:8, 55:11, 55:17, 55:21, 55:22, 56:5, 56:6, 56:15, 56:18, 57:13, 62:2, 63:3, 68:6, 83:11, 109:12, 117:4, 117:19, 118:3
**fit** [4] - 20:7, 25:19, 123:8
**five** [15] - 10:20, 10:21, 11:5, 11:14, 11:19, 22:12, 24:25, 26:17, 29:13, 46:1, 60:11, 60:14, 68:21, 76:8, 80:15
**fixed** [10] - 21:15, 22:7, 22:9, 22:11, 23:5, 23:19, 105:18, 105:24, 108:13, 116:15
**fixing** [2] - 17:2, 90:21
**fleet** [3] - 104:13, 104:14, 111:14
**floating** [1] - 87:2
**flow** [1] - 28:8
**flows** [6] - 27:11, 27:23, 28:10, 28:12, 77:3
**fluctuations** [1] - 76:9
**focus** [1] - 29:22
**focused** [3] - 18:1, 31:14, 101:3
**focusing** [1] - 9:6
**following** [1] - 4:4
**follows** [3] - 99:10, 116:24, 117:13
**follows...** [1] - 4:11
**Foodliner** [2] - 112:24, 113:9
**FOR** [1] - 1:2
**forced** [2] - 73:9, 76:18
**forecast** [14] - 12:6, 21:1, 24:5, 24:6, 49:20, 50:15, 56:3, 57:3, 64:18, 83:20, 87:9, 103:15, 106:4, 118:1
**forecasted** [8] - 14:5,

35:13, 35:15, 38:4, 38:6, 38:7, 118:3
**forecasting** [3] - 50:18, 50:19, 85:4
**forecasts** [6] - 13:10, 23:15, 35:1, 38:19, 51:17, 52:12
**forever** [1] - 41:4
**form** [1] - 73:16
**formal** [1] - 115:24
**formed** [1] - 99:11
**formerly** [2] - 111:4, 111:8
**formula** [2] - 10:16, 10:19
**forth** [2] - 72:14, 78:10
**forward** [10] - 9:17, 21:18, 50:8, 50:18, 50:21, 72:17, 72:18, 82:25, 100:10, 110:9
**forwarded** [1] - 110:20
**foundation** [1] - 3:21
**four** [11] - 22:18, 29:13, 45:7, 75:11, 77:9, 80:15, 98:2, 117:23, 121:1, 122:11, 122:15
**four-and-a-half** [4] - 45:7, 121:1, 122:11, 122:15
**fourth** [6] - 7:25, 22:4, 22:7, 28:19, 118:24, 120:7
**frame** [1] - 104:1
**framework** [2] - 3:16, 21:18
**frankly** [1] - 60:20, 67:24
**fraught** [1] - 27:13
**free** [6] - 3:17, 3:22, 18:19, 18:24, 70:3, 123:13
**FreedomLine** [21] - 18:3, 33:5, 33:25, 34:25, 38:21, 38:22, 42:8, 59:24, 63:25, 64:1, 79:16, 83:5, 83:11, 89:20, 114:9, 114:11, 114:22, 115:20, 119:15, 119:21
**FreedomLine's** [1] - 97:14
**Freightliner** [5] - 104:6, 104:7, 111:15, 111:17
**front** [2] - 34:8, 95:6
**full** [4] - 34:9, 110:18, 118:1, 118:3
**fully** [2] - 24:15, 88:21

**fun** [1] - 109:12
**fundamental** [3] - 7:2, 123:15, 124:12
**fundamentally** [1] - 30:6
**furtherance** [1] - 121:13
**future** [6] - 13:11, 27:11, 27:22, 28:11, 41:8, 77:3

**G**

**G-Platform** [41] - 18:2, 33:25, 38:1, 38:11, 38:17, 38:20, 38:21, 39:13, 42:7, 50:13, 56:22, 59:23, 81:11, 82:5, 84:24, 105:5, 105:9, 105:18, 105:24, 106:1, 106:4, 106:10, 106:19, 107:2, 107:5, 108:12, 108:21, 108:22, 109:9, 109:16, 111:5, 111:11, 113:19, 113:21, 114:8, 114:22, 115:19, 116:10, 116:15, 119:14, 119:20
**G-platforms** [1] - 116:6
**gap** [2] - 121:19, 121:20
**gather** [1] - 33:19
**general** [3] - 31:1, 44:20, 108:10
**generally** [2] - 30:11, 49:22
**generating** [2] - 77:4
**German** [1] - 111:2
**Gibbitson's** [1] - 28:6
**given** [10] - 29:4, 39:6, 40:1, 40:24, 41:6, 50:23, 50:24, 61:16, 70:15, 119:18
**going-forward** [3] - 50:18, 72:17, 72:18
**goodness** [1] - 20:6
**goods** [1] - 28:1
**Gordon** [2] - 27:8, 28:23
**Gosnell** [2] - 110:21, 111:1
**graph** [1] - 121:23
**greater** [2] - 50:4, 90:18

**gross** [10] - 44:6, 45:9, 45:13, 45:15, 45:16, 62:11, 63:13, 120:23, 121:20, 122:15
**Gross** [1] - 44:14
**grow** [1] - 27:23
**growth** [5] - 27:9, 27:14, 28:2, 28:10, 28:23
**guess** [3] - 98:24, 123:19, 124:15
**guidelines** [2] - 76:4, 76:6
**Gunning** [1] - 1:24

**H**

**HACKETT** [1] - 2:4
**half** [6] - 39:9, 45:7, 103:15, 121:1, 122:11, 122:15
**hand** [7] - 4:7, 4:13, 34:6, 36:18, 54:3, 55:3, 109:2
**handed** [3] - 4:17, 79:1, 95:19
**handing** [3] - 54:4, 109:4, 110:14
**handout** [1] - 64:7
**HANDRIGAN** [1] - 2:14
**happy** [2] - 17:19, 109:2
**hard** [4] - 63:9, 82:3, 111:12, 111:20
**harm** [4] - 6:3, 10:10, 92:25, 93:18
**haul** [3] - 32:22, 32:25
**Hayes** [1] - 112:11
**hear** [2] - 36:25, 95:16
**heard** [1] - 30:6
**hearing** [2] - 3:10, 98:25
**heavy** [1] - 65:11
**height** [1] - 77:9
**help** [1] - 123:12
**helpful** [4] - 22:16, 78:22, 98:21, 109:1
**high** [10] - 11:15, 20:7, 32:6, 39:19, 65:24, 66:4, 66:20, 69:6, 69:12, 70:10
**higher** [26] - 16:1, 16:5, 20:16, 24:10, 28:25, 39:1, 43:3, 43:23, 43:24, 44:1, 49:20, 49:22, 50:20, 50:22, 50:23, 57:1,

58:20, 58:22, 68:1, 69:12, 69:14, 70:5, 70:7, 70:8, 120:6, 121:15
higher-priced [1] - 58:22
hitting [1] - 114:22
HOLCOLMB [1] - 2:4
hold [1] - 95:24
Honor [36] - 3:8, 3:10, 3:17, 3:23, 4:3, 4:12, 5:20, 29:17, 29:24, 30:1, 34:9, 36:17, 36:23, 54:2, 54:3, 78:14, 78:24, 87:24, 88:7, 88:12, 88:13, 88:19, 95:12, 96:3, 96:13, 98:14, 98:16, 99:4, 99:5, 109:3, 110:13, 112:13, 120:20, 122:25, 123:5, 123:22
Honor's [1] - 112:4
Honor.") [1] - 124:24
HONORABLE [1] - 1:14
hoping [1] - 3:14
horizontal [1] - 90:21
horsepower [1] - 50:20
host [2] - 77:23, 120:18
hour [1] - 39:9
hour-and-a-half [1] - 39:9
hours [2] - 29:18, 88:4
house [6] - 76:14, 76:18, 76:19, 76:22, 77:2, 77:7
houses [4] - 76:16, 76:23, 76:24, 77:9
housing [2] - 77:14, 77:15
Howrey [1] - 3:24
HOWREY [1] - 2:12
Hyatt [2] - 108:19, 109:8
Hyatt's [1] - 110:7
hypothetical [1] - 119:12

**I**

i.e [9] - 9:15, 10:14, 11:1, 12:18, 18:17, 19:17, 20:5, 21:1, 43:17
I.R.S [1] - 76:6
identified [6] - 19:10,

26:4, 26:16, 26:17, 26:20, 115:22
identify [2] - 25:18, 59:19
ignored [2] - 16:15, 18:3
illuminate [1] - 124:8
image [1] - 103:5
impact [6] - 8:17, 31:17, 94:3, 94:5, 104:9, 120:17
impacts [1] - 8:8
implement [1] - 93:15
implementation [1] - 91:12
implementing [1] - 22:23
implicitly [1] - 35:11
implied [7] - 18:6, 27:22, 28:10, 35:14, 39:15, 58:13, 79:23
implies [1] - 48:4
important [3] - 31:6, 34:24, 38:16
imported [1] - 15:6
impractical [1] - 114:5
IN [2] - 1:1, 1:2
inability [1] - 7:11
inappropriate [2] - 75:17, 75:18
incentive [1] - 46:25
incentives [6] - 41:24, 44:16, 46:12, 46:20, 47:5, 111:19
Incentives [1] - 44:14
incentivize [1] - 46:13
include [7] - 6:13, 38:23, 39:5, 40:22, 49:15, 49:18, 95:5
included [15] - 17:14, 17:15, 17:18, 40:21, 51:17, 53:16, 56:17, 57:15, 57:22, 61:22, 81:13, 97:21, 97:24, 97:25, 98:2
includes [4] - 17:18, 23:19, 49:14, 49:16
including [5] - 44:9, 53:24, 89:13, 98:2, 103:2
incorrect [2] - 17:8, 95:4
increase [9] - 85:18, 85:22, 93:13, 93:16, 102:21, 103:7, 104:7, 116:5, 122:5
increased [5] - 7:10, 50:19, 107:25, 114:19, 118:9
increases [2] - 93:8,

