## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

| | |
|---|---|
| ZF MERITOR LLC and MERITOR TRANSMISSION CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>EATON CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)   Civil Action No. 06-623-SLR<br>)<br>)   **REDACTED PUBLIC VERSION**<br>)<br>)<br>)<br>)<br>) |

# DEFENDANT'S MEMORANDUM OF LAW IN
# SUPPORT OF ITS MOTION TO EXCLUDE DERAMUS TESTIMONY

## VOLUME I – EXHIBITS 1 – 7

## VOLUME II – EXHIBITS 8 - 20

OF COUNSEL:
Joseph A. Ostoyich
Erik T. Koons
William C. Lavery
Evan A. Young
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 639-7700

Theodore B. Olson
Thomas G. Hungar
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  11101
(202) 955-8500

Donald E. Reid (#1058)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 351-9219

*Attorneys for Defendant Eaton Corporation*

Original Filing Date:  March 25, 2013
Redacted Filing Date: April 1, 2013

EXHIBIT 14

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF DELAWARE

 3                      - - -

 4

      ZF MERITOR LLC and MERITOR    :   CIVIL ACTION
 5    TRANSMISSION CORPORATION,      :
                                     :
 6                  Plaintiffs,      :
                                     :
 7         vs.                       :
                                     :
 8    EATON CORPORATION,             :
                                     :
 9                  Defendant.       :   NO. 06-623 (SLR)

10

11                      - - -

12                      Wilmington, Delaware
                        Monday, October 25, 2011
13                      10:40 o'clock, a.m.
                        ***Telephone conference

14                      - - -

15    BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

16                      - - -

17    APPEARANCES:

18            DRINKER, BIDDLE & REATH LLP
              BY:  KAREN V. SULLIVAN, ESQ.
19

20                      -and-

21

22

23

24                          Valerie J. Gunning
                            Official Court Reporter
25
```

000745

```
 1    APPEARANCES (Continued):

 2
                   DICKSTEIN SHAPIRO LLP
 3                 BY:   JAY N. FASTOW, ESQ. and
                         JENNIFER HACKETT, ESQ.
 4

 5                      Counsel for Plaintiffs

 6

 7                 MORRIS, NICHOLS, ARSHT & TUNNELL
                   BY:   DONALD E. REID, ESQ.
 8

 9                       -and-

10

11                 BAKER BOTTS LLP
                   BY:   JOSEPH A. OSTOYICH, ESQ.,
12                       ERIK T. KOONS, ESQ.
                         (Washington, D.C.)

13
                         -and-
14

15                 GIBSON, DUNN & CRUTCHER LLP
                   BY:   THOMAS G. HUNGAR, ESQ.
16                       (Washington, D.C.)

17

18                      Counsel for Defendant

19                       -  -  -

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3           (REPORTER'S NOTE:  The following telephone

 4    conference was held in chambers, beginning at 10:40 a.m.)

 5

 6           THE COURT:  Counsel, this is Judge Robinson, and

 7    Valerie is here as our Court Reporter.  You need to identify

 8    yourselves when you speak so our record is clear.

 9           I need to clear up the procedural morass we seem

10    to find ourselves in as neither the plaintiff nor the

11    defendant seem to be on the same page as I am.

12           The way I handle complex litigation, generally,

13    when I bifurcate, is that I enter a final judgment pursuant

14    to Rule 54(b) on my ability only, and once the Circuit Court

15    determines liability, if there's a reason to have a damages

16    trial, we have a damages trial.

17           Now, the plaintiff wants us to go forward with

18    damages, but the reason I bifurcated was to avoid that in

19    case the Circuit Court disagrees with the jury's verdict on

20    liability.  The defendant wants me to enter zero amount

21    on damages even though we have not had a damages trial

22    yet.

23           So neither of you are on the same page with me,

24    and the question is, is there any reason why I shouldn't

25    follow my standard practice and enter basically a revised
```

000747

1    final judgment since our first order of final judgment back

2    in October of 2009 didn't mention specifically 54(b), that

3    that is how this judgment should be entered so that we can

4    have an immediate appeal on the liability issue alone.

5         So that's the question before us.  I'm not

6    inclined to follow either of your suggestions, but I need to

7    find out if there are legal obstacles to my doing and my

8    following what my standard practice really is.

9         I will start with plaintiffs' counsel.

10        MR. FASTOW:  Thank you, your Honor.  This is Jay

11   Fastow from Dickstein Shapiro for the plaintiffs.

12        And I think the point here is that the judgment

13   the Court has entered and even the one you're, I think your

14   Honor is talking about now, would not in our view, and I

15   think even Eaton has agreed with us in its filings, would

16   not be immediately appealable.  Unlike a patent case, which

17   has a separate statute, this would not be a final judgment

18   for purposes of appeal because it wouldn't include, you

19   know, all claims and all issues since relief is still

20   outstanding.  And I think that was really the basis of

21   Eaton's motion to amend the judgment, include no damages or

22   injunctive relief, which the Court, of course, denied last

23   month.  What they were saying, and we agree, is that such a

24   judgment would not be currently appealable.  They say that

25   think also didn't think that interlocutory appeal would be

1   available or be accepted by the Third Circuit.  As we just

2   filed our papers I guess on Friday, we certainly believe

3   that through interlocutory appeal under 1292(b) is not

4   appropriate.

5            THE COURT:  So 54(b) does not say what it says

6   it says?  That the Court can enter final judgment as to one

7   or more of fewer than all claims or parties?

8            MR. FASTOW:  Your Honor, I don't think that this

9   would be that, because it's -- first of all, it's not

10  parties, it's not separate parties, and then on claims, it's

11  not a judgment on a full claim because, while we have a

12  liability verdict from the jury, which the Court upheld, of

13  course, we don't have relief on any of the claims.  So that

14  would not be, in our view, an appealable 54(b) judgment

15  because there is no final verdict as to any one claim

16  because of the lack of addressing relief yet.  And that's

17  why --

18           THE COURT:  Well, just wait a minute.  So that

19  means that, in essence, a Court may never bifurcate damages

20  from liability?

21           MR. FASTOW:  Well, I think, your Honor,

22  that there is something separate in patent law for that

23  purpose.

24           THE COURT:  Well, separate patent law.  But

25  you're saying in any other kind of case, a Court -- there's

1    no legal way for the Court to bifurcate damages from

2    liability?

3              MR. FASTOW:  I think the only way -- for final

4    judgment, I think that's correct, unless for some other

5    particular situation there's a specific statute, but in

6    general, as applied here, the Court cannot make it a final

7    judgment for appealable -- appealability purposes by

8    bifurcating liability from damages.  54(b) deals with claim

9    by claim.

10             Now, the only other thing that has been raised

11   is 1292(b), interlocutory appeal, which Eaton first said is

12   not likely to be accepted by the Third Circuit.  Now it says

13   it would like that.  And, of course, among other things,

14   it's way too late for that.  The issues they're raising now

15   could have been raised as early as the motion to dismiss.

16   And we have our whole opposition on that.  I won't go

17   through all of that now, but there are many reasons why

18   1292(b) certification for interlocutory appeal is not

19   appropriate now, and as Eaton said, it's not likely to be

20   accepted by the Third Circuit.

21             So I think that is where it leaves us, your

22   Honor, is in this antitrust case, that 54(b) wouldn't work

23   to make the liability verdict and the JMOL decision

24   currently appealable, and that's why we propose that we move

25   forward to a damages trial.  The best way to materially

1   advance the ultimate termination of this litigation is to

2   move forward with a damages trial, with decision as to all

3   relief, and then have a final judgment with all claims and

4   all aspects of relief for each of the claims put together

5   and, you know, then would have appealability.

6        THE COURT:  All right.  Let's hear from

7   defendant's counsel.

8        MR. OSTOYICH:  Your Honor, it's Joe Ostoyich

9   from Baker Botts.

10       We think a 54(b) is difficult.  It might work.

11  We're not sure, but we think it's going to be difficult

12  because it is different than a patent case.

13       The alternate which we filed reasonably after we

14  got your order denying our request for a final judgment was

15  an interlocutory appeal.  We think that is also difficult.

16  Again, it might work, but we do think your Honor has been

17  clear, that the case should go to the Third Circuit before

18  it addresses damages.  We think that's the rule we should

19  continue to follow here.

20       I have on the phone with us Tom Hungar, who is

21  an appellate specialist from Gibson Dunn law firm.  If you

22  want us to address 54(b) in more detail, I think Tom would

23  be the appropriate person to talk about that.

24       THE COURT:  Well, I didn't really mean this to

25  be oral argument with kind of expert witnesses on the phone.

1    It sounds as though I need to go back to the papers and see

2    how I extract myself from the procedural morass that I put

3    myself in, apparently.

4           So if there's something more you would like to

5    state, this is the time to do it.  Otherwise, we'll get back

6    to the papers and issue something this week.

7           MR. HUNGAR:  Your Honor, this is Thomas Hungar.

8    With your permission, I'd like to give you a couple of case

9    cites on the 54(b) point.

10          THE COURT:  All right.

11          MR. HUNGAR:  Liberty mutual Insurance Company

12   against Wetzel, W-e-t-z-e-l, 424 U.S., 737, from 1976.  And

13   Riley versus Kennedy, 553 U.S., 406, from 2008.  Those are

14   cases which I believe stand for the proposition that where

15   the judgment entered does not address damages or injunctive

16   relief, there isn't a final judgment for purposes of 1291 in

17   the ordinary case, leaving the patent context aside, which

18   is why the proper mechanism for getting the issue up on

19   appeal in this context we believe is 1292(b).

20          THE COURT:  All right.  Anything else?

21          MR. OSTOYICH:  Your Honor --

22          THE COURT:  Yes?

23          MR. OSTOYICH:  -- this is Joe Ostoyich from

24   Baker Botts again.

25          May I throw out one other suggestion?  I think

```
 1    there was a similar situation in the Dentsply litigation,

 2    the class action follow-on cases.  And in that case, I think

 3    your Honor ordered the parties to effectively, to stipulate

 4    to a final judgment of appeal, which the Third Circuit

 5    accepted and they came up with a mechanism to do that.

 6            We do not have an objection to having in effect

 7    cross interlocutory appeals, so that we would appeal the

 8    liability side and plaintiffs would appeal the Daubert

 9    ruling, excluding the damages.  That might be an alternate

10    way to go here.

11            THE COURT:  Well, it certainly would be a

12    cleaner way to go, because I'm not sure how we go about the

13    damages trial when the damages expert, you know, the expert

14    for the plaintiff has -- when my Daubert opinion has so

15    thoroughly eviscerated the plaintiffs' damages expert.

16            So is that not a cleaner way of getting -- I'm

17    not sure how we go about getting a damages trial under way

18    in any event.  And I'm addressing this to plaintiffs'

19    counsel, of course.

20            MR. FASTOW:  Yes, your Honor.  Thank you.  Jay

21    Fastow.

22            I think maybe we just need to step back, because

23    we have had pending since before the liability trial, and

24    then, of course, we supplemented it after the liability

25    trial, our motion for clarification, reargument, et cetera,
```

1    on the Daubert decision.

2            And, of course, as we said in our post-trial

3    supplement, the -- among other things, the issue of the

4    strategic business plan, which, you know, the Court

5    commented on, Daubert decision has really changed, because

6    it has now been admitted into evidence, and the expert is

7    entitled to rely under the rules on information that is in

8    evidence, and this document was admitted into evidence

9    without objection by defendant.

10           And then we have the other reasons as well,

11   including the alternative damages calculations that he

12   proffered at motion, and that were supported, again, by the

13   trial, by his testimony on his econometric model.  He was

14   cross-examined on the econometric model, et cetera.

15           So I think that in terms of damages, that

16   decision is out there, and, you know, we would respectfully

17   ask the Court if we could look at that, and if they agree

18   with us on that in any of a couple of parts, either his

19   original report or the proposed alternative calculations

20   which use information that comes out of his original report,

21   just a different set of calculations, or, you know, the last

22   alternative, or one of the other alternatives we offered was

23   to revise his report.

24           But all of those worked to allow Dr. DeRamus to

25   go ahead and testify, and that way we don't have to try to

1  come up with some kind of a gerrymandered approach to

2  appealability.

3          THE COURT:  Well, that wasn't gerrymandered.

4  That made perfect sense to me.  But you're saying you want

5  me to go back and re-review my Daubert motion?  Is that what

6  you're asking me to do?  There's an outstanding motion

7  someplace that I'm supposed to review, be reviewing?

8          MR. FASTOW:  Yes, your Honor.  It's our motion

9  for clarification, reargument, and so forth that we made

10  right before the liability trial.  I'm not sure I have the

11  exact date, but it would have been around September 3rd of

12  2009.  And then there was briefing on that.  We briefed it

13  and defendant opposed it.  September 4th, 209.  Maybe we'll

14  even have a DI number.

15          And then after the trial, we supplemented it in

16  light of the trial evidence, which, of course, included the

17  strategic business plan being admitted into evidence without

18  objection.  And defendant has opposed that.  So I think

19  that's certainly ready for decision.

20          And if the Court allows Dr. DeRamus to go ahead

21  and testify based on any of the alternatives we lay out

22  there, then we certainly could proceed towards a damages

23  trial, which we think is the best and most efficient way to

24  try to bring this case towards an end.

25          THE COURT:  And so let's assume that I am going

1    to resurrect a motion that is two years old, and let's

2    assume that I deny it and we're left with the situation we

3    have now.  At that point, would it make sense to have

4    cross-appeal on liability, on the Daubert decision, and get

5    it up to the Third circuit?

6            MR. FASTOW:  Well, the other thing we have

7    pending in terms of relief, just putting damages to the

8    side, is injunctive relief.  And we do now have a situation

9    where Eaton has been found by the jury and upheld by this

10   Court to have violated three antitrust statutes, and, you

11   know, injunctive relief is, of course, part of that.  And

12   that's why I think it's important to try to move forward on

13   all bases of relief, to try to deal with this, to try to

14   deal from plaintiffs' perspective, from the competition's

15   perspective, to deal with these violations by Eaton that

16   have been found by the jury and that have been upheld by

17   this Court.

18           THE COURT:  I thought you were out of the

19   business.  What kind of injunctive relief are you

20   contemplating?

21           MR. FASTOW:  Well, we'll be putting that

22   together, your Honor.  We've been out of the business, but

23   as the trial evidence showed, there are still conversations

24   going on.  I think one or more of our witnesses testified

25   about that, that either contemplation of possibly getting

1   back in if the market were opened up for us, people

2   interested in whether we would get back in if the market

3   were opened up for us.

4           Of course, there's a big blockage, which is the

5   market has been closed on us, as the jury held, and as long

6   as that remains in place, you know, the question of entry is

7   subject to that obstacle.  But if that obstacle were taken

8   away, then it's a different question, a different set of

9   calculations.

10          THE COURT:  And so tell me again why this has

11  anything to do with the discussion we're having.

12          MR. FASTOW:  Because it says that we also would

13  have a procedure for injunctive relief as well as for

14  damages in terms of relief.

15          THE COURT:  All right.  Final word from

16  defendant's counsel.

17          MR. OSTOYICH:  Yes, your Honor.  You used the

18  word, the rhetorical question, or you asked me to go back

19  and resurrect a motion from two years ago.  That's exactly

20  what they're asking you to do and it is truly a

21  resurrection.

22          We submitted a short, two-page letter on Friday

23  laying out your Honor's repeated rulings on this, their

24  request to reconsider or proffer, and we've got quotes from

25  the transcript and your Honor's post-trial ruling of it

1    repeatedly denying it.

2              So there is no motion that's pending that can be

3    resurrected at this point.  And I do think, as counsel for

4    plaintiffs really hasn't addressed it, I do think there's a

5    possibility of having some sort of a stipulation to cross-

6    appeal.  That would be effective and efficient.  We might

7    have to work on the form of that, but I'm sure we could come

8    up with that as it was done in Dentsply, and I have not

9    heard anybody say why that won't work.

10             THE COURT:  Well --

11             MR. FASTOW:  Your Honor, if I may.

12             THE COURT:  All right.

13             MR. FASTOW:  If it would be helpful for your

14   Honor, we're happy to put together a package of all the

15   papers that have been submitted on the motion for

16   clarification or reargument that's a pending motion.

17             THE COURT:  It would not be helpful.  And I

18   don't think it's pending because it would be on my list for

19   two years.

20             So I will go back and look, and I will be in

21   touch with you folks.  And I appreciate your time this

22   morning.  Thank you.

23             (Telephone conference concluded at 10:56 a.m.)

24                      -   -   -

25

EXHIBIT 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| _____ ) | |
| ZF Meritor LLC and )  | |
| Meritor Transmission Corporation ) | |
| ) | |
| Plaintiffs, ) | **Civil Action No. 06-623-SLR** |
| ) | |
| v. ) | |
| ) | |
| Eaton Corporation ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**Expert Report of David S. Sibley**

000759

TABLE OF CONTENTS

I.      Introduction ........................................................................................................... 1

   A.    Qualifications ................................................................................................ 1

   B.    Assignment .................................................................................................... 1

   C.    Summary of Conclusions .............................................................................. 2

   D.    Outline of Report .......................................................................................... 4

II.     Damages Analysis ................................................................................................ 4

   A.    Conceptual Issues ......................................................................................... 5

   B.    The But-for World ........................................................................................ 6

   C.    ZFM's Costs Were Excessive Relative to Eaton's Costs ............................ 9

   D.    Non-Cost Factors that Reduced the Ability of ZFM to Compete ............... 14

   E.    Conclusion .................................................................................................... 19

III.    Evaluation of Dr. DeRamus' Damages Methodology ........................................ 20

   A.    Dr. DeRamus' Estimates of ZFM's Lost Profits 2002-2009 ...................... 21

       1.    *Dr. DeRamus' Market Share Forecasting Model* ................................ 21

       2.    *Dr. DeRamus' Estimates of ZFM's But-For Profit Margins* ............... 34

   B.    Dr. DeRamus' Estimates of ZFM's Lost Enterprise Value ......................... 38

IV.     Adjusted Damages Net of Discounting by ZFM ................................................ 44

V.      Appendix One: Curriculum Vitae of Davis S. Sibley ........................................ 61

VI.     Appendix Two: Documents Considered .............................................................. 70

1

000760

## I. INTRODUCTION

### A.    Qualifications

1.       My name is David S. Sibley. I am the John Michael Stuart Centennial Professor of Economics at the University of Texas at Austin. In October 2004, I completed an eighteen-month term as Deputy Assistant Attorney General for Economic Analysis in the Antitrust Division of the U.S. Department of Justice, the highest-ranking economics position within the Division. In this capacity, I supervised all economic analysis within the Antitrust Division and directed its Economic Analysis Group. As Deputy Assistant Attorney General, I also contributed to the economic analysis of general policy issues and represented the United States in Organization for Economic Cooperation and Development discussions.

2.       For the last thirty years, I have carried out extensive research in the areas of industrial organization (a field of economics that examines the behavior of firms and the structure of markets), microeconomic theory, and regulation. My publications have appeared in a number of leading economic journals, including the *Journal of Economic Theory*, *Review of Economic Studies*, *Rand Journal of Economics*, *American Economic Review*, *Econometrica*, and the *International Economic Review*, among others.

3.       I hold a Ph.D. in economics from Yale University and a B.A. in economics from Stanford University. Additional details regarding my qualifications and experience are given in my curriculum vitae, a recent copy of which is attached to this report as Appendix One.

### B.    Assignment

4.       I have been asked to review and comment on the Amended Expert Damages Report of Dr. David W. DeRamus, dated January 16, 2013.[1] In particular, I have been asked to

---

[1] Amended Expert Damages Report of David W. DeRamus (hereinafter "DeRamus Amended Damages Report"), January 16, 2013.

render an opinion on Dr. DeRamus' economic analysis and to provide my estimate of damages, if any, in the present case.

5.       As part of my investigation, I (or my staff working under my direction) have considered a number of documents and other sources of information. The materials I reviewed include, but are not limited to, the following: (1) the various expert reports and declarations of Dr. DeRamus, together with their supporting documentation; (2) documents and databases produced in discovery; (3) publicly available data and information regarding heavy-duty transmissions; (4) academic publications regarding economic issues relevant to this proceeding; and (5) depositions and trial testimony of Eaton and ZFM personnel. I also have interviewed Eaton personnel. Appendix Two provides a detailed list of the material I considered in the preparation of this report.

6.       I am being compensated at an hourly rate of $650, and my compensation is not contingent on the outcome of this proceeding. My research into the matters discussed above continues, and I reserve the right to modify or supplement my opinions as additional information becomes available.

C.    *Summary of Conclusions*

7.       This section summarizes my primary findings and conclusions. Because the report contains a detailed analysis, the following summary does not reflect all of my conclusions or all of the bases for those conclusions. The facts or data upon which I am basing the opinions set forth in this report are of a type reasonably relied upon by experts in the field of Industrial Organization. My primary conclusions are summarized as follows:

- ZFM would not have been financially viable in the but-for world. Therefore, damages are zero.

2

- In the liability portion of his 2009 report, his 2009 deposition, and his trial testimony, Dr. DeRamus asserts that Eaton's conduct reduced competition and caused transmission prices to rise. However, in his damages analyses, Dr. DeRamus implicitly assumes the opposite: in the but-for world without Eaton's allegedly anticompetitive conduct, transmission prices would have been as high or higher—not lower. His approach does not provide an economically sensible methodology with which to estimate damages.

- Dr. DeRamus provides no economically meaningful analysis that supports a conclusion that the conduct he identifies as anticompetitive was the source of any diminution in ZFM's sales, share, or profits. Moreover, if any individual element of conduct (or group of elements) were found to be lawful, his damage methodology is not capable of isolating the effects of specific allegedly anticompetitive act(s).

- Dr. DeRamus develops an econometric model to estimate ZFM's share of Class 8 but-for truck builds. His model is not economically meaningful because it fails to include any of the important determinants of ZFM's share, such as the relative prices of ZFM and rival products, product characteristics such as the perceived product quality of ZFM's product versus competitive alternatives, and ZFM's failure to offer a full product line, among other economically important factors. Instead, his model includes only "macro" variables that are entirely unrelated to whether a truck buyer will specify a ZFM or a rival supplier's transmissions.

- Dr. DeRamus finds that ZFM's shares in his but-for world are considerably higher than they actually were. He justifies this robust share growth on two grounds. First, large unforeclosed sales of ZFM's FreedomLine transmission could be expected to boost ZFM's share. Second, in his view, his forecasting model "fits" the data well. Notably, Dr. DeRamus makes no claim that ZFM's shares in the but-for world would be higher as a result of increased sales of manual transmissions.

- His first "justification" is an untestable, anecdotal impression of the record. Moreover, this justification is undercut by Dr. DeRamus' own estimates of the cost of the FreedomLine transmission which show that its costs were too high for the product to be economically viable in the long run. Furthermore, experience in the marketplace since 2009 shows that truck buyers in the North American Free Trade Agreement ("NAFTA") market prefer manual transmissions to automated mechanical transmissions, given their relative prices. Hence, it is unlikely that the market shares for FreedomLine transmissions would have grown to the extent apparently assumed by Dr. DeRamus.

- His second justification is misleading because it implies that a model that fits the data well (based on his criterion) is a reliable forecasting tool. However, I find that when his modeling approach is used to forecast market shares for portions of the pre-conduct period, differences between actual and predicted values show that the model does not forecast well at all. I also have estimated a model only slightly different from his, but that "forecasts" much lower shares for ZFM in the but-for world.

3

Furthermore, my alternative model fits the data as well or better than that of Dr. DeRamus. This shows the unreliability of Dr. DeRamus' damages analysis.

- Dr. DeRamus' method of estimating ZFM's lost enterprise value is not economically valid. Indeed, it is replete with errors. Under the likely outcome that ZFM is not financially viable in the but-for world, there is no lost enterprise value as of February 2009.

- Finally, even if one accepts Dr. DeRamus' damages analysis (which I do not), his total damages should be reduced because in the but-for world ZFM would have matched or beaten Eaton's prices in order to gain share. In making this argument, I do not intend to imply that Dr. DeRamus' damages model is reliable or accurate.

### D.   Outline of Report

8.      My report is organized as follows. Section II presents my analysis of damages assuming liability on the part of Eaton. Section III provides my evaluation of Dr. DeRamus' damages analysis.

## II. DAMAGES ANALYSIS

9.      Before considering in detail my damages analysis and that of Dr. DeRamus, several overall economic factors should be recognized. Dr. DeRamus concedes that up to the time the ZFM joint venture was formed in 1999, Meritor was a marginally profitable or money losing firm on an operating profits basis.[2] After the joint venture was formed, ZFM's sales volumes of manual transmissions (their only product at the time of the joint venture) fell from 1999 to mid-2000 (i.e., before any of the disputed long-term agreements ("LTAs") were signed) to a level below the break-even level.[3] ZFM's actual variable costs were higher than Eaton's, placing ZFM at a material competitive disadvantage. Moreover, in Dr. DeRamus' but-for world, ZFM's average variable costs remain higher than Eaton's, again placing ZFM at a material

---

[2] Deposition of David DeRamus, March 13, 2009, at 121:14-16 and 125:8-10.

[3] DeRamus Amended Damages Report, p. 10, see also Expert Report of David W. DeRamus (hereinafter "DeRamus Report"), February 17, 2009, ¶ 195, Figure 15, and footnote 297, ZFMA0356437-536.

4

competitive disadvantage. These economic factors are considered in my damages analysis and in my evaluation of Dr. DeRamus' damages analysis.

     A.     *Conceptual Issues*

10.     A threshold issue regarding damages is to determine whether ZFM would have been economically viable absent the disputed conduct. If it would not have been viable, then damages would be zero. In this section, I investigate four issues related to this point. I conclude that ZFM's performance in these areas made it unprofitable in the long run, even absent the alleged conduct.

11.     First, was ZFM operating profitably? The answer to this question is not in dispute. Dr. DeRamus states that ZFM incurred a cumulative operating loss of $93 million from 2000 until Meritor's exit from the market in 2007.[4] Of this total, $41 million in losses occurred from 2000 through March 28, 2002. Therefore, ZFM's average price was less than its average total cost for the period after 2000, including the critical period between 2000 and the end of 2003, when ZF Friedrichshafen dissolved the joint venture. Also, as noted above, prior to its joint venture with ZF Friedrichshafen, Meritor's transmission business seems to have been consistently unprofitable.[5] For my purposes, the issue is whether that unprofitability would have changed absent the disputed conduct.

12.     This leads to a second question: what were the sources of ZFM's losses? One possible reason for ZFM's unprofitability could be that its costs were excessive. From an economic standpoint, the relevant cost measure for pricing purposes is a firm's short run marginal cost, which is generally measured by its average variable cost. Examining average variable costs for Eaton and ZFM sheds light on competitive differences between the costs of the

---

[4] DeRamus Amended Damages Report, p. 10.

[5] Deposition of Dr. David DeRamus, March 13, 2009, at 121:1-20, and 124:16-125:10.

000765

two firms. This question is significant because if some or all of ZFM's losses were attributable to its higher average variable costs, such losses would not constitute antitrust damages since they would not be caused by anticompetitive conduct.

13.      A third question is whether ZFM's costs were increased due to the conduct of Eaton and the original equipment manufacturers ("OEMs"). Dr. DeRamus argues that the actual costs of ZFM's FreedomLine transmission appear artificially high because exclusionary actions taken by the OEMs, perhaps incentivized by Eaton, prevented ZFM from "industrializing" the FreedomLine and producing it at an efficient scale.[6] This question is significant: such losses would constitute antitrust damages only if some or all of ZFM's losses were attributable to the FreedomLine's average variable costs being increased by the allegedly exclusionary actions.

14.      Finally, were there quality problems or other factors that made ZFM transmissions less attractive to OEMs and truck buyers than Eaton transmission? Whatever ZFM's costs and prices, it is possible that other factors, such as these, may have inhibited ZFM's sales. This question is significant because if those quality problems or other factors were not caused by anticompetitive conduct, then losses attributable to their existence would not constitute antitrust damages.

     *B.*     *The But-for World*

15.      Initially, when Eaton and ZFM competed for OEM contracts in the 2000 to 2002 period, Eaton offered to reduce its base prices and offer rebates and other incentives to all four OEMs in order to win contracts and obtain favorable data book placement.[7] ZFM was much less

---

[6] DeRamus Report, February 17, 2009, ¶ 14.

[7] See trial testimony of Dennis Kline at 659:23-660:12. See also DX28 and DM15; EATON-00020765; EATON-00020833; EATON-00070559; DX 436 at ZFMA0340864; ZFMA07400865; PX 115; trial testimony of Kenneth Davis at 2584:18-2586:20; trial testimony of John Buck at 3113:25-3114:11, 3115:19-3117:4, 3198:9-25; trial testimony of Tony Lopes at 2443:16-19, 2444:25-2446:2.

000766

responsive. After Eaton signed LTAs with the four OEMs, ZFM still had the opportunity to sell transmissions to the OEMs in volume. None of the LTAs committed the OEMs to buy any particular number of transmissions from Eaton, or, indeed, to buy any transmissions from Eaton. The LTAs did provide incentives to the OEMs to increase purchases from Eaton through share-based rebates and other incentives. However, if ZFM had been willing and able to offer incentives to OEMs that were worth more than Eaton's incentives, those incentives could have caused the OEMs to switch from Eaton to ZFM.[8]

16.    In my 2009 report, I understood Dr. DeRamus to argue that Eaton's rebates constituted anticompetitive conduct.[9] Therefore, in my but-for damages analysis, I assumed that Eaton did not offer rebates. However, in his Amended Damages Report, Dr. DeRamus concludes: "ZFM did not lose significant market share and ultimately exit the market because it was unable or unwilling to match Eaton's prices."[10] Thus, Dr. DeRamus has changed his opinion and now concludes that Eaton's rebates did not reduce competition. Therefore, where appropriate, I assume that Eaton does offer rebates in the but-for world.

17.    With the above clarification, Dr. DeRamus characterizes Eaton's allegedly anticompetitive conduct as consisting of the following:

- agreements to exclude competing transmissions from OEM data books;
- agreements to raise the prices of non-Eaton transmissions;
- horizontal price-fixing arrangements;

---

[8] This is particularly true for the period 2000-2003. After 2003, the OEMs were aware that ZFM was being dissolved, which may have affected their purchasing decisions. See ARMFTL 006792.

[9] DeRamus Report, February 17, 2009, ¶¶ 119 and 120. See also trial testimony of David DeRamus at 1887:9-1889:1.

[10] The record suggests otherwise. See trial testimony of Thomas Lundahl at 2911:23-2912:10; ZFMA0348932; trial testimony of Dennis Kline at 659:23-660:13; and trial testimony of Mark Lampert at 2395:19-2396:5; See also DX443.

000767

- the imposition of inefficiencies and extra costs on end users;

- reduced competitive equalization payments to end users; and

- other direct evidence.[11]

18.    Dr. DeRamus asserts that Eaton's conduct created a barrier to ZFM's success that could not have been overcome by ZFM even through aggressive, competitive pricing. This assertion ignores the facts in two critical respects. First, as noted above, the LTAs did not obligate the OEMs to buy any particular number of Eaton transmissions. Second, Dr. DeRamus fails to acknowledge that much of the conduct described above was entered into by the OEMs in order to earn share-based rebates from Eaton.[12] For example:

- preferential data book positioning was driven largely by pricing and the prospect of rebates;[13]

- OEMs attempted to get their customers to "spec" Eaton transmissions rather than competing ones in order to boost rebates;[14] and

- the "horizontal price fixing" arrangement involved attempts by Volvo-Mack to increase Eaton's share, thereby increasing rebates from Eaton.

19.    Dr. DeRamus does not clearly state why Eaton's LTAs allegedly imposed inefficiencies on end users. He may be referring to attempts by the OEMs to get their customers, some of whom may have preferred ZFM transmissions to Eaton, to switch from ZFM to Eaton despite their preferences. Whether or not this represents an inefficiency is debatable, but it is not debatable that Dr. DeRamus has not measured or quantified such an alleged inefficiency. In addition, some of the conduct identified by Dr. DeRamus would not adversely affect ZFM. For

---

[11] DeRamus Report, February 17, 2009, ¶ 9.

[12] OEMs formed "growth teams" with Eaton to cooperate on how to increase Eaton's share. See Deposition of Paul Barkus, October 28, 2008 (hereinafter "Barkus Deposition"), pp. 101-102. However, the OEMs did this only to foster share and growth related rebates.

[13] See Barkus Deposition at 190:14-191:3 and 227:2-17. See also Deposition of Thomas Lundahl, October 21, 2008, at 64:3-25.

[14] See Barkus Deposition at 102:10-14.

000768

example, the alleged horizontal price-fixing agreement would increase the prices of Volvo-Mack transmissions. Such a price increase would benefit ZFM by enabling it to either raise its prices as well or keep its prices below Volvo-Mack's prices and take share from that firm.

20.     With respect to the reduced competitive equalization payments to end users, Dr. DeRamus' claim that these constitute anticompetitive conduct is incorrect.[15] From an economic perspective, a final customer cares only about the all-in price of the truck, including the cost of the transmission. The precise amounts of the rebate and equalization payments are irrelevant. The competitive equalization payment and OEM rebates both enter into the all-in price. In the end, the mix of OEM rebates and competitive equalization payments is no more than a decision about whether to emphasize "push" marketing (getting OEMs to promote the product to truck buyers) or "pull" marketing (getting truck buyers to spec a particular transmission).

21.     In sum, the OEMs' conduct did not impede ZFM's sales efforts because ZFM was free to compete with Eaton at all times by offering lower prices, larger rebates, or both. If ZFM had offered lower prices and/or larger rebates, ZFM could have induced the OEMs to increase ZFM's shares rather than Eaton's shares. Indeed, according to the statement from Dr. DeRamus quoted above, ZFM was fully capable of competing on the basis of price even in the presence of the allegedly anticompetitive conduct.

        C.    *ZFM's Costs Were Excessive Relative to Eaton's Costs*

22.     One possible reason why ZFM did not undercut Eaton's prices is that Dr. DeRamus is incorrect that ZFM could have done so profitably in the long run. Instead, ZFM's costs may have been so high that it could not have profitably undercut Eaton's prices and

---

[15] DeRamus Report, February 17, 2009, ¶¶ 3, 119, and 120.

000769

rebates, either at the time when it was competing for LTAs against Eaton or later after the LTAs had been signed.[16]

23.        I have analyzed the cost data for Eaton and ZFM used by Dr. DeRamus. Table 1 contains estimates of average variable costs for Eaton and ZFM manual and automated mechanical transmissions. ZFM's average variable costs are calculated in a manner consistent with those used by Dr. DeRamus in his "contribution margin" calculations. A firm's average variable costs do not include fixed or overhead costs, even though these costs must be covered in order for the firm to remain in business in the long run. A firm's contribution margin shows how much a firm earns in a sale in order to make a contribution to the recovery of its fixed and overhead costs.

24.        As shown in Table 1, for 9 and 10 speed manual transmissions, Eaton had considerably lower average variable costs than did ZFM. Starting in 2000, ZFM's average variable cost for producing manual transmissions was $296, or 17 percent, higher per transmission than Eaton's average variable cost (i.e., $2,003 – $1,707 = $296; and $296/$1,707 = 17%). By 2004, Eaton's average variable cost advantage had increased to $442 per transmission, so that ZFM's average variable cost for manual transmissions was 26 percent higher than Eaton's. Both of Eaton's automated mechanical transmissions, the AutoShift and the UltraShift, had average variable cost advantages that are even larger. In 2002, the average variable cost of the AutoShift was approximately half of that of the FreedomLine (i.e., $2,869 for Eaton versus $5,430 for ZFM). In 2003, the average variable cost of the UltraShift was 61 percent of that of the FreedomLine.[17] These relationships are important because they imply that at equal prices, the

---

[16] It may also be that ZFM underestimated OEMs' willingness to induce their customers to switch transmission in response to price differences. See trial testimony of Dennis Kline at 660:4-12 and 661:14-25.

[17] To be consistent with Dr. DeRamus' methodology for determining contribution margin, I calculated the average variable cost figures in Table 1 by deducting Eaton's fixed manufacturing costs from its standard overhead costs. I

000770

Eaton transmissions contribute more to the recovery of fixed and overhead costs than the corresponding ZFM transmissions, which were ultimately unable to do so. This provides a corresponding price advantage to Eaton in its competition with ZFM.

25.     Dr. DeRamus claims that ZFM's average variable cost for the FreedomLine increased because of Eaton's conduct.[18] More precisely, he believes that the exclusionary actions allegedly taken by Eaton made it impossible for ZFM to move production of the FreedomLine over to the U.S. and "industrialize" it, producing at an efficient level of output.

26.     This claim suffers from a conceptual flaw. Dr. DeRamus assumes that sales of the FreedomLine would have surged in the but-for world because the NAFTA market would have shifted from manual to automated transmissions relatively quickly. However, that did not occur. The NAFTA market has remained largely a manual market even after the exit of ZFM and successive improvements in the UltraShift.[19] This came as a surprise to OEMs, as well as ZFM and Eaton.[20] Dr. DeRamus has not performed any economic analysis that supports the claim that the FreedomLine would have had substantially more sales in the but-for world. Hence, the failure of the FreedomLine to "industrialize" could not have had a decisive effect on ZFM's profits.

27.     Next, consider Dr. DeRamus' claim that the costs of the FreedomLine would not have been excessive but for Eaton's conduct. Dr. DeRamus' 2009 report presents estimates of the actual FreedomLine average variable costs for 2001-2004 and also shows the costs that could

---

did so based on information obtained from Eaton finance and accounting personnel. Although my variable costs figures are somewhat lower than those presented in my 2009 Expert Report, which conservatively included fixed overhead costs, the variable cost figures now permit an apples-to-apples comparison with Dr. DeRamus' figures.

[18] See DeRamus Report, February 17, 2009, ¶¶ 240-241.

[19] Based on an interview with John Coll, Vice President of Sales and Marketing at Eaton. See Table 3; see also "Automated Mechanical Transmissions Gaining Steadily in Class 8 Trucks," *Truckinginfo*, May 2012, available at http://www.truckinginfo.com/article/print/story/2012/05/automated-mechanical-transmissions-gaining-steadily-in-class-8-trucks.aspx.

[20] See trial testimony of Thomas Lundahl at 2911:8-16.

000771

have been achieved if ZFM had operated at what Dr. DeRamus refers to as the "efficient scale."[21] These latter costs are the average variable costs that Dr. DeRamus believes ZFM would have attained with the FreedomLine absent the alleged conduct by Eaton and the OEMs. For the purpose of the present discussion, I assume that the estimates Dr. DeRamus presents are correct. I note, however, that his but-for market share methodology does not distinguish share increases supposedly due to FreedomLine from increases supposedly due to manual transmissions. Thus, he is unable to say when, if ever, the FreedomLine volumes would have become sufficient to permit that transmission to be produced at his hypothetical more efficient volume.

28.      According to Dr. DeRamus' own estimates, the average variable costs for the FreedomLine decline to a low of approximately $3,900 per unit. This cost estimate shows that the FreedomLine's costs are much higher than those of Eaton's AutoShift and UltraShift transmissions. As shown in Table 1, from 2000-2004, the average variable cost of the AutoShift averaged $2,842, and the average variable cost of the UltraShift averaged $3,079. Thus, Eaton's automated mechanical transmissions had costs that were 21 percent or more below the minimum average variable cost of a fully "industrialized" FreedomLine transmission (i.e., 1 – $3,079/$3,900 = 21%), and Eaton would still have had a greater ability to discount its UltraShift prices profitably than did ZFM. It makes no economic sense to assume, as does Dr. DeRamus, that in the but-for world Eaton would not offer lower prices to prevent share losses to ZFM. A reliable damages model must allow firms to take profit-maximizing actions. Dr. DeRamus' damages model is not reliable because it fails to do so.

29.      To appreciate the competitive impact of the cost differences, suppose that the prices of the FreedomLine and UltraShift transmissions in this time period were $5,000. Eaton

---

[21] See Figure 22 in Dr. DeRamus' 2009 expert report. I am not adopting that figure as the basis for my opinion. My purpose is to show that the figure serves as a basis for Dr. DeRamus' opinion regarding ZFM's costs of producing FreedomLine transmissions.

000772

could offer total rebates and competitive equalization payments (i.e., "SPIFF" payments)[22] totaling as much as $1,500 and would still be able earn a gross margin of approximately 12 percent (i.e., $5,000 − $1,500 = $3,500, and ($3,500 − $3,079)/$3,500 = 12.02%). For ZFM to match this price discount, its gross margin would have been approximately minus 11 percent (i.e., $5,000 − $1,500 = $3,500, and ($3,500 − $3,900)/$3,500 = -11.4%). This calculation assumes a fully industrialized FreedomLine based on Dr. DeRamus' opinion regarding efficient costs for the FreedomLine. Cost differences of this magnitude give Eaton far more competitive flexibility than ZFM.

30.     OEM and ZFM personnel also viewed the AutoShift as a competitor to the FreedomLine.[23] Therefore, cost comparisons between these two products are also relevant to evaluating the commercial viability of the FreedomLine. In view of the relative average variable costs of the two Eaton automated transmissions versus the FreedomLine during the critical 2000-2003 period, the FreedomLine was unlikely to be economically viable. Given how the NAFTA market has developed, the long term future of ZFM would have depended largely on its manual transmissions.[24] Table 2 shows that Eaton's share of manual transmissions in its total output remained high even after ZFM exited. In part due to these cost differences, Eaton was able to set its prices lower than ZFM's prices from 2000 onward, as shown in Table 3.

31.     With respect to manual transmissions, Dr. DeRamus does not claim that ZFM produced manual transmissions at an artificially high cost due to Eaton's conduct. There was

----

[22] A "SPIFF" is a special payment to a truck buyer for making a purchase. See DeRamus Report, February 17, 2009, ¶ 45.

[23] See ZFMA0368680; see also the trial testimony of Gregory Sharp (Freightliner) at 2373:6-16. See also the Deposition of Richard Martello, Ex. 8, at ZFMA0033229 and Ex. 10 at ZFMA0021589 and 593.

[24] Table 2 also shows that the share of FreedomLine in ZFM's total sales was high—over 30 percent. This, however, is an artifact of the steep decline in ZFM's sales of manual transmissions prior to any of the June 2000-October 2002 contracts at issue between the OEMs and Eaton. See Figure 15 in DeRamus Report, February 17, 2009.

13

never an "industrialization" issue for ZFM's manual transmissions since they were produced in the U.S. in the same ArvinMeritor factories that had produced them historically and well before the disputed conduct occurred. Hence, between Eaton and ZFM manual transmissions, the cost differences shown in Table 1 are not due to Eaton's conduct. More generally, Eaton's overall cost structure for manual transmissions was lower than ZFM's, and Dr. DeRamus has not demonstrated that ZFM's cost structure for manual transmissions was higher because of Eaton's conduct.

32.        I also note that Dr. DeRamus states that ZFM ran operating losses from its inception and also states that the pre-ZFM Meritor transmission business was not generally profitable.[25] In other words, ZFM's revenues many have covered its variable costs but not its total costs. That is, its average price failed to cover its average total cost. Therefore, in the long run, ZFM was not economically viable unless it could lower its costs and increase its sales. In the area of manual transmissions, ZFM was never able to match Eaton's cost.

> D.      *Non-Cost Factors that Reduced the Ability of ZFM to Compete*

33.        Sales of heavy duty trucks declined substantially from 1999 to 2001 and remained relatively low through 2003.[26] This reduced the derived demand for transmissions and also prompted OEMs to demand price reductions from their suppliers. ZFM apparently tried to resist the pressure to discount prices during that depressed period.[27] There also were non-cost factors that played important roles in the difficulties faced by ZFM. First, I consider quality problems. In doing so, I note at the outset that quality issues arise with many new products, and new heavy

---

[25] DeRamus Amended Damages Report, p. 10. See also Deposition of Dr. David DeRamus, March 13, 2009, at 121:1-20, and 124:16-125:10.

[26] See DeRamus Report, February 17, 2009, Figure 16, p. 83.

[27] See PX772 ; see also trial testimony of Dennis Kline at 654:6-14; see also trial testimony of Rolf Lutz at 1033:9-15; see also DX310, letter from Chris Benner, ZFMA0016042.

000774

duty truck transmissions are no exception, whether made by Eaton or ZFM. I will focus on documents that give the views of senior ZFM executives on quality issues, confining myself to the internal documents of ZFM and OEM employees. Furthermore, I use only documents from after the period during which ZFM supposedly addressed its quality problems. According to Dr. DeRamus, ZFM's quality problems were addressed by mid-2002.[28] I do not endorse his opinion on this. Indeed, it seems there were significant ongoing warranty claims on both ZFM's manual transmissions and the FreedomLine right up until the end of the ZFM joint venture. Nonetheless, for purposes of illustration, I note the following with regard to Dr. DeRamus' view that the ZFM quality problems were addressed by mid-2002. He reaches this conclusion based on his association of the quality of a given transmission with the number of warranty claims for that transmission. However, the basic design of a transmission directly affects its quality. A low-quality transmission may have few warranty claims for the simple reason that buyers purchase few such transmissions.

34.     Focusing on documents generated after the time that ZFM supposedly corrected its quality problems, there are several informative 2003 email exchanges between senior ZFM employees regarding the reliability of the G platform, ZFM's manual transmission. Manual transmissions accounted for the bulk of ZFM's sales. ZFM introduced the G platform in 2000, but the product had quality problems. Indeed, the quality problems with the G platform continued until the end of the joint venture. Therefore, the 2003 emails listed below are not referring to the types of quality problems expected of a new product. Rather, they suggest more fundamental quality problems.

---

[28] See Deposition of David DeRamus, March 6, 2013 at 127:18-128:5.

000775

- A January 17, 2003 internal letter from Dennis Kline to Thomas Gosnell states ". . . G platform overdrive transmission failures continue to mount. It appears that many of our long-term customers have experienced enough and will change specs in FY03."[29]

- A February 8, 2003 email from Thomas Gosnell to Dennis Kline states that a ". . . large, formerly [loyal] transmission customer" would ". . . not be buying our JV products due to G Platform performance issues."[30]

- An October 9, 2003 letter from Kurt Burmeister to Dennis Kline notes in regard to the G platform "Customer satisfaction continues to erode as a result of single rail top cover issues."[31]

35.     Just as telling, as of August 2002, ZFM's joint venture partner ZF Friedrichshafen viewed the quality of ArvinMeritor's manual transmissions so low that it contended ". . . that ArvinMeritor did not fairly represent the quality of the manual transmission during due diligence."[32] Indeed, ZF notified ArvinMeritor that it had a claim against it for $2.5 million on this issue: "ZF and ZF Sub were not informed accurately of the risks of warranty liability related to transmissions. ZF and ZF Sub were not informed of the failure of Meritor HVS and/or Meritor Sub to adequately design test transmission products prior to the sale of such transmissions."[33] This does not speak well of the quality of ZFM's largest selling transmission.

36.     Another non-cost issue affecting customer demand was the lack of a full ZFM product line for heavy-duty transmissions. This problem was recognized as being responsible for lost business as early as 1997,[34] but it was never fixed. This was seen as a critical competitive problem within ZFM. Richard Martello, the President of ZFM, testified:

> Q: Again, so I'm clear on the record, so you're recommending to the Board the same issue we saw back when we were looking at the Mack purchase five or six years before

---

[29] See ZFMA0198799-02.

[30] See ZFMA0186327-28.

[31] See ZFMA0179030-31.

[32] See ZFMA0000436-39.

[33] See ZFMA0001953-54.

[34] See ZFMA0002312-53 at 3.

16

this, which is we needed to developed a full line of products, full line of transmission products, the LLs, the 13-speeds, the 15-speeds, the 18s and so forth, right?

A: We needed a line of products. I never believed we needed exactly everything you said, but–

Q: Okay.

A: –but yes, we needed a fuller line of products.[35]

37.     In a July 13, 2000 ZFM Board meeting, Mr. Martello stated ". . . a full line of automated products [should] be released at every OEM and that the Company [should] develop a full Class 8 product line."[36] Two years later, at the July 3, 2002 ZFM Board meeting, a presentation states: "Freightliner, LLC and Volvo/Mack require a full Class 8 product line . . . they have communicated to us that to be considered as a viable supplier, we must have the full product line."[37] Clearly, apart from the cost issues analyzed above, ZF Meritor had quality and product line problems that adversely affected ZFM's sales throughout its brief existence.[38] Neither the quality issues nor the lack of a full product line are problems that can be attributed to Eaton's alleged conduct.

38.     Finally, it is relevant to compare the prices charged by Eaton and ZFM. Table 3 compares Eaton and ZFM prices for automated and manual transmissions. Over the period 2001-2005, ZFM's manual transmissions had an average list price approximately five percent higher than Eaton's price. The percent difference between Eaton and ZFM for automated transmissions was much larger: ZFM's FreedomLine transmission cost 13 percent more than the UltraShift in 2003, for example $((5,685 - 5,045)/5,045 = 0.127)$. These price differences persist over time.

---

[35] See Deposition of Richard Martello, pp. 157-158.

[36] See ZFMA0033226-35.

[37] ARMA017888 ZF Meritor Board Meeting Slide Deck.

[38] See letter from Jim Thomas (Freightliner) to Dennis Kline (ZFM) dated October 19, 2000. FTL 0176, Sharp Ex. 8.

Together with the differences between Eaton and ZFM regarding cost structure, quality, and breadth of product line, this suggests that ZFM knew that it could not compete directly on price with much success across all potential customers. Rather, the company appears to have pinned its hopes on the FreedomLine, hoping to attract enough customers willing to pay a premium for its two-pedal features. As events unfolded, the size of this market segment was sufficiently small as to make the success of the joint venture unlikely. As noted above, to this day the usage of automated transmissions in NAFTA has not begun to approach the levels that both Eaton and ZFM once anticipated.

39.     At this point, I address Dr. DeRamus' skepticism that Eaton's AutoShift transmission would have been a viable substitute to ZFM's FreedomLine in the but-for world because the AutoShift transmission had three pedals, whereas the FreedomLine had only two.[39] I understand that the AutoShift's clutch pedal is only used when starting and stopping. When the truck is being driven in normal operations, the transmission shifts gears automatically. Nonetheless, Dr. DeRamus notes that this technical difference between the two transmissions exists. However, none of this is directly relevant to the issue of whether or not the AutoShift competed with the FreedomLine. Most germane to that issue is whether or not the prices of the two transmissions constrained each other. Even granting that the FreedomLine had its two-pedal features, consumer choice also depends on the relative prices of the AutoShift and the FreedomLine, which were far apart.[40] For many trucking customers, though not all, this may well have been the deciding factor. The documentary evidence shows that ZFM management regarded the AutoShift as a strong competitor to the FreedomLine. This would be especially true for customers for whom the two-pedal features of the FreedomLine did not outweigh price

---

[39] See DeRamus Amended Damages Report, pp. 2-3.

[40] See Table 3. See also trial testimony of Thomas Lundahl at 2911:23-2912:10.

18

differences between the two transmissions. This was certainly true in 2001, during which the recession caused OEMs to search for new ways to reduce costs.[41]

40.     The price sensitivity of many NAFTA truck customers is illustrated by the fact that to this day, Eaton primarily sells manual transmissions. Even though Eaton has added many features over the years to its two-pedal UltraShift automated transmission, the great majority (at least 85 percent) of Eaton's customers prefer the low price of a manual transmission to the extra features of the UltraShift.[42] Thus, customers' demands show that they prefer the far lower prices of Eaton's manual transmissions to the higher priced automated mechanicals, including the FreedomLine transmission with its two-pedal features.

### E.     Conclusion

41.     ZFM had higher production costs relative to Eaton throughout its existence, a fact that persists even in Dr. DeRamus' hypothetical but-for world. The cost differential between Eaton and ZFM manual transmissions never went away, and the large cost difference between Eaton and ZFM automated transmissions would have been narrowed—but not eliminated—even if ZFM achieved the but-for share hypothesized by Dr. DeRamus and, for example, the FreedomLine had been "industrialized." ZFM also failed to cure the significant quality problems that existed with the G platform, its manual transmission offering in a NAFTA market that, to this day, consists overwhelmingly of manual transmissions. Even though its own customers told ZFM that in order to be viable it required a full product line, ZFM did not develop one. For all these reasons, I conclude that ZFM would not be economically viable in the but-for world.

---

[41] See letter from Paul Barker to Robert Harrison, DX713, ZFMA0321401.

[42] This is based on an interview with John Coll, Vice President of Sales and Marketing at Eaton. This may have begun to change in recent years. See "Automated Mechanical Transmissions Gaining Steadily in Class 8 Trucks," *Truckinginfo*, May 2012, available at http://www.truckinginfo.com/article/print/story/2012/05/automated-mechanical-transmissions-gaining-steadily-in-class-8-trucks.aspx.

000779

Therefore, ZFM could not have incurred lost profits caused by Eaton's conduct, necessarily implying that there are no economic damages.

## III.  EVALUATION OF DR. DERAMUS' DAMAGES METHODOLOGY

42.      A key assumption in Dr. DeRamus' approach is that Eaton's prices and rebates are "not separable"[43] from actions taken largely by OEMs to increase Eaton's share. This assumption is incorrect. The LTAs did not require the OEMs to purchase any particular number of Eaton transmissions. The LTAs provided share-based and other incentives for OEMs to increase purchases from Eaton. Incentives to buy Eaton transmissions, however, only influence buyer behavior if they outweigh incentives to buy from a competitor, e.g., ZFM. If ZFM had offered prices and rebates that were more attractive to OEMs than those offered by Eaton, and if ZFM's products were otherwise attractive to buyers, then OEMs would have tried to boost sales of ZFM transmissions, rather than Eaton transmissions. Indeed, if ZFM had previously offered prices and rebates that matched or beat Eaton's prices and rebates, ZFM could well have induced OEMs not to sign LTAs with Eaton in the first instance. Thus, ZFM could have effectively "de-linked" Eaton's prices and rebates from the conduct of the OEMs viewed by Dr. DeRamus as anticompetitive.

43.      Dr. DeRamus does not address this issue. However, the ability of ZFM to offer prices and rebates that matched or beat Eaton's prices and rebates is key to his claim that Eaton's prices and rebates were "not separable" from actions taken largely by OEMs to increase Eaton's share. For this reason, Dr. DeRamus' failure to address this issue shows that he has not rigorously tested his conclusion that the conduct he identifies as anticompetitive caused a diminution in ZFM's sales, market shares, and profits.

---

[43] DeRamus Amended Damages Report, p. 14.

000780

44.      In addition, Dr. DeRamus testified in his 2009 deposition that his damages model was designed to estimate the "totality" of damages.[44] Thus, if any individual element of Eaton's conduct or any group of elements of that firm's conduct were found to be lawful, Dr. DeRamus' damage methodology is not capable of disaggregating the effects of the conduct he identifies as anticompetitive.

45.      Dr. DeRamus' damages analysis has two parts. First, he estimates ZFM's lost profits over the period March 28, 2002 through February 2009. Second, he estimates ZFM's lost enterprise value as of February 2009. I consider both of Dr. DeRamus' damages analyses in this section.

### A.      Dr. DeRamus' Estimates of ZFM's Lost Profits 2002-2009

46.      Dr. DeRamus estimates ZFM's lost profits over the period March 28, 2002 through February 2009 in three steps. First, he estimates the incremental unit sales that ZFM would have made absent the challenged conduct. Second, he estimates the profit margin per unit that ZFM would have earned in the but-for world. Third, he multiplies his estimated incremental but-for unit sales times his estimated but-for margin. This yields his estimate of ZFM's lost profits.

#### 1.  Dr. DeRamus' Market Share Forecasting Model

47.      Dr. DeRamus uses the same econometric model presented in his 2009 report to estimate the annual total number of transmissions that ZFM would have sold but for Eaton's allegedly anticompetitive conduct. He obtains his estimates by multiplying ZFM's but-for monthly shares estimated from his econometric model times the actual number of Class 8 truck builds in NAFTA in that period. He subtracts from the estimated total number of transmissions

---

[44] Deposition of David DeRamus, March 13, 2009, pp. 357-358.

000781

the number of transmissions that ZFM actually sold to obtain his estimates of the incremental number of transmissions that ZFM would have sold but for Eaton's allegedly anticompetitive conduct.

48.　　　Dr. DeRamus estimates his econometric model using monthly data for the period November 1991 through September 2007. His econometric model relates ZFM's share of Class 8 truck builds to the following macroeconomic variables: (1) the number of heavy duty truck builds in NAFTA; (2) an index of consumer confidence in the U.S.; (3) the West Texas Intermediate crude oil price; and (4) the 5-year U.S. Treasury Constant Maturity interest rate. He also includes ZFM's share in the previous month to capture "market dynamics." In addition to the above variables, he includes a variable (referred to as the conduct indicator variable) that takes the value of zero before July 2000 and one thereafter. He allows the conduct variable to interact with all the other variables in his model to allow the relationship between the macroeconomic variables and market share to be different between two time periods: the period prior to the alleged conduct (i.e., November 1991 through June 2000) and the post-conduct period (i.e., July 2000 through September 2007). In effect, he uses the estimated relationship between the macroeconomic variables in the pre-conduct period to forecast ZFM shares in the alleged conduct period. During the pre-conduct period (holding other factors constant), according to his estimated regression, increases in the consumer confidence index and oil prices increased ZFM's share of U.S. Class 8 truck builds, while increases in truck builds and interest rates decreased ZFM's share.

49.　　　In his first deposition, Dr. DeRamus offered several ad hoc reasons why these variables might be connected to ZFM's share. With respect to why he included the number of truck builds, Dr. DeRamus testified: ". . . Class 8 truck builds and NAFTA is an important macro

000782

variable for the market and, therefore, it is a variable I considered reasonable to include."[45] With respect to why he included consumer confidence, Dr. DeRamus testified: "Consumer confidence is generally relevant for large or durable consumer purchases—I'm sorry. Relevant for large purchases, so it is of broad relevance, again, another macro variable that is relevant, but not necessarily a variable that I was positing as a causal relationship with ZF Meritor's market share."[46] With respect to oil prices, Dr. DeRamus stated: "an increase in oil prices is generally expected to be correlated with a decline in economic activity. . . ."[47] Although these variables may have affected the heavy duty truck market and, therefore, the transmission market as a whole, there is no reason to suppose that they affected individual firms' shares. In other words, Dr. DeRamus presented no evidence, for example, to suggest that truck buyers consult the Conference Board's "Consumer Confidence Survey" before deciding whether to specify an Eaton or a ZFM transmission. Nor did Dr. DeRamus offer any reasons to suppose that they do.

50.        This procedure has severe flaws, as I point out below. The most important is that it assumes that the structure of the market remains unchanged throughout the post-conduct period. This means that Dr. DeRamus assumes that the following economic facts (among others) remain unchanged: the relative prices of Eaton and ZFM transmissions; their relative costs; product features; and competitive entry (including vertical integration). Given these assumptions, Dr. DeRamus' procedure amounts to simply extrapolating the past, while allowing for the statistical effects of "macro" variables that have no theoretical linkage at all to ZFM's market shares.

---

[45] Deposition of David DeRamus, March 13, 2009, p. 312.

[46] Deposition of David DeRamus, March 13, 2009, p. 327.

[47] Deposition of David DeRamus, March 13, 2009, p. 157.

23

51.      In the present case, there are reasons to believe that the structure of the market in the but-for world would be very different from the past.

- From Table 1, not only were Eaton's average variable costs for manual transmissions lower on average than ZFM's average variable costs, the difference appears to have widened somewhat over time. Average variable cost is a good approximation of marginal cost. If a firm's marginal cost declines over time relative to its rivals, then the low-cost firm will wish to lower price. In this case, Eaton would have had a unilateral, profit-maximizing incentive to cut its price over time. Dr. DeRamus' report does not investigate this issue.

- Dr. DeRamus claims that in the but-for world, the FreedomLine would have been "industrialized" and would have achieved efficient scale. Therefore, in his view, the marginal cost of the FreedomLine would have fallen considerably—by approximately $1,000 per unit.[48] A profit-maximizing firm like ZFM would have been induced to cut price.

- Since it was introduced, Eaton's UltraShift has had extra features added[49] and the same likely would have occurred with the FreedomLine. Moreover, the UltraShift transmission does not seem to have had serious quality problems.[50] Hence, both products would have become closer substitutes over time. Economic logic shows that this likely would have intensified price competition between them.

---

[48] See Figure 22 and ¶¶ 240-241 in DeRamus Report, February 17, 2009 and compare the vertical distance between the two cost curves in the figure.

[49] Based on an interview with John Coll, Vice President of Sales and Marketing at Eaton.

[50] See trial testimony of Thomas Lundahl at 2912:22-2913:3

000784

- Daimler-Chrysler has introduced its heavy-duty transmission to the NAFTA market and is installing them in trucks made by its subsidiary, Freightliner, the largest OEM.[51]

- Volvo/Mack has moved production of its I-Shift and mDrive transmissions to the U.S. Approximately 47% of Volvo diesel trucks are equipped with the I-Shift transmission.[52]

- In Dr. DeRamus' but-for world, ZFM gains considerable share at Eaton's expense. In the competitive market of the but-for world, economic logic implies that Eaton would have reduced its prices in response to this loss in share.

52.     All these factors point in the same direction. In the but-for world, Eaton and ZFM likely would have reduced their prices and improved product features. Vertical integration likely would have become a greater threat to both. It is untenable to assume these problems away and simply extrapolate from 1990s industry data, as does Dr. DeRamus. It is to avoid flaws such as this that economists writing for peer-reviewed journals build models that include explanatory or independent variables based on economic theory. In the case of a product choice model that attempts to explain changes in a firm's market share over time, economic theory shows that explanatory variables such as the relative prices of substitute products and their characteristics or features should be included in the regression model. This allows the researcher to control for factors that influence a firm's share and to examine whether qualitative relationships inferred from the data have reasonable economic interpretations. In contrast, Dr. DeRamus' particular

---

[51] Detroit Press Releases (December 10, 2012), "President Obama Visits Detroit Diesel Corporation Headquarters," available at http://www.demanddetroit.com/about/press/pressreleases/detail.aspx?id=1243.

[52] "Automated Mechanical Transmissions Gaining Steadily in Class 8 Trucks," *Truckinginfo*, May 2012, available at http://www.truckinginfo.com/article/print/story/2012/05/automated-mechanical-transmissions-gaining-steadily-in-class-8-trucks.aspx.

000785

forecasting approach simply relates several macroeconomic variables to historical share data. The estimated relationship is assumed to hold in the conduct period. Dr. DeRamus acknowledges that these variables bear no direct relation to ZFM's share. Instead, he simply asserts that meaningful economic relationships are "baked in" to his forecasting model without explicitly identifying or measuring the separate effects.[53]

53.        Thus, Dr. DeRamus admits that the explanatory variables in his model have no economic or theoretical basis for inclusion. He states that in a

> [s]tructural model you would say, here's a bunch of independent variables that I hypothesize have a particular effect on the dependent variable. Something might have a positive correlation or a negative correlation or a negative relationship with the dependent variable of interest. I insert the variables that theory tells me I should insert. Theory gives me a basis for including these, I just don't willy-nilly put in any [] variables, I put in variables that have some economic basis, some theoretical basis for inclusion. And then from those results I have statistical tests to determine whether the variable of interest, the independent variable of interest actually had a statistically significant impact on the [de]pendent variable. That is the appropriate use of hypothesis testing in a structural model. In a forecasting model that's not the purpose of it. I didn't hypothesize that trucks necessarily had one—had a particular positive or negative effect on sales. I used them as a reasonable input into a forecasting model for ZF Meritor's market share.[54]

54.        In sum, Dr. DeRamus defends his model by stating: "The econometric model fits the data well, as evidenced by an R squared statistic higher than 95% and by the close fit of the predicted values to the observed values (see Figure 36 in Appendix D)."[55]

55.        *Critique of Dr. DeRamus' Market Share Forecasting Model.* There is a large body of peer-reviewed economic literature regarding how to estimate customers' product choices, and,

---

[53] Deposition of David DeRamus, March 6, 2013, p. 148 and p. 153.

[54] Deposition of David DeRamus, March 13, 2009, pp. 326-327.

[55] DeRamus Report, February 17, 2009, p. 131.

000786

thus, derive changes in a firm's market share.[56] In the present case, this standard approach would start with a model in which the demand for a particular truck transmission depends on product characteristics such as price, quality, fuel efficiency, expected longevity, maintenance costs, and how the product compares to rivals' products on those characteristics.

56.     Dr. DeRamus chose not to use the standard approach. Instead, he uses a forecasting model whose validity, according to him, depends primarily on how close the model's predicted values are to observed values in the actual world. In this section, I show that Dr. DeRamus' forecasting model is unreliable based on the criterion he uses. Therefore, given that (1) Dr. DeRamus did not use economically relevant variables in his market share model and (2) his forecasting model is unreliable according to his criterion, I conclude that his estimates of ZFM's market shares cannot form the basis of a reliable economic damages study.

57.     *Does Dr. DeRamus' model forecast accurately?* Dr. DeRamus estimates his model over the sample period November 1991 through September 2007. In this section I consider three particular problems with Dr. DeRamus' forecasting model. First, although he finds that his estimating equation fits the sample data well by examining actual and predicted values using data included in the estimation process, he did not assess how well the model forecasts "out of sample." A forecasting model that has large errors in its "out of sample" forecasts is not regarded as a model with good forecasting performance.[57] Second, because his only criterion is goodness-of-fit over the entire sample, he did not account for the possibility that

---

[56] See, e.g., Berry, S. (1994), "Estimating Discrete-Choice Models of Product Differentiation," *RAND Journal of Economics*, Vol. 25, No. 2, pp. 242-262; Nevo, A. (2000), "Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry," *RAND Journal of Economics*, Vol. 31, No. 3, pp. 395-421; Train, K. and Winston C. (2007), "Vehicle Choice Behavior and the Declining Market Share of U.S. Automakers," *International Economic Review*, Vol. 48, No. 4, pp. 1469-1496; and Kim, D. and Cotterill, R. (2008), "Cost Pass-Through in Differentiated Product Markets: The Case of U.S. Processed Cheese," *Journal of Industrial Economics*, Vol. 56, No. 1, pp. 32-48.

[57] See, e.g., Wooldridge, J. (2009), *Introductory Econometrics: A Modern Approach*, South-Western Cengage Learning: Mason, OH, Chapter 18.

000787

other, similar forecasting models may exist that fit the data just as well, but give very different share predictions. Indeed, such models exist, as I show below. The existence of such an alternative model would be regarded as evidence that the original model is misspecified. Third, Dr. DeRamus' choice of timing for his conduct variable implies, in a mathematical sense, that the alleged exclusionary activities actually began then. However, this contradicts statements in his 2009 Expert Report and his trial testimony (and, it appears, the jury verdict as well), such as:

> . . . Eaton induced the OEMs into taking a broad range of anticompetitive actions in 2002 and 2003 in order to convert more of their end customers from purchasing trucks equipped with ZFM transmissions to trucks equipped with Eaton transmissions. . . .[58]

58.     *First, Dr. DeRamus' model does not accurately forecast "out of sample."* A common technique used to evaluate the reliability of a forecasting model is to test its ability to forecast "out of sample."[59] Dr. DeRamus shows that over the period November 1991 through September 2007, the model's predicted ZFM shares are close to the actual ZFM shares (see Figure 36 in Dr. DeRamus' 2009 report).[60] But how well does the estimated model forecast market shares during a period of time outside of which the model was estimated. A model with a high R-squared value may not yield accurate forecasts in out of sample periods.

59.     I estimate Dr. DeRamus' model using his data over the period November 1991 through June 1998. I then use the estimated regression to forecast ZFM's shares over the "out of sample" period July 1998 through June 2000 and compare those forecasted shares to the actual

---

[58] See DeRamus Report, February 17, 2009, ¶ 123.

[59] See, e.g., Wooldridge, J. (2009), *Introductory Econometrics: A Modern Approach*, South-Western Cengage Learning: Mason, OH, Chapter 18.

[60] To illustrate, I calculated the correlation between the model's predicted ZFM shares and the actual ZFM shares and found that it equals 0.78. This is not surprising given that his model has an R-squared value (a measure of goodness of fit) of 0.955 (where 1.0 is a perfect fit). A correlation value ranges from -1.0 to 1.0, with zero indicating no correlation and 1.0 indicting perfect correlation.

ZFM shares. As shown in Figure 1, the gap between ZFM's actual and predicted but-for market shares are much larger than those shown in Dr. DeRamus' 2009 report (see Figure 36). Thus, I find that Dr. DeRamus' model does not accurately forecast the "out of sample" period. (Table 4 shows the regression estimates.) In particular, the correlation between the model's predicted ZFM shares and the actual ZFM shares over the period July 1998 through June 2000 equals negative 0.46. Thus, the correlation becomes less strong and moves in the opposite direction of his within sample estimation analysis. In addition, I performed the same type of "out of sample" test using the periods July 1997 through June 2000 (see Figure 2 and Table 5). The correlation between the model's predicted ZFM shares and the actual ZFM shares over this periods equals negative 0.73. Thus, a standard, "out of sample" test casts doubt on the claim that Dr. DeRamus' model is reliable since it did not forecast accurately a period of known data.[61]

60. *Second, the results of Dr. DeRamus' model are sensitive to simple changes in his macroeconomic variables.* Dr. DeRamus states that a desirable feature of a forecasting model is that it should be parsimonious.[62] He describes a parsimonious forecasting model as one that has "a sufficient number of variables but not too many such that the model loses any real intrinsic value."[63] I report here several simple changes to Dr. DeRamus' model involving similarly parsimonious models that yield sharply different forecasts of ZFM's shares.

61. Suppose that a single variable is dropped from Dr. DeRamus' model. Does the resulting model yield similar forecasts of ZFM's shares? To test this, I estimate Dr. DeRamus' model, but without the interest rate variable. As shown in Figure 3, the resulting predicted, but-for shares are substantially different than those from Dr. DeRamus' model. (See also Table 6

---

[61] See, e.g., Wooldridge, J. (2009), *Introductory Econometrics: A Modern Approach*, South-Western Cengage Learning: Mason, OH, Chapter 18.

[62] Deposition of David DeRamus, March 13, 2009, p. 314.

[63] Deposition of David DeRamus, March 13, 2009, p. 314.

29

which shows the regression estimates.) For example, Dr. DeRamus' model predicts that ZFM's share in January 2008 would be approximately 29 percent. In contrast, the same model without the interest rate predicts that ZFM's share in January 2008 would be approximately 8 percent. Moreover, according to Dr. DeRamus' stated R-squared criterion, the model without the interest rate fits the data almost exactly as well as does Dr. DeRamus' model.[64] By changing it in a way that has almost no effect on its fit with the data, I obtain but-for share predictions far different, and much lower, than his.

62.      Dr. DeRamus uses four macroeconomic variables in his regression model, but of course many other macroeconomic variables could be used. (To be clear, I do not agree that such macroeconomic variables should be used in a regression model designed to estimate ZFM's but-for shares.) Do other similarly parsimonious forecasting models yield the similar predicted values of ZFM's shares? For example, suppose we replace Dr. DeRamus' interest rate variable with the price of gold. Both of these "macro" variables are related to expectations regarding inflation. As shown in Figure 4, the resulting predicted but-for shares are substantially different than those from, and much lower than, the predicted but-for shares in Dr. DeRamus' model. (See also Table 7 which shows the regression estimates.) For example, Dr. DeRamus' model predicts that ZFM's share in January 2008 would be approximately 29 percent. In contrast, the same model replacing the interest rate with the price of gold predicts that ZFM's share in January 2008 would be approximately 1 percent. Moreover, the model that replaces the interest rate with the price of gold has no meaningful difference in fit compared to Dr. DeRamus' model. The value of R square for the model with the price of gold equals 0.959, while the value of R square in Dr. DeRamus' model equals 0.955. According to Dr. DeRamus' own criteria, my adaptation of his

---

[64] The value of R square for the model without the interest rate equals 0.954, and the value of R square in Dr. DeRamus' model equals 0.955.

000790

model is as good or better than his, yet the two models give strikingly different predicted, but-for ZFM shares. The important point is not that one model is better than another, but that his forecasting approach is unreliable.

63.     *Third, Dr. DeRamus' choice of conduct variable makes the mathematical assumption that the date an LTA was signed is also the date the allegedly anticompetitive conduct took effect.* From an economic standpoint what is the right time to say that the conduct at issue began? Dr. DeRamus' position appears to be that the alleged conduct began in the 1990s, but intensified with the July 2000 PACCAR contract, the November 2000 Freightliner contract, the February 2001 International contract (retroactive to July 2000), and the October 2002 Volvo/Mack contract. He also states that the effect of the conduct may have occurred sometime afterwards due to a "grace period," which he does not attempt to break out by OEM contract.[65] In his amended damages report, he states that to be consistent with the jury verdict, he starts his damages calculation to quantify that effect on March 28, 2002. However, he also acknowledges that the jury verdict states only that the effect/injury occurred sometime after March 28, 2002, with no precise dates for any OEM or any particular conduct.

64.     Dr. DeRamus' model assumes that the conduct began in full force starting in July 2000. However, there is considerable evidence that the events that he emphasizes took place considerably after July 2000. For example, as discussed above, three of the four OEM contracts at issue were signed after July 2000. Much of the OEM conduct under those contracts upon which Dr. DeRamus relies did not occur until after the contracts were signed. Dr. DeRamus is clear that, in his opinion, two types of OEM conduct under the contracts acted to lower ZFM

---

[65] See trial testimony of David DeRamus at 1799:13-21; 2117:15-2118:5; and 2238:9-2239:12. In addition, note that Figures 11-14 in Dr. DeRamus' 2009 expert report show that the effects of the conduct at issue only appear in OEM penetration rates with a lag, if at all.

31

sales. First, there was data book positioning, with ZFM allegedly being taken out of data books.[66]
But databook positioning took place at some unknown time after the contracts were effective
depending on when each OEM published its next databook(s). Dr. DeRamus does not set out
those dates, and I know only that they occurred sometime after the start of his conduct period.

65.     Second, Dr. DeRamus relies upon OEMs' actions to encourage their customers to
buy Eaton's lower-priced transmissions and to discourage their customers from ordering ZFM's
higher-priced transmissions, so as to be better able to earn rebates from Eaton. Again, Dr.
DeRamus fails to identify in any systematic way when each OEM took those acts. Even in Dr.
DeRamus' accounting of the events, however, it is clear that each OEM's actions did not take
place on a large scale until at least sometime between 2002 and 2003, or even later, depending
on the OEM. The OEM actions took considerable time to take effect, perhaps because of
consumer interest in ZFM's products.

66.     For example, the LTA between Eaton and Freightliner contained a provision
whereby Eaton was to be given preferential pricing in 2001. Between February, 2002 and late
2002, Freightliner engaged in a number of acts calculated to deter its customers from choosing
ZFM transmissions for their trucks, according to Dr. DeRamus' account.[67] Similarly, he points to
International's 2001 LTA with Eaton, in which he says that International agreed to put Eaton
transmissions in "recommended" status at some subsequent point in time not identified by Dr.
DeRamus. In April 2002, International supposedly imposed upcharges on ZFM transmissions,
and in July 2003 the firm announced that it would remove ZFM from the Diamond Spec

---

[66] My understanding is that this alleged conduct occurred only once during the 2000-2003 period and only with
regard to ZFM's manual transmissions—not the FreedomLine—at Freightliner in 2002 and possibly later. See the
trial testimony of Dr. DeRamus at 2165:15-2171:7.

[67] DeRamus Report, February 17, 2009, pp. 63-64.

000792

warranty program.[68] This warranty programs was not in a databook per se, but rather was a promotion featuring improved warranty coverage when a truck buyer selected a truck containing the highest-quality components offered by International. Again, Dr. DeRamus does not identify the date of that warranty program's publication, nor show any effect on ZFM's sales following its publication.

67.     A review of Dr. DeRamus' own analyses of Eaton's penetration at the OEMs also supports the view that the effect of the contracts, if any, did not start in July 2000 when Dr. DeRamus turns on his conduct variable. In no case does the Eaton share show any noticeable upward trend at or near the July 2000 date selected by DeRamus. The Freightliner contract was signed in late-2000, but the Eaton penetration rate at Freightliner did not begin to increase consistently until late 2002 or early 2003.[69] Eaton's 2001 LTA with International was made retroactive to mid-2000, but there was no increase in Eaton's penetration rate at International until the first quarter of 2003.[70] Paccar signed its LTA with Eaton in 2000 but the Eaton penetration rate there did not begin to rise until the first quarter of 2003.[71] Finally, Volvo-Mack did not sign an LTA with Eaton until October 2002, and the Eaton penetration rate there did not begin to rise until early 2003.[72] Taken together with the belated efforts by each OEM to reach Eaton's share penetration threshold, these facts make a strong case for starting the effective conduct period until sometime in 2002.

---

[68] See trial testimony of Kevin Murphy at 2807; see also trial testimony of John Buck at 3298-3301; see also PTX304; and see also trial testimony of Thomas Gosnell at 3007.

[69] DeRamus Report, February 17, 2009, Figure 11.

[70] DeRamus Report, February 17, 2009, Figure 12. See also DX0537.pdf.

[71] DeRamus Report, February 17, 2009, Figure 13.

[72] DeRamus Report, February 17, 2009, Figure 14.

000793

68.     In order to investigate the effects on Dr. DeRamus' forecasting model of changing the date the allegedly anticompetitive conduct began, I use (based on the discussion above) the date of January 2002, rather than July 2000. Keeping all other aspects of Dr. DeRamus' model the same except for this date yields substantially different predicted ZFM shares. Recall that Dr. DeRamus' model predicts that ZFM's share in January 2008 would be approximately 29 percent. In contrast, the same model with the date the allegedly anticompetitive effect began moved to January 2002 predicts that ZFM's share in January 2008 would be approximately 8 percent.[73] A similar result holds if the date the allegedly anticompetitive effect began is moved to April 2002, i.e., the beginning of the month following March 28, 2002. Clearly, the results of Dr. DeRamus' market share forecasting model are highly sensitive to the date at which one assumes that the allegedly anticompetitive conduct took effect, underscoring the lack of reliability of his damages model.

## 2.   Dr. DeRamus' Estimates of ZFM's But-For Profit Margins

69.     Dr. DeRamus presents four estimates of ZFM's but-for profit margins. First, he estimates ZFM's actual contribution margin over the period January 1996 through June 2000. The contribution margin equals average revenue per unit minus average variable cost.[74] He finds that ZFM's contribution margin averaged $1,019 per unit (see DeRamus Amended Damages Report, Table 3). Second, he reduces ZFM's actual contribution margin by assuming the firm would incur additional overhead costs over the period 2004-2009 (see DeRamus Amended Damages Report, Table 4). Third, he reduces ZFM's actual contribution margin by assuming the firm would incur additional overhead costs over the period 2002-2009 (see DeRamus Amended

---

[73] I also found that moving the start date of the conduct to January 2001 yields a similar finding that the but-for shares would decline substantially from those reported by Dr. DeRamus.

[74] Dr. DeRamus uses gross revenue to calculate his contribution margin. He offers no explanation for why this margin is appropriate for use in his damages calculations.

000794

Damages Report, Table 5). Finally, he uses his estimates of Eaton's profitability as a measure of ZFM's but-for profitability (see DeRamus Amended Damages Report, Table 6).

70.     Dr. DeRamus' methods for estimating ZFM's but-for margins have a defect: they imply but-for manual transmission prices as high or higher than those actually charged by either Eaton or ZFM. From Table 1, ZFM's average variable cost for manual transmissions in 2001 was $2,012. Adding Dr. DeRamus' assumed margin of $1,019 to the average variable cost of $2,012 leads to an "imputed" price of $3,031. This imputed price exceeds ZFM's actual average price for manual transmissions of $2,987 (see Table 3). For 2002, the but-for imputed price equals $3,123, which exceeds ZFM's actual price in 2002 of $3,039. For 2003, the but-for imputed price equals $3,089, which exceeds ZFM's actual price in 2003 of $3,021. Finally, for 2004, the but for imputed price equals $3,178, which exceeds ZFM's actual price in 2004 of $3,074. Note that Table 3 shows that these imputed, but-for ZFM prices all exceed Eaton's prices for manual transmissions.

71.     These results logically conflict with plaintiffs' theory of the case. Plaintiffs allege that Eaton's conduct reduced competition in the relevant market for transmissions. This must mean that actual prices were higher than they would have been in a but-for world without the challenged conduct. Indeed, Dr. DeRamus testified that Eaton earned monopoly profits.[75] However, using Dr. DeRamus' approach, ZFM's but-for prices for manual transmissions are at least as has high as the prices actually charged by ZFM and Eaton. Thus, according to Dr. DeRamus, a more competitive market for manual transmissions in the but-for world would apparently have had higher prices—not lower prices.

---

[75] Deposition of David DeRamus, March 13, 2009, pp. 346-347.

000795

72.      A further conceptual flaw in Dr. DeRamus' analysis is that he does not separate the effects of the conduct at issue from other reasons why ZFM did not succeed. ZFM itself was realistic about these factors. For example, in April 1999, in a review of its initial transmission strategy, ZFM noted that its initial results were not achieved because its products were "plagued by warranty issues," its products "covered only 75% of Class 8 market," and "Eaton continues technology superiority."[76] In a presentation to the Board of Directors on July 13, 2000, when discussing the variance between projected market share (expected to increase from 16.1% to 21.7%) and its actual market share (a decrease from 16.1% to 13%), Mr. Martello discussed a number of factors that contributed to this situation including:

> (i) poor product quality image; (ii) a decrease in Ryder business; (iii) turnover in the Company's sales organization, (iv) an increase in sales of Eaton AutoShift; (v) the push toward 13-speed transmissions, especially by Freightliner, (vi) the multi-year fleet business lost due to competitive equalization cutbacks in early 1999 and (vii) controlled distribution.[77]

Problems like these often take a considerable amount of time to solve (if they can be solved at all). One item in the above-quoted passage refers to a "multi-year" loss, for example. Clearly factors other than the alleged conduct discussed by Dr. DeRamus were present prior to July 2000, and those factors adversely affected ZFM's sales.

73.      As discussed above, non-challenged factors that potentially influenced ZFM's sales include continued product quality problems and ZFM's inability to offer a full product line. With respect to product quality, ZFM in July 2001 recognized that quality issues had limited its

---

[76] See ZFMA0368680.

[77] See ZFMA0356445. See also Rule 30(b)(6) Deposition of Plaintiffs, dated February 4, 2009 at 144-149.

000796

success and that future product reliability was key to the success of the joint venture.[78] Indeed one of the recognized risks in assessing its plan in July 2001 was that the G platform problems may not be fixed.[79]

74.     As noted above, the need to offer a more complete product line was also a factor known to have influenced ZFM's sales.[80] A full product line was believed to be important in (1) gaining a partnership with any OEM, (2) protecting the linehaul business, and (3) protecting residual value in the used truck market.[81] In April 2001, ZFM recognized that it had not achieved its goals of having a full product line because at that time the company was still discussing the issue of how to obtain a full product line faster.[82]

75.     Finally, Dr. DeRamus' approach is also problematic because it does not disaggregate damages. Disaggregation of damages is necessary if some portion of the reduction in ZFM's shares was due to lawful conduct or to other factors unrelated to Eaton's allegedly anticompetitive conduct. In this case, Dr. DeRamus' model would not yield a reliable estimate of damages. Dr. DeRamus' damages methodology provides an aggregate estimate of damages not linked to any specific OEM agreement, nor to any particular type of conduct by Eaton. His damages calculations do not distinguish whether business was lost due to Eaton's lower base prices, up-front rebates (as in PACCAR), or back-end rebates, engineering support in the contracts, cost-cutting support in some of the contracts, field service support, or factors entirely

---

[78] See ZF Meritor Strategy (dated July 10, 2001) at ZFMA0000233 ("product issues have limited our success in the market") and ZFMA0000239 ("future product reliability of JV products is key").

[79] See ZFMA0000242.

[80] See ARM017888.

[81] See ZFMA0348171.

[82] See ZFMA0348171.

000797

unrelated to Eaton, such as any quality gap resulting from quality problems with ZFM's transmissions. Clearly, not all of these factors are at issue in this litigation.

76.     The economic evidence shows that the impacts of the LTAs were not uniform across OEMs. For example, the fact that Volvo/Mack is vertically integrated may explain why it did not have as high a share target as the other OEMs in order to obtain rebates. The Freightliner agreement with Eaton had no explicit link between rebates and shares until 2003, whereas they were always a feature of the Paccar agreement. Looking at the actual behavior of the OEMs and ZFM, the experience of Paccar shows that ZFM was nearly always a substantial distance from the rebated-related shares implied by Paccar's agreement with Eaton. All of this suggests that the differences between OEM purchases from ZFM in the but-for world and actual ZFM sales vary across OEMs in important ways. Dr. DeRamus' approach does not isolate these separate effects. Neither does his approach allow him to identify lost profits due to factors unrelated to Eaton's conduct, e.g., demand shifts towards less expensive manual transmissions and away from higher priced automated mechanical transmissions in light of the economic downturn in 2000-2002, or technical changes.

### B.      Dr. DeRamus' Estimates of ZFM's Lost Enterprise Value

77.     Dr. DeRamus includes lost enterprise value as of February 2009 as the second component of his damages estimate. According to Dr. DeRamus, his estimate of lost enterprise value is equivalent to the present value of ZFM's future lost profits from the date of his report through perpetuity. By including an estimate of lost enterprise value as of February 2009, Dr. DeRamus implicitly assumes that ZFM would have survived the recession of 2008-2009 and would have been a viable entity in the "but for" world. Dr. DeRamus' analysis has several critical errors, each of which invalidates his conclusions.

000798

78.        Dr. DeRamus uses ArvinMeritor and Eaton as "comparables" to estimate the lost enterprise value of ZFM on a "but-for" basis. Dr. DeRamus uses two multiples to estimate the enterprise value ("EV") of ZFM: (1) EV over earnings before interest and taxes ("EBIT") and (2) EV over earnings before interest, taxes, depreciation, and amortization ("EBITDA"). Dr. DeRamus assumes that "but-for" operating profits are equivalent to EBIT and that "but-for" operating profits less depreciation are equivalent to EBITDA.[83] Dr. DeRamus estimates ZFM's enterprise value to be $244 million using the EV/EBITDA multiple and $416 million using the EV/EBIT multiple. He then used the midpoint between them, $330 million, as his estimate of lost enterprise value.

79.        *Dr. DeRamus Uses the Wrong Time Period in His Analysis.* When using a "comparables" approach to valuation, the only relevant price is the price of the comparables as of the date of the valuation, here, February 2009 according to Dr. DeRamus.[84] If a comparable method is used to estimate the value a company, contemporaneous prices are required since they will necessarily contain the best information regarding the effects of market conditions, opportunity costs, and expectations at the time of the valuation. Dr. DeRamus uses the wrong time period in his comparables approach. Dr. DeRamus purports to estimate the "but-for" value of ZFM as of February 2009, but he uses data from the comparable companies based on averages of those companies' stock prices and performance that covers the time period from 2005 through 2007. Further, Dr. DeRamus applies these multiples to his estimates of EBITDA and EBIT to still another incorrect time period, 2006 through 2008. It is very unclear for what time period, if

---

[83] Dr. DeRamus assumed an average EBIT of approximately $34 million and EBITDA of $32 million. This contradicts Dr. DeRamus' definitions of EBIT and EBITDA in Table 14 at p.166 in Dr. DeRamus' original report, where EBITDA is defined as EBIT plus depreciation and amortization. EBIT cannot be higher than EBITDA.

[84] See Internal Revenue Service, Ruling 59/60, Valuation of Stocks and Bonds. Dr. DeRamus claims in his Declaration of June 11, 2009, that Ruling 59/60 is not applicable to the present case (see ¶ 44 in his Declaration). However, he himself uses exactly the same test as that in Ruling 59/60 in his own analysis. See DeRamus Report, February 17, 2009, ¶ 307.

000799

any, this estimate on enterprise value is relevant, but it certainly does not provide a basis for estimating the enterprise value of ZFM at the end of February 2009. Dr. DeRamus' method of using comparable companies (from several years earlier than his valuation date) is not a standard method used in practice nor is it a reasonable approach to estimating enterprise value.

80.      Dr. DeRamus uses an "average" of the enterprise values using stock prices of his comparable companies, ArvinMeritor and Eaton, from the period 2005 through 2007. During the time period used by Dr. DeRamus to develop his "comparables" ratios of EV/EBITDA and EV/EBIT, the stock of ArvinMeritor was selling for approximately $10 to $20 per share; more than 15 to 30 times higher than its February 27, 2009 price of $0.63. The market and the economy changed dramatically from the time period used by Dr. DeRamus to the time period of the valuation. By using the earlier and inappropriate time period, Dr. DeRamus overstates the potential value of ZFM. In other words, an investor would not pay a price for ZFM based on prices of ArvinMeritor between $10 and $20 on February 28, 2009, when ArvinMeritor, assumed to be a comparable substitute, could be purchased for only $0.63 per share on that date.

81.      Dr. DeRamus uses Eaton as a comparable company. The use of Eaton as a comparable company in the "but for" scenario is inconsistent with the assumptions used to estimate the "but for" EBIT and EBITDA. During the time period used by Dr. DeRamus, Eaton was selling for approximately $53 to $95 per share, but it was sold for only $36.15 on February 27, 2009. Again, his use of Eaton as a comparable overstates the potential value of ZFM.

82.      *Dr. DeRamus' Estimate of Enterprise Value Using the EV/EBITDA Multiple.* Dr. DeRamus states that he estimates the "but for" enterprise value of ZFM as of February 2009.[85] Dr. DeRamus takes the average EV/EBITDA multiple of ArvinMeritor and Eaton for the period

---

[85] DeRamus Amended Damages Report, p. 24.

000800

2005-2007, i.e., 7.68, and multiplies it by his estimate of the average EBITDA for ZFM for the years 2006, 2007, and 2008[86] to calculate his estimate of ZFM's enterprise value. To estimate EBITDA, Dr. DeRamus estimates the "but-for" incremental gross profit and subtracts "but-for" overhead costs of $22,878,649 (excluding depreciation). Dr. DeRamus summarizes his estimates of EBITDA for ZFM in Table 5 of his amended report. Applying the average 2005-2007 EBITDA multiple of 7.68 to Dr. DeRamus' average estimate of EBITDA 2006-2008 of $31,758,655 yields an estimate of $244 million for ZFM's "enterprise value."

83.     *Dr. DeRamus Estimate of Enterprise Value Using the EV/EBIT Multiple.* Dr. DeRamus takes the average EV/EBIT multiple for the period 2005-2007,[87] i.e., 12.32, and multiplies it by his estimate of the average EBIT for ZFM for the years 2006, 2007, and 2008 to calculate an estimate of ZFM's enterprise value. To estimate EBIT, Dr. DeRamus uses the lost profits from the approach based on Eaton's profitability. Dr. DeRamus has compounded this error of using Eaton as a comparable company by using Eaton's profits as a proxy for ZFM's operating profits. Dr. DeRamus essentially compares a portion of Eaton's profits to Eaton's historical stock prices. However, in Dr. DeRamus' but-for world, ZFM is a more formidable competitor than it actually turned out to be. In addition, Dr. DeRamus assumes in the but-for world that the heavy-duty transmission market is more competitive and Eaton loses substantial market share to ZFM. Hence, in the but-for world, Eaton's stock price and profits would both be

---

[86] EBITDA from DeRamus Amended Damages Report, Table 7(b) are $25,229,813 for 2007 and $36,152,050 for 2008. In his original report Dr. DeRamus estimated EBITDA to be: $25,834,958 for 2007 and $13,874,463 for 2008. See DeRamus Report, February 17, 2009, Table 11. Thus, in his amended report Dr. DeRamus increased his estimate of EBITDA in 2008 from $13.8 million to $36.1 million, an increase of 160%.

[87] The average stock price over time is a somewhat meaningless measure in the context of a valuation. The price at any point in time is based on expectations and market conditions at that point in time and contemporaneous prices are always required for valuations based on market prices. Prices from the past reflect market conditions that no longer exist and past expectations are always based on less reliable information than is known in the present. Also, the average price can be dramatically different if actual time weighted, day end, month end, or quarter end stock prices are used to calculate the average. Dr. DeRamus did not provide details of this calculation. The enterprise value of the comparable companies would have been different at every moment on every day. Typically information regarding EBIT is only available quarterly when relying on publicly available financial accounting records.

000801

lower than their actual levels. Dr. DeRamus claims that operating profit is a reasonable proxy for the EBIT.[88]

84.     The internal inconsistencies of Dr. DeRamus' analysis can be illustrated by comparing the EBIT to the EBITDA that he assumes in his enterprise valuation. For 2006 he assumes that EBIT would be $42.467 million and that at the same time EBITDA is $33.894 million. Since Dr. DeRamus defined EBITDA as EBIT plus depreciation and amortization, depreciation and amortization would need to be negative $8.573 million—a nonsensical result. Similarly in 2007, his estimates of EBIT and EBITDA imply that depreciation and amortization would be negative $8.882 million (EBITDA $25.229 million and EBIT $34.112 million). Finally in 2008, Dr. DeRamus assumes that depreciation and amortization would be $11.489 million (EBITDA $36.152 and EBIT $24.662), with a change in depreciation and amortization of more than $20 million from 2007 to 2008. The inconsistencies are even greater when the amended report is compared to the original report. His original report estimated EBITDA to be $13.874 million (EBIT was 25.480 million) for 2008 compared to $36.152 million for the same time period of his amended report. The original report would have assumed depreciation and amortization of negative $11.606 million compared to the amended report's estimate of positive $11.489 million.

85.     Applying the average 2005-2007 EBIT multiple of 12.32 to Dr. DeRamus' average estimate of EBIT for 2006-2008 of $33,747,509 yields his estimate of $415,769,309 for ZFM's enterprise value.

86.     *Dr. DeRamus Fails to Consider Capital Requirements*. Dr. DeRamus does not discuss capital requirements when forecasting the increase in market share for ZFM in his but-for

---

[88] EBIT and EBITDA also include non-operating revenues and expenses.

000802

scenarios. Companies typically need to make investments in such things as plant, equipment, and working capital when they expand their business. Also, ongoing businesses need to replace equipment that becomes worn out or obsolete as time passes. Dr. DeRamus appears to assume that ZFM could have approximately doubled its sales from 2000 to 2009 without making any additional capital investments or replacing depreciated capital. To the extent additional capital investments would be required, the cost of obtaining the required capital would need to be subtracted from the "but-for" damages.

87.     Dr. DeRamus claims to have checked the reasonableness of his enterprise value estimate by calculating the net present value ("NPV") of ZFM's expected cash flows, but this is not what he has done. In fact, he performs his reasonableness check by calculating the NPV of ZFM's EBITDA. That is, he divides ZFM's EBITDA by the weighted average cost of capital minus the expected growth rate of EBITDA. Dr. DeRamus applies the discount equation to EBITDA—not to free cash flows, as required to calculate the NPV. EBITDA differs from free cash flow in several important respects. EBITDA is an accounting measure not an economic one and is not based on cash transactions. In contrast, free cash flow is the cash generated by the company after all costs of doing business including taxes and capital investments. Dr. DeRamus ignores the requirement to make capital investments in all of his forecasts. The amount of capital used by a company is a function of two things: (1) the amount of consumption of capital (estimated by depreciation) and (2) the amount of new investment. If a company simply replaces consumed capital (new investment equals depreciation), its level of capital remains the same. In contrast, if a company grows it would typically need to increase its level of capital. In all of his scenarios and in his NPV calculation, Dr. DeRamus assumes that ZFM would make no capital investments. Such a situation may be possible in the short run, but to assume that ZFM would

000803

grow at an annual rate of 2.64% into perpetuity with depreciation and no new capital investment is a mathematical impossibility.

88.      In addition, corporations generally pay income taxes, and these taxes are subtracted from operating profits when estimating free cash flow. Thus, assuming an average 35 percent combined state and federal corporate income tax rate, Dr. DeRamus' calculated enterprise value would be overstated, all else equal, by 53.8 percent.[89]

## IV. ADJUSTED DAMAGES NET OF DISCOUNTING BY ZFM

89.      In this section, I show that even if one accepts Dr. DeRamus' damages analysis (which I do not), his total damages should be reduced because in the but-for world ZFM would have match or beat Eaton's prices in order to gain share. In making this argument, I do not intend to imply that Dr. DeRamus' damages model is reliable or accurate.

90.      As discussed above, Dr. DeRamus concludes that neither Eaton's prices nor its rebates were anticompetitive. Furthermore, the conduct that Dr. DeRamus criticizes was largely engaged in by the OEMs, incentivized by rebates and price discounts from Eaton. Therefore, if ZFM had been as efficient as Eaton and had been willing to under price Eaton, the OEMs likely would not have engaged in the disputed conduct and ZFM could have made more sales than they actually did. As to how many more sales ZFM would have made, I assume that in the but-for world, ZFM would have made the sales predicated by Dr. DeRamus' econometric model.

91.      In my 2009 Expert Report for the period 1999-2006, I estimated rebates from the share-related rebates in the LTAs and from Dr. DeRamus' Eaton penetration data at each OEM. I have modified those calculations slightly,[90] and they are presented in Table 8.[91] Table 8 shows

---

[89] A tax rate of 35% means that the after-tax cash flows will be (1 - 0.35) or 65% of the pre-tax cash flows. The pre-tax cash flows will be 1/0.65 or 1.5385 higher than the after-tax cash flows, i.e., 53.38% higher.

[90] I corrected a minor error contained in my 2009 report.

000804

feasible ZFM margins at Freightliner, International, PACCAR, and Volvo/Mack. To make the analysis conservative, I allocate all of Eaton's rebates from all types of transmissions—line haul, performance, and vocational—to Eaton's line-haul transmissions, i.e., the type of transmissions produced by ZFM. For the purpose of this exercise, I assume that all incremental sales are manual transmissions.[92]

92.     Using these rebate data, I have calculated the contribution margin that ZFM should have been able to earn on the sale of manual transmissions by undercutting Eaton's prices and rebates. By doing so, ZFM would have offered the OEMs as good a deal—or better—than Eaton offered. Such lower ZFM prices and rebates would have removed the economic incentive for the OEMs to engage in the conduct that Dr. DeRamus finds to be exclusionary.

93.     Because this procedure removes the OEMs' incentive to increase Eaton's share, it also removes the effect of the disputed conduct whenever it may have taken effect. Therefore, I next assume that in the but-for world ZFM would have sold the exact number of units predicted by Dr. DeRamus' econometric forecasting model. Table 9 shows the relevant calculations and damages estimates. Column [1] shows ZFM's margins, based on undercutting Eaton's prices and rebates. Column [2] shows the incremental number of ZFM transmission builds in the but-for world. Column [3] multiplies Column [1] by Column [2] to obtain ZFM's incremental profits from discounting its prices to undercut Eaton's prices. Over the period 2002-2009, the result is that ZFM should have earned $146 million by undercutting Eaton's prices and rebates. Column [4] shows ZFM's annual lost profits as calculated by Dr. DeRamus using his "contribution

---

[91] In addition, Dr. Kevin Murphy used rebate data from Eaton, and his rebates generally are lower than my estimates. See Expert Report of Professor Kevin M. Murphy, March 17, 2009. Using Dr. Murphy's rebate data makes no qualitative difference to my conclusion. My work papers contain tables showing these results.

[92] This assumption is consistent with the fact, noted above, that through the present, the NAFTA market is mostly based on manual transmissions. Also, Dr. DeRamus provides no way of distinguishing manual from automated transmissions in his incremental but-for units sold by ZFM.

000805

margin method." Over the period 2002-2009, these lost profits equal $302 million. Finally, Column [5] equals Dr. DeRamus' lost profits (i.e., Column [4]) minus the incremental profits that ZFM should have been able to earn by undercutting Eaton's prices and rebates (i.e., Column [3]). Over the period 2002-2009, ZFM's damages, net of its incremental profits, equal $156 million. Thus, even if one were to accept his unreliable damages analysis, Dr. DeRamus' dollar damages total should be reduced considerably. Finally, Dr. DeRamus offers three other damages calculations of ZFM's lost profits over the period 2002-2009.[93] The damages in each of Dr. DeRamus' three other damages calculations also would be reduced if ZFM earned incremental profits from discounting its prices to undercut Eaton's prices.

---

[93] See DeRamus Amended Damages Report, Tables 4, 5, and 6.

000806

****

David S. Sibley
Executed on March 11, 2013

000807

TABLE 1
COMPARISON OF EATON'S AND ZFM'S AVERAGE VARIABLE COST
ACROSS ALL CUSTOMERS 2000-2004

| Year | ZFM[1] | | Eaton[2] | | |
|---|---|---|---|---|---|
| | Linehaul Manual | FreedomLine | Manual 9 & 10 | AutoShift | UltraShift |
| 2000 | 2,003 | | 1,707 | 2,682 | |
| 2001 | 2,012 | 5,721 | 1,626 | 2,863 | |
| 2002 | 2,104 | 5,430 | 1,640 | 2,869 | |
| 2003 | 2,070 | 5,025 | 1,725 | 2,984 | 3,054 |
| 2004 | 2,159 | 4,789 | 1,717 | 2,919 | 3,062 |
| Average | 2,052 | 4,985 | 1,687 | 2,842 | 3,079 |

Notes:
/1 Based on methodology used to compute contribution margin in DeRamus Amended Damages Report Table 3. Sources: *Master_monthly by prod.dta* and *ZFM Damages – BASE.xlsx* produced in DeRamus backup material.
/2 Based on Eaton HDT P&L 1999-2008 for Shenandoah, San Luis Potosi, Kings Mountain, and Shelbyville. Variable Cost Ratio = (Material Standard Costs + Labor Standard Costs + All Other Standard Costs + Total Variances + Total Variable Manufacturing Costs + Distribution Expense) / Total Sales. The average variable cost ratio for 2003-2008Q2 is used for 2000-2002. Average Variable Cost = Variable Cost Ratio x Eaton's average price. Sources: Eaton sales data and *Eaton HDT P&Ls 99-08.xls* produced in discovery.

000808

TABLE 2
RATIO OF AUTOMATED TRANSMISSIONS TO TOTAL LINEHAUL TRANSMISSIONS

| Year | Eaton[1] | ZFM[2] |
|---|---|---|
| 2000 | 0.15 | 0.00 |
| 2001 | 0.15 | 0.01 |
| 2002 | 0.11 | 0.04 |
| 2003 | 0.09 | 0.30 |
| 2004 | 0.09 | 0.37 |
| 2005 | 0.11 | 0.34 |
| 2006 | 0.15 | 0.29 |
| 2007[3] | 0.14 | 0.83 |
| 2008[4] | 0.13 | n/a |
| Average | 0.12 | 0.15 |

Notes:
/1 Based on manual 9 & 10s, AutoShift 10s, and UltraShift 10s. Source: Eaton sales data.
/2 Based on linehaul manual transmissions and FreedomLine. Source: ZFM sales data provided in the backup material of Dr. DeRamus.
/3 Data for ZFM through September 2007.
/4 Data for Eaton through May 2008.

49

000809

TABLE 3
AVERAGE PRICE PER TRANSMISSION ACROSS ALL CUSTOMERS ($)

| Year | Linehaul Manual | | Linehaul Automated | | |
|---|---|---|---|---|---|
| | ZFM | Eaton | ZFM | Eaton | |
| | | | FreedomLine | AutoShift | UltraShift |
| 2001 | 2,987 | 2,829 | 5,753 | 4,981 | |
| 2002 | 3,039 | 2,853 | 5,748 | 4,992 | |
| 2003 | 3,021 | 2,850 | 5,685 | 4,928 | 5,045 |
| 2004 | 3,074 | 2,885 | 6,804 | 4,905 | 5,145 |
| 2005 | 3,058 | 2,949 | 6,882 | 5,036 | 5,257 |
| Average 2001-2005 | 3,030 | 2,891 | 6,390 | 4,971 | 5,218 |
| Sources: ZFM sales data produced in DeRamus backup material; Eaton sales data produced in discovery. | | | | | |

000810

TABLE 4
RESULTS OF ECONOMETRIC MODEL
OUT-OF-SAMPLE FORECAST: JULY 1998 THROUGH JUNE 2000

No. of Observations:   80
$F_{(5, 74)}$:   27.63
R-Squared:   0.6850

| Variable | Coefficient |
|---|---|
| Lagged Log-Odds Ratio | 0.600 (0.000) |
| Class 8 Truck Builds in NAFTA | -0.093 (0.275) |
| Consumer Confidence | 0.003 (0.013) |
| Oil Price | 0.011 (0.244) |
| Interest Rate | -0.086 (0.010) |
| Constant | -0.676 (0.046) |
| Notes: P-values in parentheses. | |

51

000811

TABLE 5
RESULTS OF ECONOMETRIC MODEL
OUT-OF-SAMPLE FORECAST: JULY 1997 THROUGH JUNE 2000

No. of Observations:   68
$F_{(5, 62)}$:                    7.46
R-Squared:              0.5092

| Variable | Coefficient |
|---|---|
| Lagged Log-Odds Ratio | 0.450 (0.003) |
| Class 8 Truck Builds in NAFTA | -0.086 (0.322) |
| Consumer Confidence | 0.002 (0.219) |
| Oil Price | 0.021 (0.092) |
| Interest Rate | -0.085 (0.013) |
| Constant | -1.100 (0.015) |
| Notes: P-values in parentheses. | |

52

TABLE 6
RESULTS OF ECONOMETRIC MODEL WITHOUT INTEREST RATE

No. of Observations:     191
$F_{(9, 181)}$:              179.94
R-Squared:               0.9535

| Variable | Coefficient | Coefficient When Interacted with Conduct Variable |
|---|---|---|
| Lagged Log-Odds Ratio | 0.756 (0.000) | 0.227 (0.046) |
| Class 8 Truck Builds in NAFTA | -0.036 (0.381) | 0.200 (0.122) |
| Consumer Confidence | 0.002 (0.056) | -0.002 (0.332) |
| Oil Price | -0.002 (0.715) | -0.008 (0.339) |
| Constant | -0.587 (0.010) | 0.560 (0.079) |

Notes:
P-values in parentheses.
Conduct variable equals zero before July 2000 and 1 afterwards.

53

000813

TABLE 7
RESULTS OF ECONOMETRIC MODEL WITHOUT INTEREST RATE AND WITH
GOLD PRICE AS EXPLANATORY VARIABLES

No. of Observations:     191
$F_{(11, 179)}$:     157.20
R-Squared:     0.9585

| Variable | Coefficient | Coefficient When Interacted with Conduct Variable |
|---|---|---|
| Lagged Log-Odds Ratio | 0.597 (0.000) | 0.287 (0.053) |
| Class 8 Truck Builds in NAFTA | -0.080 (0.069) | 0.297 (0.018) |
| Consumer Confidence | 0.002 (0.077) | -0.004 (0.061) |
| Oil Price | -0.005 (0.362) | 0.005 (0.573) |
| Gold Price | -0.002 (0.004) | 0.000 (0.693) |
| Constant | -0.112 (0.630) | 0.454 (0.172) |

Notes:
P-values in parentheses.
Conduct variable equals zero before July 2000 and 1 afterwards.

54

000814

TABLE 8
FEASIBLE ZFM MARGINS
AT FREIGHTLINER, INTERNATIONAL, PACCAR, AND VOLVO/MACK

| Year | [1]<br>Avg. Gross Price of Eaton Linehaul Transmissions[1] ($) | [2]<br>Quantity of Eaton Linehaul Transmissions Sold[1] | [3]<br>Total Rebates Offered by Eaton Across All Transmission Products[2] ($) | [4] = [3] / [2]<br>Avg. Rebate per Eaton Linehaul Transmission ($) | [5] = [1] - [4]<br>Avg. Price of Eaton Linehaul Transmission Less per Unit Rebate ($) | [6]<br>Avg. Variable Cost of ZFM Linehaul Transmissions[3] ($) | [7] = [5] - [6]<br>ZFM Margin ($) |
|---|---|---|---|---|---|---|---|
| 1998 | 2,874 | 75,615 | 8,152,652 | 108 | 2,766 | 1,930 | 836 |
| 1999 | 2,936 | 95,651 | 24,244,126 | 253 | 2,682 | 1,923 | 759 |
| 2000 | 2,970 | 72,405 | 30,044,084 | 415 | 2,555 | 2,003 | 551 |
| 2001 | 2,829 | 41,180 | 19,320,006 | 469 | 2,360 | 2,011 | 348 |
| 2002 | 2,853 | 54,844 | 24,006,262 | 438 | 2,416 | 2,104 | 312 |
| 2003 | 2,850 | 65,999 | 17,199,519 | 261 | 2,589 | 2,070 | 520 |
| 2004 | 2,885 | 108,626 | 26,082,577 | 240 | 2,645 | 2,159 | 486 |
| 2005 | 2,949 | 134,742 | 32,023,832 | 238 | 2,711 | 2,239 | 472 |
| 2006 | 2,969 | 143,269 | 34,094,440 | 238 | 2,731 | 2,233 | 498 |
| 1998-2006 | 2,916 | 792,331 | 215,167,498 | 272 | 2,644 | 2,004 | 640 |

Notes:
/1 Based on manual transmissions (manual 9s & 10s).
/2 Based on all manual, automated, and vocational transmissions (manual 7s, 9s, 10s, 13s, & 18s; Lightning series; Top 10, 13, & 18; AutoShift 10s, 15s, & 18s; UltraShift10s; and other). Based on penetration estimates reported in Dr. DeRamus' Report and rebate provisions in Eaton's LTAs (excluding rebates not related to Eaton's share).
/3 Based on methodology used to compute contribution margin in DeRamus Amended Damages Report Table 3. Only includes linehaul manual transmissions.

000815

TABLE 9
ADJUSTED DAMAGES

| Year | [1]<br>ZFM Margin[1]<br>($) | [2]<br>DeRamus ZFM<br>Incremental But-For<br>Builds[2] | [3] = [1] x [2]<br>Profits from<br>Discounting ($) | [4]<br>DeRamus Lost Profits[2]<br>($) | [5] = [4] - [3]<br>Adjusted Damages<br>($) |
|---|---|---|---|---|---|
| 2002[3] | 312 | 11,774 | 3,676,381 | 11,996,579 | 8,320,198 |
| 2003 | 520 | 21,629 | 11,238,444 | 22,037,013 | 10,798,569 |
| 2004 | 486 | 40,769 | 19,807,567 | 41,538,714 | 21,731,146 |
| 2005 | 472 | 53,921 | 25,438,571 | 54,939,049 | 29,500,478 |
| 2006 | 498 | 57,174 | 28,471,745 | 58,253,406 | 29,781,661 |
| 2007 | 520 | 44,654 | 23,202,630 | 45,497,103 | 22,294,473 |
| 2008 | 520 | 58,557 | 30,426,498 | 59,662,093 | 29,235,596 |
| 2009[4] | 520 | 8,018 | 4,165,967 | 8,168,876 | 4,002,910 |
| 2002-2009 | 494 | 296,496 | 146,427,803 | 302,092,834 | 155,665,030 |

Notes:
/1 See Table 8, Column 7. Years 2007-2009 use the margin for 2003, the highest over 2002-2006.
/2 Based on *smearing butfor.xls* provided in backup material of Dr. DeRamus.
/3 Data begin in April 2002.
/4 Data end in February 2009.

56



FIGURE 1
ZF MERITOR BUT-FOR SHARES
TWO-YEAR HOLD-OUT SAMPLE: JULY 1998 TO JUNE 2000

Source: Backup material provided by Dr. DeRamus.

57

000817

FIGURE 2
ZF MERITOR BUT-FOR SHARES
THREE-YEAR HOLD-OUT SAMPLE: JULY 1997 TO JUNE 2000



Source: Backup material provided by Dr. DeRamus.

58

000818

FIGURE 3
ZF MERITOR BUT-FOR SHARES WITHOUT INTEREST RATE AS AN EXPLANATORY VARIABLE



Source: Backup material provided by Dr. DeRamus.

59

000819

FIGURE 4

ZF MERITOR BUT-FOR SHARES WITHOUT INTEREST RATE AND WITH GOLD PRICE AS EXPLANATORY VARIABLES



Sources: Backup material provided by Dr. DeRamus; Federal Reserve Bank of St. Louis.

000820

## V.  APPENDIX ONE: CURRICULUM VITAE OF DAVIS S. SIBLEY

**000821**

**DAVID S. SIBLEY**

Professor, Department of Economics
University of Texas at Austin
Austin, TX 78712
Phone: (512) 475-8545

**Education:**

> 1969   B. A. in Economics, Stanford University
> 1973   Ph.D. in Economics, Yale University

**Teaching Fields:**

> Graduate and undergraduate courses in industrial organization, including topics covering antitrust law and economics.

**Research Fields:**

> Vertical restrictions, including bundling and tying; vertical and horizontal mergers; public utility pricing and regulatory policy; equilibrium constraints on tests of single firm conduct under Section 2 of the Sherman Act.

**Professional Experience:**

January, 2009 – June, 2009: Visiting Professor of Law and Economics, Boston University School of Law.

> May 2003 – October 2004: Deputy Assistant Attorney General for Economic Analysis, U.S. Department of Justice, Washington, D.C.

> March, 1992 – Present: John Michael Stuart Centennial Professor of Economics, University of Texas at Austin.

> August, 1991 – March, 1992: Edward Everett Hale Centennial Professor of Economics, University of Texas at Austin.

> September, 1983 – August, 1991: Research Manager, Bell Communications Research, Morristown, NJ. Head of Economics Research Group.

> September 1981 – September 1983: Member of Technical Staff, Bell Laboratories, Murray Hill, NJ.

> September 1980 – September 1981: Adviser to the Chairman of the Civil Aeronautics Board.

000822

January 1980 – September 1980: Consultant, Civil Aeronautics Board, Washington, D.C.

September 1978 – January 1980: Senior Staff Economist, Council of Economic Advisers, Executive Office of the President, Washington, D.C.

October 1973 – September 1978: Member of Technical Staff, Bell Laboratories, Holmdel, NJ.

**Teaching:**

September 1991 – Present: Introductory Microeconomics, undergraduate and graduate Industrial Organization, business strategy and antitrust law.

Fall 1989: Visiting Lecturer, Woodrow Wilson School of Public and International Affairs, Princeton University. Graduate course in regulation and public choice.

September 1983 – December 1983: Adjunct Lecturer in Economics, University of Pennsylvania. Graduate course on regulation.

**Publications:**

**A. Journal Articles:**

"A Note on the Concavity of the Mean-Variance Problem," *Review of Economic Studies*, July 1975.

"Permanent and Transitory Income Effects in a Model of Optimal Consumption with Wage Income Uncertainty," *Journal of Economic Theory*, August 1975.

"Optimal Foreign Borrowing with Export Revenue Uncertainty," (with J. L. McCabe), *International Economic Review*, October 1976.

"The Demand for Labor in a Dynamic Model of the Firm," *Journal of Economic Theory*, October 1977.

"Optimal Decisions with Estimation Risk," (with L. C. Rafsky, R. W. Klein and R. D. Willig), *Econometrica*, November 1977.

"Regulatory Commission Behavior: Myopic vs. Forward-Looking," (with E. E. Bailey), *Economic Inquiry*, June 1978.

"Public Utility Pricing Under Risk: The Case of Self-Rationing," (with J. C. Panzar), *American Economic Review*, December 1978. To be reprinted in *The International Library of Critical Writings in Economics*, Mark Blaug (ed.), Edward Elgar Press.

000823

"A Dynamic Model of the Firm with Stochastic Regulatory Review," (with V. S. Bawa), *International Economic Review*, October 1980.

"Optimal Nonlinear Pricing for Multiproduct Monopolies," (with L. J. Mirman), *Bell Journal of Economics*, Autumn 1980. To be reprinted in *The International Library of Critical Writings in Economics*, Mark Blaug (ed.), Edward Elgar Press.

"Efficiency and Competition in the Airline Industry," (with D. R. Graham and D. P. Kaplan), *Bell Journal of Economics*, Spring 1983.

"Optimal Non-Uniform Pricing," (with M. B. Goldman and H. E. Leland), *Review of Economic Studies*, April 1984. To be reprinted in *The International Library of Critical Writings in Economics*, Mark Blaug (ed.), Edward Elgar Press.

"Reply to Lipman and Further Results," *International Economic Review*, June 1985.

"Public Utility Pricing Under Risk: A Generalization," *Economics Letters*, June 1985.

"Optimal Consumption, the Interest Rate and Wage Uncertainty," (with D. Levhari), *Economics Letters*, 1986.

"Regulating Without Cost Information: The Incremental Surplus Subsidy Scheme," (with D. M. Sappington), *International Economic Review*, May 1989.

"Asymmetric Information, Incentives and Price Cap Regulation," *Rand Journal of Economics*, Fall 1989.

"Optimal Two Part Tariffs for Inputs," (with J. C. Panzar), *Journal of Public Economics*, November 1989.

"Regulating Without Cost Information: Some Further Thoughts," (with D. M. Sappington), *International Economic Review*, November 1990.

"Compensation and Transfer Pricing in a Principal-Agent Model," (with D. E. Besanko), *International Economic Review*, February 1991.

"Thoughts on Nonlinear Pricing Under Price Cap Regulation," (with D. M. Sappington), *Rand Journal of Economics*, Spring 1992.

"Ex Ante vs. Post Pricing: Optional Calling Plans vs. Tapered Tariffs," (with K. Clay and P. Srinagesh), Journal of Regulatory Economics, 1992.

"Optimal Non-linear Pricing With Regulatory Preference over Customer Types," (with W. W. Sharkey), *Journal of Public Economics*, February 1993.

000824

"Regulatory Incentive Policies and Abuse," (with D. M. Sappington), *Journal of Regulatory Economics*, June 1993.

"A Bertrand Model of Pricing and Entry," (with W. W. Sharkey), *Economics Letters*, 1993.

"Optional Two-Part Tariffs: Toward More Effective Price Discounting," (with R. Rudkin) in *Public Utilities Fortnightly*, July 1, 1997.

"Multiproduct Nonlinear Prices with Multiple Taste Characteristics," (with P. Srinagesh), *Rand Journal of Economics*, Winter 1997.

"The Competitive Incentives of Vertically-Integrated Local Exchange Carriers: An Economic and Policy Analysis," (with D. L. Weisman), *Journal of Policy Analysis and Management*, Winter 1998.

"Having Your Cake – How to Preserve Universal-Service Cross Subsidies While Facilitating Competitive Entry," (with M. J. Doane and M. A. Williams), *Yale Journal on Regulation*, Summer 1999.

"Raising Rivals' Costs: The Entry of a Upstream Monopolist into Downstream Markets," (with D. L. Weisman), *Information, Economics and Policy* 10:451-470

"Selected Economic Analysis at the Antitrust Division: The Year in Review," (with K. Heyer), *Review of Industrial Organizations* 23*:* 95-119, 2003

"Pricing Access to a Monopoly Input," (with M. J. Doane, M. A. Williams, and S. Tsai), *Journal of Public Economic Theory,* Vol. 6., No. 4, 2004.

"Antitrust Analysis of Bundled Discounts" with P. Greenlee and D. Reitman. *International Journal of Industrial Organization* 26(5), September, 2008, 1132-1152. "Comment on Muris and Smith, "Antitrust and Bundled Discounts: An Experimental Analysis", with P. Greenlee and D. Reitman. *Antitrust Law Journal,* 77(2) 2011.

"Entry Timing and Second Mover Advantage". With Du Van Tran and Simon Wilkie. *Journal of Industrial Economics"*. 60(3) September 2012, 517-535.

65

**B. Reports and Articles in Conference Volumes, and Other Publications**

"The Dynamics of Price Adjustment in Regulated Industries," (with E. E. Bailey), in *Proceedings of IEEE Conference on Systems Control*, 1974.

"Optimal Non-Uniform Pricing for Electricity: Some Illustrative Examples," (with R. W. Koenker), in Sichel (ed.) *Public Utility Ratemaking in an Energy-Conscious Environment*, Praeger, 1979.

"Antitrust Policy in the Airline Industry," (with S. B. Jollie), Civil Aeronautics Board, October 1982. Transmitted by the CAB to Congress as part of proposed sunset legislation.

"Deregulation and the Economic Theory of Regulation," (with W. W. Sharkey), in *Proceedings of the Eleventh Annual Telecommunications Policy Research Conference*, 1983.

"An Analysis of Tapered Access Charges for End Users," (with W. E. Taylor, D. P. Heyman and J. M. Lazorchak), published in *the Proceedings of the Eighteenth Annual Williamsburg Conference on Regulation*, H. Treeing (ed.), Michigan State, 1987.

*Report to the Governor*, The Task Force on Market-Based Pricing of Electricity. Co-authored with D. M. Sappington, Appendix III.

"Optional Tariffs for Access in the FCC's Price Cap Proposal," (with D. P. Heyman and W. E. Taylor), in M. Einhorn (ed.), *Price Caps and Incentive Regulation in the Telecommunications Industry*, Kluwer, 1990.

"U.S. v. Microsoft: Were the Exclusionary Practices Anticompetitive " (with Michael J. Doane), Computer Industry Newsletter, American Bar Association, Spring 2000, Vol. 5., No. 1.

"Exclusionary Restrictions in U.S. vs. Microsoft," (with M.J. Doane and A. Nayyar), *UWLA Law Review*, 2001.

"U.S. v. Microsoft: Is the Proposed Settlement in the Public Interest?" (with Michael J. Doane), *Computer Industry Newsletter*, American Bar Association, Spring 2002, Vol. 7., No. 1.

"Raising Rivals' Costs: An Analysis of Barnes and Noble' s Proposed Acquisition of Ingram Book Company," 2002, Book Chapter in *Measuring Market Power*, Edited by Daniel Slottje, North Holland (with Michael J. Doane).

**C. Books:**

*The Theory of Public Utility Pricing*, (with S. J. Brown), Cambridge University Press, 1986. Second printing 1986. Third printing 1989.

Co-editor of *Telecommunications Demand Analysis*: *An Integrated View*, North-Holland, 1989.

**Editorial Duties:**

Associate Editor of the *Journal of Regulatory Economics*.

Guest Editor of "Bundling Rebates: The Quest for an Antitrust Theory," *Antitrust Bulletin* 50(3), Fall 2005.

Editorial Board of *Review of Industrial Organization* 2005-present.

**Unpublished Manuscripts and Revisions:**

"Tying and Bundled Discounts: Equilibrium Analysis of Section 2 Liability Tests," with Matthew Sibley. Under Revision for *Antitrust Law Journal.*

"Network Congestion and the Unilateral Effects Analysis of Mergers", with Brijesh P. Pinto. Submitted to *International Journal of Industrial Organization.*

**Other Professional Activities:**

Consultant to the Governor of New Jersey's Task Force on Market-Based Pricing of Electricity.

Referee for National Science Foundation and numerous professional journals.

Consulting for Bell operating companies on a variety of pricing and public policy issues.

Memberships: American Economic Association, American Bar Association; listed in *Who's Who in the East* 1990.

**Prior Reports and Expert Testimony within Past Four Years:**

UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION
In re: Photochromic Lens Antitrust Litigation
        Expert report and deposition testimony (2012 - 2013)
DISTRICT COURT OF HARRIS COUNTY, TEXAS, 80TH JUDICIAL DISTRICT

000827

Rx.com, Inc and Joe S. Rosson v. John M. O'Quinn & Associates, PLLC d/b/a The O'Quinn Law Firm, *et al.*
    Statement of Opinions (2012) and deposition testimony (2012)

DISTRICT COURT OF HARRIS COUNTY, TEXAS, 234TH JUDICIAL DISTRICT
Stealth, L.P. v. Aetna Health, Inc., *et al.*
    Statement of Opinions (2011) and deposition testimony (2011).

THE DISTRICT COURT OF THE 22ND JUDICIAL DISTRICT SITTING IN AND FOR SEMINOLE COUNTY, SEMINOLE DIVISION, STATE OF OKLAHOMA
Canadian Valley Electric Cooperative, Inc. v. Western Farmers Electric Cooperative, Inc.
    Expert Report (2011) and deposition testimony (2011).

UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, MARSHALL DIVISION
Wi-LAN, Inc. v. Acer, Inc., *et al.*
    Expert Report (2010).

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION
Arminak & Associates, Inc. v. Saint-Gobain Calmar, Inc., now known as MeadWestvaco Calmar, Inc.
    Expert Report (2010).

STATE OF WISCONSIN, MILWAUKEE COUNTY CIRCUIT COURT
Nehring's Brookfield Burgundy, LLC v. Arctic Glacier Wisconsin, Inc.
    Expert Report (2009).

UNITED STATES DISTRICT COURT, DISTRICT OF DELAWARE
ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation.
    Expert Report (2009) and deposition testimony.

UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, TEXARKANA DIVISION
Cody Wheeler, et al. v. Pilgrims Pride, et al.
Declaration (2008).

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF TENNESSEE
Suzanne C. Clarke and Conise P. Dillard, et al. v. Baptist Memorial Healthcare Corporation and Methodist Healthcare.
Expert Report (2008) and deposition testimony (2008).

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK
Marcus Corporation, et al. v. American Express Company and American Express Travel Related Company.
Expert Reports (2007 and 2008) and deposition testimony (2008).

000828

UNITED STATES DISTRICT COURT, NORTHEN DISTRICT OF CALIFORNIA
Jensen Enterprises vs. Olcastle Precast, Inc. *et al*.
Expert report and deposition testimony (2008).

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF TEXAS
Marissa Maderazo, et al. v. VHS San Antonio Partners, L.P., et al.
Expert Report, expert sur-rebuttal report, and deposition testimony (2008).

**VI. APPENDIX TWO: DOCUMENTS CONSIDERED**

000830

**COURT DOCUMENTS**

Expert Report of David W. DeRamus and Supporting Materials, February 17, 2009.

Amended Expert Damages Report of David W. DeRamus and Supporting Materials, January 16, 2013.

Deposition and Exhibits of David W. DeRamus, March 13, 2009.

Deposition and Exhibits of David W. DeRamus, March 6, 2013.

*Civil Action: ZF Meritor LLC and Meritor Transmission Corporation vs. Eaton* Corporation. Trial Transcript, Exhibits, and Demonstratives, September 10 - October 8, 2009.

Declarations of David W. DeRamus, June 11, 2009 and September 4, 2009.

Defendant's Supplemental Brief in Further Support of Its Motion to Exclude Opinion Testimony of Dr. David W. DeRamus, August 4, 2009.

Plaintiffs' Supplemental Brief in Opposition to Defendant Eaton Corporation's Motion to Exclude the Testimony of Dr. DeRamus, August 4, 2009.

Expert Report of Professor David S. Sibley and All Supporting Materials and Materials Cited Therein, March 17, 2009.

Expert Report of Professor Kevin M. Murphy and Supporting Materials, March 17, 2009.

Final Jury Instructions, October 7, 2009.

Jury Verdict, October 8, 2009.


**ACADEMIC, INDUSTRY, AND GOVERNMENT PUBLICATIONS**

Wooldridge, J. (2009), *Introductory Econometrics*, South-Western Cengage Learning, OH, Ch. 18.

Berry, S. (1994), "Estimating Discrete-Choice Models of Product Differentiation," *RAND Journal of Economics*, Vol. 25, No. 2, pp. 242-262.

Nevo, A. (2000), "Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry," *The RAND Journal of Economics*, Vol. 31, No. 3, pp. 395-421.

Train, K. and Winston C. (2007), "Vehicle Choice Behavior and the Declining Market Share of U.S. Automakers," *International Economic Review*, Vol. 48, No. 4, pp. 1469-1496.

Kim, D. and Cotterill, R. (2008), "Cost Pass-Through in Differentiated Product Markets: The Case of U.S. Processed Cheese," *The Journal of Industrial Economics*, Vol. 56, No. 1, pp. 32-48.

Internal Revenue Service, Ruling 59-60, "Valuation of Stocks and Bonds."

"Automated Mechanical Transmissions Gaining Steadily in Class 8 Trucks," *Truckinginfo*, May 2012, http://www.truckinginfo.com/.

000831

Detroit Press Releases (December 10, 2012), "President Obama Visits Detroit Diesel Corporation Headquarters," available at http://www.demanddetroit.com/about/press/pressreleases/detail.aspx?id=1243

**INTERVIEWS**

John Coll, Vice President of Sales and Marketing at Eaton.

David Norris, Eaton.

000832

# EXHIBIT 16

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 1

IN THE DISTRICT COURT FOR THE
DISTRICT OF DELAWARE


- - - - - - - - - - - - - - -
ZF MERITOR, LLC and MERITOR     :
TRANSMISSION CORPORATION        :
                                :
            Plaintiffs,  :   CIVIL ACTION NO.:
                v.       :   06-623 (SLR)
EATON CORPORATION,              :
                                :
                                :
            Defendant.   :CONFIDENTIAL
- - - - - - - - - - - - - - -


        Hagerstown, Maryland

      Monday, January 12, 2009

Deposition of:

            ANTONIO LOPES


called for oral examination by counsel for

Third-Party pursuant to notice, at Best Western

Grand Venice Hotel, 431 Dual Highway, Hagerstown,

Maryland, before Sylvia L. Jacobs, Court Reporter,

of Digital Evidence Group, a Notary Public in and
for the State of Maryland, beginning at 10:45
a.m., when were present on behalf of the respective
parties:
-------------------------------------------------
        DIGITAL EVIDENCE GROUP
     1111 16th Street, NW Suite 410
        Washington, DC  20036
           (202) 232-0646

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
000833

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

---

**Page 2**

1   On behalf of the Plaintiffs:
2        CHRISTOPHER WOOD, ESQUIRE
3        Adams Holcomb, L.L.P.
4        1875 I Street, Suite 810
5        Washington, D.C.  20086
6        (202) 580-8820
7
8   On behalf of the Defendant Eaton Corporation:
9        ANDREW D. LAZEROW, ESQUIRE
10       Howrey, L.L.P.
11       1299 Pennsylvania Avenue, N.W.
12       Washington, D.C.  20004-2402
13       (202) 383-7199
14
15
16
17
18
19
20
21
22

---

**Page 3**

1   APPEARANCES:  (Continued)
2   On behalf of the Third-Party Volvo Powertrain North
3        America
4        JOHN S. MARTIN, ESQUIRE
5        KRISTINA VANHORN, ESQUIRE
6        Hunton and Williams, L.L.P.
7        1900 K Street, N.W.
8        Washington, D.C.  20006-1109
9        (202) 955-1500
10
11  On behalf of Third-Party MACK:
12       TERRANCE GRUBE, ESQUIRE
13       MACK Trucks, Incorporated
14       2100 Mack Boulevard
15       Allentown, Pennsylvania  18103
16       (610) 709-3664
17
18
19
20
21  ALSO PRESENT:
22       Ellen Hebert, Videographer

---

**Page 4**

1            C O N T E N T S
2   EXAMINATION BY:                    PAGE
3     Counsel for Plaintiffs ..................    7
4     Counsel for Defendants ...............    165
5
6
7
8
9   LOPES DEPOSITION EXHIBITS: *          PAGE
10  1  Supply Agreement Eaton Transmissions ....... 35
11  2  Letter dated 4/20/99 ...................... 51
12  3  Current contract ........................... 54
13  4  Supply Agreement of 10/1/02 ................ 67
14  5  Transmission and Clutch Supply Agreement ... 67
15  6  Current Eaton Status ...................... 93
16  7  Long Term Transmission Supply Agreement ... 100
17  8  E-mail dated 6/21/02 ..................... 107
18  9  Handwritten notes ........................ 112
19  10 Internal letter dated 9/26/02 ............. 115
20  11 Letter dated 5/7/04 ...................... 124
21  12 E-mail dated 5/12/04 ..................... 131
22  13 Letter dated 6/15/04 ..................... 137

---

**Page 5**

1   EXHIBITS:  (Continued)
2   14 E-mail dated 2/1/05 and attachment ......... 146
3   15 E-mail dated 4/6/06 and attachment ......... 153
4   16 Supply Agreement of 7/1/92 ................ 172
5   17 Supply Agreement of 1/1/99 ................ 175
6   18 Volvo Global Powertrain Purchasing
7      Presentation to Suppliers ................. 217
8   19 Target 2003 ................................ 225
9   20 E-mail dated 3/16/04 and attachment ........ 245
10  21 E-mail dated 10/6/07 and attachment ........ 271
11  22 Transmission and Axle Group Status
12     Year End Report 12/14/07 .................. 281
13
14
15
16
17
18
19
20
21
22

---

2 (Pages 2 to 5)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
**000834**

Page 6

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  This is tape number
3    one of the videotaped deposition of Tony Lopes
4    taken by both parties in the matter of ZF Meritor,
5    LLC and Meritor Transmission Corporation vs. Eaton
6    Corporation in the United States District Court for
7    the District of Delaware, Civil Action Number
8    06-623 (SLR).  This deposition is being held at
9    Best West Hagerstown on this date, Monday, January
10   12, 2009 at the time on the video screen 10:45 a.m.
11         My name is Ellen Hebert.  I am the legal
12   video specialist from Digital Evidence Group.  The
13   court reporter is Sylvia Jacobs in association with
14   Digital Evidence Group.
15         Will counsel, please, introduce
16   themselves for the record?
17         MR. WOOD:  Chris Wood, Adams Holcomb, on
18   behalf of plaintiffs ZF Meritor and Meritor
19   Transmission.
20         MR. MARTIN:  Jack Martin with Hunton and
21   Williams on behalf of Volvo MACK, and the witness.
22         MR. LAZEROW:  Andrew Lazerow.  I'm with

Page 7

1    Howrey, LLP on behalf of the defendant Eaton
2    Corporation.
3          MS. VANHORN:  Kristin Van Horn of Hunton
4    and Williams on behalf of Volvo MACK and the
5    witness.
6          MR. GRUBE:  Terrance Grube, MACK Trucks,
7    Inc. on behalf of MACK Trucks, Inc. and the
8    witness.
9          THE VIDEOGRAPHER:  Will the court
10   reporter, please, swear in the witness?
11   WHEREUPON,
12              ANTONIO LOPES
13   called as a witness, and having been first duly
14   sworn, was examined and testified as follows:
15         EXAMINATION BY COUNSEL FOR PLAINTIFF
16   BY MR. WOOD:
17     Q    Good morning, Mr. Lopes.
18     A    Good morning.
19     Q    Thank you for spending some time with us
20   today.
21         Could you, please, state your full name?
22     A    Antonia Pedro Lopes DiSilva.

Page 8

1     Q    Have you ever been deposed before, sir?
2          THE WITNESS:  Would you consider the
3    Golden a deposition?
4          MR. GRUBE:  What wasn't my case, Tony.
5    I don't know.
6          THE WITNESS:  Okay.
7     A    Terry -- I guess I would say no.
8     Q    Is there any reason that you would not
9    be able to testify truthfully and accurately today?
10    A    No.
11    Q    What will happen is we'll just have a
12   series of questions and answers. I'll show you
13   some documents.  Mr. Lazerow will do the same
14   thing.  If you have any questions during the
15   proceeding, let us know.  If you need a break, let
16   us know, and if you need to talk to your counsel,
17   it's your frame work, your party in a sense so
18   we'll go at your pace, okay?
19    A    Great.
20    Q    Who is your current employer?
21    A    Volvo Powertrain, which is part of MACK
22   Trucks.

Page 9

1     Q    And could you walk me through the
2    corporate structure of MACK Trucks?  I'm not quite
3    sure how to proceed with that, but in terms of the
4    organization.  So you work for Volvo Powertrain,
5    correct?
6     A    Yes.
7     Q    Now, how does Volvo Truck North America
8    fit into that mix?
9     A    Volvo Truck North America is the
10   umbrella parent.
11    Q    Let's start then.  So Volvo Trucks North
12   America is at the top?
13    A    Yes.
14    Q    All right.  Then who is going to be the
15   first row below Volvo Trucks North America?
16    A    Volvo Trucks, and MACK Trucks.
17    Q    Two wings?
18    A    Yes.
19    Q    Where does Volvo Powertrain come in?
20    A    A division of MACK Trucks.
21    Q    What is the function of Volvo
22   Powertrain?

3 (Pages 6 to 9)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

**000835**

Page 10

1     A   Our function is to purchase driveline
2  components, transmissions, axles, engines for Volvo
3  Trucks and MACK Trucks.
4     Q   So if Volvo Powertrain purchases
5  components for both Volvo and MACK Trucks, is there
6  a similar entity on the Volvo Truck side of the
7  equation?
8     A   Not in North America.  In Europe there
9  is a Volvo Powertrain legal entity.  The North
10  American Volvo Powertrain is not a legal entity,
11  it's, it's part of the MACK Trucks.
12     Q   How long has this business structure
13  been in place in the form that you've just
14  described it to me?
15     A   Approximately since we've been acquired,
16  since Volvo acquired Renault, which owned MACK
17  Trucks, in 2001.  I'm not sure about the exact
18  date.
19     Q   When did you join Volvo Powertrain?
20     A   I actually joined MACK Trucks in 1999,
21  and then Volvo bought Renault, which owned MACK, I
22  believe in late 2000, early 2001.  I don't recall

Page 11

1  the date.
2     Q   So you started with MACK in 1999?
3     A   Correct.
4     Q   Where were you before you worked for
5  MACK Trucks?
6     A   I was at the Grove Manufacturing, which
7  is a crane company.
8     Q   Did the work that you did at Grove
9  Manufacturing have anything to do with heavy-duty
10  transmissions?
11     A   No.  I was a purchasing director, but.
12     Q   Has any of your employment prior to your
13  work at MACK Trucks involved the heavy-duty truck
14  marketplace?
15     A   No.  It was all construction equipment.
16     Q   When you joined MACK Trucks, what was
17  your position in 1999?
18     A   I was purchasing director for driveline,
19  which included axles, and transmissions only.
20     Q   So just those two components?
21     A   Those segments, which included those two
22  components.  It did not include engines.  It did

Page 12

1  not include quality.  That was acquired at a later
2  date.
3     Q   Has your title changed since 1999?
4     A   The title did not change, but my
5  responsibilities have changed.
6     Q   Okay.  Tell me about that.
7     A   2000 time frame I got the quality group,
8  which at the time was corporate.  And then in 2001
9  after the Volvo acquisition of Renault, I also have
10  responsibilities for the Volvo side of the
11  business, not just the MACK side, as well as the
12  engine group.
13     Q   So in 2001 your purchasing
14  responsibilities --
15     A   Expanded.
16     Q   -- expanded because you added the Volvo
17  side of the equation?
18     A   Correct.  And I also got the engine side
19  of the MACK.
20     Q   Sir, when you say driveline, what do you
21  mean by that?
22     A   Typically prop shafts, clutches,

Page 13

1  transmissions, and axles.
2     Q   Is that different than a drivetrain?
3     A   You basically define the drivetrain.
4  Drivetrain is a group of components, which are
5  typically defined as prop shafts, clutches,
6  transmissions, and axles.
7     Q   Have your responsibilities stayed the
8  same since 2001?
9     A   Yes.
10     Q   When you, when you joined MACK Trucks in
11  1999 who did you report to?
12     A   A gentleman by the name of Bruno
13  Linsolas, who is V.P. of purchasing for MACK
14  Trucks.
15     Q   Has the person you report to changed
16  since you joined the company?
17     A   During this time frame I've always
18  worked for Bruno, however, due to the changes in
19  the acquisition, I have two bosses.
20         In the global environment I work direct
21  line for one, and dotted line for another.  So with
22  Bruno I worked direct line until 2001, and then

4 (Pages 10 to 13)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000836

Page 14

1   when we became a global, part of a global company,
2   I became dotted line to Bruno, and direct line
3   to -- there's been a couple of bosses.
4        Q   Who was the first one?
5        A   Dennis Leblonde.
6        Q   Do you recall, Tony, how long he was
7   your boss?
8        A   Two, two and a half years.
9        Q   So until about 2003, 2004?
10       A   Yeah.  I don't recall the exact date,
11  but, yes.
12       Q   And then who became your boss after
13  Dennis?
14       A   Stenake Arronsson.
15       Q   Could you spell a little?
16       A   S-T-E-N-A-K-E A-R-R-O-N-S-S-O-N.
17       Q   Is he still your --
18       A   No.  That was two, or three years, and
19  now it's Carlos Hungria.
20       Q   Spell that last name.
21       A   H-U-N-G-R-I-A.
22       Q   He's currently your boss?

Page 15

1        A   Currently he's my -- actually as of
2   November 1st he's now my dotted line boss versus my
3   direct line boss.  And Bruno is now my direct line
4   boss.  So it's a global company, and a mix of
5   change.
6        Q   When you began in 1999, did you have any
7   folks who reported to you?
8        A   Yes.
9        Q   How many people?
10       A   I don't know, five people.
11       Q   Was anybody specifically responsible for
12  procurement of transmissions?
13       A   Yes.
14       Q   Who is that in 1999?
15       A   I believe it was Dennis McConville.
16       Q   What's his title?
17       A   Senior buyer transmissions.
18       Q   Did the individual who had that
19  responsibility change?
20       A   Mr. McConville ended up leaving the
21  business.
22       Q   Was he replaced by somebody else?

Page 16

1        A   I can't think of his first name, but his
2   last name was Blanks.  I believe there's probably
3   documentation.
4        Q   Michael?
5        A   Yeah.  Michael Blanks.
6        Q   Do you know when Mr. McConville left the
7   company?
8        A   2001 time frame, more or less.
9        Q   And if you're taking a guess, just say
10  I'm guessing, just so it's clear.
11       A   Yes.  I don't know the exact date.  I
12  mean, we could go to HR and get the actual dates.
13       Q   And Michael Blanks, do you know how long
14  he was in that position?
15       A   He took over that position and ended up
16  leaving the business as well.
17       Q   Any idea when he left?
18       A   I would say a year later, but I'm
19  guessing.  I don't know the exact date.
20       Q   How about after Mr. Blanks?
21       A   After Mr. Blanks --
22       Q   You're drawing a blank on Blanks?

Page 17

1        A   No.  I'm trying to figure out if we
2   moved it to the Greensboro buyer because at the
3   time they were also buying transmissions from
4   Meritor and Eaton, and we were in the process of
5   consolidating just one buyer.  And I don't know if
6   I transitioned at that point, or if it was done at
7   a later date.
8        Q   Is there a transmission buyer today?
9        A   Yeah.  There's always been a
10  transmission buyer.  I never bought the
11  transmission directly.  There's always been a
12  buyer, and a purchasing manager in charge of
13  transmissions.
14       Q   Who makes the final decision on which
15  transmissions to purchase?
16       A   It's a combination of many things.
17  Typically the buyer does preliminary RFQ work, and
18  then the purchasing manager analyzes that work, and
19  participates in some discussions.  And then
20  ultimately I participate in that analysis as well,
21  and because the product is so expensive, I
22  typically participate in most of the high level

5 (Pages 14 to 17)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000837

Page 18

1  negotiations.
2       And then based on the preliminary work
3  that we bring in, marketing and sales on both
4  brands so we could get their input as to whether or
5  not what we're proposing or planning to do makes
6  sense for the business.
7       Q   Is there anybody else who participates
8  in the decision making on the purchase?  You
9  mentioned marketing, sales, folks who worked for
10  you, yourself.  Anybody else that jumps to mind?
11       A   Typically I would say no.  We do the
12  preliminary work, and the hard analysis, and then
13  we get buy in from the marketable sales at each
14  brand.
15       Q   Who is Dominique Callens?
16       A   Dominique is -- during this transition
17  of becoming a global company --
18       Q   Uh-huh.
19       A   -- we have a matrix organization, and
20  Dominique is the global, or was the global
21  commodity director for this particular product of
22  transmissions.

Page 19

1       Q   So you began to interact with him after
2  the -- was there a merger, or acquisition?
3       A   It was an acquisition.
4       Q   Dominique came into the fold after the
5  acquisition?
6       A   Correct.
7       Q   Do you know how long he was in the
8  capacity as the global commodity director?
9       A   I believe he stopped being global
10  commodity director sometime in '06.
11       Q   Somebody take his place?
12       A   He now holds a different position.  Yes,
13  his name is Paulo Dakeashi.
14       Q   Really?
15       A   D-A-K-E-A-S-H-I.
16       Q   Okay.  How about David Louya, who is
17  David Louya?
18       A   David is a purchasing manager, and has
19  been a purchasing manager since the beginning.
20       Q   Am I pronouncing that correctly?
21       A   L-O-U-Y-A, Louya.
22       Q   Louya?

Page 20

1       A   Yes.
2       Q   Okay.  How long have you worked with
3  David?
4       A   Since I, since Volvo acquired the
5  business.  David started working for Volvo Trucks,
6  so he used to be the buyer, and then the purchasing
7  manager for transmissions.  So when I took
8  responsibility for the Volvo side, I actually
9  elevated David to the purchasing manager position
10  for both brands.
11       Q   Had David been at Volvo prior to the
12  acquisition?
13       A   Yes.  Not MACK, but Volvo.
14       We should review the organizational
15  structure, and legal entities because it's one,
16  it's very confusing.  And two, it keeps being
17  changed, so, but regardless of the orientation of
18  the organization, since '01 David and I have been
19  responsible for the business.
20       Q   And he reports to you?
21       A   Yes.
22       Q   When you joined the company MACK, were

Page 21

1  you given any background, or materials relating to
2  the transmission purchasing relationship that MACK
3  had with it's suppliers at that time?
4       A   I basically acquired the various
5  contracts that existed.  The buyers that at one
6  point worked for other managers, and I became
7  director of the transmission group.  I had the
8  buyers, so I had historical, some historical
9  knowledge whatever the contracts or documentation
10  at the time, as well as the buyers that were
11  performing those functions.
12       Q   Did you familiarize yourself with the
13  contracts that were in place at that time?
14       A   Yes.  At the time it was just one
15  contract, which was MACK.
16       Q   And for well, I may have already used
17  the phrase heavy-duty transmission.  What is your
18  understanding of a heavy-duty transmission?
19       A   Typically transmissions that are used in
20  Class 8 trucks.
21       Q   And a Class 8 truck is what?
22       A   A truck that handles more than 40,000

6 (Pages 18 to 21)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000838

Page 22

1  pounds, typically 10 leader or bigger.
2    Q   In 1999 when you joined MACK, with which
3  suppliers did MACK have a contract, or contracts
4  for heavy-duty transmissions?
5    A   We only had one active contract, which
6  was Eaton.  And we got purchase orders with all the
7  other OEM's.
8    Q   Who were the other OEM's that you
9  purchased heavy-duty transmissions from in 1999
10 that you used purchase orders with?
11   A   Allison, Meritor, and TREMEC.
12   Q   Is TREMEC also known as TTC?
13   A   Yes.
14   Q   In 1999, did MACK also manufacture for
15 internal consumption heavy-duty transmissions?
16   A   Yes.
17   Q   Do you remember the model, or the brand,
18 or brands that MACK manufactured?
19   A   Yes.  T-200, in '99.
20   Q   What type of application was that T-200
21 used for?
22   A   We used that product in highway as well

Page 23

1  as vocational, but the transmission is considered
2  typically a vocational product.
3    Q   You've used two different terms there,
4  highway and vocational.  Can you walk me through a
5  definition of each?  Start with highway, please.
6    A   Typically a highway product is typically
7  a product that goes a hundred to a hundred fifty
8  thousand miles a year.  It's typically used on a
9  regular transportation truck, i.e. moving product
10 from east coast to the west coast.
11       Vocational is more like cement trucks,
12 off-road trucks.  Is that sufficient?
13   Q   Yes, sir.  With regard to highway
14 trucks, is there a typical gearing pattern that
15 those will have?  And maybe my unsophistication
16 here is showing.  How many gears will those highway
17 trucks tend to have in your experience?
18   A   It's my experience that fleets usually
19 go for seven, nine, or ten.  And individual owners
20 usually go for 13, or 18, which is more performance
21 oriented.  And small to medium-sized companies use
22 whatever they feel like using.  So there's no

Page 24

1  right, or wrong solution there.  It's whatever they
2  prefer.
3    Q   You said one of the entities for whom
4  you purchase heavy-duty transmissions in the '99
5  time period was Allison?
6    A   Yes.
7    Q   For what type of applications did MACK
8  purchase Allison transmissions?
9    A   We were, and are the number one refuse
10 company in North America.
11   Q   We being MACK?
12   A   Yeah.  We being MACK, or Volvo, but
13 MACK.  At the time, Volvo had the other 25 percent.
14 During the acquisition, Volvo had to divest that
15 business because the market share was too strong.
16       So for refuse, which is waste trucks,
17 pick up, and residents, the residential pick up,
18 trash pick up, the ideal transmission, or almost
19 needed transmission is the Allison transmission.
20 And then we started also using Allison
21 transmissions in vocational product.
22   Q   Are there different segments, or niches

Page 25

1  in the vocational area?
2    A   Again, yes.  In a sense that if you have
3  soft, like sandy flooring, or land you might be
4  able to use an Allison truck, but there's many
5  reasons why somebody would pick an Allison
6  transmission versus a MACK transmission, versus a
7  Meritor transmission, versus an Eaton transmission.
8        Typically for trash you need an
9  automatic transmission.  And an automatic
10 transmission is considerably different than a
11 manual transmission.
12   Q   From what perspective?
13   A   In terms of efficiency.  If you were
14 picking up trash in one home, and going to another
15 home, to start, to shift, to pick up, and then
16 shift down, the automatic transmission allows you
17 to have it in drive, and if you take your foot off
18 the accelerator, you can actually jump out of the
19 truck.  The truck is actually set up that you're
20 actually driving standing up.  You can actually
21 jump out of the truck, and the truck rolls a couple
22 of feet.  It comes to a stop, and it's still

7 (Pages 22 to 25)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
000839

Page 26

1  working, and then you dump the trash and you get
2  back on it. So it, from an efficiency perspective
3  you can't do it without an automatic transmission.
4       The secondary reason was there were lack
5  of drivers, so there was a shift in the market that
6  was driving the customer to be very selective on
7  the transmission he or she selected.
8    Q   When you say lack of drivers, do you
9  mean lack of skilled drivers --
10   A   Right.
11   Q   -- who could operate a manual
12  transmission?
13   A   Correct.
14   Q   I believe you said, sir, that Allison
15  began to be used, or might have been used in other
16  vocations, or segments in which MACK sold into, is
17  that correct?
18   A   Primarily Allison is an automatic
19  transmission, very expensive, absolutely needed, or
20  required for refuse business, but then they started
21  to make some inroads in vocational.
22   Q   When you say inroads, what do you mean

Page 27

1  by that?
2    A   They started to get penetration on the,
3  on the vocational side of the business.
4    Q   Have they continued to gain penetration
5  on the vocational side?
6    A   Yes. Today even though they're very
7  expensive, they have approximately 18 to 20 percent
8  of the MACK business.
9    Q   How long have they been at 18 to 20
10  percent of the MACK business?
11   A   They were probably at 8 percent, or 6
12  percent in '99, and are currently 18 to 20 percent.
13   Q   Are they still continuing to trend up,
14  or has that plateaued?
15   A   I would say that's plateaued. Over 20
16  would be very difficult.
17   Q   Why do you say over 20 would be very
18  difficult?
19   A   The product is very expensive, and to
20  use on the highway side it's not realistic. The
21  customer doesn't perceive it as valuable.
22   Q   For highway application?

Page 28

1    A   Yes. At least at this point.
2       I'm not a marketing specialist, but.
3    Q   If we fast forward to the present day,
4  from whom does  -- is it okay if I use the term
5  VTNA?
6    A   Yes. Of course.
7    Q   From whom does VTNA procure heavy-duty
8  transmissions?
9    A   Today we have Allison, which is around 2
10  percent since we got rid of the refuse business.
11  We use Eaton, which is probably 85-plus percent.
12  We use Meritor, which is -- well, we used to use
13  Meritor. As of the end of '06 we don't use
14  Meritor. And we use Zed-F Freedom transmission.
15   Q   What percentage of VTNA's current
16  purchases would be made up of the Zed-F Freedomline
17  transmission?
18   A   Very little. I think at the highest
19  point in '06 it was probably eight, or nine. Today
20  it's probably one and a half.
21   Q   Those figures you use are percentages?
22   A   Yes. At VTNA.

Page 29

1    Q   Are you familiar with the term databook?
2    A   Yes.
3    Q   Is the Zed-F Freedomline transmission
4  currently published in VTNA databook?
5    A   Yes, until '09 I believe. We'll have to
6  make a decision.
7    Q   Because of the change in the engines?
8    A   Yes, whether or not we design them in.
9    Q   And currently with which entities does
10  VTNA have contracts for the procurement of
11  heavy-duty transmissions?
12   A   Today we only have one contract active,
13  which is with Eaton.
14   Q   When did you enter into that contract,
15  the active contract?
16   A   I don't recall the date, but I believe
17  it became effective '08, and ends in 2013.
18   Q   So it's a five year deal?
19   A   Correct. We actually operated without a
20  contract for about a year.
21   Q   What did you do in terms of pricing
22  delivery, and the other terms of the contract

8 (Pages 26 to 29)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
000840

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 30

1  between the period your last contract expired, and
2  you entered into the new contract?
3      A   We use a purchase order, which is other
4  method of having an understanding with a supplier.
5      Q   Did the pricing remain the same, just
6  carry over during the bridge time, or did it go to
7  a purchase -- did the pricing change?
8      A   I don't believe the pricing changed
9  other than the raw material evolution for which we
10 were still using the contractual terminology. Even
11 though the contract was not in existence, we were
12 using the same methodology.
13     Q   Did VTNA continue to operate under the
14 same contract as if it was in effect?
15     A   I would say not exactly, but almost
16 every, every contractual term was being followed.
17 We were still being standard with Eaton. We were
18 still applying raw material clauses in the contract
19 as a way to support that process, raw material
20 increases, or decreases for clutches as well as
21 transmissions.
22     Q   And the contract you're referring to,

Page 31

1  when was that contract entered, so the predecessor
2  contract to the current contract?
3      A   Again, the exact dates I don't have the
4  exact dates, but I believe it was '02 to '07. If I
5  recall, it's probably July '07 the contract ended.
6  We can validate that by the actual contract.
7      Q   Are you familiar with that contract, the
8  2002 contract?
9      A   I was, I did that contract.
10     Q   Did it meaning negotiated it?
11     A   Yes.
12     Q   Did that contract provide for
13 price-downs dependent upon share penetration?
14     A   It had rebate based on share
15 penetration. It did not allow for price-downs
16 based on share penetration.
17     Q   Did the contract provide for price-downs
18 on the price of Eaton's heavy-duty transmissions to
19 VTNA?
20     A   In '02 we had the contract for MACK
21 Trucks and VTNA, which included price-downs yearly
22 as well as rebate based structure depending on what

Page 32

1  the penetration was, you could qualify for a higher
2  rebate.
3      Q   Was there a level of penetration below
4  which VTNA would not receive a reduction in price?
5      A   The contract was established that if you
6  go below a certain level, the contract actually
7  would become null and void.
8      Q   What was that level if you recall?
9      A   I believe it was 68 percent in the '02
10 contract.
11     Q   And if the contract become null and
12 void, what was your view as to what would happen
13 with the purchasing relationship?
14         MR. MARTIN:  Objection to the form.
15         MR. LAZEROW:  Objection.
16     Q   You can answer the question.
17     A   We would operate under a PO.  If there's
18 no contract you have a PO relationship like I had
19 with Allison, or Zed-F, or Meritor, or TREMEC.
20     Q   Was maintaining the contract, the 2002
21 contract in the form negotiated important to VTNA?
22         MR. LAZEROW:  Objection.  Vague.

Page 33

1      Q   You can still answer the question.
2      A   I guess I was going ask can you explain,
3  but.
4      Q   Sure.  What was the value of the
5  contract to VTNA?
6      A   It was probably 12 to 15 percent
7  savings, excluding rebates.
8      Q   The 12 to 15 percent savings, what did
9  that consist of excluding the rebates?
10     A   Again, do you want pricing, or what are
11 you looking for?
12     Q   I'm playing off of what you said.  So I
13 don't know what goes into the 12 to 15 percent of
14 savings.
15     A   Okay.  The old contract that ended in
16 '01 time frame --
17     Q   The old MACK contract, or both?
18     A   Old Volvo contract.
19     Q   Okay.
20     A   There was a MACK contract, and a Volvo
21 contract in existence.  When we got acquired we, of
22 course, had visibility now.  You have two OEM's you

9 (Pages 30 to 33)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000841

Page 34

1   have visibility to different pricing for two
2   different OEM's.  So our job was to look at what
3   pricing Eaton was giving VTNA, or Allison, or
4   Meritor, as well as what Eaton, and Meritor, and
5   Allison was giving to MACK.  So now there's the
6   same company, and now they're charging both
7   businesses, and both contracts were ending.  It's
8   now time to do a new contract.
9        So we approached all parties, all
10  suppliers as well as Eaton since Eaton had 85, 90
11  percent penetration of VTNA, and 70-something
12  percent of MACK in the 2001 time frame.  So as we
13  approached them -- most OEM's you approach you want
14  standard position.  So we basically started
15  negotiations with everybody, Zed-F, Meritor, and
16  Eaton because those were the ideal partners for
17  vocational as well as highway depending on the
18  technology or the product offering.
19       Q   And I noticed you didn't use Zed-F
20  Meritor within your reference to the entities with
21  which you were negotiating.  You said Zed-F Meritor
22  and Eaton.  I wanted to make sure.

Page 35

1        A   Typically we would negotiate with
2   Meritor for Zed-F product, but Zed-F management
3   also participated in that discussion because
4   Meritor at the time was a marketing arm of Zed-F,
5   but didn't have full -- in our view didn't have
6   full due diligence to do the deal by themselves, so
7   Zed-F management was involved as well.
8        Q   And you participated directly in the
9   negotiations?
10       A   Not in all, but I would say when it got
11  to the end I participated in all.  There would be
12  no decision made without me knowing, or
13  participating in that decision.
14       MR. WOOD:  Let's introduce a document,
15  because I brought all these with me, and I want to
16  get rid of them.  Can we mark this?  We'll mark as
17  Lopes 1.  Can I have any sticker?
18       (Deposition Exhibit Number 1 marked for
19  identification and retained by counsel.)
20       MR. LAZEROW:  I'm not going to give you
21  all my copies.  I happen to have a copy of this
22  one.

Page 36

1        MR. GRUBE:  Thank you.
2        MR. WOOD:  This is located at VM000147
3   through 161.
4        Q   Go ahead and take a look at that, and
5   let me know when you're finished.  And if you're
6   familiar with it --
7        A   Yes.
8        Q   -- we can go ahead and ask you
9   questions.
10       A   It appears to be the 1997 contract
11  between MACK and Eaton.
12       Q   When you came on-board in '99, were you
13  provided a copy of the contract?
14       A   Yes.
15       Q   And this is the same contract that you
16  were provided?
17       A   It appears to me.  Yes.
18       Q   Can you look with me on page 14 of the
19  contract?  Do you see MACK Trucks, Inc. there?
20       A   Yes.
21       Q   Is that Mr. Linsolas' signature?
22       A   Yes.

Page 37

1        Q   And you're familiar with his signature?
2        A   I would say it looks like his signature.
3        Q   Now, in your day-to-day duties, did you
4   work with this contract, or have reason to
5   reference the contract?
6        A   Typically I would say no.  You typically
7   don't reference the contract.  The relationship
8   typically runs fairly well unless there's a
9   dispute, and each party uses the contract to try to
10  resolve the dispute, or interpret in some manner to
11  be able to resolve the dispute.
12       Q   Got you.  If you could turn with me to
13  page three of the document.  I'm at a slight
14  disadvantage, Tony, because the production copy
15  even though it lists exhibits they're not attached
16  to the document.
17       A   Oh.
18       Q   So I'm going to ask you a couple
19  questions just to see if I understand.  There's a
20  section here called Purchase and Sale.  And if
21  you'll look down to the third paragraph it says,
22  MACK will also provide Pricebook pricing consistent

10  (Pages 34 to 37)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
000842

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 38

1    with the levels outlined in the MACK Trucks
2    document transmission target pricing differentials
3    attached to and made part of this agreement as
4    Exhibit B.  Do you see that language?
5        A   Yes.
6        Q   What is the transmission target pricing
7    differentials document?
8        A   Again, I did not do this contract, so
9    I'd have to see the Exhibit B.  If you want me to
10   expand I could, but it would, I would have to see
11   Exhibit B to validate my expanded my view.
12       Q   Unfortunately, I don't have the
13   exhibits.  So could you just expand with your best
14   understanding?
15       MR. MARTIN:  If you can.  We don't want
16   you to guess, or speculate.
17       A   I believe this is one of the clauses
18   that got changed in '02.
19       Q   Going forward?
20       A   Yes.  When I look at this, I believe the
21   MACK transmission was being used as an upcharge of
22   $3,500.

Page 39

1        Q   And that's a reference to the T-200?
2        A   Yes.  We later developed the T-300, but
3    it's the same transmission.  It's just some small
4    changes in evolution.
5        Q   So pursuant to Exhibit B, the MACK
6    transmission would be priced $3,500 above what?
7        A   At this point in '97 -- and we can
8    double check, the Eaton transmission was the
9    standard transmission at MACK, not just highway but
10   we didn't even have a designation of highway versus
11   vocational, there were just the standard.  So on
12   the Pricebook, every other transmission has to be
13   at equal price, or a dollar above because typically
14   we give the best position to the standard provider.
15   And in this case, MACK and Eaton had agreed to put
16   the MACK transmission at a $3,500 disadvantage.
17       Q   To the Eaton transmission?
18       A   Yes.  Because MACK was not the standard.
19       Q   Although you inherited the contract, do
20   you have an understanding how the $3,500 amount was
21   identified?
22       A   Our transmission was much more expensive

Page 40

1    than an Eaton transmission.  So I don't know how
2    the $3,500 got agree to, but it was a substantial
3    amount of money.  So on the '02 contract I
4    rectified the situation.
5        Q   How did you rectify the situation?
6        A   We made MACK standard in vocational, and
7    Eaton only got standard position in highway.
8        Q   Why did you make that change?
9        A   Basically to destabilize Eaton so we
10   could negotiate a better deal for MACK.
11       Q   When you say destabilize, what do mean
12   by that term?
13       A   If they have standard position on all
14   the product, even though they have the best product
15   offering we did not want them to be in a position
16   to dictate to MACK how we could should operate.  So
17   we basically made MACK -- since we have our own
18   transmission, we made MACK standard in, in the
19   vocational business because we have a better
20   transmission.  So typically it's a way to give the
21   customer what they want, and at the same time get
22   the best value out of the supplier.  We believe

Page 41

1    this to be the way to do it.
2        Q   And it's your belief that the MACK
3    transmission was better for vocational purposes
4    than the Eaton transmission?
5        A   Yes.
6        Q   And by 2002 had it evolved to the 300
7    series?
8        A   It had nothing to do with the evolution.
9    It was already a better transmission.  I think I
10   was just a business arrangement before 2002, and in
11   2002 we believed this would be a way to negotiate
12   with Eaton to get the best value.
13       Q   In the 2002 contract where Eaton was
14   standard, were they also provided preferred pricing
15   position?
16       A   Yes.
17       Q   When I use the word preferred pricing
18   position, what do you interpret that as meaning?
19       A   Typically if there is a competing
20   product at equal level technology of and
21   capability, they will be put in the Pricebook
22   typically at a dollar above the Eaton price, if

11 (Pages 38 to 41)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000843

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 42

1    Eaton is a standard.  Typically it's a common
2    practice that the standard position supplier gets
3    preferred, or preferential pricing.  I believe if
4    you refer to the contract you'll see terminology to
5    that effect, not so different than the Meritor axle
6    contract which reflects Meritor as the preferred
7    standard, and preferred supplier, so just common
8    practice.
9        Q    Within the VTNA organization?
10       A    As well as MACK.
11       Q    Okay.  Have you ever examined other
12   OEM's pricing practices with regards to their
13   databook positioning?
14       A    Typically I don't have access to the
15   Pricebook unless I go out and get it.  Usually a
16   sales guy would probably do that to get some
17   inference, but typically I, purchasing guys don't
18   do that.  We just look at costs, not the price to
19   the customer.
20       Q    Got you.  Okay.  If you flip with me to
21   page, four, sir.  It's a section called OEM Rebates
22   All Eaton Transmission.  And if you look down at

Page 43

1    the bottom it says MACK vehicles built with Allison
2    automatic transmission will not be utilized for the
3    purpose of share calculation if Eaton does not have
4    a technically appropriate Eaton automated
5    transmission available to satisfy the application.
6    Do you see that language?
7        A    I don't see it.
8        Q    Really?
9        A    Where is that?
10       MR. WOOD:  Could you show him?  It's the
11   bottom of page four, the last paragraph.
12       A    Yes.
13       Q    Do you see that now?
14       A    Yes.
15       Q    Okay.  Do you have an understanding as
16   to why the Allison transmissions were carved out of
17   the calculation?
18       A    Yes.  No one in the market even today
19   has an automatic transmission.  They have automated
20   transmission, but not automatic.  And unless you
21   have an automatic, you're not able to jump out of
22   the truck and the truck rolls five or six feet and

Page 44

1    comes to a stop, which gives you an unbelievable
2    efficiency.
3        Q    Are you sure that's legal?
4        A    And no one has that.  They do it all the
5    time.
6        Q    I've never seen it.  Okay.
7        MR. LAZEROW:  You've never driven a
8    trash truck.
9        MR. WOOD:  That's true, but I have
10   watched them come by the house.
11       A    If you'll look at the truck you'll
12   actually see that it's a stand up truck.
13       Q    That's pretty cool.
14       A    It steps out.
15       Q    I believe you.
16       A    So since the product could not be
17   compared, we excluded that because it would be
18   asking MACK to participate in a particular
19   penetration level that they don't even have the
20   product to qualify it, so it became null and void.
21       Q    And when you mean they, you're referring
22   to Eaton?

Page 45

1        A    Correct, or any other OEM that has a
2    rebate type.
3        Q    Did Caterpillar begin to develop, or
4    market an automatic transmission do you know?
5        A    Yes.  They actually came to market
6    probably in late '06, early '07.
7        Q    Are they, did you, strike that.
8        Has MACK produced any of the Caterpillar
9    product?
10       A    If you know anything about Volvo versus
11   Cat that even if they had the product we would
12   never buy product from Cat.
13       Q    Do you know if that product is in the
14   market today, whether it's purchased by VTNA, or
15   any of the other OEM's?
16       A    I don't know of any OEM that's actually
17   purchasing, any truck OEM heavy-duty that's
18   purchasing their product today.
19       Q    And their product is the Caterpillar
20   product?
21       A    The Caterpillar product.
22       Q    Is Caterpillar getting out of the engine

12 (Pages 42 to 45)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000844

Page 46

1  business?
2      A   They indicated yes, and they went to the
3  market that they were getting out.
4          Another key point is Volvo also has a
5  Cat type of product, not as good as Allison, called
6  to Powertronic, which is very similar.  And we felt
7  to modify that transmission to compete against
8  Allison was probably a long shot, so we never
9  introduced it as well.
10     Q   Is the Powertronic used in somewhere
11 outside of North America?
12     A   It's used in construction equipment, but
13 it's a true automatic.
14     Q   By the way, Tony, does VTNA purchase
15 components for it's heavy-duty trucks
16 geographically, or globally?
17     A   I have responsibility -- we buy product
18 from all over the world, wherever we get the best
19 price, but the jurisdiction for North America is my
20 responsibility.
21     Q   Is you have North America as your --
22     A   Correct.

Page 47

1      Q   -- place.  Okay.  And North America
2  consists of which countries?
3      A   We only produce in North America, so it
4  would be U.S. since we only produce in U.S, but
5  North America would be for NAFTA region typically.
6      Q   Including Canada, and Mexico?
7      A   Correct.
8      Q   And do the North America trucks, are
9  they sold into Canada and Mexico?
10     A   Yes.  And some international.
11     Q   Could you turn with me to page 12,
12 please?  You'll see section 23 called Patent
13 Matters.
14         Have you had a chance to review that
15 section?
16     A   Yes.
17     Q   Are you familiar with that clause, or
18 did you ever have reason to reference that clause
19 in your day-to-day duties?
20     A   This particular cause was never acted
21 on.  Both parties, Eaton believes that we are
22 infringing.  We believe we're not, and so we never

Page 48

1  acted on whether or not we are infringing.
2      Q   The text of the clause references that
3  in the first sentence, I think, would you agree
4  with that?
5      A   Yes.
6      Q   And I'm sorry, when you say never acted
7  upon, what do you mean by that?
8      A   We believe that we have prior art that
9  would indicate that Eaton has no position.
10     Q   And they take a contrary position?
11     A   And they take a contrary position.  So
12 both parties, Eaton or us have never had reason to
13 act, even when the contract ended in '06 or '07
14 that we had a year without a contract.  And '97
15 contract to '02 where we operated without a
16 contract.  Neither party never acted on this
17 potential position, so its never been a problem
18 that we had to deal with.
19     Q   So the clause never came into play is
20 what you're saying, but it was a part of the
21 contract?
22     A   It was part of the contract before I

Page 49

1  came on-board, so I --
2      Q   Was there any type of patent clause that
3  was used in the 2002 agreement?
4      A   I'm not sure.  There might be, but I'm
5  not sure if it's in there.
6      Q   Do you recall any discussions during the
7  negotiations with Eaton about the patents?
8      A   Typically its never been a major point
9  of contention.  I think they just wanted, they
10 believed there was a patent infringement.  So they
11 wanted it there if the contract ended so they could
12 act on it, but I never saw it as a risk because I
13 had done analysis where we believe we had prior
14 art.  So if we had to go into any court to validate
15 whether or not the patent was infringed on, we felt
16 comfortable that we had no issue at MACK.
17     Q   So when you say risk, you didn't think
18 there was legal risk based upon the patents
19 themselves?
20     A   Correct.
21         MR. WOOD:  Should we take a break?
22         MR. MARTIN:  Yes.

13 (Pages 46 to 49)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000845

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

---

Page 50

1       THE VIDEOGRAPHER:  Going off the record.
2    The time is 11:44:21.
3       (Recess was taken.)
4       THE VIDEOGRAPHER:  Going back on the
5    record.  The time is 11:57:20.
6       MR. MARTIN:  Volvo MACK would like to
7    designate the deposition as highly confidential,
8    and Mr. Lopes has one point of clarification from
9    the testimony before the break.
10   BY MR. WOOD:
11      Q   Please go ahead, sir.
12      A   It's due to the legal entities, who owns
13   who.  We should validate that.
14      Q   Go ahead.
15      A   It's almost -- I would say we need to
16   double check.  I'm not sure whether the legal
17   entity I gave you is accurate.
18      MR. WOOD:  Counsel, do you want to add
19   anything to that?
20      MR. MARTIN:  I mean, what we need to
21   establish here is what he knows, and he is giving
22   you a comment on that.  You're free to follow up if

---

Page 51

1    you'd like.  I think the basic point is he's not a
2    lawyer, and he's not exactly sure on corporate
3    structure.
4       MR. WOOD:  Sure.
5    BY MR. WOOD:
6       Q   That's fine, Tony.  I understand.
7       A   I don't believe it has an impact on what
8    I told you, but I'd say let's double check just to
9    be sure that it's accurate.
10      (Deposition Exhibit Number 2 marked for
11   identification and attached to the deposition
12   transcript.)
13      Q   I've marked as Lopes Exhibit 2 a letter
14   to Tony Lopes from John Buck with the Bates range
15   Eaton 00380547 through 48.
16      Have you had a chance to review the
17   document?
18      A   Yes, sir.
19      Q   Is this a copy of a letter that you
20   received from John Buck in 1999?
21      A   Yes.
22      Q   Okay.  Did you receive this document in

---

Page 52

1    the ordinary course of your business dealings with
2    Eaton?
3       A   Repeat.
4       Q   Did you receive the document in the
5    ordinary course of your business with Eaton?
6       A   Yes.
7       Q   If you look with me on the, in the third
8    paragraph MACK transmission databook pricing.
9       A   Yes.
10      Q   There's a description there of -- well,
11   I'll just read the first sentence.  Eaton will
12   support a reduced premium for MACK transmissions
13   from the current level down to $1,500 list versus a
14   comparable Eaton transmission.
15      Is that language a reference to what you
16   mentioned to before in the '97 contract with
17   regards to the pricing position of the products?
18      A   Yes.
19      Q   What was the resolution of this
20   particular databook positioning?  Did the price
21   level then move from 3,500 to --
22      A   Yes.

---

Page 53

1       Q   -- to $1,500?
2       A   Yes.  As you can see, this was a
3    contract in place, and so realistically I had no
4    choice of changing the contract unless I requested,
5    and Eaton allowed me to modify it.
6       Q   So you requested of Eaton that the
7    contract be modified and the pricing differential
8    be reduced to 1,500, and Eaton agreed to do that?
9       A   Correct.
10      Q   If you look down the last paragraph on
11   the page that says cost reductions, it begins while
12   we cannot provide the immediate up front price
13   reductions on transmissions that MACK is looking
14   for in 2000, Eaton is willing to support active
15   VA/VE efforts in early, strike that.
16      In 1999 did you make a request of Eaton
17   for price reductions on the products that they were
18   selling you?
19      A   This contract was done before I came
20   on-board.
21      Q   So you inherited this --
22      A   I inherited this contract, and my job is

---

14 (Pages 50 to 53)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000846

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

---

Page 54

1  to provide savings every year until I die.  So this
2  contract was not good enough in terms of allowing
3  cost savings, so I have to challenge the contract.
4  One of it was the 3,500 to 1,500.  The other one
5  was would they will being to modify the contract so
6  I could get cost-downs.
7      Q   And do you, strike that.
8      Did Eaton provide the cost-downs that
9  you requested?
10     A   Eaton maintained the contract in this
11  particular clause.
12     Q   Had there been other times where you
13  requested that Eaton reduce the prices at which
14  they were selling product to you outside of the
15  terms set forth in the contract?
16     A   I would say no, because I usually -- the
17  contracts I performed have cost-downs embedded into
18  contract if you referring to the contract.
19     (Deposition Exhibit Number 3 marked for
20  identification and attached to the deposition
21  transcript.)
22     MR. WOOD:  I'll mark as Lopes Number 3

---

Page 55

1  VM200018.  You know what?
2      MR. LAZEROW:  What's wrong?
3      MR. WOOD:  Let me reread that to you.
4  VM200018467.  The document is title Current
5  Contract.
6      Do you want to sit here?  I'll just
7  reverse my angle.  Do you mind?
8      MS. VAN HORN:  No.
9      MR. WOOD:  Not that I don't like your
10  company on the right side.
11  BY MR. WOOD:
12     Q   Okay.  Have you had a chance to review
13  it?
14     A   Yes.
15     Q   Okay.
16     A   It's actually quite good.
17     Q   On the first page, Tony, it says if you
18  look on about halfway down on the right it says AP
19  Lopes 20 Feb '02.  Is that a document you created?
20     A   Yes.
21     Q   And AP are your initials?
22     A   Yes. Anthony Peter.

---

Page 56

1      Q   Do you recall why you created the
2  document?
3      A   It appears that this is a contract
4  analysis of their proposal, Eaton proposal to us,
5  and our perspective, and whether the proposal was
6  good or bad.
7      Q   And at the time were you approaching
8  this just from the perspective of MACK as opposed
9  to VTNA?
10     A   At this point I was responsible for
11  both.
12     Q   So at this point in time, in February of
13  2002 you're looking towards negotiating a new
14  contract with Eaton?
15     A   Correct.
16     Q   If you look with me on the fourth page
17  of the document with the header transmission
18  contract results.
19     A   Okay.
20     Q   Let me back up really quickly.  Did you
21  create this document in the ordinary course of
22  performing your duties for the company?

---

Page 57

1      A   Yes.  Myself, and a couple of my people.
2  Yes.
3      Q   Do you know if Mr. Louya participated in
4  the drafting of this document?
5      A   I would say he had to get certain pieces
6  of information for us to come to this analysis.
7      Q   Looking there on page four, it says
8  transmission contract results review 1997 to 2000.
9  The first bullet sayS net rebate loss of 3 percent.
10  What does that represent?
11     A   I believe we ended the contract at a 7
12  percent level.  At one point we were as high as 10
13  percent.
14     Q   So over the life of the contract, the
15  rebate level went from one percentage to another
16  percentage, which was 3 percent lower than the
17  original?
18     A   Correct.
19     Q   Okay.  The second bullet say net cost
20  increase of 3.3 percent.
21     A   Yes.
22     Q   What is that a reference to?

---

15 (Pages 54 to 57)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000847

Page 58

1      A   I don't quite recall.
2      Q   If, if you look -- I'm sorry, Tony, I
3   didn't know you were still --
4      A   I don't quite recall.  There were many
5   variables, so I'd have to go back to all the
6   variables.  This was our attempt to tell Eaton the
7   contract that we did in the past wasn't so great
8   for us.  Eaton was telling us it was great, we're
9   saying it's not so great.  So I, you know, we have
10   to have enough argumentation to go onto to next
11   round.
12      Q   So this, this side on VM200018470 are
13   your input to say this wasn't as great as we had
14   hoped, or would have liked?
15      A   Yeah.  Typically the supplier is coming
16   in saying we got a great contract, everything was
17   perfect, look how great I am.  And our analysis of
18   the previous contract are saying no, I lost 3
19   percent in market share because I started at 10, I'm now
20   at seven.  Cost increase, and I don't recall if
21   this was raw material or something else, or.
22      Q   Can you keep walking me through?  Did

Page 59

1   your market share of the T-200 shrink during the
2   life of the contract?
3      A   Yeah.  It used to be at a 60, 50 percent
4   market share, and with the 3,500 upcharge my market
5   share in T-300 went quite low.  I don't recall the
6   exact, but quite low.  Eaton increased their market
7   share by 35, so it was great for Eaton, but I'm
8   selling less T-300'S, or T-200'S.
9      MR. MARTIN:  Tony, --
10      MR. WOOD:  Go ahead.
11      MR. MARTIN:  I was going to suggest that
12   there should be a question, and you started
13   to ask one.
14      THE WITNESS:  Oh.
15      MR. MARTIN:  We we're on the same page.
16      THE WITNESS:  He asked me to go down and
17   explain.
18      MR. WOOD:  Yeah.  I was asking him to
19   walk through, but I was going to jump in too with a
20   question.
21   BY MR. WOOD:
22      Q   With reference to the bullet, it says

Page 60

1   Eaton increased market share by 35 percent.  What
2   is your understanding of, well, strike that.
3      The use of the contract assisted Eaton
4   in growing its share at MACK by 35 percent?
5      MR. LAZEROW:  Objection.  Vague.
6      A   During that time frame market share,
7   Eaton market share went up.
8      Q   All right.
9      A   These are facts.
10      Q   Was there anything in particular about
11   the structure of the contract that assisted Eaton
12   in increasing its market share at MACK in that time
13   frame?
14      A   The 3,500 upcharge in ouR view was a
15   significant --
16      Q   Contributing factor?
17      A   Yes.
18      Q   Does anything else come to mind?
19      A   If you have a $2,700 transmission to
20   $3,000 transmission, and then you put an upcharge
21   of 3,500, it stands to reason that the customer
22   will act differently with a 3,500 upcharge.  This

Page 61

1   is why we reduced it, and this is why it was
2   eliminated in the '02 contract.
3      Q   If you move forward with me two pages,
4   so it's, I think a continuation.  Transmission
5   contract results, is that what you have on the top
6   of that page?
7      A   Yes.
8      Q   The first bullet, Tony, says rebate
9   based on market share gain, no risk.  What is that
10   a reference to?
11      A   No risk for Eaton.
12      Q   For what reason?
13      A   If there is no penetration, then Eaton
14   does not have to pay us.  In order to extract value
15   out of the supplier, I have to perform.  I'm trying
16   to create contracts where I force the supplier to
17   perform so I get savings.
18      Their old contract was basically I have
19   to perform because I have to be at a certain level
20   in order for Eaton to give me value, so we changed
21   that in the next contract.
22      Q   And the second bullet, again, are we

16 (Pages 58 to 61)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000848

Page 62

1 looking at the pricing, the penalty pricing
2 provision?
3     A   Yes.  We viewed, MACK viewed this as a
4 penalty pricing on our own product.  Why we agreed
5 I don't know, but we changed that midstream on the
6 contract, and we changed that in the '02 contract.
7 We eliminated, we actually, we, MACK become
8 standard position in the next contract.
9     Q   Take me through the third bullet.  I'll
10 read it to you first.  T-200 electronics
11 development support at 25,000 per month cost.  No
12 deliverable, and no guaranteed pricing.  What is
13 that a reference to?
14    A   My predecessor felt that working with
15 Eaton, Eaton could help us take the T-300 into an
16 electronic type of transmission, because it was a
17 manual.  And at the time we were thinking about
18 making the T-200 automated.
19         So we developed a contract where we
20 would pay $25,000 to Eaton a month, but the
21 contract, or the agreement did not have any
22 deliverables from Eaton, so I canceled that.

Page 63

1     Q   As a result of, strike that.
2         Was development work pursued during your
3 tenure at MACK under the prior contract for this
4 development?
5     A   No.  I canceled it midstream.
6     Q   Prior to the termination of the '97
7 contract?
8     A   Correct.  Prior to the termination of
9 the '02, yeah, '97 contract.  Yes.  Before '02.
10 Sorry.
11    Q   That's okay.  Could you flip with me to
12 the next page?  This one has a header.  It says
13 transmission contract needs.  The first bullet says
14 2 percent price reduction in 2000.  What is that a
15 reference to?
16    A   I was asking Eaton to modify the
17 existing contract, and I was sending a message that
18 unless I get 2 percent cost-downs yearly I'm not
19 happy.
20    Q   And let me back up a tiny bit on this
21 slide as is.  The slide has the header transmission
22 contract needs.  What is the purpose of the slide

Page 64

1 overall?
2     A   It was my indication to Eaton that the
3 existing contract which I did not participate in
4 was not a great contract even though Eaton believed
5 it was a great contract, and preparation for
6 positioning for the '02 contract.  You have to
7 plant the seed in order to, way before the contract
8 ends so they're ready to.
9     Q   Was this document, Tony, did it become a
10 presentation that you used with Eaton?
11    A   Yes.
12    Q   The second bullet, T-200 upcharge relief
13 50 percent reduction max/min 1,500.  Again, I take
14 it we're talking about the penalty pricing
15 provision?
16    A   Yes.  I was indicating that okay, you
17 gave me some relief when you didn't have to during
18 the contract term, but I really want zero, not
19 1,500, which was corrected in the new contract.
20    Q   Then if you flip forward about three
21 pages to a slide entitled MACK-Eaton Contract
22 Review.  If I'm reading this right, Tony, is this

Page 65

1 the general way that you calculated both the
2 reduction in rebates, and the increase in price --
3     A   Yes.
4     Q   -- that you eluded to in your prior
5 testimony?
6     A   Yeah.  You can see that we started in
7 '97 at 10 percent, but then we reduced it to five,
8 and then it went to six.
9     Q   How, how was the rebate calculated?
10    A   Again, it was highlighted that it was
11 all transmissions sold excluding Allison.
12    Q   Did the, were there different, was there
13 a graded rebate level?  So, for instance, at X
14 percentage you would get 10 percent, at Y
15 percentage you would get five percent?
16    A   If you refer to this contract, 10
17 percent was a starting point just as a, I guess, a
18 wet the appetite.  And then it went to the model,
19 which was based on exact penetration levels.
20    Q   Tony, when did Eaton agree to modify the
21 contract so that the price penalty on the T-200's
22 would be reduced from 3,500 to 1,500?

17 (Pages 62 to 65)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
000849

Page 66

1     A   I don't, I know it was before the old
2   contract, but I don't know the exact dates.  We'd
3   have to refer to some other documentation.
4     Q   But before implementation of the 2002
5   contract, but, I guess, after April '99 when we
6   were looking at that letter?
7     A   Yes.  I would say 2000, 2001 time frame.
8     Q   Let's go ahead and look at the 2002
9   contract.
10    A   Okay.
11    Q   I know I'm excited to show it to you
12  because it's more paper I don't have to take home.
13        Before I hand you the contracts, I'm
14  actually going to hand you both the Volvo Trucks
15  North America contract, and the MACK contract.
16  While I'm preparing to hand these to you, can you
17  explain to me why VTNA ended up having two separate
18  contracts with Eaton?
19    A   It comes back to the comment that
20  counsel had made.  I was a MACK employee, so in
21  order to have a legal contract that I sign in
22  behalf of VTNA, I have to have a Power of Attorney.

Page 67

1   So I can't do a contract with MACK that covers VTNA
2   and MACK.  We had to do two separate contracts.
3        MR. WOOD:  I've marked as Lopes Exhibit
4   4 and 5 two supply agreements from 2002.  Lopes
5   Exhibit 4 is a MACK agreement with Eaton.  And
6   Lopes Exhibit 5 is a Volvo Eaton agreement.
7        (Whereupon, Deposition Exhibit Numbers 4
8   and 5 marked for identification.)
9     A   You'll find that in every case --
10       MR. MARTIN:  Hold on.
11    A   -- where the product is the same, we use
12  the same price.
13       MR. WOOD:  It's like Christmas.
14       MR. GRUBE:  Yeah.
15       MR. LAZEROW:  MACK Trucks is four.
16       MR. WOOD:  Thank you.
17  BY MR. WOOD:
18    Q   When you finish let me know, Tony, and
19  we can ask some questions about it.
20       MR. MARTIN:  Are you going to be
21  flipping back and forth, or are you going one
22  before the other, or?

Page 68

1        MR. WOOD:  I have no set course as of
2   yet, so keep them both in front of you.
3     A   I'm okay.
4   BY MR. WOOD:
5     Q   Have you had a chance to familiarize
6   yourself with the documents?
7     A   Yes.  It was a document that we created.
8     Q   Let's, let's start with what's marked as
9   Lopes Exhibit 4.
10    A   Okay.
11    Q   Based on your review of the document,
12  Tony, is this the 2002 supply agreement that you've
13  referenced in your earlier testimony between MACK
14  and Eaton Corporation?
15    A   Yes.
16    Q   Okay.  And the same for Exhibit 5.  Is
17  this the Volvo Eaton contract for the supply of
18  transmissions and clutches?
19    A   Yes.
20    Q   And both of these were negotiated, and
21  executed on VTNA's part in the normal course of
22  business?

Page 69

1     A   Yes.
2     Q   Let's see who signed those agreements.
3   Which exhibit are you looking at?
4     A   Either one.
5     Q   I have a signature page on Exhibit 5 at
6   page 14.
7     A   Yes.
8     Q   And then I have a signature page, a
9   signature page on both of them, actually, is on
10  page 14.
11    A   Yes.
12    Q   And if we look, both documents have the
13  name under either for MACK and/or Volvo Trucks as
14  Dennis Leblonde, is that correct?
15    A   Correct.
16    Q   Are you familiar with Dennis' signature?
17    A   Yes.
18    Q   Is this Dennis' signature as you know it
19  to be?
20    A   Yes.
21    Q   The name for Eaton Corporation is an
22  individual named Jim Sweetnam.

18 (Pages 66 to 69)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
000850

Page 70

1     A   Yes.
2     Q   Do you know Mr. Sweetnam?
3     A   Yes.
4     Q   Now, the general terms of those two
5   contracts, Tony, I think they're basically the
6   same.  Is there any key distinction between the two
7   contracts other that insert Volvo here versus
8   insert the name MACK here?
9         MR. MARTIN:  Objection to vagueness of
10  key.
11        MR. WOOD:  Strike the question.
12    Q   Is there any provisions between the two
13  contracts that are different?  That is one may have
14  a provision the other one does not.
15    A   The intent was to make them exactly the
16  same, so there might be small differences.
17    Q   If you look with me, let's just say at
18  MACK --
19    A   Okay.
20    Q   -- agreement, which is Lopes 4, and we
21  look on the first page, paragraph 2-A has a
22  statement that says standard.  MACK will as of the

Page 71

1   effective date, position Eaton Transmissions and
2   Clutches as a standard preferred offering in the
3   Pricebook for all MACK highway applications.
4   Notwithstanding the foregoing, Eaton Transmissions
5   will be listed as an optional transmission
6   offering.
7         So if I understood you correctly, in the
8   2002 agreements Eaton for both agreements was
9   standard on the highway products, but at MACK, MACK
10  was the standard for the vocational products, is
11  that correct?
12    A   Yes.
13    Q   Tony, whether Lopes Exhibit 4, or 5, the
14  reference to standard and preferred, is that a
15  defined term in the contract?
16    A   I believe so.
17    Q   Can you help me locate where it is
18  defined?  I actually was not able to locate a
19  definition for it.
20    A   Then it's probably not listed if you
21  haven't found it.
22    Q   Let me ask you.  What was, what is your

Page 72

1   understanding of standard and preferred as that
2   terminology is used in these contracts?
3     A   Standard is whenever you select a truck
4   and you do not specify a transmission, the standard
5   transmission will automatically be selected.
6         It's like you buying a car, you don't
7   decide which transmission type, you get standard
8   transmission.
9     Q   And the phrase preferred?
10    A   Preferred means that if you have the
11  product released, designed, and released so you've
12  made it available, you will have to put this
13  product in the Pricebook at any option price you
14  want, above or below the standard, typically it's
15  above because you want to change more for the
16  option, but competitive products, or other products
17  other than the standard supplier will be the lowest
18  level option price.
19    Q   What do you mean by lowest level option
20  price?
21    A   Using an example, if your 7-speed
22  transmission manual is a standard, and you also

Page 73

1   offer a 9, or a 13, and any other suppliers also
2   offer a 9, or a 13, if the upcharge to the standard
3   for the supplier who has standard position is $100,
4   the competitive product, or the product not
5   standard would have to be at 101.
6     Q   So if I understand correctly, the
7   preferred position would mean that the supplier's
8   product is priced less than the comparable
9   competitive product in the databook?
10    A   Yes.  I decide what the option price is,
11  but I need to be cognizant that another product, or
12  comparable product must be at least $1 above.
13    Q   If you look with me in Lopes Exhibit 4
14  to page 15 of the agreement, Tony.  If you look at
15  the bottom of the page it says Fleet Transmissions,
16  Performance on/off highway.  Do you see those
17  references?
18    A   Yes, sir.
19    Q   I think you said in the '97 contract
20  there wasn't a differentiation between types of
21  transmissions, is that correct?
22    A   I don't think I said that.  The

19 (Pages 70 to 73)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000851

Page 74

1  standard --
2      Q   Certainly if I've characterized
3  something you said incorrectly, correct me because
4  that's not my intention.
5      A   I'm sorry?
6      Q   If I misstated your testimony, do what
7  you just did and say you got it wrong.  What did
8  you say?
9      A   Can you repeat your comment?
10     Q   Sure.  In the '97 contract was there a
11 distinction made between a fleet transmission, and
12 a performance on/off highway transmission?
13     A   In the '97 contract the standard for
14 Eaton was for all transmissions.
15     Q   And in the 2002 contract the terms are
16 defined because Eaton in some instances have
17 standard, and some instances --
18     A   Correct.
19     Q   -- does not?
20     A   Eaton lost standard position on the
21 vocational side.
22     Q   And the term here "performance on/off

Page 75

1  highway," Tony, is that the same as when you use
2  the phrase vocational, or is that different?
3      A   Part of it is vocational, part of it is
4  not.  13 and 18 is typically, could be used in
5  highway for the owner-operator, or it could be
6  purely vocational.
7      Q   And are 9- and 10-speed transmissions
8  typically fleet transmissions, or I guess what we
9  referred to earlier as line-haul transmission?
10     A   Yes.  Good definition.
11     Q   And how about, since we're looking at
12 this 8LL transmissions, are those just vocation, or
13 are they also used for line haul applications at
14 VTNA?
15     A   8LL would be purely vocational, and
16 would be in the performance on and off, or a
17 portion of the performance on and off highway.
18     Q   And the 9ALL, what is that transmission?
19     A   The what?
20     Q   There's one called a RTO 9ALL.
21     A   Where do you see that?
22     Q   The performance on and off highway

Page 76

1  section.  It actually is right next to the 8LL.
2      A   Basically it's an 10LL transmission, but
3  it's a 9-speed.
4      Q   Same question with the 9ALL be used for
5  fleet, or line haul applications?
6      A   No.  It would be vocational.
7      Q   How about a 15-speed transmission?
8  We've talked about a 13, and 18.  You had stated
9  that those may be in some instances used for fleet,
10 and other instances for performance purposes.  How
11 would you characterize the use of a 15-speed, for
12 what applications is it generally --
13     A   Both.
14     Q   -- or commonly used?
15     A   Both.  13, 15's and 18's.
16     Q   When, strike that.
17         Are there specific geographic areas in
18 North America where drivers tend to use higher
19 torque rate, or a higher gear transmissions for
20 fleet applications versus other places in the
21 country?
22     A   It's more customer oriented versus

Page 77

1  different places.
2      Q   And as you testified before, it's the
3  cowboy, the owner-operator that tends to want to
4  have a lot of gears in his transmission?
5      A   You would tend to go higher in price.
6  If you're a fleet and you're buying 1,000 trucks at
7  a time, you would tend to go with exactly what you
8  need, typically the 7- or 9-speed.
9      Q   So you shoot for what's going to get the
10 job done --
11     A   Yeah.
12     Q   -- as opposed to --
13     A   At the best possible price, correct.
14 There's a big difference between a 7, 9-speed, and
15 a 13.
16     Q   For what applications is a 7-speed
17 generally used?  What's going to be the torque
18 rating for those transmissions?
19         MR. MARTIN:  Which question?
20         MR. WOOD:  The latter question.
21     A   7-speed?
22     Q   Yeah.  What are the general torque

20 (Pages 74 to 77)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000852

Page 78

1    ratings that you find a 7-speed would dwell in?
2        A   Typically less than 325 to 350
3    horsepower, and I believe there's only one customer
4    called Yellow that was consuming seven speeds at
5    the time, so it was a very low user.
6        Q   What does Yellow do for, strike that.
7            What type of applications does Yellow
8    use their trucks for?
9        A   Highway.
10       Q   Do they still buy 7-speeds?
11       A   I believe 7-speeds are no longer
12   offered, because the volume was quite low.  Eaton
13   was the only one who provided it except for MACK,
14   which still has a seven.  And Eaton was motivating
15   us to get out of it because we didn't want to
16   produce such a low volume transmission.
17       Q   On that note, if you look at the chart
18   there, it says transmission base pricing.  The
19   7-speeds it looks as if the price on the 7-speed
20   was increased by 15 percent?
21       A   Yes.
22       Q   Is that correct?

Page 79

1        A   Yes.
2        Q   Why was, why was it if you know that the
3    price of the transmission at MACK increased by 15
4    percent?
5        A   That was the motivation I was talking
6    about.  It was such a low volume, and the engine
7    horsepower kept going on up.  So the consumption at
8    7-speed was getting smaller, and smaller.  Eaton
9    was no longer interested in producing such as small
10   quantity, and so they basically tried to either not
11   offer the product, but some of my customers, in
12   this particular case Yellow, still wanted it.  So I
13   felt obligated to still try to have it available,
14   but Eaton was not willing to give me preferential
15   pricing due to the low volume.
16       Q   Why did you still feel obligated to
17   carry it?
18       A   Because at the end of the day the
19   customer, I want to please the customer.  I'm not
20   selling transmissions, I'm selling trucks, so I
21   need to support my marketing guys to sell trucks.
22       Q   The same I take it would apply for a

Page 80

1    brand as opposed to just a gearing structure of the
2    transmission?
3        A   Correct.
4        Q   So a Meritor brand if they wanted it --
5        A   Correct.
6        Q   -- that would be something you all would
7    work to try to accomplish --
8        A   Correct.
9        Q   -- for the customer?
10           Tony, you just talked about seven
11   speeds.  Was there a time when Eaton looked to
12   remove its 9-speeds as well from its offerings?
13       A   There was some discussion, but the
14   9-speed was still at a fairly nice volume.
15       Q   In 2002?
16       A   Yes.
17       Q   Do you continue to sell the 9-speeds
18   today?
19       A   I believe they're still in the product
20   offering.
21       Q   If you look with me on the section
22   called equalization, which is -- I'm sorry, it's

Page 81

1    not called equalization.
2        A   B?
3        Q   It begins equalization.  Yes, sir,
4    letter B. The last sentence reads --
5            MR. MARTIN:  Hold on.  Where are you,
6    please?
7            MR. WOOD:  I'm still on the same page.
8            THE WITNESS:  Same page.
9            MR. MARTIN:  Yeah. Okay.
10           MR. WOOD:  Are you with me?
11           MR. MARTIN:  Yep.
12   BY MR. WOOD:
13       Q   Start a new question.  I think we talked
14   a little bit earlier about when the entities came
15   together looking at the, sort of the price
16   portfolio and what one another was paying.  Does
17   this relate to that, the concept of equalization?
18       A   Yes.
19       Q   And what was the undertaking at that
20   time with regards to equalization?
21       A   Volvo MACK myself was quite frustrated
22   because Eaton wanted to follow the existing

21 (Pages 78 to 81)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000853

Page 82

1    contracts, and not give us the best possible price
2    by component because we had two OEM's now, Volvo,
3    and MACK, and I had visibility to the pricing, and
4    they wanted to follow the contract.
5        Q    Was, strike that.
6            Did VTNA make a request to Eaton to
7    equalize the pricing on the Volvo and MACK product?
8        A    We made a request that whoever had the
9    best price I wanted for both parties.
10       Q    When did you initially make that
11   request?
12       A    Before the contract expired.
13       Q    Did Eaton grant that request?
14       A    No.
15       Q    Did they grant it retroactively?
16       A    No.  They basically told us use the
17   contract, that's why the contract is there.
18           On the MACK side they did make a
19   reduction from the 3,500 upcharge to the 1,500.
20       Q    And this section B also references a
21   temporary bridge agreement, what was that?
22       A    Since the contract ended, and I was not

Page 83

1    ready to do a new contract, we actually operated
2    without a contract.  And during that time frame
3    Eaton was willing to support us with equalization
4    pricing.
5        Q    Okay.  Did that temporary bridge survive
6    from the end of the contract to the new contract?
7        A    Yes.
8        Q    And then the last sentence, Tony, reads
9    this equalized base price is deemed to be the
10   baseline for future pricing adjustments for the
11   balance of this agreement.  What does that mean?
12       A    Once you got the best pricing of either
13   OEM applied to both, than that would be the
14   starting point for the new contract.
15       Q    But based on the prior sentence, it
16   didn't include any of the bridge pricing?
17       A    The bridge pricing was the equalization
18   price.
19           MR. WOOD:  I think we need to change
20   tapes, so let's take another short break.
21           THE VIDEOGRAPHER:  This marks the end of
22   tape one in the deposition of Tony Lopes.  Going

Page 84

1    off the record.  The time is 12:41:19.
2            (Luncheon recess.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 85

1        A F T E R N O O N   S E S S I O N
2            THE VIDEOGRAPHER:  This marks the
3    beginning of tape two in the deposition of Tony
4    Lopes.  Going back on the record.  The time is
5    1:51:15.
6        Q    Good afternoon, Mr. Lopes.
7        A    Good afternoon.
8        Q    Is there anything about your testimony
9    from earlier today that you would like to change?
10       A    No.  Not at this point.
11       Q    We were looking at Lopes Exhibit 5, the
12   Volvo contract, I believe, or four, one in the same
13   at page 15 of the contract.  And we were looking at
14   the transmission base pricing chart.  Under pricing
15   for automation, if you go over to 2004, and five,
16   and six, there is a negative 1.25 percent for each
17   year.  And then below that it's DM plus 250, plus
18   150, plus 100.  What is, what is that referenced
19   to?
20       A    We knew there was a new product coming,
21   the UltraShift two.  Prior to, there was an
22   UltraShift three pedal.  Two pedal we expected the

22 (Pages 82 to 85)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000854

Page 86

1  price to go up considerably.  We were able to
2  negotiate with Eaton to suppress the increase from
3  the three pedal to the new two pedal, and $150, or
4  depending on the year.
5     Q   Is that amount then the difference that
6  you would pay between a three pedal, and a two
7  pedal?
8     A   Correct, which was a fairly good price
9  increase at the time.
10    Q   Do you, strike that.
11       When did Eaton initially state it would
12  be able to start delivery of the two pedal?
13    A   The pricing indicates '04, so I would
14  assume some time in late '03, early '04.
15    Q   If you look with me at letter E, year
16  over year pricing contingent on combined share
17  maintenance, minimum of 67 percent of build
18  excluding Allison.
19       I take it that's the provision that we
20  talked about before where 68 percent combined for
21  VTNA and MACK was what to necessary to maintain the
22  pricing provided in the contract, is that right?

Page 87

1     A   Yes.
2     Q   During the life of the contract, both
3  contracts, did the combined share ever fall below
4  68 percent?
5     A   No.
6     Q   Do you know today what the combined
7  share is on?
8     A   I believe we had '08 a 57 and a half
9  percent market share.
10    Q   And currently what is MACK's share of
11  MACK?
12    A   Close to 40 percent, depending on the
13  quarter.
14    Q   And do you know what Eaton's share at
15  Volvo is, or -- yeah, I think I'm saying that
16  right.  On the Volvo side?
17    A   VTNA?
18    Q   Yes, sir, VTNA.
19    A   I'm going from memory when I did the
20  calculation.  We do it quarterly to make sure that
21  we're within the contract, and I believe it was
22  close to 90 percent, 89-something.

Page 88

1     Q   Is there a minimum share requirement in
2  the current contract?
3     A   55.
4     Q   55 percent?
5     A   Yes.
6     Q   So if it falls below 55 percent,
7  whatever the pricing is goes away?
8     A   The contract becomes null and void, and
9  we would go to a PO type of relationship.
10    Q   Do you know what the annual, strike
11  that.
12       Are there cost savings associated with
13  the current contract?
14    A   Yes.
15    Q   What is the annual value of those cost
16  savings?
17    A   Not significant, a half a percent a
18  year.  It's very small.
19    Q   Is that a product of the minimum share
20  requirement having fallen from the prior level of
21  68 percent?
22    A   It's one of the products.  I wanted the

Page 89

1  ability to introduce another Volvo product, which
2  is the I-Shift, which is my own product above and
3  beyond the T-300, so I needed to create enough
4  penetration room to be able to introduce other
5  products and still maintain the contract.
6     Q   And the I-Shift is a two pedal automated
7  transmission?
8     A   Yes.
9     Q   Which --
10    A   Let me shut this off.  Excuse me.  I
11  apologize.
12    Q   That's fine.
13       Is the I-Shift designated as for use
14  with certain applications?
15    A   I-Shift is a highway transmission.  It
16  cannot be utilized in vocational.
17    Q   Is the I-Shift also available on MACK
18  trucks?
19    A   Not yet.  It will be introduced later
20  this year.
21    Q   Vice versa, are the T-series
22  transmissions, are they available at VTNA?

23 (Pages 86 to 89)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000855

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 90

1      A   No.
2      Q   What are the transmissions that VTNA
3  currently offers on its heavy-duty trucks?
4      A   VTNA is primarily a highway product.
5  They're very small, and vocational, so we offer
6  Allison in some cases, but 2- to 3 percent.
7      Q   I'm sorry.  How much?
8      A   2- to 3 percent only because the refuse
9  business was sold.  We have the I-Shift, which is
10  around 12 to 13 percent now.  It has been growing.
11  We have Eaton product, and we have the Zed-F
12  product.
13      Q   Zed-F product being the Freedomline?
14      A   Yes.
15      Q   In the MACK agreement, which is Exhibit
16  4, if you look on page 19, title should be
17  Attachment B.
18      A   Yes, sir.
19      Q   Is this an attachment that specifies how
20  rebates operate under the contract?
21      A   Correct.
22      Q   If the Eaton share pursuant to the

Page 91

1  contract fell under 68 percent, but was still above
2  65 percent, would you still earn a rebate?
3      A   Yes.
4      Q   You would.  Okay.
5      A   At least until 2003.
6      Q   What would happen in -- oh, I see what
7  you're saying.  Because there is none provided at
8  that level beginning in 2004?
9      A   At the time we did this contract we were
10  at 75 percent.
11      Q   Combined?
12      A   Combined.  So for Eaton to accept the
13  68, it was almost a walk away issue, but we needed
14  to have 68, a lower penetration because we're
15  establishing a five year contract.  We want to be
16  sure that the contract lives a certain time frame,
17  and it did live to its entirety, so the 68 was the
18  right level.
19      Q   When you say walk away issue, first let
20  me ask for whom?
21      A   It was a huge negotiation issue between
22  us and Eaton, because we were, we were ending '01

Page 92

1  at 75, so most suppliers would want to keep it at
2  the same level, or grow, and we established a lower
3  rate of penetration, which was tough discussion
4  point, or tough negotiation point.
5      Q   When you use the phrase "walk away" what
6  does that mean?
7      A   Basically Eaton didn't want to accept a
8  75, less than 75 percent since we were operating at
9  that level.
10      Q   What was the argument they presented to
11  you why the level should stay at 75 percent?
12      A   If they were going give us cost-downs
13  annually, plus rebates that they would like to get
14  something in return.  So for them to accept giving
15  us cost-downs and a lower penetration rate was very
16  difficult.
17      Q   By the time that the contract came to
18  its natural ending in 2007, what was the combined
19  share of Eaton and MACK for VTNA's overall
20  purchases, meaning for both MACK and VTNA?
21          MR. MARTIN:  Eaton and Mack?
22          MR. LAZEROW:  You threw in Eaton.  I

Page 93

1  think you meant Volvo and MACK.
2          MR. WOOD:  Let me try the question
3  again.
4      Q   At the termination of the contract, what
5  was MACK's penetration at the combined Volvo MACK?
6  Does that make sense?
7          MR. LAZEROW:  No.  I think you still got
8  it wrong.
9          MR. WOOD:  No.  I do mean MACK's own
10  transmissions.
11          MR. LAZEROW:  Okay.
12      A   We have to do a calculation.  I can tell
13  you that MACK transmission at MACK was been
14  averaging around 40 percent.
15      Q   Since what year, do you remember?
16      A   I can go back two, or three years.
17      Q   But just at MACK?
18      A   I don't use MACK transmission at VTNA.
19          MR. WOOD:  Let's mark as Lopes Exhibit 6
20  VM20013826 through 28.
21          (Deposition Exhibit Number 6 marked for
22   identification and attached to the transcript.)

24 (Pages 90 to 93)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000856

Page 94

1   Q   Have you had a chance to review?
2   A   Yes, sir.
3   Q   This document was produced by your
4   lawyers out of your electronic files, and the
5   electronic date designation of it was January of
6   2003.  Is this a document that you created?
7   A   I believe either myself or David, but I
8   would say most of it is mine.
9   Q   If you look with me on the third page of
10  the document, which is the last page.
11  A   Uh-huh.
12  Q   Let me back up very quickly.  What do
13  you recall being the purpose of the creation of
14  this document?
15  A   This was an update to marketing and
16  sales groups at MACK and VTNA to give them a
17  perspective on the outcome of Eaton contracts, and
18  what it does, or what it brings to the business,
19  and how they can utilize the new pricing to support
20  their business going forward.
21  Q   In this document did you and/or working
22  with David create in the ordinary course of your

Page 95

1   business?
2   A   Yeah.  We -- yes.  We referred to this
3   as a sales pitch, an internal sales pitch of what
4   we're providing to the brands.
5   Q   If you look with me on the third page of
6   the document it's entitled Current Eaton Issues,
7   I'm sorry, Current Eaton Status Issues.  The first
8   bullet states, allowed competitor to beat them
9   market with two pedal product in North America,
10  introduction first quarter '04.
11       Is the reference to competitor a
12  reference to Zed-F Meritor?
13  A   Yes.
14  Q   And that statement is within a slide
15  titled Issues, why is that demarked as an issue?
16  A   We view, we viewed and view Eaton as an
17  extremely strong supplier with product offering
18  technology, and manpower capital to produce
19  whatever they want.  However, they typically guess
20  wrong, and produce the wrong product for the
21  market.  They typically produce or design products
22  that the market may not need, and Zed-F introduced

Page 96

1   a product for North America, which was a benefit
2   for North America, and Eaton had the option of
3   introducing it before.  We had given Eaton some
4   advice of what kind of products we were looking
5   for, and they still missed.  So we were not quite
6   impressed with Eaton in that particular area.
7   Q   The second bullet states, would not
8   negotiate payment terms in new agreement, 30 days.
9   What is that a reference to?
10  A   Well, my goals for my group is to create
11  cash flow positives, so I'm trying to move all
12  suppliers to 90 days, and Eaton refused to agree to
13  go to 90 days, so we stayed at 30 days.
14  Q   Did other suppliers agree to a 90 day
15  payment term?
16  A   In North America in the transmission
17  business, no supplier agreed to 90 days.
18  Q   And Eaton was at 30 days?
19  A   Yes.
20  Q   And they stayed at 30 days?
21  A   Correct.
22  Q   Where was Zed-F Meritor, do you recall?

Page 97

1   A   45 days.  We went from 30 to 45.
2   Q   So they increased by 15 days?
3   A   Correct.
4   Q   In the third bullet, Tony, it says,
5   predatory negotiation tactics due to dominant
6   position in North America.
7       I've seen you use the word dominant a
8   few times.  What do you mean by that term?
9   A   We typically refer to a supplier as
10  dominant if they have more than 50 percent
11  penetration, so this supplier has in excess of
12  that, so we don't like dominant suppliers.  We like
13  suppliers with a lots of product offering, but not
14  so dominant, because it limits our ability
15  negotiate.  We like competition.
16  Q   How does it limit your ability to
17  negotiate?
18  A   Typically they need us as much as we
19  need them. So ideally we want to have two or three
20  suppliers offering the same type of product so we
21  can then choose, or have the ability to choose
22  without impacting us financially.

25 (Pages 94 to 97)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000857

Page 98

1    Q   And that was the case for heavy-duty
2  transmissions?
3    A   Yes.
4    Q   You reference predatory negotiation
5  tactics.  Is that a reference to the negotiation
6  for the 2002 contracts?
7    A   I've done -- at the time since '02 was
8  the only transmission agreement I had done with
9  them, so it refers to the '02 contract.
10   Q   When you use the phrase "predatory
11 negotiation tactics," are there specific tactics
12 that you're thinking of?
13   A   If you recall the previous documentation
14 where I, we had done an analysis of the old
15 contract --
16   Q   Yes, sir.
17   A   -- and how we saw the contract versus
18 how they saw the contract, if you had gotten their
19 presentation, or their view of the contract, you
20 would have found that we were quite at opposite
21 ends, our view versus their view of what the
22 contract, the previous contract had given us.  So

Page 99

1  you almost have to force them to recognize our view
2  versus their view, because they're very good
3  negotiators.
4    Q   In other documents you also reference it
5  as being difficult to negotiate with Eaton, does
6  that sound right to you?
7    A   I don't know which one, but, you know of
8  if you reference me I can --
9    Q   We can go to a document --
10   A   Yeah.
11   Q   -- at the right time.
12   A   Okay.
13   Q   I want to ask you a question if that
14 doesn't jump to mind to you.
15       Do you know an individual by the name of
16 Bruce Hollenbeck?
17   A   Yes.
18   Q   Who is Bruce Hollenbeck?
19   A   Vice president product planning for MACK
20 Trucks.
21   Q   Was he at MACK when you joined the
22 company?

Page 100

1    A   Yes, sir.
2    Q   Is he still at the company?
3    A   Yes, sir.  Still at the same position.
4    Q   So that was his position in '99?
5    A   Yes.
6    Q   And what is, what are his
7  responsibilities?
8    A   Product planning, tries to define for
9  engineering what the future product should be in
10 order to maintain market share, or participate in
11 the customer acceptance.
12       MR. WOOD:  Let's mark as Lopes Exhibit 7
13 VM200016072 through 74.
14       (Deposition Exhibit Number 7 marked for
15   identification and attached to the transcript.)
16   Q   Have you had a chance to review the
17 document?
18   A   Yes, sir.
19   Q   Now, this is another document, Tony,
20 that came out of your electronic files.  I think
21 they were warehoused on your computer.  Is this a
22 document that you received from Mr. Hollenbeck in

Page 101

1  the normal course of performing your duties?
2    A   Yeah.  I'm pretty sure, yes.
3    Q   Do you know what the purpose of this
4  document was, and why it was provided to you?
5    A   Yeah.  Any time I do a contract that
6  impacts the brands, one of the things we do is we
7  ask the brands to do a SWOT analysis on what they
8  believe are the best products to maintain our
9  market share in the marketplace.
10   Q   When you say SWOT analysis, S-W-O-T?
11   A   Yes.  And since we had a contract that
12 was coming due, which was the '97 contract, we
13 initiated meetings with the various brands what
14 would you, what would be the preferred supplier of
15 choice going forward because we need to do a five
16 year contract to protect our business.  So we do
17 our analysis, and then we do the sales pitch,
18 typically every six months to give them our view of
19 the market, and they give us their view of the
20 market, and then we try to implement.
21   Q   If you look with me at the last page of
22 the document, there's a heading number six, the

26 (Pages 98 to 101)

Page 102

1    second paragraph.  If Zed-F Meritor is chosen, do
2    you see that?
3        A   Yes, sir.
4        Q   There are no products within the range
5    for construction vehicles, and the MACK family is
6    incomplete as cited above.  The situation should be
7    better by 2002, but to build an agreement on future
8    plans is risky.  Furthermore, the Eaton product
9    line must still be offered because of customer
10   demand due to brand loyalty and image.  We estimate
11   that 50 percent of MACK vehicles will still require
12   an Eaton gearbox.  With a partnership with their
13   competitor, Eaton will retaliate and raise prices,
14   which could negate any savings of a Zed-F Meritor
15   relationship.
16       Did you discuss that language with Mr.
17   Hollenbeck, or the ideas undermining it?
18       A   Again, this is Bruce's viewpoint coming
19   to us that if we were to choose a non-Eaton
20   supplier, that our customer base would still need
21   -- there would still be 50 percent of our customers
22   that would still need an Eaton because of the

Page 103

1    product offering of any other supplier.  And the
2    only one that could come close would be Meritor
3    Zed-F, so I'd have a 50 percent product that would
4    not, would need Eaton still.
5        Q   Did you have a similar view of the
6    amount of customers who would still look to use
7    Eaton transmissions in their MACK trucks?
8        A   Yes.  The customer base would still
9    require some products that would require Eaton.
10       Q   Did you have a view that if that was the
11   case that Eaton then would put, quote/unquote,
12   retaliate if you were to enter into a deal with
13   Zed-F Meritor for the supply of transmissions?
14       MR. LAZEROW:  Objection.
15       MR. MARTIN:  Objection to the form.
16       A   We never got a quote from Eaton where
17   they were not the standard position provider, but I
18   would venture to guess if they were not the
19   standard provider that we would have different
20   pricing.
21       Q   Did that work into your thought process
22   when considering suitors for the provision of

Page 104

1    heavy-duty transmissions?
2        A   Of course.
3        Q   Did you do anything to explore that
4    possibility in terms of what would happen if you do
5    any analysis of the possible result of doing a deal
6    with Zed-F Meritor?
7        A   We tried many times and many meetings,
8    which I'm sure there's documentation, to look for
9    options where the Meritor product, plus the Zed-F
10   product, plus the MACK product, plus the MACK
11   product with some automation could fulfill the
12   whole product range from our customer base.  And
13   even though we believed that MACK, Volvo, and
14   Zed-F, and Meritor had enough capability to produce
15   a product to cover all range, it would take years,
16   and the product did not exist at the time.
17       So you saw where Mr. Hollenbeck said
18   even though it's possible, or probable, the product
19   doesn't exist yet, and we can't make decisions
20   with future intentions.  We've got to make
21   decisions based on availability of product
22   offering.

Page 105

1        Q   What would be the problem with waiting
2    for the additional product to be introduced?
3        A   We'd have a couple years where there
4    would be no product offering.  50 percent of the
5    market would not be able to be covered.  I would
6    have to go back to Eaton, Eaton would not be the
7    standard partner.  More than likely they would got
8    give me the preferential pricing, and that from a
9    business perspective didn't make sense to me, or
10   the business.
11       Q   Why would that not make sense to you, or
12   why, strike that.
13       Why did that not make sense to you?
14       A   You saw the '02 contract with multiple
15   year savings, plus rebates.  More than likely, I
16   would not ever have achieved that pricing, thus my
17   product would have cost more money, and that would
18   have positioned the brands in a negative situation
19   when they compete against the other competitors out
20   there.  So I want to provide the best possible
21   price to my brands, so they can go after the
22   market.

27 (Pages 102 to 105)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000859

Page 106

1    Q   So it was your belief that you would not
2  be able to wait for whatever period of time it
3  would require to deliver a full line through Volvo,
4  MACK, Zed-F, and Meritor?
5    A   Yes.
6    Q   And the basis for that was because you
7  were concerned that Eaton would eliminate
8  preferential pricing to you, or retaliate with
9  higher prices?
10   A   If they were not in standard position,
11 their pricing would not be as, I would never
12 achieve the pricing that I achieved.
13       You have to understand that I came in,
14 in '99.  It shows that I had a contract where Eaton
15 was supporting me to develop a new transmission. I
16 still don't have that transmission today, the T-300
17 automated.
18   Q   Today being 2009?
19   A   '08. Yeah, '09. So I still don't have
20 it from 1999 I was paying 25,000 a month, still
21 don't have that. I-Shift was going to be
22 introduced in '03. It's still not introduced in

Page 107

1  MACK late '09. 8LL, or 10LL from Meritor was going
2  to be introduced in 2000, and in '06 I still didn't
3  have a 10LL from Meritor. So you can't make
4  decisions based on potential. You have to make
5  decisions based on availability to protect the
6  business. We guessed right, for lack of a better
7  word.
8        MR. WOOD:  Let's mark as Lopes Exhibit 8
9  the document from the files of Zed-F Meritor, which
10 is found at ZFMA0308753.
11       (Deposition Exhibit Number 8 marked for
12 identification and attached to the transcript.)
13       MR. MARTIN:  Are you asking him to do
14 something with this?
15       MR. WOOD:  I was hoping he was reviewing
16 it.
17   A   That's what I'm doing it.
18       MR. MARTIN:  Do you want him to just
19 read over it?
20       MR. WOOD:  It's about a meeting in which
21 he participated.
22       MR. MARTIN:  I see that.

Page 108

1        Go ahead. He's asked you to read the
2  document, so you can go ahead and read it.
3    Q   Have you had a chance to look at it?
4    A   Yes, sir.
5    Q   In 2002 did you and others from VTNA
6  have meetings with representatives of Zed-F, and
7  Meritor to consider possible transmission
8  opportunities?
9    A   Yes.
10   Q   And in those meetings I take it you had
11 various discussions about your options, and what
12 you were trying to accomplish in the marketplace
13 with your transmission acquisitions, is that right?
14   A   It wasn't really acquisitions. It was
15 development of our product.
16   Q   I see. Okay. And Mr. Allen's, I'm
17 sorry. Rick Martello, do you know Rick Martello?
18   A   Yes. Very well.
19   Q   This is a summary from Mr. Martello of
20 one of those meetings in which you were a
21 participant. If you'll look towards the top,
22 Dominique, Tony, Dave Louya, and Michael Blanks met

Page 109

1  with various representatives of Zed-F Meritor. Do
2  you actually remember this specific meeting?
3    A   It depends on where the meeting was.
4  Where was multiple meetings, so I believe this one
5  was actually in Michigan at the Zed-F headquarters.
6    Q   And one of the discussion points towards
7  the bottom of the first page Mr. Martello writes,
8  they feel a change from Eaton to Zed-FM creates a
9  big risk which must with outlined, and
10 countermeasures established. The major reason for
11 these risks are A, Eaton's brand recognition and
12 customer loyalty base in NAFTA. And B, ZFM's lack
13 of a full product line.
14       Do you recall discussing those topics
15 with representatives of Zed-F and Meritor?
16   A   Yes.
17   Q   What was your concern regarding the lack
18 of a full product line?
19   A   When we analyzed the product offering
20 from Meritor plus Zed-F versus an Eaton product
21 offering, and what my current consumption was with
22 my customers, it was apparent that many products

28 (Pages 106 to 109)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
000860

Page 110

1 that were being consumed by our customers were not
2 yet being produced by Zed-F or Meritor.  So those
3 customers would be at a disadvantage if Eaton was
4 not the standard preferred provider.
5     Q   Why would the customers be
6 disadvantaged?
7     A   Because I would have to cancel the
8 contract with Eaton if I were to go with the
9 standard position with Zed-F or Meritor.
10     Q   What would be the result of canceling
11 the contract?
12         MR. LAZEROW: Objection.  Speculation.
13     A   We expect that I would not get as good a
14 deal as we did.
15     Q   So unless Zed-F Meritor could cover the
16 full range of products, there would be products you
17 would still have to procure from Eaton?
18     A   A substantial percentage.  That was the
19 problem.  It wasn't a 5- or 10 percent gap.  It was
20 50 percent plus gap.
21     Q   And the problem with that was your
22 assumption was the pricing would change on those

Page 111

1 products?
2     A   We've always gotten better pricing from
3 Eaton than Meritor, so when I don't offer standard
4 position to Eaton, and we expected to get not as
5 good pricing, the numbers, the financials would
6 indicate that this would not be a good option for
7 Volvo or MACK.
8     Q   The first point references brand
9 recognition and customer loyalty.  Is that
10 something that you also discussed with Zed-F
11 Meritor?
12     A   Again, this is more -- yes, we discussed
13 it.  This is more a marketing sales perspective.
14 You saw Mr. Hollenbeck's memo.
15     Q   Yes, sir.
16     A   When you have 80-plus market share, most
17 people believe that you're well respected in the
18 industry.  I'm not in sales, so I have to defer to
19 the people that are.  In this case product planning
20 and sales guys are indicating that the loyalty is
21 fairly strong.  I can't prove otherwise.  I have to
22 rely on the people that are in sales.

Page 112

1     Q   Okay.
2         MR. WOOD:  I'd like to mark as Lopes
3 Exhibit 9 another Zed-F Meritor document with the
4 Bates range ZFMA0016360 through 61.
5         (Deposition Exhibit Number 9 marked for
6     identification and attached to the transcript.
7     Q   These are handwritten notes -- sorry
8 about that, of a meeting between Volvo MACK and
9 representatives of Zed-F Meritor.  Tony, I'm just
10 going to focus you on the top of the document.
11     A   Okay.
12     Q   I take it in the 2002, 2003 time period
13 you had more than one meeting with the people from
14 Meritor Zed-F.
15     A   Yes.
16     Q   There's a reference towards the
17 beginning here that says, Volvo has a patent issue
18 with Eaton in Europe.  This issue goes away if
19 Volvo does a deal with ETN.  Do you recall whether
20 you had any discussions with representatives of
21 Zed-F Meritor on that subject?
22     A   Yes.

Page 113

1     Q   What was the substance of those
2 discussions, Tony?
3     A   Very similar to the North American
4 patent infringement issue.
5     Q   What was looked at in the '97
6 contract --
7     A   Yes.
8     Q   -- about the patents?
9     A   There appeared to be a challenge from
10 Eaton on the Volvo transmission as well, Volvo
11 Europe, --
12     Q   And --
13     A   -- which we knew nothing of until it was
14 brought to our attention.
15     Q   Who brought it to your attention?
16     A   Our own -- Eaton as well as our own
17 people internally at Europe.
18     Q   During the negotiations with Eaton for
19 the 2002 contract, were you involved in discussions
20 with Eaton where that subject was addressed?
21     A   I never brought it up with Eaton because
22 this patent issue had been many years old, and

29 (Pages 110 to 113)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000861

Page 114

1 Volvo Europe and Eaton disagreed on whether or not
2 Eaton had a legitimate right that I was infringing.
3 Since neither party ever acted on it, by acting on
4 it with Eaton, I would actually have given it more
5 value than it deserved.
6     Q   And entering the 2002 contract, did
7 Eaton and VTNA resolve in any way the referenced
8 patent issue in Europe?
9     A   We didn't resolve it, but if we were to
10 do a future contract with Eaton, then I would take
11 steps to probably eliminate the need to have a
12 patent infringement discussion.  So I basically, I
13 don't recall if the contract has any reference to
14 European patent infringement.  I don't believe it
15 does, but the intent was if I got to do it, do I
16 close the store forever because we don't believe
17 they have an issue. They haven't acted on it, but I
18 never really moved forward with it.
19     Q   Did --
20     A   It was a non-issue.
21     Q   Did Eaton and VTNA agree to make it a
22 non-issue?

Page 115

1     A   Since it was a European patent issue, it
2 didn't impact us at all in North America.  So my
3 North American contract didn't really have to deal
4 with the problem if there was a problem.
5     (Deposition Exhibit Number 10 marked for
6 identification and attached to the transcript.)
7     MR. WOOD:  I'm marking as Lopes Exhibit
8 10 a document produced from the files of Zed-F
9 Meritor.  I'm sorry, I apologize to counsel because
10 it doesn't have a Bates number on it, but I shall
11 acquire that number, and I shall provide it to
12 counsel.  This must have been taken from the
13 original set or something like that, but as a point
14 of reference, it is an internal letter within
15 Zed-Meritor from Charlie Allen dated 9/26/02.
16     MR. MARTIN:  So, Mr. Lopes, Mr. Lopes,
17 let's just wait and see what he wants you to do
18 with the document.
19     THE WITNESS:  Okay.
20     MR. MARTIN:  He's given you this series
21 of documents that have no indication you've ever
22 seen them, or had anything to do with them.  I

Page 116

1 don't want you to study them.
2     THE WITNESS:  Okay.
3     MR. MARTIN:  I want you to just wait and
4 see what it is.
5     Q   If I had you a document, I'm asking you
6 to take a look at it because I'm going to ask you
7 some questions.  It may not necessarily be a
8 document that you authored, or even received, but
9 it is on the subject matter that you would have
10 hopefully some knowledge of.  So, please, take a
11 look at the document, and I'll ask you some
12 questions, okay?
13     MR. MARTIN:  You can certainly ask him
14 to read the document.  We'll just take it step by
15 step.
16     MR. WOOD:  Sure.
17 BY MR. WOOD:
18     Q   Have you had a chance to look at it?
19     A   Yes.
20     Q   Do you know Charlie Allen?
21     A   Yes, very well.
22     Q   In the 2002 time period, how many times

Page 117

1 do you think, strike that.
2     In 2002 how many times do you think you
3 spoke with Charlie?
4     A   I don't know.  Multiple times for sure.
5     Q   And did you have discussions with him
6 about the contract that you entered into with Eaton
7 in 2002?
8     A   There was a meeting where we came back
9 and met with Meritor management, and indicated our
10 decision was going to be to go to Eaton versus
11 Meritor.
12     Q   Did you also have conversations with
13 Charlie in person, or by phone one-on-one?
14     A   I'm sure I talked to Allen multiple
15 times, but typically very colorful interpretation.
16     Q   All right.  If you look with me in the
17 summary section, there's a paragraph that begins
18 Tony indicated.
19     A   Yes.
20     Q   Tony indicated that he wants ZFM out of
21 the marketplace.  Lopes said that the push to drive
22 ZFM out is being driven by egos, he names Sweetnam

30 (Pages 114 to 117)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000862

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

**Page 118**

1  in particular.  With this contract, Eaton will have
2  secured standard position in all North American
3  truck manufacturers.
4       Did you tell Mr. Allen in any of your
5  conversations with him that Eaton was looking to
6  drive Zed-F Meritor out of the marketplace?
7    A  No.
8    Q  Did you ever reference Jim Sweetnam as
9  having an interest in having Zed-F Meritor exit the
10  marketplace?
11   A  No.  He is your competitor.
12       MR. MARTIN:  Hold on.  You've answered
13  the question.  Do you want to add to your answer?
14       THE WITNESS:  No.  No. Just --
15   Q  What was it that you were going to say,
16  Tony?
17   A  No.  I said he is your competitor.
18  That's all I said.
19   Q  Who is he, Sweetnam?
20   A  Yeah.
21   Q  Thank you.
22       In terms of the decision, not with

**Page 119**

1  really referencing that document, to enter into the
2  contract with Eaton in 2002, Tony, what were the
3  defining points that led you to enter into that
4  contract?
5    A  Market, product availability.
6    Q  In the full line?
7    A  Yes.  Product range.
8    Q  What else?
9    A  Pricing was significantly better with
10  Eaton excluding rebates, and we had secured future
11  evolution pricing on product that didn't exist yet,
12  the two pedal.
13   Q  We saw that in the contract with the
14  reference to the DM pricing?
15   A  Yeah.  So I had guaranteed pricing on
16  two pedal, which was huge.  From a three pedal to
17  two pedal, and $150 increase.  I had better pricing
18  to start with, and I had rebates on top of that.
19  Plus I had the whole product offering, so no risk
20  for my business at all, just benefits.
21   Q  Did you have any concern about the
22  continuing availability of the Freedomline?

**Page 120**

1    A  No, because it's still being offered
2  today, so I felt Zed-F was strong enough that if
3  they wanted to stay in North American market they
4  could still offer it, which they do today.
5    Q  Is there any other reasons you can think
6  of why you selected Eaton for the 2002 contract?
7    A  It was purely dollars, dollars and
8  cents.
9    Q  Did you have any concern that by doing a
10  contract with Eaton that Eaton would maintain, or
11  grow its dominant position in the market?
12   A  Yes.
13   Q  Can you elaborate on those concerns?
14   A  There was a perception as early as 2000
15  that if Meritor did not grow, eventually Meritor
16  would get out of the business.  We at Volvo
17  envisioned 20,000 transmission a year minimum as a
18  requirement for Meritor to more or less break even
19  without any additional investment for future
20  products.  Whenever you were below that, we started
21  getting concerned that Meritor would eventually
22  survive.

**Page 121**

1    Q  Did you use the potential to purchase
2  transmissions from Zed-F Meritor as a means to
3  negotiate better position in your contract with
4  Eaton?
5    A  I'm sure Eaton realized that we did not
6  sign a contract before the '97 contract expired,
7  and allowed it to expire as a view that we were
8  looking at options, and was not in any way
9  contributing to the deal we did.  I don't know,
10  you'd have to ask Eaton.  We believed that we got a
11  good deal, but.
12   Q  Did you find the 2008 -- I'm sorry, the
13  negotiation for the 2008 contract with Eaton to be
14  more difficult without having the ability to play
15  off Meritor, or Zed-F Meritor as an alternative
16  supplier?
17       MR. LAZEROW:  Objection.  Vague.
18  Speculation.
19   A  All Eaton contracts are difficult.
20  They're extremely tough negotiators.  The biggest
21  detriment to the all weight contract was that we
22  lowered the penetration to 55, which signaled to

31 (Pages 118 to 121)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000863

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

---

Page 122

1  Eaton that they were going to lose additional
2  market share.
3      Q    And the signal of less market share, how
4  did that make things more difficult?
5      A    Typically suppliers want to grow in the
6  market with you, and we established a 55 percent
7  market share penetration versus the 68, so and I
8  believed we needed to do that in order to allow my
9  I-Shift and other products we want to introduce.
10  If I made it at 68 percent level, the contract
11  would have lasted six or seven months.  If I want
12  to do a contract that lasts five years, I have to
13  establish a contract with lower penetration to
14  allow me to grow.
15      Q    Okay.  So, Tony, none of your
16  communications with Mr. Allen or others at Zed-F,
17  Zed-F Meritor did you state to them that it was
18  your understanding or belief that Eaton wanted to
19  drive or have Zed-F Meritor exit the transmission
20  business?
21      A    Typically all suppliers want more share,
22  not less.  I would be speculating to know that Jim

---

Page 123

1  Sweetnam or anybody else at Eaton wants them out.
2  They're competitors, and we want as many suppliers
3  as possible to create that competition.
4      Q    Did you have any conversations with
5  Mr. Sweetnam where he said that he wanted to take
6  out, or have Zed-F Meritor exit the marketplace?
7      A    No.  Most conversations with Sweetnam is
8  about negotiating prices, and market share
9  penetration.
10      MR. WOOD:  How much time have we gone?
11      THE VIDEOGRAPHER:  Just an hour.
12      MR. WOOD:  We just finished an hour, so
13  we have 40 or 50 minutes left.
14      Why don't we take a short break, five
15  minutes and I'll finish this tape and then turn it
16  over to Andrew.
17      THE WITNESS:  Okay.
18      THE VIDEOGRAPHER:  Going off the record.
19  The time is 2:50:03.
20      (Recess was taken.)
21      THE VIDEOGRAPHER:  Going back on the
22  record.  The time is 2:57:15.

---

Page 124

1      MR. WOOD:  Mark as Lopes Exhibit 11
2  VM200002234 through 35.
3      (Deposition Exhibit Number 11 marked for
4  identification and attached to the transcript.)
5      Q    Have you had a chance to review it?
6      A    Yes, sir.
7      Q    Is this a letter that you received in
8  the ordinary course of performing your duties at
9  MACK?
10      A    Yes.
11      Q    And the letter is from an individual
12  named David Renz.  Who is David Renz?
13      A    Vice president of sales and marketing
14  for Eaton.
15      Q    And do you recall after reviewing the
16  letter the general subject matter that's addressed
17  in the letter?
18      A    Yes.
19      Q    Could you walk me briefly through what
20  was happening at this time in terms of Eaton's
21  request, and your response on the subject?
22      A    Raw material at the time was going up

---

Page 125

1  aggressively.  The contract has raw material clause
2  that supports application of the raw material as it
3  moves up or down.  They had --
4      Q    And that's the PPI clause?
5      A    Yes.
6      Eaton was not pleased in applying the
7  contractual clause because raw material was moving
8  aggressively, and they wanted to modify that clause
9  to support getting more recovery of raw material.
10      Q    Did they ask you to modify the clause?
11      A    Yes.
12      Q    What was your response to them?
13      A    No.  Follow the contract.
14      Q    It looks like this letter followed upon
15  a meeting, or a course of discussions, is that
16  right?
17      A    It was many meetings, many discussions.
18      Q    And in this letter in the second page
19  Mr. Renz writes, we clearly recognize that these
20  surcharges fall outside of our PPI clause in the
21  contract, which is in place to manage normal
22  economic fluctuations.  So that is actually

---

32 (Pages 122 to 125)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000864

Page 126

1   consistent with your view that they were asking for
2   was not provided for in the contract?
3       A   Correct.
4       Q   Towards the end of the letter he states
5   in the second to last paragraph, it is for this
6   reason that we must reach an agreeable solution to
7   address this mounting issue as to ensure
8   uninterrupted supply.
9           At the time you read the letter, what
10  was your understanding, or reaction to that
11  statement in the letter?
12      A   They would not be complying with the
13  contract language.
14      Q   If which?
15      A   If we stopped supplying.
16      Q   Did you view that, Tony, as a credible
17  threat, or was it just gamesmanship in your view?
18      A   With Eaton there was more than
19  gamesmanship.  They were actually very concerned
20  with raw material, and really wanted us to meet and
21  discuss, and allow some recovery outside of the
22  contract clause.  And since raw material was going

Page 127

1   up aggressively, we did not want to support it
2   because we would be impacted financially.
3       Q   So at this point in time, in May 2004
4   you had told them we'd like to stay with the
5   contract is, is that right?
6       A   Yes.
7       Q   Subsequent to this letter, what was the
8   next thing that happened in your discussions on the
9   subject with Eaton?
10      A   We continued meeting, holding multiple
11  meetings all the way to Mr. Moberg level, which was
12  our president and CEO of Powertrain, and Jim
13  Sweetnam.
14      Q   Did Eaton continue to threaten to
15  withhold supply if an arrangement could not be made
16  on the subject?
17          MR. LAZEROW:  Objection.
18  Mischaracterizes his testimony.
19      Q   If I'm mischaracterizing, let me know.
20      A   We continued to have very tough
21  discussions on the subject because Eaton
22  interpretation was that this was not a regular

Page 128

1   economic event, it was something more than that,
2   and thus the PPI clause should be bypassed for some
3   time and some other resolution apply.
4       Q   Do you recall how the issue ultimately
5   was resolved?
6       A   Yes.
7       Q   What was the resolution?
8       A   We were, we allowed 0.5 percent increase
9   one time versus 6- or 7 percent that Eaton wanted.
10      Q   0.5 increase was an increase on what?
11      A   Due to raw material having moved so
12  greatly.  If we did not follow the PPI clause, the
13  existing PPI clause was a 12 month delay of an
14  impact just the way we wrote the clause, so at the
15  end of the day we negotiated, and ended up giving
16  them half a percent.
17      Q   In performing the negotiation, how did
18  the Eaton statement that it may interrupt supply of
19  product to you affect your negotiation?
20          MR. LAZEROW:  Objection.
21          MR. MARTIN:  Objection to the form.
22      Q   You can answer.

Page 129

1       A   What's the question?
2       Q   Strike the question.  Eaton essentially
3   told you if we can't work something out, we're
4   going to stop supply, is that correct?
5       A   Correct.
6       Q   How did that statement on Eaton's part
7   affect your negotiations strategy of Eaton?
8       A   When a partner challenges you that
9   they're going to stop production, it's always a
10  concern, especially in '04 when production is quite
11  high.  We felt the contract protected us so if
12  Eaton were ever to act on it we would sued them,
13  and contractually we felt we had the power to do
14  so, but raw material continued getting worse and
15  the contractual clause had a 12 month lag, so we
16  felt we needed to do something just to maintain the
17  relationship, but Eaton always wanted huge numbers,
18  and we didn't want to give huge numbers because the
19  contract protected us.  At the end of the day, we
20  agreed on half a percent.
21      Q   Did their dominant position assist them
22  extracting the pricing concession?

33 (Pages 126 to 129)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000865

Page 130

1     MR. LAZEROW:  Objection.
2     MR. MARTIN:  Object to the form.
3     MR. LAZEROW:  Speculation.
4     A   Not necessarily because the contract was
5  still valid until '07, so we still had three years
6  to go.  It was more of how do we resolve an issue
7  that Eaton is being so aggressive that they don't
8  want to follow the contract, so we had to recognize
9  raw material was a huge issue from a cash flow
10  perspective, and we felt that we should discuss it.
11  Of course, we didn't want to impact our business in
12  a negative way, and at the end of the day we
13  settled with a fairly small increase.
14     Q   When you settled that, did the PPI
15  clause remain --
16     A   Yes.
17     Q   -- remain in effect?
18     A   It was a one time here it is shut up and
19  go away and don't bring it back, for lack of a
20  better word.
21     Q   That's fine.
22     MR. WOOD:  Let's mark as Lopes Exhibit

Page 131

1  12 VM200002250 through 51.
2     Pass that down, please.
3     (Deposition Exhibit Number 12 marked for
4  identification and attached to the transcript.)
5     Q   Have you had a chance to review it?
6     A   Yes.
7     Q   This is an e-mail from you to Jerry
8  Hodel.
9     A   Hodel.
10     Q   Hodel and Carrie-Ann Baker?
11     A   Yes.
12     Q   Is this an e-mail that you drafted and
13  sent in the ordinary course of performing your
14  duties for VTNA?
15     Who are Jerry and Carrie-Ann?
16     A   Jerry is in the pricing area, he's the
17  pricing manager --
18     Q   And Carrie-Ann?
19     A   -- handles the Pricebook.  And
20  Carrie-Ann was an internal salesperson selling, or
21  educating the brands on proprietary, on Powertrain
22  products.

Page 132

1     By the way, this was related to MACK,
2  not related to VTNA.
3     Q   This is a discrete MACK issue?
4     A   Yeah, because it's T-300 Pricebook
5  issue.
6     Q   Do you recall the issue that's discussed
7  in the e-mail?
8     A   Yes.
9     Q   And what is the issue, Tony?
10     A   The contract states that on the highway
11  Eaton will be the standard, and any option pricing
12  Eaton will be the preferred pricing.  And in this
13  particular case, our MACK transmission, which is
14  not standard in the highway was at a discount to an
15  equivalent Eaton product, $500 if I recall
16  correctly.
17     Q   Is that reflected in the notes towards
18  about two-thirds the way down of the document?
19  There seems to be a comparison of the MACK
20  pricing --
21     A   Yes.
22     Q   -- with Eaton pricing.

Page 133

1     A   Correct.
2     Q   So what is the purpose of your e-mail to
3  Jerry and Carrie-Ann?
4     A   I was not compliant with the contract,
5  and Eaton was challenging me to be compliant with
6  the contract.  After some delay tactics of about
7  close to a year, the discussions became, were
8  serious, and we had to address the issue.
9     Q   What did you need to do in order to be
10  in compliance with the contract?
11     A   I took the MACK transmission on the
12  highway side only and make them a dollar higher
13  than the equivalent Eaton transmission, which made
14  it compliant to the contract.
15     Q   So the price changed, increased by $501,
16  or whatever the differential was plus a dollar?
17     A   Actually, it was 583 to 1,636, so I had
18  two options.  Either I reduced the Eaton to 582, or
19  I reduced MACK to 1,637, or I pick another number.
20     Q   Do you know what ultimately was done on
21  the issue?
22     A   Typically I move MACK up because I want

34 (Pages 130 to 133)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000866

Page 134

1  to establish a standard.  And if you pick an
2  option, I want to get as much margin as possible.
3  I don't recall what the exact number was because
4  the Pricebook changes every six months, so.
5      Q   But the idea would be to preserve the
6  margin.  You would rather go up, than bring their
7  price down?
8      A   The first time around I went from the
9  MACK price up to the Eaton price, but I don't
10  recall what we did after that.  As long I'm
11  compliant within the contract I don't care, because
12  the contract is stable.
13      Q   In order to see exactly how that played
14  out, would I look at the databooks if they were
15  still available from that time period, and I would
16  see a change in the price?
17      A   Yes.  I can tell you we changed the
18  price.  Otherwise, the contract would not have
19  survived because I was not compliant.
20      Q   Now, in discussing that, you appear to
21  write to them well, strike that.
22          In your note to them you write and say

Page 135

1  put things in perspective, a few key data points.
2  T-310 did not exist when we completed the Eaton
3  contract. We currently do eighty-plus million with
4  Eaton.  Past improvement received to date, MACK
5  minus 8.43 percent, plus minimum of 1.5 a year.
6  VTNA minus 8.43 percent plus minimum of 1.5 per
7  year.  We lowered the penetration hurdle to 68
8  percent of total volume, excluding Allison, which
9  allows for substantial growth in our products, MACK
10  products. This is what is at stake, millions of
11  dollars.  Decide wisely.
12          The millions of dollars is reference to
13  what?
14      A   Once the contract becomes null and void,
15  Eaton has the option of making the 8.43, and the
16  contractual obligations could go away.  If they go
17  away, they're worth a lot of money.
18      Q   Did you have a recollection in the 2004
19  time period what that value was to the rest of the
20  life of the contract?
21      A   Just in '04 alone it's 8.43 plus one and
22  a half, so that's 10 percent times $80 million,

Page 136

1  that's $8 million, and there's no guarantee that
2  the contract understanding would stay where it was,
3  because there was no contract.  I never had a risk
4  of getting what I wanted accomplished.
5      Q   What do you mean by that, Tony?
6      A   My own internal group needed to make a
7  change because financially it was too incorrect not
8  to, or too stupid not to.  I was trying to be nice
9  internally, and allow them to do the right
10  decision.
11      Q   I think you said subsequently action was
12  taken, and the price of the MACK transmission was
13  raised above the Eaton price.
14      A   Correct.
15      Q   Tony, who had made the decision
16  originally that the MACK product would be priced
17  below the Eaton product in violation of the
18  contract?
19      A   At the time when we introduced it, the
20  310 transmission didn't exist.  So when we
21  introduced the 310 transmission since it's a MACK
22  transmission, the pricing folks since it's my own

Page 137

1  transmission I should be able to put it in where
2  ever I want, did not know that on the highway side
3  they didn't have that flexibility.
4      Q   So they were unaware of the contract,
5  and the requirements of the contract?
6      A   They were aware of the contract, not
7  aware of all the contract requirements.
8          MR. WOOD:  Let's mark as Lopes Exhibit
9  13 VM200002230 through 31.
10          (Deposition Exhibit Number 13 marked for
11  identification and attached to the transcript.)
12      Q   Have you had a chance to review it, sir?
13      A   Yes.
14      Q   This is a series of e-mails, the first
15  from Dominique Callens to Bruno, Sten-Ake, and a
16  copy to you and Dave --
17      A   Yes.
18      Q   -- Louya, and then a response from Bruno
19  to the same individuals again copying you.
20      A   Yes.
21      Q   Is this an e-mail and a subsequent
22  e-mail, e-mail chain if you will, that you received

35 (Pages 134 to 137)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000867

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 138

1  in the ordinary course of performing your duties at
2  Eaton?
3      A   Yes.
4      Q   In looking at the document generally is
5  this in some ways the same issue that we just
6  addressed?  That is if certain performance wasn't
7  met, the contract would be canceled, and there were
8  concerns about the impact upon VTNA?
9          MR. LAZEROW:  Objection.
10  Mischaracterizes the testimony.
11      A   If the contract was voided due to either
12  party not fulfilling their obligation, the standard
13  position would not be available, the standard
14  position is not available we believe the price to
15  be different than what we had originally achieved.
16      Q   In response to -- actually, let me take
17  you to the other e-mail, Dominique's e-mail.
18      A   Yes.
19      Q   In the second paragraph or so, it says
20  he informed me that we will meet Jim Sweetnam and
21  all his staff this Tuesday to review the situation,
22  and has worked on a recommendation close to our

Page 139

1  proposal, based on our increased to 0.75 percent
2  and our agreement on their profit recovery for the
3  T-310 price positioning.
4          The T-310 price positioning, that's a
5  reference to the contract violation relating to the
6  price position of the MACK product versus the Eaton
7  product?
8      A   Correct.
9      Q   That seems at this date in June 2004
10  that that seems to be on its way to resolution?
11      A   Yes.  It was both.  It was recovery,
12  rotatory recovery and that particular issue.
13      Q   Right, because that other document we
14  looked at, I think was from May of the same year,
15  but I think you had said 0.5 percent.
16      A   Yeah.  It was actually 0.75.  I know it
17  was some small number.  They wanted six or seven,
18  and we recommended 0.75.
19      Q   And so is there a different issue going
20  on at this point in time that is causing concern
21  for you and your colleagues within VTNA in terms of
22  having the contract remain in place?

Page 140

1      A   Two issues.  We measure penetration on a
2  quarterly basis, but the -- if you reference the
3  contract, it actually says annually.  And I believe
4  it's October to October, or September to October.
5  So it's not an actual January to December.
6      Q   It's a fiscal calendar?
7      A   Yes.
8      Q   Okay.
9      A   So we were looking at the penetration
10  very closely because when we initiated the contract
11  we were are 75 plus.  We established a lower
12  penetration level to allow other products to be
13  introduced, which was 68. And we actually had
14  quarters below the 68.  If it was maintained at
15  that level, we would actually have potential of
16  canceling the contract.
17      Q   Were payments made annually on the
18  rebates?
19      A   Yes.  Actually, quarterly.
20      Q   They were made quarterly?
21      A   Yes.  We give --
22      Q   But it was only reviewed annually?

Page 141

1      A   We give Eaton, we give Eaton a report
2  based on consumption.  And based on that, they know
3  the market share, and we know the market share.  If
4  you go a couple of quarters where the market share
5  is lower than the annual market share, you have to
6  make it up, so it becomes very critical that you
7  maintain the market share equal to or above that
8  level on a quarterly basis in order to achieve the
9  annual basis contractual need.
10      Q   I'm sorry to interrupt.  So internally
11  the goal was to make sure each quarter that you
12  were making the --
13      A   68.
14      Q   -- target, 68 percent, --
15      A   Yes.
16      Q   -- is that right?
17      A   Correct.
18      Q   And at this point in time, was there a
19  concern that you were bumping up against that?
20      A   We actually hit lower than that, so
21  typically depending on the cycle, or depending on
22  the year, you have some orders where you consume

36 (Pages 138 to 141)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
000868

Page 142

1  more MACK versus less MACK.  Typically the
2  beginning of the year you tend to consume more
3  vocational products versus highway products.
4      Q    Were steps taken to ensure at that point
5  in time that you would make 68 percent or above?
6      A    Yes.  As soon as we changed the price on
7  the 310, the Eaton penetration started moving,
8  because if you recall it was over $1,000
9  difference.
10     Q    Before you made the change?
11     A    Before I made the change the 310
12  pricing, which was not compliant on the highway
13  side was actually affecting Eaton from achieving
14  the right penetration level, and was also a cause
15  of me being below the 68 percent.  Once I changed
16  that, it started correcting.
17     Q    In response to Bruno's e-mail, were
18  there any other actions that you all took to try
19  to --
20     A    We looked --
21     Q    -- to ensure that you stayed about the
22  68 percent?

Page 143

1      A    Yes.  We looked at orders in the order
2  book, the backlog, whether or not we should switch
3  them, the sales guys refused to go contact
4  customers and talk them out of what they originally
5  had selected, so we never really acted on it, but
6  we did do the analysis.
7      Q    So you did an analysis, and somebody
8  from purchasing went and said hey, fellows, is
9  there a chance we can switch some of these orders?
10     A    We asked the brand hey, of all the
11  orders that are already future, which the customer
12  already selected, is there an option of going to
13  the customer and asking them to go from a MACK to
14  an Eaton, that way our penetration would go higher.
15  We looked at those, but marketing did not want
16  to -- since it was already a sold truck, they did
17  not want to talk to the customer and talk him out
18  of what he originally had selected, and we never
19  acted on it.
20     Q    Would that have been unusual for the
21  sales reps to go to the customer and ask them to
22  change the order?

Page 144

1          MR. LAZEROW:  Objection.  Vague.
2      A    At MACK, yes.  At VTNA, no.
3      Q    Just depends on the corporate culture?
4  I'm sorry, strike that.
5      A    It's true.
6          MR. MARTIN:  Hold on.
7      Q    Wait for the question.
8          So at MACK that -- now I forgot my train
9  of thought.
10         At MACK that was something that had been
11  done in the past, or do I have it backwards?
12     A    Yeah, you have it backwards.
13     Q    Okay.
14     A    The MACK culture is you always give the
15  customer what they want, so we're extremely
16  motivated to make all kinds of modifications.
17         At VTNA, it's more of a European
18  mindset.  This is what we provide.  This is what we
19  produce, you should buy what I'm telling you to buy
20  because I know better, and this is really a MACK
21  issue, and not a VTNA issue.
22         So MACK refused to go back to the

Page 145

1  customer and try to talk the customer to move and
2  select something they hadn't previously selected,
3  and we didn't have to.
4      Q    When you reference European style, and
5  I'm not sure of the word you used, I've heard of
6  sort of a European selling model which is here's
7  the truck, and then there's more of a North
8  American model which is more of a custom spec, are
9  you familiar with that --
10     A    Yes.
11     Q    -- type of description?  Where in your
12  understanding is the market today in terms, is it
13  more of a European style, or is it still the North
14  American customer driven style?
15     A    Still a very North American model, but
16  it's moving more and more towards the European
17  model.
18     Q    Does MACK continue to use the North
19  American style, the customer specking style?
20     A    No.
21     Q    What does MACK do today?
22     A    We have an engineering group that

37 (Pages 142 to 145)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000869

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 146

1  supports Volvo and MACK, so the brands don't have
2  their on engineering anymore so, and the
3  engineering is primarily managed by the Volvo, so
4  they have to adapt to the European model.
5          MR. WOOD:  How am I doing for time?
6          THE VIDEOGRAPHER:  You are almost up to
7  three hours and 15 minutes.
8          MR. WOOD:  Okay.
9          Let's mark as Lopes Exhibit 14
10 VM200024171 through 74.
11         (Deposition Exhibit Number 14 marked for
12 identification and attached to the transcript.)
13         THE VIDEOGRAPHER:  I'm sorry.  You're at
14 three and a half hours now.
15         MR. WOOD:  All right.  We'll finish this
16 document.
17     Q   Have you had a chance to review the
18 document, sir?
19     A   Yes.
20     Q   The document begins with an e-mail from
21 you to Thomas Hard, and copy to various
22 individuals, and it attaches a -- you might call it

Page 147

1  a Powerpoint presentation, is that accurate?
2      A   Yes.
3      Q   Is the Powerpoint presentation something
4  that you drafted in the ordinary course of
5  performing your duties?
6      A   Yes.
7      Q   And you attach that and sent it to the
8  various individuals on the e-mail recipient list in
9  the ordinary course of your duties as well?
10     A   Correct.  Correct.
11     Q   The cover e-mail that you sent, who's
12 Thomas Hard?
13     A   My CFO.
14     Q   At that time he was the CFO of VTNA?
15     A   Powertrain.
16     Q   Powertrain.  Why are you sending this
17 document to Mr. Hard?
18     A   At the time we were producing quite a
19 few T-300's, and we had different people in the
20 organization running different things.  You had the
21 manufacturing guy, Roger Johnston, which is on the
22 list.  One, he has many T-300's, which could cause

Page 148

1  a compliance issue with the contract.
2          You had people at MACK that were
3  supporting compliance to the contract.  You had
4  people at MACK that were supporting non-compliance,
5  just make the contractural obligation go away.  And
6  if the contract obligation was not was met, or were
7  were not found to be compliant, these were some of
8  the risks.
9      Q   So you're trying to make the CFO aware
10 of the risks if the contract is canceled?
11     A   Yes.
12     Q   Let's take a quick look at that.  The
13 primary page seems to be the second page of the
14 document, which is a transmission update January
15 31.  The first item is a monthly surcharge of 3.4
16 percent.  What is that a reference to?
17     A   Raw material.
18     Q   And the annual value of that is $7.48
19 million?
20     A   Correct.
21     Q   Tony, is that an added cost to you, or
22 is --

Page 149

1      A   That's an added cost.  We're following
2  the contractual obligation.
3      Q   So that's a cost under the contract?
4      A   Yes.
5      Q   Are you trying to show Tom what you're
6  paying under the contract, and what you would
7  receive, what would happen if the contract went
8  away?
9      A   If the contract was not followed, we
10 were seeing anywhere between 10- and 14 percent raw
11 material increases, so the contract had hurdles and
12 had clauses that must have been followed, so it
13 gave me some protection.  If I go away from it,
14 there's no protection because there's no contract.
15     Q   I see.  And then there's a reference to
16 a base price increase of 1.29 percent?
17     A   Correct.
18     Q   What is that a reference to?
19     A   It's raw material where the supplier,
20 raw material supplier was giving a PPI but was also
21 increasing the base price.
22     Q   And again, was the contract providing

38 (Pages 146 to 149)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000870

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

---

Page 150

1   you some insulation?
2       A   Yes.  Correct.
3       Q   And then the next item says 68 percent
4   penetration that's still a contractual obligation.
5   That's a reference to having to stay above that
6   level --
7       A   Correct.
8       Q   -- to preserve these portions of the
9   contract?
10      A   And to reserve other impacts.  I'm just
11  looking at the raw material here, but you can see
12  other impacts below.
13      Q   So the -- just the raw materials $10.3
14  million?
15      A   Correct.
16      Q   And then the other consequences are what
17  you list in the second part of the document?
18      A   Correct.
19      Q   And it says consequences of contract
20  termination 2005 September 2007.  Are you saying
21  here, Tony, look if the contract was terminated
22  there are various dollar amounts that we will no

---

Page 151

1   longer enjoy in terms of the value provided to us,
2   is that right?
3       A   I think it's a combination of two
4   things.  One is future contractual obligations by
5   Eaton to give us value.  And second, was the value
6   that I've acquired from since the beginning to now
7   Eaton could say the contract is no longer valid,
8   let's go back to the original starting point.  So
9   at the time, I had already gotten seven and a half
10  percent in my favor.  The contract is over and I go
11  back to '02 I have to give back that seven and a
12  half.
13      Q   You have to give it back to Eaton?
14      A   Well, if I go back to the original
15  pricing, I would have gotten a seven and a half
16  percent increase.
17      Q   And that's, you put a value on that --
18      A   Correct.
19      Q   -- in one of the line items?
20      A   Knowing Eaton, when the contract is over
21  and they don't have standard position, we would be
22  having these discussions.  Knowing any other

---

Page 152

1   supplier for that matter.
2       Q   And then there seems to be a nonmonetary
3   factor as well, no delivery performance commitment,
4   is that right?
5       A   If you recall the time frame, at this
6   point we couldn't get product, enough product to
7   supply the whole industry.  So I'm going into the
8   best year of my life, and I don't have a contract.
9       Q   And you write possibly disastrous.
10      A   Yeah, because I couldn't hold Eaton
11  responsible to deliver what I wanted provided I
12  gave him an EDI within three weeks, and they had to
13  supply.  If they don't, I could actually request
14  dollars for lack of delivery.  Without a contract
15  it would be disastrous.
16      Q   So without a contract there are both
17  dollars value incentives to VTNA, as well as
18  delivery incentives that could disappear?
19      A   Correct.
20      Q   And you value the dollar value of the
21  contract as what potentially could be lost is
22  $47.05 million?

---

Page 153

1       A   Correct, which is the value of the
2   contract period that was still to be elapsed.
3       Q   Did you receive a response from Mr. Hard
4   on this document?
5       A   Most people internally do not like to
6   discuss negative situations like this.  He
7   basically acknowledged that I was too negative and
8   this would never occur because I would never allow
9   it to happen, which we were lucky it never
10  occurred.
11          MR. WOOD:  I'll go off now.  I'm at
12  three hours and 22 minutes.
13          THE VIDEOGRAPHER:  I was right the first
14  time.
15          MR. WOOD:  That's okay.  We'll do one
16  more document.  Is that okay with you?
17          MR. LAZEROW:  Four hours.
18          MR. WOOD:  Let's mark as Lopes Exhibit
19  15 VM200026489 through 95.
20          (Deposition Exhibit Number 15 marked for
21  identification and attached to the transcript.)
22      Q   Have you had a chance to review the

---

39 (Pages 150 to 153)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000871

Page 154

1  document?
2      A   Yes.
3      Q   The document includes an e-mail from
4  Dominique Callens, which was then, I think,
5  forwarded at a later date to Dominique as well as
6  David Louya.  The original e-mail, Tony, includes
7  you, David Louya, and Khalifa Sandrine --
8      A   Yes.
9      Q   -- as recipients.  Who is Khalifa
10  Sandrine?
11     A   Global commodity manager for
12  transmissions.
13     Q   What is the role of the global commodity
14  manager?  Oh, I'm sorry.  Was that a position that
15  Dominique once held?
16     A   Dominique is global commodity director.
17     Q   I see.  Khalifa reported to Dominique?
18     A   Correct.
19     Q   And the attachment is something called
20  an Eaton Corporation Company Profile.  Did you
21  participate in the creation of the profile?
22     A   This particular one I did not.  This was

Page 155

1  done by Jurgen Bahr, which is vice president of
2  product planning and secretary to our CEO, Mr.
3  Moberg.
4      Q   In Dominique's e-mail from April 11,
5  2005 he writes please, find the document which has
6  been prepared by Jurgen, and I would look to convey
7  to you his thanks for your contribution.
8          Do you recall whether you reviewed this,
9  or provided any input into the document?
10     A   Yes, we provided input.  We had created
11  a Cummins company profile, which was about 94
12  pages.  Jurgen really liked it, because it was a
13  prospective on competition even though Cummins is a
14  supplier to us as well, like Eaton.
15         Since we produced our own transmission,
16  Jurgen requested can we create one like this, and
17  my recollection is that Jurgen got all the
18  financials, and he requested us to give certain
19  pieces of information.
20     Q   In the e-mail that Dominique sent to you
21  as well as the attachment, did you receive that in
22  the ordinary course of performing your duties?

Page 156

1      A   Yes.
2      Q   And looking at the summary itself, can
3  you turn with me to slide number four.  There's a
4  section called Business Segment Truck and --
5      A   Which section?
6      Q   I'm sorry.  Halfway through that first
7  paragraph on Business Segment Truck it says, this
8  development has been made possible thanks to
9  Eaton's further expansion of it's market dominance
10  in CV transmission to the almost monopolistic
11  position of today where Eaton controls more than 80
12  percent of the transmission marked for HD trucks.
13  Below are examples of tools that Eaton has used to
14  build that position.  And the document goes on,
15  Tony, to talk about LTA's, Roadranger package, and
16  ITC proceedings.
17         Did you provide any substantive
18  contribution to the drafting of the text relating
19  to those items?
20     A   Which, which section here?
21     Q   Yes, sir.  I'm looking at slide number
22  four.

Page 157

1      A   Yes.
2      Q   And it rolls over to slide number five.
3      A   Yes.  We gave our perspective on our
4  current contracts that we have, or had previously.
5  LTA with penetration thresholds, and if you don't
6  achieve the threshold penetration, we in essence
7  the contract is null and void.
8      Q   Tony, when you said we, were you working
9  with David on this as well, or who else contributed
10  to this section?
11     A   On the penetration threshold either
12  myself or David gave the previous contracts
13  threshold limits and rebates schemes, and rebate
14  amounts and so on going back all the way to '97 to
15  Mr. Bahr.
16     Q   And did you craft the language in this
17  section, or did Jurgen take your input --
18     A   Jurgen -- this is an executive summary,
19  Jurgen wrote it.  Jurgen at this point was
20  developing this document because we were
21  contemplating pursuing buying a transmission
22  provider.  We wanted to get a complete view of the

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

**000872**

Page 158

1  market, and we started with Eaton and then.
2     Q   Based on your input in Jurgen's drafting
3  of the summary, do you agree with the way that he
4  has formulated the section, the contents section?
5        MR. MARTIN:  Which section are you on
6  now?
7        MR. WOOD:  Yeah, I apologize.  The
8  section that I'm looking at is the Business Segment
9  Truck, so let me just restate the question.
10       THE VIDEOGRAPHER:  The tape is going to
11 run out.
12       MR. WOOD:  Okay.  We'll go off the
13 record.
14       THE VIDEOGRAPHER:  This marks the end of
15 tape two in the deposition of Tony Lopes.  Going
16 off the record.  The time is 3:46:30.
17       (Recess was taken.)
18       THE VIDEOGRAPHER:  This marks the
19 beginning of tape three in the deposition of Tony
20 Lopes.  Going back on the record.  The time is
21 3:56:18.
22 BY MR. WOOD:

Page 159

1     Q   Mr. Lopes we were looking at Lopes
2  Exhibit 15, and you were focusing on the segment
3  Business Segment Truck.  Just to make sure I
4  understand, Mr. Bahr drafted this section based
5  upon information that you and Mr. Louya provided to
6  him?
7     A   It was a combination of what we provided
8  plus whatever he could find in the marketplace.
9     Q   And reviewing the document, do you agree
10 with the statements and observations that Mr. Bahr
11 makes in this section, the presentation which is
12 entitled Business Segment Truck?
13    A   Are we looking at a particular --
14       MR. LAZEROW:  To the end?  Five is what
15 you're talking about?
16       MR. MARTIN:  Wait.  Let him finish.
17       MR. LAZEROW:  All the way to through --
18       MR. WOOD:  No, sir.  There is a section
19 called Business Segment Truck.
20       MR. LAZEROW:  All the way through to
21 Volvo Business Relations with Eaton?
22       MR. WOOD:  No, sir.  There's a section

Page 160

1  called Business Segment Truck.  There's a next
2  heading called Volvo Business Relation with Eaton.
3  That's a different section.
4        MR. LAZEROW:  Right.
5        MR. WOOD:  So I was just asking about
6  the section called Business Segment Truck.
7        MR. LAZEROW:  On page five?
8        MR. WOOD:  Yes, sir.
9        MR. LAZEROW:  I want to make sure I
10 understand.
11    A   Are we looking at this section, this and
12 all the other sections, or?
13 BY MR. WOOD:
14    Q   Let's strike the question, and let me
15 just ask you this.
16    A   Please.
17    Q   In reviewing the executive summary as a
18 whole, do you disagree with any of statements or
19 observations that are set forth in the document?
20       MR. LAZEROW:  Objection.
21       MR. MARTIN:  Well, objection likewise.
22       You want him to go through the six or so

Page 161

1  page document and tell you whether he agrees with
2  all the statements in it?
3        MR. WOOD:  Yes.  I believe he reviewed
4  the document, but I can ask.
5        MR. MARTIN:  He reviewed it as a
6  preliminary to answering questions.
7        MR. WOOD:  Fair point, Counsel.
8  BY MR. WOOD:
9     Q   Let's go back to the original question.
10 I was focusing on the segment, Tony, called
11 Business Segment Truck that runs from page four to
12 page five.
13    A   Yes.
14    Q   And that section I understand
15 incorporates information that you, Mr. Louya, and
16 possibly others provided to Mr. Bahr, is that
17 correct?
18    A   That's correct.
19    Q   And in reviewing that section called
20 Business Segment truck, do you agree with the
21 statements and observations that are set forth in
22 that section?

41 (Pages 158 to 161)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000873

Page 162

1     A   I would have to go, I would have to go
2   area by area if you wanted me to respond.
3     Q   Sure.  Please, do.
4     A   So in the Business Segment Truck
5   first --
6     Q   First paragraph.
7     A   First paragraph?
8     Q   Yes, sir.
9     A   I don't know if the numbers are correct,
10  but I would assume that Eaton is 18 to 20 percent
11  operating margin, and a very profitable business
12  based on my analysis --
13    Q   Okay.
14    A   -- of the group.  LTA is a penetration
15  thresholds.  I know the VTNA, and the MACK
16  threshold because we established it.  I would have
17  no visibility if the other OEM's are 90, or 50, or
18  80, or.  I have no opinion on that.
19    Q   Okay.
20    A   He assumes it's high, but I don't even
21  know how he would come up to a number, but, so I
22  don't know.  The above has lead to that Eaton's

Page 163

1   only North American competitor, Meritor, has
2   gradually been marginalized to its current market
3   position with a 10 percent market share.  I agree
4   with 10 percent market share number.
5     Q   Okay.
6     A   Roadranger package --
7         MR. MARTIN:  There's a problem with your
8   mike.
9         THE VIDEOGRAPHER:  That's much better.
10        THE WITNESS:  My apologies.  Is it okay
11  now, or?
12    A   Roadranger package, they do have, Eaton
13  and Dana do have a marketing relationship where
14  they package the axle, and transmission, and
15  clutch, and brakes to basically offer the customer
16  even a more complete package rather than just an
17  overall transmission --
18    Q   Okay.
19    A   -- product line.  The $1,000 USD cash
20  incentive, we have knowledge that there is some key
21  customers, that there is a rebate mechanism above
22  and beyond to the OEM's directly to the end-user,

Page 164

1   and this is, this is from time to time something
2   that the supplier does in the markets.  We have
3   knowledge of that.
4         The ITC for blocking market entries, it
5   is true that they created a patent infringement
6   issue on the Zed-F transmission, which disrupted
7   some of our availability.
8     Q   Tony, what's your understanding of the
9   price --
10        MR. MARTIN:  Hold on.
11        Have you finished your answer?
12        THE WITNESS:  No.
13    A   Again, the negotiations I don't know
14  exactly what he's recommending, but I would say
15  that negotiations are extremely difficult with
16  Eaton, very tough negotiations.  I have not had an
17  opportunity to get better pricing from a
18  competitor, so I'm forced to go with Eaton just out
19  of, to be able to protect my by business, and be
20  able to get the best possible pricing for my
21  business.  The raw material I think it's
22  understood, and we've just discussed Volvo business

Page 165

1   relationship with Eaton, the numbers --
2         MR. MARTIN:  I think the question was
3   ending --
4         MR. WOOD:  Right.  It terminated.
5         MR. MARTIN:  -- with that section.
6     Q   And the last question, in terms of the
7   input that you gave to Mr. Bahr, is it accurately
8   reflected in the document?
9     A   Yeah.  Yes.
10        MR. LAZEROW:  Objection.
11        MR. WOOD:  I'll reserve whatever time
12  that I have left.  25 minutes I guess.
13        EXAMINATION FOR COUNSEL FOR THE
14  DEFENDANT BY MR. LAZEROW:
15    Q   Good afternoon, Mr. Lopes.
16    A   Good afternoon.
17    Q   My name is Andrew Lazerow.  I'm an
18  attorney representing Eaton Corporation in this
19  matter.
20        You and I have never met before today,
21  is that correct?
22    A   Correct.

42 (Pages 162 to 165)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000874

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 166

1    Q    We've never talked on the phone?
2    A    Correct.
3    Q    Your goal in entering into any contract
4    with a supplier is to secure the best prices for
5    Volvo Powertrain, is that right?
6    A    Correct.
7    Q    And another goal is a secure the best
8    possible products for Volvo Powertrain, is that
9    right?
10   A    Correct.
11   Q    And the reason you're doing this is
12   because you want Volvo and MACK to be able to offer
13   the most attractive prices to buyers of trucks, is
14   that right?
15   A    Correct.
16   Q    And you want Volvo and MACK to be able
17   to offer the best possible products in term of
18   technology, and efficiency, or whatever performance
19   measures truck owners are looking for to truck
20   purchasers, is that right?
21   A    Correct.
22   Q    And I've now sat and heard you talk for

Page 167

1    about three and a half hours, and I get the sense
2    that you do not enter into contracts that you don't
3    believe are beneficial to Volvo Powertrain, is that
4    right?
5        MR. WOOD:  Object to the form.
6    A    That's correct.
7    Q    And that you do not enter into contracts
8    that you don't believe will be beneficial to
9    Volvo's and MACK's customers, is that right?
10   A    Correct.
11   Q    And one of the reasons you push your
12   suppliers for the best possible prices is so that
13   you can lower your prices to truck purchasers, is
14   that right?
15   A    Basically it's to give my marketing
16   sale's group all the tools that they need to
17   conquer new customers, whether or not they want to
18   pass it on it's up to them, but ideally position
19   them that they could do that.
20   Q    Are you aware as to whether the cost
21   savings that you're able to achieve with any
22   particular supplier are passed on to the end-user,

Page 168

1    or truck purchaser?
2    A    I'm aware that many are passed on.  Some
3    are kept to improve margin.
4    Q    Okay.  Do you know whether in fact the
5    cost savings that you've discussed here today in
6    the 2002 contract with Eaton were passed on to
7    truck purchasers?
8    A    In many cases yes.
9    Q    Do you know the size of those --
10   A    It depends --
11   Q    -- pass through?
12   A    It depends on the deal.  Fleet deals are
13   more aggressive than small fleets, or individuals.
14   Q    Are you able to put even an average
15   percentage decrease in the price of the trucks that
16   were offered to truck owners as a result of the
17   2002 contract?
18       MR. WOOD:  Object to form and
19   foundation.
20   A    Impossible.  Impossible to come to a
21   conclusion, you know.  I have maybe a $3,000
22   component out of $100,000 truck.  It's not --

Page 169

1    Q    You sell trucks, right?
2    A    Yes.
3    Q    You don't sell transmissions?
4    A    Correct.
5    Q    I was wondering whether internally there
6    had been any analysis done of what was actually
7    passed through in terms of the savings that have
8    been achieved by your negotiations of the contract
9    with Eaton, and I think the answer is no.
10   A    No.
11   Q    You're not aware?
12   A    I don't have direct knowledge of a
13   percentage.
14   Q    The 2002 contracts between Eaton and
15   Volvo, and Eaton MACK were not the first time that
16   Volvo and MACK had tied, that rebates were not
17   tied, were tied to penetration, is that right?
18   A    That is correct.
19   Q    So if we look back at the 1997 contract,
20   for example, Exhibit Number 1 should be in front of
21   you.
22       MR. WOOD:  The contract itself.

43 (Pages 166 to 169)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000875

Page 170

1     THE WITNESS: Okay.
2         MR. WOOD: Probably that document.
3  BY MR. LAZEROW:
4     Q    So the Exhibit Number 1 is the 1997
5  Supply Agreement between MACK Trucks and Eaton, do
6  you see that?
7     A    Yes.
8     Q    If you turn to the fourth page, you'll
9  see it says section five you'll see it says OEM
10 Rebates all Eaton transmissions, do you see that?
11    A    Yes, sir.
12    Q    And so for the first 12 month period
13 July 1, 1997 through June 30, 1998 Eaton paid MACK
14 a flat 10 percent rebate, is that right?
15    A    Correct.
16    Q    And that was a 10 percent rebate on the
17 purchases of Eaton transmissions by MACK?
18    A    Correct.
19    Q    And then from July 1, 1998 through June
20 30, 2002 the Eaton rebate that was achieved by MACK
21 was tied to specific shares of Eaton transmissions,
22 is that right?

Page 171

1     A    Correct.
2     Q    And I believe you said -- let me ask
3  this question. When this contract was entered into
4  in 1997, do you know what Eaton's share was with
5  MACK?
6     A    I know that we ended around 75 percent.
7     Q    In 2002?
8     A    Yes.
9     Q    What about 1997, do you know where it
10 started?
11    A    I could go back, but I don't know exact
12 number.
13    Q    Okay.
14    A    I wasn't around at the point.
15    Q    Do you have a recollection -- so let me
16 back up.
17        By 2002 your MACK was at 75 percent, is
18 that right?
19    A    MACK and VTNA together were at 75
20 percent.
21    Q    Do you know whether MACK was achieving a
22 7 percent rebate in 2002?

Page 172

1     A    MACK would have been around 60, so
2  probably 6 to 5 percent.
3     Q    In fact, the 1997 agreement was not the
4  first agreement where there had been rebates tied
5  to the penetration levels.
6     A    I have not found a contract at MACK
7  that's longer than '97, because at the time it
8  moved from Allentown to Hagerstown, and that --
9  those contracts are no longer available, or lost,
10 transferred.
11    Q    What about Volvo contracts that had been
12 in existence prior to 2002?
13    A    I believe there's contracts before. I
14 know for a fact there's contracts before '02.
15        (Deposition Exhibit Number 16 marked for
16 identification and attached to the transcript.)
17    Q    I've now handed you what has been marked
18 for identification as Deposition Exhibit Number 16.
19 It is entitled Supply Agreement on the first page.
20 It is Bates Number VM000180 through 198.
21        If you take a moment to review that
22 document I'll have some questions.

Page 173

1     A    Okay.
2     Q    Have you ever seen this document before?
3     A    Briefly, yes.
4     Q    Okay. What is Exhibit 16?
5     A    It's a contract between Eaton and VTNA.
6     Q    If you look on VM000197, the signature
7  page.
8     A    Yes.
9     Q    Do you recognize any of the signatures
10 under Volvo GM Heavy Truck Corporation?
11    A    Larry Moore, which was my counterpart at
12 VTNA.
13    Q    If you go back to the first page, you'll
14 see this the term paragraph section one, the term
15 of this agreement was for five years. That is it
16 says the term of the agreement will begin on July
17 1, 1992 and end on June 30, 1997, do you see that?
18    A    Yes, sir.
19    Q    If you turn to the fourth page of the
20 contract, do you see at the top there's a rebate
21 percentage next to a combined share incentive, do
22 you see that?

44 (Pages 170 to 173)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
000876

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

---

Page 174

1     A   Yes.
2     Q   Have you ever seen that schedule before
3   today?
4     A   I would say no.
5     Q   At the time that MACK and Volvo joined
6   up, did you become aware that Volvo had contracts
7   that tied the rebate to share percentages?
8     A   Yes.
9     Q   And, but you don't know if you saw this
10  contract?
11    A   The '97 contract was the one I referred
12  to, because that was the starting point for the '02
13  contract, earlier contracts.  I don't understand
14  this combined share incentive.
15    Q   Okay.
16    A   I don't know how you can go over 100, so
17  I don't --
18    Q   Well, if you look further I think it's a
19  combination of transmission and axle products.
20    A   Uh-huh.
21    Q   But you don't have a specific
22  recollection that there was a time were

---

Page 175

1   transmission and axle products were together in
2   terms of share for --
3     A   No.
4     Q   -- Volvo?
5     A   Because I came onboard in '99, sorry.
6     Q   When you say the 1997 agreement, were
7   you talking about the MACK 1977 agreement?
8     A   I believe there's another agreement
9   after this.
10    Q   Okay.
11    A   After '97.
12    Q   Okay.
13    A   That ended more or less at the same time
14  as the MACK agreement, and then we did a new
15  agreement. That's where we had equalized pricing.
16    MR. WOOD:  Tony, just for the record,
17  when you say this, you're talking about that
18  exhibit in front of you?
19    THE WITNESS:  This contract ends in '97.
20    MR. WOOD:  All right.  Thank you.
21    (Deposition Exhibit Number 17 marked for
22  identification and attached to the transcript.)

---

Page 176

1     A   So there should be a later contract.
2     Q   I'm now handing you what was been marked
3   for identification purposes as Lopes Exhibit Number
4   17.  That is a document entitled Supply Agreement
5   Eaton 01119577 through Eaton 01119604.  If you take
6   a moment to review that document.
7     A   I'm familiar with this document.
8     Q   What is Lopes Exhibit Number 17?
9     A   A contract between Eaton and Volvo, VTNA
10  to be exact between '99 and 2001 December.
11    Q   And if you turn to page 13 of the
12  contract --
13    A   Yes.
14    Q   -- should be a signature page.
15    A   Yes.
16    Q   Do you recognize the signature above
17  Volvo Trucks North America?
18    A   Yes.
19    Q   Whose signature is that?
20    A   It's Marc Gustafson.
21    Q   And had you joined, this is Volvo.
22       When you, Volvo and MACK were combined,

---

Page 177

1   did you review this contract at the time, or soon
2   thereafter?
3     A   Yes.  Soon thereafter.
4     Q   If you look under section 2-A on the
5   first page.
6     A   Section two?
7     Q   2-A, yeah.
8     A   Okay.
9     Q   It says supply of heavy-duty
10  transmissions and clutches.  It says A, standard
11  except as otherwise set forth below, VTNA will
12  offer Eaton's heavy-duty transmissions, the
13  transmissions, and clutches, the clutches, as its
14  standard, parens, listed standard offering as
15  published in the databook by truck chassis offering
16  for all VTNA truck models, the qualifying models.
17  Do you see that?
18    A   Yes.
19    Q   So is it fair to say that under the 1999
20  agreement that Eaton had standard position at VTNA?
21    A   Yes, that is correct.
22    Q   And by having standard position, does

---

45 (Pages 174 to 177)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000877

Page 178

1  that mean that there are no other transmissions
2  available?
3      A   No.
4      Q   Other transmissions are available?
5      A   Correct.
6      Q   So even after this agreement was signed,
7  VTNA offered other entities transmissions --
8          MR. WOOD: Object to the form.
9      Q   -- besides Eaton?
10     A   Yes.  Meritor, Zed-F, as well as
11 Allison.
12     Q   Do you have an understanding as to
13 whether it is standard, standard in the industry to
14 have supply contracts that deal with the
15 positioning of the databook?
16     A   Yes.
17     Q   That's something you're familiar with?
18     A   Yes.
19     Q   Why is it that contracts for supplier of
20 products in Class 8 heavy-duty truck market deal
21 with the positioning of the databook?
22     A   The standard appears to be extremely

Page 179

1  valuable to the supplier because if you don't
2  chose, you get the standard.  So it's an automatic
3  win for the supplier, so the supplier perceives
4  that to be valuable, and I think it is valuable.
5      Q   And in your experience, is Eaton the
6  only suppler you've dealt with who has asked for
7  the standard position?
8      A   No.  No.
9      Q   Okay.  Have there been times when
10 Meritor has asked for standard position on its
11 products?
12     A   Yes.
13     Q   And at any point between 1999 when you
14 joined MACK and today, has Volvo or MACK entered
15 into contracts with Meritor that give Meritor
16 standard position with any product?
17     A   Yes.
18     Q   What products?
19     A   Front axles, rear axles, drivelines, and
20 brakes, slack adjustors.
21     Q   When was that contract, or those
22 contracts entered if you know?

Page 180

1      A   Compressors.  During my time at MACK it
2  depends on which contract you're talking about.
3      Q   Has there ever been a contract that has
4  been for five years or more, in other words the
5  terms were five years or more with Meritor for any
6  products you just mentioned?
7      A   Five years typically.
8      Q   So the answer is yes?
9      A   Yes.
10     Q   And when was the first contract that you
11 negotiated with Meritor that was a five year, or
12 longer term for any products you just mentioned?
13     A   Probably 2001.
14     Q   And did those, did that contract provide
15 a rebate to MACK or Volvo?
16     A   Yes.
17     Q   Okay.  And was that rebate, were those
18 rebates tied to penetration levels?
19     A   Yes.
20     Q   What were the levels if you remember?
21     A   We'd have to reference the contract, but
22 typically small percentage in rebates, but on the

Page 181

1  axle contract at VTNA was 85-plus.
2      Q   Meaning that Volvo, VTNA did not receive
3  any rebates unless they, the axle penetration was
4  85 percent or more?
5      A   Correct.
6      Q   And in those contracts, did Meritor
7  provide cost-downs, or price decreases?
8      A   Yes.  Predominantly cost down based, and
9  then it had an additional kicker, which was the
10 rebate.  And I would have to check the exact
11 percentage.  It could 84, or -- but it was a fairly
12 high percentage.
13     Q   And do you recall the ballpark, or the
14 exact number of the rebate amounts?  Meaning 1
15 percent, 2 percent, what the scale was?
16     A   Typically 0.5 to one and a half.
17     Q   And is it your goal when you're
18 negotiating with the supplier to have more of the
19 cost savings be in the upfront price reductions
20 versus the rebates?
21     A   Our goal in all cases is to get
22 guaranteed cost-downs year over year that have

46 (Pages 178 to 181)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000878

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 182

1  nothing to do with rebates.  As soon as you make it
2  rebate based, you're asking me to perform for you,
3  or Meritor because if I don't achieve that, I don't
4  get anything.  So I prefer to create contracts that
5  regardless of what happens I get something.
6      Q   Did the 2001 contract with Meritor
7  regarding axles give Meritor standard and preferred
8  position in VTNA's databooks?
9      A   Yes.
10     Q   Is there an agreement, a similar
11  agreement in place today, meaning at some point
12  after that agreement expired there has been a new
13  agreement with Meritor put in place?
14     A   Yes.
15     Q   When was that put into place?
16     A   2002.  And then it was extended to 2009.
17  Will end in May 2009.
18     Q   And the one that's going to end in May
19  of 2009, does it have a high penetration level tied
20  to rebates?
21         MR. WOOD:  Object to the form.
22     A   VTNA has a high penetration level in

Page 183

1  terms of rebate.  There is no penetration, no low
2  level penetration level, just an additional kicker.
3      Q   Does the contract that's going to expire
4  in May of 2009 give standard position to Meritor's
5  axles --
6      A   Yes.
7      Q   -- at VTNA?
8          If you look on page two of Exhibit
9  Number 17 at the very bottom of page two, there's a
10  section 3-F entitled Permitted Cost Increases.
11  Notwithstanding the foregoing, if the percentage
12  share of either transmission or clutches originally
13  installed in the trucks is sold by VTNA during the
14  period as defined below does not reach at least 70
15  percent of those trucks sold, excluding for all
16  purposes all trucks sold carrying Allison
17  automatics and trucks sold carrying transmissions
18  or clutches purchased from a third-party under
19  Section 12-B thereof, Eaton will be entitled to
20  request 100 percent recovery of the actual
21  documented material, labor, and overhead costs
22  increases over the established price for the

Page 184

1  previous year incurred by Eaton and directly
2  attributable to Eaton's manufacture of
3  transmissions and clutches sold to VTNA during such
4  period.  Do you see that --
5      A   Yes.
6      Q   -- sentence?  What is your understanding
7  of the sentence I just read?
8      A   If my penetration level is not met, that
9  Eaton has the right to request price modifications
10  due to labor, overhead, documented material etc.
11     Q   Is this a provision that's similar to
12  the provision that you and Mr. Wood talked a lot
13  about today that's in the 2002 contract in terms of
14  being able to, Eaton being able to recover?
15     A   This provision I don't believe is in the
16  2002 contract.
17     Q   Do you know whether under this provision
18  Eaton ever asked for recovery?
19     A   The new contract we created for MACK and
20  Volvo is the '02 contract, and we, I'm pretty sure
21  we eliminated the ability from Eaton to come back
22  and request for a price increase if we did not

Page 185

1  achieve the desired penetration.
2      Q   Volvo Powertrain wanted to eliminate
3  this provision?
4      A   Yes.
5      Q   And you ultimately were successful?
6      A   Correct.  I believe if you go back that
7  this is not there.
8      Q   We're going to the other contract, so
9  we'll go through and if you see it --
10     A   Okay.
11     Q   -- just tell me.
12     A   I don't believe it's is there, because I
13  didn't want to give the supplier the opportunity to
14  have the right to ask for a price increase, that's
15  not good.
16     Q   Then if you turn to page 15 of the
17  contract this is a section called Rebates, do you
18  see that?
19     A   Yes, sir.
20     Q   Do you see the transmission share starts
21  the shares at 70 percent, and it goes up to 95
22  percent, right?

47 (Pages 182 to 185)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000879

Page 186

1     A   Yes.
2     Q   And am I reading this correctly then
3  that Volvo does not receive any rebate between 70
4  percent and 75 percent, --
5     A   Correct.
6     Q   -- is that right?  And the highest
7  amount of rebate they can receive is 4.5 percent
8  for a 95 percent or greater share, is that right?
9     A   Correct.
10    Q   Do you know whether under this contract
11 Volvo ever received that 4.5 percent rebate?
12    A   I don't believe we've ever achieved.  I
13 think we hit 90, but we never hit 95.
14    Q   And so going into the negotiations for
15 the '02, 2002 contract I believe you said that the
16 combined share was around 75 percent.
17    A   Correct.
18    Q   At the end of the five year contract,
19 meaning at the end of 2007, where was the combined
20 share?
21    A   68 for all intense and purposes.
22    Q   So it's fair to say that over those five

Page 187

1  years Eaton's share declined at Volvo and MACK in
2  terms of heavy-duty transmissions?
3     A   That is correct.
4        MR. WOOD:  Objection to the form.
5     Q   And do you have a sense as to what was
6  made up in terms of which transmissions were being,
7  made up the difference between the 75 and the 68,
8  was it the MACK product?
9     A   MACK, Allison penetration grew, and
10 Zed-F penetration grew.
11    Q   Earlier you said that you had done an
12 analysis that you believe that Meritor needed
13 20,000 transmissions in order to break even.  Is
14 that a characterization of what you said?
15    A   Yes.
16    Q   Do you recall when that analysis was
17 done what penetration that corresponded to, or
18 would have corresponded to?
19       MR. WOOD:  Object to the form.
20    A   20,000 is not just dependent on MACK and
21 Volvo, it's the whole industry.
22    Q   Oh, okay.  That wasn't 20,000 at just

Page 188

1  Volvo MACK?
2     A   It was 20,000 --
3     Q   Okay.
4     A   -- total, and we had multiple
5  discussions with Meritor because the product used
6  to be produced in Laurenburg, North Carolina, or
7  maybe it's South Carolina, where they indicated
8  that they needed at least 20,000 to survive.
9     Q   And who was they?
10    A   Chuck.  Mr. Allen and various other
11 executives at Meritor.
12    Q   And was that before you had signed the
13 2002 contracts with Eaton?
14    A   It's tough to say.  I mean, it probably
15 occurred during those negotiations where our
16 concern was will they survive, and your volume is
17 not so significant.  We had our own issues because
18 our volume was very low, and very expensive.  And I
19 don't recall the exact meeting, or meetings where
20 that occurred.
21    Q   Let's look at the 2002 contracts, which
22 are Exhibits 4 and 5.

Page 189

1     A   Exhibit?
2     Q   Let's start, let's just use Exhibit 4.
3        MR. WOOD:  One of them you don't have
4  all the attachments.
5     Q   Exhibit 4, this is the 2002 contract
6  between Eaton and MACK, is that right?
7     A   Exhibit 4?
8     Q   Exhibit 4.
9     A   Okay.
10    Q   The first page paragraph one the term
11 says five year term October 1, 2002.
12    A   Yes.
13    Q   And September 3, 2007, is that right?
14    A   Yes.
15    Q   Is it fair to say that Volvo Powertrain
16 wanted a five year term on this contract?
17    A   Yes.
18    Q   Do you recall that Eaton actually wanted
19 a longer term?
20    A   I'm not sure.  I know there was
21 discussions of seven years, but I don't really know
22 who was driving it, us or them.

48 (Pages 186 to 189)

Page 190

1     Q   Why did Volvo Powertrain want a five
2  year agreement?
3     A   Because the negotiations are quite
4  difficult with OEM's of Eaton's size.  You
5  typically want to create value.  One way to create
6  value is create visibility to the OEM, and the
7  supplier, and to create a partnership.  So this
8  would be a good way to establish a long-term
9  agreement versus a short-term agreement to be able
10 to protect both businesses, but primary my
11 business.
12    Q   Did you protect your business with the
13 2002 contract with Eaton?
14    A   Yes.  We got decent pricing, and we had
15 product availability during the '06 ramp up.
16    Q   What did you mean by the word, using the
17 word partnership, the five year term would create a
18 partnership?  What were you thinking?
19    A   Typically the supplier wants visibility
20 so they can plan their investments, and we want
21 multi-year cost-downs that we can get back to our
22 brands so they can go out and make their own

Page 191

1  long-term contracts with the various fleets knowing
2  that the price is established, there is no risk for
3  price volatility.
4     Q   Earlier I asked you about the goals for
5  the 2002 contracts that Volvo Powertrain had.  Is
6  it fair to say that one of the goals was not to
7  drive Meritor out of the transmission business?
8     A   No, absolutely.  Our goal was to
9  actually create penetration, or create savings on
10 an annual basis, and create additional competitors
11 so I have an opportunity to select different
12 options for my business.
13    Q   In fact, it was at least 32 percent that
14 you could select for your business without putting
15 at jeopardy any of the cost savings or the rebates?
16    A   32 percent?
17    Q   100 minus 68.
18    A   Okay.
19        MR. WOOD:  Object to form.
20    Q   The other side of 68.  In other words,
21 what I'm saying is in this contract Volvo is able
22 to build in a 32 percent push in whereby you retain

Page 192

1  the savings that it had negotiated, and retained
2  some rebates without -- by having other suppliers,
3  or its own brand have that kind of penetration, is
4  that right?
5     A   Correct.
6     Q   And if you look at paragraph 2-A, you
7  looked at this earlier.  This is the paragraph that
8  gives Eaton standard and preferred price point
9  position on their MACK highway applications, do you
10 see that?
11    A   Yes.
12    Q   It gives, makes it clear that
13 essentially MACK is going to be the standard and
14 preferred option at the, on the vocational segment,
15 is that right?
16    A   Correct.
17    Q   So from the earlier contract Eaton lost
18 standard preferred position for the vocational
19 segment?
20    A   That is correct.
21    Q   That was something that Volvo Powertrain
22 wanted?

Page 193

1     A   Correct.
2     Q   Turn to the next page please, sir.
3  Paragraph four says Value Analysis Value
4  Engineering, do you see that?
5     A   Yes.
6     Q   Feel free to read it, but my question is
7  what is your understanding of what is, what is laid
8  out in section four.
9     A   This is a typical clause in our contract
10 template where we ask the supplier to be
11 responsible to supply cost savings ideas that
12 require us to also participate either through
13 design, or what's called value out, or value
14 engineering.
15    Q   And do you see a reference in the first
16 paragraph to one-half percent fleet sales?
17    A   Yes.
18    Q   What is that?  Why is there a reference
19 to a one-half percent fleet sales in this paragraph
20 four?
21    A   This half percent, this half percent
22 could actually be used to support the contractual

49 (Pages 190 to 193)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
000881

Page 194

1  commitment on the fleet sales side.  Fleet sales
2  being 9-speed, and 10-speed, which are the most
3  competitive.
4      Q   Is this a cost savings to MACK?
5      A   Typically a cost savings idea when it's,
6  when it's delivered, or found.  It's tough to put a
7  price on it until you actually implement it.  Once
8  you implement it you know what the cost level is,
9  and then you can decide okay, if I have a 1 percent
10 savings in the contract, this delivered half a
11 percent, then I only have to give you half a
12 percent more from a commercial perspective because
13 if they don't find anything they got to give me the
14 1 percent.
15     Q   And did Eaton actually commit resources
16 to value analysis value engineering team?
17     A   Yes.
18     Q   And was this paragraph four something
19 that was of benefit to Volvo Powertrain?
20     A   Yes.  We had project teams meeting
21 minimally monthly, and then quarterly, and then
22 applying whatever ideas seemed or deemed to be

Page 195

1  acceptable by both parties.
2      Q   And did any ideas actually come to
3  fruition such that they were put into the market?
4      A   Yes.
5      Q   Which ones?
6      A   Many.  Typically very small ideas, you
7  know, changing this bracket, changing the
8  electronics.  We actually changed the electronics
9  in the dashboard, and product that you could
10 actually see if the transmission was working
11 properly, and what gear it was in.  And you
12 actually had multiple dashboard board display, so
13 we simplified and go to one and reduced some cost.
14 I don't recall the other ones.  You'd have to go to
15 some of the paperwork that would indicate the other
16 ones.
17     Q   But you view it as that there were many
18 cost savings, regardless of the size there were
19 many that came out of --
20     A   Yes.
21     Q   -- this effort, is that right?
22     A   Yes.

Page 196

1      Q   Are you able to identify what the
2  biggest cost savings was that came out of the value
3  analysis value engineering effort between Volvo,
4  between MACK and --
5      A   The dashboard idea was close to 60 to
6  $80 if I recall correctly.
7      Q   60 or $80 in terms of decrease?
8      A   Cost down, yes, because you had to
9  display multiple places and you didn't require it.
10 So we were actually able to come up with one
11 display, agree on it, modified the design and able
12 to eliminate the cost.
13     Q   Before the 2002 contract was entered,
14 and from the time you started at MACK, was there an
15 effort within MACK or Volvo to your knowledge to
16 consolidate the number of suppliers that were being
17 used by either of those brands?
18     A   Yes.
19     Q   What was the purpose of the
20 consolidation?
21     A   Primarily to simplify the business,
22 leverage more turn over so you could get better

Page 197

1  pricing, and eliminate some of the cost in
2  engineering and so on.
3      Q   And --
4      A   We still have that need today.
5      Q   In the time period between 1999 and 2002
6  as part of that consolidation effort, did Volvo or
7  MACK eliminate any transmission competitors from
8  their offers?
9      A   1999 to '02, no.
10     Q   What about between 2002 and the end of
11 2006 when Meritor stopped selling transmissions?
12     A   No.
13     Q   Turn to page five of the contract,
14 please.  There's a paragraph eight entitled New
15 Product.  Again, feel free to read it, but my
16 question is what is your understanding of what's
17 laid out in paragraph eight, Section A of the
18 contract?
19     A   Which section?  All sections?
20     Q   Just generally Section A.  What is, what
21 is the, what is laid out in terms of what this
22 does, and why it's in the contract, your

50 (Pages 194 to 197)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

**000882**

Page 198

1  understanding of this Section A.
2      A    A, was primarily to indicate that Eaton
3  could not start a new product with another OEM and
4  give that OEM a jump start of a year, or six months
5  and then offer it to Volvo and MACK.  We wanted to
6  get access to any new technology that they were
7  able to produce at the same time.
8          B, was to create a steering committee
9  where both parties got connected multiple times a
10 year to provide better relationship if you will,
11 something that we have done with a couple of our
12 suppliers.
13         C, was to get a dedicated engineer to
14 properly look at these VA/VE opportunities, and
15 introduce them expeditiously.  So we basically had
16 a dedicated resource commitment.
17         D, was Eaton would actually provide the
18 prototypes or the changes coming at its own price
19 so my engineering never have a budget issue
20 because we could actually get the new product free.
21         E, was more of a training situation.  I
22 want people at my factory or any other training

Page 199

1  that I may require some application and experts
2  from Eaton to train my own people with no cost to
3  Volvo or MACK.
4          F, was an attempt to protect the
5  contractual pricing.
6          Imagine if I did a contract in '02, and
7  Eaton decides to come up with a lookalike model but
8  call it a different model and create new pricing,
9  then all the cost savings that I had committed for
10 the next five years would go away because it's a
11 new model and it wasn't included in the contract.
12 So any new product that was introduced would have
13 to be at parity pricing or better, so it was just
14 to make sure that the contract was actually worth
15 something.
16     Q    Is it fair to say that section eight is
17 something that Volvo Powertrain wanted in this
18 contract?
19     A    I'm sorry?
20     Q    Something that Volvo Powertrain wanted
21 in this contract, is that right?
22     A    Yeah.  This is a typical clause that we

Page 200

1  add to our MACK Volvo template because it protects
2  or, demands certain performance from the supplier.
3      Q    Provides certain benefits to Volvo
4  Powertrain?
5      A    Correct.
6      Q    Turn to page seven of the agreement.
7  There's a clause entitled 14, Competitiveness.  Do
8  you see that?
9      A    Yes.
10     Q    Under this clause it says Eaton will use
11 best efforts to keep transmissions and clutches
12 competitive in technology and price as set forth
13 below for the duration of this agreement.  Do you
14 see that?
15     A    Yes.
16     Q    And then ultimately if Eaton is not
17 keeping up with the technology, it provides that
18 MACK can notify you, is that right?
19     A    Right.
20     Q    And that MACK can go with a different
21 supplier if the technology is better than Eaton's,
22 is that right?

Page 201

1      A    Yes.
2      Q    Has there ever been a time since signing
3  this contract up until today that, or up until the
4  end of the contract that this paragraph was evoked
5  by either Volvo or MACK?
6      A    Related to technology or
7  competitiveness?
8      Q    Yes.
9      A    No.
10     Q    But, but it was your understanding at
11 the time of signing this contract that MACK had the
12 ability to insist that Eaton have the best
13 technology in the marketplace?
14     A    It indicates that if you don't, I can
15 chose a different partner.  It doesn't necessarily
16 force Eaton to have the best technology.
17     Q    I guess what I'm saying is your, is it
18 your understanding of this contract that if there
19 is a technology that you believe is better than
20 you're getting from Eaton you can go to Eaton and
21 notify them --
22     A    Correct.

51 (Pages 198 to 201)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000883

Page 202

1    Q    -- about that?
2    A    Absolutely. And I could introduce that
3  technology.
4    Q    And not be subject to the rebate
5  calculation, is that right?
6    A    I believe so, but I would have to read
7  the whole thing to allow for that, but I believe
8  that was the intent.
9    Q    And there was not a time that this
10  clause was invoked by MACK to your knowledge?
11    A    In this particular case, it doesn't, I
12  thought it said that if a particular component does
13  not, I could actually introduce that component, and
14  the product is still -- the remaining contract
15  still intact. I don't believe it says that. I
16  think it says I don't have to offer you a standard
17  position.
18    Q    I apologize. I didn't mischaracterize
19  it. That's exactly what it says, that if there's a
20  product that you deem, that Volvo Powertrain deems
21  to be better --
22    A    Yes.

Page 203

1    Q    -- and Eaton can't match it, than you
2  can list at standard in your databook.
3    A    Correct.
4    Q    And that doesn't, then doesn't effect
5  any of the --
6    A    The contract would still remain in place
7  except the standard position option is no longer
8  there.
9    Q    Let's go to page 15, which should be
10  Attachment A, transmission and clutch pricing.
11    A    Yes.
12    Q    I want to make sure I understand the
13  numbers in the box next to fleet 9-, slash,
14  10-speed lightening, do you see that?
15    A    Yes.
16    Q    Do you see there's, in 2002 there's the
17  word equal, and then below it minus 2.75 percent,
18  do you see that?
19    A    Yes.
20    Q    What does that portray? What does that
21  mean?
22    A    We got the best equalization pricing of

Page 204

1  either party, either MACK or Volvo, whoever had the
2  best price on 9-speeds. I got that as a starting
3  point. And then I got an additional minus 2.75.
4    Q    And then what about in 2003, there's two
5  numbers there. There's a minus 1.5 percent, and
6  then a minus 0.5 percent. Minus 0.5 percent, does
7  that go with the VA/VE?
8    A    Yes.
9    Q    So other than the 7-speeds in the other
10  three categories listed there, is it a fair
11  characterization to say that over the entire life
12  of this contract Eaton gave MACK price reductions
13  each year on its products?
14        MR. WOOD:  Object to the form.
15    Q    Is that right?
16        MR. WOOD:  Same objection.
17    A    What's the question?
18    Q    That -- I'm trying to make sure I
19  understand. For the fleet performance on/off
20  automation products that Eaton was providing that
21  Eaton was giving price reductions each year through
22  the life of the contract.

Page 205

1    A    Yeah. That's what the contract
2  indicates.
3        MR. WOOD:  Object to the form.
4    Q    And that for the two pedal that wasn't
5  out in 2002 that MACK had locked in the pricing on
6  that product in relation to the three pedal, is
7  that right?
8    A    That is correct.
9    Q    And that was a benefit to Volvo
10  Powertrain to lock in the pricing on a product that
11  didn't even exist at that point in the market?
12    A    We believe it to be a benefit not
13  knowing what the price was going to be. Maybe they
14  would have given us a better price, but at the time
15  knowing that from 3-speed, three pedal to two pedal
16  would than likely the evolution would cost a lot of
17  money, we at least identified what that level would
18  be, and what that price level would be. And we
19  agreed because we believe that price to be
20  reasonable.
21    Q    If you go down to Section E, or letter
22  E, Mr. Wood asked you about the 68 percent, do you

52 (Pages 202 to 205)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000884

Page 206

1  see that?
2      A   Yes.
3      Q   Going into the negotiation, or during
4  the negotiations, did Eaton ask for a higher level
5  than 68 percent?
6      A   Yes.
7      Q   What did Eaton want, if you recall in
8  terms of the penetration level?
9      A   They wanted 80-plus, and worse case 75
10  because the last quarter in '01 was at the 75
11  percent level, so as a minimum they wanted 75.
12      Q   And Eaton didn't get its worse case?
13      A   We couldn't accept it because we knew
14  that we wanted to introduce other products.  Our
15  product plan would indicate that if it was 75, the
16  contract would not last the full five years.
17      Q   Was there a percentage below 68 that
18  Volvo Powertrain wanted going into the
19  negotiations?
20      A   We wanted no penetration limits period.
21  We wanted to actually eliminate it, and they wanted
22  80.  And we ended up with 68.

Page 207

1      Q   And that was below the level that was in
2  existence at that time?
3      A   Correct.  7 percent, 17 points less.
4      Q   And it's fair to say that Volvo
5  Powertrain wasn't willing to walk away from the
6  contract when Eaton insisted on a share level,
7  penetration level of some number.  In other words,
8  you wanted zero going in?
9      A   I wanted zero because I don't have any
10  contract that says I have to perform, because you
11  could have a quality issue that would actually
12  affect the penetration and actually cancel the
13  contract.  So to me I don't like -- when I do
14  contracts with a supplier, I don't like contracts
15  that force me to perform.  I'd rather have
16  contracts that force the supplier to perform.  This
17  was perceived by me and continues to be anytime you
18  have a market share penetration as a performance,
19  the supplier is asking me to perform.
20      Q   But you weren't willing to walk away
21  from this contract?
22      A   We believe that 68 percent was

Page 208

1  sufficient for us to do the contract, and the
2  contract to survive during that frame.  And since I
3  wanted the savings and the equalization, and the
4  rebates we did the deal.
5      Q   In the course of negotiating the current
6  contract, the '08 contract, did Volvo Powertrain
7  analyze how much savings it achieved over the 2002
8  contract?
9      A   Yes.
10      Q   How much?
11      A   I don't recall.
12      Q   $10, $100, a million, 10 million, 100
13  million, any recollection?
14      A   We were doing 80 million plus a year.
15  2.75 percent the first year, plus another one and a
16  half, plus another one and a half, so under '06 it
17  was around eight and a half to 9 percent times 80
18  million, so 7.6 million a year.
19      Q   Okay.
20      A   And the back years.  I try not to do too
21  many analysis where the supplier is giving me
22  benefit.  It's not -- I try not to do too many

Page 209

1  analysis where it measures what the supplier is
2  giving me, because the supplier usually knows that
3  number, and makes it very clear what he's
4  providing.
5      Q   In the course of negotiations that's one
6  of the things a supplier might use --
7      A   Correct.
8      Q   -- to tell you what they've delivered to
9  you.  In the course of negotiations with Eaton for
10  the 2008 contract, did Eaton tell you what they
11  believed was the savings that Volvo Powertrain had
12  achieved in the 2002 contract?
13      A   Yes.
14      Q   What was that number?
15      A   I don't recall the number.  It was a big
16  number.
17      Q   Okay.
18      A   Usually very beneficial for Eaton to
19  specify how great the contract was, and our view is
20  that this is expected as a performance measurement,
21  so you're giving me 1.5, and I want two.  You
22  actually did not meet my expectations, so you're

53 (Pages 206 to 209)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35
000885

Page 210

1  actually below.
2      Q   Did the, in the course of the
3  negotiations for the current contract, did Eaton
4  express to you that they believe they, the 2002
5  contracts were not left beneficial to them?
6      A   Yes.
7      Q   What was the substance of what Eaton
8  said?
9      A   They expected continued penetration and
10  growth, thus more penetration, and it was not
11  achieved.  Our contract obligation was to be at 68
12  or better, we met it.  As far as we were concerned,
13  the contract was a great success because we were
14  compliant within the contract expectations.
15     Q   Did Eaton individuals express to you
16  their concern about the share growth not happening
17  was tied to the fact that they had provided cost
18  reductions and price-downs, and rebates to Volvo
19  Powertrain?
20     A   Yes.
21     Q   Is that a fair characterization?
22     A   Yes.

Page 211

1      Q   Let's look at the rebate structure,
2  which is on page 19.  Attachment B, rebate.  Do you
3  see that?
4      A   Yes.
5      Q   Do you see that the rebate levels don't
6  ever get above 2 percent, do you see that?
7      A   Yes.
8      Q   Do you know why that is?  In other
9  words, remember we looked at the earlier contract
10  it was a 4.5 percent rebate, we looked at that
11  specifically --
12     A   Yes.
13     Q   -- in the earlier contract?  Why is it
14  that the 4.5 percent, or number at that level
15  didn't carry over in the 2002 contract?
16     A   We modified the contract to be more
17  cost-downs.  Eaton wanted it to be a rebate-based
18  contract, so we did a mix.  So the rebate came
19  down, and the cost per year went up.  And the
20  market share numbers penetration are lower, so the
21  rebates were lower.
22     Q   In the time periods when the combined

Page 212

1  share did not meet 68 percent, did Eaton ever
2  actually terminate this contract?
3      A   They couldn't.
4          MR. WOOD:  Object to the form.
5  Characterization.
6      A   They couldn't because it was an annual
7  analysis, so when they got the report that said 66,
8  you can't cancel based on one quarter.  You have to
9  go back and do the addition of all the other
10  quarters, and that was never achieved.  So we were
11  compliant within the contract.  They did not have
12  the option to further pursue cancellation, or
13  discuss cancellation.
14         MR. MARTIN:  Are you moving on from
15  those contracts?
16         MR. LAZEROW:  Yes.
17         MR. MARTIN:  Maybe we could have a short
18  break.
19         MR. LAZEROW:  Sure.
20         THE VIDEOGRAPHER:  Going off the record.
21  The time is 4:55:32.
22         (Recess was taken.)

Page 213

1          THE VIDEOGRAPHER:  Going back on the
2  record.  The time is 5:13:09.
3      Q   This morning, Mr. Lopes, you made a
4  reference to whether Volvo Powertrain was going to
5  engineer the Freedomline in relation to the '09
6  engine changes, is that right?
7      A   Yes.
8      Q   What is your understanding of the cost,
9  if any, for Volvo Powertrain to decide to include a
10  transmission in its offering in terms of the
11  engineering, other costs that it has to undertake
12  to make a transmission available?
13     A   It's almost impossible to pick a number,
14  but since we already have Freedom in our product
15  portfolio, it was just a question of continuing,
16  and the change in the engine is understood.
17         We don't know the exact number, but the
18  reason we're thinking about not offering it is the
19  Freedomline penetration is quite low, thus we do
20  not see a risk for the customer base.  And Eaton
21  has now come up with Evolution Two that appears to
22  be working fairly well, and then we also introduce

54  (Pages 210 to 213)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000886

Page 214

1  the I-Shift at VTNA, and they're going to introduce
2  it at MACK.  Thus in essence we'll have two, two
3  pedal transmissions.  We'll eliminate one, and add
4  one.
5      Q   What about when you're considering
6  whether to add a transmission to the product
7  portfolio, is it an expensive undertaking to
8  engineer that into the chassis that are offered?
9      A   Minimum two to five million dollars
10 depending on how big the change is.
11     Q   Two to five million dollars?
12     A   Yes.
13     Q   One time type costs?
14     A   Yes, because you've got testing
15 validation.  You've got to make sure you're
16 connected with electronics.  And as the electronics
17 get more and more sophisticated, it becomes more
18 and more costly.
19     Q   And have there been product,
20 transmission products that to your knowledge MACK
21 or Volvo has not offered because of the engineering
22 costs associated with being able to offer the

Page 215

1  transmission?
2      A   Yes.
3      Q   Which ones?
4      A   We did not introduce an Eaton product
5  called Lightening the second time around because we
6  felt there was no value, and the transmission was
7  not perceived to be a good one.
8          We did not introduce the Ecomet, which
9  was a Zed-F transmission, which at one point we had
10 an opportunity to do so.  And just recently we are
11 in discussions with Eaton on whether or not we
12 should introduce their vocational, their new
13 automated vocational product, which we have said
14 we're not going to introduce unless the market
15 dictates that we should.
16     Q   When was the I-Shift introduced at
17 Volvo?
18     A   I'd say mid '05.
19     Q   And you might have said this earlier,
20 but what is the current penetration of the I-Shift
21 at Volvo?
22     A   For the year, I believe it's a little

Page 216

1  over 10 percent.
2      Q   For 2008?
3      A   For 2007.
4      Q   2007.  What about for 2008?
5      A   We believe it will grow to about, again,
6  the market or the volume is so volatile, so our
7  forecast was originally 3250, 3,250 units for '08,
8  but that was based on 24,000 trucks.  We're
9  probably doing seventeen, sixteen thousand trucks,
10 so I would assume that that will come down
11 accordingly.
12     Q   Is the market down right now?
13     A   Yes.
14     Q   And what is -- if you recall in the time
15 period between 2000 and October 2002 when the
16 contract with Eaton was entered into what the
17 market was like then?
18     A   In terms of volume, or in terms of
19 penetration of automated?
20     Q   No, in terms of volume.  In terms of was
21 the, was the market up cycle, down cycle if you
22 recall.

Page 217

1      A   '01 was an up cycle because '02 we were
2  going to introduce a new engine.
3          (Whereupon, Deposition Exhibit Number 18
4  marked for identification and attached to the
5  transcript.)
6      Q   I'm now handing you what has been marked
7  for identification purposes as Lopes Exhibit Number
8  18.  It is a document Bates label VM2_0016191
9  through 206.  It is a document from the files of
10 Volvo MACK entitled Volvo Global Powertrain
11 Purchasing Presentation to Supplier Volvo Global
12 Powertrain draft February 26, 2001.
13         If you take a moment to familiarize
14 yourself with that document.
15     A   Okay.
16     Q   Did you prepare Exhibit Number 18?
17     A   I prepared some, some of the slides,
18 yes.
19     Q   So you had some input into this
20 document?
21     A   Yes.
22     Q   Was this a document, or a final version

55 (Pages 214 to 217)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000887

Page 218

1  of this document presented to certain suppliers of
2  Volvo Global Powertrain, do you recall?
3      A   I believe this was shared in a supplier
4  day meeting, or a version of this.  We typically
5  have annual supplier days where we shared some of
6  this.
7      Q   Okay.
8      A   And most of this stuff has been shared
9  on and off at supplier days.
10     Q   If you turn to VM2_00016204.
11     A   Yes.
12     Q   This says at the top our mission,
13  purchase the best value for the final customer.  Do
14  you see that?
15     A   Yes.
16     Q   Do you know if this is a page that you
17  drafted, or provided input for?
18     A   This is our mission, so.
19     Q   Purchase the best value for the final
20  customer?
21     A   Yes.
22     Q   The final customer being truck

Page 219

1  purchasers?
2      A   Yes, the end-user.
3      Q   And then underneath that, the first
4  bullet point says Volvo Global Powertrain strategy
5  is to develop, and the second check mark says
6  transmissions and axles, consolidation of the
7  group's product range and an optimizes made/buy
8  structure.  Do you see that?
9      A   Correct.
10     Q   Do you have an understanding of what it
11  means optimizes make/buy structure?
12     A   Yes.
13     Q   What does that mean?
14     A   Any of the products that we deem to be
15  new technology, we should ask one of our suppliers
16  or an external supplier to produce that product.
17  Any product that had high technology, or perceived
18  to be from a future perspective, we should invest
19  more and actually product internally.
20     Q   Was that a strategy that in or around
21  February 2001 that Volvo Powertrain was
22  undertaking?

Page 220

1      A   Yes.
2      Q   Is that a strategy that Volvo Powertrain
3  continues to undertake today?
4      A   Yes.
5      Q   And then in what I just read there also
6  a reference to the consolidation of the group's
7  product range, do you see that?
8      A   Yes.
9      Q   What's your understanding of that
10  phrase?
11     A   Well, we took the manual Volvo
12  transmission, European transmission and actually
13  requested Zed-F and Eaton to give us a proposal to
14  produce that transmission in Europe as well as in
15  Brazil.
16         Eaton has been producing that
17  transmission for four or five years.  The low
18  technology transmission, a second transmission
19  manual, and two pedal we continue to invest
20  internally.  And the non-automated transmission in
21  Europe we're currently doing an RFQ at Eaton and
22  Zed-F to produce that either in Poland at the Eaton

Page 221

1  facility, or at Zed-F facility in Germany.
2      Q   The phrase, consolidation of the group's
3  product range, does that refer to eliminating
4  certain products from the portfolio that would be
5  offered?
6      A   It does, but the important thing is
7  because we do so much product internationally, as
8  much as we would like to believe that Europe
9  doesn't want that transmission anymore, we still
10  produce 30,000 trucks all over the world, and that
11  marketplace still prefers the low-end product,
12  which is the manual transmission.  So we can't get
13  rid of it because there's still a need for it.
14     Q   The next bullet point reads, suppliers
15  selected to work with us will benefit from, the
16  first check mark says, larger volumes and secured
17  market shares.  Do you see that?
18     A   Yes.
19     Q   What's your understanding, what's your
20  understanding of those phrases that I just read?
21     A   Again, this is us selling to the
22  suppliers.  So we're saying we're a big company, if

56 (Pages 218 to 221)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000888

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

---

Page 222

1    we're able to reduce our portfolio, and you get
2    that portfolio, you know, less complexity and you
3    produce the whole amount, so we're basically --
4    it's a selling technique to the supply base.
5         Q    Was that a strategy that Volvo
6    Powertrain were undertaking in or around February
7    2001 to select suppliers who it could give secure
8    market shares to?
9         A    Yes.
10        Q    Based on larger volumes, is that right?
11        A    It's many things.  It's manufacturing
12   footprint around the world to eliminate currency
13   risk, to eliminate supply risk, to eliminate
14   logistics risk.  It's a supplier that has the
15   capability to actually provide that knowledge and
16   continue to improve on the product and to have a
17   supplier that when I don't, I deem the product to
18   be less than ideal from a technology perspective I
19   can dump it on a supplier that has a product
20   footprint, a product portfolio and footprint that
21   can continue to add value to that particular
22   product so it lasts a little longer.

---

Page 223

1         Q    If you go to the next page, this should
2    read first stage 2001, 2002 program global 200.  Do
3    you see that?
4         A    Yes.
5         Q    Cost reduction on current trucks, slash,
6    selection of Volvo Global Powertrain preferred
7    suppliers.  The second bullet point reads Volvo
8    Global Powertrain will reduce in this process by
9    minimum one-third the current number of suppliers
10   in order to develop business with the most
11   competitive ones.  Do you see that?
12        A    Yes.
13        Q    Is that just a reflection on what we've
14   already talked about in terms of consolidation of
15   suppliers?
16        A    Yes.  We actually achieved that.
17        Q    You achieved the one-third?
18        A    Yes.
19        Q    And that's, is that globally?
20        A    Yes.
21        Q    What about North America, do you know if
22   you achieved the one-third, one-third reduction in

---

Page 224

1    the number of suppliers in North America?
2         A    Yes, because we eliminated, we went from
3    18 platforms on the engine to three platforms.  And
4    with that, all the suppliers that were North
5    America suppliers basically went away because the
6    old engine, MACK engine went away.
7         Q    The three suppliers are who are you
8    talking about?
9         A    It's not so much three suppliers.  We
10   went from 18 platforms --
11        Q    I'm sorry.  Right.  Right.
12        A    -- to three platforms.
13        Q    Three platforms being what?
14        A    An MD9, MD11, and MD13 engine.  So we
15   went from, they offered Cummins.  At one point I
16   offered Cat.  At one point I offered a truck
17   diesel.  I offered my own product, MACK Renault
18   product, various Volvo products.  I now just have
19   an MD911, which is the same engine.  MD13, and an
20   MD16.
21        Q    And the next bullet point says we're
22   expecting very aggressive proposals from the

---

Page 225

1    supplier base.  Do you see that?
2         A    Yes.
3         Q    Why was it that Volvo was expecting very
4    aggressive proposals from the supplier base?
5         A    We were reinventing ourselves, and we
6    were huge, huge proliferation of product.  If we
7    moved our proliferation down, we could actually
8    offer extremely interesting volumes to whoever
9    decided to do business with us.  And we felt that
10   volume would recover or be able to be leveraged
11   into aggressive cost-downs.
12        Q    And was transmissions, the transmission
13   contract with Eaton a reflection of that?
14        A    This is more engine directed because we
15   were not able to perform these kinds of ideas with
16   vendor components like Eaton, or Meritor axles, or
17   data axles.  So not quite ideal for the vendor
18   component side.
19        Q    I'm done with that one.
20        (Deposition Exhibit Number 19 marked for
21   identification and attached to the transcript.)
22        Q    I'm now handing you what been marked for

---

57 (Pages 222 to 225)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000889

Page 226

1  identification purposes as Lopes Deposition Exhibit
2  19. It's from the files of Volvo MACK, Bates label
3  VM2_00001293 through 1317, and it's entitled on the
4  front Target 2003.
5        Have you ever seen this document before?
6     A   Yes.
7     Q   In what context prior to today?
8     A   This was actually created earlier than
9  '03. Whenever Volvo bought Renault, we did a
10 complete analysis on each segment, each commodity,
11 what each brand purchased, and who the suppliers
12 were, and what kind of synergies we can expect from
13 the combination, or the merger.
14    Q   So was this a document you provided
15 input in, or drafted?
16    A   All sites.
17    Q   Provided --
18    A   Provided input, and then it was
19 consolidated with a third-party consultant.
20    Q   Was the document you received in the
21 ordinary course of your business working for Volvo
22 Powertrain?

Page 227

1     A   Yes.
2     Q   Can you go to the fourth page, page
3  four. Do you see that it says spend 2003
4  estimated, --
5     A   Yes.
6     Q   -- do you see that? And it says 16 334
7  MSEK, do you see that?
8     A   Yes.
9     Q   What is MSEK?
10    A   Million SEK.
11    Q   Which is a, what is that?
12    A   Currently. Swedish currently.
13    Q   Swedish currency.
14        And then under the supplier you'll see a
15 supplier list. Do you see that?
16    A   Yes.
17    Q   Am I reading this right the estimated
18 spend in 2003 between ZF Group and Meritor
19 Automotive was over three million SEC, or is it
20 three billion?
21    A   Three billion.
22    Q   Okay. Do you have an understanding that

Page 228

1  that's the level of the span in 2003 that Volvo
2  worldwide was spending with ZF Meritor Automotive?
3     A   Yes.
4     Q   And do you know whether the level before
5  2003 was at that level for those two entities?
6     A   I would say yes, because you don't
7  change these kinds of components overnight. You
8  know, it's multi-year contracts, and it's fairly
9  stable unless the marketplace goes up or down.
10    Q   And the span with Eaton Corporation
11 estimate of 2003 was 887 million?
12    A   Yes.
13    Q   Is that right?
14    A   Yes.
15    Q   That's SEK again?
16    A   Yes.
17    Q   Did the size of the spending ever come
18 into the discussions around the 2002 contracts with
19 Eaton?
20        MR. WOOD: Object to the form.
21    A   I don't understand the question.
22    Q   I'm wondering if you ever, if anyone

Page 229

1  from the Volvo Powertrain side raised with Eaton
2  that you spent a lot more money with ZF and Meritor
3  than you did with Eaton.
4     A   I would say no.
5     Q   Never came up in the negotiations?
6     A   Typically I would discuss how much I
7  purchased though the Eaton combination of either
8  valves, air equip, or -- which was 250 million to
9  300 million.
10    Q   If you go the page 13.
11    A   Yes.
12    Q   It says our approach to reach the
13 targets. Do you see that?
14    A   Uh-huh. Yes.
15    Q   And this says on current product 2001,
16 slash, 2002. It says strategic sourcing, low cost
17 countries transfers, yearly negotiation, secure
18 with long-term contract with existing suppliers,
19 and leverage new supplier choice. Do you see that?
20    A   Yes.
21    Q   Do you have an understanding what the
22 last bullet point means, leverage new supplier

58 (Pages 226 to 229)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000890

Page 230

1 choice?
2     A    Depending on what each contract was
3 coming due or ending, we needed to not just look at
4 it from a continental approach.  We needed to look
5 at a global approach if at all possible where we
6 could leverage it, and we had the analysis to
7 pursue that line of understanding.
8     Q    Do you recall -- I'm done with that.
9         THE WITNESS:  He was trying to get me
10 more coffee.  I'm fine.
11     Q    Do you recall in the late 2003 time
12 period that Meritor raised the price of the
13 Freedomline?
14         MR. WOOD:  Object to the form.
15     A    I don't recall the timing, but, yes.
16 There was a time when Meritor due to currency and
17 other factors increased the price.
18     Q    Do you recall the size of that increase?
19     A    It was close to $2,000.
20     Q    And do you have a recollection as to how
21 that affected, if at all the sales of the
22 Freedomline transmission at either Volvo or MACK?

Page 231

1     A    It had a huge impact because we had to
2 go back and challenge Zed-F on orders that were
3 already existing that we needed to maintain the
4 price.  So I had -- typically Freedom was selling
5 quite well.  So we had orders that went out six
6 months, and we already had established the
7 negotiation with the end-user.  And now if I have
8 to go and ask the end-user for another 2,000, it
9 would not be perceived professional.  So we were
10 able to work through that, and, but then any new
11 orders would be at the new price.
12     Q    And did, do you have an understanding as
13 to whether there were, whether the level of orders
14 after the price increase was put in was affected?
15     A    It was reduced.
16     Q    Do you remember --
17     A    For a fact.
18     Q    Do you know how much in terms of a
19 percentage of numbers?
20     A    I would say I don't want to quote
21 numbers, but year over year the numbers went down
22 when Freedom was growing nicely, and we had repeat

Page 232

1 customers, but when you want to go to the customer
2 and ask them for a new order, or he wants a new
3 order but the price went up --
4     Q    At the time that the price increase was
5 put in place, did you have discussions with
6 Meritor, or Zed-F individuals about the increase in
7 the price?
8     A    Yes.
9     Q    And what was, what were you trying to
10 covey to Zed-F or Meritor individuals in those
11 discussions?
12     A    This would stop the penetration that
13 they been, that they had enjoyed since they
14 introduced the product.
15     Q    What do you recall was the response when
16 you conveyed that to Zed-Fed or Meritor or
17 individuals?
18     A    Meritor believed that we were correct,
19 and wanted to support us, but Zed-F did not see the
20 growth that they expected because automation was
21 not picking up as much speed as we all would have
22 liked.  And eventually due to currently issues, and

Page 233

1 cost of material, they could no longer support that
2 price level, and ultimately they won, and we
3 increased the price accordingly.  And the
4 penetration went lower.
5     Q    Can we look at Exhibit 12?  We're going
6 to go through some of the exhibits that we went
7 through this morning.
8     A    Yes.
9     Q    This is to, refresh your recollection,
10 an e-mail you wrote in May 2004 regarding the
11 T-310, and the T-309 Pricebook, do you see that?
12     A    Yes.
13     Q    Under the section, put things in
14 perspective, a few key data points, number three
15 you say past improvements received to date MACK
16 Trucks minus 8.43 percent, plus min of 1.5 percent
17 per year.  Do you see that?
18     A    Yes.
19     Q    What does the minus 8.43 percent refer
20 to?
21     A    The productivity, of the equalization
22 plus the productivity to that point.

59 (Pages 230 to 233)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000891

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 234

1     Q   So up to, up til May 12, 2004 from the
2  signing of the contract, MACK had received 8.43
3  percent in productivity benefits, is that a fair
4  way to say it?
5     A   I would say yes.  If you take the
6  equalization value of the best price possible, and
7  then they apply that as the baseline, that in
8  itself was worth something.  And then you had '02,
9  '03, and '04 cost-downs basically brings you to
10  that level.
11     Q   So was the minus 8.43 percent a yearly
12  figure, or a total to date?
13     A   It was since the contract started to the
14  date in question.
15     Q   Okay.  So it's roughly a year and a half
16  time period, the contract being signed in November
17  of 2002?
18     A   Correct, plus equalization.
19     Q   Right.
20     A   That includes equalization.
21     Q   And then what does the 1.5 percent refer
22  to?

Page 235

1     A   The continued productivity going
2  forward, plus the rebate and VA/VE wasn't an
3  accurate number.  It was more of a, you know, a
4  number to indicate the direction because depending
5  on the product type, either performance or
6  automation, or 9- and 10-speeds, the number is
7  different.
8     Q   Is it fair to say that under the 2002
9  contracts the price reductions, and the -- the
10  price reduction primarily were more value to MACK
11  and Volvo than the rebate part of the contract?
12     A   Yes, because the rebates were minimized,
13  and the cost-downs are additive.  It's like getting
14  a salary increase versus a bonus.
15     Q   Number four says we lowered the
16  penetration hurdle to 68 percent of total volume,
17  excluding Allison, which allows for substantial
18  growth of the MACK products.  Do you see that?
19     A   Yes.
20     Q   Do you still agree with that sentence
21  sitting here today?
22     A   Yes.  At the time we did the contract,

Page 236

1  we wanted to allow our internal people to get an
2  additional 10,000 units, and by creating a 68
3  percent we would allow the growth for internal
4  products.
5     Q   And at the time, the internal products
6  you're talking about were T-300?
7     A   Correct.
8     Q   Okay.
9     A   We only had the T-300 available at that
10  point.  We had no other products released.
11     Q   Was the T-200 available at this point?
12     A   The T-300 replaced the T-200.  It was
13  some design changes on the shifting mechanism.
14     Q   And so is it fair to say that MACK's
15  T-300 product achieved substantial growth in the
16  time period we're looking at here between signing
17  the contract in May of 2004?
18     A   Yes.  We went from 15 to 20 units a day
19  to as high as 85 units a day.
20     Q   If you look at Exhibit Number 3.
21     A   Yes.
22     Q   I believe this is a presentation, I

Page 237

1  think earlier in your testimony, a presentation you
2  used with Eaton, is that right?
3     A   Various.  I believe we did one with --
4     Q   If you go to the third page.
5     MR. MARTIN:  Did you finish your answer?
6     A   Certain pieces of this were used with
7  Eaton.
8     Q   Okay.  Sorry, I thought you were done.
9     If you go to the third page of this
10  presentation, at the very top it should be entitled
11  Mack, slash, Eaton Business Basics.
12     A   Yes.
13     Q   The last bullet on this page reads
14  rebates welcome, year over year price reductions
15  are required.  Do you see that?
16     A   Yes.
17     Q   Do you know if that's the sentence
18  statement was presented to Eaton?
19     A   Yes, it was.
20     Q   What were you conveying to Eaton with
21  that bullet point I just read?
22     A   I would not do a contract for five years

60 (Pages 234 to 237)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000892

Page 238

1    if I didn't have multi-year cost-downs.
2       Q    Is it fair to say you were saying to
3    Eaton multi-year cost-downs were more important
4    than the rebates to you?
5       A    I was telling them that rebates are
6    okay, because ultimately my goal was to extract
7    value from supply base, so rebates I shouldn't say
8    no.  I'll accept them, but I also want multi-year
9    cost-downs that are not performance based, or
10   you're challenging me to perform.
11      Q    Earlier one of the contracts we saw had
12   a level of 7 percent for potential rebates that
13   were available, do you remember that?
14      A    Yes.
15      Q    Were you saying to Eaton we're not just
16   going to deal with straight 7 percent, or some
17   straight rebate number, we're going to do more than
18   just rebates, is that right?
19      A    If you recall, the 7 percent required
20   90-plus percent penetration.  That would got give
21   me the capability of introducing I-Shaft,
22   introducing -- so I couldn't pursue my own product

Page 239

1    planning, or product portfolio goals as well.  So I
2    needed balance.
3       Q    If you turn to page VM200018472.  This
4    is a page I think we looked at earlier.  The second
5    bullet point talks about the multi-level penalty
6    pricing clause $3,500.
7       A    Yes.
8       Q    Right.  I might have missed this, but
9    did you ever learn why it was that MACK had agreed
10   to price its own product $3,500 more than Eaton's
11   product?
12      A    I would say no.
13      Q    Okay.
14      A    Because every time I questioned,
15   everybody denied that this was not such good deal,
16   and, but nobody wanted to take credit for it.
17      Q    Ultimately when you came in, you were
18   able to get Eaton to lower that to a $1,500 --
19      A    Correct.
20      Q    -- difference.  Even though the contract
21   that was in place Eaton could have stood by the
22   contract?

Page 240

1       A    That's correct.
2       Q    Let's go to Exhibit Number 6.
3       A    Yes.
4       Q    I believe -- correct me if I'm wrong.  I
5    believe you said this Exhibit 6 was an internal
6    sales pitch that the purchasing group made to the
7    marketing and sales group, is that right?
8       A    Correct.
9       Q    And on the first page the third bullet,
10   point Eaton has the most complete product offering
11   in NA, parens, with the exception of two pedal
12   introduction.  Do you see that?
13      A    Yes.
14      Q    What did you mean by that bullet point?
15      A    The product range was fairly complete.
16   The two pedal introduction at this point depending
17   on what the date was didn't exist, or was not good
18   enough.  I don't have the date in front of me, but
19   I believe Eaton introduced a two pedal in late '03,
20   early '04.
21      Q    And when you were -- it says the most
22   complete product offering, that's referring to

Page 241

1    across both the highway and the vocational sense?
2       A    Correct.
3       Q    And is it fair to say that at the time
4    you signed the contract with Eaton in 2002, the
5    combined entity of ZF-Meritor did not have the
6    product breadth that Eaton had?
7       A    That is correct.
8       Q    That was one of the reasons that you
9    ultimately chose Eaton?
10      A    That is correct.
11      Q    Among others.  I'm not trying to limit
12   you.  One of the reasons that you chose Eaton was
13   its full product line, is that right?
14      A    Correct.
15      Q    You referred a few times to Eaton being
16   tough negotiators today.
17      A    Yes.
18      Q    Right?
19      A    Still are.
20      Q    I'll tell them you said that.  No, I
21   won't actually, but was Meritor tough negotiators
22   around axles?

61 (Pages 238 to 241)

Page 242

1    A    Yes.
2    Q    And what has been Meritor's axle
3  penetration at MACK since you've been there?  Do
4  you have a range if you will?  I'm not looking for
5  year by year, but when you got to MACK in 1999, was
6  Meritor's axle high?
7    A    I would say typically less than 20
8  percent at MACK.
9    Q    Higher at Volvo?
10   A    Volvo was, since I can remember its been
11  80 percent plus, as high as 90.
12   Q    And is the current contract for axles
13  with Meritor for both Volvo MACK?
14   A    Yes.
15   Q    If you turn to Number 11, this is the
16  letter from David Renz to you and Mr. Linsolas --
17   A    Yes.
18   Q    -- dated May 7, 2004 regarding steel
19  surcharges.  In or around that time, May 2004, was
20  Eaton the only supplier to Volvo Powertrain that
21  was asking for increases for steel prices, pricing?
22   A    No.

Page 243

1    Q    Did Meritor also ask for steel price
2  increases?
3    A    Yes.
4    Q    Do you recall the outcome of that
5  request to Volvo Powertrain from Meritor?
6    A    Their contract was similar in the PPI
7  clause, but it allowed recovery quicker than the
8  Eaton contract, so Eaton was not being able to
9  recover as quickly as Meritor.
10       Meritor eventually ended up breaking the
11  contract, and we had to go to a new contract type
12  to be able to allow recovery.
13   Q    The contract you're talking about is for
14  which products?
15   A    Axles.  There was no contract for
16  transmissions.
17   Q    When did Meritor break that contract?
18   A    Some time in '04.
19   Q    And it's your understanding they broke
20  it because of the steel increase issue?
21   A    Yeah.  The contract clause with Meritor
22  was written slightly different.  It indicated that

Page 244

1  if steel moves more than 10 percent, that we needed
2  to get together and renegotiate.  And at the time,
3  raw material had moved over 10 percent, so that
4  created an event called an economic condition not
5  able to be controlled or manged, so we actually
6  renegotiated.
7    Q    Did Meritor ask for increases for steel
8  surcharge on its transmissions?
9    A    Yes.
10   Q    And that was in the 2004 time frame?
11   A    Yes.
12   Q    Do you recall the size that they were
13  asking?
14   A    Very small, because we could have -- we
15  were in a position to say your product offering and
16  your percentage is so low, fine, take it away, I
17  just won't offer it.
18   Q    And did Volvo Powertrain ultimately
19  agree to any amount of surcharges for Meritor's
20  transmissions?
21   A    I don't believe so, and if so, a very
22  small amount, maybe a 1 percent range.

Page 245

1        MR. LAZEROW:  We're at the end of the
2  tape.  So why don't we take a five minute break,
3  and let me see where I am.  I think I'm close, and
4  we'll turn it over if he's got time.  Let's go off
5  the record.
6        THE VIDEOGRAPHER:  This marks the end of
7  tape three in the deposition of Tony Lopes.  Going
8  off the record.  The time is 5:51:54.
9        (Recess was taken.)
10       (Deposition Exhibit Number 20 marked for
11  identification and attached to the transcript.)
12       THE VIDEOGRAPHER:  This marks the
13  beginning of tape four in the deposition of Tony
14  Lopes.  Going back on the record.  The time is
15  5:57:59.
16  BY MR. LAZEROW:
17   Q    Turn to Exhibit Number 15.
18   A    Yes.
19   Q    Exhibit 15 an e-mail from Dominique
20  Callens to you, Mr. Louya, Ms. Sandrine Khalifa
21  entitled Eaton Company Profile April 11, 2005 and
22  it has an attachment.  Do you remember this

62 (Pages 242 to 245)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000894

Page 246

1  document?
2      A   Yes.
3      Q   Mr. Wood showed this to you earlier
4  today.  There was a good deal of confusion around
5  slide number four, so I want to go back to it for a
6  minute.
7      A   Okay.
8          MR. WOOD:  Object to the
9  characterization.
10         MR. LAZEROW:  Well, the record will
11 reflect whether there was confusion or not.
12 BY MR. LAZEROW:
13     Q   I want to ask you about one specific
14 sentence.  I think what Mr. Wood had done was he
15 had asked you about the Business Segment Truck
16 section, and asked you whether you agreed with all
17 the statements.  And you went through and you
18 picked certain statements out that I think you were
19 saying you couldn't verify, is that right?  Is that
20 a fair characterization of what your answer was to
21 that series of questions?
22     A   Actually, most of them I said I agreed

Page 247

1  with.  There was a couple, I basically took section
2  by section --
3      Q   Yes.
4      A   -- to get give feedback.
5      Q   My concern was that there were
6  statements you didn't talk about as to whether you
7  agreed or disagreed, that's why I want to look at
8  one specific statement, okay?
9      A   Okay.  I guess I would ask you to ask
10 whatever statement.
11     Q   Yeah.
12     A   -- you think.
13     Q   Yeah.  I'm going to.  I just want to
14 make sure the record is clear as to what your
15 position is, whether you agree or not.
16         The reference is to Eaton in the first
17 paragraph of this segment as almost monopolistic
18 position of today.  Do you see that phrase?
19     A   Yes.
20     Q   Do you see that phrase?
21     A   Yes.  This development has been made
22 possible -- yes.

Page 248

1      Q   When you were giving your answer and you
2  didn't discuss that, is that because you didn't
3  agree with it, or you agree with that
4  characterization?
5      A   I would say that if you have a supplier
6  who has a market share penetration of 80 percent
7  plus, it's a monopolistic position.  We do not want
8  any supplier to have more than 50, that would be
9  our preference.
10     Q   So in April of 2005 Eaton's market share
11 was not 80 percent, is that right?
12         MR. WOOD:  Object to the form.
13     Q   68 percent is what you've been talking
14 about today.
15     A   Okay.  I apologize.  This 80 percent is
16 market share.
17     Q   Oh.
18     A   That means NAFTA market.
19     Q   Okay.
20     A   It has nothing to do with my own
21 penetration.
22     Q   And do you know actually what Eaton's

Page 249

1  market penetration was in NAFTA in April of 2005?
2      A   I can't tell you the exact number, but I
3  would say it's over 80 percent on heavy-duty
4  market.
5      Q   And are there other suppliers that you
6  deal with who have that strong of penetration in
7  their product category?
8      A   I can't think of one except for Allison
9  perhaps.  If you take the Allison product, even
10 though they might be 5-, 6 percent of the total
11 market, in their niche there is no other product.
12     Q   Are you a lawyer?
13     A   No.
14     Q   Okay.  I want to hand you what is
15 Exhibit Number 20 I've marked for identification
16 purposes, Number 20.  This is --
17         MR. WOOD:  Do you have one for me?
18         MR. LAZEROW:  No.
19         MR. WOOD:  Thank you.
20     Q   This is a document Bates number
21 ZFMA0163487 through 95.  It is a, the first page is
22 an e-mail from David Louya dated March 16, 2004 to

63 (Pages 246 to 249)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000895

Page 250

1  a number of people at Zed-F and ArvinMeritor copied
2  to Mr. Callens and Tony Lopes.  The subject is
3  forward meeting minutes, the attachment.  The
4  document lists two attachments, March meetings, dot
5  doc.  Freedomline transmissions, dot PPT.  And the
6  e-mail reads gentleman, please, find the meeting
7  minutes and presentation for our meeting in
8  Michigan on March 10th.
9       Do you want a moment to review the
10 document?
11   A   Yes, I would appreciate it.
12      Okay.
13   Q   You received this e-mail and the
14 attachments in the ordinary course of business for
15 Volvo Powertrain, is that right?
16   A   Yes.
17   Q   And you were in a meeting with ZF and
18 MarvinMeritor representatives in and around March
19 10, 2004 where the subject Freedomline came up, --
20   A   Yes.
21   Q   -- is that right?  If you go to the
22 third page of this document, which is Bates label

Page 251

1  ZFMA0163489, and this is part of the meeting
2  minutes for that meeting?
3   A   Yes.
4   Q   The second paragraph is the one I want
5  to look at which says, ZF indicated willingness to
6  wait to gauge the success of the Eaton UltraShift.
7  If this product is successful, ZF is willing to be
8  a low volume niche player in North America.  Do you
9  see that?
10   A   Yes.
11   Q   Do you recall that statement being made
12 at this March 10th meeting?
13   A   Yes.
14   Q   Who made it?
15   A   I believe it was Mr. Rolf.
16   Q   Rolf Lutz?
17   A   Yes.
18   Q   Do you recall what it was he was, that
19 he actually conveyed to the Volvo Powertrain
20 individuals at the meeting?
21   A   We were discussing availability of the
22 product.

Page 252

1   Q   Of the Freedomline?
2   A   Yes, because the volume in Europe, and
3  the volume in North America had grown
4  substantially, and they could no longer maintain
5  capacity.  So they were actually airfreighting the
6  product, and at the time were requesting for a huge
7  price increase.  Our existing customers that had
8  orders that went out further than upfront orders,
9  that negotiation had already been established as I
10 indicated, so we needed to protect at least those
11 customers.  And because he was so busy in Europe,
12 he felt by the North American business doesn't
13 appear to have grown like I expected it, that
14 limited his options to create a manufacturing
15 footprint in Mexico, or North America, so he was
16 basically willing to see if the Eaton product would
17 make a splash or maybe not, in which case the price
18 increase we would have to accept it, and the
19 customers would continue buying it at the top level
20 because there was no other product.
21   Q   And I think you testified earlier the
22 customers didn't continue buying it after price

Page 253

1  increase at the levels it had been bought, is that
2  right?
3   A   Correct.  There was -- it had an impact.
4   Q   Are you able to characterize the amount
5  of that impact?
6   A   You have to understand that the
7  automated product was still only 10 at 18 percent
8  of the market, so it's not the whole market.  And
9  Volvo was, I think at the highest point consuming
10 around 2,000 Zed-F transmissions.  And Zed-F was
11 selling around 4,000 transmission in the whole of
12 NAFTA, so we were 50 percent of that, even though
13 it was a small number in terms of the whole
14 transmissions.  We were a huge consumer of those
15 transmissions, and Zed-F expected eight to ten
16 thousand units before they could invest in North
17 America, and they never reached that number.
18   Q   Today what percentage of Volvo and
19 MACK's transmissions that are consumed are
20 automated transmissions?
21   A   Probably 10- to 11 percent.  When you
22 combine the two brands, probably 15- to 16 percent.

64 (Pages 250 to 253)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000896

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

---

Page 254

1  I'm lying.  It's higher than that because of our
2  own I-Shift product.  I would say it's probably 18-
3  to 19 percent at Volvo, and a much small number at
4  MACK.
5      Q   If you turn to the fourth page of this
6  document, which is Bates number ZFMA0163490.  This
7  appears to be a Powerpoint presentation.  Do you
8  see this page?
9      A   Yes.
10     Q   And at the bottom left you'll see it has
11  your name next to the 4th of March.  March 10,
12  2004, do you see that?
13     A   Yes.
14     Q   Is this -- and the pages that follow it
15  presentation made at the March 10th meeting?
16     A   I can't say this for sure, but more than
17  likely it was.
18     Q   Do you see the first bullet point that
19  says VTNA introduction Jan 2003, do you see that?
20     A   Yes.
21     Q   Was the Freedomline introduced at VTNA
22  in January 2003?

---

Page 255

1      A   Yes.  Was available to be selected.  It
2  was probably introduced two, or three months before
3  that.
4      Q   It was at that point, January 2003 that
5  truck purchasers could select --
6      A   Yes.
7      Q   -- the Freedomline?
8      A   Yes, from the Pricebook.
9      Q   And up until March 10th, March 10, 2004
10  VTNA sold 1,370 transmissions, is that right?
11     A   Yes.
12     Q   And that was below the forecast that
13  VTNA had for over 2,100 units, is that right?
14     A   Not so much that it was below.  Were
15  forecasting.  Again, we were just in March, so we
16  were forecasting 2,100 units.
17     Q   Got it.
18     A   So we would have been 50 percent
19  consumption.  I was going from memory, but the
20  numbers are quite close.
21     Q   Turn to the next page.  It says supplier
22  hard points.  It says December 12, 2003 letter of

---

Page 256

1  $1,250 transmission price increase.  Do you see
2  that?
3      A   Yes.
4      Q   Does this refresh your recollection as
5  to the date of the transmission, the increase on
6  the Freedomline?
7          MR. WOOD:  Object to the form.
8      A   I actually would like to correct my
9  previous statements.  I indicated close to 2,000.
10  It was only 1,250, so.
11     Q   I was going to give you a chance --
12     A   I apologize for that.
13     Q   I was going to get there, but I was
14  trying to see if the date December 12, 2003 is
15  consistent with your recollection as to the timing
16  of the Freedomline presentation.
17         MR. WOOD:  Same objection.
18     A   Yes, but we did not accept that original
19  request for price increase at that point.
20     Q   Was it fair to say that less than a year
21  after the Freedomline had been made available to
22  Volvo's customers ZF-Meritor come in with a $1,250

---

Page 257

1  price increase?
2      A   That is correct.
3          MR. WOOD:  Object to the form.
4          Did you get all that?
5          THE COURT REPORTER:  Uh-huh.  Object to
6  the form.  That is correct.
7      Q   And had the December 12, 2003 letter
8  indicated that the price protection for all orders,
9  all firm orders in 2004?
10     A   No.
11     Q   The December 12, 2003 letter didn't say
12  that?
13     A   That's correct.
14     Q   Do you recall what it said?
15     A   They had nothing to do with future
16  orders.  It was effective --
17     Q   Okay.
18     A   -- December 31.  January 1st my price
19  would go up.
20     Q   Turn to the next page.  Was this a page
21  that was presented to the ZF and the Meritor
22  representatives in this March 10, 2004 meeting?

---

65 (Pages 254 to 257)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000897

Page 258

1    A    Yes.
2    Q    What is portrayed on this page?
3    A    Basically we tried to indicate that
4  previous orders where the negotiation between our
5  sales people and the end-user were already
6  established, that we would have expected those
7  prices to remain intact, and if there were
8  additional orders, potential orders, which is a
9  secondary purchase from existing customers that
10  were in the books but had not been fully
11  negotiated, that those would also be protected.
12    Q    Do you see there's a reference to 789
13  orders for the December 12, 2003 entry, do you see
14  that?
15    A    Yes.
16    Q    February 6, 2004 it says 435 orders.
17    A    Yes.
18    Q    And the bullet point reads our minimum
19  expectation is to price protect the remaining 354
20  orders.
21    A    Correct.
22    Q    Did ZF or Meritor price protect the

Page 259

1  remaining 354 orders?
2    A    Yes.
3    Q    When ultimately did they agree to do
4  that if you know?
5    A    Later in '04.
6    Q    They did not agree at the March 10th --
7    A    Correct.
8    Q    And were you able to put a month in
9  terms of later in '04?  Was it April, May, June?
10    A    It was, it was difficult for Zed-F to
11  agree to commit to frozen pricing when we could not
12  tell them exactly the orders, and if the orders
13  were recurring secondary buyers where by bought the
14  first time, and the second time around, or were
15  they conquests.  They wanted all kinds of
16  information, and we had to go and get that
17  information.
18    Q    Turn to the next page.  It says
19  Freedomline Transmissions Automation Overview.  And
20  in the first bullet point it says Databook upcharge
21  at VTNA has increased from 6,000 to 9,000.  Do you
22  see that?

Page 260

1    A    Yes.
2    Q    Is it the case that the Freedomline
3  price increase that ZF Meritor imposed on Volvo
4  resulted in a 50 percent list price increase of
5  Freedomline?
6    A    That is correct.
7    Q    The last bullet point says Allison has
8  extended, quote, vocation rebate program, end quote
9  to highway segment.  Do you see that?
10    A    Yes.
11    Q    What does that mean?
12    THE WITNESS:  Will any of this
13  information be shared?  Is this confidential
14  information?
15    MR. MARTIN:  No.  This entire deposition
16  has been --
17    Q    It will not be shared.
18    A    Okay.
19    Q    It has been labeled highly confidential
20  by your attorney, and therefore attorneys -- the
21  only people who can see this are attorneys from the
22  parties, not the parties themselves, and certain

Page 261

1  designated in-house counsel, but they're not
2  permitted to share the business.
3    A    Okay.
4    Q    Allison is not a party to this case, so
5  Allison definitely will not see this.
6    A    I'm not so interested in Allison. I'm
7  more interested in Eaton having this information
8  I'm about to share.
9    Q    Yes.
10    A    Today Allison since they're a niche
11  monopolistic supplier, because no one else has the
12  product offering, they do not have to give a
13  rebate.  Today I get rebate for the refuse
14  application, which they don't have a need to
15  because I can't perform the function without their
16  product.
17    And they also allow a rebate of $3,000
18  for the highway side, as well as $3,000 for the
19  vocational side.  So even though their product is
20  perceived to be more expensive, and is more
21  expensive, once they give you the $3,000 rebate the
22  acquisition cost becomes less than Freedom, or less

66 (Pages 258 to 261)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000898

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 262

1    than UltraShift, quite interesting.
2        Q   Has Allison's penetration of the highway
3    segment been increasing over time?
4            MR. WOOD:  Object to the form.
5        A   Not so much highway, but nicely in
6    vocation.
7        Q   Is vocational different than refuse --
8        A   Yes.
9        Q   -- in your mind?
10       A   Yes.
11       Q   So Allison's penetration at Volvo and
12   MACK in the vocational segment has been increasing?
13       A   Yes. And the reason it's, one of the
14   reasons it's not increasing on highway is Volvo
15   MACK never released it on the highway trucks
16   because we believe it's not really needed there.
17   It's not a good fit.
18       Q   Do you recall the time that the 2002
19   contract was entered with Eaton what Allison's
20   penetration was in the vocational segment at Volvo
21   and MACK?
22       A   Less than, total less than 5 percent.

Page 263

1        Q   Do you know what it was at the end of
2    2007?
3        A   MACK was at 20, and VTNA was much
4    smaller because we got rid of the refuse business.
5    We had to divest the business to auto car.
6        Q   And the vocational segment is something
7    that's part of Eaton's 2002 contract, right?
8        A   Yes.
9        Q   The last line in this page we're looking
10   at ZFMA0163493 says, in conclusion, --
11       A   Where?
12       Q   Same page.
13       A   Same page.  Sorry.
14       Q   It says, in conclusion Freedomline is
15   pricing itself out of the market.  Do you see that?
16       A   That was our perspective, yes.
17       Q   Is that something you conveyed to ZF
18   ArvinMeritor representatives in March 10, 2004?
19       A   Yes.
20       Q   Let's go to two pages back, which is
21   ZFMA0163495.  And is this a page that was presented
22   to ZF and ArvinMeritor representatives at the March

Page 264

1    10, 2004 meeting?
2        A   We believe so.
3        Q   And the first bullet point says, ZF
4    support of VTP companies is extremely questionable.
5    Do you see that?
6        A   Yes.
7        Q   What were you attempting to convey to
8    the ZF and ArvinMeritor representatives at the
9    meeting with that bullet point?
10       A   Primarily we were questioning their long
11   term vision for staying in North America.  I had
12   capacity issues, which I thought I would never
13   have, but they were there.  I had a price agreement
14   with a PO, and a price agreement, but that was
15   change with a price increase.  I was expecting them
16   to introduce the product in North America, which
17   would eliminate logistics pricing and currency
18   risk, which would be a real contender to the Eaton
19   product, and that never materialized.
20       Q   And the last bullet point says ZF needs
21   an OEM partner.  Do you see that?
22       A   Yes.

Page 265

1        Q   What was that statement intended to
2    convey to the ZF and ArvinMeritor representatives
3    at the March 10, 2004 meeting?
4        A   Basically that they needed us more than
5    we needed them.  And since we are already released
6    with them, and I was 53 percent of the penetration
7    in North America, I would think they would want to
8    treat me a little bit better.
9        Q   After this time, were there ever any
10   customers who came to you and said I want to buy
11   the Freedomline but can't get it?
12       A   No, because I still supported it. So
13   most customers recognized there was a capacity, a
14   true capacity issue where Europe was really moving
15   up, and I still offer it today.  So a customer
16   could still get it, but at that particular moment
17   in time the customer did not always get what he
18   wanted, but most of them were willing to switch.
19   That's why the 700 was, ended up being a much
20   smaller number.
21       Q   After signing the 2002 contracts with
22   Eaton for the transmissions, did any of Meritor's

67 (Pages 262 to 265)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000899

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 266

1  transmission products that had already been
2  engineered into Volvo and MACK's chassis get
3  removed from the databooks?
4      A  I can't think of any.
5      Q  Do you believe that the 2002 contracts
6  with Eaton for the supply of transmissions was a
7  benefit to Volvo and MACK?
8          MR. WOOD:  Object to the form.
9      A  Yes.
10     Q  Do you believe that those contracts were
11  of benefit to the end-users of Volvo and MACK's
12  products, meaning the truck purchasers?
13         MR. WOOD:  Object to the form.
14     A  I would say anything that's good for me
15  should be good for the end-user.
16         MR. LAZEROW:  Thank you very much for
17  your time.
18         THE WITNESS:  Okay.
19         FURTHER EXAMINATION BY COUNSEL FOR THE
20  PLAINTIFFS BY MR. WOOD:
21     Q  Tony, I'd like to spend a few minutes
22  with you and go over a few documents, and then ask

Page 267

1  you a couple of questions.
2      A  Of course.
3      Q  In your recent testimony, I think you
4  stated that Zed-F was looking to have 8,000 to
5  10,000 units sold on an annual basis --
6      A  Yes.
7      Q  -- in North America before they would
8  invested.  Is that what you testified to?
9      A  We actually had -- yes, that's correct.
10     Q  And I was just curious.  When you said
11  invest, what do you mean by that?
12     A  We actually had discussions with Meritor
13  and Zed-F to actually introduce their product into
14  the Laurelbrook facility.  We had discussed
15  locations, area, square footage.  They showed us
16  plans to do that, but they needed to get to that
17  level before they moved some people to North
18  America and actually --
19     Q  A phrase I've heard before is called
20  industrialize?
21     A  Yes.
22     Q  So they discussed with you the plan to

Page 268

1  industrialize --
2      A  Correct.  Thank you.
3      Q  I think you testified that it was your
4  belief that if the product was introduced, or
5  industrialized in North America that would have
6  been a real contender to the Eaton product, is that
7  correct?
8      A  Yes.  Our perception was that it was a
9  better product, and it still has an edge over the
10  Eaton product.
11     Q  Still being today?
12     A  Yes.
13     Q  Is that why you continue to offer it?
14     A  For the time being, it's already
15  released.  It doesn't cost me anything.  If the
16  customer wants it, it make sense to offer the
17  customer what they want.
18     Q  I think a couple times in your testimony
19  I think you referred to Allison as a niche
20  monopolistic supplier.  When you said niche, what
21  niche are you referring to?
22     A  I cannot operate successfully in the

Page 269

1  refuse market without a true automatic
2  transmission, which is Allison is the only producer
3  at the moment.
4      Q  So niche equals refuse?
5      A  Correct.
6      Q  I think reference was made earlier to
7  this being a down market now, --
8      A  Yes.
9      Q  -- is that correct?  How does this down
10  market compare to, strike that.
11         When was the last time there was a down
12  market in the heavy-duty truck marketplace?
13     A  '07, '08.
14     Q  And when was the last time before that?
15     A  Define down market.  Less than 200,000,
16  or less than 170, or?
17     Q  Where there is -- there are ups and
18  downs in cycles, would you say that's right?
19     A  Yes.
20     Q  So I'm just looking for a dip as opposed
21  to an upward cycle.
22     A  2002 was probably the dip.  We

68 (Pages 266 to 269)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000900

1/12/2009      ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

---

Page 270

1    introduced a new product in late '02. Actually, it
2    was '03. We introduced new engines on '02, so we
3    had to pre-buy. And in '03 it went down. In '04
4    it came up. '05 it went higher, '06 went higher
5    even, and then '07 came down again.
6        Q   And before 2002 was there a dip between
7    the time you joined MACK in 2002?
8        A   There was a, it was in a growth mode
9    from '99.
10       Q   During this current down market, have
11   you approached any of your suppliers seeking price
12   reductions, or other value, or benefits because of
13   the downturn itself?
14       A   Yes, but most suppliers that have a
15   current contract tell me to refer to the contract.
16   Asking and getting are two, two different things.
17       Q   Let me show you two documents that
18   relate to the negotiation of the 2008 contract.
19   I'd like to close out with that --
20       A   Sure.
21       Q   -- if I may.
22       MR. WOOD: I'm marking as Lopes Exhibit

---

Page 271

1    21 VM200004300 through 4317.
2        (Deposition Exhibit Number 21 marked for
3    identification and attached to the transcript.)
4        Q   Have you finished familiarizing yourself
5    with it, Tony?
6        A   Yes. More or less, yes.
7        Q   The cover to the document, Tony, is an
8    e-mail from you to Carlos Hungria.
9        A   Yes.
10       Q   H-U-N-G-R-I-A. Who is that individual?
11       A   My direct boss.
12       Q   That's the individual you referenced
13   earlier --
14       A   Yes.
15       Q   -- dotted line with Bruno?
16       A   No. I'm dotted line to Carlos. It just
17   happened in November this year.
18       Q   Okay. And this e-mail and the
19   attachment, the attachment itself is this a
20   document that you created, or helped create?
21       A   Myself and David, yes.
22       Q   David being?

---

Page 272

1        A   Louya. This is a typical summary of the
2    contract and analysis that we offer to various
3    management personnel just to brief them on what is
4    the contract, and where are we and so on.
5        Q   So the e-mail itself and the attachment
6    are documents that you would create in the ordinary
7    course of your business?
8        A   Yes.
9        Q   Looking at the document, the attachment,
10   Tony, if you would look with me on page three. The
11   title is Eaton Contract Evolution.
12       A   Yes.
13       Q   The last bullet says new contract
14   discussions have been difficult, because Eaton is
15   looking for growth, and we are introducing the
16   I-Shift in North America.
17       Beyond these reasons that you've
18   identified here, let me just ask you do you agree
19   that sitting here that those two items, Eaton
20   looking for growth and your introduction of the
21   I-Shift were making the negotiation difficult at
22   that time?

---

Page 273

1        A   Those are some of the items, yes.
2        Q   Were there other items that made the
3    negotiation difficult?
4        A   Yeah. Terms, evolution where we wanted
5    90. They maintained 30.
6        Q   Days?
7        A   Yes. We wanted a raw material clause
8    that had a hurdle of 2 percent, they refused. I
9    mean, there's a litany of things, but these were
10   two of the critical ones for sure.
11       Q   The next page is a chart that says chart
12   presentation.
13       A   Yes.
14       Q   Where did you aggregate your data, or
15   how did you come up with the pie chart?
16       A   We look at the NAFTA market being in
17   '06, so this would have been around 340,000 trucks,
18   and how much did Zed-F get, how much did Allison
19   get, how much did MACK get.
20       Q   Okay. Where did you compile your
21   information, where did you gather how much each
22   supplier had in terms of sales?

---

69 (Pages 270 to 273)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000901

Page 274

1    A   Each truck is registered, and once it's
2  registered, you actually -- anybody can get this
3  information.  And then we know what product they
4  select, so you can -- like the MACK is 40 percent
5  in the MACK brand, but MACK is only 11 percent of
6  the total NAFTA.  So it becomes 40 percent of 10,
7  so it's 4 percent.
8    Q   All right.  If you look with me to, walk
9  me through this just generally.  I'm not going to
10  ask you to walk me through each page.
11    A   Which page?
12    Q   I'm now at page seven, but it proceeds
13  through a number of pages.  Are these each a
14  description of various proposals that Eaton made to
15  you --
16    A   Yes.
17    Q   -- for a new contract?  Is it fair to
18  say for each of those proposals that a thread that
19  runs through all of them is that Eaton is seeking a
20  price increase, Eaton was seeking share-based
21  rebates, and Eaton was seeking the right to
22  terminate the contract if its penetration fell

Page 275

1  below a certain amount?
2    A   Correct.
3        MR. LAZEROW:  Objection as to form.
4    Q   And if you look with me on page 12.  I'm
5  sorry, I'm off, and I'm off a lot.  On page 15, the
6  very first bullet.  Volvo/MACK is the only OEM that
7  Eaton does not have 90 percent plus market share.
8  What was the basis for that statement, how do you
9  know that information?
10    A   Well, we know that they have and 89
11  percent in the whole market, and we know that
12  they're at 68 or less, and mine does the other
13  ones.  Either somebody has to be at 99, and the
14  other one at 82, or -- I mean this is a generality,
15  but I would say that if they own 89 percent of the
16  total market --
17    Q   I follow you.
18    A   -- it's not, it's not full knowledge at
19  each OEM, but I would say it's --
20    Q   What do you mean it's not full
21  knowledge?
22    A   I don't know if they have 92 or 85 at

Page 276

1  Freight Liner, and 99 at Bacar, or Kenworth, or
2  Peterbilt, but I don't know for a fact that exact
3  percentage.
4    Q   If you look at the third bullet, Eaton
5  wants to use their usual contractual model, which
6  is pro-growth model, rebates associated with market
7  share penetration.  What did you mean by usual
8  contractual model?
9    A   If you look back at all the previous
10  contracts, '92, '97, 2002, 2007, there's always a
11  rebate piece, which is part of their model, which
12  asks for the OEM to perform.  I refer to it as a
13  performance demand, you need to give me X percent
14  of penetration based with a rebate, which we, Volvo
15  have many times told them we do not like, but it
16  appears that many suppliers like that model,
17  because I have that model in various contracts.
18    Q   The next, there's a sub-bullet that says
19  this does not work for an OEM that has vertically
20  integrated transmission products.  Is that a
21  reference in part to MACK and/or Volvo?
22    A   Correct.  It's very difficult for me to

Page 277

1  continue growing from a market share penetration
2  when I want to introduce my own products, and I
3  happen to be the only OEM, MACK Volvo together,
4  that have our own products to introduce. So it
5  makes sense that we have a problem with it.  We
6  want to grow I-Shift.  We want to grow T-300, and
7  Eaton is indicating I want to grow.
8    Q   The next sub-bullet, Eaton wants to
9  impose price increases/obstacles to prevent any OEM
10  from pursuing vertical integration.  To date, Eaton
11  has been successful in this strategy due to their
12  market dominance.
13    A   They would not give me as preferred
14  pricing if I did not offer them a growth strategy.
15  Once I establish the 55 percent penetration versus
16  the 68, their pricing doesn't become as aggressive
17  as it could be.
18    Q   So the more you're willing to offer
19  penetration, the more they're willing to offer you
20  incentives?
21    A   In the past that's been the case.  So
22  you see scenario one, scenario two, the no growth

70 (Pages 274 to 277)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000902

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

Page 278

1  scenario is worse than a growth scenario.
2      Q   What is the basis for your statement in
3  the sub-sub-bullet, to date, Eaton has been
4  successful in this strategy due to their market
5  dominance?
6      A   They've been able to grow -- it's an
7  inference.  They've been able to grow everywhere
8  else, so this appears to be working for them except
9  at MACK and Volvo where every contract we've
10 established a lower level of market share
11 penetration, which they do not particularly like.
12     Q   If you switch to the next page 16.  The
13 second bullet says, Eaton will implement a 7.7
14 percent increase if we do not have a LOI by
15 November 16, 2007.
16         Did you enter into an LOI?  I don't know
17 if I said LOI.  I'm sorry, let me read that again,
18 strike what I was saying there.
19         The bullet says Eaton will implement a
20 7.7 percent increase if we do not have a LOI by
21 November 16, 2007.  Did Volvo Truck North America
22 enter into an LOI with Eaton by that date?

Page 279

1      A   I don't actually recall, but I believe
2  we did some letter of intent that would indicate to
3  buy us more time to actually conclude the contract.
4      Q   Did somebody at Eaton make a statement
5  to you that the LOI had to be agreed to, or
6  implemented by November 16, 2007 in order to avoid
7  a price increase?
8      A   Since there was no contract, yes.  Since
9  there was no contract, and we were not going to
10 pursue additional contracts, the pricing would
11 change by 7.7.
12     Q   Who was the individual that conveyed
13 that information to you?
14     A   Sales management, and multiple people at
15 Eaton, but sales management.  Larry Singlewaldt,
16 which is the current sales manager.
17     Q   Tom Grim?
18     A   Tom at this point had moved on to a new
19 position, so.
20     Q   We talked a little bit before about
21 credible threat versus gamesmanship.  Did you
22 consider that statement that they would increase

Page 280

1  the price if an LOI hadn't been entered by November
2  16, 2007 to be a threat, or gamesmanship on their
3  part?
4          MR. LAZEROW:  Objection.  Vague.
5      A   Neither.  We truly believed that this
6  contract since we had not established a contract we
7  would not remain in the old pricing scheme, and the
8  pricing would change by 7.7.  It was basically
9  their willingness to say look, if you're not
10 willing to do a contract, and we've tried six or
11 seven scenarios, then let's admit that we're not
12 going to do a contract and let's go to the PO type
13 of relationship, in which case the price goes up
14 7.7.  It was one of their proposals.
15     Q   So at that point in time you believed
16 them that they would increase the price by 7.7
17 percent?
18     A   Yes.
19     Q   Now, just the contract itself -- I guess
20 I'll go ahead and introduce this quickly.  It talks
21 about it looks like a couple of the provisions that
22 go in the contract.

Page 281

1          (Deposition Exhibit Number 22 marked for
2  identification and attached to the transcript.)
3      Q   This is Lopes Exhibit 22, and it is
4  found at VM200017761 through 68.
5          MR. LAZEROW:  Is that 22?
6          MR. MARTIN:  Yep.  22.
7      Q   Have you had a chance to review the
8  document?
9      A   Yes.
10     Q   This is another one of the documents,
11 Tony, that your lawyers produced to the parties.
12 It was taken from your electronic files.  Is this a
13 document that you created?
14     A   No.  This is a report that every
15 purchasing manager does at the end of the year for
16 all 55 employees that we have in purchasing.  Every
17 purchasing manager gives an update what did we do
18 this year, and some highlights.
19     Q   The document I take it you received in
20 the ordinary course of performing your duties for
21 VTNA.
22     A   Yes.

71 (Pages 278 to 281)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000903

Page 282

1    Q   If you look with me on page four, it's
2  called Eaton Status.  Do you see that, sir?
3    A   Yes.
4    Q   Who compiled the information in this
5  Powerpoint slide, or this page?
6    A   David and his buyers would have done
7  this.
8    Q   And the bottom part being the last
9  bullet it says, new agreement will run from January
10  1, 2008 through December 31, 2012.  And then it has
11  three sub-bullets.  Is each of those bullets
12  accurate as to your understanding of what is in
13  that contract, including the length of the
14  contract?
15    A   It's a high level view, but yes.
16    Q   And this second bullet says, 5 percent
17  increase over the term of agreement.  What does,
18  what does that mean?
19    A   We got from the last contract to this
20  contract, we had a 3- to 4 percent increase due to
21  raw material, which the old contract did not allow
22  full recovery.  And we had been participating

Page 283

1  without a contract for close to a year, so Eaton
2  had not been allowed to change the recovery
3  process, and with the new contract, the recovery
4  process was adjusted, so we had a 3- to 4 percent
5  upfront, and then the next January we had another 1
6  percent increase, which brought it to the 5 percent
7  level.
8    Q   Does this contract provide for
9  price-downs?
10    A   Very little.  It allows some in the
11  clutch, but --
12    Q   How about with regards to --
13    MR. MARTIN:  Did you finish your answer?
14    MR. WOOD:  I'm sorry.  I jumped in
15  there.
16    A   Aside from VA/VE, very little.  Very
17  little.
18    Q   Specifically with regards to heavy-duty
19  transmissions, do you know if there are any
20  cost-downs provided for?
21    A   I'd have to reference the contract, but
22  very little.  I think it's a quarter of a percent.

Page 284

1    Q   The payment terms still at 30 days, or
2  did you, were you able to negotiate?
3    A   Still at 30 days.
4    Q   Still at 30 days?
5    A   Yes.
6    MR. WOOD:  Okay.  That's all I have.
7  Andrew?
8    MR. LAZEROW:  Just follow up on these
9  two documents.
10    FURTHER EXAMINATION BY COUNSEL FOR THE
11  DEFENDANT BY MR. LAZEROW:
12    Q   Ultimately Volvo Powertrain signed the
13  contract recently with Eaton for heavy-duty
14  transmissions, right?
15    A   Yes.
16    Q   And that contract provided benefits to
17  Volvo Powertrain, is that right?
18    A   Yes.
19    Q   You wouldn't have entered into a
20  contract that didn't provide benefits to Volvo
21  Powertrain, is that right?
22    A   That's correct.

Page 285

1    Q   And does the new contract provide
2  benefits to end-users, meaning truck purchasers?
3    MR. WOOD:  Object to the form.  Calls
4  for speculation.
5    Q   To your knowledge.
6    A   Again, I have some price increased due
7  to raw material.  I have product availability.  So
8  yes and no.  I was not able to get my expectation
9  of cost-downs, but yes.  We believe that this would
10  be beneficial for Volvo.
11    Q   You were able to get enough of your
12  expectations satisfied that you would want to sign
13  the contract?
14    A   That's correct.
15    Q   And you did not face the 7.7 percent
16  price increase at any point, is that right?
17    A   That's correct.
18    Q   And I believe you testified, just
19  correct me if I'm wrong, that most of the price
20  increase that's listed on that bullet point of 5
21  percent increase is due to the raw materials?
22    A   It was raw material recovery.

72 (Pages 282 to 285)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000904

1/12/2009     ZF Meritor LLC et al v. Eaton Corporation Antonio Lopes
Confidential

---

Page 286

1     Q   And Eaton had not recovered raw
2  materials price increase prior to that?
3     A   They had recovered, but not as much as
4  they expected, or other suppliers have recovered,
5  due to the contract clause.
6     Q   And is there some process under the
7  contract that requires Eaton to prove the amount of
8  raw material increases it's facing?
9     A   It's PPI based, so we can both reference
10  it, and then there's a formulation to apply.  So
11  it's auditable.
12     MR. LAZEROW:  Thank you for your time.
13     THE VIDEOGRAPHER:  This concludes
14  today's videotaped deposition of Tony Lopes.  Going
15  off the record.  The time is 6:47:41.
16     (Deposition of ANTONIO LOPES, was
17  concluded at 6:47, p.m.)
18        * * * * *
19
20
21
22

---

Page 288

1          CERTIFICATE OF NOTARY PUBLIC
2     I, SYLVIA L. JACOBS, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears in
5  the foregoing deposition was duly sworn by me; that
6  the testimony of said witness was taken by me in
7  stenotype and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness; that
10  I am neither counsel for, related to, nor employed
11  by any of the parties to the action in which this
12  deposition was taken; and, further that I am not a
13  relative or employee of any counsel or attorney
14  employed by the parties hereto, nor financially or
15  otherwise interested in the outcome of this action.
16
17          SYLVIA L. JACOBS
18          Notary Public in and for
19          the State of Maryland
20  My commission expires:
21  June 26, 2012
22

---

Page 287

1  Antonio Lopes
   c/o John S. Martin, Esq.
2  Hunton and Williams, LLP
   1900 K Street, N.W.
3  Washington, D.C.  20006
4  Case: Meritor v. Eaton
5  Date of deposition: 01/12/09
6  Deponent: Mr. Antonio Lopes
7  Please be advised that the transcript in the above
8  referenced matter is now complete and ready for signature.
9  The deponent may come to this office to sign the transcript,
10  a copy may be purchased for the witness to review and sign,
11  or the deponent and/or counsel may waive the option of signing.
12  Please advise us of the option selected.
13  Please forward the errata sheet and the original signed
14  signature page to counsel noticing the deposition, noting the applicable
15  time period allowed for such by the governing Rules of Procedure.
16  If you have any questions, please do not hesitate to call our office at
17  (202)-232-0646.
18
19  Sincerely,
20
21  Digital Evidence Group
   Copyright 2009 Digital Evidence Group
22  Copying is forbidden, including electronically, absent express written consent.

---

Page 289

1  Digital Evidence Group, L.L.C.
2  1111 16th Street, Northwest, Suite 410
3  Washington, D.C. 20036
4  (202) 232-0646
5
   SIGNATURE PAGE
6
7
8  Case Name: Meritor v. Eaton
9  Witness Name: Mr. Antonio Lopes
10  Deposition Date: 01/12/09
11  I do hereby acknowledge that I have read
   and examined the foregoing pages
12  of the transcript of my deposition and that:
13
14  (Check appropriate box):
15  ( ) The same is a true, correct and
   complete transcription of the answers given by
16  me to the questions therein recorded.
17  ( ) Except for the changes noted in the
   attached Errata Sheet, the same is a true,
18  correct and complete transcription of the
   answers given by me to the questions therein
19  recorded.
20
21  _____    _____
22  DATE              WITNESS SIGNATURE

---

73 (Pages 286 to 289)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000905

Page 290

1   Digital Evidence Group, L.L.C.
2   1111 16th Street, Northwest, Suite 410
3   Washington, D.C. 20036
4   (202) 232-0646
5

        E R R A T A   S H E E T
6
7
8   Case Name: Meritor v. Eaton
9   Witness Name: Mr. Antonio Lopes
10  Deposition Date: 01/12/09
11    Page No.   Line No.      Change
12
13
14
15
16
17
18
19
20
21  _____      _____
22      Signature              Date

74 (Page 290)

ba913691-c5ca-4d1c-80b0-4bc0ace2e35

000906

EXHIBIT 17

**ArvinMeritor.**

2135 W. Maple Rd.
Troy, MI 48084

19 September 2002

Paul D. Barkus
Supply Manager
International Truck and Engine Company
4201 Winfield Road
Warrenville, Illinois 60555

Dear Paul:

I know we have taken an extraordinary period of time to respond to your letter of 18 June regarding a 5% cost reduction on all ZFMeritor transmissions. The reason for this delay was to fully understand the implications of your request. At this time, we respectfully are unable to reduce our prices any further than the current low price levels. Although, I believe we can add value to International. I offer the following discussion for your consideration.

Clearly we are a small, but vital, player in the industry today. First, our manual transmissions are very competitive today with comparable industry products.

Second, in the growing market of automation, our new automated FreedomLine is second to none. As a matter of fact, International quickly embraced the FreedomLine for it's superior performance and significant value proposition. In contrast, competitive automated products have had reliability problems, poor driveability and minimal investment.

What does this mean for International? International's requested price reduction from ZFMeritor is estimated at approximately $500,000 for any given year. The challenge becomes, how can International use ZFMeritor to capture incremental market share and counteract any other negative financial impact. Here are just two examples where ZFMeritor can offer value to International.

1. International has roughly 200 FreedomLine orders in the system to date. On an annualized basis this number would be, conservatively, about 1,000 units near term. If International gross margins are $3,000 to $5,000 per each truck sale, this represents at least $3 MM in margin.

2. Furthermore, when ZFMeritor manual and automated transmissions are maintained in the databook, International has continuing purchasing leverage or power. As a result, your net transmission purchase may provide a 2% reduction, which as an estimate, equates to $1 to $1.5 MM. If ZFM were discontinued, the probability of any reduction will be low.



-1-



Highly Confidential
ZFMA0016042

000907

As a result of these two examples, International can leverage significant value from the total transmission purchase while receiving the benefits of advanced technology products such as the FreedomLine. In this short exercise, it appears this could be an alternative approach, which creates more value than across the board cost reductions- *perhaps 8x more value*.

Another element of this approach is strategic in nature. I've discussed this briefly and at a high level with John Ringlein. Given the economic leverage ZFMeritor provides, would it not be beneficial to solicit ideas in which International could further enhance this position? I would like to discuss this with you and John at your earliest convenience.

Paul, before International decides on how to proceed, I would like to have the benefit of your experience and knowledge in an effort to keep our transmission business viable and to retain your overall purchasing power intact.

I'll call you to verify your receipt of this letter and to schedule a meeting to discuss this issue.

Sincerely,

Chris Benner
General OEM Sales Manager
Commercial Vehicle Systems
ArvinMeritor LLC
248-435-1140


cc:   John Ringlein
      Dennis Kline
      Bob Harrison
      Rick Martello
      Charlie Allen

-2-

Highly Confidential
ZFMA0016043
000908

EXHIBIT 18

**FREIGHTLINER** ®
LLC
A DaimlerChrysler Company

October 19, 2000

Freightliner LLC
4747 N Channel Avenue
Portland, Oregon 97217-7699
P O Box 3849
Portland, Oregon 97208-3849
503.745.8000 Phone
503.745.8921 Fax

<u>VIA FACSIMILE 248-435-8206</u>

ArvinMeritor, Inc.
2135 W Maple Road
Troy, MI 48084

Attention: Dennis Kline-Vice President of Sales-ArvinMeritor

**Re:  Supply Agreement effective October 1, 1998 by and between Freightliner Corporation (nka Freightliner LLC) and its subsidiaries (collectively "Freightliner") and Meritor Heavy Automotive Systems, LLC (nka Arvin Meritor) together with supply agreement dated August 9, 1999 between Freightliner and ZF Meritor incorporating the terms of such agreement (both collectively referred to herein as the agreement).**

This letter is being provided to you as notice pursuant to Section 14 of the Agreement with respect only to the transmissions and clutches provided under the Agreement.  Freightliner has been offered transmission products that provide a significant competitive advantage over your products in price and technology.

Eaton has proposed to Freightliner 10 speed transmissions and dampened clutches at a price significantly below ZF Meritor's current prices to Freightliner.  Eaton has also offered as an integral part of its proposal the following products that are currently unavailable from you:

- Full torque range of 13 speed transmissions.
- 15 and 18 speed transmissions.
- 8LL transmissions.
- Autoshifting 6, 7,10 and 18 speed transmissions.

You were obligated under the Agreement at Exhibit B to have had available certain of these products for potential exclusive Freightliner use, specifically a 8LL Transmission and a 6 Speed AMT by June, 2000, and a multi-speed automated mechanical transmission in 1999, but failed to do so.

Eaton has also made available a self-adjusting clutch that is of better technology than your adjusting clutch, which is still in the development and test stage.

Accordingly, this letter constitutes notice that you have ninety (90) days pursuant to Section 14 of the Agreement to produce acceptable plans to (1) provide the 10 speed and dampened clutch products at prices competitive to Eaton,  (2) provide products competitive in both quality and price to the unavailable transmissions and (3) become competitive in price and technology with the Eaton self-adjusting clutch.

Very truly yours,

*James W. Thomas*

James W. Thomas
Vice President, Purchasing

**DX
436**

DEPOSITION
EXHIBIT

8  Shop
AW 21108 GS
Confidential
ZFMA0340864

000909

**FREIGHTLINER®**
*LLC*
A DaimlerChrysler Company

James W. Thomas
Vice President Purchasing

October 19, 2000

Freightliner LLC
4747 N Channel Avenue
Portland, Oregon 97217-7699
503.745.8840 Phone
503.745.8192 Fax
JimThomas@Freightliner.com

Mr. Dennis Kline
Vice President of Sales
ArvinMeritor, Inc.
2135 W Maple Road
Troy, MI 48084

Dear Dennis,

As a follow up to our call yesterday, I am advising you that Freightliner has been presented with an offer for transmissions and clutches from your competitor. This offer most likely will be accepted by Freightliner. Acceptance would result in the loss of standard position for transmissions and clutches effective in about 90 days. All ZF Meritor transmission and clutch products would continue to be offered in our data books as options for the remainder of our contract.

Dennis, attached is a letter outlining our position from the perspective of the contract. It was developed by our Legal Department to meet the formal requirements of the contract.

As agreed yesterday, you will meet with us to discuss this further and, at your option, to develop a competitive response.

Yours truly,

Jim Thomas

/jh

bcc: Ted Southworth
Harvey Hewett
Greg Sharp

Confidential
ZFMA0340865

000910

EXHIBIT 19

RESTRICTED USE: HIGHLY
CONFIDENTIAL – 06-623 (SLR)

000850

Tom Floyd

| | |
|---|---|
| From: | Benner, Christian [Christian.Benner@ArvinMeritor.com] |
| Sent: | Tuesday, June 04, 2002 4:21 AM |
| To: | 'Tom Floyd' |
| Subject: | RE: ZFM/ ZF Transmission Proposal |

Tom: I'll call you first thing today to discuss.

CB

-----Original Message-----
From: Tom Floyd [mailto:Tom.Floyd@paccar.com]
Sent: Tuesday, June 04, 2002 1:33 AM
To: Benner, Christian
Cc: tom.lundahl@PACCAR.com
Subject: RE: ZFM/ ZF Transmission Proposal

Chris:  I tried to call but haven't been able to reach you.

Suffice it to say that after reviewing the proposal from ZF Meritor, PACCAR
was extremely disappointed.  In particular:

1) We were very clear that your proposal should not include requirements
regarding exclusive position because it would be a waste of both of our
time.  We said if you so desired, you should submit a secondary proposal
including exclusivity, but that it would require some extraordinary benefits
for PACCAR in order to receive consideration.

2) The rebate schedule does not provide incentive that will grow ZFM
business.  The rewards for share growth are small and the steps to receive
them are large.

3) The remainder of your requirements regarding sole sourcing of DAF
transmissions from ZF, promoting only your products at industry events,
restrictions on DAF developing new technology , etc. are requests that we
would expect to see only in conjunction with major incremental commercial
concessions.

In summary, it is extremely frustrating that PACCAR has waited more than 6
months for ZF Meritor to submit this proposal only to have the results be so
far off the mark.  Please contact me as soon as soon as possible to discuss.

-----Original Message-----
From: Benner, Christian [ <mailto:Christian.Benner@ArvinMeritor.com>
mailto:Christian.Benner@ArvinMeritor.com]
Sent: Friday, May 17, 2002 11:16 AM
To: Tom Floyd
Cc: Allen, Charles; Jablonski, Christopher
Subject: ZFM/ ZF Transmission Proposal

Tom: Please find enclosed the subject proposal per our discussion on Tuesday
night. After your review, we would like to schedule a meeting or conference
call to discuss the proposal.

  <<ZFM 17May02.ppt>>

Best Regards, CB





**DX 287**

EXHIBIT 20

Confidential Discovery Material

**Barkus, Paul D**

| | |
|---|---|
| From: | Barkus, Paul D |
| Sent: | Friday, January 11, 2002 3:17 PM |
| To: | 'Skelnik, Gaylynn |
| Cc: | Ringlein, John F; Pesek, Laura A |
| Subject: | RE: Meritor Transmission Pricing - April '02 Price Pages |

**EXHIBIT** 12

*Barkus*
*10·28·08*

Gaylynn,

I got a phone message from Bob Harrison, our Meritor rep, this morning stating that after much internal discussion they have decided to not offer any transmission reductions even though their list prices could be increased. This decision is supported by their President, Rick Martello. Our strategy was to give Meritor the impression that our Partnership with Eaton provided us with HD reductions that would increase Meritor's list price if they didn't offset the widened price gap.

That started as a bluff, but when we look at our option prices between the two supplier there appears to be some cost/price inconsistency. I would like to go over some of these figures before we go to press with the next price book. If Meritor price adjustments are applied to our book, it would add credibility to our original threat and bring our list prices in line with where they should be. I put together some comparisons off our July book, but we changed our standard 9200 transmission offering from a 9 to a 10 speed in the January 2002 book so those numbers are different now. I asked Chad Critchley, APA, for a new cub fan....waiting for a promise date. I believe we can still use the similar model comparisons for our discussion if the new cub fan isn't available, unfortunately my spreadsheet is limited to three particular torque ratings. Let me know when you have a few minutes to talk about this matter.

Thanks,
Paul Barkus

-----Original Message-----

| | |
|---|---|
| From: | Skelnik, Gaylynn |
| Sent: | Thursday, January 03, 2002 12:02 PM |
| To: | Barkus, Paul D |
| Cc: | Ringlein, John F; Pesek, Laura A |
| Subject: | Meritor Transmission Pricing - April '02 Price Pages |

Paul,

I found my note. Based on the APA cost figures you had previously provided, I would recommend increasing Meritor's list prices by $57 for codes 13MET, 13MEZ, & 13MEU.

Do you concur, or do you want to go back to Meritor? I would appreciate a response by next Friday, January 11.

Thanks!

*Gaylynn Skelnik*
Truck Pricing Manager
gaylynn.skelnik@nav-international.com
630/753-2953 T
630/753-2582 F

-----Original Message-----

| | |
|---|---|
| From: | Skelnik, Gaylynn |
| Sent: | Monday, December 10, 2001 12:02 PM |
| To: | Barkus, Paul D |
| Cc: | Critchley, Chad W; Maloni, Joe T |
| Subject: | RE: Transmission Installed costs in 9000i models |

**ITE-000042**

Paul,

I finally had a chance to look into this. I recalculated Meritor's list price based upon APA's cost figures and fell short of our current list. We also need to add $228 list for 13WAP lube pump (as cost was included in their numbers). From

1

HIGHLY CONFIDENTIAL -- 06-623 (SLR)



DX 400

**ITE-000042**

000912

Confidential Discovery Material

ITE-000044

# Eaton Vs Meritor Transmission Cost Comparison

1/11/2002

9200 SBA Model

| | Standard | Optional | Optional | Optional | Optional | Optional | Optional |
|---|---|---|---|---|---|---|---|
| | 13GGT FR-12210B | 13GHA FR-13210B | 13MET M-13G10A-M13 | 13GHK FRO-14210B | 13MEZ MO-14G10A-M14 | 13GHJ FR-14210B | 13MEU M-14G10A-M14 |
| Std. Cost - Eng. Var. | | $ (5) | $ 6 | $ (5) | $ 6 | $ (5) | $ 6 |
| Std. Cost - Trans. | | $ 2,896 | $ 3,124 | $ 3,041 | $ 3,201 | $ 3,043 | $ 3,168 |
| Std. Cost - Yoke | | $ 55 | $ 5 | $ 55 | $ 5 | $ 55 | $ 5 |
| Total | $ - | $ 2,946 | $ 3,135 | $ 3,091 | $ 3,212 | $ 3,093 | $ 3,179 |
| Meritor Gap | | | $ 189 | | $ 121 | | $ 86 |
| List Price | $ - | $ 248 | $ 311 | $ 539 | $ 439 | $ 484 | $ 384 |
| **Suggested List** | | | $ 569 | | $ 744 | | $ 630 |

file: Eaton Vs Meritor Transmission Cost Comparison 1-02.xls

HIGHLY CONFIDENTIAL -- 06-623 (SLR)

ITE-000044

000913

Confidential Discovery Material

what I can tell, my list may be "light" by around $57 using APA's figures.  One other thing that stuck out was the SPL-250 flange cost of $43.03 - which had not been included in Meritor's transmission price calculations in the past.

I thought you might want to add this to your negotiation list with Meritor (although I realize I'm late).

Thanks,

*Gaylynn Skelnik*
Truck Pricing Manager
gaylynn.skelnik@nav-international.com
630/753-2953 T
630/753-2582 F

> -----Original Message-----
> **From:** Barkus, Paul D
> **Sent:** Thursday, November 29, 2001 4:34 PM
> **To:** Skelnik, Gaylynn
> **Subject:** FW: Transmission Installed costs in 9000i models
>
> Gaylynn,
>
> I'm forwarding the Cub Fan (I still think that's a stupid name) to you that shows the comparisons between the Meritor and Eaton transmissions.  According to the numbers on APA's analysis the Eaton product is less expensive.  How do we verify these figures?  Please advise.
>
> Paul Barkus
> -----Original Message-----
> **From:** Critchley, Chad W
> **Sent:** Friday, November 02, 2001 9:24 AM
> **To:** Barkus, Paul D; Maloni, Joe T
> **Subject:** Transmission Installed costs in 9000i models
>
> Paul,
>
> Here is the transmission information you requested.  Let us know if you have any questions?
>
>
> << File: Joe's Trans study cond.xls >>
>
>
> Chad & Joe

ITE-000043

2

# EXHIBIT 21

## NOTICE

This Notice is given and made as of August 29th, 2002, by ZF Friedrichshafen AG, a corporation under the laws of Germany ("ZF"), and ZF AG Holding, Inc., a Delaware corporation and a wholly-owned subsidiary of ZF ("ZF Sub"), to ArvinMeritor, Inc., a Delaware corporation ("ARM"). Meritor Heavy Vehicle Systems, LLC, a Delaware limited liability company ("Meritor HVS"), and Meritor Transmission Corporation, a Delaware corporation and a wholly-owned subsidiary of Meritor HVS ("Meritor Sub").

ZF and ZF Sub hereby give notice pursuant to Section 8.3.3 of the Membership Interest Purchase Agreement executed among the parties hereto effective August 31, 1999 ("Purchase Agreement"), that ZF and ZF Sub believe they have claims for indemnification under Section 8.1.2 of the Purchase Agreement.

### CLAIM NO. 1

This claim is for breaches of Sections 4.2.4 of the Asset Transfer Agreement and 4.2.21(4) of the Purchase Agreement, failure to disclose materially adverse information related to the Business. ZF and ZF Sub were not informed accurately of the risks of warranty liability related to transmissions. ZF and ZF Sub were not informed of the failure of Meritor HVS and/or Meritor Sub to adequately design and test transmission products prior to the sale of such transmissions. ZF and ZF Sub were not informed of extended warranties granted on Clutch Products.

### CLAIM NO. 2

This claim is for breaches of Section 4.2.20 of the Purchase Agreement, failure of the Meritor Clutch Company financial statements to comply with US GAAP. The year-end financial statements provided by Meritor HVS and Meritor Sub do not reflect warranty reserves consistent with the warranty experience or the extended warranties provided for products sold prior to the Closing.

### DAMAGES

ZF and ZF Sub have sustained actual damages in the form of diminution of the value of their Membership Interest in ZF Meritor, LLC, which damages are in excess of $2,500,000.00.

ZF FRIEDRICHSHAFEN AG                    ZF AG HOLDING, INC.

By: Thomas J. Schank, Attorney          By: Thomas J. Schank, Attorney for
for ZF Friedrichshafen AG               ZF AG Holding, Inc.

zf/meritor.notice

EXHIBIT

DX
308

Highly Confidential
ZFMA0001953

One Canton Square
1700 Canton Avenue
Toledo, OH 43624
Phone: (419) 255-4300
Fax: (419) 255-9121
E-Mail: tomschank@hunterschank.com

**HUNTER & SCHANK
CO., L.P.A.**

# Fax

TO:         Meritor Heavy Vehicle Systems, LLC c/o Meritor Automotive, Inc.
            Attn: General Counsel  facsimile no. 248-435-2184

            Meritor Transmission Corporation
            Attn: General Counsel  facsimile no. 248-435-2184

COPY:        Miller, Canfield, Paddock and Stone, PLC
            Attn: Kent E. Shafer  facsimile no 313-496-8451

            ArvinMeritor, Inc.
            Attn: Office of General Counsel  facsimile no: 248- 435-2934

            ZF Meritor, LLC
            Attn: President facsimile no. 910-844-9428

            Meritor Clutch Company
            Attn: President facsimile no. 910-844-9428

FROM:       Thomas J. Schank, Attorney for ZF Friedrichshafen AG and ZF AG Holding, Inc.

DATE:       Thursday, August 29, 2002

PAGES:      Two (2) including cover

*CONFIDENTIALITY NOTE*

The documents accompanying this fax communication contain information from the law firm of Hunter & Schank Co., L.P.A, which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware than any disclosure, copying, distribution or use of the contents of this fax communication is prohibited. If you have reached this fax in error, please notify us by telephone immediately so that we can arrange for the retrieval.

Highly Confidential
ZFMA0001954

**000916**

EXHIBIT 22

ZF Friedrichshafen AG    Meeting minutes – ZF – ARM meeting Frankfurt Sept., 10    Page: 1

| Dept. code LBW-B | Dictated by Error! Reference source not found.11 | Document no. | Telephone | Date |
|---|---|---|---|---|

**Participants:** R. Lutz, N-SL; A. Hartmann, VVZ; D. Mayer, LBW-B; D. Kline (Sales); R. Guy (Finance); N. Exton (Corporate Developm.); C. Soderstrom (Finance [via telecon]); C. Myers, CFO ZFNAO

**c.c.** W. Vogel, N; O. Schafhauser N-C, W. Walzer, N-SL-LBW; H. F. Collenberg, N-NAO

Meeting minutes:              Restructuring J.V., FreedomLine offer ZF – ARM

# 1. FreedomLine business reengineering after J.V. – General understanding

1.1. ARM initial offer/business model:

- ARM reviewed the manufacturers representative concept (similar to the existing relationship with Sachs) as its preferred business model, a detailed discussion followed on financial risks (inventory, title to goods, exchange rate etc)

- 500 $ assembly/sales & marketing/warranty admin. charge includes:

  - ordering
  - receiving
  - testing
  - Marketing
  - OEM negotiations
  - Warranty administration
  - inventory handling
  - assembly N.A. add ons
  - shipping
  - representing
  - trade shows
  - etc.

- 300 $ marketing fund:
  - 250 $ CE
  - 50 $
    - Drivetrain on the move (Motm)
    - Shows (Mid America, etc.)
    - Umbrella campaings

⇒ ARM will provide a detailed list of covered services and the resp. amount
⇒ ~~ARM understanding is:~~ ZF agreed to cover all warranty (engineering, design and manufacturing) on FreedomLine including North American add on's but excluding the assembly operation of the add ons which would be underdaken by ARM in Laurinburg
⇒ ARM would invoice ZF for these services. ZF has financial risk throughout all business processes. ARM is not intended to cover risks like:
  - exchange rate
  - valuation reserve (inventory valuation risk)
  - accounts receivable (bad debt)
  - warranty
  - financing (imputed interests)
- Considerable discussion took place on the North American add ons, ARM undertook to explore the costs of providing these where it undertook some of the financial risk (to be reflected in the cost) but ZF would still invoice the final assembly to the OEM




DX 303

Confidential
ZFMA0185923

000917

| Dept. code | Dictated by | Document no. | Telephone | Date |
|---|---|---|---|---|
| LBW-B | Error! Reference source not found.11 | | | |

- Concepts for a continuing JV were discussed where the JV would be an engineering or an engineering/marketing JV only such that a legal entity would continue to be the commercial/brand presence of ZF Meritor – no consensus on structure was reached.

⇨

## 1.2 ZF initial business model/FreedomLine offer

- ZF has product ownership FreedomLine
- ZF is responsible for design, application engineering, base t/m. assembly (incl. procurement, quality, ordering, material planning, inventory, etc. for the base t/m.), warranty (3 years, 300.000 miles, parts & labour), reman/aftermarket parts supply and warranty administration.
- ZF is selling the base t/m. (excl. N.A. add ons) to ARM, Lbrg. incl. warranty. The business responsibility is transferred to ARM when the t/m. reaches Lbrg.
- ARM purchases, assembles and distributes the transmission incl. N. A. add ons. N. A. sales order entry and invoicing is performed by ARM.

⇨ **ZF philosophy is that the financial responsibility is going with the organization that has the process responsibility.**
⇨ **ZF is willing to offer the FreedomLine at variable cost. Business/Sales price must be reengineered in order to achieve a cash break even situation.**
⇨ **According to ARM the min. warranty to be offered for NAFTA is 3 years, 350' miles. ZF will follow that minimum request and adjust the calculation.**

## 1.3 FreedomLine business process charts: Act. ZFM – ZF proposal – ARM proposal

1. Transferprice CBU t/m.:
TFP was offered by ZF in EUR. ARM denied to cover any exchange rate risk. The initial J.V. exchange rate risk model isn't an option for ARM.

⇨ **Therefore the exchange rate risk has to be covered by the sales price.**

2. Assembly:
The actual variable costs for N. A. add on assembly of $ 24 ZFM need to be reviewed with ZFM, since ARM has information, that the actual variable costs of this process is $ 35.

⇨ **D. Mayer will review with ZFM/D. Coleman**

3. Indirect services/Supply chain management/Procurement
ARM will provide these services at variable costs to ZF, but will not cover any risks like:
- valuation reserve (inventory valuation risk)
- accounts receivable (bad debt)
- financing (imputed interests)

As an option ARM proposed that ZF is sourcing N. A. add ons in NAFTA and assembles these parts in Friedrichshafen. Based on the short term fluctuation of the NAFTA market and the incremental costs for transportation, etc. ZF evaluates this option as not economical.

⇨ **ARM to provide ZF the calculation assumption for supply chain services as outlined in the business process chart**

Confidential
ZFMA0185924

ZF Friedrichshafen AG      **Meeting minutes – ZF – ARM meeting Frankfurt Sept., 10**      Page: 3

| Dept. code | Dictated by | Document no. | Telephone | Date |
|---|---|---|---|---|
| LBW-B | Error! Reference source not found.11 | | | |

⇨ **ZF to calculate the risk portion of these costs into the calculation**

4. Sales & Marketing
Actual costs of ZFM is based on ZFM BP 06/02 FreedomLine sales & marketing budget divided by 5.000 units = $ 673. Actual costs of CE/PA (500$) have been added to the calculation, in order to make it comparable to the ARM offer.

⇨ **ARM offer of $500 does include add on assembly, warranty admin and sales & marketing. ZF requires a breakdown per process of: sales & marketing, warranty administration & assembly cost.**

5. Warranty/Service Administration
ARM argued that ARM warranty administration organization is a must to serve ARM customer satisfaction. All costs related to the warranty/Service section are included in the flat fee per unit. ARM
proposed that extraordinary warranty service provided by ARM should be compensated by ZF as extra charge.

⇨ **ARM to provide cost assumption/proposal of compensation of extraordinary cost p. t/m.**

Both parties need to agree on a defined budget for sales policy/warranty (good will) according to ARM.

⇨ **ARM to provide a proposal**

Based on actual 12 month r/100 failure rate of  103, engineering capacity to reduce this rate is priority No. 1. ZF has the understanding that the warranty administration process can be managed by ZFI, Vernon Hills. If design, engineering & warranty responsibility is in the hands of ZF, an external warranty administration is evaluated as a risk on engineering and therefore warranty cost. The warranty administration process of ZF's coach and off-highway vehicles are handled already by ZFI, V.H.

⇨ **ZF and ARM to agree which company leads the warranty administration process and which requirements of the other partner have to be fulfilled.**

Release process rules need to be set by ZF if service is performed by ARM (rules of engagement). According to ARM offer, ZF personnel can be placed into ARM warranty admin. organization.

6. Warranty accrual/claims p. t/m.
Warranty reduction from 5 years, 750' miles down to 3 years, 350' miles is a must from ZF point of view. The actual ZFM accrual p. t/m. of $ 200 is unrealistic. According to minimum requirement of the class 8 market, ZF is willing to increase warranty conditions  to 3 years; 350' miles, parts (with associated channel mark ups) and labour. This is the max. risk ZF is willing to cover. The parties discussed the potential for an extended warranty to be offered in the market for a fee to be determined

⇨ **ZF will update warranty accrual rate assumption accordingly.**

Confidential
ZFMA0185925

**000919**

| Dept. code | Dictated by | Document no. | Telephone | Date |
|---|---|---|---|---|
| LBW-B | Error! Reference source not found.11 | | | |

The amount of the vendor recovery portion for warranty needs to be checked. The calculation of the base t/m. warranty out of ZFF does include vendor reimbursements. The contractual situation with N. A. add on suppliers need to be checked.

⇨ **D. Mayer will check with D. Coleman the actual legal conditions.**

7. Engineering
ARM is calculating with $100 p. t/m. @ 10.000 units = 1 Mio. p.a. Basic assumption is to reduce headcount down to 6 heads and concentrate on the actual applications in the field w/o. introducing new applications (e.g. 2007 emission law changes, GS3.4, etc.). According to ARM the whole engineering budget (including design and application) has to be covered 100% by ZF.

ZF engineering budget assumption is ca. 2,6 Mio. $. Including 11 heads, ZFF support, travel expense, engine calibration, testing expense, etc. Divided by 5.000 units = $ 532 p. t/m. This includes new products and applications.
ZF is interested to have an engineering J.V. between ZF and ARM and share the budgeted costs. ARM is offering engineering facility & services (dyno tests, etc.) on variable costs as a compromise.

⇨ **ARM to provide variable cost if ZF is staying in the engineering facility in Lbrg. as a fixed charge.**

ZF to determine the organizational structure of the engineering group located in Lbrg. To which organization is the engineering group reporting? Which organization is employing the engineers (ARM, ZFI, ZFF)?

⇨ **ZF to provide concept.**

8. Aftermarket/Reman/Parts supply
Reman business for ZF's coach & off highway division is located at ZFI, Vernon Hills. ARM agrees to build up class 8 reman at ZFI, V. H.

ARM recommended to handle the aftermarket parts sales out of Lbrg. or Florence, due to the existing business channels.
Since ZF is handling the reman and aftermarket parts supply for coach and off-highway out of ZFI, V. H., ZF has the understanding that class 8 parts supply can be handled the most cost effective way out of ZFI.
The parties were unable to agree on aftermarket parts supply at this time (to be tabled for future discussions)

9. Administration
ZF has cost estimation is $142 per t/m. (ARM requests further clarification on this figure) for imputed interest and controlling/finance service.

⇨ **Services should be included in the responsible business process of each party.**

## 2. Dissolve J.V – cost of closure

Confidential
ZFMA0185926

**000920**

ZF Friedrichshafen AG        **Meeting minutes – ZF – ARM meeting Frankfurt Sept., 10**        Page: 5

| Dept. code | Dictated by | Document no. | Telephone | Date |
|---|---|---|---|---|
| LBW-B | Error! Reference source not found.11 | | | |

2.1 Basic structure is:
ARM receives:
- ⇨ G-product rights,
- ⇨ Laurinburg facility
- ⇨ G-platform personnel
- ⇨ Fixed assets

ZF receives:
- ⇨ FreedomLine product rights
- ⇨ FreedomLine engineering personnel

2.2 Open issues:
- ⇨ Not discussed Not discussed
- ⇨ Coverage of closure costs
  - o ARM Position: Both parties share equally (50:50) the closure/restructuring costs to dissolve the JV of $41.6m prepared by ZFM
  - o ZF Position: a) No additional cash after closure b) ZF would transfer all of its ownership interests in Laurinburg assets to ARM at zero value c) ZF would accept 100% responsibility for all FreedomLine warranty costs that are applicable for product sold by the JV prior to dissolution d) ARM would assume all other costs for closure/restructuring including G Platform warranty costs that are applicable for product sold by the JV prior to dissolution (ARM presumes ZF expects this to include clutch warranty also) e) ZF would drop its claim that the quality of the G Platform was misrepresented in the original purchase contract  ZF stated this position in comparison to internal arguments supporting a $39 million claim against ARM. Reasoning: Initial ZFM Business Plan (09/99) which was the basis for purchase price of ZF's 50%-share of $51 Mio. wasn't reached by far in the areas: Market share, sales incentives, G-platform warranty (see presentation charts) ARM comment: Handouts (pages 1 through 15, excluding the back up documents which were not supplied) were distributed in the meeting, however only page 6 of the presentation charts was reviewed. Regarding warranty ZF has been able to satisfy itself that there is evidence supporting the breaches identified in the formal claim notice. ARM raised numerous items in the meeting refuting the basis for ZF's claims.  It is ZF's understanding that the claim is at least as much worth as ZF's portion of the closure costs of the J.V. Therefore ZF offers not to pay any further cash after closure of the current J.V. activities if the claim won't be prosecuted.
  - o Each party rejected the other parties proposal on closure/restructuring.

## 3. FreedomLine sales 2004+:

Outstanding CE obligation for placed and pending orders is 455+720 (number of FreedomLine units) respectively. Each pending order has an expiration date and presuming they have expired then the CE can be cancelled. .

- ⇨ ARM/ZFM to proceed and cut down CE/PA with customers where possible

OEM-Databooks will be issued Jan. – May 04. OEM's will accept no price increase earlier. Otherwise FreedomLine will be shut off immediate. It is ZF's recommendation  that CE/PA + Motm should be

Confidential
ZFMA0185927

| Dept. code LBW-B | Dictated by Error! Reference source not found.11 | Document no. | Telephone | Date |
|---|---|---|---|---|

reduced to a max. of ca. $ 100 asap, since there is no contribution margin at the current costs @ ZFMeritor.

> ⇨ **ARM to prepare sales force that warranty will be adjusted to 3 years, 350' miles. Extended warranty 5 years, 750' miles need to be calculated and sold to customer. ARM to provide proposal.**

## 4. ZFM Funding Oct. – Dec. 03:

ZFM to get clear direction from parents for these time period. E. G. reductions in: headcount, invest, CE/PA and warranty conditions.

> ⇨ **Action BoD**

Cash Flow Fcst. Sept. 03:$ (4,8) Mio. (100%). Estimated cash needs Oct. – Dec. 03: ca. $ (4) Mio. p.m. +3,8 Mio. Earn-out-adj. = $ (8,2) Mio + $ (2,8) Mio. short in Aug. 03 = $ (11,0) Mio. cash needs.

If ZF does not fund ZFM Sept. 03 + ARM would have to check legal opportunities.

## 5. Next meeting
26. September; 14.00 -16.30 (MET)
               8.00 – 10.30 (EST)
TBD: meeting or video conference

Confidential
ZFMA0185928

EXHIBIT 23

**ArvinMeritor**™                              **Internal Letter**

Date:   **January 17, 2003**          No.   **dkar-1202**

To:     **Tom Gosnell**               From:  **Dennis Kline**

Subject: **ACTIVITY REPORT FOR THE MONTH OF DECEMBER 2002**

Privileged & Confidential

**Create Shareowner Value**
   **Australia**
   • Nothing to report due to extensive holiday shutdown during the month
   **Europe**
   • VOLVO/RVI ST priest negotiations continued through December with numerous meetings and elimination of a number of obstacles. Preliminary MOU being drafted by the respective legal representatives in January.
   • Official ARM response drafted to MAN categorically rejecting their claim for compensation on the ELSA 1 slack adjuster Re-Call campaign.
   • IVECO delivery situation remains critical for both Cameri supplied Axles and Brakes with a 73K Euro claim entered by IVECO for line disruptions.
   • Seddon – We have finally closed and agreed on the amount regarding "Delay and Disruption" due to the problems associated with the supply of axles in the last 12 months following the transfer of Maudslay production to Cameri. After many discussions we got a compromise of £ 45.000 (the IVECO request was £ 132.260).
   • The hardware comparison between the DCX brake and the ArvinMeritor Q plus took place in December.  A day after we got a written statement that DCX, Kassel has decided for the time being to continue with their in-plant production. Comment from our purchasing contacts: This was a Powersystems project and a Powersystems decision – no influence from purchasing.
   **South America**
   • Nothing to report due to extensive holiday shutdown during the month
   **North America**
   • **Proposals:**
      ▫ Mack and Volvo have awarded ArvinMeritor standard position for Drivelines through receipt of an LOI.
      ▫ Non-drive front axle quotation was presented to 3P for standard position at Volvo and Mack.  Volvo vehicle dynamics advised they want to see aggressive cost downs from ArvinMeritor through contract duration. (2003-2007) but will not agree to Meritor as the standard offering beyond PNG (2004).  This is due to the global group developing their non-drive front axle, (V-70) which will be marketed as the preferred 12-13K.
      ▫ A tentative agreement was reached with International on a seven-year agreement to supply air brakes and front and rear axles for 9000 and 5000 models.

**DX 518**

Confidential
ZFMA0198799

**000923**

- ❑ Meritor WABCO proposal for standard position reportedly are approximately 5-7 % high 3P. The Volvo global team in Europe by 02/21/02 will make the final decision for standard positions at both Volvo and Mack.
- Volvo has over 230 confirmed FreedomLine orders.
- There are currently 99 FreedomLine units in the backlog at Peterbilt and 263 units have been built and sold.
- Dennis Kline and Ken Santschi met with Chris Patterson and Brain Mooers to establish a change in practice relative to the issuing of debit memo that are not pre-approved as valid charges by an ArvinMeritor representative; agreement /change pending further internal discussion at Freightliner. Discussion followed on the CamLaster brake investment and potential for recovery.
- Two Roll Stability Control meetings between Meritor WABCO, Kenworth and PACCAR were conducted in December that should elicit a supplier selection in February 2003. Kenworth is admittedly behind in the process relative to Peterbilt. Only one supplier will be selected to meet both divisions' needs. Meritor WABCO will need to develop a cab mounted ECU for Kenworth.
- Kurt Burmeister, Mike Colaccino, Chris Benner and Ken Santschi met with Mark Lampert to discuss a cooperative strategy aimed at meeting penetration objectives. Agreement was reached that concessions issued on trucks will not be used to advantage a drivetrain supplier but would use databook pricing as the basis for differentiation. Mark also agreed to initiate activity to have his field sales staff support axle/brake penetration improvement goals.
- In the Canadian Market, fleets are once again asking for quotes for build dates in February/March/April time frame. Many small fleet owner operators are looking at stock orders. Small and medium size fleets are currently asking for quotes and are buying. The vocational side is still going strong. Contractors are passing orders to dealers for spring 2003 delivery. Roll out of the 2003 Warranty has been completed for major customers.
- Markets across the Northern Region are recovering. Activity at the fleet and dealer level is slowly gaining momentum. Customers have accepted the fact that the new engines are their only option and some have made buying decisions. Dealers are refraining from ordering stock units due to short lead times.
- All across the regions District Managers are putting on Warranty presentations. The reaction from dealers is either lukewarm, or negative. Not much excitement over the potential revenue from selling warranties. Fleets, on the other hand, have reacted very negatively to our position, some threatening to switch suppliers of axle product. Much potential here to test our negotiating skills. Grandfathering warranties where we are required to do so.
- G platform overdrive transmission failures continue to mount. It appears that many of our long-term customers have experienced enough and will change specs in FY03.
- Freightliner and Interstate Distributors are reporting and increase in Eaton's incentives to retain the AutoShift specification on Interstate's 3 year/1100 unit order. To keep this deal, Eaton is including more cash ($2200 per truck) and 200 UltraShift Transmissions (two pedal units) at no cost over the AutoShift. ZF Meritor views this as simply too rich to compete.
- Warranty and Vocational Warranty YTD thru December.
  - ○ Claim count down by 7500 claims or 20%.
  - ○ Expense down $3.5 M or 27%
  - ○ Value of reduced or denied claims $3.6 M (1800 claims) or 17% increase YTD vs. FY'02
  - ○ Cost per claim down 9% YTD
    - ▪ OEM Warranty Period down 14%
    - ▪ Vocational Warranty Period down 1%
- Campaigns and Retrofits YTD thru December.

Confidential
ZFMA0198800

**000924**

- o Claim count up 17,500 claims or 719%.
- o Expense up $2.5 M or 354%
- The manufacturing sector again shows signs of life, as the ISM Index jumped sharply from 49.2 to 54.74 in December (a reading above 50 indicates expansion), including a large gain in the new orders component.  This is encouraging, as it follows five months of little or no growth in manufacturing.
- Preliminary November class 8 orders increased for the fourth consecutive month to 10,729 units in November.  Preliminary net orders weakened in December to 9,100 units, resulting in a Q1 total of 29,790 units; (3,583) units or (10.7%) below the prior year quarter.
- The Advantage Plan brochure was completed with copies sent to each member of NAFO.  We have created separate pricing sheets for the U.S. and Canada, which will be inserted into the brochure for their respective regions.  Canadian pricing was set using the CVS AOP exchange rate of 1.586.
- JB Hunt has recently reported that their '02 Detroit Diesel equipped Internationals with fewer than 60,000 miles, are obtaining ½ mile less per gallon fuel mileage.  Conversely, Cummins equipped tractors seem to be operating with no decline in fuel economy.

### Exceed Customer Expectations

- RE Garrison, Cullman, AL has had 5 Freedoms in T-600 Kenworths for 6 months with excellent results. All 5 Freedoms have drivers enthused with the overall performance and ease of operation. The top five drivers operating these Freedoms are quoted as saying, "I'll drive nothing but the Freedoms from here on out".
- RHP 11 - Suspensions continue to be damaged by CN and CP railroads. Vans are lifted in the air and suspension bags seem to extend fully and pinch when lowered. Customers are complaining about the number of damaged bags.
  - o Werner suspension retrofit program being reopened / funded
    - ▪ Trailer Division to determine action plan for additional fleet commitments that were originally funded through RYAB.  One major fleet involved is U.S. Express.

### Out-Perform the Competition

- Both Peterbilt and Kenworth released their 1/1/03 databooks with no appreciable changes to ArvinMeritor's competitive position.  A comparative document is being prepared for distribution to NAFO.
- The AutoShift two pedal transmission is being engineered at both Kenworth and Peterbilt.  Release is not anticipated until mid to late 2003 as the same rigorous standards set for the FreedomLine will be applied.
- Armellini Express, Stuart, FL and DB Trucking, Ft. Lauderdale, FL are very impressed with the performance of their Freedom transmissions. Armellini is looking at purchasing 60 tractors in 2003, 30 to be ordered for May delivery. All 60 could be Freedoms.
- Searcy Trucking - Fleet has ordered 8 new Volvo trucks for FY03.  Current spec is for all ARM except for Hendrickson front axle and Eaton 13 speed transmissions.   This is breakthrough business for ARM on axles, currently all Eaton fleet.
- Mike Moyer of Carmenita Truck Center in La Mirada, CA has sold three FreedomLine units to Armored Transport in Los Angeles.  The units replaced an original order for Eaton AutoShift.

### Develop An Employee Valued Culture

### Build Supplier Relationships

- Volvo Marketing has a total of 8 trucks that will be used for the Mid America Truck show along with many other events planned throughout North America.   Meritor has

Confidential
ZFMA0198801
000925

negotiated to have three of the trucks speced with the FreedomLine Transmission. Ninety-five percent of all the trucks they speced have Meritor components.

- Members of LVS, AET, CVS Suspensions and Meritor Wabco conducted, respectively, a door and roof, intake and emissions, advanced suspension and roll stability presentation at PACCAR to Purchasing and Kenworth Senior Management; the result of which are LVS and AET plant tours and RSC supplier selection in February.  A similar meeting is pending at Peterbilt in January.
- An ADB axle integration team has been formed to generate a quote at PACCAR's request that more closely approximates current foundation brake and axle prices.
- Terry Tosie (ArvinMeritor), Dan Lavely (Meritor WABCO), and Loren Dreier (ZF Meritor) hosted the annual Peterbilt Christmas luncheon.  There were 59 Peterbilt employees in attendance.
- Account team hosted a holiday customer appreciation event for Freightliner personnel and spouses on December12.  Approximately 125 persons attended.

**Enhance Social Responsibility**
- 

**Distribution:**

| | | |
|---|---|---|
| Chris Benner | Graeme Hall | Kurt Burmeister |
| Sam Turner | Maurice Haft | Silvio Barros |
| Bob Rosenthal | Brad Arnold | Rick Martello |
| Mike Barnett | Rakesh Sachdev | Dale Bell |
| Tim Farney | Joe Malkowski | Carlo Mondin |
| Marlene Vorhees | Mike Pennington | Steve Luc |
| Denny Sandberg | Customer Service Reps | OEM Sales |
| Regional Managers | Joe Mejaly | |

Confidential
ZFMA0198802

000926

EXHIBIT 24

## Unknown

| | |
|---|---|
| **From:** | Gosnell, Thomas |
| **Sent:** | Saturday, February 08, 2003 11:31 AM |
| **To:** | Wolfgang.Vogel@zf.com |
| **Cc:** | Kline, Dennis |
| **Subject:** | FW: Knight Transportation Transmission issues. |

Wolfgang,
Here is some more bad news regarding a large, formerly lyal transmission customer who will not be buying our JV products due to G Platform performance issues.

Tom

-----Original Message-----
| | |
|---|---|
| **From:** | Hinesley, John |
| **Sent:** | Friday, February 07, 2003 4:19 PM |
| **To:** | Gosnell, Thomas |
| **Cc:** | Kline, Dennis; Burmeister, Kurt; Delmege, Dale; Hatcher, Donnie |
| **Subject:** | Knight Transportation Transmission Issues. |

### Knight Transportation - Phoenix, Az.

Knight has over 1700 tractors with the full Meritor Drivetrian Plus.  Seventy five percent are Freightliners with the last two years purchases being Volvos.

Knight ordered 400 Volvo tractors this year.   The business result is that 150 Volvo tractors will be converted to the competitors products.

As a side note the fleet will also purchase 700 trailers this year with Meritor components.

### Product Problems

*Transmission--*

Repeated failures of transmission products generally from 225K miles to 350K miles. The customer is not satisfied with any explanation of product improvements, primarily because they continue to have failures.

- Top cover problems

- Shift collar wear (with both single rail and three rail covers)

- Synchronizer wear and burning

- Air filter regulators

*Clutch--*

Repeated failures of clutch products at mileages as low as 90K. The customer at one time tracked an increase in clutch costs from



1



Confidential
ZFMA0186327

000927

$26,000 to $85,000 from one six-month period to the next.

- Burned

- Worn out

- Broken Springs

- Bearing failures

*FF981--*

Knight has experienced multiple failures with the bearing issue on the FF981, including a fire that appears to be caused by the product (a whole loss of $94,000). We have put in place the Apache Group to troubleshoot and replace any faulty FF981 product, and this problem appears to be moving off the radar screen. However, it is important to note, because it was a contributing element of customer frustration during all the transmission and clutch issues.

We will continue to try and regain the business and will keep management updated.

**McMullen Trucking - Carter Lake, Iowa**

Another situation that Mike Czipar ( sales DM) and Terry Tosie ( OEM rep.) was confronted with on 2-5-03.   McMullen is a 190 tractor operator with around 130 Freightliners and 60 Peterbilts in the fleet.   The last order was the Peterbilts.

Marty McMullen has been a true Drivetrain Plus supporter for over 10 years.    If fact on last years Peterbilts order - he told Peterbilt to either include the Meritor drivelines or cancel the order.   Marty has never ask us for CE money but has always expected us to take care of issues and to have policy money when warranty is not applicable.

The fleet has experienced all our transmission issues from the past.  I.e.. Thrust washers; top covers and AFR's.  Also they have had syncro failures that we not warranty but some policy was used to keep the business.  Marty believes that in the last year we are backing away from all issues.   The fleet has 25 of our overdrive transmissions.  Of these 10 have had top cover issues.   The fleet is now seeing the AFR issues.

Eaton has made very generous CE offers to gain the specifications.  Even though Eaton is already a price advantage at Peterbilt - they are offering another $500 to McMullen to change his specs.

McMullen will order 40 tractors in the next two weeks.

John Hinesley

2

Confidential
ZFMA0186328

000928

EXHIBIT 25



MarketCapChart.org - Chart Historical Market Cap Data For Thousands of Stocks - The World's First and Only Free Source - Copyright 2011 by Evan Wu and Jared Sleeper. All Rights Reserved.

EXHIBIT 26

Chart Historical Market Cap Data - MarketCapChart.org                          Page 1 of 1



MarketCapChart.org - Chart Historical Market Cap Data For Thousands of Stocks - The World's First and Only Free Source - Copyright 2011 by Evan Wu and Jared Sleeper. All Rights Reserved.

**000930**