118:20
increasing [3] - 85:25, 86:4, 118:10
incremental [24] - 10:12, 11:1, 37:6, 42:4, 42:5, 59:21, 59:22, 59:25, 60:1, 61:3, 62:8, 62:11, 63:3, 63:6, 63:13, 63:18, 63:20, 66:22, 69:16, 69:17, 106:17, 107:4, 120:7
incurred [9] - 21:14, 21:24, 64:20, 66:12, 66:14, 66:16, 116:9, 116:21, 120:8
indeed [6] - 9:2, 29:22, 90:1, 90:5, 97:12, 98:8
independent [13] - 15:19, 19:10, 24:17, 24:19, 24:22, 31:9, 32:1, 32:4, 35:15, 35:18, 60:14, 79:11, 79:15
independently [1] - 26:19
index [4] - 27:25, 115:8, 115:9, 115:16
indicate [3] - 117:5, 117:7, 117:22
indicated [1] - 3:11
indicates [3] - 117:21, 117:24, 118:1
indicating [1] - 100:24
indicator [1] - 115:25
individual [7] - 51:8, 57:4, 73:15, 92:14, 93:6, 93:7, 114:4
individually [1] - 91:16
individuals [3] - 12:20, 13:14, 53:5
induces [2] - 93:10, 104:7
indulge [1] - 98:14
indulgence [2] - 112:4, 123:1
industries [1] - 28:7
industry [8] - 26:8, 26:21, 28:1, 72:20, 72:23, 78:1, 84:12, 107:12
infeasible [1] - 97:12
infer [1] - 66:3
inference [1] - 115:12
inflated [1] - 29:4
information [26] - 4:24, 11:25, 12:15, 13:13, 19:14, 23:9,

36:2, 36:10, 51:5, 51:11, 52:24, 53:1, 53:19, 57:19, 73:14, 74:11, 74:17, 80:9, 80:10, 80:17, 81:14, 81:21, 85:16, 86:6, 99:2, 104:3
inherent [1] - 11:12
initial [4] - 28:13, 41:4, 99:21
innovation [1] - 8:9
innovations [1] - 8:10
input [5] - 23:1, 36:4, 36:7, 66:24, 79:21
inputs [5] - 21:8, 22:23, 22:24, 78:12, 84:2
instance [1] - 3:19
instances [1] - 93:9
instead [2] - 40:9, 68:2
interest [15] - 15:4, 15:22, 16:19, 17:2, 17:4, 17:6, 18:24, 25:23, 27:19, 27:20, 28:21, 31:14, 58:14, 98:3
internal [2] - 13:10, 23:1
interpret [2] - 44:20, 49:6
interrupt [2] - 3:17, 5:21
introduced [2] - 105:6, 107:21
introducing [1] - 8:10
introduction [4] - 56:4, 56:9, 107:13, 114:14
introductions [2] - 51:13, 55:15
introductory [4] - 89:8, 89:10, 92:17, 98:7
investment [3] - 12:23, 86:20, 87:14
investments [1] - 26:16
invite [1] - 123:11
invoice [3] - 16:1, 44:11, 122:14
involved [2] - 26:7, 26:8
involving [1] - 10:10
irrelevant [1] - 16:18
isolate [1] - 108:8
issue [14] - 12:18, 16:18, 26:7, 28:1, 31:24, 33:13, 33:18, 72:11, 101:3,

115:10, 120:15, 121:7, 121:8, 124:21
issues [26] - 19:22, 77:23, 94:11, 100:10, 107:11, 107:14, 107:17, 107:24, 111:6, 111:11, 114:12, 114:16, 114:17, 115:1, 115:11, 115:22, 116:1, 116:13, 118:18, 119:5, 120:18, 122:2, 122:7, 122:8
item [1] - 50:9
items [1] - 39:6
iterations [1] - 80:4
itself [2] - 26:17, 50:9

**J**

J.V [1] - 111:5
January [5] - 104:24, 112:13, 113:1, 113:9, 113:13
JAY [1] - 2:3
JENNIFER [1] - 2:4
Joe [1] - 3:23
joint [12] - 21:16, 26:10, 71:1, 98:11, 98:12, 99:7, 99:12, 102:13, 110:21, 112:18, 113:13, 113:15
JOSEPH [1] - 2:13
July [4] - 1:12, 20:18, 100:9, 102:2
June [3] - 103:25, 117:16, 117:20
junk [2] - 123:9, 124:3
jury [4] - 29:12, 123:9, 124:8

**K**

KAREN [1] - 1:18
keep [2] - 40:14, 108:4
kind [5] - 3:21, 52:19, 57:18, 72:11, 123:20
kinds [1] - 39:3
Kline [2] - 112:15, 112:17
Kline's [1] - 112:20
Knight [3] - 110:12, 110:17, 111:24
knowledgeable [1] - 13:14

## L

label [1] - 37:16
labeled [1] - 38:18
lacked [1] - 73:20
lag [1] - 97:24
large [3] - 56:22, 111:4, 111:8
larger [1] - 4:14
largest [1] - 13:4
last [3] - 3:10, 54:19, 72:22
laurels [1] - 124:17
law [1] - 124:1
lay [1] - 3:21
lays [1] - 74:13
LAZEROW [1] - 2:13
leadership [1] - 12:21
least [4] - 6:16, 86:5, 88:17, 91:4
led [1] - 113:15
left [2] - 55:3, 88:13
left-hand [1] - 55:3
length [1] - 16:13
Lepages [1] - 123:23
less [7] - 46:3, 64:14, 65:1, 65:3, 69:8, 89:12, 124:22
less-than-expected [1] - 89:12
letting [1] - 40:7
level [9] - 34:23, 56:25, 58:20, 69:1, 69:13, 70:5, 94:5, 110:25, 112:1
leveling [1] - 44:6
levels [9] - 34:22, 38:23, 38:25, 41:19, 49:18, 50:4, 56:24, 57:25, 58:2
levied [1] - 24:12
liability [6] - 11:6, 19:16, 20:11, 92:23, 109:25, 122:7
light [2] - 13:7, 83:21
likely [1] - 13:15
line [59] - 17:12, 17:23, 18:1, 18:2, 32:22, 32:25, 37:11, 38:8, 38:9, 40:1, 41:7, 41:17, 42:7, 42:16, 43:2, 44:22, 47:9, 48:22, 49:4, 50:9, 56:18, 57:5, 58:10, 59:14, 59:16, 62:11, 62:15, 62:18, 62:20, 62:24, 63:10, 63:11, 63:12, 63:13, 63:16, 63:19, 63:22,

64:4, 64:21, 65:10, 65:14, 65:22, 66:15, 66:23, 67:13, 68:8, 79:8, 82:4, 96:9, 100:17, 102:24, 106:10, 106:15, 121:24
Linehaul [17] - 42:17, 65:15, 65:23, 66:4, 66:8, 66:20, 67:5, 67:7, 67:11, 67:14, 67:22, 67:25, 68:1, 68:8, 68:14, 69:6
Linehauls [1] - 65:15
lines [3] - 36:24, 69:20, 121:23
link [1] - 93:17
liquidity [1] - 77:22
listed [3] - 37:18, 59:15, 94:15
lists [1] - 103:3
LL [1] - 33:9
LLC [1] - 1:4
LLP [3] - 1:18, 2:2, 2:12
load [1] - 34:15
long-term [2] - 107:22, 109:11
look [3] - 11:24, 33:12, 36:21, 37:11, 47:4, 60:25, 70:12, 71:21, 73:3, 74:5, 75:8, 76:15, 76:23, 77:8, 80:8, 87:22, 89:5, 91:13, 92:9, 94:4, 94:8, 98:13, 100:16, 101:4, 106:5, 106:6, 108:19, 110:6, 110:7, 111:18, 123:17
looked [25] - 20:6, 23:16, 25:15, 35:25, 52:24, 52:25, 58:17, 68:24, 72:6, 74:1, 74:8, 74:10, 89:11, 91:16, 94:10, 94:11, 94:12, 94:15, 102:24, 106:9, 107:11, 107:23, 115:1, 119:5, 120:23
looking [17] - 33:19, 34:13, 54:16, 55:12, 59:4, 69:20, 71:9, 72:1, 72:5, 73:2, 74:25, 75:3, 78:1, 91:10, 113:25, 118:13, 118:14
loosely [1] - 92:23
losing [1] - 84:19

loss [4] - 25:11, 101:13, 101:14, 121:7
losses [5] - 64:19, 65:1, 66:12, 66:16, 111:21
lost [62] - 9:13, 9:15, 10:1, 10:8, 10:11, 10:12, 10:17, 10:22, 10:23, 11:1, 11:4, 13:20, 14:2, 15:14, 17:5, 18:18, 22:21, 23:25, 25:1, 25:2, 25:7, 25:11, 27:4, 27:16, 36:4, 37:4, 60:10, 60:17, 62:8, 64:6, 68:21, 68:25, 69:21, 72:2, 72:16, 75:15, 88:22, 89:7, 104:14, 106:1, 108:14, 109:16, 111:8, 111:24, 112:2, 113:9, 119:13, 119:14, 119:19, 119:20, 119:23, 120:11, 121:4, 121:19, 122:19
loud [1] - 36:25
low [7] - 11:15, 34:15, 41:18, 70:10, 73:10, 77:21
lower [20] - 15:10, 18:6, 21:25, 22:17, 23:18, 28:19, 30:24, 45:3, 65:18, 65:21, 67:24, 75:11, 89:12, 120:11, 121:1, 121:5, 122:1, 122:11, 122:15, 122:21
lower-than-expected [1] - 89:12
lowered [2] - 21:25, 22:3
loyal [2] - 111:4, 111:8
LTA [2] - 91:23, 104:6
LTAs [22] - 89:24, 89:25, 90:4, 90:6, 90:9, 90:11, 90:12, 90:15, 91:1, 91:12, 92:1, 92:3, 92:18, 93:21, 98:8, 100:3, 100:6, 102:8, 103:23, 110:2, 121:13

## M

Mac [1] - 90:21

macroeconomic [1] - 94:11
magically [1] - 73:8
magnitude [1] - 69:8
mail [1] - 112:14
major [2] - 76:10, 91:7
management [2] - 83:18, 103:18
manipulated [1] - 123:21
manner [1] - 15:11
manual [23] - 32:7, 32:10, 34:15, 34:25, 38:1, 44:23, 48:6, 48:12, 49:10, 55:1, 56:20, 57:16, 79:7, 79:12, 84:24, 99:12, 120:12, 120:25, 121:4, 121:21, 122:10, 122:15, 122:21
manuals [2] - 43:4, 46:9
manufacturers [1] - 47:25
manufacturing [1] - 28:1
March [1] - 102:5
margin [2] - 13:25, 65:24
marginal [2] - 21:19, 21:21
market [107] - 5:7, 5:14, 5:16, 5:19, 7:13, 8:11, 8:18, 9:23, 11:8, 11:9, 11:10, 13:2, 13:5, 13:11, 13:22, 14:5, 14:8, 14:14, 15:17, 19:9, 19:14, 19:17, 20:15, 23:2, 23:23, 23:24, 24:6, 24:9, 31:6, 32:22, 36:13, 38:13, 39:2, 60:23, 61:5, 61:8, 65:23, 66:4, 66:21, 67:5, 67:11, 67:12, 67:15, 68:9, 70:14, 71:14, 73:11, 74:22, 75:10, 76:9, 76:10, 76:14, 76:20, 76:22, 77:10, 77:14, 77:15, 77:20, 77:22, 79:22, 79:24, 79:25, 80:12, 83:8, 83:21, 84:9, 84:20, 88:23, 89:7, 89:12, 89:14, 90:10, 90:17, 90:18, 91:3, 91:11, 91:14, 92:6, 92:20, 93:3, 94:7, 94:14,

97:15, 97:24, 100:5, 100:6, 100:7, 100:14, 100:17, 100:21, 102:10, 102:11, 102:14, 102:20, 104:9, 105:6, 106:3, 106:23, 108:1, 109:24, 114:17, 114:19, 115:3, 115:21, 119:14
Marketing [1] - 112:18
markets [4] - 5:2, 32:23, 82:22
Martello [6] - 12:21, 81:1, 98:11, 102:13, 102:19, 103:22
material [2] - 93:2, 98:24
materiality [1] - 93:1
math [5] - 43:2, 46:5, 46:11, 48:4, 48:18
matter [6] - 16:10, 43:2, 43:6, 43:7, 95:4, 114:9
McCoy [2] - 112:15, 112:23
mean [5] - 40:3, 78:21, 90:4, 107:9, 115:5
means [8] - 33:1, 49:6, 56:9, 89:24, 90:9, 92:19, 93:21, 116:17
measure [29] - 10:22, 11:3, 13:23, 13:25, 14:1, 21:4, 23:18, 23:22, 25:21, 25:22, 60:22, 61:4, 61:7, 61:20, 61:23, 61:24, 73:1, 80:12, 91:13, 91:17, 98:3, 98:4, 115:8, 115:24, 116:2, 118:12, 121:11
measured [9] - 15:11, 16:21, 61:12, 65:17, 72:2, 73:23, 75:16, 75:19, 75:24
measures [3] - 61:16, 70:25, 71:4
measuring [4] - 11:4, 73:19, 115:11, 115:12
median [1] - 70:9
meet [1] - 93:15
meeting [3] - 83:16, 85:25, 101:11
meetings [1] - 83:17
MELISSA [1] - 2:14
memory [1] - 62:17
mentioned [8] - 16:17,

23:5, 27:9, 31:2, 55:18, 61:15, 86:7, 104:5
**merely** [1] - 6:5
**Meritor** [78] - 3:9, 5:4, 7:10, 9:13, 9:16, 9:21, 10:13, 11:9, 11:13, 12:6, 12:21, 13:22, 14:5, 17:4, 21:14, 21:16, 26:10, 27:2, 28:19, 28:20, 29:6, 32:13, 32:16, 32:18, 33:3, 33:16, 35:3, 35:20, 37:14, 40:2, 40:20, 42:22, 44:19, 46:12, 46:19, 50:3, 57:15, 64:20, 65:19, 66:7, 66:12, 66:14, 66:18, 67:4, 67:10, 69:17, 69:18, 71:1, 71:4, 71:18, 72:7, 73:4, 73:8, 83:18, 86:8, 86:9, 86:19, 87:5, 89:16, 92:11, 95:2, 96:20, 96:22, 98:10, 100:14, 101:10, 107:19, 110:18, 114:19, 119:6, 121:17, 121:24, 122:2, 122:3
**MERITOR** [2] - 1:4
**Meritor's** [32] - 8:17, 14:19, 19:9, 19:18, 21:2, 22:10, 23:22, 25:24, 27:18, 31:22, 32:24, 38:6, 42:16, 45:3, 48:17, 48:23, 67:14, 67:21, 68:4, 68:8, 68:25, 72:17, 78:5, 79:23, 88:22, 91:14, 97:24, 100:17, 104:8, 115:11, 121:21, 122:5
**Method** [12] - 19:5, 42:2, 59:17, 60:2, 60:6, 61:4, 62:13, 62:15, 63:2, 70:5, 70:8, 70:9
**method** [55] - 10:5, 12:3, 12:4, 12:5, 12:7, 12:11, 13:20, 13:24, 15:15, 19:5, 20:23, 21:6, 21:7, 21:19, 22:4, 22:6, 22:7, 22:18, 22:19, 22:20, 22:21, 22:23, 23:10, 23:14, 23:15, 24:1, 24:17, 25:25,

27:17, 28:19, 30:15, 36:11, 37:3, 42:5, 60:16, 60:18, 60:22, 60:25, 61:14, 61:18, 62:1, 62:8, 62:20, 65:5, 65:6, 66:7, 69:5, 70:9, 89:19, 118:24, 119:22, 120:7
**methodologies** [1] - 29:11
**methodology** [9] - 8:21, 10:3, 11:20, 19:15, 30:7, 35:5, 66:15, 71:24, 108:4
**Methods** [1] - 69:11
**methods** [8] - 10:21, 16:22, 23:3, 24:16, 24:25, 30:13, 80:15, 80:18
**metrics** [1] - 24:5
**mid** [1] - 90:13
**mid-2002** [9] - 102:15, 102:17, 102:18, 105:15, 105:17, 105:24, 108:13, 108:14, 109:16
**mid-nineties** [1] - 90:13
**middle** [2] - 86:11, 112:14
**might** [5] - 4:4, 76:7, 77:1, 77:6, 89:6
**Mike** [1] - 112:14
**million** [14] - 28:25, 64:24, 65:1, 65:3, 69:9, 69:21, 116:11, 117:1, 117:3, 117:16, 117:20, 117:23, 118:3
**mind** [5] - 40:14, 87:24, 96:13, 96:14, 113:2
**minimum** [1] - 93:23
**minus** [1] - 42:5
**minute** [6] - 31:12, 47:7, 47:11, 51:2, 81:22, 88:4
**minutes** [6] - 85:25, 88:6, 88:13, 88:17, 101:11, 112:8
**mischaracterized** [1] - 16:15
**misleading** [1] - 44:2
**Mix** [1] - 86:10
**mix** [4] - 17:22, 49:16, 50:17, 50:18
**mixing** [1] - 77:18
**model** [30] - 19:7, 19:8, 19:21, 19:24,

20:3, 20:5, 20:7, 20:9, 20:17, 20:22, 20:24, 21:8, 23:1, 24:8, 27:9, 28:23, 67:1, 80:5, 80:11, 87:19, 96:20, 96:25, 97:3, 97:7, 97:11, 97:13, 97:18, 97:21, 97:22
**models** [2] - 27:6, 56:10
**modest** [1] - 27:24
**modified** [1] - 53:12
**moment** [3] - 52:7, 91:21, 106:13
**money** [1] - 18:15
**monopolistically** [4] - 65:24, 66:20, 69:6, 69:12
**monopolization** [1] - 5:10
**monopoly** [5] - 5:18, 66:1, 66:3, 69:1, 70:5
**months** [1] - 72:22
**MORRIS** [1] - 2:9
**most** [8] - 10:9, 11:20, 27:16, 27:17, 31:23, 74:10, 74:16, 80:10
**mount** [2] - 108:23, 109:10
**MR** [71] - 3:8, 3:14, 3:23, 4:3, 4:12, 4:14, 4:19, 5:20, 5:24, 29:17, 29:24, 30:1, 30:4, 34:9, 34:12, 36:17, 36:20, 36:23, 37:2, 41:16, 47:18, 54:2, 54:7, 78:14, 78:18, 78:20, 78:24, 79:4, 79:5, 82:1, 87:24, 88:5, 88:7, 88:12, 88:19, 88:24, 89:2, 89:4, 95:12, 95:16, 96:3, 96:5, 96:12, 96:15, 96:18, 98:14, 98:16, 99:4, 99:5, 100:1, 101:22, 101:25, 106:18, 109:3, 109:7, 110:13, 110:16, 112:4, 112:9, 112:11, 112:16, 113:8, 116:22, 117:11, 118:7, 120:20, 120:22, 122:25, 123:3, 123:5, 123:22
**multi** [2] - 104:13, 104:14

**multi-year** [2] - 104:13, 104:14
**multiple** [6] - 16:22, 25:23, 27:16, 28:25, 29:2, 87:8
**multiples** [7] - 25:13, 25:16, 25:17, 26:13, 26:24, 27:1, 72:14
**multiplied** [6] - 10:14, 21:3, 61:12, 61:13, 65:14, 66:21
**multiply** [3] - 38:9, 59:17, 59:21
**multiplying** [3] - 10:22, 11:1, 14:15

## N

**name** [1] - 25:12
**namely** [3] - 18:2, 26:5, 26:15
**narrow** [1] - 26:25
**narrowly** [1] - 68:13
**necessarily** [7] - 37:21, 64:19, 68:13, 69:18, 73:7, 121:6, 121:16
**necessary** [1] - 97:12
**need** [18] - 31:4, 31:6, 34:21, 48:20, 58:15, 76:8, 76:9, 83:20, 85:7, 94:1, 95:15, 96:1, 103:18, 106:5, 106:6, 110:4, 112:8, 124:18
**negligible** [1] - 119:9
**negotiated** [1] - 104:2
**negotiations** [2] - 93:5, 103:24
**neighborhood** [1] - 76:23
**neighbors** [1] - 76:15
**neighbors'** [1] - 77:8
**net** [25] - 17:16, 37:18, 39:5, 41:21, 41:23, 42:10, 44:6, 44:8, 44:20, 45:22, 45:25, 46:1, 48:5, 48:8, 48:11, 48:22, 49:8, 49:9, 56:19, 59:7, 59:11, 81:10, 82:7, 82:8
**never** [1] - 63:25
**nevertheless** [1] - 22:16
**New** [2] - 54:21, 56:1
**new** [2] - 56:4, 107:13
**news** [1] - 111:3
**next** [10] - 15:15,

18:13, 55:9, 62:6, 68:20, 104:15, 108:20, 116:25, 117:6, 117:11
**NICHOLS** [1] - 2:9
**nine** [1] - 72:22
**nines** [2] - 48:1, 57:13
**nineties** [1] - 90:13
**NO** [1] - 1:9
**nominal** [4] - 18:15, 18:19, 18:22, 29:10
**non** [1] - 7:24
**normalcy** [1] - 76:21
**note** [2] - 51:15, 101:16
**nothing** [3] - 106:8, 107:3, 107:8
**noticed** [1] - 98:20
**notion** [2] - 98:18, 124:2
**November** [7] - 12:18, 14:3, 51:10, 78:11, 103:13, 106:20
**number** [50] - 11:1, 14:12, 14:13, 14:16, 16:25, 17:16, 20:25, 25:4, 33:17, 33:19, 33:23, 33:24, 34:13, 34:18, 35:3, 35:14, 37:19, 38:4, 38:5, 38:6, 38:9, 38:10, 38:12, 38:14, 39:5, 40:2, 43:18, 57:22, 59:6, 59:12, 64:25, 65:22, 66:15, 67:7, 79:9, 79:24, 81:18, 82:16, 84:18, 84:25, 85:13, 85:14, 85:22, 103:1, 106:10, 111:14
**numbers** [26] - 18:19, 18:22, 32:21, 33:13, 43:21, 43:23, 43:24, 44:1, 44:3, 53:9, 53:11, 56:16, 60:5, 64:2, 68:18, 82:3, 82:14, 83:23, 84:4, 84:7, 84:23, 85:20, 86:3, 87:6, 87:16
**numerous** [1] - 87:2

## O

**o'clock** [1] - 1:12
**object** [1] - 5:21
**objection** [1] - 98:16
**observe** [1] - 93:19
**obtained** [7] - 26:24, 37:14, 39:12, 40:1,

43:4, 67:4, 96:20
**obviously** [2] - 26:7, 75:10
**occur** [1] - 56:10
**occurred** [3] - 20:14, 30:17, 100:24
**occurring** [7] - 13:2, 91:8, 92:6, 100:11, 111:12, 116:1, 118:18
**October** [10] - 53:21, 53:24, 54:13, 55:8, 55:12, 56:12, 83:16, 85:6, 102:5, 103:25
**OEM** [11] - 8:1, 16:1, 42:18, 43:10, 43:19, 44:25, 46:3, 90:25, 93:14, 93:15, 122:13
**OEM's** [1] - 93:11
**OEMs** [17] - 31:5, 31:18, 41:24, 44:7, 44:12, 45:22, 85:23, 89:24, 90:7, 91:7, 93:5, 93:6, 93:10, 121:13, 121:15, 121:20, 122:5
**OF** [1] - 1:2
**offered** [2] - 21:18, 121:16
**Official** [1] - 1:24
**often** [3] - 11:25, 27:8, 30:12
**once** [2] - 18:12, 41:13
**one** [83] - 9:12, 13:4, 13:7, 17:11, 17:12, 17:23, 18:1, 18:19, 18:20, 18:22, 19:2, 21:8, 25:1, 26:9, 28:18, 30:16, 31:11, 31:23, 33:12, 33:24, 36:10, 37:3, 38:15, 38:19, 38:20, 40:14, 42:5, 43:10, 46:23, 47:7, 47:11, 50:9, 50:16, 55:8, 55:22, 60:16, 62:11, 63:1, 63:19, 64:7, 65:10, 67:17, 68:24, 69:2, 71:6, 71:17, 78:19, 78:20, 78:21, 81:20, 81:22, 86:4, 87:3, 87:12, 87:13, 90:20, 91:21, 91:24, 93:1, 95:15, 95:17, 96:15, 98:10, 99:11, 99:24, 100:3, 101:12, 101:13, 102:4, 104:13, 104:19, 106:13, 110:1, 111:23, 114:15,

115:7, 115:15, 119:22, 120:4, 121:6
**ones** [2] - 43:11, 53:4
**ongoing** [2] - 106:1, 107:2
**operating** [11] - 23:18, 23:24, 27:19, 64:8, 64:12, 65:6, 69:1, 78:5, 118:25, 120:7
**operations** [1] - 22:16
**opinion** [3] - 9:6, 27:13, 94:3
**opposed** [4] - 20:18, 22:11, 64:18, 68:1
**optimistic** [1] - 89:19
**oranges** [2] - 17:9, 49:13
**order** [3] - 4:25, 67:24, 93:25
**orders** [2] - 69:8, 112:25
**organization** [1] - 103:6
**orient** [1] - 113:5
**OSTOYICH** [59] - 2:13, 3:23, 5:20, 30:1, 30:4, 34:9, 34:12, 36:17, 36:20, 36:23, 37:2, 41:16, 47:18, 54:2, 54:7, 78:14, 78:18, 78:20, 78:24, 79:4, 79:5, 82:1, 87:24, 88:5, 88:7, 88:12, 88:19, 88:24, 89:2, 89:4, 95:12, 95:16, 96:3, 96:5, 96:12, 96:15, 96:18, 98:14, 99:5, 100:1, 101:22, 101:25, 106:18, 109:3, 109:7, 110:13, 110:16, 112:4, 112:9, 112:11, 112:16, 113:8, 116:22, 117:11, 118:7, 120:20, 120:22, 122:25, 123:3
**Ostoyich** [3] - 3:24, 79:1, 95:19
**overall** [1] - 13:5, 19:3, 30:15, 32:21, 82:21, 82:22, 94:12, 100:7, 106:23
**overarching** [4] - 10:3, 22:22, 60:18, 61:23
**overdrive** [2] - 108:22, 109:9
**overly** [1] - 89:19
**own** [5] - 4:25, 76:5,

107:17, 109:21, 122:9
**owners** [2] - 26:10, 83:19

## P

**P&L** [2] - 17:16, 69:18
**p.m** [3] - 1:12, 3:4, 125:2
**Paccar** [4] - 91:18, 92:2, 92:8, 92:9
**Paccar's** [1] - 92:11
**page** [13] - 9:24, 54:13, 54:19, 60:9, 60:10, 62:6, 68:20, 96:8, 101:23, 105:4, 108:20, 109:8, 112:14
**Page** [31] - 36:22, 42:11, 42:12, 47:4, 48:11, 48:25, 60:25, 62:4, 63:9, 65:4, 71:22, 81:17, 81:18, 81:24, 81:25, 82:2, 83:1, 83:15, 86:7, 86:8, 87:22, 88:25, 91:24, 96:9, 96:16, 98:13, 100:16, 104:22, 104:23, 112:13, 116:19
**Pages** [1] - 60:10
**pages** [5] - 91:9, 92:4, 124:19, 124:20, 124:22
**paid** [7] - 7:20, 8:1, 35:25, 72:1, 116:25, 117:3, 121:15
**paper** [1] - 110:6
**Paragraph** [10] - 71:21, 71:22, 87:22, 88:25, 92:17, 94:18, 97:19, 104:22, 105:3, 105:17
**paragraph** [6] - 89:8, 89:10, 92:18, 97:4, 98:7, 105:1
**parameter** [7] - 15:3, 15:22, 16:18, 17:4, 31:14, 58:14, 58:15
**parent** [2] - 26:7, 26:9
**part** [23] - 7:3, 8:15, 17:13, 32:3, 37:3, 42:8, 43:14, 51:18, 53:20, 56:13, 62:20, 63:22, 64:4, 70:18, 70:21, 74:19, 75:4, 95:22, 115:19, 116:2, 120:15, 121:18, 122:18

**particular** [42] - 8:9, 12:10, 12:11, 12:16, 12:24, 13:7, 16:12, 17:12, 18:1, 20:19, 24:1, 24:13, 25:12, 26:4, 26:21, 31:19, 35:20, 41:7, 41:10, 42:7, 44:18, 50:18, 50:24, 52:25, 57:3, 57:7, 59:22, 73:9, 73:13, 76:19, 80:21, 80:22, 84:7, 84:11, 84:25, 85:12, 91:13, 91:14, 91:18, 120:2, 122:19
**particularly** [8] - 13:15, 15:3, 36:3, 53:12, 55:24, 56:2, 107:12, 108:2
**partnership** [1] - 90:25
**past** [1] - 82:23
**patience** [1] - 59:10
**pattern** [2] - 114:18, 119:8
**PAUL** [2] - 2:3
**Paul** [1] - 3:8
**Pause** [7] - 47:13, 78:23, 81:23, 88:2, 91:22, 106:14, 113:6
**pay** [11] - 70:14, 71:10, 72:6, 73:1, 73:20, 74:1, 74:5, 74:8, 74:18, 77:13, 77:15
**paying** [1] - 76:24, 122:4
**payments** [2] - 44:9, 48:17
**peak** [3] - 116:8, 118:15, 118:17
**pegged** [1] - 100:24
**pegging** [1] - 101:6
**penetration** [3] - 89:20, 90:18, 102:20
**people** [1] - 76:24
**per** [37] - 10:23, 12:9, 15:4, 15:5, 15:6, 15:8, 15:11, 15:24, 16:20, 21:4, 23:6, 23:11, 24:4, 31:14, 31:15, 36:5, 37:20, 39:15, 39:21, 42:3, 43:17, 47:9, 47:21, 47:25, 48:19, 58:13, 61:24, 81:10, 85:23, 116:7, 116:13, 118:14, 118:17
**per-unit** [23] - 12:9, 15:4, 15:5, 15:6,

15:8, 15:11, 15:24, 21:4, 23:6, 23:11, 24:4, 31:14, 31:15, 36:5, 39:15, 39:21, 61:24, 85:23, 116:7, 116:13, 118:14
**percent** [17] - 28:3, 28:5, 45:7, 45:23, 46:2, 67:5, 67:11, 68:9, 68:10, 102:21, 121:1, 121:5, 122:11, 122:15, 122:21
**percentage** [3] - 16:24, 34:2, 67:12
**percentages** [2] - 67:25, 68:11
**perceptions** [1] - 84:12
**perform** [1] - 82:24
**performance** [22] - 32:14, 32:16, 32:23, 33:3, 33:6, 33:7, 33:9, 33:17, 33:20, 34:15, 49:21, 57:6, 58:21, 65:19, 67:12, 67:22, 68:2, 68:3, 90:2, 111:5, 111:11, 115:21
**performed** [6] - 6:16, 6:24, 20:4, 20:8, 35:16, 36:11
**performing** [1] - 8:23
**perhaps** [1] - 7:23
**period** [59] - 14:6, 14:7, 14:17, 19:19, 20:9, 20:14, 20:25, 21:1, 21:3, 21:15, 22:8, 23:21, 27:21, 28:8, 29:15, 33:18, 43:12, 46:17, 49:20, 50:8, 53:24, 55:20, 64:20, 66:12, 69:5, 69:22, 72:8, 72:12, 72:14, 72:16, 74:11, 74:14, 74:17, 74:23, 74:25, 76:4, 76:16, 78:5, 78:7, 83:17, 84:10, 90:8, 90:24, 91:1, 98:1, 100:9, 100:12, 101:2, 102:9, 103:23, 106:5, 108:2, 111:17, 115:3, 116:1, 116:8, 120:9, 122:11
**periods** [1] - 55:25
**person** [5] - 81:6, 82:10, 82:14, 83:10, 86:16

**personal** [1] - 85:8
**perspective** [3] - 5:1, 9:1, 116:12
**perspectives** [1] - 13:14
**Phoenix** [1] - 110:17
**physical** [2] - 36:18, 115:24
**pick** [1] - 77:8
**picked** [2] - 29:3, 85:12
**picking** [1] - 84:6, 98:19
**piece** [2] - 85:16, 116:16
**pieces** [1] - 98:19
**place** [3] - 18:9, 103:20, 113:23
**Plaintiff** [1] - 3:9
**plaintiff** [4] - 9:7, 9:12, 112:10
**PLAINTIFF'S** [1] - 125:11
**Plaintiffs** [2] - 1:6, 2:7
**plaintiffs** [4] - 9:3, 10:2, 30:8, 64:11
**PLAINTIFFS'** [1] - 4:8
**plan** [66] - 12:6, 12:8, 12:10, 12:17, 12:24, 13:7, 13:19, 13:21, 14:4, 14:10, 15:2, 15:13, 15:20, 16:1, 19:14, 22:25, 23:4, 23:7, 23:12, 24:2, 24:6, 24:20, 24:23, 35:12, 36:10, 36:12, 37:18, 38:5, 38:14, 38:17, 39:16, 40:2, 40:25, 50:8, 51:6, 51:10, 51:18, 52:1, 52:3, 52:6, 52:7, 52:8, 52:9, 52:14, 52:17, 52:25, 53:3, 53:11, 53:14, 53:16, 57:8, 78:8, 78:11, 78:13, 82:10, 82:15, 83:6, 83:10, 84:22, 86:12, 103:14, 106:21, 123:16, 123:24, 124:13
**planned** [2] - 117:7, 117:23
**plans** [9] - 12:14, 13:1, 51:7, 51:11, 53:6, 57:25, 58:17, 84:17, 85:11
**platform** [1] - 59:22
**Platform** [44] - 18:2, 33:25, 38:1, 38:11, 38:17, 38:20, 38:21,

39:13, 42:7, 50:13, 56:22, 59:23, 64:2, 81:11, 82:5, 84:24, 105:5, 105:9, 105:18, 105:24, 106:1, 106:4, 106:10, 106:19, 107:2, 107:5, 107:21, 108:12, 108:21, 108:22, 109:9, 109:16, 111:5, 111:11, 113:19, 113:21, 114:8, 114:22, 115:19, 116:10, 116:15, 119:14, 119:20
**platforms** [1] - 116:6
**play** [4] - 98:9, 99:6, 99:8, 116:22
**played** [3] - 99:9, 116:23, 117:12
**plots** [1] - 100:13
**plotted** [3] - 47:5, 47:19, 121:2
**plus** [3] - 10:1, 60:17, 110:18
**point** [13] - 3:7, 20:17, 29:12, 36:24, 51:1, 70:15, 73:11, 75:3, 88:21, 96:8, 105:1, 109:25, 112:6
**pointed** [3] - 17:23, 37:23, 85:19
**pointing** [2] - 70:3, 110:1
**points** [5] - 34:3, 43:8, 43:21, 73:10, 85:8
**poor** [2] - 103:5, 104:19
**popped** [1] - 38:7
**portion** [3] - 18:4, 25:1, 67:5
**posit** [3] - 33:21, 48:23, 67:14
**position** [1] - 35:2
**possibility** [2] - 21:14, 21:23
**possible** [1] - 108:6
**possibly** [1] - 6:17
**postulated** [1] - 25:5
**potential** [4] - 33:8, 44:2, 89:11, 94:13
**power** [2] - 5:18, 66:3
**pre** [6] - 13:24, 16:19, 44:8, 56:9, 56:16, 80:15
**pre-profit** [1] - 16:19
**pre-profits** [1] - 13:24
**pre-release** [1] - 56:16

**pre-releases** [1] - 56:9
**pre-revenue** [1] - 44:8
**pre-units** [1] - 80:15
**precise** [3] - 50:2, 57:22, 120:19
**predicting** [1] - 57:10
**predictions** [1] - 13:11
**premise** [1] - 73:6
**premised** [2] - 61:18, 61:22
**prepare** [1] - 60:6
**prepared** [24] - 3:16, 4:3, 4:20, 12:6, 12:17, 12:19, 13:16, 13:17, 14:6, 14:9, 53:5, 53:21, 53:23, 54:13, 68:16, 80:23, 81:4, 81:7, 82:10, 82:15, 83:10, 86:16, 87:9, 110:8
**preparing** [5] - 52:8, 54:10, 54:17, 84:21, 112:21
**preproduction** [1] - 55:25
**present** [11] - 18:14, 18:23, 18:24, 19:1, 27:11, 27:22, 28:11, 29:11, 41:8, 70:2, 70:3
**presentation** [5] - 53:25, 83:2, 85:5, 101:11, 102:12
**presented** [9] - 12:18, 12:19, 32:21, 33:13, 36:2, 53:2, 80:24, 81:2, 123:25
**president** [9] - 80:24, 80:25, 82:19, 87:15, 98:11, 98:12, 99:6, 101:11, 102:13
**President** [2] - 12:21, 112:17
**president's** [7] - 53:20, 53:23, 53:25, 54:9, 54:12, 85:6
**pressure** [1] - 111:19
**presuming** [1] - 115:7
**pretty** [1] - 31:25
**preventing** [1] - 54:4
**previous** [6] - 12:25, 24:16, 51:6, 57:24, 85:10, 103:14
**previously** [5] - 6:22, 15:9, 24:11, 49:5, 107:19
**Price** [1] - 86:10
**price** [96] - 7:22, 15:19, 16:20, 17:2, 24:22, 27:25, 32:5,

32:10, 32:13, 35:8, 35:12, 35:15, 35:16, 35:19, 36:6, 37:13, 37:20, 39:2, 39:6, 39:11, 39:12, 39:18, 39:23, 39:25, 40:4, 40:6, 40:9, 40:10, 40:11, 40:18, 41:17, 41:21, 41:23, 42:10, 42:16, 42:20, 43:2, 43:4, 43:16, 43:19, 44:5, 44:6, 44:7, 44:11, 44:20, 44:23, 44:25, 45:9, 45:22, 46:1, 46:6, 46:9, 46:25, 47:20, 47:25, 48:5, 48:6, 48:8, 48:12, 48:22, 49:6, 49:8, 49:9, 50:16, 56:19, 56:20, 57:14, 58:2, 58:9, 59:13, 59:16, 62:23, 63:23, 74:19, 75:4, 79:7, 79:12, 79:16, 80:18, 81:7, 82:3, 85:5, 85:23, 86:1, 89:13, 90:21, 93:7, 93:15, 94:13, 95:2, 96:22, 97:4, 104:7, 122:20
**price-fixing** [2] - 17:2, 90:21
**priced** [2] - 50:22, 58:22
**prices** [67] - 7:20, 7:22, 8:1, 15:1, 15:21, 15:25, 16:1, 16:5, 16:20, 17:3, 18:5, 18:6, 18:8, 18:9, 18:10, 24:11, 30:24, 31:3, 31:4, 31:5, 31:9, 31:16, 31:18, 31:22, 32:1, 32:4, 35:24, 36:1, 36:2, 36:4, 37:22, 40:14, 42:21, 42:22, 43:10, 45:3, 48:13, 48:17, 49:20, 49:22, 58:19, 63:1, 74:22, 85:8, 85:17, 85:18, 86:1, 86:4, 93:14, 120:12, 120:24, 121:14, 121:15, 121:16, 121:20, 121:21, 121:25, 122:1, 122:2, 122:6, 122:10, 122:15
**pricing** [5] - 61:19, 78:9, 80:13, 94:14, 98:5
**primarily** [2] - 32:21,

33:1
**primary** [20] - 15:22, 17:4, 22:21, 36:4, 90:1, 90:5, 90:10, 90:12, 91:5, 92:18, 92:24, 93:21, 93:24, 94:6, 98:8, 100:3, 101:3, 102:7, 107:23, 107:24
**problem** [2] - 113:24, 120:1
**problems** [22] - 101:16, 105:8, 105:17, 105:24, 106:2, 107:2, 107:20, 108:12, 109:17, 109:19, 113:19, 113:21, 114:10, 114:13, 114:22, 114:24, 115:20, 119:6, 119:15, 119:20, 119:21
**procedure** [1] - 65:17
**procedures** [2] - 53:6, 113:22
**proceed** [3] - 3:7, 3:19, 112:10
**proceedings** [2] - 3:3, 88:10
**process** [5] - 77:1, 83:24, 84:4
**processing** [1] - 113:22
**produce** [3] - 13:7, 33:3, 39:1
**produced** [3] - 33:17, 35:25, 36:1
**producing** [2] - 26:8, 27:25
**Product** [2] - 54:21, 56:1
**product** [22] - 17:22, 18:1, 40:1, 41:7, 51:9, 55:15, 55:19, 56:4, 57:5, 57:22, 60:4, 65:11, 86:5, 93:12, 103:5, 104:19, 107:16, 114:14
**product-by-product** [1] - 86:5
**production** [3] - 7:9, 32:24, 56:16
**products** [21] - 17:13, 17:14, 18:2, 18:5, 26:9, 26:12, 44:11, 49:16, 50:5, 51:14, 55:1, 55:17, 58:1, 58:7, 58:8, 58:22,

84:13, 89:13,
107:13, 111:5
**professionals** [1] -
12:20
**profit** [40] - 10:15,
10:23, 12:9, 15:4,
15:11, 15:14, 15:24,
16:19, 16:25, 17:1,
17:5, 18:12, 23:2,
23:7, 23:11, 23:16,
24:21, 27:19, 36:5,
61:4, 61:13, 61:16,
61:20, 61:24, 61:25,
62:8, 62:11, 63:13,
64:8, 64:12, 64:18,
64:22, 65:6, 65:24,
66:9, 72:6, 77:4,
80:15
**profit-generating** [1] -
77:4
**profitability** [18] -
23:16, 23:24, 24:4,
25:24, 65:2, 65:7,
66:8, 66:17, 69:3,
69:6, 71:1, 71:5,
72:17, 73:3, 73:4,
80:6, 80:13
**profitable** [2] - 70:18,
70:21
**profits** [76] - 9:13,
9:18, 9:20, 10:1,
10:9, 10:11, 10:12,
10:17, 10:22, 11:3,
11:5, 11:13, 13:12,
13:20, 13:24, 14:1,
15:5, 15:6, 15:9,
17:5, 18:18, 21:4,
22:10, 22:21, 23:17,
23:18, 23:24, 23:25,
25:1, 25:2, 25:22,
30:8, 30:16, 31:14,
31:15, 36:5, 37:4,
42:6, 60:1, 60:11,
60:17, 62:8, 64:6,
64:18, 64:22, 65:10,
65:15, 65:22, 66:1,
66:4, 66:13, 66:19,
66:20, 68:1, 68:2,
68:21, 68:25, 69:1,
69:4, 69:7, 69:8,
69:13, 69:17, 69:21,
70:5, 71:11, 72:13,
72:16, 73:21, 73:24,
78:5, 78:6, 119:20,
119:23
**projected** [9] - 14:14,
15:1, 15:25, 20:22,
20:24, 22:8, 27:1,
51:12, 102:20
**projecting** [1] - 57:7

**projection** [1] - 99:21
**projections** [10] -
15:5, 15:13, 15:17,
33:2, 38:13, 50:3,
51:16, 97:14, 103:18
**projects** [1] - 40:20
**promise** [4] - 36:24,
51:1, 52:7, 120:20
**proposed** [1] - 5:16
**proven** [1] - 13:16
**provide** [15] - 6:24,
11:14, 11:20, 21:21,
29:9, 31:16, 45:23,
50:12, 51:8, 57:21,
65:18, 67:24, 85:7,
85:22, 101:1
**provided** [13] - 4:24,
20:15, 26:12, 29:1,
31:21, 38:19, 44:18,
45:12, 46:17, 46:19,
47:21, 50:3, 50:4
**provides** [13] - 13:13,
19:12, 19:15, 19:20,
21:19, 23:1, 24:17,
35:12, 35:13, 45:10,
59:3, 65:21
**provision** [2] - 104:6,
120:15
**provisions** [4] - 90:14,
90:16, 91:2, 92:1
**proxy** [5] - 37:21,
52:1, 52:14
**public** [1] - 26:6
**publicly** [5] - 25:18,
25:19, 26:10, 26:20,
74:12
**publisher** [1] - 28:6
**publishes** [1] - 28:6
**pull** [1] - 101:22
**purchase** [2] - 45:11,
92:11
**purchasers** [1] - 47:10
**purchases** [2] -
101:15, 113:19
**purpose** [5] - 19:11,
66:19, 71:13, 98:24,
108:10
**purposes** [12] - 5:3,
15:23, 19:12, 24:20,
37:21, 53:12, 58:16,
71:10, 97:11, 123:6,
124:1
**push** [1] - 103:7
**put** [12] - 3:15, 4:1,
36:17, 45:20, 48:18,
76:14, 76:22, 82:15,
89:2, 96:13, 96:15,
113:22
**putting** [1] - 68:2
**pyramid** [1] - 119:8

**pyramid-shaped** [1] -
119:8

## Q

**qua** [1] - 7:23
**qualitative** [2] - 97:8,
115:25
**quality** [14] - 84:13,
89:16, 94:11,
101:16, 103:5,
104:19, 114:16,
115:8, 115:9,
115:10, 115:11,
115:12, 119:6
**quantitative** [1] -
116:1
**quantities** [1] - 47:17
**quantity** [2] - 58:10,
119:9
**questioning** [2] - 3:12,
16:11
**questions** [6] - 3:18,
30:2, 98:18, 123:11,
123:12, 124:5
**quick** [2] - 3:15,
111:13
**quicker** [1] - 39:9
**quickly** [1] - 113:3
**quite** [4] - 26:5, 70:4,
82:13, 93:4

## R

**R-squared** [1] - 20:8
**raising** [1] - 7:7
**range** [13] - 11:15,
11:25, 12:14, 12:15,
26:25, 42:23, 45:23,
46:2, 46:10, 47:2,
49:11, 69:12, 69:21
**rate** [6] - 18:24, 27:24,
28:2, 28:10, 70:3,
72:13
**rates** [5] - 27:14,
27:15, 97:23, 98:3
**rather** [4] - 23:15,
24:3, 36:18, 73:1
**rating** [1] - 51:12
**ratings** [3] - 39:4,
50:19, 51:12
**ratio** [2] - 14:7, 65:14
**reach** [1] - 9:6
**reached** [1] - 98:25
**read** [6] - 63:10, 82:3,
96:16, 112:20,
117:9, 119:16
**reading** [1] - 67:13
**real** [1] - 124:15

**really** [6] - 30:13, 40:4,
113:3, 113:15,
123:14, 124:14
**reason** [3] - 11:4,
17:7, 24:14
**reasonable** [17] -
11:16, 11:18, 12:2,
16:23, 18:25, 26:5,
26:13, 26:22, 27:17,
29:2, 52:4, 52:16,
61:20, 61:24, 78:6,
99:1
**reasonableness** [6] -
15:17, 19:13, 36:7,
52:12, 53:10, 83:20
**reasons** [3] - 83:12,
99:23, 100:2
**REATH** [1] - 1:18
**rebate** [1] - 120:24
**Rebates** [1] - 44:14
**rebates** [12] - 41:23,
44:15, 45:10, 45:12,
45:13, 45:22, 46:6,
46:8, 47:24, 120:16,
120:24
**rebuilds** [1] - 40:24
**receive** [1] - 59:11
**receiving** [1] - 47:16
**recent** [2] - 74:10,
74:16
**recess** [2] - 88:8,
88:10
**recessed** [1] - 125:2
**recognize** [4] - 54:8,
77:19, 77:20, 103:19
**recognizing** [1] -
103:22
**record** [4] - 5:21,
13:17, 39:24, 98:18
**records** [1] - 101:4
**recovers** [1] - 76:20
**RECROSS** [1] -
125:12
**redirect** [2] - 29:23,
123:4
**REDIRECT** [1] -
125:12
**redoing** [1] - 57:3
**reduce** [1] - 46:6
**reduced** [2] - 83:14,
103:15
**reducing** [1] - 86:1
**reduction** [6] - 9:15,
31:20, 84:15, 85:4,
85:7, 94:12
**refer** [4] - 18:9, 21:1,
43:15, 113:23
**reference** [1] - 86:22
**referenced** [1] - 94:20
**referencing** [1] - 62:17

**referred** [2] - 27:8,
43:16
**referring** [1] - 102:1
**refers** [1] - 90:25
**reflect** [2] - 30:17,
77:22
**reflecting** [1] - 68:14
**reflection** [2] - 48:19,
114:1
**reflects** [1] - 37:17
**regard** [9] - 5:14, 6:15,
8:24, 11:12, 13:18,
31:13, 31:16, 84:12,
123:22
**regarding** [2] - 50:5,
111:3
**REID** [1] - 2:9
**reintroduced** [1] -
56:5
**relates** [1] - 115:13
**relative** [8] - 12:25,
25:20, 25:21, 85:10,
85:18, 95:2, 96:22,
115:8
**release** [1] - 56:16
**released** [2] - 55:20,
114:12
**releases** [1] - 56:9
**relevant** [4] - 5:2,
5:18, 32:23, 97:16
**reliability** [4] - 36:12,
44:3, 53:11, 123:8
**reliable** [8] - 13:15,
15:13, 19:25, 20:2,
39:16, 60:21, 80:10,
124:2
**relied** [8] - 12:5,
53:15, 53:20, 53:23,
54:9, 54:16, 82:10,
82:15
**rely** [2] - 19:2, 23:10
**relying** [1] - 23:15
**remaining** [1] - 112:25
**remember** [1] - 53:22
**removal** [2] - 31:20,
111:19
**remove** [1] - 93:10
**removing** [1] - 93:11
**repairs** [1] - 40:23
**report** [83] - 4:20,
4:23, 6:14, 9:16,
11:6, 14:1, 14:12,
16:2, 17:13, 17:16,
17:23, 18:8, 18:17,
18:21, 18:23, 18:24,
20:11, 22:13, 25:5,
27:9, 28:18, 29:8,
29:16, 33:23, 34:5,
34:6, 34:10, 34:19,
34:20, 35:9, 35:21,

36:16, 36:21, 36:22, 42:13, 45:6, 45:14, 46:16, 49:1, 53:20, 53:21, 54:9, 54:10, 54:12, 54:16, 54:17, 66:2, 70:13, 71:12, 71:15, 71:20, 71:21, 75:6, 85:6, 85:7, 86:7, 87:7, 87:17, 87:23, 88:25, 89:5, 90:6, 91:8, 91:17, 94:16, 99:1, 100:13, 100:17, 101:1, 101:20, 102:2, 104:5, 104:20, 104:23, 105:16, 110:8, 110:11, 112:21, 114:6, 114:7, 123:8, 124:12

**reported** [1] - 109:14

**Reporter** [1] - 1:24

**reports** [5] - 53:23, 53:25, 60:5, 109:9, 111:1

**represent** [2] - 117:3, 117:18

**representation** [1] - 69:18

**representations** [1] - 45:17

**representative** [2] - 116:18, 116:20

**represents** [1] - 37:6

**request** [3] - 81:3, 83:3, 87:10

**required** [1] - 124:11

**requirements** [3] - 50:20, 58:25, 90:19

**research** [1] - 4:25

**resolved** [1] - 105:14

**respected** [1] - 28:6

**respond** [1] - 124:24

**response** [2] - 16:9, 16:14

**rest** [2] - 110:3, 124:17

**result** [10] - 7:11, 7:23, 11:11, 12:24, 23:8, 28:17, 32:5, 84:19, 116:10

**resulted** [3] - 7:7, 24:10, 28:24

**resulting** [1] - 114:23

**results** [6] - 11:15, 24:8, 38:16, 61:17, 64:16, 106:7

**resumed** [1] - 88:10

**revenue** [28] - 17:16, 35:14, 37:7, 37:17, 37:18, 37:19, 37:20, 39:5, 39:6, 39:15,

39:21, 40:11, 42:5, 43:17, 44:8, 58:13, 59:11, 63:6, 63:18, 63:20, 76:6, 77:3, 81:10, 82:6, 82:11, 85:2

**revenues** [18] - 17:18, 35:13, 39:22, 40:1, 40:19, 40:23, 40:25, 41:3, 41:6, 43:11, 44:10, 48:9, 49:14, 50:11, 56:11, 58:3, 59:4

**review** [4] - 4:24, 47:1, 107:7, 107:9

**reviewed** [6] - 6:6, 12:14, 26:21, 51:5, 81:2, 81:5

**revise** [3] - 13:6, 103:18

**revised** [7] - 12:25, 13:1, 83:1, 83:2, 84:13, 84:14, 86:12

**Rick** [2] - 12:21, 98:10

**rise** [1] - 6:21

**risk** [3] - 18:19, 18:23, 70:3

**risk-free** [2] - 18:19, 70:3

**rivals** [1] - 7:7

**ROBINSON** [1] - 1:14

**rough** [1] - 9:25

**row** [1] - 38:10

**Rule** [1] - 123:6

**running** [1] - 8:2

**runs** [2] - 55:8, 55:12

**Ryder** [4] - 84:15, 101:13, 101:14, 103:5

**Ryder's** [1] - 101:14

**S**

**sale** [5] - 40:20, 41:4, 55:24, 71:18, 113:9

**sales** [50] - 8:17, 10:23, 14:20, 17:5, 20:21, 21:2, 21:3, 25:21, 40:23, 41:10, 48:9, 49:14, 50:10, 50:12, 56:22, 69:16, 81:12, 82:7, 82:8, 82:9, 84:16, 88:22, 89:7, 89:12, 92:20, 94:12, 96:21, 99:13, 103:6, 103:7, 106:1, 107:1, 107:22, 108:14, 109:16, 111:8, 111:24,

112:2, 115:13, 115:16, 115:23, 118:18, 119:9, 119:14, 119:19, 120:11, 121:4, 121:11, 121:19, 122:19

**Sales** [1] - 112:17

**satisfy** [2] - 15:12, 20:2

**saw** [1] - 32:25

**say-so** [1] - 6:8

**scan** [1] - 111:13

**scanned** [1] - 113:2

**scenarios** [1] - 75:14

**scenes** [1] - 86:3

**schedule** [1] - 39:25

**science** [2] - 123:9, 124:3

**screen** [3] - 36:18, 38:7, 89:3

**screening** [1] - 14:24

**scroll** [2] - 101:23, 110:19

**se** [1] - 16:20

**second** [10] - 7:5, 9:14, 15:15, 36:11, 42:8, 60:9, 60:22, 61:18, 109:8, 120:21

**secondary** [3] - 92:19, 93:22, 94:8

**Section** [2] - 66:3, 91:20

**section** [7] - 11:6, 20:11, 66:2, 89:5, 89:9, 92:2, 94:10

**see** [29] - 37:25, 43:17, 45:2, 47:1, 50:11, 51:16, 51:19, 54:23, 54:24, 55:2, 60:12, 80:8, 86:14, 86:15, 93:4, 93:7, 94:5, 106:15, 107:11, 108:17, 108:24, 108:25, 110:4, 114:18, 115:1, 118:16, 119:5, 123:17

**seeing** [1] - 116:6

**segment** [2] - 66:4, 66:21

**selected** [2] - 22:25, 42:19

**sell** [11] - 32:16, 40:11, 49:22, 58:11, 59:7, 59:18, 73:9, 76:18, 76:19, 85:23, 106:11

**sellers** [1] - 77:20

**selling** [6] - 32:6, 32:10, 32:14, 49:9,

76:15, 77:6

**semblance** [1] - 76:21

**senior** [1] - 110:25

**sense** [3] - 30:17, 58:19, 76:17

**sensitive** [1] - 36:5

**sent** [5] - 80:25, 86:18, 87:4, 87:13

**separate** [13] - 10:20, 17:12, 18:22, 19:20, 22:33, 34:24, 61:7, 119:13, 119:19, 120:11, 121:3, 121:19, 122:18

**separated** [1] - 50:9

**separately** [1] - 15:21

**September** [2] - 55:9, 55:13

**seriously** [1] - 44:2

**serve** [1] - 19:11

**serves** [1] - 19:12

**set** [9] - 26:15, 26:22, 29:3, 44:10, 74:24, 80:6, 80:7, 84:7, 111:1

**sets** [1] - 26:15

**seven** [2] - 6:17, 103:3

**several** [7] - 19:12, 74:9, 85:8, 92:4, 104:1, 116:10

**severe** [2] - 77:20, 114:18

**shall** [2] - 34:6, 88:4

**shaped** [1] - 119:8

**SHAPIRO** [1] - 2:2

**share** [48] - 7:13, 13:22, 14:14, 15:17, 20:22, 23:2, 23:23, 24:7, 38:7, 38:9, 38:13, 60:23, 61:5, 61:8, 67:14, 68:8, 79:24, 80:12, 83:8, 84:11, 88:23, 89:7, 89:13, 90:18, 91:3, 91:11, 91:14, 92:6, 92:20, 94:14, 96:20, 97:25, 100:5, 100:14, 100:18, 100:21, 101:5, 101:9, 102:8, 102:11, 102:14, 102:20, 104:9, 108:1, 114:19, 114:23, 115:3, 119:14

**shares** [12] - 13:11, 14:8, 19:9, 19:14, 20:16, 20:24, 24:9, 36:13, 68:4, 79:22, 91:14, 106:3

**sharp** [1] - 114:20

**sheet** [2] - 68:12, 80:16

**sheets** [4] - 53:5, 57:4, 58:13, 84:2

**Shift** [3] - 38:24, 55:19, 81:13

**shift** [3] - 103:7, 114:12, 114:13

**short** [2] - 88:8, 88:10

**shorthand** [3] - 37:17, 40:6, 40:8

**show** [3] - 105:21, 108:17, 116:16

**showed** [2] - 20:15, 58:24

**showing** [1] - 98:17

**shown** [1] - 117:8

**shows** [5] - 24:14, 83:2, 100:17, 118:5, 122:17

**side** [1] - 55:3

**significance** [3] - 94:4, 94:5, 110:1

**significant** [30] - 8:17, 11:7, 11:10, 19:18, 20:12, 33:17, 35:3, 64:14, 66:11, 84:15, 89:25, 90:4, 91:2, 94:2, 98:8, 101:13, 101:14, 104:23, 105:4, 105:8, 107:17, 107:20, 108:16, 109:22, 110:2, 111:16, 111:18, 111:19, 118:16, 119:7

**significantly** [6] - 15:10, 20:16, 70:7, 70:8, 83:15, 118:15

**similar** [2] - 42:8, 109:21

**simple** [2] - 31:25, 93:20

**simply** [9] - 22:23, 24:9, 39:6, 53:8, 57:16, 64:2, 71:19, 73:18, 118:19

**sine** [1] - 7:23

**single** [2] - 11:20, 52:11

**sit** [1] - 34:1

**sitting** [1] - 124:7

**situation** [1] - 103:2

**six** [1] - 6:16

**sixth** [1] - 8:14

**size** [3] - 14:5, 47:3, 100:7

**slide** [1] - 68:5

**slides** [1] - 4:4

tie [2] - 15:7, 120:2
tied [2] - 28:16, 82:21
ties [1] - 43:18
Timetable [2] - 54:22, 56:1
timetable [2] - 54:25, 56:13
timing [1] - 55:24
title [4] - 44:13, 45:20, 47:14, 110:23
titles [1] - 112:19
today [4] - 34:2, 77:13, 123:6, 123:10
together [1] - 91:15
Tom [1] - 110:21
tomorrow [3] - 76:14, 76:22, 76:24
took [16] - 14:3, 14:7, 22:7, 22:11, 25:7, 60:19, 66:19, 79:13, 79:16, 79:19, 79:22, 81:18, 83:4, 97:22, 106:20, 108:18
top [4] - 44:13, 54:12, 54:21, 109:8
topics [1] - 88:20
torque [6] - 32:6, 39:4, 50:19, 51:12, 58:25
total [20] - 10:1, 10:2, 14:4, 14:16, 33:24, 34:23, 37:18, 38:6, 40:1, 43:11, 47:16, 47:17, 59:12, 59:22, 67:7, 80:1, 84:9, 98:2, 106:20, 116:9
towards [1] - 103:7
track [1] - 13:17
tractors [1] - 110:18
traded [5] - 25:19, 26:6, 26:11, 26:20, 74:12
transaction [1] - 43:10
transactions [1] - 42:19
transcript [1] - 95:19
TRANSMISSION [1] - 1:5
Transmission [2] - 3:9, 86:9
transmission [35] - 32:22, 33:9, 34:14, 34:15, 34:23, 35:9, 35:19, 35:20, 39:1, 39:7, 39:13, 40:24, 59:23, 96:21, 96:23, 99:12, 105:24, 107:21, 108:22, 109:10, 109:16, 111:4, 111:9, 113:19, 113:21,

117:15, 117:19, 118:2, 120:12, 121:21, 122:3, 122:10, 122:20
Transmissions [1] - 107:20
transmissions [96] - 7:10, 11:2, 32:7, 32:11, 32:14, 32:16, 32:23, 32:25, 33:4, 33:7, 33:10, 33:18, 33:20, 33:24, 33:25, 34:25, 35:4, 37:14, 38:1, 38:11, 39:3, 39:4, 40:21, 41:11, 42:4, 42:17, 42:19, 44:23, 45:1, 45:4, 45:11, 46:14, 48:6, 48:13, 48:23, 49:10, 49:17, 49:18, 49:21, 49:22, 49:24, 50:17, 50:22, 50:25, 51:4, 51:16, 51:21, 53:16, 56:20, 56:23, 56:25, 57:6, 57:13, 57:16, 57:17, 58:11, 58:20, 58:21, 58:23, 59:1, 59:6, 59:7, 59:12, 59:19, 65:11, 65:20, 67:22, 68:3, 68:15, 79:7, 79:13, 79:16, 79:19, 81:12, 84:18, 84:24, 89:17, 95:3, 97:5, 97:8, 100:11, 103:8, 104:8, 105:5, 105:18, 107:18, 109:21, 111:10, 119:7, 120:25, 121:5, 122:16, 122:22
transmittal [1] - 87:4
Transportation [3] - 110:12, 110:17, 111:24
treat [1] - 91:15
tremendous [1] - 114:13
trial [2] - 98:23, 124:7
truck [16] - 14:16, 41:24, 45:10, 46:13, 46:18, 46:25, 47:3, 47:6, 47:10, 47:20, 47:24, 47:25, 79:24, 80:1, 98:2, 112:25
Truck [1] - 112:14
trucks [5] - 14:13, 14:19, 20:25, 38:6, 38:9
true [1] - 29:5
try [3] - 52:20, 59:10,

123:19
trying [4] - 46:5, 72:9, 113:5, 120:2
Tuesday [1] - 1:12
TUNNELL [1] - 2:9
turn [6] - 12:3, 36:16, 38:10, 62:4, 66:17, 115:13
turnover [1] - 103:6
two [16] - 9:11, 14:7, 26:4, 26:14, 28:3, 38:19, 43:8, 69:20, 70:8, 70:9, 70:10, 70:25, 71:4, 88:4, 106:12, 121:23
type [4] - 9:7, 57:22, 90:16
types [6] - 9:7, 9:11, 58:1, 59:6, 65:11, 91:8
typically [1] - 11:24

## U

U.S [1] - 26:18
U.S.D.C.J [1] - 1:14
ultimate [2] - 17:1, 17:6
ultimately [14] - 11:9, 17:21, 19:2, 23:3, 33:5, 58:14, 62:21, 68:9, 69:16, 109:22, 113:15, 115:10, 120:14, 121:9
uncertainty [1] - 11:12
unclear [1] - 115:9
under [8] - 20:21, 46:2, 61:4, 69:5, 82:18, 117:14, 117:15, 123:6
underlying [10] - 13:18, 33:14, 53:9, 58:12, 60:4, 67:19, 73:2, 73:21, 84:2
understandable [1] - 3:15
understood [1] - 5:23
undertaken [1] - 89:24
unfair [1] - 98:21
unit [40] - 10:23, 12:9, 15:4, 15:5, 15:6, 15:8, 15:11, 15:24, 16:20, 20:21, 21:2, 21:3, 21:4, 23:6, 23:11, 24:4, 31:14, 31:15, 36:5, 37:20, 39:15, 39:21, 43:17, 47:9, 47:21, 47:25, 48:20, 58:13, 61:24,

81:10, 85:23, 106:20, 116:7, 116:13, 118:14, 118:17
UNITED [1] - 1:1
units [29] - 10:12, 10:15, 11:1, 12:9, 14:2, 14:3, 35:14, 37:19, 38:4, 38:5, 38:13, 38:14, 40:2, 48:20, 51:9, 57:22, 59:18, 59:22, 66:22, 67:21, 80:15, 82:5, 83:11, 84:23, 106:4, 106:10, 106:16, 106:17, 107:4
unknown [2] - 58:10, 81:4
unless [1] - 56:16
unnecessary [2] - 22:14, 35:11
unrelated [9] - 9:23, 14:20, 14:22, 14:23, 36:14, 76:7
unreliable [1] - 24:17
up [48] - 4:7, 4:13, 9:14, 17:11, 18:10, 18:16, 36:18, 36:22, 36:24, 41:18, 44:5, 44:13, 45:20, 51:20, 54:21, 58:2, 58:4, 58:5, 60:20, 63:3, 64:1, 65:4, 71:18, 71:22, 75:8, 78:20, 78:24, 82:5, 83:12, 85:14, 87:25, 89:2, 94:17, 95:13, 96:13, 96:15, 101:21, 101:22, 107:5, 109:2, 109:8, 110:10, 110:11, 110:19, 111:1, 112:11, 112:12, 120:2
update [1] - 83:20
useful [1] - 4:4
utilized [1] - 24:25

## V

Valerie [1] - 1:24
valuable [1] - 8:10
valuation [14] - 25:25, 27:9, 27:12, 28:11, 28:19, 28:24, 72:11, 73:11, 73:13, 73:15, 76:1, 76:2, 77:19
valuations [5] - 26:13, 74:21, 77:22, 78:1, 78:7

value [50] - 9:15, 9:16, 10:1, 11:19, 18:14, 18:15, 18:22, 18:23, 18:24, 19:1, 22:22, 25:8, 25:11, 25:12, 25:19, 27:3, 27:4, 27:10, 27:11, 27:16, 27:22, 28:11, 29:11, 30:16, 41:8, 53:9, 60:18, 70:2, 70:3, 70:11, 70:13, 70:14, 70:24, 70:25, 71:3, 71:9, 71:14, 71:15, 71:24, 72:2, 72:10, 73:23, 74:18, 75:16, 76:12, 76:13, 76:23, 77:3, 116:13
values [3] - 42:3, 75:15, 116:15
valuing [1] - 77:2
variable [13] - 13:25, 17:1, 17:6, 23:4, 23:6, 59:25, 60:3, 61:19, 95:1, 96:21, 97:13, 97:24, 97:25
variables [4] - 19:10, 94:23, 97:20, 98:2
variance [2] - 22:18, 102:19
Variance [1] - 86:10
variant [1] - 22:20
varied [1] - 47:3
variety [2] - 19:9, 20:4
various [13] - 7:2, 13:8, 28:7, 33:9, 38:25, 60:19, 80:4, 84:18, 84:19, 89:24, 92:1, 101:18, 102:6
venture [11] - 21:17, 26:10, 98:11, 98:12, 99:7, 99:12, 102:13, 110:21, 112:18, 113:13, 113:16
ventures [1] - 71:1
verifiable [1] - 6:7
verification [1] - 15:1
verified [6] - 15:3, 15:4, 15:8, 36:12, 48:21, 80:16
verify [6] - 16:21, 23:5, 52:11, 53:6, 53:10, 106:7
versions [2] - 4:15, 87:2
versus [6] - 31:5, 34:25, 47:16, 59:4, 67:8, 119:15
Vice [1] - 112:17
videotape [3] - 99:25, 117:10, 118:6

000742

**Videotaped** [1] - 116:23
**videotaped** [2] - 99:9, 117:12
**view** [3] - 65:24, 68:14, 77:15
**Vogel** [1] - 111:1
**Volume** [1] - 86:10
**volume** [13] - 33:20, 35:20, 58:7, 61:8, 61:9, 79:19, 81:7, 83:4, 83:5, 83:7, 83:14, 84:15, 106:20
**volumes** [7] - 36:8, 36:9, 36:14, 56:2, 78:10, 82:22, 83:9
**vs** [1] - 1:7

77:15
**Wilmington** [1] - 1:11
**witness** [6] - 4:10, 54:3, 79:2, 95:20, 95:23, 109:4
**WITNESS** [11] - 40:5, 40:13, 40:19, 41:5, 41:14, 47:14, 81:24, 91:23, 106:15, 113:7, 125:12
**Witness** [1] - 124:10
**witness)** [1] - 54:5
**witnesses** [2] - 98:10, 98:19
**Wolfgang** [2] - 111:1, 111:3
**wondering** [1] - 82:14
**WOOD** [1] - 2:5
**words** [6] - 3:20, 67:16, 68:7, 68:16, 68:18, 79:11
**world** [61] - 10:13, 11:3, 11:12, 11:14, 30:11, 30:17, 30:19, 30:20, 30:21, 30:23, 30:24, 32:6, 32:11, 32:14, 32:17, 32:24, 33:21, 34:14, 35:4, 50:1, 51:3, 51:20, 51:23, 52:2, 52:15, 52:20, 53:16, 57:11, 57:12, 58:10, 59:5, 61:11, 64:11, 64:13, 64:21, 65:20, 66:8, 66:14, 67:1, 67:2, 67:9, 68:10, 71:17, 72:7, 73:7, 77:5, 78:9, 80:2, 105:25, 106:1, 106:11, 108:3, 111:7, 111:9, 113:12, 118:11, 118:22, 119:1, 119:3, 121:9
**worse** [2] - 117:7, 117:23
**worth** [2] - 69:4, 124:21
**write** [2] - 75:22, 75:23
**wrote** [2] - 59:14, 75:19

55:9, 55:11, 55:17, 55:22, 56:5, 56:6, 56:15, 56:18, 57:14, 63:3, 66:16, 74:10, 74:17, 83:11, 104:13, 104:14, 104:15, 106:11, 109:12, 117:4, 117:16, 117:19, 117:20, 118:1, 118:3
**years** [10] - 22:11, 29:13, 68:6, 74:9, 75:11, 76:8, 77:9, 78:1
**yourself** [3] - 15:12, 20:2, 123:13

## Z

**zero** [3] - 102:11, 106:16, 107:4
**ZF** [99] - 1:4, 3:9, 5:4, 7:10, 8:17, 9:13, 9:16, 9:21, 10:13, 11:9, 11:13, 12:6, 12:21, 13:22, 14:5, 14:19, 17:4, 19:9, 19:18, 21:2, 21:14, 21:16, 22:10, 23:22, 25:23, 26:10, 27:2, 27:18, 28:19, 28:20, 29:6, 31:22, 32:13, 32:16, 32:18, 32:24, 33:3, 33:16, 35:2, 35:20, 37:14, 38:6, 40:2, 40:20, 44:19, 46:19, 48:14, 48:17, 48:23, 50:3, 57:15, 64:20, 65:19, 66:7, 66:12, 66:13, 66:18, 67:4, 67:10, 67:14, 67:20, 68:4, 68:8, 68:25, 69:17, 69:18, 71:1, 71:4, 71:18, 72:7, 72:17, 73:4, 73:8, 78:5, 79:23, 83:18, 83:19, 86:9, 86:19, 87:5, 88:22, 91:14, 92:11, 96:20, 96:22, 97:24, 100:14, 101:10, 104:8, 107:19, 114:19, 115:11, 119:6, 121:16, 122:2, 122:3, 122:5
**ZFM** [5] - 36:1, 90:10, 93:12, 94:7, 105:4
**ZFM's** [7] - 36:8, 36:9, 93:2, 93:14, 105:17, 105:19, 108:1

## W

**wagon** [1] - 49:12
**wait** [3] - 76:20, 106:9, 125:1
**walk** [3] - 20:20, 36:24, 112:12
**warranties** [2] - 118:10, 118:17
**warrants** [1] - 117:4
**warranty** [35] - 104:24, 105:4, 105:8, 105:19, 106:2, 107:11, 107:13, 107:24, 113:22, 114:11, 114:13, 114:16, 114:22, 115:20, 115:22, 116:4, 116:7, 116:10, 116:20, 116:25, 117:15, 117:19, 118:2, 118:8, 118:17, 118:21, 119:5, 119:6, 119:11, 119:15, 119:20, 119:21, 120:5, 120:6
**Washington** [2] - 2:5, 2:14
**water** [1] - 87:25
**ways** [8] - 11:5, 11:14, 22:23, 28:17, 60:11, 60:14, 97:11, 123:20
**weighted** [1] - 18:5
**welcome** [1] - 79:4
**well-respected** [1] - 28:6
**whole** [3] - 77:23, 100:3, 120:17
**wide** [2] - 12:14, 12:15
**willing** [2] - 77:12,

## Y

**year** [52] - 29:5, 29:6, 29:9, 32:17, 33:22, 34:19, 37:24, 39:14, 39:19, 41:6, 41:9, 41:18, 42:22, 43:3, 45:2, 47:19, 49:25, 53:17, 55:5, 55:8,

# EXHIBIT 13



# North American Heavy-Duty Vehicle Production by Year

ZFM Launches Aug 1999

ZFM Operationally Dissolved Dec 2003

Units

263
323
294
150
170
164
235
324

Sep 30 1998
Sep 30 1999
Sep 30 2000
Sep 30 2001
Sep 30 2002
Sep 30 2003
Sep 30 2004
Sep 30 2005

Source: DX 545, ArvinMeritor 2002 Annual Report
DX 550, ArvinMeritor 2007 Annual Report

DX 722

000744